**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| TIMOTHY WHITE, | § | |
|    *Plaintiff*, | § | |
| | § | |
| *v.* | § | Case No. 3:11-cv-01817-B |
| | § | |
| REGIONAL ADJUSTMENT BUREAU, | § | |
| INC. D/B/A RAB, INC., | § | |
|    *Defendant.* | § | |

**PLAINTIFF TIMOTHY WHITE'S BRIEF IN RESPONSE TO DEFENDANT
REGIONAL ADJUSTMENT BUREAU'S MOTION TO COMPEL DISCOVERY**

**I.    INTRODUCTION.**

This is civil action brought by Timothy White, Ph.D., M.S., M.A., against Regional Adjustment Bureau, Inc. — the debt collection company that falsely threatened to strip Mr. White of his degrees, his license, and his family's livelihood.

On December 15, 2011, defense counsel Robbie Malone deposed Dr. White, exploring the nature and measure of his damages — including mental anguish, preexisting medical conditions, and medical diagnoses — at length. Dr. White's counsel afforded Ms. Malone significant latitude in examining Dr. White.

On April 2, 2012, Ms. Malone filed a motion to compel Dr. White to sit for a second deposition. On Defendant's behalf she argues that she "must now be allowed" to depose Dr. White again, at his expense, because his counsel "obstructed with discovery [sic], interfered with the conduction [sic] of the deposition, and prohibited [defense counsel] from eliciting **any** testimony from [Dr. White] regarding his mental anguish claims, his symptoms, and what his doctor said about his conditions." (Doc. #23, p. 5) (emphasis added).

Ms. Malone's fantastic charges of discovery obstruction are patently false and seem almost delusional. Dr. White respectfully requests that this motion be denied and further submits that Ms. Malone's unconcern for truthfulness legitimately warrants sanctions.

## II. STATEMENT OF RELEVANT PROCEDURE.

1. On July 28, 2011, Dr. White filed this action under the federal Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.*, the Texas Debt Collection Act ("TDCA"), Tex. Fin. Code Ann. § 392 *et seq.*, and the Texas Deceptive Trade Practices – Consumer Protection Act ("DTPA"), Tex. Bus. & Com. Ann. § 17.50 *et seq.* (*See* Doc. #1).

2. On December 15, 2011, Defendant deposed Dr. White. *See* Exhibit A (Deposition transcript of Timothy White).

3. On February 2, 2012, Defendant moved to compel Dr. White to produce documents and provide supplemental information concerning "all health issues," including the identities of Dr. White's physicians, for the past five (5) years. (*See* Doc. #18).

4. On February 22, 2012, the Court ordered the parties to confer and Dr. White, because he seeks damages for mental and physical harm caused by Defendant, to provide contact information for his physicians. (*See* Doc. #20).

5. On March 1, 2012, because Dr. White agreed to provide contact information for his physicians, the Court denied Defendant's motion to compel as moot. (*See* Doc. #22).

6. On March 9, 2012, Dr. White provided contact information for his physicians.

7. On April 2, 2012, Ms. Malone signed and filed Defendant's motion to compel a second deposition of Dr. White. (*See* Doc. #23).

8. On July 4, 2012, Dr. White's expert designations and expert reports come due; discovery closes on September 14, 2012. (*See* Doc. #14).

### III. STANDARD OF REVIEW.

Rule 30(a)(2)(B) provides in unmistakable language that a person who has already been deposed cannot be deposed again without leave of court. Despite this, Defendant argues that it "must now be allowed" to depose Dr. White a second time. (Doc #23, p. 5). Under Rule 30(a)(2)(B), leave of court is required to subject a person to a second deposition. Such leave "shall be granted to the extent consistent with the principles stated in Rule 26(b)(2)." Rule 26(b)(2) confers considerable discretion upon a district court to limit discovery, especially where the party seeking discovery has already had "ample opportunity" to obtain the information sought, or where the information sought is unreasonably cumulative or duplicative, and the burden of the proposed discovery outweighs its likely benefit. *Seymore v. Penn Mar., Inc.*, CIV.A. G-05-528, 2007 WL 101818 (S.D. Tex. Jan. 8, 2007) (citing Fed. R. Civ. P. 26(b)(2)).[1]

### IV. DEFENDANT'S MOTION IS FRIVOLOUS AND WARRANTS THE IMPOSITION OF SANCTIONS AGAINST DEFENSE COUNSEL.

Ms. Malone — who conducted the examination of Dr. White and received a copy of his deposition transcript — has falsely represented to the Court that Dr. White's counsel interfered with Dr. White's deposition and prevented Ms. Malone from "asking any questions" and developing or eliciting "any testimony regarding [Dr. White's] allegations of mental anguish, preexisting conditions, and diagnoses from his doctors." (*See* Doc. 23, pp. 3-5). "To leave even

---

[1] Rule 26(b)(2) provides, in relevant part, that the court may limit discovery if it determines that:

> (i) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity by discovery in the action to obtain the information sought; or (iii) the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues.

Fed. R. Civ. P. 26(b)(2).

a glimmer of hope that such conduct will be tolerated by the Court threatens the precious perception of a fair adversary system as viewed through the eyes of clients, opposing counsel and the judiciary." *Graham v. Dallas Indep. Sch. Dist.*, 3:04-CV-2461-B, 2006 WL 507944 (N.D. Tex. Jan. 10, 2006).

Defendant's motion should be denied precisely because a second deposition of Dr. White would be unreasonably cumulative and duplicative in light of Dr. White's first deposition, during which Defendant had ample opportunity to obtain — and in fact did obtain — the information sought.

### A. Without Obstruction Ms. Malone Examined Dr. White At Length About His Mental Anguish, Preexisting Medical Conditions, Physicians, And Diagnoses.

Ms. Malone represents in support of Defendant's motion: "During the deposition plaintiff's counsel prevented [defense] counsel from developing any testimony regarding plaintiff's allegations of mental anguish, preexisting conditions, and diagnoses from his doctors." (Doc. #23 p. 1). She further represents: "Plaintiff's counsel prevent[ed] [defense counsel] from asking any questions regarding plaintiff's doctors and medical condition." (Doc. #23 p. 3). Had Ms. Malone been candid with the Court, she would have told the Court that she interrogated Dr. White extensively about his mental anguish allegations, preexisting conditions, and physician's diagnoses. The excerpts of Dr. White's deposition testimony, attached as Exhibit A and summarized in the table below, prove that she was not.

4

| PAGE / LINE | SUBSTANCE OF TESTIMONY |
|---|---|
| 7:10-8:4 | Preexisting medical conditions (ankylosing spondylitis[2]); diagnosis; date of diagnosis; treatment; aggravating factors; medication; |
| 68:1 – 70:10 | Direct and indirect harms caused by Defendant including worry, constant anxiety, and feelings of helplessness; |
| 82:2 – 93:25 | Mental anguish and emotional distress, including panic attacks; triggering events, frequency, duration, symptoms, treatment; identification of single treating physician (rheumatologist), description of treatment; confirmation that no specific psychological or psychiatric care sought; prescription medication (Gabapentin[3]); non-medical treatment such as church and pastoral counseling and thought-stopping exercises; alternative possible causes including unrelated stressors; availability and attempts to seek treatment through university; confirmation of no formal diagnoses; discussion of ethical prohibition on self-diagnosis; five axes of DSM-3 diagnostics; |
| 100:3 – 103:7 | Confirmation of no diagnosis related to panic attacks; no specific plans for medical evaluation or psychiatric evaluation regarding panic attacks; no specific plans to seek psychological treatment; discussion of preexisting medical condition (ankylosing spondylitis); date of diagnosis (1998); identity of diagnosing physician (rheumatologist) exacerbation of preexisting condition due to anxiety; rheumatologist statements regarding exacerbation and anxiety causing flare-ups; possibility of debilitation; chronic nature of illness; mental anguish; prognosis (eye problems, migration into heart and lungs); |
| 103:8-10 | Confirmation that no discussions relating to the alleged debt or Defendant's attempts to collect the alleged debt or telephone calls placed in connection, were had between Dr. White and his physician; |
| 104:7-105:5 | Identity of each person with whom Dr. White discussed panic attacks (rheumatologist – not in connection with debt collection; family); confirmation of no discussions with any healthcare providers other |

---

[2] Ankylosing spondylitis is a long-term disease that causes inflammation of the joints between the spinal bones, and the joints between the spine and pelvis. It eventually causes the affected spinal bones to join together. *See* U.S. National Library of Medicine, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001457/ .

[3] Antiepileptic drugs like gabapentin are commonly used for treating neuropathic pain, usually defined as pain due to damage to nerves. This would include postherpetic neuralgia (persistent pain experienced in an area previously affected by shingles), painful complications of diabetes, nerve injury pain, phantom limb pain, fibromyalgia and trigeminal neuralgia. This type of pain can be severe and long-lasting, is associated with lack of sleep, fatigue, and depression, and a reduced quality of life. *See id.*, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0014677/ .

| | |
|---|---|
| | than rheumatologist; additional confirmation that no medical care sought regarding panic attacks and no discussions had with any healthcare professional other than rheumatologist (no discussion of debt collection or related telephone calls); |
| 105:14-20 | Additional confirmation that no discussions were had between Dr. Davis and his rheumatologist about telephone calls or student loan debt issue; |
| 105:14-107:21 | Identities of all persons with whom Dr. Davis discussed mental anguish and panic attacks (partner and parents); confirmation that none are medical professionals; family medical history; |
| 107:22-108:16 | Personal medical history; confirmation of no previous treatment for panic attacks or anxiety disorders; |
| 109:23-110:7 | Belief that Defendant intentionally caused harm and bases for belief; |
| 113:21-114:18 | Description of specific threats to take license, degree, tax returns; "ruin life;" Defendant's refusal to work out payment plan; |
| 125:18-25 | Economic damages; |
| 127:14-128:6 | Additional confirmation of no current plans to seek medical treatment for mental anguish, psychiatric, counseling, or otherwise; |
| 132:23-139:13 | Nine (9) minute cross examination; |
| 141:2-144:23 | Dr. White's "definition of mental anguish;" defense counsel's admission that all mental anguish had been covered on direct examination; additional discussion of mental anguish (panic attacks, general worry, feelings of helplessness, depression); |

**B.     Dr. White Testified Repeatedly That He Had No Additional Testimony To Give Regarding His Doctors And Medical Conditions.**

Even if Ms. Malone's examination was not exhaustive — which it was — Dr. White's testimony plainly shows that he had nothing left to offer. Dr. White repeatedly testified that (1) his rheumatologist, Dr. John Cush, was the only healthcare professional with whom he discussed

6

any aspect of his mental anguish, (2) that his discussions with Dr. Cush exclusively concerned his panic attacks, and (3) involved no reference to Defendant's alleged unlawful conduct.

Dr. White also testified repeatedly about Dr. Cush's diagnosis, prescribed course of treatment, and prognosis, as well as (4) the substantive details of their discussions. *See* Table, *supra.* Consistently, Dr. White further testified that he had neither sought to obtain medical care or treatment from any other healthcare professional (including psychiatrists and psychologists) concerning his mental anguish, nor ever discussed his mental anguish with any such person. *See* Table, *supra.* On the topics of his preexisting medical conditions, physicians, and mental anguish Dr. White's testimony was exhaustive.

## VI.  STATE LAW LEGAL AND MEDICAL REQUIREMENTS FOR ESTABLISHING MENTAL ANGUISH ARE INAPPLICABLE UNDER THE FDCPA.

Defendant contends that it was impeded in attempting to elicit testimony "establishing both the legal and medical requirements of mental anguish." (Doc. #23, p. 3). However, such requirements do not apply to Dr. White's recovery of actual damages, including for mental anguish and emotional distress, under the FDCPA.

"A majority of district courts have concluded that the FDCPA does not require a plaintiff to satisfy the state law elements of intentional or negligent infliction of emotional distress to recover actual damages for emotional distress under 15 U.S.C. § 1692k(a)." *Davis v. Creditors Interchange Receivable Mgmt., LLC*, 585 F. Supp. 2d 968, 971 (N.D. Ohio 2008).

In *Smith v. Law Offices of Mitchell N. Kay*, 124 B.R. 182 (D. Del. 1991), the court offered three reasons supportive of the majority position. First, Congress intended for the FDCPA to create a more effective weapon against abusive debt collection practices than provided by existing state law remedies. *Id.* at 188. Second, Congress designed the FDCPA to create a uniform law governing debt collection. *Id.* at 189. Third, the structure and purpose of

7

the FDCPA closely track the Fair Credit Reporting Act ("FCRA"), and courts interpreting the FCRA have concluded that "actual damages for emotional distress can be proved independently of state law requirements" for intentional or negligent infliction of emotional distress. *Id*. at 188.

### A. Providing Recovery For Emotional Distress Caused By Abusive Debt Collectors Was Of Principal Concern When Congress Enacted The FDCPA.

Courts construing the FDCPA have noted Congress's concern for emotional harms. *See Crossley v. Lieberman,* 90 B.R. 682, 692 (E.D .Pa. 1988); *Teng v. Metropolitan Retail Recovery, Inc.,* 851 F. Supp. 61, 68–70 (E.D.N.Y.1994). The FDCPA's drafters were greatly concerned about emotional harms inflicted by abusive debt collectors. The Congressional findings note that abusive debt collection causes "marital instability" and "invasions of individual privacy" along with economic harms like "personal bankruptcies" and "loss of jobs." *15 U.S.C. § 1692(a).* The Senate Committee noted that abusive debt collectors cause "suffering and anguish." S. Rep. 95–382, at 2, U.S. Code Cong. & Admin. News 1977, pp. 1695, 1696.

The Committee expressed concern about practices that take a primarily emotional toll, such as using "obscene or profane language, threats of violence, telephone calls at unreasonable hours, ... [and] disclosing a consumer's personal affairs to friends, neighbors, or an employer." *Id.* The Senate Report underscored the role of private plaintiffs in combating abusive debt collection practices. S. Rep. 95–382, at 5, U.S. Code Cong. & Admin. News 1977, pp. 1695, 1700 (FDCPA will be "primarily self-enforcing" because "consumers who have been subjected to collection abuses will be enforcing compliance").

If courts demanded plaintiffs victimized by these practices meet the tort standard for emotional distress, recovery might often, if not nearly always be unlikely. *See Greene v. Rash,* 89 F.R.D. 314, 316 (E.D.Tenn.1980) ("the aggrieved plaintiff would not be able to recover any actual damages under 15 U.S.C. § 1692k(a)(1), except to the extent that he or she might have

8

suffered some related out-of-pocket expenses."); *Smith, supra,* 124 B.R. at 188 n. 6, ("[e]xisting state laws would, in many cases afford no relief at all to the victim[s] of abusive debt collection practices.").

"Denying plaintiffs an adequate remedy risks undermining the entire statutory scheme. Indifference, if not impunity towards its mandate might prevail. Indeed, if Congress is to be viewed as having incorporated the state standard into the statute, it made little sense or difference for it to have enacted it." *Davis v. Creditors Interchange Receivable Mgmt., LLC*, 585 F. Supp. 2d 968, 973 (N.D. Ohio 2008).

**B. Grafting State-Law Requirements On To The FDCPA Would Defeat Congress's Intent To Create A Uniform Level Of Baseline Protection To Consumers.**

Congress intended, moreover, to provide a uniform, national baseline of protection for victims of abusive debt collection practices. A primary purpose of the FDCPA was to "promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. § 1692(e). The FDCPA permits states to enact more stringent debt collection laws, but it expressly preempts state regimes that are less stringent than the FDCPA. 15 U.S.C. § 1692. *See also* S. Rep. 95–382, at *6, U.S. Code Cong. & Admin.News 1977, pp. 1695, 1700 (The FDCPA annuls only "inconsistent" state laws, "with stronger State laws not regarded as inconsistent.").

To justify a national baseline, the Senate Committee explained that debt collectors in states with less restrictive laws were undermining efforts by other states to enforce more consumer-friendly laws. At the time the FDCPA was enacted, new telephone technology brought about a "dramatic increase in interstate collections." S. Rep. 95–382, at *2, U.S. Code Cong. & Admin.News 1977, pp. 1695, 1697. States seeking to protect consumers found themselves "unable to act against unscrupulous debt collectors who harass[ed] consumers from

9

another state." *Id*. This development, according to the Committee, was a "prime reason why federal legislation was necessary." *Id.*

"Interjecting the vagaries of state tort standards into the FDCPA's remedial scheme would undermine, if not defeat entirely the Congressional objective of national uniformity in the statute's application and enforcement. A uniform damages rule, applicable without regard to state standards for recovery for infliction of emotional distress, ensures that debtors in all states uniformly have an adequate remedy against abusive debt collection practices." *Davis*, 585 F. Supp. 2d at 974.

> **C.  Judicial Interpretation Of The FCRA Is Consistent With The Majority Rule That State-Law Elements Do Not Apply To Recovery Of Actual Damages Under The FDCPA.**

The damages standard under the FCRA provides a valuable source of guidance when interpreting the FDCPA. *See, e.g.*, *Smith*, 124 B.R. at 187 ("Due to similarities in language, structure, and purpose between the statutes, it is instructive for this Court to consider how actual damages for emotional distress under the FCRA have been dealt with by other courts"); *see also McGrady v. Nissan Motor Acceptance Corp.,* 40 F. Supp. 2d 1323, 1338 (M.D. Ala.1998). This makes sense, as the FDCPA and FCRA share similar purposes. Both are consumer protection statutes "designed not to overly burden valid credit reporting or debt collection practices." *Smith, supra,* 124 B.R. at 187. Both create private rights of action for willful and negligent noncompliance with the statute. *Id.*

The FCRA permits a consumer to recover "any actual damages sustained by the consumer as a result" of willful noncompliance with the FCRA. 15 U.S.C. § 1681n(a)(1). The FCRA also permits recovery of actual damages in cases of negligent noncompliance. 15 U.S.C. § 1681 o(a)(1). The "Civil Liability" section of the FDCPA is similarly worded, allowing

recovery for "any actual damage sustained" by the injured party as a result of noncompliance. 15 U.S.C. § 1692k(a)(1). Under the FCRA, actual damages may include economic damages and damages for "humiliation and mental distress." *Sloane v. Equifax Information Services, LLC,* 510 F.3d 495, 500 (4th Cir.2007); *see also Bryant v. TRW, Inc.,* 487 F.Supp. 1234, 1239–40 (E.D.Mich.1980).

Courts construing the FCRA have concluded that the actual damages provision permits recovery for mental anguish apart from state law requirements. In *Millstone, supra,* 528 F.2d at 834, the court upheld the district court's award of actual damages for emotional distress resulting from an FCRA violation. The district court awarded actual damages to the plaintiff for "sleeplessness and nervousness." *Millstone v. O'Hanlon Reports,* 383 F. Supp. 269, 276 (E.D. Mo.1974). On appeal, the court concluded that the plaintiff had an "independent cause of action under the Fair Credit Reporting Act," and that the standard for damages was "quite apart from any recovery he might have sought in tort." *Millstone, supra*, 528 F.2d at 834.

Other courts have reached a similar conclusion regarding actual damages under the FCRA. *In Bryant v. TRW, Inc.* 487 F. Supp. 1234, 1239 (E.D.Mich.1980), *aff'd* 689 F.2d 72 (6th Cir.1982), the court instructed the jury to consider "mental anguish," "embarrassment," and "humiliation" in determining the proper measure of actual damages to award the victim of an FCRA violation. Likewise, in *Thompson v. San Antonio Retail Merchants Ass'n,* 682 F.2d 509, 514 (5th Cir. 1982), the court affirmed an actual damage award for emotional distress based on the plaintiff's testimony that a denial of credit "hurt him deeply" and caused him "humiliation and embarrassment." In neither case did the court use state tort law to determine the proper damage award. *Smith, supra*, 124 B.R. at 188.

The majority of district courts interpreting the FDCPA have followed this logic.[4] For example, in *Santacruz v. Standley & Associates, LLC*, the plaintiff alleged that she suffered from panic attacks, anxiety, stress, insomnia, and hair loss as a result of the defendants' FDCPA violations. 2011 WL 1043338 at *5. The defendants argued that the plaintiff had provided no corroborative evidence of causation between the FDCPA violations and her emotional distress, and that her deposition testimony, standing alone, was insufficient to prove emotional damages as a matter of law. The district court disagreed, holding: "[The] [p]laintiff may rely on her own testimony to establish emotional distress damages, provided that it is sufficiently detailed and does not rely on conclusory statements." 2011 WL 1043338 at *5 (citing *Wantz*, 386 F.3d 829, 834 (7th Cir. 2004); *McCammon*, 493 F. Supp. 2d 1166, 1171-72 (D. Colo. 2007) ("noting that there is no authority for the proposition that a plaintiff requires expert testimony on causation to recover actual damages in FDCPA claims").

## VII. DR. WHITE HAD NO ADDITIONAL TESTIMONY TO GIVE CONCERNING HIS RECOVERY OF ACTUAL DAMAGES UNDER STATE LAW.

Discussed *supra* at Section IV.B. Also, "updated employment and medical information can readily be obtained through supplementation of previous disclosures and discovery responses" without subjecting Dr. White to the expense and burden of appearing for a second deposition. *Seymore*, 2007 WL 101818 at *1 (S.D. Tex. Jan. 8, 2007) (citing Fed. R. Civ. P.

---

[4] *See e.g. Teng v. Metropolitan Retail Recovery Inc*., 851 F.Supp. 61, 68–69 (E.D.N.Y. 1994); *Donahue v. NFS, Inc*., 781 F.Supp. 188, 193–94 (W.D.N.Y.1991); *Smith v. Law Offices of Mitchell N. Kay*, 124 B.R. 182, 185 (D.Del.1991); *Crossley v. Lieberman*, 90 B.R. 682 (E.D. Pa. 1988), aff'd, 868 F.2d 566 (3d Cir.1989); *Santacruz v. Standley & Associates, LLC*, 10-CV-00623-CMA-CBS, 2011 WL 1043338 (D. Colo. Mar. 17, 2011); *Wantz v. Experian Information Solutions,* 386 F.3d 829, 834 (7th Cir. 2004); *Donahue v. NFS, Inc.,* 781 F.Supp. 188, 193 (W.D.N.Y.1991); *In re Maxwell,* 281 B.R. 101, 118 (Bankr. D. Mass.2002); *In re Hart,* 246 B.R. 709, 732 (Bankr. D. Mass.2000); *Miller v. Midland Funding, LLC,* 2008 WL 4093004, at *3 (C.D. Cal.); *Lowe v. Elite Recovery Solutions, L.P.,* 2008 WL 324777, at *4 (E.D. Cal.); *Panahiasl v. Gurney,* 2007 WL 738642, at *1, 2007 U.S. Dist. LEXIS 17269, at *3 (N.D. Cal.); *Wenrich v. Cole,* 2001 WL 4994, at *5–6, 2000 U.S. Dist. LEXIS 18687, at *15 (E.D. Pa.); *Howze v. Romano,* 1994 WL 827162, at *3, 1994 U.S. Dist. LEXIS 20547, at *8–9 (D.Del.).*McCammon v. Bibler, Newman & Reynolds, P.A.,* 493 F. Supp. 2d 1166, 1171-72 (D. Colo. 2007) (noting that there is no authority for the proposition that a plaintiff requires expert testimony on causation to recover actual damages in FDCPA claims).

26(e) ("imposing duty to supplement or to amend materially incomplete or incorrect discovery responses"). Furthermore, Dr. White is required to disclose by September 14, 2012, any testifying experts along with a copy of his or her report. *See* Section II. ¶8, *supra*. After any such disclosure, Defendant may examine those expert witnesses regarding their opinions, conclusions, and all facts and data upon which they are premised.

### VII. MS. MALONE ELECTED TO CONCLUDE THE DEPOSITION AFTER DR. WHITE'S COUNSEL REFUSED HER ATTEMPTS TO ELICIT AN UNETHICAL DIFFERENTIAL SELF-DIAGNOSIS FROM DR. WHITE.

During her redirect examination of Dr. White, Ms. Malone asked him whether he understood that "under the ethical guidelines for a counselor in the State of Texas, that [Dr. White] is prohibited from a making a diagnosis for [himself]." Dr. White responded that he did not intend to diagnose himself with a disorder, but that his symptoms have caused mental anguish. Ms. Malone replied: "All right. Let's back this up then . . . so without having to go through it all, that was the panic attacks we talked about earlier?" "Yes," said Dr. White . . . and "general worry, the constant worrying" . . . and "symptoms of depression . . . helplessness, guilt, feeling powerless, feeling hopeless about the future. . . Yes, I'm definitely having those." *See* Appendix A, pp. 57 – 61.

Soon after, Ms. Malone asked: "And you – you've told me that you have not – you would not put this in a category of a depressive disorder; is that correct?" Dr. White responded that he couldn't say and couldn't ethically make a self-diagnosis. The following exchange ensued:

Q. You can't diagnose yourself.

A. Right.

Q. I know. But you would agree with me that with regard to any particular disorder, there are certain number of symptoms that have to be met before it meets – the definition of disorder.

A. Yes.

Q. And at this point, you're not – you're not saying that you --

MR. RADBIL: Don't answer that question.

MS. MALONE: You -- I haven't even asked the question yet, Counsel.

MR. RADBIL: Don't answer any question that causes you to have to even [come] close to diagnosing yourself with anything or analyzing your symptoms in connection with a diagnosis. I would advise strongly against that.

Q. As you sit here today, you are not saying that you meet the definition of those; is that fair, sir?

MR. RADBIL: Do not answer that question. It requires a question about diagnosing yourself. It's a negative so ...

MS. MALONE: You know what, we're going to come back to the Judge, so I'm going to stop the deposition based on the fact that you're interfering. You're wanting him to testify about medical conditions and you don't want me to ask him questions about it.

MR. RADBIL: Ask him about his medical conditions.

MS. MALONE: No, you are the --

MR. RADBIL: Don't ask him to diagnose himself.

MS. MALONE: You are asking. You asked him --

MR. RADBIL: You're asking whether he has a certain diagnosis or whether he does not. If you ask him whether he does not have a diagnosis, you're asking him to make a diagnosis.

MS. MALONE: You know what, Counsel --

MR. RADBIL: You're asking him to draw a negative inference.

MS. MALONE: I'm going to stop the deposition at this point. We're going to file a Motion to Compel. That's our certificate of conference.

\*\*\*

MR. RADBIL: I don't want to have him testify about making a diagnosis.

MS. MALONE: You did.

MR. RADBIL: I don't want the witness to answer any question –

14

MS. MALONE:  Yes, well, you should have thought about his license before you started this, Counsel.  You're doing it.  You had him diagnose that he had mental anguish and these symptoms.  Now you want to deal with the consequences of it, Counsel, we'll be back here.

MR. RADBIL: I find your conduct unethical.  I find your conduct in attempting to purposely, what it seems like, put him in a position where he's doing something that is unethical, as far as his training, is beyond reproach.  You can ask him about his mental anguish, his symptoms, but you specifically asked the witness whether he thought he fell into a category or whether or not his symptoms added up to an official diagnosis, which you know he cannot do.

\*\*\*

MR. RADBIL:  You're free to ask him about his symptoms, but you're not free to ask him how they fall into an official diagnosis.

MS. MALONE: I didn't.  I said you're not ask – you're not giving us a diagnosis, are you?  And he said no.

MR. RADBIL: Can we read that last question?

MS. MALONE:  No.  We're not reading anything back.  You know, I'm done.  I'm finishing the deposition.

MR. RADBIL: That's your decision.

MS. MALONE: No it's your decision because you won't allow him to answer the question . . .

\*\*\*

MR. RADBIL: You may ask him about his medical condition, about his mental anguish, about his symptoms.  You may not ask him whether or not his particular symptoms rise to the level of a certain diagnosis or not.  You may not ask him to diagnose himself or make a negative statement that infers a diagnosis.

MS. MALONE: That's not what I asked him. . . .

MR. RADBIL: Can we read – that's not the question.

MS. MALONE: No.

MR. RADBIL: Can we read back –

MS. MALONE: No. We're not going back to read back.

MR. RADBIL: Why?

MS. MALONE: Because we have –

MR. RADBIL: It's perfectly clear.

MS. MALONE: Because – no.  Because –

MR. RADBIL: It's perfectly clear in the record.

MS. MALONE: You know what?  No. You are intentionally trying to run this over to keep the court reporter and videographer late. . . .and you are intentionally doing this because you know your answers to interrogatories say that he – that you're not going to answer these questions.

MR. RADBIL:  For the record, my cross-examination was five or so minutes.

MS. MALONE: No it wasn't.

MR. RADBIL:  We are now in a redirect that is dragging on.

MS. MALONE: No, we are in a fight with counsel who's asking stupid questions and making stupid accusations.

MR. RADBIL: I'm sorry that you feel that way.

MS. MALONE: I don't care.  We're done.

MR. RADBIL: Okay.  Well, thank you for having us.

MS. MALONE: You know, Noah, you really think you're smart, buddy, but you're not. We're done.  Mr. White, I will see you again.

Appendix A, pp. 57 – 64.

## VIII.  CONCLUSION.

    Defendant's motion to compel Dr. White to appear for a second deposition is frivolous, and Ms. Malone's patently false representations to the Court are unacceptable.  Defendant's motion should be denied and Ms. Malone should be sanctioned.

Dated:  April 12, 2012.

Respectfully submitted,

WEISBERG & MEYERS, LLC

By: /s/ Noah D. Radbil
    Noah D. Radbil
    Texas Bar No. 24071015
    noah.radbil@attorneysforconsumers.com
    WEISBERG & MEYERS, LLC
    Two Allen Center
    1200 Smith Street, Sixteenth Floor
    Houston, Texas 77002
    Telephone:    (888) 595-9111
    Facsimile:    (866) 317-2674

*Attorneys for Plaintiff*
TIMOTHY WHITE

## CERTIFICATE OF SERVICE

I hereby certify that on April 12, 2012, I filed the foregoing document electronically filed with the clerk of the U.S. District Court for the Northern District of Texas, Dallas Division, using the electronic case filing system of the court, which will send notification of such filing to:

Robbie Malone
Northpark Central, Suite 1850
8750 North Central Expressway
Dallas, Texas 75231

By: /s/ Noah D. Radbil
    Noah D. Radbil