IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| TIMOTHY WHITE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO.  3:11-cv-01817-B |
| | § | |
| REGIONAL ADJUSTMENT | § | |
| BUREAU, INC. d/b/a RAB, INC. | § | |
| | § | |
| Defendant. | § | |

**PLAINTIFF'S RESPONSE TO DEFENDANT REGIONAL ADJUSTMENT BUREAU INC.'S
MOTION AND BRIEF FOR FRCP 37 SANCTIONS**

# APPENDIX OF EXHIBITS

# Robbie Malone

### A Professional Limited Liability Company
### Attorneys and Counselors

**Nakisha Lewis, Paralegal**
DIRECT DIAL: (214) 346-2627
E-MAIL: nlewis@rmalonelaw.com

NORTHPARK CENTRAL, SUITE 1850
8750 N. CENTRAL EXPRESSWAY
DALLAS, TEXAS 75231
(214) 346-2630
FAX (214) 346-2631

October 6, 2011

***CM/RRR 7010 2780 0000 4552 8148***
Dennis R. Kurz
Weisberg & Meyers, L.L.C.
9330 LBJ Freeway, Ste. 900
Dallas, Texas 75243

RE:   Case No. 3:11-cv-01817-B; Timothy White v. Regional Adjustment Bureau, Inc.;
pending in the U.S. District Court, Northern District of Texas, Dallas Division;
Claim No. 264349; Our File No. 984.0280

Dear Dennis,

In connection with the above referenced matter, attached please find the following discovery
requests;

1.   Defendant Regional Adjustment Bureau, Inc.'s First Set of Interrogatories to
Plaintiff Timothy White;

2.   Defendant Regional Adjustment Bureau, Inc.'s First Requests for Admissions
to Plaintiff Timothy White, and

3.   Defendant Regional Adjustment Bureau, Inc.'s First Requests for Production
to Plaintiff Timothy White.

If you have any questions, please feel free to call.

Sincerely,

*Nakisha Lewis*

Nakisha Lewis

NL/nl
Enclosure

M:\9840000 CHUBB FILES\9840280 Timothy White v. Regional Adjustment Bureau, Inc. dba RAB,
Inc\Letters\9840280 L.P03-ROG RFA RFP.wpd

App. 1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| TIMOTHY WHITE, | § | |
| | § | |
| PLAINTIFF, | § | |
| | § | |
| V. | § | Case No.: W09-CA-232 |
| | § | |
| REGIONAL ADJUSTMENT BUREAU, INC. | § | |
| | § | |
| DEFENDANT. | § | |
| | § | |

### DEFENDANT REGIONAL ADJUSTMENT BUREAU, INC.'S
### FIRST SET OF INTERROGATORIES TO
### PLAINTIFF TIMOTHY WHITE

To:   Plaintiff, Timothy White, by and through his attorney of record, Dennis R. Kurz,
Weisberg & Meyers, L.L.C., 9330 LBJ Freeway, Ste. 900, Dallas, Texas 75243.


Pursuant to FRCP 33, FEDERAL RULES OF CIVIL PROCEDURE, you are hereby requested to

answer each of the following interrogatories separately and fully in writing under oath. Spaces

are provided for your answers following each interrogatory. The amount of space is not intended

as, and should not be construed as, an indication of the amount of information sought. If

additional space is needed to fully answer any interrogatory, please continue your answer on the

back side of the interrogatories, in the margin, or on a separate sheet of paper to be included with

your answers. You are hereby requested to deliver your answers to these interrogatories to the

undersigned in not more than thirty (30) days after service of these interrogatories upon you, and

to file supplementary answers should you obtain further relevant information after answering

same. You are requested to answer the following:

**DEFENDANT'S FIRST SET OF INTERROGATORIES TO PLAINTIFF** - Page 1
M:\9840000 CHUBB FILES\9840280 Timothy White v. Regional Adjustment Bureau, Inc. dba RAB,
Inc\Discovery\984.0280P.ROG1.wpd

App. 2

# I.

## DEFINITIONS

As used in the attached discovery the following terms shall have the following meanings:

1.     The word "document" or "documents" shall mean the original of the information recorded in a tangible form including, but not limited to, information printed, typewritten, handwritten, photographed, filed, e-mailed, recorded by electronic means upon a tape or disk or any other means of recording and shall include (but not limited to):  letters; e-mails; memoranda; handwritten notes; agreements; deeds; contracts; promissory notes; books; pamphlets; brochures; newspapers; magazines; periodicals; catalogs; price lists; checks; canceled checks; invoices; sales receipts; charge receipts; personal receipts; bank records; tapes; computer printouts; data cards; programs or other input or output of data processing systems; photographs (positive print or negative); transcripts of interviews or testimony before any person, officer, or body whether sworn or unsworn; written statements or notes of interview or testimony; diaries; calendars; logs; expense records or other financial data; charts; graphs; maps; drawings or other representational depiction; telephone records; telegrams; telefax; phonograph records; magnetic tape, drum, or disk records; motion picture film; microfilm or microfiche.  The term "document" or "documents" shall also mean every copy of a document where such copy is not an identical duplicate of the original, and shall include all postscripts, notations, addendums, changes, notations, modifications, alterations or revisions of each document or documents.

2.     The term "correspondence", as used herein, shall include, but shall not be limited to, any letter, e-mail, telegram, telex, telefax, TWX, notice, message, memorandum or other written communication or transcription or notes of a communication.

3.     The term "communication", as used herein, shall mean any written, oral or other transmission of fact, information, ideas or opinion, including, but not limited to, any utterance, notation, questions, command, interjection, expression, gesture, suggestive conduct or statement of any nature whatsoever, any conversation (whether by telephone or otherwise), and any meetings and also including, but not limited to, correspondence, e-mails, financial records, corporate records, reports and documents as defined immediately above.

4.     The term "regarding", as used herein, shall mean, in an indirect manner, contain, record, discuss, mention, note, evidence, memorialize, analyze, describe, comment upon, refer to, have any connection with or have any tendency to prove or disprove the matter set forth.

5.     The term "relate(s) to" or "relating to", as used herein shall mean, in an indirect manner, contain, record, discuss, mention, note, evidence, memorialize, analyze, describe, comment upon, refer to, have any connection with or have any tendency to prove or disprove the matters set forth.

**DEFENDANT'S FIRST SET OF INTERROGATORIES TO PLAINTIFF** - Page 2

6.      The word "and," and the word "or", as used herein, shall, where the context permits, shall be construed to mean "and/or."

7.      The term "date", as used herein, shall mean the exact day, month and year if ascertainable, or, if not, the best approximation (including relationship to other events).

8.      The word "person" or "persons" shall include any natural person or any other entity, including but not limited to, firms, corporations, associations, partnerships, joint ventures and trusts, governments, governmental agencies or bodies, or other form of legal or business entity.

9.      The term "Plaintiff" or "you", as used herein, shall mean and refer to **Plaintiff Timothy White**, and shall include any and all of Plaintiff's attorneys, officers, directors, employees and authorized agents and representatives.

10.     The term "Defendant", as used herein, shall mean and refer to **Defendant Regional Adjustment Bureau, Inc.** and shall include any and all of its attorneys, officers, directors, employees and authorized agents and representatives.

11.     The term "Petition," as used herein, shall mean the Plaintiff's Original Petition, and any amendments thereto, filed in this action by Plaintiff.

12.     Wherever appropriate, the singular form of a word shall be interpreted as including the plural, and the masculine form of a word shall be interpreted as including the feminine.

13.     The term "Account" means the debt which Plaintiff alleges that Defendant attempted to collect and to which Plaintiff refers in Plaintiff's Original Petition and any amendments thereto, filed in this action by Plaintiff.

14.     The term "debt" as used herein, shall mean the debt which Plaintiff alleges that Defendant attempted to collect and to which Plaintiff refers in Plaintiff's Original Petition and any amendments thereto, filed in this action by Plaintiff.

**DEFENDANT'S FIRST SET OF INTERROGATORIES TO PLAINTIFF** - **Page 3**
M:\9840000 CHUBB FILES\9840280 Timothy White v. Regional Adjustment Bureau, Inc. dba RAB, Inc\Discovery\984.0280P.ROG1.wpd

App. 4

## II.

## FIRST SET OF INTERROGATORIES

**INTERROGATORY NO. 1:** State the full name, date of birth, driver's license number and current residence of the person or persons answering these Interrogatories.

**ANSWER:**

**INTERROGATORY NO. 2:** Identify your employment history including name of employer, address and phone number, for the last ten (10) years.

**ANSWER:**

**INTERROGATORY NO. 3:** Identify your cellular phone carrier; include the business address, telephone number and account number.

**ANSWER:**

**INTERROGATORY NO. 4:** Identify specifically any and all documents, photographs, audiotapes, records or reports in your custody or under your control which support your claims that Defendant violated § 1692c(a)(3) of the FDCPA, by communicating at the consumer's place of employment if the debt collector knows or has reason to know that the consumer's employer prohibits the consumer from receiving such communication, as alleged in Plaintiff's Original Petition.

**ANSWER:**

**INTERROGATORY NO. 5:** Identify specifically any and all documents, photographs, audiotapes, records or reports in your custody or under your control which support your claims that Defendant violated § 1692d(6) of the FDCPA, by placing calls to the Plaintiff without disclosing the identity of the debt collection agency, as alleged in Plaintiff's Original Petition.

**ANSWER:**

**INTERROGATORY NO. 6:** Identify specifically any and all documents, photographs, audiotapes, records or reports in your custody or under your control which support your claims that Defendant

**DEFENDANT'S FIRST SET OF INTERROGATORIES TO PLAINTIFF - Page 4**
M:\9840000 CHUBB FILES\9840280 Timothy White v. Regional Adjustment Bureau, Inc. dba RAB, Inc\Discovery\984.0280P.ROG1.wpd

App. 5

violated§ 1692e(11) of the FDCPA, by failing to notify Plaintiff that the communication was from a debt collector, as alleged in Plaintiff's Original Petition.

**ANSWER:**


**INTERROGATORY NO. 7:** Identify specifically any and all documents, photographs, audiotapes, records or reports in your custody or under your control which support your claims that Defendant violated TEX. FIN. CODE § 392.304(a)(4), by failing to disclose clearly in communication with Plaintiff the name of the person to whom the debt has been assigned or is owed when making a demand for money, as alleged in Plaintiff's Original Petition.

**ANSWER:**


**INTERROGATORY NO. 8:** Identify specifically any and all documents, photographs, audiotapes, records or reports in your custody or under your control which support your claims that Defendant violated TEX. FIN. CODE § 392.304(a)(5)(B), by failing to disclose that the communication is from a debt collector where such communication was an oral communication between Defendant and Plaintiff subsequent to the initial communication, as alleged in Plaintiff's Original Petition.

**ANSWER:**


**INTERROGATORY NO. 9:** Identify specifically any and all documents, photographs, audiotapes, records or reports in your custody or under your control which support your claims that Defendant violated TEX. FIN. CODE § 392.304(a)(19), by using false representation or deceptive means to collect a debt or obtain information concerning a consumer, as alleged in Plaintiff's Original Petition.

**ANSWER:**


**INTERROGATORY NO. 10:** Do you possess evidence or knowledge which can be used to impeach Defendant or any other person identified by Defendant as a person with knowledge of relevant facts, with evidence of a criminal conviction, as described in Rule 609 of the Texas Rules of Evidence? If so, please describe in detail such evidence, giving the name of the accused, nature of conviction and charges on which convicted, year of conviction and whether or not parole has been successfully completed or pardon granted.

**ANSWER:**

**INTERROGATORY NO. 11:** State the nature of your actual damages.

**ANSWER:**

**INTERROGATORY NO. 12:** Please describe all telephone conversations Plaintiff had with Defendant which supports Plaintiff's allegations that Defendant violated 1692c(a)(3) of the FDCPA, by communicating at the consumer's place of employment if the debt collector knows or has reason to know that the consumer's employer prohibits the consumer from receiving such communication, as alleged in Plaintiff's Original Petition.

**ANSWER:**

**INTERROGATORY NO. 13:** Please describe all telephone conversations Plaintiff had with Defendant which supports Plaintiff's allegations that Defendant violated § 1692d(6) of the FDCPA, by placing calls to the Plaintiff without disclosing the identity of the debt collection agency, as alleged in Plaintiff's Original Petition.

**ANSWER:**

**INTERROGATORY NO. 14:** Please describe all telephone conversations Plaintiff had with Defendant which supports Plaintiff's allegations that Defendant violated § 1692e(11) of the FDCPA, by failing to notify Plaintiff that the communication was from a debt collector, as alleged in Plaintiff's Original Petition.

**ANSWER:**

**INTERROGATORY NO. 15:** Please describe all telephone conversations Plaintiff had with Defendant which supports Plaintiff's allegations that Defendant violated TEX. FIN. CODE § 392.304(a)(4) of the TDCPA, by failing to disclose clearly in communication with Plaintiff the name of the person to whom the debt has been assigned or is owed when making a demand for money, as alleged in Plaintiff's Original Petition.

**ANSWER:**

**INTERROGATORY NO. 16:** Please describe all telephone conversations Plaintiff had with Defendant which supports Plaintiff's allegations that Defendant violated TEX. FIN. CODE §

**DEFENDANT'S FIRST SET OF INTERROGATORIES TO PLAINTIFF - Page 6**

App. 7

392.304(a)(5)(B), by failing to disclose that the communication is from a debt collector where such communication was an oral communication between Defendant and Plaintiff subsequent to the initial communication, as alleged in Plaintiff's Original Petition.

**ANSWER:**

**INTERROGATORY NO. 17:** Please describe all telephone conversations Plaintiff had with Defendant which supports Plaintiff's allegations that Defendant violated TEX. FIN. CODE § 392.304(a)(5)(B) of the TDCPA, by using false representation or deceptive means to collect a debt or obtain information concerning a consumer, as alleged in Plaintiff's Original Petition.

**ANSWER:**

**INTERROGATORY NO. 18:** Identify all documents which you have been requested to produce in any request for production, propounded upon you in this case, which are no longer in your possession, custody, or control.

**ANSWER:**

**INTERROGATORY NO. 19:** If you have been a party to a lawsuit ("lawsuit" includes a small claim, civil, criminal, divorce, child custody or other action filed in any municipal, state or federal court) in the past 10 years, state the style, cause or case number, and court in which the lawsuit was filed, a brief description of the lawsuit, and whether you were a Plaintiff or Defendant.

**ANSWER:**

**INTERROGATORY NO. 20:** Please state your entire criminal history, including but not limited to all arrests, convictions, indictments, deferred adjudications, probations and prison time.  If Plaintiff has no criminal history, please state as such.

**ANSWER:**

**INTERROGATORY NO. 21:** Identify specifically any and all documents, photographs, audiotapes, records or reports in your custody or under your control which support your claim that you have suffered damages.

**ANSWER:**

**INTERROGATORY NO. 22:** Identify by name address and telephone number any and all doctors, psychiatrists, psychologists, psychotherapists, and/or medical providers who have treated you for the symptoms of stress and/or mental anguish alleged in Plaintiff's Original Petition.

**ANSWER:**

**INTERROGATORY NO. 23:** If you likely will require medical and/or psychiatric treatment in the future with respect to the symptoms of stress and/or mental anguish alleged in Plaintiff's Original Petition, state the name and address of each person who has advised you that you will likely require medical and/or psychiatric treatment in the future, the treatment you will likely receive, the date such treatment will likely be received, and the cost of such future medical and/or psychiatric treatment.

**ANSWER:**

**INTERROGATORY NO. 24:** Identify specifically any and all present and former doctors for Plaintiff within the last five (5) years.

**ANSWER:**

App. 9

Respectfully submitted,

**ROBBIE MALONE, PLLC**

_(signature)_

Robbie Malone
State Bar No. 12876450
E-mail: rmalone@rmalonelaw.com
JACOB C. BOSWELL
State Bar No. 24061269
E-mail:jboswell@rmalonelaw.com
Northpark Central, Suite 1850
8750 N. Central Expressway
Dallas, Texas 75231
(214) 346-2630
(214) 346-2631 (Fax)

**COUNSEL FOR DEFENDANT**
*Regional Adjustment Bureau, Inc.*

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing document has been forwarded via certified mail, return receipt requested on this 6th day of October, 2011 to:

Dennis R. Kurz
Weisberg & Meyers, L.L.C.
9330 LBJ Freeway, Ste. 900
Dallas, Texas 75243
　　　*Counsel for Plaintiff*

_(signature)_

ROBBIE MALONE/JACOB C. BOSWELL

**DEFENDANT'S FIRST SET OF INTERROGATORIES TO PLAINTIFF** - **Page 9**
　M:\9840000 CHUBB FILES\9840280 Timothy White v. Regional Adjustment Bureau, Inc. dba RAB, Inc\Discovery\984.0280P.ROG1.wpd

App. 10

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

TIMOTHY WHITE,                        §
                                      §
        PLAINTIFF,                    §
                                      §
V.                                    §          Case No.: W09-CA-232
                                      §
REGIONAL ADJUSTMENT BUREAU, INC.      §
                                      §
        DEFENDANT.                    §
                                      §

### DEFENDANT REGIONAL ADJUSTMENT BUREAU, INC.'S
### FIRST REQUESTS FOR ADMISSIONS TO
### PLAINTIFF TIMOTHY WHITE

To:    Plaintiff, Timothy White, by and through his attorney of record, Dennis R. Kurz,
       Weisberg & Meyers, L.L.C., 9330 LBJ Freeway, Ste. 900, Dallas, Texas 75243.

       Pursuant to FRCP 36, FEDERAL RULES OF CIVIL PROCEDURE, Defendant Regional

Adjustment Bureau, Inc., serves the following First Request for Admissions to Plaintiff. The

following First Request for Admissions should be answered separately and under oath and served

on the undersigned attorney no later than thirty (30) days from the date of service hereof, and should

be answered in compliance with Federal Rules of Civil Procedure.

# I.

## DEFINITIONS

As used in the attached discovery the following terms shall have the following meanings:

1.     The word "document" or "documents" shall mean the original of the information recorded in a tangible form including, but not limited to, information printed, typewritten, handwritten, photographed, filed, e-mailed, recorded by electronic means upon a tape or disk or any other means of recording and shall include (but not be limited to): letters; e-mails; memoranda; handwritten notes; agreements; deeds; contracts; promissory notes; books; pamphlets; brochures; newspapers; magazines; periodicals; catalogs; price lists; checks; canceled checks; invoices; sales receipts; charge receipts; personal receipts; bank records; tapes; computer printouts; data cards; programs or other input or output of data processing systems; photographs (positive print or negative); transcripts of interviews or testimony before any person, officer, or body whether sworn or unsworn; written statements or notes of interview or testimony; diaries; calendars; logs; expense records or other financial data; charts; graphs; maps; drawings or other representational depiction; telephone records; telegrams; telefax; phonograph records; magnetic tape, drum, or disk records; motion picture film; microfilm or microfiche. The term "document" or "documents" shall also mean every copy of a document where such copy is not an identical duplicate of the original, and shall include all postscripts, notations, addendums, changes, notations, modifications, alterations or revisions of each document or documents.

2.     The term "correspondence", as used herein, shall include, but shall not be limited to, any letter, e-mail, telegram, telex, telefax, TWX, notice, message, memorandum or other written communication or transcription or notes of a communication.

3.     The term "communication", as used herein, shall mean any written, oral or other transmission of fact, information, ideas or opinion, including, but not limited to, any utterance, notation, questions, command, interjection, expression, gesture, suggestive conduct or statement of any nature whatsoever, any conversation (whether by telephone or otherwise), and any meetings and also including, but not limited to, correspondence, e-mails, financial records, corporate records, reports and documents as defined immediately above.

4.     The term "regarding", as used herein, shall mean, in an indirect manner, contain, record, discuss, mention, note, evidence, memorialize, analyze, describe, comment upon, refer to, have any connection with or have any tendency to prove or disprove the matter set forth.

5.     The term "relate(s) to" or "relating to", as used herein shall mean, in an indirect manner, contain, record, discuss, mention, note, evidence, memorialize, analyze, describe, comment upon, refer to, have any connection with or have any tendency to prove or disprove the matters set forth.

**DEFENDANT'S FIRST REQUESTS FOR ADMISSIONS TO PLAINTIFF - Page 2**
M:\9840000 CHUBB FILES\9840280 Timothy White v. Regional Adjustment Bureau, Inc. dba RAB,
Inc\Discovery\984.0280P.RFA1.wpd

App. 12

6.      The word "and," and the word "or", as used herein, shall, where the context permits, shall be construed to mean "and/or."

7.      The term "date", as used herein, shall mean the exact day, month and year if ascertainable, or, if not, the best approximation (including relationship to other events).

8.      The word "person" or "persons" shall include any natural person or any other entity, including but not limited to, firms, corporations, associations, partnerships, joint ventures and trusts, governments, governmental agencies or bodies, or other form of legal or business entity.

9.      The term "Plaintiff" or "you", as used herein, shall mean and refer to **Plaintiff Timothy White**, and shall include any and all of Plaintiff's attorneys, officers, directors, employees and authorized agents and representatives.

10.     The term "Defendant", as used herein, shall mean and refer to **Defendant Regional Adjustment Bureau, Inc.,** and shall include any and all of its attorneys, officers, directors, employees and authorized agents and representatives.

11.     The term "Petition," as used herein, shall mean the Plaintiff's Original Petition, and any amendments thereto, filed in this action by Plaintiff.

12.     Wherever appropriate, the singular form of a word shall be interpreted as including the plural, and the masculine form of a word shall be interpreted as including the feminine.

13.     The term "Account" means the debt which Plaintiff alleges that Defendant attempted to collect and to which Plaintiff refers in Plaintiff's Original Petition and any amendments thereto, filed in this action by Plaintiff.

14.     The term "debt" as used herein, shall mean the debt which Plaintiff alleges that Defendant attempted to collect and to which Plaintiff refers in Plaintiff's Original Petition and any amendments thereto, filed in this action by Plaintiff.

App. 13

## II.
## FIRST REQUEST FOR ADMISSIONS

**REQUEST FOR ADMISSION NO. 1:** Admit that you have no documented evidence of damages related to stress and/or mental anguish due to Defendant Regional Adjustment Bureau, Inc.'s collection efforts.

**RESPONSE:**


**REQUEST FOR ADMISSION NO. 2:** Admit that you have no evidence of damages related to stress and/or mental anguish due to Defendant Regional Adjustment Bureau, Inc.'s collection efforts.

**RESPONSE:**


**REQUEST FOR ADMISSION NO. 3:** Admit that you have not sought medical or psychiatric care or treatment as a result of symptoms of the stress and/or mental anguish.

**RESPONSE:**


**REQUEST FOR ADMISSION NO. 4:** Admit you have no evidence that any agent, representative, and/or employee of Defendant Regional Adjustment Bureau, Inc. harassed Plaintiff.

**RESPONSE:**


**REQUEST FOR ADMISSION NO. 5:** Admit you have no documented evidence that any agent, representative, and/or employee of Defendant Regional Adjustment Bureau, Inc. annoyed Plaintiff.

**RESPONSE:**


**REQUEST FOR ADMISSION NO. 6:** Admit you have no documented evidence that any agent, representative, and/or employee of Defendant Regional Adjustment Bureau, Inc. abused Plaintiff.

**RESPONSE:**


**REQUEST FOR ADMISSION NO. 7:** Admit you have no evidence that any agent, representative, and/or employee of Defendant Regional Adjustment Bureau, Inc. abused Plaintiff.

App. 14

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 8:** Admit you have suffered no actual damage as the result of any act or omission committed by Defendant Regional Adjustment Bureau, Inc.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 9:** Admit you have no documented evidence that you suffered actual damage as the result of any act or omission committed by DefendantRegional Adjustment Bureau, Inc.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 10:** Admit you have no evidence that any agent, representative, and/or employee of Defendant violated the Fair Debt Collection Practices Act, as alleged in Plaintiff's Original Petition.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 11:** Admit you have no documented evidence that any agent, representative, and/or employee of Defendant violated the  Fair Debt Collection Practices Act, as alleged in Plaintiff's Original Petition.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 12:** Admit you never disputed the debt to Regional Adjustment Bureau, Inc. in writing.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 13:** Admit you did not request in writing that Regional Adjustment Bureau, Inc. validate the debt.

**RESPONSE:**

**DEFENDANT'S FIRST REQUESTS FOR ADMISSIONS TO PLAINTIFF - Page 5**
M:\9840000 CHUBB FILES\9840280 Timothy White v. Regional Adjustment Bureau, Inc. dba RAB,
Inc\Discovery\984.0280P.RFA1.wpd

App. 15

**REQUEST FOR ADMISSION NO. 14:** Admit that you owe the debt.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 15:** Admit that you did not dispute the debt in writing within the prescribed 30 day period.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 16:** Admit that you did not send any written communications to Regional Adjustment Bureau, Inc. prior to filing this lawsuit.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 17:** Admit that you are suing Regional Adjustment Bureau, Inc. for the purpose of harassing Regional Adjustment Bureau, Inc.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 18:** Admit you have no evidence that any agent, representative, and/or employee of Defendant violated § 1692c(a)(3) of the FDCPA, by communicating at the consumer's place of employment if the debt collector knows or has reason to know that the consumer's employer prohibits the consumer from receiving such communication, as alleged in Plaintiff's Original Petition.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 19:** Admit you have no evidence that any agent, representative, and/or employee of Defendant violated § 1692d(6) of the FDCPA, by placing calls to the Plaintiff without disclosing the identity of the debt collection agency, as alleged in Plaintiff's Original Petition.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 20:** Admit you have no evidence that any agent, representative, and/or employee of Defendant violated § 1692e(11) of the FDCPA, by failing to

notify Plaintiff that the communication was from a debt collector, as alleged in Plaintiff's Original Petition.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 21:** Admit you have no evidence that any agent, representative, and/or employee of Defendant violated TEX. FIN. CODE § 392.304(a)(4), by failing to disclose clearing in communication with Plaintiff the name of the person to whom the debt has been assigned or is owed when making a demand for money, as alleged in Plaintiff's Original Petition.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 22:** Admit you have no evidence that any agent, representative, and/or employee of Defendant TEX. FIN. CODE § 392.304(a)(5)(B), by failing to disclose that the communication is from a debt collector where such communication was an oral communication between Defendant and Plaintiff subsequent to the initial communication, as alleged in Plaintiff's Original Petition.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 23:** Admit you have no evidence that any agent, representative, and/or employee of Defendant TEX. FIN. CODE § 392.304(a)(19), by using false representation or deceptive means to collect a debt or obtain information concerning a consumer, as alleged in Plaintiff's Original Petition.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 24:** Admit that you provided telephone numbers to your creditor to contact you.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 25:** Admit that you consent to telephone calls from your creditors.

**RESPONSE:**

App. 17

**REQUEST FOR ADMISSION NO. 26:** Admit that you did not record telephone conversations between yourself and Defendant Regional Adjustment Bureau, Inc.'s debt collector employees.

**RESPONSE:**


**REQUEST FOR ADMISSION NO. 27:** Admit you did not send in writing a cease and desist letter to Regional Adjustment Bureau, Inc.

**RESPONSE:**


**REQUEST FOR ADMISSION NO. 28:** Admit you have no evidence that any agent, representative, and/or employee of Defendant violated the Telephone Consumer Protection Act, as alleged in Plaintiff's Original Petition.

**RESPONSE:**


**REQUEST FOR ADMISSION NO. 29:** Admit that the only telephone you have is a cellular phone.

**RESPONSE:**


**REQUEST FOR ADMISSION NO. 30:** Admit that you did not provide Defendant with an alternative phone number to be contacted on.

**RESPONSE:**

App. 18

Respectfully submitted,

**ROBBIE MALONE, PLLC**

_____
Robbie Malone
State Bar No. 12876450
E-mail: rmalone@rmalonelaw.com
JACOB C. BOSWELL
State Bar No. 24061269
E-mail:jboswell@rmalonelaw.com
Northpark Central, Suite 1850
8750 N. Central Expressway
Dallas, Texas 75231
(214) 346-2630
(214) 346-2631 (Fax)

**COUNSEL FOR DEFENDANT**
_Regional Adjustment Bureau, Inc._

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing document has been forwarded via certified mail, return receipt requested on this 6th day of October, 2011 to:

Dennis R. Kurz
Weisberg & Meyers, L.L.C.
9330 LBJ Freeway, Ste. 900
Dallas, Texas 75243
_**Counsel for Plaintiff**_

_____
ROBBIE MALONE/JACOB C. BOSWELL

**DEFENDANT'S FIRST REQUESTS FOR ADMISSIONS TO PLAINTIFF** - Page 9
M:\9840000 CHUBB FILES\9840280 Timothy White v. Regional Adjustment Bureau, Inc. dba RAB,
Inc\Discovery\984.0280P.RFA1.wpd

App. 19

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| TIMOTHY WHITE, | § | |
| | § | |
| PLAINTIFF, | § | |
| | § | |
| V. | § | Case No.: W09-CA-232 |
| | § | |
| REGIONAL ADJUSTMENT BUREAU, INC. | § | |
| | § | |
| DEFENDANT. | § | |
| | § | |

### DEFENDANT REGIONAL ADJUSTMENT BUREAU, INC.'S
### FIRST REQUESTS FOR PRODUCTION TO
### PLAINTIFF TIMOTHY WHITE

To:   Plaintiff, Timothy White, by and through his attorney of record, Dennis R. Kurz,
      Weisberg & Meyers, L.L.C., 9330 LBJ Freeway, Ste. 900, Dallas, Texas 75243.

Pursuant to FRCP 34, FEDERAL RULES OF CIVIL PROCEDURE, Defendant Regional

Adjustment Bureau, Inc., requests that Plaintiff Timothy White, produces the following documents

requested herein within thirty (30) days after of receipt of this request. at the law office of Robbie

Malone, PLLC located at 8750 North Central Expressway, Dallas, Texas 75231.

**DEFENDANT'S FIRST REQUESTS FOR PRODUCTION TO PLAINTIFF** - Page 1
M:\9840000 CHUBB FILES\9840280 Timothy White v. Regional Adjustment Bureau, Inc. dba RAB,
Inc\Discovery\984.0280P.RFP1.wpd

App. 20

# I.

## DEFINITIONS

As used in the attached discovery the following terms shall have the following meanings:

1.      The word "document" or "documents" shall mean the original of the information recorded in a tangible form including, but not limited to, information printed, typewritten, handwritten, photographed, filed, e-mailed, recorded by electronic means upon a tape or disk or any other means of recording and shall include (but not be limited to): letters; e-mails; memoranda; handwritten notes; agreements; deeds; contracts; promissory notes; books; pamphlets; brochures; newspapers; magazines; periodicals; catalogs; price lists; checks; canceled checks; invoices; sales receipts; charge receipts; personal receipts; bank records; tapes; computer printouts; data cards; programs or other input or output of data processing systems; photographs (positive print or negative); transcripts of interviews or testimony before any person, officer, or body whether sworn or unsworn; written statements or notes of interview or testimony; diaries; calendars; logs; expense records or other financial data; charts; graphs; maps; drawings or other representational depiction; telephone records; telegrams; telefax; phonograph records; magnetic tape, drum, or disk records; motion picture film; microfilm or microfiche.  The term "document" or "documents" shall also mean every copy of a document where such copy is not an identical duplicate of the original, and shall include all postscripts, notations, addendums, changes, notations, modifications, alterations or revisions of each document or documents.

2.      The term "correspondence", as used herein, shall include, but shall not be limited to, any letter, e-mail, telegram, telex, telefax, TWX, notice, message, memorandum or other written communication or transcription or notes of a communication.

3.      The term "communication", as used herein, shall mean any written, oral or other transmission of fact, information, ideas or opinion, including, but not limited to, any utterance, notation, questions, command, interjection, expression, gesture, suggestive conduct or statement of any nature whatsoever, any conversation (whether by telephone or otherwise), and any meetings and also including, but not limited to, correspondence, e-mails, financial records, corporate records, reports and documents as defined immediately above.

4.      The term "regarding", as used herein, shall mean, in an indirect manner, contain, record, discuss, mention, note, evidence, memorialize, analyze, describe, comment upon, refer to, have any connection with or have any tendency to prove or disprove the matter set forth.

5.      The term "relate(s) to" or "relating to", as used herein shall mean, in an indirect manner, contain, record, discuss, mention, note, evidence, memorialize, analyze, describe, comment

upon, refer to, have any connection with or have any tendency to prove or disprove the matters set forth.

6.    The word "and," and the word "or", as used herein, shall, where the context permits, shall be construed to mean "and/or."

7.    The term "date", as used herein, shall mean the exact day, month and year if ascertainable, or, if not, the best approximation (including relationship to other events).

8.    The word "person" or "persons" shall include any natural person or any other entity, including but not limited to, firms, corporations, associations, partnerships, joint ventures and trusts, governments, governmental agencies or bodies, or other form of legal or business entity.

9.    The term "Plaintiffs" or "you", as used herein, shall mean and refer to **Plaintiff Timothy White**, and shall include any and all of Plaintiff's attorneys, officers, directors, employees and authorized agents and representatives.

10.    The term "Defendant", as used herein, shall mean and refer to **Defendant Regional Adjustment Bureau, Inc.** and shall include any and all of its attorneys, officers, directors, employees and authorized agents and representatives.

11.    The term "Petition," as used herein, shall mean the Plaintiff's Original Petition, and any amendments thereto, filed in this action by Plaintiff.

12.    Wherever appropriate, the singular form of a word shall be interpreted as including the plural, and the masculine form of a word shall be interpreted as including the feminine.

13.    The term "Account" means the debt which Plaintiff alleges that Defendant attempted to collect and to which Plaintiff refers in Plaintiff's Original Petition and any amendments thereto, filed in this action by Plaintiff.

14.    The term "debt" as used herein, shall mean the debt which Plaintiff alleges that Defendant attempted to collect and to which Plaintiff refers in Plaintiff's Original Petition and any amendments thereto, filed in this action by Plaintiff.

## II.

## FIRST REQUEST FOR PRODUCTION

**REQUEST FOR PRODUCTION NO. 1:** Produce copies of all form letters, envelopes, and other documents received by Plaintiff from Defendant Regional Adjustment Bureau, Inc. to allegedly attempt to collect the debt.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 2:** Produce on CD, copies of any and all audiotapes or electronic recordings of telephone conversations or recorded telephone messages, regarding the alleged debt collection referenced in Plaintiff's Original Petition.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 3:** Produce copies of any and all notes, calendars or other documents used to document or verify Defendant's contact with Plaintiff.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 4:** Produce copies of any and all documents supporting Plaintiff's claim for damages; by "damages" Defendant means the term to include only the element of damages for which Plaintiff has the burden of proof at trial, and does not intend that Plaintiff produce evidence of violations or causation in response to this request.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 5:** Produce copies of any letters or correspondence providing written notice from Plaintiff to Defendant Regional Adjustment Bureau, Inc. disputing the alleged debt and demanding verification and validation of the debt.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 6:** Produce copies of any letters or correspondence providing written notice from Plaintiff to Defendant Regional Adjustment Bureau, Inc., requesting

**DEFENDANT'S FIRST REQUESTS FOR PRODUCTION TO PLAINTIFF - Page 4**
M:\9840000 CHUBB FILES\9840280 Timothy White v. Regional Adjustment Bureau, Inc. dba RAB, Inc\Discovery\984.0280P.RFP1.wpd

App. 23

that Defendant cease telephone calls to Plaintiff.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 7:** Produce copies of any documents in your possession which you contend support your allegation that Defendant violated § 1692c(a)(3) of the FDCPA, by communicating at the consumer's place of employment if the debt collector knows or has reason to know that the consumer's employer prohibits the consumer from receiving such communication, as alleged in Plaintiff's Original Petition.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 8:** Produce copies of any documents in your possession which you contend support your allegation that Defendant violated § 1692d(6) of the FDCPA, by placing calls to the Plaintiff without disclosing the identity of the debt collection agency, as alleged in Plaintiff's Original Petition.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 9:** Produce copies of any documents in your possession which you contend support your allegation that Defendant violated § 1692e(11) of the FDCPA, by failing to notify Plaintiff that the communication was from a debt collector, as alleged in Plaintiff's Original Petition.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 10:** Produce copies of any documents in your possession which you contend support your allegation that Defendant violated § TEX. FIN. CODE § 392.304(a)(4) , by failing to disclose clearly in communication with Plaintiff the name of the person to whom the debt has been assigned or is owed when making a demand for money, as alleged in Plaintiff's Original Petition.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 11:** Produce copies of any documents in your possession which you contend support your allegation that Defendant violated TEX. FIN. CODE § 392.304(a)(5)(B), by failing to disclose that the communication is from a debt collector where such

communication was an oral communication between Defendant and Plaintiff subsequent to the initial communication, as alleged in Plaintiff's Original Petition.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 12:**  Produce copies of any documents in your possession which you contend support your allegation that Defendant violated TEX. FIN. CODE § 392.304(a)(19) by using false representation or deceptive means to collect a debt or obtain information concerning a consumer, as alleged in Plaintiff's Original Petition.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 13:**  Produce copies of any documents in your possession which you contend support your allegation that Defendant violated the Telephone Consumer Protection Act, as alleged in Plaintiff's Original Petition.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 14:**  Produce copies of any documents in your possession which you contend support your allegation that Defendant violated the Fair Debt Collection Practices Act, as alleged in Plaintiff's Original Petition.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 15:** Produce copies of any documents in your possession which you contend support your allegation that Defendant Regional Adjustment Bureau, Inc., utilized harassing and abusive tactics, as alleged in Plaintiff's Original Petition.

**RESPONSE**:

**REQUEST FOR PRODUCTION NO. 16:**  Please produce all documents reviewed or relied upon by you in preparation of your responses to discovery requests propounded upon you in this case by the Defendant.

**RESPONSE:**

**DEFENDANT'S FIRST REQUESTS FOR PRODUCTION TO PLAINTIFF - Page 6**
M:\9840000 CHUBB FILES\9840280 Timothy White v. Regional Adjustment Bureau, Inc. dba RAB,
Inc\Discovery\984.0280P.RFP1.wpd

App. 25

**REQUEST FOR PRODUCTION NO.17:** Produce all documents reflecting attorneys fees, costs, fee agreements, engagement letters, billing records and/or invoices, from the attorneys representing you in this case, for which you are seeking compensation.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 18:** Produce all curriculum vitae and reports of all persons you have retained as consulting experts and whose mental impressions or opinions have been reviewed by any of your testifying experts.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 19:** Produce all documents evidencing or relating to opinions, factual observations, and/or investigations by persons whom you have retained as consulting experts and whose mental impressions or opinions have been reviewed by any of your testifying experts.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 20:** Produce all documents, letters, files, invoices, and/or correspondence, which relate in any manner whatsoever, to the debt referenced in Plaintiff's Original Petition.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 21:** Produce all documents, letters, files, invoices, medical records, psychiatric records, or reports which support your allegation that you have suffered damages; by "damages" Defendant means the term to include only the element of damages for which Plaintiff has the burden of proof at trial, and does not intend that Plaintiff produce evidence of violations or causation in response to this request.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 22:** Produce copies of any documents in your possession which you contend support your allegation that "Regional Adjustment Bureau, Inc.'s" actions caused the Plaintiff to suffer damages", as alleged in Plaintiff's Original Petition.

**DEFENDANT'S FIRST REQUESTS FOR PRODUCTION TO PLAINTIFF - Page 7**
M:\9840000 CHUBB FILES\9840280 Timothy White v. Regional Adjustment Bureau, Inc. dba RAB,
Inc\Discovery\984.0280P.RFP1.wpd

App. 26

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 23:** Produce copies of any documents in your possession which you contend will support your claim that you are entitled to exemplary damages against Defendant Regional Adjustment Bureau, Inc.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 24:** Produce all documents reflecting attorneys fees, costs, fee agreements, engagement letters, billing records and/or invoices, from the attorneys representing you.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 25:** Produce copies of all documents in your possession from all present and former doctors seen within the last five (5) years.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 26:** Produce copies of any documents, medical or psychiatric records in your possession, which support your allegation that you have suffered injury, including stress and/or mental anguish.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 27:**
Produce copies of all cellular phone bills for the cellular number at which you allege Defendant contacted you.

**RESPONSE:**


**DEFENDANT'S FIRST REQUESTS FOR PRODUCTION TO PLAINTIFF - Page 8**
M:\9840000 CHUBB FILES\9840280 Timothy White v. Regional Adjustment Bureau, Inc. dba RAB,
Inc\Discovery\984.0280P.RFP1.wpd

App. 27

Respectfully submitted,

**ROBBIE MALONE, PLLC**

*[signature]*
_____
Robbie Malone
State Bar No. 12876450
E-mail: rmalone@rmalonelaw.com
JACOB C. BOSWELL
State Bar No. 24061269
E-mail:jboswell@rmalonelaw.com
Northpark Central, Suite 1850
8750 N. Central Expressway
Dallas, Texas 75231
(214) 346-2630
(214) 346-2631 (Fax)

**COUNSEL FOR DEFENDANT**
*Regional Adjustment Bureau, Inc.*

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing document has been forwarded via certified mail, return receipt requested on this 6th day of October, 2011 to:

Dennis R. Kurz
Weisberg & Meyers, L.L.C.
9330 LBJ Freeway, Ste. 900
Dallas, Texas 75243
*Counsel for Plaintiff*

*[signature]*
_____
ROBBIE MALONE/JACOB C. BOSWELL

**DEFENDANT'S FIRST REQUESTS FOR PRODUCTION TO PLAINTIFF - Page 9**
M:\9840000 CHUBB FILES\9840280 Timothy White v. Regional Adjustment Bureau, Inc. dba RAB, Inc\Discovery\984.0280P.RFP1.wpd

App. 28

**Noah Radbil**

| | |
|---|---|
| **From:** | RJ Lamb |
| **Sent:** | Monday, November 07, 2011 3:18 PM |
| **To:** | 'rmalone@rmalonelaw.com' |
| **Cc:** | Dennis Kurz; Tremain Davis |
| **Subject:** | White v. Regional Adjustment - Discovery Responses |
| **Attachments:** | Plaintiff's Response to Defendant's Interrogatories.pdf; Plaintiff's Response to Defendant's Request for Admissions.pdf; Plaintiff's Response to Defendant's Request for Production.pdf; Bates# 000001.WMA; Bates#000002.WMA; Bates#000003.WMA |

Mrs. Malone,

Attached please find our responses to your discovery requests for the above-mentioned case. We have also mailed this to your office, along with a CD of our audiotapes.


Thanks,

**R.J. Lamb**
**Weisberg & Meyers**
888 595 9111 ext 116
866 565 1327 facsimile
WMLaw.AttorneysForConsumers.com

*Licensed in Arizona

General Disclaimer: The information contained in this electronic communication is to be considered confidential and intended only for the use of the recipient named above. The information is or may be legally privileged and expresses the opinion of the writer only. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please re-send this communication to the sender listed above, delete the original message and any copy of it from your computer system.


Statement Required by U.S. Treasury Department:

The U.S. Treasury Department requires us to advise you that this written advice is not intended or written by our firm to be used, and cannot be used by any taxpayer, for the purpose of avoiding any penalties that may be imposed under the Internal Revenue Code. Written advice from our firm relating to Federal tax matters may not, without our express written consent, be used in promoting, marketing or recommending any entity, investment plan or arrangement to any taxpayer, other than the recipient of the written advice.

App. 29

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

| | | |
|---|---|---|
| TIMOTHY WHITE, | § | |
| Plaintiff | § | |
| | § | CIVIL ACTION NO. 3:11-cv-01817-B |
| vs. | § | |
| | § | |
| REGIONAL ADJUSTMENT | § | |
| BUREAU, INC. D/B/A RAB, INC., | § | |
| Defendant | § | |

## PLAINTIFF TIMOTHY WHITE'S RESPONSES TO DEFENDANT'S
## FIRST SET OF INTERROGATORIES

TO:  Defendant, Regional Adjustment Bureau, by and through its attorney of record, Robbie Malone, Beene & Malone, PLLC, 8750 N. Central Expwy., Ste. 1850, Dallas, Texas 75231.

Plaintiff, Timothy White serves these answers to Defendant, Regional Adjustment Bureau, Inc.'s First Set of Interrogatories made under Federal Rules
of Civil Procedure 197.

Respectfully submitted,
Weisberg & Meyers, LLC
5025 N. Central Avenue, No. 602
Phoenix, AZ 85012

By:    *Dennis R. Kurz*
   Dennis R. Kurz
   State Bar No. 24068183
   Attorney for Plaintiff

App. 30

## CERTIFICATE OF SERVICE

I certify that on November 7, 2011 a copy of the foregoing was served on Defendant Regional Adjustment Bureau, Inc. through counsel of record Robbie Malone via electronic mail to: rmalone@rmalonelaw.com and via U.S. Mail on this 7th day of November, 2011:


Robbie Malone, Esq.
Malone & Beene PLLC
8750 N. Central Expwy., Ste 1850
Dallas, TX 75231


By:   *Dennis R. Kurz*
Dennis R. Kurz

## PLAINTIFF'S RESPONSE TO DEFENDANT'S FIRST SET OF INTERROGATORIES

**INTERROGATORY NO. 1:**  State the full name, date of birth, driver's license number and current residence of the person or persons answering these interrogatories

**ANSWER:**

> Plaintiff, Timothy White, DOB 5/10/1967, TX DL # 12371648, Kilarney Dr., Dallas TX 75218.

> Plaintiff Attorneys, Weisberg & Meyers, LLC, 5025 N. Central Avenue, No. 602, Phoenix, AZ 85012.  Plaintiff objects to the remainder of this interrogatory because it is not relevant and not reasonably likely to lead to admissible evidence.

**INTERROGATORY NO. 2:** Identity your employment history including name of employer, address and phone number, for the last ten (10) years.

**ANSWER:**  Objection, irrelevant and unduly burdensome.  Notwithstanding this objection, Plaintiff submits employment information during the relevant times of this cause of action (February to April 2011):

> Texas A&M University-Commerce
> Department of Psychology and Special Education
> 2600 South Neal Street
> Commerce, TX 75429
> 903-886-5594

**INTERROGATORY NO. 3:**  Identify your cellular phone carrier; include the business address, telephone number and account number.

**ANSWER**:

> AT&T Wireless
> P.O. Box 650553
> Dallas, TX 75265
> Phone Number: 281-435-1163
> Account Number:████0462

**INTERROGATORY NO.4:** Identify specifically any and all documents, photographs, audiotapes, records or reports in your custody or under your control which support your claims that Defendant violated § 1692c(a)(3) of the FDCPA, by communicating at the consumer's place of employment if the debt collector knows or has reason to know that the consumer's employer prohibits the consumer from receiving such communication, as alleged in Plaintiffs Original Petition.

burdensome in that this requests seeks a description of each and ever act within the course of conduct spanning a significant period of time without providing any temporal limitation. Subject to and without the foregoing limitations, Plaintiff further objects on the grounds that this request is overly broad and unduly burdensome in that it seeks to force Plaintiff to marshal his entire body of evidence before trial. See all records previously produced by Plaintiff, as well as all of Defendant's records. Plaintiff hereby expressly reserves the right to supplement this response throughout the continuing course of discovery.

**INTERROGATORY NO.18:** Identify all documents which you have been requested to produce in any request for production, propounded upon you in this case, which are no longer in your possession, custody, or control.

**ANSWER:** Plaintiff is working on, but has not yet, received the documents requested. Once received Plaintiff will answer this interrogatory.

**INTERROGATORY NO. 19:** If you have been a party to a lawsuit ("lawsuit" includes a small claim, civil, criminal, divorce, child custody or other action filed in any municipal, state or federal court) in the past 10 years, state the style, cause or case number, and court in which the lawsuit was filed, a brief description of the lawsuit, and whether you were a Plaintiff or Defendant.

**ANSWER**: No criminal history.

**INTERROGATORY NO.20**: Please state your entire criminal history, including but not limited to all arrests, convictions, indictments, deferred adjudications, probations and prison time. If Plaintiff has no criminal history, please state as such.

**ANSWER:** No criminal history.

**INTERROGATORY NO.21:** Identify specifically any and all documents, photographs, audiotapes, records or reports in your custody or under your control which support your claim that you have suffered damages.

**ANSWER**: None. Plaintiff hereby expressly reserves the right to supplement this response throughout the continuing course of discovery.

**INTERROGATORY NO.22:** Identify by name address and telephone number any and all doctors, psychiatrists, psychologists, psychotherapists, and/or medical providers who have treated you for the symptoms of stress and/or mental anguish alleged in Plaintiff's Original Petition.

**ANSWER**:

Arthritis Care and Research Center.

9900 N. Central Expressway Suite 550
Dallas, TX 75231

**INTERROGATORY NO.23:** If you likely will require medical and/or psychiatric treatment in the future with respect to the symptoms of stress and/or mental anguish alleged in Plaintiff's Original Petition, state the name and address of each person who has advised you that you will likely require medical and/or psychiatric treatment in the future, the treatment you will likely receive, the date such treatment will likely be received, and the cost of such future medical and/or psychiatric treatment.

**ANSWER:**   None.   Plaintiff hereby expressly reserves the right to supplement this response throughout the continuing course of discovery.

**INTERROGATORY NO. 24:** Identify specifically any and all present and former doctors for Plaintiff within the last five (5) years.

**ANSWER**:   Plaintiff objects to this Interrogatory on the grounds that it is not relevant, unduly burdensome, and seeks confidential information.



**JRA**
Certified Court Reporters

January 4, 2012

LONE STAR OVERNIGHT

Mr. Noah D. Radbil
WEISBERG & MEYERS
1200 Smith Street
Sixteenth Floor
Houston, Texas  77002

     RE:  Timothy White vs. Regional Adjustment Bureau, Inc. d/b/a RAB, Inc.
      Case No. 3:11-CV-01817-B

Dear Mr. Radbil:

   Enclosed please find the original of the deposition transcript of Timothy White taken in regard to the above-referenced cause on December 15, 2011.

   I am submitting the original transcript to you so that you may obtain the notarized signature of the witness.  If there should be any changes, please have the witness make those on the corrigendum page that is located at the back of the transcript.

   Please return the executed transcript to my office within thirty (30) days so I may then notify counsel of any changes or corrections and forward same to the appropriate counsel for safekeeping.

   We have enjoyed working with you on this matter.  If we can be of further assistance, please do not hesitate to contact us.

      Sincerely,

      Diana D. Thrash /CT

      Diana D. Thrash, CSR

Enclosures

cc: LONE STAR OVERNIGHT
   Ms. Robbie Malone (w/encs.)

JANIS ROGERS
& ASSOCIATES
1545 WEST MOCKINGBIRD LANE
SUITE 1032
DALLAS, TX 75235
214/631-2655
FAX 214/631-2690
depos@jracsr.com

App. 35

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

TIMOTHY WHITE,                          )
                                        )
    Plaintiff,                        )
                                        )
VS.                                     )   CA NO. 3:11-CV-01817-B
                                        )
REGIONAL ADJUSTMENT BUREAU              )
INC. D/B/A RAB, INC.,                   )
                                        )
    Defendant.                        )

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL VIDEOTAPED DEPOSITION OF

TIMOTHY WHITE

DECEMBER 15, 2011

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

# ORIGINAL

ORIGINAL

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF TEXAS
2                    DALLAS DIVISION

3    TIMOTHY WHITE,              )
                                 )
4         Plaintiff,             )
                                 )
5    vs.                         )  CASE NO. 3:11-CV-01817-B
                                 )
6    REGIONAL ADJUSTMENT BUREAU, )
     INC. D/B/A RAB, INC.,       )
7                                )
          Defendant.             )
8

9

10       ***********************************************

11           ORAL VIDEOTAPED DEPOSITION OF

12                   TIMOTHY WHITE

13               DECEMBER 15, 2011

14       ***********************************************

15                  **ORIGINAL**

16       ORAL VIDEOTAPED DEPOSITION OF TIMOTHY WHITE,

17   produced as a witness at the instance of the Defendant,

18   and duly sworn, was taken in the above-styled and

19   numbered cause on the 15th day of December, 2011, from

20   8:50 a.m. to 11:32 a.m., before Diana D. Thrash, CSR in

21   and for the State of Texas, reported stenographically, at

22   the offices of Robbie Malone, 8750 North Central

23   Expressway, Suite 1850, Dallas, Texas 75231, pursuant to

24   the Federal Rules of Civil Procedure and the provisions

25   stated on the record or attached hereto.

TIMOTHY WHITE                    12/15/2011

```
 1                    A P P E A R A N C E S

 2      FOR THE PLAINTIFF:

 3            Mr. Noah D. Radbil
              WEISBERG & MEYERS
 4            1200 Smith Street
              Sixteenth Floor
 5            Houston, Texas  77002
              Phone:   (888) 595-1111
 6            E-mail:  noah.radbil@attorneysforconsumers.com

 7      FOR THE DEFENDANT:

 8            Ms. Robbie Malone
              ATTORNEY AT LAW
 9            8750 North Central Expressway
              Suite 1850
10            Dallas, Texas  75231
              Phone:   (214) 346-2625
11            Fax:     (214) 346-2631
              E-mail:  rmalone@rmalonelaw.com

12
        ALSO PRESENT:
13
              Mr. Xerxes Martin
14            Mr. Thad Strobach, Videographer

15

16

17

18

19

20

21

22

23

24

25
```

App. 40

1                              I N D E X

2    WITNESS                                          PAGE

3    TIMOTHY WHITE

4            Examination by Ms. Malone ........................4
             Examination by Mr. Radbil ......................132
5            Further Examination by Ms. Malone ..............139

6                          EXHIBITS INDEX

7    NUMBER                 DESCRIPTION            IDENTIFIED

8    1     Photocopy of cover of DSM-4 TR             130

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

TIMOTHY WHITE                          12/15/2011

```
 1              P R O C E E D I N G S
 2              THE VIDEOGRAPHER:  We are going on the
 3     record December the 15th, 2011, for the deposition of
 4     Timothy White.  The time is 8:50 a.m.
 5              If Counsel wants to state any agreements
 6     and appearances, now would be the time to do that.
 7              MR. RADBIL:  Noah Radbil for the plaintiff
 8     Tim White.
 9              Mr. White would like to read his
10     deposition transcript.
11              MS. MALONE:  Robbie Malone for the
12     defendant, and I think we made an agreement we didn't
13     have to do a formal reading of the notice or the style of
14     the case in this case; is that correct, Mr. Radbil?
15              MR. RADBIL:  Agreed.
16              MS. MALONE:  All right.
17                       TIMOTHY WHITE,
18     having been first duly sworn, testified as follows:
19                       EXAMINATION
20     BY MS. MALONE:
21        Q.    Mr. White, we met a moment before the
22     deposition, but let me just reintroduce myself.  My name
23     is Robbie Malone.  Do you understand that I represent
24     Regional Adjustment Bureau, who we may refer to as RAB in
25     this case?
```

TIMOTHY WHITE                    12/15/2011

| | | |
|---|---|---|
| 08:52 | 1 | Yes? |
| | 2 | A.    Yes. |
| | 3 | Q.    Have you ever had your deposition taken before, |
| | 4 | sir? |
| 08:52 | 5 | A.    No. |
| | 6 | Q.    Okay.  There are a couple of ground rules that |
| | 7 | are not big, but just want to go over them with you, and |
| | 8 | I'm sure your attorney may have told you this, but just |
| | 9 | so there's no question, let's be clear.  If you answer |
| 08:.. | 10 | out loud as opposed to a shake of the head or uh-huh or |
| | 11 | huh-uh, that's the way it gets on the record.  So if you |
| | 12 | give me an uh-huh or huh-uh or shake of the head, I may |
| | 13 | prompt you to give me a verbal yes or no, sir.  I'm not |
| | 14 | trying to be rude. |
| 08:53 | 15 | A.    Okay. |
| | 16 | Q.    It's really for the record.  Okay? |
| | 17 | A.    Okay. |
| | 18 | Q.    The other thing is that in normal conversation, |
| | 19 | we often know where someone's going with their question |
| 08:53 | 20 | and we'll start answering before they finish their |
| | 21 | question.  We can't do that on the record because -- |
| | 22 | she's good, but she can't take down two people talking at |
| | 23 | the same time.  Okay? |
| | 24 | A.    Yes. |
| 08:53 | 25 | Q.    If you will let me finish my long-winded West |

App. 43

TIMOTHY WHITE                          12/15/2011

08:53   1       Texas questions before you start your answer, I'd
        2       appreciate it, but by the same token, if for some reason
        3       I cut you off, let me know and I will try to give you the
        4       same courtesy.  Okay?
08:53   5           A.   Yes.
        6           Q.   Okay.  And last but not least, this is -- or
        7       two more things.  If you need a break for some reason,
        8       please let me know and we'll be happy to accommodate you,
        9       but I would ask that you do that before we have a
08:53  10       question on the table; is that fair?
       11           A.   Yes.
       12           Q.   And the other thing is that if you don't
       13       understand a question for some reason, please let me know
       14       and I will try to do my best to clarify it.  If you give
08:53  15       me an answer, I'm going to assume that you understood the
       16       question.  Do you understand?
       17           A.   Yes.
       18           Q.   Okay.  All right.  Did you review any
       19       particular documents for today, sir?
08:54  20           A.   No.
       21           Q.   All right.  Mr. White, are you on any
       22       medications this morning?
       23           A.   No.
       24           Q.   Do you take medications on a daily basis?
08:54  25           A.   No.

**TIMOTHY WHITE**                    **12/15/2011**

08:54  1        Q.      I noticed in your answers to discovery there

2    was a reference to an Arthritis Care Center.  Do you have

3    arthritis?

4        A.      No.

08:54  5        Q.      Okay.  Do you not receive treatment from them,

6    or did you receive treatment from them?

7        A.      I do receive treatment from them.

8        Q.      Okay.  So what kind of treatment are you

9    getting?

08:54 10        A.      I have ankylosing spondylitis.

11        Q.      Okay.  And that does not require regular

12    medication then?

13        A.      No, not necessarily.  Every case is different

14    but --

08:54 15        Q.      Okay.

16        A.      -- I prefer not to take medication.

17        Q.      That's fine.  So do you treat it with some sort

18    of physical therapy or something along those lines?

19        A.      Yes, exercise.

08:55 20        Q.      Okay.  How long have you had that particular

21    diagnosis?

22        A.      Since 1998.

23        Q.      And is it under control at this point?

24        A.      Not -- no, it's not.

08:55 25        Q.      Okay.  Is it -- is it painful for you?

TIMOTHY WHITE                    12/15/2011

08:55  1        A.    Yes.

       2        Q.    Is it -- on a rainy day like today, is it more

       3    painful than not?

       4        A.    No.

08:55  5        Q.    Okay.  Anything about that that would affect

       6    your ability to remember facts or to understand questions

       7    that are being made -- given to you?

       8        A.    No.

       9        Q.    How are you employed, sir?

08:55 10        A.    I have several jobs.

      11        Q.    Okay.  Tell me.

      12        A.    Should I start --

      13        Q.    Sure.

      14        A.    -- just one at a time?

08:55 15        Q.    Sure.

      16        A.    I have worked for Simple Surrogacy for three

      17    and a half years.

      18        Q.    Okay.  Wait.  Let me -- I think we may -- right

      19    now currently today, how are you employed?

08:55 20        A.    That's one.

      21        Q.    Okay.  All right.  Simple Surrogacy.  All

      22    right.  So you have multiple jobs today, right?

      23        A.    Yes.

      24        Q.    Okay.  All right.  Go ahead.  Simple Surrogacy.

08:56 25        A.    The next one just ended yesterday.  I taught

App. 46

08:56 1        for Texas A&M Commerce.

2            Q.    Uh-huh.

3            A.    But I'm not teaching in the spring.  I have

4        been teaching all year.

08:56 5            Q.    Uh-huh.  Any other jobs?

6            A.    Yes.  MHN Insurance part time.

7            Q.    Okay.  Any other jobs?

8            A.    No.

9            Q.    Okay.  What do you do for Simple Surrogacy?

08:56 10            A.    I interview potential surrogate mothers and

11        parents.

12            Q.    And you said you've done that job for about

13        three years?

14            A.    Three and a half.

08:56 15            Q.    Three and a half.  Okay.  Do you have a

16        particular title?

17            A.    Associate counselor.

18            Q.    Do you have a degree in psychology?

19            A.    Yes.

08:56 20            Q.    Okay.  What is your specific degree, sir?

21            A.    I have several.

22            Q.    Okay.

23            A.    Should I start with the...

24            Q.    Name them all for me.  That's the simplest way.

08:57 25            A.    BA psychology, MA counseling psychology, MS

TIMOTHY WHITE                    12/15/2011

08:57   1      research psychology, Ph.D. educational psychology.

        2           Q.    Okay.  Do you hold a psychology license with

        3      the State of Texas?

        4           A.    No, I have a license -- a counselor's

08:57   5      license --

        6           Q.    Okay.

        7           A.    -- for 10 years.

        8           Q.    All right.  And have you had any complaints

        9      filed on your license?

08:57  10           A.    No.

       11           Q.    That's under that new combined board that does

       12      social workers and LMFTs and all that kind of stuff,

       13      right?

       14           A.    Yes.

08:57  15           Q.    Okay.  Did you have a particular focus in your

       16      psychology practice?

       17           A.    Interviewing, evaluation and assessment.

       18           Q.    Okay.  I understand there's certain

       19      psychologists who specialize in inpatient as opposed to

08:58  20      outpatient.  Do you have a preference as to that?

       21           A.    Outpatient.

       22           Q.    Do you do functional -- high-functioning-type

       23      diagnoses as opposed to more complex, like disassociate

       24      IDT disorder, that kind of thing?

08:58  25           A.    Yes, the higher functioning.

TIMOTHY WHITE                    12/15/2011

08:58  1        Q.    Okay.  Have you had an active counseling

2    practice in the last 10 years?

3        A.    Yes.

4        Q.    How many patients roughly did you see in a

08:58  5    month?  Just average.

6        A.    It -- it varies a lot.

7        Q.    Okay.  Would you consider yourself to be a

8    full-time counselor?

9        A.    No.

08:58 10        Q.    Did you have any supervisory roles over others

11    seeking counseling license?

12        A.    No.

13        Q.    All right.  We'll come back to that in a

14    minute.

08:58 15              Let me ask you about your position at

16    Texas A&M in Commerce.  What were you teaching?

17        A.    Psychology.

18        Q.    Okay.  What level student?

19        A.    Undergraduate.

08:59 20        Q.    Was this a basic psychology class?

21        A.    No, abnormal psychology.

22        Q.    Okay.  Now, Mr. White, why are you no longer

23    going to be working at A&M Commerce?

24        A.    I graduated.

08:59 25        Q.    Okay.  So you finished -- you were teaching as

App. 49

TIMOTHY WHITE                          12/15/2011

08:59  1   part of a teaching assistant's position; is that --

2        A.    Yes.

3        Q.    That's what it was.  So did you complete your

4   Ph.D. when?  Now?

08:59  5        A.    I just completed it.

6        Q.    This week?

7        A.    Yes.

8        Q.    Well, congratulations, sir.

9        A.    Thank you.

08:59  10       Q.    So you've already done your dissertation and

11  all of your -- your required internships for the State?

12       A.    Yes.

13       Q.    Okay.  What was your dissertation in?

14       A.    It was topic in social cognition.

08:59  15       Q.    Okay.  And I'm assuming that if I were to look

16  for it, I could find it at Texas A&M University Commerce?

17       A.    Yes.

18       Q.    Okay.  Were you -- with your degree in

19  educational psychology, is there a particular direction

09:00  20  that you are looking to use that degree?  Is there --

21  what would you do with this -- with your particular type

22  of educational psychology degree?

23       A.    My -- I want to write and revise protocols for

24  the NIH.

09:00  25       Q.    Okay.  National Institution for Health; is that

TIMOTHY WHITE                         12/15/2011

09:00   1        right?

        2            A.    Yes.

        3            Q.    Okay.   Mr. White, I'm a little bit confused by

        4        one thing.   It's my understanding that the debt in

09:00   5        question has to do with a student loan or a series of

        6        student loans; is that correct?

        7            A.    Yes.

        8            Q.    Is there some reason you didn't seek a

        9        deferment while you were completing your Ph.D.?

09:00  10            A.    I did.

       11            Q.    Okay.   Did they ever -- did they turn you down?

       12            A.    Yes.

       13            Q.    Why?   Did they give you a reason why?

       14            A.    No.

09:00  15            Q.    Did you appeal that decision?

       16            A.    Yes.

       17            Q.    And I'm assuming you lost?

       18            A.    Yes.

       19            Q.    Did they give you a reason why?

09:01  20            A.    No.

       21            Q.    Did they give you any paperwork as to why you

       22        weren't --

       23            A.    No.

       24            Q.    Okay.   How much -- the student loans that were

09:01  25        involved here had to do with obtaining your degree in

09:01 1    psychology; is that correct?

2        A.    Yes.

3        Q.    Were they your master's level, what?

4        A.    That was my first master's -- my undergraduate

09:01 5    and my first master's.  I didn't borrow any money after

6    that --

7        Q.    Okay.

8        A.    -- for my last two degrees.

9        Q.    Okay.  So this was the -- what you used to get

09:01 10   your bachelor's degree and your MA in --

11       A.    Counseling psychology.

12       Q.    -- counseling.

13             Now, the -- the work that you did in that

14   area for your bachelor's and your MA in counseling, is

09:01 15   that what allowed you to obtain your counseling license

16   with the State of Texas?

17       A.    Yes.

18       Q.    And did you use the information that you

19   learned in those courses to help you in your business of

09:01 20   being a counselor?

21       A.    Yes.

22       Q.    Without that coursework and the classes that

23   you took, would you be qualified to sit for any sort of

24   counseling license?

09:02 25       A.    No.

**TIMOTHY WHITE**                    **12/15/2011**

09:02  1      Q.     Sometimes when students are working on their MA

2      or their MS, they are allowed to do an internship as part

3      of the school that satisfies the State licensing

4      requirements.  Did you do that as well?

09:02  5      A.     Yes.

6      Q.     So for part of the time, you were actually

7      working while you were getting funding from the school

8      loan program; is that correct?

9      A.     No.

09:02  10      Q.     No?  They didn't pay for you while you were

11      doing your internship?

12      A.     I can't say a hundred percent, but I think that

13      once my internship started, I didn't borrow money.

14      Q.     Okay.

09:02  15      A.     I -- I can't say --

16      Q.     Okay.  But it would be fair to say that you

17      couldn't qualify for that internship if you hadn't done

18      the original coursework for which you did borrow money,

19      correct?

09:03  20      A.     Yes.

21      Q.     In your answers to discovery, it indicates that

22      you are in the department -- or were in the department of

23      psychology and special education.  Did you work on the

24      special education side at all?

09:03  25      A.     No.

TIMOTHY WHITE                    12/15/2011

09:03  1        Q.    Okay.  Who was your dissertation mentor?

       2        A.    Gail Johnson.

       3        Q.    Was that also your Ph.D. advisor?

       4        A.    Yes.

09:03  5        Q.    Was it one and the same.

       6              Okay.  Most programs it is, but there are

       7        those rare that they split it, so I want to ask.

       8              All right.  Now, have you -- what do you

       9        do for MHN Insurance?

09:03 10        A.    It's telephonic review of mostly admissions

      11        for -- mental health admissions, approve or deny.

      12        Q.    Okay.  So you're the person that if I have a --

      13        want to do a preadmit, I call up on the phone and talk to

      14        you about what it is I'm trying to do to get preapproval

09:04 15        through my health insurance?

      16        A.    Right.  Precertification.

      17        Q.    Okay.  So -- and that precertification, in your

      18        particular field, because your background is psychology,

      19        you work with folks who are seeking mental health

09:04 20        commitments and/or sessions for outpatient; is that fair?

      21        A.    Yes.

      22        Q.    Okay.  When you were -- do you continue to

      23        operate your counseling practice?

      24        A.    Yes.

09:04 25        Q.    Okay.  So that's your fourth job then, I guess,

TIMOTHY WHITE                    12/15/2011

09:04    1    right?

2        A.    Well, Simple Surrogacy isn't actually my

3    employer.  I'm in private practice and they contract with

4    me.

09:04    5        Q.    Okay.  I did not understand that.  So your work

6    with Simple Surge -- Surrogacy is through a contract

7    relationship?

8        A.    Yes, but they're my only client so --

9        Q.    You're capture counsel.

09:05   10        A.    -- in a way I do work for them.  I don't have

11    any other clients currently.

12        Q.    That's fine.

13              Okay.  So then your patient load will

14    consist of doing evaluations for folks related to their

09:05   15    surrogacy.  You're not seeing them for any other kind of

16    mental health issue; is that fair?

17        A.    Yes.

18        Q.    Okay.  I -- I know that in psychology practice,

19    there are cert -- there are forensic rules about what you

09:05   20    can and can't do in terms of evaluations, but I'm not

21    familiar with the surrogacy issue.  So is it the same

22    rule -- that if you evaluate them, you cannot treat

23    them -- as it is in -- in forensic psychology?

24        A.    Yes.

09:05   25        Q.    Okay.  So you're not going to get any repeat

**TIMOTHY WHITE**                    **12/15/2011**

| | | |
|---|---|---|
| 09:05 | 1 | patients out of this program? |
| | 2 | A.    No. |
| | 3 | Q.    All right.  And you do not have an ongoing |
| | 4 | existing counseling basis where you're diagnosing or |
| 09:05 | 5 | providing working diagnosis under the DSM and continuing |
| | 6 | to treat them; is that fair? |
| | 7 | A.    Yes. |
| | 8 | Q.    When you did your internship programs, either |
| | 9 | in your master's level or your Ph.D level, did you |
| 09:06 | 10 | conduct counseling through the school programs? |
| | 11 | A.    No. |
| | 12 | Q.    Okay.  Did you do active counseling as part of |
| | 13 | your internship? |
| | 14 | A.    Yes. |
| 09:06 | 15 | Q.    Okay. |
| | 16 | A.    For my master's. |
| | 17 | Q.    For your master's? |
| | 18 | A.    Yes. |
| | 19 | Q.    And did you see patients as part of that? |
| 09:06 | 20 | A.    Yes. |
| | 21 | Q.    Was it ongoing patient relationships where you |
| | 22 | saw them more than once, you saw them -- |
| | 23 | A.    Yes. |
| | 24 | Q.    -- a number of times. |
| 09:06 | 25 | Okay.  Was there a particular type of |

TIMOTHY WHITE                    12/15/2011

| | | |
|---|---|---|
| 09:06 | 1 | diagnosis that you were seeing? |
| | 2 | A.    It varied. |
| | 3 | Q.    Okay. |
| | 4 | A.    No, I wouldn't say. |
| 09:06 | 5 | Q.    All right.  Were they outpatient or inpatient? |
| | 6 | A.    Outpatient. |
| | 7 | Q.    Okay.  Were they high functioning or low |
| | 8 | functioning? |
| | 9 | A.    Mixed. |
| 09:06 | 10 | Q.    Mixed.  Were you seeing folks mostly in the |
| | 11 | area of adjustment disorders, depression, PTSD, that kind |
| | 12 | of -- type of patient, or were you seeing schizophrenics? |
| | 13 | A.    If by higher functioning you mean not |
| | 14 | chronically mentally ill, then mostly high functioning. |
| 09:07 | 15 | Q.    Okay.  They could be chronically mentally ill. |
| | 16 | I meant people who, despite of their mental illness, are |
| | 17 | able to hold down a job and do their day-to-day |
| | 18 | activities. |
| | 19 | A.    Mixed. |
| 09:07 | 20 | Q.    Mixed.  Okay.  Did you ever treat anyone with a |
| | 21 | factitious disorder, sir? |
| | 22 | A.    No. |
| | 23 | Q.    Do you know what a factitious disorder is? |
| | 24 | A.    Yes. |
| 09:07 | 25 | Q.    Can you tell the jury what a factitious |

09:07  1    disorder is?

2         A.    The -- it's a somatoform disorder by which

3    someone believes they're sick but they're not.

4         Q.    Uh-huh.  To either gain monetary or some other

09:07  5    kind of emotional reward, correct?

6         A.    That would be malingering.

7         Q.    Well, there is a portion of factitious disorder

8    where someone adopts symptoms for attention seeking,

9    correct?

09:08 10         A.    Attention, yes.

11         Q.    Okay.  And malingering is when someone -- we

12    call it -- we used to call it psychosomatic, right, where

13    someone would pretend like or would think they had an

14    illness because it would get them some monetary benefit,

09:08 15    correct?

16         A.    I'm not sure.

17         Q.    You're not sure?

18         A.    (Moving head side to side.)

19         Q.    Okay.  All right.  Well, have you ever heard

09:08 20    the expression in the medical field greenback effect?

21         A.    No.

22         Q.    As part of your teaching related to malingering

23    and other types of disorders where folks will present

24    symptoms that may not be accurate for their actual

09:08 25    condition, were you ever taught that some folks will

09:08   1    pretend like they have certain types of mental anguish or

2    physical symptoms in order to obtain money as part of a

3    lawsuit?

4         A.    Yes.

09:08   5         Q.    Okay.  Let's back up a little bit and talk

6    about your educational background.  I know we've talked

7    about your degrees.  Can you tell me where you went to

8    high school, sir?

9         A.    Hargrave High School, Huffman, Texas.

09:09  10         Q.    Huffman, Texas.  Where's Huffman?

11         A.    It's about, oh, 30 miles northeast of Houston.

12         Q.    Okay.  Houston I know; Huffman not so much.

13               All right.  So where did you get your

14    undergraduate degree?

09:09  15         A.    UT Austin.

16         Q.    Okay.  And your first master's?

17         A.    Ball State University in Muncie, Indiana.

18         Q.    They have a great basketball team up there.

19         A.    (Moving head up and down.)

09:09  20         Q.    So your second master's?

21         A.    That was at Texas A&M Commerce.

22         Q.    And your Ph.D is from Texas A&M Commerce,

23    correct?

24         A.    Yes.

09:09  25         Q.    Were you part of the psychology matching

TIMOTHY WHITE                    12/15/2011

09:10   1   program at UT Austin?

2        A.    No.

3        Q.    Do you know Dr. Kiley?

4        A.    No.

09:10   5   Q.    Okay.  All right.  When did you complete your

6   undergraduate degree?

7        A.    1998.

8        Q.    Your master's degree at Ball State?

9        A.    2000.

09:10  10   Q.    Your master's degree at Texas A&M University

11   Commerce?

12       A.    2011.

13       Q.    And your Ph.D is 2011?

14       A.    Yes.

09:10  15   Q.    So you -- did you complete your master's in

16   research and your Ph.D at the same time, sir?

17       A.    I did.

18       Q.    Okay.

19       A.    I completed the master's as part of the Ph.D.

09:10  20   program.  I just didn't file something on -- on time or

21   it would have been 2010 --

22       Q.    Okay.

23       A.    -- that I graduated.

24       Q.    Okay.  So they allowed you to combine the two?

09:10  25   A.    (Moving head up and down.)

TIMOTHY WHITE                     12/15/2011

09:10    1          Q.    All right.  So --

         2          A.    I wasn't worried so much about that one.  I was

         3     focused on the Ph.D.

         4          Q.    Oh, sure.  I just -- I know that they have

09:10    5     joint programs.  I was just trying to understand what way

         6     you did.

         7                All right.  And both of those were

         8     completed last week?

         9          A.    Yes.  I'm sorry.  Do you mean the master's and

09:11   10     the Ph.D.?

        11          Q.    Yes.  Well --

        12          A.    The master's has a definite graduation date of

        13     May 2011, and then this week was the Ph.D.

        14          Q.    Okay.  Thank you, sir.

09:11   15                So you haven't actually walked across the

        16     stage for your Ph.D yet?

        17          A.    Saturday.

        18          Q.    Oh, great.

        19                All right.  Outside of doing work related

09:11   20     to completion of your various psychology degrees, have

        21     you ever had any other job?

        22          A.    I don't understand the question.

        23          Q.    Sure.  I understand you did various jobs while

        24     you were in college working towards your degree.  I just

09:11   25     want to know if you've had any other job or any other --

TIMOTHY WHITE                    12/15/2011

09:11  1         A.    Oh, definitely.

       2         Q.    Okay.  Is there a particular type of work that

       3    you've done besides psychology?

       4         A.    No.

09:12  5         Q.    Okay.  All right.  When the phone calls in this

       6    case were -- so your date of birth is May 10th, 1967; is

       7    that correct?

       8         A.    Yes.

       9         Q.    Are you a married man?

09:12 10         A.    No.

      11         Q.    Do you have a -- have you -- I'm sure you

      12    haven't, but have you ever been arrested for a crime?

      13         A.    No.

      14         Q.    Okay.  Have you ever filed any other lawsuits?

09:12 15         A.    No.

      16         Q.    There are some things that are lawsuits that

      17    people don't realize are, so let me ask you about them.

      18    Have you ever filed for a divorce?

      19         A.    No.

09:12 20         Q.    Bankruptcy?

      21         A.    No.

      22         Q.    Okay.  Have you ever filed a complaint with the

      23    Better Business Bureau about a company?

      24         A.    No.

09:13 25         Q.    Ever file a complaint with the Texas Attorney

TIMOTHY WHITE                    12/15/2011

| | | |
|---|---|---|
| 09:13 | 1 | General's Consumer Protection Division about a company? |
| | 2 | A.   No. |
| | 3 | Q.   Okay.  How about with any federal agency?  Have |
| | 4 | you ever complained to any federal agency regarding a |
| 09:13 | 5 | company? |
| | 6 | A.   No. |
| | 7 | Q.   I know you just completed your Ph.D.  Do you |
| | 8 | have plans to sit for the Ph.D psychology license? |
| | 9 | A.   Yes. |
| 09:13 | 10 | Q.   When's that test come around? |
| | 11 | A.   That's in spring and fall. |
| | 12 | Q.   Okay.  All right.  And it's my understanding |
| | 13 | that the particular debt here was from the Texas |
| | 14 | Guaranteed Student Loan Program; is that correct? |
| 09:13 | 15 | A.   Yes. |
| | 16 | Q.   And it's approximately $148,000? |
| | 17 | A.   Yes. |
| | 18 | Q.   Do you owe that money, sir? |
| | 19 | A.   I don't believe it's accurate. |
| 09:14 | 20 | Q.   Okay. |
| | 21 | A.   It's mostly interest. |
| | 22 | Q.   So how much of that do you believe is accurate? |
| | 23 | A.   I would estimate 40,000. |
| | 24 | Q.   All right.  Do you deny that that's the amount |
| 09:14 | 25 | that the actual creditor is alleging you owe?  Not my |

09:14  1    client, but the actual creditor.

2         A.    Could you restate the question?

3         Q.    Sure.  I'll try to.  Do you -- would you agree

4    that Texas Guaranteed Student Loan Program is alleging it

09:14  5    to be 148,000?

6         A.    Yes.

7         Q.    Okay.  And you have made a dispute with them

8    directly?

9         A.    Yes.

09:14 10         Q.    Do you have plans to pay back those funds?

11         A.    Yes.

12         Q.    Have you made a specific payment plan, sir?

13         A.    On my own, yes.

14         Q.    Okay.  Not with them.  You haven't worked out

09:14 15    an arrangement with them; is that fair?

16         A.    No -- I mean -- I have not, no.

17         Q.    Okay.  It's my understanding with regard to

18    student loans there are certain kinds of programs they

19    can offer you to reinstate you or to help you to qualify

09:15 20    that you have to sign documents for.  Have you done that?

21         A.    I requested it, and it was denied.

22         Q.    Okay.  Have you filled out any applications for

23    the Texas Guaranteed Student Loan Program?

24         A.    Applications for loans or --

09:15 25         Q.    Applications to refinance or to rework your

**TIMOTHY WHITE**                    **12/15/2011**

09:15   1      loan programs.

2         A.    Yes.

3         Q.    Okay.  And when did you fill those out?

4         A.    2008 or '9.  I -- I'm sorry.  I don't remember

09:15   5      for sure.

6         Q.    Okay.  Were those online?

7         A.    Yes.

8         Q.    Did you keep copies of any of that paperwork,

9      sir?

09:15 10        A.    Electronic copies, I think so.

11        Q.    Okay.  So if -- if you were to go back to your

12     home to your computer or wherever you keep your computer,

13     you believe you may have copies of that?

14        A.    I think so.  Actually, it's a receipt saying it

09:16 15     was received, not the actual form itself.

16        Q.    Okay.  Do you recall the form?

17        A.    I don't.  I'm sorry.

18        Q.    Okay.  Well, maybe not the specific questions,

19     but do you recall that the form asked specific

09:16 20     information related to your personal financial situation?

21        A.    Yes.

22        Q.    Okay.  Asked you how much you were making, what

23     kind of work you were doing?

24        A.    Yes.

09:16 25        Q.    Did it ask you about your current status as far

TIMOTHY WHITE                 12/15/2011

09:16  1    as being a student?

       2        A.    I don't remember.

       3        Q.    Okay.  Do you recall if the work asked -- if

       4    the form asked you to provide contact information, like

09:16  5    addresses, e-mail addresses, that kind of thing?

       6        A.    Yes, they did for my schools.

       7        Q.    Okay.  Did they --

       8        A.    Yes, and I provided it.

       9        Q.    Okay.  Now we're talking specifically about the

09:16 10    Texas Guaranteed Student Loan Program.

      11        A.    Right.

      12        Q.    Yes.  Okay.  Do you recall if it asked for you

      13    to provide phone numbers?

      14        A.    Yes, I'm sure it did.

09:17 15        Q.    Okay.  And did you provide the information

      16    requested by the Texas Guaranteed Student Loan Program?

      17              MR. RADBIL:  Objection, form.

      18        Q.    Unless someone tells you not to answer, you

      19    answer.  Sorry.  We don't --

09:17 20        A.    Oh --

      21        Q.    -- have a judge to rule.

      22        A.    Oh, no, I'm sorry.  I'm just -- I'm thinking.

      23        Q.    Oh, okay.

      24        A.    I provided my home number, yes, the landline.

09:17 25        Q.    And you're certain you only provided a

TIMOTHY WHITE                    12/15/2011

09:17  1          landline, sir?

    2          A.    Yes.

    3          Q.    Okay.  How many phone numbers do you have?

    4          A.    Two.

09:17  5          Q.    Okay.  Can you provide -- what numbers are

    6    those?  Give me -- give me the first one.  What's your

    7    home number?

    8          A.    Home number current or when I applied?

    9          Q.    I tell you what.  Why don't you tell me what

09:17 10    your number was when you applied.

   11          A.    (832)203-8049.

   12          Q.    How long -- and when did you change numbers for

   13    home?

   14          A.    That was my number for five years, and I

09:18 15    changed it in 2010.

   16          Q.    Okay.  So that would be through 2010?

   17          A.    Right.

   18          Q.    Okay.  And that is a landline.  Is that -- did

   19    I understand, this (832)203 number is a landline?

09:18 20          A.    Yes.

   21          Q.    Okay.  And who -- do you recall who the service

   22    was with?

   23          A.    It was Comcast.

   24          Q.    Okay.  And what is your number for your home

09:18 25    line as of 2010?

TIMOTHY WHITE                          12/15/2011

| | | | |
|---|---|---|---|
| 09:18 | 1 | A. | In 2010 it was (214)792-9650. |
| | 2 | Q. | Again, is that a landline? |
| | 3 | A. | Yes. |
| | 4 | Q. | And do you recall what service that's through? |
| 09:18 | 5 | A. | Time Warner. |
| | 6 | Q. | And that's still your number today? |
| | 7 | A. | No, it's not. |
| | 8 | Q. | Okay.  When did you change that number? |
| | 9 | A. | On the 1st of this month. |
| 09:19 | 10 | Q. | December? |
| | 11 | A. | I just moved. |
| | 12 | Q. | Okay.  You just moved; where did you move to? |
| | 13 | A. | Just down the street -- |
| | 14 | Q. | Okay. |
| 09:19 | 15 | A. | -- from here. |
| | 16 | Q. | From -- from this office? |
| | 17 | A. | Yes. |
| | 18 | Q. | Boy, that was convenient for you today, wasn't |
| | 19 | | it? |
| 09:19 | 20 | A. | (Moving head up and down.) |
| | 21 | Q. | All right.  So you moved from -- did you move |
| | 22 | | from Commerce then to Dallas; is that what you did? |
| | 23 | A. | No, I've always been in Dallas. |
| | 24 | Q. | So you just commuted to Commerce? |
| 09:19 | 25 | A. | I was renting a place and -- and just moved to |

TIMOTHY WHITE                    12/15/2011

| | | |
|---|---|---|
| 09:19 | 1 | a different place -- |
| | 2 | Q.    Okay. |
| | 3 | A.    -- more permanent, after relocating to Dallas. |
| | 4 | Q.    Okay. |
| 09:19 | 5 | A.    Do you need my current number? |
| | 6 | Q.    Yes, sir.  What's your current phone number -- |
| | 7 | home phone number? |
| | 8 | A.    I'm sorry.  It just started.  I could check on |
| | 9 | my phone if you need it. |
| 09:19 | 10 | Q.    You know, during a break if you don't mind -- |
| | 11 | A.    Okay. |
| | 12 | Q.    -- checking and then -- and that way -- |
| | 13 | A.    Sorry. |
| | 14 | Q.    -- I just want to make sure that we have all |
| 09:19 | 15 | phone numbers to make sure that -- I'm going to be |
| | 16 | honest.  We're going to make sure nobody is calling you |
| | 17 | so -- at least from us. |
| | 18 | All right.  Cell phone number?  You said |
| | 19 | that you have had a cell phone number for this entire |
| 09:20 | 20 | time; is that correct? |
| | 21 | A.    Yes.  I've had the same cell phone number for |
| | 22 | four or five years. |
| | 23 | Q.    Okay.  Well, you gave me a home phone number |
| | 24 | that you said you had approximately five years through |
| 09:20 | 25 | 2010, so I'm taking that meaning going back 2005; is that |

TIMOTHY WHITE                    12/15/2011

09:20   1    correct?

        2        A.    Yes.

        3        Q.    Have you had the same cell phone number since

        4    2005?

09:20   5        A.    I think it was 2007 or '8 that --

        6        Q.    Okay.

        7        A.    -- I got that number.

        8        Q.    Tell me what your cell phone number was, if you

        9    remember, before this current number.

09:20   10        A.    I've -- it's always been the same.  Since about

        11    2007, I've had the same cell phone.  I still have it

        12    today.

        13        Q.    Okay.  Did you -- do you recall what your

        14    number was between 2005 and 2007?

09:20   15        A.    No.

        16        Q.    All right.  Tell me what your cell phone number

        17    is currently, sir.

        18        A.    (281)435-1163.

        19        Q.    281 area code, is that normally the Houston

09:21   20    area?

        21        A.    Yes.

        22        Q.    Did you get this number when you were living in

        23    Houston?

        24        A.    Yes.

09:21   25        Q.    Okay.  When did you move to Dallas?

09:21  1        A.      In June of 2010.

       2        Q.      Okay.  When did you leave the Houston area?

       3        A.      February 2010.

       4        Q.      I'm sorry.  I guess I'm just missing something

09:21  5    here.

       6                Were you commuting from Houston to

       7    Commerce to go to college?

       8        A.      Yes.  I went in the summers and took my

       9    vacation time and took summer classes.  It was not an

09:21 10    online program so --

      11        Q.      Okay.

      12        A.      -- I --

      13        Q.      So you were not a full-time student while you

      14    were working on your Ph.D?

09:21 15        A.      No.  That's why it's taken 10 years.

      16        Q.      Okay.  What was your job then, sir?

      17        A.      During the whole time?

      18        Q.      Yeah.

      19        A.      Well, I believe I only had two --

09:22 20        Q.      All right.

      21        A.      -- before Simple Surrogacy and that was from

      22    2000 -- 2000 to 2003 --

      23        Q.      Uh-huh.

      24        A.      -- University of Texas Medical Branch.

09:22 25        Q.      UTMB Galveston?

TIMOTHY WHITE                    12/15/2011

| | | | |
|---|---|---|---|
| 09:22 | 1 | A. | Yes. |
| | 2 | Q. | What did you do for them? |
| | 3 | A. | I was a clinical research coordinator. |
| | 4 | Q. | So you ran a lab? |
| 09:22 | 5 | A. | Yes. |
| | 6 | Q. | What particular department? |
| | 7 | A. | Psychiatry. |
| | 8 | Q. | Do you know Dr. Goodwin? |
| | 9 | A. | I do. |
| 09:22 | 10 | Q. | So do I. |

11          All right.  So you ran a lab.  And where

12   were you after 2003?

13   A.    At a company called Blues Management

14   Incorporated.

09:22  15   Q.    What does Blues Management do?

16   A.    They have inpatient, outpatient programs.

17   Q.    Okay.  What did you do for them?

18   A.    Mental health services.

19   Q.    So were you a counselor?

09:23  20   A.    No.  For the first three years, I was the

21   director of their clinical trials site.

22   Q.    Running a lab again --

23   A.    Yes.

24   Q.    -- basically.

09:23  25          Okay.  Okay.  And then after that?

TIMOTHY WHITE                    12/15/2011

09:23  1        A.    And after that, I transferred to their testing

2    department.

3        Q.    What kind of testing were you doing?

4        A.    Psychological evaluations --

09:23  5        Q.    Okay.

6        A.    -- under supervision of a --

7        Q.    Sure.

8        A.    -- forensic psychologist.

9        Q.    Like MMPI --

09:23 10        A.    Yes.

11        Q.    -- draw a person?

12        A.    Full psychological battery.

13        Q.    Okay.

14        A.    That was for a CPS contract.

09:23 15        Q.    For Child Protective Services?

16        A.    (Moving head up and down.)

17        Q.    Yes?

18        A.    Yes.

19        Q.    Okay.  So I'm assuming you have all the

09:23 20    certifications necessary to administer those tests, even

21    if you were not yet qualified to -- to render the formal

22    opinion?

23        A.    Yes.

24        Q.    Okay.

09:23 25        A.    I had a counselor's license, which was

TIMOTHY WHITE                    12/15/2011

09:23  1    sufficient.

    2         Q.    Sure.  I understand.

    3                    Who was your supervisor at Blues

    4    Management?

09:24  5         A.    Richard Austin.

    6         Q.    Okay.  Why did you leave them?

    7         A.    I'm sorry.  There are two reasons --

    8         Q.    Okay.

    9         A.    -- if you need them both.

09:24 10         Q.    Sure.

   11         A.    Dr. Austin was very sick.  He wasn't able to

   12    continue working.  I really wanted to work with him and I

   13    didn't want to continue if I wasn't working with him --

   14    he was my mentor -- so that and a combination of a much

09:24 15    higher salary at United Behavioral Health --

   16         Q.    Okay.

   17         A.    -- or United Health Group.

   18         Q.    So when did you start working for United Health

   19    Group?

09:24 20         A.    In -- I'm sorry.  I missed them earlier.

   21         Q.    That's fine.

   22         A.    I've had a lot of jobs.  They're from 2 -- July

   23    of 2007 to January of 2010.

   24         Q.    Did you do precertifications for them for

09:25 25    mental health patients?

TIMOTHY WHITE                          12/15/2011

09:25  1        A.      Yes.   The same thing I do now.

    2        Q.      Why did you leave them?

    3        A.      To finish my Ph.D.  It wasn't going to be

    4   possible in summers.  I had reached the end of -- you

09:25  5   know, at 10 years, that's the -- the deadline to complete

    6   a Ph.D program, so I realized I would have to come here

    7   in order to do that.

    8        Q.      Okay.  So you were working at United Health

    9   Group in Houston?

09:25 10        A.      Yes.

   11        Q.      Or was it one of their suburb branches?  I

   12   don't know if it only is in Houston or do they -- is it

   13   in -- where's it actually located?

   14        A.      Actually I think they call it Optim Health now.

09:25 15   It's the behavioral health part of United.

   16        Q.      Sure.  Where's it located?

   17        A.      In Houston.

   18        Q.      Okay.  In Houston proper?

   19        A.      Yes.

09:25 20        Q.      Okay.  So you were pushing up on your 10 years

   21   to complete your Ph.D or lose all your coursework.

   22        A.      Right.

   23        Q.      Is that it basically, sir?

   24        A.      Yes.

09:25 25        Q.      Okay.  It's all right as long as you realize I

TIMOTHY WHITE                    12/15/2011

09:25 1      just need a verbal answer; I'm not trying to be rude.

2               Why did you use -- leave UTMB Galveston?

3       A.    For the position at Blues Management.

4       Q.    Okay.  Was it better pay?

09:26 5      A.    It was advancement.  There weren't a lot of

6       places to go at UTMB, and there -- they -- there was a

7       director's job at -- at Blues Management.

8       Q.    Okay.  Was there a partic -- you said you were

9       working in a particular lab.  What -- what -- was it

09:26 10     again psych testing, or was it something else?

11      A.    There was testing involved, neuropsych testing.

12      Not -- not personality testing.  This was --

13      Q.    No, I understand the difference.

14      A.    Okay.

09:26 15     Q.    Okay.

16      A.    In support of clinical trials.

17      Q.    Language arts?

18      A.    Clinical trials.

19      Q.    Clinical trials.  Okay.  I'm sorry.  I thought

09:26 20     you -- I've got a little bit of allergies, so I didn't

21      hear you.  That's okay.

22               All right.  Any other jobs that -- that

23      you missed?  You've now told me about MHN, Simple

24      Surrogacy and teaching at Texas A&M Commerce, as well as

09:27 25     your clinical work with UTMB Galveston, Blues Management

TIMOTHY WHITE                    12/15/2011

09:27  1        and then your precert work with United Health Group.   Is

       2        that it?

       3               A.    And then MHN --

       4               Q.    MHN.

09:27  5               A.    -- currently.

       6               Q.    That's it?

       7               A.    That's it.

       8               Q.    Is your position at MHN a full-time job, sir?

       9               A.    No.

09:27 10               Q.    Okay.  How many hours a week do you work?

      11               A.    24.

      12               Q.    Okay.  And your position at Simple Surrogacy --

      13        that's actually your counseling practice and you have a

      14        contract.  How many hours do you work there --

09:27 15               A.    Oh --

      16               Q.    -- a week?

      17               A.    -- it varies a lot.

      18               Q.    So it can be one -- one evaluation to 15?

      19               A.    Yes.

09:27 20               Q.    Okay.

      21               A.    Sometimes it is.

      22               Q.    And just so I'm clear, when you're doing

      23        these -- these evaluations for the Simple Surrogacy

      24        program, are you doing a full battery of psych testing?

09:27 25               A.    No.

09:27  1        Q.    No.  What kind of testing are you doing?

       2        A.    Actually, it's not fair to call them

       3   evaluations.  They're not called that at all.  They're --

       4        Q.    Are they called interviews?

09:28  5        A.    -- psychosocial interviews, yes.

       6        Q.    Okay.  All right.  Psychosocial interview like

       7   they would give for presentencing investigation for a

       8   criminal case?

       9        A.    Yes.

09:28 10        Q.    Something along those lines.

      11              Okay.  So you're looking mostly at their

      12   background and what they can tell you that they've gone

      13   through as opposed to doing personality-driven testing;

      14   is that fair?

09:28 15        A.    Right.  There's no testing involved.

      16        Q.    Anybody filed a complaint about your

      17   evaluation?

      18        A.    No.

      19        Q.    Okay.  At least you don't know about it if they

09:28 20   have; is that fair?

      21        A.    Yes.

      22        Q.    Okay.  In your own words, sir, can you tell me

      23   what you believe that my client Regional Adjustment

      24   Bureau did that was wrong?

09:28 25        A.    Could you be more specific?  I -- I have --

TIMOTHY WHITE                    12/15/2011

09:28   1        Q.    I just --

        2        A.    -- several concerns about...

        3        Q.    I just want to know, from your position,

        4    what -- what you believe.  I'm not asking for a legal

09:29   5    opinion at all.  I just want to know from you, as

        6    Mr. Timothy White, what it is you're complaining about

        7    with regard to my client.  And if it takes you -- if it's

        8    several things, that's fine.  Just give me a list and

        9    we'll go back to each of them in detail.

09:29  10        A.    Refusal to establish a realistic payment plan,

       11    despite my willingness to pay.

       12        Q.    Okay.  Anything else?

       13        A.    Calling me repeatedly at a number I asked them

       14    not to, my work number, which rang to my cell phone, and

09:29  15    I explained that to them.

       16        Q.    Okay.  Anything else?

       17        A.    Continuing to report me to the State board,

       18    other places as well they claim to have reported my

       19    default status to, despite the fact that I contacted them

09:30  20    and I was trying to set up a payment plan.

       21        Q.    Okay.  Anything else?

       22        A.    Just an unrealistic expectation of $2400 a

       23    month for a loan payment that I don't think most people

       24    would be able to afford.

09:30  25        Q.    Okay.

TIMOTHY WHITE                    12/15/2011

09:30  1       A.     And refusal to cooperate with anything -- any

    2    other amount.

    3       Q.     All right.  Anything else, sir?

    4       A.     No, I -- I think that's it.

09:30  5       Q.     Okay.  All right.  Let's start with your --

    6    kind of going to jump in the middle here.  You said they

    7    continued to report you to the State board.  What State

    8    board are you referring to?

    9       A.     That's the State Board of Examiners of

09:31 10    Professional Counselors.

   11       Q.     Do you -- are you aware that the State Board of

   12    Examiners for Professional Counselors has a requirement

   13    related to status on student loans?

   14       A.     Yes.

09:31 15       Q.     And what is that requirement, sir?

   16       A.     If you're reported -- if someone is reported in

   17    default who is a license holder, they -- they will not

   18    renew your license.

   19       Q.     Okay.  Have they renewed your license?

09:31 20       A.     It's not up for renewal until May of 2012, but

   21    no, they won't at this point, and I'll lose my job.

   22       Q.     All right.  Are you in default on the loan?

   23       A.     Officially, yes.

   24       Q.     Do you know if this is something that the --

09:31 25    that my client did or do you know if it's something that

09:32  1          the Texas Guaranteed Student Loan Program did?

2               A.    I couldn't say.

3               Q.    Okay.  So you don't know for sure who reported

4          it; is that fair?

09:32  5               A.    I -- I believe that to be Texas Guaranteed, not

6          Regional Adjustment, but I can't be sure.

7               Q.    Okay.  So if it turns out that in fact it's

8          Texas Guaranteed Student Loan Program that's reporting

9          you as opposed to Regional Adjustment, your beef about

09:32 10          that's really with the student loan program, not my

11          client; is that fair, sir?

12               A.    Yes.

13               Q.    Okay.  So -- and you're not -- at this

14          position -- point, you're not sure if -- who actually is

09:32 15          the one who has -- who had reported it to the State

16          board; is that fair?

17               A.    The representative from Regional Adjustment

18          Bureau stated that she would continue to report me.  I

19          don't have proof that they did though, no.

09:32 20               Q.    Okay.  Do you know if there is a contractual

21          requirement from the State of Texas that -- with the

22          Guaranteed Student Loan Program that they must be

23          reported to the State board?

24               A.    Yes.

09:33 25               Q.    There is a requirement?

09:33 1      A.     I don't -- no, I don't know that.

2      Q.     Okay.

3      A.     I'm sorry.  I misunderstood.  No.

4      Q.     That's fine.  That's -- that's why I clarified

09:33 5  because you looked a little confused.

6                   All right.  So you don't know if there is

7  a -- an obligation that guar -- Texas Guaranteed Student

8  Loan, as a State-affiliated program, has an absolute

9  requirement that it must be reported to the State

09:33 10  licensing board; is that fair?

11      A.     Yes.

12      Q.     Would it surprise you to find out that, in

13  fact, there is a requirement that a State agency or a

14  State-affiliated program has an obligation to report

09:33 15  those matters to State licensing boards when the State of

16  Texas has paid your loan?

17      A.     That would not surprise me, no.

18      Q.     Okay.  Now let's be clear that we understand

19  what happened here, Mr. White.  You took out a loan with

09:33 20  someone, and the Texas Guaranteed Student Loan Program

21  kicked in, because you were in default, and paid off that

22  loan and now owns the debt; is that correct?

23                   MR. RADBIL:  Objection, form.

24      A.     I -- I can't say.

09:34 25      Q.     Okay.  Do you recall --

TIMOTHY WHITE                          12/15/2011

09:34   1        A.      I'm not --

        2        Q.      -- who your original loan was with?

        3        A.      Yes.

        4        Q.      Who was it with?

09:34   5        A.      A company called Unipac.

        6        Q.      Okay.  Do you recall that you signed a -- a --

        7   a student loan that had a Texas Guaranteed Loan Program

        8   guarantee, that if the student defaulted on it, that the

        9   State of Texas would pick up the tab?

09:34  10        A.      No.

       11        Q.      All right.  You said that you felt that there

       12   was unreasonable expectation for the dollar amount of

       13   the -- of the payment plan that was being set.

       14        A.      Yes.

09:34  15        Q.      Do you know who made -- who made the

       16   determination of what payment must be made?  Was it my

       17   client or was it Texas Guaranteed Student Loan?

       18        A.      I don't know.

       19        Q.      Okay.  Do you know if Texas Guaranteed Student

09:34  20   Loan sets the dollar amounts that they want to receive in

       21   payment?

       22        A.      I couldn't say.  It was quoted to me by RAB.

       23        Q.      Okay.  Do you know whether or not they were

       24   just the messenger, or were they the decision maker?

09:35  25        A.      No, I don't know.

TIMOTHY WHITE                    12/15/2011

09:35   1          Q.    If it turns out that those parameters for the

2          amount of the student loan pay -- repayments are set by

3          Texas Guaranteed as opposed to -- let me -- is it all

4          right with you if I say Texas Guaranteed instead of the

09:35   5          whole loan -- name --

6          A.    Sure.

7          Q.    -- that you and I both understand what we're

8          talking about?

9          A.    Yes.

09:35  10          Q.    Okay.  All right.  If it turns out that the

11          amount of the payment is determined by Texas Guaranteed

12          and not Regional Adjustment Bureau, is your complaint

13          then with Texas Guaranteed as opposed to my client?

14                MR. RADBIL:  Objection, form.

09:35  15          A.    I can't say.

16          Q.    Okay.  When the information regarding the

17          amount of the student loan was provided to you by whoever

18          you spoke to with Regional Adjustment Bureau, did you

19          contact Guaranteed directly -- Texas Guaranteed directly

09:36  20          to see if they had any wiggle room, so to speak, in the

21          payment amount?

22          A.    I tried to contact them.

23          Q.    What did you do to try to contact them?

24          A.    First I tried by telephone.  One -- they have

09:36  25          an automated system.  Once I put in my Social, they told

09:36  1     me to contact Regional Adjustment Bureau.  They

     2     wouldn't...

     3         Q.    Okay.  So they had referred it to a creditor?

     4         A.    I could not find a live person.  After multiple

09:36  5     attempts, I wrote them a letter.  I didn't receive any

     6     response.

     7         Q.    Okay.  Did you keep a copy of the letter you

     8     wrote to Texas Guaranteed?

     9         A.    I did.

09:36 10         Q.    Okay.  Did --

    11         A.    It wasn't certified though.

    12         Q.    Okay.  Do you recall generally what the letter

    13     said?

    14         A.    Just that I had been contacted by Regional

09:36 15     Adjustment Bureau and that I would like to set up a

    16     realistic payment plan.

    17         Q.    Okay.

    18         A.    And that's it.

    19         Q.    All right.  And then did you go online to make

09:36 20     any attempts by e-mail or any other forms online with

    21     Texas Guaranteed directly?

    22         A.    Not at that time, no.

    23         Q.    Okay.  Did you at some later point?

    24         A.    No.

09:37 25         Q.    Earlier?

App. 85

TIMOTHY WHITE                    12/15/2011

09:37  1        A.    Back in 2008 that we talked about before.

2        Q.    Okay.  So the application attempts were at

3   2008, but after you were contacted by Regional Adjustment

4   Bureau, you did not apply for any loan deferments or

09:37  5   anything along those lines; is that fair?

6        A.    Well, I wasn't allowed to.  I couldn't get that

7   far in their system.  They -- they -- I would just get a

8   message telling me to contact RAB.

9        Q.    Okay.  Would you start to fill out the form and

09:37  10   it would cut you off; is that what you're saying, sir?

11        A.    Oh, no.  I'm sorry.  I mean by phone.  I didn't

12   try online.  I had been denied before, and I thought it

13   best to talk to someone in person.

14        Q.    Okay.  All right.  The other complaint that you

09:38  15   had with regard to Regional Adjustment Bureau is -- you

16   actually said refused to establish realistic payment

17   plan, and then later you said an unrealistic expectation

18   of $2400 a month and refusal to consider any other

19   amount.  They same -- kind of sound like the same thing

09:38  20   to me.  Is there something different about the -- in your

21   mind that you listed them separately -- those complaints

22   separately?

23        A.    No, I hadn't mentioned that earlier, so --

24        Q.    Okay.

09:38  25        A.    -- just meant to clarify --

TIMOTHY WHITE                          12/15/2011

09:38  1        Q.    Okay.

       2        A.    -- the...

       3        Q.    The amount?

       4        A.    They speak to the same issue, yes.

09:38  5        Q.    Okay.  So in terms of your testimony about

       6   that, I don't need to rehash it.  We've already covered

       7   it; is that fair, sir?

       8        A.    Yes.

       9        Q.    Okay.  The one complaint that we have not gone

09:38 10   over is you said they called repeatedly at a number you

      11   asked them not to call, which was your office number; is

      12   that correct?  Which you said was forwarded to your cell

      13   phone.

      14        A.    Yes.

09:38 15        Q.    So the number you asked them not to call was

      16   your office number; is that correct?

      17        A.    Yes and no.  It was the number Simple Surrogacy

      18   provides for me.  It's their 800 number and I have an

      19   extension to call.  They contacted that number.  Actually

09:39 20   they contacted Simple as well, but -- at their main

      21   number, but they contacted that number for me repeatedly,

      22   and it rolls over to my cell phone but I can't answer the

      23   call, and I explained that.

      24        Q.    Why can't you answer the call?

09:39 25        A.    It's telling you you have a voice mail, that

TIMOTHY WHITE                     12/15/2011

09:39  1    you need to call in and find -- and listen to.  You can't

2    do it as it's coming in.

3         Q.    Okay.  So it's -- it's -- it's not a rollover

4    in the sense that my phone calls are forwarded to my cell

09:39  5    phone when I push a function on my desk number.  This is

6    just a notification to check your voice mail that you

7    have a message; is that fair?

8         A.    Yes.

9         Q.    Okay.  So did Regional Adjustment Bureau -- let

09:40 10    me understand this.

11              What you're getting on your cell phone is

12    a notification from your work telephone, and your work

13    telephone is saying, hey, you got a message, check it;

14    is --

09:40 15         A.    Yes.

16         Q.    -- that correct?

17         A.    Yes.

18         Q.    So Regional Adjustment Bureau wasn't actually

19    leaving a message on your cell phone; is that correct?

09:40 20         A.    Well, after that, yes, they knew they would be

21    leaving a message that would ring to my cell phone, yes.

22         Q.    Okay.  But in --

23         A.    But on the cell phone voice mail --

24         Q.    Not?

09:40 25         A.    -- no.

09:40  1        Q.    Okay.  So I'm trying to understand this, sir,

2        so that -- that -- I'm sorry.  I'm technologically

3        challenged --

4        A.    Oh, sorry.

09:40  5        Q.    -- so please bear with me.

6              Your phone system, the way it works, your

7        telephone at Surrogacy, was that if someone were to call

8        in and leave a message for you, it would be stored

9        actually on your landline, your surrogacy phone line; is

09:40 10       that correct?

11             MR. RADBIL:  Objection, form.

12       Q.    Am I understanding that correct?

13       A.    I'm not certain.

14       Q.    Okay.  But the message or whatever message

09:40 15       someone was trying to leave on your Surrogacy phone line,

16       that actual message would not be transferred to your cell

17       phone --

18             MR. RADBIL:  Objection --

19       Q.    -- is that correct?

09:41 20             MR. RADBIL:  -- form.

21             Objection, form.

22       A.    I can't say.  I'm --

23       Q.    Okay.

24       A.    -- a little technologically challenged --

09:41 25       Q.    All right.

TIMOTHY WHITE                    12/15/2011

09:41  1        A.      -- for that --

       2        Q.      Your -- what --

       3        A.      -- so...

       4        Q.      -- I understood you to say was that you

09:41  5   couldn't answer the phone if they -- on your cell phone

       6   if they tried to call in on your Surrogacy number; is

       7   that correct?

       8        A.      Right.

       9        Q.      So you couldn't --

09:41 10        A.      Yes.

      11        Q.      -- pick up the phone and -- and have the

      12   conversation with whoever was trying to call your

      13   Surrogacy number; is that correct?

      14        A.      Right.

09:41 15        Q.      You would get -- on your cell phone, all you're

      16   getting is a notification from your Surrogacy phone

      17   saying, hey, you got a message, call in to check your

      18   Surrogacy voice mails.

      19        A.      Yes.

09:41 20        Q.      Is that correct?

      21        A.      Yes.

      22        Q.      Did you get any messages directly on your cell

      23   phone number --

      24        A.      Yes.

09:41 25        Q.      -- from RAB?

App. 90

TIMOTHY WHITE                    12/15/2011

09:41    1        A.    I did.

         2        Q.    Okay.  And were those calls different than the

         3   ones you're complaining about that were going to your

         4   Surrogacy line?

09:41    5        A.    There were a lot of calls.  I don't remember

         6   how many.  There weren't as many to my cell phone, and

         7   I'm not sure how she -- how they got the number, but

         8   there -- I think there were at least two --

         9        Q.    Okay.

09:42   10        A.    -- directly to my cell phone.

        11        Q.    At least two to your cell phone?

        12        A.    Yes.

        13        Q.    All right, sir.

        14        A.    Where messages were left.

09:42   15        Q.    Okay.  Where messages were left.

        16        A.    Yes.

        17        Q.    Do you know how those calls were made to you?

        18   Do you know what kind of telephone system was used to

        19   call you?

09:42   20        A.    I have no idea.

        21        Q.    Okay.  If those calls were made on a manual

        22   telephone system, would you have a complaint about it?

        23        A.    I'm not sure I know what you mean by manual.

        24        Q.    I mean someone picking up the --

09:42   25        A.    Oh.

TIMOTHY WHITE                    12/15/2011

| | | |
|---|---|---|
| 09:42 | 1 | Q.    -- phone as opposed to a computer. |
| | 2 | MR. RADBIL:  Objection, form. |
| | 3 | A.    I'm not sure. |
| | 4 | Q.    Okay.  Have you ever read your complaint in |
| 09:42 | 5 | this case, sir? |
| | 6 | A.    Yes. |
| | 7 | Q.    Okay.  Have you read it recently? |
| | 8 | A.    Yes. |
| | 9 | Q.    Did you read it in preparation for today? |
| 09:42 | 10 | A.    No. |
| | 11 | Q.    Did you read your discovery responses -- |
| | 12 | A.    No. |
| | 13 | Q.    -- in preparation -- no? |
| | 14 | Have you ever read your discovery |
| 09:43 | 15 | responses? |
| | 16 | A.    Yes. |
| | 17 | Q.    Okay.  I am horrible about time, so please let |
| | 18 | me know if you need a comfort break.  I don't know how |
| | 19 | long we've been going. |
| 09:43 | 20 | A.    I don't, but I did -- I do have another |
| | 21 | complaint about RAB that I didn't mention -- I'm sorry -- |
| | 22 | Q.    Oh, that's -- |
| | 23 | A.    -- now that I'm... |
| | 24 | Q.    -- perfect.  Let me know.  What is that? |
| 09:43 | 25 | A.    This is -- and this is distinctly different. |

**TIMOTHY WHITE**                    **12/15/2011**

09:43  1      It was the threats that they made to take away my

2      license.  They actually -- she actually threatened to

3      take my Ph.D when I earned it to keep me from getting my

4      degree, and she said there were worse things they could

09:43  5      do and -- and that -- their calls are supposed to be

6      recorded, so I assume that's recorded out there

7      somewhere, but she did make those threats.

8           Q.   Okay.  Specifically what threat did she make

9      regarding your license?

09:43 10           A.   She threatened to have my license revoked,

11      which actually isn't the case.  I think probably what she

12      meant was to keep them from renewing my license.

13           Q.   Okay.  Did she say that she would have it done

14      or she -- did she say that was a consequence of not

09:44 15      paying your student loans?

16           A.   A consequence.

17           Q.   Okay.  She didn't say it's something she could

18      do.  She was just saying if you don't pay your student

19      loans, they can --

09:44 20           A.   I'm sorry.

21           Q.   -- keep --

22           A.   I need to clarify.  She said Regional

23      Adjustment Bureau would do that.

24           Q.   She said Regional Adjustment Bureau could take

09:44 25      your license; is that your testimony, sir?

TIMOTHY WHITE                    12/15/2011

09:44  1        A.     Yes.

       2        Q.     You understood, did you not, that the State of

       3   Texas could refuse to renew -- renew your license for

       4   failure to pay the student loans.

09:44  5               MR. RADBIL:    Objection, form.

       6        A.     Not at the time, no.

       7        Q.     Okay.  How did you learn that?

       8        A.     I looked up the information and called the

       9   board myself.

09:44 10        Q.     Okay.  So you've confirmed that with the State

      11   board yourself?

      12        A.     Yes.

      13        Q.     Okay.  All right.  And you said that she made

      14   some sort of threat regarding your Ph.D.  What was that

09:44 15   threat, sir?

      16        A.     Yes, and I don't know if she mentioned RAB or

      17   it was Texas Guaranteed for that particular threat, but

      18   she -- she said that it was possible to take my degree

      19   and keep me from ever being able to use it.

09:45 20        Q.     Okay.  Did you understand her to say that

      21   either Texas Guaranteed Student Loan or RAB could report

      22   the information to the school so they would not issue

      23   your degree; is that what you understood it to mean?

      24        A.     That's not the way it was stated.

09:45 25        Q.     Okay.  Then to the best of your ability, tell

TIMOTHY WHITE                    12/15/2011

09:45  1      me what it would say.

       2          A.    She stated that they could take it from me.

       3          Q.    Okay.  Who is this person that made these

       4      threats?

09:45  5          A.    Karen Nelson.

       6          Q.    All right.  Did you record any of those calls?

       7          A.    No.  I don't record calls.

       8          Q.    We have recordings in this case of voice mails.

       9      Did you record those?

09:45 10          A.    I --

      11          Q.    From your attorney.

      12          A.    Yes.

      13          Q.    You recorded those?

      14          A.    Yes.

09:45 15          Q.    How did you record them?

      16          A.    They're -- I'm sorry.  They're voice mails.

      17      They're already recorded.  I'm not sure I understand.

      18          Q.    Okay.  They were provided to us with a female

      19      voice saying this is a call that was left on so and so's

09:46 20      number and then there's a recording.  Did you make that

      21      recording, sir?

      22          A.    They're auto -- automatically made.  I didn't

      23      initiate the recording.  It's part of the service of

      24      voice mail.

09:46 25          Q.    Did you record them from the voice mail to a --

09:46  1    a -- some sort of a disk or a tape recording?

2         A.    No.

3         Q.    And your testimony today is that of the actual

4    conversations that you had, you didn't record any of

09:46  5    those?

6              MR. RADBIL:  Objection --

7         A.    No.

8              MR. RADBIL:  -- form.

9         Q.    Is that correct?

09:46 10        A.    I did not.

11        Q.    So we are correct, there are no -- if -- if all

12   I have are recordings of messages left on answering

13   machine, that's all there is as far as recordings that

14   you are aware of that were made through you; is that

09:46 15   fair?

16              MR. RADBIL:  Objection, form.

17        A.    Yes.

18        Q.    Okay.  All right.  Did anyone at RAB call you

19   any derogatory names?

09:47 20        A.    I don't recall.

21        Q.    Do you recall anybody cussing you out?

22        A.    No.

23        Q.    Recall anybody threatening you physically?

24        A.    No.

09:47 25        Q.    Did anybody threaten to take your home?

| | | |
|---|---|---|
| 09:47 | 1 | A. No. |
| | 2 | Q. Did anyone threaten to have you arrested? |
| | 3 | A. No. |
| | 4 | Q. Anyone threaten to take your -- garnish your |
| 09:47 | 5 | checking account? |
| | 6 | A. Yes. |
| | 7 | Q. Who did? |
| | 8 | A. Karen Nelson. |
| | 9 | Q. Okay. What did she say? |
| 09:47 | 10 | A. And my tax return as well. |
| | 11 | Q. Okay. Did she say she could garnish or the |
| | 12 | Texas Guaranteed Student Loan could garnish your tax |
| | 13 | return? |
| | 14 | A. I -- I don't recall -- |
| 09:47 | 15 | Q. Do you know that -- |
| | 16 | A. -- exactly. |
| | 17 | Q. -- that a State agency can, in fact, garnish |
| | 18 | your tax return? |
| | 19 | A. Yes. |
| 09:48 | 20 | MR. RADBIL: Objection, form. |
| | 21 | Q. Okay. You know that to be true? |
| | 22 | A. Yes. |
| | 23 | Q. Has it happened to you? |
| | 24 | A. No. |
| 09:48 | 25 | Q. Not yet? |

TIMOTHY WHITE                    12/15/2011

09:48   1          A.      No.

        2          Q.      How do you know that to be true, sir?

        3          A.      My pay stubs.

        4          Q.      Explain.

09:48   5          A.      The record of my income, there's never been a

        6    garnishment.

        7          Q.      Oh, okay.  I'm sorry.  How do you know it to be

        8    true that a State agency can garnish your tax return if

        9    you don't pay student loans back?

09:48  10          A.      I can't recall exactly where I learned that

       11    information.  It was my researching the student loans and

       12    how to -- how to manage payment.

       13          Q.      Do you have any student loans that are funded

       14    through Sallie Mae?

09:48  15          A.      They were until it was taken over by Texas

       16    Guaranteed.

       17          Q.      Okay.  When you had the loans with Sallie Mae

       18    before they were taken over by Texas Guaranteed, did you

       19    sign any forms or applications providing contact

09:49  20    information?

       21          A.      When the loan was managed by Sallie Mae?

       22          Q.      Yes, sir.

       23          A.      Yes.

       24          Q.      Did you provide them with your cell phone

09:49  25    number?

TIMOTHY WHITE                          12/15/2011

09:49  1        A.     I don't recall.

       2        Q.     Now, Mr. White, is your complaint that they

       3   were calling on -- calling you on your cell phone number

       4   or the content of the conversation?

09:49  5               MR. RADBIL:  Objection, form.

       6        A.     I'm sorry.  Could you restate?

       7        Q.     Sure.  I'll be glad to.  I'm trying to

       8   understand if your complaint is the fact that they --

       9   that you may have had a call on your cell phone or is

09:49 10   your complaint what they said to you --

      11               MR. RADBIL:  Objection --

      12        Q.     -- on the telephone?

      13               MR. RADBIL:  -- form.

      14               MS. MALONE:  Please let me finish my

09:49 15   question before you object, Counsel.

      16        Q.     Do you understand my question?

      17        A.     No.

      18        Q.     Okay.  Are you upset with RAB for making a call

      19   that may have gone to your cell phone, or are you mad at

09:49 20   RAB for the content of what they said to you when they

      21   spoke to you?

      22               MR. RADBIL:  Objection, form.

      23        A.     Yes to both.

      24        Q.     Okay.  Did you -- were you charged for any of

09:50 25   those phone calls on your cell phone?