```
        IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF TEXAS
                  DALLAS DIVISION

TIMOTHY WHITE,               )
                             )
          Plaintiff,         )
                             )
vs.                          ) 3:11-CV-1817-B
                             )
REGIONAL ADJUSTMENT          )
BUREAU, INC., d/b/a          )
RAB, INC.,                   )
                             )
          Defendant.         )
```

```
        MOTION FOR SANCTIONS - VOLUME 1
        BEFORE THE HONORABLE JANE J. BOYLE
           UNITED STATES DISTRICT JUDGE
                  AUGUST 2, 2013
```

                A P P E A R A N C E S

For the Plaintiff:

        WEISBERG & MEYERS, LLC
        5025 N Central Avenue - #602
        Phoenix, AZ 85012
        888/595-9111
        BY:  MARSHALL S. MEYERS
             NOAH RADBIL

For the Defendant:

        ROBBIE L. MALONE
        EUGENE E. MARTIN
        8750 North Central Expressway - Suite 1850
        Dallas, TX  75231
        (214)346-2631

COURT REPORTER:  SHAWNIE ARCHULETA, TX CCR No. 7533
                 1100 Commerce Street
                 Dallas, Texas 75242

proceedings reported by mechanical stenography,
transcript produced by computer.

TRANSCRIPT OF PROCEEDINGS

Opening Remarks                                          3

NOAH RADBIL

Direct Examination By Ms. Malone                        44
Cross-Examination by Mr. Meyers                        125
Redirect Examination by Ms. Malone                    198
Recross Examination by Mr. Meyers                     202


HEARING TO BE CONTINUED

EXHIBITS ADMITTED INTO EVIDENCE:

Plaintiff's 1  FedEx Receipt              186

Plaintiff's 2  Document                  187

1              (In open court at 10:00 a.m.)

2              THE COURT:  For the record, this is Civil

3    Action 3:11-CV-1817, Timothy White v. Regional

4    Adjustment Bureau.

5              We are here this morning on the Defendant

6    Regional Adjustment Bureau's Motion for Sanctions

7    under Section 1927 of Title 28, as well as Defendant

8    Regional Adjustment Bureau's Motion for Sanctions

9    pursuant to Rule 37.

10             I have the responses, which I have

11   reviewed, and I would like to go ahead and get

12   started by having the parties who are here and --

13   state who you are and who you represent.

14             MR. MEYERS:  Good morning, Your Honor.

15   Marshall Meyers.  Nice to be in your court, although

16   I wish it was under different circumstances, of

17   course.  I am here representing my firm, and to the

18   extent the Court allows, Mr. Radbil as well.

19             THE COURT:  Thank you very much.

20             MR. RADBIL:  Noah Radbil, Your Honor.  I

21   represented Timothy White at trial.

22             MS. MALONE:  Robbie Malone, Your Honor.  I

23   represent Regional Adjustment Bureau, with the help

24   of Mr. Martin.

25             MR. MARTIN:  Eugene Martin.

```
 1              THE COURT:  All right.  Obviously the

 2   Court is in a little bit of a different position for

 3   this motion for sanctions than courts usually find

 4   themselves in, given the fact that we had a trial

 5   and most of what I think this is based upon either

 6   occurred during the trial or was raised and

 7   discussed at the trial.  So this isn't brand-new to

 8   me.

 9              I would like to get started by having the

10   defendants just come forward and give me a brief

11   summary for the record of what you are seeking, and

12   then we will figure out next how we are going to

13   approach this.  Go ahead.

14              MS. MALONE:  Just so I'm clear, would you

15   like for us to give a general overview or what our

16   claims are?

17              THE COURT:  General overview first.

18              MS. MALONE:  Your Honor, I think you know

19   from the case that I have been practicing law for

20   some 27 years.  I started off as a state court

21   prosecutor.  I have never filed a motion like this,

22   nor have I heard of anyone being in a position I

23   found myself in during the course of the trial.  I

24   do not take this matter lightly, and I do not bring

25   it to the Court's attention without concern for both
```

1  the Court's time and for the things that occurred in

2  the trial.

3            The cases discussing Rule 37 indicate

4  specifically that the Court should grant sanctions

5  for several reasons -- one of which is important in

6  this case -- to deter others from violating or to

7  continue to violate Rule 37's obligations to

8  supplement discovery.

9            We will offer evidence to the Court today

10  specifically relating to 37 violations that occurred

11  in trial that impacted my client.  While it is true

12  that the jury ultimately found in my client's favor,

13  it did cost my client significant money in the time

14  that I had to prepare and in my client's evaluation

15  of the case as we went along.

16            THE COURT:  Slow down just a little bit.

17            MS. MALONE:  Sorry, Your Honor.  This is a

18  bigger issue for 37.  The Rule 37 Motion, Your

19  Honor, is also for the Court to deter that behavior

20  from continuing in the future.  In this particular

21  instance, since 2010, Weisberg & Meyers has filed

22  almost -- it's 972, going on to 1,000 lawsuits in

23  federal court across the United States.

24            Mr. Radbil is listed as lead counsel for

25  86 of those cases here in cases in federal court

1   alone, not counting state court filings.  So our

2   concern, Your Honor, is that, unless the Court makes

3   it clear to them that their behavior in refusing to

4   properly answer discovery and abusing the discovery

5   process will continue and harm other parties as well

6   as their own clients'.

7          One of the pieces of evidence we will

8   forward to the Court -- and I don't mean to go

9   shorthand by giving the Court references to the

10  testimony -- was Mr. White's testimony; specifically

11  that he had concerns about his actual damage claims.

12  And actually, in December prior to the trial, he had

13  discussions with Mr. Radbil and another partner in

14  that firm about his damage claim; prepared his own

15  memorandum for damages.

16         And as the Court will recall, Mr. White

17  said that he was told, we don't need to answer those

18  questions.  He expressed concern to the Court that

19  he was being sort of left out to dry without any

20  understanding of the process from his counsel.

21         So this is not just an attorney being mad

22  at another attorney under Rule 37, Your Honor, we

23  have all had those little spats.  We typically

24  resolve them without the Court needing an

25  evidentiary hearing.

1          This is a situation where there is a

2     fundamental lack of understanding that you must

3     respect both the Court, the judicial process, and

4     Rule 37 in honestly answering discovery and then not

5     trying to sandbag the trial, as happened in this

6     case.

7          The second issue that we have filed -- and

8     Your Honor, we're going to ask the Court to

9     specifically make sure that Mr. Radbil and his firm

10    are aware that those flagrant violations will not be

11    tolerated.  And we believe that we can show more

12    than $7,500 in damages specifically related to

13    attorney's fees addressing just those issues before

14    we get to the 37 motion itself.  So in trial prep,

15    we spent that much time.  We are going to ask the

16    Court to --

17          THE COURT:  Let's do one thing now that

18    you are starting to get into the categories.

19    Obviously, the costs have been awarded already.  The

20    Rule 68 motion, we've resolved.  So why don't we

21    just go category by category as to what we are going

22    to be focusing on.  I know it's in your briefing,

23    but that might be a helpful way to close your

24    opening statement.

25          MS. MALONE:  Sure.  Under Rule 37, we are

1    going to ask the Court to award my client the

2    additional time that I had to file motions to try to

3    get them to clarify their exhibits prior to trial.

4    As the Court may recall, we didn't have exhibits

5    from them leading into trial; the additional time I

6    had to prepare for witnesses that they late-named

7    and ultimately never called; the additional time

8    that I had to deal with bringing up these damages of

9    this 40,000 and 5,000.  I had to search through

10   discovery responses and bring them to the Court's

11   attention; not to mention a punitive factor of just,

12   after being told they could not go into counseling

13   at sidebar, then asking questions about it, so there

14   is a punitive function to that.

15          The total number of attorney's fees that

16   we have calculated that are related solely to the

17   Rule 37 actions where they attempted to offer the

18   evidence at trial is in the range of $7,500, Your

19   Honor.

20          There are some numbers that I could not

21   quantify for the Court.  For example, I didn't have

22   exhibits.  It took me longer to prepare some

23   cross-examinations of their witnesses because I was

24   guessing as to what their exhibits were.  I can't

25   quantify that for the Court except to tell you that

1    I spent more time in general preparation for trial

2    because I was not allowed to get that information.

3              Another example of that under Rule 37,

4    Your Honor, was -- actually, I think we put it under

5    27, you could argue it either way -- that under the

6    Court's standing order, each of the parties was

7    required to proffer to the Court a statement as to

8    why each of our exhibits would be offered into

9    evidence to assist to see if we could resolve issues

10   prior to trial.  I did that, and I didn't get that

11   in return.

12             And so we came to trial, and I was given a

13   stack of exhibits at trial and told basically that,

14   you know, here they are, with no explanation of how

15   they were admissible, including such things as

16   entire depositions.  So we wasted the Court's time

17   and my time going through each of the exhibits for

18   the Court to make preliminary rulings to have them

19   only offer one exhibit at trial.  So, Your Honor, I

20   can't quantify exactly those numbers.

21             We are going to ask the Court to consider

22   that part of the trial was extended because of that

23   and leave it to the Court's discretion as to how

24   much, based on your years of experience of seeing

25   trials, that cost.

```
 1              Another example, Your Honor --
 2              THE COURT:  For a minute we were just
 3    talking about pretrial Rule 37 type of issues.  So
 4    are we still talking about these Rule 37 issues and
 5    how they might have then impacted the costs at
 6    trial?
 7              MS. MALONE:  Yes, ma'am.  An example on
 8    that is that we were supposed to confer about
 9    specific exhibits relating to any damage models or
10    those kinds of things, and he did not actually offer
11    one at trial, but that's an example of the Rule 37.
12              Most of the 37, Your Honor, has to do with
13    the question on the actual damage claim; the
14    question on the counseling or the fact that he
15    testified, and their answer to discovery was that he
16    was not in counseling; and then the questions
17    related to the witnesses that were identified late,
18    some of which were never identified to us; and the
19    whole problem with their going back and forth on
20    whether or not they were going to offer an expert
21    witness.
22              There are some actions related to that,
23    Your Honor, that were not brought to you in the
24    court that we will bring evidence of.  For example,
25    I received a telephone call from one of the doctor's
```

1    attorneys who had been subpoenaed and his client

2    never spoke to them.  Obviously that's a concern to

3    me because I think that doctor is now testifying.

4            THE COURT:  Okay.  Say that again, and

5    slow down.

6            MS. MALONE:  Yes, ma'am.  One of the

7    doctor's attorneys called me --

8            THE COURT:  The plaintiff's attorneys.

9            MS. MALONE:  Yes.  One of the plaintiff's

10   attorneys -- I'm sorry, Your Honor.  I understand

11   why you are confused.  I forgot we have a Dr. White

12   here.

13           There was a person identified in discovery

14   late by the name of Arlene Betancourt who was a

15   doctor.  And her attorney called me in my office

16   because she had received a subpoena to come testify

17   in this trial without any communication, had no clue

18   as to what the testimony was going to be.  And

19   obviously, this is a med/mal attorney that I know,

20   Your Honor, so he wanted to know if we were really

21   going to trial.  That goes to the point that they

22   told the Court they were not offering any expert

23   testimony, and at the same time they were

24   subpoenaing doctors to appear at trial.  And so

25   that's an example of the 37, Your Honor, and the

1   weight directly impacted me.

2         I will also tell the Court that with that

3   particular individual, I learned from his -- her

4   attorney that Mr. Radbil didn't return the calls of

5   the doctor's attorney even to work out what date or

6   how they would appear.  So that's an issue that goes

7   to the 37 and their late designations.

8         The time I spent in my office, outlines I

9   had to draft I would have not otherwise drafted if I

10  believed that they weren't going to try to backdoor

11  an expert.  So with all that being said, that's the

12  heart of the 37 motion, Your Honor, and it's

13  primarily directed at those things that they took in

14  court and tried to do.

15        The 1927 is really the bigger issue.  Your

16  Honor, I know in the course of litigation attorneys

17  can rub each other raw, we can nitpick each other,

18  and generally we let that go when the case is over.

19  This is not one of those situations.  I have never

20  seen an attorney who consistently refuses to

21  recognize the fundamental practice that we have.

22        The example I will give to the Court comes

23  from your own statement, Your Honor.  At page 32 of

24  the transcript, the Court noted:  You have let your

25  client down.  You weren't prepared for trial.  You

1   didn't submit marked exhibits.  You took on theories
2   that made no sense.  You made statements, at least
3   four that I can think of off the top of my head,
4   that were completely untrue.  Your strategies and
5   questions were not close to what I thought they
6   would compared to summary judgment.  You handled
7   yourself as what I see as detrimental to your client
8   in this case.
9            That's the heart of our 27 motion, Your
10  Honor.  Because had he handled this case correctly
11  from the very beginning, this case would have
12  settled within the first month.  My client, Regional
13  Adjustment Bureau who I have represented off and on
14  for the last ten years, typically settles every case
15  when it walks in the door.  One of the things that
16  we will offer to the Court is an e-mail where I
17  asked opposing counsel to give me a demand and was
18  told no.  So it's not just one little thing, it's
19  the whole circumstances that led to this case being
20  vexatious and improperly tried.
21           1927 is the only mechanism I have to get
22  it before the Court for the Court to be able to say,
23  this attorney needs to practice in a more competent
24  and fair fashion, both for consumers and for the
25  court system and for everyone else.  And in all due

1    respect, Your Honor, I have never seen anyone who

2    behaves the way Mr. Radbil does with complete

3    disregard for the Court.

4           We have other examples that we would bring

5    to the Court about how they used that fee agreement.

6    They will tell the Court it's irrelevant, but it is

7    not, Your Honor.  It gives the motive.  It explains

8    to the Court that the fee agreement shifts the

9    ability to settle the case out of hands of the

10   consumers that they say they are trying to protect

11   to Weisberg & Meyers.  And the consumers find

12   themselves in a position where Dr. White did where

13   they are trapped.  They can't fire their attorney

14   even if they don't like how they are representing

15   them.  There was no, no evidence that Dr. White was

16   ever told he could be subjected to any cost if they

17   lost this trial.

18          And Your Honor, we have other cases where

19   that has happened here in Dallas County.  And if the

20   Court will permit us, we will bring evidence to show

21   this was pattern, not an oversight on their part.

22          We have cases of –– testimony of their

23   clients where they say, I was not told of a

24   settlement offer.  And in both of those cases,

25   judgments in the amount in excess of $40,000 were

1   rendered against their clients.

2          So this -- it's not nitpicking, it's not

3   my job, Your Honor, to -- I don't make it a practice

4   to do that.  But when you have a situation where

5   attorneys who have the audacity to call themselves

6   attorneys for consumers are in fact manipulating

7   consumers and taking advantage of them, 1927 is the

8   only way I have to show the Court that this is a

9   pattern on their behalf.

10          As to the firm, Your Honor, we will show

11   the Court through the records that the law firm

12   partners were involved in billing.  I don't think

13   they supervised Mr. Radbil one bit.  If you look at

14   the evidence, it will show you they, in fact,

15   e-mailed little things here and there, but they did

16   not make sure he was actually capable of practicing

17   law in this case or actually trying cases.

18          We will also offer to the Court at least

19   one other example of some flagrant lack of knowledge

20   Mr. Radbil has about the fundamental practice of law

21   to show that they were on notice or should have been

22   on notice that the last thing they ought to be doing

23   was putting him in federal court to try a case in

24   front of the Court.

25          We are going to leave it up to the Court

1    as to the sanctions.  We have pled -- and we are not

2    going to go through the detail of proving up our

3    reasonableness of the hourly attorney's fees since

4    the Court has already ruled on that in the other

5    motion.

6            We believe we have proven up that $95,000

7    worth of attorney's fees total for 1927.  We are not

8    going to double dip, Your Honor.  We will allow the

9    Court's discretion as to what you believe is a fair

10   enough sanction to bring it to their attention that

11   they cannot practice law in such a manner that

12   causes these issues.

13           The last thing I would tell the Court is

14   we have a case out of the Southern District that is

15   currently pending before Judge Hughes against

16   Mr. Radbil in which the defense counsel has asked

17   the Court to award $50,000 in sanctions for similar

18   behavior and also to suspend his license to practice

19   in the Southern District.  Judge Hughes has not

20   ruled on it yet.

21           I wanted the Court to understand that this

22   is not an isolated event, and we are trying our best

23   to sort of bring to the Court's attention that

24   Mr. Radbil, when he does things that are dishonest,

25   that's just who he is and it's not appropriate.

```
 1              I would finish with the Court again.  You
 2    said:  We will have a full sanction hearing, not
 3    only about your conduct and misrepresenting the
 4    facts to the Court over and over in this case and
 5    falsely accusing counsel, which are two of the most
 6    serious offenses that you can make before a
 7    tribunal, but I am also really concerned that you
 8    are not capable or competent to be representing
 9    clients in federal court, so the hearing will bear
10    your qualifications.
11              That's today, Your Honor, and we ask the
12    Court to take it seriously.
13              THE COURT:  Thank you.
14              Mr. Meyers.
15              MR. MEYERS:  It's exceptionally difficult,
16    Judge, to sit and listen to what Ms. Malone said.  I
17    am here, Your Honor, to take responsibility for
18    anything that my firm did, and Mr. Radbil is part of
19    my firm.  Ms. Malone certainly uses a lot of words,
20    but I see them, Your Honor, as really naked
21    allegations.  There are clearly some things -- and
22    obviously Mr. Radbil being late to trial, there is
23    no excuse for that, there is no response to that,
24    and we deserve whatever penalty the Court imposes
25    for that.
```

```
 1              To suggest that Mr. Radbil is a liar
 2    really hurts me, Your Honor, because I know Noah and
 3    have worked with him for a long time.  I'm here to
 4    listen, like the Court is, to the evidence and see
 5    if I'm mistaken.  But everything I know about Noah
 6    runs contradictory to what Ms. Malone says.
 7              When we talk about the Rule 37 motion,
 8    Your Honor, I think we laid out in our response
 9    point by point to every allegation that Ms. Malone
10    made how she was mistaken as to what occurred.  And
11    I believe in the 1927 motion we did the same, Your
12    Honor.
13              Obviously I'm not here to ask the Court to
14    reconsider anything.  I'm not here to say that the
15    Court's prior rulings weren't correct.  But I've
16    obviously got to touch on some of these issues to
17    show the difference between us being wrong as a
18    matter of fact or law in the Court's view versus us
19    engaging in behavior that deserves sanctions.  And I
20    can't talk about one without crossing into the
21    other, but I want to be clear.  I'm not asking the
22    Court to reconsider anything.
23              What occurs in other cases?  I'm going to
24    do my very best not to speak about other cases and
25    other experiences with Ms. Malone in litigating
```

```
 1    cases with her.  To the extent that I do raise a
 2    case, Your Honor, it would be to just draw a
 3    comparison or contrast, but it's certainly not to
 4    chastise anything that Ms. Malone does in her
 5    practice.  That's not why I am here, Your Honor, and
 6    I want to be clear that if I have to speak about
 7    another case it's for the purpose of drawing an
 8    illustration for the Court.
 9            I'm going to -- I've had my fee agreement
10    vetted by my ethics attorney, and I've had it
11    presented to other courts, and they have never had
12    anyone tell me the things that Ms. Malone says.  But
13    I'm going to submit it to the Texas Bar.  I'm going
14    to attach a copy of Ms. Malone's motion and explain
15    that there is a lawyer that believes my fee
16    agreement is unethical and it harms my clients, and
17    I'm going to ask for their opinion on it.  If they
18    tell me there is something wrong with it, I will
19    change it, Your Honor.
20            It is obviously imperative to me as a
21    person, not as a lawyer but as a person, that I do
22    things the right way and my firm does things the
23    right way.  And to suggest I am manipulating
24    consumers is really a very tough pill to swallow.
25            I've -- Ms. Malone says we filed a
```

1    thousand lawsuits in federal court since 2010.  My

2    firm does practice in a number of states.  And

3    Ms. Malone brings to the Court's attention a couple

4    of depositions where things are excerpted and taken

5    not in the full context.

6             I don't -- one transgression, Your Honor,

7    is enough.  Do one thing wrong, it's not an excuse,

8    oh, it's only one thing, look at all these things.

9    So I'm not trying to say if something was done wrong

10   in any case that it's okay.

11            But I believe that if what Ms. Malone was

12   saying about this manipulating consumers and being

13   these horrible, horrible people that I would have a

14   flurry of bar complaints filed against me and my

15   lawyers.  And I don't, Your Honor.  I've never had a

16   bar tell me or any of my lawyers that anything we've

17   done is wrong.  Sure, we have had a handful of

18   clients file bar complaints.  I don't know, I think

19   maybe five out of 6-, 7,000, 8,000 clients, Your

20   Honor; not bar complaints related to my fee

21   agreement, however.

22            THE COURT:  Is there anything in your fee

23   agreement that discourages, to say the least, the

24   filing of bar complaints out of the attorney-client

25   relationship?

1              MR. MEYERS:  No, Your Honor.

2              THE COURT:  Okay.

3              MR. MEYERS:  And I want to make sure I

4    understand the Court's question.  That I would say

5    in my fee agreement, if you file a bar complaint

6    that I may do --

7              THE COURT:  It's just more general than

8    that.  Is there any kind of disincentive in your

9    agreement that you have clients sign toward them

10   filing some kind of grievance or bar complaint

11   against you or one of your lawyers.

12             MR. MEYERS:  I don't believe so, Judge.

13   But to the extent that the Court or the Texas Bar

14   will answer that question for me and give me an

15   opinion, then I will address whatever someone

16   suggests to me would possibly deter someone from

17   filing a bar complaint.

18             The Better Business Bureau, Judge, is

19   certainly not the end-all be-all of anything, but if

20   you look at my BBB page, Your Honor, you will see, I

21   don't know, I think there are 40, 45 people happy,

22   thrilled with what my firm has done for them.  I

23   have one person saying they didn't like the service

24   that I provided to them.  That was in Arizona, and

25   that was me.  And that person, we ended up resolving

 1    the case for them, waiving our fees, being done with
 2    the whole thing, showing up at a hearing.  They
 3    never corrected what they wrote on the bar, but I
 4    think that if there was this horrible thing going on
 5    in my law firm that everyone would know, the judges,
 6    the Bars, the BBB and everyone else.
 7            So I like to think, Judge, that we are
 8    good at what we do and that we work very hard to be
 9    good at what we do and that our good work does cause
10    consternation to the people who we allege violate
11    the law, and I can understand why people would want
12    to think bad things about me.
13            But -- and you know, Judge, I try to be an
14    empathetic person, and I understand the Court and
15    the very serious, grave issues that it deals with.
16    And I can understand how being in here over a d(6)
17    e(11) claim might be an aggravant.
18            THE COURT:  Probably one of the more
19    important things that the Court does; I wouldn't
20    call it an aggravant.
21            MR. MEYERS:  But you understand the
22    sentiment.  And my point, Judge, is that the law is
23    the law, the rules are the rules.  There was a time,
24    Judge, in the district of Arizona you have to file
25    things in 13 font and I was filing them in 12 font.

1    This is going back seven, eight, nine years.  And

2    Judge Anderson told me in open court, chastised me,

3    told me I'm using the wrong font.  It seems like a

4    harmless error, so to speak, but there is no such

5    thing.  The rule is the rule, the law is the law.

6    You follow it to the T or you expose yourself to the

7    consequences of not doing so.

8            So Judge, I don't feel that I am a bad

9    person for believing if a debt collector doesn't

10   comply with d(6) e(11) that they should be given a

11   free pass, and that's the way I have always

12   practiced.  I have been in consumer protection since

13   I was a law clerk; worked at law firm for several

14   years as a managing attorney of their Arizona

15   office.  And then I started my own firm with my

16   partner, Alex Weisberg and our wives, practicing out

17   of our homes to start our firm and to build it into

18   something that I like to think practices very good

19   law.

20           THE COURT:  Mr. Meyers, I am glad you are

21   here today, because I think it will be helpful to

22   have someone that's in charge of the firm maybe

23   explain some of the irregularities that have been

24   seen by the Court throughout this case.  So let me

25   ask you a couple of questions:  Whose firm is it?

```
1   Who are the managing partners?  Who are the owners

2   of the firm?

3            MR. MEYERS:  The equity partners are

4   myself and Alex Weisberg.  And Aaron Radbil is a

5   nonequity partner.  I am the managing partner and

6   ultimately responsible for everything.

7            THE COURT:  How many lawyers are there in

8   your firm?

9            MR. MEYERS:  There are -- we've had some

10  turnover recently, Judge, so I just need a moment to

11  calculate that.  I used to be able to do it off the

12  top of my head.

13           At this moment in time, Your Honor, I

14  believe we have 11 member attorneys of the firm, and

15  then of course we have lawyers that we work with in

16  a co-counsel relationship.

17           THE COURT:  How does that work?

18           MR. MEYERS:  The co-counsel?

19           THE COURT:  Yes.

20           MR. MEYERS:  When you say how, you want me

21  to just give you an overview?

22           THE COURT:  I am trying to get an idea of

23  the number of people that you are in charge of that

24  handle these cases.  So you say there are 11 members

25  of the firm.  And lots of people can use the
```

1    terminology "co-counsel," and that means a lot of

2    different things to a lot of different people, but I

3    don't know what that means.  What does that mean in

4    your case?

5             MR. MEYERS:  Sure.  When I speak of the

6    member attorneys, Your Honor, I mean members of my

7    firm who are licensed in different jurisdictions.

8             THE COURT:  And there are 11 of them.

9             MR. MEYERS:  Correct, Your Honor.  And

10   forgive me, I will, as I sit down, retrace my

11   numbers, but that's certainly a fair estimate in

12   everyone that I have listed here.

13            So in a co-counseling case, Your Honor,

14   it's literally that:  Weisberg & Meyers, co-counsel

15   to John Doe client, your case with, for example, in

16   Michigan and Ohio with the law offices of Ronald

17   Weiss.  We are completely co-counsel on the cases.

18   The fee agreement says we are co-counsel.  We share

19   responsibility per the ethical rules for

20   co-counseling.  We share the lifting with Mr. Weiss.

21   And this is just giving you an example, Your Honor.

22            We share the lifting with Mr. Weiss.  He

23   would obviously be there to attend appearances and

24   kind of the things on the ground.  And I like to see

25   if we can lend our knowledge to him in, you know,

1  vetting cases, Your Honor, and speaking about why

2  this may be a case and speaking about the theories

3  of the case.  Mr. Weiss would prepare his discovery

4  and his disclosure.  If the case went to a

5  deposition, I would probably personal want to

6  pro hac in on the case.

7          THE COURT:  Okay.  But Mr. Weiss, for

8  example, how many Mr. Weiss's are there out there?

9  Because it doesn't sound like this is some kind of

10  random pairing in a random case and you have this

11  attorney.  It sounds as though you have some people

12  either on maybe a retainer or on some kind of a list

13  across the country that operate like Mr. Weiss; is

14  that right?

15          MR. MEYERS:  I am very careful in who I

16  would associate my firm with, so I have a handful

17  people, yes, in various states who I choose to work

18  with.

19          THE COURT:  How many people would that be?

20          MR. MEYERS:  I missed one member attorney,

21  Your Honor, so I would add to 12.

22          THE COURT:  Okay.

23          MR. MEYERS:  I would, again, like, Your

24  Honor, the opportunity to just rethink this, but I'm

25  going to answer what I have right here.

```
 1              Four people, Your Honor, that I work with
 2      in co-counsel arrangements in the following states:
 3      Michigan; Ohio; New Mexico; Wisconsin.  So Michigan
 4      and Ohio for Mr. Weiss; New Mexico for a lawyer by
 5      the name of Anita Kelley; and I work with a lawyer
 6      named J.D. Haas in Wisconsin --
 7              THE COURT:  H-O-S-S?
 8              MR. MEYERS:  H-A-A-S -- in most courts in
 9      Wisconsin.  I am licensed in a federal court in
10      Wisconsin, in Nebraska, in Iowa, North Dakota and
11      South Dakota.  Mr. Haas is licensed in those states.
12      And then an attorney named John Skinner who we work
13      with in Massachusetts and New Hampshire.  These are
14      the people who my firm actively accepts co-counsel
15      cases with.
16              Now, during this case, Your Honor, we had
17      a couple other member attorneys of our firm, Craig
18      Ehrlich, who was a nonequity partner who left the
19      firm, and Paul Guibao.
20              The way that relationship is, Craig is a
21      fraternity brother, my little brother in a
22      fraternity, best friend, known him for 20-something
23      years.  And Paul is one of his very good friends.
24      So that's how -- I worked with Craig, and then Paul
25      worked with us.  Although, interestingly enough, I
```

1    worked with Paul before I worked with Craig in this

2    capacity.  They have left the firm, and are on their

3    own.

4            When they left, there were a number of

5    cases that Weisberg & and Meyers had accepted in

6    which they took with them.  So those cases -- that

7    discrete number, I don't know.  It's 30 cases, 40

8    cases, Your Honor, that remained in a co-counsel

9    relationship.  But the new cases and the new clients

10   they engage have nothing to do with my firm.

11           THE COURT:  So what you have named me so

12   far are the firms or lawyers out there that are in

13   co-counsel arrangements with your firm.

14           MR. MEYERS:  The first group, Weiss,

15   Kelly, Haas, and Skinner, those are people who I

16   work with on a co-counsel arrangement.

17           Ehrlich and Guibao used to be --

18           THE COURT:  Right, I understand that.

19           MR. MEYERS:  Okay.  Yes, right, but no

20   more.  And then there are a couple other people like

21   that, like Ehrlich and Guibao, who don't work with

22   my firm at all.  They have their own cases, their

23   own firm, we just share some resources.  Your Honor,

24   for example, some office support, some telephone

25   lines, websites and things like that.  But they are

1    doing their own cases, and unless I am in a

2    co-counsel arrangement with them I have nothing do

3    with their cases.

4         THE COURT:  Where is the main operation

5    set up for this firm?

6         MR. MEYERS:  My corporate office, Your

7    Honor, is in Phoenix where I am.

8         THE COURT:  Okay.  And are you licensed in

9    other than Phoenix, Arizona?

10         MR. MEYERS:  I am licensed in Arizona.  I

11   stay in federal court.  And then I am licensed in

12   various federal courts; but no, I am not licensed in

13   any other state courts.

14         THE COURT:  Where exactly is your firm?

15   Is it in a building, a law firm building?

16         MR. MEYERS:  Yes, Your Honor, it's a suite

17   in an office.

18         THE COURT:  How long has it been in

19   operation, your firm?

20         MR. MEYERS:  We started in the summer of

21   2006.

22         THE COURT:  Okay.  And what did you do

23   before that?

24         MR. MEYERS:  I worked at a different

25   consumer law firm called Krohn & Moss.  My history,

1    Your Honor, I was in law school, then I was a law

2    clerk at Krohn & Moss.  The first day out of law

3    school, they charged me with opening up an Arizona

4    practice and running it, you know, and starting and

5    running the Arizona office.  Great experience.  It

6    got up to the Arizona Supreme Court a couple of

7    times my first couple of years, appellate court,

8    tried cases, et cetera; great experience as far as

9    practical get out there and do it.

10           So then in 2006, Alex Weisberg and I left

11   Krohn & Moss to start our own firm.  We started a

12   firm as an Arizona and Florida lemon law firm;

13   that's all we were doing was Arizona and Florida

14   lemon law cases.  And then we had some opportunities

15   develop to expand our lemon law practice in, I

16   believe, New Mexico and Texas.  We had member

17   attorneys, not people -- anyone associated with my

18   firm anymore, they are just people who were there

19   and who left.

20           And then, Your Honor, in maybe 2008, we

21   expanded from just lemon law to get into a broader

22   consumer finance practice.  And from there, Your

23   Honor, we have not just been doing FDCPA cases, I

24   take a TILA case; for example, I tried one in the

25   District of Colorado a couple of months ago.

1    Obviously I do consumer fraud, and I will only do

2    consumer work though.

3            I do some work in actually consulting debt

4    collectors about plaintiff's attorney's fees and how

5    to deal with those and minimize them and fight them.

6    I don't do any work against the substantive claim,

7    but I do counsel people how to deal with the issue

8    of attorney's fees.

9            THE COURT:  Mr. Meyers, have you ever been

10   in trouble with the State Bar anywhere in the United

11   States?

12           MR. MEYERS:  I have had a couple of bar

13   complaints filed, Your Honor, but never, ever, ever,

14   has it passed even the just beginning stage.  For

15   example, I represented a client --

16           THE COURT:  That's fine.  You don't have

17   to tell me.  What about Mr. Weisberg?

18           MR. MEYERS:  No, Your Honor -- no, I'm

19   sorry.  Hang on, Your Honor.  Yes.  Mr. Weisberg,

20   when we were at Krohn & Moss, there was

21   apparently -- and this is not involving me, and this

22   is going back many years, so I'm going to tell you

23   the best I can remember.  There was apparently

24   something on the Krohn & Moss website that one of

25   the opposing counsel took exception with and filed a

1   bar complaint against Alex.  I don't remember

2   exactly how it was disposed of.  I'm sure they

3   corrected the website, and I'm sure they understood

4   that it wasn't Alex's doing, but nothing, nothing

5   more than that.  I mean, never anyone saying I've

6   held them hostage for fees, stolen money --

7          THE COURT:  Okay.  Have you -- have you

8   ever had a lawsuit filed against you by a former

9   client in your career?

10          MR. MEYERS:  Yes, Your Honor.  And I want

11  to correct one other thing.  At Krohn & Moss -- and

12  actually, this is going back 10 or 11 years -- there

13  was something with an IOLTA account that their

14  bookkeeper messed up.  And of course since it was in

15  Arizona, I had to take responsibility for that.

16          THE COURT:  Okay.  Let's get back to

17  lawsuits by former clients against you.

18          MR. MEYERS:  Yes, one client, Your Honor.

19  We have sued --

20          THE COURT:  Just one?

21          MR. MEYERS:  Yes, Your Honor.  We have

22  sued two clients in our entire lives.  Okay?  One

23  client, a gentleman in Texas as it happens to be,

24  the defendant -- it was a lemon law case.  BMW sent

25  him directly the settlement check which included our

1   attorney's fees, and he kept it and he refused to

2   pay us.  So we sued him, and that's actually a

3   pending lawsuit.

4            THE COURT:  Have you ever used your fee

5   agreement as something to rely upon in halting a

6   suit by a former client or discouraging?

7            MR. MEYERS:  No, Your Honor.

8            THE COURT:  Okay.  That answers that

9   question.

10            Now I want to know, how did you come upon

11   Mr. Radbil?

12            MR. MEYERS:  Well, it's all very tight

13   relations in my firm.  And I'm a really very

14   distrustful person, so I have to really know that

15   someone is not going to be someone that I don't want

16   to work with.

17            So how I came upon Noah was through his

18   brother, Aaron.  How I came upon Aaron was because

19   Aaron was a law clerk for Alex in the Florida office

20   of Krohn & Moss.  So Aaron worked for Alex as a law

21   clerk.  Alex and I -- Aaron got licensed and

22   ultimately moved from Florida, where he went to law

23   school, to Illinois to practice in the Illinois

24   office.  By that time, the time he was licensed --

25            THE COURT:  Slow down a little bit,

1    please.

2          MR. MEYERS:  -- and I might be a little

3    bit hazy on my dates, Alex and I had left

4    Krohn & Moss and started our own firm.  But Alex and

5    Aaron had developed a nice relationship, and Aaron

6    had a very excellent reputation for writing and

7    lawyering.  So we ultimately reached an agreement

8    for him to join us at Weisberg & Meyers.

9          THE COURT:  This is the brother Aaron.

10          MR. MEYERS:  Yes.  So what happened, Your

11    Honor, obviously we're just working together.  And

12    then Noah used to work for a law firm called

13    Camara & Sibley, a couple of Harvard law graduates,

14    and they were doing some complex litigation, and we

15    wanted to work with them on more class actions and

16    more complex things than what we were doing.

17    Figured, hey, that's a great group of people to work

18    with and kind of learn from and everything.  So we

19    started to do that.  And then, as it turned out,

20    that relationship did not work as well as we would

21    like because, quite honestly, I felt like our cases

22    were not getting --

23          THE COURT:  Let's just get to Mr. Radbil.

24    Okay?

25          MR. MEYERS:  Yes.  So Noah was there.  So

1    in other words, how we worked with Camara & Sibley

2    was because obviously Noah worked there.  So that's

3    how I first began to work with Noah.  And then after

4    some time of working with Camara & Sibley, Noah

5    decided to join our firm.  So I know him from my

6    relationship with his brother.

7              THE COURT:  Have you actually ever seen

8    Mr. Radbil in operation?

9              MR. MEYERS:  I have not seen him at trial,

10   Your Honor.  I have seen him at deposition, and I

11   have seen him -- we do meetings, Your Honor,

12   about --

13             THE COURT:  That's my question, have you

14   seen him?

15             MR. MEYERS:  At trial?

16             THE COURT:  Have you seen in him

17   operation?  You say you haven't seen him in trial --

18             MR. MEYERS:  Well --

19             THE COURT:  -- but you've seen him in

20   depositions.

21             MR. MEYERS:  Yes.  And I have seen him

22   explain theories in cases in our weekly meetings

23   about what cases we think are sufficient to bring

24   claims on.  Before any lawsuit gets filed, Judge --

25             THE COURT:  You don't have to get into

```
 1   that long diatribe there.

 2            MR. MEYERS:  Sure.

 3            THE COURT:  Tell me, where did Mr. Noah

 4   Radbil go to law school?

 5            MR. MEYERS:  He went to Southwest.

 6            THE COURT:  Where?

 7            MR. MEYERS:  In Texas.

 8            THE COURT:  In Texas.

 9            MR. MEYERS:  Yes.

10            THE COURT:  Okay.  And you have seen the

11   law degree?

12            MR. MEYERS:  Yes, Your Honor.

13            THE COURT:  And he is licensed to practice

14   in Texas?

15            MR. MEYERS:  Yes, Your Honor.

16            THE COURT:  What about you?  Where did you

17   go to law school?

18            MR. MEYERS:  I went to the John Marshall

19   Law School in Chicago.

20            THE COURT:  When did you graduate?

21            MR. MEYERS:  I graduated in 2000.

22            THE COURT:  Okay.  All right.

23            What I would like to do is, I will let you

24   finish up with any kind of opening remarks and then

25   I would like to go ahead and turn it over to the
```

1   movants here and get started with the basis for

2   their motion.

3             MR. MEYERS:  Yes, Your Honor.

4             To get back to that.  I'm here, Your

5   Honor, to -- to learn from the Court what we could

6   have done differently, what we could have done

7   better.  And I'm here to explain, Your Honor, that

8   no matter how it is casted, it is not who I am as a

9   lawyer, as a business person, as a human being, to

10  be the terrible person that Ms. Malone makes me out

11  to be.

12            I am very selective in the cases I bring

13  and in the clients I accept, Your Honor.  And

14  certainly it's the practice of law, and I've got to

15  get better at it, and I believe that I will get

16  better every day until I obviously stop working,

17  Your Honor.  But at the end of the day, Your Honor,

18  I think -- I would -- very clear on being late to

19  trial, no question, sanctions.

20            A little less clear on what exactly it was

21  that we did during the case that is worthy of

22  sanctions.  And I would like obviously to hear

23  specifically and be able to present the Court

24  evidence.

25            Otherwise, the trial, Your Honor, I have

```
 1   read the transcript.  I have a general problem with
 2   armchair quarterbacking.  If I'm not there, I have a
 3   general problem with telling people how they should
 4   have and could have done things differently
 5   because --
 6             THE COURT:  Let me ask you this:  Have you
 7   talked to Dr. Timothy white about any of this.
 8             MR. MEYERS:  You know, I have not, Your
 9   Honor.
10             THE COURT:  So you've got all of these
11   motions for sanctions, you've got a highly unusual
12   situation with one of your attorneys in your
13   12-member firm, and you haven't talked to the client
14   about what happened?
15             MR. MEYERS:  You know, I haven't, Your
16   Honor.  I haven't.  And it was a decision that I did
17   not want to bring up anything to Dr. White that
18   would, you know, rehash anything that was bad that
19   occurred, Your Honor.  And because I was not there,
20   I really didn't want to get a skewed vision of what
21   happened.  I wanted my understanding to be based on
22   the transcript, itself, because that would seem to
23   be the strongest indicator of what happened.
24             THE COURT:  You're kidding.  You're
25   kidding about that.  You haven't talked to this
```

1  client.  Is he -- so do you even know, as the person

2  in charge of the firm and here to take

3  responsibility as you have described it, whether or

4  not he's a happy former client?  Is he -- do you

5  know anything about that?

6          MR. MEYERS:  I know that we've had

7  communications with him after the trial.

8          THE COURT:  Who is "we"?

9          MR. MEYERS:  Our office.

10         THE COURT:  Who does that mean?

11         MR. MEYERS:  I know Noah, in particular,

12  Your Honor.  I don't think that he would be a

13  satisfied client, Your Honor.  I don't think he

14  would be satisfied because we didn't ultimately win

15  for him.  But I think it's a different issue.  Is he

16  satisfied versus does he think we did something

17  untoward him?

18         And you know, Your Honor, this has been a

19  very difficult, difficult thing for me to get my

20  head around.  I've been very conflicted about

21  exactly how I would deal with it, deal with the

22  whole thing.  And I ultimately decided, Your Honor,

23  that I wanted to come here and I wanted to listen to

24  the Court and listen to Ms. Malone, because I've

25  obviously heard Mr. Radbil's story.

1              THE COURT:  Let me ask you this:  How many

2    lawsuits does Mr. Radbil have his name on across the

3    United States, just a ballpark estimate, because I

4    heard the word 86 in Texas.  Do you have any idea

5    about that?

6              MR. MEYERS:  When you say his name, do you

7    mean appearance?

8              THE COURT:  What lawsuits is he in charge

9    of out of your law firm?

10             MR. MEYERS:  No, Your Honor, I don't know

11   the answer to he's in charge of this many lawsuits

12   because I feel that as the --

13             THE COURT:  Let's change the question,

14   then.

15             MR. MEYERS:  Sure.

16             THE COURT:  How many lawsuits would he be

17   listed as counsel of record on the docket sheet

18   across the country?

19             MR. MEYERS:  There would be only one case

20   outside of Texas where he would be counsel of record

21   or one of the counsel of record, and that's a class

22   action that's waiting for a certification.  It's got

23   a preliminary approval.

24             THE COURT:  How many in Texas?

25             MR. MEYERS:  I think that there are

```
 1    probably maybe 25 state court lawsuits, between

 2    lemon law and --

 3           THE COURT:  You don't have to parse it

 4    down for me, I am asking numbers; 24 state, how many

 5    federal?

 6           MR. MEYERS:  I would say probably, Your

 7    Honor, another 25 federal suits; I would assume 50

 8    cases.  And Your Honor that is -- I can't answer

 9    that question if I just delve into it, but I would

10    say probably about 50 cases, Your Honor.

11           THE COURT:  With your 12-member firm

12    across the United States, not these co-counsel

13    situations, but your 12-member firm, about how many

14    lawsuits, state and federal combined, generally

15    would you say are your -- is your 12-member firm

16    involved in?

17           MR. MEYERS:  I would say at this point,

18    Your Honor, we probably have 250 pending lawsuits.

19           THE COURT:  Across the United States,

20    state and federal?

21           MR. MEYERS:  Yes.  And Your Honor, I could

22    be -- it could be 300, Your Honor, it could be 350,

23    but it's right in that range, Your Honor.

24           THE COURT:  Okay.  Mr. Meyers, is there

25    anything else before we get started?
```

```
 1              MR. MEYERS:  No, I don't think so, Your
 2   Honor.
 3              THE COURT:  All right.  Thank you.
 4              Ms. Malone.
 5              MS. MALONE:  Your Honor, did you want --
 6   did Mr. Radbil want to speak -- I didn't want to --
 7              THE COURT:  I'm assuming Mr. Meyers is
 8   speaking for him.  Mr. Meyers, is that correct?
 9              MR. MEYERS:  To the extent that I can,
10   Your Honor, and to the extent that it's an
11   appropriate question, yes, I would like to, Your
12   Honor.
13              THE COURT:  Speak for him?
14              MR. MEYERS:  Yes, Your Honor.  And I'm
15   sure there are going to be some things that only
16   Mr. Radbil would be able to speak to.
17              THE COURT:  Understand.  Just as far as
18   up-front, I was assuming you were here to speak
19   up-front for him; but yes, absolutely there will be
20   some questions that he will have to answer.
21              MR. MEYERS:  Right.
22              THE COURT:  Thank you.
23              MS. MALONE:  Your Honor, at this time the
24   movant would call Noah Radbil to the stand.
25              THE COURT:  Mr. Radbil.
```

```
 1          I do have a question while Mr. Radbil is
 2   getting up here.
 3          Mr. Meyers, did you get any messages from
 4   my office yesterday about appearing here, to call us
 5   back?
 6          MR. MEYERS:  Perhaps, Your Honor.  I was
 7   headed to the airport about one o'clock.  And Your
 8   Honor, I would like to fix something that I said.
 9   Mr. Radbil and I tried a case in the Eastern
10   District of Texas about six weeks ago, so I tried
11   the case.  Mr. Radbil didn't question anyone; he did
12   help me with some arguments to the Court.  So to the
13   extent I have seen him at trial in that regard --
14          THE COURT:  Was it one of the consumer
15   cases?
16          MR. MEYERS:  It was case against
17   Ms. Malone.
18          THE COURT:  Mr. Radbil, raise your right
19   hand, please.
20                    NOAH RADBIL,
21   having been first duly sworn, testified as follows:
22          THE WITNESS:  I do.
23          THE COURT:  Have a seat, please.
24          Ms. Malone.
25          MS. MALONE:  Thank you, Your Honor.
```

44

1          **DIRECT EXAMINATION**

2  Q.   (By Ms. Malone)  Mr. Radbil, just so we are

3  clear, can you tell us what year you graduated from

4  South Texas?

5  A.   December of 2009.

6  Q.   You graduated from law school the same time you

7  were licensed?

8  A.   Maybe it was late 2008.  I don't recall

9  exactly.  I know I was licensed in December of 2009.

10  Q.   My question, sir, was:  When did you graduate

11  from law school?

12  A.   A few months prior.  I don't remember the exact

13  date.

14  Q.   Mr. Radbil, have you shared with Mr. White that

15  the Court has awarded costs against him in this

16  case?

17          THE WITNESS:  Your Honor, I would object

18  to that on the ground of attorney-client privilege.

19          THE COURT:  Overruled.  Speak into the

20  microphone.  I can't hear you.

21  Q.   (By Ms. Malone)  Have you told Mr. White that

22  the Court has awarded court costs against him?

23  A.   No, because he is not paying the court costs.

24  Q.   Okay.  Have you made arrangements with

25  Mr. White or Dr. White that you would pay court

1   costs?

2   A.    Yes.

3   Q.    And did you memorialize that in writing to

4   Dr. White?

5   A.    No, but I believe it's on the record at trial,

6   if I'm not mistaken.

7             THE COURT:  Why don't you sit up, that way

8   you don't have to move up every time.  Or else move

9   the microphone so you don't have to rock back and

10  forth like that, please.

11  A.    If I'm not mistaken, that's the agreement we

12  discussed on the record at trial.

13  Q.    (By Ms. Malone)  You are telling the Court that

14  at trial you told Dr. White if there were court

15  costs or other matters awarded against him that you

16  would take care of it?

17  A.    That's my recollection, yes.

18  Q.    Mr. Radbil, are you familiar with the Dondi

19  case?

20  A.    I've read it, yes.

21  Q.    And have you affirmed to the case that you have

22  read and are willing to follow the Dondi case?

23  A.    I have.

24  Q.    Are you familiar with the Texas Attorney Creed,

25  sir?

1   A.    I am.

2   Q.    And have you confirmed -- or have you advised

3   the courts that you are following the Texas Attorney

4   Creed as it has been adopted by Dondi.

5            THE COURT:  Mr. Radbil, please keep your

6   hands down and sit up to the microphone.  Pull it

7   towards you if you have to.

8   A.    I don't recall advising the Court of that, but

9   I do recall the lawyer's creed.  And to the extent

10   that answers that question --

11   Q.    You do understand, sir, that in a number of the

12   standing orders in Texas in federal court there is a

13   provision where the attorneys must affirm they have

14   read and agree to follow the terms of the Dondi

15   case; not just Judge Boyle, other courts.

16   A.    I'm aware of that.

17   Q.    And you have made that assertion to courts,

18   correct?

19   A.    Sure.

20   Q.    Okay.  Mr. Radbil, where is your office located

21   in Texas?

22   A.    We have satellite offices or office addresses

23   in Texas, but I recently moved to Phoenix, Arizona,

24   with my brother, and I office with Marshall and him

25   in Phoenix, Arizona.

```
1    Q.    When did you move to Phoenix, sir?

2    A.    Last year.

3    Q.    What time?

4    A.    I don't recall exactly.

5    Q.    Okay.  And your satellite offices before you

6    moved to Phoenix, did you have a physical office

7    that you went to?

8    A.    I worked from an office in Rice Village in

9    Texas, and then I had an office in the Medical

10   Center in Houston, Texas.  And then I moved to

11   Arizona.

12   Q.    Sir, my question is:  Did you have a physical

13   office that you went to on a daily basis?

14   A.    Yes.

15   Q.    You had an actual physical office, not a

16   virtual office --

17   A.    Yes.

18   Q.    -- that you went into and I could come visit

19   you there.

20   A.    Uh-huh.

21   Q.    You had pictures on the wall.

22   A.    There was pictures, yes.

23   Q.    Your pictures?

24   A.    I'm sorry?

25   Q.    Your pictures, your office?
```

1    A.    Yes.

2    Q.    And that you decorated with your law firm --

3    your law license hanging.

4    A.    I don't know whether it was framed or not,

5    but -- it may not have been framed at that point,

6    but. . .

7    Q.    Is it --

8    A.    There were certain -- sorry, go ahead.

9    Q.    Go ahead.

10   A.    I had certain things hanging, a certificate for

11   when I clerked for the Attorney General of the State

12   of Texas.  I had a thank you note from Tom Craddick,

13   the Speaker of the House, when I served as his Chief

14   of Staff during a Special Legislative Session.  And

15   I believe I had my UT Austin degree framed, as well.

16   Q.    There are two addresses that you have given to

17   the State of Texas through the bar as addresses

18   where you physically had an office.  One was on

19   Alameda.  Did you have a physical office there?

20   A.    Uh-huh.

21   Q.    Yes?

22   A.    That's correct.

23   Q.    And then your mail could be delivered there and

24   you would pick it up yourself.

25   A.    Yes.  Well -- yes, that's correct.  There would

```
 1  be a concierge downstairs who would call up and I
 2  could walk down.  And I had a physical mailbox,
 3  also, but it was in the same building that my office
 4  was and I didn't -- yeah, it was delivered to my
 5  office, same physical address.
 6  Q.   And the same thing with Smith Street, you had a
 7  physical office located in the Smith Street
 8  building.
 9  A.   No, I think the Smith Street office was used
10  for mailing.
11  Q.   Okay.  So it's a virtual office, a virtual
12  office.  It's not an actual office where you would
13  go in and be; is that correct?
14  A.   Yes, that's correct.
15  Q.   And that's the address that you have listed
16  with the State Bar, correct?
17  A.   Currently?
18  Q.   Yes.
19  A.   No, I think I have updated my address.
20  Q.   I looked at it this morning.  That's the
21  address you have listed with the State Bar; is that
22  correct, sir?
23  A.   No, I don't think that it is.  I think I have
24  updated it.
25  Q.   So you think the State Bar hasn't corrected
```

1    what you have submitted yet?

2    A.    I logged onto my State Bar page and updated my

3    address.   I haven't checked to see what it says, but

4    I do recall updating it.

5              MS. MALONE:   Your Honor, may I approach?

6              THE COURT:   You may.

7    Q.    (By Ms. Malone)   Mr. Radbil, do you recognize

8    that as the State Bar of Texas website for you

9    printed off at the bottom on August the 2nd, 2013?

10   A.    Sure.

11   Q.    And it has listed as your physical address

12   Smith Street in Houston, Texas, correct?

13   A.    I don't see the --

14   Q.    At the top of the form, Mr. Radbil, it says

15   work address.

16   A.    Yes.   That's -- okay.   Yes.   It says Two Allen

17   Center, 1200 Smith Street, 16th Floor, Houston,

18   Texas 77002.

19   Q.    In fact, there was a time during the course of

20   this case during one of the depositions that you

21   were actually suspended by the State of Texas

22   because your State Bar dues went to some address

23   that you didn't get, correct?

24   A.    Incorrect.

25   Q.    Incorrect?   You got them and just didn't pay

1   your invoices?

2   A.   I would be happy to --

3           MR. MEYERS:  Your Honor, I would object to

4   the relevance of these questions.

5           THE WITNESS:  Let me --

6           THE COURT:  I overrule the objection.

7   Right now I think this goes to credibility.  And

8   once again, as during the trial, I am not sure what

9   Mr. Radbil is agreeing to and what he's not.  So

10  Ms. Malone, if you would ask the question again and

11  just listen to it and answer the question asked.  Go

12  ahead.

13  Q.   (By Ms. Malone)  Mr. Radbil, during the course

14  of this case on the second deposition that was taken

15  of Bob Wyatt, at that time you were technically

16  suspended from the State Bar of Texas for failure to

17  pay your bar dues; isn't that correct?

18  A.   I don't know the answer to that.  I don't

19  recall the exact date when that occurred.  I know

20  that you and I had a case in the Dallas County

21  District Court, and before court one morning I came

22  in and was sitting next to you.  And then we made

23  our appearances on the record, at which time you

24  said there was a housekeeping matter, Judge.  It's

25  come to my attention that Mr. Radbil has been -- his

1   law license has been suspended for not paying bar

2   dues, at which point -- and this is all on the

3   record.  Of course I was surprised and shocked and

4   told the judge that that was news to me, that it was

5   something that my firm handles as a logistical

6   matter for me.  And you said that I couldn't appear

7   in court.  And we actually called the State Bar on a

8   conference call and found out that what I had to do

9   was just to pay my dues immediately and that I could

10   do that online, and we took care of that online and

11   proceeded.  So there's a record of that, and I would

12   defer the Court --

13          THE COURT:  You were suspended, she was

14   right, correct?

15          THE WITNESS:  I don't know whether --

16          THE COURT:  Oh, come on, Mr. Radbil.  You

17   were suspended when she said you were suspended, you

18   just agreed to it by talking about what you did with

19   the State Bar; you were suspended when she said you

20   were suspended during that case for not paying your

21   dues, correct?

22          THE WITNESS:  I don't know the answer to

23   that.  I think the fee issue is the eligible

24   practice versus merit-based suspension.

25          THE COURT:  Were you suspended from the

1   practice of law for not paying your dues?

2           THE WITNESS:  I would have to contact the

3   State Bar and find out the answer to that.

4           THE COURT:  So you don't know the answer.

5           THE WITNESS:  Correct.

6           THE COURT:  I don't believe you.

7           All right.  Next question.

8           MR. MEYERS:  Your Honor, I will stipulate

9   that it is the firm's responsibility to pay the

10  dues.  To the extent we missed the mark on that --

11          THE COURT:  So you are supporting

12  Mr. Radbil -- you are supporting this charade up

13  here.

14          MR. MEYERS:  I am simply saying, Your

15  Honor, that it is my responsibility to, when I get a

16  bill, pay the bar dues.

17          THE COURT:  Mr. Meyers, if I had a lawyer

18  in my firm that even began to do some of the things

19  that have occurred on the record in this case with

20  Mr. Radbil, he would be nowhere close to the law

21  firm.  The fact that we are back here today after

22  all of that and he's doing the same thing and it's

23  so obvious and it's so outrageous, I am looking to

24  you to say, do you not recognize this?

25          MR. MEYERS:  Your Honor, if it were me up

```
 1   there, I believe I would have answered the question
 2   yes.
 3              THE COURT:  Right.  All right.
 4              Ms. Malone.
 5   Q.   (By Ms. Malone)  Mr. Radbil, did you have a
 6   conversation with Mr. Marshall Meyers about the
 7   trial of this matter after it occurred?
 8              THE COURT:  Put your hands down.
 9   A.   I did.
10   Q.   (By Ms. Malone)  Did you talk about the
11   specific issues that arose in the trial regarding
12   Rule 37?
13   A.   I did.
14   Q.   You did?
15   A.   I did.
16   Q.   Did you tell Mr. Meyers that you felt that the
17   problem with the initial disclosures was the action
18   of the prior attorney and you had no responsibility
19   to supplement?
20   A.   I don't recall doing that, no.
21   Q.   Okay.  Let's talk a minute about the local
22   counsel.  In the Northern District, you have a
23   mailing address, is that correct, sir?
24   A.   I believe so, yes.
25   Q.   And it's -- I think it's somewhere off 635,
```

1  correct?  I'm sorry, you may not know 635 is LBJ.

2  Yes?

3  A.   Yes.

4  Q.   Okay.  And you have designated Mr. Claunch as

5  someone who is acting as local counsel for you in

6  this case.

7  A.   Kirk Claunch.

8  Q.   And Mr. Claunch's name doesn't appear in any of

9  the billing records of this case; isn't that

10  correct, sir?

11  A.   I don't know the answer offhand.

12  Q.   Did Mr. Claunch do any work on this case?

13  A.   I spoke to Mr. Claunch several times in this

14  case.

15  Q.   Did he do anything specifically in regard to

16  meeting with the client?

17  A.   What do you mean, do anything?

18  Q.   Did he have any meetings with the client to

19  talk about testimony and procedures at trial, sir?

20  A.   No.  I believe that we entered Mr. Claunch's

21  appearance in response to an e-mail from you saying

22  that we are going to file an 8310 motion at which

23  time, to be on the safe side, we entered the

24  appearance of Mr. Claunch.

25  Q.   And that motion would have been that you were

1  in violation of the local rules for the Northern

2  District for not having an attorney who resided or

3  had an office within the Northern District; isn't

4  that correct, sir?

5  A.    Correct.

6  Q.    And you were in violation of the rule at the

7  time I sent you the notice.

8  A.    It's unclear, but I think that's why we entered

9  the appearance of Kirk Claunch, because we wanted to

10  comply and make sure we were complying.

11  Q.    Let's be clear, Mr. Radbil:  You do not live in

12  the Northern District of Texas, do you?

13  A.    I do not.

14  Q.    You do not have a physical office that you go

15  to on a daily bases in the Northern District of

16  Texas, do you?

17  A.    No; that is why we have local counsel, Kirk

18  Claunch, who appears in cases filed in the Northern

19  District of Texas.

20  Q.    And at the time that I sent you that e-mail,

21  you did not have anyone designated as local counsel;

22  isn't that correct, sir?

23  A.    Yes, that's correct.

24  Q.    You understand that, as a member of the

25  Northern District, you are required to read and

1  follow their rules.

2  A.    I understand that.

3  Q.    Mr. Radbil, did you have any discussion with

4  Mr. Meyer (sic) prior to trial as to how to conduct

5  opening statements in this case?

6  A.    I did.

7  Q.    You did?

8  A.    Uh-huh.

9  Q.    Did you bill for that time with Mr. Meyer?

10  A.    I don't recall.

11  Q.    Did you talk to Mr. Meyer about how you would

12  proceed with producing evidence in this case?

13  A.    His name is Mr. Meyers.

14  Q.    I apologize.  Mr. Meyers.

15  A.    Thank you.  Regarding how I would proceed with

16  evidence in this case?

17  Q.    Yes, sir.

18  A.    Yes.

19  Q.    You did?

20  A.    I did.

21  Q.    How long were your meetings with Mr. Meyers?

22  A.    I met with Mr. Meyers, I met with Craig

23  Ehrlich, I met with my brother, specifically before

24  the mediated settlement conference to outline a

25  detailed plan in accordance with communicating with

1    our client to negotiate the resolution of this case.

2              I met with Mr. Meyers first; I met with

3    Mr. Craig Ehrlich second; I met with Aaron Radbil

4    third.  All had different views slightly, but all

5    gave input.  And then I counseled -- excuse me --

6    Dr. White for some time regarding his claims and the

7    outline that I put together for the mediated

8    settlement conference before we went in.  So that

9    was, you know, also part of trial preparations

10   because it was so close.

11   Q.   So you're telling the Court that what you did

12   in these meetings to discuss the mediated settlement

13   matters was what you did to prepare for trial in

14   this case?

15   A.   No; that was a tiny, small piece of what I did

16   to prepare for trial in this case.  In fact, we

17   didn't think the case would be tried, nor did we

18   understand the logic of proceeding after summary

19   judgment had been granted.  But that was not

20   something we could control other than to prepare for

21   the mediated settlement conference and try to settle

22   the matter without trial.  So that's why so much

23   time was spent preparing for the mediated settlement

24   conference.

25             THE COURT:  Did you ever give them a

1   demand figure?

2          THE WITNESS:  At the mediated settlement

3   conference?

4          THE COURT:  Any time.

5          THE WITNESS:  We did, yes.

6          THE COURT:  What was the figure?

7          THE WITNESS:  I believe we gave their

8   client a presuit demand.  I believe it was -- I

9   don't remember the exact figure, but the letters I

10  saved, it was under $10,000.

11         MR. MEYERS:  I could present the Court

12  with the demands and the chronology, Your Honor.

13         THE WITNESS:  Yeah, and there was also --

14         THE COURT:  Let's stop for just a moment.

15  Ms. Malone, maybe you can clear this up for me,

16  because I know there is an issue about the demand.

17  Q.   (By Ms. Malone)  Mr. Radbil, if you would turn

18  with us in the exhibit tabs before you -- I have

19  made a courtesy copy just to make it easy.

20         MS. MALONE:  Your Honor, these are the

21  same ones the Court has.

22  Q.   (By Ms. Malone)  If you would look with me at

23  Tab Number 10.

24  A.   E-mail from Kurz.

25  Q.   Yes, it's Tab Number 10, sir.

1   A.   Okay.

2   Q.   In September of 2011, this e-mail indicates I

3   requested a demand.  And what was Mr. Kurz's

4   response at that time?

5   A.   Dennis Kurz wrote to you on Friday,

6   September 9, 2011:  Robbie, you had asked me for a

7   demand in this case, given our initial pre-lit

8   demand had expired.  As this case is now in

9   litigation, we have no demand at this time.

10          I think this is clarified in the joint

11   status report that we filed in this court --

12          THE COURT:  Hold on, Mr. Radbil.  That was

13   not her question.

14   Q.   (By Ms. Malone)  Mr. Radbil, did I file an

15   offer of judgment that was received by your office?

16   A.   Did you file one?

17   Q.   Send one to you, serve an offer of judgment in

18   September of 2011 in this case?

19   A.   I believe an offer of judgment or -- yes.

20   Q.   And Mr. Radbil, let's be clear, prior to the

21   mediated settlement conference, you personally made

22   no settlement demand on me; is that correct?

23   A.   Did I personally communicate them?

24   Q.   Yes, sir.

25   A.   Our firm did.

```
1    Q.    No, I'm asking if you did.

2    A.    No; our firm did.

3    Q.    Isn't it also true that following the summary

4    judgment motion only Mr. Meyers communicated with me

5    regarding settlements.

6    A.    That's incorrect.

7    Q.    Are you saying that you communicated with me

8    regarding settlements after the summary judgment

9    ruling by the Court?

10   A.    Specifically, yes.

11   Q.    At mediation only.

12   A.    No, prior to.

13   Q.    When did you communicate a demand to me,

14   Mr. Radbil?

15   A.    I remember -- I have an e-mail in one of the

16   binders that you and I are discussing settlement,

17   particularly my view that our clients would

18   hopefully resolve this matter at the mediated

19   settlement conference so we wouldn't have to try

20   Dr. White's remaining claims.

21             THE COURT:  The question she asked you

22   was, when did you communicate a demand to her?

23             THE WITNESS:  There was an initial demand

24   before we filed suit, and then far before the

25   mediated settlement conference there was an $8,500
```

 1   demand that was communicated to Ms. Malone.

 2           THE COURT:  By you?

 3           THE WITNESS:  Personally, no, it was not.

 4   Q.   (By Ms. Malone)  My question is:  When did you

 5   relay any demands to me prior to the mediated

 6   settlement conference, Mr. Radbil?

 7   A.   Relay or personally -- I didn't personally --

 8   Q.   Personally give me one, Mr. Radbil.

 9   A.   I don't recall whether I did or not.  I may

10   have --

11   Q.   Thank you, sir.

12   A.   -- but we certainly --

13   Q.   Okay.  Now, Mr. Radbil, at the mediated

14   settlement conference, did you make a demand in

15   excess of $100,000?

16   A.   Does the Court allow me to talk about the

17   mediated settlement conference?

18           THE COURT:  I want you to answer the

19   question; yes.

20   A.   After discussing with my client at length and

21   based on the strategy that I had prepared in good

22   faith to try to settle this matter, I think that,

23   yes, a demand over $100,000 was made, although I

24   don't recall the specific amount.

25   Q.   Did Judge Stickney tell you that that demand

 1   was inappropriate in a case with the kind of damages

 2   we had.

 3   A.   I don't recall.  I don't think so.

 4   Q.   Okay.  All right.  Mr. Radbil, let me talk to

 5   you a minute about the exhibits that were used in

 6   trial in terms of the hard copy exhibits that were

 7   given.

 8        Did you send to me at any point in time the

 9   Court-required description of what exhibits would be

10   offered by you and the basis for their admission?

11   A.   Sure.

12   Q.   You sent me a description, Mr. Radbil, that you

13   were filing with the Court and me that described the

14   basis for your admission of each of the exhibits you

15   proffered at trial?  Is that your testimony, sir?

16   A.   We sent pretrial disclosures in late 2012, and

17   those pretrial disclosures outlined by document

18   number that was on file with the court the specific

19   exhibits that we intended to offer.

20            THE COURT:  Of course that was not the

21   question.  She's asking you about trial exhibits.

22   That's a big difference from pretrial disclosures.

23            Did you send her any kind of indication

24   that trial exhibits -- where you gave a description

25   of specific trial exhibits?

```
 1              THE WITNESS:  Those were our trial
 2   exhibits.  It was a trial exhibit list that was
 3   communicated to Ms. Malone.
 4              THE COURT:  But that was your pretrial
 5   disclosure list.  Are you saying it was one and the
 6   same?
 7              THE WITNESS:  I am saying there were two
 8   pretrial disclosures, and the first exhibit list was
 9   communicated to Ms. Malone well before.
10              THE COURT:  Right.  Is this your trial
11   exhibit list?
12              THE WITNESS:  Yes.
13              THE COURT:  How was it so designated?
14              Don't answer that.  Let me give it back to
15   Ms. Malone.
16   Q.   (By Ms. Malone)  Mr. Radbil, are you familiar
17   with the Court's trial scheduling order in this
18   case?
19   A.   I am.
20   Q.   Do you recall that Judge Boyle specifically had
21   a provision that, separate and apart from the simple
22   list for each exhibit that would be offered at
23   trial, that there must be an accompanying document
24   that described the basis for that admission, and the
25   order further warns that failure to do so may
```

1   prevent the document from being proffered.

2       Do you recall that portion of the order,

3   Mr. Radbil?

4   A.   I have reviewed and am familiar with all

5   aspects of that order.

6   Q.   And did you provide to me a copy of a document

7   that meets Judge Boyle's requirement that describes

8   the basis for the admission of each deposition -- or

9   each exhibit that you intended to proffer?

10  A.   I think so, yes.

11  Q.   When did you do that Mr. Radbil?

12  A.   That was the document I was discussing before,

13  the chart listing all of the exhibits with the

14  parenthetical designation of where they appeared in

15  the record and detailed what exactly they are.  So I

16  think we agreed on the exhibits that we actually

17  moved to admit during trial, with the exception of

18  Plaintiff's Exhibit 10 which was the website that

19  Dr. White -- or Mr. Wyatt testified about the RAB

20  website.

21  Q.   Mr. Radbil, you offered the depositions of

22  Dr. White as an exhibit on your pretrial list, did

23  you not?

24  A.   For, yes, rebuttal and impeachment.

25  Q.   And also his affidavit, correct?

1   A.    Yes.

2   Q.    And those were not agreed by me; in fact, I

3   objected to them, and my objection was sustained on

4   hearsay, is that correct, Mr. Radbil?

5   A.    We didn't move to admit at trial the

6   declaration of Dr. White.

7   Q.    That's right, Mr. Radbil.  You did it in the

8   pretrial the day before trial started; isn't that

9   correct?

10  A.    No, we had listed the exhibit, and you lodged

11  an objection to it.  And the Court ruled that -- I

12  believe, that the recordings that the declaration

13  authenticated would have to be modified in terms of

14  any preliminary speaking that was on those

15  recordings; otherwise, Dr. White would be able to

16  authenticate them at trial.

17  Q.    Mr. Radbil, are you telling the Court that you

18  did not in the exhibits in the pretrial matter have

19  a discussion with her about whether or not the

20  depositions of the parties would be admissible at

21  trial, that you did not submit those to the Court

22  for consideration as admission prior to trial on the

23  day of the pretrial?  Is that your testimony?

24  A.    Can you repeat the last part of the question?

25  I didn't understand.  Please recite it.

1  Q.   Are you telling the Court that your trial

2  exhibit list that included as Exhibit Number 1 the

3  deposition of your client, that you never asked the

4  Court in the pretrial matter to rule on admission of

5  that document prior?

6  A.   I think it was your objection, I think we had a

7  discussion.  If I recall, the Court said that

8  depositions, themselves, are not admissible as

9  exhibits but can be used for impeachment or

10 rebuttal.

11      And then I think the Court also reminded me

12 that if the witness was available, of course they

13 couldn't be used on direct examination except for --

14 they had to be used for impeachment or rebuttal and

15 they were never to go back to the jury as exhibits,

16 themselves, but they could be read, you know, and

17 used for impeachment and rebuttal purposes.

18 Q.   Mr. Radbil, do you believe -- or have you told

19 to a court that peremptory strikes must be exhausted

20 prior to the Court making rulings on challenges for

21 cause?

22      MR. MEYERS:  Object to the question on

23 relevance.  I'm not quite sure I understand.

24      THE COURT:  Well, I think it's another

25 area of concern, and I think for right now that I

1   understand where you are going with this,

2   Ms. Malone.  But I do want to skip over that and

3   move to the next part.

4        What I would like to do is take a

5   five-minute break and then start back up.  So be

6   ready on your next topic in five minutes.

7        MS. MALONE:  Thank you, Your Honor.

8        (Recess taken.)

9        THE COURT:  Let me put a little focus on

10  this.  What I would like to do try to do is go

11  through maybe the areas that you raise in your

12  Rule 37 and 1927, sort of in maybe an outline form

13  so that I know which topic we are going to.  And

14  maybe you can sort of start with that particular

15  topic.  I do want to skip over the jury issue and

16  move to your next one.

17       And Mr. Radbil, I'm just going to tell you

18  that your answers have been similarly confusing and

19  lacking in credibility as they were during the

20  trial.  I'm going to give you a chance to answer

21  these questions, but if you continue this circular

22  avoidance you have been doing, I will find that you

23  are not telling the truth, because that's the only

24  thing I can assume, and we are not going to spend

25  ten minutes having you circle around each question.

1   All right.

2   　　　　MS. MALONE:   Thank you, Your Honor.

3   Q.   (By Ms. Malone)   Actually, Mr. Radbil, I want

4   to talk to you specifically about the Rule 37.   The

5   first one has to do with the actual damage claim.

6   　　　If you would turn with me please, sir, to Tab

7   Number 1.

8   A.   Okay.

9   Q.   Page 164 within Tab Number 1, do you see it

10   says, Def. App. at the bottom?

11   A.   I'm there.

12   Q.   You would agree with me, sir, would you not

13   that this was your initial responses to disclosures?

14   A.   These were our Rule 26 initial disclosures,

15   yes.

16   Q.   Correct.   And under Tab A, at that point your

17   answer was:   Plaintiff claims actual damages under

18   the Federal Fair Debt Collection Practices Act at

19   this time in the amount of 1,500 but reserves the

20   right to disclose additional damages suffered should

21   they become known, correct?

22   A.   Yes.   On May 29th -- I'm sorry,

23   September 29th 2011.

24   Q.   That was your answer, is that correct, sir?

25   A.   That was our initial disclosure.

```
 1    Q.    All right.  If you would turn with me to Tab 2,
 2    sir.  This would be the initial disclosures that you
 3    filed supplemental on February the -- I'm sorry, on
 4    January the 18th, 2011, correct -- or 2012.
 5    A.    No, this is -- actually, I think there is a
 6    mistake in the date.  I think it's 2013.  So this
 7    was filed I think --
 8    Q.    I will --
 9    A.    -- sometime --
10    Q.    I will concede with you, Mr. Radbil, this was
11    the one filed at the first of this year.  So
12    January -- other than the error on the date, this
13    was filed in January of this year, correct?
14    A.    I don't think it was filed.
15    Q.    It was provided to me, right, sir?
16    A.    It was served by you I think.
17    Q.    If you would turn with me please to page 158.
18    A.    Okay.
19    Q.    And you will agree with me, sir, beginning at
20    the bottom under Actual Damages, your answer at that
21    time was:  Plaintiff's actual damages not only
22    include any out-of-pocket expenses but also damages
23    for public humiliation, embarrassment, mental
24    anguish and emotional distress.
25          Is that correct?
```

1   A.   That's what it says, yes.  That's correct.

2   Q.   All right.  If you would look with me, sir, to

3   Tab 8.  This would be the attorney's fee invoices

4   that your firm submitted to us in discovery,

5   correct?

6   A.   I have a portion of the transcript that starts

7   at page 187.

8   Q.   I'm sorry, I said the wrong number.  Tab 7.  I

9   apologize, Mr. Radbil.  You with me?

10  A.   Yeah, this -- yes.

11  Q.   And these are the fee invoices from your firm,

12  correct?

13  A.   Without reviewing them all, I assume so, yes.

14  Q.   Okay.  And if you would look at the bottom

15  of -- I'm looking at 108, which is where I got the 8

16  from, the second page.

17  A.   Okay.

18  Q.   And on December 6th, at that time, which is

19  about the fourth entry down, you billed, received

20  and reviewed Dr. White's memorandum regarding actual

21  damages to this file, correct?

22  A.   That's correct.

23  Q.   And you also -- above that, your brother, Aaron

24  Radbil, who is a partner in your firm, also noted,

25  review statement of actual damages, correct?

1  A.    Also correct.

2  Q.    So on December 6th of 2012, the two of you had

3  been provided information regarding actual damages

4  from your client, Mr. White, correct?

5  A.    Dr. White provided us a confidential settlement

6  memorandum in connection with my preparing him for

7  the mediated settlement conference.  Specifically, I

8  asked Dr. White to sit down and to think very hard

9  about what he thought his actual damages were and

10 what he thought would be a fair result so that I

11 could get a number from him in terms of what he

12 estimated his actual damages at so I could know

13 specifically how to prepare for the mediated

14 settlement conference in a manner that would end

15 up --

16         THE COURT:  Okay.  You have answered that.

17 Q.    (By Ms. Malone)  So in December of 2006, you

18 were aware of what your client believed his actual

19 damages were, correct?

20 A.    Did you say September 2006?

21 Q.    December 6th, 2012.

22 A.    Yes.

23 Q.    And you did not supplement your answers to

24 supplemental disclosures until January 18, 2013,

25 correct, sir?

```
1   A.   I think that's correct, yes.
2   Q.   And in fact, sir, nowhere in your supplemental
3   answers does it identify that Dr. White believed he
4   had lost a 5,000-dollar teaching assignment or was
5   out of pocket $40,000 for additional fees, correct?
6   A.   That's correct.  And the reason that it does
7   not --
8            THE COURT:  That was the question.  You've
9   answered it.  Go ahead.
10           THE WITNESS:  Okay.
11  Q.   (By Ms. Malone)  Okay.  If you will look with
12  me on Tab 8, which is a portion of the testimony
13  from Dr. White at trial beginning on page 189 --
14  A.   Yes.
15  Q.   -- at approximately line 13, without reading
16  all of it, will you agree with me that Dr. White
17  said that he had incurred an additional $40,000 in
18  costs on the student loan?
19  A.   You don't want me to read it?
20  Q.   I said, without reading it out loud, could you
21  agree with me that Dr. White testified at trial that
22  he was out of pocket approximately $40,000 because
23  of the student loan?
24  A.   He did testify that he was out $40,000.
25           THE COURT:  Thank you.  Go ahead.  Next
```

1  question.

2  Q.   (By Ms. Malone)  And then also, on the next

3  page, which is page 202 of the transcript, would you

4  agree with me at the -- Mr. Radbil, have you turned

5  the page, sir, to page 202?

6  A.   Um-hum.

7  Q.   And will you agree with me that at line 3 that

8  Dr. White also testified at trial that he lost

9  $5,000 by not teaching a class, correct?

10  A.   Yes, correct.

11  Q.   And you would also agree with me that Dr. White

12  admitted that he did not testify to that fact in his

13  deposition, correct?

14  A.   Where is that?

15  Q.   Immediately below it, Mr. Radbil, beginning

16  line 5, going through line 7, sir.

17          THE COURT:  Page 202.

18  A.   It's not clear to me what he's denying,

19  actually, in looking at this.

20  Q.   (By Ms. Malone)  Okay.  Mr. Radbil, will you

21  agree with me that Dr. White in his deposition said

22  he was not out of pocket any expenses in his job,

23  and at trial he said he was out of pocket 5,000?

24  A.   Sure.

25  Q.   All right.  And Mr. Radbil, regarding whether

1  or not Dr. White sought any counseling, will you

2  agree with me that in his deposition he testified

3  that the only thing he did was make an appointment

4  that he did not keep with a counselor, specifically

5  about counseling, not about his rheumatologist.

6  A.    I believe that that's accurate, yes.

7  Q.    And will you agree with me that at trial,

8  despite the fact that Mr. White had said --

9  Dr. White had testified that he had not sought

10  counseling with a counselor, you proceeded to ask

11  Dr. White if he had sought out counseling when he

12  was on the stand.

13  A.    He did not testify that he did not seek

14  counseling.   He testified that he had made an

15  appointment at Texas A&M where he was a student for

16  counseling.   And in response to your question about

17  whether he sought that counseling as a result of the

18  stress of being a grad student or due to the panic

19  and anxiety at issue in this case, he responded

20  specifically that it was due to the panic and

21  anxiety in this case.

22  Q.    Mr. Radbil, will you agree with me that

23  Dr. White never saw a counselor at Texas A&M; his

24  testimony was he canceled the appointment.

25  A.    No, I disagree.   He sought counseling; he made

1   the appointment.

2   Q.   Mr. Radbil, are you seriously suggesting to

3   Judge Boyle that making an appointment and not

4   actually going is the same thing as seeing a

5   counselor?

6   A.   I am saying that Dr. White testified, yes, that

7   he sought actual counseling for the panic attacks

8   and anxiety at Texas A&M and had made an appointment

9   and that his symptoms improved so that he canceled

10  the appointment and then they got worse later.  And

11  you --

12          THE COURT:   That's fine.  You answered the

13  question.  Go ahead.

14  Q.   (By Ms. Malone)  All right.  Now, Mr. Radbil,

15  you will agree with me that at the trial when the

16  question regarding counseling came up that we

17  approached the bench and the Court held a little

18  bench conference about counseling on the side.

19  A.   I agree, yes.

20  Q.   You will agree with me that, despite the fact

21  that Judge Boyle specifically said, you are not

22  going to go into the counseling question since you

23  had not changed your answers to interrogatories to

24  show that he had sought a psychological counseling

25  session, actually attended one, that you still

1   continued to ask questions about counseling in

2   redirect.

3   A.   I disagree with that.

4   Q.   Would you turn with me to page 216 of that Tab

5   8, under Redirect, line 15.

6   A.   I don't have -- I do.

7   Q.   This is on redirect following our ruling with

8   Judge Boyle, you said:  Dr. White, did you do any

9   sort of counseling.

10      Is that correct?

11   A.   That's incorrect; that's not what it says.

12   Q.   Okay.  Going down to line 20:  I think

13   Ms. Malone asked you, did you see a counselor.

14      Did you bring it back up after Judge Boyle

15   specifically told you not to?

16   A.   It says, Question:  I think Ms. Malone asked

17   you, did you see a counselor.

18      And you responded:  No.

19      And the next question, if you recall, was,

20   quote:  A lot of churches has what you call pastoral

21   counseling.  Are you familiar that those -- so

22   that's what's on the page.

23   Q.   All right.  You know what, Mr. Radbil?  You and

24   I are going to disagree about what you did.  Let's

25   move on to the next question which has to do with

78

1    the naming of witnesses and trial experts.

2         If you will turn with me, please, sir, to Tab

3    Number 5 --

4    A.    Okay.

5    Q.    -- and these were the pretrial disclosures that

6    you filed on December the 7th, 2012, that were

7    actually filed with the Court, correct, sir?

8    A.    Yes.

9    Q.    And just so we can have a point, will you agree

10   with me that you have listed nine potential

11   witnesses at that time.

12   A.    That's correct.

13   Q.    And those were not included in the initial

14   disclosures that we looked at, isn't that right,

15   Mr. Radbil?

16   A.    No, they were supplemented as a result of the

17   agreement that you and I reached regarding the

18   identity of five doctors and --

19   Q.    Mr. Radbil, my question was:  Were these

20   individuals identified in your initial disclosures?

21   A.    In our initial disclosures, they were not.

22   Q.    All right.  And then, if you would turn with me

23   to Tab 6, sir -- just so we are clear.  The

24   discovery cutoff in this case was September 4, 2012.

25   Do you recall that?

1  A.   I think that sounds about right.  I don't

2  recall the exact date.

3  Q.   All right.  And under Tab 6, we have your first

4  supplemental pretrial disclosures, correct?

5  A.   Under Tab 6?

6  Q.   Yes, sir.

7  A.   Yes.

8  Q.   And these were filed with the Court on January

9  the 18th, 2013, correct?

10 A.   I don't know what -- yeah, they were filed on

11 January 18, 2013, when they were served and filed I

12 guess.

13 Q.   Right.  And if you will turn with me now,

14 instead of going through 9, we now have 14 --

15 actually, there are 15, because there is a couple

16 listed together at the end.  Would you agree with me

17 on that?

18 A.   Yes.

19 Q.   Would you agree with me that witnesses 10, 11,

20 12 and 13 had not been identified in your

21 disclosures prior to this time.

22 A.   I think that's correct, yes.

23 Q.   And Number 14, which was a couple, was also not

24 listed in the prior disclosures.

25 A.   That's correct.

1   Q.   So some four months after trial and on the

2   eve -- after the discovery cutoff and on the eve of

3   trial, you have identified five new witnesses that

4   have not been disclosed, correct, sir?  I'm sorry,

5   six; four individual ones and two combined.

6   A.   Yes, that's correct.

7   Q.   And let's talk about who these folks are.

8        Number 14, Robert and Christine Wilson were, in

9   fact, Mr. White's neighbors, correct?

10  A.   Yes.

11  Q.   And those are witnesses that Mr. White could

12  have told you about long before the discovery

13  cutoff, correct?

14  A.   He could have, yes.

15  Q.   And you would also agree with me that the other

16  individuals were members of the Texas A&M

17  University-Commerce Department of Counseling --

18  Department of Psychology where Mr. White was working

19  on his doctoral program.

20  A.   Ms. Cureton, as we discussed at trial, was one

21  of his students while earning his Ph.D there, she

22  was a grad student that was working with him.  And

23  Audra Blythe and Nancy Lamphere and Tracy Henley, I

24  believe, were people who did work at the school and

25  who knew Dr. White.

1  Q.   And those names had not been identified at any

2  point in the discovery prior to this filing on

3  January 18; isn't that correct?

4  A.   That is correct.

5  Q.   And in fact, Mr. Radbil, despite the fact that

6  you named them so late, you actually subpoenaed both

7  Ms. Cureton and the two Wilsons, correct?

8  A.   I did subpoena Ms. Cureton and his neighbors,

9  the two Wilsons.

10 Q.   They appeared here in the courtroom, correct?

11 A.   They did.

12 Q.   And you had not actually spoken to the two

13 Wilsons; they weren't even sure why they were here.

14 A.   I had not.

15 Q.   You had not spoken to them.  So you subpoenaed

16 them to court, witnesses you had not spoken to,

17 correct, sir?

18 A.   I think --

19 Q.   Is that correct, Mr. Radbil?

20 A.   Subpoenaed witnesses I had not spoken to, that

21 is correct, yes.

22 Q.   And these were your client's neighbors, friends

23 of his.

24 A.   That's correct.

25 Q.   You didn't think it was appropriate to talk to

1   a witness before you brought them to federal court?

2   A.   No, I trusted my client.

3   Q.   You trusted your client to prepare your

4   witnesses?

5   A.   I didn't prepare these witnesses.

6           THE COURT:   That's okay.   Let's move on to

7   your next topic.

8   Q.   (By Ms. Malone)   Let's talk specifically about

9   naming experts.

10      Mr. Radbil, will you agree with me that we

11  filed on behalf of my client a Motion to Exclude

12  Unnamed Experts or Expert Testimony on November the

13  30th of 2012?

14  A.   I don't recall the date, but you filed several

15  motions on that.

16  Q.   And on the first motion in November, you did

17  not file a response, correct?

18  A.   That's correct.

19  Q.   And on the second motion -- you filed a second

20  motion following --

21          THE COURT:   Ms. Malone, slow down a little

22  bit.

23          MS. MALONE:   I'm sorry, Your Honor.

24  Q.   (By Ms. Malone)   Following your late

25  designation on January the 18th, you filed a second

1  motion for supplementing our original motion to

2  exclude unnamed experts, is that correct, sir?

3  A.   Sounds correct, yes.

4  Q.   You actually filed a response to exclude to

5  that motion, correct?

6  A.   Stating we had no experts.

7  Q.   That you were not going to identify them as

8  experts.

9  A.   We had no experts to identify.  They would not

10  provide expert testimony.  We did not disclose

11  anybody pursuant to 26 which --

12          THE COURT:  Hold on.  You answered the

13  question.  Go on Ms. Malone.

14  Q.   (By Ms. Malone)  Did you subpoena

15  Dr. Betancourt to appear in court?

16  A.   Dr. Betancourt?

17  Q.   Yes.

18  A.   I believe so, yes.

19  Q.   Did you know Dr. Betancourt was a medical

20  doctor who would be testifying about your client's

21  physical condition?

22  A.   No, that's not my understanding.  I understood

23  that Ms. Betancourt was a medical doctor.

24  Q.   And you didn't speak with her.

25  A.   I don't recall speaking with Ms. Betancourt

1   before trial, no.

2   Q.   You designated her to testify as to damages, is

3   that right, Mr. Radbil?

4   A.   To damages yes.

5   Q.   And you don't believe that a medical doctor

6   offering testimony on damages and causation would be

7   required to be designated as an expert, is that your

8   testimony?

9   A.   She was never designated to testify about

10  causation ever.

11  Q.   You were just going to have her come here and

12  testify about what, Mr. Radbil?

13  A.   Her personal observation in a nontreatment

14  context of who this man is as a person and whether

15  anything has changed or whether she has noticed any

16  difference in him.

17        THE COURT:  How would that be relevant

18  coming from her as opposed to the next-door

19  neighbor?

20        THE WITNESS:  He's in psychology.  And

21  these just happened to be the people, Your Honor,

22  that he was around, and they just happened to have

23  Ph.Ds or degrees.  But our view, respectfully, was

24  that, just because they were qualified in some other

25  case to testify as an expert or possessed expert

1    qualifications, didn't mean they couldn't testify,

2    for example, in a car accident case where a car ran

3    a red light --

4            THE COURT:  You've answered my question.

5            Go ahead.

6    Q.   (By Ms. Malone)  Mr. Radbil, when we talked

7    specifically about the doctor, are you telling the

8    Court that you did not intend to have any of his

9    medical doctors testify that he had an exacerbation

10   of his symptoms for his acute condition as a result

11   of his being upset over these telephone calls?

12   A.   That is what I am saying.

13   Q.   Will you also agree that you actually, in

14   response to our supplemental motion to exclude, you

15   actually wrote in a pleading to the Court:

16   Defendant moves this Court to exclude each of

17   Dr. White's witnesses claiming untimely disclosure

18   and speculating that each will provide expert

19   testimony.  Contrary to defendant's claims and

20   speculative argument, Dr. White timely disclosed

21   each fact witness, one of whom will provide expert

22   testimony.

23   A.   That's -- yes, was supposed to be none of whom.

24   And I think that reads with the rest of the motion,

25   which asks for the motion to be denied because we

1    have no experts and don't intend to present expert

2    testimony.

3    Q.   Do you think that if you say, "one of whom who

4    will provide expert testimony," that will cause the

5    other side to think they will need to prepare for

6    experts?

7    A.   In that context absolutely not, I would not

8    expect that.

9    Q.   I would like for you to look with me, if you

10   would, please, sir, in the attorney invoices, which

11   I believe is Tab Number 7.

12   A.   Okay, I'm at Tab 7.

13   Q.   If you would turn to page 111, sir.

14   A.   Okay.

15   Q.   And if you will look down with me, beginning at

16   September 21, 2012, there is an entry by Melissa

17   Norton.  Is that correct?  Do you see it, sir?

18   A.   September 21st, 2012?

19   Q.   Yes.

20   A.   I see it.

21   Q.   And Melissa Norton is an employee of

22   Weisberg & Meyers, correct, sir?  Mr. Radbil?

23   A.   She was; yeah, she was.

24        THE COURT:  Once again, Ms. Malone, I will

25   ask you to slow down just so I can keep up with you.

```
 1              MS. MALONE:  Okay.  Thank you.
 2              THE COURT:  Go ahead.
 3    Q.   (By Ms. Malone)  Will you look over to that
 4    entry, and beginning at the third line, I'm going to
 5    read it, Mr. Radbil.  Correct me if I read it wrong:
 6    Prepared letter to expert re: date for trial,
 7    attorney for review, and prepare for mailing.
 8         Have I read that correctly?
 9    A.   Yes.
10    Q.   If you would turn with me to the preceding
11    page, which is 109 -- these are in reverse
12    chronological order Mr. Radbil.  Looking at --
13              THE COURT:  Slow down.  Let me get there,
14    too.  109?
15              MS. MALONE:  Yes, ma'am.
16              THE COURT:  All right.
17    Q.   (By Ms. Malone)  See where it says, December 3,
18    2012, Sonya Rodriguez?
19    A.   I do.
20    Q.   And at the end of that entry, does it say:
21    Review file for any experts used, correct?
22    A.   Yes.
23    Q.   Did you receive a call from Ken Braxton?
24    A.   I don't recall.  Tell me who Ken Braxton is.
25    Q.   Dr. Betancourt's's attorney.
```

1    A.    I may have.  I really don't remember.  But

2    there was several witnesses obviously; it's possible

3    that I did.

4    Q.    Did you return his call?

5    A.    Yes -- well, I don't know if -- I returned

6    somebody's call, but I don't know if it was his

7    attorney or somebody else's attorney.  Somebody said

8    that one of the doctors was out of town doing

9    something, so. . . I don't know whether it was him.

10   Q.    Okay.  Mr. Radbil, I want to switch slightly

11   gears to the 1927 issue.  Did you receive a copy of

12   the order that Judge Boyle entered on the Friday

13   preceding trial saying that we were supposed to --

14          THE COURT:  Ms. Malone this would be

15   helpful if we just probably stayed with 37 and then

16   moved to the 1927, because there is so much in here.

17   If you are switching now to 1927, that's fine.

18          MS. MALONE:  I am with him.  But Your

19   Honor, if you want me to address the 37 with

20   Mr. Meyers, I'm happy to do that, or do you want me

21   to just continue?  Those were the main topics under

22   the 37, so I have covered them with Mr. Radbil.

23          THE COURT:  Let's do this.  Before we go

24   any further, if you will slowly just give me a

25   summary of your points -- I know they are in your

1   briefing, and I know you have asked them -- so that

2   the record is clear as to the specific just labels

3   of Rule 37 violations you are alleging here.

4            MS. MALONE:  The first one, Your Honor, is

5   the actual damages of 40,000 and 5,000, which were

6   never identified during the course of the discovery

7   responses.

8            THE COURT:  Okay.

9            MS. MALONE:  The second one, Your Honor,

10  is the issue with the counselor --

11           THE COURT:  I'm sorry.  Let me back you up

12  a minute, just so that we are clear.  On the damages

13  issue, the point was never identified, but yet at

14  trial there was a 40,000-dollar damages testimony

15  from the plaintiff.  Okay.

16           MS. MALONE:  Yes, Your Honor.  And

17  Mr. Radbil was fully aware of that based on their

18  invoices, he was aware of it in December but did not

19  supplement it to us -- did not supplement anything

20  to us until January 18th and did not include that

21  testimony.

22           THE COURT:  Correct, and he solicited the

23  testimony.

24           MS. MALONE:  Yes, ma'am.

25           THE COURT:  Elicited the testimony.

1            MS. MALONE:  The second one, Your Honor,

2     would be in relation to the counseling issue.  At

3     deposition, Dr. White testified that he didn't

4     actually seek out -- he didn't attend any sessions

5     with a psychologist.

6            And in his answers to discovery, he also

7     said, when we asked specifically to identify

8     treaters for psychological matters, the answer was

9     none.

10            At trial, Mr. Radbil attempted to ask him

11     about counseling.  I'm hearing now that he is

12     arguing that making an appointment was his point;

13     that was not what he said at the sidebar.  I will

14     ask the Court to re-read that.  And I do not think

15     it's appropriate to try to backdoor -- make that

16     kind of argument that seeking counseling is making

17     an appointment that you never keep.

18            THE COURT:  Do you have the sidebar right

19     there in front of you?  As much as we can, there is

20     so much detail here, I think it is helpful to have

21     some order to it.

22            MS. MALONE:  Can I have Mr. Martin look

23     for that while we --

24            THE COURT:  Absolutely.

25            MS. MALONE:  It's towards the end of his

1   testimony.

2          THE COURT:  We're going on to your next

3   topic while he looks for the sidebar and the

4   counseling issue.

5          MS. MALONE:  Yes, ma'am.  And the next

6   one, Your Honor, was the issue with the witnesses.

7   I put those in two categories.  The first one were

8   these trial witnesses.  There were six that were

9   named in January, months after the discovery cutoff,

10  that were colleagues and neighbors of Dr. White that

11  had never been provided to us in discovery, some of

12  whom had degrees in psychology that would have been

13  relevant in a mental anguish case.  Obviously,

14  that's my first one.

15         The second one is the expert witness

16  testimony.  In that category, I put Dr. Betancourt

17  and also Dr. Cush, although he didn't subpoena

18  Dr. Cush, apparently.  In that case, Your Honor, he

19  wants to have him testify as to damages supposedly.

20  He never designated them as experts.

21         Dr. White testified that he did not

22  discuss these issues with any of his treating

23  physicians in his deposition.  He talked to them

24  about his symptoms but not the causation issue.  And

25  for him to suggest that a medical doctor would come

1   into this courtroom and offer testimony on damages

2   only and that would not be used as bootstrapping his

3   mental anguish claim is just not appropriate.  I

4   think that he had every intention of asking them if

5   those symptoms would have been caused by emotional

6   upset for his client.  So those are the four that

7   have to do with that.

8           And the section, Your Honor, related to

9   the trial transcript for the bench conference begins

10  on page 187 of Volume 2, and it ends at 188

11  volume -- page 188, line 11, Your Honor.

12          THE COURT:  Go ahead and do a question and

13  answer for me slowly.

14          MS. MALONE:  Do you want me to read it?

15          THE COURT:  Yes.

16          MS. MALONE:  Question by Mr. Radbil:  "And

17  have you sought any counseling or treatment as a

18  result?

19          "The Court:  Excuse me.  Ms. Malone.

20          "Ms. Malone: Objection, Rule 37.  The

21  specific question on this was not supplemented to

22  change that answer, and the answer was none at the

23  time."

24          THE COURT:  Okay.  And at this point, are

25  we sidebar or in front of the jury?

1          MS. MALONE:  This is in front of the jury.

2          THE COURT:  Okay.  That's what I thought.

3          MS. MALONE:  The Court:  Approach the

4    bench, please.

5          And it notes that it was held at the

6    bench.

7          "The Court:  Ms. Malone, what's your

8    objection?

9          "Ms. Malone:  Sure.  I asked him a

10   specific question regarding treatment for this

11   matter and if he was going through any treatment or

12   if there was any further in Interrogatory 33 asking

13   for current or future psychiatric care, and his

14   answer was no, no.

15         "Mr. Radbil:  I don't know the answer.

16         "The Court:  I'm assuming you must be

17   looking for something favorable or you wouldn't have

18   asked it.

19         "Mr. Radbil:  Sure.

20         "The Court:  Do you think he's going to

21   say none?

22         "Mr. Radbil:  No.

23         "The Court:  That's the good faith answer,

24   so I would sustain the objection.

25         "Ms. Malone:  Thank you."

```
 1              THE COURT:  Okay.  Go ahead.
 2   Q.   (By Ms. Malone)  Mr. Radbil, did you meet with
 3   Dr. White to talk to him about what his testimony
 4   would be at trial?
 5   A.   Of course.
 6   Q.   Did you talk to him about what his testimony
 7   would be with regard to counseling?
 8   A.   No.
 9   Q.   You put a witness on the stand, your primary
10   witness, and did you not talk to him about his
11   damages?
12   A.   When I met in person with him, I did not; but
13   we talked several times prior to that on the
14   telephone for several hours, and everything had been
15   discussed.
16              MS. MALONE:  Your Honor, do you need
17   anything else on 37 or should I proceed?
18              THE COURT:  No.  Go ahead.
19              MS. MALONE:  All right.
20   Q.   (By Ms. Malone)  Mr. Radbil, do you recall in
21   February the Friday before trial that Judge Boyle
22   issued an order requiring the attorneys to confer on
23   the various motions that were pending before the
24   Court?
25   A.   Can I go back for a second?  When I said,
```

1   everything has been discussed, I don't mean

2   scripted; I mean we discussed his claims, but I

3   realize that could be somewhat vague.  But yes, I do

4   remember that order.

5   Q.   Okay.  Do you remember that Judge Boyle

6   specifically ordered the two of us to confer to

7   discuss the issues related to the pending motions?

8   A.   I do recall that.

9   Q.   And do you recall receiving an e-mail from me

10   on the evening, on Friday the 22nd at 5:31 p.m.,

11   asking you to confer on Saturday morning?

12   A.   I don't know if I received it, but I remember

13   that e-mail, yes.

14   Q.   And you did not respond to that e-mail, did

15   you, sir?

16   A.   I don't know whether I received that e-mail on

17   time or at the time it was sent, but I do recall the

18   e-mail.

19   Q.   You did not respond to it at any time, did you,

20   sir?

21   A.   I think we conferred; so I think yes, we did.

22   Q.   Did you respond to that e-mail within the next

23   two days, sir?

24   A.   Not sure when I responded, but it was shortly

25   after, because I think we conferred on Sunday.

1  Q.   And on Saturday, February the 23rd, did you

2  receive a voicemail from me at 10:01 asking you to

3  confer per the Court's order?

4  A.   If you say so.

5  Q.   And also at 10:54, did you receive a -- I'm

6  sorry.  At 10:06 did you receive a follow-up e-mail

7  from me advising you I was in my office and would

8  like to confer?

9  A.   That I sent that or you sent that?

10  Q.   I sent it.

11  A.   If you say so.

12  Q.   You didn't respond, did you, Mr. Radbil?

13  A.   Again, I would have to go on what you say, but

14  sure.

15  Q.   And at 10:54 I left you a second message on

16  your voicemail asking for a conference.  Did you

17  receive that, sir?

18  A.   I'm sure I did.

19  Q.   At 10:56 I followed that up with an e-mail and

20  e-mailed you another copy of the exhibits, did I

21  not, sir?

22  A.   And mailed me a copy of the exhibits?

23  Q.   My exhibits.

24  A.   I recall that you refused to provide courtesy

25  copies of your exhibits.

1   Q.   Mr. Radbil, did you receive a hard copy of the

2   exhibits that were hand-delivered to your office

3   that you gave on LBJ.

4        We have a green card, Mr. Radbil.

5   A.   No, I didn't receive a physical copy, as I told

6   you on the telephone.

7   Q.   Your office received a copy of those exhibits,

8   did they not, Mr. Radbil?

9   A.   Yes.

10  Q.   And you did not get them, correct?

11  A.   Correct.

12  Q.   And I e-mailed to you -- I have the e-mails,

13  Mr. Radbil, copies of all of the exhibits on

14  Saturday the 22nd where I personally scanned them in

15  and sent them to you.  Are you telling the Court you

16  did not receive them then?

17  A.   On the 22nd of?

18  Q.   February, sir.

19  A.   I recall -- no, I don't recall you scanning

20  documents.  I recall discussing this issue at length

21  in e-mails which we can provide and enter into the

22  record, and I think they speak for themselves.

23  Q.   Do you recall receiving any copies of exhibits

24  from me via e-mail, Mr. Radbil?

25  A.   The only thing that I can recall --

```
 1              THE COURT:  Do you recall it or not?
 2              THE WITNESS:  No.
 3              THE COURT:  All right.
 4    Q.   (By Ms. Malone)  Would you please turn, sir, to
 5    Exhibit Number -- Tab Number 12.  The date of this
 6    e-mail is -- this is from me to you on February the
 7    18th, 2012.
 8    A.   I'm familiar with this e-mail.
 9    Q.   Do you see in the e-mail where I provided you
10    with a certified mail receipt document indicating
11    that a hard copy of all trial exhibits had been
12    delivered to your office on the 13th?
13    A.   Yes, that's accurate.
14    Q.   And do you see a note that I have not received
15    your actual exhibits and asked you when I could
16    expect them; is that correct?
17    A.   That's what the e-mail says, that's correct.
18    Q.   And in fact, Mr. Radbil, you never provided
19    hard copies of your exhibits to the Court, isn't
20    that true?
21    A.   I believe that's incorrect.
22    Q.   You provided hard copies to Judge Boyle --
23    A.   I believe so.
24    Q.   -- even though --
25              THE COURT:  No, no, you didn't.  Go ahead.
```

1    Q.   (By Ms. Malone)  And if you would look at the

2    next exhibit, on page 115, on Wednesday, February

3    the 20th, will you note I wrote an e-mail to you

4    saying:  I still did not receive copies that were

5    due to us last Friday, only partial faxes.  And I

6    asked you to please give them as well as the signed

7    statements supporting the admission of those

8    exhibits.

9    A.   Where are you?

10   Q.   The very next page, Mr. Radbil.

11            THE COURT:  Slow, slow down.

12            MS. MALONE:  I'm sorry, Your Honor.  I

13   apologize.

14            THE COURT:  That's all right.

15   A.   The e-mail is -- it's a true and correct copy

16   of our communications.  It says what it says, yes.

17   Q.   (By Ms. Malone)  Do you agree that you received

18   this e-mail, sir?

19   A.   This is an e-mail conversation between you and

20   I.

21            THE COURT:  Let's be clear what e-mail we

22   are talking about, if you could.  I know you

23   probably were but --

24            MS. MALONE:  Sure.  E-mail on February 20

25   from me to you, Mr. Radbil, asking you again for

 1   hard copies of -- of copies of your exhibits and

 2   noting that we had received only partial faxes that

 3   were incomplete and asked you to provide us with the

 4   responses as well as the Court's required signed

 5   statement for admission.

 6            THE COURT:  Okay.  And that's in Exhibit

 7   12, one of the e-mails, it looks like it's marked

 8   116 on the bottom.

 9            MS. MALONE:  It's 115, Your Honor.

10            THE COURT:  115, okay.

11   A.   Yes, that's what the e-mail says.

12   Q.   (By Ms. Malone)  Okay.  And page 116, do you

13   recall receiving an e-mail from me still indicating

14   that the faxes your office had sent to me did not

15   come through fully and asking you to please provide

16   me with better copies?

17   A.   Yes.  And --

18            THE COURT:  That answers the question.

19   A.   Yes.

20   Q.   (By Ms. Malone)  And will you see -- let's see.

21   On 18 -- 118, Mr. Radbil, I'm -- some of these are a

22   little bit repetitious, so I'm going to skip on.

23        118, on the Saturday before trial, do you see

24   that I still note I do not have complete or real

25   copies of your proposed exhibits and also note that

1   I have -- I am scanning in the exhibits and sending

2   them to you via e-mail, my exhibits, even though you

3   had a hard copy?

4   A.    I didn't have a hard copy that I could look at.

5            THE COURT:   That's not the question.

6   Q.    (By Ms. Malone)   Do you see it says an

7   attachment, Exhibit 1?

8   A.    It says, Attachments 2013.

9   Q.    Sure.

10  A.    I don't know what that attachment was.   But

11  I --

12  Q.    Mr. Radbil, will you look through the next ones

13  and see where I reference that I am giving you

14  exhibits with an attachment that were provided?

15  A.    Which page are you on specifically?

16  Q.    They continue on page 119 through the end, and

17  I sent each attachment as a separate exhibit -- each

18  exhibit as a separate attachment to an e-mail on

19  those dates, correct?

20  A.    I see your e-mails, but I do not recall and I

21  don't think, in fact, that I've ever received

22  courtesy e-mail copies from you, which is consistent

23  with your previous --

24            THE COURT:   Mr. Radbil, this is just

25  torture.   No lawyer should have to go through what

     1    you have put them through in this case.  It's one

     2    thing after another thing after another thing.  The

     3    frustration that is so obvious from the e-mails and

     4    from the statements during the trial and here today

     5    are so obvious, and I do not understand this

     6    complete refusal to accept responsibility for what

     7    you are doing.  And not only that, to inflict this

     8    kind of malicious behavior on another attorney,

     9    because that's all I'm seeing here over and over and

    10    over again.  You can't even agree that you got

    11    e-mails that you got that have attachments.  You

    12    can't even do that.

    13              I don't understand it, and I haven't

    14    understood it since you started in this case.  We

    15    are going to break until 1:15, and we are going to

    16    finish this today one way or another.  So see you

    17    back here at 1:15.

    18              (Recess taken._

    19              THE COURT:  Ms. Malone.

    20              MS. MALONE:  May it please the Court?

    21              THE COURT:  Go ahead.

    22    Q.   (By Ms. Malone)  Mr. Radbil, we were talking

    23    about my attempts to communicate with you on the

    24    23rd prior to trial.  If my phone records indicate

    25    that I called you nine times to your office and your

1  cell phone and I sent 11 e-mails to you on Saturday,

2  do you have a reason to disagree with that?

3  A.    No.

4  Q.    And you did not speak with me until Sunday,

5  correct?

6  A.    We conferenced on Sunday afternoon, that's

7  correct.

8  Q.    You didn't send me an e-mail saying, I'm not

9  available, I will give you a time, anything like

10 that, correct?

11 A.    I think there was some correspondence where we

12 arranged the time.

13 Q.    On Sunday?

14 A.    I think so.

15 Q.    But on Saturday, when I was trying to reach out

16 to you per the court order, you did not respond to

17 me, correct?

18 A.    I think that's correct, yes.

19 Q.    You are aware in the Texas Attorney Creed there

20 is a requirement that you should respond promptly to

21 opposing counsel, correct?

22 A.    Yes, I'm aware.

23 Q.    All right.  Mr. Radbil, before lunch we were

24 talking about your communications with your client

25 related to the judgment that has been entered

```
 1   against him for court costs.  Do you recall that?
 2   A.   Yes.
 3   Q.   And you have not advised your client of that
 4   judgment; is that correct?
 5             MR. MEYERS:  Objection, Your Honor, asked
 6   and answered.
 7             THE COURT:  Overruled.  I need to get some
 8   context, go ahead.
 9   Q.   (By Ms. Malone)  Is that correct?
10   A.   Yes.  And I'm -- I think that the award was
11   made, but I think everybody was clear who it was
12   made against.
13   Q.   Mr. Radbil, have you made arrangements to pay
14   that judgment for your client?
15   A.   To pay that judgment for our client?
16   Q.   Yes, you, sir.
17             MR. MEYERS:  There is not a judgment.
18   There is an order awarding costs --
19             THE COURT:  I understand, and you can take
20   that up on cross-examination.  Go ahead.
21   Q.   (By Ms. Malone)  Have you made arrangements to
22   have that paid for your client?
23   A.   I am not responsible for making those types of
24   arrangements.
25   Q.   Mr. Radbil, do you know if having an order
```

1    granting monetary sanctions against your client

2    could have a negative impact on his ability to

3    obtain credit?

4            MR. MEYERS:  Object to the question on

5    relevance.  I'm not sure I understand it.

6            THE COURT:  Ms. Malone?

7            MS. MALONE:  Your Honor, under 103 Texas

8    Rules of Disciplinary Procedure, he has an absolute

9    requirement to advise his client of that.  This goes

10   to the whole thing of him not being competent to

11   practice in federal court.  The rule specifically

12   says that a lawyer may not withhold information to

13   serve their own interest or convenience.  He hasn't

14   told his client about this.  He doesn't know if his

15   client has any impact in terms of credit.  His

16   client is a licensed professional in Texas, and

17   having a judgment against him could have a direct

18   impact on his livelihood.  He doesn't know; he

19   hasn't checked it out.

20           THE COURT:  Overrule the objection.  I

21   will let you pursue that.

22   A.   Please restate the question.

23   Q.   (By Ms. Malone)  Have you done anything to

24   determine whether or not having a monetary order by

25   a federal court requiring your client to pay court

1    costs would have any impact on his creditability?

2    A.    No, I haven't done any research on that issue.

3    Q.    Have you done any research to determine whether

4    or not it would have any impact on his maintaining a

5    license as a professional in the State of Texas as

6    an LPC or a psychologist?

7    A.    No, I have not.

8    Q.    Are you familiar, sir, with the Texas Rules of

9    Disciplinary Procedure?

10   A.    I am.

11   Q.    You are aware that Rule 103 requires that a

12   lawyer shall keep a client reasonably informed about

13   the status of a matter and promptly comply with

14   reasonable requests of information.

15   A.    Of course.

16   Q.    And you are aware that under the comments, a

17   lawyer may not withhold information to serve the

18   lawyer's own interest or convenience, correct?

19   A.    I'm aware.

20   Q.    And you have still -- you have still chosen not

21   to advise your client of that order.  Is that

22   correct, sir?

23   A.    That's a misstatement.  The award --

24          THE COURT:  Put your hand down, please.  I

25   can't hear you.

```
1   A.    I think it was clear from the trial transcript
2   that our client would not be responsible for paying
3   any sanction or attorney's fees that were awarded.
4   I think that's clear from the record.  So I'm not
5   clear that costs have been awarded against him
6   personally or whether they have been awarded to the
7   defendant and we're responsible for paying them.  It
8   is my understanding that we are responsible for
9   paying the costs.
10  Q.    (By Ms. Malone)  Mr. Radbil, do you understand
11  that one of the other obligations in the Texas
12  Attorney Creed is for you to comply with requests
13  made by the Court?
14  A.    I'm aware.
15  Q.    And did Judge Boyle on Tuesday in the trial
16  tell you that you were to call me or we were to have
17  a discussion regarding a proposed charge for the
18  Court?
19  A.    Where is that in the transcript?  I don't
20  recall.
21  Q.    You don't recall?
22  A.    No, I don't.
23  Q.    Do you recall telling me on the telephone that
24  you were going to -- you didn't have time to talk
25  about the charge, that you were going to talk with
```

1   your girlfriend and eat?

2   A.   Yes, I do remember that, and I said can we talk

3   later.  And you said --

4   Q.   In the morning.  You talked to me at 9:00 at

5   night, correct, Mr. Radbil?

6   A.   I don't know what time it was, but I

7   specifically said that I was going to come home and

8   I was going to have dinner.

9   Q.   Mr. Radbil, the next morning you were supposed

10  to appear in Court at 8:00 a.m. to discuss the

11  charge; is that correct?

12  A.   Correct.

13  Q.   And you did not appear, correct?

14  A.   That is correct.

15  Q.   And your testimony to the Court was that you

16  had food allergies and had overslept, correct?

17  A.   Milk allergy, yes, and I don't think --

18  Q.   You did not --

19  A.   It was wrong to not appear and to be late; yes,

20  it was wrong.

21  Q.   You did not call the Court or make a formal

22  apology at that time, correct?

23  A.   No.  I was extremely flustered, and I should

24  have.  If I could have that moment back, I certainly

25  would apologize profusely; however, I can't.  But

1   that doesn't -- that doesn't make it any right or

2   less wrong.  It was an error on my part.  It was

3   severe, and I am responsible for it.

4   Q.   Mr. Radbil, you also told the Court that

5   defendant had agreed that an automatic telephone

6   dialing testimony was used in this case, and that's

7   not true, isn't it, sir?

8   A.   I did say that, and I still do think that that

9   is true.

10  Q.   You do agree, Mr. Radbil, that, in fact, I

11  opposed that throughout the case and, in fact, made

12  a motion for directed verdict on that issue.

13  A.   I'm aware.

14  Q.   And it was granted.

15  A.   I'm aware.

16  Q.   You also will agree that you told the Court you

17  believed that request for disclosure responses

18  regarding actual damages had been supplemented when

19  they had not, correct?

20  A.   Yes.

21  Q.   You also told the Court, made an argument to

22  the Court, that Mr. White had no knowledge regarding

23  the contract with Texas Guaranteed, based on the

24  first deposition, without telling the Court there

25  had been a subsequent deposition that supplemented

1   that testimony; isn't that correct?

2   A.   I can't answer that question without it being

3   misleading.  The first deposition was used as a

4   prior inconsistent statement, and that's how I

5   intended to use it, because the man had been the

6   go-to guy on training for a number of years, yet,

7   six months prior, couldn't identify the specific

8   documents that were used in training, so. . .

9   Q.   Did you advise the Court that there had been a

10  subsequent deposition taken when you made that

11  argument?

12  A.   I think you advised the Court there had been a

13  subsequent deposition.

14          THE COURT:  That doesn't answer the

15  question.

16  Q.   (By Ms. Malone)  Did you advise her?

17  A.   No, because his testimony was all that was

18  important.

19  Q.   Do you understand, Mr. Radbil, that you have an

20  obligation to advise the Court fully of facts prior

21  to making a motion?

22  A.   Of course.

23  Q.   Mr. Radbil, you also told the Court during the

24  course of the trial that your client did not appear

25  on the date of verdict because he had to work; is

1    that correct?

2    A.    That is correct.

3    Q.    And your client testified to the Court the

4    reason he was not there was because you told him he

5    did not have to be there; isn't that correct?

6    A.    No.  What I told my client regarding the

7    specific issue when he told me he had to work is

8    that, I will call you when the verdict comes in or

9    text message you and you should be here.  And he

10   said, do I absolutely have to be?  And I said, you

11   should be, and then I did and he came.

12   Q.    Mr. Radbil, your client testified to the Court

13   that the reason that he was not there was because

14   you told him he did not have to be there; is that

15   correct?

16   A.    I told him he should be there, yes.

17   Q.    That's not what I said.

18   A.    Have to?  Yes, I did not say, you have to; I

19   said, you should be.

20   Q.    Mr. Radbil, my question wasn't what you said.

21   My question was, didn't your client tell the Court,

22   in fact, that he was not there because he was told

23   that he was not -- he didn't have to be there.

24   A.    Yes, he did.  Well --

25   Q.    In fact --

1  A.    -- let me correct that.  I would defer to his

2  exact words on that issue.

3  Q.    Happy to do that, Mr. Radbil.

4  A.    Thank you.

5  Q.    In Volume 3, beginning on page 20 in response

6  to the Court's question --

7           THE COURT:  One moment.  Are we talking

8  about an exhibit?

9           THE WITNESS:  This is a transcript.

10          MS. MALONE:  Your Honor, I don't have it

11 in the small book.

12          THE COURT:  That's fine.  Let's just make

13 sure the record is clear -- so that we can all refer

14 to the record -- on line and page and document that

15 you are referring to.

16          MS. MALONE:  Sure.  Thank you, Your Honor.

17 Q.    (By Ms. Malone)  I am reading from the

18 transcript, Volume 3, page 20, beginning at line 11.

19 The Court is questioning Mr. White as to where he

20 was that morning.

21    The Court's question is:  "Is there some reason

22 that you weren't here for the verdict this morning?"

23    Mr. White's answer at that time was:  "I was

24 advised by my attorney that I didn't have to be

25 here."

```
 1            MR. MEYERS:  I'm sorry, where are we
 2    exactly?  Volume 3, page 20?  Is that what you said?
 3            MS. MALONE:  Volume 3, page 20.
 4            THE COURT:  Let's give Mr. Meyers a chance
 5    to get there.
 6    Q.   (By Ms. Malone)  Do you recall that was
 7    Mr. White's testimony?
 8            THE COURT:  Let him get there.
 9            MS. MALONE:  I'm sorry, Your Honor.
10            MR. MEYERS:  Ms. Malone, could I see and
11    compare your page to mine?  I don't know why I don't
12    have what you are talking about.
13            This is Volume 4, isn't it?
14            MS. MALONE:  Your Honor, you know what?
15    He's correct, they were combined into one binder.
16            THE COURT:  Mr. Meyers, tell us when you
17    are where you need to be.
18            MR. MEYERS:  Okay.  Okay.  I am there,
19    thank you.
20            MS. MALONE:  And for clarification, Your
21    Honor, I apologize.  They were combined in one
22    binder, but it is Volume 4 beginning on page 20,
23    line 11.
24            THE COURT:  Okay.
25    Q.   (By Ms. Malone)  The Court's question:  "Is
```

1   there some reason why you weren't here for the

2   verdict this morning?"

3        Dr. White's answer:  "I was advised by my

4   attorney that I didn't have to be here."

5        "The Court:  Okay.  All right.  The indication

6   we had was that you had to go to work.

7        "Mr. White:  I did.  Yes, I did have to work.

8   I have a lot of --

9        "The Court:  I'm understanding that.  Okay.  So

10  it was your counsel that told you you didn't have to

11  be here."

12       "Dr. White:  Yes."

13       Then in response to cross-examination from you,

14  Mr. Radbil, you questioned Dr. White on the next

15  page, beginning at line 20, so it would be page 21,

16  Volume 4, line 20:  "Mr. White, didn't I advise you

17  that you should be here when the verdict came back?"

18       "Dr. White:  You advised me that I did not need

19  to be here; it was not necessary.

20       "Mr. Radbil:  And did I advise you that you

21  should be here when the verdict came back this

22  morning when we --

23       "The Court:  Just be honest, Dr. White.

24       "Dr. White:  A few minutes ago, yes.

25       "The Court:  But not before a few minutes ago.

1          "Dr. White:  Right."

2          Isn't that what you your client testified to in

3     the courtroom?

4     A.    That is what he testified to, yes.

5     Q.    Mr. Radbil, do you think it is important to

6     relay offers of settlement to your client?

7     A.    I do.

8     Q.    And do you have a policy in your office that

9     you do that?

10    A.    Yes.

11    Q.    In fact, there are at least two occasions where

12    you have not done that with Texas consumers; isn't

13    that true?

14    A.    Me?

15    Q.    Yes.

16    A.    No, that's untrue.

17    Q.    Your office?

18    A.    My office?

19    Q.    Yes.

20    A.    Only would that happen if we had the client's

21    clear authority to reject an offer or accept an

22    offer.  If the client provides terms that we can

23    settle the case on, then we stay within those bounds

24    or we obtain additional authority before acting on

25    an offer or for making another demand.

1  Q.   Do you recall Dan Lopez?

2  A.   I do.

3           MS. MALONE:  Your Honor, this is attached

4  as an exhibit.

5           MR. MEYERS:  Objection to relevance.  We

6  are here to talk about this case.  As far as

7  Mr. Lopez's case goes, there is an affidavit that

8  Ms. Malone didn't include in your materials.

9           THE COURT:  I think it goes -- overrule

10  the objection.  I don't want to spend too much time

11  on this, but I think it goes to Mr. Radbil's

12  credibility.  Go ahead.

13           MR. MEYERS:  But he was not the counsel at

14  the time that this issue Ms.--

15           THE COURT:  You can take that up on cross.

16  Go ahead.

17           MR. MEYERS:  Okay.

18           MS. MALONE:  I didn't put it in the small

19  book, Your Honor, but for the Court's reference it

20  is Def. App. 0135 attached to our 1937 motion.

21           THE COURT:  What exhibit?  Oh, it's just

22  attached to the motion?

23           MS. MALONE:  Yes.  Yes, ma'am.  And it

24  would be in the middle of Dan Lopez's deposition,

25  beginning at page 40:  "Would you agree with me,

1   Mr. Radbil, that in his deposition Mr. Lopez

2   indicated that he was not advised of a 2,000-dollar

3   offer to settle?"

4   A.    I think that's correct, yes.

5   Q.    And in fact, that case went to judgment against

6   Mr. Lopez for $42,500, and you were the lead

7   counsel, correct?

8   A.    Not at the time of that offer, no, I was not

9   lead counsel.

10  Q.    You were lead counsel at the time of the trial,

11  were you not, Mr. Radbil?

12  A.    At the time of trial, yes, I was.

13  Q.    And are you aware of the Whaley case,

14  Mr. Radbil?

15  A.    I'm aware, yes.

16  Q.    And are you aware in her deposition Ms. Whaley

17  testified that she had not been advised there was an

18  offer of settlement made to her?

19  A.    When?

20  Q.    In the deposition.

21  A.    I don't understand.  If you are referring to

22  the deposition testimony about an offer that

23  occurred when I wasn't on the case or working on the

24  case?

25              THE COURT:  Let's let her clear it up with

1   a question.

2   Q.   (By Ms. Malone)   Would you agree with me that

3   in Ms. Whaley's deposition she testified that she

4   had not been made aware of an offer of settlement by

5   someone from your firm.

6   A.   She also testified, I believe.

7   Q.   Did she say that, sir?

8   A.   Sure.

9   Q.   Are you aware that Ms. Whaley had a

10   92,000-dollar judgment entered against her while you

11   were lead counsel?

12   A.   I'm sorry.

13   Q.   An almost 92,000-dollar judgment entered

14   against Ms. Whaley?

15   A.   Can you repeat the question?

16   Q.   Are you aware that a 92,000-dollar judgment has

17   been entered against Ms. Whaley while you were lead

18   counsel?

19   A.   Is it 92,000?

20   Q.   I think when you do the math it is, Mr. Radbil.

21   If it's just short of 92, it's between 91 and

22   92,000.

23   A.   Yes, whatever the judgment says, I will defer

24   to that.

25   Q.   And in fact, on Monday you were ordered to

```
1   appear here for a hearing in Judge Hoffman's Court
2   on a motion regarding discovery in aid of judgment,
3   correct?
4   A.   Was I ordered to appear?
5   Q.   There was a hearing set by Judge Hoffman,
6   correct?
7   A.   Yes, and that was --
8   Q.   And you did not appear.
9   A.   We filed --
10          THE COURT:  Please put your hand down
11  because it obscures the audio.
12  Q.   (By Ms. Malone)  And you did not appear, right,
13  Mr. Radbil?
14  A.   We did not.
15  Q.   And a 700-dollar judgment was entered against
16  you personally by Judge Hoffman.
17  A.   Yes.
18  Q.   And isn't it also true that, despite the fact
19  that an almost 92,000-dollar judgment was entered
20  against your client, you were actually advertising
21  on your website a notable trial victory on behalf of
22  your consumer in the Whaley case.
23  A.   That's correct.
24  Q.   In fact, your firm paid for a press release
25  stating that you had a notable trial victory in that
```

1   case.

2   A.   I don't know whether our firm paid for a press

3   release.

4           MR. MEYERS:   Your Honor, this is very

5   misleading.   The press release was after the trial,

6   and what Ms. Ms. Malone is talking about is after a

7   second trial.   We can get into it on

8   cross-examination.

9           THE COURT:   All right.   Overruled.

10  Q.   (By Ms. Malone)   After the second trial, did

11  you remove that from your site, Mr. Radbil?

12  A.   Apparently not, no.

13  Q.   And in fact, Mr. Radbil, you represent,

14  according to you, consumers who are least

15  sophisticated, correct?

16  A.   No.   The least sophisticated standard is an

17  objective one.

18  Q.   That you apply to your clients.

19  A.   It doesn't necessarily apply to our clients,

20  it's the objective standard that's used for

21  review --

22          THE COURT:   Pull the microphone closer.

23  Again, I can't hear you.

24  A.   It's the objective standard that's used to

25  review claims under the Federal Fair Debt Collection

1   Practices Act 15 usc 1692.

2   Q.   And you ask the courts to apply the least

3   sophisticated standard to your clients, right?

4   A.   Objectively, yes.

5   Q.   In this particular case, you were advertising

6   that you have prevailed at trial and you are not

7   advising your clients that there may be more to the

8   story than is there, correct?

9   A.   I don't understand.  Are you saying do I advise

10  my clients there is more to the story?  No, of

11  course not.

12  Q.   All right.  Mr. Radbil, in the Brown case, was

13  a directed verdict given on all 19 claims that you

14  submitted to the Court?

15  A.   The case is on appeal, yes.

16  Q.   And the case is on appeal with a full

17  transcript, correct?

18  A.   It's -- it was submitted over a year ago, I

19  believe, to the Fifth District Court of Appeals.

20  Q.   Actually, to the Fort Worth Court of Appeals.

21  A.   Actually, yes.

22  Q.   In that case you obtained a complete copy of

23  the transcript, of the trial transcript.

24  A.   Yes, I presume.  We have the record, the

25  appellate record.

```
1   Q.    That's an appellate record being used by

2   Weisberg & Meyers to write an appeal.

3   A.    I don't know.

4   Q.    You didn't write the appeal?

5   A.    Write the appeal on what?

6   Q.    On the Brown case.

7   A.    You said was it being used to write an appeal.

8   Q.    It was cited in the appeal.  Did you write the

9   appeal?

10  A.    Yes.

11  Q.    Okay.  Were there others in your office who

12  wrote on that appeal?

13  A.    Yes.

14  Q.    And did Mr. Marshall Meyers read the transcript

15  from that trial?

16  A.    I don't know.

17  Q.    Do you think, Mr. Radbil, after having three

18  cases with negative consequences to your clients

19  that you might perhaps think about doing some

20  additional training on trial techniques?

21  A.    I have.  I always try to improve.  I'm

22  constantly reading about law.

23  Q.    All right.  Mr. Radbil, on the fee agreement

24  that you have signed in this case for Mr. White,

25  that is a similar fee agreement that you use for
```

1    your consumers, correct?

2    A.    The one I signed?

3    Q.    The one Mr. White signed.

4    A.    Dr. White?

5    Q.    Yes, that's the one you use typically.

6    A.    I don't know if that's the current version,

7    but, yes, that would be the one at the time that we

8    used for individuals in my class action cases.

9    Q.    And according to that fee agreement, if a

10   consumer does not agree to -- well, let's just look

11   at the language.  If you would turn with me to Tab

12   14, sir.

13         MR. MEYERS:  Your Honor, I would volunteer

14   to answer all questions about the fee agreement.  I

15   think they are more appropriately directed to me.

16         THE COURT:  I will allow some of this, and

17   then I want to wrap it up and turn to the cross.  I

18   understand the position that the defense has taken

19   with regard to this fee agreement.  At least it does

20   appear unusual, and I think it goes along with their

21   theory of what has occurred in this case, and I will

22   allow her to do that.  I will certainly allow you to

23   argue and bring it up on cross.

24         MR. MEYERS:  Thank you.

25   Q.    (By Ms. Malone)  Under Subpart 11 of the

1  agreement, does the agreement state that:  If a

2  client enters into any agreement whatsoever of the

3  defendant that does not require the defendant to pay

4  in full the attorney's fees and costs incurred by

5  Weisberg & Meyers in its representation of a client

6  without prior written consent of Weisberg & Meyers

7  for client to enter into such agreement would be one

8  of the ways in which the claimant would be required

9  to reimburse your firm for fees?

10 A.   On this issue, I want to defer to the language

11 here.  I'm not saying I don't know --

12 Q.   Did I read it correctly, Mr. Radbil?

13 A.   I don't think so.  It says what it says.  I can

14 read it if you like, and I will be happy to admit

15 that it says what it says.

16 Q.   Mr. Radbil, if Mr. White or Ms. Whaley or

17 Mr. Lopez had agreed to settle the case, could they

18 have done so without your consent?

19 A.   Absolutely.

20 Q.   And would they have been required to reimburse

21 your firm for fees?

22 A.   I don't know.  I don't think that any

23 Weisberg & Meyers client has ever reimbursed

24 Weisberg & Meyers for anything.

25 Q.   Does your fee agreement provide that they would

125

 1   be required to reimburse your firm for fees?

 2   A.   It provides there are only three ways a client

 3   can be required to pay fees to Weisberg & Meyers for

 4   anything more than the amounts stated above.  This

 5   is a provision --

 6             THE COURT:  That's not what she asked you.

 7   Keep answering the question, please.  Go ahead and

 8   ask another question, Ms. Malone.

 9             MS. MALONE:  Your Honor, unless the Court

10   wants something more specific about 1927, I -- I

11   could go through some more delays and tactics and

12   stuff, but I am happy to stand on our briefing.

13             THE COURT:  All right.  Let's get

14   Mr. Meyers up here to start the cross.

15             MR. MEYERS:  Thank you, Your Honor.

16                    **CROSS-EXAMINATION**

17   Q.   (By Mr. Meyers)  Noah, are you trying to avoid

18   answering questions here today?

19   A.   No, I'm not.

20   Q.   It's my understanding that you would like to

21   give full and complete answers to the questions and

22   give them some context; is that right?

23             MS. MALONE:  Objection, Your Honor,

24   leading.

25             THE COURT:  I'm going to allow it for

1   purposes of this hearing as long as it doesn't go

2   too far.  Overruled.

3   A.   Yes, that's correct.

4   Q.   (By Mr. Meyers)  Ms. Malone has raised a number

5   of issues that I would like to spend a little bit of

6   time going over with you.  Let's start, Noah with --

7            THE COURT:  Please use surnames, all

8   right?

9            MR. MEYERS:  Yes, I'm sorry.  It's habit,

10  of course.

11           Do you want me to go over Rule 37, 1927

12  or --

13           THE COURT:  I would like to have it

14  organized.  I don't know what your plan was.  I was

15  assuming that's how you were going.  I think we need

16  to have it as organized as possible.

17           MR. MEYERS:  Yes, Your Honor.

18  Q.   (By Mr. Meyers)  Noah, I would like to ask you

19  some questions -- Mr. Radbil, I would like to ask

20  you some questions about the disclosures and the

21  chronology of disclosures in the case.

22       Did you -- are you aware that an initial

23  disclosure statement was served on Ms. Malone,

24  counsel for RAB?

25  A.   Yes.

1    Q.   And in that initial disclosure statement, you

2    identified a -- is it correct that you identified a

3    statutory damage under the FDCPA, actual damages,

4    damages -- possible damages under the Texas Debt

5    Collection Act and possible damages under the

6    Telephone Consumer Protection Act?

7    A.   I think that's what was disclosed, yes.

8    Q.   You are aware that Ms. Malone served

9    interrogatories on our office on behalf of

10   Dr. White, right?

11   A.   I'm aware, yes.

12   Q.   And --

13          MR. MEYERS:  Your Honor, may I approach

14   the witness?

15          THE COURT:  You may.

16   Q.   (By Mr. Meyers)  I would like to hand you,

17   Mr. Radbil, a copy of the responses to the first set

18   of interrogatories.

19   A.   Okay.

20   Q.   Now, Ms. Malone in her interrogatories to our

21   office asked two questions at least about medical

22   care providers; is that correct?

23   A.   Yes, I think so.

24   Q.   Okay.  If you could take a look, Mr. Radbil, at

25   Interrogatory Number 22 and Interrogatory Number 23,

1  and I would like to ask you a couple of questions

2  about those.

3  A.   I recall these.

4  Q.   Okay.  Interrogatory 22, what does that ask

5  for, Mr. Radbil?

6  A.   Interrogatory Number 22 reads, quote:  Identify

7  by name and telephone number any and all doctors,

8  psychiatrists, psychologists, psychotherapists

9  and/or medical providers who have treated you for

10  symptoms of stress and/or mental anguish alleged in

11  plaintiff's original petition."

12       "Answer:  Arthritis Care and Research Center,

13  9900 North Central Expressway, Suite 550, Dallas,

14  Texas  75331."

15  Q.   Is that an accurate answer, Mr. Radbil?

16  A.   It's my understanding that that is accurate.

17  That's the address for Dr. Cush, the rheumatologist

18  who provided treatment, including prescription

19  medications specifically for that issue.

20  Q.   Okay.  It's my understanding that in

21  Ms. Malone's Rule 37 motion for sanctions, she

22  states that we answered "None" to the question of

23  medical providers; is that right?

24  A.   Yes.  In the transcript she phrased it

25  Interrogatory Number 33, which there is no

1  Interrogatory Number 33.  But in 23, we did state

2  "None" to 23.

3       And that states, quote:  If you likely will

4  require medical and/or psychiatric treatment in the

5  future with respect to the symptoms of stress and/or

6  mental anguish related to the plaintiff's original

7  petition.  State the name and address of each person

8  who has advised you that you will likely require

9  medical and/or psychiatric treatment in the future,

10  the treatment you will likely receive, and the date

11  such treatment will likely be received, and the

12  costs of such future medical and psychiatric

13  treatment.

14       The answer:  "None.  The plaintiff hereby

15  expresses his right to supplement his response

16  throughout the continuing course of discovery."

17  Q.   So it's my understanding, Mr. Radbil, that we

18  answered the question, have you received any

19  treatment, with the person who plaintiff testified

20  he went to treatment for, is that right?

21  A.   We didn't name Dr. Cush by name, we gave the

22  Arthritis Care and Research Center where he works

23  with the address.

24  Q.   Is it a truthful answer, Mr. Radbil, that no

25  one has ever told Dr. White that he will likely

1   require future treatment for what occurred here?

2   A.   I think that's correct, yes.

3   Q.   Do you -- Mr. Radbil, do you recall attending

4   Dr. White's deposition?

5   A.   I do.  I recall.

6        MR. MEYERS:  May I approach, Your Honor?

7        THE COURT:  You may.

8   Q.   (By Mr. Meyers)  Mr. Radbil --

9        MS. MALONE:  Your Honor, I would just ask

10  for a copy.

11       MR. MEYERS:  I'm sorry.

12       THE COURT:  Do you want line and page,

13  please.

14       MR. MEYERS:  Yes, Your Honor.

15  Q.   (By Mr. Meyers)  Mr. Radbil, I'm looking at

16  page 86, 87, 88, and 89 of Dr. White's deposition

17  transcript.

18  A.   I see those pages, four pages.

19  Q.   I'm sorry?

20  A.   I see them.

21  Q.   Okay.  What pages, in fact, do you have up

22  there, Mr. Radbil?

23  A.   This starts at 86 and is sequential through

24  105.

25  Q.   Can you tell me exactly what pages you have

1   there?

2   A.   Page 86, page 87, page 88, page 89, page 101,

3   page 104, page 105.

4   Q.   Thank you.  When you look at pages 86 to 89,

5   Mr. Radbil, did Dr. White explain that he saw

6   Dr. Cush at the Arthritis Care Center for

7   antianxiety medicine?

8   A.   He does, yes.

9        MS. MALONE:  Your Honor, why don't we just

10  read it?

11       THE COURT:  Let's be clear about

12  something.  Exactly what does this respond to?  What

13  accusation?

14       MR. MEYERS:  The accusation that we never

15  disclosed that Dr. White had sought counseling or

16  had seen a doctor for his anxiety.

17       THE COURT:  Okay.  And Ms. Malone, just

18  because this all can be very confusing and has been

19  since this case started, I think you have more

20  context, tell me what your response is to what's

21  going on right now.

22       MS. MALONE:  Your Honor, if you look at

23  page 87 through 88, I specifically asked his client:

24  "Are you seeing anyone who has a psychology or

25  psychiatry background --"

 1                THE COURT:  Slow down and speak up,

 2     please.

 3                MR. MEYERS:  Sure.  "Are you seeing anyone

 4     who has a psychology or a psychiatry background?  .

 5                "Answer:  No.

 6                "Do you do any sort of counseling with

 7     Dr. Cush?

 8                "Answer:  No.

 9                "Do you see a counselor?

10                "Answer:  No."

11                And then I go on to ask him about pastoral

12     counseling; answer, no.  So he wasn't getting any

13     counseling from anyone, which is what I told the

14     Court on sidebar from his testimony.

15                And if you look at Number 23, it says he

16     doesn't have any plan -- I should have said 23

17     instead of 33, but they say no one says he's got

18     training.  We are not saying he doesn't see someone

19     for his rheumatology issue.  This is specifically

20     about counseling, and that was the issue in the 37

21     at the time of the issue in court.

22                THE COURT:  All right.  Mr. Meyers.

23                MR. MEYERS:  Thank you, Your Honor.

24     Interrogatory 22 states, doctors -- it includes

25     doctors.  It doesn't say simply psychiatrists; it

1    says, doctors, psychiatrists, psychologists,

2    psychotherapists and/or medical providers.

3              THE COURT:  You can see how they would

4    have gotten confused by what she is seeking versus

5    what you're answering.

6              MR. MEYERS:  I think I can.

7              THE COURT:  You don't think that's a

8    little bit misleading or confusing?

9              MR. MEYERS:  I can see that, Your Honor,

10   yes.

11             THE COURT:  Let's move on to your next

12   point, then.

13             MR. MEYERS:  Okay.  Well, your Honor, the

14   point that Ms. Malone is making is that we didn't

15   disclose that he saw anyone and that we stated no to

16   the question of future, has anyone told you you will

17   need future medical treatment for this.  The answer

18   is no.  The truthful answer is no, and that's the

19   answer we gave.  But somehow that is being turned

20   into we sandbagged them with all these extra

21   witnesses.

22             THE COURT:  Your client even said that you

23   sandbagged them, the next day.  He said it was a

24   sandbag.  I thought it was, too.

25             MR. MEYERS:  If sandbagged, Your Honor,

```
 1   requires intent, then it could not have been
 2   sandbagged.  If sandbag can be a function of an
 3   unintentional, negligent, not as careful way to
 4   phrase things as one should have --
 5            THE COURT:  I understand that is your
 6   position and the tactic of your law firm.  I do
 7   understand that that's the approach that you are
 8   taking, so there is no reason to argue it any
 9   further.  Let's move on to your next point in cross.
10   Okay?
11            MR. MEYERS:  Yes, Your Honor.
12   Q.   (By Mr. Meyers)  Mr. Radbil, did Ms. Malone
13   file a motion to compel on the issue of counseling
14   and medical treatment, et cetera?
15   A.   She did.
16   Q.   And how was that motion to compel disposed of?
17   A.   After an in-person hearing before Magistrate
18   Judge Kaplan, that motion was denied.  There's a
19   written order, I believe.
20   Q.   It's my understanding that you and Ms. Malone
21   got together in person to discuss what she perceived
22   to be insufficient discovery responses and that you
23   provided additional responses; is that right?
24   A.   When?
25   Q.   After the -- after the Court had held a hearing
```

1    on a motion to compel.

2    A.    There are two different motions to compel.

3    Q.    Please tell me.

4    A.    There was one motion to compel that was filed

5    initially that there was no conference conducted on

6    the defense part.  And that motion -- Judge Kaplan

7    ordered they confer meaningfully, and we did confer

8    meaningfully.  And we filed a joint status report

9    stating we had conferred and resolved the issue, and

10   if we would supplement certain interrogatory

11   responses and produce our fee agreement that there

12   were no further issues to decide.  And based upon

13   that status report, the Court denied the defense

14   motion as moot because we worked everything out

15   after a conference.

16        And then there was a second motion to compel.

17   There was a motion to compel the second deposition

18   of Dr. White.  And the defense alleged that I had

19   obstructed discovery and that they had not been able

20   to obtain, quote, any information relating to

21   Dr. White's medical condition and his healthcare,

22   et cetera.  And that motion was denied on its merit

23   after Judge Kaplan reviewed the transcript of the

24   deposition testimony and also our response.

25   Q.    Thank you.  Mr. Radbil, I'm looking at a

1   Certificate of Service that reads, March 9th, 2012,

2   and a document entitled Plaintiff's Supplemented

3   Response to Defendant's First Set of

4   Interrogatories.  In that document from March 9th,

5   2012, you identified Arlene Betancourt, John Cush,

6   Paul Sanders and Xavier Castillo; is that correct?

7   A.    That is correct, yes.

8   Q.    After the date of that supplementation --

9   strike that.

10        After this discovery dispute, the first motion,

11  the responses, the supplemental responses, the

12  second motion, the order, did Ms. Malone raise

13  issues to you about insufficient discovery?

14  A.    No.  The status report states that if she

15  received the supplemental responses that we agreed

16  upon there were no more issues to resolve.

17  Q.    You understand that there is a supplemental

18  disclosure, Plaintiff Timothy White's First

19  Supplemental Rule 26(a) Disclosure Statement that's

20  dated January 18, 2012, but that's actually from

21  January 18, 2013.

22  A.    Yes, I'm aware.

23  Q.    Okay.  This is after of the date discovery

24  closed, right?

25  A.    That is correct.

```
 1              MR. MEYERS:  Your Honor, may I approach?
 2              THE COURT:  You may.
 3   Q.   (By Mr. Meyers)  Mr. Radbil, as I look at the
 4   first section here, speaking to the witnesses we may
 5   call, I see a number of witnesses that we did
 6   disclose, and I see that prior to the discovery
 7   cutoff, and I see a number of witnesses that we
 8   didn't disclose prior to the discovery cutoff; is
 9   that right?
10   A.   That's correct.
11   Q.   Okay.  Any of the witnesses that we did not
12   disclose prior to the discovery cutoff, were you
13   aware of these witnesses?
14   A.   No, not until shortly before the settlement
15   conference.
16   Q.   Did you intend to withhold witnesses from
17   Ms. Malone?
18   A.   Of course not.
19   Q.   And you became aware of these witnesses, you
20   said, shortly before the settlement conference.  Why
21   is it that it came up then?
22   A.   Because I had conferenced with Dr. White
23   several times for literally hours and told him to
24   sit down and think very carefully about what he
25   thought was a fair outcome in this case in terms of
```

1    the damages that he had suffered.  And I said, sleep

2    on it.  Don't tell me tonight, don't tell me now,

3    think about very carefully what you think is fair.

4         And in response, Dr. White provided us with, I

5    believe, two documents outlining many events that in

6    this case -- I mean, it was very detailed.  And

7    that's where these people's names were first brought

8    up.  And we promptly disclosed them, although we

9    acknowledged, I believe at trial, that they would

10   probably be subject to a motion to strike, and we

11   expected that sort of a ruling.

12   Q.   So you can understand that if we didn't

13   disclose witnesses prior to a discovery cutoff,

14   then, absent some sort of extraordinary

15   circumstances, perhaps rebuttal even, it would not

16   be right to use those witnesses, right?

17   A.   Yes, it would not be right.  Certainly I think

18   they would be subject to being struck for direct

19   witnesses, and then rebuttal is, you know,

20   questionable.  Yes, it's not great, but we felt that

21   since we knew about them that we should disclose

22   them.

23   Q.   That's really the bottom line, you disclosed

24   them when you learned about them, right?

25   A.   Yes.  And far prior to January --

1          THE COURT:  Let's wait for a question.

2    Q.   (By Mr. Meyers)  Dr. White's memo.  I have read

3    it, and I recall reading it.  You are familiar that

4    our firm now presents our clients with what we call

5    an actual damages questionnaire, where we go through

6    a whole litany of issues that really, in hindsight,

7    should have been something we should have been doing

8    all along, right?

9    A.   Sure.

10   Q.   Had we done that here, had we had that measure

11   in place, then perhaps we would have been advised of

12   Dr. White's thoughts at an earlier time, right?

13   A.   Yes, possibly.  Some clients don't even -- if

14   you ask them directly, don't even take the time that

15   Dr. White took to go over and create this outline.

16   I can think of, you know, a few that I have, you

17   know, had to say, please, you know, give me more

18   information on this, this, or this.  But Dr. White

19   was reasonable.  And as I was talking to him, I

20   think he took -- he really understood that he should

21   sit down and think critically about this, and he got

22   back to us and put in a lot of time obviously.

23   Q.   In hindsight, it would have been nice for us to

24   ask him that question a lot earlier, right?

25   A.   Yes.

1   Q.   You would agree that it's my responsibility to

2   manage the potential new client intake process,

3   right?

4   A.   Yes.

5   Q.   And you would agree that it's my fault if I did

6   not implement an actual damages questionnaire

7   sooner.

8          MS. MALONE:  Objection, Your Honor.  I

9   object for one reason because he is leading and

10  offering testimony that he can take the stand on.

11  And secondly, it doesn't matter if they had a

12  procedure.  An attorney has an obligation under the

13  rules when they are lead counsel to manage that

14  case, and that's just not true.  But I would object

15  to his leading and offering testimony in the guise

16  of questions where I can't cross-examine him.

17         THE COURT:  You can cross-examine him if

18  he's going to be offering testimony.  I will

19  overrule the objection.  I have given some leeway

20  certainly on the direct, and I will allow it on the

21  cross.  Go ahead.

22  Q.   (By Mr. Meyers)  Could you answer my question?

23  A.   Yes.

24  Q.   Okay.

25  A.   The answer is yes.

1    Q.    Okay.

2    A.    But it's not only --

3           THE COURT:  Let's wait for a question.  Go

4    ahead.

5    Q.    (By Mr. Meyers)  The memorandum from Dr. White,

6    that was a memorandum to us, correct?

7    A.    Yes, it was a memorandum that was e-mailed to

8    me, if I recall correctly, in response to many hours

9    of talking to Dr. White.  And it's not solely your

10   obligation.  We all have an obligation when we are

11   working on a case to get all of the information and

12   all of the facts --

13          THE COURT:  All right.  I hear you.  Let's

14   get another question and answer, please.

15   Q.    (By Mr. Meyers)  The content of Dr. White's

16   memo and the reasoning behind how he calculated what

17   he thought would be a fair settlement, did you agree

18   with all that as a matter of law and logic?

19   A.    No.

20   Q.    Okay.  But it was our client -- our client's

21   venting and just saying, this is what I think,

22   right?

23   A.    Our client --

24          THE COURT:  Mr. Meyers, can I ask what

25   point this is going to?  It sounds more like a

 1    general defense of the firm generally as opposed to

 2    any of the specific things brought up by the

 3    defense.

 4              MR. MEYERS:  Yes, Your Honor.  Yes.  It's

 5    going to the point that we did not counsel Dr. White

 6    to talk about this $40,000 in interest and penalties

 7    and this $5,000 that he didn't get a chance to teach

 8    a class.  It was actually kind of rogue.  I'm not

 9    finding a fault with him --

10              THE COURT:  It was kind of evoked out of

11    blue by the doctor and wasn't brought up by counsel?

12              MS. MALONE:  It was not counseled by us,

13    Your Honor, absolutely not.

14              THE COURT:  So he just came up with it?

15              MR. MEYERS:  When you say, he just came up

16    with it --

17              THE COURT:  Well, you tell me.  What does

18    this mean?  You tell me what it means.

19              MR. MEYERS:  What it means, Your Honor, is

20    under no set of circumstances did we ever say to

21    him, you need to say you have $40,000 in interest

22    and penalties and $5,000 in a class that you

23    couldn't teach.  As a matter of fact, Your Honor, we

24    disagreed with it.  It didn't make any sense.

25              He was not -- there is no way to suggest

1    that RAB would be responsible through its actions

2    for the $40,000 alleged as interest.  And there was

3    never anything presented by Dr. White to us saying,

4    here's how I couldn't teach a class for $5,000.  I

5    am not saying he did anything wrong.  He's just a

6    guy, and he was just talking.  But under no set of

7    circumstances did we ever suggest he say that; none.

8              And when he did say it in his memo, Judge,

9    or things he said in his memo, we didn't agree with

10   that and tried to explain to him why we don't agree.

11   But you can't always control everything your client

12   or any witness says, Your Honor.

13             THE COURT:  Okay.  Go ahead.

14             MR. MEYERS:  So that is where my questions

15   are going.

16             THE COURT:  I understand.  Is there

17   anything else on that point?

18   Q.   (By Mr. Meyers)  Mr. Radbil, did you ever ask a

19   jury for this $45,000 that Dr. White testified

20   about?

21   A.   No.  And I never asked Dr. White to specify or

22   quantify the amount of actual damages that he

23   sought.  The answer was an unsolicited statement.

24             THE COURT:  Let me hold on for just a

25   second.  I need to look at the transcript where

1    Dr. White came up with that testimony, if somebody

2    could direct me to the particular page and

3    attachment.

4              MS. MALONE:  Your Honor, we actually put

5    that testimony, I believe, in one of those tabs.  I

6    will get it for you.  Under Tab 8, Your Honor, the

7    testimony regarding the 40,000 is on page 189.  The

8    testimony regarding the 5,000 is on page 202.

9              THE COURT:  All right.  Give me just a

10   moment.

11             (Pause in the proceedings.)

12             THE COURT:  All right.  Let's move to the

13   next point.

14             MR. MEYERS:  Thank you, Your Honor.

15   Q.   (By Mr. Meyers)  Mr. Radbil, going into the

16   trial, did you or our firm believe as a matter of

17   fact that Dr. White had economic damages as a result

18   of the collection activity by RAB?

19   A.   No, I didn't see any damages that could be

20   traced back to RAB's conduct or definitive proof.

21   Q.   Any economic damages; is that right?

22   A.   Economic, right.

23   Q.   And we were of the mindset, however, that

24   Dr. White had actual damages in the form of

25   emotional distress, anguish and the like, correct?

1   A.   Yes.

2   Q.   Okay.  And at any time did we counsel Dr. White

3   to say, this is the specific amount of actual

4   damages in the form of emotional distress that you

5   are supposed to ask for?

6   A.   No, of course not.

7   Q.   Did you ever ask a jury for that, to say a

8   specific amount of money?

9   A.   I never asked Dr. White to state or quantify a

10  specific sum of actual damages to the jury, because

11  the only thing I saw was mental anguish and

12  emotional distress which, you know -- we of course

13  got Dr. White's view on what he legitimately

14  suffered, but no, it's not something that I would

15  ask somebody to quantify.

16  Q.   Okay.  And in our initial disclosure statement,

17  we stated actual damages to be determined by the

18  trier of fact, right?

19  A.   Yes.

20  Q.   Did you call any of these witnesses that we

21  disclosed late at trial?

22  A.   No.  In fact, we accommodated and didn't fight

23  very hard on the motion to strike them and we

24  expected that result.  I think Ms. Cureton was the

25  only witness who was left over who wasn't let go by

```
 1   agreement of the party, and she was later let go.
 2   So none of them were called.
 3   Q.   When you asked Dr. White the question that led
 4   him to explaining this $40,000 in economic damages
 5   as a result of RAB's collection activity, do you
 6   recall if Ms. Malone objected to that question or
 7   that answer?
 8   A.   No, and it's not on page 202 either.  It was
 9   much earlier.  I recall the exact question was:
10   What is the status of your student loans today?  And
11   the reason that that was asked was to show that he
12   is not, quote, a deadbeat who intended to take a
13   free ride off the state of Texas, which, you know,
14   we feared would be prejudicial.  So I wanted to get
15   testimony from Dr. White that, my loans today are
16   current and I intend on paying them back; and no, I
17   did not want to steal money from the State of Texas
18   or anything like that, so. . . I asked him what the
19   state of the student loan was.
20   Q.   Did Ms. Malone object to that question?
21   A.   She did not.
22          THE COURT:  Before you go any further,
23   give me just a moment here.
24          MR. MEYERS:  I have a single copy of the
25   whole transcript if the Court needs it.
```

```
1              THE COURT:  That's okay.  I think I have
2    what I need.
3              Let's take a five-minute break.
4              (Recess taken.)
5              THE COURT:  I'm going to ask a question of
6    Mr. Radbil, and perhaps it also goes to your own
7    representations here, Mr. Meyers.  But as I
8    understand it, the position today of the plaintiff's
9    firm is that this $40,000 that Ms. Malone -- or
10   45,000 that Ms. Malone thought was purposely being
11   elicited from Dr. White without having ever been
12   disclosed or indicated in any way to the defense was
13   going to be a damage amount, that the position today
14   is that that -- at least the 40,000-dollar figure
15   just pretty much came out of the blue as sort of a
16   rogue response not supported or sponsored in any way
17   by the plaintiff; is that right?
18             MR. MEYERS:  Yes, Your Honor.  You have to
19   remember I wasn't there.
20             THE COURT:  But that's what you as an
21   officer of the court have just represented to the
22   Court by your questions.
23             MR. MEYERS:  Absolutely never was I aware
24   that Dr. White was going to say, I have these
25   $40,000 in damages.  And if I was aware, I would
```

1    have told him I don't think that's right.

2            THE COURT:  What about Mr. Radbil?  You

3    are here on behalf of him, too.  What is your

4    position, that it is the exact same situation with

5    him?

6            MR. MEYERS:  My position on Mr. Radbil is

7    I have absolutely no knowledge that he ever told

8    Dr. White that you could have this money or that you

9    could testify about this money.

10           THE COURT:  Now you are changing your

11   theory.  What you elicited and clearly suggested

12   before we just took that break was that the theory

13   of the plaintiff with regard to this undisclosed

14   damage argument by the defense is that it came out

15   of the blue; no one knew.  Mr. Radbil nor you knew

16   it was going to happen, so that's why it wasn't ever

17   disclosed, because Dr. White just came out with this

18   and surprised Mr. Radbil.  Is that the position?

19           MR. MEYERS:  Yes.  My position, Your

20   Honor --

21           THE COURT:  And that's Mr. Radbil's

22   position.

23           MR. MEYERS:  It's my understanding that's

24   his position.

25           THE COURT:  Is that your position,

1    Mr. Radbil, yes or no?

2              THE WITNESS:  May I explain?

3              THE COURT:  Yes or no.  That is was a

4    rogue response.  Do you agree with that?

5              THE WITNESS:  Yes, it was.

6              THE COURT:  It wasn't expected by you.

7              THE WITNESS:  No.

8              THE COURT:  Okay.  But you never, ever

9    uttered a word of that when the Court questioned you

10   about this during the trial.

11             THE WITNESS:  I tried to --

12             THE COURT:  No, you didn't.  I'm looking

13   at at least part of the transcript.  This would be

14   during the discussion with the Court during the

15   motion for directed verdict.  And Ms. Malone said --

16   and I don't have the page or transcript, I'm just

17   looking at the attachment to her Rule 37 sanctions

18   motion.

19             It says:  Defendant's App 1.  Ms. Malone

20   said in there:  In their late-filed January 2013

21   supplements, the only thing they supplemented were

22   witness names.  They did not change that answer,

23   which was in regard to the damages.

24             And in Mr. White's deposition, I asked him

25   specifically regarding out-of-pocket expenses.  His

```
 1   answer was, "None."  Today he testified $5,000 for
 2   losing a teaching assignment, plus 40,000 in costs
 3   related to this loan modification and some other
 4   things we hadn't heard about before.
 5              Ms. Malone goes on:  Judge, I have just
 6   never seen this.  I don't really make Rule 37
 7   motions, but I'm a little frustrated.
 8              I turned it over to Mr. Radbil.
 9   Mr. Radbil, you said:  I may be young, Your Honor,
10   but I don't litigate in bad faith.
11              I questioned that, to paraphrase, and you
12   went on.  I do not, Mr. Radbil, you said.  And in
13   our supplemental disclosures, our pretrial
14   disclosures, we have amended that.  I believe with
15   respect to those charges -- and again, we are
16   talking about this damage figure -- Mr. White
17   incurred, he incurred those after the deposition.
18              I said to you:  Where are the submissions
19   that give them -- the defense -- notice of the
20   amount of damages you are seeking outside of the
21   initial response that Ms. Malone referred to?  Where
22   are they disclosed?
23              You said:  In the pretrial order.  They
24   were disclosed at the mediated settlement
25   conference.
```

1          And I said:  Okay.  Well, you know better

2     than that.  You know -- the federal rules require

3     you to respond to the questions about damages so

4     that they can meet your proof at trial.  So the fact

5     that you discussed it at the mediation doesn't

6     count.

7          And you said:  Okay.  You went on, and I

8     asked you to show me where -- you said they were

9     disclosed in the pretrial disclosures, and I said:

10    Where?

11         And you said:  I believe we copied and

12    pasted from the pretrial order.  I don't know if we

13    have a copy of the pretrial disclosures with me.

14         Ms. Malone, do you have those, I asked?

15         yes, I do, she said.  We looked at those

16    and there was nothing there.

17         And it goes on and on and on, asking about

18    this damages figure.  And at some point I said:  You

19    can't tell me off the top of your head where you

20    might have disclosed the specific amount beyond

21    1,500?

22         And then you said:  A specific amount, I

23    don't know whether we did disclose a specific

24    amount.

25         And then you went on and said:  There's a

1    requirement to disclose the exact amount of the

2    damages that we are seeking?

3            And we went on and talked about the fact

4    that you may not have a basic understanding of the

5    federal rules.

6            There was no indication whatsoever during

7    that exchange that this was a rogue response, which

8    lends again further force to the defense position

9    that there has been just a constant, consistent

10   amount of fabrication and lying and prevarication in

11   this case by Mr. Radbil.

12           Ms. Malone, did you have something to add?

13           MS. MALONE:  Yes, Your Honor, I do,

14   actually.  From the Court's transcript on Volume 3,

15   page 18, this is Dr. White talking regarding that

16   issue on the damages.

17           Do you want me to just read it to the

18   Court?

19           THE COURT:  Is this what he said the next

20   day when he came in?

21           MS. MALONE:  Yes, ma'am.

22           THE COURT:  That's fine.  Just don't read

23   too fast.

24           MS. MALONE:  The Court asked:  Any

25   questions?

```
 1            Dr. White said:  "Just one.  And I
 2   apologize, it seems presumptuous for me -- seems
 3   like I'm acting like my own attorney, which I am not
 4   in any way.  But I felt like I should make a
 5   response to the issue of sandbagging yesterday with
 6   the claims.
 7            "I did quantify the damages.  And they
 8   were not an abstract sum for mental anguish, they
 9   were real financial damages that I suffered.  I made
10   sure Mr. Radbil had that information.  The Court
11   recorded it in a settlement conference, and I was
12   led to believe that it would be submitted for this
13   trial, which of course it wasn't.  So I apologize.
14            THE COURT:  All right.  That's what he
15   said.  All right.  If there's nothing else on this
16   particular point, I find at least as to that
17   particular point that Mr. Radbil's response and your
18   representation for him is wholly incredible, is not
19   believable.  Let's move on to your next point.
20            THE WITNESS:  May I add one more thing?
21            THE COURT:  No, you may not.  Go ahead.
22            Next point, Mr. Meyers, please.
23            MR. MEYERS:  Yes, Your Honor.  It just
24   takes me a moment to understand what the Court is
25   saying, that I'm here lying, that I knew Mr. White
```

1   was going to ask for this money that I don't believe

2   he is entitled to.

3            THE COURT:  Mr. Meyers, let's move on to

4   your next point.  Okay?  I think I have made my

5   point.

6   Q.   (By Mr. Meyers)  Mr. Radbil, do you have a way

7   in your mind to quantify another person's

8   emotional -- the value, the monetary value of

9   another person's emotional distress?

10  A.   To do what I did in this case, which is to have

11  somebody think critically about it and give me some

12  sort of number I can look at based on the facts and

13  circumstances.  But to quantify the specific amount,

14  it's very difficult.  I mean, it's not a question

15  for me to answer.

16  Q.   Mr. Radbil, Ms. Malone suggested to the Court

17  that we had an expert in the wings waiting to

18  testify and pointed to a billing entry that said,

19  prepared letter to expert.  Have you ever seen a

20  letter in the file to an expert?

21  A.   No, because we've never had an expert.

22  Q.   And we never submitted a bill to this Court

23  seeking payment, did we?

24  A.   Of what?

25  Q.   Our attorney's fees.

1   A.   I think in connection with the motion to

2   compel, but other than that . . .

3   Q.   Okay.

4   A.   I don't think so.

5   Q.   Ms. Malone mentioned this Whaley trial.

6           MR. MEYERS:  May I approach, Your Honor?

7           THE COURT:  You may.

8   Q.   (By Mr. Meyers)  Did you prevail, Mr. Radbil,

9   in the first trial representing Shannon Whaley?

10  A.   I think so, yes.

11  Q.   Was Ms. Malone counsel of record at that trial?

12  A.   She was.

13  Q.   Did she start the case as counsel of record?

14  A.   She did not.

15  Q.   Okay.  And at the trial -- and you have the

16  verdict form there -- were any attorney's fees

17  awarded to Ms. Malone by the jury when they found in

18  favor of her client on a debt collection claim?

19  A.   Yeah.  There was a counterclaim that was

20  brought for breach of a promissory note.  And the

21  jury determined that Ms. Whaley did, in fact, owe

22  the money on the note and specifically found the

23  amount plaintiff agreed to pay -- Question 6 says,

24  it asks the jury to determine the amount of money

25  that Shannon Whaley owed on the promissory note.

1   The amount was $6,140; collection costs, answer zero

2   dollars.

3         Question 7 asked:  What is a reasonable

4   fee for the necessary services of the defendant's

5   attorneys pursuant --

6         THE COURT:  You're going to have to slow

7   down, please.

8         THE WITNESS:  -- in pursuing the

9   counterclaim only stated in dollars and cents.  And

10  A asked for representation of the trial court, and

11  the answer was zero; B asked for representation

12  through appeal to the Court of Appeals, the answer

13  was zero; C asked for representation at the petition

14  for --

15        THE COURT:  You are reading too fast

16  again, please.

17        THE WITNESS:  -- at the petition for

18  review stage in the Supreme Court of Texas, answer

19  zero.

20        For representation at the merits briefing

21  of stage in the Supreme Court of Texas, answer is

22  zero.

23        For representation through oral argument

24  and completion of proceedings in the Supreme Court

25  of Texas, answer also zero.

 1            THE COURT:  Maybe we can just summarize.
 2   It's all a zero for attorney's fees; is that right?
 3            THE WITNESS:  Yes.
 4            THE COURT:  Let's move on to another
 5   point, please.
 6   Q.   (By Mr. Meyers)  Mr. Radbil, Ms. Malone raised
 7   issues that you did not provide trial exhibits to
 8   her and did not provide trial exhibits to the Court.
 9   Do you recall that?
10   A.   I do.
11   Q.   Do you recall having e-mail exchanges with
12   Ms. Malone's office regarding trial exhibits and
13   trying to work out whatever issues there were?
14   A.   I remember talking on the telephone about
15   exhibits also and requesting that Ms. Malone please
16   provide courtesy copies because I didn't have the
17   physical copies that she mailed to our Texas office.
18   And she refused to provide what she would call a
19   second copy despite my requests.
20        And we also -- I think the record will indicate
21   that we provided her exhibits via fax.  And when one
22   of the paralegals at Weisberg & Meyers reported to
23   me three of the exhibits I believe didn't go through
24   and what should she do, I said, well, e-mail them in
25   that case.  And then I remember getting a response

1    that Ms. Malone had refused to accept them by e-mail

2    and, you know, what to do, so. . .

3              THE COURT:  Who was that paralegal?

4              THE WITNESS:  Kathy Bopp, I believe.

5              THE COURT:  How would we reach her?  Does

6    she still work there?

7              THE WITNESS:  She does.

8              THE COURT:  She works in Dallas?

9              THE WITNESS:  She's in Phoenix.

10             THE COURT:  In Phoenix.  Where were you

11   when the exhibits were being faxed and not going

12   through?

13             THE WITNESS:  Houston, Texas.  I was at a

14   summary judgment hearing.

15             THE COURT:  So she was communicating this

16   via e-mail?

17             THE WITNESS:  Yes, via e-mail.

18             THE COURT:  Do you have any copies of

19   those e-mails from her?

20             THE WITNESS:  We do, yes.

21             THE COURT:  Where would they be?

22             MR. MEYERS:  I, unfortunately, Your Honor,

23   have it on my phone.  I would be happy to bring it

24   the Court.

25             THE COURT:  Do you have your phone with

1   you?

2            MR. MEYERS:  I do.

3            THE COURT:  Let's see if we can find it.

4            MR. MEYERS:  May I turn on my phone?

5            THE COURT:  You may.  What was her name

6   again?

7            MR. MEYERS:  Kathy Bopp, B-O-P-P.

8            THE COURT:  Okay.

9            MR. MEYERS:  If it would please the Court,

10  I could have the same e-mail faxed after I show it

11  to the court on the phone.

12           THE COURT:  Let's see if we can find it

13  first.  This was about what date?

14           MR. MEYERS:  I believe February 19th, Your

15  Honor.  I just need one second, and it will pop up.

16           May I approach the bench, Your Honor?

17           THE COURT:  Why don't you show it to

18  opposing counsel, first.

19           MS. MALONE:  Your Honor, I guess I

20  understood that there was supposed -- you were

21  asking him for e-mails between him and Ms. Bopp.

22           THE COURT:  That's right.

23           MS. MALONE:  That's not what this is.

24           THE COURT:  This is between what

25  Mr. Radbil has said was an exchange that would

1   support his version of events as to what happened

2   with the exhibits, and he indicated to me that he

3   had a back-and-forth with Ms. Bopp and that would be

4   verified by e-mail exchange.  And you indicated you

5   had that on your phone.

6           MR. MEYERS:  I misunderstood.  I could get

7   those e-mails, Your Honor.  What I have is an e-mail

8   from Ms. Malone -- an exchange from Ms. Malone and

9   Ms. Bopp on this issue.

10          THE WITNESS:  Yes, get the e-mail.

11          THE COURT:  That's not what I was asking

12  for.  He indicated he had some with her and him and

13  that's not what that is, so let's move on.

14          THE WITNESS:  Your Honor, that line --

15  that message was forwarded to me by Ms. Bopp, I

16  believe.  And she said, what should I do?  How do I

17  get these documents to her?  That was the original

18  message that Ms. Bopp -- the original communication

19  between Ms. Bopp and Ms. Malone.

20          THE COURT:  We don't have that right now,

21  is that right?

22          THE WITNESS:  Ms. Bopp forwarded, I

23  believe, the original message from her, but I'm sure

24  we can ask her to forward the one that she

25  forwarded.

```
 1            THE COURT:  I am just trying to see where

 2   we can find some verification of what it is you are

 3   saying.  Let's move on to the next point.  Okay?

 4            MR. MEYERS:  Yes.

 5   Q.   (By Mr. Meyers)  Mr. Radbil, do you recall

 6   Ms. Bopp advising you that Ms. Malone told her she

 7   has not agreed to accept service of the documents by

 8   e-mail?

 9   A.   I think she refused to accept service via

10   e-mail, see below, or something along those lines.

11   Q.   And you recall Ms. Bopp trying to again fax the

12   documents on February 19th to Ms. Malone and telling

13   you that they would not go through?

14   A.   And in fact, I told Ms. Malone when we spoke to

15   contact Ms. Bopp in Phoenix to provide the facsimile

16   confirmations.  And apparently she did, and we have

17   that e-mail also, because I was in Houston, Texas,

18   for a summary judgment hearing.

19            THE COURT:  On Saturday before trial?

20            THE WITNESS:  No, it was before Saturday.

21   It was, I think, week's end right before trial.

22            THE COURT:  Okay.

23            THE WITNESS:  It's Brown v. Portfolio

24   Recovery Services and Portfolio --

25            THE COURT:  That's fine.
```

1  Q.   (By Mr. Meyers)  Is it your understanding,

2  Mr. Radbil, that you faxed -- that our office faxed

3  copies of the trial exhibits to Ms. Malone, and then

4  when we heard they were insufficient and tried to

5  get her better copies?

6  A.   That's a fact, yes.

7  Q.   Okay.  All right.  You heard the Court's -- the

8  Court tell you that the Court did not receive our

9  trial exhibits, right?

10 A.   Yes.

11       MR. MEYERS:  May I approach the witness,

12 Your Honor?

13       THE COURT:  You may.

14 Q.   (By Mr. Meyers)  Did you believe, Mr. Radbil,

15 that the Court had gotten our trial exhibits?

16 A.   Yes; mistakenly, yes.

17 Q.   And why did you believe that the Court had

18 gotten our trial exhibits?

19 A.   Because I mailed them from Houston, Texas, to

20 the Court, and I mailed them in what I thought was a

21 timely fashion, but I should have followed up with

22 the Court and double-checked.  Unfortunately, I

23 didn't, but I do know that I did mail them.

24 Q.   And to support your belief that you mailed

25 them, you have a FedEx bill, a receipt showing it

1  was paid, and a FedEx delivery confirmation, right?

2  A.    I do.

3  Q.    But you understand now, that despite that, the

4  Court did not get the exhibits?

5  A.    I do.

6  Q.    Okay.  And you agree that it would have been a

7  better practice to call and confirm rather than rely

8  on a FedEx receipt, right?

9  A.    Of course.

10  Q.    Did you prevail in a trial in the Western

11  District of Texas under the FDCPA and TCPA before

12  Sam Sparks, Judge Sparks?

13              MS. MALONE:  Your Honor --

14              THE COURT:  Excuse me.

15              MS. MALONE:  -- I'm going to object to the

16  relevance of trials that are not related

17  specifically to this.

18              THE COURT:  I will let him go into this

19  generally, because I let the defense go into it, as

20  long as we don't get too far afield.  Go ahead.

21  A.    I do, yes.

22  Q.    (By Mr. Meyers)  So before Judge Sparks in a

23  case very similar to this you did succeed, right?

24  A.    Yes, that's correct.

25              THE COURT:  Is that a jury trial or

```
 1   summary judgment?
 2             THE WITNESS:  Jury trial, Your Honor.
 3             THE COURT:  When was that?
 4             THE WITNESS:  Late 2011 or -- I think it
 5   was late 2011 or 2012.
 6             THE COURT:  Did you try that by yourself?
 7             THE WITNESS:  I did.
 8             THE COURT:  Who was counsel on the other
 9   side?
10             THE WITNESS:  What was his name?
11             MR. MEYERS:  Was his last name Boyd?
12             THE WITNESS:  No, it wasn't.
13             MR. MEYERS:  What was the case name?
14             THE WITNESS:  Adamcik v. Credit Control
15   Services, Incorporated.  It was a published opinion,
16   because we had postjudgment briefing regarding TCPA
17   and whether or not oral (inaudible) was permissible.
18   That was the main issue.  Judge Sparks had offered
19   the Blast Fast (phonetic) case, and he was
20   interested in that particular issue.
21             THE COURT:  Okay.  That's fine.
22   Q.   (By Mr. Meyers)  Mr. Radbil, I would like to
23   talk to you about the 1927 motion and -- I'm sorry,
24   strike that.
25             MS. MALONE:  Your Honor, I would like one
```

165

1   moment to review my notes to make sure I am ready to

2   move on.

3           THE COURT:  Sure.

4           (Pause in the proceedings.)

5           MR. MEYERS:  I would like to move on to

6   the 1927, Your Honor.

7           THE COURT:  Go ahead.

8   Q.   (By Mr. Meyers)  Mr. Radbil, Ms. Malone

9   questioned you about an e-mail from Dennis Kurz, who

10  is no longer with our firm, talking about not having

11  a demand at a particular time.  Do you recall that?

12  A.   I do.

13  Q.   Okay.

14          MR. MEYERS:  May I approach the witness,

15  Your Honor?

16          THE COURT:  You may.

17  Q.   (By Mr. Meyers)  I would like to ask you some

18  questions in order of those documents, Mr. Radbil.

19          THE COURT:  Would you please make sure the

20  defense knows what you are referring to so they have

21  them in front of them?

22          MR. MEYERS:  Yes, absolutely, Your Honor.

23          THE COURT:  Okay.

24  Q.   (By Mr. Meyers)  Mr. Radbil, on March 31st,

25  2011, before suit was ever filed, did we send

```
 1    Regional Adjustment Bureau in Tennessee a notice
 2    letter?
 3    A.    On March 31st, 2011, yes.
 4    Q.    Did that letter notify them about the claims
 5    that we thought we had?
 6    A.    Yes.
 7    Q.    And did that letter make a demand for
 8    settlement?
 9    A.    Yes, $7,500 inclusive of fees and costs.
10    Q.    Okay.  And on May 2nd, prior to filing a
11    lawsuit, is there a correspondence in that packet I
12    just gave you where we followed up with Regional
13    Adjustment Bureau trying to resolve the case prior
14    to filing suit?
15    A.    Yes, on March 2nd, 2011.
16    Q.    Could you read that letter for me, please?
17    A.    It's addressed to Regional Adjustment Bureau;
18    Attention, Legal Department; 7000 Goodlett Farms
19    Parkway, Suite 501, Cordova, Tennessee.
20          THE COURT:  Just go ahead and cut to the
21    language in it, please.
22    A.    To whom it may concern:  RAB was first given
23    notice of this claim on or about March 31st, 2011.
24    Despite the passage of one month, we have not been
25    able to settle.  I would prefer to resolve this
```

1    matter amicably without having to get the courts

2    involved.  This letter is just an attempt to see if

3    we can reach a settlement agreement without any

4    further expense than necessary, and to this end we

5    will delay our filing of this claim.

6               THE COURT:  Okay.  Before you go any

7    further on that, I want to just make sure the

8    defense -- is this an exhibit, or do you have this?

9    Are you aware of this before today, Ms. Malone?  I

10   mean, this letter that he is reading from?

11              MS. MALONE:  Your Honor, they produced

12   these documents in discovery in the main case.

13   These were not documents that were ever given to me

14   prior to litigation, and I don't think he's saying

15   that.

16              THE COURT:  I'm just making sure that this

17   is not something you have never seen before today

18   and therefore it shouldn't be being read into the

19   record.

20              MS. MALONE:  No.

21              THE COURT:  Okay.  That's fine.  Let's go

22   ahead.

23   Q.   (By Mr. Meyers)  Mr. Radbil, in the packet that

24   I gave you, there is a September 14th, 2011, offer

25   of judgment from Ms. Malone, correct?

1   A.   Yes, I see the cover letter with the offer

2   attached --

3   Q.   Okay.

4   A.   -- dated September 14th, 2011.

5   Q.   And that offer of judgment offered to resolve

6   the entire claim for $1,000 plus attorney's fees; is

7   that right?

8   A.   It states:  Pursuant to Rule --

9   Q.   Mr. Radbil, just tell me, is that right?

10  A.   Yes, that's -- that's correct.

11  Q.   Okay.  Did that offer of judgment offer Court

12  costs?  I'm just curious?

13  A.   It did not.

14  Q.   Are you familiar with an identical offer of

15  judgment being deemed invalid in the case of Whatley

16  v. CreditWatch for that very reason?

17  A.   I think so, yes.

18              MS. MALONE:  Objection, Your Honor --

19              THE COURT:  Sustained.

20  Q.   (By Mr. Meyers)  Mr. Radbil, I'm looking at an

21  e-mail from me to Mr. White dated September 20,

22  2011, at 6:46 p.m.

23  A.   I have that e-mail in front of me.

24  Q.   Okay.  And prior to disclosing this, after the

25  trial and in receipt of Ms. Malone's motion for

1  sanctions, did we get Mr. White's permission to

2  share this e-mail?

3         MS. MALONE:  Your Honor, I'm going to

4  object to hearsay, given the fact they have

5  testified he hasn't talked to Mr. White and

6  Mr. Meyers has not.  And I'm sorry, Your Honor, but

7  I feel a little uncomfortable accepting a document

8  to graycats@hotmail.com as being Mr. White with some

9  indicia of authenticity.

10         THE WITNESS:  I can testify to that.

11         MS. MALONE:  And I don't know how he can

12  testify this is someone else's e-mail.  But Your

13  Honor, my concern here is they are picking and

14  choosing what of their client's attorney-client

15  communication that they are waiving privilege on.

16  And given the fact that Dr. White expressed concerns

17  about his relationship in the trial, I really don't

18  know that Dr. White has agreed to that.

19         And as the Court knows, it is the right of

20  the client, not the attorney, to choose when that

21  privilege can arise.  And for the record, Your

22  Honor, I find this highly odd, given the fact they

23  haven't told him that there is an order out there

24  which could cause him to have to pay almost $10,000

25  to my client in court costs, but they are saying,

1  but we got permission to release this document when

2  they did not, by their own admission, discuss the

3  other order with Dr. White.

4         It just seems really odd to me, Judge,

5  that they can -- and I would remind the Court in

6  reading the Texas Rules of Disciplinary Procedure,

7  it says you cannot, as an attorney, withhold

8  information from your client for your own interest.

9  That's exactly what this is.

10         They are making an effort to produce -- or

11  to waive a privilege for Dr. White as to this item,

12  but they are not telling him the whole story about

13  the case as to the order.  And you know, Judge, I'm

14  not exactly sure what my objection is, because what

15  I'm saying is I think it's improper for Dr. White's

16  privileges to be waived when it suits them and to

17  raise it when they want to as to other issues

18  without Dr. White having a voice in this.

19         THE COURT:  Well, at lot of this is

20  irregular.  The discussions back and forth with

21  Dr. White, Mr. Radbil, and I suppose Mr. Meyers have

22  been addressed in some fashion in other areas at

23  length, and so I'm not concerned about that.  But I

24  am trying to make sure what the authenticity of this

25  is.

```
 1              Is this something that you sponsor, that
 2     you drafted, Mr. Meyers?
 3              MR. MEYERS:  Yes, Your Honor.  This is my
 4     e-mail to Dr. White relaying to him the 1,000-dollar
 5     Rule 68 offer and my confirming that he didn't want
 6     to accept it.
 7              THE COURT:  Okay.  Tell me exactly what
 8     point this goes to.
 9              MR. MEYERS:  Directly to Ms. Malone's
10     point that I never relayed the offer to Dr. White.
11              THE COURT:  All right.  Are you marking
12     this as an exhibit, or how is it that we are
13     supposed to consider this as part of the record,
14     because they have their exhibits marked.  And once
15     again, as what happened at trial, I don't have any
16     exhibits from you.  And so I'm not sure, did you
17     give them exhibits ahead of time, or do you have a
18     book of exhibits?
19              MR. MEYERS:  This is in our -- attached as
20     an exhibit to our response to the 1927 motion, Your
21     Honor.
22              THE COURT:  Okay.  All right.  Let's go
23     ahead, then.  If you want to explain it, it's
24     already part of the record as part of the filings,
25     that's fine.
```

1   Q.    (By Mr. Meyers)  Mr. Radbil, are you aware of

2   an e-mail being sent to Ms. Malone on January 5th,

3   2012, by Dennis Kurz making a demand of the $8,500

4   to settle the case?

5              THE COURT:  One moment.

6   A.    I am.

7              THE COURT:  Excuse me.  Mr. Radbil, we

8   have an objection.

9              MS. MALONE:  Your Honor, first of all I'm

10  going to object as improper predicate showing how

11  Mr. Radbil would have knowledge related to this.  It

12  is also hearsay.  I don't recall ever seeing this

13  e-mail.  So I want to know how they are going to

14  authenticate it without Mr. Kurz.

15             THE COURT:  Mr. Meyers.

16             MR. MEYERS:  Your Honor, I -- I'm here to

17  show the truth.

18             THE COURT:  Okay.  That is not a legal

19  response, now, come on.  What is the -- who is it

20  that can authenticate this document?

21             MR. MEYERS:  I would think I can, Your

22  Honor.

23             THE COURT:  How?

24             MR. MEYERS:  Because this demand, it says

25  here --

1          THE COURT:  I don't want to hear what it

2   says.  Tell me how you can be able to say this is

3   what it purports to be if he's not here.

4          MR. MEYERS:  It was sent in the ordinary

5   course of business, Your Honor, pursuant to --

6          THE COURT:  I'm going to sustain the

7   objection.  Let's move on to the next point.

8          Let me ask, though, is Dr. White still a

9   client?

10         MR. MEYERS:  I don't know how -- I don't

11  know how to answer that question, Your Honor.  I

12  don't know specifically when the relationship would

13  technically end.  I don't have any active matters

14  for him at this time.

15         THE COURT:  So is there any reason why we

16  couldn't call upon him to come down and help kind of

17  corroborate some of these things that you and

18  Mr. Radbil are saying?

19         MR. MEYERS:  I don't think so, Your Honor.

20         THE COURT:  All right.  Go ahead.

21         MR. MEYERS:  May I approach, Your Honor?

22         THE COURT:  You may.

23  Q.  (By Mr. Meyers)  I have just handed you,

24  Mr. Radbil, part of Ms. Malone's billing.  Are there

25  redacted entries?

1    A.    There are redacted entries, yes.

2    Q.    Okay.  And are there entries redacted on

3    either -- sometime between 1/4 and 1/6?

4    A.    They are.

5               THE COURT:  Let's be clear on what point

6    this is going to.

7               MR. MEYERS:  I believe the e-mail was

8    received by Ms. Malone that the Court isn't letting

9    in.

10              THE COURT:  If you want to submit this as

11   some kind of a record document, that's fine, but at

12   this point I would like to move on from that point.

13   All right.

14              THE WITNESS:  It's already in the record.

15              THE COURT:  Let's wait for a question.

16              I realize there are some attachments to

17   the plaintiff's response.  For the most part from

18   what I am hearing, some of these are reliable and

19   some are not.  This one that we have been referring

20   to most recently in my view is not sufficient to

21   give it any kind of weight one way or the other,

22   just so that I am clear on that.

23   Q.    (By Mr. Meyers)  After we prevailed on several

24   claims at summary judgment, Mr. Radbil, are you

25   aware of Ms. Malone reiterating the same offer of

1  $1,000 plus attorney's fees?

2  A.    I am, yes.

3  Q.    Do you believe, Mr. Radbil, that we made good

4  faith efforts to try to settle this case?

5  A.    I do believe that.

6  Q.    Okay.  Do you, Mr. Radbil, recall -- strike

7  that.

8      Do you think, Mr. Radbil, that Dr. White's only

9  option in this case was to accept $1,000 to settle

10  his matter?

11  A.    No, I think that -- no is the answer.

12  Q.    Did Dr. White ever express to you that $1,000

13  was not sufficient in his view?

14  A.    Yes, he did.

15      THE COURT:  Let's talk about that for a

16  minute.  Because the day that you didn't appear,

17  Mr. Radbil, for a couple of hours, Dr. White, here

18  on the record after we waited some time for you,

19  expressed a lot of anxiety about what had happened

20  in the trial and about your conduct and indicated

21  that he wanted to talk to Ms. Malone.  And it was my

22  understanding that he reached an agreement with her

23  before you got here.

24      Ms. Malone, is that your recollection?

25      MS. MALONE:  Yes, Your Honor, he did.

 1                 THE COURT:  All right.  So once you got

 2     here, that was off the table.  Why don't you tell me

 3     what happened.

 4                 THE WITNESS:  Well, I think that it's in

 5     the transcript.  And at some point --

 6                 THE COURT:  You've got to speak into the

 7     microphone.  We can't hear you.

 8                 THE WITNESS:  At some point the Court

 9     allowed me to counsel Dr. White, and I advised him,

10     you know, that I felt that his claims should proceed

11     based on what he told me during the settlement

12     conference and what I knew that he wanted out of

13     this case, and I addressed his concerns.

14                 And for the record, I have a good

15     relationship with Dr. White, because I spent a

16     significant amount of time talking to him, preparing

17     for the mediated settlement conference, preparing

18     for trial, and our correspondence dates back, but

19     specifically before the settlement conference we

20     talked --

21                 THE COURT:  Okay.  What did he agree to

22     settle?  What did he tell you he agreed that morning

23     that you didn't appear, what had he agreed to

24     settle, what amount?

25                 THE WITNESS:  It's my understanding that

1    it was $1,000.

2             THE COURT:  Okay.  And you told him you

3    advised him against that.

4             THE WITNESS:  I did, yes.

5             THE COURT:  Okay.

6             THE WITNESS:  Based --

7             THE COURT:  All right.  All right.  And

8    then I believe the jury came back with nothing.

9             THE WITNESS:  They did, yes.

10            THE COURT:  I think we actually called

11   them back in here just to make sure there wasn't any

12   figure that we were missing.  I do want to hear some

13   more clarification from Ms. Malone on this, because

14   I am questioning the credibility, Mr. Radbil, of

15   your statements of your relationship with Dr. White

16   and the specifics of the conversation you had with

17   him that morning when he appeared to be very

18   frustrated with you, not understanding, as he said,

19   the sandbagging the day before.  And also he seemed

20   more than willing to get this over with and come to

21   an agreement with the defense.  And then you came,

22   and that changed.

23            And on top of that, we have that strange

24   client agreement that you have which we even talked

25   about at that point.  So I just want to make clear,

1  I have some questions about what actually occurred

2  between you and Dr. White and your position on

3  settlement versus his.

4          Having said that, we will take a

5  ten-minute break, and then we will take it back up.

6  And if we don't finish this today, we are going to

7  have it another day, and we will continue this until

8  it's over.

9          (Recess taken.)

10          THE COURT:  Let's go ahead.

11          MR. MEYERS:  Your Honor, at some point

12  prior, I had a misunderstanding of the e-mail you

13  wanted to see regarding the trial exhibits.  I did

14  get those other e-mails showing Mr. Radbil told

15  Kathy to send Ms. Malone the exhibits.

16          THE COURT:  Let me back up for a minute

17  and just clarify something.  This -- not on that

18  topic, but on the FedEx.

19          MR. MEYERS:  Yes.

20          THE COURT:  Where is that in the record?

21  Is that part of your responses?  Is that somewhere,

22  this FedEx, about the exhibits being delivered for

23  the trial?

24          MR. MEYERS:  No, Your Honor, that was not

25  raised in Ms. Malone's motion.  She raised it today.

1          THE COURT:  That's not my question.  My

2     question is, I haven't seen this before.  Some of

3     these things I haven't seen before you have

4     clarified are part of the response and attachment.

5     It is it attached to any of your responses?

6          MR. MEYERS:  No, Your Honor.

7          THE COURT:  Okay.  And have you seen it

8     before, Ms. Malone?

9          MS. MALONE:  No, Your Honor, I have not.

10          THE COURT:  In the numerous conversations

11     I had with Mr. Radbil about where the exhibit --

12     hard copy exhibits were during the trial, never once

13     was it said that he had FedExed them and was

14     surprised that they hadn't gotten here.  There was

15     no mention that, okay, I will get them to you

16     tomorrow or get them to you soon.  So this is the

17     first time I have heard anything about a FedEx.  So

18     do you have a copy, Ms. Malone, of what this is?

19          MS. MALONE:  Yes, ma'am.

20          THE COURT:  You've gotten it today?

21          MS. MALONE:  Yes, ma'am, I did.

22          THE COURT:  Okay.  Can you explain why

23     this has never been raised before?

24          MR. MEYERS:  It doesn't seem, Your Honor,

25     in the totality of what we are talking about today,

1    to be the chief issue.  And please, I'm not saying

2    that I take it lightly, but Ms. Malone didn't raise

3    it as her basis for Rule 37 or 1927 that we didn't

4    give the Court the trial exhibits.  So it wouldn't

5    be something we would naturally argue.

6              Now, today the issue of the trial exhibits

7    came up, so we were prepared --

8              THE COURT:  But why was this never -- why

9    did Mr. Radbil never mention this under heated

10   questions by and comments by defense counsel during

11   the trial?  It seems like a pretty important thing

12   to have been explained.

13             MR. MEYERS:  I can speculate, Your Honor,

14   and I can tell you why I think it did not come out.

15             THE COURT:  Maybe, Mr. Radbil, you can

16   tell me why you never raised this.  I asked you

17   point-blank more than one time where were my

18   exhibits, and you said, I will get them to you.

19             THE WITNESS:  It's my fault.  I should

20   have followed up with the Court, and I should have

21   raised the issue.  When we were talking about

22   exhibits, especially the day that I was late and

23   then I believe the last day of trial, I was

24   flustered and it was not my best -- my best

25   performance at trial and not my best day in the

 1  courtroom.

 2          THE COURT:  Mr. Radbil, but you never

 3  mentioned it ever.  When we talked about it at the

 4  beginning of the case I asked where the exhibits

 5  were before maybe you were flustered, and you never

 6  brought up that you FedExed them, ever.

 7          THE WITNESS:  I do recall during reviewing

 8  the transcript, then, for some reason it popped in

 9  my head that I had done that from Houston, Texas,

10  because I remembered I got the exhibit stickers

11  because I needed additional exhibit stickers.  And I

12  remember specifically -- I remember doing it.  But

13  at that point for some reason I didn't.  I apologize

14  to the Court.

15          THE COURT:  So what happened to them?  Did

16  they get lost?

17          THE WITNESS:  I don't know.

18          THE COURT:  Did you file a complaint with

19  FedEx?

20          THE WITNESS:  Of course not, no.  The

21  only -- I don't know what happened to the exhibits.

22  I should have followed up with the Court about if

23  the Court received them, but I -- I don't have a

24  reason for why I didn't raise the issue.

25          THE COURT:  Where is the FedEx document

1  that you all have been referring to?  Why don't you

2  see if you can locate it and hand it over to my law

3  clerk, please.

4           THE WITNESS:  I think there is one more

5  also, which is my --

6           THE COURT:  Just a moment.  So this has

7  got -- tell me how you came about this, Mr. Meyers.

8           MR. MEYERS:  Came about the pieces of

9  paper you are looking at?

10           THE COURT:  Yes.

11           MR. MEYERS:  Mr. Radbil provided them to

12  me.  I asked him, what do you mean we didn't give

13  the judge the copies of the exhibits?

14           And he said, I thought we did.

15           Why did you think we did?

16           Here's why.  Okay.

17           In my view, you probably should have

18  followed up with that instead of just assuming they

19  were delivered.

20           And he said, you know what, you're right.

21           THE COURT:  Show me or tell me where on

22  here I can be able to tell that this actually was a

23  package that contained the trial exhibits in this

24  case.

25           MR. MEYERS:  I don't -- I don't think you

1   can, Your Honor.  But you can see the receipt, the

2   day of the mailing slip, you can see your name and

3   address on there.  I'm sure the Court didn't get

4   them, but I'm also sure that we tried to get them to

5   the Court.

6          THE COURT:  Once again -- you say you

7   don't understand why this is maybe an issue of any

8   import.  But once again, it's a trail of numerous

9   misrepresentations and complete change of

10   circumstances from what was said previously to what

11   was said after that to what is being said today.  So

12   it's important, because it looks like it's made up.

13   It looks like it's not true.

14          And that is the most important issue to

15   the Court is whether or not there has been lying to

16   the tribunal in this case.  It's one of the most

17   serious infractions that an attorney can make.  So

18   once again, Mr. Radbil and I had this conversation.

19   It was never mentioned to the defense, it was never

20   mentioned to me, and here we go, today comes in a

21   FedEx receipt.  It doesn't make sense.

22          MR. MEYERS:  I understand what the Court

23   is saying.  And I would not have -- if it were me

24   here, Your Honor, I would have perhaps not made some

25   of the arguments and statements that were made.  I

 1   wasn't here, Judge.  And all I can do is tell you

 2   that for me, personally, my word means more to me

 3   than anything.  The Court thinks I'm untruthful, I

 4   don't really know how to deal with that.  I really

 5   don't.  I understand the bread crumbs here, Judge,

 6   and how they appear.  I think that our motion or our

 7   responses address the issues raised.  I think

 8   when -- but, you know, Judge, when you don't show up

 9   on time for something -- you know.

10           My parents, they were divorced.  That's

11   what they always fought about, my mom always being

12   late.  It's instilled in my head.  That's one of the

13   most important things to me is being on time.  So

14   when someone doesn't show up on time for something,

15   it looks like everything in the past gives weight to

16   everything in the past, and I get it.  And I can't

17   tell you that I wouldn't think the same thing,

18   Judge, I really can't.

19           THE COURT:  This FedEx receipt is right

20   now not marked as an exhibit.  It's not part of the

21   attachments, and I'm not sure if it -- well, I am

22   concerned that if it deserves any weight it would be

23   inference against Mr. Radbil based upon the fact

24   that I have just seen it for the first time today.

25   But if you want this to be part of the record, then

1   it needs to be made so.

2          MR. MEYERS:  I would like the documents

3   that I have asked Mr. Radbil about to be part of the

4   record, yes, Your Honor.

5          THE COURT:  They need to be marked, and

6   that needs to be specific so the record is clear.

7   This isn't marked as anything, so we need to take

8   care of that.  I will pass this back down.  Make

9   sure if there is something that you want part of the

10  record that it's marked and that we either have it

11  as an attachment or it's been admitted for purposes

12  of the hearing.

13         MR. MEYERS:  Can I go back up there and

14  get some of those?

15         THE COURT:  Yes.

16         MR. MEYERS:  Thank you.

17         THE COURT:  Why don't you retrieve the

18  FedEx receipt.

19         MR. MEYERS:  How, Your Honor, would I go

20  about marking them now?

21         THE COURT:  Just use a pen.

22         MR. MEYERS:  May I have 60 seconds or so

23  to do this?

24         THE COURT:  Go ahead.

25         (Pause in the proceedings.)

```
 1              THE COURT:  I want you to hand those first
 2   to the defense so they can take a look.
 3              MR. MEYERS:  All I have there is the FedEx
 4   receipt and the Whaley verdict form, Your Honor.
 5              MS. MALONE:  Your Honor, they are in
 6   different order.  I have an objection to the FedEx
 7   document as it not being an original and that I have
 8   not seen the original or have no way to test the
 9   authenticity of it.  It also does not identify what
10   was contained within the package or give us any idea
11   of what was contained in the package.
12              I do have a concern about this, given the
13   fact that I did not receive originals and I
14   consistently asked them for them in e-mails before
15   the Court and was not provided them until the first
16   day of trial when he handed me a notebook.  So I do
17   object to Plaintiff's 1.  I do understand that the
18   Court is accepting it for purposes of argument, but
19   I wanted my objection for the record.
20              THE COURT:  All right.  Overruled.  I'm
21   going to permit Plaintiff's 1.  How much weight and
22   which direction that will go is another matter, but
23   I will admit it.
24              MS. MALONE:  I have no objection to
25   Plaintiff's 2, Your Honor.
```

```
 1                THE COURT:  Is it 1 and 2?
 2                MS. MALONE:  Two is the charge from
 3     Whaley; it is a matter of public record and I have
 4     no objection.
 5                THE COURT:  Plaintiff's 2 is admitted.
 6                MR. MEYERS:  May I?
 7                THE COURT:  Yes.
 8                MR. MEYERS:  By no means, Judge, was I
 9     trying to diminish the importance of providing you
10     the trial exhibits.
11                THE COURT:  I understand.
12                MR. MEYERS:  I'm merely saying --
13                THE COURT:  Let's go ahead and move ahead.
14     All right?
15                MR. MEYERS:  Does the Court want to see
16     the e-mails between Noah and Kathy about getting
17     Ms. Malone the exhibits?
18                THE COURT:  Have you shown them to
19     Ms. Malone?
20                MR. MEYERS:  No, I wanted to ask the Court
21     first.
22                THE COURT:  Go ahead and hand them to her,
23     and I want to see what she has to say about them.
24                MR. MEYERS:  Okay.
25                THE COURT:  Is this still on your cell
```

1  phone?

2        MR. MEYERS:  Again, I should have thought

3  this would be an issue and I didn't.

4        THE COURT:  Let's move ahead from this.

5  We don't have it in hard copy, and I want to move on

6  from this issue.  I understand your position is that

7  you found them on your cell phone.

8        MR. MEYERS:  I asked them to be sent to

9  me.  I didn't have them on my phone.  I would ask

10  leave of the Court to supplement the record with

11  that, maybe prior to when we come back.

12        THE COURT:  As far as leave to supplement,

13  I don't know what I am giving you leave to

14  supplement until I see it, so I will have to see it

15  and make a decision and give them a chance to look

16  at it first.  All right?

17        MR. MEYERS:  Yes, Your Honor.

18  Q.   (By Mr. Meyers)  Mr. Radbil, Ms. Malone and the

19  Court had asked you some questions about the two

20  depositions of Mr. Wyatt, the first deposition and

21  the second deposition.  Why is it that you raised

22  the issue of both depositions or the first

23  deposition and the second, if we had a second

24  deposition?

25  A.   Mr. Wyatt, I believe, served as the Vice

1    President of their Compliance Department and Human

2    Resources Director, according to his testimony, and

3    he had served in that capacity for a number of

4    years.  So at the first deposition, I examined Dr.--

5    Mr. Wyatt on the policies and procedures that are

6    employed to prevent violations of the Federal Fair

7    Debt Collection Practices Act and in connection with

8    the Telephone Consumer Protection Act claims.  And

9    the documents produced referenced other documents,

10   specifically a policy and procedure manual of Texas

11   Guaranteed that had never been produced.  And Dr.--

12   Mr. Wyatt could not testify that he even was aware

13   that the manual existed, let alone its content,

14   despite its responsiveness and it clearly being

15   identified in the documents that were produced.

16       As somebody who had worked there as the

17   Director of Compliance and Training for a number of

18   years, the fact that he didn't know at that point in

19   time what these procedures were was wholly

20   inconsistent with the subsequent testimony, that he

21   knew what these procedures were at trial, because

22   how can you be responsible for something that

23   basically you don't know about and providing

24   training on and being in charge of.

25           So I attempted to use it as a prior

1    inconsistent statement of Mr. Wyatt because it cut

2    across -- it cut across the grain of what he was

3    saying at trial.  And the fact that he had been

4    later prepared on that document didn't change the

5    fact that he had no knowledge of it a couple of

6    months before when he had been serving the whole

7    time as the Director of Compliance and Human

8    Resources.

9    Q.    Do you recall, Mr. Radbil, what the Lopez case

10   that Ms. Malone mentioned was about?

11   A.    I do.  Dan Lopez v. RS Clark Associates,

12   Incorporated.

13          THE COURT:  You are mumbling a little bit.

14   Please speak up and pull the microphone closer

15   please.

16   A.    The style of the case is Dan Lopez v. RS Clark

17   Associates, Incorporated.  It was pending in the

18   14th Judicial District Court before Dallas County

19   and is now on appeal to the Fifth District Court of

20   Appeals.

21   Q.    It's my understanding that that case, summed

22   up, is how our client, Mr. Lopez, sent a cease and

23   desist certified to RS Clark's statutory agent; is

24   that right?

25   A.    The statutory agent.

1   Q.   And then the statutory agent said they never

2   received the document; is that correct?

3   A.   That's correct.

4   Q.   So they continued to contact him, RS Clark?

5   A.   And the affidavit of Wes Rowden, who is the

6   owner of RS Clark and Associates, in his affidavit

7   he states that they, shortly after, switched

8   registered agents because, had they been given the

9   letter at the time that it was given or at the time

10  that it was received, they would have immediately

11  ceased collection and reported the debt as disputed

12  to the credit bureaus.  Notwithstanding, you know,

13  we did not prevail on the merits of those claims,

14  and we appealed.

15  Q.   And the client was sanctioned; is that right?

16  A.   That's correct.

17  Q.   Okay.  Just sanctioned because the Court found

18  that him mailing a letter to the statutory agent was

19  not a sufficient basis to bring a claim?

20  A.   No.  The Court found that Mr. Lopez brought

21  claims in bad faith and/or for the purposes of

22  harassment under Section 17.50 of the Texas

23  Deceptive Trade Practices Consumer Protection Act.

24  And the Court also increased the amount of

25  supersedeas bond that Mr. Lopez would have to post,

```
 1   and we challenged that.

 2            THE COURT:  Please speak up and please

 3   speak more clearly.

 4   A.   We posted a bond on behalf of Mr. Lopez in the

 5   amount of -- that didn't include the award for

 6   attorney's fees.

 7            THE COURT:  Let's get to the point here,

 8   please, Mr. Meyers.

 9            MR. MEYERS:  I just wanted the Court to

10   understand what that case was about since Ms. Malone

11   raised it.

12            THE COURT:  Let's move ahead, please.

13            MR. MEYERS:  Yes, Your Honor.  I do not

14   think -- yes, I'm sorry.  I would like, Your Honor,

15   just to briefly address, Ms. Malone had raised the

16   issue of the Telephone Consumer Protection Act or

17   related to the Court that it was not in either of

18   her motions, but I would just like the Court to hear

19   our basis for thinking that was a claim, Your Honor?

20            THE COURT:  All right.

21            MR. MEYERS:  Okay.  May I approach, Your

22   Honor?

23            THE COURT:  You may.  This is the issue

24   with the auto dialer?

25            MR. MEYERS:  Yes, Your Honor.
```

```
 1   Q.    (By Mr. Meyers)  I would like the Court to know

 2   that I was in the same situation with Ms. Malone, it

 3   is a dialer/it isn't a dialer, before Judge Shell.

 4   And the jury found that it was a dialer, Your Honor.

 5   That the Court didn't find it was a dialer was

 6   obviously the Court's province.  But to suggest it's

 7   a dialer and to advance the dialer through for the

 8   reason I am about to explain, Judge, I think is just

 9   the difference between being wrong in the Court's

10   eyes and being vexatious in the Court's eyes.

11             MS. MALONE:  Your Honor, if I could?

12             THE COURT:  Ms. Malone.

13             MS. MALONE:  Yes.  Thank you, Your Honor.

14   The only thing that I would note to Mr. Meyers, I

15   did not object to their raising the argument.  What

16   I objected to and what the Court took objection to

17   at trial was their suggestion that I had conceded it

18   was a dialer, and so it's a very narrow thing.  But

19   Mr. Meyers and I will probably go toe to toe on this

20   issue about whether or not something is a dialer

21   numerous times.  I am not arguing that they had a

22   legal right to make that argument, I am simply

23   arguing that for them to tell the Court that I

24   conceded it when I have done nothing but fight about

25   it for the last five years is inappropriate.
```

1              THE COURT:  Can you address that point?

2              MR. MEYERS:  Yes, and I will make anything

3     I have to say a lot shorter, Your Honor.

4              THE COURT:  Go ahead.

5              MR. MEYERS:  I'm afraid to say it, Judge,

6     because reading the transcript I know you did not

7     take kindly to this.  And again, I'm not suggesting

8     anything other than to explain why Noah thought that

9     he had a right to say Ms. Malone conceded it was a

10    dialer.  I understand the Court did not like the

11    argument, and I'm not saying anything about that.

12    I'm merely saying that in the pretrial order, as you

13    know, it says three of the calls were made with the

14    dialer, one of them was outbound.

15             To us it seemed intuitive, okay, you know,

16    we believe it's a dialer.  We believe it's a dialer

17    as a matter of law and we believe it's a dialer as a

18    matter of fact.  Here we are disagreeing as to the

19    amount of possible dialer calls.  Okay, that makes

20    sense.  But at least we seem to be in agreement that

21    at least for some point a dialer was used.

22             I -- I don't know, Your Honor.  If it were

23    me, I don't know that I would have handled it

24    differently, Judge.  I don't know that I wouldn't

25    have said, I thought the pretrial order was what we

1    agreed on.  I don't know -- I don't know how far to
2    push that, but I think at least presumptively we
3    have to rely on the pretrial order just to begin as
4    a starting point.
5              And then I think that probably, Your
6    Honor, it would have been appropriate to say, okay,
7    I -- I concede that there is an error in there, and
8    I won't advance that argument.  Let's get to the
9    facts and see if it's a dialer as opposed to
10   pretrial says it's a dialer, pretrial says it's a
11   dialer, but presumptively that's why we thought
12   that.
13             THE COURT:  But you wouldn't have done
14   that if you were in Mr. Radbil's place.
15             MR. MEYERS:  You know, Your Honor, I'm --
16   I'm a very big believer in psychology, Your Honor,
17   and I think that to acknowledge the other side's
18   argument is to give credibility to your position,
19   so. . .
20             THE COURT:  But to misrepresent their
21   position is a completely different matter.  I think
22   I have heard all of this before.
23             Ms. Malone, anything you want to add,
24   because I want to move forward?
25             MS. MALONE:  No, Your Honor.

```
 1                THE COURT:  Let's go ahead.  Next point.
 2                MR. MEYERS:  The last point on the dialer?
 3                THE COURT:  I don't want to hear anything
 4   more about the dialer; we have covered that, I
 5   understand.
 6                MR. MEYERS:  Sure.  Okay.
 7                THE COURT:  It's not the legal issue, it's
 8   the representation of the position of the defense.
 9                MR. MEYERS:  Right.
10   Q.   (By Mr. Meyers)  Mr. Radbil, are you happy to
11   be here today?
12   A.   Under these circumstances?  It's the worst
13   thing that I can think of.
14   Q.   Okay.  If you are given the opportunity to show
15   this Court and Ms. Malone that really the picture
16   being painted here is not who you are, are you going
17   to do that?
18   A.   I would like nothing more than to do exactly
19   that.
20   Q.   Has anyone -- have you expressed your
21   displeasure with yourself over appearing late?
22   A.   Repeatedly.
23   Q.   Okay.  Have you expressed to me that you see
24   you could have done things differently?
25   A.   Yes.
```

197

1   Q.   Okay.  Do you believe that you engaged in

2   vexatious harassing conduct?

3   A.   No, I don't.

4   Q.   Is that something that you suggest that we do

5   at Weisberg & Meyers?

6   A.   No.

7   Q.   Is that something that Weisberg & Meyers

8   suggests you do?

9   A.   No.

10  Q.   Okay.  Do you believe that you withheld

11  evidence in an attempt to sandbag Ms. Malone?

12  A.   No, that's not true.

13  Q.   Do we advocate you sandbagging people at

14  Weisberg & Meyers?

15  A.   Of course not.

16  Q.   Do you encourage us to do that?

17  A.   No, I do not.

18          MR. MEYERS:  I have nothing further, Your

19  Honor, at this time.

20          THE COURT:  Any questions of Mr. Radbil?

21          MS. MALONE:  No, ma'am.

22          THE COURT:  No.

23          MS. MALONE:  Well, I only had one, Your

24  Honor, but. . .

25          THE COURT:  Come on up and ask it then.

```
 1            MS. MALONE:   Okay.
 2                  REDIRECT EXAMINATION
 3   Q.   (By Ms. Malone)  Mr. Radbil, earlier you
 4   testified to Mr. Meyers that on December the 6th you
 5   read a memo from your client detailing the doctors
 6   and damages that he had laid out for you to support
 7   your damage claim, correct?
 8   A.   Did I say it was on December 6th?
 9   Q.   That's what your billing invoice has said.  If
10   you want to look at it, Mr. Radbil.
11   A.   I will defer to the invoices then.
12   Q.   I will represent to you that on Defendant's
13   App. 0108 under Tab 7, the entry says, December 6,
14   review and -- receive and review Dr. White's
15   memorandum regarding actual damages.
16   A.   Okay.
17   Q.   Okay.
18   A.   There are two memorandums.
19   Q.   Yes, sir.  And the second memorandum detailed
20   witnesses and doctors that he had identified,
21   correct?
22   A.   I don't know whether it was the first or the
23   second, but both were approximately the same week
24   that I was talking to Dr. White in preparation.
25   Q.   And that was December of 2012, correct?
```

199

1   A.   I believe so, yes.

2   Q.   And you did not supplement to identify those

3   witnesses until January the 18th of 2013, correct?

4   A.   Can you specify which witnesses?

5   Q.   The additional witnesses that were named that

6   you said you learned about from his memo were not

7   added until the January 18th of 2013.

8   A.   Ms. Jaclynn Cureton, who is a student at Texas

9   A&M --

10          THE COURT:  That's not the question; just

11   yes or no.

12   A.   Yes, there were certain witnesses.

13   Q.   And you waited from December 6th to

14   January 18th before you identified them to

15   defendants, correct?

16   A.   I think that's -- well, I don't know when we

17   identified them to the defendants exactly, but if

18   that's the dates, then that would be true.

19   Q.   Do you recall that you did it first in your

20   First Supplemental Rule 26(a) Disclosure Statement?

21   A.   Not as to the five doctors who were identified

22   much, much earlier in accordance with our agreement

23   to supplement, but as to the witnesses that I only

24   found out about a very short time before trial, yes.

25   Q.   And Mr. Radbil, your testimony was that you did

1  not offer them at trial; is that correct?

2  A.   I think that's -- yes.

3  Q.   But you subpoenaed them?

4  A.   I did.

5  Q.   And they actually came here to the courtroom,

6  correct?  Ms. Cureton and both of the Wilsons came

7  here to the courtroom.

8  A.   Sure.

9  Q.   And the judge swore them in.

10 A.   Yes.

11 Q.   So you, in fact, did anticipate the possibility

12 that you would use them at trial.

13 A.   I think that was covered in the pretrial

14 conference, and I think we agreed that, to the

15 extent there was some rebuttal need for them, they

16 would remain under subpoena.  But to the extent that

17 they were offered under direct and due to the late

18 disclosure and our concession they weren't

19 particularly important witnesses, they would not be

20 allowed on direct, and I expected that type of

21 ruling from the Court, if I recall correctly.

22 Q.   Mr. Radbil, in addition to that, you also

23 subpoenaed a bunch of individual employees from my

24 client who were located in Memphis, correct?

25 A.   That's correct.

```
 1   Q.   And you --
 2             MR. MEYERS:  Your Honor, I would object.
 3   I don't think this was within the scope of things
 4   and beyond where exactly --
 5             THE COURT:  I agree.  Let's move on unless
 6   there is something that bears on --
 7             MS. MALONE:  You're right, Your Honor.
 8   Q.   (By Ms. Malone)  So Mr. Radbil, you also
 9   testified that you did not argue to the Court or to
10   the jury to give you the 40,000 and $5,000 in your
11   closing argument, correct?
12   A.   Yes, I said --
13   Q.   And that closing argument occurred after we had
14   had a Rule 37 hearing in front of the Court where I
15   raised it as a concern, correct?
16   A.   No.  Consistently, if you read the entire
17   transcript through and through --
18             THE COURT:  Slow down and answer the
19   question, please.
20             THE WITNESS:  The answer is no.
21   Q.   (By Ms. Malone)  Did that closing argument
22   occur after I had made an oral Rule 37 motion
23   specifically about those damage claims to the Court?
24   A.   Which damage claims?
25   Q.   The 40,000 and the 5,000.
```

 1   A.   Yes.

 2          MS. MALONE:   Thank you.   No further

 3   questions, Your Honor.

 4          THE COURT:   Anything else?

 5          MR. MEYERS:   Just one question, Your

 6   Honor.

 7                **RECROSS-EXAMINATION**

 8   Q.   (By Mr. Meyers)   In the final pretrial

 9   disclosure, the one that we agree disclosed people

10   late, you -- we listed them, the witnesses for

11   damages.   Was it your idea to have them provide

12   expert testimony as to this condition causes this

13   damage, or were they there to provide, if they were

14   to testify, fact testimony, hey, I saw Tim White and

15   he did A, B, C & D, which would support your claim

16   for damages?

17   A.   Yes.   And I think the example I gave is,

18   anybody can be qualified to testify in a given case

19   as an expert.   But that doesn't mean, just because

20   you are a mechanic, you have to give an opinion as

21   to a mechanical defect.   This guy can testify it was

22   warm or cold outside.   These are facts.   And these

23   are people that happen to be working around

24   Dr. White because he's in this field.   So his

25   colleagues happen to be qualified in other areas

1    that their testimony was not going to touch.

2         And I think we also argued in the pretrial

3    conference that, to the extent that that line was

4    crossed, there could be an objection at trial.  But

5    throughout the entire course of this case, we have

6    tried to make as clear as we could, and probably

7    didn't do it clear enough, obviously, but we have

8    never deviated to say we have an expert.  The only

9    instance I can think of is the typo that says "none"

10   versus "one".

11        But our conduct -- we didn't respond to

12   the first and the second motion to strike the

13   unnamed experts by saying there are none to strike,

14   there are no 26(a)(3) experts.  Had there been we

15   agree they would not have been timely.

16   Q.   Certainly understand how people think otherwise

17   now, in light of everything that has occurred.

18   A.   Yes.

19        THE COURT:  And because that's a confusing

20   point and all of this is confusing, so much of it,

21   Ms. Malone, just for the record, would you just give

22   me the position of the defense on that particular

23   point?

24        MS. MALONE:  Yes, Your Honor.  The problem

25   with having medical providers come in and testify as

1    to Dr. White's condition would be that if he's

2    asking him what their symptoms were and how they

3    related in saying that his stress caused an

4    aggravation of his symptoms, by the very nature of

5    that we go into causation.  So as to some of the

6    doctors, that's the issue.

7            As to some of the individuals that he

8    worked with, because of the fact that they were

9    employees at Texas A&M University in the

10   Psychology -- Commerce, in the Psychology

11   Department, which they would have elicited on

12   testimony, then their testimony about his symptoms

13   would, by their very nature, be given different

14   weight by a jury who is describing what they see are

15   symptoms, and that was the concern that we had.

16           THE COURT:  Okay.  Now, on another point,

17   the issue that you raised with regard to the closing

18   argument versus the Rule 37 brief discussion that we

19   had before the closing argument was what?  I don't

20   have the argument in front of me.

21           MS. MALONE:  Sure.  In the Rule 37 brief

22   moment that we had, I raised to the Court my

23   concerns about the 40,000 and the 5,000, and the

24   Court had gone through the discovery responses with

25   Mr. Radbil and expressed displeasure.

```
1              THE COURT:  Right.

2              MS. MALONE:  Then he did closing

3    arguments, and of course he did not raise the 40,000

4    and 5,000.  My point is that, had that motion not

5    happened, I'm not sure he wouldn't, because it

6    certainly came out in the trial.

7              THE COURT:  All right.  Thank you.

8    Anything else?

9    Q.   (By Mr. Meyers)  You've heard Ms. Malone

10   speculate as to a number of things, haven't you?

11   A.   I believe that I have.

12   Q.   Okay.

13             MR. MEYERS:  Thank you, Your Honor.

14             THE COURT:  Mr. Radbil, here's part of the

15   problem.  Just for example, with all of your

16   conduct, this whole idea, when you were arguing

17   about Mr. Wyatt and the corporate representative

18   deposition and how inadequate it was and how his

19   testimony was inadequate in that regard, the point

20   that finally came around when Ms. Malone objected

21   was that you had been quoting for your point from

22   the first deposition when, in fact, without

23   mentioning it or clarifying, there was a second

24   deposition that was ordered for the very reason that

25   you were complaining by Judge Kaplan.
```

1              Now, I know you take the position that it
2     wasn't sufficient, but it was disingenuous and it
3     was misleading.  And it has continued over and over
4     again in this case, and I don't want to hear
5     anything from you right now.
6              The concern is that I'm not seeing any
7     indication from you today, other than the fact that
8     you were late to court, that you did anything wrong.
9     Is that what your position is, that you are right
10    and they are just nitpicking?
11             THE WITNESS:  No, Your Honor.  My position
12    is that I didn't do anything --
13             THE COURT:  Speak up, please.
14             THE WITNESS:  My position is that nothing
15    was done in bad faith; nothing was done
16    intentionally or vexatiously.  It wasn't my best day
17    at trial.  I have been much better.  And I apologize
18    to the Court for not being as articulate as I could
19    have been and not laying out the arguments in a more
20    appropriate form.  Notwithstanding, everything that
21    I did I did with good intentions and with the best
22    interests of Dr. White and mine.
23             I told the Court before that our
24    relationship is good, and it is, Dr. White's and
25    mine.  I have spent a lot of time, and I care about

1    him.  So to the extent -- it's difficult not to

2    react when you have personal allegations of this

3    nature raised.  And my only intent coming here today

4    was to clarify why I took certain actions or made

5    certain arguments that I wasn't able to fully

6    articulate, unfortunately, during the trial.

7            THE COURT:  What I am seeing is an

8    overwhelming record of misrepresentations and

9    misconduct and not being honest with the Court about

10   one thing after another after another.  And I called

11   you on them during the trial, defense has called you

12   on them here again today, and I still haven't heard

13   any indication from you that you did anything wrong,

14   that you knew what you were doing was wrong, it's

15   all not in bad faith, and that is just absolutely

16   contradicted by the record.

17            And what at least I was hoping to hear

18   from you today was that you recognized that and are

19   sorry, and I don't see that.  And I don't see that

20   from you, Mr. Meyers, except for a little bit more

21   of a concession that his behavior was unacceptable.

22            Just as I said, this one argument that we

23   had, this long concern you had about the not getting

24   the 30(b)(6) deposition when, in fact, you were

25   quoting from the one that you had already cured and

1    allowed to have redone by Judge Kaplan, it's just

2    one thing like that after another after another

3    after another.  So you can step down.

4            I would like to move ahead and see

5    whatever else we have.  I would like to hear a

6    little bit more specific on the attorney's fees and

7    the nexus or causation therefore, the conduct and

8    the attorney's fees.  But otherwise, you can step

9    down, Mr. Radbil, and we're going to move ahead.  I

10   will let you respond to anything you want to, but

11   right now I want to move to the next phase of this.

12   Go ahead.

13           MS. MALONE:  Your Honor, I had intended to

14   call Mr. Meyers to talk a little bit about the lack

15   of supervision, since we've held the firm

16   responsible for some of this.  And also to talk to

17   him about a pattern of Mr. Radbil having been

18   accused of such behavior, including an October 31st,

19   2011, motion by Hartline Dacus, which is pending

20   before Judge Hughes, in which they specifically

21   accuse him of violating the Texas Disciplinary Rules

22   of Professional Conduct, Lawyer's Creed, and the

23   Federal Rules of Procedure and ask for 50,000 in

24   sanctions and of course license to be withdrawn.

25           My purpose is not to -- I've got a pattern

SHAWNIE ARCHULETA, CSR/CRR
FEDERAL COURT REPORTER — 214.753.2747

1    of about five cases that Mr. Meyers should have

2    known that Mr. Radbil needed additional supervision

3    in order to become the lawyer that he tells the

4    Court he wishes to be.  I can hold that and move on

5    to our testimony here, Your Honor, and come back, or

6    I can submit that to you by a separate brief if you

7    would prefer just to get us moving along.  I'm happy

8    do what the Court would like to do at this point.

9            THE COURT:  Here is what my thoughts are

10   at this point.  There is more to this.  This is a

11   very, very serious type of hearing, conduct that is

12   completely unacceptable not only professionally

13   towards opposing counsel, but the Court had

14   firsthand view of the anguish that this behavior

15   caused the client when he was left here for two

16   hours with no word from counsel.

17           We need to finish this.  And we need to

18   make sure that the record is clear before the

19   ultimate decision and responsibility is determined.

20   With Mr. Meyers -- with your position that

21   Mr. Meyers should be called to testify for his

22   responsibility and that of the firm, I think that

23   may be appropriate, but I don't think it's

24   appropriate today because, as far as I know, he

25   hasn't been placed on notice that he might be

1   subject to that kind of sanction.  And when you are

2   talking about potential bad faith conduct -- and I

3   want to be sure I'm clear, the Court is also going

4   to rely here on its inherent authority -- then I

5   think Mr. Meyers needs to have a chance to find

6   counsel and speak on his own behalf and on behalf of

7   his firm.

8          MS. MALONE:  Okay.  With that

9   understanding, I will take the stand and Mr. Martin

10  will examine me as to the other issues, Your Honor.

11         THE COURT:  Let me do this.  It's -- we've

12  been going all day on this just about.  We are going

13  to have to reschedule this.  My open day next week

14  is Wednesday, Wednesday morning.  I would like to

15  start Wednesday morning at 9:00.  Yes, that means

16  everybody comes back, but there is no other choice

17  here.  We are not finished with it and both sides

18  deserve a full hearing on this.  So I will get an

19  order out on this today, but I want to see you back

20  here at 9:00 next Wednesday.  All right?  We will be

21  in recess.

22         MS. MALONE:  Thank you, Your Honor.

23            (Court in recess at 4:16 p.m.)

24

25

1                    C E R T I F I C A T E

2              I, Shawnie Archuleta, CCR/CRR, certify

3     that the foregoing is a transcript from the record

4     of the proceedings in the foregoing entitled matter.

5              I further certify that the transcript fees

6     format comply with those prescribed by the Court and

7     the Judicial Conference of the United States.

8              This 6th day of August 2013.

9

10

11                         s/Shawnie Archuleta
                           Shawnie Archuleta CCR No. 7533
12                         Official Court Reporter
                           The Northern District of Texas
13                         Dallas Division

14

15

16    My CSR license expires:  December 31, 2013

17    Business address:  1100 Commerce Street
                         Dallas, TX  75242
18    Telephone Number:  214.753.2747

19

20

21

22

23

24

25

**SHAWNIE ARCHULETA, CSR/CRR**
**FEDERAL COURT REPORTER — 214.753.2747**