```
 1            IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF TEXAS
 2                    DALLAS DIVISION

 3   TIMOTHY WHITE,              )
                                 )
 4            Plaintiff,         )
                                 )
 5   vs.                         )  3:11-CV-1817-B
                                 )
 6   REGIONAL ADJUSTMENT         )
     BUREAU, INC., d/b/a         )
 7   RAB, INC.,                  )
                                 )
 8            Defendant.         )

 9            MOTION FOR SANCTIONS - VOLUME 5
             BEFORE THE HONORABLE JANE J. BOYLE
10              UNITED STATES DISTRICT JUDGE
                    NOVEMBER 26, 2013
11
                  A P P E A R A N C E S
12   MARSHALL S. MEYERS, PRO SE:

13        WEISBERG & MEYERS, LLC
          5025 N Central Avenue - #602
14        Phoenix, AZ 85012
          888/595-9111
15
     For Mr. Radbil:
16
          MARTIN DISIERE JEFFERSON & WISDOM
17        808 Travis Suite 2000
          Houston, TX 77002
18        713/632-1700
          BY:  DALE JEFFERSON
19             RAUL H. SUAZO

20   For RAB:

21        ROBBIE L. MALONE
          EUGENE E. MARTIN
22        8750 North Central Expressway - Suite 1850
          Dallas, TX  75231
23        (214)346-2631

24

25
```

1    COURT REPORTER:   SHAWNIE ARCHULETA, TX CCR No. 7533
                       1100 Commerce Street
2                      Dallas, Texas 75242

3    proceedings reported by mechanical stenography,
     transcript produced by computer.
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    TRANSCRIPT OF PROCEEDINGS

2    NOAH RADBIL

3    Continued Direct Examination By Mr. Suazo          5
     Cross-Examination by Ms. Malone                   57
4
     Closing Argument By Mr. Meyers                   108
5    Closing Argument By Mr. Jefferson                110
     Closing Argument by Mr. Martin                   152
6

7    EXHIBITS:

8    Radbil Exhibit 38                                107

9    RAB Exhibit 45

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court at 10:00 a.m.)

2          THE COURT:  Good morning.  For the record

3   this, is Civil Action 3:11-CV-1817.  We're here for

4   the final hearing on the motions by the defendant

5   Regional Adjustment Bureau for sanctions under

6   Rule 37 and Title 28 U.S.C. Section 1927.

7          I wanted to get an idea of what the

8   parties have planned so I can at least tell you if

9   that is what is in accordance with what my plan is,

10  and I think it is.  The understanding is that

11  Mr. Radbil will be back up on the stand for no

12  longer than an hour -- and I will time that -- with

13  Mr. Suazo, and then Ms. Malone has no longer than an

14  hour of questions for Mr. Radbil.

15         And then, as I understand it, unless the

16  Court plans otherwise, we will be talking about

17  closing statements.  So with that in mind, go ahead

18  and introduce yourselves, each side for the record,

19  and then I want to hear your comments on that time

20  frame.

21         MR. MEYERS:  Good morning, Your Honor.

22  Marshall Meyers for Weisberg & Meyers.  Sounds good,

23  Your Honor.

24         MR. JEFFERSON:  Dale Jefferson and Raul

25  Suazo for Mr. Radbil.  And yes, we conferred with

1    Rod earlier and believe that we can stick within the

2    parameters that you have suggested.

3                 THE COURT:  Thank you.

4                 MS. MALONE:  Robbie Malone and Xerxes

5    Martin on behalf of Regional Adjustment Bureau, and

6    I will try not to talk fast to make sure we keep

7    within that time period.  I will try to keep it

8    slow.

9                 THE COURT:  Appreciate it very much.

10                If nothing else, Mr. Radbil come back up

11   here.  You are under oath.  And Mr. Suazo, if you

12   will.

13                         **NOAH RADBIL,**

14   having been first duly sworn, testified as follows:

15                **CONTINUED DIRECT EXAMINATION**

16                MR. SUAZO:  May I proceed, Your Honor?

17                THE COURT:  Mr. Suazo, go ahead.

18   Q.   (By Mr. Suazo)  Good morning, Mr. Radbil.  Are

19   you ready to continue?

20   A.   Good morning.  I am.

21   Q.   We have an hour, so let's try to be real quick

22   and real efficient, because I have a couple of

23   areas -- a number of areas that I want to try to

24   cover with you in a pretty short time period.

25                At the last hearing we had covered a number of

1  grounds, and I want to cover a couple more of the

2  grounds that were related to the events that

3  occurred with this specific case.

4      One of them was, there was some discussion

5  about you having subpoenaed witnesses and then not

6  actually spoken with them before they arrived at

7  trial.  Do you remember that line of inquiry?

8  A.   I do.

9  Q.   The suggestion was, I think, that you shouldn't

10  call a witness to the stand without having

11  interviewed them in advance of them appearing down

12  at the courthouse.  Do you remember that line of

13  inquiry?

14  A.   I do.

15  Q.   First of all, were these, in your opinion, key

16  witnesses to the case?

17  A.   No.

18  Q.   Were these people, for example, that had

19  negotiated an agreement on behalf of Dr. White, and

20  that agreement was the subject of the trial?

21  A.   No.

22  Q.   Were these witnesses that had heard some

23  fraudulent misrepresentation or anything along those

24  lines?

25  A.   No.

1   Q.   What, briefly, was the role of these witnesses

2   if they were going to be allowed to testify?

3   A.   They were people who he interacted with in his

4   day-to-day life, and they were going to testify

5   about his condition generally from a lay

6   perspective.

7   Q.   So this is basically kind of, for lack of a

8   better set of terminology, a moan and groan witness?

9   A.   Precisely.

10  Q.   Is there a strategic reason sometimes to not

11  call a witness and talk to them before they actually

12  take the stand?

13  A.   Yes, there is.

14  Q.   Just briefly, without going into much detail,

15  what would that be?

16  A.   The question on cross would be, did you talk to

17  the other counsel, and the inference is that their

18  testimony may be coached or they may have been told

19  what to say, so. . .

20  Q.   If you would look at your notebook there, Tab

21  16, I want to direct you to Volume 1, page 41 of the

22  trial transcript.

23       Before this trial ever started -- if you go to

24  line 20 of page 41.

25  A.   Which binder?  I'm sorry.

1  Q.   It's that one that you have your hand on.  And
2  if you will go to Tab 16, you will see the
3  transcript from the trial, from the pretrial
4  conference, Volume I, February 25th, 2013.  And if
5  you would just go to page 41, begin at line 20, you
6  will see that you describe the issue of a
7  continuance versus not calling these witnesses.  If
8  you could just summarize for the Court what you told
9  the Court with regard to these witnesses.
10 A.   I said, quote:  The reason they weren't
11 disclosed is because, as I was preparing my client
12 for pretrial, and I was somewhat surprised that
13 there were additional people also.
14 Q.   Let me focus you to line 20.
15 A.   Line 20?  Okay:  But again, I don't think the
16 case is going to turn on them.  So if it's going to
17 be a choice between a continuance versus excluding
18 them, I think Dr. White can testify certainly about
19 whether or not his neighbor saw him in his car at
20 one point doing something or other.  I don't
21 think --
22 Q.   And the point is this:  Did you view these
23 people as significant key witnesses to the case?
24 A.   No.  And they had --
25 Q.   Were these Dr. White's friends or colleagues?

1  A.   Two were his neighbors, and the rest were

2  people he worked with.

3  Q.   All right.  The next issue I want to kind of

4  skip over to are the exhibits, and there were a

5  number of questions asked about exchanging exhibits.

6  And the question was whether or not you had provided

7  RAB's counsel with a copy of the exhibits in a

8  timely manner.  So I want to look at this real

9  briefly from the perspective of two reasonable

10 lawyers trying to figure out a solution to a

11 problem.

12      First of all, did you designate volumes and

13 volumes and thousands of pages of exhibits for this

14 trial?

15 A.   No, I did not.

16 Q.   Did you have more exhibits than what RAB has

17 submitted just for this sanctions hearing?

18 A.   No, I believe I had less.

19 Q.   Do you remember how many exhibits that you

20 listed at the -- for the trial of this case?

21 A.   No.  I want to say 16, 17, 18, 19, around that

22 area, around 20.

23 Q.   All right.  If you would, let's go to Tab 17 of

24 the notebook.  And this, by the way, is RAB

25 Sanctions Exhibit Number 5.

1      And just briefly, to be efficient here, is this

2  a pretrial disclosure that came from your office for

3  Dr. White dated December 7, 2012?

4  A.    That's correct.

5  Q.    And how many days in advance of the trial -- of

6  the February 20th roughly trial are we talking

7  about?  Roughly 60 days before trial, maybe a little

8  longer?

9  A.    Yes.

10  Q.    Is there an exhibit list on this December 7th,

11  2012, filing?

12  A.    There is attached as page Number 4, which is

13  Defendant's App. 01444.

14  Q.    It looks like the 18th exhibit is any

15  admissible exhibit identified by RAB.  So would you

16  agree that there were 17 exhibits that you

17  designated on behalf of Dr. White?

18  A.    Yes.

19  Q.    If you could, keep that page handy and go to

20  the next Tab, and it's Radbil Exhibit Number 25.

21  And just briefly, is this a First Supplemental Rule

22  26(a) Disclosure Statement?

23  A.    It is.

24  Q.    And on the last page, you see a Certificate of

25  Service dated January 18, 2012?

1   A.    Yes.

2   Q.    And then if you skip a couple of pages back to

3   the sixth page of the exhibit, there is also a Bates

4   label on it, App. 212.  Do you see an exhibit list

5   there?  It should be Tab 18, Mr. Radbil.

6   A.    Yes, I do.

7   Q.    Okay.  If you could compare the page I told you

8   to keep your hand on, compare those two exhibit

9   lists just real briefly, are they the same?

10  A.    They look to be the same.  And I will make one

11  correction.  I think the date is incorrect on Tab

12  18.  I believe it's 2013.

13  Q.    Fair enough.  All right.  Now, let's just pick

14  one of the lists, since they are the same, and let's

15  kind of go down it real quick.

16        Is there any doubt in your mind that RAB knew

17  and already had a copy of what Exhibits 1 through 5

18  were from the description that was provided on the

19  exhibit list?

20  A.    No question in my mind.

21  Q.    What are Exhibits 1 through 5?  What are they,

22  just generally?  Without reading every single one of

23  them, what are they generally dealing with?

24  A.    They are depositions.

25  Q.    All right.  Let's go to -- there's a couple

1    more.  We need to do 6 through 17.  But before we do

2    that, take a look at the -- look at the next Tab,

3    and this is docket entry number 98.  It's RAB's

4    trial exhibit list.  And do you see their trial

5    exhibit list?

6    A.   I do.

7    Q.   All right.  So let's go through this.  Hold

8    your finger on those two pages.  Is White Exhibit 6

9    the same as RAB Exhibit 1?

10   A.   It is.

11   Q.   Is White Exhibit 14 the same as RAB Exhibit 5?

12   A.   It is.

13   Q.   Is White Exhibit 15 the same as RAB Exhibit 6?

14   A.   It is.

15   Q.   Is White Exhibit 16 the same as RAB Exhibit 8?

16   A.   Yes.

17   Q.   Is White Exhibit 17 the same as RAB Exhibit 2?

18   A.   Yes.

19   Q.   All right.  So that leaves us with 7 through 12

20   and Number 13.  Let's focus on Number 13 real quick.

21        Is there any doubt in your mind that RAB knew

22   what White Exhibit 13 was and why?  Why do you say

23   that?

24   A.   They produced it, and it's Bates label RAB 0046

25   to 0097 and then RAB 0216 to 0267.

1    Q.    So the document on the exhibit list, on the

2    Dr. White exhibit list, was identified by RAB Bates

3    pages --

4    A.    That's correct.

5    Q.    -- is that correct?

6    A.    Yes.

7    Q.    All right.  So let's go to Exhibit 7.  Is there

8    any doubt in your mind that RAB knew what White

9    Exhibit 7 was?

10   A.    No.

11   Q.    Why not?

12   A.    They were Regional Adjustment Bureau,

13   Incorporated's, own account notes that they

14   produced.  And again, they are marked by Bates label

15   RAB 0215.  They are marked by RAB and identified by

16   us as -- by their Bates label.

17   Q.    That leaves us now with Exhibits 8 through 12.

18   We have covered every single one.  Is there any

19   doubt in your mind that RAB's counsel or RAB knew

20   what White Exhibits 8 through 12 were?

21   A.    8 through 12?

22   Q.    Yes.  Are they identified by some way on the

23   exhibit list?

24   A.    Yes.  They are identified by docket number and

25   page number for Exhibit 5.  And there is a

1   declaration which is identified by docket number and

2   the Internet Web page, which is Exhibit Number 10,

3   Tab 18, page Number 6, which is App. 212.  That was

4   an Internet Web page with an address and also was on

5   file with the Court.  And the docket number and page

6   number or the pin cite is there --

7   Q.   Let me stop you for just a second.  8 through

8   12, at the very end of the description of the

9   exhibit there is a parenthetical that says, See doc

10  page 60, 5 of 5.  Is Doc 60 the PACER ID number?

11  A.   Doc 60 I think is the declaration of Timothy

12  White.

13  Q.   Well, for example, the Internet Web page,

14  Exhibit 10, it says Doc 51-2.  That was part of your

15  summary judgment briefing, correct?

16  A.   Yes.

17  Q.   And is Doc 51-2 the reference to the PACER

18  document number on file with the Court?

19  A.   Yes.  The appendix would be 51-2 docketed.

20  Q.   So given that there are PACER ID numbers for 8

21  through 12 -- and we have covered all the

22  exhibits -- is there any doubt in your mind that RAB

23  knew what these exhibits were?

24  A.   No question.

25  Q.   By disclosing these exhibits 75 days or so

1  before the actual trial was set to commence,

2  Mr. Radbil, were you purposefully doing something

3  with a bad faith motive to try to ambush the

4  opposing side?

5  A.    No, sir.

6          THE COURT:  Mr. Suazo, if you could,

7  because there are so many factual scenarios here

8  that the parties are going over, specifically to

9  what point that RAB has made in connection with

10  these sanctions motions does this go?  Obviously, it

11  goes to something about disclosures and exhibits,

12  but I want to be clear on that.

13          MR. SUAZO:  There has been -- and if you

14  look at some of the briefing, there has been an

15  argument that counsel didn't properly or timely

16  exchange exhibits.  And my point --

17          THE COURT:  Actual physical exhibits or

18  lists?

19          MR. SUAZO:  Actual physical exhibits.  And

20  I'm getting to the actual physical exchange in just

21  a moment.  But the point I'm trying to look at is,

22  from the perspective of two reasonable lawyers with

23  a problem here, the list identifies sufficiently all

24  of the exhibits.  I understand that there may still

25  be a requirement that you actually physically

1  exchange the exhibits.

2        THE COURT:  Well, it's not just a

3  requirement, it was part of the Court's order.

4        MR. SUAZO:  Well, part of the Court's

5  order, and I'm getting to that.  But the point that

6  I'm trying to get at is, there is no prejudice, no

7  harm, no fowl, because all of the documents that are

8  sufficient -- a lot of the documents are the same as

9  the ones on their exhibit list.  Some of them are

10  very simply the deposition, and so I'm actually

11  going to the prejudice standpoint, the damages

12  standpoint.

13        THE COURT:  That's what I want to make

14  sure I understand.  So it goes to the prejudice or

15  lack thereof and not to whether or not this was

16  something that should not have occurred.  In other

17  words, you have to follow the Court's order, you

18  have to follow the local rules.  You are not saying

19  that this somehow exculpates him from that.  As I

20  understand it, it's more to how prejudiced were they

21  for what he did wrong.

22        MR. SUAZO:  Only to the extent, Judge,

23  that sanctions would require bad faith.  And I can't

24  see someone putting this detailed of a disclosure if

25  they didn't transmit the exhibits timely doing that

1    in bad faith or as some part of ambush, because the

2    description is pretty detailed.

3          THE COURT:  I understand that that's your

4    theory.  All right.  Go ahead.

5    Q.   (By Mr. Suazo)  Okay.  Mr. Radbil, did you, in

6    fact, attempt to exchange exhibits with Ms. Malone?

7    A.   I did.

8    Q.   Were there some communications or

9    miscommunications between the two of you involving

10    the exchange of exhibits?

11    A.   There were communications between Ms. Malone

12    and I.  And I specifically requested courtesy

13    copies, which were refused because the originals

14    that Ms. Malone had attempted to provide were sent

15    to the Dallas office where I presume -- although I'm

16    not sure -- that she knew I was not at.  I think she

17    knew I was in Phoenix.

18        Nonetheless, we faxed the exhibits.  And I was

19    traveling at the time.  I heard from one of the

20    paralegals or secretaries, and she said that all of

21    the documents had gone through except for two.  And

22    I said, e-mail them.  And the response was, she's

23    refusing to accept the documents by e-mail.

24    Q.   Okay.  Let me stop you there and break it down.

25    Did you instruct an employee at Weisburg & Meyers to

 1   e-mail Ms. Malone a copy of the exhibits?

 2   A.   Yes.

 3   Q.   Let's go to Tab 20 of that notebook.  This is

 4   Radbil Exhibit 14.  And this, by the way, is

 5   attached also as Exhibit C to the affidavit of Cathy

 6   Bopp, which is listed as docket entry 143-3 filed on

 7   August 7th, 2013, by Weisberg & Meyers in connection

 8   with these sanctions proceedings.

 9        And just briefly, what's going on with this

10   particular exhibit, Regional Adjustment Bureau

11   Exhibit 14?  What is it is?

12   A.   It's an attempt to get her copies of the

13   exhibits so we can meaningly confer.  It documents

14   the course of our attempts to get her the copies of

15   the exhibits, physical copies.

16   Q.   I want to read the first sentence of this

17   e-mail from Ms. Malone to Ms. Bopp.  Ms. Bopp is an

18   employee of Weisberg & Meyers or was at the time of

19   this e-mail exchange, correct?

20   A.   At the time she was.

21   Q.   And the e-mail says:  I have not agreed to

22   accept service of the documents by e-mail.

23        Do you see that?

24   A.   Yes.

25   Q.   And is that -- am I reading that correctly?

1    A.    It says:  I have not agreed to accept service

2    of the documents by e-mail.

3    Q.    Okay.  And so were efforts being made to

4    exchange the exhibits with Ms. Malone by you and/or

5    your office?

6    A.    Yes.

7    Q.    Did you file a pleading in this case entitled,

8    Status Report Regarding Pretrial Exhibit Exchange

9    and Conference that's marked as docket entry 103

10   that just goes through the entire history of all of

11   the e-mails and communications that were undertaken?

12   A.    Yes.

13   Q.    And I don't want to go through it because it

14   was a pretty long filing with a number of documents.

15   But you actually remember doing that?

16   A.    Yes.

17   Q.    Did you, Mr. Radbil, send a copy of the

18   exhibits to the Court?

19   A.    I did.

20   Q.    Take a look at Tab 21, which is Radbil

21   Exhibit 13.  And let me just ask, is this the

22   Federal Express package receipt that entailed

23   sending the exhibits to the Court?

24   A.    It is.

25   Q.    Do you see at the top of this Radbil

1  Exhibit 13, Radbil Sanctions Exhibit 13, there's a

2  number on the FedEx package, 801778145610, that's

3  the tracking number.  Do you see that?

4  A.    I do.

5  Q.    Does that match the receipt down at the bottom

6  of that exhibit?  You have to turn your head

7  sideways to see it.

8  A.    Yes.

9  Q.    Is this your handwriting on this document?

10 A.    It is.

11 Q.    Why were you actually the one that was

12 physically doing all of this?

13 A.    A lack of administrative support.  I had asked

14 for --

15 Q.    It wasn't -- it wasn't a legal assistant, it

16 was actually you that did this?

17 A.    I printed the exhibits from the hotel in

18 Houston, and I had the taxi cab driver stop at FedEx

19 on the way to, I believe, the airport, and I ran in

20 and used my credit card and overnighted them.  And

21 again, I should have followed up with the Court;

22 but, yes, it was actually me, and that's why.

23 Q.    All right.  All right.  There was also some

24 discussion about you not returning Ms. Malone's

25 calls on a Saturday to talk about exhibits, and of

1    course I think a lot of the exhibits are the same

2    that are being offered.  But did you, Mr. Radbil,

3    call Ms. Malone back within 24 hours of receiving

4    all of the e-mails and phone calls from her?

5    A.   I don't know whether she initiated contact

6    again with me or whether I returned her call, but we

7    did end up speaking within 24 hours and conferencing

8    to work out a number of the issues that were

9    required by the Court-ordered conference.

10   Q.   Okay.  If you would, take a look at Tab 22 in

11   your notebook.  It's document entry 118-9, filed

12   with this Court.  It's marked with a Bates label

13   App. 304.  It was part of RAB's file in this case.

14   And there's a time entry four lines down in

15   Ms. Malone's time entries, and it reflects there's a

16   two-hour conference call on February 24th, which is

17   a Sunday, a conference call with plaintiff's

18   attorney.  Do you see that?

19   A.   I do.

20   Q.   And it's listed as two hours.  Do you generally

21   agree that you had a two-hour telephone conference

22   within 24 hours of the phone calls and the e-mails

23   that went to you the day before?

24   A.   We talked extensively, yes; I would agree with

25   that statement.

```
 1   Q.   All right.  So to the extent there's anything

 2   that suggests or implies that the two of you didn't

 3   speak within 24 hours or have a lengthy conversation

 4   within 24 hours of all these phone calls, is that

 5   correct, or did you get back in touch with her?

 6   A.   No, we were in touch within 24 hours.

 7   Q.   Okay.  Let's go on to a couple other additional

 8   points.  There was some discussion about whether or

 9   not at the -- well, there was some discussion at the

10   first sanctions hearing in this case where one of

11   your disclosures said "one of whom" instead of "none

12   of whom."  Do you remember the discussion about that

13   typo?

14   A.   I do, yes.

15   Q.   And that discussion was with regard to listing

16   the witnesses that said, "one of whom will be called

17   as an expert," and you meant to put down what?

18   A.   There is an N missing after the M dash, so it

19   is supposed to be "none of whom," which is

20   consistent with the response itself.

21        I think that was the second response -- the

22   first response had filed two motions to strike

23   experts that we hadn't designated.  The first we

24   didn't even respond to because there was nothing to

25   strike.
```

1    Q.    So just real briefly, you do remember admitting

2    at the first sanctions hearing that that was a typo.

3    It should have said "none of whom will be called as

4    an expert," but it said "one of whom," by accident.

5    A.    Yes, that was my error.

6    Q.    And there was a suggestion that this led to

7    additional work by RAB during the questioning.  Do

8    you remember that?

9    A.    Yes.

10   Q.    So I kind of want to turn that around a little

11   bit.  Do you remember your position to the Court

12   that RAB agreed that it used an automated telephone

13   dialer system, an ATDS?

14   A.    I remember my argument to the Court, yes.

15   Q.    And where did you get that argument from?

16   A.    The pretrial order that was divided into

17   sections, the defendant's and plaintiff's sections;

18   again, from the defendant's section.

19   Q.    Let's go to Tab 23, if you would.  This is

20   Radbil Sanctions Exhibit 6, and let's go to page 5.

21   And in fact, it's the last paragraph, the last two

22   sentences.  And let me know when you are there.

23   A.    I'm there.

24   Q.    All right.  Go ahead and read the last two

25   sentences to this Court.

1      Is this where you were getting the argument

2   that it was undisputed?

3   A.   Yes.  This was not the sole piece of evidence,

4   but, yes, in large part.

5   Q.   Go ahead and read those two sentences to the

6   Court.

7   A.   "Defendant contends that the vast majority of

8   its calls were made manually.  In fact, only three

9   calls were made engaging the ATDS, and only one of

10  those was an outbound call."

11  Q.   Okay.  Before you just blurted that statement

12  out to a jury during opening statement or during

13  examination of a witness, did you actually bring

14  this to the Court's attention whether you could

15  refer to this as undisputed before any proceedings

16  began with the jury in the box?

17  A.   I did.  And the purpose was to eliminate

18  disputes and questions over facts which were really

19  not disputed.  And I believed that this was a fact

20  that, based on their business records and the

21  pretrial order, that it shouldn't be something that

22  would be argued about or in dispute.

23  Q.   All right.  Let's go to Tab 24.  It's Volume 2

24  of the jury trial, and it's page 80, and there's

25  some discussion in there about the joint pretrial

1    order.  And it looks like at page 80, lines 2

2    through 6, you're explaining to the Court your

3    belief that it's undisputed.  Is that true?

4    A.    Can you repeat the question, please?

5    Q.    It looks like at lines 2 through 6 you're

6    talking to the Court about your position that in the

7    joint pretrial order it's undisputed that an ATDS

8    was used, at least for three phone calls.  Is that

9    generally correct?

10   A.    There's no mention of three phone calls in

11   there, but I do -- yes.

12   Q.    And then it looks like at lines 12 through 15

13   you're actually going to read from the joint

14   pretrial order.  Do you see that?

15   A.    Yes, I do.

16   Q.    And then, because the jury was ready to come in

17   or was going to come into the box and time was kind

18   of cramped, the argument had to be continued, and it

19   was decided that it was not undisputed at that

20   point.

21   A.    Yes, the Court ruled that it was not

22   undisputed, and so the Court ordered that I couldn't

23   say that it was a fact.

24   Q.    Right.  And the point that I'm trying to get at

25   is, Mr. Radbil, before you started making any of

1  that argument to the jury or while they were in the

2  room, did you bring that to the attention of the

3  Court?

4  A.   I brought it to the attention of the Court I

5  believe before the pretrial order was signed, and

6  then again after the pretrial order was signed.

7       THE COURT:  Okay.  Let me just make sure

8  I'm clear on this.  I know the defense doesn't agree

9  with that.  His argument had been that it was in the

10 pretrial order when the other side got upset about

11 it.  And I'm trying to figure out where it was that

12 this was, as you kind of have portrayed, calmly

13 addressed and okayed so that he was taken off guard

14 when this was not allowed.  How did that occur?

15      MR. SUAZO:  Well, I wouldn't necessarily

16 say that it was calmly addressed --

17      THE COURT:  That's not my recollection.

18      MR. SUAZO:  -- because the jurors are

19 waiting to come in, and this gets brought up to the

20 Court.  And I think Mr. Radbil had a few instances

21 where he was asking the Court, can I do this, can I

22 do this, can I do that.

23      THE COURT:  Well, the position, though,

24 when Ms. Malone raised this, was this was clearly

25 never agreed to.  He pointed us to the pretrial

1    order, and my recollection is I had him read from

2    it.  I don't remember this ever being the subject of

3    any specific discussion pretrial, and I don't think

4    that's what you're suggesting, but I want to make

5    sure the record isn't indicating that.

6              MR. SUAZO:  It's hard for me to say that

7    it was brought pretrial, because the pretrial

8    conference was the day before --

9              THE COURT:  Well, the point is very

10   simple.  We are not splitting hairs here.  The point

11   that seems to being made here, at least the

12   inference we're supposed to draw from this, is that

13   somehow he was perfectly within his right because of

14   the discussions with the Court and also because of

15   the pretrial order to be surprised about this, that

16   this was undisputed.  I don't recall that at all.

17             He pointed me to the pretrial order, and I

18   don't remember any discussion, any discussion, where

19   this was back and forth with the defense or with the

20   Court until they got upset because he started to

21   bring it up, however he brought it up, I can't

22   remember now, and he pointed me back to the pretrial

23   order.  So you are not suggesting that we have just

24   all forgotten that it was all okayed for him ahead

25   of time, are you?

```
 1              MR. SUAZO:  No.

 2              THE COURT:  That's all I want to know.

 3              MR. SUAZO:  And I just succinctly make my

 4    point.  I think that Mr. Radbil gave a fair

 5    interpretation of the joint pretrial order.  As I

 6    read it, I could fairly interpret it.  It could be

 7    interpreted many ways, but I think that's a fair

 8    interpretation, and he did bring it before the Court

 9    before --

10              THE COURT:  I understand that's your

11    position, but I just want to make sure there is not

12    a broader scope that you are putting on this than

13    what actually happened.  It's his interpretation

14    that was in his head that he gave me, not before,

15    not during, not until it came up when it was raised

16    by Ms. Malone and he read it from the pretrial

17    order.  I don't recall it.  And you are not saying

18    it was ever discussed, okayed, or addressed before

19    that except to the extent that we're supposed to

20    think that that's what happened.

21              MR. SUAZO:  I think that the record

22    reflects that Mr. Radbil actually attempted to bring

23    it to the Court's attention.

24              THE COURT:  When?

25              MR. SUAZO:  Volume 2, page 80.
```

**SHAWNIE ARCHULETA, CSR/CRR**
**FEDERAL COURT REPORTER – 214.753.2747**

```
 1              THE COURT:  What part of the court trial
 2    was that?
 3              MR. SUAZO:  That was before any witness --
 4    what part?
 5              MR. RADBIL:  Sorry, Your Honor.
 6              MR. SUAZO:  I think it was before opening
 7    or anything.
 8              THE COURT:  Let's get the line and page of
 9    the transcript.  I just want to find the transcript,
10    Mr. Radbil.  Just point us to the line and page
11    where this was raised.
12              MR. SUAZO:  Volume 2, page 80.
13              THE COURT:  What line?
14              MR. SUAZO:  Line 2 is where it begins.
15              THE COURT:  And just so that I'm clear,
16    exactly what part of the trial is this?
17              MR. SUAZO:  I believe this is before
18    opening.
19              THE COURT:  Volume 2, page?
20              MR. SUAZO:  80.
21              THE COURT:  80.  Okay.
22              MS. MALONE:  I was just going to clarify
23    to the Court.  We did the pretrial the day before.
24    This is after we've already done our pretrial stuff.
25    This is the next morning after the Court -- I think
```

1   actually after we've already done jury selection and

2   we are about to do opening.

3          I think the Court is thinking we are

4   talking about this is a pretrial conference, which

5   did not occur in the pretrial conference when we

6   were doing all the preliminary matters.  This is

7   after we have selected a jury and right before we

8   are doing opening argument, and he raises it for the

9   first time, and we were understandably upset about

10  it.

11         THE COURT:  Let's hear the question and

12  answer, either from you or Mr. Radbil.  I don't want

13  argument from you, Mr. Radbil, I just want you to

14  answer the question.  So let's go back and forth on

15  that transcript so it's clear what we are talking

16  about occurred pretrial, whether it was the day

17  before or minutes before the jury started.

18  Q.   (By Mr. Suazo)  Mr. Radbil, Volume 1, page 80,

19  just briefly tell the Court your recollection.

20         THE COURT:  Just read it.  Just read it.

21  Question, answer, that's what I want to hear.

22  Q.   (By Mr. Suazo)  Okay.  Mr. Radbil, if you would

23  pick up at page 80, line 2 and read what you say to

24  the Court through line 6; lines 2 through 6,

25  Mr. Radbil.

1  A.    2 through 6 read:

2       "Mr. Radbil:  I would like to also say

3  regarding --"

4            THE COURT:  Slow, slow, slow.

5  A.   "I would like to also say regarding -- one

6  moment -- that the defendant does, in fact, possess

7  and use an automatic telephone dialing system as

8  defined by the TCPA as provided for in the pretrial

9  order."

10  Q.   And then the Court says at lines 7 to 8:  "I

11  don't think that's undisputed."

12       And Ms. Malone says at lines 9 through 10:

13  "That is absolutely disputed, Your Honor."

14       And at line 11 the Court says:  "It's not

15  undisputed."

16       And then what do you tell the Court between

17  lines 12 through 15?

18  A.   I was attempting to explain --

19  Q.   Just read the transcript, Mr. Radbil.

20  A.   Mr. Radbil states, quote:  "Defendant's

21  contentions, Your Honor, state, defendant contends

22  that the vast majority of its calls were made

23  manually.  In fact, only three calls were made

24  engaging --"

25  Q.   And then the Court stops you and says, picking

 1  up at line 16:  "It's not undisputed.  It's not
 2  undisputed, so you can't say that it's a fact.
 3  Okay?  I disagree with you.  I will let you make a
 4  record on it.  But right now I want to get to
 5  framing up this opening argument.  You can't say
 6  that, what you just asked me to say."
 7       And then picking up at line 22 we go on to a
 8  different topic.
 9  A.   Yes.  And I would also like to add --
10            THE COURT:  Okay.  Now what I would like
11  to know -- that was what was discussed before the
12  jury trial started.  Now, fast-forward to where you
13  were a few minutes ago in the trial that I'm trying
14  to figure out somehow mitigates this or explains
15  what occurred that is another point on the sanctions
16  motion.
17            MR. SUAZO:  Well, once again, Judge, I'm
18  going to the issue of bad faith.  And they put this
19  in their motion that Mr. Radbil argued to the Court
20  that it was -- it was undisputed when it was known
21  that it was always disputed.
22            That was an argument in either the 1927 or
23  Rule 37 Motion for Sanctions.  I'm sorry, I just
24  don't remember.  But it was one of their arguments.
25  And the point that I'm trying to make is, number

1    one, it's a fair interpretation given to what was in

2    the pretrial order; and then, number two, before an

3    opening statement was made or before this was

4    blurted out to the jury, he did bring it to the

5    Court's attention.

6              So to the extent that Mr. Radbil is trying

7    to do something in bad faith, I think it would have

8    just been a blurt out in the middle of the

9    proceedings as opposed to, Judge, may I do this,

10   which is how I'm reading that.

11             THE COURT:  Okay.  And I was thinking that

12   there was another juncture in the trial towards the

13   end that this came up again that you were somehow

14   focusing on as well.

15             MR. SUAZO:  I'm not.  I'm not.  It was

16   merely the bringing it to the Court's attention in

17   advance.

18             MR. RADBIL:  Your Honor, may I?

19             THE COURT:  Let's go question and answer,

20   Mr. Radbil.  You have lawyers, as I said last time.

21   It's a very good thing you have them, it's helping

22   the Court focus on the defense here, and that's the

23   way I want to keep doing it.

24   Q.   (By Mr. Suazo)  Mr. Radbil, we have a lot to

25   cover in a very short time.

```
 1        The next one that I want to jump on to is the

 2   client not being at the jury deliberations or not

 3   being here for the reading of the verdict.  Okay?

 4        First of all, do you remember the issue

 5   surrounding your client not being present for the

 6   verdict?

 7   A.   I do.

 8   Q.   When you went to sleep the night before while

 9   the jury was still out, were you expecting Dr. White

10   to attend the next morning?

11   A.   Yes, at some point.

12   Q.   Did you receive a text message from him the

13   following morning?

14   A.   I did.

15   Q.   Let's take a look at Tab 25, which is marked as

16   Radbil Sanctions Exhibit 35.  And briefly, what are

17   these?  Tell the Court what these are.

18   A.   These are text messages between Dr. White and

19   myself in which he -- should I read them?

20   Q.   Well, we will go through them real quick.

21   A.   The bottom line is that he had to work, and he

22   had to make money.  He was very concerned about

23   missing work, so he asked whether he absolutely had

24   to be there or not.  And I recommended that he

25   should be there when the jury was back.  And when
```

1    the verdict came back, I told him he should be here.

2    Q.   Let's go through these real briefly.   Did

3    Dr. White send you a message at 7:09 a.m. saying, "I

4    just left you a message.   Is everything okay?"

5    A.   Yes.

6    Q.   And did Dr. White follow that up at 7:27:   "Are

7    you in court?  Please let me know.   I hope it makes

8    sense to the Court that I work 70 hours a week with

9    blind and deaf -- blind people who wait an average

10   of three months for an appointment with me."

11   A.   Yes.

12   Q.   And if you go to the next page, did you respond

13   to the question of whether you were in court with

14   the answer, "Yes"?

15   A.   I did.

16   Q.   And then later, at 8:10 a.m. -- well, it says

17   8:10 a.m., and is the response:   "They are not back

18   yet, but you should be here when they do come back"?

19   A.   That is what I said, yes.

20   Q.   And then at 8:11 a.m., does it say, "A verdict

21   is in"?

22   A.   It does.

23   Q.   And then after that, at 8:12 a.m., does

24   Dr. White say, "what time?"

25   A.   Uh-huh.

```
 1   Q.    Is that a yes?

 2   A.    That's a yes.

 3   Q.    And do you respond to that by saying, "Now"?

 4   A.    Yes.

 5   Q.    After you respond at 8:12 a.m. and say, "Now,"

 6   does he respond at 8:13 a.m., "I will come.  I am

 7   about 20 minutes away"?

 8   A.    Yes.

 9   Q.    At 8:50 a.m. does he say, "On my way up"?

10   A.    Yes.

11   Q.    Is that how everything unfolded with Dr. White

12   not being here for the reading of the verdict?

13   A.    The Marshal had approached me and mentioned

14   that the judge wanted Dr. White to be here.  And I

15   showed the Marshal the text message at the time and

16   said Dr. White was on his way up.

17   Q.    Mr. Radbil, when you were quizzed about this

18   later on and you told the Court that you wanted --

19   you advised Dr. White that he should be here, were

20   you attempting to be honest in your communications

21   with the Court?

22   A.    I was.

23   Q.    Were you doing anything disrespectful by trying

24   to not have Dr. White here for the reading of the

25   verdict?
```

A.   No.  But I understand the Court's concern, and
I understand how it could look that way.  And to the
extent I offended the Court, I do apologize.

When we walked out of court the day before, we
discussed this issue, and it was in terms of
absolute -- do I absolutely really need to be there,
and it wasn't because he was scared to be there, it
was because he wanted to go to work, and he was
concerned about working, so. . . I could understand
the Court's concern, but I did not try to mislead
the Court or Dr. White about his obligations.

Q.   Mr. Radbil, we've been at maybe four or five
sanctions hearings.  Have you seen a representative
from RAB at any of these sanctions hearings where
they are seeking hundreds of thousands of dollars,
whatever it is that they are seeking in monetary
damages, have you seen a RAB representative?

A.   There was, I believe, a few people in the pews
back there at some point.  I don't know who they
were or whom they were with.

Q.   Let me ask you this:  Ms. Malone testified that
a RAB representative hadn't been here.  Do you
dispute that?

A.   No, I don't.

Q.   Have you seen a corporate representative that

```
1    you cross-examined?
2    A.    Mr. Wyatt.
3              THE COURT:  I need to know what your point
4    is.  What difference does that make?
5              MR. SUAZO:  Well, Judge, I don't know
6    if -- to the extent that the issue is whether or not
7    the client was not here for the reading of the
8    verdict, it's similarly an issue with RAB not having
9    a representative here for the sanctions.  If the
10   issue --
11             THE COURT:  I would completely disagree
12   with that, but I think you have made that point, so
13   let's go ahead.  I think it would multiply the
14   difficulties that RAB has experienced in this case
15   based upon the conduct of these lawyers to have them
16   come here for each of these, however long, five
17   hearings we've had, but I would like for you to move
18   on to your next point.
19             MR. SUAZO:  Yes, Your Honor.
20   Q.    (By Mr. Suazo)  On the next topic,
21   Mr. Radbil -- and I'm going to focus in on Tab 26,
22   which is Volume 2, page 168 of the -- of the trial.
23   You attempted to call RAB's corporate representative
24   essentially twice in a row.  Do you remember that?
25   A.    Very clearly, yes.
```

```
 1          THE COURT:  I just want to make sure we
 2   are not covering ground that we have covered three
 3   or four times already.  The area that I believe you
 4   are going into now is where Mr. Radbil wanted to
 5   call this corporate representative back and argued
 6   strongly about the deficiency of the discovery,
 7   quoting from a deposition, only to determine later,
 8   after Ms. Malone responded, that he was quoting from
 9   the initial deposition.  He had already made those
10   arguments to the magistrate judge and, in fact, had
11   gotten a second deposition, but he did not disclose
12   that to me.  So a major part of the reason he was
13   asking to call him and the basis for the pretrial
14   deficiency was simply misrepresented to the Court.
15          If we're going back over what we have
16   already gone over, I don't want to do that.  We have
17   talked about this now several times.
18          MR. SUAZO:  Judge, the sole point that I
19   was going to make was, we did cover at the last
20   hearing how I thought using the second deposition --
21   or the first deposition was an impeachable point.
22   We covered that, and that wasn't my intent.
23          What I was going to go through was, I just
24   wanted to establish that -- well, though it looks
25   very unusual, and I would certainly not do that --
```

```
 1   and I think Mr. Radbil now knows that you can't --
 2   before a jury, have the appearance of one witness
 3   taking the stand and then coming down and then
 4   putting them back on, because it just looks very odd
 5   and very unusual.
 6           The mentality of it is, I've been in cases
 7   also where you wind up having to take two
 8   depositions because someone will say, well, he was
 9   here in his individual capacity and not his
10   corporate capacity.  That was the logic
11   that Mr. Radbil had, but it just looks so unusual in
12   court that it just shouldn't have been done.  I
13   don't think it was bad faith, I think it was just a
14   mistake.  It just was not very well thought out.
15           THE COURT:  To argue from the first
16   deposition when he had a second, is that what you
17   are saying is a mistake?
18           MR. SUAZO:  No.  I think that was probably
19   not a point that was communicated well to the Court,
20   because I think I could have communicated the basis
21   for impeaching the witness with the first
22   deposition.  I think I could have -- I can see
23   there's a basis for impeaching that first witness.
24           What I think is very unusual is calling
25   the witness to the stand, then having them come
```

1   down.  And then, after he sits down saying, come

2   back to the stand and let me do it now.  It should

3   have been done all in one --

4          THE COURT:  I don't think that's unusual

5   at all.  I think it happens all the time.  The point

6   is that the way that Mr. Radbil posed it adamantly

7   as to why he should get to ask this man some more

8   questions was the deficiency provided by this

9   particular individual during the pretrial.

10          I don't think the up and down, that

11   happens in every case, is a point.  But we've made

12   that point, and I understand where you are going

13   with it.  And I will be determining the sanctions

14   issue, and I think we have covered it very, very

15   thoroughly.

16          MR. SUAZO:  Fair enough.  Fair enough.

17   Q.   (By Mr. Suazo)  Let's just keep going, then, to

18   a couple more points.

19          There's been some claims, Mr. Radbil, that you

20   -- that settlement negotiations were in bad faith,

21   and I want to ask you a couple of yes-or-no

22   questions.

23          Did you make the initial demand?

24   A.   No.

25   Q.   Did you personally reject the offer of

1    judgment?

2    A.    No.

3    Q.    Did you spend a large chunk of time defending

4    and defeating a summary judgment and prevailing on

5    your own?

6    A.    I did.

7    Q.    Did you attend a mediation conference?

8    A.    The mediated settlement conference, yes.

9    Q.    And you saw the order that came that said that

10   the parties negotiated in good faith, and there were

11   no objections to that order after it came down,

12   correct?

13   A.    That's correct.

14   Q.    There was an issue at the outset of the trial

15   about subpoenaing out-of-jurisdiction witnesses.

16   Why did you think you could issue the subpoena to

17   Ms. Malone about out-of-jurisdiction witnesses?

18   A.    Because I erroneously relied on the Court's

19   order, which is based on a factual scenario, which

20   the Court misunderstood, and the Court had no

21   authority to subpoena those individuals.  And the

22   order said that they must -- the defense had to

23   accept service or produce them at trial.  The

24   defense elected to accept service of the subpoenas

25   then move to quash on grounds similarly asserted.

1    So I relied on the -- erroneously relied.

2         THE COURT:  Of course we have covered this

3    so many times, Mr. Suazo.  The problem, again, with

4    that was that despite the Court's understanding,

5    which has happened in many corporate out-of-state

6    cases where the parties agreed, they did not here.

7    And it was an extreme example of Mr. Radbil's lack

8    of experience that he didn't have any idea how to

9    get these individuals here; that he hadn't done this

10   kind of discussion and agreement; and that, without

11   that, he had no clue as to how to get the people

12   here.

13        That's the point.  And again, it just

14   appears throughout this case as just a wholesale

15   lack of experience.

16        Let's move on to your next point.  All

17   right?

18   Q.   (By Mr. Suazo)  Mr. Radbil, how old are you?

19   A.   Thirty-two.

20   Q.   Ms. Malone says that she's been practicing law

21   for 27 years.  Did you hear that testimony?

22   A.   I recall that.

23   Q.   She said she has tried thousands and thousands

24   of cases.

25   A.   I don't know if she said thousands.

1    Q.    Hundreds, maybe I'm overselling that; tons of
2    cases.
3    A.    She's experienced, yes.
4    Q.    And at the last hearing the judge was asking
5    you some questions about you were over your head and
6    you were outmatched.  Do you remember those
7    questions?
8          THE COURT:  I don't think outmatched is
9    the point.  The point was not outmatched, the point
10   was whether or not Mr. Radbil agreed, one, had he
11   done anything wrong by taking on this case with this
12   level of experience; and two, did he agree that he
13   was in over his head.  It had nothing to do with
14   overmatched.  So let's make sure that's clear.  And
15   go ahead, if that's the question, let's hear the
16   answer again.
17   Q.    (By Mr. Suazo)  Okay.  So you were in over your
18   head.  Mr. Radbil, when Ms. Malone tried her first
19   case, you were, what, five years old?
20   A.    I don't know how old I was.
21         THE COURT:  This is really, really a waste
22   of time.  Let's move off this, because I have some
23   questions for Mr. Radbil about that particular area,
24   but I want you to finish up your points.
25         MR. SUAZO:  Sure.  Sure.

1    Q.   (By Mr. Suazo)   During Mr. Meyers' testimony,

2    he said that it takes two to tango, and he made the

3    reference to Ms. Malone and to you having disputes.

4    Let me just ask, since we've gone over some of your

5    other cases on PACER, of all of your cases in PACER,

6    how many -- or what percentage do you say wound up

7    with you actually trying that case?

8    A.   I -- I don't know.

9    Q.   It was very few that went to trial out of all

10   of the cases that you have handled.

11   A.   Yes.

12   Q.   And have you handled multiple cases with

13   Ms. Malone?

14   A.   I have, yes.

15   Q.   Do they have a tendency to wind up being

16   contentious?

17   A.   Yes.   I think she mentioned that in the trial

18   transcript, actually.

19   Q.   Have you won and lost cases against her?

20   A.   Yes.

21   Q.   Do you or Weisberg & Meyers have difficulty

22   working with Ms. Malone on some occasions?

23   A.   I do.

24   Q.   Can you think of an example in this case

25   involving a protective order?

 1   A.   Yes.

 2            THE COURT:  And we covered that last time,

 3   as well.  This was the protective order that was

 4   faxed by Mr. Martin that the paralegal had given him

 5   that had the wrong format that the two lawyers

 6   agreed at some point.

 7            All right, Mr. Suazo, what is the point?

 8   I want to make sure we haven't had it before.

 9            MR. SUAZO:  Yes.  The point I am trying to

10   make, Judge, is, a protective order was proposed,

11   and it's Radbil Exhibit-- well, a protective order

12   was proposed by Weisberg & Meyers for this case when

13   Weisberg & Meyers was producing documents.

14            On Exhibit 23, Radbil Exhibit 23, a

15   response letter is written by RAB.  And they say,

16   I'm not signing the protective order.  If you had

17   requested an m order from me before you spent --

18   before I spent two months trying to get documents,

19   before you filed a motion to compel, I might have

20   agreed.

21            THE COURT:  Who is saying this?

22            MR. SUAZO:  This is Ms. Malone.  In other

23   words, the short shrift of it is, I'm not going to

24   sign a protective order.

25            Well, fast-forward a couple of months, it

1   comes time for RAB to produce documents.  And

2   according to RAB or Radbil Exhibit 19, the e-mail

3   comes in from Ms. Malone to Dennis Kurz, and it

4   says:  Somewhere along the way, a protective order

5   or a confidentiality agreement regarding production

6   of documents wasn't signed.

7        Now, this is maybe a week, couple of days

8   before a deposition is about to take place of RAB's

9   corporate rep.  And so the point is, here is three

10  months earlier a protective order was proposed by

11  Weisberg & Meyers.  It's not signed.  And then three

12  months later we need a protective order in this

13  case.  It's just an example of the contentiousness

14  between the two -- between the two sides.

15       THE COURT:  Okay.

16  Q.   (By Mr. Suazo)  Mr. Radbil, did you want to add

17  something briefly to that dialogue?

18  A.   Yes.  The parties agreed to enter into a

19  protective order in the Rule 22(f) joint report.

20  Both parties signed that, and that was the original

21  agreement for the protective order.  And I believe

22  in the letter that you referenced, written by

23  Ms. Malone, she said there wasn't any agreement for

24  a protective order at any time.  Where, in fact, at

25  the outset of the case we contemplated such an

1   order.

2   Q.   Okay.  And so that's the point.

3          THE COURT:  I will let Ms. Malone take

4   that up.  You have about seven minutes left, so

5   let's move ahead.

6   Q.   (By Mr. Suazo)  Was there an issue also

7   involving the motion to compel that was filed by RAB

8   pretrial that bothered you to some extent?

9   A.   Yeah, it bothered me greatly, because

10  Ms. Malone accused me of obstructing discovery to

11  the point that she was able to elicit no testimony

12  about Dr. White's health issues and mental anguish.

13  And we had a hearing, the motion was denied, and a

14  written order followed explaining that all questions

15  were answered fully.

16  Q.   Okay.  So let me ask you this:  Radbil Exhibit

17  7 is a RAB Motion to Brief to Compel Discovery.  It

18  says:  During the deposition, plaintiff's counsel

19  prevented RAB's counsel from developing any

20  testimony, any testimony regarding plaintiff's

21  allegations of mental anguish, preexisting

22  conditions, and a diagnoses from his doctors.

23          Is that a true statement in that motion to

24  compel?

25  A.   Yes.

1    Q.    No, no, is that a true statement that

2    Ms. Malone was saying that she was denied any

3    ability to develop that testimony?

4    A.    No, that's a false statement.

5    Q.    And is the entire deposition before the Court,

6    Dr. White's deposition in one of the previous

7    filings that you made?

8    A.    Yes, and I summarized it.

9    Q.    And did the deposition actually end not on

10   direct, but direct, cross, and then redirect?

11   A.    Yes.

12   Q.    And was there plenty of mental anguish covered

13   throughout that deposition?

14   A.    Yes.

15   Q.    Okay.  You mentioned to me -- and I want to

16   make sure real quick -- there was a brother that you

17   had, Aaron Radbil.  Was there another brother that

18   you had?

19   A.    Samuel Radbil.

20   Q.    All right.  I want to talk to you real briefly,

21   Mr. Radbil, about being late to court.  If you

22   could, just briefly, and to the extent you can do

23   this very briefly, can you walk the Court through

24   the night before and then the morning wake-up, just

25   very briefly.

1    A.   Yes.  I was up late working, and I had eaten

2    something with lactose or cheese at the Aloft Hotel.

3    I am lactose intolerant or have lactose

4    malabsorption or some other things that I would

5    prefer if we could not have on the record.  It was

6    really not an excuse for what happened.  It was

7    unacceptable, and it showed lack of respect for the

8    Court, regardless, and I take full responsibility

9    for it.

10            THE COURT:  I appreciate that, and I think

11   we have covered this a number of times. Mr. Radbil

12   has covered it, and I think this is exactly how he

13   has covered it before, and that's his position on

14   what happened.

15   Q.   Just real quick, Mr. Radbil, when you woke up

16   that morning and realized you were late, what did

17   you do?

18   A.   I called the Court.

19   Q.   Did you get to the Court as soon as you could?

20   A.   It's a block away, so I ran.

21   Q.   Did you take a shower before you came, or did

22   you just immediately pop up and get over here?

23   A.   I think I may have wet my hair.

24   Q.   Were you just -- was your mind -- I'm looking

25   for the right word.  The word I'm thinking is

1   freaking out, because that's probably what I would

2   be doing.

3   A.    Yes, yes.

4   Q.    Mr. Radbil, did you draft the Motion for

5   Summary Judgment and Response to the Motion for

6   Summary Judgment that this Court at least granted in

7   part, your motion?

8   A.    Yes, I did.

9   Q.    Did anyone at the law firm ever compliment you

10  on the amount of effort and the brief that you filed

11  with the Court that this Court granted?

12  A.    I don't recall.

13  Q.    Did you put a lot of effort into getting that

14  motion granted?

15  A.    A tremendous amount.

16  Q.    Mr. Radbil, would you agree with me that not

17  all lawyers are federal court trial lawyers?

18  A.    Not all are federal court trial lawyers?

19  Q.    Right.

20  A.    Sure.

21  Q.    You have transactional lawyers?

22  A.    Sure.

23  Q.    IP lawyers?

24  A.    Um-hum.

25  Q.    You might have a class action lawyer?

1   A.    Um-hum.

2   Q.    You might have all kinds of different,

3   researchers or writers.  Do you understand that?

4   A.    MDL lawyers.

5   Q.    You might even have pretrial lawyers, lawyers

6   who do the workup and somebody who tries the case,

7   right?

8   A.    Appellate lawyers; a wide variety, yeah.

9   Q.    Okay.

10          MR. SUAZO:  Judge, I think I'm probably

11   out of time.  Am I?

12          THE COURT:  You can ask a couple more

13   questions, and then you will be out of time.

14   Q.    (By Mr. Suazo)  Mr. Radbil, I'm just about out

15   of time.  Something was brought up about the

16   Scarlott case, another case where a sanction order

17   was issued.  I just want to ask a few questions

18   about it.

19        Did you have independent counsel at that

20   proceeding before Judge Hughes on the Scarlott case?

21   A.    No.

22   Q.    Did people take the stand and raise their right

23   hand and testify during that proceeding?

24   A.    No, I don't believe so.

25   Q.    As I appreciate it, part of the gist of what

```
 1    the motion for sanctions was, was that the case
 2    should have been dismissed against Nissan because
 3    Nissan had claimed that they were not the ones that
 4    were responsible for the lemon of the car, that
 5    there was an after-installed mirror.
 6         So let me just build a timeline.  According to
 7    PACER, plaintiff's original petition in that case
 8    was filed on October 19th, 2009.  Did you even have
 9    a law license when that case was filed and signed up
10    by Weisberg & Meyers?
11    A.   I don't think the Bar results had come out yet.
12    I certainly hadn't -- no.
13    Q.   The case was removed on December 6, 2010.  Had
14    you filed a designation of co-counsel in federal
15    court by the time the case was removed?
16    A.   I'm not sure.  I would have to defer to the
17    Court's records on that.
18    Q.   According to PACER, your brother, Aaron, and
19    you appeared on November 22, 2007, after it was
20    removed.
21    A.   Um-hum.
22    Q.   Do you have any reason to dispute that?
23    A.   No.
24    Q.   On October 21, 2013, Mr. Kurz, who was
25    initially the lawyer on this case, was struck from
```

 1    the case for having 55 or so cases in the Southern

 2    District of Texas without a license or without

 3    having been admitted to practice in the Southern

 4    District of Texas.

 5    A.    Correct.

 6    Q.    Did you know anything about that in advance of

 7    that?

 8    A.    No.

 9              THE COURT:  Was Mr. Kurz associated with

10    the Meyers firm?

11              MR. SUAZO:  Mr. Kurz, I believe, was with

12    Weisberg & Meyers, but there was a disassociation

13    when a number of things happened.

14              THE COURT:  But it is an example of

15    something going awry with a person who had been

16    associated with Weisberg & Meyers it sounds like.

17              MR. SUAZO:  I don't necessarily want to

18    use the word awry.

19              THE COURT:  Irregular.

20              MR. SUAZO:  But the judge did issue an

21    order that struck Mr. Kurz from the case, and then I

22    think there was a disassociation while he was

23    attempting to correct that.

24              THE COURT:  All right.

25    Q.    (By Mr. Suazo)  And then, Mr. Radbil, ten days

```
 1   after that order came down against Mr. Kurz, did
 2   Nissan file a motion for sanctions?
 3            THE COURT:  It might be helpful for me to
 4   hear what you are saying if you focus on Mr. Suazo.
 5            MR. RADBIL:  I'm sorry.
 6   Q.   (By Mr. Suazo)  Mr. Radbil, ten days after that
 7   happened with Mr. Kurz, a motion for sanctions was
 8   filed by Nissan.  Does that timeline --
 9   A.   Sounds correct, yes.
10   Q.   All right.  Did you appear as attorney in
11   charge on that case on August 28th, 2012, or roughly
12   thereabouts, if that's what the record showed?
13   A.   Yes, if that's what the record shows, I did.
14   Q.   Okay.  With the allegation being that the case
15   should have been dismissed earlier as a new lawyer
16   to the firm, someone who had been there one or two
17   years; a case that, according to the affidavit filed
18   with this Court or filed with the Court in the
19   Nissan case by Alex Weisberg, that you normally go
20   around dismissing cases that were signed up by named
21   partners in the firm.
22   A.   I don't have that --
23   Q.   Okay.
24   A.   -- or I didn't.
25   Q.   Is the sanctions order from Judge Hughes up on
```

```
 1   appeal?

 2   A.   It is.

 3          MR. SUAZO:  Okay.  Your Honor, I think I

 4   have probably gone over the one hour.  I appreciate

 5   you giving me extra time.

 6          THE COURT:  I appreciate it, Mr. Suazo.

 7   My questions and interruptions to you should not in

 8   way indicate my regard for you and the thorough job

 9   you have done and your representation of Mr. Radbil

10   here.  All right?

11          MR. SUAZO:  Thank you, Your Honor.

12          THE COURT:  Thank you.

13          Ms. Malone.

14          THE COURT:  Before we start, I do want to

15   take a two-minute break.  Let's make it two, no more

16   than three, and we will start back up with the cross

17   of Mr. Radbil for another hour.

18          (Recess taken)

19          THE COURT:  Ms. Malone.

20          MS. MALONE:  Thank you, Your Honor.

21          MR. RADBIL:  Is it okay if I take notes?

22          THE COURT:  Take notes?  I suppose so.

23          MR. SUAZO:  Mr. Radbil, just keep them

24   very nominal if you do.

25          MR. RADBIL:  Okay.
```

```
 1            MS. MALONE:  Thank you, Your Honor.

 2            THE COURT:  Ms. Malone.

 3                   CROSS-EXAMINATION

 4   Q.  (By Ms. Malone)  Mr. Radbil, let's start

 5   talking for a moment about the address that you

 6   provided to the Court.  I'm looking at the

 7   transcript from the pretrial conference, Volume I of

 8   the original White case.

 9        Will you agree with me that the address that

10   you provided to the Court as the address for you for

11   service was 9330 LBJ Freeway, Suite 900, Dallas,

12   Texas.  Would you like to see it, Mr. Radbil, to be

13   clear?

14   A.   No.  If it says that and I provided that, then

15   I agree with you.

16   Q.  And you would agree with me that the local

17   rules require that you provide the address for

18   service -- service purposes that you intend to be

19   used in the case, correct?

20   A.   Yes.

21   Q.  And Mr. Radbil, the other address that appears

22   for you in the pleadings from time to time is an

23   address in Houston, correct?

24   A.   Kirk Claunch's address also I believe appeared.

25   Q.   I understand.  I'm asking about you,
```

```
 1   Mr. Radbil.  The address that you provided would be
 2   in Houston, correct?  That's the one that you
 3   usually use in federal court cases in Texas,
 4   correct?
 5   A.    In Dallas, I believe we used the Dallas
 6   address; in Houston, Southern District of Texas
 7   cases, we used the Houston address I believe.
 8   Q.    And you would anticipate that attorneys from
 9   the other side would serve documents on you at the
10   address you provide to the Court, isn't that
11   correct, Mr. Radbil?
12   A.    Unless otherwise directed, yes.
13   Q.    Unless you provide another address to the Court
14   as your service address, right, Mr. Radbil?
15   A.    Or as a professional courtesy as otherwise
16   directed.
17   Q.    And let's talk about that for a moment.  In
18   addition to having a hand-delivered set of records
19   sent to your office before the February 15th date, I
20   also scanned them in to you at your request the
21   weekend before trial, did I not?
22   A.    I don't know whether you scanned them in, and I
23   don't know -- February 15th?  What date -- where are
24   you getting that date from?  I'm not trying to avoid
25   the question, I just want to know the dates.
```

1    Q.   That's fine, Mr. Radbil.  I will back up.

2         We talked about with Mr. Meyers the

3    time-before-last that the Court order that you

4    proposed -- and I believe it's Document Number 70 --

5    with the Court, there is a proposed date for

6    exchanging exhibits for February the 15th.  And then

7    there was a proposed date to provide the Court with

8    copies of the exhibits for the 20th.

9         Do you recall us talking about that with

10   Mr. Meyers?

11   A.   No.

12   Q.   All right.  That's fine.  I don't care.

13        Will you agree with me that, in addition to

14   having a hand-delivered set to you, that I sent you

15   e-mails that we discussed in your prior testimony

16   showing that I had also scanned in the exhibits and

17   sent them to you as well?

18   A.   I recall you presenting e-mails.  I don't

19   recall receiving e-mails nor any attachments to

20   them, which I think I explained last time also.

21   Q.   And the fact of the matter is, when you arrived

22   at court on the -- day two of the jury trial -- day

23   one of the jury trial, second day after the pretrial

24   conference, you still did not have a copy of the

25   exhibits available to you or didn't bring them with

1    you even though I had scanned them in and

2    hand-delivered them to you, correct?

3    A.    A copy of whose exhibits?

4    Q.    My exhibits.

5    A.    I believe I had a copy of your exhibits.

6    Q.    I will read for you from the transcript, Volume

7    2, line 5:

8         "Mr. Radbil:  What is the defense number for

9    November 4, 2011?"

10        And the Court said:  "The record isn't going to

11   work if you all are conferring back and forth like

12   that."

13        Because you asked me, and I said to the Court:

14        "Ms. Malone:  Your Honor, I don't think

15   Mr. Radbil brought my copy of exhibits with him.  If

16   you will oblige me, I brought a spare, and I will

17   give it to him now in the courtroom."

18        Isn't that, Mr. Radbil, what happened?

19   A.    No, I had a copy of your exhibits with me.

20   Q.    You didn't bring them with you to the

21   courtroom, Mr. Radbil, I handed you a copy so you

22   could look at the exhibits in the middle of the

23   hearing.  Isn't that correct, Mr. Radbil?

24   A.    No, ma'am, that's not correct.

25   Q.    Mr. Radbil, at the trial you only had a

```
 1   briefcase.  You didn't bring any notebooks or
 2   anything else.
 3   A.    No, that's not correct.
 4   Q.    You brought something other than your
 5   briefcase.
 6   A.    Yes.
 7   Q.    What did you bring, Mr. Radbil?
 8   A.    I believe I brought a box.
 9   Q.    Let's talk about your testimony regarding being
10   overworked.
11   A.    Which testimony?
12   Q.    Which came from the last trial -- I'm sorry --
13   was that, at the last minute Mr. Kurz left in August
14   of 2012 and left you with 100 cases, something to
15   that effect, correct?
16   A.    I don't recall testifying that -- I disagree
17   that that was my testimony.
18   Q.    Did you testify to the Court that you believed
19   that Mr. Kurz left in 2012, in August of 2012, and
20   around that time you then had approximately 100
21   trials that you were suddenly responsible for.
22   A.    No, not trials.
23   Q.    Cases.
24   A.    Cases, yes.
25   Q.    Yes.  And that was your testimony, correct?
```

```
1   A.    I don't recall.
2            THE COURT:  Just a few minutes ago?  Just
3   a few minutes ago?  You don't remember that from a
4   few minutes ago?
5            MR. RADBIL:  I don't.
6   Q.   (By Ms. Malone)  Mr. Radbil, you testified --
7            MS. MALONE:  Your Honor, can I just show
8   him the transcript?
9            THE COURT:  Yes.  Just what transcript and
10  line and page.
11           MS. MALONE:  Yes, ma'am.  This would be
12  the Motion for Sanctions Hearing, Volume 4.  I don't
13  have the transcript from a few minutes ago, but I
14  have the one from two weeks ago.
15           THE COURT:  All right.
16           MS. MALONE:  Beginning at line 236 -- page
17  236, line 18, flipping over to page 237, line 1.
18           THE COURT:  All right.  You may approach.
19  A.   So I disagree with your characterization of the
20  testimony.  This was on a temporary basis.
21           THE COURT:  Okay.  Why don't we have you
22  establish the point by reading from the transcript
23  slowly, please, Ms. Malone.
24           MS. MALONE:  Yes, Your Honor.
25           THE COURT:  This is from the last
```

1   hearing --

2          MS. MALONE:  Yes, Your Honor.

3          THE COURT:  -- of November the 6th.

4          MS. MALONE:  It's Volume 4 of the

5   sanctions hearing, beginning page 236, line 18:

6   "Why did Mr. Kurz cease being an attorney in charge

7   of this case?"

8          "Answer:  He quit.

9          "Question:  When did he quit?  Do you

10  recall roughly" -- I'm sorry.  "Do you remember

11  roughly the approximate time frame?

12         "Answer:  Yes.  The approximate time frame

13  was when I appeared as counsel in this case.

14         "Question:  Would that be sometime around

15  August of 2012?"

16         And then finishing on page 237, line 1:

17         "Answer:  Yes."

18         THE COURT:  And those answers are coming

19  from Mr. Radbil?

20         MS. MALONE:  Yes.  And the questioner is

21  Mr. Suazo.

22         THE COURT:  Okay.

23  Q.  (By Ms. Malone)  Have I read that correctly,

24  Mr. Radbil?

25  A.   Yes.

```
 1            THE COURT:  Just move up a little bit
 2   closer to the microphone, please.
 3   A.    Yes.
 4   Q.    (By Ms. Malone)  So your testimony last time
 5   was that you became responsible for this file around
 6   the time Mr. Kurz quit in August of 2012.
 7   A.    Yes.
 8   Q.    If you would look, please, at Defendant's
 9   Exhibit Number 27.  Do you have it?  I think it's
10   the white one.  Mr. Radbil, I believe it's the white
11   one, sir.
12   A.    Thank you.
13   Q.    Exhibit 7, please, sir.
14   A.    I'm at Tab 7.
15   Q.    Okay.  And I believe that you and I are looking
16   at the fee invoices for Weisberg & Meyers.
17   A.    Yes.
18   Q.    Okay.  And these are in reverse chronological
19   order, Mr. Radbil.  And if you will flip to the last
20   page.
21   A.    Okay.
22   Q.    Page 140.  And it shows this file was
23   officially opened on March the 17th of 2011,
24   correct?
25         Let me rephrase the question, Mr. Radbil.  Will
```

1   you agree the first entry appears at March 17, 2011,

2   on invoices provided to us by Weisberg & Meyers?

3   A.   As long as it's in chronological order, yes.

4   Q.   These were the order they were given to me,

5   sir.  They appear to be in reverse chronological

6   order, correct?

7   A.   Well, there's March -- well, that's 2012.  Have

8   you gone through them and confirmed that?

9            THE COURT:  I think that wasn't the

10   question.

11            Mr. Suazo?

12            MR. SUAZO:  I just want to know the dates.

13            MS. MALONE:  140.

14            MR. SUAZO:  I only have -- I have two sets

15   of her exhibits, if I can find it.

16            MS. MALONE:  I'm happy to let him share

17   with me, Judge.

18            MR. SUAZO:  May I approach?

19            THE COURT:  Yes.

20            MR. RADBIL:  They do appear to be in

21   reverse.

22            MR. SUAZO:  Can I stand over his shoulder?

23            THE COURT:  I'm not comfortable with that.

24   Which exhibit book is this that we are talking

25   about?

1        MS. MALONE:  It's from Regional Adjustment

2   Bureau's exhibits.  It would be Exhibit 7.  It's a

3   copy of the Weisberg & Meyers invoices.

4        THE COURT:  You can use these, Mr. Suazo.

5   I will just hand them to you, Court's Exhibit 7.

6        MR. SUAZO:  Thank you, Your Honor.

7   Q.   (By Ms. Malone)  Mr. Radbil, when we're looking

8   at Exhibit 7, the first date that appears, unless

9   there's some anomaly, is March 17, 2011.

10  A.   First time entry, yes.

11  Q.   Okay.  And if you will flip over to page 138 --

12  A.   Uh-huh.

13  Q.   Yes?  Are you with me?

14  A.   I am.

15  Q.   -- on September the 7th, 2011, there's an entry

16  for you appearing at that time, correct?

17  A.   The entry reads:  "Prepare e-mail to Robbie

18  Malone Re: Court order in-person conference

19  scheduling."

20  Q.   Mr. Radbil, my question simply was:  Is there a

21  reference to an entry by you on September 7th, 2011?

22  A.   Yes, there's an entry with --

23  Q.   I don't need to know what it says.  I'm just

24  asking about the date, sir.  Is that correct?

25  A.   Yes.

1   Q.   And there's also an entry on September the 8th,

2   2011, as well, correct?

3   A.   Yes.  "Review e-mail from Robbie Malone

4   concerning scheduling of the in-person conference."

5   Q.   Thank you, Mr. Radbil.  I really don't care

6   about the things, I'm just talking about dates.  All

7   right?

8        Then there is an entry on September 8, 2011,

9   from Mr. Kurz, as well.

10  A.   There is.

11  Q.   Right above that, correct?

12  A.   Um-hum.

13  Q.   And Mr. Radbil, would it surprise you to learn

14  that, if you were to add up all of the time that

15  Mr. Kurz has been on this file, from its opening on

16  March the 17th until your first entry on

17  September 7, 2011, that he has spent only 2.1 hours.

18  A.   No.  This is very early in the case.

19  Q.   Okay.

20           THE COURT:  Okay.  You answered the

21  question.  Thank you.  Go ahead.

22  Q.   (By Ms. Malone)  And Mr. Radbil, would you also

23  turn with me, please, to page 133 of that same

24  record.

25  A.   Okay.  I'm at 133.

```
 1    Q.   And if you will look at December 15th, do you
 2    see there is a reference that you attended a
 3    deposition for your client?
 4    A.   Yes.
 5    Q.   Okay.  And will you also agree with me that on
 6    that same page there are five entries for Mr. Kurz?
 7    A.   There's six.
 8    Q.   Okay.  Six entries for Mr. Kurz, correct?
 9    A.   Um-hum.
10    Q.   If you will look with me, please, on page 124,
11    and now we're in 2012, correct?
12    A.   Yes.
13    Q.   And will you agree with me that you see entries
14    there in June of 2012 for Dennis Kurz, correct?
15    A.   You said three?
16    Q.   Two; if there's three, there's three.
17    A.   I'm sorry.
18    Q.   Two for June of 2012.
19    A.   Yes, that's correct, two for June of 2012.
20    Q.   And if you will turn to page 122.
21    A.   Okay.
22    Q.   And you will see on the bottom of that page
23    that you actually took my client's deposition,
24    correct?
25    A.   I did, yes.
```

1    Q.    And so prior to Mr. Kurz leaving in August of

2    2012, you presented your client for deposition; you

3    took my client's depositions; and you appeared for

4    every hearing that occurred in this case.  Isn't

5    that correct, sir?

6    A.    I don't know if I appeared for every hearing.

7    I think that I did, yes.

8    Q.    But you took the depositions.

9    A.    Yes, I did take two depositions.

10   Q.    Mr. Kurz did not take the lead on any

11   deposition or hearing prior to his leaving in August

12   of 2012, correct?

13   A.    That's correct.  Well, took the lead, I think,

14   on scheduling the initial conference; but yeah.

15   Q.    Other than scheduling, you did all of the

16   substantive work.  Is that fair, Mr. Radbil?

17   A.    That is fair, yes.

18   Q.    All right.  And then as we looked at Exhibit 13

19   in our same matter, during this period of time where

20   Mr. Kurz was working on the file with you, if you

21   will look at our Exhibit 13, sir, Tab 13, you will

22   see that there are a number of -- there's a couple

23   of charts that indicate work that was being done by

24   Mr. Weisberg, Mr. Meyers, Mr. Ehrlich, and your

25   brother, Aaron Radbil, all partners with the firm

1    throughout this period of time, correct?

2    A.    Throughout which period?

3    Q.    The length of this time; the entirety of this

4    case, sir.

5    A.    Are these taken verbatim --

6    Q.    Yes, sir?

7    A.    Then, yes, I agree with that.

8    Q.    Do you agree that after Mr. Kurz left, you had

9    a number of conversations with your brother

10   regarding how to handle this case, who was a partner

11   at Weisberg & Meyers, according to your account

12   records.

13   A.    Yes, of course.

14   Q.    Okay.  Now let's talk a little bit about the

15   disclosures in this case.  Do you agree with your

16   counsel that if you don't put something in your

17   disclosures you are not allowed to put it into

18   evidence?

19   A.    Would you mind clarifying the question, please?

20   Q.    Do you agree with your counsel that if you do

21   not disclose something properly in responses to

22   disclosures you cannot use that as evidence in

23   trial?

24   A.    There are circumstances which you can.  For

25   example, in rebuttal, if you couldn't --

 1          THE COURT:  She didn't ask about rebuttal.

 2   We all understand rebuttal is different; scheduling

 3   order actually recounts that.

 4   A.    Then yes, I agree.

 5   Q.    (By Ms. Malone)  Okay.  If you would look with

 6   me, Mr. Radbil, under Exhibit 1, will you agree with

 7   me on page 3 of that exhibit, which is Dep App. 164

 8   that you wrote, "Plaintiff claims actual damages" --

 9   and I'm going to skip the formal reading of the

10   statute at this time -- "in the amount of $1,500,

11   but reserves the right to disclose any additional

12   damages suffered should they become known."

13   Correct?

14   A.    I did not write that.

15   Q.    I didn't ask that.  I asked you what the

16   disclosure said, Mr. Radbil.

17   A.    I thought you asked if I wrote it.

18   Q.    No, sir.  I asked you if that's what the

19   disclosure said.

20   A.    "Plaintiff claims actual damages under the

21   Federal Fair Debt Collection Practices Act at this

22   time in the amount of $1,500 but reserves the right

23   to disclose any additional damages should they

24   become known.  Plaintiff also claims statutory

25   damages recoverable under the FDCPA."

```
 1    Q.   I just asked you if it says that the amount of
 2    $1,500 reserves the right to disclose.  Is that what
 3    it says?  That's as far as I need you to look at.
 4    A.   Under the rule of optional completeness --
 5              THE COURT:  That wasn't the question.  Be
 6    sure to answer the question.
 7    Q.   (By Ms. Malone)  Is that what it says, Mr.
 8    Radbil?
 9    A.   It does, and if I could read the rest.
10    Q.   If you could turn back, Mr. Radbil, to
11    Defendant's Exhibit 7, which is Tab 7.  I want you
12    to look at the second page of your invoices.
13    A.   Certainly.  Say that again.  Defendant's App.
14    01?
15    Q.   08.
16    A.   Got it.
17    Q.   And do you see December 6th, and December 6th
18    there is an entry for both yourself and for your
19    brother referencing e-mails and discussing a
20    memorandum regarding actual damages from Dr. White.
21    A.   Yes.
22    Q.   And at the first hearing you testified that, in
23    fact, on December 6th, that you reviewed two memos
24    regarding damages from Dr. White, correct?
25    A.   If I did, that was a mistake.  There's two
```

1   memos.

2   Q.   But you said at the last hearing that you

3   reviewed -- around December 6th, you reviewed two

4   memos from Dr. White regarding damages, correct?

5   A.   Could you read the testimony, please?

6           THE COURT:  Just refer him to the page, if

7   you have it.

8   Q.   (By Ms. Malone)  Okay.  I believe that the page

9   begins on page 71, sanction hearing, and continues

10  on to page 73.  And I believe he's discussing about

11  the two of them looking at the memos.  That's

12  really -- I don't care if there's one or two.  But

13  on December 6th, you looked at a memo discussing

14  damages according to your invoices, correct?

15  A.   Yes, sir.

16  Q.   Now, if you would look, please, in your

17  attorney's notebook that they provided to you there,

18  Radbil Exhibit Number 34, there should be an

19  affidavit for Dr. White.

20  A.   Okay.

21  Q.   And attached to it there is a memo dated

22  December 28th, 2012.

23  A.   Yes.

24  Q.   And you will agree with me this is the only

25  memo regarding damages from Dr. White that's been

1    produced as an exhibit in this case, correct,

2    Mr. Radbil?  It's the only one attached to his

3    affidavit, correct?

4    A.   What's the question, whether it's the only one

5    attached to the affidavit or produced in the case?

6            THE COURT:  She said:  "And you will agree

7    with me this is the only memo regarding damages from

8    Dr. White that's been produced as an exhibit in this

9    case."  That's the question.

10   A.   Based on the exhibits that I'm looking at, I

11   know they may have been supplemented.  I think

12   that's accurate.

13   Q.   (By Ms. Malone)  Okay.

14           MR. SUAZO:  Your Honor, I have the actual

15   memo, if it will speed it up.

16           THE COURT:  The actual memo.  All right.

17   Would you hand that to Ms. Malone?

18           MS. MALONE:  I have never seen this, Your

19   Honor.

20           THE COURT:  All right.  Go ahead.

21           MR. SUAZO:  It's an attorney-client

22   privileged communication to some extent, and I know

23   we have -- it's gone from Dr. White to the law firm.

24   And I know we've kind of gone through that privilege

25   to some extent, but that's -- I mean --

1           THE COURT:  Okay.  Let me just figure out
2  what this is.
3           Ms. Malone.
4           MR. RADBIL:  It's --
5           THE COURT:  Excuse me, Mr. Radbil, I don't
6  need anything from you.
7           MS. MALONE:  Well, Your Honor --
8           THE COURT:  What is going on, and what is
9  this?
10          MS. MALONE:  It appears to me, although we
11 have never seen it before, it appears to be a
12 December 6th unsigned, unnamed e-mail.  It just
13 says, "Dr. Mr. Radbil."  And there's discussion of a
14 number of hard damages that his client is talking
15 about, none of which were disclosed to us:  20,000
16 plus added to my student loan; 5,000 for dropping a
17 teaching class, which would have increased my income
18 by 20,000; another discussion about -- a question
19 about his average psychology salary that he doesn't
20 get to make at 75,000.
21          THE COURT:  Just so we can retrace this
22 for whoever might be reading this at some point,
23 this came from looking at -- starting along the line
24 of your questioning to discern how much time
25 Mr. Kurz versus Mr. Radbil actually spent on this

1  case.  And now you are going through the billing

2  entries, and you're talking about specific

3  disclosures with regard to witnesses and evidence.

4  And I think you have referred him to a specific

5  something on a memo, on a certain date entry.  What

6  entry was that?

7        MS. MALONE:  Your Honor, we had finished

8  with the issue about Mr. Kurz.

9        I was going to their suggestion that the

10  disclosures did not need to be supplemented and

11  their argument that he had, in fact, given the

12  Court -- or given us a specific answer on actual

13  damages.  And in response to that, Mr. Radbil's

14  counsel had filed an affidavit, which I believe is

15  Exhibit 34 of Mr. White that has attached a

16  December 28th memo.

17        We had never seen the December 6th memo,

18  which was clearly referenced in their notes.  And

19  they are arguing that this 40,000 and 5,000 had been

20  discussed with Dr. White, and they were not going to

21  proceed against it.  And now I'm given something

22  that they purport to be the December 6th memo from

23  Dr. White, which describes a whole lot of hard

24  damage numbers that were never disclosed to us.

25        THE COURT:  Okay.  Let's go back to what

1   the specific reference was in the evidence that you

2   were looking at that brought all of this up.

3           MS. MALONE:  I was looking at two things.

4   I was looking at our -- the invoices that they

5   produced to us, which are Exhibit 7, which shows

6   that Mr. Radbil saw -- it says, "Received and

7   reviewed Dr. White's memorandum regarding actual

8   damages," which I am assuming this is what Mr. Suazo

9   has handed me is that memo.

10          In response to our questioning, Mr. Suazo

11  and Mr. Jefferson had produced an affidavit from

12  Dr. White.  And the only damage document attached

13  was a damage document -- was a -- dated

14  December 28th.  And since the invoices stopped on

15  December 12th, there was no reference to it in their

16  invoices.

17          So I wanted to know where it was, the

18  actual memo that he looked at that he says he

19  discussed with Dr. White.  So now they have provided

20  it.  And Judge, I'm not suggesting that Mr. Suazo or

21  Mr. Jefferson has done anything incorrect by any

22  means, but this certainly proves our point.

23          He was given a memo from his client that

24  details the 20,000 additional student loan, the

25  $5,000 that he testified to from the stand, and

1    another 20,000 in actual income, as well as 30,000

2    in past due debt, and he comes up with a number that

3    he wants, which is 150,000.

4         THE COURT:  Which would comport with

5    Dr. White's discussion with the Court while we were

6    waiting for Mr. Radbil that he did quantify the

7    damages.

8              Mr. Suazo, let me hear from you on this.

9              MR. SUAZO:  Judge, the reason we gave the

10   memo right now is because the questioning seemed to

11   suggest that there were two time entries reviewing

12   two memos.  And first of all, I wanted to let the

13   Court know there were two memos.  There were, in

14   fact, two memos, and that was the other memo.  There

15   wasn't billing going on for a memo that didn't

16   exist.  That's number one.

17             The December 28th memo that's already part

18   of the record is substantially similar.  So it goes

19   from December 28th to December 6th.  They are very

20   similar.  There may be some variation, but the point

21   of the memo is the same.

22             Both of these memos are attorney-client

23   privileged information.  It's a little bit

24   irregular, I think, for me to just hand over an

25   attorney-client privilege, but we are kind of beyond

1   being regular, I guess, to some extent.  So I just

2   turned that over, which, to some extent --

3         THE COURT:  Which would waive it for that

4   particular document.

5         MR. SUAZO:  Well --

6         THE COURT:  It would.

7         MR. SUAZO:  -- I'm afraid to get to that

8   point, but it seems that's where we've come.  And

9   the accusation needed to be -- I guess Mr. Radbil

10  needed to defend himself with that memo.  So to some

11  extent I am invoking the lawyer's ability to defend

12  himself.

13        THE COURT:  I understand, but it does

14  waive the privilege as to that particular document.

15  And I don't see that we need to go down the road of

16  figuring out how far out that also waives it, but it

17  does waive it to that document.

18        So with that in mind -- Mr. Radbil,

19  please -- Ms. Malone, where are we with this?

20        MS. MALONE:  Your Honor, the problem is

21  that the document they attached to Dr. White's does

22  no such thing.  There is not one single reference to

23  a monetary amount anywhere in this document.  It

24  does name some additional witnesses, which, again,

25  our point is he got it December 28th.  He tells us

1    about it January the 18th, which is clearly not as

2    soon as he could.  This is not the same memo at all.

3    I would be happy for the Court to compare them,

4    because they are not the same.

5            THE COURT:  What now, at this point, are

6    you seeking to do?

7            MS. MALONE:  Well, Judge, what I was going

8    to do, which this actually even bolsters my point,

9    was, I was going to actually at this point show the

10   Court what Mr. Radbil did in the trial transcript

11   with regard to actual damages.  The argument or the

12   suggestion has been that he didn't -- he didn't

13   elicit or solicit any testimony related to that.

14   But I have from Volume 2, the trial transcript at

15   page 218, a question by Mr. Radbil:  "Did the fact

16   that Regional Adjustment Bureau continued to call

17   your Simple Surrogacy employment telephone numbers

18   after you told them not to cause you to suffer

19   actual damages?"

20           And if the Court will recall, his

21   disclosure question was 1,500 in actual damages.  We

22   now know there were discussions about a whole lot

23   more.

24           In response to that, their client said:

25   "Yes, it caused a domino effect in my life that

1    caused me to develop mental health symptoms I had

2    never experienced before, and it literally cost me

3    by adding exponentially to my debt with some

4    out-of-pocket costs."

5            THE COURT:  Okay.  All right.  What I

6    would like to do before we go any further with this

7    is, Mr. Suazo, make your record, and I will move

8    ahead with questions of Mr. Radbil.

9            MR. SUAZO:  Yes, Judge.  We gave the memo

10   for the limited purpose of establishing that there

11   was the existence of a memo.  I think the point --

12   to a large extent, we have covered this.  We had a

13   lot of argument at the last hearing, where we -- I

14   think we have already plowed this ground.  Because

15   our position was, there was not a question during

16   those 22 pages of examination of Dr. White where

17   Mr. Radbil solicited damages testimony or asked for

18   it in opening or asked for it in close.

19           So I still -- the fact that someone gives

20   you a memo outlining some damages if they are not

21   being sought, I don't necessarily think triggers a

22   disclosure obligation if they are not being sought.

23           THE COURT:  Well, I know that's the

24   argument, and I haven't decided that issue yet.  I

25   think the question now is, can she now go forward

1   with this memo, and I think she can.  Understand

2   how -- I think the context is clear now as to how

3   that came up and how it's been turned over to them,

4   but I think that Ms. Malone can use it.

5           How and what weight I'm going to give

6   it -- do you mind, Mr. Radbil, please -- how and how

7   much weight I'm going to give it, I haven't decided

8   yet.  But I do think that she gets to use it and

9   keep it, obviously make a copy and give you the

10  original back.  But I would like to go ahead then.

11          MS. MALONE:  Your Honor, under that

12  context, then, I would move to add this as a late

13  exhibit.  I think we are at Exhibit 44, so it would

14  be 45.

15          THE COURT:  I'm going to admit it as

16  Exhibit 45 for RAB.  I understand that Mr. Suazo

17  objects to that.

18          MR. SUAZO:  Yes, Your Honor.

19          THE COURT:  And I understand and note your

20  objection for the record.

21          MR. SUAZO:  Thank you.

22       (RAB Exhibit 45 admitted into evidence.)

23  Q.   (By Ms. Malone)  Mr. Radbil, you are familiar

24  with the December 6th memo you heard us discussing

25  from your client?

```
1    A.    I am.
2    Q.    And Exhibit 45, although it doesn't have
3    Dr. White's name on it, is, in fact, the memo that
4    we are discussing; is that correct?
5    A.    May I see the memo?
6               THE COURT:  Go ahead.
7    A.    Yes.  And --
8               MS. MALONE:  That's all my questions.
9               THE COURT:  That is the memo?
10              THE WITNESS:  It is, yes.
11              THE COURT:  That's 45 of RAB.
12              MR. RADBIL:  May I add?
13              THE COURT:  I will let you add if your
14   attorney wants to ask you a question in a minute,
15   very limited, but right now I want to go ahead with
16   this.
17              MR. RADBIL:  It just had to do --
18              THE COURT:  No, I want to go ahead with
19   this, Mr. Radbil.
20   Q.    (By Ms. Malone)  Mr. Radbil, will you agree
21   that there are a number of dollar amounts
22   specifically listed in this memo by Dr. White?
23   A.    I do, yes.
24   Q.    Will you agree that those numbers were never
25   disclosed to the defendant?
```

1   A.    I agree.

2   Q.    And will you agree, sir, that in your

3   testimony -- or your questioning of Dr. White, that

4   you asked him at page 218, beginning at line 12:

5   "Did the fact that Regional Adjustment Bureau

6   continued to call your Simple Surrogacy employment

7   telephone numbers after you told them not to cause

8   you to suffer actual damages?"  Correct?

9   A.    Yes, which matches up with the last paragraph

10  of --

11  Q.    Did I also -- my question was, did you say

12  that, sir?  Yes.

13          THE COURT:  Did you say it, Mr. Radbil?

14  Just say yes or no if you can answer it yes or no.

15  Did you say it?

16          MR. RADBIL:  Frankly, I can't recall

17  exactly what you just said.  So say it one more

18  time, please, and I will answer yes or no.

19          (Record read by the Court as follows:)

20          THE COURT:  "Will you agree that there are

21  a number of dollar amounts specifically listed in

22  this memo by Dr. White?"

23          Will you agree with that?

24          MR. RADBIL:  Yes.

25          THE COURT:  "Will you agree that those

1   numbers were never disclosed to the defendant?"

2           MR. RADBIL:  Yes.

3           THE COURT:  "And will you agree, sir, that

4   in your testimony -- or your questioning of Dr.

5   White, that you asked him at page 218, beginning at

6   line 12:  'Did the fact that Regional Adjustment

7   Bureau continued to call your Simple Surrogacy

8   employment telephone numbers after you told them not

9   to cause you to suffer actual damages?'"

10          MR. RADBIL:  Actual damages, yes.

11  Q.   (By Ms. Malone)  And will you agree that

12  Dr. White answered:  "Yes, it caused a domino effect

13  in my life that caused me to develop mental health

14  symptoms I had never experienced before, and it

15  literally cost me by adding exponentially to my debt

16  and out-of-pocket costs."

17          Did your client answer that question that way?

18  A.   If that's what the transcript says, yes.

19  Q.   It is?

20  A.   Then, yes.

21  Q.   Do you recall that, Mr. Radbil?  Independently

22  from the record, do you recall it?

23  A.   Somewhat, yes; not the exact words.

24  Q.   Will you agree that in your closing, at page 63

25  in Volume 3, you said to the jury:  "And I think the

1   evidence shows there are legitimate, actual damages

2   in this case."  Isn't that correct?

3   A.   Yes.

4   Q.   Okay.  Now, Mr. Radbil, let me just switch a

5   little bit.  You wrote the briefing in response to

6   our Rule 37 motion?

7   A.   I did.

8   Q.   And in that motion -- we talked a little bit

9   about it last time.  But at document 125, which is

10  Plaintiff's Response to Defendant Regional

11  Adjustment Bureau Inc.'s Motion and Brief for FRCP

12  Rule 37 Sanctions, will you agree that in this

13  briefing you do not say, this is something our

14  client came up with and we told him not to do it?

15  A.   I need to review a copy.  I know which page you

16  are talking about, but I don't know the wording, and

17  I am hesitant to answer the question yes or no.

18        MS. MALONE:  Your Honor, may I approach

19  him to show him page 12?

20        THE COURT:  You may.

21        MR. RADBIL:  Thank you.

22        THE COURT:  And just so we're clear, it's

23  page 12 of the Rule 37 motion filed by you.

24        MS. MALONE:  Yes.  I think it's document

25  125, Your Honor.

```
 1              THE COURT:  Thank you.
 2   Q.  (By Ms. Malone)  Your answer, Mr. Radbil?
 3   A.   Can you -- if the language that you highlighted
 4   there is the language, yes, I wrote that.
 5   Q.   Okay.  My question was:  Will you agree that
 6   there's no reference in here to this being a rogue
 7   answer or something your client said even though you
 8   had told him that you weren't going to ask for it.
 9   Isn't that fair?
10   A.   I didn't look for that.
11   Q.   On this page, sir.
12              THE COURT:  On this page of what, just so
13   we are clear.
14              MS. MALONE:  Document 125 of the motion
15   for -- your response to our Rule 37 sanctions
16   motion.
17              MR. RADBIL:  I didn't read the entire
18   page.
19              THE COURT:  Take it back up there.
20              MR. RADBIL:  And I'm limited to this page?
21              MS. MALONE:  That's the page I'm asking
22   you about, Mr. Radbil.
23              MR. RADBIL:  Okay.  What was the question
24   again?
25   Q.   (By Ms. Malone)  You agree that this page --
```

1    may I have it back?  This page does not contain any

2    reference to this being a -- the $40,000 being a

3    discussion that you had with your client that you

4    told him wasn't coming into evidence, anything along

5    those lines, would you agree?

6    A.    Right.  It talks all about it being privileged

7    and not ordinarily discoverable absent showing a

8    substantial need to discover the information.

9    Q.    Mr. Radbil, are you seriously suggesting to the

10   Court that saying something is a privileged document

11   is the same thing as saying that this was your rogue

12   client's answer to a question in court and you had

13   no idea they were going to say, are you seriously

14   suggesting that to the Court?

15   A.    No, I don't equate those two things.

16   Q.    Okay.  So there is nothing on this page that

17   said, this is something our client came up with and

18   we told him it was not going to be admissible and he

19   did it on his own.  Is that fair?

20   A.    On that page?

21   Q.    Yes, sir.

22          THE COURT:  Right.  Put the hands down.

23   Put the hands down and answer the question.

24   A.    No.  But our client --

25   Q.    (By Ms. Malone)  Thank you, Mr. Radbil.

1          And would you agree with me, sir, that

2     Dr. White testified to the Court that he had been

3     assured that his claims for actual damages would be

4     admitted into evidence?

5     A.    For actual damages.

6     Q.    Right.  And you will also agree with me,

7     Mr. Radbil, that, in fact, the affidavit you have

8     for Mr. White merely says that you are not going to

9     ask the jury for a specific dollar amount; it does

10    not reference what evidence will be offered into the

11    case.  Isn't that correct?

12    A.    His affidavit, yes, that's correct.

13    Q.    And let's look at this again from your attorney

14    records.  We went through this before, Mr. Radbil --

15    Mr. Radbil, is there something, funny, sir?

16    A.    No, I am waiting to offer an exhibit in

17    rebuttal that will prove the opposite of what you

18    are driving at.

19          THE COURT:  Why don't you go on to another

20    question, Ms. Malone.

21          MS. MALONE:  Sure.

22    Q.    (By Ms. Malone)  Mr. Radbil, do you agree that,

23    according to your testimony, somewhere in January of

24    2012 that someone in your office decided this case

25    following your client's deposition was --

```
 1              THE COURT:  Slow.
 2    Q.    (By Ms. Malone)  -- was worth $8,500?
 3    A.    That someone in my office decided it was worth
 4    $8,500?  I don't know.
 5    Q.    Do you agree that that's what your testimony
 6    has been, that that was the demand that was made by
 7    your office in January of 2012?
 8    A.    Yes.
 9    Q.    And you will agree that the summary judgment
10    ruling occurred in November of 2012.
11    A.    Sure, yes.
12    Q.    And that following that ruling, you will agree
13    that we looked at e-mails from Mr. Meyers that
14    indicated he valued the case at $65,000, correct?
15    That's the demand he made for settlement, correct?
16    A.    I don't know how he valued the case, but he
17    made a demand; I think it was in that amount.
18    Q.    And do you agree with me, sir, that the only
19    thing that happened between the demand by Mr. Meyers
20    of 65,000 and the mediated settlement conference
21    were the December 6th memo and the December 28th
22    memo from your client.
23    A.    We communicated.
24    Q.    Not about settlement.  I'm talking about
25    substantive about the case.
```

91

1  A.    I think we communicated.

2  Q.    Mr. Radbil, did anything else change the value

3  of the case between November 28th and the mediated

4  settlement conference with the exception of your

5  client's memos regarding damages?

6  A.    Between which dates?

7  Q.    November 28th and the mediated settlement

8  conference in February of 2013.

9  A.    Yes, our client's memos on actual damages.

10  Q.    Would that be consistent, and would you agree

11  that you believe that those memos regarding actual

12  damages were to help guide you at the mediated

13  settlement conference?

14  A.    They served as -- well, I asked Dr. White to

15  think long and hard about what he thought he

16  deserved in the real world in terms of actual

17  damages.  And I also asked him to produce any

18  evidence he had of any economic damages, to which he

19  replied that he could not find any evidence

20  supporting the additional money that was added by

21  the nonparty, Texas Guaranteed, after searching.

22  But nonetheless --

23  Q.    That's another memo you haven't provided to us,

24  right, Mr. Radbil?

25  A.    No, that's an e-mail.

1   Q.   Mr. Radbil, will you agree with me at the

2   mediated settlement conference that your demand was

3   up over $100,000?

4   A.   Yes.

5   Q.   All right.  Let's switch gears slightly.  I

6   want to talk to you about the expert witnesses.

7        You said that there was a motion you filed

8   where you said there was -- none of the experts

9   would be -- none of the individuals would be expert

10  witnesses, correct?

11  A.   Yes.

12  Q.   If you would look at Exhibit 7, Tab 7 --

13  A.   Okay.

14  Q.   -- page 109.

15  A.   Got it.

16  Q.   And do you see December 3rd, Sonya Rodriguez

17  references reviewing file regarding experts,

18  correct?  Review file for expert's use, correct?

19  A.   What's the date?

20  Q.   December 3rd.

21  A.   E-mail to attorneys.  Brief status.  Re:

22  nonparty trial subpoenas.  Do we need them?  Please

23  provide names.  Review file for any experts used.

24  Q.   Okay.  Turn to page 111.

25  A.   Okay.

```
 1   Q.   September 21st, 2012.

 2   A.   Um-hum.

 3   Q.   Melissa Norton, do you see it?

 4   A.   Um-hum.

 5   Q.   Yes, sir?

 6   A.   Yes.

 7   Q.   Do you see it, Mr. Radbil?

 8   A.   There are two entries with Melissa Norton --

 9   Q.   I'm talking about the first one, sir.

10   A.   I see both of them, yes.

11   Q.   On the first one, you see the third line down,

12   it says, "Prepare letter to expert Re: date of

13   trial."  Correct?

14   A.   Yes.

15   Q.   Mr. Radbil, let's change gears just a little

16   bit.

17        You were at the hearing, the Scarlott hearing?

18   A.   Yes.

19   Q.   And your client, Ms. Scarlott, was present?

20   A.   She was.

21   Q.   And did Judge Hughes at that hearing tell you

22   that he found your practice to be incompetent?

23   A.   I don't recall.  I believe that he insulted me

24   in numerous ways.

25   Q.   Did he say you were incompetent?
```

```
 1  A.    I believe so.
 2  Q.    Did he say that you had a lack of understanding
 3  throughout the entire case?
 4  A.    I don't know whether he used those exact words,
 5  but, again, he insulted me quite thoroughly.
 6  Q.    Did he say you were unteachable?
 7  A.    He did say that, yes.
 8  Q.    Did he tell you that he found that instead of
 9  helping your client, you chose to file a bunch of
10  pleadings hoping to get money, but what you really
11  wanted to do was get some money for Noah Radbil?
12  A.    He did say that, I specifically recall.
13  Q.    Did he tell you that you have been gratuitously
14  litigious and persisted wrong headily in saying that
15  because your thoughts are pure your deeds are purer?
16  A.    I recall those words.  If the order is correct,
17  I'm not sure.
18  Q.    Do you recall he also told you that you have
19  consistently taken action to impose the cost of your
20  inability to do your job on the defendant and
21  others?
22  A.    Yes.
23  Q.    Did he say that you conducted no reasonable
24  investigation into the case?
25  A.    No.
```

1    Q.    Did he say you exhibited gross incompetence in

2    serving the wrong party?

3    A.    I disagree with that.

4    Q.    I'm not asking if you disagree, I'm asking did

5    he say it, Mr. Radbil?

6    A.    I defer to the transcript; but yes, he said

7    many, many bad things about me.

8    Q.    Did he say that your deeds and performance are

9    defective?

10   A.    I don't recall, but --

11   Q.    Did he say that every time one of your

12   arguments turns out to lead to a dead end, then you

13   change it?

14   A.    He may have, yes.

15   Q.    Did he say that both you and your firm were

16   unfocused and unprincipled?

17   A.    I don't recall that.

18   Q.    Did he tell you that you illustrate your

19   inability to behave like a lawyer?

20   A.    Yes, he did say that.

21   Q.    And on the record, did Mr. Meyers indicate to

22   the Court that he would, as the firm, would take

23   care of the 195,000-dollar sanction; they would be

24   responsible for it, not you?

25   A.    I don't think there was a 195,000-dollar

1    sanction.

2    Q.   All right.   Mr. Radbil, did Mr. Meyers say that

3    the firm would be responsible for whatever sanction

4    ultimately was found against in the case?

5    A.   I don't recall whether he said that on the

6    record.

7                THE COURT:   Where did you get that from?

8                MS. MALONE:   The transcript, Your Honor.

9                THE COURT:   You don't remember if he said

10   that?

11               MR. RADBIL:   No.   I remember Judge Hughes

12   saying that --

13               THE COURT:   The question is, what do you

14   remember Mr. Meyers saying?

15               MR. RADBIL:   I don't remember Mr. Meyers

16   saying that on the record.

17   Q.   (By Ms. Malone)   Did Judge Hughes say:

18   "Mr. Radbil, I have been counseling you all along

19   that you have a method of operation and you're

20   perfectly happy with it.   You see nothing wrong with

21   it.   You think it's bizarre that people are upset

22   that they are sued when they're the wrong party or

23   when the right party is sued three and a half years

24   after the incident on a two-year limitation and they

25   are perplexed when you won't drop it.   And you see

1   nothing wrong with not dropping a party whom you

2   have sued too late, that it's just -- it's confusing

3   to you."

4        Did Judge Hughes say that?

5   A.   Yes, he did say that.

6   Q.   Did Judge Hughes say:  "You're being sanctioned

7   for abusive prolongation of litigation, of tendering

8   an expert late in the case who was unqualified for

9   reason of his association with the firm and because

10  he failed to consider alternatives to his preferred

11  theory -- that makes him an advocate, not an

12  evaluator -- for all of the other things that you've

13  done in this case that made it take way too long,

14  the evolving nature of every claim, every argument.

15  It's not just today that you won't stick to the

16  point."

17       Did Judge Hughes say that?

18  A.   Yes, he did.

19  Q.   Mr. Radbil, do you believe that you did

20  anything wrong in this case, in the trial of this

21  case, other than be late for court?

22  A.   Which case?

23  Q.   This case.

24  A.   Wrong?  What do you mean by wrong?

25            THE COURT:  What do you think it means?

```
 1              MR. RADBIL:  I think it means --
 2              THE COURT:  Sit up to the microphone.
 3              MR. RADBIL:  I think if the question means
 4    bad faith, I can confidently say, no, I did not
 5    litigate in bad faith.  If the question is, are
 6    there things I could have done differently,
 7    certainly.  I know that it was wrong to be late for
 8    trial.
 9              THE COURT:  You made your point.  You made
10    your point.
11              Ms. Malone, what's your next question,
12    please?
13    Q.   (By Ms. Malone)  Mr. Radbil, do you believe you
14    just made a mistake in the handling of this case?
15    A.    Which part of the case?
16              THE COURT:  Any part of the case.
17              MS. MALONE:  Any part of it.
18              THE COURT:  This is our sixth hearing on
19    your conduct; any part of it, Mr. Radbil.
20    A.    Yes, I think that I am not perfect.  And I have
21    made mistakes in good faith, probably several
22    mistakes in good faith throughout the course of the
23    trial, as I'm sure Ms. Malone has.
24    Q.   (By Ms. Malone)  What mistake did you make,
25    Mr. Radbil?
```

1  A.   I made the mistake of relying on a court's

2  order erroneously.  I made a mistake of making a

3  pretrial argument that the judge was not receptive

4  to, and I should have picked up on that.  I made the

5  mistake of not pursuing sanctions against you

6  before -- when you filed a motion to compel arguing

7  that you had --

8          THE COURT:  Okay.  We're getting the

9  picture here, Mr. Radbil.  I think the answer is,

10  you don't think you did anything wrong.

11          What else do you have, Ms. Malone?

12  Q.   (By Ms. Malone)  Mr. Radbil, do you believe

13  that you have not -- that you are untrained or you

14  have not been trained sufficiently to handle federal

15  court matters?

16  A.   No, and I would like to go back if I could.

17  Q.   Do you believe, Mr. Radbil, that you have been

18  unsupervised --

19          THE COURT:  No, you can't go back.  Answer

20  the question.

21  Q.   (By Ms. Malone)  Do you believe you were

22  unsupervised in the handling of the White case?

23  A.   At times, yes.

24  Q.   Do you think that -- how were you unsupervised,

25  Mr. Radbil?

1  A.   It wasn't so much a lack of supervision as a

2  lack of support.

3  Q.   Clerical support, Mr. Radbil, that's the only

4  thing that you think was a problem for you?

5  A.   I didn't say that.

6  Q.   Okay.  Do you believe that this simply wasn't

7  your best day at trial?

8  A.   If you're implying that that's the only thing

9  that I think I did wrong or could have done

10  differently, the answer is no.

11  Q.   Do you think you were in over your head,

12  Mr. Radbil?

13  A.   Absolutely not.

14  Q.   Do you believe that you did not understand what

15  Judge Boyle asked you when we were talking about the

16  sanctions, about the 40,000-dollar disclosures, when

17  we had the Rule 37 sanction in trial?

18  A.   I don't understand the question.

19  Q.   Well, your attorney suggested last time that

20  you misunderstood the question the judge asked you

21  when she was asking you where you had disclosed the

22  40,000 and 5,000.

23  A.   Sure.

24  Q.   Do you believe that you just didn't understand

25  what Judge Boyle was asking you?

1   A.    Yes.

2   Q.    Do you believe -- but you didn't put that in

3   your motion, in your response to the motion, did you

4   Mr. Radbil?

5   A.    You only let me look at one page.

6   Q.    Mr. Radbil, you didn't put it in your motion.

7   You know what you wrote, don't you, sir?

8   A.    I don't recall the entire motion.

9   Q.    All right.  Mr. Radbil, do you believe that you

10  properly and timely supplemented materials pretrial?

11        THE COURT:  Yes or no.

12  A.    With regard to everything except witnesses,

13  which were disclosed as soon as practical and were

14  conceded to be excused at trial, we expected those.

15  Q.    (By Ms. Malone)  Do you believe you owe Judge

16  Boyle an apology?

17  A.    Yes, I do.

18  Q.    Do you think you have given her one?

19  A.    I think I have apologized on several occasions.

20  Q.    Do you think telling a judge that she's smart

21  and you appreciate her career choice is an apology

22  for your conduct in court?

23  A.    No.  And if you don't think that I have, Judge

24  Boyle --

25        THE COURT:  I understand, Mr. Radbil.  I

1  think it's just a very, very basic way of thinking

2  that you have persisted in that has absolutely no

3  willingness or acknowledgment or character, if you

4  will, to admit what happened here.  That's all I

5  need to hear.

6              MR. RADBIL:  I just --

7              THE COURT:  No.  Ms. Malone, we are

8  finished, and I would like to get my Exhibit Number

9  7 back.  I have heard all the testimony I need to

10  hear.  If I decide that Dr. White is an appropriate

11  witness in the case, I will notify everyone at the

12  time and give you a chance.  I don't right now think

13  that.  I would like to Exhibit 7 back at this time,

14  please.

15              You can step down, Mr. Radbil.

16              MS. MALONE:  Your Honor, my apologies.  I

17  don't have an exhibit sticker for -- this is the

18  one -- the December 6th one that came in late.

19              THE COURT:  That's Exhibit 45.  Just mark

20  it with a pen.

21              We are going to break until 1:15, and then

22  I'm going to hear, as I understand it, three

23  arguments of no longer than 30 minutes each, and

24  then we will be done.

25              And then I will instruct you all that the

1   Court will go back and review all of this and write

2   an opinion on it.  I don't want any further briefing

3   or filing without leave of Court.  We will see you

4   back here in about an hour and ten minutes.

5               MS. MALONE:  Judge, I have one correction.

6               THE COURT:  Ms. Malone?

7               MS. MALONE:  Since we are the movant,

8   normally we would save five minutes for rebuttal.  I

9   don't mind, if you want us to say we are doing 30

10  minutes only, we will.  If not --

11              THE COURT:  I would just as soon, since

12  you are the moving party, I think I have all of the

13  moving part of this.  I would like them to go and

14  defend the situation, and then you finish with

15  rebuttal.  Essentially, the opening is just to

16  recount what the evidence showed.  I have been here,

17  and I know what it showed.

18              We will see you back in one hour and ten

19  minutes.

20              (Recess taken.)

21              THE COURT:  All right.  As I said, we are

22  going to have 30 minutes, and I believe we have

23  three people arguing.  The defense side, I don't

24  know how you want to split this up or who is going

25  to argue.  And I say the defense side, and I'm

1  talking about as far as the sanctions motions go.

2  Mr. Jefferson?  Mr. Suazo?

3          MR. JEFFERSON:  Your Honor, I'm going to

4  let Mr. Suazo take a break, and I'm going to do the

5  close.  But am I to understand that each of us get

6  30 minutes, or is that 30 --

7          THE COURT:  30, 30, and 30.

8          MR. JEFFERSON:  Okay.  We have talked

9  about it, and I don't know that we have a particular

10 preference.  Mr. Meyers tells me that he's only got

11 about five minutes or so.  If that's the case, I

12 would prefer he goes first, but it's your call.

13         THE COURT:  That's fine.  That's fine.  I

14 didn't have a set method of who goes first.  I just

15 don't see any need to have an opening and rebuttal.

16 After all of this, I think we are just fine with

17 letting RAB make their arguments as a rebuttal

18 argument and let the plaintiff/nonmoving parties on

19 the sanctions motion go first.

20         MR. JEFFERSON:  And, Your Honor, I think

21 Mr. Suazo has some housekeeping as a result of the

22 last exhibit that the Court left in.  I think for

23 optional completeness, there were some other e-mails

24 pertinent to that.

25         THE COURT:  And before you even address

105

1   that with me, Ms. Malone has to see what you will be

2   handing to me.

3          MR. SUAZO:  Yes.

4          (Pause in the proceedings; discussion held

5   off the record.)

6          THE COURT:  We are going to go off the

7   record until after you all have had a chance to

8   address this.

9          (Pause in the proceedings.)

10         MS. MALONE:  Judge, obviously we are going

11  to have a general objection about the tardiness of

12  this, because this has been in their possession all

13  the time.  But understanding the Court's prior

14  instruction that you are going to decide what to

15  consider, I do feel like I need to protect my

16  record.  This is a document they have had all along.

17  I have just seen it for the first time, and the

18  evidence is already closed, but I understand the

19  Court will probably consider them.

20         THE COURT:  Tell me what it is, Mr. Suazo,

21  and we will go from there.

22         Come up to the microphone.

23         MR. SUAZO:  This relates to the memorandum

24  that was just furnished today.

25         THE COURT:  Which is now RAB 45.

SHAWNIE ARCHULETA, CSR/CRR
FEDERAL COURT REPORTER – 214.753.2747

```
 1              MR. SUAZO:  RAB 45.  And this is
 2    continuation of a discussion on that memo.  So it's
 3    optional completeness.
 4              And the other one is an e-mail that
 5    authorizes the use of the memo so that Mr. Radbil --
 6    we're not being viewed as going out of the realm of
 7    waiving the attorney-client privilege.  There was
 8    permission by Dr. White.  And so we have that e-mail
 9    and then a continuation.
10              THE COURT:  Permission by Dr. White.  And
11    I understand that that is certainly something that
12    you feel most comfortable having.  It doesn't mean
13    that, although we are long done with this, that he
14    hasn't somehow waived it by virtue of waiving it
15    otherwise, but I don't think we are going to --
16    Mr. Meyers, are you all right?
17              MR. MEYERS:  Yes, Your Honor.
18              THE COURT:  I don't think we are going to
19    get into any more evidence, so I don't think that
20    will become an issue.  I just want to make sure that
21    I haven't foreclosed that possibility should it come
22    up again in the future.
23              MR. SUAZO:  Okay.
24              THE COURT:  So those will be Radbil
25    Exhibits --
```

```
 1              MR. SUAZO:  I think it would be the last

 2    Radbil exhibit, which I think will be Radbil

 3    Exhibit, I believe, 38.

 4              THE COURT:  338 or 38?

 5              MR. SUAZO:  Just 38.

 6              THE COURT:  I thought that's what you

 7    said.  Okay.  All right.

 8              With the understanding that Ms. Malone has

 9    objected to these as not having seen them and

10    untimely and for all those reasons, I'm going to

11    admit, without determining at this point whether or

12    not I'm going to consider it, Radbil 38.

13        (Radbil Exhibit 38 admitted into evidence.)

14              MS. MALONE:  I was just waiting for a

15    copy.

16              MR. SUAZO:  Yes.

17              MS. MALONE:  That's all.

18              MR. SUAZO:  Judge, I have it scribbled on

19    the Radbil Exhibit 38 just so the court reporter

20    will know that she may need to scribble that on

21    there.

22              THE COURT:  All right.  With that, both

23    sides ready?

24              Mr. Meyers, you have 30 minutes.  It's

25    2:25 -- or 1:25.
```

1          MR. MEYERS:  I apologize, Your Honor, for

2    disrespecting the bench after the first hearing.  It

3    was a human reaction to being called a liar and a

4    fraud.  I can't take it back.  I can't undo it.  I

5    can simply bear the consequences of having done so.

6          And you know, Judge, I just, with all due

7    respect, momentarily forgot that the Court is human

8    too.  And as the Court considers my punishment for

9    my transgression, I ask the Court to consider, at

10   least as partial punishment, the fact that a lot of

11   horrible things have been said about me in the

12   courtroom and the reverberating effect of that and

13   all the horrible things that are now being said

14   about me outside the courtroom, just a partial

15   punishment.

16          When I first appeared at the hearing,

17   Judge, I had two objectives in mind:  One was to

18   help defend Mr. Radbil against Ms. Malone's

19   allegations; and the other was to defend

20   Weisberg & Meyers against Ms. Malone's allegations.

21   If I had to do it all over again, I would have never

22   walked into the courtroom.  But like I can't take

23   back my immature response to being called a liar and

24   a fraud, I can't take back that I put my firm and

25   myself square in the middle of these things.  All I

1   can do, again, is bear the consequences.

2           And the consequences, Judge, at least some

3   of the consequences, are that I am now going to

4   begin winding Weisberg & Meyers, which I've

5   obviously devoted my life to since 2006.  I have

6   never wound down a law firm, Judge; I don't know a

7   timeline, I don't know what it takes.  But after

8   wrestling with the decision every day and night

9   since the last hearing, I have absolutely,

10  positively decided to do this and to devote the

11  remainder of my firm's resources towards honorably

12  concluding the representations that we currently

13  have.  Once that's done, I will close

14  Weisberg & Meyers forever.

15          And handling these cases, Judge, this

16  remaining, I don't know, 150 cases or so, along with

17  vetting issues raised here to the Arizona Bar, the

18  Texas Bar, and, to the extent necessary and with all

19  due respect to the Fifth Circuit, that's going to

20  consume all of my energy for, I'm sure, at least the

21  next year.  So while I wind down the firm, Judge,

22  Weisberg & Meyers will engage no new clients and

23  file no new lawsuits in 2014.  And once this is

24  done, it won't be a viable entity, and it will be

25  closed forever.

1          I beg you to consider that, Judge, again,

2  just as partial punishment for my transgression, the

3  fact that I'm going to have to close the business

4  and law firm that I have devoted my blood, sweat,

5  and tears to since 2006.

6          As to the substantive matters, Judge, I'm

7  going to rest on the evidence that has been

8  submitted.  This is a closing argument; it's not

9  evidence, and I am going to rest on the actual

10  evidence.  My silence, Judge, is not acquiescence to

11  anything that's been said.  It's not a concession of

12  wrongdoing or liability.  It is a concession that my

13  spirit is beaten.  And as you consider my remaining

14  punishment, Judge, I beg for your mercy in

15  considering what I have just said.

16          Thank you.

17          THE COURT:  Thank you, Mr. Meyers.

18          Mr. Jefferson.

19          MR. JEFFERSON:  May it please the Court,

20  Counsel.

21          Your Honor, thank you for the opportunity

22  to speak before you on behalf of Mr. Radbil.  You

23  know, this matter has become kind of like a

24  stepchild to me.  I didn't bring it into this world,

25  but I have been asked to see it through.  And in

1    that context, I appreciate the Court's time and

2    attention to my remarks.

3              And as I was thinking about how I could

4    best categorize my remarks and how to summarize them

5    in a brief amount of time, three words kind of came

6    to mind that I think summarize this whole dispute.

7    Those words are name, blame, and shame, and I think

8    they best describe the underlying case in these

9    proceedings, and I think you will see why.

10             Because when I talk about name, I guess

11   the first thing we have to do is look at the name of

12   what Mr. Radbil is being accused of in this case.

13   There are three things that are before the Court:

14             The Rule 37 sanctions regarding discovery

15   cooperation.  And if you look at the four corners of

16   the pleadings of the other side, those deal with

17   actual damages and experts.  That's what they

18   complain about in their Rule 37 motion, and so

19   that's what's before the Court.

20             Then there is their Section 1927 motion,

21   which is the multiplication of vexatious litigation

22   component.

23             And then, of course, thirdly, completely

24   independent of that, is this Court's obvious

25   inherent power to sanction.

1           And without offending the Court's

2    sensibility, I do think it's appropriate to discuss

3    briefly kind of the standard of review when we're

4    going to analyze the conduct of the parties

5    involved.

6           And with respect to Rule 37, one of the

7    things that the Court has to look at is if the Court

8    finds that there has been unnecessary resistance to

9    discovery, is it substantially justified?  Is there

10   an existence of a genuine dispute?  And of course,

11   that's limited to just the case at hand.  It doesn't

12   matter what has transpired in the state of

13   Washington or the State of Florida or anywhere else,

14   that's what Rule 37 requires.

15          With respect to 1927, what the standard of

16   review is in that matter is that there has to be an

17   attorney who so multiplies the proceedings

18   unreasonably and vexatiously -- that's conjunctive,

19   and not disjunctive -- and that person maybe liable

20   for costs and attorney fees reasonably incurred as a

21   result of that conduct.

22          And then, of course, this Court knows what

23   its inherent power is to sanction.  But certainly

24   the Court therefore knows that the standard is

25   related to the conduct in the litigation at bar as

1    opposed to in other matters.  And this Court knows
2    that it's charged with the duty of exercising its
3    inherent powers with some degree of restraint, and
4    therefore a finding of bad faith or improper motive
5    must be shown.
6             Now, I think that's important, because we
7    have to therefore look at what is the relief that's
8    being sought in this case and analyze that under the
9    standard of review.  And in this case, what is being
10   sought is that RAB is seeking to shift the entirety
11   of the cost of this litigation to Mr. Radbil and to
12   Weisberg & Meyers.  They haven't broken it down in
13   any particularity.  Obviously, I only represent
14   Mr. Radbil.  But the point being is that the
15   testimony was that, through the end of October, they
16   had $133,000 in fees, and that's what they are
17   seeking in this case.
18            And when they seek to shift the entire
19   cost, the claimant must prove by clear and
20   convincing evidence that every facet of the
21   litigation was patently meritless; there was a lack
22   of a reason to file it and prosecute the case.  We
23   are going to talk about those elements when we go
24   through some of the particulars of their 1927
25   complaints.

```
 1              But I think -- from the outset, I think
 2    the Court can agree that certainly the entirety of
 3    the costs should not be shifted in this case,
 4    particularly when you have a number of motions that
 5    were filed by Weisberg & Meyers and Mr. Radbil in
 6    which they prevailed and motions that were filed by
 7    the other side which were denied.  Certainly you
 8    can't say that, for example, a motion for partial
 9    summary judgment that was granted was something that
10    was filed in bad faith.
11              And so the other aspect of the first word
12    that I talked about, name, that I wanted to talk
13    about, is kind of the issue of name calling.  And
14    we're going to talk about that a little bit when we
15    discuss bad faith.
16              And I say that, because I appreciated
17    Mr. Meyers' comments, because it is hard to sit
18    there when your professional reputation, as well as
19    your professional ability to practice in the future,
20    is on the line.
21              And that doesn't necessarily change things
22    all across the board, but I guess it does show that,
23    when you're dealing with very serious issues like
24    this and serious allegations, that, at bear minimum,
25    you shouldn't have a double standard.
```

```
 1          And I think this Court has looked -- this
 2   is obviously not the first time the Court has faced
 3   a Rule 37 or a 1927 situation.  And so this Court
 4   knows that it's somewhat equitable in nature, and
 5   that, therefore, the party that seeks their fees,
 6   particularly when they seek all of them, they have
 7   to also have clean hands.
 8          I think some of the cases say something
 9   along the lines of that those who live in glass
10   pleadings shouldn't throw sanction stones.  I am
11   certainly not accusing my esteemed colleagues over
12   here of any of that, but I do think it's important
13   to look at some of the double standards that have
14   happened in this case vis-a-vis the relief that they
15   sought in their motion.
16          For example, one of the things that they
17   seek relief for in this case is they seek sanctions
18   and claim that it was vexatious, bad faith,
19   improper, whatever nomenclature they want to use, to
20   say that Mr. Radbil shouldn't have gotten up there
21   in saying that the auto dialer was used three times.
22   And even if that wound up in the joint pretrial
23   order, which, in fact, it did, the argument by RAB
24   says, well, that's a mistake and they shouldn't --
25   should have known it was a mistake because it's
```

1    inconsistent with all of our other arguments.  Okay?
2           I'm not saying that that's an unreasonable
3    position at all.  The joint pretrial motion did say
4    that.  It does say joint.  It said so under the
5    defendant's portion.  And if they want to say that
6    that's a mistake, so be it.
7           But what then we look at -- by the way,
8    the joint pretrial order is Radbil Exhibit Number 6.
9    But compare that to the response to the pretrial
10   motions, I believe it's docket entry number 95.
11   That's the issue where there was a typo, where the
12   document should have said, "none of whom," but
13   unfortunately it said, "one of whom."
14          Their position is, look, our mistake on
15   the joint pretrial order, well, that's a mistake,
16   and you should have known it was a mistake based
17   upon other pleadings.  But with respect to this
18   pleading, well, you must have just done that in bad
19   faith, because, when it says, "one of whom" versus
20   "none of whom," we are entitled to believe and rely
21   upon that.  Even though five days earlier, docket
22   entry number 90 is the response to the motion to
23   strike experts where, the first time the motion is
24   filed, no response is even filed because they are
25   saying we are not even going to have any experts;

1    the second time the response indicated that --

2    docket entry number 90 says, there are no experts to

3    strike.

4              So five days later, when there is a

5    typo -- the point is, there is a typo.  There is no

6    bad faith there, and yet their position is, that's

7    not a typo, it's bad faith.  But when it came to our

8    same type of mistake, well, there's nothing wrong

9    with that, it's just a mistake.

10             The same thing happened with the

11   protective order.  In the spring of 2012, the

12   plaintiff asked for a protective order for the case

13   of fee bills; RAB says no.  Then, when it's time for

14   RAB to produce records, they want a protective

15   order.  So that's when it happens.

16             Mr. Martin sends to Mr. Radbil a

17   protective order and says, it's the same one we used

18   in the Lee case.  Mr. Radbil looked it over,

19   contacted him and says, that representation is not

20   true.  It's not the same one as the Lee case, and

21   you made some changes, your false statements to me,

22   notwithstanding.  Now it gets corrected; the

23   protective order gets entered.  We heard

24   Mr. Martin's testimony on that, where he said it was

25   just an honest mistake, and I am certainly not here

1   suggesting to the Court that it's anything but that.

2          But my point is, once again, it just goes

3   to show that even good lawyers, conscientious

4   lawyers, can make mistakes and we ought not to have

5   a double standard.

6          We saw it on the motion to compel.  RAB

7   found a motion to compel saying they didn't get any

8   testimony from Dr. White's deposition on damages.

9   And while there were some good faith disagreements

10  in the deposition -- and I'm not saying that there

11  was not a good faith basis to file the motion to

12  compel -- that particular statement was not

13  accurate.  There was a hearing on the motion, and

14  the motion was denied.  And of course they seek

15  their fees for that because they seek the fees for

16  everything.

17         And so I could go through and perhaps list

18  others, but I've got limited time.  And I just want

19  to point out to the Court that, when we're dealing

20  with the issue of double standard in the context of

21  what the standard of review is, I think it makes it

22  hard to find bad faith.

23         So let's now then --

24         THE COURT:  I will give you your time back

25  on this, Mr. Jefferson.  So what is the Court to do?

1    This is the sixth time we have been together.  You

2    have heard the frustration that sounded like was

3    coming from Judge Hughes in his transcript, and I

4    feel identically as he did from what I've seen in

5    this case.

6              You're right, one, two, three mistakes;

7    good, busy lawyers do this.  I've watched it for the

8    last 30 years, and no one gets sanctioned.  So what

9    do you do?  Are you saying that there's nothing that

10   should be done by the Court in this case by way of

11   sanctions?

12             MR. JEFFERSON:  You know, Judge, I'm

13   not -- I certainly don't want to suggest that I'm in

14   a better position than you.  But I think, frankly,

15   and I think Mr. Suazo will be man enough to admit it

16   that he stole it from me, but I think the most

17   profound thing that's been said in all of the time

18   that we have been together was one time when

19   Mr. Suazo was asking Mr. Radbil a question, and it

20   was a straight-up question, and Mr. Radbil, with all

21   due respect, he took a left turn at Albuquerque.

22   And you stopped him and you said you were

23   frustrated, and Mr. Suazo said, Your Honor, I'm

24   frustrated, because, when I ask Mr. Radbil what time

25   it is, he tells me how to build a watch.  And I

1    refer to that as the dark and stormy night syndrome.

2    And Mr. Radbil is not the first good person that I

3    have met with that particular problem.

4              But the dark and stormy night syndrome

5    basically is:  Tell me when you were born.  And the

6    answer is:  It was a dark and stormy night when

7    mother went into labor.  The stars were low and the

8    moon was high on the windswept plains, and suddenly,

9    without warning, her water burst.  Dad reached for

10   the keys to the Impala station wagon, and we went to

11   the Community General Hospital.

12             THE COURT:  You still haven't answered my

13   question, Mr. Jefferson.  You can pick every tiny

14   detail, and there are millions of them as to what

15   occurred in this case, and you have, and you've

16   given some discussion as to why it's not

17   sanctionable.  But I keep waiting for someone on

18   this side to say, this is wrong.  Lawyers don't do

19   this; lawyers don't behave like this; lawyers don't

20   treat their clients this; law firms don't promote

21   their law firms with lawyers like this.  This is

22   wrong.

23             Judge Hughes saw it, and obviously other

24   courts have seen it.  I am not hearing any of that.

25   I haven't heard it from Mr. Meyers or Mr. Radbil.

1    And with all due respect, I haven't heard it out of
2    the able defense that you have presented.
3             MR. JEFFERSON:  Thank you, Your Honor.
4    And I hope to cover that in the context of some of
5    the specific arguments.  But let me just briefly
6    tell the Court this.  Okay?
7             The Court is the factfinder.  And so just
8    like we don't get to substitute our views for the
9    jury, this Court already knows what the standard --
10   the standard of review is.  And I hope to go through
11   on the list of the things that they complain about
12   and provide to the Court a reasonable explanation.
13            THE COURT:  Which does answer my question,
14   if that's where you are going --
15            MR. JEFFERSON:  Yes, it does --
16            THE COURT:  -- is that no sanctions should
17   be imposed in this case.
18            MR. JEFFERSON:  Yes.
19            THE COURT:  Let's go there.
20            MR. JEFFERSON:  Very fair, because that's
21   actually -- that's actually the next thing.  But the
22   reason why I went through the dark and stormy night,
23   because it's a prelude to all of this because --
24   because it does go to show what I believe was the
25   basis for miscommunication between Mr. Radbil and

        1    the Court, which I think that the Court could

        2    rightfully take as somebody being disrespectful to

        3    the Court.  Because I have to tell you, when I am

        4    preparing -- and it's not been just Mr. Radbil.  I

        5    have had other people with the dark and stormy night

        6    syndrome.  It is incredibly frustrating.  It doesn't

        7    mean that Mr. Radbil disrespects me as an attorney.

        8    I happen to know from other comments that he's made

        9    that he doesn't feel that way.

       10          But under the heat of the moment, when we

       11    get into a role playing situation, although I'm not

       12    a psychologist or a trial scientist or anything like

       13    that, and so I can't give you a diagnosis, I can

       14    just tell you what happens.  And while it's

       15    frustrating, I don't think it is meant to be

       16    disrespectful.

       17          And the best example of that, which is one

       18    of the things that they complain about, is the whole

       19    issue of the failure to disclose damages.  And we

       20    have spent a lot of time on that particular issue,

       21    and that's one of the two things that they outline

       22    in their -- in their motion.  So let's talk about

       23    that 40,000-dollar one.  Okay?

       24          You know, Mr. Radbil struggled with the

       25    client on this one because he didn't believe the

 1    40,000 additional loan fees were recoverable against

 2    the debt collector, although Texas Guaranteed was

 3    something else.  And one of the reasons why the

 4    record was just supplemented -- and I won't read it

 5    verbatim -- but you now have in front of you the

 6    newly-added Exhibit 38, which was correspondence

 7    from Dr. White to Mr. Radbil that goes through that

 8    issue and says:  I know that I have to have

 9    documentation for this, and I'm looking for my copy.

10    It goes through this whole issue of damages.

11            I point that out because, at some point in

12    time Dr. White was saying, well, gee, I thought that

13    this issue would be brought up.  It was brought up

14    in the moderated settlement conference.

15            The e-mail communication shows that

16    Dr. White knew that there needed to be

17    documentation.  But unfortunately, when we get up to

18    the apex which is you, there is -- there's no doubt

19    about it.  There is a lack of communication to you.

20    Okay?

21            And so then the question becomes, is the

22    lack of communication to you a -- is it bad faith

23    and disrespect to the Court, or is it something

24    else?  And I think that as you've seen him interact

25    and when you look at the logic of the situation, I

1   frankly it's hard to believe that somehow or another

2   it was some sort of secret scheme to try to sneak

3   something past.  He doesn't bring it up in the

4   opening statement.  And the question that Mr. Radbil

5   asked didn't solicit a 40,000-dollar damage

6   response.

7          What Mr. Radbil was concerned about on

8   that particular issue is that he didn't want his

9   client to come across as a deadbeat.  Because a lot

10  of times when you have these type of cases, the

11  reason why people are getting the phone calls to

12  begin with and getting the letters to begin with is

13  because they have defaulted on some kind of

14  underlying financial obligation.

15         And I have never tried one of those cases

16  and don't claim to be an expert on them, but I do

17  understand from a general standpoint that that would

18  be an issue that you would need to debunk in front

19  of a jury, i.e., that your client isn't a deadbeat.

20         Now, I've got to tell you, I don't have --

21  I don't have a crystal ball to tell you why

22  Mr. Radbil had such a disconnect with what was a

23  straightforward question from you when you are

24  saying, where is it that you disclosed this

25  information?  And you asked him that question.  And

1    in your eyes -- and it was true, because you knew

2    what the intent of your question was.  Mr. Radbil

3    took the proverbial left turn at Albuquerque, and he

4    started talking about the issue of, well, you can't

5    quantify these type of damages because they are only

6    mental anguish damages, and I disclosed that.

7            And of course you're going, no, this is

8    not disclosed.  And you're asking him questions

9    about the $40,000.  And for whatever reason, he's

10   processing it based upon what he has disclosed in

11   the joint pretrial order.

12           And if you look at the joint pretrial

13   order, which is Radbil Exhibit Number 6, right,

14   wrong, or indifferent, this is how Mr. Radbil

15   defines actual damages:  Defendant's wrongful

16   conduct caused plaintiff to suffer legitimate,

17   actual damage.  Plaintiff's actual damage does not

18   only include any out-of-pocket expenses, but also

19   damages for personal humiliation, embarrassment,

20   mental anguish, and emotional distress.  And then he

21   cites authority for that.

22           And then he says:  The jury must determine

23   for themselves upon the consideration of the facts

24   of the case what damages have actually been

25   sustained by plaintiff in consequence of the

1   unauthorized and wrongful acts of defendant.

2        Okay?  That's what he disclosed, and

3   that's what he's talking about in this case.

4   Clearly, what happened with both the

5   miscommunication and with -- and with what

6   ultimately transpired was unfortunate.  But -- but

7   given the fact of what he put in the joint pretrial

8   order, given the fact that when the $40,000 comes

9   out on a question where he asks a general question

10  about actual damages that's not objected to, it's

11  hard to say that that was some sort of intentional

12  plan or scheme.

13       Now, the -- and the other issue on the

14  damages was the 5,000-dollar damage issue, but that

15  came out during Ms. Malone's examination and not

16  Mr. Radbil's examination.  And so that's the issue

17  with respect to -- to the issue of the failure to

18  disclose damages.

19       Now, the other issue was the failure to

20  disclose expert witnesses.  And once again, Judge,

21  you know, admittedly, there was a little bit of

22  disconnect there.  But at the end of the day, I

23  think if you go back and look at docket entries 90

24  and 95 that I discussed before, it's very clear when

25  they filed a motion to strike, he said, there are no

1   expert witnesses to strike.

2          Their apparent response to that is they

3   found a couple of entries in the Weisberg & Meyers's

4   fee records, both of whom are from paralegals, that

5   say, we sent a letter to an expert witness.  But

6   they clearly couldn't have -- or have never argued

7   that they somehow relied upon an entry from a

8   paralegal on those fee bills.  And more importantly,

9   the contemporaneous motion filed right before trial,

10  it kind of goes back to this double standard issue,

11  says, we don't have any expert witnesses.

12         Now, does that mean that the issue

13  couldn't have been handled better?  No, it doesn't.

14  But I would note that when I went through the Malone

15  law firm's fee records, it revealed spending extra

16  time working on exam outlines only once on February

17  the 14th for three hours.

18         Now, there was one other issue about these

19  witnesses, Judge, because I want to make sure that I

20  am completely candid here.  And that is at some

21  point in time a decision was made, and I think

22  perhaps it was an institutional decision, that we're

23  not going to talk to these witnesses in advance and

24  find out what they are going to say.

25         And I heard Mr. Meyers say that, and I saw

1    the reaction on your face, and I was told that I had

2    the same bad poker face and I had the same reaction.

3    So once again, I will admit, I have never tried a

4    fair debt collection practice act case.  So maybe

5    there is a reason why you don't talk to these people

6    in advance.

7              THE COURT:  I know that you don't think

8    that, Mr. Jefferson.

9              MR. JEFFERSON:  But as I said --

10             THE COURT:  In the interest of advocacy --

11             MR. JEFFERSON:  But --

12             THE COURT:  Let me finish.  In the

13   interest of advocacy, there isn't a first year law

14   student that would tell you that you should ever put

15   a witness on that you haven't talked to under any

16   circumstances.  The fact that someone might be able

17   to say you've been coached -- well, first of all, I

18   don't allow that in here because it's work product.

19   But certainly that has gone on in millions and

20   millions of trials, and that strategy makes no sense

21   under no circumstance.

22             So let's move on to another point.

23             MR. JEFFERSON:  That's exactly my point.

24   I just wanted to drop a footnote that maybe there is

25   some nuance about the Fair Debt Collections Practice

1    Act that I don't know about.

2           THE COURT:  I would prefer that you move

3    on to another point.  You are doing fine --

4           MR. JEFFERSON:  But --

5           THE COURT:  -- except for that, so just

6    move on.  I don't want to hear anything more about

7    that point, because it's a not a point that I think

8    has any validity.  So please move on to the next

9    point.  All right?

10          MR. JEFFERSON:  Sure.  Sure.

11          And Judge, the next thing that is argued

12   in this case is the -- are the other reasons.

13   Anyway, let me wrap up by saying that under Rule 37,

14   those are the two things, the failure to disclose

15   damages and the failure to disclose expert

16   witnesses.

17          Now, under the 1927, in addition to those

18   arguments which I have already addressed, they say,

19   well, this was somewhat of a trial by ambush, but

20   this goes back to that same economic actual damages

21   issue.  And frankly, it's illogical to suggest that

22   the plan was to not disclose the damages, not

23   disclose the witnesses; to file a motion saying you

24   don't have any expert witnesses, and then smuggle it

25   all past an experienced judge and then say, here

1    comes my opening statement, I'm going to start

2    asking for all of these particular damages.  That's

3    not what happened.  And if he did want to conduct a

4    trial by ambush, I think he would have directly

5    answered those questions in his short 25-page direct

6    as reflected in the record, and he didn't.

7            The next one that they argue is, well,

8    they negotiated in bad faith and they refused an

9    offer of judgment.  Well, I think the testimony here

10   as to Mr. Radbil is that that's above his pay grade;

11   that he's not the make-or-break person in terms of

12   settlement, he has to get authority.  And with

13   respect to their argument they rejected and ignored

14   the pre-suit demands, the evidence is pretty clear

15   that this was not his case to begin with.

16           So those allegations are not ones that are

17   specific to Mr. Radbil.  I would point out, however,

18   that when there was the moderated settlement

19   conference with the magistrate, the magistrate said

20   that the negotiations there, where Mr. Radbil was,

21   were negotiated in good faith.

22           So then they say, well, there has been a

23   multiplication of proceedings because they had to

24   file a motion to compel --

25           THE COURT:  Slow down just a little bit.

1    I will let you finish.

2         MR. JEFFERSON:  They multiplied the

3    proceedings because there was a -- because they had

4    to file a motion to compel.  The motion to compel

5    was ultimately denied as moot; things worked out,

6    and that's what lawyers are supposed to do.

7    Sometimes you file motions, and then after the

8    motions get filed you work them out, and that

9    happened on both sides of the street in this case.

10   They had to file objections to the disclosures we

11   have talked about that.  They had to file a motion

12   to quash on the subpoenas.  Okay?

13        Now, with respect to the subpoena issue --

14   again, I wasn't there.  But the Court had a minute

15   order that called for subpoenas or to make

16   arrangements to bring the witnesses to trial.  Once

17   again, this is a situation where there was a

18   breakdown in communication.  Mr. Radbil thought that

19   your order meant one thing; obviously, it didn't

20   mean that.  And so -- but I don't think that that is

21   any type of evidence of bad faith.

22        Then I think you have to look at their

23   other aspect of the multiplication when they talk

24   about all of the other motions.  Well, when

25   Mr. Radbil was on pleadings, he filed eight motions

1    in the 19 months that this case pended.  He filed

2    docket entry number 9, a motion to extend time under

3    the 26F conference, which was granted; docket entry

4    32, motion for leave to file under seal and motion

5    to compel.  And the motion for leave to file under

6    seal was denied, and the motion to compel was

7    granted in part.

8            Docket entry 38, emergency motion to

9    extend time to respond to a motion for summary

10   judgment, and that was granted over opposing

11   counsel's opposition.

12           Then there was docket entry 50, a motion

13   for leave to file a corrected motion for summary

14   judgment response.  It was granted over the other

15   side declining to say whether or not they were

16   opposed or not.  And I only point that out because

17   one of the complaints in this case was

18   that Mr. Radbil was not quick enough in returning

19   phone calls prior to trial with respect to issues

20   involving witnesses and exhibits and the like.

21           But if you look at the Certificate of

22   Conference in this motion, it goes and points out

23   that they never got a response from opposing counsel

24   on whether or not they were opposed.  And once

25   again, I'm not subscribing an ill motive towards

1    opposing counsel on that at all.  We lawyers get

2    busy.  If I have opposing counsel that are trying to

3    reach me right now, they are out of luck.  I will

4    get to them to tomorrow or when I get to them, and

5    that's what happens when you are in trial.  The

6    point being is that you can't take that one thing

7    and say, okay, well, that's evidence of bad faith

8    when it happens on both sides and it happens all the

9    time in the practice of law.  I could go on with the

10   other motions, but there are -- some of them are

11   things, like docket entry 83, a motion in limine,

12   and that's just part of the standard practice.

13           I think what is important is that there

14   was ultimately an estimate that the trial would take

15   approximately two-and-a-half days.  That's what the

16   parties said in the joint pretrial order, which is

17   docket entry 108, and the parties both estimated

18   two-and-a-half days.  Mr. Radbil called only two

19   witnesses, and that's how long the trial lasted.  So

20   it's hard to say, therefore, that the proceedings

21   were multiplied when they came in under budget or at

22   budget, so to speak.

23           Then they argue the issue, generally, that

24   the litigation was vexatious.  And in part they said

25   that what they really focused in on here was the

1    corporate rep depo and the trial policy manual

2    issue.

3          And you know, Judge, this is one of those

4    issues where you have to look at it and say, okay,

5    would a more experienced lawyer, knowing how to

6    handle this issue, when you have somebody who wears

7    multiple hats?  Okay.  And I think the answer to

8    that question is probably yes.  Okay?

9          And I don't know what his level of

10   experience was or the level of supervision that he

11   got.  But admittedly, the practice at the firm at

12   this point in time is, if you're going to call a

13   witness who is a third party, you don't even find

14   out what they are supposed to say in advance.  So I

15   find it hard to fault Mr. Radbil in that situation.

16   But the Court, you know, asked me to be candid on

17   certain issues where I would agree that, yeah, this

18   is something that could have been handled better,

19   and that's certainly one of them.

20          One of the other issues they have brought

21   up is the issue of the Weisberg & Meyers fee

22   contract.  I think the evidence in this case has

23   established that whatever the Weisberg & Meyers fee

24   contract says or doesn't say has no bearing on

25   Mr. Radbil because he has no input into it, no

1    ability to change it, and Mr. White's case was

2    signed up before it was assigned to him.

3            And then there was the issue about -- the

4    issue about counseling when not disclosed and the

5    sidebar ruling.  And Judge, once again, you know,

6    this is kind of the dark and stormy night deal in

7    reverse.  Okay?

8            I appreciate, because there are some

9    people that are this way, and I happen to be one of

10   these people.  There are some people, if you look at

11   them and you say, do you know what time it is?  Most

12   people would go, it's 1:54.

13           My -- because of my training, the way I

14   am, I would say, okay, objection, nonresponsive.  I

15   didn't ask you what time is it, I asked you do you

16   know what time it is, and that's a yes-or-no

17   question.  Maybe I asked you that question not

18   because I wanted to know what time it was, maybe I

19   asked you that question because I wanted you to pull

20   up your sleeve to see whether or not you had an

21   expensive watch on.  There may be some other issues.

22           The point that I am making here is that

23   there are some people who -- other people, like my

24   wife, for example, would say that, you know, you

25   just -- you just sliced the bread too thin for me

1    when it comes to the use of words.

2            And what we had happened in this situation

3    was frankly a poorly-worded question, which is --

4    but it is a matter of semantics.  He said to

5    Dr. White, did you seek or obtain counseling?  And

6    what he was looking to elicit from Mr. White,

7    according to Mr. Radbil's testimony, was the fact

8    that he made some appointmentS to go see some

9    doctors and that, thereafter, they were pulled down.

10   Okay?  That's what he was hoping to accomplish.

11           And I will be the first one to admit that

12   the question could have been asked better, because

13   in that situation you wouldn't need the word

14   "obtained" in the sentence.  His explanation is,

15   well, I was trying to highlight the distinction.

16   Okay?  And I get that.  Okay?

17           I think it's a bad distinction,

18   personally, as somebody who was a fellow wordsmith,

19   but that's what it is.  But I don't think that you

20   can jump, therefore, to the presumption to say he

21   asked that question with the intentional purpose of

22   eliciting some sort of coached testimony.

23           THE COURT:  Now, this is the area where we

24   had the sidebar because of an objection, correct?

25           MR. JEFFERSON:  Exactly.

1            THE COURT:  And I asked him, after I heard

2    what the objection was -- that's going to be a fire

3    alarm, which is for the first floor.  So maybe we

4    can get our court security officer to see if they

5    can turn the volume down.

6            So Ms. Malone objects to that; they come

7    around sidebar; she tells me why she's objecting.

8    And I asked him the question as to -- he said

9    something to the effect that he didn't know what he

10   was going to say, but I asked him if it was going to

11   be favorable, and I believe he said yes.  Is that my

12   correct recollection?

13           MR. JEFFERSON:  Yes, Your Honor.

14           THE COURT:  That doesn't square with that

15   theory that you just posed.

16           MR. JEFFERSON:  Respectfully, Your Honor,

17   I believe it does, because what he thought he was

18   going to say that was favorable was, I made some

19   appointments to go see the doctor.

20           THE COURT:  He said he didn't know what he

21   was going to say.

22           MR. JEFFERSON:  Well, I get you.  Okay.

23   In other words, it kind of goes back again, okay,

24   you meet with a witness, but you don't necessarily

25   coach a witness.  And so I get that once again we

1    have a communication -- you know, I keep using the

2    word difficulty.  There's probably a better word, I

3    just can't come up with it at the moment.

4          Noah has in his mind what he thinks that

5    the answer is going to be, and he knows where he's

6    going.  And as we have found in other situations,

7    you know, sometimes that road is not going where it

8    needs to go; sometimes that road is going to

9    Albuquerque.  And that's the point that I'm making

10   here, is that in Noah's mind he's saying, I talked

11   to him about this issue, I haven't asked him this

12   particular question, but here's what I'm hoping that

13   the answer is going to be.

14         So then that goes back to the question of,

15   well, could the witness have been better prepared?

16   Well, yeah, I think the answer to that question is

17   yes.  But the fact that the witness was not prepared

18   better I don't believe is the same thing as bad

19   faith, and that's the only point that I am trying to

20   make.  I am certainly not trying to suggest that the

21   Court's recollection of the sidebar is incorrect,

22   because I believe you have recited it correctly.

23         The next thing that they argued is that

24   they failed to provide trial exhibits to the Court,

25   and there was an issue about the compliance with the

1    Court order.  And you know what, Judge, that's

2    another one of those things.  Okay?  That happened

3    in this case.  That happened in this case.

4            And so then the question becomes, why did

5    it happen in this case?  And I think the testimony

6    was, was that Weisberg & Meyers had problems with

7    their fax machine back at the home office.  That was

8    the place that was giving Mr. Radbil support for a

9    Texas-based lawsuit, was the office back in Phoenix,

10   he's in Texas, they're in Arizona, and he is

11   actually at a hearing in Houston, I believe, so he

12   does the best that he can.

13           Now, does that mean, therefore, that he

14   didn't violate the Court's order to actually

15   physically exchange the exhibits?  No, it doesn't.

16   But I certainly don't think that you can say, A,

17   that Mr. Radbil, as a nonpartner, salaried

18   associate, should be strictly liable for the amount

19   or lack thereof for the administrative support that

20   he gets.

21           And I think under the circumstances he did

22   a commendable job of doing the best he could by

23   having a cab driver take him to the Federal Express

24   office and taking on this paralegal-type task

25   himself.

1           And so once again, that's something that
2   the Court has to look at, because by the letter of
3   the law, that's clearly a court order that wasn't
4   followed.  Then the question becomes, is that
5   Mr. Radbil's fault or is that somebody else's fault?
6           THE COURT:  All right.  Let's give this a
7   second.  We were told this was going to happen this
8   afternoon a few days ago.  It's a rehearsal, and it
9   doesn't effect this, but let's see if we have any
10  information.
11          (Pause in the proceedings.)
12          THE COURT:  They are going to try to get
13  the volume turned down.  I want to keep going.
14          MR. JEFFERSON:  Actually, it's not really
15  bothering me, Judge.
16          Just to go through some of the others,
17  they had the issue of talking about they called and
18  e-mail approximately 20 times on Saturday before
19  trial; we have already talked about that issue.  We
20  had the issue about telling the client that he
21  should be at the deliberations and not having to be.
22          And so what Mr. Suazo did this morning
23  with Mr. Radbil was to go through the text messages,
24  which I think put all of that in context.  And when
25  you see those text messages, what Dr. White says is

1    that he said, in essence, look, I've got a lot of

2    handicapped-type patients and they need me, and

3    that's where I really need to be.  So I can't

4    explain why Dr. White said to the Court what he

5    said.  Okay?  I can't.  But I know what the e-mails

6    show -- or the text messages show, and they show

7    exactly what Mr. Radbil's testimony was.

8         We've talked about some of the other

9    issues like the automated calling device; I dealt

10   with that issue up above.  The protective order, I

11   dealt with that issue up above.  And then there was

12   the issue about his failure to file an earlier

13   motion to compel to get redacted records and asking

14   the Court to review them in camera.  Okay?

15        Judge, this is another one of those areas

16   that the Court may be correct, that an earlier

17   motion to compel may have addressed the issue.  But

18   you know, the other way to look at it is, is that

19   the practical approach of reviewing a few pages in

20   camera before trial as opposed to filing an actual

21   motion, which they would then argue, I guess, was

22   vexatious.  It certainly wasn't abusive.  From a

23   trial standpoint, if I was handling that case, you

24   know, would I have wanted to have that issue heard

25   sooner?  Well, sure I would have.  Okay.  Absolutely

1    I would have.  But a strategic timing mistake is not

2    the same thing as bad faith.

3              And neither is the other issue that they

4    talk about, about wanting to call the witness twice

5    in a row.  I mean, I saw that happen -- I saw that

6    happen in this hearing when, after I had

7    cross-examined Mr. Martin, Mr. Meyers asked, well,

8    will he get to go now, or will we just recall all

9    these people.

10             THE COURT:  Are you talking about the

11   corporate representative?

12             MR. JEFFERSON:  Yes.

13             THE COURT:  I mean, the whole problem with

14   that is, we have been over it ad nauseam, is that he

15   was arguing with an argument that had a false

16   premise; it was disingenuous.  And again, in a

17   vacuum, perhaps, it could have been explained, but

18   it's just a pattern of so many of these and a

19   refusal to acknowledge.  All right.  I don't mean to

20   interrupt you, but . . .

21             MR. JEFFERSON:  Well, yeah, and certainly

22   defendants have been known to have someone speak in

23   different capacities.  And I think a more

24   experienced lawyer may have indeed handled that

25   situation differently.  He was here trying the case

 1   by himself, doing the best that he could, but I

 2   don't think that that equates to the issue of bad

 3   faith.

 4         And you know, you may remember when I

 5   cross-examined Mr. Martin -- I mean, I just met him;

 6   he's a delightful fellow.  I enjoyed actually

 7   meeting his dad and chatting with him about mutual

 8   friends.  I thought he was very forthright.  And I

 9   asked him some questions toward the very end, and

10   one of them was kind of tough, and it was the

11   cross-examination about bad faith.  And I finally

12   asked the question, I said, you know, let's exclude

13   everybody else on the planet except you and

14   Mr. Radbil.  And ultimately the response I got was,

15   well, you know, I've just had some problems dealing

16   with Mr. Radbil and his firm in a lot of these kind

17   of cases.

18         And I'm not here to dismiss any of his

19   testimony, but what I am suggesting is that, when we

20   asked for the particulars of bad faith, that's the

21   answer that we got from them.

22         THE COURT:  Mr. Jefferson, that's the

23   whole unique problem here in this case.  It's an

24   aberration from normal Rule 37, 1927 bad faith

25   conduct type of lawyer issues.  It's a pattern.

1   It's a pattern of promoting incompetence and then

2   ignoring it and refusing to admit that it's going

3   on, and it obviously happened in Houston, as well.

4   I mean, it's -- there is not a case out there on the

5   case books where this kind of conduct has gone on

6   that I could find, and I haven't seen any that have

7   been submitted.  It's beyond the kind of thing most

8   lawyers would even think about allowing to continue.

9   I'm not talking about you, I'm talking about the

10  lawyers in this case, Mr. Radbil and Mr. Meyers.

11  It's very worrisome.

12          MR. JEFFERSON:  Your Honor, I'm certainly

13  not dismissing the daunting task that the Court has.

14  I would point out that, respectfully, I don't

15  believe the Court has the ability to sanction

16  anybody over here for activities that happened in

17  the Court.

18          THE COURT:  Right, but -- but the problem

19  is, since no one involved, Mr. Meyers and --

20  Mr. Jefferson, I appreciate -- I know you are

21  looking at your notes, but I appreciate you looking

22  at me -- Mr. Meyers or Mr. Radbil will agree that

23  anything they did was wrong, that the Court has to

24  look to their credibility.  Are they telling me the

25  truth?  Are they making this up?  Because it looks

1    like they are making it up.

2          And all circumstantial evidence, I think,

3    is relevant and permissible to consider what

4    happened in this case, their intent and the

5    truthfulness of what they have told me in this case.

6    And if they are telling me one thing and I am

7    hearing Judge Hughes in a case that went on during

8    this saying exactly what this Court is thinking,

9    well, that's circumstantial evidence at least of

10   their intent and their motives in this case.

11         MR. JEFFERSON:  Yes, and I certainly

12   understand the Court's argument there.  And in fact,

13   I think we objected to some of the -- some of that

14   testimony early on on the basis of relevance, and

15   this Court gave us that explanation.  So we clearly

16   understand where the Court is coming from.

17         So I certainly don't want to get down in a

18   debate over what transpired in all of those cases.

19   I do know a little bit about the Scarlott case based

20   upon the testimony from Mr. Radbil this morning.

21   And once again, that was a case that was not filed

22   by him that he inherited, again, from Mr. Kurz who

23   started the downhill snowball rolling by apparently

24   having 55 cases filed in federal court in Texas

25   without being certified in the various districts.

1             But that's not the -- that's not the fault
2      of Associate Radbil.  Now, it is his fault, and
3      certainly he has to answer for some of the other
4      things that the judge found in that particular case.
5      I understand that there was not an evidentiary
6      hearing like you have afforded in this case, and I
7      know that they are taking the matter up on appeal.
8             So again, I'm not trying to dismiss what
9      the Court is saying about looking at it from
10     circumstantial evidence.  But I guess the point that
11     I'm trying to make is that whatever faults that the
12     Court may find with the law firm should not be
13     imputed to the associate who has inherited files or
14     who doesn't have control over such things as the fee
15     contracts.  That's the point I'm trying to make.
16             THE COURT:  Of course that would be unless
17     he was complicit and knew what was going on and
18     acted accordingly, and that's the question.
19             MR. JEFFERSON:  Yes.  And you may recall
20     that I asked Mr. Meyers those questions to elicit
21     those responses, and I appreciated his candor when
22     he said that that was not -- that did not fall
23     within the ambit of Mr. Radbil's job or job
24     description.
25             THE COURT:  Right.  But Mr. Meyers would

1   not be the only source the Court would rely upon in

2   order to determine that particular fact.

3           MR. JEFFERSON:  Fair.

4           THE COURT:  All right.

5           MR. JEFFERSON:  And so frankly, Judge, in

6   my brief remaining moments here, it kind of gets to

7   my last point of the issue of the shame, because

8   what happened here was certainly a shame.  And you

9   know, Mr. Radbil had tried to tender a check before

10  for the time that he was late.  I understand

11  Ms. Malone's position, that she didn't want to take

12  it because she didn't feel that she could, and I

13  know that Mr. Radbil still stands ready, willing,

14  and able to personally pay for that, and he offers

15  no excuses.

16          THE COURT:  That's a 650-dollar check?

17          MR. JEFFERSON:  It's -- it's 175 and 140

18  added together times two hours plus interest --

19          THE COURT:  All right.

20          MR. JEFFERSON:  -- is I believe what the

21  calculation was.

22          The -- but the point is, though, is that

23  it would be a shame to hold Mr. Radbil personally

24  responsible for clerical matters or lack of support,

25  and he already has this sanction issue hanging over

 1   his head.

 2         Ms. Malone made the point when she was

 3   cross-examining Mr. Meyers about, well, you know,

 4   you can't -- you say you can't endorse Noah Radbil,

 5   but then you send him to the Scarlott hearing on the

 6   motion for sanctions.

 7         And I am not suggesting that Mr. Meyers

 8   has offered up Mr. Radbil as any sort of sacrificial

 9   lamb, but the fact of the matter is, the guy has got

10   no job, no health insurance; he's still offering to

11   personally pay for things.  And I know that because

12   of the nature of his personality.  And I think the

13   Court -- and certainly I know from talking to

14   opposing counsel -- that they doubt the sincerity of

15   his actions.

16         And all I can say about that is that --

17   well, I will just use some of the quotes that this

18   Court said, and I will try to get them right.  I

19   think that this morning, for example, you said that

20   you believe that Mr. Radbil has a wholesale lack of

21   experience; that he had no clue on how to get in

22   witnesses; that you had talked previously -- and as

23   we kind of, I don't want to use the word joked, but

24   we interchanged about the issue of the firm policy

25   of not finding out what third-party witnesses are

1    going to say until they show up the first time on

2    the stand.  Those are serious issues.  And those are

3    issues that can be addressed by the Court in

4    whatever way that they think they need to do with

5    respect to the law firm.  And obviously I don't

6    speak for them, but with respect to Mr. Radbil, I

7    don't think that the answer to that question is

8    saying that, you know, you should have learned that

9    by the age of 32 and you haven't, so therefore

10   you're going to be disbarred in the Northern

11   District of Texas, which means you will therefore

12   have to report it back to the other districts.  And

13   then the domino effect is, in essence, that he

14   becomes unemployable.

15          Again, that is certainly up to the Court

16   under its inherent powers.  But again, I go back to

17   Mr. Meyers' apology when he pointed out how hard it

18   is to maintain one's cool when you are being called

19   a liar.  I have represented in the past and continue

20   to represent a lot of lawyers, and humble pie is

21   hard to eat for anybody, and it's particularly hard

22   to swallow for lawyers.

23          And I'm not suggesting to the Court that

24   any of the defendants over here have a full stomach,

25   but I also don't think they need a stomach-ectomy if

1     that's a word.

2           THE COURT:  Mr. Jefferson, I understand.

3     I appreciate that you are here.  I think it's helped

4     quite a bit that Mr. Radbil has counsel just in the

5     communication of this.

6           It's just very frustrating to not -- still

7     not know what really has gone on between the Meyers'

8     firm and Mr. Radbil and what actually caused all of

9     this to occur.  But I have watched lawyers for --

10    since I've been on the bench since 1990, for the

11    most part, in sanctions hearings.  And invariably,

12    even the ones that have committed the worst conduct,

13    it's usually one or two incidents, and if they don't

14    admit it, that's fine.  But it's never -- most

15    lawyers, even the worst conduct, will come forward

16    and say, I'm sorry, I want to respect the

17    profession, I'm going to do this better, and there's

18    an honesty there about what's gone on.  That hasn't

19    occurred here.  We've had six hearings just trying

20    to get that, and nothing close to that has occurred.

21    So I don't agree that this is characteristic of

22    other lawyers involved in sanctions hearings at all.

23    This is an aberration from anything I have ever

24    seen.

25          MR. JEFFERSON:  Well, I didn't mean to

1    equate anybody in this case to any of my prior

2    cases.  I was making a general statement.  And

3    certainly I hope that Mr. Suazo and I have done

4    nothing to inhibit Mr. Radbil from making those

5    statements.  But I guess what I would point out in

6    my final remarks would be this, and it's why I went

7    back and I told Mr. Radbil that I was going to talk

8    about the dark and stormy night syndrome, because I

9    said it to him right after we first met.

10            And the fact of the matter is he -- he has

11   some communication quirks.  I mean, I remember for

12   example one time you -- you thought that Mr. Radbil

13   was making some unusual facial gestures when he was

14   trying to get our attention about a document.  There

15   was another time in the hearing --

16            THE COURT:  Well, he was.  Let's wrap this

17   up.  You're far --

18            MR. JEFFERSON:  Yeah, these are my last

19   comments.  There was another time that you thought

20   that maybe he was trying to intimidate Mr. Meyers,

21   and you said something --

22            THE COURT:  Well, it looked like he was.

23            MR. JEFFERSON:  Exactly.

24            THE COURT:  That's the point,

25   Mr. Jefferson.  I think you have made that point.

1    Let's move on to the final comments, because it's

2    time to wrap it up, and those areas are not getting

3    you anywhere.

4            MR. JEFFERSON:  Judge, that was my final

5    comment, and that would be simply this, is that I

6    get -- I completely get, and I think Mr. Radbil

7    gets, that you believe that he has demonstrated a

8    lack of respect for the procedure.  And the only

9    thing that I am saying is, is that when I first

10   dealt with Mr. Radbil, I completely understood where

11   that came from.

12           And my only point about bringing those

13   things out was to simply say that some of the

14   communication quirks that you have for Mr. Radbil

15   are just that, communication quirks, because they

16   are the same -- they are the same dealing with me,

17   and he's paying me.  So thank you for your time.

18           THE COURT:  Thank you, Mr. Jefferson.

19           Ms. Malone?

20           MS. MALONE:  Actually, it's Mr. Martin.

21           THE COURT:  Mr. Martin.

22           MR. MARTIN:  Thank you.  If I could get a

23   five-minute warning when my time is approaching?

24           THE COURT:  Yes, I will.

25           MR. MARTIN:  Thank you.  What we have

 1   heard here is not attorneys for consumers, but

 2   rather attorneys for greed.  And to do that, they

 3   have taken advantage of consumers and posed a threat

 4   to consumers trying to recover attorney's fees under

 5   a fee shifting statute.

 6         What we have also seen, as the way these

 7   proceedings have shaped, is it simply appears that

 8   plaintiffs' attorneys came down here for a slap on

 9   the hand, and even now it seems they will only admit

10   that Mr. Radbil was late for court.  We really have

11   seen no genuine apology and no genuine remorse about

12   what has happened, and it's simply shocking.

13         We've also seen that this firm thinks

14   sanctions or the threat of sanctions doesn't seem to

15   mean anything unless there is money attached to it.

16   And it's money that seems get their attention.  Even

17   when the courts have sanctioned them monetarily,

18   they seem to justify what happened.

19         The Colorado Court was wrong in one case,

20   and the Tenth Circuit upholding that case was wrong

21   as well.  Clearly, the sanction has to be punitive

22   to get their attention and also to protect

23   endangered consumers, as this Court has mentioned.

24         First, to deal with Regional Adjustment

25   Bureau's or RAB's motions for sanctions under

1    Rule 37, a court imposes discovery sanctions to:

2    One, secure compliance with the rules of discovery;

3    two, to deter others from violating them; and three,

4    punish those who violate them.  I am reading from

5    the case, National Hockey League v. Metropolitan

6    Hockey Club, Incorporated, 427 U.S. 639 at 643,

7    1976.

8            And in this case it's clear that

9    plaintiff's counsel tried to sandbag Regional

10   Adjustment Bureau at trial, and the evidence is

11   overwhelming.  First, to address the issue with the

12   experts -- experts, additional witnesses, they

13   disclosed them late in the game.  And their excuse

14   for that is that Dr. White had not disclosed any of

15   these people until they were actually included in

16   their pretrial disclosures or supplemental pretrial

17   disclosures.

18           Well, that completely ignores the

19   discovery deadline in this case in actually telling

20   their client that we need this information by this

21   deadline.  It just completely ignores that and

22   supports the position that they are being

23   sandbagged.

24           And then, to focus on the $45,000 issue or

25   at least the 40,000 and interest and those issues

1    just regarding those actual damages.  First, when

2    Mr. Radbil was asked by the Court during trial,

3    Mr. Radbil stated that the damages were disclosed in

4    the pretrial order.  When the pretrial order was

5    looked at and it wasn't there, he then said it was

6    disclosed at the mediated settlement conference.

7    After that was discussed, he then went back to

8    saying the pretrial order, but then said they

9    weren't sure if they disclosed a specific amount.

10   It keeps changing.

11           After that, we can, in plaintiff's

12   response to RAB's motion for Rule 37 sanctions,

13   which is docket entry 125, plaintiff's counsel chose

14   to argue that the actual damages memo, not a mental

15   anguish memo, was privileged, protected from

16   disclosure, and it was RAB's fault for not

17   requesting a court ruling on the privileged material

18   and failing to show any substantial need for the

19   memorandum or that it could not obtain equivalent

20   evidence through its client, Texas Guaranteed.

21   That's talking about the increase in interest and

22   dealings with the student loan, added out-of-pocket

23   damages or economic damages attributable to RAB's

24   contact -- RAB's conduct and their allegations.

25           Then moving on, in the same briefing,

1    plaintiff's counsel and Dr. White argue that

2    Dr. White also separately disclosed that he would

3    seek economic damages in an amount to be determined

4    by a trier of fact at trial.  There's a separation

5    here between economic damages and mental anguish.

6    Both of them were sought in this.  And it's clear

7    that they were both sought looking at their initial

8    disclosures where it says actual damages.

9            Moving on, at trial, in plaintiff's

10   counsel's absence, we heard Dr. White state that he

11   prepared a memorandum on these damages and was

12   assured they would be presented at trial.  To read

13   from the transcript, from February 27th in the

14   trial, page 17, line 16, Mr. White stated:  I did

15   quantify the damages, and they were not in abstract

16   sum for mental anguish, they were real, financial

17   damages that I suffered.  I made sure Mr. Radbil had

18   that information.  The judge recorded it in the

19   settlement conference, and I was led to believe it

20   would be submitted for this trial, which of course

21   it wasn't, so I apologize.

22           And now, just today, we have seen the

23   December 6th memo, which is now RAB's Exhibit 45,

24   which completely proves our point about these

25   damages.  They really did seek these damages, and

1   now we are seeing the memo that shows them, shows

2   they reviewed them, and nothing to show that they

3   ever advised them that they would not be submitted

4   at trial, not be submitted in pretrial disclosures

5   or whatever.  It's pretty clear they sought these

6   damages and just withheld them from defendant's

7   counsel.

8           Again, with the $40,000, the whole story

9   that we have heard in these proceedings is that

10  plaintiff's counsel had told Dr. White that those

11  damages were not recoverable.  And just today, with

12  this memo and everything, and then with the e-mail

13  supplementing, I believe it's Radbil Exhibit 38, now

14  we hear that the reason that they weren't submitted

15  at trial or pretrial is because Dr. White could not

16  find the evidence.  So there again, the story

17  changes.  And I will admit that this Court expanded

18  my vocabulary with the word prevarication.  That's

19  all we see here, is the prevarication and the

20  changing of the stories.

21          Judge Hughes, in the Scarlott transcript,

22  pretty much hit the nail on the head when he said

23  that when plaintiff's counsel hits a dead end, they

24  simply reform their story and go with another one,

25  and that's all they have done here.

1          And again, just kind of rehashing how they

2     argue in these hearings that he did not seek an

3     actual damages amount.  They just were going for a

4     general, you choose, we're not going to tell you

5     what to choose, but just a generality, a number for

6     actual damages.  They argued this in the briefing,

7     as well, in docket entry 125.

8          Well, how is it that the settlement

9     demands, the history of that in this case, seemed to

10    reflect a jump of those actual damages that they

11    apparently advised him that weren't recoverable or

12    did not seek at trial.  We see the jump that

13    essentially correlates with that 40 or $45,000.

14         We see that number is also reflected --

15    well, first we saw that number based on Dr. White's

16    answer from a question that Mr. Radbil asked him.

17    That number came elicited from a question by his

18    counsel.  The clear point is they sought these

19    damages.

20         To repeat what this Court had said

21    previously, there is no indication whatsoever during

22    that exchange that this was a rogue response, which

23    lends again further force to the defense position

24    that there has been a just -- just a constant,

25    consistent amount of fabrication and lying and

1    prevarication in this case by Mr. Radbil.

2            And to summarize on the Rule 37, RAB has

3    incurred $2,989 in costs for drafting its motions on

4    Rule 37 and incurred $6,681.50 in costs from the

5    pretrial issues caused by this discovery abuse.

6            Moving on to the 1927 motion, as well as

7    this Court's inherent power.  And briefly, as a

8    purview, RAB believes at a minimum it should be at

9    least compensated for all of its time and expense in

10   these hearings.  I think everyone can agree that

11   these have gone on much longer than anyone ever

12   anticipated, and frankly they are not enjoyable for

13   anyone.

14           But under 28 United States Code 1927, the

15   three elements of these sanctions are:  One, the

16   attorney must engage in unreasonable and vexatious

17   conduct; two, conduct must multiply the proceedings;

18   three, the amount of the sanction cannot exceed the

19   costs incurred due to this unreasonable conduct.

20           And back to my previous statement about

21   these hearings, it is clear that all of these

22   hearings have been the cause of unreasonable and

23   vexatious conduct.

24           The conduct also multiplied these

25   proceedings.  We have obviously been here for all of

1    these hearings, and that is clear multiplicity of

2    the proceedings.

3            And then, the amount of sanction cannot

4    exceed the costs incurred.  We have broken down the

5    costs since posttrial and postbriefing.

6            And then, last, the Court, as I stated,

7    can also use its inherent power to levy sanctions

8    against plaintiff's counsel.

9            So based upon the conduct at this hearing

10   and the conduct and representations in these

11   evidentiary hearings, these sanctions must be

12   punitive to stop this kind of behavior that appears

13   to come from the very founders of Weisberg & Meyers.

14           We have seen Mr. Meyers stand by

15   Mr. Radbil's conduct, and, furthermore, we have seen

16   sanctions levied against his other named partner,

17   Mr. Weisberg, in other cases.

18           Here, we have seen kind of a prevalent

19   theme that the apple has not fallen far from the

20   tree and that the roots of the tree are poisonous.

21           We have -- just in these proceedings, we

22   have seen similar conduct from Mr. Meyers, and

23   honestly it's hard to determine who is the true root

24   of the problems with what we have witnessed here.

25           And so far, to break down some of the

1    misrepresentations, there's kind of two elements in

2    here, misrepresentations and just fundamental

3    misunderstandings of how to practice law.  To break

4    down the misrepresentations that we have seen by

5    Mr. Radbil, we have seen his biography on the

6    website, the show cause orders in the Washington

7    cases and the misrepresentations to those courts.

8              We have seen his failing --

9              THE COURT:  Talking about the

10   representation that he represented a major league

11   baseball player.

12             MR. MARTIN:  I kind of lumped that into

13   the biography on the website.  With the Washington

14   cases, I am referring to the pro hac vice

15   applications, with the address, the bar number,

16   et cetera.

17             Failing to inform the Court that Regional

18   Adjustment Bureau's corporate representative's

19   deposition was actually taken twice, and that

20   situation was similar to the e-mails offered about

21   myself, which is just not wanting to give the Court

22   the whole story.  What I am referring to is having

23   to do with the protective order, how they left out

24   the e-mails where I worked as fast as I could to

25   correct that issue, explain what happened, and get

1    an agreeable protective order.

2            On the lines of the protective order, in

3    pleadings, Mr. Radbil stated that he never received

4    the protective order that was proposed before the

5    eve of the deposition, where, in fact, attached in

6    the briefings in this case we actually have the read

7    receipt notice from the previous e-mail where it had

8    been provided to him that he claimed he had not

9    received.  We have the read receipt notice stating

10   that after he said this in a briefing, he had

11   deleted that e-mail without ever reading it.

12           And also, just to clarify the issue of us

13   refusing to enter a protective order, well, that

14   offer from plaintiff's counsel occurred after we had

15   filed a motion to compel.  I believe plaintiff's

16   counsel agreed to finally produce their fee

17   agreements in this case, and Judge Kaplan's order

18   reflected that.  It said nothing about a protective

19   order.  Judge Kaplan said, you have to turn this

20   over, and we refused to enter a protective order for

21   that.

22           Judge Kaplan didn't require it, and it

23   wasn't required, and so we refused to enter one at

24   that time.  However, we did want to enter a

25   protective order to protect our client's trade

1   secrets and whatever personal information,

2   et cetera, may be contained in the documents for

3   production.

4        So moving on, we also heard how White said

5   that he was told that the damage would be submitted

6   to the jury -- or to the Court.  But in this

7   hearing, we heard how Dr. White was advised that

8   they shouldn't ask for those damages, yet they asked

9   for them in the mediated settlement conference.  It

10  all just doesn't make sense, and it's just further,

11  again, prevarication.

12       Both attorneys expressed here that the

13  damages came out of nowhere; yet, after the fact, we

14  see these memorandums, especially the one today that

15  Dr. White gave to his counsel, and not one but two

16  attorneys reviewed these memos, yet nothing was ever

17  produced to defendant's counsel.  Seems like there

18  was never even a consideration of should any of this

19  be supplemented and be produced to RAB's counsel.

20       We heard about the expert witnesses and

21  the argument about the late designation of fact

22  witnesses and they were not going to give expert

23  testimony.  And then you got the pleading that says,

24  "one of which will give expert testimony."  It's an

25  alleged typo, but their billing invoices contain an

1    entry by Melissa Norton stating, "Prepare letter to

2    expert re: date for trial, to attorney for review,

3    and prepare for mailing."

4         Who is left to plant this idea of an

5    expert witness into a support staff or paralegal's

6    mind but her supervisors, the people supervising

7    her, giving her instructions, et cetera.  There's

8    almost no way that she would all of a sudden think,

9    we've got an expert witness or a mislabel or

10   misnomer a witness as an expert witness.  And then

11   that's even correlated with the pleading that says,

12   "one of which will give expert testimony."  And

13   we're talking about a handful of doctors; we are

14   talking about a plaintiff, Dr. White, who has a

15   serious medical condition and is claiming all of

16   these alleged mental anguish damages, an expert is

17   required in this case.  So it doesn't make sense

18   that no experts -- no witnesses were going to give

19   expert testimony in this case.

20        And last, we heard Dr. White state,

21   himself, that he did not know or understand the

22   consequences of our Rule 68 offer of judgment.  That

23   happened the last day in trial when his counsel

24   wasn't present; he said he did not understand the

25   repercussions of Rule 68 when questioned by this

1   Court and when raised by RAB.  And now, one of the

2   pleadings in this case is an affidavit that states

3   that Mr. White actually did understand Rule 68.  So

4   it just doesn't make sense.

5        And to shift to misrepresentations by

6   Mr. Meyers, again, the misrepresentations on the

7   website fall in his lap, too.  We heard he is the

8   gatekeeper, as well as the owner of the website, and

9   he takes responsibility for the content on his site,

10  which is also a site that he uses to solicit

11  business for his firm.

12       We reviewed the Twitter accounts and the

13  advertising of the White case after it was tried and

14  ultimately lost by plaintiff's counsel.  It was also

15  soliciting Texas consumers, and the tweet also

16  stated that Texans need a Texas-sized

17  representation, after he seemed to have said that he

18  was no longer taking Texas clients due to these

19  proceedings.

20       We heard him state that it was a rogue

21  client regarding the testimony on damages, but all

22  of the evidence put together, it doesn't appear that

23  it was a rogue client.  He was actually the first

24  person to state that it seemed like a rogue client

25  and Dr. White's mistake.

 1          We heard about the Stovall case, where his
 2   co-senior partner of the firm was sanctioned for
 3   misrepresentations to the Court in suborning
 4   perjury, which was also found on both the trial and
 5   appellate level.
 6          We heard him say that they were not
 7   engaging any new Texas state clients in light of
 8   these proceedings.  And that's kind of odd, because
 9   I'm not sure if too many people actually describe
10   clients as state or federal clients; you have state
11   and federal cases or claims.  And the crux of this
12   is that all of these types of consumers, consumer
13   complaints, they can be filed in both state and
14   federal court.
15          There's just no weight to this argument
16   that he states that they weren't taking Texas
17   clients and then going around on October 24th filing
18   a case in, I believe, the Southern District that we
19   testified to.  And it was also filed only under Joe
20   Panvini's name, rather than Mr. Meyers.  And that
21   came subsequent to Volume 3 of the sanctions
22   hearings, page 112, lines 18 through 20, where
23   Mr. Meyers stated:  It will never happen again by
24   anyone at my law firm, only me, given that these
25   will all be cases that I handle myself.

1              After he made that statement, a case was

2     filed in either the Southern or Western District by

3     his firm.  His name doesn't appear on the docket

4     sheet and doesn't appear as the signature block on

5     the case.

6              And even more so, we have actually found

7     out in between the last hearing and this hearing

8     that another case was filed in the Western District,

9     a class action complaint titled -- it's in the

10    Western District, Maynard v. DOS Enterprises,

11    et al., Case 1:13-CV-00988-SS, an alleged class

12    action complaint filed in the Western District.

13    Only Mr. Panvini shows up on the signature block

14    again, and Mr. Meyers does not show up on the docket

15    sheet.  And Mr. Panvini, the one who signed on it,

16    he is the attorney that Mr. Meyers testified to that

17    has never tried a case.  So you have an attorney who

18    has never tried a case seeking class certification

19    in the Western District.

20             And then finally, we also heard Mr. Meyers

21    talking about separating from Mr. Radbil; how he

22    would not recommend him to anyone.  And then

23    Mr. Radbil represented his firm in front of Judge

24    Hughes in the Scarlott case just days after the

25    those statements -- or actually the day after those

1    statements.

2         And I do want to say that we heard

3    Mr. Meyers' closing argument, stating that he is

4    winding down the law firm and concluding

5    representations.  He makes that statement just, I

6    believe, 14 days after he filed a class action in

7    the Western District, so. . .

8         And then I stated that there are two

9    things, misrepresentations and fundamental

10   misunderstanding of how to practice law, and I'm

11   going to hit on the misunderstanding of how to

12   practice law now.

13        We have seen Mr. Radbil and Mr. Meyers

14   both trying to call a witness twice at two separate

15   times, one being RAB's corporate representative,

16   Mr. Wyatt, and then myself, as well.  And then we

17   see that, believing that they disclosed his damages

18   in pretrial mediation as properly disclosing them.

19   This Court stated in the February 26th partial

20   transcript of proceedings, page 33, lines 2 through

21   5, this Court stated:  "Your strategy and your

22   questions weren't even close to what I thought they

23   would be compared to the summary judgment

24   pleadings."

25        Following that, line 6 through 7, this

1  Court stated:  "So you have handled yourself in a

2  way that I see is detrimental to your client in this

3  case."

4          These actual sanctions hearings, they

5  started off by the Court hearing that plaintiff's

6  counsel and his firm have not even informed

7  Dr. White that the Court ordered nearly $10,000 of

8  costs to be paid to defendant by him.  In response

9  to that, this Court simply said, you're kidding.

10          We have also had the fundamental

11 misunderstanding of the issue with the subpoenas out

12 of state.  And our argument there is that is just a

13 fundamental misunderstanding of the law, and

14 plaintiffs just simply blame the Court for that.

15          We hear that plaintiff's counsel relied on

16 his clients to prepare the subpoenaed witnesses for

17 trial.  In response to that, this Court just simply

18 stated that that's malpractice.  And then we also

19 found out that Mr. Meyers never speaks to non-client

20 witnesses except for maybe a courtesy call that they

21 will be subpoenaed.  That speaks for itself.

22          The issues pointed out with the basic

23 process of jury selection, we saw that referenced in

24 the Brown case that we hit on; the statements by

25 Judge Hughes, which reflect on the firm's entire

1    practice; and then also, just simply the ultimate

2    lack of candor to the Court.

3          A lot of these problems are direct

4    violations of the Ethics Rules of Texas.  They also

5    evidence the possibility that the lack of training

6    and supervision by Mr. Meyers is just the simple

7    potential of poisonous fruit.

8          We heard how this case simply started off

9    with no settlement demand; when one was requested,

10   none was given.  At trial we heard that Mr. White

11   did not know what the Rule 60 offer meant.  In his

12   e-mail that counsel produced showed -- stated that

13   he understood the rule consequences, but nothing

14   evidences that understanding.  There is nothing to

15   show that he understood that the costs could be

16   shifted to him.  His October 2nd declaration just

17   fully contradicts his testimony at trial, stating

18   that he did not know the consequences of it.

19         In these proceedings, we have also looked

20   at two Texas cases where clients stated that they

21   did not receive a settlement offer.  An attorney or

22   a firm would never want any evidence out there of

23   them not relaying settlement offers.  Here we have

24   two examples of it by one firm.

25         Then we also have this case where it's

1    questionable whether Dr. White truly received this
2    settlement offer, this Rule 68 offer of judgment,
3    and he certainly did not understand the consequences
4    of it.  Maybe if Dr. White was told that if the jury
5    came back with a number between 1 and 1,000 of
6    damages, he would have been stuck with Regional
7    Adjustment Bureau's entire bill.  They also didn't
8    bring Mr. White here to clarify on that issue.
9            In our exhibits, RAB's Exhibit 30, we
10   include the ethics rule, that the client decides
11   settlement, not the firm.  And again, we don't
12   actually know what happened here, but we have
13   reviewed Weisberg & Meyers's fee agreement, which
14   sure did put Dr. White between a rock and a hard
15   place and potentially caused him to not accept an
16   in-court settlement that was made after his counsel
17   did not show up.
18           We now have seen in the evidence of the
19   case, which is in Weisberg & Meyers Number 23, where
20   they use the fee agreement as a sword against their
21   client when she received none of the counseling as
22   she was promised by her Weisberg & Meyers attorney
23   and accepted a very favorable settlement offer.
24   Then Weisberg & Meyers came after her for the fees.
25           We heard Mr. Meyers state while he was

1    testifying, "My attorney-client agreement has since

2    changed to add that clients may be responsible for

3    court costs should they lose their case."  And based

4    upon what has occurred here today, I will add the

5    fact that, if a client loses a case, that bad faith

6    attorney's fees may be awarded against them.

7              THE COURT:  Five minutes.

8              MR. MARTIN:  That just shows that they

9    aren't willing to take blame or responsibility for

10   these consequences.  With the fee agreement, they

11   just simply add a provision to say that our client

12   can be liable for this.  You are now aware of it.

13             Last, for 1927 sanctions and this Court's

14   inherent power to sanction, we should look to where

15   liability can fall.  The Professional Rules of

16   Responsibility delineate duties of supervising

17   attorneys; supervision was nowhere to be found in

18   this case.

19             We heard Mr. Meyers state he had never

20   even seen Mr. Radbil at trial; he did not even see

21   Mr. Radbil in trial after a directed verdict on 19

22   claims was granted in the Brown case, or $42,500 was

23   sanctioned against his client in the Lopez case, and

24   $92,000 in a judgment was awarded to the defendant

25   in the Whaley case.

**SHAWNIE ARCHULETA, CSR/CRR**
**FEDERAL COURT REPORTER — 214.753.2747**

1          In looking at their billing records, there
2     really are no signs of supervision.  It mainly just
3     consists of supervising partners just sending out
4     settlement e-mails.
5          This Court stated to Mr. Meyers, "It's
6     shocking that you are practicing law with this
7     attitude."
8          And then the Court also stated, "These
9     proceedings supports the position of the defense
10    counsel that you freely misrepresent yourself and
11    support that kind of activity in the other lawyers
12    that you work with which is of grave concern."
13         We heard Judge Hughes say, "A firm that
14    was unfocused and unprincipled.  This is prolific
15    here coming from the top and the tree poisoning the
16    fruit."
17         As a managing partner of the firm, he has
18    the duty to supervise and essentially mold the young
19    associates into seasoned attorneys.  And what we see
20    here is a young associate who had no supervision
21    allowed to violate the discovery rules and let his
22    client down at trial.
23         Then we also see a supervisor come in and
24    think nothing went wrong except for Mr. Radbil being
25    two hours late, and that's just absurd.  Something

1  as fundamentally flawed and sanctions are

2  appropriate to compensate Regional Adjustment Bureau

3  for the amount of fees incurred throughout this

4  litigation, especially in response to the sanctions

5  issues and to prevent further future conduct of

6  Weisberg & Meyers; and then, last, to preserve the

7  integrity of the bar and its performance before the

8  federal courts.

9       It takes a monetary award to get this firm

10  to change its actions.  We heard from Mr. Meyers

11  that for the show cause orders that the Court did

12  not sanction him, so I guess there wasn't a problem

13  there.  That was in the Oregon case, the Brookter

14  case, the Saunders case.  Mr. Meyers simply stated,

15  pretty much, that those don't count because they

16  were not monetarily sanctioned.  They did not change

17  their ways, and we are here trying to wrap up a

18  number of those prevailing problems.

19       We have also just seemingly heard everyone

20  else is to blame, it's not our fault.  All we have

21  heard is it's Dr. White's fault, being a rogue

22  client; it was Robbie Malone, PLLC's fault for

23  bringing all these issues up; it's Regional

24  Adjustment Bureau's fault for being the defendant in

25  this case; it's the webmaster for the biography;

1   it's the support staff for not sending out the

2   exhibits; it's the marketing company for the tweets

3   regarding this case; it's Judge Hughes just being

4   too rough on them; and then it's even this Court's

5   fault on the subpoena issue and then the pretrial

6   argument for the pretrial order.

7          In conclusion, on the conduct, it does

8   seem that a poisonous apple fell right next to the

9   tree; now it's up to the farmer, which is this

10  Court, to figure out the remedy.

11         On to the damages in this case, RAB

12  incurred $87,155 in reasonable and necessary

13  attorney's fees through the trial.  This Court has

14  already awarded the costs that it incurred up to

15  that point.  Since then, not including November, the

16  fees have been $44,951.50.

17         Regional Adjustment Bureau has been

18  required to prosecute these motions to protect

19  consumers.  It should not cost them to do so.  The

20  entirety of this litigation has come to total of

21  $133,051.50, which does not even include our time

22  here today, preparation for the November hearings,

23  which now this is the second one.  And since the

24  briefing on attorney's fees, nearly all of RAB's

25  fees incurred have been due to the sanctions

1    briefing and these hearings and the preparation for

2    these hearings.  Those are directly due to the

3    Rule 37 violations and the 1927 and the conduct that

4    is sanctionable under this Court's inherent power.

5           These hearings have also been elongated,

6    in part, because of the plaintiff's motion for

7    continuance on the eve of the second hearing, since

8    they believed they were only showing up for a slap

9    on the hand.

10          All of the work and hours resulting in

11   fees spent by RAB easily establish that plaintiff's

12   counsel's vexatious conduct multiply these

13   proceedings exponentially and especially posttrial.

14   At a minimum, RAB should at least be compensated for

15   the sanctions briefing and hearings.

16          So now, just as they proclaim that they

17   are private attorney generals for consumers, RAB has

18   been a private attorney general for the bar, the

19   Court, and the consumers, such as Dr. White, which

20   have been threatened by this kind of representation.

21          Just like the FDCPA as a fee shifting

22   statute, because our client has acted as a private

23   attorney general here for everyone through these

24   four days of hearings, one day for the midnight

25   motion for continuance, RAB should be reimbursed for

these damages resulting from Mr. Radbil, Mr. Meyers, and Weisberg & Meyers' conduct.

Damages accruing, as I speak here right now, but also damages that possibly could have been prevented if Mr. Radbil and Mr. Meyers could have realized that their actions were so wrong and if they had come down here and shown remorse, given apology, could have resolved it, but obviously that didn't happen.

The easiest way to compensate RAB and its counsel's hard, diligent work is under this Court's inherent power.  These hearings have been primarily about misrepresentations:  The misrepresentations made in discovery, in trial, and directly to these courts; not only in trial, but also in these proceedings; misrepresentations on their website and the press release detail about the Whaley case; and also, again, in these sanctions hearings; also, in their very slogan, Attorneys for Consumers.  At some point we have to call these what they are, not really misrepresentations, but lies.

Thank you.

THE COURT:  Thank you.  All right, ladies and gentlemen.  Couple of things:  No more filings; no letters; no nothing.  I will enter an order to

1    that effect.  If there is something that either side

2    believes should be filed with the Court, you must

3    first seek leave.  I have plenty of papers and

4    transcripts to read over before I enter the order in

5    this case.

6              With that said, I don't know that there's

7    anything more that can be said at this juncture, so

8    we are in recess.  I will have the order out, I

9    hope, forthwith.

10             We will be in recess.

11                (Court in recess at 2:51 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**SHAWNIE ARCHULETA, CSR/CRR**
**FEDERAL COURT REPORTER — 214.753.2747**

1                 C E R T I F I C A T E

2            I, Shawnie Archuleta, CCR/CRR, certify

3    that the foregoing is a transcript from the record

4    of the proceedings in the foregoing entitled matter.

5            I further certify that the transcript fees

6    format comply with those prescribed by the Court and

7    the Judicial Conference of the United States.

8            This 30th day of January 2014.

9

10

11                      s/Shawnie Archuleta
                        Shawnie Archuleta CCR No. 7533
12                      Official Court Reporter
                        The Northern District of Texas
13                      Dallas Division

14

15

16   My CSR license expires:  December 31, 2014

17   Business address:  1100 Commerce Street
                        Dallas, TX  75242
18   Telephone Number:  214.753.2747

19

20

21

22

23

24

25

**SHAWNIE ARCHULETA, CSR/CRR**
**FEDERAL COURT REPORTER — 214.753.2747**