IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

TIMOTHY WHITE,                    )
                                  )
          Plaintiff,              )
                                  )
vs.                               )  3:11-CV-1817-B
                                  )
REGIONAL ADJUSTMENT               )
BUREAU, INC., d/b/a               )
RAB, INC.,                        )
                                  )
          Defendant.              )

MOTION FOR SANCTIONS – VOLUME 4
BEFORE THE HONORABLE JANE J. BOYLE
UNITED STATES DISTRICT JUDGE
NOVEMBER 6, 2013

A P P E A R A N C E S
MARSHALL S. MEYERS, PRO SE:

     WEISBERG & MEYERS, LLC
     5025 N Central Avenue – #602
     Phoenix, AZ 85012
     888/595-9111

For Mr. Radbil:

     MARTIN DISIERE JEFFERSON & WISDOM
     808 Travis Suite 2000
     Houston, TX 77002
     713/632-1700
     BY:  DALE JEFFERSON
          RAUL H. SUAZO

For RAB:

     ROBBIE L. MALONE
     EUGENE E. MARTIN
     8750 North Central Expressway – Suite 1850
     Dallas, TX  75231
     (214)346-2631

SHAWNIE ARCHULETA, CSR/CRR
FEDERAL COURT REPORTER – 214.753.2747

COURT REPORTER:   SHAWNIE ARCHULETA, TX CCR No. 7533
                  1100 Commerce Street
                  Dallas, Texas 75242

proceedings reported by mechanical stenography,
transcript produced by computer.

### TRANSCRIPT OF PROCEEDINGS – VOLUME 4

XERXES EUGENE MARTIN, IV

Direct Examination By Ms. Malone              15
Cross-Examination by Mr. Jefferson            27
Cross-Examination by Mr. Meyers               40

ROBBIE MALONE

Direct Examination By Mr. Martin             112
Cross-Examination by Mr. Jefferson           156
Cross-Examination by Mr. Meyers              192

NOAH RADBIL

Redirect Examination by Mr. Suazo            235

Reporter's Certificate                       308

### EXHIBITS ADMITTED INTO EVIDENCE

| EXHIBIT | DESCRIPTION | OFFERED/ADMITTED |
|---|---|---|
| RAB Exhibits 1 – 44 | | 12 |
| Radbil Exhibits 1 – 32 and 34 | | 11 |
| Radbil Exhibits 35, 36 and 37 | | 13 |
| Weisberg & Meyers Exhibits 1 – 33 | | 9 |
| Weisberg & Meyers Exhibit 32 | | 14 |

```
 1              (In open court at 10:00 a.m.)

 2              THE COURT:  Good morning.  This is case

 3    3:11-CV-1817, Timothy White v. Regional Adjustment

 4    Bureau, d/b/a RAB.  We are here this morning on the

 5    fourth hearing on the defendant's motion for

 6    sanctions under 18 U.S.C. Section 1927, that's

 7    Document Number 20, with all of the pleadings

 8    attached to that, and defendant Regional Adjustment

 9    Bureau's motion and brief for sanctions pursuant to

10    Rule 37, and that's document 119.  Those were filed

11    shortly after the trial, both of them, March the

12    26th of 2013.

13              All right.  I'd like to begin, as I have,

14    by having the parties introduce themselves for the

15    record, and I'm going to start with counsel for the

16    plaintiffs.

17              MR. MEYERS:  Good morning, Your Honor.

18    Marshall Meyers on behalf of myself and

19    Weisberg & Meyers.

20              THE COURT:  Thank you.

21              MR. MEYERS:  Your Honor, Dale Jefferson

22    and my partner Raul Suazo.  We represent Noah Radbil

23    for purposes of the 1927 and Rule 37 hearing.

24              THE COURT:  Thank you, Mr. Jefferson.  And

25    Mr. Radbil is here, as well.
```

```
 1              For the defense?

 2              MS. MALONE:  Robbie Malone and Xerxes

 3   Martin on behalf of Regional Adjustment Bureau.

 4              THE COURT:  Thank you very much.

 5              My recollection is, from looking at all of

 6   the transcripts from the last few hearings, is that

 7   we left off here with -- we finished with

 8   Mr. Meyers.

 9              MR. JEFFERSON:  Yes, I believe we did

10   finish with Mr. Meyers.

11              THE COURT:  Okay.

12              MR. MEYERS:  You did, Your Honor.

13              THE COURT:  And next up, then, is

14   Mr. Suazo is going to call Ms. Malone; is that

15   right?

16              MS. MALONE:  Your Honor, we are still

17   presenting the end of our case, and I was going to

18   have Mr. Martin for a short time, and then I will

19   testify, and then we will be finished.

20              THE COURT:  Thank you.  That's what I

21   thought we were doing.

22              MR. JEFFERSON:  And Your Honor, Ms. Malone

23   and I had a chance to visit the other day and then

24   visited with Mr. Meyers this morning to do our

25   dead-level best why each of us prospectively
```

1   representing our clients but being mindful of the

2   judicial resources and time.  So Ms. Malone had made

3   a request that perhaps some of the issues relating

4   to her claim for attorney's fees could be done in

5   terms of briefing so that we don't have to slug

6   through on a line item by line item basis with

7   respect to her or Mr. Martin going through and

8   saying, okay, on this date you had this time entry,

9   how much time did you spend, and what's your hourly

10   rate and that kind of stuff.

11          If the Court is okay with that, we are not

12   going to object to doing some post-hearing

13   submission on whatever their fee issue was.

14          THE COURT:  I appreciate that,

15   Mr. Jefferson, but honestly, I think I have probably

16   read my last brief in this case.  There are

17   mountains of paper covering all of this.  I would

18   just as soon have it covered in the hearing than

19   having it objected to and more paper back and forth

20   in this case.  My hope and plan is that, unless

21   there is some absolute need, there will be no

22   further submissions in this case on these issues.

23   So I would like to go ahead.  And you have it all

24   documented and with you today, right?

25          MS. MALONE:  Yes, Your Honor.

1              THE COURT:  That's the way I would to do

2       it, then.

3              MR. JEFFERSON:  And the second thing that

4       we had discussed -- and again, that's why we're

5       bringing it up now, because you ultimately get to

6       decide.  Mr. Suazo and I weren't at the first

7       hearing, but I understand that there was some

8       discussions at the first hearing about, you know,

9       the opportunity for counsel to do some form of a

10      close.  And again, counsel and I kind of discussed

11      it beforehand, and we're hopeful -- because we

12      certainly want to get finished today, we are hopeful

13      that the Court will allow us to do that.

14             Because frankly, I think that will allow

15      us to short-circuit, if you will, some of the

16      testimony so that witnesses don't have to

17      necessarily have some sort of aha moment, saying,

18      when you put this exhibit with this exhibit, it

19      means this.  I think that can best be done by

20      counsel making their arguments and summarizing.  So

21      we wanted to clarify that, at the conclusion of the

22      testimony, which I believe will be concluded today,

23      that counsel for each side will have an opportunity

24      to make some brief remarks to the Court.

25             THE COURT:  Absolutely.

1          MR. JEFFERSON:  Thank you, Your Honor.

2          THE COURT:  I do want to also make sure

3   that -- I believe at this point, as of the beginning

4   of the last hearing in October -- I admitted,

5   understanding there were objections, but also

6   understanding this is a court-reviewed issue and not

7   jury, the exhibits that each Mr. Radbil, the

8   plaintiff's counsel's firm, Weisberg & Meyers, as

9   well as RAB had to offer.

10          And I know there have been a couple of

11  perhaps extra ones that have been requested to be

12  supplemented in the record.  So let's just go really

13  quickly over each exhibit, the numbered exhibits.

14  And I'm going to start with those plaintiff's

15  exhibits that the plaintiffs take the position --

16  and when I say that, I'm talking about the law firm,

17  because Mr. Radbil has his own.  The exhibits, I've

18  got them all here organized, we have been through

19  them at length yesterday, but I want to make sure I

20  know what everybody agrees is in.

21          There were some -- was also an issue about

22  a redacted version of some of the documents that I

23  don't know that I got last time, we talked about it,

24  but we left with the idea that everything would be

25  taken care of.  So Mr. Meyers, tell me what numbered

1   exhibits in your view are in for Weisberg & Meyers.

2          MR. MEYERS:  It was my understanding at

3   the last hearing that the Court said that it was

4   admitting all of the exhibits.

5          THE COURT:  Right, but I need the

6   numbers --

7          MR. MEYERS:  Oh, I'm sorry.

8          THE COURT:  -- in your view, what those

9   numbers are.  I have that documented in the

10  transcript, but I'm trying to make sure that

11  everyone agrees so that there is no dispute on the

12  details.

13         MR. MEYERS:  One -- Law Firm 1 through 33,

14  Your Honor.  And there were two exhibits -- we ended

15  the last hearing at 31, so then there were two

16  exhibits that I sought to supplement with, and I do

17  have copies of those for the Court if it wants to.

18         THE COURT:  We will talk about that in

19  just a moment.  But right now, it's your view that

20  1 -- in complete sequence with nothing left out --

21  through 33 is in evidence.

22         MR. MEYERS:  With the caveat that there is

23  an exhibit that needs redactions.

24         THE COURT:  Which exhibit is that?

25         MR. MEYERS:  That is -- it's either

1    Exhibit 22 -- I think it's Exhibit 22.  Yes, it's

2    Exhibit 22, Your Honor.

3            THE COURT:  Okay.  All right.  And then

4    for Mr. Radbil, the exhibits that have been admitted

5    for Mr. Radbil.

6            MR. SUAZO:  I think we have Exhibits 1

7    through 37.  We initially had 1 through 34, and then

8    there was the latest leave to supplement that went

9    35, 36, and 37.

10           THE COURT:  Right now what I am talking

11   about is what has actually been admitted in a

12   hearing by the Court.  And we're going to talk about

13   those motions for leave to supplement in just a

14   moment.  But let's just talk about what's been -- so

15   the record is very clear if there's an appeal,

16   what's been admitted.  So for Mr. Radbil you're

17   saying 1 through 34.

18           MR. SUAZO:  Yes, Your Honor.

19           MS. MALONE:  Your Honor, there is one

20   caveat.  On Exhibit Number 33, the one that was

21   filed with the Court for Mr. Radbil, it says that

22   there is no document there.  It just says that it

23   may be offered, but there is no actual document

24   offered into evidence.

25           MR. SUAZO:  That's correct, Your Honor.

1    So it would be 1 through 32 and 34.  The way things

2    are going, I don't see a need to offer 33.

3              THE COURT:  So one through 34 with the

4    exception of 33, correct?

5              MR. SUAZO:  Yes, Your Honor.

6              THE COURT:  And then you have some that

7    you -- a couple or one or two that you want to

8    supplement, and we will talk about that in a moment.

9              MR. SUAZO:  Your Honor, one other thing,

10   as well.

11             THE COURT:  Yes.

12             MR. SUAZO:  There were a number of

13   exhibits attached to the various motions and the

14   responses.  And not that those were formally offered

15   up by either side at the prior hearing, but I think

16   they are at least before the Court in form of paper.

17             THE COURT:  Just to be clear, those are

18   not exhibits.  And I think the appellate record

19   would be really very confusing if we were to try to

20   pick through and see what attachments to motions

21   filed are exhibits.  So they are not exhibits.  They

22   are part of the record as having been filed and

23   having been referred to in the motions, so I feel

24   very comfortable that I can refer to those in the

25   order that I prepare.  But they are not exhibits.

1   They are just attachments to motions that have been

2   filed.  Okay.

3           And for RAB?

4           MS. MALONE:  1 through 42, Your Honor --

5           THE COURT:  1 through 42.

6           MS. MALONE:  -- have already been

7   admitted.

8           THE COURT:  Okay.  All right.  With that,

9   then, let's talk for a minute about what has been

10  sought to be supplemented.  I have RAB's request to

11  supplement, it's unopposed, and I just want to be

12  clear that those are which numbered exhibits?

13          MS. MALONE:  43 and 44, Your Honor.

14          THE COURT:  Both sides agree to those?

15          MR. MEYERS:  Yes, Your Honor.

16          THE COURT:  Defense Exhibits 43 and 44 are

17  now admitted.

18          And then so far as Mr. Radbil, the

19  supplemental exhibits -- and remind me the numbers

20  of those.

21          MR. SUAZO:  35, 36 and 37.

22          THE COURT:  Was there any objection to

23  that?

24          MS. MALONE:  We didn't make a formal

25  objection, Your Honor.  So for the purposes of this

1    hearing, we will agree to the admission.

2          THE COURT:  I'm sorry, what?

3          MS. MALONE:  We did not make a formal

4    objection when we had a discussion with them, but

5    for purposes of this hearing, I feel comfortable

6    agreeing to their admission.

7          THE COURT:  And that's?

8          MR. SUAZO:  35, 36 and 37.

9          THE COURT:  Okay.  When we finish today,

10   we will make sure all of what you have just

11   described here is on the record and redacted and in

12   proper form with our court reporter so that the

13   record is -- I've got my copies, and if we need to

14   use some of those, that's fine, but we need to make

15   sure we have a complete set of exhibits that you

16   have just described.

17         And then for plaintiff's supplemental

18   exhibits, Mr. Meyers?

19         MR. MEYERS:  That would be Number 32 and

20   33, Your Honor.

21         THE COURT:  Do both sides, everyone agree

22   to that?

23         MS. MALONE:  Yes, Your Honor.

24         MR. SUAZO:  You yes, Your Honor.

25         THE COURT:  So the Law Firm's Exhibits 32

1    and 33 are admitted.  So that should make the record

2    clear right now as to what's in evidence.  Anyone

3    have any questions?

4              MR. MEYERS:  I have copies and a revised

5    exhibit list if the Court needs it.

6              THE COURT:  Well, I have everyone's

7    proposed supplemental exhibits and exhibit lists.

8    We can take care of that at the end.  Just make sure

9    that all of these additional exhibits are part of

10   the exhibits that you leave with the Court as part

11   of the record.  Okay?

12             All right.  Where are we?

13             MS. MALONE:  I was about to call

14   Mr. Martin to the stand, if the Court is ready.

15             MR. JEFFERSON:  Judge, my apologies.  This

16   morning I got very ill.  I'm not -- we're going to

17   go forward with the hearing and everything, but if I

18   leave the courtroom quickly, I want you to know I am

19   not trying to offend anybody, I just may need to

20   take care of some things.

21             THE COURT:  Are we talking something like

22   a heart or something like that?

23             MR. JEFFERSON:  No, no.  I just started

24   throwing up a lot.  I'm blaming Sonny Bryan's

25   Steakhouse on the West End.  But anyway, if at some

1    point in time I'm looking down, I just didn't want

2    the Court to think I was disrespectful or getting up

3    to make a phone call or something like that.

4            THE COURT:  Thank you for letting me know.

5    I'm sorry you're not feeling better.

6            Okay.  Mr. Martin.

7                    **XERXES EUGENE MARTIN, IV,**

8    **having been first duly sworn, testified as follows:**

9            THE WITNESS:  Yes, I do.

10           THE COURT:  Have a seat, please.

11                   **DIRECT EXAMINATION**

12   Q.   (By Ms. Malone)  State your name for the record

13   please, sir.

14   A.   Eugene Xerxes Martin, IV.

15   Q.   Will you tell the Court a little bit about your

16   educational background?

17   A.   I went to Baylor University undergrad, and

18   after that I went to South Texas College of Law.  I

19   graduated there in May of 2011.  I took the bar

20   shortly after that and became a licensed Texas

21   attorney in November of 2011.

22   Q.   And could you tell the Court a little bit about

23   your work experience, starting with your clerking

24   experience.

25   A.   I started as a law clerk for Robbie Malone, PLC

1  after I had taken the bar.

2        THE COURT:  Slow down just a little bit.

3  A.   And in my time there, I attended hearings and

4  helped draft motions.

5        After I became an attorney, I attended

6  hearings, I practiced in hearings, continued the

7  motion practice, and I've also participated in a

8  handful of trials.

9  Q.   And Mr. Martin, prior to joining my firm as a

10  clerk, did you do some internships while in law

11  school?

12  A.   I interned twice for the Dallas District

13  Attorney's office.  I also interned for the Fifth

14  District Court of Appeals here in Dallas, and that's

15  the extent of my internships.

16  Q.   And were you assigned to a particular judge?

17  A.   I was assigned to Justice Jim Moseley on the

18  Fifth District.

19  Q.   While you were at the District Attorney's

20  Office as an intern, did you watch and observe

21  trials?

22  A.   Yes, I did.

23  Q.   Did you participate in preparation for those

24  trials?

25  A.   Yes, I did.

1  Q.   During the -- were you working on the White v.

2  Regional Adjustment Bureau case?

3  A.   Yes, I did.

4  Q.   What was your role with that case?

5  A.   A lot of the role in it was some of the review

6  of discovery.  I attended depositions.  I helped

7  prepare for depositions.  I did an extensive amount

8  of the briefing and pleadings in this case.  I did a

9  good amount of the trial preparation.  I was in here

10 for parts of the trial.  And then I also did a lot

11 of postjudgment pleading drafting.

12 Q.   And you have attended the entire sanctions

13 hearings process, correct?

14 A.   I have also attended all of the sanctions

15 hearings.

16 Q.   Did you make notes of your time as you went

17 through these various processes?

18 A.   Yes, I did.

19 Q.   And are those reflected in Exhibit 41, which

20 would be most of our attorney's fees invoices; is

21 that correct?

22 A.   Yes.

23 Q.   Did you review those prior to them being

24 submitted to the insurance company for payment?

25 A.   Yes, I did.

---

**SHAWNIE ARCHULETA, CSR/CRR**
**FEDERAL COURT REPORTER — 214.753.2747**

```
 1    Q.    Now, Mr. Meyers -- I knew I was going to say
 2    that.  I apologize to you.
 3         Mr. Martin, were you present in the hearing --
 4    or do you recall in the last hearing where
 5    Mr. Meyers testified at page 134, we are not
 6    engaging new Texas state clients?
 7    A.    Yes, I was.
 8    Q.    Were you also present when he testified that he
 9    would be sure that the cases filed in Texas would be
10    under his name directly as opposed to his firm name
11    to be sure that none of this would ever happen
12    again?
13    A.    Yes, I was present for that.
14    Q.    Did you have occasion to do any research to
15    find out if there were cases that were filed by that
16    firm subsequent to the October 9th hearing?
17    A.    Yes, I did.
18    Q.    What did you find?
19    A.    On November 1st, I performed a search on PACER
20    for the four districts -- in the four United States
21    District Courts in Texas.  And when I searched, I
22    searched Mr. Meyers' name, as well as an associate
23    of Weisberg & Meyers' name, Joe Panvini, and the
24    results of the search brought up a case filed in the
25    Southern District of Texas on October 24th, 2013.
```

19

1  Q.    What was the style and name of that case, sir?

2  A.    The name of the case is Juan Lee v. Joanna

3  Palacios Montealvo, doing business as Toyz-R-Us Auto

4  Sales; Toyz spelled with a Z.

5  Q.    Did you look to see who was listed as attorney

6  of record for that case?

7  A.    Juan Lee is represented by Joseph Panvini of

8  Weisberg & Meyers, LLC.

9  Q.    Is Mr. Meyers listed anywhere as counsel of

10  record in that case?

11  A.    No, he is not listed in the represented by or

12  the signature for the plaintiff's counsel.

13  Q.    Just for context, this was approximately two

14  weeks after our hearing?

15  A.    Yes.

16  Q.    Did you also have occasion to do some

17  additional search regarding Weisberg & Meyers

18  advertising for Texas clients?

19  A.    Yes.  I also performed a general search on

20  Weisberg & Meyers.  In the past, I had seen that

21  they had a Twitter account, and so I ended up

22  reviewing that.

23  Q.    Did you find any reference to Texas consumers

24  in the Twitter accounts?

25  A.    On September 24th, they had made a posting on

1   their Twitter account that stated, Consumers in

2   Texas deserve Texas size representation and

3   protection.

4   Q.   So two weeks before the hearing,

5   Weisberg & Meyers was soliciting or advertising for

6   Texas consumers.

7   A.   Yes.

8   Q.   In the process of looking for that consumer

9   account, did you find anything related to this suit,

10  sir?

11  A.   Yes.

12  Q.   Can you tell the Court what you found?

13  A.   In the past, I had seen that

14  Weisberg & Meyers -- Weisberg & Meyers sort of has

15  another Twitter account that is under the name

16  Consumer Law QA.

17  Q.   Let me stop you there.  Whose photograph

18  appears next to that Twitter account?

19  A.   Mr. Meyers'.

20  Q.   Tell us what you found.

21  A.   In reviewing some of the postings under that

22  account, on July 25th there is a tweet or post of

23  Mr. White v. Regional Adjustment Bureau,

24  Incorporated, hash tag TCPA, hash tag consumer

25  rights, hash tag violations, and it includes a link.

1  Q.    Okay.  And so we are clear, this is

2  July 25th of this year?

3  A.    Yes.

4  Q.    And that would be approximately five months

5  after the trial for the White case.

6  A.    Yes.

7  Q.    When you clicked on to the link, what did you

8  find?

9  A.    The link is to an article posted on Consumer

10  Law QA, a website.  It's an article entitled:

11  Mr. White v. Regional Adjustment Bureau,

12  Incorporated, Telephone Consumer Protection Act,

13  TCPA, violation December 3rd, 2012.

14  Q.    And does the article describe what kinds of

15  recovery Mr -- or Dr. White might make?

16  A.    The article states that Dr. White is entitled

17  to statutory damages of up to $1,000 in actual

18  damages as determined by a jury.  And it also states

19  that the Texas Debt Collection Act entitles

20  Dr. White to actual damages.  Both statutes entitle

21  Dr. White to recover the full measure of his

22  reasonable attorney's fees and costs as determined

23  by the federal district court judge.  And then it

24  also states that he is entitled to a minimum of $500

25  per call under the TCPA and up to $1,500 per call.

1   Q.   Did it give an approximate call count?

2   A.   It states that RAB placed more than 70 calls to

3   Dr. White.

4   Q.   Does it give a description of other cases in

5   which Weisberg & Meyers has recovered funds under

6   the TCPA?

7   A.   It states that Weisberg & Meyers has recently

8   recovered $20,000 and $113,000 for its clients.

9   Q.   At the bottom of the article, does it indicate

10  what day it was last modified?

11  A.   It states it was last modified May 9, 2013.

12  Q.   And anywhere in this article does it indicate

13  that the trial had already occurred?

14  A.   No, it doesn't.

15  Q.   Does it indicate that Dr. White had, in fact,

16  already lost the case?

17  A.   No, it doesn't.

18  Q.   Is there a third page that is attached to the

19  article?

20  A.   Yes.  Below the article, there's an option for

21  a free case evaluation, no obligation lawyer review,

22  and it has boxes to input first name, last name,

23  e-mail, phone number, state, and interested in.

24  Q.   So it's a client solicitation?

25  A.   Yes.

1    Q.    Using the White case in May and July of 2013?

2    A.    Correct.

3    Q.    Mr. Meyers -- Mr. Meyers had referenced -- I'm

4    sorry.  I apologize.  It was Mr. Radbil's exhibits

5    indicated that there's an exchange between the two

6    of you regarding a confidentiality agreement.  Do

7    you remember that, sir?

8    A.    Yes, I do.

9    Q.    And just for the Court's reference, the

10   exhibits that Mr. Radbil discusses that about are

11   Exhibits 15 through 16, 19, 20, 21, 23, 24 and 26.

12   And I want you to basically tell the Court what it

13   is that was going on with the confidentiality

14   agreement.

15   A.    This was shortly before our client's deposition

16   was going to be taken by Mr. Radbil.  I believe two

17   days before the deposition we had conferred

18   regarding the topic list for the deposition.  At the

19   end of our conference on that, I had stated to him,

20   we haven't received back the confidentiality

21   agreement that we had sent to them for us to produce

22   withheld documents under privilege.

23        He responded to me something along the lines

24   of, I don't know the confidentiality agreement

25   you're referring to, and, what are these documents

1    you are withholding.

2         I stated, it probably has something to do with

3    the policies and procedures.  And so then it went on

4    from there.

5              And the next day, he's stating he's never

6    been proposed this confidentiality agreement for the

7    documents, and -- I'm trying to recall exactly.  And

8    so then there was a lot of e-mails back and forth

9    regarding entering a confidentiality agreement that

10   day, the day before the deposition, for us to

11   produce the documents.

12        And so we were going back and forth.  He was

13   wanting to enter one that they were proposing, and

14   we were wanting him to enter the one that we had

15   sent to him about two weeks prior, which he claimed

16   he hadn't received.

17        And in the end, we started discussing that he

18   would be willing to enter the confidentiality

19   agreement that we had entered in I believe the Lee

20   case that we had recently had with plaintiff's

21   counsel, Weisberg & Meyers, as well as I believe the

22   Whatley case that we had had with Weisberg & Meyers.

23        And so once we reached that agreement, I went

24   to our paralegal and requested the confidentiality

25   agreement that we had entered in those cases.  She

1   gave me a copy of the proposed one from those cases,

2   and I reviewed it, submitted it to Mr. Radbil

3   stating it was the same one from those cases.

4       Later, I received an e-mail from him claiming I

5   had a misrepresentation, that that was not the

6   confidentiality agreement that was entered in those

7   cases.

8       I discussed it with the paralegal.  After I

9   mentioned that to her, she recalled that

10  Weisberg & Meyers had one change that they had made

11  to the confidentiality agreement, which was the one

12  subsequently entered.

13          And so then right after I had received the

14  e-mail from him stating I made the

15  misrepresentation, I apologized to him.  I stated

16  that that's what happened, our paralegal handed me

17  that one.  I believe it was the same one from that

18  case.  I believe it was the same one proposed but

19  not the one entered.  So I apologized for that, and

20  we resolved it from there.

21  Q.  Would you look at Exhibit 43 in the White

22  notebook, sir.  It's ours.

23          THE COURT:  So it would be RAB Exhibit --

24          MS. MALONE:  43, Your Honor.

25          THE COURT:  Okay.

```
1    A.    Okay.

2    Q.    (By Ms. Malone)  And Mr. Martin, at the bottom

3    there are some Bates number, if you would just turn

4    to Bates number 18, 0018.

5    A.    Okay.

6    Q.    And could you tell the Court what the e-mail is

7    at the bottom of the page?

8    A.    This is the e-mail I sent in response to when

9    he stated I made the misrepresentation.

10   Q.    Did you apologize for any misrepresentation

11   that you had given to them?

12   A.    Yes, I apologized for that misrepresentation.

13   Q.    And you provided him with the one that he

14   requested?

15   A.    Yes.

16   Q.    So you -- how long of a period of time before

17   you corrected the mistake you had made?

18   A.    It was within the hour, when I had time to

19   research and review it and speak to the paralegal.

20   Q.    Did you intentionally misrepresent anything to

21   Mr. Radbil?

22   A.    No, I did not.

23   Q.    Did you immediately correct it when he brought

24   it to your attention?

25   A.    Yes.
```

```
 1   Q.   Did he sign the agreement that he requested to
 2   be signed?
 3   A.   Yes.
 4   Q.   Did you also sign that agreement?
 5   A.   Yes.
 6          MS. MALONE:   No further questions, Your
 7   Honor.
 8          THE COURT:   All right.  Mr. Jefferson.
 9                 CROSS-EXAMINATION
10   Q.   (By Mr. Meyers)  Good morning, Mr. Martin.  How
11   are you?
12   A.   Doing all right, how about you?
13   Q.   Good, thank you, under the circumstances.
14          Remind me, again, sir, how many years have you
15   been licensed?
16   A.   I've been licensed since 2011, so it's pretty
17   much two years to this day.
18   Q.   Have you ever first chaired a jury trial, sir?
19   A.   Could you repeat that?
20   Q.   Have you ever first chaired a jury trial?
21   A.   No, I have not.
22   Q.   Have you ever first chaired any trial before?
23   A.   No, I have not.
24   Q.   Would you say with respect to the amount of
25   time that you spent at the actual trial of the White
```

1   case versus the amount of time that you've spent at

2   the sanctions hearing, what have you spent more time

3   at in this courtroom, the trial or the sanctions

4   hearing?

5   A.    Sanctions hearing.

6   Q.    Now, you were asked a series of questions by

7   Ms. Malone concerning Mr. Meyers' testimony, and you

8   recalled some PACER research that you did regarding

9   the Juan Lee v. Palacios, Toyz case.

10        Do you recall that testimony?

11  A.    Yes.

12  Q.    And would you agree with me, sir, that when you

13  did that search you did not find the name of Noah

14  Radbil?  True?

15  A.    True.

16  Q.    And of course you know that Mr. Radbil is no

17  longer affiliated with Weisberg & Meyers and has not

18  been so for some period of time, correct?

19  A.    There's some question with the Of Counsel, but,

20  yes, it appears that he's no longer affiliated.

21  Q.    And with respect to the Of Counsel, since you

22  were asked questions about what you recalled about

23  Mr. Meyers' testimony, you also recall Mr. Meyers'

24  testimony, do you not, where he testified that

25  Mr. Radbil did not have access to the firm's

1   website.   Do you recall that?

2   A.   Yes.

3   Q.   And that Mr. Radbil did not have the ability to

4   make changes to anything involving the firm's

5   computer advertising systems?

6   A.   That's correct.

7   Q.   Okay.  And so just to be clear on that, with

8   respect to the stuff that you talked about regarding

9   the September 24 Twitter information that you

10  indicated you saw a photograph of Mr. Meyers, you

11  would agree that there was no such photograph of

12  Mr. Radbil, Noah Radbil, true?

13  A.   Yes.

14  Q.   And likewise, with respect to the information

15  that you looked at with respect to Juan Lee and all

16  of the other searches that you did, you didn't find

17  any filings by Noah Radbil as being someone filing a

18  lawsuit in conjunction with Weisberg & Meyers,

19  correct?

20  A.   Correct.

21  Q.   Now let's talk about the last issue that you

22  talked about with respect to Ms. Malone concerning

23  the protective order, just so we can kind of wrap a

24  bow on this.  As I appreciate it, you prepared a

25  proposed protective order, and you wrote an e-mail

1    to Noah Radbil saying it was the same one that was

2    entered in another case, and that turned out to be a

3    mistake, right?

4    A.    Yes.

5    Q.    Okay.  And mistakes happen, right?

6    A.    Correct.

7    Q.    Sure.  Do you feel like as you get older and

8    you get more experience you will make less mistakes?

9    A.    Hope so.

10   Q.    And by the way, when you -- when you did that,

11   your testimony was that you didn't do it in bad

12   faith and that you didn't do it intentionally, you

13   weren't trying to pull one over, you just made a

14   mistake, and when it was called to your attention,

15   you rectified the mistake, correct?

16   A.    Correct.

17   Q.    And so to that degree, you've asked Mr. Radbil

18   to give you the benefit of the doubt in that regard,

19   correct?

20   A.    Sure.

21   Q.    Okay.  And do you think there's anything wrong

22   with that in terms of a lawyer asking another lawyer

23   to give him the benefit of the doubt?

24   A.    Not particularly.

25   Q.    Okay.  And I guess my question here is that, at

1   the end of the day when you're asked a question

2   like, did you do it in bad faith, or, did you do it

3   intentionally, at the end of the day when we are

4   dealing with issues such as motive and intent,

5   that's something that's inherently internal as to

6   the individual person, true?

7   A.    Is your question kind of determining bad faith,

8   is that only one that the person that's accused of

9   can answer?

10  Q.    Well, I guess -- let me put it this way:

11  There -- if somebody gets up there and they say with

12  respect to, say, this protective order, I didn't do

13  it in bad faith, I didn't do it intentionally,

14  that's an issue where at the end of the day you're

15  asking, as you did in this case, Mr. Radbil to take

16  your word at it, correct?

17  A.    Correct.

18  Q.    In other words, there's not -- there's not a

19  document that we can look at that would establish

20  some sort of truth meter or something that existed

21  at that point in time when you wrote the e-mail.

22  It's something that, as an officer of the court, we

23  have to take your word on, that you simply made a

24  mistake and that you weren't trying to put one over

25  on Mr. Radbil, right?

```
 1   A.    That's correct.
 2   Q.    Okay.  And so my question is:  As to you -- and
 3   I'm limiting my questions just to you.  And I
 4   understand that many times it was Ms. Malone who was
 5   the person who was in charge of this case.  But as
 6   it related to your personal dealings with
 7   Mr. Radbil -- and just so I'm clear on the
 8   parameters, I want to make sure that my question is
 9   just you, Mr. Xerxes Martin and Mr. Noah Radbil.  So
10   I'm not asking about anyone else at the Malone law
11   firm or anybody else at the Weisberg & Meyers law
12   firm.  So my question to you as you sit here today
13   is:  Are you accusing Mr. Radbil of intentionally
14   trying to put something over on you personally?
15              THE COURT:  At what point in time?
16              MR. JEFFERSON:  Thank you, Your Honor.
17   Q.    (By Mr. Jefferson)  Limiting it to your
18   dealings solely in the White case and no other case.
19   A.    I don't think like anything can actually be put
20   towards me in this situation.  This more so has to
21   do with the case, our client, and not particularly
22   any dealing with me.
23   Q.    Okay.  And that's why I made sure, because I'm
24   not asking you to speculate as to your client or
25   your paralegals or your boss or anybody else, and
```

1    I'm not asking about you anybody else, either.  I'm

2    asking you just about Noah and just in the White

3    case.  And is the answer to my question, no, there

4    is nothing that I am accusing him of of trying to

5    pull over on me, Xerxes Martin?

6    A.   With the phrasing of pull over, I don't think

7    that really fits.

8         THE COURT:  It's a little confusing,

9    Mr. Jefferson.

10        MR. JEFFERSON:  Okay.  I will re-ask it.

11        THE COURT:  Well, let me just say, there

12   is a wealth of testimony about things that

13   Mr. Radbil did during the course of this case that

14   affected their firm.  And so to parse it up I think

15   is a little confusing under the circumstances.  So

16   maybe you can make the question clearer.

17        MR. JEFFERSON:  Okay.  All right.  Let me

18   break it down.

19   Q.   (By Mr. Jefferson)  You understand that you are

20   a distinct individual and human being separate and

21   apart from Ms. Malone, any employee of the Malone

22   law firm, RAB and CHUBB Insurance Company, you

23   understand that, don't you?

24   A.   Yes.

25   Q.   And you understand that Noah Radbil is a

1    separate human being, separate and apart from the

2    Weisberg & Meyers law firm and any of his clients,

3    true?

4    A.   Yes.

5    Q.   Okay.  And so what I'm trying to figure out now

6    is that, in your personal dealings with Mr. Noah

7    Radbil -- and again, now that we have limited the

8    parameters to just you and Noah Radbil and no other

9    person on the planet and solely relating to the

10   White case, my question to you is:  Are there any

11   mistakes that Noah Radbil made where you're saying,

12   no, that wasn't a mistake, that was something that

13   he did intentionally and in bad faith?

14           THE COURT:  I just don't understand the

15   relevance of that.  What difference does that make?

16           MR. JEFFERSON:  Well, because that's --

17   that's one of the -- one of the issues that I think

18   that the Court would look at in its ability to

19   inherently sanction someone, which is whether or not

20   there is a belief by someone that they acted in bad

21   faith.

22           THE COURT:  But you are putting it in a

23   context that it doesn't belong.  The intent on

24   Mr. Radbil's part was as to the case and I suppose

25   as to the firm or as what he did to the case

1    affected the firm.  But to put it in that -- I just

2    think that's irrelevant, and I think it's confusing,

3    and I don't think it answers -- goes to the issues

4    that have to be determined by the Court.  So let's

5    ask another question.  All right?

6            MR. JEFFERSON:  Well, then, let me see if

7    I can go about it in a different way.

8    Q.   (By Mr. Jefferson)  Do you contend that any of

9    the complaints being lodged against Mr. Radbil, ones

10   that you have personal knowledge of -- and Judge,

11   that's kind of the reason I'm making the

12   limitations, because I don't want him to speculate

13   about Ms. Malone or anybody else.  I want to know

14   just this gentleman's personal knowledge.  Okay?  So

15   maybe that will help you.  Okay?

16       So with that caveat, that I am seeking just

17   your personal knowledge as opposed to extrapolations

18   or what other people may say, feel, or testify to,

19   are you of the opinion that Mr. Radbil did something

20   to you in his dealings with you that was in bad

21   faith of your personal knowledge?

22   A.   I'm not necessarily in the position to make

23   that determination.  However, one thing that does

24   stick out is conferences regarding motions.  Two in

25   particular:  Motion to compel.  Every case we have

1    dealt with Mr. Radbil, as well as Weisberg & Meyers,

2    we are forced to file a motion to compel to get

3    their attorney fee agreements and their billing

4    invoices, as well as information regarding actual

5    damages.

6    Q.    Okay.

7    A.    We have had -- we have had numerous cases with

8    that, that actually happened in this case.   Every

9    time they refused to produced them, we are forced to

10   draft a motion to compel, we were forced to obtain

11   judicial intervention to finally get those

12   documents.

13        Every single time we have had to file a motion

14   to compel, we've had it ruled on, and it's been

15   ruled on in our favor.   And even continuing with the

16   last case we dealt with them, which was the Payne v.

17   Progressive Financial Services in the Northern

18   District in Fort Worth in front of Judge Means, we

19   had to do the exact same thing.

20             MR. JEFFERSON:  I need to object as

21   nonresponsive since my question was clearly limited

22   to the White case and clearly limited to Mr. Radbil,

23   and you gave an answer regarding both other members

24   of Weisberg & Meyers and other cases.

25             THE COURT:  Overrule the objection.

```
 1            MR. JEFFERSON:  So can you answer the
 2   question that I asked?
 3            THE COURT:  I think he's answered the
 4   question, Mr. Jefferson.  If you want him -- if you
 5   want me to consider whatever he said and take out
 6   consideration of what he said about the other case
 7   in Fort Worth, I will do so.
 8            MR. JEFFERSON:  Thank you.  That's all I
 9   need.
10            THE COURT:  I think he has answered the
11   question.
12   A.   I do have another conference regarding the
13   White case which had to do with us filing a motion
14   to leave to file our bill of costs in this case.
15   And that conference took well more time of mine and
16   Mr. Radbil's than it should have.  Instead of
17   getting a simple answer one day, I had to wait for
18   the next day for him to review our motion and
19   respond.  It was a motion for us asking for almost
20   $10,000 of costs from his client, which I'm pretty
21   sure any attorney in his position would oppose
22   outright.
23   Q.   But you understand that Mr. Radbil is not a
24   principal in the firm, correct?
25   A.   Yes.
```

1  Q.   And by the way, ultimately all of the costs

2  were paid, true?

3  A.   True.

4  Q.   Okay.  Now, would you agree with me that any

5  conduct by Weisberg & Meyers or Noah Radbil in any

6  other case did not have the effect of multiplying

7  the proceedings in this case, the White case?

8  A.   I think that's correct.

9           MR. JEFFERSON:  Thank you, sir.

10          THE COURT:  Mr. Meyers.

11          MR. MEYERS:  Thank you.

12          Your Honor, will we have the opportunity

13 to call witnesses in our case in chief?

14          THE COURT:  I'm not sure why you're asking

15 me this.  You've already testified.

16          MR. MEYERS:  Okay.  So this is

17 Mr. Martin's one time on the stand?

18          THE COURT:  I'm confused, because this is

19 the fourth time we've been together on this.

20 Ms. Malone has put her witnesses on.

21          Ms. Malone, do you have any thoughts on

22 this?

23          MS. MALONE:  Well, Your Honor, I

24 understood that we were all going to get the

25 evidence as the witness was on the stand as typical

---

**SHAWNIE ARCHULETA, CSR/CRR**
**FEDERAL COURT REPORTER – 214.753.2747**

```
 1   so as to save the Court's time.  I think it's a
 2   waste of the Court's time for us to re-call
 3   witnesses to go back over the same things.
 4          THE COURT:  I agree.  So finish up with
 5   each witness.  And my understanding, Mr. Jefferson,
 6   it's very clear from our last hearing what was left
 7   in this case to do.  Has that changed?
 8          MR. JEFFERSON:  No, it's not, Your Honor.
 9   I agree with Ms. Malone, with the one caveat is that
10   we said last time that we were going to re-call Noah
11   because we were told that when he first testified he
12   was not represented by counsel.
13          THE COURT:  That's fine.  I was just
14   trying to figure out where this was coming from.
15   Mr. Meyers, what were you planning on doing besides
16   calling yourself, which you have already done?  What
17   other witnesses did you have?
18          MR. MEYERS:  Just asking, Your Honor, but
19   you have answered.
20          THE COURT:  No, no, I don't know what you
21   are asking me, though.  Are you asking me -- do you
22   have a slade of witnesses that we haven't heard
23   about yet?  I don't think that's what you're asking
24   me.  I hope not.
25          MR. MEYERS:  No.
```

 1          THE COURT:  I just misunderstood what you

 2     were asking me.  If you are going to call him, go

 3     ahead and ask the questions now instead of

 4     re-calling him.  Is that it?

 5          MR. MEYERS:  Yes.

 6          THE COURT:  Apologize for the

 7     misunderstanding.

 8          MR. MEYERS:  Thank you, Your Honor.

 9                    **CROSS-EXAMINATION**

10     Q.   (By Mr. Meyers)  Mr. Martin, you just testified

11     about some representations that I made at the last

12     hearing.  You've reviewed the transcript from the

13     last hearing?

14     A.   Yes.

15     Q.   Okay.  Do you recall when I was explaining the

16     sets of Texas cases?  I explained there were Texas

17     federal cases, Texas state cases, and those were all

18     filed, and then unfiled cases.  Do you recall that?

19          THE COURT:  Maybe you can refer us to a

20     line and page on the transcript.

21          MR. MEYERS:  That's at about page 155, and

22     it explains -- and it's pretty much going through --

23     or starting maybe at 154, line 18.

24          THE COURT:  Okay.  You don't have to read

25     it, just go ahead and ask your question.  And if he

1  needs to look at the transcript, if you will show it

2  to him.

3  Q.   (By Mr. Meyers)  Do you recall me explaining

4  there are several different blocks of cases?

5  A.   Yes.

6  Q.   And I explained that there were Texas federal

7  cases filed, Texas state cases filed and unfiled

8  cases.  Do you recall that?

9  A.   Yes.

10  Q.   Okay.  So when you state that I said that we

11  were not engaging any new Texas state cases, do you

12  understand from the way I described the block of

13  cases what I meant at that time?

14  A.   I guess there can be a difference between Texas

15  state cases and Texas federal cases.  It could have

16  also been interpreted as the State of Texas cases.

17  Q.   And that's fair.  You said State of Texas, but

18  you at least understood where my distinction was,

19  given that I broke it up into three different

20  classes of cases.  Is that fair?

21  A.   There could be a difference.

22         THE COURT:  So are you saying, Mr. Meyers,

23  that what you said in here was that your firm wasn't

24  filing any more Texas state cases?

25         MR. MEYERS:  Yes, that my firm at that

```
 1   time was not engaging any clients under Texas only,

 2   Texas state law claims only, or filing any Texas

 3   state lawsuits.

 4             THE COURT:  Where is that specific

 5   statement so I can see it?

 6             MR. MEYERS:  154 and 155, Your Honor.

 7             THE COURT:  Give me the lines, please.

 8             MR. MEYERS:  Yes, Your Honor.

 9             MS. MALONE:  Your Honor, if I could, while

10   you're looking, the line that Mr. Meyers was

11   responding to from Mr. Martin's testimony is page

12   134, lines 4 and 5, as well.

13             THE COURT:  Okay.  I just want to make

14   sure I'm clear on some of these points because

15   there's so much information.  Give me just a minute.

16             I think on 134, the question that's a

17   response by you Mr. Meyers was:  We are not engaging

18   any new Texas state clients.

19             And then I said:  Well, Texas state

20   clients or clients anywhere?  Don't you think it

21   would be considered a deceptive trade practice or

22   false advertising to have him -- talking about

23   Mr. Radbil -- as promoted on your firm website

24   without disclaiming and notifying people what's

25   happened to him?
```

1          okay.  And why don't you show me where now

2     in the transcript that you were referring.

3          MR. MEYERS:  Yes.  That's an accurate

4     description when I say Texas state that Ms. Malone

5     pointed out.  But starting at page 154, Your Honor,

6     line 18, I explain that I'm referring to several

7     different blocks of cases, and then I explain the

8     blocks of cases on page 155, Your Honor.

9          MS. MALONE:  Your Honor, just as optional

10    completeness, I would ask the Court to look at the

11    question that starts with the answer, and it's

12    referring to motions to substitute.

13         THE COURT:  What line is that?

14         MS. MALONE:  It begins on line 12, Your

15    Honor, page 154.

16         THE COURT:  You say, line 12:

17         Question:  And I apologize, but I want, if

18    you will, to put a little meat on that bone.  When

19    you are talking about the motion to substitute

20    counsel, are you referring to -- asking me,

21    Mr. Meyers asking me -- to all of the cases in which

22    Noah Radbil is listed as an attorney of record with

23    Weisberg & Meyers?

24         Answer:  I am referring to several -- I've

25    got that confused.

1          You say:  I'm referring to several

2     different blocks of cases.  One would be cases filed

3     in federal court where Mr. Radbil is -- I'm not sure

4     who is doing the answering and who is doing the

5     questioning here.

6          Let's go back to find out what the point

7     is that you are making here, Mr. Meyers.  What's the

8     point that you think was made that's incorrect, and

9     where is the clarification?

10          MR. MEYERS:  The point that I was making,

11    Your Honor, is when I said at that time that the

12    firm was not engaging any new Texas state clients, I

13    meant that we were not at that time taking any cases

14    with Texas state law claims only.

15          And if you see on page 155 at line 2, 2

16    through 5:  The next set of cases, Mr. Jefferson,

17    is -- or are cases filed in Texas State Court where

18    the firm does not employ any Texas attorneys any

19    longer.

20          And then at line 21, on the same page,

21    Your Honor:  And since he departed, there is no new

22    or are no new Texas state clients being engaged by

23    the firm.

24          So what I meant by that, Your Honor, as

25    the way I break up the several different blocks of

1    cases is that, in the absence having another lawyer

2    licensed in Texas State Court, my firm was not

3    taking Texas State Court cases.

4              THE COURT:  And I think part of this was

5    in the context of the earlier line of questioning

6    about that Mr. Radbil was promoted as Of Counsel on

7    this website that you have during the period of time

8    that all of this was going on.  And back in the

9    earlier part of the transcript, I'm saying, any

10   clients in Texas, clients anywhere.  Don't you think

11   it would be a deceptive trade practice to have him

12   promoted on your firm website without disclaiming or

13   notifying people what happened to him.

14              So I think it's almost that we are talking

15   about apples and oranges here with regard to that.

16   I've got your point as far as what you say about

17   Texas state cases.  Let's go ahead, then.

18   Q.    (By Mr. Meyers)  Now, Mr. Martin, you had

19   stated that I said during the last hearing that I

20   would be handling all of the Texas cases myself.  Is

21   that what you said?

22   A.    That's pretty close to how I recall it.

23   Q.    Okay.  I didn't know that you were going to

24   raise that point, so it's going to take me some time

25   to find in this transcript exactly what I said.  But

```
 1   does it sound right to you that I said I was going
 2   to have to handle all of the future cases, future
 3   Texas or the foreseeable future Texas trials myself?
 4   Does that sound right?
 5            MS. MALONE:  Your Honor, I would be happy
 6   to provide with him a page and line number, and I'm
 7   happy to give Mr. Martin --
 8            THE COURT:  I think that will move things
 9   along better.
10            MS. MALONE:  It's page 112.
11            May I approach the witness, Your Honor?
12            THE COURT:  Yes, you may.
13            MS. MALONE:  It's at page 112.  His
14   testimony that we were referring to begins at line 9
15   going through 14, saying that he would make sure his
16   name was involved.
17            THE WITNESS:  What line does it start on?
18            All right.  Starting on page 112, line 9:
19   I explained to her then -- her being Ms. Malone --
20   that I was in the process of getting admitted to
21   these courts, before federal courts in Texas, so I
22   could actively make sure under my name, directly, as
23   opposed to my firm name, which is my name, that none
24   of this ever occurred again.
25            THE COURT:  And to be clear, this is
```

1  Mr. Meyers speaking.  You are reading Mr. Meyers'

2  statements from the record at the last hearing.

3           MR. MARTIN:  Yes.

4           THE COURT:  Okay.

5  Q.   (By Mr. Meyers)  I assume, Mr. Martin, that you

6  read my affidavit that I submitted prior to the last

7  hearing?

8  A.   Yes.

9  Q.   Okay.  And you recall in that affidavit me

10 stating, prior to what occurred in this case, it was

11 not my intent to handle all foreseeable future Texas

12 trials myself or to personally handle all of

13 Ms. Malone's cases as lead counsel?  Do you recall

14 that?

15 A.   A little bit.  I'm confused on what time frame

16 that's referring to, though.

17 Q.   The affidavit was filed on October 2nd.

18 A.   Right.  Is that statement referring to the

19 future or your past intent?

20           THE COURT:  Mr. Meyers, let me -- you tend

21 to be a little confusing when you question -- so far

22 when you're questioning him because of asking him

23 just things that are in a general transcript

24 somewhere.  But based on the point that you just

25 made about that you couldn't possibly handle all of

```
 1    the Texas cases yourself, is that what you were

 2    saying?

 3              MR. MEYERS:  No, Your Honor.

 4              THE COURT:  What were you saying?

 5              MR. MEYERS:  What I was saying --

 6              THE COURT:  Okay.  Hold on a second.  I

 7    will just read it.  It says:  Okay.  And you recall

 8    in that affidavit me stating, prior to what occurred

 9    in this case, it was not my intent to handle all

10    foreseeable future Texas trials myself or to

11    personally handle all of Ms. Malone's cases as lead

12    counsel?

13              Okay.  That was your question.  What you

14    said at the hearing was:  And I aver to the Court --

15    this is page 112, line 15:  And I aver to the Court,

16    for what it's worth to the Court, that as soon as I

17    clearly understand all of the things that the Court

18    does not care for, that they will never happen again

19    by anyone at my law firm or by me, given that these

20    will all be cases that I handle myself.  I have

21    narrowed down my firm's active caseload

22    significantly over the course of the year to make

23    sure that I have an absolute handle on everything

24    that occurs.

25              So that seems to be slightly contradictory
```

49

```
 1   to the point that you just made, and I'm just trying
 2   to get this straight.  Go ahead.
 3   Q.   (By Mr. Meyers)  Okay.  If I could not sign the
 4   complaint, the one complaint that you mention that
 5   was filed, if I could not review that complaint, do
 6   you suggest I should have signed it?
 7   A.   I can't really answer that.  I mean, it's kind
 8   of contradictory to what you said, and we are
 9   dealing with an electronic signature.
10   Q.   Okay.  Do you let things get electronically
11   signed with your name that you don't review?
12   A.   Well, I make ways to review them.
13   Q.   Is that a no?
14   A.   Yes.
15   Q.   Do you have any idea in the case that you
16   mention when the statute of limitations was?
17   A.   No.
18   Q.   Okay.  And in all fairness, neither do I.
19        Do you have any reason to believe that because
20   an associate attorney admitted in that court signed
21   the complaint, that that means that I'm not going to
22   be handling that case?
23   A.   Give me one second.
24        On the statute of limitations, I'm not sure for
25   lemon law if it's one year or two years, but the
```

1    first factual allegation is August 23rd.  So it's

2    probably at least August 23rd, 2014.

3         What was your second question?

4    Q.   My second question was that another lawyer at

5    the firm signed a complaint that I was not capable

6    of reviewing.  Does that mean that I am not going to

7    be litigating that case?

8    A.   I believe, going against your testimony so you

9    have an absolute handle on everything that occurs,

10   you would be intending to actually review answer --

11   or complaints filed in Texas.

12   Q.   Do you have any idea that my firm does a

13   litigation meeting before any complaint is filed to

14   go over the factual allegations and legal

15   allegations --

16   A.   No.

17   Q.   -- in a complaint?

18   A.   No.

19   Q.   Okay.  If I tell you that we do, do you have

20   any evidence to dispute that?

21   A.   No.

22   Q.   And that's different than actually looking at a

23   finalized product, right?

24   A.   Can be.

25   Q.   Okay.  You mentioned a website article and a

1    few Twitter postings.  Do you recall that?

2    A.    Yes.

3    Q.    Okay.  Do you know that I fired the company who

4    was running that website and posting because I

5    didn't feel that they were putting forth proper

6    material?  Did you know that?

7    A.    No.

8    Q.    Did you know that since the time I fired them,

9    which would have been after the July post that you

10   mentioned, that I've actually done the Twitter

11   posting myself?

12   A.    No.

13   Q.    Okay.  Does saying Texas clients deserve

14   Texas-size representation, what does that mean?

15   A.    Sounds like soliciting business in Texas.

16   Q.    Okay.  I have to admit since I fired that

17   company I just started to even get into social

18   media.  I don't do it personally.

19            THE COURT:  Let's -- you can testify again

20   if you need to, but I think we ought to make it

21   questions.  Okay?

22            MR. MEYERS:  Sure.  Yes.  Yes, Your Honor.

23   I'm sorry.  I'm sorry.

24   Q.    (By Mr. Meyers)  Mr. Martin, Exhibit 8 in my

25   set of exhibits -- may I bring up my exhibits for

1    the witness, Your Honor?

2              THE COURT:  You may.  Why don't you take

3    the rest of them and put them down on that lower

4    shelf so they are not sitting right there.  I prefer

5    you put them down there.

6              MR. MEYERS:  Right here?

7              THE COURT:  Yes.  Okay.

8    Q.   (By Mr. Meyers)  Exhibit 8, Mr. Martin, that's

9    Defendant CreditWatch's Response to Plaintiff's

10   Motion for Attorney's Fees in the trial where Noah

11   and I were present and Ms. Malone was present and

12   you were present a couple of the days, maybe through

13   some of it.

14   A.   I believe I missed one of the days.

15   Q.   You missed one of the days?

16   A.   But yes, that's the pleading from it.

17   Q.   Your signature appears on this pleading, does

18   it not?

19             THE COURT:  Excuse me.

20             MS. MALONE:  Your Honor, I would like to

21   make a formal objection and reiterate, this document

22   is a pleading, a live pleading in an ongoing case in

23   Judge Means' court.  To my knowledge nothing about

24   this document -- there's been no allegation that

25   Mr. Martin or myself has done anything improper in

```
 1   this court.  I don't see how documents from other
 2   lawsuits are -- other than to try to suggest we have
 3   done something improperly, which we have had no
 4   notice or any allegations, would be proper for the
 5   purposes of this hearing.
 6             THE COURT:  Overruled.  You are not on
 7   this hearing for sanctions against you nor is
 8   Mr. Martin.  Other cases have been brought up by the
 9   defense, and I will let him do that to an extent.
10   Go ahead.  What's your question?
11             MR. MEYERS:  Thank you, Your Honor.
12   Q.   (By Mr. Meyers)  You signed this pleading,
13   Mr. Martin?
14   A.   It's actually Robbie Malone.
15   Q.   Does your name appear on the pleading?
16   A.   My name is in the signature block.
17   Q.   Okay.  Do you endorse the pleading?
18   A.   Yes.
19   Q.   Okay.  The reason I'm asking you questions
20   about this pleading --
21             THE COURT:  I thought we were going to
22   stick with questions.
23             MR. MEYERS:  I'm sorry?
24             THE COURT:  I thought we were going to
25   stick with questions.
```

```
 1              MR. MEYERS:  Yes, Your Honor.  I'm sorry.
 2              THE COURT:  Go ahead.
 3   Q.  (By Mr. Meyers)  Have you reviewed this
 4   pleading, Mr. Martin?
 5   A.   It's been a while, but yes.
 6   Q.   On page 3 of this pleading, at paragraph 5,
 7   there is a sentence that this paragraph speaks to
 8   about what several courts have thought about
 9   Weisberg & Meyers' fee petitions.
10        Are you familiar with that?
11   A.   Yes.
12   Q.   Do you know how these cases, these handful of
13   cases were selected for inclusion in your brief?
14   A.   Research.
15   Q.   Okay.  Did you research all of the cases
16   involving Weisberg & Meyers?
17              THE COURT:  Okay.  Now I understand where
18   the limitations ought to be.  Obviously, the
19   sanctions motions are against you and Mr. Radbil and
20   your firm.  There could be a credibility point that
21   could be made where something in the course of this
22   case was done that you think is the same kind of
23   conduct, the other side, goes to credibility and how
24   reasonable your point is.  And perhaps something in
25   another case might be, but it certainly doesn't open
```

1  the door for you to get into asking them about

2  attorney-client privileged issues in other cases.

3  They have not waived that, their client hasn't

4  waived it, so I think that's inappropriate,

5  Mr. Meyers.  So I won't allow you to ask those kind

6  of questions about a pending case or even if a case

7  is over if attorney-client privilege still stands.

8          MR. MEYERS:  I am terribly sorry.  That

9  wasn't my intent.

10         THE COURT:  I understand, but that's what

11 you were effectively doing even if that wasn't your

12 intent.  Let's move on to another point.  Another

13 point.  New point.

14         MR. MEYERS:  Okay.  I hope this is a new

15 point, Your Honor.

16         THE COURT:  I do, too.

17 Q.  (By Mr. Meyers)  I'm curious how come you did

18 not provide the Whatley court with a full

19 recitation --

20         THE COURT:  Same question.

21         MR. MEYERS:  Okay.

22         THE COURT:  You're getting into

23 attorney-client work product and that type of thing.

24         MR. MEYERS:  Yes, Your Honor.  Yes, Your

25 Honor.

```
 1              THE COURT:  You've made the point.
 2              MR. MEYERS:  Yes, Your Honor.
 3    Q.   (By Mr. Meyers)  On page 8, paragraph 14 of the
 4    same pleading, Mr. Martin, there is a statement in
 5    paragraph 14 that Marshall Meyers, Aaron Radbil, Joe
 6    Panvini, Dennis Kurz, and Russell Thompson are
 7    attorneys not licensed in Texas, either by the state
 8    or by the United States District of Texas.
 9    Mr. Meyers is admitted pro hac vice.  Do you see
10    that?
11    A.   Yes.
12    Q.   Mr. Radbil was not admitted in a Texas court or
13    the State of Texas.  Do you know if Mr. Kurz was
14    admitted in the State of Texas and the four district
15    courts at the time this pleading was written?
16    A.   I don't recall.
17    Q.   I'm sorry?
18    A.   I said I don't recall.
19    Q.   Do you know if I was admitted in the Eastern
20    District of Texas and not pro hac vice at the time
21    of this trial?
22    A.   I would assume I researched it at the time;
23    hence why I wrote, Mr. Meyers is admitted pro hac
24    vice.
25    Q.   If I showed you the certificates showing when I
```

```
 1   was admitted in that court, would you believe that

 2   at the time that you wrote this, on July 15th, that

 3   I was admitted in that court and that Dennis Kurz

 4   was admitted in every court in Texas and that Joe

 5   Panvini and Russell Thompson were admitted in all

 6   four federal courts in Texas at the time you wrote

 7   that?

 8   A.   It's possible.

 9   Q.   On line 20 -- I'm sorry, paragraph 20, page 11,

10   Mr. Martin --

11   A.   Okay.

12   Q.   -- the paragraph starts:  In the present case,

13   plaintiff's action can be considered anything but a

14   successful suit.

15        And continues:  By all accounts, the matter was

16   completely unsuccessful.

17        Do you see that?

18   A.   I'm not sure about the last part you stated.

19   Q.   It's the fifth line from the end of the

20   paragraph.

21   A.   Okay.

22   Q.   You've -- you've seen the jury verdict.  You

23   might have even been there for the jury's verdict in

24   that case.

25        Was that case completely unsuccessful for the
```

1  plaintiff?

2  A.    In my opinion, yes.  He only recovered a

3  thousand dollars statutory, no actual damages, under

4  the FDCPA claims.

5  Q.    Did he recover under the TCPA?

6  A.    The reason that's not addressed in this motion

7  is because attorney's fees aren't recoverable, and

8  this is in response to your request for attorney's

9  fees.

10 Q.    Okay.  The maximum statutory damage in the

11 FDCPA is a thousand dollars, right?

12 A.    Yes.

13 Q.    And that's completely unsuccessful, getting the

14 maximum?

15 A.    In comparison to what was sought, I believe so.

16 Q.    Do you recall the amount of actual damages that

17 were asked for?

18 A.    I don't think there was ever a number out

19 there.

20        THE COURT:  Mr. Meyers, what were your

21 attorney's fees in that case?

22        MR. MEYERS:  I believe $78,000, Your

23 Honor -- strike that.  They were considerably higher

24 than that.  We reduced them because we did not seek

25 time for the TCPA claims.

---

```
 1              THE COURT:  How much did your client get?
 2              MR. MEYERS:  It's still pending.
 3              THE COURT:  What is the amount that is
 4    speculated he will get.
 5              MR. MEYERS:  He should get $9,000, Your
 6    Honor.
 7              THE COURT:  Based on what?
 8              MR. MEYERS:  Based on a thousand dollars
 9    for the FDCPA and $500 a call for the 16 calls we
10    asked for.  We, of course in our briefing, asked for
11    treble damages as well, and I am about to hit that
12    brief, Your Honor.
13              THE COURT:  Your client is asking for at
14    least 78,000 -- you are asking at least $78,000 in
15    attorney's fees.
16              MR. MEYERS:  Yes.
17    Q.   (By Mr. Meyers)  And on the point that Judge
18    Boyle just made, you're familiar with the Whaley v.
19    Lockhart case, right?
20    A.   Yes.
21    Q.   Your verdict is one of your exhibits, right?
22    A.   Yes.
23    Q.   You sought and received attorney's fees in that
24    case under a contract provision for debt collection,
25    right?
```

1    A.    It's actually a Texas statute for breach of

2    contract claims, so it's not actually a debt

3    collection rule.

4    Q.    And in the proposed judgment that you presented

5    to the Court, you asked for, I believe, $105,000 in

6    attorney's fees.

7    A.    I don't recall.

8    Q.    Okay.  The judgment is one of your exhibits.

9    And you collected or received a judgment of about

10   $6,500 was the -- strike that.

11        From -- on the breach of contract claim,

12   itself, after the 600-or-so-dollars that the

13   plaintiff recovered, your collected amount,

14   according to the jury's verdict, was about $6,500,

15   right?

16   A.    I think the amount of our judgment was $6,150,

17   and that claim was only brought because it was

18   asserted as a counterclaim.

19   Q.    But you had asked for in the judgment or the

20   proposed judgment $109,441.79?

21             THE COURT:  Mr. Meyers?  Mr. Meyers, what

22   is the point of this?  Where are you going with

23   this?  What does it prove?

24             MR. MEYERS:  It proves, Your Honor, that

25   to the extent that the other side thinks that a

**SHAWNIE ARCHULETA, CSR/CRR**
**FEDERAL COURT REPORTER - 214.753.2747**

```
 1    78,000-dollar request is unfair, that they have a
 2    100,000-dollar request.
 3              THE COURT:  They didn't say that.  I'm
 4    just trying to figure out where it is you're going
 5    or what it is you're proving in any way that's
 6    salient to the issues in this case by asking them
 7    about other cases and what they asked for.
 8              I can understand if they were accused of
 9    similar conduct or something maybe to a certain
10    extent, but you are the one here looking at
11    sanctions, not them.  And it doesn't give you the
12    right to go through every case and ask them every
13    little question about attorney-client privileges.
14    It's really just a waste of time.  So I want you to
15    move off this point and get to points that help you
16    establish your theory of this sanctions motion,
17    defense.
18              MR. MEYERS:  Yes, Your Honor.  I'm trying
19    to do that.
20              THE COURT:  It doesn't -- but you're not.
21    So what I'm telling you is to move on to something
22    else besides nitpicking through what it is they
23    thought and what their strategy was in unrelated
24    cases, unless you can tie it to something that bears
25    upon the issues that I have to decide in this case.
```

```
 1   And so far you haven't done that, so let's move

 2   ahead.

 3              MR. MEYERS:  Yes, Your Honor.  I will hold

 4   any further explanation of what I was trying to do.

 5              THE COURT:  It's not time for you to

 6   explain, it's time for you to ask questions.  You

 7   have had a lengthy time on the witness stand to

 8   explain.  So let's move on to some points that bear

 9   upon the issues of your defense.  Okay?

10              MR. MEYERS:  Yes, Your Honor.

11              THE COURT:  Don't need any comments, just

12   need you to start asking questions.  Okay?

13              MR. MEYERS:  Yes, Your Honor.

14   Q.   (By Mr. Meyers)  In Exhibit 9, Mr. Martin --

15   A.   Okay.

16   Q.   -- you wrote that brief?

17   A.   Yes.

18   Q.   Okay.

19              THE COURT:  Before we get into this, just

20   tell me what it is that you are going to go towards

21   with this brief questioning.  What is it that you

22   are going to ask him about that hopefully will make

23   a point for you.

24              MR. MEYERS:  What I am going to ask him is

25   why he states that I mislead the Court and that I
```

1   disingenuously claim and disingenuously state.

2            THE COURT:  All right.  Let's ask him

3   that.

4   Q.   (By Mr. Meyers)  So you state, Mr. Martin, that

5   plaintiff misleads the Court initially requesting

6   and arguing 23 violations.

7   A.   Could you give me a page number?

8   Q.   Yes.  It's page 8, the top of page 8, header C.

9   A.   My recollection of this was, after the trial in

10  the courtroom -- it might be on the record of the

11  case.  But I believe that you had conceded post-jury

12  argument that there's only I think 16 calls that you

13  would end up being seeking damages, where your

14  motion that this is in response to mentioned that

15  you were seeking it for 23 but then would reduce it

16  for another number.

17  Q.   Did the jury come back with 23 calls,

18  Mr. Martin?  The verdict is included if you need to

19  see it.  It's an exhibit.

20            MS. MALONE:  Your Honor, just by objection

21  on --

22            THE COURT:  You need to speak up and slow

23  down.

24            MS. MALONE:  I'm sorry, I apologize.

25  Under the rule of optional completeness, if

```
 1   Mr. Martin would look at page 9, it is Mr. Meyers'
 2   actual testimony to the Court about the 23 calls,
 3   that he would not seek 23 calls, whereas, his
 4   briefing motion, in fact, did.
 5              THE COURT:  Okay.
 6   Q.   (By Mr. Meyers)  Do you recall, Mr. Martin,
 7   that the jury found 23 calls?
 8   A.   I don't recall.  I don't see the verdict here.
 9   Q.   Okay.  The verdict is part of the record, and
10   it shows --
11              THE COURT:  I thought we were going to
12   stick with questions.
13              MR. MEYERS:  Sorry.
14   Q.   (By Mr. Meyers)  Do you recall, Mr. Martin, the
15   memorandum regarding the TCPA that I submitted to
16   the Court that you were going to respond to?
17   A.   Vaguely.
18   Q.   Okay.  Vaguely?  Okay.
19   A.   Sure.
20   Q.   On page 9 of this exhibit that we are
21   discussing, number 9 --
22   A.   Okay.
23   Q.   -- you state in paragraph 15 that I
24   disingenuously state, quote, after the jury returned
25   its verdict, however, Mr. Wiley informed this Court
```

```
 1    that he would seek damages for only 16 of
 2    CreditWatch's violations.
 3         Do you recall that?
 4    A.   Sure.
 5    Q.   Okay.  And do you recall exactly what I said in
 6    the motion seeking damages under the TCPA?
 7    A.   No.
 8    Q.   Okay.  I stated:  After the jury returned its
 9    verdict, however, Mr. Whatley informed this Court
10    that he would seek damages for only 16 of
11    CreditWatch's violations.  Accordingly, he asks it
12    to award him $500 for each of the 16 violations and
13    then to treble that award.  In all, he seeks $24,000
14    under the TCPA.
15    A.   Okay.
16    Q.   Okay.  Is that disingenuous, that I was asking
17    the Court for 16 calls when I expressly said that?
18    A.   I think it could have been worded better maybe.
19    But I believe it's referring to disingenuously by
20    leading the memorandum off, arguing about 23 calls
21    and entitling him to 11,500 when, apparently, the
22    records showed otherwise, that there were not 23
23    calls.
24         And then also the fact that --
25    Q.   Thank you, Mr. Martin.
```

```
 1              THE COURT:  Why don't you let him finish.
 2    A.    -- how in the transcript -- or the record of
 3    the case recited on page 9 at the very top, how you
 4    stated, now there are 18 calls total, and in your
 5    memorandum you state there are 23 calls made.  So he
 6    is entitled to 11,500 rather than the multiplier of
 7    18 calls.
 8    Q.    Okay.  Exhibit 7 is the jury's verdict, and you
 9    can see that the jury came back with 23 calls; is
10    that correct?
11    A.    What page did you say again?
12    Q.    It's Exhibit 7?
13    A.    And what page is it?
14              MR. MEYERS:  I think I may have given him
15    one of my books, Your Honor.
16              THE COURT:  Tell him what page.  Why don't
17    you approach.
18    A.    What catches my attention is Question Number 5
19    on page 2 of Exhibit 7, it states:  How many calls,
20    if any, do you find from a preponderance of the
21    evidence were made by defendant to plaintiff's cell
22    phone using an ATDS without consent in violation of
23    the TCPA?  And the answer there is 16.
24    Q.    And then on the next page?
25    A.    How many calls, if any, do you find from a
```

1    preponderance of the evidence were made by defendant

2    to plaintiff's cell phone using an artificial or

3    prerecorded voice without consent in violation of

4    the TCPA?  And the answer there is 7.

5         And I believe part of the basis of how many

6    calls are argued, obviously you had admitted that

7    there were 18 calls made.  And totaling up these two

8    numbers is the 23 you speak of, but there is also

9    the possibility, which I believe is the fact in this

10   case, that those phone calls overlap.

11   Q.   And that they overlap was, in fact, why I said

12   16 calls to the Court; isn't that right?

13   A.   I don't know your purpose of your statement.

14   Q.   But you would agree that after the jury

15   returned its verdict, however, and Mr. Whatley

16   informed the Court that he would seek damages for

17   only 16 of CreditWatch's violations, accordingly he

18   asked it to award him $500 for each of those 16

19   violations and then to treble that award.  That's

20   pretty clear that I'm only asking for 16, right?

21   A.   Give me one second.  I believe if that was his

22   intent -- or your intent, that your memorandum for

23   the TCPA damages wouldn't have led off stating there

24   were 23 calls and he's entitled to 11,500 damages.

25   It could have led off stating there are 16 calls

1   he's stating damages for.

2   Q.   Is it possible that in the memo I strictly

3   stated what the jury verdict said?

4        My point, Mr. Martin is, in your brief, you say

5   I mislead and I am disingenuous, yet it's crystal

6   clear I said I asked for 16 calls.

7   A.   It's my opinion that you were disingenuous

8   stating that there were 23 calls when you had

9   previously said 18.

10  Q.   That same memo that we are speaking about, I

11  write:  Here the jury found that CreditWatch made 16

12  calls to Mr. Whatley's cell phone.  It also found

13  that CreditWatch made seven calls to Mr. Whatley's

14  cell phone using artificial and prerecorded device.

15       MS. MALONE:  Your Honor, I'm going to

16  object to reading documents into the record that are

17  not evidence.  It's really unfair to ask the witness

18  to testify to something that's not in front of him.

19       THE COURT:  Is what you are reading from

20  in evidence, Mr. Meyers?

21       MR. MEYERS:  No.

22       THE COURT:  I sustain the objection.

23  Q.   (By Mr. Meyers)  Mr. Martin, was -- before, you

24  were reading from a website about the Timothy White

25  case, you were reading from a Twitter account, is

1    that it?

2    A.    What's your question?

3    Q.    Were you reading from a Twitter account?

4    A.    When?

5    Q.    When you were testifying in response to

6    Ms. Malone's questions?

7    A.    Yes, I was refreshing my recollection.

8    Q.    Okay.  Was what you were reading into the

9    record in evidence?

10   A.    No.

11   Q.    Okay.  In your motion for sanctions --

12   A.    Which one?

13   Q.    The 1927.

14   A.    Okay.

15   Q.    -- you make the allegation that my office did

16   not communicate the $1,000 offer to Mr. White.  Do

17   you recall that?

18   A.    There is evidence that that's possible.

19   Q.    Have you had the opportunity to review

20   Mr. Radbil's Exhibit 34, the affidavit of Dr. White?

21   A.    Yes.

22   Q.    Okay.  After you reviewed that affidavit, do

23   you still think that the offer was not communicated

24   to Dr. White?

25   A.    What part of it are you referring to?

```
 1   Q.    What part of the affidavit?
 2   A.    Sure.
 3   Q.    Well, I'm referring to the affidavit and the
 4   exhibits in general.
 5              THE COURT:  Well, you need to give us an
 6   exhibit number.
 7              MR. MEYERS:  It's Exhibit 34, Your Honor.
 8              THE COURT:  So why don't you make sure
 9   he's got that.  It's not going to be in plaintiff's
10   exhibits, it's going to be in Radbil's Exhibits, 34.
11              THE WITNESS:  I've got it.
12              THE COURT:  Unless you have it there.
13              THE WITNESS:  Radbil's exhibits, and yes,
14   I have a copy.
15   A.    Regarding whether an offer was conveyed, the
16   evidence shows that maybe an offer was conveyed, and
17   it's more shifted to whether Dr. White actually knew
18   what the consequences of Rule 68 were.
19         And throughout the proceedings, his testimony
20   in court, he stated that he did not know the
21   repercussions of Rule 68 regarding our settlement
22   offer of judgment.  And then now is this Exhibit 34,
23   where it seems to contradict his testimony on the
24   record at trial.
25   Q.    Okay.  In paragraph 2 of that affidavit,
```

1    Mr. Martin --

2    A.   Okay.

3    Q.   -- Dr. White says:  Mr. Meyers communicated to

4    me RAB's offer of judgment in the amount of $1,000.

5    Mr. Meyers explained that the offer was tendered

6    under Rule 68 of the Federal Rules of Civil

7    Procedure and explained to me the consequences of my

8    decision not to accept or respond to the offer.

9         Is that right?

10   A.   I wasn't party to that conversation, so I don't

11   know how it was explained or anything, but that's

12   what it says.

13   Q.   Okay.  And I would like to -- do you recall at

14   the first hearing when we presented to the Court the

15   e-mail between Dr. White and myself, and Ms. Malone

16   objected that graycats@hotmail did not indicate it

17   was Dr. White's e-mail address?  Do you recall that?

18   A.   Yes.

19   Q.   Okay.  Paragraph 11, Dr. White confirms that

20   that is, in fact, his e-mail address?

21   A.   Yes.

22   Q.   If you would just take a moment, Mr. Martin, to

23   read through Exhibits A through C of that affidavit,

24   it will only take you a moment.

25   A.   Okay.

```
 1   Q.   Now that you have read the e-mails, do you
 2   believe that my office did not communicate the
 3   Rule 68 offer to Dr. White?
 4   A.   I don't believe in the evidence -- or in the
 5   exhibits that there's really any evidence that the
 6   repercussions of Rule 68 were explained to him.
 7   Q.   My question was, do you believe that my
 8   offer -- my office conveyed the offer to Dr. White?
 9            THE COURT:  Let me ask this, because --
10   before we go any further, because there's so much
11   involved in this hearing and all the issues.
12   Ms. Malone, from your recollection -- and
13   Mr. Meyers, I think I've got yours -- but your
14   position on whether or not this is contradictory to
15   what's been offered in the record already or not and
16   how, just so that I'm clear on this.
17            MS. MALONE:  Your Honor, at the trial --
18   and I was looking for the reference, and Mr. Martin
19   actually might know where it is a little faster --
20   when the Court was having a discussion with
21   Dr. White when Mr. Radbil was not here, we talked
22   about the fact that we had made an offer to him, and
23   I told the Court that I had been concerned that he
24   may not be aware of that offer based on the Lopez
25   case and the Whaley case, where we had learned in
```

1    deposition that their clients said they were never

2    given offers.

3            And there was a discussion between

4    Dr. White and the Court, and he seemed to indicate

5    that he was not aware that an offer had been made.

6    So that was Dr. White's testimony at trial, which is

7    certainly what Mr. Martin used in the course of his

8    motion for sanctions.

9            Then, last time, October 2nd, before the

10   third hearing, we get an affidavit from Dr. White,

11   still no Dr. White, but we get an affidavit from

12   Dr. White, which is contradictory to what his

13   testimony was to the Court.  And I don't have

14   that --

15           THE COURT:  We will take a break here in a

16   minute.  But who obtained the declaration of Timothy

17   White?

18           MR. MEYERS:  Mr. Jefferson, Mr. Radbil,

19   and I all spoke to Dr. White.

20           THE COURT:  Okay.  So it was pretty

21   recent?

22           MR. MEYERS:  Prior to the last hearing,

23   yes, Your Honor.

24           THE COURT:  So he's local, and you know

25   how to reach him?

```
 1              MR. MEYERS:  Yes.  Yeah.

 2              THE COURT:  Can I get a phone number?  I

 3    think we need to get him down here.

 4              MR. RADBIL:  214 -- I don't remember the

 5    remember the middle, but the last four are 1163.

 6              THE COURT:  That won't help me.

 7              MR. RADBIL:  I will grab it.

 8              THE COURT:  Okay.  I would like to call

 9    him.  I think we need to have him down here and

10    answer some questions.

11              MR. RADBIL:  The U.S. Marshal has my

12    cellular telephone outside.

13              THE COURT:  Does he work at the same place

14    he used to?

15              MR. RADBIL:  Simple Surrogacy.

16              THE COURT:  Where did you all go to get

17    the affidavit?  Was it at his office or home or

18    what?

19              MR. RADBIL:  It was a conference call,

20    Your Honor.

21              THE COURT:  Conference call.  But the

22    affidavit must have gone to him to sign.

23              MR. JEFFERSON:  I can actually explain

24    that, Judge.

25              THE COURT:  Mr. Jefferson.
```

```
 1              MR. JEFFERSON:  Yes.  And I can't remember
 2     who found it, but apparently there is a mobile
 3     notary service.  And so what happened was, was that
 4     the affidavit was put together, I think by
 5     Mr. Meyers.  Mr. Meyers sent the affidavit to my
 6     office, and my secretary e-mailed it to the mobile
 7     notary service of Dallas, who then drove it out to
 8     Dr. White's home, which is -- and I apologize, I
 9     don't know my Dallas suburbs, but it was in some
10     suburb.  And then it was scanned and e-mailed back
11     and then filed.  And whatever day all the exhibits
12     were filed was the day that that happened.
13              THE COURT:  Okay.  And I'm not faulting
14     anything you have done, Mr. Jefferson.  If anything,
15     you have been a breath of fresh air in these
16     proceedings.  But I think we need to talk to
17     Dr. White, and I think we need to locate him.  And
18     if he won't come, we will get him subpoenaed by the
19     Court to be down here and answer some of this,
20     because this goes to the crux of what happened.  And
21     I talked to him directly during the trial the day
22     that Mr. Radbil didn't come, and it seems to be very
23     different.  And so it does worry me that he's taken
24     a step back from what he said.
25              We're going to take a ten-minute break.  I
```

1    would like to get that phone number so we can

2    contact him and just find out what his side of the

3    story is in person.

4              We will be in recess.

5         (Recess taken from 11:31 to 11:43.)

6              THE COURT:  I have the number, and I think

7    we will move on, Mr. Meyers.  And Mr. Martin, if you

8    will come back up here.

9              MR. MEYERS:  Your Honor, I would like to

10   correct one thing I didn't have the opportunity to

11   correct.

12             THE COURT:  Okay.

13             MR. MEYERS:  You had asked who prepared

14   the affidavit.  I prepared paragraphs 1 through 5

15   and paragraph 11, and then I forwarded it to

16   Mr. Jefferson and Mr. Radbil, and I don't know what

17   happened after that point.  I'm not having any

18   problem with the affidavit, but just for the point

19   of accuracy.

20             THE COURT:  Okay.  Let's go ahead with

21   more questions, please.

22   Q.   (By Mr. Meyers)  Mr. Martin, do you recall at

23   the first hearing Judge Boyle asked if we coached --

24   and that may not be her exact word -- Mr. White to

25   testify as to an amount of actual damages, and we

 1 | said no?  Do you recall that?
 2 | A.    Somewhat.
 3 | Q.    Okay.  And at that point --
 4 |       THE COURT:  I think what happened is that
 5 | originally, at the first hearing maybe, your
 6 | explanation for Dr. White's, I guess, outburst was
 7 | how you described it then, was that he was a rogue
 8 | client at some point.  And then it kind of changed
 9 | and got tempered into a different issue, but you
10 | said he was a rogue client.
11 |       And I don't know where your theory is now,
12 | but that's how -- as though you weren't -- this
13 | testimony was never expected or intended to come
14 | out, given the fact that a damages amount had never
15 | been disclosed to the defense.  And I just want to
16 | be clear on that.  Go ahead.
17 |       MR. MEYERS:  I'm not in any position to
18 | argue with the Court.  I don't believe that those
19 | were my exact words, but I understand the point the
20 | Court is making.
21 |       THE COURT:  All right.  Go ahead.
22 | Q.    (By Mr. Meyers)  Do you recall more or less
23 | that, Mr. Martin?
24 | A.    I can't necessarily agree with your summary of
25 | it, but I remember discussions regarding the

 1  testimony.

 2  Q.   Okay.  Would it be fair to say that on that

 3  point at the sanctions hearing --

 4          THE COURT:  Which sanctions hearing are we

 5  talking about?

 6          MR. MEYERS:  The first day, Your Honor.

 7          THE COURT:  The first one?

 8          MR. MEYERS:  Yes, Your Honor.

 9          THE COURT:  And what page are we talking

10  about in the transcript?  That's going to be August

11  the 2nd.

12          MR. MEYERS:  It is, Your Honor.  I don't

13  know the answer to that.

14          THE COURT:  Okay.  I have it up here, and

15  I want to find what we are talking about.

16          MS. MALONE:  Your Honor, the language

17  where Mr. Meyers described his client as being --

18  and I quote -- actually kind of rogue, it appears at

19  page 142.

20          THE COURT:  Of the first transcript?

21          MS. MALONE:  Yes, ma'am.

22          THE COURT:  If you have that, take a look

23  at it.  I want to make sure that the record doesn't

24  blur or confuse what was said in a prior hearing,

25  especially on important points.

1          And on that page in the first transcript
2     starting at line 4 -- well, let me go to the page
3     before.  I asked something about where your
4     questions were going to with regard to calculation
5     of damages and fair settlement, something of that
6     nature.  And in response to that area of questioning
7     on line 4 of page 112 of that first transcript.
8          MS. MALONE:  142, Your Honor.
9          THE COURT:  142, I'm sorry.  It's:  Yes.
10    It's going to the point that we did not counsel
11    Dr. White to talk about this 40,000 in interest and
12    penalties and this 5,000 that he didn't get a chance
13    to teach a class.  It was actually kind of rogue.
14    I'm not finding fault with him.
15          So that's what you said that day.  And
16    then I was asking:  So he just came up with it?
17          And you say:  When he say, he just came up
18    with it --
19          And I said:  Well, you tell me.  What does
20    that mean?
21          And you said:  What it means, Your
22    Honor -- and this is you, Mr. Meyers -- is under no
23    set of circumstances did we ever say to him, you
24    need to say you have 40,000 in interest and
25    penalties and 5,000 in a class that you couldn't

1   teach.  As a matter of fact, Your Honor, we

2   disagreed with it.  It didn't make any sense.

3          So that's what you said.  And on that

4   note, at the trial, itself, when that testimony was

5   beginning to be elicited by Mr. Radbil and

6   Ms. Malone asked for a sidebar, she objected because

7   this figure had not been disclosed.  And Mr. Radbil

8   indicated he wasn't sure what the answer would be.

9          And I said, you expect that he's got an

10  answer, something like favorable to you or something

11  of that nature, and Mr. Radbil said yes.

12         So understanding that, I sustained the

13  objection because it was directly violating the

14  ruling I had made earlier about no damages

15  disclosed, no damages testified about.

16         So let's move on to your next point.

17  Q.   (By Mr. Meyers)  Paragraph 9 of Dr. White's

18  affidavit, Mr. Martin --

19  A.   Okay.

20  Q.   -- could you just take a moment to read that?

21  A.   Okay.

22  Q.   Do you believe, as we sit here today, that Noah

23  or I -- Mr. Radbil or I instructed Dr. White to

24  provide the jury a specific dollar figure in

25  damages?

1  A.   I'm not quite sure what to believe on y'all's

2  communications and what he did.

3  Q.   Thank you.

4       Mr. Martin, if I told you that I'm looking at a

5  certificate from the Eastern District of Texas that

6  says I was admitted on April 24, 2013, would you

7  believe me?

8  A.   Maybe.

9  Q.   If I told you I was looking at a certificate

10  from the Southern District of Texas stating I was

11  admitted on June 13th, 2013, would you believe me?

12  A.   Quick thing about these is, I'm not sure at the

13  time if I may or may not have researched whether you

14  were admitted, whether it's a period of processing a

15  request, and it could take a period of days for it

16  to be processed, and I don't know if it ends up

17  being retroactive to when an application is made.

18  So I couldn't really tell you when you were licensed

19  or not.

20  Q.   Do you know why I asked you those questions?

21  A.   I believe it has to do with the CreditWatch

22  briefing.

23  Q.   Right.  I assumed that you just made a mistake.

24  A.   I don't necessarily know if I made a mistake or

25  not.  If, according to my research checking on those

1    Court's websites, it says you were not licensed,

2    then I believe I would have been correct at the

3    time, so. . .

4    Q.    Okay.  Ms. Malone, when she was examining me,

5    asked a particular line of questioning about

6    Mr. Radbil on two occasions arguing that you have to

7    strike -- during the jury selection process and who

8    goes first peremptory, cause, et cetera.  Do you

9    recall that?

10   A.    Yes.

11   Q.    Do you recall her mentioning that he did it

12   twice, right?

13   A.    That what?

14   Q.    That he did it on two occasions.

15   A.    No, I don't think that was said.

16   Q.    Okay.

17   A.    I think what was said was he did that in the

18   Brown case and then brought it up in the motion for

19   new trial, but I could be wrong.  I don't believe it

20   was said that he did that twice.

21   Q.    Okay.  And I could be wrong.  Thank you.

22         The way you phrase it, he did it at the Brown

23   trial and then brought it up in the Brown motion for

24   new trial.  Is that to suggest that it's wrong to

25   reargue a decided issue?

1    A.    No; I was just stating that it was an issue

2    twice in that case.

3    Q.    Okay.  If a lawyer makes a mistake on one

4    occasion, do you find that objectionable?  Do you

5    find that an affront to the profession?

6    A.    I mean, people probably have different --

7    differentiating definitions of mistake, and it

8    depends on what was actually a mistake or not,

9    whether something was intentional.  It's a little

10   broad to answer to one specific thing the way you're

11   asking it.

12   Q.    Okay.  Do you think someone could make the same

13   mistake four times in four different cases?

14            THE COURT:  Are we talking about the issue

15   where Mr. Radbil argued as a legal matter that

16   peremptory strikes come before strikes for cause?

17            MR. MEYERS:  I was just talking generally,

18   Your Honor.

19            THE COURT:  Isn't that what the argument

20   was, though?  It was about peremptories versus

21   strikes for cause.

22            MR. MEYERS:  I believe it was, Your Honor.

23   A.    Could you repeat your question?

24   Q.    (By Mr. Meyers)  Yes.  Do you believe -- and

25   that's -- I asked you -- I believe this happened in

1   the White case, and I could be wrong.  But do you

2   believe that a lawyer can make the same mistake,

3   mistake of a legal argument, in four separate cases?

4   A.    It's possible.

5   Q.    Okay.  So what would distinguish between

6   someone making a mistake four times and someone

7   doing it on purpose four times?

8   A.    Well, that kind of goes to what I was saying

9   about the definition of mistake.  If it's on

10  purpose, it might not be a mistake.

11  Q.    Okay.

12          THE COURT:  Also -- and again, I feel the

13  need to just fill in the blanks here at some point,

14  I have heard so much of this.

15          This is the same lawyer that you're

16  touting on your firm website as experienced trial

17  counsel.  And at least in some advertising up there,

18  I recall from the last time, it indicated he had

19  represented college students towards the NCAA issues

20  and a major league baseball player.  So yes, that be

21  inconsistent if that kind of representation is being

22  made out there and that kind of mistake, pretty

23  basic voir dire mistake is being made.

24  Q.    (By Mr. Meyers)  Mr. Martin, I understand one

25  of the issues in this case is that a lawyer and a

1    witness say contradicting or conflicting things; is

2    that right?

3    A.    Are you referring to the amount of damages in

4    the testimony?

5    Q.    For example, sure.

6    A.    Yes, that is one of the issues generally.

7    Q.    Okay.  And that a lawyer and a witness say

8    different things.  Does that make the lawyer a liar?

9    A.    Depends.

10   Q.    Okay.  Have you ever been involved in a case

11   where a witness or two have made one statement and

12   then a lawyer or two have made the opposite

13   statement?

14   A.    Not that I recall.

15   Q.    Okay.  Do you recall in the Whatley v.

16   CreditWatch case that two witnesses for the

17   defendant spoke about the existence of a contract

18   and two lawyers for the defendant said the contract

19   didn't exist?  Do you recall that?

20   A.    In regards to that, if there was a written

21   contract, there's a difference between one being --

22   how do I word this?  I understand what you are going

23   towards.

24        At one time there was a written contract.  No

25   one has seen it since.  So there is a difference --

1   the testimony that you are referring to of the two

2   CreditWatch witnesses, they both stated there is or

3   was a written contract, not that they had it or

4   anything.

5   Q.    So you're making a distinction between someone

6   acknowledging the existence of the contract and the

7   existence itself.

8   A.    I'm not quite sure I'm following you, there.

9   Q.    My point, Mr.-- strike that.  It wasn't a

10   question, Your Honor.

11        Part of the concern you have here, Mr. Martin,

12   you and Ms. Malone have here, is how difficult

13   discovery was in this case; is that right?

14   A.    It's usually difficult in this case and a few

15   others with you.

16   Q.    Okay.  And I believe what you said is there's

17   always a few issues that we fight you on, right?

18   A.    Sure.

19   Q.    Okay.  Would you say that there are always a

20   few issues that you fight us on?

21   A.    I would say that's a fair statement.

22   Q.    Okay.  So, in fact, in your Rule 37 Motion for

23   Sanctions in Whatley v. AHF, do you recall that

24   motion for sanctions?

25   A.    Yes.

1    Q.    And what I'm talking about is, in Whatley v.

2    AHF, you heard me last time talk about the three

3    cases, White, Whatley, Whatley?

4    A.    Yes.

5    Q.    In Whatley v. AHF, after your side won on

6    summary judgment, you also submitted a 1927, a 37, a

7    54 and 68 Motion for Sanctions and Attorney's Fees.

8    Do you recall that?

9    A.    Yes.

10   Q.    Those motions were denied?

11   A.    Yes.

12   Q.    Do you recall including that in your exhibit

13   book?

14   A.    We didn't include it in our exhibit book.  It's

15   not related to this case.

16   Q.    But you would agree there are things not

17   related to the case in your exhibit book, right?

18   A.    I disagree with that.

19   Q.    Okay.  Do you recall at the beginning of the

20   first day of the hearing on August 2nd Ms. Malone

21   stating that she's never filed motions like this

22   before?

23   A.    I would have to read the testimony.  I think it

24   was more that she's never seen conduct like this.

25            THE COURT:  It's all right.  I recall the

1    testimony.  Let's move ahead.

2              MR. MEYERS:  Yes, Your Honor.

3              THE COURT:  I recall what she said.

4              MR. MEYERS:  Yes, Your Honor.

5    Q.   (By Mr. Meyers)  I know an issue in this case,

6    Mr. Martin, was about the dialer manual, is that

7    right, one of the issues here?

8    A.   Not -- not an issue that we brought before the

9    Court.

10   Q.   I'm saying an issue in the case was a dialer

11   manual, right?

12   A.   It came up.

13   Q.   Okay.  Could you see how the dialer manual

14   could be relevant, reasonably calculable to lead to

15   the discovery of admissible evidence, a dialer

16   manual?

17   A.   The situation you are referring to is a

18   situation where our client didn't have it and I

19   don't believe had access to one either.  You can't

20   produce something you don't have.

21   Q.   And that was the position you all took in the

22   Whatley CreditWatch case and the Brown v. Enterprise

23   case.

24   A.   I'm not familiar with Brown.  And in the

25   Whatley case -- are you referring to the contract or

1    the dialer?

2    Q.    The dialer manual.

3    A.    Not familiar with the Brown case, to answer

4    that.  And with the Whatley case, I think it's the

5    same situation, they didn't have the contract or the

6    manual.  The manual is what you're referring to.

7    Q.    Did you read the appellate order in the Brown

8    case?  Did you have a chance to read the appellate

9    order?

10   A.    Yes.

11   Q.    Did you have a chance to see how the appellate

12   court noted how vigorously the defendant there

13   fought to keep the manual out?

14   A.    I remember that being there in dicta.

15   Q.    Okay.  Have you had the opportunity to review

16   the various fee awards and fee opinions issued with

17   regard to my firm?

18   A.    I've looked at some more than others.  But the

19   affidavit that you had filed with the Court I really

20   just casually glanced at it.

21   Q.    Okay.  That's Exhibit 28 of our exhibit book,

22   please.

23   A.    Okay.

24   Q.    Could you just take a moment to look through

25   that chart?

```
 1   A.    Sure.  I'm ready.

 2   Q.    Okay.  Do you see multiple courts have awarded

 3   us 100 percent of our fees?

 4   A.    Well, I'm not -- I don't really recall the

 5   documents these are based on, so it's hard for me to

 6   answer that.  And I also don't know if each of the

 7   ones were 100 percent awarded.  It could have been a

 8   default judgment.

 9   Q.    So you had the time to review a handful of bad

10   opinions but not any of the good opinions, is that

11   fair?

12   A.    In preparing for these sanctions hearings, your

13   attorney's fees awarded in other cases I didn't see

14   as an issue at hand.

15   Q.    In the fee -- your various fee motions,

16   Mr. Martin --

17   A.    In this case?

18   Q.    Yes, Mr. Martin -- you speculate as to all of

19   the bad things that we do to our clients.  We deduct

20   from their thousand dollars filing fees and

21   deposition costs and leave them nothing.  We sue

22   them if they quit, et cetera, et cetera.  Do you

23   recall that?

24   A.    I think -- I don't agree with your statement.

25   Q.    And do you not agree because I'm not speaking
```

1  verbatim, or do you not agree with the crux of what

2  you were saying?

3  A.   Both.  Like, for instance, how you state that

4  we sue our clients if -- how ever you state it about

5  we sue our clients.  What we, to my recollection,

6  posed in our motion is that your fee agreement

7  leaves you the possibility of suing each of your

8  clients.

9  Q.   And do you think that's inappropriate in and of

10 itself?

11 A.   It depends.

12 Q.   Was that a yes or a no?

13          THE COURT:  It was an, It depends.

14 A.   I believe the fee agreement is inappropriate.

15 Q.   (By Mr. Meyers)  Okay.  Can you tell me what

16 you feel is inappropriate about it?

17 A.   I believe that it takes settlement authority

18 out of your client's hands and that you use it to

19 attempt to get all of your attorney's fees in a

20 case, and if you don't, hold that against the

21 client.

22 Q.   You say you believe that.  Do you have any

23 evidence that I do that?

24 A.   You included two, I guess, original petitions

25 in your exhibits.  One had to do with where your

1    co-senior partner failed to meet with his client and

2    give her advice on an upcoming hearing in an

3    underlying debt case where she accepted a

4    settlement, and you went after her for the fees.

5    Q.   Do you know the scope of that representation?

6    A.   I would imagine it's for her federal FDCPA

7    claims.

8    Q.   Okay.  Did you have the opportunity at any time

9    to review document 147, which was an affidavit filed

10   by Russell Thompson, and then document 146 filed by

11   Joe Panvini?

12            THE COURT:  Are those documents on the

13   docket sheet?

14            MR. MEYERS:  Yes.

15   A.   It's been a while since I reviewed them.

16   Q.   (By Mr. Meyers)  You had the opportunity to?

17   A.   Yes.

18   Q.   Did you notice in Mr. Thompson's affidavit he

19   speaks of nearly 500 cases that we had clients just

20   abandon us or defendants tell us information that

21   made us feel that their claim was right and that we

22   closed those files and didn't seek anything from

23   anyone?  Do you recall that?

24   A.   I don't recall it, but it doesn't mean the fee

25   agreement doesn't pose that option.

```
 1   Q.    In reaching the conclusion that the fee

 2   agreement is improper, have you reviewed any ethical

 3   opinions from any bar anywhere?

 4   A.    I read the ones that you had included in your

 5   letter to the bar, and I don't think they apply in

 6   this situation.  And just going over the Texas

 7   ethics rules, it's my opinion that it takes

 8   settlement authority out of your clients' hands.

 9   Q.    I appreciate that that's your opinion.

10         THE COURT:  Did the Arizona Bar ever give

11   you an opinion?

12         MR. MEYERS:  They have not yet, Your

13   Honor.

14         THE COURT:  Okay.

15   Q.   (By Mr. Meyers)  Did you see similarities

16   between, for example, what the District of Columbia

17   Bar said and my fee agreement?

18   A.    I don't really recall.

19   Q.    Okay.  Did you happen to have the occasion to

20   read document 154 and its exhibits, the affidavit of

21   Tremain Davis?

22         THE COURT:  Mr. Meyers, this is a

23   difficult process here, because you are asking him

24   about things that he couldn't possibly have

25   memorized seriatim.  So it's kind of a waste of time
```

1   to ask him, when he can't be sure unless he has it

2   in front of him.

3           So it sounds like something I will be

4   reading, if I haven't already -- and I have read

5   most of this stuff -- upon submission or you have

6   already testified about it at length.  But I would

7   prefer that you stick with questions that he has

8   some firsthand knowledge of.  Okay?

9           MR. MEYERS:  Yes, I will certainly try,

10  Your Honor.  I may err, but you will put me back on

11  course, and I will be right back there, Your Honor.

12  I'm sorry.

13  Q.   (By Mr. Meyers)  In this case, Mr. Martin --

14  A.   Uh-huh.

15  Q.   -- if Dr. White didn't want $1,000, do you

16  think that my firm did wrong in not making him take

17  $1,000?

18  A.   I don't know if you properly disclosed the

19  effects of Rule 68 or not.  I can't necessarily

20  answer that.

21  Q.   That wasn't my question.  My question was

22  merely, if he didn't want $1,000, do you think we

23  did wrong in not making him take $1,000?

24  A.   I think it goes, again, to settlement for

25  $1,000 or an offer of judgment for $1,000.  If it

1    was posed as just a settlement of $1,000 and he says

2    he doesn't want a settlement of $1,000, then no.

3    But in this situation it was a Rule 68 offer, which

4    may or may not have made a difference.

5    Q.   Okay.  If ultimately he didn't want $1,000 how

6    ever it was offered it to him, did we do wrong in

7    not making him take it?

8            THE COURT:  I think that's been asked and

9    answered.

10           MR. MEYERS:  Okay.

11           THE COURT:  Okay.

12   Q.   (By Mr. Meyers)  Are you aware, prior to the

13   filing of the lawsuit, that we sent two letters to

14   your client trying to resolve this matter?

15   A.   Yes.

16   Q.   Okay.  And are you at least now aware that

17   Dennis Kurz, in January of 2012, made an

18   8,500-dollar demand to Ms. Malone?

19   A.   It's possible.

20   Q.   You say it's possible based on what?

21   A.   Just some discussions.

22   Q.   And Dennis' e-mail attached to his affidavit?

23   A.   It's been a while since I've looked at it.

24   Q.   Okay.

25           THE COURT:  The representation at the

1    first hearing, regardless of what you have just

2    talked about in early 2012 or something, was that

3    there was no demand made I think before and then

4    after the mediated settlement conference.  And

5    that's going to be in that first transcript of this

6    August 6th hearing where Mr. Radbil said that -- I

7    said:  You're telling the Court that you did, in

8    these meetings, discuss the mediated -- discuss the

9    mediated settlement matters -- I can't decipher

10   exactly my question, but it was about discussion of

11   the demand.

12          Mr. Radbil said, no -- the answer was:

13   No; that was a tiny, small piece of what I did to

14   prepare for trial in this case -- and this is

15   Mr. Radbil.  In fact, we didn't understand -- we

16   didn't think the case would be tried, nor did we

17   understand the logic of proceeding after summary

18   judgment had been granted.

19          And the question was back to Mr. Radbil by

20   the Court:  Did you ever give them a demand figure?

21          And Mr. Radbil's answer was:  At the

22   mediated settlement conference?

23          And I said:  At any time.

24          And Mr. Radbil said:  We did, yes.

25          And I said:  What was the figure?

 1            And then he goes back to:  I believe we
 2   gave their client a pre-suit demand.  I believe it
 3   was -- I don't remember the exact figure, but the
 4   letters I saved, it was under $10,000.  That was a
 5   pre-suit demand.
 6            And then you said, Mr. Meyers, you stood
 7   up and said you could present the Court a
 8   chronology.
 9            And then Ms. Malone, I asked her to
10   clarify, and she referred the Court to, I believe it
11   was, Tab Number 10, an e-mail from Mr. Kurz in
12   September of 2011.  The E-mail indicates a demand
13   was requested by defense counsel.
14            And Mr. Kurz wrote:  Robbie you had asked
15   me for a demand in this case -- and this is
16   September 9, 2011 -- given our initial pre-lit
17   demand had expired.  As this case is now in
18   litigation, we have no demand at this time.
19            And again, without getting into all of the
20   back and forth:  Mr. Radbil, prior to the mediated
21   settlement conference, you personally made no
22   settlement demand on Ms. Malone, was her question.
23            And he said:  Did I personally communicate
24   them?
25            And she said:  Yes.

1            And he said:  Our firm did.

2            Then it goes on and on and on, and it

3    turns out there was no demand.  And so there was

4    this issue with Mr. Radbil starting off this whole

5    line of questioning with didn't understand the logic

6    of going to trial after summary judgment when, in

7    fact, no demand had been made.  And that is

8    substantiated in the first transcript of the first

9    hearing.

10           So I just want that to be clear, because I

11   think so much of this just goes in circles, and I

12   want to get back to the truth of what actually

13   happened.

14           All right.  Mr. Meyers, let's go ahead.

15           MR. MEYERS:  Thank you, Your Honor.

16   Q.  (By Mr. Meyers)  I can only speak -- strike

17   that.

18   A.  I can answer what you're getting towards about

19   an 8,500-dollar settlement demand.  No demand was

20   ever -- no settlement offer was made to me

21   personally.  And the one you are referring to,

22   Ms. Malone does not have recollection of receiving

23   it.

24   Q.  Okay.  But you know the one I'm referring to.

25   It's attached to Mr. Kurz' affidavit, document 142,

1  from January 5th, 2012?

2  A.   I can't recall it, but I know through all of

3  these proceedings there has been discussion of the

4  8,500-dollar settlement.

5       THE COURT:  So let's clear up this point.

6  In a nutshell, what does Mr. Kurz's affidavit say

7  with regard to the demand?  What and when and how

8  much?

9       MR. MEYERS:  As a matter of regular

10  business practice, he saves e-mails.

11       On January 5th, on behalf of Timothy

12  White, I made an 8,500-dollar demand to counsel for

13  Regional Adjustment Bureau, Inc., via e-mail.

14       THE COURT:  January 5, 2012.

15       MR. MEYERS:  2012.

16       THE COURT:  All right.

17       MR. MEYERS:  So the chronology, Your

18  Honor, would be two pre-litigation letters, offer of

19  judgment -- or perhaps what's your demand, no

20  demand, offer of judgment $8,500.

21       THE COURT:  Ms. Malone, if you could just

22  clarify the testimony on this so far, because it

23  seems inconsistent with what Mr. Kurz has just said

24  to have been said by Mr. Meyers.

25       MS. MALONE:  Your Honor, I don't remember

1    receiving a demand.  But to be honest, Your Honor,

2    if they want to say they sent us an 8,500-dollar

3    demand, it actually goes to our point to prove that

4    their damages stuff is worse.  Because that demand,

5    by the date that he is saying, would have been after

6    Dr. White's his deposition, which would have meant

7    that someone in their firm valued the case at

8    $8,500.

9              There is one thing that I think was sort

10   of glossed over, and I'm sure Mr. Meyers will

11   correct it.  After summary judgment, Mr. Meyers

12   reached out to me and said he wanted $65,000.  Then

13   after they got the damages memo from their client at

14   the mediated settlement conference where the damages

15   memo talked about, I assume, the $45,000, then

16   Mr. Radbil's demand at the mediated settlement

17   conference was never below $100,000.

18             So I don't remember the $8,500.  If he

19   wants me to say there was one, it actually hurts

20   their argument more on the damages side.  So I will

21   say, Judge, okay, I don't remember it, but it

22   actually proves our point that they did tell their

23   client the $45,000 would be admissible.

24             THE COURT:  The mediated settlement

25   conference took place in late fall of 2012.

1          MS. MALONE:  No, ma'am.  The mediated

2    settlement conference took place a couple of weeks

3    before trial.  I believe that it was early February.

4          THE COURT:  2013.

5          MS. MALONE:  Yes.

6          THE COURT:  Let's go, Mr. Meyers, please.

7          MR. MEYERS:  Thank you.

8    Q.   (By Mr. Meyers)  In your experience, have you

9    seen clients waiver between settling high, settling

10   low, wanting to litigate?

11   A.   Yeah, it happens.

12   Q.   In your experience, there are times in the

13   course of a case that one may want to flesh out some

14   evidence and get an understanding of the case prior

15   to engaging in settlement discussions.  Is that

16   true?

17   A.   Are you referring to discovery or

18   pre-litigation or . . .

19   Q.   Just times in a case.

20   A.   Sure.

21   Q.   There are times when judicial intervention is

22   required to get a party to supplement discovery,

23   right?

24   A.   Yes.

25   Q.   If Dr. White did not want $1,000 at any point

1   in the litigation, would continuing with the
2   litigation be vexatious?
3   A.    I can't really answer that question the way
4   it's asked, because it goes to our argument
5   regarding it being an offer of judgment.
6   Q.    In paragraph 24 of your motion for Rule 37
7   sanctions, which is document 120, you state:
8   Focusing on the statutory damages hypothetically, if
9   any client of Weisberg & Meyers recovers the maximum
10  amount of statutory damages and nothing for actual
11  damages, Weisberg & Meyers can deduct filing fees of
12  $370 in federal court, the cost of taking one
13  deposition and the cost of one original transcript,
14  and the client's 1,000-dollar recovery is gone.  Do
15  you recall that?
16  A.    Sure.
17  Q.    Any evidence that my firm has ever done that?
18  A.    Any information about that is protected, so I
19  would not have access to it.  As it says,
20  hypothetically.
21  Q.    Okay.  And in paragraph 25, on page 13 you
22  continue:  The greed is vastly evident in the three
23  ways Weisberg & Meyers attempts to recover its
24  attorney's fees from their own client if they aren't
25  obtained through litigation.

1  A.    Okay.

2  Q.    Do you have reason to believe that I have sued

3  more clients than the two lawsuits that I presented

4  to the Court because the Court asked me?

5  A.    No.

6  Q.    One of those lawsuits -- have you had the

7  opportunity to read them?

8  A.    It's been a while.

9  Q.    One of those lawsuits alleged that the

10 defendant sent the check to the client and the

11 client kept our attorney's fees and never paid us.

12 Do you recall that?

13 A.    Yes.

14 Q.    Do you think it was wrong for me to sue that

15 client?

16        THE COURT:  Mr. Meyers, I just want you to

17 know that you have had him up here at least as long,

18 if not longer, than Ms. Malone did.  And I'm going

19 to give you ten more minutes to finish up these

20 questions, because I can't just let you go all day

21 like I have done in the past.  So make sure you pose

22 the questions that you want the answers to.  Okay?

23        MR. MEYERS:  Yes, Your Honor.  Thank you.

24 A.    The issue is not you going out and suing all

25 these clients.  The issue is that your fee agreement

1    allows you to.  Whether you exercise that option,

2    that's up to you, but it's in your fee agreement and

3    it allows you to do that.

4    Q.   (By Mr. Meyers)  So it's your position that an

5    attorney-client contract can't say to the client, if

6    you don't pay the bill, we have the right to sue

7    you.  Is that right?

8    A.    Depends on the contract.

9    Q.    Okay.  In the exhibit book, your exhibit book,

10   included are orders to show cause in the case of

11   Little-Cadman, Paris, and Saunders.

12   A.    Correct.

13   Q.    Were those -- I'm not asking you anything about

14   privileged communications.

15   A.    Okay.

16   Q.    Did you research those cases to find those

17   orders yourself?

18   A.    Could you repeat the cases?

19          THE COURT:  Can you give us the exhibit

20   numbers you're referring to?

21          MR. MEYERS:  Yes, Your Honor.

22          I'm having trouble finding my exhibit

23   list, Your Honor, I'm sorry.

24          THE COURT:  Well, Exhibit Number 21 is the

25   Little-Cadman case.  And what was the other one you

```
 1   were looking for?

 2           MR. MEYERS:  Paris.

 3           THE COURT:  Harris?

 4           MR. MEYERS:  Paris.  P-A-R-I-S.

 5   A.   Paris is Exhibit 20, and Ivy Little-Cadman is

 6   Exhibit 21, and Saunders is Exhibit 28.

 7   Q.   (By Mr. Meyers)  Did you have the opportunity,

 8   Mr. Martin, to research and find those cases

 9   yourself?

10           THE COURT:  I'm not sure what difference

11   that makes, and you're running out of time.  So

12   let's ask another question about the point that

13   you're making with this.

14           MR. MEYERS:  Yes, Your Honor.

15   Q.   (By Mr. Meyers)  I'm curious why those orders

16   were included without the corresponding orders

17   discharging the order to show cause in each case.

18   A.   Because it shows misrepresentations to the

19   Court.  In these orders, the Court believes there

20   are misrepresentations.

21   Q.   And do you think after a hearing on those cases

22   that the Court still felt there were

23   misrepresentations and just decided not to sanction

24   us?

25   A.   Yes.
```

1   Q.   So you think the Court would find

2   misrepresentations and decide not to sanction?

3   A.   It's possible.  In discovery disputes, the

4   rules allow sanctions to be levied based on the

5   court's orders.  The courts do not often award

6   discovery sanctions in motions to compel.

7   Q.   But those were not orders on motions to compel,

8   were they?

9   A.   No.

10          MR. MEYERS:  Okay.  I just have a few more

11   questions, Your Honor, given the Court's timeline,

12   just a few more questions.

13   Q.   (By Mr. Meyers)  As a general proposition,

14   Mr. Martin, if a client has made it clear to a

15   lawyer that a particular proposal for settlement

16   would be unacceptable to the client, do you think

17   that the lawyer still has a duty to convey that

18   unacceptable proposal?

19   A.   It might depend.

20   Q.   In the case of Whatley v. AHF --

21   A.   Yes.

22   Q.   -- your firm won that case on summary judgment.

23   And did it ask for something in the neighborhood of

24   $120,000 in attorney's fees and sanctions?

25   A.   It's possible.  I'm not sure what the number

1  is, but we did seek our attorney's fees.

2  Q.    And that court denied your motion?

3  A.    Correct.

4  Q.    Do you recall reading that order?

5  A.    A little bit.

6  Q.    Or those orders I should say.  There is

7  Exhibit 15 to my book, Mr. Martin.

8           THE COURT:  This will be your last

9  question, Mr. Meyers.

10           MR. MEYERS:  Okay.

11           MS. MALONE:  Exhibit 15?

12           MR. MEYERS:  Yes.

13           THE COURT:  Whose Exhibit 15?

14           MR. MEYERS:  Mine, Your Honor.  And Your

15  Honor, did you mean the last few minutes of the line

16  of questioning?

17           THE COURT:  This is the last area I'm

18  going to allow you to ask a question.

19           MR. MEYERS:  So that's maybe three or four

20  short questions?

21           THE COURT:  If you want to spend your time

22  on this, that's fine, but that's all you're going to

23  get.

24           MR. MEYERS:  Yes.

25  A.    Exhibit 15.

```
1   Q.   (By Mr. Meyers)  Okay.  You had the opportunity
2   to object to the magistrate judge's findings in both
3   orders, did you not?
4   A.   To tell you the truth, when the docket was
5   closed on this case after the liability was
6   determined, the ECF notifications actually stopped
7   being sent out.  And so we actually discovered the
8   orders after the 15 days.
9   Q.   You discovered the orders after the 15 days.
10  Okay.
11       Did you move to ask the Court for leave, given
12  that you didn't get ECFs to file a late objection?
13  A.   I believe our client didn't want to proceed.
14            THE COURT:  Mr. Meyers, that will be it.
15  You can take a seat.  We're going to break.
16            Before we do, I have one clarification to
17  make, if you will take a seat, please, and
18  Mr. Martin you can step down.  I don't need any more
19  from Mr. Martin.
20            Just because this testimony and this
21  evidence seems to go in circles, Mr. Meyers, with
22  all due respect, especially when you are up there, I
23  just want to talk about these two, three orders that
24  you say were sanctions, show cause orders by the
25  courts that were discharged, so that it doesn't
```

1   leave a false impression about the severity of these

2   orders.

3          The first one is 20.  And this is a show

4   cause order by a district court in Seattle.  And

5   it's talking about Mr. Radbil filing a third

6   application for pro hac vice.

7          The Court says:  The Court finds the

8   plaintiff's third application again fails for

9   misrepresenting information to the Court.  While

10  Mr. Robbins was the one who filed the application

11  through the Court's electronic filing system, the

12  application is signed by Matthew Cunanan as local

13  counsel.  In reviewing the application, Mr. Cunanan

14  does not provide his correct bar number.  Instead,

15  Mr. Cunanan provides Mr. Trigsted's bar number --

16  and she's goes into the address.  Considering this

17  is the third time plaintiff has failed to properly

18  file an application for pro hac vice, the Court will

19  not take this misinformation lightly.

20         The second order is also out of the

21  Washington court.  I believe it's by a different

22  judge -- is it the same judge --

23         MR. MEYERS:  It is a different judge, Your

24  Honor.

25         THE COURT:  All right.  Different judge --

1    on the same issue dealing with the pro hac vice

2    filings.  All of this leaves us with a case filed by

3    a plaintiff who has three attorneys, none of whom is

4    eligible to practice in this district and all of

5    whom have been on notice of this fact since at least

6    August the 19th.  And this was October.

7    Mr. Trigsted now seeks leave to withdraw.  This ship

8    may be sinking, but Mr. Trigsted will not be

9    permitted to flee just yet . . . show cause why

10   Messrs. Robbins, Radbil, and Trigsted should not be

11   sanctioned for their misrepresentations to the

12   Court.

13           And then, finally, 28 I think was the next

14   one where it was discharged, Mr. Meyers, and I don't

15   have any reason to not believe you about that.

16           The Saunders case, which is by a district

17   judge in the Eastern District of New York:  The

18   evidence in the record before me suggests that

19   plaintiff may have engaged in a game of cat and

20   mouse with first as creditor and then as collection

21   company obscuring his identity so that there was no

22   way the -- the collection company could know with

23   whom he was dealing.  And it goes on and on about

24   Rule 11 sanctions.

25           So I want to be clear that these orders

```
 1   have some very serious language in them by the
 2   courts that wrote them, it's not a motion by
 3   counsel.
 4           We're going to break for an hour and 15
 5   minutes, and then I want to finish up with whatever
 6   last witnesses there are and put this case to bed so
 7   the Court can do an order.
 8           We will be in recess until 1:45.
 9           (Recess taken from 12:30 to 1:45.)
10           THE COURT:  And we are where exactly,
11   Ms. Malone?
12           MS. MALONE:  I was about to take the
13   stand, Your Honor, for the end of our side.
14           THE COURT:  Okay.  And is Mr. Martin going
15   to question you?
16           MS. MALONE:  Yes, ma'am.
17           THE COURT:  Mr. Radbil, did you have
18   something?
19           MR. RADBIL:  No.  I didn't hear if you
20   said we could be seated.
21           THE COURT:  Yes, that's fine.
22           Ms. Malone, if you will raise your right
23   hand.
24
25
```

1                    **ROBBIE MALONE,**

2    **having been first duly sworn, testified as follows:**

3              THE WITNESS:  Yes.

4                    **DIRECT EXAMINATION**

5    Q.   (By Mr. Martin)  All right.  Ms. Malone, could

6    you please identify yourself to the Court?

7    A.    My name is Robbie Malone.

8    Q.    Okay.  And could you tell us about your

9    experience and what you do?

10   A.    I graduated from law school in 1986 and was

11   licensed the same year.  Prior to being licensed, I

12   worked on a third year bar card with the Brazos

13   County County Attorney's Office.  I was a state

14   court prosecutor there.

15        I worked for the State of Texas with, first,

16   the General Counsel's Office for Texas A&M and then

17   in the Medical Malpractice Division at the Attorney

18   General's Office in Austin until I went into private

19   practice roughly 20 years ago.  And then, since that

20   time I have been a partner or had my own firm in

21   private practice pretty much the whole time.

22   Q.    Have you tried cases as lead counsel other than

23   this one?

24   A.    Yeah.

25   Q.    Could you estimate maybe how many cases you

1   have tried as lead counsel?

2   A.   I can't.  I tried a ton of cases as a

3   prosecutor.  And in the old days, back when I

4   started practicing 20 years ago, 27 years ago, we

5   tried a lot more cases.  So I have tried hundreds of

6   cases, to be honest with you.

7   Q.   So you own your own firm now, correct?

8   A.   Right.

9   Q.   What's your prior, I guess, private practice

10  experience before owning your own firm?

11  A.   Well, I think the point that you're going to is

12  that I was a partner in a bigger firm called

13  Hiersche, Hayward, here in the Dallas area.  There

14  were about -- we had about 50 people then, I don't

15  know what their staffing is now.  I was a partner

16  with that firm for some period of time.

17       Then I joined Mike Bean, who was also an

18  insurance defense attorney in town, and we had our

19  own firm for a while.  And when he went in-house

20  with his client, I chose to stay without a partner

21  at that time.  And that was probably six years ago,

22  something like that.

23  Q.   We sort of glossed over this a hair, but what

24  types of cases have you handled?

25  A.   I started off -- if you get past the criminal

1    experience, when I worked for the State, I did

2    everything from Tort Claims Act to tenure EEOC

3    violations.

4         When I went into the med-mal division, I

5    obviously specialized in medical malpractice

6    defense, predominantly representing state hospitals

7    and doctors and nurses who were employed by the

8    State of Texas at various facilities and

9    psychological folks.

10        During the course of that, I sort of developed

11   an expertise in doing psychology malpractice

12   defense.  So when I first came into private

13   practice, I would say probably 60 percent of my

14   cases were in the field of psychology malpractice

15   defense, but I globally sort of handled any kind of

16   malpractice.  I have represented lawyers, I have

17   represented accountants, I have represented

18   insurance agents, insurance adjusters, people who

19   develop software, anything you can get sued for on a

20   professional basis.

21        Somewhere around, I want to say, 12 years ago,

22   I started being assigned, through the insurance

23   companies, debt collection agency cases.  And that

24   practice has gone up and down, depending on the

25   types of suits that are filed.  I have never done

115

1   just one type of work.

2   Q.   Okay.  And you talk about being a member of

3   Hiersche, Hayward.  What was your position there?

4   A.   I was a partner.  Officially we were called

5   members, but I was a partner.

6   Q.   And while you were there, did they provide --

7   or did you provide any training towards associates?

8   A.   Sure.  I had -- because I had the most trial

9   experience, sometimes in civil firms --

10          THE COURT:  Slow down just a little bit.

11  All right?

12  A.   Sometimes in civil firms, there are not as many

13  lawyers who have tried cases.  So if you have trial

14  experience, you tend to get the responsibility of

15  training young lawyers to try cases, to handle

16  depositions, to go through hearings.

17         It sort of fell upon me, if we had a new

18  associate.  I usually had six to seven associates in

19  those days who worked directly for me.  This was

20  before tort reform, and we had a lot more med-mal

21  then.

22         I would also help out in other areas.  And if

23  there was a young lawyer who had trouble taking

24  depositions or was struggling with hearings, then I

25  would work with that particular person.  I did

1    everything from attending hearings with them and

2    giving them pointers, to reading transcripts after

3    they had done it and giving them advice; going to

4    depositions, letting them tag along with me; getting

5    them to do different parts of the trial so that they

6    would be able to handle one when it came their time

7    to do it.

8    Q.    And you briefly mentioned trial at the end.

9    You had also supervised with trials.  Could you

10   elaborate just a little bit on that?

11   A.    Sure.  I almost always, even today, if I can, I

12   try to bring a second chair with me to trial.

13   Sometimes my clients won't pay for it, so they just

14   come along for the learning experience.  I think

15   that the best thing that a young lawyer can do is

16   come into the courtroom and try things.

17        So, for example, with the case of any associate

18   I have brought, I assign them some responsibility in

19   the trial that they are the ones to do that.  It

20   might be they argue the motion in limine.  I usually

21   will give them one witness, I work with them on the

22   development of that, and they work with me on how to

23   prep a case.

24        And so I try to get them more and more involved

25   as their development goes so that they are able to

1    try a case hopefully some day on their own.

2    Q.    Do you do the same similar training with your

3    own firm today?

4    A.    Yes, I do.  I think you have come to a lot of

5    stuff with me, and I have seen you.

6    Q.    And could you also describe a little bit of the

7    supervision you provide on a daily basis with your

8    own firm?

9    A.    Sure.  We have -- typically, at any given time,

10   we have some young lawyers who are a little more

11   experienced than others, so it's kind of a joint

12   thing.

13        As an attorney becomes more experienced, I get

14   them to help in the supervision of the younger

15   lawyers, because I think that's part of the learning

16   process, is to teach each other how to do things.

17        I read motions that are drafted.  I'll be

18   honest, I don't draft as many motions, probably not

19   very many anymore because they are time consuming

20   and are usually better suited for someone who can

21   devote the time to write them without being

22   interrupted.  So we will assign a task to someone,

23   and then, as the attorney who has drafted the

24   motion, I often let them have the opportunity to

25   argue it, and I will go with them.

1    In the case of certain kinds of discovery

2  motions, I, for example, have assigned you to go

3  with -- we have a younger lawyer now, Mr. Jones, to

4  go and watch him do his hearings and make sure that

5  he knows how to do it.

6    If there is ever a question about what happens,

7  I order the transcript.  Specifically with a case

8  with you, there was a visiting judge that did a

9  strange thing.  I ordered the transcript and I read

10  it to see if we could figure out what happened in

11  the hearing and how it could have been handled

12  differently, because there was kind of an odd ruling

13  there, not really relevant to the case.  But it was

14  about training, to make sure you could move to the

15  next level.

16  Q.   All right.  And turning towards this case a

17  little bit, have you represented Regional Adjustment

18  Bureau before?

19  A.   Yes.

20  Q.   Okay.  How did those cases go?

21  A.   Regional Adjustment Bureau is one of my clients

22  that, whenever I would get an assignment from them,

23  typically within the first 60 days we would settle

24  the case.  This is the only one where we went beyond

25  60 days that I remember.  There may be one that went

1   90, but nothing longer than that.

2   Q.   So can you briefly -- and I know we have been

3   over it quite a bit, but briefly describe what

4   happened at the outset of this case.

5   A.   When the case was first assigned to me from the

6   insurance company, there is a standing report that

7   we have to fill out.  And one of the questions is,

8   have you reached out to opposing counsel to find out

9   what their demand is?  And anyone who does insurance

10  defense work knows that that's a standing question.

11       So I almost always, when I get a new case, even

12  if I don't have the formal report requirement yet, I

13  almost always send an e-mail to the opposing side

14  and say, hey, I just got this, tell me what you're

15  looking for, because that's one of the factors that

16  goes into valuation and strategy of handling the

17  case.

18       I did that in this case and got an e-mail back

19  from Mr. Kurz saying they were not able to respond

20  at this time.

21  Q.   Okay.  And did you do anything in response to

22  that for your client?

23  A.   Yes.  We filed an offer of judgment to try to

24  push the issue towards resolution early in the case.

25  Q.   What was the amount of that offer of judgment?

```
 1   A.   It was $1,000 plus attorney's fees.  I don't
 2   think it listed court costs, but it was $1,000 plus
 3   attorney's fees to be determined by the Court.
 4   Q.   All right.  And so then, in this case, we
 5   received initial disclosures.  Do you recall those
 6   initial disclosures?
 7   A.   I do.
 8   Q.   Let me back up one second.  Did you receive a
 9   response to that offer of judgment?
10   A.   I did not -- well, you're right, I did not to
11   the offer of judgment.  I had received a prior offer
12   saying they weren't going to make an offer.
13          THE COURT:  When would this have been,
14   Ms. Malone, that you got notification that there
15   wouldn't be an offer?
16          THE WITNESS:  I think it would have been
17   September the 9th, 2011.  That was Exhibit 10 for
18   Regional Adjustment Bureau.  That was the e-mail
19   from Mr. Kurz.
20          THE COURT:  Thank you.
21   Q.   (By Mr. Martin)  And then the offer of judgment
22   occurred after this.
23   A.   Yes.
24   Q.   Back to the initial disclosures.  Did you
25   receive an initial disclosure for Dr. White on
```

1   damages?

2   A.    Yes, I did.

3   Q.    Do you recall what that initial disclosure

4   stated?

5   A.    It was $1,500.  There was other language, but

6   the amount for actual damages was $1,500.  I think

7   they also mentioned statutory damages and attorney's

8   fees.

9   Q.    Did this $1,500 ever change?

10  A.    No.

11  Q.    It didn't change at any point throughout the

12  litigation?

13  A.    No.

14  Q.    How did you use this number in your case

15  valuation?

16  A.    Well, it does a lot of things.  The

17  determination of what actual damages are -- for

18  example, a 1,500-dollar actual damage claim will not

19  warrant me to go out and order somebody's medical

20  records, because the cost of medical records can be

21  anywhere from $1,000 to $2,000 or more, depending on

22  the length of treatment.  So if I get an actual

23  damage claim for $1,500, I'm not going to pay to get

24  that plaintiff's medical records because they are

25  not going to -- that number is pretty good.  I'm

1  going to live with that 1,500-dollar number.

2  Q.   Okay.  And did this number not changing

3  multiply the proceedings in this case?

4  A.   In my opinion, it did.

5  Q.   Could you describe how you believe that

6  extended that?

7  A.   Well, several things:  It affected our

8  evaluation of the case.  So when we go, for example,

9  through the settlement conference, we're looking at

10  $1,500 as the maximum they can recover for actual

11  damages.  We're getting, from Judge Stickney,

12  demands of over $100,000, and we're saying, how can

13  they prove actual damages?  And we are asking

14  questions about it, and they just don't add up.

15       And so I'm pretty sure that if they have some

16  claim for actual damages that's above $1,500, it's

17  not going to be admissible at trial.  I was never

18  told what their allegations were, what their alleged

19  damages were, but the number I was getting implied

20  to me that something else was going on in the case

21  that I was not aware of.  And it certainly affected

22  the ability to settle the case.

23  Q.   You never received medical records or discovery

24  responses to reflect any increase in damages?

25  A.   No.

1    Q.   And so at trial, what happened regarding

2    damages?

3    A.   Dr. White was testifying on the stand, and

4    there were two things he said that caught my -- that

5    caught me completely off guard, and I did not

6    object -- I didn't object at the time.

7         He said that he had been damaged to the tune of

8    $40,000 related to interest and penalties and other

9    fees that were associated with the student loan,

10   which was the underlying debt in question.

11        And then he testified later that he had lost a

12   contract position at the -- a teaching position at

13   the school for $5,000.  I did question him about

14   that and got him to admit that that was not

15   something he had relayed in his deposition.

16        Then Mr. Radbil had asked him some question

17   related to whether or not he had -- I may have this

18   chronology wrong.  I think the 5,000 came first, and

19   I think the 40,000 came later.

20             THE COURT:  Ms. Malone, just to be clear,

21   this is what happened at trial.

22             MS. MALONE:  Yes, ma'am.

23   A.   I think the 40,000 actually may have come later

24   during the course of Dr. White's testimony.  But he

25   then said -- Mr. Radbil asked him a question about

1   counseling, and I objected on a Rule 37 motion, and

2   we went to the Court and I pointed out that

3   Dr. White had said he had never seen a counselor and

4   that was the responses to our discovery.

5        Later, in the Rule 37 motion hearing at the

6   close of trial that day, Mr. Radbil tried to suggest

7   that making an appointment for a counselor is

8   seeking counseling, which I don't think at all is

9   the case.  But the Court did keep out the actual

10  counseling testimony from going to the jury.

11  Q.   And then referring to counseling, have you

12  received an exhibit in these proceedings that

13  reflected that he did seek counseling or obtained

14  counseling?

15  A.   There was -- there was some sort of reference

16  to a memo from December 28th about some sort of

17  medical records, but I'm not really sure who it was

18  for or any more detail than that.

19  Q.   No medical records were produced in this case;

20  is that correct?

21  A.   That's correct.

22  Q.   And no discovery response was supplemented to

23  state anything that he had been receiving or seeking

24  counseling?

25  A.   That's correct.

1    Q.    And so now what we just described at trial, did

2    that cause you surprise?

3    A.    Oh, absolutely.

4    Q.    And your client surprise, as well?

5    A.    Sure, because we had thought our actual damage

6    number maximum was going to be $1,500, and now we

7    are hearing about $45,000 of hard damages.

8    Q.    Further, did this prejudice you and your

9    client?

10   A.    Well, as it turned out the jury ruled in our

11   favor, so it didn't.  But it certainly did in the

12   way we were handling the case at that time.

13   Q.    And so it did expose your client to harm that

14   you didn't anticipate?

15   A.    Well, because the jury ultimately came in our

16   favor, I can't say that it -- that there was

17   long-lasting harm on the issue.  It certainly was a

18   problem in trial.

19   Q.    Okay.  And these issues have caused detriment

20   to your client ongoing from that date regarding

21   these motions, these proceedings, and it's costing

22   your client money as we speak, correct?

23           MR. JEFFERSON:  Objection, leading and

24   compound.

25           THE COURT:  Sustained.  Rephrase it.

1   Q.   (By Mr. Martin)   This has caused detriment to

2   your client, correct?

3   A.   Sure.   Since that time, we have had motions --

4   and I guess we are in our fourth day of hearing --

5   in preparation related to those that my client has

6   been paying for.

7   Q.   Okay.   Now I'm going to discuss another issue

8   in this case.   There was an issue regarding experts,

9   correct?

10  A.   Yes.

11  Q.   Did anything in this case make you believe that

12  an expert would be needed for the plaintiff's case

13  in chief?

14  A.   Yes.

15  Q.   Okay.   What would that have been?

16  A.   Well, there were a couple of things.   There had

17  been a suggestion at some point that their client's

18  preexisting medical condition, which was ankylosing

19  spondylitis, was somehow aggravated by this, but

20  there had never been anything to substantiate that.

21      And then we saw two names of doctors that

22  showed up in disclosures, I think in response to a

23  question about who his treating physicians were,

24  that were related to that treatment.

25      Towards the last couple of days before trial, I

1   received a call from an attorney, who is an old

2   friend of mine, a med-mal defense attorney, who

3   represented one of the doctors and was calling

4   because his client received a subpoena for this

5   trial.

6        And his client doctor wanted to know if the

7   case was really going on, and he wanted to know what

8   the case was about and what the testimony would be

9   about.  And certainly I -- I think I told him that I

10  didn't know he had been subpoenaed, and I think I

11  may have provided him with Mr. Radbil's cell phone

12  number so he could talk to him directly.  I don't

13  know if they ever spoke.

14             THE COURT:  Slow, slow, slow down a little

15  bit.

16  A.   I don't know if they ever actually spoke,

17  though.

18  Q.   (By Mr. Martin)  And I guess there are two

19  issues a little bit intertwined with this, being

20  experts and then also witnesses.  Was there a number

21  of witnesses disclosed in this case by plaintiff?

22  A.   There were a number of witnesses that were

23  disclosed late in January, long after the discovery

24  cutoff.  On the eve of trial, there were a whole

25  bunch of new -- I think it was six new witnesses

1    that we had never been told about.  So we had to

2    file motions to complain about their potential at

3    trial.  Some of them were actually subpoenaed and

4    showed up in the courtroom.

5    Q.   Okay.  And you mentioned that you filed some

6    motions.  So you took action to protect your client

7    based on this, correct?

8    A.   Sure.  I can't give you all of the names of the

9    motions.  I think there was a motion to strike late

10   designated expert.  I think there was probably a

11   motion to strike undisclosed witness -- I don't know

12   the exact title.  I could look in the sheets and

13   find it for you.

14   Q.   Okay.  And each of these pleadings cost your

15   client money, correct?

16   A.   Yes.

17   Q.   And do you believe that filing these pleadings

18   were reasonable?

19   A.   I don't think I had a choice.  I think if I had

20   not objected to these witnesses, that would have

21   been probably malpractice on my part.

22   Q.   And so you believe they were necessary in these

23   proceedings?

24   A.   Yes, absolutely.

25   Q.   And moving on, you also mentioned the issue of

1    subpoenas.  Plaintiff's counsel issued trial

2    subpoenas on various people, correct?

3    A.    Yes.

4    Q.    And was it your opinion that one of these

5    people could have been an expert witness?

6    A.    One of the doctors, the medical doctor, I think

7    it was Dr. Betancourt who called me, yes.

8    Q.    All right.  To rephrase, you believe that one

9    of these witnesses might have been providing expert

10   testimony?

11   A.    Yes, because, one, I knew what their profession

12   was.  The second thing was, we had attorney fee

13   invoices from the firm, and there were two -- there

14   were several references in -- by the firm, I mean

15   Weisberg & Meyers.  There were references from

16   paralegals in their law firm about communications

17   with experts and letters to experts to confirm their

18   availability for trial.

19   Q.    Okay.  And so dealing with these, it cost your

20   client money, basically, in the means of attorney's

21   fees?

22   A.    Yes, absolutely.

23   Q.    And so then another issue in this case dealt

24   with exchange of exhibits before trial, correct?

25   A.    Yes.

1  Q.   We had talked about how there was a deadline to

2  submit exhibits to the Court, correct?

3  A.   Right.

4  Q.   And there was also a requirement to confer with

5  opposing counsel regarding what exhibits would be

6  used at trial, correct?

7  A.   Yes.

8  Q.   Could you, I guess, describe to the Court what

9  you did to comply with this Court order?

10 A.   There was actually two parts to that.  The

11 original scheduling order had passed, so we had to

12 have some new dates.  The Court adopted the dates

13 proposed by the plaintiff.  And my recollection was

14 that it was a February 15th date that we were

15 supposed to exchange hard copy exhibits.

16      And the Court's order required that you would

17 also have a description explaining why the document

18 would be admissible and warned that, if you didn't

19 have this, the Court may not accept it at trial.

20      So prior to February 15th, like the 12th or

21 13th, something like that, I actually had those

22 copies hand-delivered -- FedExed to -- certified

23 mailed to the firm, and I may be wrong it may be

24 FedEx, but we gave them the tracking number.  And I

25 didn't receive the exhibits back from

1   Weisberg & Meyers.

2        So I think the 15th must have been like a

3   Thursday, because it wasn't until the 19th that I

4   got any real communication from them.  I was --

5   e-mailed Mr. Radbil and asked him where my exhibits

6   were.  Then I started getting these bizarre faxes,

7   which I think I now understand why they were the way

8   they were, but they were pixels that covered half

9   the page.

10        I have subsequently learned from Mr. Weisberg

11   (sic) that there may have been a glitch in their

12   faxing program.  But at the time, I didn't know what

13   they were, I just knew that they were not complete.

14   I kept saying, these are not complete, send me new

15   documents.  I couldn't get anywhere with that.

16        And we were supposed to submit hard copy

17   binders with tabs to the Court by the 20th; I did

18   that, we had ours hand-delivered.  And I think that

19   Judge Boyle issued an order on the Friday before

20   trial saying, okay, guys, I want you to talk about

21   these exhibits, and I mean it, try to work out what

22   you can do, or words to that effect.

23        So that Friday evening when I got the order, I

24   started calling Mr. Radbil.  He never returned my

25   call on Friday evening.  So Saturday I called him

```
 1    and e-mailed him ten times each way and asked him to

 2    set up a time so that we could talk about the

 3    exhibits, and I never got a response from him at

 4    all.

 5         Sunday afternoon, I came home from church, and

 6    I got a call from Mr. Radbil that he wanted to talk

 7    about exhibits that afternoon.  No apology for not

 8    returning a courtesy call or at least telling me,

 9    you know, I can't talk now, but giving me an

10    alternate time, and then we spoke about exhibits.

11         I did agree with him that if he would just

12    bring me an actual copy of the exhibits to the

13    courtroom the next morning, I would not complain any

14    further about the fact that I didn't have hard copy

15    exhibits until we got to court, and he did bring

16    them to me that morning.  I don't believe he brought

17    a copy that morning for Judge Boyle, though.  I

18    didn't see him have one.

19    Q.   Just to clarify one thing:  You mentioned

20    Mr. Weisberg.  Did Mr. Weisberg tell you about the

21    fax problem or was it --

22    A.   I'm sorry.  I said Mr. Weisberg, but it was

23    Mr. Meyers, I apologize.

24    Q.   I wanted to clarify that.

25    A.   In a subsequent, different issue, there was
```

1    something he faxed me and it had that weird pixel

2    thing.  And I said something to him about it, and he

3    said, oh, it's the fax machine that's doing it.  I

4    sure would have appreciated knowing it was the fax

5    program.  I went, oh, that explains why these

6    exhibits had these weird pixels and were not

7    legible.  I wish I would have known that, I probably

8    would not have been quite as miffed at Mr. Radbil at

9    the time as I was.

10             THE COURT:  He being Mr. Radbil or

11   Mr. Meyers.

12   A.   Mr. Meyers explained to me there was some sort

13   of programming problem with his fax program.  I

14   don't know exactly what it was.  Our fax machine at

15   work is more of the old, traditional style.  But I

16   do take his explanation, and that would definitely

17   explain why it was strange.  And it was unrelated to

18   these exhibits, though, and it was way later.

19   Q.   (By Mr. Martin)  And so you described having to

20   go in the office Saturday and also dealing with this

21   Sunday.  Those are outside of your normal business

22   hours, correct?

23   A.   Sure.

24   Q.   And working this time on the exhibits, dealing

25   with attempts to confer, cost your client extra

1   money, correct?

2   A.   It did.   I never did get the required

3   statement.

4        Oh, and the other thing is that Mr. Radbil was

5   complaining that he had not received his hard copy

6   of the exhibits.   I still don't what happened, but

7   he admitted his office received them.   But at some

8   point I actually scanned them in and sent them in

9   myself on Saturday afternoon just so that would not

10  be an argument he had, because apparently his office

11  didn't scan them in for him.   I never did understand

12  the problem, to be honest with you.

13  Q.   So dealing with the issues with these exhibits,

14  did that cost your client excess fees that should

15  not have been incurred?

16  A.   Yes.

17  Q.   Okay.

18  A.   And it messed up my Saturday afternoon, I've

19  got to be honest with you.

20  Q.   All right.   Diverting back to our Rule 37

21  Motion for Sanctions and 28 U.S.C. 1927 Motion for

22  Sanctions, have you estimated costs that this --

23  that were incurred to your client?

24  A.   Sure.   We actually went through the exhibits --

25  I mean the fees, which are in Exhibit 41, and that

1  goes through the end of August.  And we had not done

2  the September bills at the time, at the last thing,

3  but I did review the September and October bills --

4  I don't think we've included November -- but to come

5  up with calculations.  On the Rule 37 for drafting

6  the motion --

7  Q.    Let me cut you off for just a second.

8  A.    Okay.

9  Q.    I would like to kind of go over the Johnson

10  factors that go into attorney's fees.

11  A.    Yes.

12  Q.    Are you familiar with Johnson v. Georgia

13  Highway Express case?

14  A.    Yes, Fifth Circuit.

15  Q.    And are you familiar that that case enumerated

16  various factors that go into the reasonableness and

17  necessity of attorney's fees?

18  A.    I am.

19  Q.    I would like to walk through those factors with

20  you.

21        Are you familiar with time and labor required?

22  A.    Yes.

23  Q.    How would you go towards how that applied in

24  this case in your fees?

25  A.    In this particular case, we looked at the --

1   for the Rule 37 motion, we looked at the specific

2   motions, et cetera, that we had to draft related to

3   that to the extent that they weren't intertwined and

4   just looked at those numbers completely.  I think

5   that the Court had already said our rates were

6   reasonable, so we focused more on the hours that

7   were done.

8   Q.   Okay.  What about novelty and difficulty of the

9   issues?

10  A.   On the Rule 37 motion, I think we've already

11  talked about this, I have never in almost -- I guess

12  I am now on my 28th year of practice, and I have

13  never had an attorney have this problem with the

14  Rule 37 in the middle of trial, where someone is

15  offering testimony that had never been supplemented

16  of the nature of damages like that.  I had never

17  seen that before.  I asked around and couldn't find

18  anyone else who did.  So we didn't have a standard

19  motion like that, so it had to be drafted from

20  scratch, and we had to do appropriate research to

21  support those claims.

22  Q.   And since we're also seeking all of our fees

23  from this case, could you also hit on that regarding

24  the entire case?

25  A.   Sure.  I think under 1927, the Court has the

```
 1   right to use this as a punitive thing and recover
 2   all fees for our clients.  She also has the right
 3   and the inherent authority to do that.
 4       In my opinion, this case is very unusual
 5   because of the conduct of the attorneys on the other
 6   side and because of the unfortunate history of
 7   sanctions motions, et cetera, and orders by other
 8   courts, that this seems to be a pattern.  So I think
 9   it's unusual in that sense, and I would think it --
10   I don't think I will ever see a motion like this
11   again, to be honest with you.
12   Q.   And moving into the next factor, could you
13   describe the required skill for this case?
14   A.   I do think that we are -- we meet the required
15   skill level.  I have tried a number of these.  One
16   year, a couple of years ago, I tried six FDCPA debt
17   collection cases within one standard year.  I don't
18   know where I am now, but I think I have probably
19   tried more than ten, less than 20 of just this type
20   of case.  So I think we are certainly qualified to
21   do that.  I think this is actually your third --
22   second or third trial on this.
23   Q.   And moving on to the next factor, whether other
24   employment is precluded?
25   A.   That's not a factor here.  We get work from
```

1   clients routinely, whether I am trying one case or

2   not.  To be honest, I have a pretty steady flow of

3   business, and that's not an issue here.  I didn't

4   have to turn down any work because of working on

5   this case.

6   Q.    And the next factor would be the customary fee

7   in a case like this.

8   A.    I think that our insurance defense rates, as

9   proven up by Mr. Stevens, are below the customary

10  hourly rates for Texas in general and below the

11  Dallas rate.  They are probably consistent with what

12  most insurance defense attorneys are able to charge.

13  They have subsequently raised our rate, because

14  apparently we were low for the Dallas area for

15  insurance defense attorneys.

16          THE COURT:  What's your hourly rate?

17          MS. MALONE:  As of this month, Your Honor,

18  it's gone up to 200, but it was 175 through the bulk

19  of the case.  And for partners, I think it was 140,

20  and for associates, and it's gone up to 160; and 85

21  for paralegals, gone up to 90; and that would be the

22  same for the law clerks.

23          THE COURT:  A lot different from the six-

24  and 700 I have seen.

25          MS. MALONE:  Insurance defense lawyers are

1    paid pretty cheaply, Judge.

2    Q.   (By Mr. Martin)  You didn't request this fee

3    increase from your insurance carrier.

4    A.   No; usually you have to beg them to give you

5    even five dollars more.  I think that they did a

6    review of their panel counsel, and based on the fact

7    that we have done good work for them -- and I have

8    been on their panel counsel list for CHUBB now at

9    least 15 years -- they decided I needed a raise.  I

10   was actually kind of surprised, but happy.

11   Q.   Would you recall that this rate increased at

12   the beginning of September?

13   A.   The rate increased at the beginning of

14   September?

15   Q.   Right.

16   A.   Okay.  I know it was this fall, but I wouldn't

17   remember the exact date.

18   Q.   Moving on to the Johnson factors, the next

19   factor would be whether the fee is fixed or

20   contingent.

21   A.   This is not a fixed fee case; it's an hourly

22   rate case.

23   Q.   All right.  And the next factor, could you

24   describe the time limitations in this case?

25            THE COURT:  So it's not a fixed fee case.

```
 1              THE WITNESS:  You're right; it is not a
 2    fixed fee case, it is an hourly rate case.  And
 3    there have been no -- other than the normal time
 4    limitations put on us by the Court, there have been
 5    no emergency situations from the client, no
 6    injunctive hearings, nothing like that.  So it's not
 7    been a time-urgent problem created by the client.
 8    Q.   (By Mr. Martin)  Moving on, could you hit on
 9    the next factor of the amount involved and the
10    results obtained?
11    A.   Well, I think the results obtained were very
12    good.  On the defense side, sometimes we try cases
13    where we are trying what we call damages case.  So
14    any time we can get a zero award for damages, we
15    consider that to be a successful trial.
16         The amount in controversy, I guess it depends
17    on how you value the case.  We always value the case
18    on the 1,500-dollar amount, but apparently that was
19    not Dr. White's position nor his attorney's based on
20    what happened at the mediated settlement conference.
21         So if they are looking at 100,000-plus verdict,
22    then I think our fees are -- in any case, I think
23    our fees are good because of the fact that our
24    client won.
25    Q.   Have you read case law that states that this is
```

1   usually the most important factor in the Johnson

2   cases?

3   A.   Yes; success is the most important factor.

4   Q.   Okay.  And could you hit on the next factor of

5   the attorney's experience, reputation, and ability?

6   A.   If it's talking about mine, I think that

7   certainly I have tried a number of cases for 28

8   years.  I'm an AV rated attorney with

9   Martindale-Hubbell, something that I actually think

10  is earned.

11      I've -- I believe that I have a good reputation

12  in the community.  I know I certainly do among the

13  lawyers that I regularly deal with, at least that I

14  have good relationships with every one of them for

15  the most part, with the exception of perhaps the

16  Weisberg & Meyers firm.

17  Q.   To expand on this factor a little bit, could

18  you also describe, I guess, your associates' rates

19  with their experience and if you believe that's

20  justified?

21  A.   Sure.  In this particular case, I think the

22  majority of the associate work was conducted by

23  yourself.  You are paid the associate rate, which I

24  believe was 140 to 160, given the raise.  For a

25  second-year attorney in the Dallas area, that's low.

1    You, actually, for a young lawyer, are probably more
2    experienced than a lot of other lawyers.  In my
3    opinion, you've already managed to take direct on a
4    couple of important witnesses in a trial which was
5    very successful for our client.  You have conducted
6    a number of hearings that have done really well.  I
7    think a lot of it has to do with the fact that you
8    sought out the ability to watch trials early on.  So
9    while you are a young lawyer, a second-year lawyer,
10   I think you are probably much more experienced than
11   that.
12   Q.   I have to say thank you.
13        And under that factor, as well, could you
14   describe that with a paralegal?
15   A.   Our paralegal, Ms. Lewis, has been working for
16   us now, oh, for more than -- I think more than five
17   years.  She is a certified paralegal who graduated
18   with a paralegal degree I think from Blinn College
19   is my recollection.  She worked for the Texas
20   Attorney General's Office before she came to us.
21   She's been around for, oh, gosh, I think now
22   probably in her ninth or tenth year.  We are the
23   first private practice job she has had.  She does
24   paralegal work, it's not clerical work.  She
25   actually does things that assist us in trial

1  preparation and things that lawyers would otherwise

2  have to do.  I think she is well qualified.

3  Q.    And the 80- or 90-dollar billing rate is

4  reasonable for her qualifications?

5  A.    It's probably on the low side, but I think it's

6  appropriate.

7  Q.    Moving on to the next Johnson factor, could you

8  hit on the undesirability of the case?

9  A.    That rule is really more applicable to the

10  plaintiff's side of the case.  I don't think that

11  actually applies to the defendants.

12  Q.    And then the next factor, how about the nature

13  and length of the professional relationship with the

14  client?

15  A.    That one is kind of a split thing, because I

16  have worked for RAB off and on -- I'm not sure.  The

17  first case I got from them was maybe six years ago,

18  and I've had periodic work from them.

19       My relationship with CHUBB, which is where the

20  work really generated from, goes back much longer

21  than that.  I know it's probably more than 15 years

22  now, probably about 18 or so years.  So I have had a

23  longstanding relationship with CHUBB.

24  Q.    And then the last Johnson factor, how about

25  awards in similar cases?

1   A.   I've seen a number of cases where there have

2   been awards for the entirety of the case.  I think

3   we actually cited in our briefing a case where, in a

4   1927 situation, the Court thought it appropriate to

5   award the entire costs of the defense to the

6   defendants.  And I believe we cited that -- I think

7   I read that case to the Court at one of the prior

8   hearings, so I do think it's appropriate.  I can get

9   the case cite if the Court needs it.

10  Q.   Okay.  And so then moving along, are you

11  familiar with reasonable and customary rates for

12  attorneys in Dallas County Texas?

13  A.   Yes.

14  Q.   And Dallas County Texas is where this Court is

15  actually located?

16  A.   Yes.

17  Q.   Okay.  And then throughout this case, did you

18  and your firm keep time sheets in defending RAB in

19  this case?

20  A.   We keep contemporaneous time sheets.  They are

21  turned in, for the most part, daily and entered in

22  weekly by our billing department -- billing person,

23  I should say, she's not a department.

24  Q.   And have you reviewed these invoices for this

25  case?

1    A.    Yes, I have.

2    Q.    And in your opinion, were the fees listed in

3    these invoices reasonable?

4    A.    Yes.

5    Q.    Were they also necessary in this litigation?

6    A.    Yes.

7    Q.    Okay.  And in reviewing these invoices, which

8    is Exhibit 41 -- Exhibit 41 is your

9    March 30th through September 1 invoices, correct?

10   A.    Correct.

11   Q.    Are there redactions in those invoices?

12   A.    Absolutely.

13   Q.    Could you describe the purpose of these

14   redactions?

15   A.    There are several redactions.  I should say

16   first how the billing process works in an insurance

17   defense case, which is actually applicable here.

18        We submit fees electronically or invoices

19   electronically to the carrier.  And the carrier

20   sometimes will challenge portions of the document or

21   may say that, well, we think you should have had a

22   paralegal do this or what have you.

23        So one of the things we did is we redacted or

24   waived fees that, for whatever reason, the carrier

25   had chosen to challenge us on.  I think probably

1   90 percent of our stuff goes through fine.

2       In reviewing these, there were some things I

3   felt should be redacted as a matter of judgment.   I

4   think there were some times where we may have spent

5   a little longer than I thought was in good

6   conscience to ask Judge Boyle to award.

7       There were some times where -- actually, I hate

8   to admit it, but it's true -- in going through this,

9   I found a reference to another case that had slipped

10  through both our audit and the insurance company's

11  audit.   So I removed those and subtracted those from

12  the total award that we were seeking.

13      And there are also redactions related to pure

14  attorney-client communication and to things that I

15  thought were beyond what we should do on attorney

16  work product.   But for the most part, I didn't

17  redact anything else.

18  Q.   So the redactions that you referred to on

19  different cases, you are not seeking those from

20  plaintiff's counsel.

21  A.   No.   We put waived, and I believe that we

22  struck them out.   And I know that we subtracted them

23  out from the final numbers.

24  Q.   And to clarify, all of this is done in the

25  exercise of billing judgment, correct?

1   A.    Yes, absolutely.

2   Q.    That's because it would not be appropriate to

3   seek those fees from the opposing counsel.

4   A.    I think the case law is pretty clear that, if

5   you are seeking fees, you have an obligation to show

6   an exercise of billing judgment and to do the things

7   that I have just discussed.

8   Q.    Moving on to the actual costs in this

9   litigation.  First off, I want to state, did you

10  bring your September and October invoices with you

11  today?

12  A.    I did.  And we did bring copies in case they

13  wanted to question me about it, but I was just going

14  to offer testimony on them.

15  Q.    And just so the record reflects, I have

16  tendered copies of these to opposing counsel.

17        Could you go into the estimates you have

18  prepared on this case?

19  A.    Sure.  Obviously we've asked for the entire

20  case, which would be 133,000.  That's easy.  It's

21  just the total of everything through the October

22  setting.

23        But if we were to break it out into parts, we

24  actually have a chart that I'm happy to share with

25  both opposing counsel and the Court that reflects

1   these numbers, if the Court would like that.

2            THE COURT:  Do you have that with you?

3            MS. MALONE:  I'm looking for a copy right

4   now.

5            THE COURT:  And would you just hand it

6   over to plaintiff's counsel?

7            MR. MARTIN:  I have misplaced my copy.

8            THE COURT:  That's fine.

9   A.    I would be happy -- I will look for it when I

10  get over there, because I think I may have put it

11  somewhere else.

12       For drafting the 1927 motions, the total of

13  that was $8,270, which included dealing with the

14  various motion to compel, the conferences regarding

15  the confidentiality agreement, the motion to exclude

16  experts, the objections to their disclosures, late

17  disclosures, the supplemental motion to exclude

18  experts, and the reply to their various responses on

19  the subpoenas.  Including that, as well as our 1927

20  motion, the total of that is $8,270.

21       The separate pleadings --

22            THE COURT:  One moment.  It might be

23  helpful, Mr. Martin, if you could just go up there

24  while you are talking, and you can look at it at the

25  same time.  That way the questions can be clear, and

1    you can be sharing that document.

2              MR. MARTIN:  Sure.

3              THE COURT:  So we just finished with the

4    8,270.

5    A.    8,270.  And then the drafting of the Rule 37

6    motion, which is $2,989, which is included in the

7    expert's late -- I'm sorry.  That's just the

8    drafting of the 37 motion, itself, before the Court.

9         We also have a Rule 37 issue.  We had motions

10   that we had to deal with on the experts; late

11   witness designation; issues with their subpoenas;

12   pretrial objections; additions to the motions in

13   limine related to the late designations; and

14   supplemental motions to exclude related to that.

15   The total on that is $6,681.50.

16        Then we looked at the sanctions from the end of

17   trial through August, which would be the cost of

18   preparation for the hearings and doing the hearing

19   process through August.  The total of that is

20   $23,836.50.  That included preparing exhibits and

21   serving them to the Court.

22   Q.    That included the drafting of your sanctions

23   motions, as well as the replies, correct?

24   A.    And also actually preparing outlines for the

25   hearings, the whole preparation for the hearing

process itself.  Proving up attorney's fees was
about $1,700, and those would have been the motions
and negotiating -- not negotiating, but obtaining
the affidavit from Mr. Stevens and getting him the
documents he needed to review in order to render the
opinion he had about the reasonableness of our
attorney's fees.

Q.   You're not actually seeking fees incurred for
drafting the motion for attorney's fees under Rule
5468, correct?

A.   No; that's actually for working on the
affidavits and getting that information available to
the Court.

Our September invoice was $4,049.  That was
completely related to appearing in court, doing the
hearings and preparation for the hearings.

The October invoice was larger.  It was
$14,782.  There were two hearings in October -- I'm
sorry.  There was a much longer hearing, but there
was some evidence that was required to be submitted
to us prior to it.

We also had, I believe, those late-drafted
affidavits from Mr. Meyers' office that came to us
late with all the exhibits.  So there were a number
of things done at the last minute, plus appearing in

1   court and preparation for dealing with Mr. Meyers

2   and some research related to that matter, and that

3   total was 14,000.

4   Q.   Let me elaborate on these two invoices a little

5   bit.  For the September and October invoices, you

6   have reviewed these invoices, correct?

7   A.   Yes.

8   Q.   Have you exercised judgment on these billing

9   invoices?

10  A.   I did.  I also redacted -- I think there was

11  one charge that just shouldn't have been charged on

12  this case, and we subtracted that, so the remaining

13  total was $4,049.

14  Q.   And with the October invoice, you state that it

15  is a good amount higher than the September invoice.

16  A.   Right.

17  Q.   Were there numerous documents filed by

18  Weisberg & Meyers and Mr. Radbil in this case?

19  A.   Sure.  There were a bunch of things that were

20  due, according to the Court order, on October 2nd,

21  so we had to prepare our exhibits and file them.

22       And then we received a bunch of exhibits and

23  affidavits, and I think there were objections that

24  had to be filed.  I'm looking through here.  Looks

25  to me that most of this was related to work that you

1   did in reviewing the exhibits and working on

2   cross-materials related.

3       I think that most of my prep time was -- I was

4   actually on vacation, so most of my prep time was a

5   few days right before the hearing when I finalized

6   preparation for the hearing.

7   Q.   In your opinion, would the review and time put

8   into these exhibits be reasonable?

9   A.   Oh, absolutely necessary and reasonable.

10  Q.   Okay.  And so you gave us the total of the

11  costs incurred due to Rule 37 issues pre-briefing.

12  A.   Yes.

13  Q.   Could you repeat that total.

14  A.   Pre-briefing, it was $6,681.50.  By

15  pre-briefing, I believe we are talking about the

16  formal 37 motion that has been submitted to the

17  Court that we are here on today.

18  Q.   And that number could actually be low because

19  it doesn't include any time from trial, correct?

20  A.   It actually doesn't include -- I will give you

21  an example.  When we learned about some of these

22  witnesses, I had to -- because I -- I don't think

23  you can allow a witness to take the stand without

24  some preparation.  I prepared outlines for some of

25  these doctors -- or at least Dr. Betancourt that I

1    thought was going to testify.  We didn't charge for

2    that.

3         I actually had to work into my examination of

4    Dr. White a few more questions to sort of eliminate

5    that problem.  I prepared outlines for some of the

6    family members -- I mean family members' friends

7    that Dr. White testified to.

8         There was a neighbor that he had whose name

9    also showed up as a psychologist, so it took me a

10   while to track down whether or not he was a

11   psychologist.  We didn't include any of that in our

12   cost, which would have been a fair thing for us to

13   have done.  We were just trying to do things that

14   were more easily quantifiable.  So some of my trial

15   prep did not get added into the Rule 37 problems.

16   Q.   And then moving on to the separate 1927

17   sanctions motion, have you estimated costs incurred

18   due to conduct that you believe is sanctionable

19   under 1927?

20   A.   Well, again, there are other things that are

21   not included here.  What we have specifically asked

22   the Court in terms of pleadings is $6,960.50.  This

23   does not include, for example, all of the costs I

24   mentioned to Mr. Radbil doing what the Court asked

25   to us do in terms of talking about exhibits.

1        Unfortunately, I can't say that there has ever

2   been -- I actually don't usually do them, I try to

3   pawn them off on you, Mr. Martin.  But if there had

4   been discussions on motions to confer, most of those

5   times with Mr. Radbil, those sometimes would take an

6   hour to an hour and 20 minutes to work through each

7   of the issues.  And I believe that those would have

8   been fair game, but we did not include those in this

9   number.  We tried to stick to mostly the pleadings

10  documents as opposed to some of the intertwined

11  things in terms of a specific 1927 motion.

12  Q.   And we did deal with the issue where Mr. Radbil

13  was late to trial and the Court had stated we would

14  be compensated for the three hours of our time.

15  Have you come to the calculation for that?

16  A.   That would be for $945, which would have been

17  for the time for both of us.  That was one of those

18  days that both of us were here.  You were here

19  specifically to help me with the issues related to

20  the charge, and Mr. Radbil did not appear.

21  Q.   And we had previously filed a motion for our

22  attorney's fees in this case where we totaled up all

23  of the amounts while exercising billing judgment.

24       Do you have the number of fees we requested in

25  that motion?

1   A.   Sure.  And that would have been through the end

2   of trial, which was $87,155, and obviously that's

3   been increased by the amount of time we have gone

4   through these hearings and the work since that time.

5   Q.   What is the total of the entire amount with

6   sanctions and attorney's fees?

7   A.   Just to be clear, the amount since the trial

8   involving the sanctions hearings and actually

9   attending the sanctions hearings, is $44,951.50.  So

10  the total amount we have asked the Court to award us

11  is $133,051.50.

12  Q.   Could these amounts that you have estimated and

13  given to us, could those actually be lower than the

14  costs incurred?

15  A.   They are lower than the costs incurred to our

16  client.

17  Q.   And with all of these proceedings, the motions

18  filed for sanctions, is this a personal vendetta you

19  have?

20  A.   No, absolutely not.

21  Q.   Were these proceedings in the best interest of

22  your client?

23  A.   I think they were in the best interest of my

24  client, because I think this case should have

25  resolved at the very beginning.  I think it's also a

1   bigger issue, because I think it's probably in the

2   best interest of the legal community to deal with

3   these kinds of issues.

4            MR. MARTIN:  No further questions.

5            THE COURT:  Mr. Jefferson.

6            MR. JEFFERSON:  Thank you, Your Honor.

7            THE COURT:  Do you have the chart that she

8   was looking at, a copy of it?

9            MR. MARTIN:  I found one of them.

10           THE COURT:  All right.  We're just going

11  to consider that a demonstrative exhibit for right

12  now.

13                   **CROSS-EXAMINATION**

14           MR. JEFFERSON:  May I proceed, Your Honor?

15           THE COURT:  You may.

16  Q.   (By Mr. Jefferson)  Ms. Malone, good afternoon.

17  A.   Good afternoon.  I hope you are feeling better.

18  Q.   Well, thank you.  I hope I am, too, and I will

19  do my best to be brief.

20       Now, let's establish a couple of parameters

21  here, first of all.  The sanctions motion that is

22  being sought, both the Rule 37 and the 1927 costs,

23  those are being sought against the firm and Noah and

24  not Dr. White, correct?

25  A.   Mr. Radbil, yes, correct.

```
 1   Q.   Yes, I'm sorry.  I'm not sure what I said, but,

 2   yes, against the firm and Noah Radbil, but not

 3   Dr. White, correct?

 4   A.   Yes, that's correct.

 5   Q.   Okay.

 6   A.   There was a different motion against Dr. White

 7   that the Court has already taken care of.

 8   Q.   And in that regard, just so the record is clear

 9   on that, with respect to the costs of court that

10   were assessed, those costs of court have now been

11   paid.  True?

12   A.   We received a check, yes.

13   Q.   And there's a little bit of a question on some

14   timing issues.  You had indicated before that you

15   thought that Mr. Radbil was three hours late for

16   trial, and so I want to clarify that.  What time was

17   Mr. Radbil supposed to be here on the date that he

18   was late for court?

19   A.   He was supposed to be here at 8:00 a.m.  I

20   think he showed up at 10:15.  If I said three

21   hours --

22        THE COURT:  Well, I think the issue there

23   was that his client had told us pretty clearly that

24   he was supposed to meet his client at 7:00, and

25   that's where it all started.  His client was out
```

SHAWNIE ARCHULETA, CSR/CRR
FEDERAL COURT REPORTER – 214.753.2747

1   here bewildered that he couldn't find him at seven,

2   so that's where the three hours came from.

3   Q.   Fair.  But here's where there is a divergence,

4   because you are not asking the Court to order a

5   reimbursement for the time that Mr. Radbil was late

6   meeting with his client, you want costs for the two

7   hours and 15 minutes, from the time he should have

8   been here at eight until the time he got here at

9   10:15.

10          THE COURT:  Understood.

11  A.   I think the 9:45 number, if you add it up,

12  doesn't add up exactly.  So it is reduced at some

13  percentage.

14  Q.   (By Mr. Jefferson)  And perhaps, then, there

15  has been a miscalculation, and if there has, we will

16  certainly clarify it.  But would you agree that

17  Mr. Radbil has tendered to you a check, I believe

18  it's in the amount of approximately $635, to

19  approximate the two hours and 15 minutes?

20  A.   He gave -- he tried to give me a check.  I told

21  him that I did not feel comfortable receiving it

22  until the court ordered it.  I don't know the dollar

23  amount, but I take your word for it.

24  Q.   Fair enough.

25          THE COURT:  So you did not accept the

1   check.

2            THE WITNESS:  I didn't think the Court had

3   ordered it yet.

4            THE COURT:  Right.

5   Q.   (By Mr. Jefferson)  Fair.  And so the point

6   that I'm simply trying to make, and we can certainly

7   ask Mr. Radbil for the particular amount, is that

8   Mr. Radbil, that was something that he at least

9   attempted to pay.

10  A.   Sure.  But we don't know what amount the Court

11  has awarded yet.

12  Q.   Sure.

13  A.   She could do more if she wanted, for example.

14  Q.   Absolutely.  The point being is that you are

15  certainly not trying to dispute that, irrespective

16  of the fact that the hearing wasn't over with, that

17  Mr. Radbil tried to pay that in advance.

18  A.   No, I am not at all.  I just didn't feel

19  comfortable taking it yet.

20  Q.   Fair.  Thank you, ma'am.

21       Now, you have numbered a number of cases

22  against Weisberg & Meyers, true?

23  A.   Yes, I think we have.

24  Q.   And they've brought cases against a number of

25  your different clients, not just RAB, correct?

1  A.   Yes.  I think this is the only RAB case we had.

2  Q.   Okay.  And they have been designated as class

3  counsel in other cases that you have been involved

4  in, or have they not?

5  A.   No, they have never been designated class

6  counsel in any case of mine.

7  Q.   Of yours, okay.  Have you moved for sanctions

8  against them in other cases?

9  A.   Well, the only case that I'm aware that I can

10 recall is that, following this hearing, there was --

11 well, I should tell you that there was a Supreme

12 Court case that came out during this trial that

13 seemed to indicate you could recover costs and maybe

14 attorney's fees when you had won on certain issues.

15      So following this trial, we already had it

16 briefed, we filed the same similar motion in one

17 case that I'm aware of with them.  And then the

18 magistrate said they didn't do it, our client was

19 fine to let it go at that point.  We just took a run

20 at it and it didn't happen, but it's not the same

21 motion as this one.

22 Q.   Sure, sure.  Let me ask you this question:  And

23 you know, obviously, I'm a little bit new to this

24 matter, so I wasn't here for the first two hearings,

25 but was there a corporate representative from RAB

1   present at either of the first two hearings on the

2   sanctions issue?

3   A.    I didn't -- he wouldn't be offering testimony.

4   I did not ask my client to appear.

5   Q.    Okay.

6   A.    Neither did Dr. White.

7   Q.    Okay.  So just to be clear, the answer is --

8   for whatever reason, the answer is no.  True?

9   A.    No, no.

10  Q.    I know that somebody came in.

11  A.    That would be Mr. Martin's father.

12          MR. JEFFERSON:  Oh, afternoon, Mr. Martin.

13  Q.    (By Mr. Jefferson)  I actually know who he is,

14  at least by name.

15  A.    You would be the only person in Dallas who

16  doesn't today, so. . .

17  Q.    Well, I'm on the other side of that.  That's

18  not a representative of RAB here today.

19  A.    No.

20  Q.    That's my point.  Thank you.

21      Now, is it your belief that debt collection

22  cases such as Dr. White's are rarely settled in

23  mediation?

24  A.    In general, that is probably true.  There have

25  been times where it has happened, but most of the

1    time these cases settle early on among the attorneys

2    and mediators rarely help.

3    Q.    Would you also agree that, if they don't settle

4    early on in the process, the primary reason or the

5    primary stumbling block in these type of fee

6    shifting cases is because of issues regarding

7    attorney's fees?

8    A.    That's not always true, because sometimes there

9    are actual damage concerns, but I would say the vast

10   majority of the times that's true.

11   Q.    Yes.  And although I wasn't here -- and for the

12   Court's reference, I'm referencing page 14, starting

13   at line 4 of the initial hearing that started on

14   August the 2nd and in particular with respect to

15   Ms. Malone's opening statement.

16        And Ms. Malone, I'm happy to show it to you,

17   but let me just ask you the question because I think

18   you will recall it.  And it's where you talk about

19   the motive, and you were talking specifically about

20   the fee agreement.  And do you recall saying

21   something to the effect of, the fee agreement, it

22   gives the motive.  It explains to the Court that the

23   fee agreement shifts the ability to settle the case

24   out of the hands of the consumers that they say they

25   are trying to protect to Weisberg & Meyers.

```
 1        Do you recall saying that, in general?
 2   A.    That is -- those exact words, I don't recall.
 3   I don't doubt that I said that because I believe
 4   their fee agreement does that.
 5   Q.    Okay.  So let's talk about that for a second.
 6   You've heard the testimony in here from Mr. Meyers
 7   previously.  You don't dispute the fact that
 8   Mr. Radbil didn't have anything to do with the
 9   drafting of the fee agreement in this case, you
10   don't dispute that, do you?
11   A.    I have no reason to believe -- I think that
12   that's a form that probably predated his employment.
13   I have no reason that he played with it at any point
14   in time.
15   Q.    In fact, if we look at the original complaint
16   that was filed on behalf of Dr. White, we would
17   not -- we would not see Noah Radbil's name on that,
18   correct?
19   A.    I think that is correct.  I know I dealt with
20   Mr. Kurz.  I don't remember whose names were on the
21   pleadings, but I think that's correct.
22   Q.    Okay.  You certainly remember -- and that's
23   fine, the record will speak for itself.
24        You certainly remember that the original
25   attorney in charge in this case was Mr. Dennis Kurz,
```

```
 1  right?  Or do you recall that?
 2  A.   He's the person I dealt with.  I can't swear
 3  that he was designated as lead counsel.  But my
 4  suspicion would be yes, because usually that's who I
 5  would talk to.
 6  Q.   Okay.  And there were some questions before,
 7  and I think Mr. Martin testified that he didn't
 8  recall about a pre-suit -- he said that you didn't
 9  recall whether or not there was a pre-suit demand
10  for $8,500 in the case, but that would have been
11  from either Mr. Kurz or somebody else since that
12  predated Mr. Radbil's tenure on the case, right.
13  A.   I don't think they were referring to a pre-suit
14  demand.  I think they were talking about an
15  8,500-dollar offer or demand that Mr. Meyers said
16  was relayed to me by Mr. Kurz, which I have no
17  actual memory of.
18  Q.   Fair enough.
19  A.   But I don't think it was pre-suit.
20  Q.   Fair.  Do you recall that at some other point
21  in time you asked Mr. Kurz for a demand and that
22  Mr. Kurz said that at this time he wasn't going to
23  make that demand?
24  A.   That would have been early into the case.  I
25  think we looked at it, it was September the 9th when
```

1   he said that, 2011.

2   Q.   Right.   September 9, 2011, Mr. Kurz said that

3   he wouldn't make a monetary demand for settlement,

4   correct?

5   A.   Yeah; words to that effect, yeah.

6   Q.   Yeah, yeah.   And the point being is that

7   Mr. Radbil had nothing to do with the decision maker

8   of a higher up like Mr. Kurz or anybody else right?

9   A.   I have no clue how their process worked, to be

10  honest with you.   I could only tell you who relayed

11  the information to me.

12  Q.   Okay.   And it was someone other than

13  Mr. Radbil.

14  A.   Right.   I don't know if Mr. Radbil was involved

15  in that case or not.   Sometimes I have had younger

16  lawyers working on stuff with me.   I don't know if

17  Mr. Radbil was.

18  Q.   And we're talking about September of 2011.

19  When you made your Rule 68 offer of judgment, that

20  was made to Mr. Kurz, correct?

21  A.   Probably.   I don't remember the letter, but I

22  think that sounds right.

23  Q.   Okay.   And you would agree that since it's a

24  Rule 68 motion there should be a certificate of

25  service on there.

1   A.   On the -- oh, there was.  I think there was

2   a -- I think there was a discussion about it in the

3   briefing that they had received it but didn't

4   respond to it.

5   Q.   Yes.  And do you recall that that certificate

6   of service shows it was sent to Mr. Kurz?

7   A.   I don't doubt you, I just honestly don't

8   remember what the certificate of service says.  I

9   don't doubt you at all.  If you tell me it says

10  that, that's fine.

11  Q.   Fair enough.  Thank you.

12       And for whatever reason, there were some

13  objections filed concerning getting this case to an

14  early mediation.  Do you recall that?

15  A.   Mr. Kurz and I made a joint objection about

16  mediation together.

17  Q.   Yes.  And to be fair about that, you conferred

18  with Mr. Kurz, and that was a -- that was a joint

19  decision.  But whoever was involved in that joint

20  decision when those discussions were going on, one

21  person that was not a part of those discussions was

22  Mr. Noah Radbil, true?

23  A.   Mr. Kurz was in trial, is my recollection, at

24  the time.  I don't recall if I received a call from

25  Mr. Radbil to relay information to him back and

```
 1   forth, but there was some sort of intermediary.  And
 2   I don't remember who it was, to be honest with you,
 3   Mr. Jefferson, but somebody called me because he was
 4   in trial somewhere in East Texas, so we went back
 5   and forth.
 6        But ultimately, I understood that that was a
 7   joint decision made with Mr. Kurz.  If it was
 8   Mr. Radbil that called me, I don't remember.  I just
 9   remember he was in trial and somebody else called me
10   for him on his behalf is what they said.
11   Q.   Okay.  Let me ask this question since you just
12   testified previously that you keep contemporaneous
13   time records and that those would -- those are
14   entered almost daily.  Would your time records
15   reflect who it was that you talked to?
16   A.   It's possible, but it's also very likely I just
17   put Plaintiff's Attorney.  If it does say in there
18   that I spoke with someone else, I did.  It's also
19   very likely I just put Plaintiff's Counsel.
20   Q.   Okay.  And we can look at that at your leisure.
21   And really, all I'm interested in is that, if it has
22   my client's name in there -- if it doesn't have my
23   client's name in there, then --
24   A.   What I can tell you is I don't remember
25   speaking to Mr. Radbil, but I cannot say that I only
```

1   spoke to Mr. Kurz.

2   Q.   Okay.  Now, do you recall in November of 2012

3   you had settlement discussions that took place with

4   Mr. Meyers?

5   A.   Mr. Meyers -- they were e-mail exchanges, but

6   yes.

7   Q.   Okay.  And -- and was Mr. Radbil included on

8   those e-mail exchanges?

9   A.   He -- Mr. Meyers may have cc'd him on them, but

10  my e-mails were addressed directly to Mr. Meyers and

11  his e-mails were to me.  But I think that

12  Mr. Radbil's name may have been as a cc on at least

13  some of them, but I'm not positive.  We can look at

14  them.

15  Q.   Sure.

16  A.   He wasn't part of the conversation.  He may

17  have been copied on them.

18  Q.   And you have anticipated my next question.

19  Regardless of the cc list -- and I don't recall him

20  being on there, but they will reflect whatever they

21  are.  The point is that the two principals, if you

22  will, were the ones who were having those

23  discussions, right?

24  A.   The e-mails, yes.

25  Q.   Now, Mr. Radbil, however, did participate in

1  the -- in the moderated settlement conference with

2  the magistrate.

3  A.    Judge Stickney, yes.

4  Q.    It's Radbil Exhibit Number 1, but I don't think

5  you will have to look at it, but I want you to feel

6  free to.   The magistrate judge's settlement report

7  says that the parties conducted the settlement

8  negotiations in good faith but were unable to reach

9  a settlement, correct?

10 A.    That's what Judge Stickney told us that he

11 would be entering, and that's what the order I think

12 said.

13 Q.    And neither side in this case filed an

14 objection to the magistrate's report, true?

15 A.    We -- we had all of the decision makers

16 present, and we exchanged offers, so I think we both

17 felt we had complied with that.

18 Q.    Yes, yes.   But my question is, is that after

19 the magistrate judge issued his report, nobody filed

20 something that said -- where Mr. Radbil said you

21 negotiated in bad faith or you said Mr. Radbil

22 negotiated in bad faith, correct?

23 A.    I don't recall anybody filing anything like

24 that.

25 Q.    Okay.   Let's do this.   Ultimately, one of the

1    things that you do is that there's a joint pretrial
2    order that gets filed in this case, correct?
3    A.    Yes.  I think there is in every federal court
4    case.
5    Q.    Okay, and I'm laying the predicate here.  But
6    my point being is, I think that the trial estimate
7    that was given in the joint pretrial order was
8    two-and-a-half days.  Do you disagree with that?
9    A.    I don't remember.  That sounds reasonable for a
10   debt collection case.
11   Q.    Okay.  And by the time this case started until
12   the time the case was concluded, even with the
13   tardiness of Mr. Radbil, the trial concluded within
14   two-and-a-half days, correct?
15   A.    Yes, because the judge -- because the other
16   witnesses did not testify, yes.
17   Q.    Okay.  For whatever reason, it concluded in the
18   time frame that the parties estimated.  True?
19   A.    I -- this is where I'm -- we -- we did a
20   pretrial conference on Monday, the trial started on
21   Tuesday.  I want to say we finished Thursday or
22   Friday, but I don't remember for sure, Mr.--
23   Mr. Jefferson.  But we have the transcript we can
24   check the time.
25   Q.    Sure.  Okay.  Now let's talk about -- let's

1  talk just briefly about the issue of expert

2  witnesses.  And in particular, I'm referring now to

3  the pretrial transcript at page 76.

4       Do you recall the Court noting, when it came to

5  the subject of experts, that:  I think in good faith

6  both sides have addressed this issue of expert

7  witnesses or lack thereof.  But I agree, from what I

8  have heard so far, it goes to the very core of what

9  your client is accusing them of doing.  And right

10  now I overrule the objection.  Let's move on.

11 A.   I'm sorry, I don't have enough context to tell

12 you.  I believe you are reading it correctly.  I

13 don't remember that testimony or the context for it.

14 If you want to show me, I will be happy to.  I just

15 don't have the context for that, I'm sorry.

16 Q.   Very fair.  And my question is simply, because

17 I don't want to belabor the point, and the record

18 will reflect whatever it is, and I appreciate you

19 not disputing my reading abilities, but it says what

20 it says, right?

21 A.   Right.  But I don't know what you are talking

22 about, if there was more to it.  And I really didn't

23 understand what you were saying.  I'm sorry.

24 Q.   Fair enough.  Let's go to the issue of exhibits

25 for a moment.

```
 1                THE COURT:  Mr. Jefferson, on that, what
 2   are you quoting from, the pretrial conference or at
 3   trial?
 4                MR. JEFFERSON:  Yes, it's at page 76, what
 5   I have listed as pretrial transcript.
 6                MS. MALONE:  Those were the objections
 7   that the Court was ruling on?
 8                MR. JEFFERSON:  Yes, that's correct.
 9                MS. MALONE:  I don't remember what the
10   objection was that she overruled.  And I'm sorry,
11   from what you read to me, I just didn't get the
12   context.
13                THE COURT:  So to answer my question, that
14   was the pretrial conference.
15                MR. JEFFERSON:  Yes, Your Honor.
16   Q.   (By Mr. Jefferson)  Now let's talk about the
17   issue of exhibits.  You gave some testimony about
18   what your normal workdays were and the like.  And
19   like you, I also try not to work on Saturday and
20   Sunday.  But would you agree with me that many times
21   if you have a trial that starts on Monday that
22   Saturday and Sunday do become workdays?
23   A.   Sure, but I try to respect the other attorney's
24   time and return calls and minimize the impact we
25   have on each other's lives, as you have with me,
```

1    Mr. Jefferson, to be honest with you.

2    Q.    Thank you.  And I guess my question is, is

3    that's certainly a two-way street, in other words,

4    because you are balancing what you need to do and

5    family time and other activities; there's only so

6    many things that you can get to on a weekend,

7    correct?

8    A.    Sure.  But I would have called and said, hey, I

9    can't talk to you, after the second call, and said,

10   let's pick a time when I can.  I wouldn't have just

11   ignored the ten calls and e-mails.

12   Q.    Okay.  And that, of course, presumes that

13   that's what Mr. Radbil actually did.  I mean, you

14   are not sitting here saying that you know that he

15   contemporaneously received your telephone calls and

16   then decided to maliciously not answer them or

17   anything.

18   A.    I don't know.  All I know is that I called him

19   on his cell phone and his work number and I e-mailed

20   him.  Usually one of those ways will get an attorney

21   who has been ordered by the judge to confer with the

22   other side to correspond.

23        And I will note that he didn't apologize to me

24   when he did finally speak to me.  He didn't say, I'm

25   sorry, I didn't get your calls, or, I apologize, I

1    didn't get any of your e-mails.  I got no sort of

2    sign of courtesy that you would expect from an

3    attorney who has had their phone on the blink or

4    something like that.

5    Q.   A fair point.  A fair point.  And I guess my --

6    and I guess my question is, because I want to move

7    from the issue of courtesy and what Mr. Radbil's

8    sensitivities were or weren't to the actual Court

9    order.  It's my understanding that what the Court

10   said was that the Court wanted you and plaintiff's

11   counsel to confer prior to the commencement of

12   trial.  True?

13   A.   Yeah, I think it might have said prior to the

14   pretrial, which would be the next day.

15   Q.   And while it may not have been as prompt as you

16   would have liked or with the courtesies that you may

17   have been afforded previously, it did at least occur

18   prior to the commencement of trial.  True?

19   A.   I spoke with Mr. Radbil, and I will not say

20   that we got very far, but I did speak with him.

21   Q.   Fair.  Now let's talk about -- let's talk about

22   some of the cost issues for a moment.  Prior to

23   today, had you ever disclosed the amount of damages

24   that you were seeking in terms of the monetary

25   recovery?

```
 1   A.   We did in the motions, the original motions.
 2   Today we just supplemented them for the new time
 3   that had been given --
 4   Q.   Okay.
 5   A.   -- for the last two months, because those were
 6   not created at the time we did our last exhibits.
 7   Q.   Are you asking the Court to award you fees for
 8   time that either the client wrote off or that you
 9   didn't charge your client for?
10   A.   No, we subtracted those.  I think you will see
11   that they were waived.  And if you were to look at
12   the numbers, we subtracted those from the total
13   bills.
14   Q.   Okay.  And so therefore, if we go through your
15   bills or the Court goes through your bills, since
16   you kept them as you testified contemporaneously and
17   that they were entered daily --
18   A.   They are entered weekly, but we handwrite them
19   daily.
20   Q.   Fair.  We do that, too.
21   A.   It's old school.
22   Q.   Or we try to.
23        So therefore, your time records will reflect,
24   for example -- and I know you testified to some
25   things that you wrote off.  But if, for example, you
```

1    charged your client for preparing a witness outline

2    for a witness that you contend was late disclosed or

3    improperly disclosed, then that will be reflected in

4    your time records?

5    A.    Right.

6    Q.    Okay.  And just so I'm clear on this, are you

7    contending that the plaintiff in this case late

8    disclosed witnesses?

9    A.    Yes, absolutely.

10   Q.    Okay.  And are the late-disclosed witnesses,

11   for lack of a better term -- and I hate to use the

12   colloquial term for it -- but would those be the

13   moan and groan witnesses, his friends and colleagues

14   who were purportedly going to testify about his

15   mental anguish?

16   A.    The majority of them I would put in the

17   traditional moaners and groaners.  But I think there

18   were one or two who were, by trade, psychologists

19   and they may have known him at work.

20         But that testimony, unfortunately when you have

21   someone that has a psychology background like that,

22   it sort of takes it out of that and puts it into a

23   quasi something else category.

24         Other than that, yeah, I think there was only

25   one that fit in that category.  The others I would

1    call moaners and groaners.

2    Q.    And when you talk about that fit quasi into

3    another category, the point that you are making is

4    that because they have -- based upon their

5    knowledge, skill, training, and experience that they

6    have a degree that might qualify them as an expert

7    witness, that therefore they may be testifying as an

8    expert witness.

9    A.    Right.

10   Q.    But you would certainly agree with me, for

11   example, let's say you had an automobile accident

12   case and one of the witnesses to the car wreck is an

13   engineer or a police officer.  That doesn't

14   automatically transform that fact witness into an

15   ipso facto expert witness simply because they happen

16   to have knowledge, skill, training, and experience

17   that would qualify them to be an expert witness in

18   certain circumstances merely because they happen to

19   fortuitously be there.  You would agree with that,

20   wouldn't you?

21   A.    In a general proposition, but a psychologist

22   testifying about mental anguish is a little bit

23   different.

24   Q.    Okay.  And ultimately whoever this psychologist

25   was, that psychologist did not testify, true?

1    A.    That's correct, absolutely.

2    Q.    And I want to go into one of the other points

3    that you made with respect to supervision issues.

4    When I read your opening statement, you made the

5    statement:   I don't think that they supervise

6    Mr. Radbil one bit.

7         What's the basis for your contention that you

8    don't think that Mr. Radbil was supervised?

9    A.    Because I've seen Mr. Radbil in trial and in

10   hearings.  And some of the things that Mr. Radbil

11   has done in depositions tells me that no one has

12   taught him some fundamental things that you would

13   know if you were being supervised.

14        I have never seen anyone come with Mr. Radbil,

15   save one hearing.  He's always been by himself.  I

16   have seen Mr. Radbil in depositions have to -- well,

17   we tried a case in Fort Worth, and he didn't know

18   how many jurors you were allowed in state court,

19   which is set by the rules.  He was calling someone

20   else asking them for advice.  He didn't know the

21   fundamentals of the state court practice, which

22   tells me that no one was telling him how to do

23   things.  And frankly, I felt a little sorry for him

24   about it.

25   Q.    And so by the same token, is his lack of

1  training something that you blame Mr. Radbil for

2  personally?

3  A.   Not his lack of training; some of the things

4  he's done, I would hold Mr. Radbil personally

5  responsible for.

6  Q.   Okay.  And I guess at the end of the day --

7  without going into a laundry list of those

8  complaints, at the end of the day could those

9  deficiencies either have been cured in the past or

10  can they be cured in the future if Mr. Radbil, in

11  your opinion, had better supervision, training, and

12  education?

13  A.   I'm trying to answer your question honestly.

14  Some things yes, some things no.  Lying to the Court

15  is not about lack of supervision.  That's just -- I

16  don't care who you are, how long you have been

17  practicing law, you should know that you do not lie

18  to a judge.

19  Q.   Okay.

20  A.   But other than that kind of thing, a lot of

21  mistakes Mr. Radbil made I do think could be

22  resolved if he actually did some training, like

23  taking care to make sure that your disclosures are

24  made timely.  That's a training issue.  That's

25  the -- that's one thing I tell people all the time

1    is, you know, 45 days before a deadline for

2    discovery you go through and supplement your

3    discovery.  That comes from the top and that comes

4    from training, and that's something he could cure

5    through experience and someone telling him how to

6    practice law.

7    Q.   And I want to go to the issue about -- about

8    lying to the Court.  And I think for purposes of the

9    record we need to be very clear concerning that

10   allegation.  And so without -- without trying to

11   overdo or overbeat the point, can you just briefly

12   tell me what you believe those misrepresentations

13   were?

14   A.   Oh, gosh.  Okay.  I will try to be fair.

15   Mr. Radbil told the Court that he believed that the

16   $1,500 had been supplemented in some disclosure.

17   And then we gave the Court a copy of the actual

18   supplementation.  And at that point he changed his

19   story to, well, I don't believe I'm required to

20   supplement under the rules.  And Judge Boyle talked

21   to him about what Rule 37 actually says.

22        Then he said, we told them -- the magistrate at

23   the mediated settlement conference, and that

24   suffices, and Judge Boyle corrected him at that

25   point.  So I think those things were, in fact, not

1    true.  He had not supplemented them, and he

2    certainly I believe knew that he had an obligation

3    to do it.

4        Where it actually then gets more complicated,

5    unfortunately, is in the sanction hearing -- well,

6    on the stand, then, Mr. Radbil, upon questioning

7    from Mr. Meyers, took the position that the entire

8    $45,000 came from a rogue client.  We had never

9    heard that statement before.  He never said that to

10   Judge Boyle that -- he never -- when we were having

11   the 37 motion in the middle of trial, he never said,

12   Judge, I had no clue my client was going to say

13   that.  In fact, he said, we are not required to tell

14   them that, Judge.  That's fine, they know, they

15   heard about it at the mediated settlement

16   conference.  I don't know how else you characterize

17   that.  To me, it was a lie; you could call it a

18   misrepresentation.  I think Judge Boyle talked about

19   it.

20       And you further compound that with Dr. White's

21   testimony, which we pulled for the Court in case

22   Dr. White shows up, where Dr. White sua sponte said

23   to the Judge that Mr. Radbil had personally promised

24   him that those damages would be submitted at trial.

25       And I looked at Dr. White's declaration, and

 1   what it actually says is just that he was told they

 2   were not going to ask the jury for an amount.  It

 3   never says anything different.  It doesn't say in

 4   his declaration that he was not told that those

 5   damages would not be admitted at trial.

 6        I don't know how to -- I know those things are

 7   very contradictory.  In my opinion, Mr. Radbil lied

 8   to the Court.  And I'm sorry to say that, but that's

 9   exactly what I saw.

10        Another example was that Mr. Radbil told the

11   Court that I had taken a position on a dialer, that

12   he -- whether or not something was a DTDS, that he

13   knew was not my position and he knew I had been

14   fighting all along.  I had filed motions for summary

15   judgment about it.  It was something that I had been

16   disputing all along.  And that, to me, was -- maybe

17   he was arguing a point, but to me, knowing that I

18   had not said that, was not a good position.

19        A third thing that he did that, in my opinion

20   was maybe a lie by omission, is that he argued to

21   the Court about re-calling my client to the stand as

22   a corporate representative.  And he went on and on

23   to Judge Boyle about how my client had testified a

24   certain way in deposition one and never told the

25   judge that -- our position was that topic was not

```
1    proper, it was not done.  And we resubmitted the
2    witness after he had educated himself, and there was
3    a second deposition that directly addressed the
4    point.  I think that was a misrepresentation to the
5    Court.  And I don't know how else you characterize
6    that.
7         I think there was a fourth thing that came up.
8    Off the top of my head, those where the main ones.
9    And frankly, when he said what he said about the
10   rogue client, it turned my stomach because that, to
11   me, was a flat-out lie to the Court, and you just
12   don't do that.
13   Q.   Okay.  And by the way, I appreciate your candor
14   because -- because we need to make sure that we
15   address each one of these when Mr. Radbil takes the
16   stand.
17   A.   And understand, there may be more.  Those are
18   just the ones you asked me off the top of my head.
19            THE COURT:  Just to be clear,
20   Mr. Jefferson, the record is replete with
21   problematic conduct by Mr. Radbil, and the Court
22   viewed it.  And so the requirement for determining
23   whether or not it happened isn't going to hinge
24   specifically on what Ms. Malone states.
25            This last portion where Mr. Radbil was
```

```
 1    trying to re-call a witness that he had had on the
 2    stand for quite some time and was indicating with
 3    great urgency that he had had a very unfair
 4    situation in the pretrial during discovery with this
 5    witness -- and he's quoting from a deposition and
 6    how this witness never testified to this and never
 7    testified to that -- it turns out later that he's
 8    quoting from the first deposition before Judge
 9    Kaplan had ordered a second deposition which, in
10    fact, occurred and cured the defect.
11              So it was things like that.  And I don't
12    want the record -- as big as this record is going to
13    be and as convoluted as all of this is, I want all
14    of that to be clear, and that it would be impossible
15    to sit here for three days and go through every
16    single thing that happened that was problematic
17    about Mr. Radbil's conduct.
18              MR. JEFFERSON:  Yes.  And thank you,
19    Judge, because you make a very important
20    distinction, and it's the same distinction that I
21    was trying to make.  I was not trying to limit
22    Ms. Malone, because my question was not -- to use
23    your excellent phrase -- problematic conduct.
24    There's a distinction and a difference between
25    problematic conduct, either be it, you know, goofy,
```

1    dumb, inexperienced, forgetful, a mistake, or the

2    whole other laundry list, and all of those things

3    can be problematic.  But merely because something is

4    problematic does not mean that somebody acted with

5    deceit and intent.  That's the only distinction I

6    was trying to make.

7            THE COURT:  Correct.  But the distinction

8    has to be clear that Ms. Malone isn't tied

9    forever -- whether or not she wins or loses this

10   sanctions hearing -- to what she says up here,

11   specifically as to what he said that I might have

12   thought was misrepresenting himself.  This record is

13   just too big to discern that at this moment, unless

14   you want to spend another three or four days on

15   this.  I think it carries over, and I just want that

16   to be clear.

17           MR. JEFFERSON:  Yes, Your Honor.  And I

18   certainly understand that you're not only the umpire

19   but you're also the fact-finder.  But I was --

20   how ever inartfully, that was the distinction I was

21   trying to make.

22           THE COURT:  I understand.

23           MR. JEFFERSON:  Thank you.

24   Q.   (By Mr. Jefferson)  And by the way, with

25   respect -- let me just take one of these that you

1   mentioned, the auto dialer.  For whatever reason,

2   there was something in the pretrial that indicated

3   that an auto dialer was used.  For how ever that got

4   in there, that got in there, right?

5   A.   As you know, pretrials are exchanged back and

6   forth.  I don't know how it got in there, but he

7   certainly knew that was not my position.  I also

8   don't think that that's what that meant.

9        And the Court told him at the time that she did

10  not think that it was fair for him to say something

11  if it was a mistake that was in the pretrial.  And

12  I'm not trying to point fingers, because that

13  document went back and forth between several people.

14  And I don't know who put it in there or how it got

15  there, and I'm not saying it came from Mr. Radbil's

16  office because I don't know.  But he knew that was

17  not my position, and he certainly shouldn't have

18  suggested to the Court that it was.

19  Q.   Fair.  And just so we are clear, I'm not trying

20  to point any fingers, either.

21  A.   Right.

22  Q.   Again, I'm kind of talking about kind of the

23  distinction between, you know, problematic conduct

24  versus something that's deceitful.  So thank you for

25  that clarification.

```
 1        Let me just ask you this question, because
 2   there has been a variety of stuff that has been
 3   requested.  And when I looked through the opening
 4   statements that you made, you know, you laid out for
 5   the Court all of the various options that were
 6   available with respect to sanctions both under 37
 7   and 1927 --
 8   A.    Inherent authority.
 9   Q.    Yes -- against everybody involved.  But since I
10   just represent Mr. Radbil, I'm going to ask you
11   solely about Mr. Radbil, and let me just ask you
12   this question straight up:  Is -- is it -- is it
13   your position here today that one of the remedies
14   that you are going to ask the Court for today,
15   understanding of course that the Court can do
16   whatever the Court wants under its own inherent
17   authority irrespective of whatever you or I or these
18   other folks have to say, but I'm just asking you as
19   a fellow member of the bar, are you asking the Court
20   to have Noah Radbil be disbarred in the Northern
21   District of Texas?
22   A.    I think that lying to a federal judge warrants
23   that disbarment for Mr. Radbil.  Personally, I would
24   hate to see that happen.  But the fact of the matter
25   is, I think that the judge may have no choice, given
```

1    the number of times that he lied to the Court.

2         The reason I say personally, from a

3    professional standpoint I don't think that that

4    should be tolerated and those lawyers should be

5    disbarred.  Personally I just don't like to do that

6    to someone else.

7    Q.   Okay.  And do you believe that there are lesser

8    restrictive means, to the extent that the Court

9    finds that Mr. Radbil -- and again, I'm leaving the

10   firm out of this, I don't represent them.  But to

11   the extent that Mr. Radbil in his individual

12   capacity, not based upon inadequate training or

13   supervision, but because of any particularized

14   problematic conduct, are there other ways, short of

15   disbarment, in which some of those matters may be

16   addressed?

17   A.   If Mr. Radbil had come forward and apologized

18   to Judge Boyle the very first day at the very first

19   hearing for more than just being late for court,

20   shown remorse and accepted -- like Mr. Martin did --

21   accepted that he made a mistake and apologized and

22   rectified it immediately, then I think any of the

23   following things might work.

24        I think Mr. Radbil could be on sort of a

25   probated sentence, and if he didn't do certain

1    things over a period of time his license could be
2    revoked.  I think there is ample evidence that this
3    firm -- and unfortunately, I can't separate
4    Mr. Radbil from that because he was involved in a
5    lot of those Washington things -- don't take
6    sanctions from federal courts seriously.
7         So I think that there would have to be some
8    evidence that he did training, maybe some
9    restrictions that he be required to have supervision
10   on cases that he was handling that could be
11   quantified in some way.
12        I think he would have to do continuing
13   education.  Maybe because of the lying factor, maybe
14   he would need some sort of counseling.  I am coming
15   up with ideas that I have seen in clients that I
16   have represented who had bar matters, kinds of
17   things that the State Bar has approved for someone
18   who would be on a lesser -- a less -- a less than
19   complete disbarment action.
20        And honestly, if Mr. Radbil had apologized to
21   the Court and to my client, I probably would be
22   advocating that, but Mr. Radbil seems to show no
23   remorse.  So in that position, I'm not sure that
24   Judge Boyle has a choice.
25   Q.   Okay.  And you made a reference a moment ago to

1   the Washington things.  Those relate to the

2   pro hac vice motions that I believe the judge read a

3   portion of prior to our lunch break, correct?

4   A.   Right.  And I think that it's Ivy, Cadman and

5   Paris, I think those are the cases.  But I have

6   seen -- you have to understand, Mr. Jefferson, I

7   have seen Mr. Radbil and his lack of respect for

8   Judge Hoffman in state court and, frankly, to Judge

9   Boyle in this court.  So I think he doesn't get the

10  duty that lawyers have to the Court.

11       And I know that Judge Hughes entered an order

12  for a 196,000-dollar sanction against him and the

13  law firm personally the day after our last hearing.

14  And it's my understanding that Mr. Radbil was the

15  primary attorney there.  That tells me he did not

16  show respect to Judge Hughes as well.

17            THE COURT:  Is that Judge Hughes or Judge

18  Hoyt?

19            MS. MALONE:  That's Judge Hughes down in

20  Houston.

21  A.   Judge Hoyt told him that he needed to stop

22  petty gamesmanship, and that was personal to

23  Mr. Radbil.  He immediately turned around and filed

24  a motion directly related to that.  If there were to

25  be something different than taking his Northern

1    District license, I think there would to be some way

2    that Judge Boyle could be comfortable that he would

3    learn some skills -- which I think he's capable of

4    doing, he passed the bar -- and that he would know

5    that lying to a judge is never okay.  And lying to

6    opposing counsel is not great, but I'm more willing

7    to swallow that than lying to a federal judge.

8    Q.   I appreciate your answer.  And for the record,

9    I need to object as nonresponsive since I only asked

10   about Washington.

11       So returning to the Washington question, let me

12   just ask you:  Do you have any personal knowledge of

13   the underlying facts of those Washington matters?

14   A.   No, I just know what the judges said.

15   Q.   So for example, were you aware of the fact that

16   the Washington cases were not Weisberg & Meyers

17   cases, those were actually -- or at least one of

18   them was a case where the Washington lawyers already

19   had it and then they sought to bring in

20   Weisberg & Meyers, or do you know one way or the

21   other?

22   A.   I don't know.  All I know is what the order

23   said was to identify them.

24       MR. JEFFERSON:  Fair enough.  Thank you

25   for your time, ma'am.

192

```
 1              THE COURT:  Thank you, Mr. Jefferson.

 2              Mr. Meyers.

 3              MR. MEYERS:  May I have three minutes to

 4    run to the restroom?

 5              THE COURT:  We will take a ten-minute

 6    break.

 7              (Recess taken from 3:19 to 3:26.)

 8              THE COURT:  Mr. Meyers.

 9              MR. MEYERS:  Thank you, Your Honor.

10              THE COURT:  Ms. Malone is back up.

11                      CROSS-EXAMINATION

12    Q.   (By Mr. Meyers)  Ms. Malone, I don't recall

13    whether it was during Mr. Martin's questioning or

14    Mr. Jefferson's questioning, but you talked about

15    the United States Supreme Court case that was

16    decided during this trial.

17    A.   Yes.

18    Q.   Okay.  That's the Marx opinion?

19    A.   I think the name of the case -- at this exact

20    moment, it escapes me.  I apologize.  It's the one

21    that said that if there's a Rule 68, that you can

22    recover fees from the other side and costs and also

23    left open the option for fees, but it definitely

24    gave costs to the other side.

25    Q.   When you say, it gave costs to the other side,
```

1    you're aware that, prior to that opinion being

2    issued, that the Ninth Circuit had said no and that

3    the 7th Circuit -- or the 10th Circuit had said yes.

4    A.    Honestly, I am not an expert on 9th Circuit

5    law.  I don't regularly follow 9th Circuit; I tend

6    to stick closer to home, 5th Circuit mostly.  I

7    don't doubt you, I just don't know.

8    Q.    The reason I ask the question is, at the time

9    that the opinion came out, do you have any reason to

10   disagree there was a split in authority about

11   whether Rule 68 costs could be recovered in an FDCPA

12   action?

13   A.    I think that the Rule 68 statute always

14   provided that to be at the discretion of the Court.

15   I think what that Supreme Court case said increased

16   your probability of getting it.  I still think 68

17   said for a long time that it was at the discretion

18   of the Court.  I think that was the rule.  All that

19   that Supreme Court case did was sort of give the

20   green light to absolutely being cost, but it was

21   already in the rule that the Supreme Court was

22   interpreting.

23   Q.    You will agree that the opinion says what it

24   says.

25   A.    It says what it says.  I don't remember.

1  Q.   You had stated that, and I may not be phrasing

2  it correctly, but that this case was litigated over

3  the issue of attorney's fees or continued in

4  litigation over attorney's fees; is that right?

5  A.   No.  He asked me if that happens a lot of times

6  in cases like this.  And I said, yes, sometimes they

7  do.  I don't think we were talking about this one

8  specifically, we were just talking in general.

9  Q.   Your Rule 68 offer here offered attorney's

10 fees, right?

11 A.   Yes.

12 Q.   You've read Dr. White's affidavit, you've read

13 the e-mails attached to it, and you just

14 acknowledged that your Rule 68 offered attorney's

15 fees.  Do you think that the Rule 68 offer was

16 rejected because of attorney's fees?

17 A.   I have no clue why Dr. White rejected it.

18 Q.   So that means you don't have an opinion?

19 A.   I don't know Dr. White.  I don't know why he

20 rejected it.

21 Q.   Okay.  There was some conversation about the

22 chronology of demands here in this case.

23 A.   Yes.

24 Q.   You agree that prior to filing the lawsuit my

25 office sent two letters to your client without

1    knowing you represented them?

2    A.    There were two letters that you produced

3    pre-litigation.  My client didn't remember receiving

4    them.  Debt collection companies get a lot of stuff,

5    but you did produce something that you said was

6    mailed to him.  We are not denying that those were

7    sent pre-suit.

8    Q.    Then a lawsuit was filed, and you did reach out

9    to us, correct?

10    A.    Yes.

11    Q.    And we responded that Dr. White did not have a

12    settlement demand at this time.

13    A.    I don't think that's exactly what it said, but

14    I was told there was no demand.

15    Q.    At this time it said, right?

16    A.    I don't remember, Mr. Meyers.  I'm happy to

17    read the e-mail for you if you like.

18    Q.    It says what it says.

19    A.    Right.

20    Q.    And then shortly thereafter, I understand you

21    don't recall receiving an e-mail from Dennis, but in

22    January of 2012 there was a demand made; is that

23    right?

24    A.    I still don't recall that.  You're telling us

25    it was sent to us.  I don't remember seeing it.  As

```
 1    I told you earlier, I think that hurts you more than
 2    helps you.  So if you want to say it happened, it
 3    happened.
 4              THE COURT:  I think the question is
 5    everything that's been offered.  Is that somewhere
 6    in all these documents, the offer?
 7              MR. MEYERS:  Yes.
 8              THE COURT:  Where?
 9              MR. MEYERS:  It is, amongst other places,
10    in the affidavit of Dennis Kurz.
11              THE COURT:  I'm talking about an e-mail or
12    something, a letter.
13              MR. MEYERS:  Yes, the e-mail, itself.
14              THE COURT:  Mr. Radbil, you've got
15    lawyers.  So if you want to talk about something,
16    hand it to your lawyers.
17              MR. MEYERS:  Mr. Kurz's affidavit is --
18              THE COURT:  I understand it's in Kurz's
19    affidavit.  Just give me the exhibit where it would
20    be somewhere like in an e-mail or something.
21              MR. MEYERS:  It is.
22              THE COURT:  Give me the exhibit number.
23              MR. MEYERS:  Document 142, Exhibit A.
24              THE COURT:  Okay.  Of your exhibits.
25              MR. MEYERS:  No, Your Honor, just of
```

1  Mr. Kurz's affidavit.  And then I believe it's in

2  the motion practice, as well, Your Honor.

3           MR. MARTIN:  Docket entry 142.

4           THE COURT:  Docket entry 142.  Are you

5  still just talking about the affidavit?

6           MR. MEYERS:  No, Your Honor.  The E-mail

7  is attached as an exhibit.

8           THE COURT:  All right.  I have seen it.

9  At least I have seen the document and I have an idea

10  I have seen the e-mail.  That's at 142.  Okay.

11           MR. MEYERS:  It is also in the motion

12  practice, Your Honor.

13           THE COURT:  All right.  Go ahead.

14  Q.  (By Mr. Meyers)  You -- Ms. Malone, I included

15  some e-mail exchanges between us in various cases in

16  our exhibits.  Are you aware of that?

17  A.   Yes.

18  Q.   Okay.  You have previously told me that I've

19  said to you that you could call me any time about

20  anything, right?

21  A.   In the e-mails -- are you asking me if that's

22  in the e-mails?  I have said that to you -- you have

23  said that to me.  I don't know if it's in the

24  specific e-mails, Mr. Meyers.  You have told me

25  that; I haven't done that, but you have told me

1    that.

2    Q.    I don't say that you had any obligation to call

3    me at any time during this case, but did you call me

4    about any of the problems you had in this case?

5    A.    I have had problems with Mr. Radbil off and on.

6    There's only one time that I actually reached out to

7    you about it, but it was not related to this case.

8    Mr. Radbil, for some reason, started referring to me

9    as Roberta in pleadings.  And I got a call from the

10   Fifth Court of Appeals in Dallas, because they

11   couldn't identify me in the Court Texas Bar because

12   there is no Roberta Malone.

13        And I sent e-mails to you to tell Mr. Radbil --

14   I don't know why he did it, I've been called a lot

15   worse than Roberta, but that's not my name -- if he

16   would please call me my legal name, because my name

17   is not a nickname, that the Court would appreciate

18   it.

19        That's the only time I remember specifically

20   talking to you about Mr. Radbil.  And that was more,

21   don't do this, the courts are getting ticked.

22   Q.    I recall that exchange.  Do you recall him ever

23   referring to you as Roberta after that?

24   A.    No.  Then he got onto this kick of wanting to

25   know my middle name.  He got close, but didn't get

```
 1    it quite right.  I kept telling him, look, just
 2    Robbie Malone.  I don't even use my husband's last
 3    name.  Let's just go with what I've always been
 4    called.
 5          It was silly, to be honest with you.  If it
 6    hadn't been an irritant to the Court, I wouldn't
 7    have said anything to you about it then.
 8    Q.    As you sit here today, Ms. Malone --
 9    A.    Wait.  I have told you before -- I forgot.  I
10    have complained to you in this case that Mr. Radbil
11    did not return my phone calls, and you did promptly
12    respond to me.  And I said thank you for calling me
13    back.
14    Q.    You did.  That was after the trial.
15    A.    No, actually, I think it was before, when you
16    were talking to me around Thanksgiving time.  I
17    think I may have said, gosh, I'm really glad to hear
18    from you.  Mr. Radbil doesn't respond to me about
19    this kind of stuff, and I'm happy to see that you
20    are looking at the case.
21    Q.    Okay.
22    A.    I think that's the first time, and I did
23    afterwards, too.
24    Q.    Okay.
25    A.    I did appreciate you calling me back.
```

```
1    Q.   I don't suggest, as we sit here today, that I
2    could have been an aid to you in this case or to the
3    issues in this case, but I just need to be clear.
4    And I don't suggest to you that you had any duty to
5    contact me, but you didn't contact me if you called
6    Mr. Radbil repeatedly about the trial exhibits or
7    anything else to see if I could help.
8    A.   Mr. Meyers, I did not.  If you would like for
9    me to tell you why, I would be happy to.
10   Q.   Again, I don't suggest you have a duty to.
11   A.   I didn't, because in my dealings with you I had
12   the very strong opinion that you didn't want to hear
13   it.
14   Q.   Okay.
15   A.   That you thought I was tattling on your
16   associates if I said anything.  So I didn't think it
17   was helpful to me, my client, or to Mr. Radbil for
18   me to tell you I didn't think this kid knew what he
19   was doing.
20   Q.   When you said, this kid didn't know what he was
21   doing, prior to this trial Mr. Radbil had won a
22   federal court trial in front of Judge Sparks in the
23   Adamcik matter.  Are you aware of that?
24   A.   I had seen Mr. Radbil in trial myself, though,
25   and I had seen him in depositions.  He never had
```

1  outlines, he never had notebooks; he didn't

2  understand the fundamentals.

3       In this case, when we took a break after

4  starting voir dire, Mr. Radbil asked me personally,

5  in front of his client, how to put his evidence on.

6  And I just said to him, I don't think my client

7  wants me to tell you how to try your case, and he

8  left.

9       I don't think he was doing it to be glib.  I

10 honestly thought that he really thought that as an

11 older attorney that I would give him some advice,

12 which you can't do with your client standing there.

13 I really think he didn't know what he was doing.

14 Q.   You are aware prior to this trial he had

15 succeeded in Adamcik before Judge Sparks.

16 A.   Racehorse Haynes once said, you can lose a case

17 to a taxi cab driver.  Stuff happens.  That doesn't

18 mean he knew what he was doing.

19 Q.   I understand.

20 A.   It's not based on whether or not he won a

21 trial, Mr. Meyers.  It's whether or not -- I have

22 lost trials where I have done very good work.  I

23 have won trials when it was really not my best day.

24 It's whether or not he knew and understood the

25 fundamentals.  I don't know what happened in the

202

1    Adamcik case.  I know that what I saw was someone

2    who did not understand how to prepare a case and try

3    it in front of a jury.  And I think that that was

4    because he was not being trained or supervised.  I'm

5    sorry, but that's my opinion.

6    Q.   I appreciate that.  Thank you.

7         The reason I'm asking you the question is just

8    based on your conclusion that he wasn't being

9    supervised or trained.  So I am just kind of asking

10   you to look at something from my perspective.  Prior

11   to what occurred here, he had won the Adamcik trial.

12   Are you aware of that?

13            THE COURT:  That's been established.  It's

14   in the record.  We talked about it at the last

15   hearing and the one before that.

16            MR. MEYERS:  Okay.  Thank you.

17   Q.   (By Mr. Meyers)  Are you aware, Ms. Malone,

18   that prior to the trial here, he had been certified

19   as adequate class counsel, along with my law firm,

20   in this court?

21   A.   I saw that you filed that.

22            THE COURT:  In this court.  Okay.  Let's

23   talk about that.  Let's be clear on this, because

24   for some reason I think the last time you were here

25   you brought an order that I signed -- and I want to

1   be specific.  Again, it's more of this misleading

2   way that you have of dealing with everything,

3   Mr. Meyers.

4            Judge Lynn had a case.  She was out ill

5   for a period of time that particular summer, and all

6   of us took certain things and hearings on for her.

7   That's what that was, period.  It was one hearing,

8   and the case went back to her.

9            So to infer, as you have with so many

10  things, that there was some stamp of approval of

11  behavior in a case by this Court prior to today is,

12  again, misleading and not true.  All right?

13           MR. MEYERS:  Yes, I'm terribly sorry, Your

14  Honor, and --

15           THE COURT:  It was a settlement fairness

16  hearing, period.  I did it for Judge Lynn, and

17  that's what it was about.  Let's move on to the next

18  point.

19           MR. MEYERS:  I'm sorry.  I wasn't aware of

20  the circumstances.

21           THE COURT:  Next point.

22  Q.   (By Mr. Meyers)  Prior to the trial here, you

23  and Mr. Radbil had tried the Brown v. Enterprise

24  case?

25  A.   I think we had tried two cases before this one,

1   but that was one of them, yes.

2   Q.   Okay.  And the appellate court recently issued

3   an opinion remanding that case with a directive to

4   enter judgment on a TCPA claim?

5   A.   It's already up on appeal to the Supreme Court.

6   And I think that that's a good example, Mr. Meyers,

7   that Mr. Radbil objected to the visiting judge, and

8   the Court of Appeals talked about his waiver because

9   he didn't understand the fundamental rules.  That

10  one I'm not so critical of, because he also, in my

11  opinion, waived his right of appeal.  And that one I

12  think the Supreme Court will rule in my favor on.

13      He didn't know how many jurors; he didn't know

14  how to put his evidence on.  We objected on hearsay,

15  he didn't have sponsoring witnesses.  He didn't have

16  any outlines.  His clients were digging exhibits

17  out.  But the real kicker to me, Mr. Meyers, was I

18  went to the ladies' room, and when I came back

19  Mr. Radbil was looking at my trial counsel book.

20  And in Tarrant County, that will get you in trouble

21  with the judge.  Instead of bringing it to your

22  attention or to the Court, I told Mr. Radbil,

23  because he was a young guy, if I catch you at my

24  counsel table again, we will have a discussion with

25  the Court.  To me that's not okay.  You can win a

1    case or lose a case, it's how you do it that counts.

2        I'm on the defense side.  I lose a lot of cases

3    where I'm only trying them on damages.  You would

4    say I lost, my client would say I won, because

5    that's what happens on the defense side.  I don't

6    look at that.  I look at how he did it.  He didn't

7    know how to try the case.

8        What the Court of Appeals said was that they

9    disagreed with the judge who dismissed everything on

10   directed verdict.  That's a big deal, when you have

11   a judge who is Judge Holman, who was 35 years -- I

12   think 20 on the 2nd Circuit or the Second Court of

13   Appeals from Fort Worth, another 15 as a trial court

14   judge.  Mr. Radbil told him he wasn't qualified to

15   hear the case, and that really did not set well with

16   the Court.  You don't tell a judge who has that many

17   years of experience he's not qualified to hear what,

18   in his opinion, was a fairly routine case.

19   Q.   What you just said about being at your table,

20   you have never told me that before, right?

21   A.   No, I have not.  I didn't want to tattle on

22   him.  It wasn't my job, Mr. Meyers.  You seemed to

23   have, in my opinion, endorsed Mr. Radbil all along,

24   and I really didn't think you wanted to hear it, so

25   I never told you.

1      The truth is, if it had been someone from

2  Mr. Jefferson's firm, which I know his firm pretty

3  well, I would have called up a partner over there

4  and said, hey, look, you have a kid over there that

5  just did something bad.  I didn't rat on him to the

6  judge, but you need to talk to him.  I don't have

7  that same feeling from you.

8  Q.    I included as exhibits various e-mails between

9  us.

10  A.    You mentioned that, yes.

11  Q.    In these e-mails, you don't ever tell me these

12  things that you tell me now, that you think so lowly

13  of me.

14  A.    I'm talking about his lack of supervision,

15  Mr. Meyers.  It's not personal.  I think as

16  attorneys we have an obligation to make sure that

17  the attorneys who work under us are given a fair

18  training and fair opportunity to do that.

19      Until this trial started, until this sanctions

20  hearing started, I didn't know if it was Mr. Radbil

21  or if it was you.  After the first day, when I saw

22  your examination of Mr. Radbil and you took him down

23  the line of the rogue client and your questioning of

24  him, then my opinion was -- before that, I thought

25  it was mostly Mr. Radbil.  That day I decided, you

1    know what, he's been given some really bad advice.

2    And frankly, I don't know who trained you, I know

3    that you're a younger attorney than I am, but

4    something's wrong in the tree if you guys think this

5    is okay.

6         And my impression is that, the fact that you

7    had Mr. Radbil represent you the very next day in a

8    hearing in front of Judge Hughes, where you had

9    Mr. Radbil take lead in front of Judge Hughes the

10   very next day after Judge Boyle talked to you about

11   whether or not you endorsed his behavior, tells me

12   that you haven't learned anything about this

13   process, and that is a concern for me.  It's not

14   personal, it's for the profession.

15   Q.   You're speculating as to my mindset, right?

16   A.   I don't know what your mindset is.  All I know

17   is what I have seen.  And what I have seen is that

18   Mr. Radbil has been put in a position where he was

19   not qualified to do what he was doing.  And if that

20   was his own making, then it was Mr. Radbil's fault.

21   If it was yours as his lead attorney, then it was

22   your fault.

23   Q.   Can you tell me, Ms. Malone, as we sit here

24   today, all of your non-client colleagues that have

25   told you that I'm a liar, dishonest, deceptive,

1    misleading?

2    A.    Oh, colleagues.  You mean attorneys?

3    Q.    Sure.

4    A.    Why?  I guess I'm going to have to --

5              MR. MARTIN:  Objection, relevance.

6              THE COURT:  Well, if you have -- if you

7    know some lawyers or nonlawyers, go ahead.  He's

8    asked the question.

9    A.    Okay.  A number of members of the Map List have

10   questioned your trustworthiness.  I can't remember

11   all their names.  A couple of guys from Washington

12   State have talked about the fact that they believe

13   that you have lied to the Court, and I'm afraid I

14   only know them by face.  I don't actually know their

15   full names.  We were just having a beer, and they

16   told me the story.

17             I've heard from --

18   Q.    Can you tell me the name of any of these

19   people?

20             THE COURT:  No, no, we're not going to do

21   this, Mr. Meyers.  Move on.  All right?

22             MR. MEYERS:  Yes.

23             THE COURT:  Are you just going to get a

24   little hit list there and start calling them, is

25   that what this is about?  I don't understand this.

1   Go ahead and ask your next question.

2           MR. MEYERS:  Yes, Your Honor.

3   Q.   (By Mr. Meyers)  Can you point to the lies that

4   I have told in this case in your view?

5   A.   In my view?

6   Q.   Yes.

7   A.   I think it was a lie when you told the Court

8   that the testimony related to the 40,000 to 5,000

9   was a result of a rogue client.  Because that is

10  certainly not what Mr. Radbil said, and that was

11  certainly not what Dr. White said.  And then for you

12  to later say you never say rogue client, which you

13  have said a couple of times, that was not true.

14          I think you lied when you told the Court that

15  you were not soliciting Texas clients.  Because two

16  weeks before the hearing, on your Twitter account

17  you were saying that Texas clients deserve Texas

18  size representation.  Two weeks after you told the

19  Court that you were not going to sign up any new

20  Texas clients and that, if you do, you would be

21  handling them personally, you file a pleading that's

22  not there.  I think that was a lie.  I'm sorry, but

23  I do.

24          I think your website contains flat-out lies.  I

25  think the information about the Guajardo case was a

1    lie.  I think the information about the Whaley case

2    on the website was a lie.  I think most of the

3    representations about Mr. Radbil's experiences were

4    not true.  I don't think that he was the lead

5    counsel in the NCAA case.  I don't think he was the

6    lead counsel for a major league baseball player.

7         I do believe you when you said that you didn't

8    actually check those representations.  But whenever

9    you, as a member -- as a founding partner of a firm

10   puts that information out to the community, then you

11   are responsible for that.

12        I'm sure there are many more things.  Those are

13   just the two things that came to mind as I sat here.

14   There are things that you have said, Mr. Meyers, in

15   the course of the hearing last time that I found not

16   to be credible.

17        When you said -- there were some things you

18   said I thought were incredibly candid, but they were

19   not good lawyering.  When you said you don't talk to

20   witnesses before you put them on the stand.  I

21   believed you when you said it, because that made a

22   whole lot of sense to me, when working with

23   Mr. Radbil, but I think that was bad lawyering.

24   That wasn't a lie, that was just bad lawyering.

25   There are other things I would take issue with.  I

1   don't have a list.  I didn't make one, I'm sorry.

2        Oh, I also think it was a lie when you told the

3   Court that you would not recommend Mr. Radbil to a

4   family member, because the very next day you walked

5   into Judge Hughes court, and it's my understanding

6   Mr. Radbil took lead on that hearing.  If that's

7   true, then that was a lie.  You do endorse him.

8             THE COURT:  Is that true?  Did Mr. Radbil

9   take the lead on that?

10             MR. MEYERS:  He did not, Your Honor.  But

11   Judge Hughes did ask the other Mr. Radbil to sit

12   down and for this Mr. Radbil to stand up.

13             THE COURT:  This Mr. Radbil that we have

14   here in court today, Noah?

15             MR. MEYERS:  Judge Hughes asked that, yes.

16             THE COURT:  So what does that mean?  Did

17   he do the talking?

18             MR. MEYERS:  At Judge Hughes' direction,

19   when Judge Hughes told the other Mr. Radbil to sit

20   down.

21             THE COURT:  So he did take the lead.

22             MR. MEYERS:  No, he didn't.  The other

23   Mr. Radbil started talking.  Then at some point

24   during the hearing, Judge Hughes said to Aaron

25   Radbil, I want to hear from Noah Radbil.

```
 1            THE COURT:  So Noah Radbil, if not the
 2   lead, was the co-lead.
 3            MR. MEYERS:  Well, he was named in the
 4   sanctions motion, Judge.
 5            THE COURT:  Ms. Malone, when you say take
 6   the lead, tell me about that.
 7            MS. MALONE:  Well, it's my understanding
 8   from Mr. Patterson, because I wasn't there, but
 9   Mr. Patterson told me that Noah Radbil argued the
10   majority of the time.  He said that essentially the
11   hearing went like two-and-a-half, three hours and
12   that the vast majority of the time was Noah Radbil
13   arguing directly with Judge Hughes.  That's what he
14   said.
15            THE COURT:  And is that -- how did that --
16   what was that hearing about?  What was the
17   sanctions?  What was the sanctions?
18            MR. MEYERS:  1927, Your Honor.
19            THE COURT:  Okay.  And what were the
20   accusations?
21            MR. MEYERS:  That Mr. Radbil --
22            THE COURT:  Did he say Noah or Aaron?
23            MS. MALONE:  Both.
24            MR. MEYERS:  Both of them were alleged
25   to -- I have the transcript.  I can give it to the
```

1   Court.

2           THE COURT:  Just tell me, because you

3   brought it up.  Tell me about it.

4           MR. MEYERS:  That basically we lied to the

5   Court.

6           THE COURT:  Okay.  And did the Court end

7   up agreeing and sanctioning them both?

8           MR. MEYERS:  No.  The Court sanctioned

9   Mr. Noah Radbil and applied it to the firm, as well.

10          THE COURT:  For how much money?

11          MR. MEYERS:  $195,000.

12          THE COURT:  Has it been paid?

13          MR. MEYERS:  No, it has not, Your Honor.

14          THE COURT:  What is the alleged lie that

15  was supposedly told?

16          MR. MEYERS:  There were several

17  allegations of lies.  It revolves around a defect in

18  a car and what caused the defect.

19          THE COURT:  Just give me an idea.  What

20  were some of the lies that Judge Hughes believed

21  occurred?

22          MR. MEYERS:  Well, I don't know, Your

23  Honor, that Judge Hughes, during the hearing, said

24  that there were lies, Judge.

25          THE COURT:  What were the lies?  What were

```
 1    the accusations, Mr. Meyers?  You know what I am
 2    asking you.  Answer the question.  What were the
 3    statements that Judge Hughes believed were lies?
 4              MR. MEYERS:  I don't know the answer to
 5    that, Your Honor.
 6              THE COURT:  See, I think that's not true.
 7              MR. MEYERS:  Okay.
 8              THE COURT:  Were you there at the hearing?
 9              MR. MEYERS:  Yes.
10              THE COURT:  But you don't know what the
11    lies were.  You got a 100-something-thousand dollar
12    sanction by someone, who is at least associated or
13    was associated with your firm, who argued at the
14    hearing, and you don't know what the lies were.
15              MR. MEYERS:  Judge Hughes did not speak
16    about lies primarily.
17              THE COURT:  You read the papers, didn't
18    you?
19              MR. MEYERS:  I'm sorry?
20              THE COURT:  You read the papers?
21              MR. MEYERS:  I did, Your Honor.
22              THE COURT:  What do the papers say?
23              MR. MEYERS:  The papers filed by the
24    defendant talked about lies in the defects in the
25    car.
```

```
 1              THE COURT:  All right.

 2              MS. MALONE:  Your Honor --

 3              MR. MEYERS:  They also talked, Your Honor,

 4   about bringing a claim late past the statute of

 5   limitations.

 6              THE COURT:  Mr. Meyers, this is

 7   unbelievable that someone like you is out in the

 8   public practicing law and presenting yourself as an

 9   attorney and counselor and taking money for that.  I

10   don't know how you or your firm or Mr. Radbil, for

11   that matter, is even retaining clients at this point

12   without telling them about all of this, let alone

13   soliciting new clients.  It seems, at a minimum,

14   some sort of deceptive trade practice, if not out

15   and out fraud.

16              I don't -- I've never seen anything like

17   this in 30 years, the prevarication by you and

18   Mr. Radbil.  It's just -- it's almost impossible to

19   believe anything you say and what you just said is

20   just another example of that.

21              This notion last time that you -- that you

22   don't ever talk to your witnesses before they

23   testify, I think you probably want to go ahead and

24   tell your clients that, especially these major

25   league baseball player types that might expect that
```

1  you are going to prepare for trial.

2          Anyway, let's move back.  Ms. Malone, what

3  else did you have on that topic, and then we will

4  move to the next one?

5          MS. MALONE:  The only thing, Your Honor,

6  is you asked what the allegations were, and I was

7  just going to tell the Court that the Scarlott case

8  is the one we were talking about.  Under RAB's

9  Exhibit Number 16 is the allegation being made by

10  Nissan as to what the lies were.  It certainly

11  doesn't reflect what Judge Hughes thought.

12          And then for the Court's notice, we added

13  as Exhibit Number 44, which was one of the late

14  exhibits we had, Your Honor, and that is the final

15  order issued by Judge Hughes for the

16  190-something-thousand dollars, and that's all I was

17  going to say.

18          THE COURT:  Thank you.

19          Mr. Meyers, let's go to your next

20  question.

21          MR. MEYERS:  Thank you, Your Honor.

22  Q.  (By Mr. Meyers)  Ms. Malone, at the first

23  sanctions hearing, you were just talking about the

24  rogue testimony.  On page 142, lines 4 through 9.

25  A.  Okay.  You said, it was kind of rogue.

1   Q.   And then I said, I'm not finding a fault with

2   him, right?

3   A.   Doesn't matter.   When the Court asked you about

4   it, you continued to suggest that it came out of the

5   blue and you didn't know it was coming.   That was

6   very much consistent with you calling it a rogue

7   thing.   And then, for you to later say you never

8   used the word rogue was just wrong, which is what

9   you said when you were on the stand the other day.

10       To me, that's not the real problem here,

11   Mr. Meyers.   You asked me for an example of

12   something you had said that I found to be a lie, and

13   that was an example.   That is not the thing I am

14   most offended by, by any means.

15   Q.   As we sit here today, when I said I am not

16   finding fault with the client, do you think I tried

17   to blame the client?

18   A.   I think you absolutely tried to blame the

19   client.   I think it's just like when you absolutely

20   tried to blame your webmaster for the Twitter pages.

21   Q.   Okay.   The various orders that you included and

22   that you cite, the few not so favorable fee

23   opinions, the few orders that were orders to show

24   cause that were discharged, did you research those

25   cases yourself?

1   A.   To be honest, Mr. Martin took the lead on that,

2   but some of them I have seen other places.  I think

3   in our exhibits we only had show cause orders, but I

4   think we did have a passing reference to the other

5   in our other motion.

6   Q.   Did you just ask other defense lawyers to give

7   you all of the bad stuff they had on

8   Weisberg & Meyers?

9   A.   No, I did not just do any one thing.

10  Mr. Meyers -- honestly, Mr. Martin Googled Noah

11  Radbil, and the Washington orders popped up on

12  Google.

13  Q.   Okay.

14  A.   But I mean, yeah, did other defense attorneys

15  give me stuff?  Sure.  I have seen other stuff.

16  Obviously I obtained a copy of the Scarlott order

17  from Jeff Patterson.  He sent it to me after it was

18  issued.  I didn't ask him to, particularly, but he

19  did give it to me.  He knew I would be looking for

20  it.

21  Q.   You have been monitoring the Scarlott case, I

22  assume?

23  A.   No, I have not.  Nissan doesn't pay me; I don't

24  have time to go monitor it.  Something happens from

25  time to time, and we might look at it.  And that

```
 1    would normally be a heads-up from either something

 2    you filed or from something that Mr. Patterson

 3    mentioned to me, but I honestly have not.  I think I

 4    have read one pleading in the Scarlott case, which

 5    would be the one that's included in our thing in the

 6    order.  I didn't even read your response to it.

 7    Q.   Mr. Patterson presented an e-mail that Dennis

 8    Kurz sent you that you sent to Mr. Patterson about

 9    representations about telling me that the case was

10    not a good case after the deposition.  Do you recall

11    that?

12    A.   I wasn't there when Mr. Patterson -- I wasn't

13    at the hearing, so I don't know what Mr. Patterson

14    did.  I know you have told me he did that.

15    Q.   Do you recall the e-mail, Ms. Malone?

16    A.   You put it as one of your exhibits.  I don't

17    remember what it specifically says.  I think I

18    didn't say anything.  All I think is that it was

19    just forwarded, the e-mail that I received, from one

20    person to another person without comment.

21    Q.   That's right.  It's Exhibit 32.  I'm just

22    confirming that Dennis Kurz sent you an e-mail,

23    former employee of mine, and you forwarded it to

24    Mr. Patterson, right?

25    A.   I forwarded an e-mail to Mr. Patterson, yes.  I
```

1    don't know if you were Of Counsel with Mr. Kurz or

2    not.  I don't know the exact situation that you guys

3    have going on.  I'm not denying that he's your

4    former employee, I just don't know.

5    Q.    And Exhibit 33 -- strike that.

6          The e-mail that Mr. Kurz sent you was from

7    August of this year; is that right?

8    A.    I'm sorry, which exhibit?

9    Q.    32.

10   A.    32 or 33?

11   Q.    32.

12   A.    Okay.  I'm sorry.  I'm having a hole punch

13   problem here.

14         The e-mail Mr. Kurz sent to me was dated

15   August 30th.

16   Q.    Of this year?

17   A.    Yes.

18   Q.    Okay.  And have you read it?

19   A.    I read it before, but if you want me to skim

20   it, I will be happy to.

21   Q.    Sure.

22   A.    Sure.  I just re-read it.

23   Q.    It relates to Dennis', Mr. Kurz's, supposed

24   opinion of the case and what he supposedly told you,

25   right?

1    A.    This is what Mr. Kurz told me about the case?

2    Q.    Yes.

3    A.    He sent me an e-mail telling me that he had

4    been called to federal court.  And he's complaining

5    about what happened and that he had recommended you

6    drop the case, I think he said the word begged, and

7    that the plea was shot down and the case was given

8    to the brothers, Radbil.

9    Q.    Did you have the opportunity to read

10   Exhibit 33?

11   A.    You sent me Exhibit 33 -- you sent me the

12   attachments to Exhibit 33 over the weekend after

13   that hearing.  And I looked at it then, and Mr. Kurz

14   in that e-mail says something different.  I didn't

15   use either e-mail, so I don't have a -- I don't have

16   a dog in that fight, Mr. Meyers.  I don't know if

17   it's true or not.  I didn't see the case, I didn't

18   see the information.  All I did was send something

19   to a defense attorney who I knew was working on the

20   case and said, here you go.  I didn't know he was

21   going to use the e-mail from Mr. Kurz.  I had no

22   clue.  He didn't ask my permission, not that he had

23   to, but I certainly didn't know it.  And I would

24   have personally probably not used hearsay on hearsay

25   e-mail as evidence in a hearing myself, but that's

1    just me, because that's what this is.  It's a

2    statement from Kurz just forwarded without comment

3    from me to Patterson.  I have no clue if what Kurz

4    is saying is true or not.  Nor do I have any clue of

5    whether the e-mail you have is true or not, I don't

6    know.  I really don't one way or the other.  And I'm

7    not suggesting that either side is right, because I

8    really truly don't know.

9    Q.   You would agree that the e-mail that Mr. Kurz

10   sent you versus the e-mail that he sent me

11   three-and-a-half years prior are completely

12   different.

13   A.   Completely different.  I don't know the context

14   of them, but I could read that the e-mail that you

15   submitted was referring to a Rule 11 or some sort of

16   sanction motion offer at that time.  And so I don't

17   know if he was referring to the demand that was

18   being made before there was a problem with the tech,

19   or if it had to do with the whole case.  And I don't

20   know, because I didn't know -- I don't have any

21   context for it.

22        But I'm not -- but it had a question in my

23   mind, and I wasn't sure even what was going on.  And

24   I really don't know, Mr. Meyers.  I'm just telling

25   you, it's not clear to me -- if they are

1    contradictory, it's not clear to me what they are

2    both referring to.

3         All I know is that I gave the e-mail to

4    Mr. Patterson because I thought it might be helpful

5    to him, and that's all I did.

6    Q.   I understand that.  Do you -- do you think that

7    my testimony was -- that you should have told me

8    that the websites were wrong?

9    A.   Well, you basically said that you wish I had

10   told you that the websites were wrong.  Or -- yeah,

11   you did.  And I think the judge said how dare I --

12   sarcastically, how dare she not tell you the

13   websites were wrong.

14        But I did.  I told you that information about

15   the Whaley site was wrong on your website, and you

16   didn't take it down, not at that time you didn't.

17   So that's why I thought that that was -- your

18   statement that, had you known it you would have

19   corrected it, that's why I didn't believe it.

20   Q.   I'm just unclear on your answer.  Did I say

21   that you should have told me about the website?

22   A.   You know, I don't know if you said should have

23   or wished I had.  All I know is that the one time I

24   did tell you about information on your website being

25   wrong, you did not take it down.  So frankly it

1    didn't matter one way or the other.

2    Q.   I sent a letter to the bar asking their

3    opinion, right?

4    A.   Right.  But you admitted on the stand that that

5    description of that case was probably not accurate.

6              THE COURT:  Is that the website, the AFC,

7    or something else?

8              MS. MALONE:  That would be Mr. Radbil's

9    bio, Your Honor.

10             THE COURT:  Which would be what website?

11             MS. MALONE:  On the firm website.  It's

12   Exhibit 37, Your Honor.

13             THE COURT:  Yes, I have it.  Okay.  So you

14   actually did think -- did you screen this at all

15   before it went up, Mr. Meyers, Defense Exhibit 37?

16             MR. MEYERS:  I don't recall, Judge.  It

17   was so long ago.

18             THE COURT:  Okay.  But you think that

19   would be a good practice, an ethical practice to

20   screen the public postings about young attorneys

21   that are associated with your firm?  Do you think

22   that would be a good practice?

23             MR. MEYERS:  Yes, yes.

24             THE COURT:  Okay.  So someone who is only

25   out of law school since 2009, as I recall, late 2009

1   if I'm right, if not, it was late '08, did you think

2   it was a surprise that he would have been

3   representing a major league baseball player in a

4   seven-figure breach of fiduciary duty case?

5           MR. MEYERS:  We spoke about this last

6   time, Your Honor.  I just relied on people to write

7   an accurate bio.

8           THE COURT:  But you're a lawyer, and you

9   didn't have a little question in your mind about the

10  accuracy of that?

11          MR. MEYERS:  I didn't, Your Honor.

12          THE COURT:  Was it naiveté, is that what

13  it was?

14          MR. MEYERS:  It's assuming, Judge, that

15  people tell the truth.

16          THE COURT:  Okay.  But it also takes on

17  the responsibility of being part of that

18  communication to the general public.

19          And what about the -- the one with regard

20  to the NCAA players against -- Mr. Radbil was

21  amongst a group of several lawyers representing a

22  group of former NCAA Division I athletes.  I don't

23  know when this was posted, but he couldn't have been

24  out of law school more than a couple of years.  Did

25  you not think that was strange?

1          MR. MEYERS:  Given where he worked, Your

2     Honor, I really didn't think that.

3          THE COURT:  Let's talk about that, where

4     he worked.  I haven't asked you yet why, but I'm

5     asking you this because you're raising these

6     questions with Ms. Malone, and I want to get to the

7     bottom of this.  How did you come upon Mr. Radbil?

8     He was at a bigger firm, a successful firm, is that

9     what it was?

10         MR. MEYERS:  I came upon --

11         THE COURT:  I know how you came upon him,

12    I think you testified to that.  But what do you know

13    about his activity at this other firm?

14         MR. MEYERS:  Well, I know just a couple of

15    things, Your Honor.

16         THE COURT:  What's the name of the firm?

17         MR. MEYERS:  The firm where he was before

18    he joined us is Camaro Sibley.

19         THE COURT:  And there was one other one.

20         MR. MEYERS:  AZA, yes, Your Honor.

21         THE COURT:  And do those lawyers and those

22    partners in that firm endorse Mr. Radbil to this

23    day?

24         MR. MEYERS:  I haven't spoken to them,

25    Your Honor.

227

          1          THE COURT:  Do you have any idea?  If they

          2   were to come down here and talk about this, that

          3   they would endorse his representations that

          4   obviously occurred when he was with their firm?

          5          MR. MEYERS:  When I was in town, Your

          6   Honor, for a trial that I was pro hac vice in the

          7   Southern District, we went to dinner with

          8   Mr. Camara and Mr. Sibley from that firm, a couple

          9   other lawyers from that firm, Mr. Ahmad from AZA,

         10   and there were a handful of other lawyers there,

         11   Your Honor.  Everything seemed good, but that was

         12   the only time that I've ever met Mr. Ahmad --

         13          THE COURT:  Okay.  You've answered my

         14   question.  Let's go on with the questioning.

         15   Q.  (By Mr. Meyers)  As we sit here today,

         16   Ms. Malone, are you aware that one of the questions

         17   you asked me about my website was that a judgment --

         18   or a Newswire that a judgment wasn't entered for

         19   Mr. Masters against Wells Fargo, as we sit here

         20   today do you know that a judgment was entered?

         21   A.   I don't think that's what my argument with you

         22   was.  My argument was that the Newswire article

         23   implied that you had won a big judgment when, in

         24   fact, you got a 13,000-dollar judgment that

         25   basically Judge Sparks said, either you take it or

```
 1   else.  It wasn't a win.

 2       I mean a judgment was entered, but when you

 3   read the case from Judge Sparks, it was not a big

 4   victory.  And the problem was the news article

 5   implied something different than what had actually

 6   happened when you read Judge Sparks' opinion, who I

 7   happen to know by the way, from my old med-mal days.

 8   So I took that very seriously what he said.

 9   Q.   As we sit here today, you have read Dr. White's

10   affidavit.  Do you think what he wrote in his

11   affidavit, that we didn't tell him to say a number,

12   do you think that's true or not true?

13   A.   I know what he testified -- I re-read his

14   testimony to the Court.  And what he said -- two

15   things:  He said that he was never told about the

16   consequences of the offer of judgment.  He said that

17   very specifically to Judge Boyle.

18       And a few pages later he said that he had been

19   assured by Mr. Radbil that the damages would be

20   offered into evidence.  I can get you the cites.  He

21   very specifically said that.  And on his own, it was

22   not questioning from the Court or from me, he

23   apologized to the Court for sandbagging and said he

24   had been assured from Mr. Radbil that those damages

25   numbers would come into evidence.
```

1      Now, when I read his declaration, I see there
2  is a direct contradiction to the statement about
3  being told about what the Rule 68 offer made.  I
4  don't know which one is right.  I know they are
5  inconsistent.
6      When I read the question about the testimony,
7  there's nothing in his declaration that specifically
8  states that he was not told that the damages amounts
9  would not be awarded.  What the declaration says
10 very carefully is that he was told they would not
11 ask the jury for a specific amount.  I took that to
12 be possible that he understood that Mr. Radbil would
13 not ask for a dollar amount in closing.
14     I don't know how -- how to explain those two
15 things.  One is directly contradictory; the other
16 one may not be.  I think the only person who can
17 explain that is Dr. White, but I know what he told
18 Judge Boyle.  And I also am curious why Dr. White
19 was not here to explain it himself, but that's just
20 me.
21          THE COURT:  Why is that, Mr. Meyers?
22          MR. MEYERS:  Your Honor, it states in the
23 affidavit why he wasn't here that day.  You would
24 have to ask him.
25          THE COURT:  You tell me, because you

1    questioned him.  You said you prepared part of those

2    paragraphs.  Why didn't he come here to explain all

3    of those things?

4            MR. MEYERS:  He had a prior business

5    engagement.

6            MS. MALONE:  That was October.

7            THE COURT:  Is there any reason why he

8    wouldn't be able to come down to explain all of this

9    in person after the conflict it seems that there is

10   between his affidavit and his statements to the

11   Court?

12           MR. MEYERS:  I couldn't speak for him.  I

13   don't see why not.

14           THE COURT:  Have you spoken to him today?

15           MR. MEYERS:  I have not.

16           THE COURT:  Has Mr. Radbil spoken to him

17   today, to your knowledge?

18           MR. MEYERS:  I have no idea.

19           THE COURT:  All right.

20           MS. MALONE:  I did have one other

21   question, which probably can be explained away by

22   Mr. Jefferson.  At least in the exhibit that we were

23   given for the declaration, the signature page is in

24   a completely different format than the actual body

25   of the thing.  It may have to do with what he was

1    explaining about the e-mailing.  But it is not a

2    continuous document, and he may can explain that.

3    And I didn't -- I think we may have generally

4    objected to that, but we made some general

5    objections, but they are different and I don't know

6    why that is.  I think that Dr. White would be the

7    best person to ask.

8    Q.    (By Mr. Meyers)  Do you think, Ms. Malone,

9    people who are being collected by debt collectors,

10   do you think they have money to hire an attorney as

11   a rule?

12   A.    I have seen the rare occasion when they do.

13   But as a general rule, they probably don't, because

14   that's why they are being collected on in the first

15   place, but there have been some that do.  I would

16   say 95 percent the other way, though.

17   Q.    So I assume you don't object to me taking the

18   cases on a fee shifting provision, you object to me

19   asking that the client see that my bill gets paid if

20   he settles; is that right?

21   A.    Mr. Meyers, I have no problem with plaintiffs'

22   attorneys filing suits.  I'm a defense attorney.  If

23   you don't file suits, I don't have work.  But I do

24   think you have to do it ethically and you have to do

25   it fairly, and that's my objection.  But I don't

1  have a problem in general.

2       I understand.  I'm a med/mal -- I used to do a

3  ton of med-mal defense.  I have one med-mal case

4  right now because plaintiffs' lawyers aren't allowed

5  to file them.  I understand that if you don't exist,

6  we don't work.  I have no general problem with the

7  practice of law.

8  Q.   You included part of the ethical rules as an

9  exhibit?

10  A.   Yes, I did, just for ease of reference.

11  Q.   When you say, ease of reference, what do you

12  mean?

13            THE COURT:  Mr. Meyers, I'm not sure where

14  all these questions are going, but it seems that you

15  are up here quite a bit just sort of, I don't know,

16  passing time or buying time.  I'm going to give you

17  five minutes, so use your best questions.  You've

18  had her since 3:25, and it's going to be an hour

19  here pretty soon, so. . .

20  A.   We were going to be talking about them, so I

21  put them in as exhibits so that we would be able to

22  refer to them, and I think I actually had you look

23  at some of them during the course of examination.

24  So by ease of reference, I just thought it was

25  easier for us, than to guess what the rule said, we

```
 1   would have it to look at.  That's what I meant.
 2   Q.   Do you believe that the rules are standards for
 3   procedural decisions?
 4   A.   I'm sorry.  Standards for the federal court?
 5   Q.   For procedural decisions, yes.
 6   A.   I don't guess -- if you're talking about 1937,
 7   I don't think that this -- to Rule 37, I don't think
 8   they have a direct application to that.
 9               THE COURT:  Now I know you're buying time.
10   Let's ask some real questions.  Let's ask some
11   questions.
12               MR. MEYERS:  Your Honor, thank you for
13   allowing me the time up here.
14               THE COURT:  Any other questions that you
15   have?  Let's make sure I know what they are, if you
16   think you've been cut off.  Tell me where else you
17   want to go, and I will let you know if I think
18   that's a waste of time or not.  Anything else?
19               MR. MEYERS:  Not at this time.  Thank you,
20   Your Honor.
21               THE COURT:  All right.  We started this
22   with Mr. Martin.  I'm assuming there's no follow-up.
23               MR. MEYERS:  No.
24               THE COURT:  Go ahead, Ms. Malone, you can
25   step down.
```

 1              Ms. Malone, as far as your evidence goes

 2    in this sanctions hearing, where are we?

 3              MS. MALONE:  We rest, Your Honor.

 4              THE COURT:  Mr. Jefferson?

 5              MR. JEFFERSON:  Yes, Your Honor.  As the

 6    Court noted and I think wanted, Mr. Suazo is going

 7    to present him, but we will call Mr. Radbil back to

 8    the stand.  He's been previously sworn.

 9              THE COURT:  Mr. Radbil is still under

10    oath.  Come on back up here.

11              MR. RADBIL:  Thank you, Your Honor.

12              MR. SUAZO:  Your Honor, there are a number

13    of notebooks up there.  I have given one to

14    Ms. Malone, and I have tried to synthesize

15    everything into one notebook, if I can give it to

16    the Court.  I'm not offering this.

17              THE COURT:  I know you're not, but we have

18    spent quite some time organizing exhibits over the

19    last few days so that I know where everything is.

20    Are they plaintiff's exhibits, Radbil exhibits?

21              MR. SUAZO:  They are Radbil exhibits, RAB

22    exhibits, documents referenced in the motions.

23              THE COURT:  That's fine.  But I can find

24    them, because I know where everything is.  I would

25    just as soon not have another notebook up here, but

```
 1   I appreciate your attempt to streamline.  I think I
 2   can probably find it pretty quickly.
 3             MR. SUAZO:  May I approach the witness?
 4             THE COURT:  Just make sure it's clear
 5   which party's exhibit you are dealing with --
 6             MR. RADBIL:  I will be happy to --
 7             THE COURT:  Mr. Radbil, I know it's hard
 8   for lawyers not to talk when you have a lawyer, but
 9   you've got to let your lawyer talk.
10             MR. RADBIL:  I'm sorry, Your Honor.
11             MR. SUAZO:  May I proceed, Your Honor?
12             THE COURT:  Go ahead.
13             MR. JEFFERSON:  I don't want the
14   proceedings to stop.  May I be excused for a moment?
15             THE COURT:  You may.
16                         NOAH RADBIL,
17   having been previously sworn, testified as follows:
18                   REDIRECT EXAMINATION
19   Q.   (By Mr. Suazo)  Mr. Radbil, are you employed at
20   the moment?
21   A.   I am not employed.
22   Q.   You're not drawing a salary or health insurance
23   benefits or anything like that?
24   A.   No.  My health insurance was recently canceled.
25   Q.   We have a lot of stuff that's been discussed,
```

1   and I'm going to try to zero it in, at least,

2   because I know the Court has suggested that we focus

3   on the proceedings in this case a couple of times.

4   So I'm going to try to start out with the

5   proceedings in this case.

6       First of all, did you do the initial intake on

7   this Dr. White case?

8   A.   No.

9   Q.   Did you sign the fee agreement with Dr. White?

10  A.   No.

11  Q.   Did you make the initial demand letter?

12  A.   No.

13  Q.   Did your name appear on the original complaint

14  in this case when it was filed on July 28th, 2011?

15  A.   Did not.

16  Q.   Who was the attorney in charge on this case?

17  A.   Originally, Dennis Kurz.

18  Q.   Why did Mr. Kurz cease being the attorney in

19  charge of this case?

20  A.   He quit.

21  Q.   When did he quit?  Do you remember roughly the

22  approximate time frame?

23  A.   Yes.  The approximate time frame was when I

24  appeared as counsel in this case.

25  Q.   Would that be sometime around August of 2012?

1    A.    Yes.

2    Q.    And when Mr. Kurz left the firm, how many other

3    attorneys do you remember there being at

4    Weisberg & Meyers that were licensed in Texas?

5    A.    To my knowledge, I was the only one licensed in

6    Texas for the last two or so years.  I think there

7    was one lawyer who lasted a month and a half or so,

8    perhaps longer, but basically me.

9    Q.    How many cases do you approximate that you then

10   had to take over as counsel when that happened?

11   A.    On a temporary basis, it was the Texas cases,

12   which amounts to probably 100 or more.

13   Q.    And you were licensed when?  What year were you

14   licensed?

15   A.    December of 2009.

16   Q.    So roughly July 2012 as a lawyer that had just

17   completed maybe 18 months of practice, you were then

18   listed as the attorney of record for nearly 100

19   cases.  Is that fair?

20   A.    If not more, yes.

21   Q.    Was this one of those cases, that Dr. White v.

22   Regional Adjustment Bureau case?

23   A.    This was one of those cases.

24   Q.    All right.  Let's focus, if we could, on the

25   pretrial components of this case and the pretrial

1    components of the motion before getting into some of

2    the more specific complaints.

3        Do you understand that RAB is making the claim

4    that you multiplied the proceedings unreasonably and

5    vexatiously?

6    A.    I understand.

7    Q.    Have you reviewed the docket sheet recently to

8    prepare yourself to come testify?

9    A.    I have.

10   Q.    How many people did you depose in the 18 months

11   that this case pended before the Court?

12   A.    One person.

13   Q.    How many sets of written discovery did you or

14   the law firm serve in this case in connection with

15   the claim that there was some unreasonable vexatious

16   and multiplying of the proceedings?

17   A.    I believe one set.

18   Q.    How many motions did Weisberg & Meyers file for

19   Dr. White in the total 18 months that this case was

20   pending before the Court?

21   A.    Eight motions, i believe.

22   Q.    Let's just kind of briefly run through them,

23   not spend a lot of time on them.  The first one is

24   docket entry number 9, September 14, 2011.  There

25   was a motion to extend time for a Rule 26f

1    Conference filed by the firm before you appeared in

2    the case.  Do you know what the result of that

3    motion was?

4    A.    It was granted.

5    Q.    On July 22nd, 2012, docket entry number 32,

6    there was a motion for leave to file under seal a

7    motion to compel a second deposition and a motion to

8    compel a second deposition, all filed kind of

9    simultaneously.  Tell us why you filed that

10   combination of motions and what the disposition was.

11   A.    I didn't want to allow anything to distract

12   from the discovery obstruction that I saw and that I

13   wanted to communicate to the Court.  So out of an

14   abundance of caution and to protect the proprietary

15   or confidential information of the defendant, I went

16   ahead and filed it under seal.

17        The standards were not particular enough, and

18   Judge Kaplan, I believe, denied the motion to seal

19   and struck the motion to compel and refused to allow

20   any further motions relating to discovery without a

21   conference, which we soon scheduled and held.

22   Q.    Was there a protective order in the case at the

23   time?

24   A.    At that time, I don't believe there was a

25   protective order.

---

**SHAWNIE ARCHULETA, CSR/CRR**
**FEDERAL COURT REPORTER – 214.753.2747**

```
 1   Q.    Or an agreed confidentiality --
 2   A.    It was an agreed confidentiality order.
 3              THE COURT:  Are you all right?
 4              MR. JEFFERSON:  Yes.  Thank you.
 5   Appreciate the Court's consideration.
 6              THE COURT:  All right.  Go ahead.
 7   Q.    (By Mr. Suazo)  And was there a -- I think the
 8   question was, was there a confidentiality agreement
 9   at the time regarding disclosure of confidential
10   information?
11   A.    I believe so, yes.  And the deposition --
12   Q.    I'm sorry.
13   A.    Go ahead, I'm sorry.
14   Q.    Is that why you filed a motion to leave to file
15   under seal a motion to compel a second deposition
16   out of respect for the confidentiality of the
17   deposition?
18   A.    Yes, because that information means nothing to
19   me outside of the case, and I had to protect it out
20   of respect.
21              MS. MALONE:  Your Honor, I'm sorry, I can
22   barely hear Mr. Radbil.
23              THE COURT:  It's a problem that's been
24   throughout these hearings.  Please pull the
25   microphone closer and speak up.  Thank you for
```

 1    notifying me of that.

 2              THE WITNESS:  Should I repeat that?

 3              THE COURT:  Yes, go ahead and repeat that

 4    last answer.

 5    A.    Out of respect for the defendant, I filed it

 6    under seal, even though it hadn't been properly

 7    designated as confidential under the confidentiality

 8    agreement.

 9    Q.    (By Mr. Suazo)  And then to the extent that you

10    were asking for a second deposition, what did the

11    Court do with that component of the motion to

12    compel?

13    A.    Well, we had a conference, and the Court looked

14    at the answers given by the corporate representative

15    designated by Regional Adjustment Bureau and found

16    them lacking and warranting a second deposition on

17    topics that were material to the elements of the

18    claims.

19    Q.    So in other words, it was granted as to a

20    second deposition?

21    A.    Yes.

22    Q.    According to docket entry number 38, on

23    August 23rd, 2012, there was an emergency motion to

24    extend time to respond to the motion for summary

25    judgment.  Can you tell us why you filed that motion

```
 1   and what the disposition was?
 2   A.   Yes.   After the conference with Judge Kaplan,
 3   there were a number of documents that were referred
 4   to in the original productions that had not been
 5   produced.  And Ms. Malone said she needed to Bates
 6   label them, but refused to provide a certain time to
 7   produce them.  And we had summary judgment deadlines
 8   and dispositive motion deadlines quickly
 9   approaching.  So in the absence of a firm date and
10   unable to plan for the review of the information and
11   use of it in dispositive motion practice, we asked
12   the Court to extend the time to file dispositive
13   motions, and that motion was granted.
14   Q.   Did Ms. Malone oppose that motion for
15   additional time?
16   A.   I believe she did.
17   Q.   On September 10th, 2012, docket entry number
18   50, you filed a motion for leave to file a corrected
19   motion for summary judgment motion response.  Tell
20   us why you filed that motion and what its
21   disposition was.
22   A.   I erred and did not comply fully with the table
23   of contents and I believe the appendix requirements
24   of the Northern District of Texas.  Having realized
25   that, I filed a motion for leave, and it was
```

1   granted.

2   Q.   Did you attempt to get in touch with Ms. Malone

3   regarding that motion for leave?

4   A.   I did.  And I believe -- sometime ago now, I

5   believe I was threatened with the (inaudible) 182

6   motion, and I didn't get an answer from her one way

7   or another.

8   Q.   First of all, did you attempt to get in touch

9   with her, yes or no?

10   A.   Of course.

11   Q.   And according to your certificate of

12   conference -- do you do certificate of conferences

13   when you file these kind of motions?

14   A.   I do.

15   Q.   And according to your certificate of

16   conference, she didn't return your call.  Does that

17   comport with your memory?

18   A.   Yes.

19   Q.   So the disposition of that motion, though, was

20   what?  Was it granted?

21   A.   It was.

22   Q.   On September 12, 2012, docket entry number 51,

23   you filed a motion for summary judgment.  We know

24   why you filed that, but what was the outcome of that

25   motion?

```
 1   A.    Summary judgment was granted in plaintiff's
 2   favor in four out of eight statutory claims, I
 3   believe, two of the Texas Debt Collection Act
 4   claims, which is Texas Finance Code Chapter 392,
 5   et cetera, and the Federal Fair Debt Collection
 6   Practices Act, 15 U.S.C. 1692.  And there were fact
 7   questions relating to whether an automatic telephone
 8   dialing system was used to place calls or a
 9   pre-recorded voice was used to place calls to a cell
10   phone without prior express consent to the called
11   party.
12        So we had four claims that we prevailed on,
13   which were fee shifting claims.  And we had
14   Telephone Consumer Protection Act claims where there
15   were fact questions.
16        And I believe, if I'm not mistaken, I can't
17   recall whether one of our claims was dismissed or if
18   we abandoned it, but I don't recall offhand.
19   Q.    Okay.  But in short, it was granted in part and
20   denied in part, your motion for summary judgment.
21   A.    That's correct.
22   Q.    Docket entry number 77, on February 1st, 2013,
23   there was an objection to a pretrial disclosure.
24   Tell us why you filed that objection and what the
25   disposition was.
```

1   A.    Tell me the date again, please?

2   Q.    February 1st, 2013.  Do you remember?

3   A.    February 1st, 2013.  Yeah, I believe it was an

4   objection -- I'm not certain.  I think it may have

5   been an objection to the nondisclosure of the

6   individual telephone numbers and contact information

7   for witnesses of Regional Adjustment Bureau's

8   employees.  And also the redaction, I believe, of

9   certain materials from the set of documents

10  produced, the second set of production produced.

11  Q.    And let me ask, what was the ruling on that

12  objection?

13  A.    Was that Doc 77?

14  Q.    Yes.

15  A.    The motion was granted.  And Ms. Malone and her

16  law firm were required to either accept service of

17  the subpoenas as officers of the court or produce

18  them for trial to testify, and the Court reserved a

19  ruling on the redaction issue.

20  Q.    Okay.  On docket entry 83, on February 1st,

21  2013, you filed a motion in limine.  Were some of

22  those granted and some of those denied?

23  A.    Yes.

24  Q.    And then finally, on February 13, 2013, the

25  final motion that you filed in the case was an

1   emergency motion to reset the pretrial conference.

2   A.   Yes.

3   Q.   Can you tell us briefly why you filed that and

4   what the result was?

5   A.   I was appointed class counsel in the matter of

6   Little-King v. Hayt, Hayt, & Landau in the District

7   Court of New Jersey, and it was preliminarily

8   approved.  We sent out a class notice to more than

9   50,000 individuals in the state of New Jersey and

10   Pennsylvania, and the final fairness hearing had

11   been scheduled for the same day as the pretrial

12   conference.

13            THE COURT:  And you were lead counsel on

14   that matter?

15            MR. RADBIL:  I was.

16            THE COURT:  How many years had you been

17   practicing at that point?

18            MR. RADBIL:  Four.

19            THE COURT:  All right.

20   Q.   (By Mr. Suazo)  Okay.  Mr. Radbil, focusing --

21   those were the only eight motions that were filed

22   during -- before trial.  Would you agree with that?

23   A.   By me?

24   Q.   By you.

25   A.   Yes.

1    Q.    All right.  So let's kind of focus on the trial

2    components of the multiplication of proceedings

3    claim.  First of all, and I think Mr. Jefferson

4    covered this, how long did the trial take?

5    A.    Two-and-a-half days.

6    Q.    And if you look at Tab 1 in the notebook and go

7    to page 14 of 16, and this is going to be Radbil

8    sanctions, Exhibit 6.  If you look at paragraph 5,

9    what was the joint estimate of how long the trial

10   was going to take in this case?

11   A.    Two and one half days.

12   Q.    If you look at the last page of that exhibit,

13   looks like the Certificate of Service is

14   February 8th 2012.  So this two-and-a-half day

15   estimate obviously is before anything that happened

16   at trial had taken place, correct?

17   A.    I have a page 15 that's in my binder that looks

18   as if it's misplaced dated February 26, 2013.  The

19   very next page is page 16.

20   Q.    The last page should be a Certificate of

21   Service.  Is that what you have?

22   A.    Yes, dated February 8, 2012.

23   Q.    Okay.  That's obviously before the trial had

24   begun, correct?

25   A.    Yes.  The pretrial conference was the 22nd, I

1  believe.

2  Q.   All right.  If you go to the next Tab, the next

3  Tab is your entire direct examination of Dr. White.

4  This is found at Volume 2 of the trial transcript

5  from pages 169 through 191.  And let me just ask you

6  this question:  How many pages of transcript did you

7  absorb in conducting the direct examination of

8  Dr. White?

9  A.   I'm going to have to count, if you will give me

10  a second.

11  Q.   Is it 20, 25 pages?  Begins at 165 and ends at

12  191.

13  A.   It was brief.

14  Q.   It wasn't a long-drawn-out examination of

15  Dr. White.

16  A.   Mine of him, no.

17  Q.   On the next Tab, which is Tab 3, it's Volume 3,

18  pages 61 through 63, Volume 3 of the trial

19  transcript, it's your entire closing argument?

20  A.   Yes.

21  Q.   Tell the Court in connection with the claims

22  that the proceedings were multiplied, how many pages

23  did you absorb in conducting your closing argument?

24  A.   Three pages.

25  Q.   As you sit here today, Mr. Radbil -- and let's

```
 1   shelve being tardy to Court that one day for a
 2   moment -- is there anything that you did that you
 3   feel you did purposefully, on purpose, in bad faith
 4   to multiply the proceedings in this case beyond the
 5   original trial estimate?
 6   A.   No.
 7   Q.   Let's focus on the Rule 37 motion for sanctions
 8   that RAB has filed.  And one of the themes that runs
 9   through the brief is that you attempted to conduct a
10   trial by ambush on the opposing side with quotes
11   that you then came to trial in attempt to ambush RAB
12   for asking for $45,000 in actual damages and present
13   expert testimony.  Have you seen those types of
14   arguments being made against you in the Rule 37
15   motion?
16   A.   Repeatedly, yes.
17   Q.   Did you develop some trial plan, Mr. Radbil,
18   that you would purposefully and in bad faith not
19   disclose damages because you believed that you could
20   maneuver some undisclosed figures past Judge Boyle
21   or Ms. Malone?
22   A.   No.  As I discussed with Mr. Meyers,
23   Mr. Ehrlich, and my brother, in preparation for the
24   mediated settlement conference and for trial, there
25   was no intention of asking any juror for any
```

1   specific sum of money for damages.  The damages were

2   mental anguish damages which cannot be quantified,

3   and that's what I believed the standard of law was.

4   So I believed it was a question for the jury, which

5   is why I did not ask the jury at any time for a

6   specific sum or a sum certain of money.

7            THE COURT:  Do you still think you didn't

8   have to tell them that you were going for the

9   whatever it was, couple of thousand -- what was the

10  figure they asked for?

11           MS. MALONE:  $45,000.

12           THE COURT:  $45,000, that you didn't have

13  to tell them in advance?  You don't think you had to

14  do that?

15           MR. RADBIL:  No.  May I explain why?

16           THE COURT:  You said something during the

17  question-and-answer session we had during trial,

18  that you didn't think the federal rules of

19  procedures said that you should quantify damages if

20  you knew them in advance, so I was mystified by

21  that.  So if you have a reason for why you didn't

22  think you had to give them that 45,000-dollar

23  figure, it conflicts slightly with this idea that it

24  was a rogue answer from your client, doesn't it?

25           MR. RADBIL:  No, not particularly.

```
 1   Because the damages that -- the $45,000 in damages,
 2   I believe, as is actual damages and memos, plural,
 3   will show he attributed to the lender, not the
 4   defendant in this case.  So you can't trace any
 5   damages back to the lender in the case.
 6            THE COURT:  And you're out there
 7   practicing law and you still take this position on
 8   the damages questioning is astonishing to me.  I
 9   apologize.  Having sat through the trial and hearing
10   the varying explanations for this, I continue to be
11   amazed.  And I appreciate so much counsel that's
12   here, and I hope you understand that this is not, in
13   any way, anything against you.  I think it's a wise
14   decision that Mr. Radbil came here with you.  But it
15   is frustrating, having sat here and seeing the
16   varying stories and the lack of experience and the
17   arrogance about whether or not he did anything
18   wrong.
19            Go ahead and ask your next question.
20            MR. SUAZO:  Your Honor, we will come to
21   those points very specifically --
22            THE COURT:  Okay.
23            MR. SUAZO:  -- in just a moment.
24   Q.   (By Mr. Suazo)  So Mr. Radbil, I think we were
25   talking about whether you had a plan.  Just please,
```

```
 1    if you can, try to answer my question, which is,
 2    first of all, did you develop some trial plan that
 3    you would purposely not disclose damages because you
 4    thought you could get one past Judge Boyle and
 5    Ms. Malone?
 6    A.    No.
 7    Q.    Did you have some plan that you would not
 8    timely disclose witnesses because you thought you
 9    had a good chance of getting the witnesses through
10    an objection from Ms. Malone and beyond Judge Boyle?
11    A.    Absolutely not.
12    Q.    If you look at Tab 4, Volume 1, page 24, this
13    is in the pretrial conference before any trial has
14    even begun.
15           THE COURT:  I'm sorry.  What exhibit would
16    this be of yours?
17           MR. SUAZO:  This would be Volume 1, page
18    24 of the trial transcript.
19           THE COURT:  And is that an exhibit in any
20    of these documents that have been submitted?  Do I
21    have that in front of me in any form as an exhibit?
22           MR. SUAZO:  I'm not certain if the actual
23    trial transcripts have been provided to the Court in
24    that form.
25           THE COURT:  I don't have the trial
```

```
 1   transcripts, and I didn't even know that they had
 2   been ordered in full.
 3            MR. SUAZO:  They have been, Your Honor.  I
 4   can hand you the transcript.
 5            THE COURT:  That would be great.  That
 6   would be helpful.
 7            MR. SUAZO:  May I approach, Your Honor?
 8            THE COURT:  You may.  I knew excerpts had
 9   been produced, I just wasn't sure if the entire
10   transcript had been produced.  Let's do the best we
11   can.  Why don't you come around to this side and
12   hand it to the court security officer and he can
13   hand it to me.  Is this an extra copy?
14            MR. SUAZO:  Well, Your Honor, it's my only
15   copy, but I'm willing to forgo it.
16            THE COURT:  I will give it back to you.
17            MR. SUAZO:  And what we have done is, we
18   have four tabs, Volume 1, 2, 3, 4.  Those are the
19   four tabs.
20            THE COURT:  Does the defense have the
21   transcript?
22            MS. MALONE:  Yes, Your Honor, we do.
23            THE COURT:  Okay.
24   Q.   (By Mr. Suazo)  So we were going to Volume 1,
25   page 24, and this is lines 4 through 8.  And this is
```

254

1   at the opening pretrial conference when the

2   objection to these witnesses was ultimately made.

3   Did you withdraw the witnesses upon the objection?

4   A.   Yes.  And I also noted there was no intent to

5   offer causation testimony, that they were moan and

6   groan, as it was said before, type of witnesses.

7   Q.   After that objection was sustained or you

8   withdrew the witnesses, did you ever attempt to call

9   any of these witnesses to the stand?

10  A.   No, sir.

11          THE COURT:  Let me just be clear, because

12  there was some -- it's a little confusing.  I know

13  about the medical testimony.  But as I recollect,

14  there was an issue with regard to employees of RAB,

15  right?

16          MS. MALONE:  Right.

17          THE COURT:  And I, the Court,

18  misunderstood, because in 99 percent of the cases I

19  have with any corporation, the parties are in

20  agreement about providing and not providing.

21          In this particular case, there was not,

22  nor could I require that there be -- and I don't

23  even think it's a bad faith practice, I think it's

24  up to the corporation -- that I mistakenly believed

25  they weren't providing when agreements had been made

```
 1   to the contrary.  I was wrong about that.  But
 2   Mr. Radbil had a complete misunderstanding of the
 3   authority, his authority and the Court's authority,
 4   to bring these people in from out of state.  And he
 5   was dumbfounded by this particular point, and there
 6   was another example of his lack of knowledge.
 7          The Court made a mistake by presuming that
 8   they had had some agreement, and that's exactly what
 9   happened there.  So there were five employees that I
10   directed them to bring with no jurisdiction to do
11   so, my problem, and then there were these other
12   medical people, which is a separate issue.
13          MS. MALONE:  And Your Honor, there were
14   also some individuals that -- the neighbors from
15   next door from Dr. White who appeared in the
16   courtroom and the Court swore them in, so they were
17   part of the late disclosed witnesses.  And while
18   it's true that Mr. Radbil did not call them to the
19   stand, he actually had them come into the courtroom
20   and be sworn in as witnesses.  I guess just in case,
21   I don't know.  But that was the day after the
22   pretrial conference.  And I will tell the Court he
23   did agree to withdraw part of the witnesses on the
24   Sunday before the pretrial, though.
25          THE COURT:  Okay.  It was getting a little
```

 1    confusing, because we have spoken so much about the

 2    medical witnesses.  We haven't spoken at all about

 3    this issue with regard to the Court's jurisdiction

 4    to bring a corporate employee here.  Unless they are

 5    an officer or director, it's not there, and that's

 6    what happened.  That was my mistake.

 7              MR. SUAZO:  Right.  And I think with

 8    regard to the disclosure issue, the complaint about

 9    the failure to disclose, I don't think there was a

10    complaint that Mr. Radbil failed to disclose

11    employees of RAB, and that's why that's a

12    separate --

13              THE COURT:  I agree.

14              MR. SUAZO:  I was not getting to that

15    point, but I will try to address that.

16              THE COURT:  Okay.  Let's go ahead.

17    Q.   (By Mr. Suazo)  Mr. Radbil, let's kind of skip

18    over to the issue of damages, and let's start out

19    with economic damages.

20         And I have read RAB's Rule 37 motion contending

21    that you, Mr. Radbil, sought economic damages at

22    trial for Dr. White.  So I want to kind of address

23    that.  And if you -- if you could take a look at Tab

24    5.  This is RAB's Rule 37 motion, docket entry

25    number 119, page 8.  You can even go to page 1 and

```
1    page 8.  There are some references there that
2    Mr. Radbil, you attempted or you sought those
3    damages.  Do you see those references in that
4    motion?
5    A.   If you could help me out and point me to a line
6    number or paragraph.
7    Q.   If you go to paragraph 12:  Plaintiff's
8    counsel's discovery conduct lead -- this is on page
9    8 -- to the necessity of numerous motions. . . RAB
10   was forced to seek this Court's intervention to have
11   plaintiff produce discovery regarding actual
12   damages.  Despite this, plaintiff never supplemented
13   discovery, responses, or disclosures on actual
14   damages to represent $45,000 in damages he sought at
15   trial.
16        And then at page 1, talking about the
17   plaintiff's counsel then came to trial in attempt to
18   ambush RAB by asking for $45,000 in actual damages
19   and present expert testimony.  And this is in a
20   sanctions motion being filed against you and the
21   firm, not against Dr. White.  Do you see those
22   remarks?
23   A.   I do, and those remarks are not true.
24   Q.   I have taken a look at your opening statement.
25   It's in Tab 6 in your notebook, which is Volume 2,
```

1   pages 87 through 93 --

2             THE COURT:  It's all right.  Go ahead.  I

3   have a pretty good recollection of it, but go ahead.

4   Q.   (By Mr. Suazo)  Mr. Radbil, during your opening

5   argument or opening statement, did you ask for

6   $45,000 in economic damages?  And you can take a

7   look at your opening statement.  It's about six

8   pages.

9   A.   I did not.

10  Q.   Did you ask for economic damages?

11            THE COURT:  I'm sorry, but I need to take

12  about a five-minute break here and come back to

13  this.

14            (Recess taken from 4:44 to 4:54.)

15            THE COURT:  I thought it might be easier

16  if I could get e-mail access to the transcript, and

17  I have now.  So I will give this back to you,

18  Mr. Suazo.  All right.  Go ahead.

19  Q.   (By Mr. Suazo)  Mr. Radbil, I think where we

20  left off was whether or not you had asked for any

21  economic damages in the opening remarks that you

22  made before the jury in your opening statement.

23  What was your answer to that question?

24  A.   The answer was no.

25  Q.   All right.  Let's take a look at your direct

1   examination of Dr. White.  It's Tab 2 of that

2   notebook that I gave you.  It's Volume 2, pages 169

3   to 191 of the trial testimony.  Do you remember

4   examining Dr. White during trial?

5   A.    I do.

6   Q.    Did you ask Dr. White during the direct

7   examination to calculate his damages for the jury?

8   A.    His images?

9   Q.    His damages.

10  A.    No.  I asked Dr. White the status of his

11  student loans and the reason -- well, I asked him

12  to -- what the status of his student loans were.

13  Q.    Did you ask him to do a mathematical

14  calculation for the jurors of his economic damages?

15  A.    No.  I just wanted to make sure that the jury

16  knew that he was making efforts to repay his loans

17  rather than be portrayed as a deadbeat.

18  Q.    So I take it, then, the answer is no, you did

19  not ask him to do a chart or anything like that or

20  do the math.

21          THE COURT:  Could you give me the page of

22  the transcript?

23          MR. SUAZO:  It's Volume 2, pages 169

24  through 191.  That's his direct examination.

25          THE COURT:  Got it.  Thank you.

```
 1   Q.    (By Mr. Suazo)  Did you ask him about a lost

 2   teaching position during the direct examination?

 3   A.    I don't recall doing so, no.

 4   Q.    Well, if the record reflects that there's no

 5   such question between pages 169 and 191 and that's

 6   your only direct examination, would you let the

 7   record reflect that you didn't ask him about a lost

 8   teaching position?

 9   A.    I think that's reasonable, yes.

10   Q.    Did you suggest during your 22-page examination

11   of Dr. White on direct that Dr. White in any way

12   suffered $45,000 in damages, in economic damages?

13   A.    No.

14   Q.    Did you ask Dr. White during your direct

15   examination whether he was seeking the $40,000 in

16   damages?

17   A.    I did not.

18   Q.    Did you in any way intend on asking him to

19   quantify some $40,000 or $45,000 in damages?

20   A.    No, I did not.

21   Q.    All right.  If you would go back to Tab 2 and

22   take a look at page 189 of Volume 2, still in your

23   direct -- I'm sorry, looks like Tab 7, I'm sorry,

24   still Volume 2, page 189.  And the question that you

25   just referenced was asked:  What was the status of
```

1    your loans today?

2         And let me know when you get there, at page

3    189.

4    A.   Yes.  The question:  And what is the status of

5    your loans today?

6    Q.   That's at line 11.

7    A.   Yes.

8    Q.   What were you trying to solicit with that

9    question?

10   A.   I just wanted to make sure the ladies and

11   gentlemen of the jury knew that he wasn't

12   intentionally taking money without intent to repay

13   from the State of Texas.

14   Q.   Were you trying to find out if the loans were

15   in default?

16   A.   I just wanted to portray him in a good light

17   rather than a bad one; that he's making effort and

18   that he intends to pay the loans rather than abscond

19   with the money of the taxpayers.

20   Q.   Does the status of the loan have anything to do

21   with RAB debt collection efforts?

22   A.   No, sir.

23   Q.   And so when you were asking him that question,

24   what the status of the loan was, were you attempting

25   to solicit a response that wound up tailing off into

1  $40,000 in damages.

2  A.   No, it was an unsolicited answer to what I

3  think is a proper question.

4  Q.   Did he eventually, at the end of that answer --

5  at the end of his answer, did he actually answer the

6  question whether they were in default or not?

7  A.   He eventually answered the question that I

8  asked, yes.

9  Q.   If the record shows that, on the next page, you

10  asked an additional question on default on loans and

11  he just answered it and said they weren't in

12  default, was that what you were attempting to

13  solicit with your questioning?

14  A.   Yes.  And I knew that he had defaulted on other

15  loans, and I wanted to be up front with the ladies

16  and gentlemen of the jury, so I wanted him to

17  explain not amounts, but I wanted him to explain his

18  situation, generally speaking.

19  Q.   All right.  Mr. Radbil, what is your

20  understanding of the disclosure obligation under

21  Rule 26 of the Federal Rules of Civil Procedure for

22  economic damages that are not being claimed in the

23  lawsuit?  Do you think there is a duty to disclose

24  damages that are not being claimed or only damages

25  that you are claiming and seeking?

263

A.    My understanding is the latter, that you have
to disclose and quantify economic damages that you
are claiming and seeking, but mental anguish damages
are inherently unquantifiable.   Therefore, as I
understand Fifth Circuit law, the jury determines
the amount based on the history of the plaintiff.
And the way that I prepared Dr. White and the way I
prepare other client's --

          MR. SUAZO:  Mr. Radbil, look at the Court.

          THE COURT:  Here is the question.

          MR. RADBIL:  Yes.

          THE COURT:  Yes, the defense attorney or
plaintiff's attorney can get up there and ask the
jury for a certain specified sum of damages in
argument.  But the distinction here is that you
specifically solicited expected testimony from him,
and that's what you basically said in the sidebar,
of 45,000, and that should have been disclosed to
them.

          MR. RADBIL:  Sorry to interrupt.

          THE COURT:  You can't have a witness
testify about specific economic damages and not
disclose that to them pursuant to their questions,
and that's the distinction that I see.  And I don't
know where you're referring to in the federal rules

1    that you don't have to do that.

2            And we did the sidebar, and this is the

3    interesting part about the sidebar.  She objected.

4    She said that the answer and question that you are

5    asking him and he was about to answer wasn't

6    supplemented.  And you approached the bench.

7            And I said:  What is your objection,

8    Ms. Malone?

9            And she said, I asked him for a question

10   regarding treatment for this matter and if he was

11   going through any treatment or if there was any

12   further treatment, in interrogatory number 33, and

13   asking for future psychiatric care --

14           MR. SUAZO:  Can I get a page?  I'm sorry.

15           THE COURT:  Yes.  I'm at page 187 --

16           MR. RADBIL:  May I speak?

17           THE COURT:  -- moving to 188.  And his

18   statement to that in response to Ms. Malone's

19   question, that she hadn't been told in any

20   interrogatories about him seeking treatment or

21   future treatment, Mr. Radbil said, I don't know the

22   answer.

23           And I said to him, you must be looking for

24   something favorable or you wouldn't have asked it.

25           And he answers, sure.

1          And I said, do you think he's going to say

2     none?

3          And he said no.  And the objection was

4     sustained.  So I disagree with this construction of

5     the law, but go ahead.  I just want to be clear

6     about the representation that was made to the Court.

7          MR. SUAZO:  If I can address that point,

8     because what we were talking about -- there's three

9     points that have been made by RAB.  One of them is

10    the $40,000; the next one is the $5,000; and the

11    next one is the counseling.  I think what the Court

12    was just referring to was the counseling, the

13    question about counseling, page 188.

14          THE COURT:  Partly.  But he came out with

15    this 45,000-dollar figure in two or three different

16    answers.  And that fact, regardless of the

17    counseling part, was never disclosed to them,

18    either.

19          Ms. Malone?

20          MS. MALONE:  Yes.  The other thing I would

21    point out to the Court is that we actually had a

22    motion in limine that specifically stated that he

23    would not -- he would talk to witnesses and that

24    they would not seek for answers that were outside of

25    their disclosures.  This is a standard motion in

1   limine, and I think the Court granted it.

2          THE COURT:  That was partly what was the

3   purpose of the objection at the sidebar.  So I

4   understand the point that you are making, but my

5   recollection and from the record refreshed is

6   different.

7          MR. SUAZO:  Okay.  Well, Your Honor, and

8   that's -- I appreciate that, because his entire

9   direct is right there in the 22 pages, page 169

10  through 191.  That's the only reference to the

11  $40,000 in response to that question.

12         THE COURT:  So let me make sure I am

13  clear, then, on the defensive theory here by counsel

14  to the position that the defendants have taken and I

15  agree with from the record that they didn't -- that

16  Mr. Radbil never disclosed this $45,000 nor did he

17  disclose counseling.  What is the defense theory on

18  that for Mr. Radbil?

19         MR. SUAZO:  The defense theory is that

20  Mr. Radbil never sought those damages during trial.

21         THE COURT:  No, I mean your theory for him

22  today.

23         MR. SUAZO:  Yes, Your Honor.  It was never

24  sought by the plaintiff in the case, in the

25  underlying case, if you would.  It was never asked

for in opening, it was never asked for in direct, it
was never asked for in closing.  It just wasn't
sought.

      The $5,000 was solicited on cross by
Ms. Malone.  It wasn't even a question during the
direct examination by Mr. Radbil.  So we have the
$40,000 that comes out in response to that one
question, and I believe we just pinpointed the page,
page 189 of Volume 2.  That was the only question:
What is the status of your loans?

      The response to that question -- a
directly responsive answer to that question could
have been, well, they are not in default.  But there
was an additional -- there was additional verbiage.

      THE COURT:  He didn't explain that at the
sidebar, Mr. Suazo.  Ms. Malone gave him every
opportunity to be clear on what her problem was with
what he was asking about in connection with this
testimony and in connection with the motion in
limine, and he never said what you are saying.  So
that may be what he's arguing now, but that is not
the way that it came out.

      Ms. Malone, is there any more
clarification you want to make on this?

      MS. MALONE:  The only thing, Your Honor,

1    it is true that the reference to the 5,000 came up

2    when I asked him, which is part of our point about

3    the Rule 37.  I asked him, his client:  You have not

4    been out of pocket any money as a result of these

5    events?

6              And then he says:  I lost 5,000 by not

7    teaching a class.

8              And I got him to clarify that that didn't

9    happen.  But the whole point to this, Your Honor, is

10   that he was charged in the motion in limine to tell

11   his witness that they were stuck with whatever the

12   disclosures were.  And he did not tell the Court,

13   ever, that this was just something his client said.

14   In fact, he argued with the Court that he had no

15   obligation to do it.

16             We had an entire motion 37, a short

17   hearing at the end of the day, and not once did he

18   ever say, oh, my client said this, despite the fact

19   that I told him that you're going to have to just go

20   with what's your in your disclosures.

21             And in the motion in limine -- the duty of

22   attorney under a motion in limine is to make sure

23   that the witnesses are advised of what the rules are

24   with regard to that.  So I don't see how it's not

25   Mr. Radbil's responsibility.  You don't just put a

1    witness up there and expect them to know what the

2    motion in limine is about that's already been ruled

3    on by the Court.

4            THE COURT:  I agree.  I agree, and that's

5    the point.

6            MR. SUAZO:  Judge, in fairness, Dr. White

7    was here for all these proceedings.  Dr. White was

8    able to observe all these proceedings.

9            MS. MALONE:  He wasn't here at the

10   pretrial.

11           MR. SUAZO:  And I'm not even certain,

12   Judge, that a motion in limine on that point was

13   granted.  Because at the end of the pretrial

14   conference, Ms. Malone -- I didn't see a ruling in

15   the pretrial conference on any motion in limine.

16           THE COURT:  Well, I tell you what, if

17   we're going to parse through this, then we're going

18   to do it right now, because I'm going to get -- this

19   has gone on way too much in this case.  He puts

20   nuances that weren't there in what really happened,

21   and it's clear from the record and my recollection,

22   as well as the recollection of defense counsel and

23   all of the papers.  So I want to find out right now

24   what the answer to this is.  We're not going to skim

25   over this.

```
 1              MR. RADBIL:  Thank you.

 2              THE COURT:  Mr. Radbil, would you please

 3    be quiet?

 4              MR. RADBIL:  Yes.

 5              THE COURT:  I want to give you,

 6    Ms. Malone, and you, Mr. Suazo, a chance to look at

 7    this.  Let's find out exactly what the point is and

 8    find out what's correct and what's not correct.  All

 9    right?  Let's get the answer.  I will give them a

10    chance to look for it, and I will give you a chance

11    to look for it.  And Mr. Radbil, you can step down.

12              MR. RADBIL:  Thank you, Your Honor.

13              MR. SUAZO:  Your Honor, I hate to ask for

14    clarification.  What's the point that I need to work

15    out with Ms. Malone, the issue of the limine?

16              THE COURT:  What actually occurred that

17    right now the defense theory is was either all right

18    or mistaken but not a violation of his duties under

19    the rules of discovery or his responsibilities

20    pursuant to the Court's order on the motion in

21    limine.  That's what I'm asking.  Because the point

22    that I understand you're making is that he didn't

23    violate a motion in limine, he didn't violate any

24    rules of discovery in not disclosing this, and that

25    there wasn't anything wrong with what happened
```

 1   there.

 2            His theory and explanation have changed

 3   and evolved from hearing to trial to today, and I

 4   want to find out exactly what happened.  We're not

 5   going to gloss over this anymore.  I want to get the

 6   right details, precisely what their position is and

 7   where the answers are in the record, and yours as

 8   well.  How ever long it takes, we will get to the

 9   bottom of this.  We will take a break until you all

10   have a chance to find it.

11            (Recess taken from 5:08 to 5:31.)

12            THE COURT:  I want to get back to that

13   issue of damages and the basis for the defense

14   motion, which was the damages and then if a

15   quantifiable number was asked during deposition and

16   discovery and never forthcoming.  And there was also

17   no indication that he had sought any kind of

18   counseling.  I guess he called and left a message

19   for someone and hadn't gotten it.  That was my

20   understanding of what they thought.

21            Then at trial Mr. Radbil asked Dr. White

22   about to get answers in the affirmative that he had,

23   in fact, sought treatment.  And then there is the

24   other issue of him coming up with the $45,000 in, I

25   guess, outstanding loans.

1          The question is whether or not this

2     $40,000 should have been disclosed by Mr. Radbil

3     under the Federal Rules of Civil Procedure or

4     otherwise.  It continues to be the Court's position

5     that it should have been and was not and was another

6     example of misconduct by Mr. Radbil.

7          So I'm going to give Mr. Suazo a chance to

8     tell me the support for your theory, and then I want

9     to hear from Ms. Malone.  I apologize for this, but

10    it's just that there's so much here.  And anyone

11    reading this record in the future is going to be

12    very confused if they don't understand where this

13    discussion -- how this is based upon other evidence

14    and whether or not it's inconsistent, so I'm trying

15    to make it as clear as possible.

16          MR. SUAZO:  Your Honor, our position would

17    be that, with respect to the questions that

18    Mr. Radbil asked Dr. White at trial, because we're

19    focusing in on the trial conduct, in the opening,

20    which was I think the six-page opening statement in

21    Volume 2, he didn't ask for any of these damages.

22          In Volume 2 at pages 169 through 191, he

23    gives a direct examination.  I've read the record.

24    I don't read the record as Mr. Radbil asking

25    specifically a question that would solicit the

 1   $40,000.  That answer came out in response to a

 2   question that said, what is the status of those

 3   loans?  The correctly responsive answer to that

 4   would have been, they are in default, or, this is

 5   the amount that's owed.

 6           If you read the answer to that question,

 7   there could very well be a nonresponsive objection

 8   sustained to that, I think.  Then it goes into

 9   closing argument, and Mr. Radbil doesn't ask for the

10   $40,000 or the $5,000 and the like.

11           Now, granted, when the Court quizzes

12   Mr. Radbil at Volume 2, I think pages 252 through

13   258, Mr. Radbil gives a very series of what I would

14   call frustrating answers.  I have worked with

15   Mr. Radbil, and I can tell the Court I have been

16   frustrated working with Mr. Radbil on occasion.  But

17   I don't think Mr. Radbil has intentionally or

18   purposefully attempted to mislead me, at least, in

19   any way.  I just think that's part of the nature of

20   Mr. Radbil, that sometimes you ask him a question of

21   what time it is, and you get a little bit of how the

22   clock was invented.

23           THE COURT:  Right.

24           MR. SUAZO:  I hate to say that with him

25   staring at me and looking at me, that's the truth;

1   that's my perception of him.

2          I think what happened was, when the Court

3   asked the question at page 252, the question that

4   was, where are the disclosures of damages, aside

5   from the initial disclosures that Ms. Malone

6   requested or had referred to, because Ms. Malone had

7   referred to the initial disclosures.

8          His answer to that question was correct.

9   He said, we supplemented those disclosures.  They

10  are supplemented here.  He gave the Court the

11  identity of the document where they were disclosed.

12         What the Court, I think, was looking for

13  in response to that question was, where is the

14  40,000 and where is the 5,000 disclosed?  That

15  wasn't in the question, but I think that's what the

16  Court was looking for.  The response was a correct

17  answer, because he said, they're in our supplemented

18  disclosures.

19         THE COURT:  What was it in the

20  supplemented disclosures that would have revealed

21  the 40 or the five?

22         MR. SUAZO:  Nothing.

23         THE COURT:  Okay.  And the position he's

24  taking today on the witness stand from him is that

25  he didn't have to disclose this because you don't

1    have to disclose these types of mental anguish

2    damages, as I recall, just a few minutes ago.

3            MR. SUAZO:  Not mental anguish damages,

4    economic damages that are not being sought.  If

5    Mr. Radbil was not seeking those damages as counsel,

6    if he wasn't intending to ask the jury to award

7    them -- if I have a number of economic damages but

8    I'm not claiming them in a lawsuit, I don't think I

9    have a duty to disclose those damages if I am not

10   seeking them.  If I don't disclose them, then I

11   don't get to put on the evidence of them.

12           THE COURT:  Where is it we are supposed to

13   buy into this idea that he wasn't seeking them but

14   that they were irrelevant to the cause of damages?

15           MR. SUAZO:  In three areas, Judge:  First,

16   in the opening statement where he makes no remark

17   about them; second, in the 22-page direct

18   examination, where he doesn't ask a specific

19   question, had you suffered damages, economic

20   damages, as a result of this.  The answer it is in

21   response to is, what is the status of the loans?

22   And then the third one is in the closing arguments

23   where he doesn't ask --

24           THE COURT:  Well, he couldn't at that

25   point.  He was firmly told this was off limits.  I

1    want to hear from Ms. Malone in just a moment.  But

2    it seems to me that this 40,000 in loan information

3    or student loans and then the 5,000 is a

4    quantifiable sum; that it depends on your

5    perspective as to whether or not he was looking for

6    it.  It sounds to me like he was.

7            When Dr. White was here waiting

8    for Mr. Radbil that morning, this is what he said to

9    the Court.  I asked him if he had any questions, and

10   he said:  "Just one.  And I apologize, it seems

11   presumptuous for me -- seems like I'm acting like my

12   own attorney, which I am not in any way.  But I felt

13   like I should make a response to the issue of

14   sandbagging yesterday with the claims.

15           "I did quantify the damages.  And they

16   were not an abstract sum for mental anguish, they

17   were real financial damages that I suffered.  I made

18   sure Mr. Radbil had that information.  The judge

19   recorded it in the settlement conference, and I was

20   led to believe it would be submitted for this trial,

21   which of course it wasn't.  So I apologize."

22           That's what he said.  So you can

23   understand there are two reasonable -- one really

24   reasonable inference that I think can be taken from

25   what happened and what you've said.  But I would

1    like to give -- I will give you a chance to finish,

2    but I want to give Ms. Malone a chance to explain

3    this.

4            Because as I go back through -- and I have

5    been back through all of this more than once.  But

6    I'm just going back through the pretrial conference

7    now and, again, it's just marked with these kinds of

8    problems with Mr. Radbil:  One, not knowing the

9    answer to important legal questions that he should

10   never have been in court if he didn't know the

11   answers to; and then prevaricating on his position

12   as to why he doesn't know the answer; and then

13   arrogantly insisting that he's right.  And that

14   seems to have been the pattern throughout this case,

15   even to the point where he will misrepresent

16   something.  That's the pattern I have seen.  I will

17   let you finish in just a minute.

18           Ms. Malone.

19           MS. MALONE:  Your Honor, I agree with you.

20   One thing I would point out in the pretrial

21   conference.  We went back and looked, and there

22   wasn't a specific discussion about the disclosures.

23           There, however, was a lengthy discussion

24   about the problem with their late designation of

25   witnesses in the disclosure and the Court reminding

1   him of his obligation to have timely done that and

2   that the Court would not allow that kind of late

3   disclosure from happening.

4         So if you want to take it from that that

5   the Court had already reminded him that he had a

6   duty under Rule 26 and that he would be stuck with

7   what was relevant at the point in time that it

8   occurred.  If I could read for the Court, if I

9   could, this is actually from document 125.

10        THE COURT:  Read slow.

11        MS. MALONE:  Document 125 is the response

12   that plaintiff's counsel -- signed by Mr. Radbil, I

13   believe -- submitted in response to our Rule 37

14   motion for that we're here for.

15        And on page 12, they write:  Having been

16   prepared specifically at the request of his counsel

17   in preparation for trial, Dr. White's memorandum

18   regarding his actual damages would not ordinarily be

19   discoverable absent RAB showing a substantial need

20   for the materials to prepare its case and an

21   inability, without undue hardship, to obtain

22   substantially equivalent evidence by any other

23   means.  And it cites to the rule.

24        And then states:  Dr. White's deposition

25   provided such means.  And then it says:  See App 25,

1   White deposition, estimating disputed amount of debt

2   owed to Texas Guaranteed at $40,000.

3            And in their brief, Your Honor, which

4   certainly isn't under the heat of fire, he certainly

5   had time to think about what he wrote, no word in

6   here says, our client said this without our advice,

7   or, our client did this on their own.  The first and

8   only time that we heard the testimony that this came

9   out of the blue was in the sanctions hearing where

10  Mr. Meyers started cross-examining Mr. Radbil.  I

11  didn't even know it was a question to ask.

12           So the idea that this was the client's --

13  it wasn't in the written papers.  It's not cited

14  anywhere in any of the briefing or any of the

15  transcript when we had this situation going on.  It

16  only came up when we were actually at the hearing

17  and Mr. Meyers was questioning him.

18           MR. RADBIL:  When we were --

19           THE COURT:  No, Mr. Radbil.

20           MS. MALONE:  And I also, Your Honor, was

21  going to cite to you the same thing you did, which

22  is what Dr. White told us, that he had been assured

23  that testimony would be admissible at trial.

24           THE COURT:  All right.

25           Mr. Suazo, finish up, and let's go on with

1    some more questions.

2            MR. SUAZO:  If I could have just a brief

3    point to that, because I did want to cover what the

4    client said.  And there is a memorandum -- I think

5    it's been put into the record -- of what Dr. White

6    prepared.  And following his preparation of that

7    memorandum, there's some discussions between

8    Mr. Radbil -- I feel it's a little unusual getting

9    into all the attorney-client information, but I

10   realize that I've got to do it here -- that

11   Mr. Radbil had conversations with him about it and

12   had conversations, from what I understand

13   from Mr. Radbil, that these are damages attributed

14   to the Texas Guaranteed loan.  Even in the brief

15   that Ms. Malone just referred to, there's a

16   reference to the Texas Guaranteed loan, that there

17   were additional charges by Texas Guaranteed.

18           And we can ask Mr. Radbil why -- why

19   didn't you seek those damages, and I've asked him

20   that.  And he says that those are as a result of

21   things that were done by Texas Guaranteed, not RAB.

22   I didn't think that I could quantify that.

23           This is a memorandum that's prepared

24   December 28th, 2012.  This is after discovery is

25   closed that this memorandum comes.  If Mr. Radbil

```
1    comes flying down to the courtroom on December 29th
2    and says, I'm seeking these damages against the
3    defendant that I haven't sued, there's going to be a
4    whole world of other different problems.  So that's
5    number one.
6              And then number two, I think -- I think
7    what you're going to see is Mr. Radbil, while there
8    may not have been any statement regarding, I didn't
9    ask -- I wasn't expecting this response from my
10   client before he was put on the stand to testify
11   live at a hearing.  I think the actual better
12   evidence that I would implore the Court to look at
13   is the actual questions during those 22 pages of
14   direct examination.  Those are the questions.  And
15   look and see if there's fairly a question where
16   Mr. Radbil is trying to sneak out some damages
17   somewhere.
18             I think that's -- to me, maybe the
19   briefing is bad, maybe they should have done a
20   better job briefing it at that point.  Maybe
21   Mr. Radbil should have done a better job answering
22   the questions.  But if you look at the questions
23   that he asked between pages 169 and 191 -- it's only
24   22 pages -- I don't think there's a question
25   soliciting that type of response.
```

 1            THE COURT:  Thank you, Mr. Suazo.

 2            MS. MALONE:  The only thing, Your Honor,

 3    it has to do with this December 28th memo from

 4    Dr. White.

 5            If the Court will recall when we were at

 6    the hearing with Mr. Radbil to begin with, he told

 7    us, based on the invoices that he provided to us

 8    from the trial, that he received memos from

 9    Dr. White for December 6th and December 7th, and he

10    said those memos had to do with his damages.

11            We never heard about this December 28th

12    memo until much later.  He billed for them three

13    weeks before.  So I want to know where the memos are

14    that he testified in the first trial or in the first

15    part of this hearing that refer to the damages, not

16    this one that's December 28th.  I want to see the

17    ones that he talked about that he had and relied on

18    and testified to the Court the first time around.

19            THE COURT:  So, Counsel, I think I have

20    heard both side out on this.  I just wanted to

21    clarify where everyone was coming from.  Move to

22    your next point.

23            MR. SUAZO:  One more point, and I promise

24    it will be very brief.

25            THE COURT:  Briefly.

**SHAWNIE ARCHULETA, CSR/CRR**
**FEDERAL COURT REPORTER – 214.753.2747**

1          MR. SUAZO:  In the pretrial conference

2    towards the very end, it deals with the point that

3    the Court raised about the limine issue.  And at the

4    very end the Court says -- and I will give you a --

5    it's Volume 1, page 85.  The Court says:  I would

6    now like to hear from the defense on their motion in

7    limine and, again, hopefully we can get through some

8    of this because we have already discussed it or it's

9    been -- it's boilerplate.

10         So this is the Court moving from the

11   motions in limine to the defense, and the response

12   is:  Judge, actually it's not boilerplate, but we

13   have covered it through the rulings you have made on

14   the exhibits and witness list.  The only thing in

15   our motion in limine had to do with the

16   admissibility of witnesses or exhibits, so I think

17   you have already covered everything.

18         So I'm not certain there was a ruling on

19   damages.  Not to say whether there was a ruling on a

20   limine or not, someone should come flying forward

21   with some damages, but I'm not certain that there

22   was a ruling on any limine point.

23         THE COURT:  Thank you, Mr. Suazo.

24         Ms. Malone.

25         MS. MALONE:  Your Honor, I didn't find a

1    reference, and we don't have our motion.  But

2    clearly I thought the Court had taken care of a lot

3    of my motions, so I didn't argue the whole thing.

4    I'm not sure if there was a specific one.  I would

5    still stand that the fact the Court chastised him

6    about late disclosure of witnesses should have put

7    him on notice that he was stuck with his disclosures

8    at that time.

9              MR. RADBIL:  If I may, please.

10             THE COURT:  No, Mr. Radbil, you may not.

11   You have lawyers that speak for you, and you are

12   lucky that you do.

13             Go ahead.

14   Q.   (By Mr. Suazo)  Mr. Radbil, I'm trying to

15   streamline some of the damages, but I do want to get

16   your testimony on it.  We have covered the $40,000.

17   I think we got through the 5,000-dollar teaching

18   job.  Who solicited the testimony regarding the

19   5,000-dollar teaching job?  Was that you or was that

20   RAB?

21   A.   That was RAB, but I would like to go back for

22   one brief moment.

23             THE COURT:  No, we are not going back.

24   We're going with Mr. Suazo's questions.

25             Go ahead.

```
 1   Q.   (By Mr. Suazo)  Who solicited that testimony,
 2   Mr. Radbil?
 3   A.   It was solicited on cross-examination by Robbie
 4   Malone.
 5   Q.   Okay.  Is there a brief point that you would
 6   like to say that you can make very briefly?
 7            THE COURT:  I don't want to go back to
 8   what we have just discussed on the damages, we have
 9   covered that.  So if that's what it's about, I'm not
10   going to let him do it.  Let's move on to the next
11   point.
12   Q.   (By Mr. Suazo)  Let's close out the loop on
13   economic damages for a moment.  There was discussion
14   by the Court.  It begins on Tab 11 in your notebook,
15   Volume 2, page 252, where it is begins -- where the
16   Court starts asking you for the -- where the
17   disclosures were.
18       Can you tell the Court -- look at the Court and
19   tell the Court what you think happened in those
20   pages, between 252 and 258, where she asks you,
21   where are the disclosures?
22            THE COURT:  Let me get there.
23            Okay.  Go ahead.
24   Q.   (By Mr. Suazo)  Mr. Radbil, the Court asked you
25   some questions, and it dealt with economic damages.
```

1   And the Court has expressed some dissatisfaction

2   with you and your responses to these questions.

3       What do you -- what's your explanation for what

4   transpired between pages 252 and 258?

5   A.   It goes back to the memorandums that Dr. White

6   prepared.  And those are key, because Dr. White says

7   in those memorandums -- and he's given us permission

8   to use them, by the way.  He says that the

9   additional $40,000 in economic damages was a result

10  of Texas Guaranteed adding fees, which we were not

11  seeking from the debt collector, Regional Adjustment

12  Bureau.  So it's --

13  Q.   Let me stop you for just a second here.  The

14  Court asks you -- because Ms. Malone makes an

15  objection based upon initial disclosures.  And she

16  tells the Court, these are the initial disclosures.

17      And then the Court asks you at page 252, line

18  23:  Where are the submissions that give them notice

19  of the amount of damages that you are seeking

20  outside of the initial response that Ms. Malone

21  referred to -- that being the initial disclosures

22  that Ms. Malone referred to.

23      What was your response?

24  A.   I believe that -- what page are you on?

25  Q.   At page 252, line 23.  It's in Tab 11 of your

```
 1   notebook.
 2   A.    I believe we copied and pasted from the
 3   pretrial order -- from the pretrial disclosures and
 4   for the pretrial order, excuse me.  And there is no
 5   quantified amount, because we didn't intend to
 6   quantify or ask the jury to quantify.
 7   Q.    Did you tell the Court that the damages that
 8   were being sought in response to that question were
 9   in the pretrial order?
10   A.    Yes, I did.
11   Q.    Is the response to that question where your
12   damages are disclosed true?  Is that where you
13   disclosed your damages in your pretrial order?
14   A.    The damages that we were seeking, yes.
15   Q.    Were disclosed where?
16   A.    In the pretrial order.
17   Q.    All right.  So if we pick up at page 254, the
18   question at line 23, the answer is:  I guess my
19   question is, where is it in there that talks about
20   this amount of money above the $1,500 that you
21   initially disclosed?
22         Go ahead and read down and summarize -- go
23   ahead and read down and summarize your answer, if
24   you want to look at your next series of answers.
25   A.    Sure.  I've got it.  Judge Boyle asked, quote:
```

1    I guess my question is, where is it in there that
2    talks about this amount of money above the $1,500
3    that you initially disclosed?
4    Q.    Let me stop you real quick.
5    A.    Uh-huh.
6    Q.    Were you seeking damages in this case -- when
7    you incorporate mental anguish damages, were you
8    seeking more than $1,500?  Were you hoping to get
9    more than $1,500?
10   A.    In mental anguish damages?
11   Q.    Yes.
12   A.    Yes, for Dr. White.
13   Q.    Did you want to be limited to $1,500 in mental
14   anguish damages?
15   A.    No.
16   Q.    Do you tell the Court somewhere in response to
17   her questions over the next page or two that it's
18   not quantified?
19   A.    Yes.  On page 255, line 3, I say:  It's not
20   quantified.
21   Q.    Did the Court, then, get a copy of the joint
22   pretrial order that you referred her to?
23   A.    I do not know the answer to that.
24   Q.    Well, does the Court then, later on, along with
25   Ms. Malone and yourself, read from the pretrial

1   order?

2   A.   It was filed, yes.

3   Q.   Well, I mean, I'm talking about in the next

4   couple of pages of questions, does someone read your

5   response to the pretrial order or some disclosure of

6   damages?

7   A.   The Court asked:  "What is your position on

8   that?

9              "Mr. Radbil:  That the damages --

10             "The Court:  You have a federal practice,

11   is that what you say?

12             "Mr. Radbil:  I'm sorry?

13             "The Court:  You have a federal practice,

14   and you don't know the answer to that question?

15             "Mr. Radbil:  He's seeking damages --

16             "The Court:  How about a straight answer?

17             "Mr. Radbil -- for mental anguish and

18   emotional distress.

19             "The Court:  How about a straight answer?

20   You don't know the answer to that question?

21             "Mr. Radbil:  That is a straight answer to

22   the question.

23             "The Court:  That you have no obligation

24   to quantify your damages in federal practice when

25   asked in discovery and even by virtue of the

1    disclosure requirement.  You're saying that you

2    don't know if that's a requirement.  You don't know

3    that that's a requirement.  That's what you have

4    said.  Am I right?

5              "Mr. Radbil:  That's a question for -- the

6    jury determines the actual amount of damages.

7              "The Court:  Mr. Radbil" -- et cetera.

8    Q.    Do you trail, then, into the mental anguish

9    damages?

10        Mr. Radbil, look at me for just a second.

11   A.    Okay.

12   Q.    Do you think that you need to disclose the

13   amount of your mental anguish damages?

14   A.    No, I don't think they are quantifiable.

15   Q.    Okay.  It looks to me like there's some

16   miscommunication going on between you and the Court.

17   The Court is talking about 40,000 and 5,000.  What

18   you are talking about?

19   A.    The mental anguish damages that are separate

20   from the amount that Texas Guaranteed added to his

21   loans, who is not a party to his lawsuit, and that

22   we could not have recovered from the defendant in

23   this lawsuit.

24   Q.    When you asked the Court about disclosing the

25   specific amount of damages, what are you talking

1   about?  Economic damages, mental anguish damages?

2   A.    Mental anguish damages.

3   Q.    Mr. Radbil, the Court -- if you read the

4   transcript, it appears to me that the Court is

5   asking about economic damages or the 40 and five.

6       How do you get from that over to mental anguish

7   damages?  What happened?

8   A.    The only damage we were seeking were mental

9   anguish.  So which line are you on?

10  Q.    I'm just asking you, in general, how is it that

11  you get to mental anguish damages?

12  A.    Because shortly before the mediated settlement

13  conference, Dr. White provided two memorandums.  And

14  he couldn't find the documents that would even

15  support the Texas Guaranteed addition of money to

16  the student loans, and I had asked for it.  As soon

17  as he sent it, I said, please provide all

18  information immediately.  Even though we are late,

19  discovery is closed, the client says, I've got this,

20  this, and this, so send the information.  But he

21  couldn't find it.

22      But he said, for my mental anguish damages, and

23  then he said a figure after giving it careful

24  thought, as I recommended, and then we went to the

25  mediated settlement conference and unfortunately we

1    didn't settle.

2    Q.   Mr. Radbil, did you want Dr. White to be sealed

3    off at $1,500 in mental anguish damages?

4    A.   No, absolutely not.

5    Q.   Were you, in answering these questions to the

6    Court, as frustrating as this may have been, were

7    you trying to be disrespectful or dishonest to the

8    Court, or were you trying to multiply the

9    proceedings that was going on in this case in any

10   way?

11   A.   First, I apologize, Judge Boyle, to you,

12   because I respect you.  I understand the career path

13   you have taken, and I respect that very much.  I

14   know you are very smart.  And I'm not attempting or

15   trying to be arrogant.  And I know sometimes I may

16   explain the clock or try to explain it when you ask

17   what time it is, but that's just part of who I am, I

18   guess.  I was just trying to help my client.

19         And I truly believed, based on case law that I

20   had looked at, that when you are seeking mental

21   anguish damages, that you don't have to quantify.

22   Keeping in mind that at the last minute is when I

23   find out about this $40,000 allegedly added by Texas

24   Guaranteed.  And then I took action and asked the

25   client to substantiate that with documents, which he

1    couldn't do.

2         And we're ready at the point where, even if we

3    did try to add a party, the party probably wouldn't

4    be added at that point.  And if they were added,

5    there would be all sorts of complications.  It

6    wasn't advisable, because he lacked information,

7    proof, and we had one defendant, and we were so

8    close to trial.

9              THE COURT:  Mr. Radbil, do you see what a

10   mess this caused, even if I believe exactly what you

11   are saying today as to your motives?  Do you see

12   what your behavior, your conduct, your inexperience

13   and the arrogance about it has caused?  Four

14   hearings now, thousands of dollars worth of

15   attorney's fees, and you still don't seem to be

16   accepting responsibility for the fact that you were

17   way in on over your head and sort of making it up as

18   you go.  That's part of the problem here.

19             MR. RADBIL:  I wasn't making it up as I

20   went.

21             THE COURT:  You were way in over your head

22   in that case, way in over your head.

23             MR. RADBIL:  I'm really -- I respect your

24   -- I respected your decision with the witnesses, the

25   five witnesses.  I let a lot of things go during the

294

 1   pretrial, as I wanted this case to be tried

 2   efficiently.  When the witness issue with the

 3   experts was debated, Your Honor said the parties

 4   handled it in good faith.  I made concessions so we

 5   could move along.  After the first day, I think Your

 6   Honor said we have done pretty well.

 7           THE COURT:  Mr. Radbil, you had basic

 8   issues with evidentiary exhibits that you didn't

 9   know how to get in with the proper foundation.  I

10   don't want to get off on a trail here.  Let's go

11   ahead and move to your next point.  I've got his

12   position.

13   Q.   (By Mr. Suazo)  Okay.  Mr. Radbil, you were

14   here at trial by yourself, right?

15   A.   I was, yes.

16   Q.   You didn't have another attorney or anyone else

17   here with you at trial, right?

18   A.   I was alone.

19   Q.   Did you do the best that you could for your

20   client.  Was that your goal?

21   A.   Yes, absolutely.

22   Q.   Okay.  Mr. Radbil, there was some question

23   about mental anguish damages and the question that

24   you asked Dr. White pertaining to whether he had

25   sought or received counseling.  Do you remember the

 1  discussion that we asked about, that question that

 2  you asked?

 3  A.    I remember that perfectly, yes.

 4  Q.    All right.  Let's go to that actual question.

 5  It's at Volume 2, page 187.  This is at Tab 13.

 6  A.    Okay.

 7  Q.    All right.  If you look at pages -- or at

 8  lines, let's see, 3 through 7, do you see where

 9  Dr. White is talking about anxiety?

10  A.    Yes.  The Court had just read a question back

11  when I struggled with it a little bit.  I was trying

12  to give the jury a sense of the impact that these

13  events had had on his life compared to some other

14  traumatic event.  And the Court read back the

15  question, and Dr. White's answer was:  I don't think

16  I can.  I've always had pretty good coping skills,

17  so I didn't have this kind of anxiety before.  It

18  never happened.  I have nothing to compare it to.  I

19  have always been able to stay in control.

20  Q.    Mr. Radbil, just trying to keep kind of some

21  flow going, you do see him in those lines talking

22  about anxiety.  Right?

23  A.    I do.

24  Q.    And then the question that you asked him, then,

25  at page 187, lines 8 through 9:  And have you sought

1    any counseling or treatment as a result?

2        And that's when the Rule 37 objection takes

3    place, and you get -- looks like there's a

4    conference at the bench.  Do you see that?

5    A.   I do.

6    Q.   And Ms. Malone then goes on and says:  His

7    answer to that question asking for future -- I asked

8    him a specific question regarding treatment for this

9    matter and if he was going through any treatment or

10   if there was any further, in Interrogatory 33,

11   asking for current or future psychiatric care, and

12   his answer was, No.  No.

13   A.   I said:  I don't know the answer.

14   Q.   Well, let me ask you:  Do you think that there

15   was some disclosure of Dr. White having anxiety,

16   seeking treatment for anxiety?

17   A.   I knew there was, because in the pretrial I

18   noted to the Court that his testimony, even though

19   the five witnesses would not be here, would not or

20   should not deviate from the testimony at his

21   deposition regarding things of this nature.  And I

22   believe that the exact question was asked during his

23   deposition.

24   Q.   Mr. Radbil, at Dr. White's deposition, which is

25   attached to your response to RAB's motion for

1   sanctions, it's marked -- it's Tab 14 of your book.

2   A.    Okay.

3   Q.    At page 173 -- at the bottom you see App. 173,

4   it's page 135 of the deposition.

5   A.    I do.

6   Q.    The question is asked:  Your rheumatologist is

7   treating you for what.  What is your rheumatologist

8   treating you for?

9          And Dr. White's answer was -- I don't know how

10  to pronounce that:  Ankylosing spondylitis, symptoms

11  of anxiety --

12              THE COURT:  Maybe you should spell it.

13              MR. SUAZO:  A-N-K-Y-L-O-S-I-N-G, and then

14  a new word, S-P-O-N-D-Y-L-I-T-I-S .

15  Q.    (By Mr. Suazo)  -- and symptoms of anxiety, and

16  that's it.

17          And then the next question at line 22 is:  So

18  you have sought -- have you sought medical treatment

19  for your anxiety?

20  A.    Which page?  I'm sorry.

21  Q.    It's still the same exact page, the last page

22  of Tab 14 in your book, which is App. 173.

23  A.    Okay.

24  Q.    Your response to the motion for sanctions, and

25  the question is:  So you have sought -- have you

```
 1    sought medical treatment for your anxiety?

 2         And the answer is:  Yes.

 3         Is that correct?

 4    A.   That is correct.  And if you'd flip back also

 5    to page 88, Ms. Malone asked:

 6         "A lot of churches have what they call pastoral

 7    counseling, and I know you're familiar that those

 8    folks have some training in counseling background.

 9    Do you do pastoral counseling?

10         "No.

11         "Are you a pastoral counseling volunteer at

12    your church?

13         "No."

14              THE COURT:  Slow down.

15    A.   "Okay.  Does your church offer that?

16         "I -- I don't attend church.

17         "Okay.  Not all folks do.  I just -- just

18    wanted to know if it was available to you.  That's

19    all.  Okay.  At your school, at Texas A&M Commerce,

20    a lot of psychology --

21              THE COURT:  You really need to read slower

22    than that.  Okay?

23    A.   "Okay.  At your school at Texas A&M University

24    Commerce, a lot of psychology programs have student

25    counseling for helping graduate students go through
```

```
 1   what appears to be basically a very stressful time
 2   in their life.  Did you partake in that?"
 3        "I set up an appointment.  My symptoms got
 4   better.  I decided not to go.  I -- I didn't really
 5   have time to do it anyway.  Then they got worse
 6   later.
 7        "Question:  Okay.  So did you -- you set up an
 8   appointment to deal with your panic attacks
 9   specifically?
10        "Answer:  Yes.
11        "Question:  Not the stress of being a graduate
12   student?
13        "Answer:  Right.
14        "Okay.  That's fine.  I just want to make sure
15   I understand why.  And you were a no-show -- or
16   canceled the appointment?
17        "Answer:  I called and canceled."
18   Q.   Let me just stop you there.
19        Mr. Radbil, this is at App. 126 and App. 127 of
20   the response to the motion for sanctions.
21        And let me just ask you this, because there
22   were some -- the previous page Dr. White testified
23   in his deposition that he had gotten treatment for
24   anxiety from his rheumatologist.
25        Was Dr. Cush the rheumatologist?
```

1   A.   He was, yes.

2   Q.   Was Dr. Cush disclosed in advance of trial,

3   well in advance of trial?

4   A.   In the initial disclosures -- I'm sorry.   In

5   the first response to the interrogatories, The

6   Arthritis Care and Research Center --

7   Q.   Is that a yes?

8   A.   Yes.

9   Q.   Take a look, if you would, at Tab 15 in your

10  book.   And this is RAB Sanctions, Exhibit Number 4.

11  Let's go to the last page.

12       This is a document signed by Mr. Kurz, and this

13  is the Plaintiff's Supplemented Response to

14  Defendant's First Set of Interrogatories.   Do you

15  see that?

16  A.   Uh-huh, I do.

17  Q.   And it looks like right above Mr. Kurz's

18  signature is a Certificate of Service.   It's dated

19  March 9th, 2012, right?

20  A.   Correct.

21  Q.   That's 11 months before trial, correct?

22  A.   Yes.

23  Q.   Is Dr. Cush's name on there as someone that he

24  had sought treatment from?

25  A.   It is.

```
 1   Q.    Mr. Radbil, why didn't you articulate this
 2   disclosure to Judge Boyle when the questions were
 3   asked about disclosure of counseling or anxiety
 4   treatment?  Why didn't you articulate this
 5   disclosure?
 6   A.    Part of it was being confused by
 7   Interrogatory Number 33, which doesn't exist.  And
 8   part of it was because the deposition testimony had
 9   been so clear that, you know, I didn't think there
10   was any doubt.
11   Q.    Mr. Radbil, let me -- did you do your best when
12   you were asked these questions?
13   A.    Yes.
14   Q.    And put forth the best disclosure you possibly
15   could?
16           THE COURT:  But at the sidebar, when
17   Ms. Malone articulated precisely what her objection
18   was, that she had asked Dr. White a specific
19   question regarding treatment for the matter and if
20   he was going through any treatment and asking for
21   current or future psychiatric care, his answer was
22   no, no.
23           Mr. Radbil then said to me and to
24   Ms. Malone, I don't know the answer.
25           Basically, I don't know what he's going to
```

1   say to this.  That conflicts with what he is talking

2   about now.

3          MR. SUAZO:  Right, Your Honor.  And what I

4   am trying to establish is that there is a

5   disclosure; that Mr. Radbil didn't articulate the

6   best disclosure possible to the Court.  I don't

7   think he did that in bad faith or on purpose.  I

8   think that that's just -- perhaps he should have

9   done a better job of articulating that disclosure.

10  That doesn't, in my view, rise to the level of bad

11  faith.

12         THE COURT:  I understand your point,

13  Mr. Suazo, and I think you are doing a very good job

14  of articulating your position on this.  But it's

15  just -- it's in a series, a great series of

16  circumstances that otherwise it would be easy to

17  look at it the way you are describing, but it makes

18  it more difficult as the circumstances expand in

19  this case to look at it that way, because it's one

20  of many.  And Ms. Malone wants to say something, and

21  then we're going to talk about when we are going to

22  meet again.

23         MS. MALONE:  Your Honor, the only thing I

24  would like to do is just, under the Rule of Optional

25  Completeness, there is another additional testimony

1    that appears in document 128, which is their

2    response, at Appendix 141.  Again, this is from

3    Dr. White's testimony relating to Dr. Cush.

4            THE COURT:  Document 128, as filed in the

5    Court docket?

6            MS. MALONE:  Yes, Your Honor.  It is the

7    exhibit that is Dr. White's testimony.

8            At line 4, we're talking about -- he's

9    saying that he's trying to tell the Court that he

10   disclosed that he saw Dr. Cush for this anxiety

11   related to the complaints about the suit.

12           And at line 4 on page 103 of Dr. White's

13   deposition, I asked:

14           "Question:  And obviously that's -- so you

15   want your rheumatologist to be the primary person

16   you're speaking to; is that fair?"

17           "Answer:  Yes.

18           "Question:  Have you talked with your

19   doctor at all about any of this related to the debts

20   or the telephone calls?

21           "Answer:  No."

22           So he didn't get counseling for anxiety

23   related to the telephone calls or anything about

24   that.  We were never told that.  In fact, that's

25   contrary to his deposition testimony, which is that

1    he may have been seeing Dr. Cush for his very

2    serious health condition, and there's certainly

3    anxiety related to that.  He never sought treatment

4    for these telephone calls by Dr. White's own

5    testimony.

6            THE COURT:  What we're going to do --

7    Mr. Suazo, I understand you have a different

8    position.  I will let you finish up, but then I want

9    to talk about, unfortunately, when we are going to

10   have to finish this up.

11           Go ahead.  Did you have anything else?

12           MR. SUAZO:  I was just going to say, just

13   briefly in response to that, once again, I think

14   that's fair game for impeachment, because there's

15   different things that are being said in the

16   deposition.

17           It's the same thing, to some extent, about

18   what's going on with the corporate representative

19   where he gave two depositions.  The first

20   deposition, the man didn't know anything about the

21   policies; a motion to compel had to be filed.  He

22   then came back, and he then studied up for the quiz,

23   I guess, and was able to answer some questions.

24           It's an impeachable point to be able to

25   use that first deposition and say, look, I asked you

1    about all this stuff on June the 4th, and you didn't

2    know anything about it.  We had to reassemble on

3    July 28th, and then all of a sudden you knew

4    something about this.

5            THE COURT:  But then, in context, that's

6    the precise area that yet another one of these

7    strange occurrences occurred with Mr. Radbil, where

8    he's vehemently arguing to the Court why he should

9    get to re-call or call this corporate

10   representative -- re-call, I believe it was, to the

11   witness stand, because he never got enough in his

12   deposition, and he starts citing to the problems

13   with the deposition.  And finally, Ms. Malone

14   clarifies that they did get another deposition.

15           And I said:  So you're quoting from the

16   first deposition to support your argument now that

17   you can call him back without telling me.  It's that

18   kind of a thing.

19           This really is just one detail after

20   another, where everything has to be explained.  No

21   defense lawyer should ever have to do this to

22   represent their client, have this much that they

23   have to -- every single fact has a nuanced answer.

24           I appreciate the fact that you all are

25   here, I really do.  And I know that you were hoping

1    to be done not only today, but much earlier.

2            Mr. Radbil, you can step down.  I think

3    what we need to do is, we're going to have to be

4    back here, all of us.  I'm going to just have all of

5    you confer.  I will make the day available.  We can

6    do it Thanksgiving Day.  I'm sure everybody is

7    available that day.  I'm not being serious, but we

8    are going to do it, and I want to do it before the

9    end of November if there's any way possible.

10           So talk to each other, and let's see what

11   we have to do.  And Ms. Malone and Mr. Martin, I

12   hate that you are having to spend your work time

13   over here on this sanctions motion.  One more day.

14   This will be the fifth time we've set it.

15           Any thoughts on scheduling, Mr. Jefferson?

16           MR. JEFFERSON:  Thank you for asking,

17   Judge.  We will certainly circle up and, you know,

18   we need to do what we need to do to represent our

19   client, but I believe that clearly next time will be

20   it.

21           And I was just looking at the clock.  I'm

22   hoping that my secretary is still there in the

23   unlikely event that, you know, she's expecting

24   overtime or anything else like that.  I mean, we can

25   certainly get an answer --

```
 1              THE COURT:  I don't need anything tonight.

 2              MR. JEFFERSON:  Okay.  But we will

 3  endeavor -- I know there is one week where I'm out,

 4  but I think we can endeavor and make this a priority

 5  to get this finished in the month of November.

 6              THE COURT:  Now, before you leave, let's

 7  just make sure that all of the exhibits are here.

 8  I'm not worried about looking through and making

 9  sure the redactions have been done or whatnot that

10  we have talked about.  Just make sure that each of

11  the three plaintiff notebooks and the two, the one

12  Radbil with the additions and the one for defendants

13  with the additions, are here with the supplements in

14  them.  All right?

15              All right, ladies and gentlemen, we will

16  see you next time.

17                  (Court in recess at 6:14 p.m.)

18

19

20

21

22

23

24

25
```

1                     C E R T I F I C A T E

2               I, Shawnie Archuleta, CCR/CRR, certify

3     that the foregoing is a transcript from the record

4     of the proceedings in the foregoing entitled matter.

5               I further certify that the transcript fees

6     format comply with those prescribed by the Court and

7     the Judicial Conference of the United States.

8               This 20th day of November 2013.

9

10

11                      s/Shawnie Archuleta
                        Shawnie Archuleta CCR No. 7533
12                      Official Court Reporter
                        The Northern District of Texas
13                      Dallas Division

14

15

16    My CSR license expires:  December 31, 2013

17    Business address:  1100 Commerce Street
                         Dallas, TX  75242
18    Telephone Number:  214.753.2747

19

20

21

22

23

24

25