IN THE UNITED STATES DISTRICT COURT
**FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **TIMOTHY WHITE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **3:11-CV-1817-B** |
| | ) | |
| **REGIONAL ADJUSTMENT** | ) | |
| **BUREAU, INC., d/b/a** | ) | |
| **RAB, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MOTION FOR SANCTIONS – VOLUME 3
BEFORE THE HONORABLE JANE J. BOYLE
UNITED STATES DISTRICT JUDGE
OCTOBER 9, 2013**

**A P P E A R A N C E S**
**MARSHALL S. MEYERS, PRO SE:**

> **WEISBERG & MEYERS, LLC**
> **5025 N Central Avenue – #602**
> **Phoenix, AZ 85012**
> **888/595-9111**

For Mr. Radbil:

> MARTIN DISIERE JEFFERSON & WISDOM
> 808 Travis Suite 2000
> Houston, TX 77002
> 713/632-1700
> BY:  DALE JEFFERSON
>      RAUL H. SUAZO

**For the RAB:**

> **ROBBIE L. MALONE**
> **EUGENE E. MARTIN**
> **8750 North Central Expressway – Suite 1850**
> **Dallas, TX  75231**
> **(214)346-2631**

**COURT REPORTER:    SHAWNIE ARCHULETA, TX CCR No. 7533**
**                    1100 Commerce Street**
**                    Dallas, Texas 75242**

**proceedings reported by mechanical stenography,**
**transcript produced by computer.**


              TRANSCRIPT OF PROCEEDINGS – VOLUME 3

MARSHALL MEYERS

Direct Examination By Ms. Malone                    14
Narrative Testimony by Mr. Meyers                   109
Cross-Examination by Mr. Jefferson                  152
Redirect Examination by Ms. Malone                  172
Recross Examination by Mr. Jefferson                183

               **EXHIBITS ADMITTED INTO EVIDENCE**

EXHIBIT           DESCRIPTION           OFFERED/ADMITTED

RAB Exhibits 1 – 42                              8

Radbil Exhibits 1 – 34                           9

Law Firm Exhibits 1 – 32                         9

1           (In open court at 10:00 a.m.)

2           THE COURT:  Good morning.  For the record,

3    this is Civil Action 3:11-CV-1817, Timothy White v.

4    Regional Adjustment Bureau.

5           We are here for the third, I guess,

6    hearing in connection with the defendant's motions

7    for sanctions for conduct alleged to have occurred

8    before, during, and after the trial in this case.

9           The documents that triggered this hearing

10   are document 120, which is the motion and then the

11   responsive briefing, and then document 119, which is

12   the original motion on the Rule 37 sanctions and the

13   responsive briefing.

14          We had two hearings.  We left the last one

15   with still more to address, in particular the -- I

16   think Ms. Malone was attempting to call Mr. Meyers

17   to the stand.  We had taken a continuance on all of

18   that so Mr. Meyers, pursuant to the Court's

19   admonishment, could understand his rights and what

20   the sanctions, potential sanctions were -- which I,

21   again, emphasize are not contempt, civil or

22   criminal, but their connection to allowing

23   sanctioning being in any way responsible for the

24   underlying conduct in this case during the trial and

25   after.  So that was August; it's now October the

1   10th, third installment of this review of all this

2   conduct.

3         I want to begin by having the parties

4   introduce themselves for the record, and then let's

5   talk about the exhibits, where we are and where we

6   are going to go next, starting with counsel for the

7   Plaintiff.

8         MR. MEYERS:  Good morning, Your Honor.

9   Marshall Meyers, appearing on behalf of myself and

10   Weisberg & Meyers.  And Your Honor, I am terribly

11   sorry about my behavior at the last hearing, and you

12   will never see anything like that from me again in

13   your courtroom.

14         THE COURT:  Thank you, Mr. Meyers.

15         MR. JEFFERSON:  Your Honor, I am Dale

16   Jefferson, and I am here with my partner, Raul

17   Suazo.  Pursuant to the Court's instruction last

18   time, that Mr. Radbil consider retaining independent

19   counsel, he took this Court's advice.  So we have

20   been retained, not to represent the underlying

21   plaintiff, but for purposes of representing

22   Mr. Radbil for today's hearing.

23         THE COURT:  Thank you very much,

24   Mr. Jefferson.

25         Mr. Suazo would, spell your last name?

 1            MR. SUAZO:  Suazo, S-U-A-Z-O.

 2            THE COURT:  I can't recall -- and I'm sure

 3      I've gotten motions from you all -- but are you a

 4      Dallas firm or outside of Dallas?

 5            MR. JEFFERSON:  We have -- our firm is

 6      based in Houston.  And although Mr. Suazo is from

 7      Dallas, he had the good sense to move back to

 8      Houston with me.  So our firm is headquartered in

 9      Houston, but we have about a nine-lawyer office here

10      in Dallas and about a ten-lawyer office in Austin,

11      as well.

12            THE COURT:  That will be fine.  Thank you

13      very much.  And I see Mr. Radbil is here, as well.

14            Okay.  Ms. Malone

15            MS. MALONE:  Good morning, Your Honor.

16      Robbie Malone on behalf of Regional Adjustment

17      Bureau and my able associate, Xerxes Martin.

18            THE COURT:  All right.  The first thing I

19      wanted to do is just clarify the exhibits.  I know

20      understandably we have more exhibits that are being

21      proposed to be offered, given the issues as we have

22      described them, kind of moving to maybe a larger

23      scope in the case.  But I don't specifically recall,

24      other than what is attached to the original

25      briefing, that we actually have specific exhibits in

1   evidence.  So why don't we clarify where we are and

2   what's being offered.

3           Ms. Malone, why don't we start with you.

4           MS. MALONE:  Thank you, Your Honor.

5           At the last hearing, Your Honor, what we

6   had done is, just for ease of clarification for this

7   Court, we presented the Court with a notebook and

8   counsel, as well the witness, with Exhibits 1

9   through 14, which were specifically taken as

10  exhibits to our various motions.

11          What I have done today for the Court is, I

12  have incorporated them into one binder and continued

13  doing 15 through, I think it's 42, Your Honor.  And

14  I do think we need to formally proffer 1 through 14,

15  just for clarification of the record, although we

16  talked about them ad nauseam at the last hearing.

17          So I just picked up numbering.  And for

18  ease of the Court and everyone else, I just made one

19  binder so that the Court would have two from us.

20          THE COURT:  Okay.  That helps.  I have

21  Mr. Radbil's exhibit list, and then I have some for

22  the firm as a whole.  So Mr. Radbil's, I'm assuming,

23  are being handled by Mr. Jefferson.

24          MR. JEFFERSON:  Yes, Your Honor.

25  Mr. Suazo and I will handle those, as well as

1    Mr. Radbil's objections to those proffered by the

2    other side.

3            THE COURT:  Okay.  What I am inclined to

4    do, ladies and gentlemen, is, the Rules of Evidence

5    typically don't apply to a sanctions hearing.  They

6    can apply to a contempt, but this is not a contempt.

7            Obviously, even when the rules don't apply

8    pursuant to Rule 1101 of the Federal Rules of

9    Evidence, the Court certainly has to ensure that

10   there is some reliability and not issues that are so

11   loaded with hearsay that it can't possibly be fair

12   to offer them on the other side.

13           But having said that, it seems to me the

14   appropriate thing to do is to admit all of these

15   exhibits, hear what everyone has to say, and then

16   the Court can determine on its own how much weight,

17   if any, to assign to the exhibits so that we aren't

18   going back and forth with objections.

19           I note your objections for the record,

20   Ms. Malone, but I think that's a better use of our

21   time being that we are not dealing with a jury here.

22           So with regard to your exhibits, starting

23   first, you have 1 through -- what is it?

24           MS. MALONE:  42, Your Honor.

25           THE COURT:  One through 42.  I will let

```
 1    you note your objection for the record, plaintiff's
 2    side, but I'm inclined, as I am with your exhibits,
 3    to admit those.
 4              Mr. Jefferson?
 5              MR. JEFFERSON:  Your Honor, we're fine
 6    with the Court's protocol.
 7              THE COURT:  Okay.
 8              Mr. Meyers?
 9              MR. MEYERS:  We've noted our objections on
10    paper, but I agree with, Your Honor, as you wish.
11              THE COURT:  All right.  So Regional
12    Adjustment Bureau's Exhibits 1 through 42 are
13    admitted.  Again, the Court will decide how much, if
14    any, weight to give each of those as I hear more of
15    the evidence in the hearing.
16              On the Radbil exhibit list, I have
17    Exhibits 1 through -- it looks like -- 34.  Is that
18    right, Mr. Jefferson?  Mr. Suazo?
19              MR. SUAZO:  Yes.
20              THE COURT:  And I note that there are some
21    objections, and you are not waiving those
22    objections, Ms. Malone, you continue to lodge the
23    objections you lodged in your filings, your Court
24    filings.
25              MS. MALONE:  Yes, ma'am, I do.
```

1          THE COURT:  Again, overruling those

2     objections, it doesn't mean that I will consider

3     these or how much I will consider these, but I think

4     under the circumstances it's appropriate to move the

5     case along by admitting Radbil's Exhibits 1 through

6     34 for the record in this case.

7          And then finally, we have the law firm

8     exhibits, which it looks like 1 through 31.

9          Is that what I have up here, Mr. Meyers?

10         MR. MEYERS:  Yes, Your Honor.

11         THE COURT:  Any others besides 1 through

12    31?

13         MR. MEYERS:  Only the things that have

14    been filed, Your Honor, affidavits from the

15    different records keepers.

16         THE COURT:  Right, and we discussed that a

17    little bit last time.  I'm going to admit

18    plaintiff's exhibits, and that is going to be what

19    has been offered by Mr. Meyers on behalf of the law

20    firm, designated Plaintiff's 1 through 31 as part of

21    the record; again, with the same caveat as to how

22    much I will -- Ms. Malone?

23         MS. MALONE:  Yes, Your Honor.  There are

24    two problems -- not big ones -- and I think they are

25    easily solved.

```
 1              In our conversation about objections with

 2    Mr. Jefferson, I had agreed to remove a couple of

 3    pages of one of my exhibits, and I would like to

 4    honor that agreement, Your Honor, if I could.  I

 5    would be happy to correct the Court's copy and also

 6    the witness copy, if you would like, on a break.

 7    It's not going to be an issue for this morning.

 8              THE COURT:  Okay.  Let's just make sure

 9    you corrected the copies.  And mine are up here if

10    you want to have our court security officer get them

11    for you.

12              MR. JEFFERSON:  Thank you, Counsel.

13              MS. MALONE:  You're welcome.

14              And the other issue, Your Honor, is with

15    regard to the Law Firm's Exhibit Number 22, which

16    was related to correspondence in the Boudreaux case.

17    We have a copy of the confidentiality agreement that

18    was in place with that.

19              I believe Mr. Meyers indicated to me that

20    he would be willing to redact the terms of the

21    settlement agreement out of those e-mails before

22    they were actually offered.  We didn't anticipate

23    this when we were having that conversation.

24              If he would withdraw those, Your Honor,

25    then it would not -- redact those portions, it would
```

```
1   not violate the confidentiality agreement.

2           THE COURT:  Agree with that, Mr. Meyers?

3           MR. MEYERS:  Absolutely.

4           MR. JEFFERSON:  No objection here.

5           THE COURT:  We will just make sure that by

6   the end of the hearing or at a break or otherwise

7   that these adjustments are made.

8           All right.  Anything else?

9           MS. MALONE:  No, ma'am.

10          MR. MEYERS:  Thank you, Your Honor.

11          THE COURT:  All right.  It's been a while.

12  I think it's been good we have had a break since the

13  last hearings with all that went on.

14          I think the question now is, where are we?

15  My recollection was that we began to put this off

16  for the future when Mr. Meyers became aware that

17  perhaps he needed to assess his situation and

18  acquire counsel, or at least get an idea of where he

19  might fit into this potential sanctions order.  And

20  that was prompted, I think, by Ms. Malone's attempt

21  to call him to the witness stand.

22          So where are we, in your view?  In my view

23  we still have some evidence to be offered, and

24  certainly Mr. Meyers is going to get a chance to

25  offer any evidence he wants, and Mr. Radbil as well.
```

1          Ms. Malone since we left with you, tell me

2    what your position is on where we go from here.

3          MS. MALONE:  I believe I call Mr. Meyers

4    to the stand, Your Honor, and we proceed with

5    testimony.

6          THE COURT:  Okay.  All right.

7          Anyone else have anything to say on the

8    order of the proof?

9          MR. JEFFERSON:  Your Honor, I -- the only

10   thing that I would -- that I would request from the

11   Court is that Ms. Malone and I have had an

12   opportunity to confer several times prior to today

13   to try to expedite the process.  And I certainly

14   appreciate the Court's help with exhibits.  We took

15   that upon ourselves to try to speed it up, so thank

16   you for that.

17          And I understand that it could very well

18   be that Mr. Meyers might be on the stand for quite a

19   long time, and that if that that's the case that

20   sadly we may not finish today.  So I came prepared

21   with my calendar of open dates, to the extent that

22   we don't finish.

23          And I was just going to ask the Court if

24   we could work on an agreed date, to the extent that

25   we don't finish.  My 25th wedding anniversary is

 1    coming up, and I am taking my wife on a trip, and I

 2    need to protect the interests of my client, but I

 3    need to protect the interests of my wife.

 4            THE COURT:  Certainly the sanctions being

 5    quite more severe on the family end --

 6            MR. JEFFERSON:  Since it's on the record,

 7    I will note that you said it and not me, so I am

 8    clearly not disagreeing.

 9            THE COURT:  All right.  I am hoping that

10    we won't be carried over, but certainly I will work

11    with you if we are.  I am hoping that we can move

12    this along, but I certainly want to give Mr. Meyers

13    a chance to say what he wants to say and the

14    questions asked that Ms. Malone wants to ask.  So we

15    will work with you on that, I promise.

16            MR. JEFFERSON:  Very good.  Thank you,

17    Your Honor.

18            THE COURT:  Mr. Meyers?

19            MR. MEYERS:  I have a blank notebook here,

20    Your Honor, that I was hoping that I could take to

21    the stand with me.

22            THE COURT:  Sure, absolutely.

23            MR. MEYERS:  Thank you.

24            THE COURT:  You ready?

25            MR. MEYERS:  Yes.

```
1                    THE COURT:  Come on up.
2                         MARSHALL MEYERS,
3      having been first duly sworn, testified as follows:
4                         DIRECT EXAMINATION
5      Q.   (By Ms. Malone)  Thank you, Mr. Meyers.
6            Just as a way of background, when we left last
7      time, I believe we were talking about that your firm
8      is essentially a national law firm and that it
9      practices across the country; is that correct?
10                    MR. MEYERS:  I would object to that
11     question on the grounds of relevance.
12                    THE COURT:  Overruled.
13     A.   My firm practices in several states, yes.
14     Q.   (By Mr. Meyers)  Okay.  And you are actually
15     now licensed in the Federal District Court in the
16     Northern District of Texas, correct?
17     A.   Yes.
18     Q.   And that's only been something that you did
19     recently; I think you had done it just a few days
20     before our last hearing, correct?
21     A.   I believe that is correct.
22     Q.   And as part of that, you committed to the Court
23     that you had read the Dondi decision, correct?
24     A.   Yes, I did.
25     Q.   And you have done that?
```

```
1   A.    I have done that.

2   Q.    And you have read the local rules?

3   A.    Yes.

4   Q.    And you know that the local rules do require

5   that you provide an address in the Northern District

6   or wherever you are going to be that is a legitimate

7   address for service for you, correct?

8   A.    I'm not sure I understand the question, but I

9   do understand that I need to provide an address

10  where you can send me correspondence.  And I further

11  understand that a satellite office where I am not

12  normally does not constitute an office.

13  Q.    And you understand that pursuant to Local Rule

14  83.13 you have to keep that information accurate on

15  the Court's website, correct?

16  A.    I believe you.  I don't recall the rule, but

17  I'm aware that I must keep the information accurate.

18  Q.    Okay.  And we had talked last time that your

19  firm has filed since 2011 at least 467 lawsuits

20  across the country, correct?

21  A.    I'm sure it's more than that.

22  Q.    Okay.  I meant in the year 2011, Mr. Meyers.

23  Is that correct?

24  A.    I don't know the answer to that, but I have no

25  reason to disagree with you at the present time.
```

1    Q.    And when we were looking specifically at.

2    Mr. Radbil, since 2010 he's filed some 86 lawsuits

3    in federal court in Texas, correct, as lead counsel?

4    A.    I don't have that specific information, but I

5    have no reason to disagree with you at the present

6    time.

7    Q.    Okay.  And in fact, until I guess a little over

8    a week ago, on your firm website you listed

9    Mr. Radbil as the managing attorney for Texas,

10   correct?

11   A.    I think that's correct.

12   Q.    And now he's listed as Of Counsel, correct?

13   A.    That is correct.

14   Q.    And no other attorney on your website besides

15   Mr. Radbil actually held a State of Texas license;

16   is that correct?

17   A.    That is correct.

18   Q.    And in your briefing you indicated that you

19   believed it was appropriate for the partners at

20   Weisberg & Meyers to supervise Mr. Radbil, correct?

21   A.    Yes.

22   Q.    And you think that you provided a reasonable

23   hand of guidance involving Mr. Radbil in this case,

24   sir?

25   A.    Given how displeased the Court is with what

```
 1   occurred, I'm sure that I could have done a better
 2   job.
 3   Q.   Okay.  And if you would look with me at the
 4   white notebook under Tab 13, which would be
 5   Exhibit 13.
 6   A.   Yes.
 7   Q.   These are entries taken from your billing
 8   records which reflect the partners in your firm who
 9   billed on this particular file.  Do you recall
10   those.
11   A.   Do I recall?
12   Q.   Do you recall that you made entries on this
13   file, sir?
14   A.   Yes.
15   Q.   Okay.  And do you have reason to disagree that
16   you, Mr. Weisberg and Craig Ehrlich and Eric Radbil,
17   all partners in your firm at the time, made entries
18   and indicated they have reviewed some portion of
19   this case.
20   A.   That's correct.
21   Q.   You understand that there are certain
22   requirements under the Texas Disciplinary Rules for
23   supervision of an attorney, correct?
24   A.   I'm sure.
25   Q.   And you understand that the Texas attorney
```

1   creed, which has been adopted by the Northern

2   District in Dondi, as well as the Texas Bar

3   Association, also has requirements about being

4   honest with the Court, correct?

5   A.    Yes.

6   Q.    And there are requirements that you also have

7   to be honest with the general public, correct?

8   A.    Yes.

9   Q.    If you would look with me, sir, at

10  Exhibit Number 15.  This is a motion for new trial

11  that was filed by Mr. Radbil in a case in Tarrant

12  County.  Do you see that?

13  A.    Yes.

14  Q.    Would you turn with me to page 765, which would

15  be the last paragraph or the last section in that

16  motion.

17  A.    I am here.

18  Q.    Do you see here that Mr. Radbil is making a

19  motion to the Court indicating that he believes that

20  a counsel must exhaust their peremptory strikes

21  prior to the Court making rulings on motions for

22  cause on jurors?

23  A.    Could you repeat that, please?

24  Q.    Sure.  If you need to read it, please do so,

25  sir.

1         Do you see from this particular section that

2    Mr. Radbil is making the argument that counsel must

3    exhaust their peremptory strikes prior to the Court

4    ruling on motion to cause strikes on particular

5    jurors?

6    A.    Okay.  I have read that.

7    Q.    Okay.  And that's essentially what he's saying,

8    is he not, Mr. Meyers?

9    A.    I'm sorry, would you repeat the question one

10   last time?

11   Q.    Sure.  Would you agree with me that he is

12   arguing that the Court should have required the

13   peremptory strikes to be exhausted prior to making

14   rulings on motions for cause.

15   A.    I think the pleading says what it says, but I

16   don't have a reason to disagree with what you are

17   saying.

18   Q.    Okay.  And that's not the way the jury

19   selection works, does it, Mr. Meyers?

20   A.    I think the rules speak for themselves.

21   Q.    I am asking you, sir, as a supervising

22   attorney, is that the way jury selection is supposed

23   to work?

24         THE COURT:  What pages of the motion are

25   you referring to, Ms. Malone?

 1               MS. MALONE:  Your Honor, there is a big

 2     number at the bottom, 765.

 3               THE COURT:  765?

 4               MS. MALONE:  Yes, ma'am.

 5               THE COURT:  Okay.  All right.

 6               MS. MALONE:  It's IX, Your Honor.

 7               THE COURT:  Okay.

 8     A.   I believe -- and I could be wrong -- that you

 9     strike for cause and then you do peremptory

10     challenges.

11     Q.   (By Ms. Malone)  So as of September 2011, when

12     Mr. Radbil filed this motion, he at least did not

13     appear to understand the process for jury selection,

14     is that fair?

15     A.   I can't say that.

16     Q.   Did you read the transcript from the Brown

17     trial, sir?

18     A.   I've read parts of it, yes, and I may have

19     fully read it on one occasion.

20     Q.   Okay.

21     A.   But it would have been a very long time ago.

22     Q.   Okay.  So as of 2011, Mr. Radbil filed a motion

23     that would indicate he didn't understand the jury

24     selection process in trial, correct?

25               MR. JEFFERSON:  Your Honor, we will object

1    to the extent it asks him to speculate as to what

2    Mr. Radbil's state of mind was.

3              THE COURT:  Sustained.  I just think the

4    question is, very simply, if this was the argument

5    being made and if he agrees -- if Mr. Meyers agrees

6    that this would be a correct legal argument, and it

7    looks like that is the argument being made.  So the

8    question is:  Do you agree that this would be

9    incorrect?

10             THE WITNESS:  I'm a little confused by the

11   questions back and forth, but I do agree and believe

12   that you would strike for cause and then exercise

13   peremptory challenges, if that's what's being asked.

14             THE COURT:  All right.

15   Q.   (By Ms. Malone)  Thank you.

16        If you would look with me at Exhibit 16, sir.

17   If you would look at the top of this, it indicates

18   the filing date is October 31st of 2011, correct?

19   A.   Yes.

20   Q.   And this is a motion that is being made by

21   Nissan against -- in the Scarlott case, correct?

22   A.   Yes.

23   Q.   And do you see in the first paragraph that

24   Nissan is alleging that Mr. Radbil and his brother

25   and another attorney in your firm made material

1    misrepresentations to the Court?

2    A.    Well, that is what the pleading says, yes.

3    Q.    And it also indicates in this motion that

4    Nissan has found that Mr. Radbil and his brother and

5    another attorney have violated the terms of the

6    Texas Disciplinary Rules of Professional Conduct,

7    the Texas Lawyer's Creed, and the Federal Rules of

8    Civil Procedure.  That's what the motion says in the

9    first paragraph, right?

10   A.    That is what the motion says, yes.

11   Q.    And on the next page at the beginning, in fact,

12   Nissan has asked the Court to sanction Mr. Radbil

13   and his brother and another attorney and your law

14   firm to deter them for future abuse of the justice

15   system, correct?

16   A.    That is what the motion says.

17   Q.    And if you read through this motion, it also

18   asks the Court to suspend them from practicing

19   before that court, before the Southern District of

20   Texas, correct?

21   A.    That is what the motion says.

22   Q.    And that is actually set for hearing tomorrow,

23   is it not?

24   A.    That is correct.

25   Q.    Did you, following this motion that you

1   received from -- or that your firm received in the

2   Scarlott case, did you have any communication with

3   the attorney from Nissan to find out if there was

4   any legitimacy to their concerns?

5   A.    I have spoken with the attorney from Nissan,

6   but I do not think that I contacted him after the

7   filing of the motion.  I don't recall doing so.

8   Q.    Okay.  Now, if we will look at Exhibit 17, sir.

9   Seventeen is a final judgment in the Lopez case; is

10  that correct?

11  A.    Yes.

12  Q.    And this was a case in which Mr. Radbil served

13  as lead counsel at trial.

14  A.    Yes.

15  Q.    And according to the information that was

16  provided in his deposition, Mr. Lopez indicated he

17  had not been advised of a settlement offer.  Is that

18  correct, that's what the deposition said?

19  A.    The deposition says that, correct.

20  Q.    And in this case, Mr. Lopez wound up getting a

21  verdict or a judgment in the amount of $42,500

22  against him, is that correct, sir?

23  A.    That is what the document says, yes.

24  Q.    And again, just so we are clear, this occurred

25  in January of 2012, correct?  It's on the first

1   line, Mr. Meyers, of the judgment, the day of the --
2   A.   Yes.
3   Q.   And you would agree with me that that was more
4   than a year before the White trial, correct?
5   A.   Yes.
6   Q.   Again, did you have any communications with
7   Mr. Lopez to find out if he had any reason to be
8   concerned about not being advised of the settlement
9   offers?
10  A.   I did speak with Mr. Lopez.
11  Q.   Okay.  At the time the judgment was filed?
12  A.   I recall -- and again, this is a year and a
13  half ago, but I recall speaking with Mr. Lopez on
14  several occasions.  I recall --
15  Q.   Did Mr. Lopez indicate that he was happy with
16  his representation?
17  A.   I don't recall Mr. Lopez making any comments
18  about the quality of his representation.
19  Q.   Did you have any conversations with the
20  attorneys who represented the defendants in that
21  particular case?
22  A.   Yes.
23  Q.   Did you have any conversations with them about
24  the manner in which the trial was conducted?
25  A.   I don't think our conversations were about

1   that.

2   Q.   Were you aware that Mr. Radbil attempted to

3   recuse Judge Moye in that case?

4   A.   Yes.

5   Q.   Were you aware that he did so based upon a

6   campaign contribution?

7   A.   Yes.

8   Q.   Do you think that was appropriate?

9   A.   Well, at the time I thought it was appropriate.

10  I'm not sure in hindsight that it was.

11  Q.   In your briefing you indicated that you did not

12  believe that you had an obligation to relay

13  subsequent offers to a client if they told you they

14  were not interested in settlement at the beginning;

15  is that correct?

16  A.   I don't recall that in the briefing.  However,

17  I do recall thinking that if a client has given us a

18  bottom line authority and told us this is what he

19  wants, that if an offer did not cover his needs or a

20  client's needs, that we could reject it.

21  Q.   Okay.  Now, Mr. Meyers, if you would look with

22  me, please, to Tab Number 30, which are excerpts

23  from the Texas Rules of Disciplinary Conduct, I

24  would ask you, sir, to turn to page 10.  There are

25  numbers at the bottom of it.

1    A.    Yes.  One moment, please.

2    Q.    No problem.

3    A.    Okay.  I'm there.

4    Q.    1.02.  Does it indicate that a lawyer shall

5    abide by a client's decision whether to accept an

6    offer of settlement of a matter except as otherwise

7    offered by law?

8    A.    That is what it says, yes.

9    Q.    And on the next page under Comment, does it say

10   that the client has ultimate authority to determine

11   the objectives to be served by legal representation,

12   correct?

13   A.    Your question again, please?

14   Q.    Sure.  Does it indicate here that the client

15   has the ultimate authority to determine the

16   objectives to be served by legal representation?

17   A.    Continuing within the limits imposed by law,

18   the lawyer's professional obligations, and the

19   agreed scope of representation, yes, it does.

20   Q.    Fair enough.  Thank you, Mr. Meyer -- Meyers, I

21   apologize.  I had an employee whose last name was

22   Meyer and I slip with that, and I do apologize.

23   A.    I am the last of the Meyers generation, so no

24   one is going to be offended.

25   Q.    Let's talk about Exhibit 18, if you could look

1    with me, sir.

2    A.    Yes.

3    Q.    Exhibit 18 is the final judgment that was

4    entered into in the Whaley case; is that correct?

5    A.    Yes.

6    Q.    And the trial in this case, as indicated by the

7    first line, occurred on July the 10th of 2012.

8    A.    Okay.

9    Q.    That's what the first line says, doesn't it?

10   A.    Yes.

11   Q.    You would agree with me, sir, that the ultimate

12   finding in this case resulted in a verdict in excess

13   of $90,000 against Ms. Whaley.

14   A.    Not having done the math, I take your word for

15   it.  But I do see that there is a judgment against

16   her, yes.

17   Q.    You agree with me 5,490 plus 85,000 is north of

18   90,000, just rounding it up.

19   A.    Yes.

20   Q.    And you would agree with me, sir -- we have

21   talked about this with Mr. Radbil -- that under the

22   original verdict, that the 5,490 was awarded in

23   favor of the company, and Ms. Whaley's amount was

24   $650, as indicated by the Court's judgment.

25   A.    We talked about that?

1   Q.   No, we did with Mr. Radbil at the last hearing,

2   sir.  You and I haven't spoken about it yet.

3   A.   Okay.  Then I'm not sure of your question.

4   Q.   You know what?  That's fair, Mr. Meyers.

5        Will you agree with me, if you read paragraph

6   number 2, that the initial verdict in favor of the

7   defendant from the jury was for $6,140, and

8   plaintiff was awarded $650, leaving the defendant

9   with a net recovery of $5,490.

10  A.   Yes.

11  Q.   So that was in favor of the defendant, correct?

12  A.   There was a verdict in favor of both parties,

13  and the net recovery was more to the defendant than

14  the plaintiff, short of attorney's fees if that's

15  what you are asking.

16  Q.   Yes, I am asking you that.

17       And you would agree with me, sir, that on your

18  website, however, you listed this Whaley case as a

19  notable victory on behalf of Mr. Radbil, correct?

20  A.   Yes, there was a time when that was listed on

21  the website.

22  Q.   Sure; until about a week ago.

23  A.   I'm not sure, but I will take your word for it.

24  Q.   In fact, you sent out a news press release, a

25  paid submission, indicating that that was a trial

1   victory, correct?

2   A.   Yes.

3   Q.   Okay.  And if you would look with me at

4   Exhibit 19, which is continuing with the Whaley

5   case, on page 2 -- this is a motion filed by your

6   firm, correct, sir?

7   A.   Yes.

8   Q.   Okay.  Signed electronically by Mr. Radbil.

9   A.   Okay.

10  Q.   Okay.  And in Paragraph Number 8 it indicates

11  that -- that the -- that you are withdrawing because

12  Ms. Whaley will not agree to pay the costs of the

13  appellate record; is that correct?

14  A.   Could you repeat your question, please?

15  Q.   Will you agree with me in paragraph 8 that

16  there is an indication that you are withdrawing as

17  attorney of record, or the firm is, because

18  Ms. Whaley is reluctant or refuses to bear the cost

19  of the appellate record?

20       I am paraphrasing, Mr. Meyers.

21  A.   Well, it says she's failed to communicate with

22  her counsel for weeks.  And above says that she's

23  dealing with family issues rendering her no time to

24  speak with us.  So I think there were several

25  reasons why we felt compelled to withdraw.

```
1   Q.    And continuing on you say:  Without her
2   agreement to pay the cost of the record on appeal,
3   continued representation would be financially
4   burdensome; correct?
5   A.    The motion says that, yes.
6   Q.    Yes.  In that case, are you aware, Mr. Meyers,
7   that an offer of $7,000 and forgiveness of
8   Ms. Whaley's debt was made to Mr. Radbil?
9   A.    I don't recall that as we sit here today, but
10  that is not to say it is not true, and it's not to
11  say that I wasn't aware of it at a time.  As we sit
12  here today, I do not have a recollection of
13  settlement negotiations.
14  Q.    And do you know that Ms. Whaley indicated to
15  Judge Hoffman that she was not aware of that offer?
16  A.    I believe you have said that, yes.
17  Q.    All right.  Now let's talk a little bit about
18  this particular trial.  Mr. Meyers, do you believe
19  that it is important to follow rules regarding
20  scheduling orders and following up with exhibits?
21            THE COURT:  Back up just a minute on that
22  7,000.  Was that to her or was it 7,000 she would
23  give them and it would all go away.
24            MS. MALONE:  It would have been -- I'm
25  sorry, Your Honor.  It would have been 7,000 paid to
```

1    her and her law firm to decide how to distribute,

2    and they would forgive the 6,000-dollar debt.

3              THE COURT:  Thank you.

4              MS. MALONE:  So instead, she got a

5    90,000-dollar judgment against her.

6    Q.    (By Ms. Malone)  Now, you believe it's

7    important to follow the rules with regard to meeting

8    exhibits and doing deadlines along the way?

9    A.    I do.

10   Q.    Okay.  And I apologize to you, Mr. Meyers,

11   because this is not an exhibit, but in this

12   particular case -- and I will tell you where it can

13   be found, Document Number 70 -- your firm proposed

14   exhibit exchanges in this case.  And if you would

15   like to have a copy, I would be happy to show it to

16   you.

17         Do you recall that there was a time when your

18   firm was asked, pursuant to the Court's order, to

19   give proposals of remaining deadlines?

20   A.    In this case?

21   Q.    Yes.

22   A.    I don't have a specific recollection of that,

23   but I'm sure it is true.

24   Q.    Okay.  And if Court Document Number 70

25   indicates that your firm proposed that you would

**SHAWNIE ARCHULETA, CSR/CRR**
**FEDERAL COURT REPORTER — 214.753.2747**

1  exchange exhibits with opposing counsel on

2  February 15th, do you have reason to disagree with

3  that, sir?

4  A.    I don't.

5  Q.    And if it also indicates that your firm

6  proposed that there would be a deadline to submit

7  exhibits to the Court on February 20th, do you have

8  reason to disagree with that?

9  A.    I don't.

10 Q.    And just to wrap this up:  On Document Number

11 71, Judge Boyle, in an order, adopted the deadlines

12 proposed by your firm.

13       Do you have reason to disagree with that?

14 A.    I don't.

15 Q.    Okay.  I would like for you to look with me --

16 you have Mr. Radbil's exhibits up there.

17 A.    I do.  I do, yes.

18 Q.    Exhibit Number 15, please.  Now, recall that

19 the order said that exhibits should be given to

20 opposing counsel or exchanged among attorneys on

21 February the 15th, right?

22 A.    That is what you said, yes.

23       MS. MALONE:  Your Honor, may I give it to

24 him so he can have it?

25       THE COURT:  You may.

1    Q.   (By Ms. Malone)  I don't want you to have any

2    doubt in your mind, Mr. Meyers.

3    A.   Thank you.

4    Q.   You're welcome.

5         Do you see that, the February 15th date?  Do

6    you see it, sir?

7    A.   Yes.

8    Q.   Okay.  Under Exhibit 15 for Mr. Radbil,

9    Mr. Radbil's firm -- counsel has produced exhibits

10   that were exchanged involving -- you know what?  I

11   completely apologize to you.  I gave you the wrong

12   exhibit number.  I wrote down the wrong one, and I

13   apologize.  Let me tell you which one it is.  I

14   believe it's Exhibit Number 14.  I was one off.

15   That would probably make it make more sense.  Are

16   you with me, Exhibit 14, sir, is some e-mails

17   exchanged between your office and myself?

18   A.   Exhibit 14?

19   Q.   Yes, sir.

20   A.   Yes.  I'm sorry, Exhibit 14 I'm looking at.

21   Q.   Would you agree with me, sir, that the e-mail,

22   Cathy Bopp, is one of your assistants?

23   A.   She's a paralegal, yes.

24   Q.   It indicates on Tuesday, February the 19th,

25   that they were still attempting to give exhibits to

1    me; is that correct?

2    A.   The e-mail indicates that, yes.

3    Q.   So that's four days after the deadline to

4    exchange exhibits, correct?

5    A.   That is correct.

6    Q.   Okay.  If you would look with me at

7    Exhibit Number 13, it should be a FedEx document.

8    A.   Yes.

9    Q.   Okay.  According to the scheduling order,

10   exhibits to the Court should have been provided to

11   the Court by February 20th, correct?

12   A.   That is correct.

13   Q.   And the FedEx package and the print-off

14   indicates that it was mailed from Houston on

15   February 21st with a scheduled delivery to the Court

16   on February 22nd.

17   A.   That is correct.

18   Q.   And that would be beyond the deadlines

19   scheduled with the Court, correct?

20   A.   Yes.  And this is one of the areas that I

21   mentioned to you, that I could have done a better

22   job of helping.

23   Q.   All right.  There have been other problems

24   with -- let's look at Exhibit Number 20, please,

25   Mr. Meyers.

1  A.   Okay.

2  Q.   This is a case from Seattle Washington, Paris

3  v. Steinberg.

4       I'm sorry Mr. Meyers, in my exhibit book, I

5  apologize to you.

6  A.   Sure.   Yes.

7  Q.   Okay.   And on this form there is a show cause

8  order of why the Court should not impose Rule 11

9  sanctions, correct?

10  A.   Yes.

11  Q.   And part of the indication from this record, if

12  you read through it on the next page, beginning on

13  page 2, that Mr. Trigsted presented an address that

14  appeared -- that was impossible to place on a map,

15  correct?

16  A.   That is what the order says yes.

17  Q.   And in the next paragraph, the Court found that

18  this was the third application for pro hac on behalf

19  of Noah Radbil, and the Court finds that it again

20  fails for misrepresenting information to the Court,

21  correct?

22  A.   That is what it says, yes.

23  Q.   And also there is a concern that an incorrect

24  bar number is provided?

25  A.   That is correct.

1   Q.    And an address that's inconsistent with that

2   provided to the Court, correct?

3   A.    That is correct.

4   Q.    All right.  Exhibit Number 21, sir.

5         This is from the Ivy Little-Cadman case, again

6   from the State of Washington.

7   A.    Yes, these orders are back to back.  Yes, I see

8   those.

9   Q.    And there is another show cause order involving

10  Rule 11 sanctions, correct?

11  A.    Yes.

12  Q.    And again, similar problems are addressed here

13  about addresses not constituting offices, correct?

14  A.    Yes.

15  Q.    And the Court is concerned and states that they

16  were looking at whether or not they should be

17  sanctioned for misrepresentations to the Court.

18  A.    That is what the order says, yes.

19  Q.    Thank you.

20        Exhibit Number 22 is an order from Judge Hoyt,

21  correct?

22  A.    Yes.

23  Q.    Judge Hoyt is in the Southern District of

24  Texas.

25  A.    Yes.

1  Q.   And you are aware that Mr. Radbil was the

2  attorney of record on this case?

3  A.   That seems likely.

4  Q.   All right.  And if you would just look at the

5  last page of the order signed by Judge Hoyt on the

6  26th day of April, 2011.

7  A.   Yes.

8  Q.   Not to beat a dead horse, but two years before

9  this trial, correct?

10  A.   Yes.

11  Q.   And Judge Hoyt says:  The Court admonishes the

12  plaintiff's attorney that it will not permit such

13  petty gamesmanship in the future.  Correct?

14  A.   That is what the order says, yes.

15  Q.   Did you have any discussions with Mr. Radbil

16  following the issuance of this order about the way

17  in which he may have offended Judge Hoyt?

18  A.   I think it was likely after seeing a footnote

19  like that, that we discussed it internally within

20  our firm, but I do not recall specifically.

21  Q.   And part of the concern here was that

22  Mr. Radbil was arguing that an offer of judgment

23  should have been sent by certified mail and not

24  faxed to the opposing side, correct?

25  A.   I don't know the answer to that.

```
 1   Q.   Okay.  If you want to skim the order, feel free
 2   to, Mr. Meyers.  I'm not trying to trick you.  I
 3   want to make sure you understand it.
 4   A.   Yes, if I may have a moment.
 5   Q.   Sure.
 6        (Pause in the proceedings.)
 7   A.   I see where it says that, yes.
 8   Q.   Okay.  And in fact, following that, recently in
 9   the Payne case, Mr. Radbil made that exact same
10   argument against my firm even though we had both
11   faxed and sent it by certified mail.
12        Do you recall that, Mr. Meyers?
13   A.   I don't, but I believe you.
14           THE COURT:  Payne case being where?
15           MS. MALONE:  Your Honor, it's in Judge
16   Means' Court.  I apologize.
17           THE COURT:  Okay.
18   A.   I believe you.
19   Q.   (By Ms. Malone)  And that case is actually on
20   appeal with the Fifth Circuit, correct?
21   A.   I believe it is, yes.
22   Q.   So the thing that Judge Hoyt considered to be
23   petty gamesmanship continued to be an argument by
24   Mr. Radbil, correct?
25   A.   I'm not sure, but I have no reason to disagree
```

1    with what you are saying.  And I would simply rely

2    on the rules for the proper way to do it.

3    Q.    Okay.  If you would turn with me to Exhibit 23.

4    We are now going away from Mr. Radbil, talking about

5    partners in your firm.

6    A.    Yes.

7    Q.    Okay.  Exhibit Number 23 is an order issued by

8    the District of Colorado involving your client,

9    Alyssa Danielson-Holland; is that correct?

10   A.    Yes.

11   Q.    In this case, the Court found sanctions -- if

12   you would turn to page 3 of the order -- against

13   your partner, Craig Ehrlich, who was your partner at

14   the time, correct?

15   A.    That is correct.

16   Q.    And I understood that you told the Court he no

17   longer is, to be fair?

18   A.    That is correct.

19   Q.    In this case, on page 3, the Court wrote:  It

20   is apparent that Craig Ehrlich as plaintiff's

21   counsel elected to proceed to trial without

22   plausible evidence to support the claim made.  He is

23   therefore responsible for the defendant's attorney's

24   fees for legal services subsequent to the entry of

25   summary judgment.  Is that correct?

1    A.    The order says that, yes.

2    Q.    And it's not just Judge Matsch who made that

3    ruling, if you will turn with me to Exhibit Number

4    24 -- are you there?

5    A.    Yes.

6    Q.    The 10th Circuit for the United States Court of

7    Appeals affirmed Judge Matsch's ruling, correct?

8    A.    Yes.

9    Q.    And on page 5 of that order, the Court wrote

10   that:  Although Ms. Danielson-Holland's deposition

11   testimony persuaded the magistrate judge and the

12   district court that the abusive-language claim

13   should proceed, Mr. Ehrlich should have realized

14   upon careful continual re-evaluation of the claim as

15   he prepared for trial that he lacked evidence,

16   particularly telephone records, supporting her

17   assertion and testimony.   Correct?

18   A.    That is what the order says, yes.

19   Q.    It's an opinion, correct?

20   A.    Yes.  I'm sorry.

21   Q.    That's fine.  I just want to make sure you and

22   I are looking at the same thing.

23   A.    Yes.

24   Q.    On page 6, the 10th Circuit found:  Mr. Ehrlich

25   therefore either failed to properly prepare for

1  trial or the evidence did not exist to establish the
2  call occurred.  Is that correct?
3  A.   That is what the opinion says.
4  Q.   And Mr. Ehrlich is one of the individuals who
5  billed on the White file as working with Mr. Radbil
6  in preparation for trial, correct?
7  A.   Yes.
8  Q.   And I believe Mr. Radbil testified at the last
9  hearing that he spoke with both you, his brother,
10 and Mr. Ehrlich about how to prepare to trial,
11 correct?
12 A.   I believe that to be true.
13 Q.   All right.  If you would look with me at
14 Exhibit Number 25 --
15 A.   Yes.
16 Q.   -- this is the case of Barchard v. Kass,
17 Shuler, Solomon, Spector, Foyle & Singer, correct?
18 A.   Yes.
19 Q.   And to shorthand it, this is a sanction order
20 issued against your current partner, Alex Weisberg,
21 correct?
22 A.   And our client, yes.
23 Q.   And your founding partner, correct?
24 A.   Yes.
25 Q.   Okay.  If you would look with me on page 3 of

```
 1   that order, you will find that the judge found that

 2   there was a violation for filing under the Bad Faith

 3   Section, 1692(k) -- can we shorthand that,

 4   Mr. Meyers?

 5   A.    The order says that, yes.

 6   Q.    And it said that the plaintiff's attorneys knew

 7   or should have known raised no justiciable issue of

 8   law or fact, and that was filed in bad faith and

 9   solely for the purposes of harassment.  Correct?

10   A.    The order says that, yes.

11   Q.    And they awarded $56,000 to Kass, Shuler,

12   correct?

13   A.    Yes.

14   Q.    And you appealed that case, right?

15   A.    Yes.

16   Q.    And it got appealed again, right?

17   A.    We prevailed on appeal.  And then they appealed

18   and they prevailed on appeal for a lack of evidence,

19   correct.

20   Q.    Right.  And in this case --

21   A.    And we have petitioned for cert as well.

22   Q.    All right.  Under Exhibit Number 26, we have

23   the District Court of Appeal for Florida finding on

24   August of 2013 -- I'm sorry, the opinion was filed

25   on August 2013, correct?
```

```
 1   A.    Yes.
 2   Q.    And the ultimate finding, if you will look on
 3   page 3 of that order, the Court affirmed the
 4   original trial court's finding of bad faith.
 5   A.    Yes.  The Court says that the circuit court was
 6   obliged to affirm the county court's judgment but
 7   only in part, as we will explain, because the record
 8   brought forward by Barchard was inadequate to
 9   demonstrate reversible error, yes.
10   Q.    Okay.  Look with me please, sir, at
11   Exhibit Number 27.
12   A.    Yes.
13   Q.    This is a case out of Stovall -- this case is
14   styled Stovall v. MSR BPO out of the federal court
15   in Florida, correct?
16   A.    Yes.
17   Q.    And again, this is a case involving founding
18   partner Mr. Weisberg?
19   A.    Yes.
20   Q.    Whose name appears in the billing records of
21   this file, as well, correct?
22   A.    Yes.
23   Q.    In this case, there is an allegation by the
24   opposing side on page 2 that Mr. Weisberg
25   participated in discovery abuse; that he made
```

1    misrepresentations to the Court in his opening

2    statement; and that he suborned perjury from his

3    client.  Correct?

4    A.    That is what the motion alleges, yes.

5    Q.    All right.  If you would, please, flip with me

6    to Exhibit Number 42.

7    A.    Yes.

8    Q.    There has been a recent ruling by the

9    magistrate in this case, correct?

10   A.    Yes.

11   Q.    And there was, in fact, an evidentiary hearing

12   like this in that case, correct?

13   A.    I'm not sure it was quite like this, but there

14   was an evidentiary hearing, yes.

15   Q.    Okay.  According to the magistrate ruling,

16   beginning on page 13, in the opening section it

17   says:  To the extent that Weisberg had reason to

18   know the 2010 assertions related to activity by

19   another entity prior to MRS involvement and then

20   prompted Stovall to testify to the activity as

21   happening in 2011 rather than 2010, he knowingly and

22   recklessly pursued which claims which clearly would

23   have been foreclosed and it unreasonably prolonged

24   the litigation of the harassment counts.

25        Is that correct?

1   A.   That is what the order says.

2   Q.   And on page 15 --

3   A.   Yes.

4   Q.   -- in the first full paragraph, Mr. White --

5   the Court is reciting Mr. Weisberg's argument.

6              THE COURT:   Are we on 42?

7              MS. MALONE:   Still on Exhibit 42, Your

8   Honor, on page 15.

9              THE COURT:   Thanks.

10   Q.   (By Ms. Malone)   Are you with me?   Mr. Meyers.

11   A.   I am; I'm with you.

12   Q.   Just making sure.

13       In the first full paragraph on that page it

14   indicates:   Weisberg maintains that nobody at his

15   firm encouraged, suggested, participated in, or was

16   aware of plaintiff's removal of information from the

17   first version of the telephone log spreadsheet.

18   Instead, this caught them by surprise.

19       Is that correct?

20   A.   That is what the order says, yes.

21   Q.   That is what Mr. Weisberg argued, is it not?

22   A.   I have to rely on the order to know that, so I

23   assume that is what he argued because it's quoted in

24   the order.

25   Q.   Blamed it on the client.

1    A.    I believe that the Court found the client to be

2    dishonest.

3    Q.    He also found Mr. Weisberg to have acted

4    involved.  On page 17, last paragraph it begins:

5    Mr. Weisberg, as lead counsel and a supervisor of

6    his associate, Mr. Sullivan -- Mr. Sullivan is still

7    an associate with your firm?

8    A.    Yes.

9    Q.    -- was without reasonable excuse in passing on

10   the altered versions of the telephone log

11   spreadsheets to MRS even though certain numbers had

12   been clearly omitted without further examination or

13   notation.  Even at this juncture, posttrial,

14   Mr. Weisberg refuses to admit that one of the

15   telephone log spreadsheets omitted Stovall's calls

16   to his firm.

17        Have I read that correctly, sir?

18   A.    You have read it correctly, yes.

19   Q.    Continuing on, skip down a little bit, it says:

20   Particularly in light of Mr. Sullivan's

21   representations to this Court in his declaration on

22   this issue, that appear designed to mislead or

23   obscure the extent of Stovall's redactions, the

24   Court finds Mr. Weisberg and Mr. Sullivan's actions

25   to be sanctionable.

1      Have I read that correctly?

2    A.    You have.

3    Q.    Okay.  And on page 22 of the same order, the

4    Court goes on to say:  Mr. Weisberg's denial of

5    knowledge of the 281 telephone number being on

6    Stovall Grand Asian Travel Website because it was

7    not provided to him by the Court or defendant is a

8    completely unreasonable position, warranting

9    sanctions.

10      Is that correct?

11   A.    That is what the order says, yes.

12   Q.    On the last page it indicates that the Court

13   found a punitive damage of $15,000 directly against

14   Mr. Weisberg for his own conduct and as supervisor

15   of Mr. Sullivan, correct?

16   A.    That is correct.

17   Q.    And a separate finding of $15,000 against the

18   client, Mr. Stovall, correct?

19   A.    That is correct.

20   Q.    Now, in your affidavits to the Court, you

21   indicate to the Court that no attorney has ever been

22   disciplined while at your firm.  Is that correct,

23   Mr. Meyers?

24   A.    That is correct.

25   Q.    You don't consider federal sanctions to be

1    disciplinary actions?

2    A.   You know, I think that that was probably poor

3    phrasing.  I meant by a bar, but yes, I do consider

4    federal sanctions to be discipline.

5              THE COURT:  Ms. Malone, when you say, "the

6    affidavit," I know we have talked about that before,

7    but what exhibit is it and where is it located so

8    the record is clear?

9              MS. MALONE:  Your Honor, it was his

10   original affidavit that he filed on the last

11   hearing, and he didn't reurge it.  But I will be

12   happy to -- Mr. Martin will make a note and get you

13   the exhibit number.

14             THE COURT:  I believe it was filed right

15   on the day of or after August the 6th or 7th.

16             MS. MALONE:  Yes, Your Honor, that's the

17   one I was thinking of.

18             THE WITNESS:  I think, Your Honor, that I

19   said that in an October 2nd affidavit that I filed,

20   although it may be also in a different affidavit.

21             THE COURT:  Okay.

22             THE WITNESS:  But I don't have a

23   recollection.  Could I beg the Court for a

24   five-minute bathroom break.

25             THE COURT:  Yes, that's fine.  We will

```
 1   take a five-minute bathroom break.

 2              THE WITNESS:  Thank you.

 3              (Recess taken.)

 4              MR. JEFFERSON:  Your Honor, I understand

 5   potential witness has entered, so we need to invoke

 6   the rule.

 7              THE COURT:  The witness is?

 8              MS. MALONE:  It would be Mr. Patterson,

 9   Your Honor.  I will withdraw him from the witness

10   list.  I'm not going to call him.

11              THE COURT:  Do you plan to call him?

12              MR. JEFFERSON:  He is not on our witness

13   list, I do not believe.

14              THE COURT:  And if Ms. Malone is not going

15   to call him, essentially by doing this she's

16   forfeited a chance to call him, and she's agreed to

17   that.

18              MS. MALONE:  I don't need him anymore.

19   Mr. Meyers gave me the testimony I wanted.

20              THE COURT:  All right.  Everybody all

21   right with that?  Certainly the Rule is invoked,

22   which means that witnesses have to stay outside.  It

23   also means that no one, witness or not, can talk

24   about the testimony with anyone else other than the

25   lawyers in the case, so as long as that is clear to
```

```
 1   everyone.

 2           MR. JEFFERSON:  Okay.  Thank you, Your

 3   Honor.

 4           MS. MALONE:  Obviously, with the

 5   exception, if he's invoking the Rule, Mr. Martin and

 6   I are both on the witness list.

 7           THE COURT:  That's fine.  You are

 8   representative of the parties, that's an exception.

 9           MS. MALONE:  Thank you, Your Honor.  I did

10   two bits of housekeeping for you.

11           One, you asked me -- we talked about the

12   cite for Payne v. Progressive Financial Service.

13   It's in the Northern District of Texas, Cause Number

14   13-10381.  That is in Judge Means' court.

15           The item we were talking about was in

16   their response to our motion to dismiss.  I

17   apologize to the Court, we weren't able to get a

18   document number on our phones in the courtroom.

19           THE COURT:  Okay.

20           MS. MALONE:  And the --

21           THE COURT:  Affidavit.

22           MS. MALONE:  Regarding the affidavit, Your

23   Honor, is, in fact, document 158, which was the

24   affidavit filed by Mr. Meyers on the 2nd.  The

25   referenced testimony was on page 4 in footnote 2.
```

1    Approximately two-thirds down in the middle of the

2    page he says:  And I can absolutely, positively tell

3    this Court that no attorney at Weisberg & Meyers has

4    ever been disciplined while at this firm.

5            THE COURT:  All right.  Thank you.

6    Q.   (By Ms. Malone)  Continuing with Exhibit Number

7    28, Mr. Meyers.

8    A.   Yes.

9    Q.   And this is the case of Saunders v. NCO

10   Financial System against your firm in New York.

11   A.   Yes.

12   Q.   And in this case the Court in the first

13   paragraph indicates that she is requiring plaintiff

14   and his attorney to show cause why monetary

15   sanctions should not be imposed under Rule 11,

16   correct?

17   A.   Judge Cogan did, yes.

18   Q.   And continuing on page 5 of the opinion, under

19   IV.Rule 11 considerations in the second paragraph,

20   the judge wrote:  I have a serious concern that this

21   lawsuit reflects an attempt by plaintiff and/or his

22   attorney to manipulate the law for an improper

23   purpose.  The record before me clearly raises an

24   issue as to whether plaintiff deliberately misled

25   NCO for the purpose of creating a claim against it

```
 1   under the FDCPA and the TCPA that could be settled
 2   for nuisance value plus attorney's fees.
 3        Have I read that correctly?
 4   A.   Yes.
 5             THE COURT:  And the exhibit you were
 6   reading from, Ms. Malone?
 7             MS. MALONE:  It's Exhibit 28, Your Honor.
 8             THE COURT:  All right.  28, I didn't have
 9   that.
10   Q.   (By Ms. Malone)  And then on page 6 of that
11   same opinion in the second paragraph above the
12   conclusion, the Court writes:  I have serious doubts
13   as to whether the arguments that the plaintiff's
14   attorneys have advanced have been made in good
15   faith.  In light of plaintiff's repeated failures to
16   disclose that he was PLS of Maryland.
17        Have I read that correctly, sir?
18   A.   Yes.
19   Q.   You appeared for a show cause hearing in that
20   case.
21   A.   I did.
22   Q.   And the judge decided not to grant sanctions.
23   A.   That is correct.
24   Q.   Right.  Let's go to Exhibit Number 29.  This is
25   the Allison v. Michael J. Scott, PC, case out of the
```

```
 1   Southern District of Houston.
 2   A.    Yes.
 3   Q.    And this is one of your clients.
 4   A.    Yes.
 5   Q.    Okay.  And in this case, if you will look,
 6   there is a filing of a Notice of Settlement on
 7   behalf of your firm -- on behalf of Mr. Allison
 8   signed by a partner at your firm, correct?
 9   A.    It is a Notice of Settlement, but Mr. Kurz was
10   never a partner.
11   Q.    I apologize, sir.
12   A.    No problem.
13   Q.    Okay.  But you list him as one of the higher
14   attorneys in your firm because you billed him at a
15   higher rate.
16   A.    When he was with the firm, yes, he was a higher
17   attorney.
18   Q.    And was there a settlement in this case,
19   Mr. Meyers?
20   A.    Well, I had a chance to look at the file this
21   morning.  And Mr. Scott sent us a letter that was
22   dated May 24th; said on the letter for delivery
23   May 30th, but that was transmitted to us via e-mail
24   May 29th.  And of course I'm going back reviewing
25   the file for my recollection.  And that letter said:
```

```
1    Here's -- I have enclosed -- and I paraphrase:  I
2    have enclosed a 100-dollar check.  I think your
3    proposed amendment is frivolous, and that was about
4    it.  So I believe it was a settlement.  I understand
5    that Mr. Scott may feel otherwise.  I'm not sure
6    what the answer is.
7    Q.   And if Mr. Scott, who is my client, were to
8    come forward and testify that there was no
9    settlement, that this Notice of Settlement was to
10   avoid a hearing, if you will look on the first page
11   of that exhibit on May 31, 2012, do you have any
12   reason to dispute that?
13            MR. JEFFERSON:  Your Honor, that calls for
14   speculation as to what her client might testify
15   about.
16            THE COURT:  Well, only if you can answer
17   without speculating.  I'm not sure that you can, but
18   ask the question again.
19            MS. MALONE:  I will try.
20   Q.   (By Ms. Malone)  There was a hearing --
21   according to this document, there was a Notice of
22   Setting for May the 31st, 2012, correct, on the
23   first page, Mr. Meyers?
24   A.   Yes.
25   Q.   And this Notice of Settlement was filed the day
```

1    before that hearing.

2    A.    Yes.

3    Q.    And the Order of Dismissal was subsequently

4    issued the day of the hearing, correct?

5    A.    Yes.

6    Q.    Did Mr. Allison receive $100 from your firm?

7    A.    Yes.

8    Q.    Did you sign any sort of settlement agreements

9    with Mr. Scott?

10   A.    I don't believe that his letter included a

11   release.  I do know that we did not recover any fees

12   and waived our costs, as well.

13   Q.    Did you sign any settlement agreements with

14   Mr. Scott?

15   A.    I didn't sign anything, but I don't believe so.

16   If Mr. Scott says we did, then I would believe him.

17   Q.    If Mr. Scott says there was no settlement

18   agreement signed, would that be accurate with your

19   recollection?

20   A.    I would have no reason to dispute that at the

21   present time.

22   Q.    Okay.  Exhibit Number 4 is an example of a

23   class action of an order involving class

24   certification.  Are you with me?

25   A.    I see that.  Yes.

1    Q.   And if you will look with me on page 7 of the

2    order -- of the order, there is a reference by the

3    Court that the evidence provided to the Court as to

4    the qualifications for the firm to be class counsel

5    comes from the firm resume and the firm website.

6         That's typically what you guys do, correct?

7    You use your files that are on your firm website,

8    correct?

9    A.   I don't have any reason to dispute that at the

10   present time.  I'm sure we rely on more than that,

11   but I'm not certain exactly what we do at this time.

12   Q.   All right.  If you look with me at Exhibit 31,

13   sir.

14   A.   Yes.

15   Q.   This is the biography from your website of

16   Mr. Aaron Radbil, Mr. Radbil's brother; is that

17   correct?

18   A.   It appears to be, yes.

19   Q.   Under Notable Trial Victories next to his

20   photograph, do you see where it says:  A Texas

21   federal jury awarded a consumer 121,000 in damages

22   for a debt collector's violation --

23             THE COURT REPORTER:  Excuse me.  Can you

24   please start that over again.

25   Q.   (By Ms. Malone)  Does it say:  A Texas federal

 1   jury awarded a consumer 121,000 in damages for a

 2   debt collector's violation of -- and can I -- can I

 3   agree that I haven't read all of the statutes and

 4   just stop there, because that's the main part?

 5   A.   Yes.

 6   Q.   Okay.  And is that accurate?

 7   A.   I can see how it is accurate, and I can see how

 8   it is less than accurate.

 9   Q.   Following on that same page under the

10   Fifth Circuit Court of Appeals, there's an entry for

11   Mr. Radbil saying:  The United States Court of

12   Appeals for the Fifth Circuit reversed the district

13   court's ruling granting a debt collector's

14   post-trial motions for judgment as a matter of

15   law -- correct -- to alter or amend the verdict, and

16   for a new trial, and remanded the case to the

17   district court to enter judgment in the consumer's

18   favor.

19   A.   I think you read that correctly.

20   Q.   In fact, if you look at Exhibit Number 32, the

21   amount -- the last page of the opinion from the

22   Fifth Circuit on page 13, is that they are going to

23   enter a judgment in the amount of $4,500 to

24   Ms. Guajardo correct?

25   A.   Yes.

1    Q.    Mr. Meyers, you are familiar with the Rules

2    of -- under the Texas Rules of Disciplinary --

3    sorry, the Texas Rules of Professional Conduct about

4    how you advertise and don't advertise, are you not?

5    A.    I am familiar, yes.

6    Q.    And I have some of the excerpts, if you will

7    look under Tab 30 on page 92, Rule 7.02.

8    A.    Yes.

9    Q.    It says that:  A lawyer shall not make or

10   sponsor a false or misleading communication about

11   the qualifications or the services of any lawyer or

12   firm.  A communication is false or misleading if it:

13   One, contains a material representation of fact or

14   law -- I'm sorry, material misrepresentation of fact

15   or law or omits a fact necessary to make the

16   statement considered as a whole not materially

17   misleading.  Correct?

18   A.    It does say that.

19   Q.    It also talks about a communication being false

20   or misleading if it contains any reference in a

21   public media advertisement to past successes or

22   results obtained unless the amount involved was

23   actually received by the client.  Is that correct?

24   A.    Yes.

25   Q.    All right.  Let's go back to Mr. Radbil's

1   form -- I'm sorry, biography, I called it the wrong

2   thing.  If you will look under Notable Class

3   Actions.

4            MR. JEFFERSON:  I'm sorry, there are two

5   Mr. Radbil's.

6            MS. MALONE:  Aaron Radbil, Exhibit 31.  I

7   apologize, Counsel.

8            MR. JEFFERSON:  Okay.

9   Q.   (By Ms. Malone)  We are at Exhibit 31.

10  A.   Yes.

11  Q.   If you will go to page 3 of 4 under Notable

12  Class Actions, sir.

13  A.   Yes.

14  Q.   It says:  A prospective class of individuals

15  alleged that Southwest Airlines flew 46 Boeing 737s

16  on more than 60,000 flights in violation of federal

17  air-safety regulations governing the maintenance and

18  operation of aircraft.  Correct?

19  A.   It does say that.

20  Q.   And this is touting Mr. Aaron Radbil, who is

21  your partier, right?

22  A.   At the present time, yes.

23  Q.   And this is touting his skill set on your

24  website, correct?

25  A.   Yes.

1   Q.   All right.  If you will look with me at

2   Exhibit 34, this would be the Beason case, correct?

3   A.   That is what it says.

4   Q.   And it indicates:  A notice of voluntary

5   dismissal -- this was done prior to a class being

6   certified, was it not?

7   A.   I know nothing about this case.  This is not a

8   case with my law firm.

9   Q.   It's not with your law firm?

10  A.   No.

11  Q.   If you look on the next page it indicates it

12  was actually done by Krohn & Moss, correct?

13  A.   It does.

14  Q.   On the next page?

15  A.   Yes.

16  Q.   Oh, I'm sorry.  I thought you asked me a

17  question.  I apologize, Mr. Meyers.  I thought that

18  was an, It does, question mark.  I apologize.

19  A.   No problem.

20  Q.   All right.  Also going back to Exhibit 31, you

21  do take responsibility for information on your

22  website as the managing partner, don't you,

23  Mr. Meyers?

24  A.   I must, yes.

25  Q.   Okay.  Under Exhibit 31 on the last page,

1   again, touting Mr. Aaron Radbil's success, it

2   indicates:  A prospective class of individuals

3   alleging injury resulting from freescore.com's

4   violations of the Federal Credit Repair

5   Organizations Act and gives us a cite for the Stout

6   case, correct?

7   A.   Yes.

8   Q.   If you will look with me, sir, under Tab Number

9   33.  Here is a copy of the Stout case, which, if you

10  will turn to the second page, you will see that the

11  Defendant's Motion to Dismiss is granted, and

12  because the motion is granted, Plaintiff's Motion

13  for Class Certification is therefore rendered moot.

14  Is that correct?

15  A.   Yes.

16  Q.   So there was no class certification in the

17  Freescore case, correct, sir?

18  A.   That is correct -- I believe that's correct.  I

19  know the case is on appeal.  But the order says what

20  it says, and I have no reason to disagree with that.

21  Q.   All right.  Fair enough.  Let's look at

22  Exhibit Tab Number 35.

23  A.   Okay.

24  Q.   And this is a print-off from the Law Firm

25  Newswire, which is a paid submission service,

1   correct?

2   A.   Yes.

3   Q.   And that means that your firm pays them to do a

4   press release.

5   A.   In so many words, I think that's a fair

6   statement.

7   Q.   Right.  And you draft the press release, right?

8   A.   No, I don't.  But I certainly have -- I

9   certainly have editorial review over it and may

10  adjust it.  I think we have done two; but no, I did

11  not draft it.

12  Q.   All right.  And on this page there is a

13  judgment obtained against Wells Fargo Bank touting

14  the law firms of Weisberg & Meyers and another firm,

15  announcing that they have attained judgment against

16  Wells Fargo Bank South Central for violations of the

17  TCPA, correct?

18  A.   That is correct.

19  Q.   This indicates it was a victory for your firm.

20  A.   Yes.

21  Q.   All right.

22  A.   Strike that.  I'm not sure it indicates

23  anything of an opinion.  It does say that we

24  obtained a judgment, yes.

25  Q.   All right.  If you will look with me under Tab

1    Number 36, this would be Judge Sparks' order --

2    A.    Yes.

3    Q.    -- order from the Austin Federal Court?

4    A.    Yes.

5    Q.    And on page 2 of that order, the Court

6    indicates at the bottom:  It must assume Masters has

7    stubbornly refused to accept a full settlement offer

8    and has directed his counsel to continue litigating.

9    And there is a footnote, correct?

10   A.    Yes.

11   Q.    The footnote says:  The only other possible

12   assumption -- that counsel's personal interests in

13   an eventual class action recovery has trumped his

14   duty to offer sound advice to his current client --

15   is one the Court is not willing to make.  Right?

16   A.    The order does say both of those things.

17   Q.    And if you will turn with me on page 5, in the

18   last paragraph prior to the conclusion, the Court

19   states that it will deny the motion to reconsider

20   and grant the pending motion to dismiss, as

21   Wells Fargo's offer fully satisfies Masters' TCPA

22   claim and renders it moot.

23        This is a situation where Judge Sparks -- are

24   you -- have you lost me, Mr. Meyers?

25   A.    I may have.  Where were you, please?

1   Q.    On page 5.

2   A.    Yes.

3   Q.    Do you see the paragraph beginning, Seeing no

4   basis?

5   A.    Yes.

6   Q.    Starting after the comma.

7   A.    Yes.

8   Q.    Okay.

9   A.    Yes, I read that; yes.

10   Q.    Have you reviewed it?

11   A.    Yes.

12   Q.    This is a situation where the Court said that

13   they were going to take the offer Wells Fargo had

14   made, correct?

15   A.    That the Court said the plaintiff was going to

16   take the offer?

17   Q.    Or else he was going to dismiss the case as

18   moot.

19   A.    I think so, yes.

20   Q.    So this isn't a victory that was won on behalf

21   of Mr. Aaron Radbil, was it?

22   A.    The judgment was subsequently entered.

23   Q.    All right.  Let's continue on to Exhibit Number

24   37.  Now, this was the website for Noah Radbil,

25   printed off earlier in the year, but I will concede

```
 1    to you, Mr. Meyers, you have changed it since this

 2    time, like about a week ago.  Are you with me?

 3    A.   Yes.

 4    Q.   All right.  On the first page of the entry,

 5    there is a reference to a victory under Notable

 6    Trial Victories where Mr. Radbil served as lead

 7    counsel on the matter of Whaley and discussed that

 8    this was a victory, correct?

 9    A.   Yes, sir.

10    Q.   And Whaley is the case we talked about earlier

11    that resulted in a 92,000-dollar judgment against --

12    or a 90,000-dollar judgment against your client,

13    correct?

14    A.   Yes.

15    Q.   And you have since removed that, correct?

16    A.   Yes.

17    Q.   And there are also in here some specific

18    references to -- I'm sorry -- to other sort of

19    victories that Mr. Radbil had obtained on behalf of

20    the firm, correct, or in his experience, correct?

21    A.   Yes, both of those statements are correct.

22    Q.   All right.  Under Notable Representation -- you

23    checked these out before you put them on your

24    website, didn't you, Mr. Meyers?

25    A.   I don't think I did.
```

```
 1   Q.   Well, let's just take a look.  Let's move down
 2   to under Notable Representation, the second one,
 3   regarding RIAA music-downloading case.
 4   A.   Okay.
 5   Q.   Are you with me on that one?  Do you know the
 6   name of that case?
 7   A.   That's not a case from my firm, so no, I do
 8   not.
 9   Q.   You put it on your firm website.
10   A.   It was put on my firm website.  And if your
11   point, Ms. Malone, is that I should do a better job
12   with what is on my website, I will agree with you.
13   Q.   My point is that you are misrepresenting what
14   Mr. Radbil's skills are on your firm website.
15        Let me show what -- the case is actually called
16   Capital v. Thomas.
17   A.   Okay.
18   Q.   And according to the Court's website, which I
19   can give you a cite on it, if I can read my form,
20   the initial jury trial was October 4, 2007, some two
21   years before Mr. Radbil was licensed as an attorney,
22   correct?
23   A.   I have no idea.
24   Q.   When he was licensed as an attorney?
25   A.   No, when the trial was.
```

1    Q.   And according to the court website, these

2    damages that were reduced occurred in 2011 and has

3    subsequently been reinstated by the U.S. Court of

4    Appeals in the 8th Circuit, you don't know one way

5    or the other, is that right?

6           MR. JEFFERSON:  Objection, Your Honor, it

7    assumes facts not in evidence.

8           THE COURT:  Overruled.

9    A.   I know nothing about the case.

10   Q.   (By Ms. Malone)  So you allowed this to be your

11   website without checking it out to make sure it's

12   valid, correct?

13   A.   I think that's a fair statement.

14   Q.   All right.  And let's look down on the second

15   page of that, and there is also one regarding

16   Scribd.  Do you know that that case also was

17   concluded before Mr. Radbil became licensed as an

18   attorney?

19   A.   I know nothing about that case, either.

20   Q.   And in the NCAA case, Mr. Radbil's name does

21   not appear as one of the attorneys of record.

22   A.   I know nothing about that case.

23   Q.   So you have all these representations about

24   Mr. Radbil's skill set that you did not verify, is

25   that fair?

```
 1   A.   I think that's fair.
 2           THE COURT:  Ms. Malone, let's just make
 3   sure.  We talked about the RIAA blurb under Notable
 4   Representation, and you mentioned two others.  Can
 5   you tell me where those are?
 6           MS. MALONE:  Yes, ma'am.  And I apologize,
 7   Judge, I think they put additional pages on mine.
 8   But on page 3 of his thing under Notable
 9   Representation, about -- there's a -- about the
10   fifth one up from the bottom on my page, it says
11   Mr. Radbil served as plaintiff's counsel for several
12   authors in a copyright-infringement case action
13   against Scribd, and I located that one.
14           And then the entry below that refers to
15   the NCAA suit.  And that case actually is found in
16   the 9th Circuit, Cause Number 10-15387, and
17   Mr. Radbil does not appear as counsel of record.
18           MS. MALONE:  Okay.
19           THE COURT:  Yes.
20   Q.   (By Ms. Malone)  All right.  Mr. Meyers, the
21   firm website that you produced, I think it's
22   Attorneys for Consumers that has the information
23   about your law firm on it, am I getting the name
24   right, AFC, is that it?
25   A.   We appear on a website called Attorneys for
```

1   Consumers, if that's what you are asking,

2   attorneysforconsumers.com, if that's what you are

3   asking.

4   Q.   And on that website your firm appears on is

5   actually web mastered by a company called AFC Legal

6   Marketing, LLC, correct?

7   A.   That is correct.

8   Q.   You are actually one of the attorneys of that

9   company.

10  A.   That is correct.

11  Q.   You are the owner of that company, right?

12  A.   I am one of them, yes.

13  Q.   And you are responsible for the content on your

14  firm website, correct?

15  A.   I don't write it all, and I certainly don't

16  write things for other attorneys.  But I think it is

17  more fair than not to say I am responsible for what

18  appears there, yes.

19  Q.   Well, let's be clear, Mr. Meyers.  According to

20  the Texas Disciplinary Rules of Professional

21  Conduct, as the managing partner of the firm, you

22  have a responsibility to make sure that the

23  information relayed about your law firm and the

24  skills of your attorneys is accurate.  Isn't that

25  true?

1  A.    I think that's a fair statement, yes.

2  Q.    Okay.  Let's look under Tab Number 38.  This is

3  another one of the Law Firm Newswire paid

4  submissions, correct?

5  A.    One of two, yes.

6  Q.    Okay.  We looked at one earlier, so this is the

7  second one.

8  A.    Correct.

9  Q.    And in this, again, you are citing that, Dallas

10  Texas Jury's Unanimous Verdict Finds -- and then I

11  think we had a little copying problem there, I

12  apologize -- Guilty of Violating Federal Law.

13  Correct?

14  A.    Yes.

15  Q.    And when you read this, it suggests that there

16  was a jury verdict and a victory in favor of your

17  client, does it not?

18  A.    Yes.

19  Q.    And my client complained about that, did they

20  not?

21  A.    Yes.

22  Q.    They complained to the Law Firm Newswire and

23  asked them to remove the site, correct?

24  A.    Yes.

25  Q.    They complained to the Better Business Bureau

71

1   about the website, correct?

2   A.   Yes.

3   Q.   And they complained to you and asked you to

4   remove that website, correct?

5   A.   I think that's close to correct, yes.

6   Q.   And then you reached out to me and said, hey,

7   did you know anything about this, correct, which was

8   appreciated by the way.

9   A.   I reached out to you.  I don't know that what

10  you said accurately reflects what I said or that it

11  doesn't, but I certainly reached out to you, yes.

12  Q.   Okay.  And I asked you to remove it from the

13  website, did I not?

14  A.   I think in so many words that's a fair

15  statement.  I think there was considerably more to

16  the conversation between us, but I think that's a

17  fair statement.

18  Q.   I also asked you to remove the paid submission,

19  did I not?

20  A.   I thought we were talking about the paid

21  submission.

22  Q.   We are talking about both, the paid submission

23  and the reference on Mr. Noah Radbil's biography on

24  the website regarding the case.  Didn't I ask you to

25  remove both of them?

```
1    A.    I think you probably did.  I'm not sure exactly

2    how the conversation went, and certainly I would

3    like the opportunity to fully recite it to the

4    Court, but I think you are making fair statements.

5    Q.    Okay.  And in fact, I told you if you just

6    removed it would probably satisfy my client's

7    complaint, correct?

8    A.    Yes.

9    Q.    And instead of removing it, you then, under

10   Exhibit Number 39, wrote a letter to the Texas State

11   Bar --

12   A.    Yes.

13   Q.    -- correct?

14   A.    Yes.

15   Q.    And you asked them to review whether or not --

16   we don't have to guess what the communication was,

17   because the e-mails are here, telling us what I

18   asked you to do and that I told you if you just

19   removed it my client's complaints would go away.

20   Correct?

21   A.    Yes.

22   Q.    And you did not remove those -- you did not

23   remove the paid submission, correct, even as we sit

24   here today, right?

25   A.    The paid submission is there, correct.
```

1  Q.   And you have removed it, in fairness to you,

2  from Mr. Radbil's bio on your website, which still

3  remains, but it's now listed as Of Counsel, correct?

4  A.   Yes.

5  Q.   So if a consumer were to find these, they would

6  think Mr. Radbil had won a big victory, correct?

7  A.   I'm not sure what a jury or prospective

8  consumer would conclude.

9        THE COURT:  Remind me what actually

10  happened in this case.  I know we have it in the

11  earlier exhibits.

12        MS. MALONE:  Sure.  Your Honor, in this

13  case, there was a mixed verdict from the jury.  The

14  jury found $6,140 in favor of my client.  I believe

15  it was $650 in favor of their client, making my

16  client the net victor.  They did not at that time

17  award attorney's fees, but under Texas law that's

18  not an option.  Judge Hoffman continued the trial on

19  the matter and awarded $85,000 to my client.

20        This is the one, Your Honor, where their

21  client indicated that she was not aware that she had

22  been offered $7,000 and in addition that they would

23  waive their claims for the 6,000-plus-dollar debt.

24        This is also the one, Your Honor, that we

25  talked about where Mr. Radbil did not appear before

1   Judge Hoffman and that Judge Hoffman sanctioned him

2   for $700.

3   Q.   (By Ms. Malone)  Now, Mr. Meyers, we have

4   talked quite a bit in this case about exhibits and

5   when things should have been notified under the

6   Rule 37 motion from Mr. Radbil.  Do you recall that

7   testimony?  Probably not.

8   A.   I recall some of it.

9   Q.   Okay.  In the testimony that Mr. Radbil

10  provided to us, he indicated that he believed that

11  he -- I'm sorry, let me back up.

12      He indicated that he learned from his client

13  additional witnesses in December of 2012.  Do you

14  recall that?

15  A.   Yes.

16  Q.   And you recall that we looked at Exhibit 7 in

17  our binder showing that your firm had reviewed those

18  damages on December the 6th.  It's on the second

19  page of the exhibit, Mr. Meyers.  Do you recall that

20  testimony?

21  A.   Yes.

22  Q.   And there's two entries, one by Aaron Radbil

23  and one by Noah Radbil indicating they had reviewed

24  actual damages and discussed it via e-mail, at

25  least, with you on occasions, correct?

1    A.    That's what the entries say, yes.

2    Q.    And that's when you were made aware that

3    Mr. White had done some sort of evaluation and

4    determination of what his damages are, correct?

5    A.    I think that is probably a more fair statement

6    than not.  But it would assume that I'm wholly

7    cognizant of time lines and things like that, so I'm

8    not sure.  But again, I think that is a more fair

9    statement than not.

10   Q.    Okay.  In fairness, if we look at page 62 from

11   the first sanction hearing, which, I apologize, is

12   not there, Mr.-- I'm sorry.  I will come back to

13   this one.

14        Mr. Radbil testified that those two entries

15   referenced to the damage memos from your client.  Do

16   you recall that?

17   A.    Yes.

18   Q.    And if you look on the first page you will see

19   that the last entry entered here is December 15,

20   2012, correct?

21   A.    I'm sorry, say that again.

22   Q.    Sure.  The last entry that we have in the time

23   notes that was an exhibit that we had possession of

24   shows December 12th, 2012.  Correct?

25   A.    Yes.

 1   Q.   Okay.  Have you reviewed the affidavit from
 2   Timothy White?
 3   A.   Yes.
 4   Q.   It is in, I believe, Mr. Radbil's exhibits,
 5   Number 34.
 6   A.   I'm there.
 7   Q.   Okay.  And do you see that in paragraph 7 on
 8   page 2 he talks about providing an e-mail that is
 9   Exhibit D regarding his damage claim.
10   A.   Yes.
11   Q.   It flips over into the next page.
12   A.   Yes.
13   Q.   Are you with me?
14   A.   Yes.
15   Q.   And if you will look -- and what they have
16   marked as Exhibit Number D, the date of that e-mail
17   is December 28th, 2012; is that correct?
18   A.   Yes.
19   Q.   So three weeks after Mr. Radbil's entry in the
20   case, there was an e-mail that they reviewed about
21   damages, correct?
22   A.   Yes, that was three weeks after; yes,
23   thereabouts, yeah.
24   Q.   So according to these records, on December 6th,
25   Mr. Aaron Radbil, Mr. Noah Radbil, and yourself saw

1    an e-mail from your client regarding damages, nobody

2    supplemented the discovery.  And according to that

3    affidavit, which I am a little confused when I see

4    the December 28th e-mail and the December 6th

5    e-mail, there is yet another e-mail discussing

6    damages from Dr. White, correct?

7    A.    Would you repeat that, please?

8    Q.    Sure.  Unless there's a problem here, but

9    according to your invoices that you submitted as

10   damages in discovery, the e-mails that Mr. Radbil

11   received discussing damages was on December 6th.

12   The e-mail provided in Mr. White's affidavit

13   references a December 28th e-mail, correct?

14   A.    Yes.

15   Q.    And even after this -- if this is a third

16   e-mail or if it's a second e-mail read on

17   December 28th, still there is no supplementation of

18   discovery at that time, correct?

19   A.    I believe discovery had closed, but I think

20   that that's true, there was no supplementation.

21   Q.    Even if discovery is closed, you do have an

22   obligation or a duty to supplement if information is

23   incorrect, do you not, Mr. Meyers?

24   A.    I think so, yes.

25   Q.    In the pleadings before this Court, you have

1  indicated that you believe there was an offer made

2  on January the 5th, 2012, of $8,500, a demand made

3  by your office, correct?

4  A.   I'm not sure of the date, but, yes, we did make

5  that demand.

6  Q.   Okay.  And Mr. White's deposition occurred on

7  December 15th, 2011, correct?

8  A.   I don't know, but i will take your word for it.

9  Q.   Okay.  Well, if you want to look, it is in that

10 Exhibit 7, 0113 -- I'm sorry, 133.  It would help if

11 I read the number correctly, I apologize.

12 A.   What date did you say, Ms. Malone?

13 Q.   Looks like on December 15th, Mr. Radbil

14 appeared at a deposition of his client.

15 A.   Yes.

16 Q.   Okay.  So on December 15th, 2011, Dr. White's

17 deposition occurs, and then approximately three

18 weeks later your office sends a demand indicating

19 that it would take $8,500 to settle according to

20 you, correct?

21 A.   Yes.

22 Q.   Okay.  I don't remember receiving the e-mail,

23 that's not really the point.  All right?

24      On November the 28th of 2012, one of the

25 exhibits that you provided to us indicates your

 1  demand was $65,000, correct?

 2  A.    Yes.

 3  Q.    Okay.  On December 28th and December 6th, we

 4  know from your invoices and from Dr. White's

 5  deposition there's some discussion of damages,

 6  correct?

 7  A.    Yes.

 8  Q.    And then following that, on February the 11th,

 9  2013, there's a settlement conference with Judge

10  Stickney, correct?

11  A.    I believe that to be true.

12  Q.    And between the time of your demand on

13  November 28th and a settlement conference with Judge

14  Stickney, there are no other depositions, there are

15  no rulings by the Court, other than procedural for

16  us to proceed with trial, correct?

17  A.    I take your word for it, yes.

18  Q.    Okay.  On -- at trial -- or at the last

19  hearing, Mr. Radbil indicated that at the settlement

20  conference his demand was in excess of $100,000.

21  A.    I believe that to be true.

22  Q.    Okay.  So you're following with me that your

23  demand was $65,000 on November 28th.  Your client

24  writes you memos indicating, we believe, based on

25  testimony to this Court, $45,000 in additional

1  demand, and at Judge Stickney's settlement

2  conference your demand is now over $100,000.  Is

3  that fair?

4  A.    At the present time, I have no reason to

5  disagree with what you are saying.

6  Q.    Dr. White testified, as we read at the last

7  hearing, that he was assured by Mr. Radbil that his

8  damage demands of the $45,000 would be admissible at

9  trial.

10  A.    Could you say that again, please?

11  Q.    Sure.  Dr. White testified or -- or made a

12  statement to Judge Boyle -- and we discussed that at

13  the last hearing -- that he had been assured by

14  Mr. Radbil that his damages would be admissible at

15  trial.

16  A.    I think that you have stated his testimony

17  accurately, but I am not completely sure.  I have no

18  reason to disagree with what you are saying at the

19  present time.

20  Q.    All right.  I would like to talk to you about

21  your fee agreement, and that can be found at

22  Exhibit 14, Tab 14, Mr. Meyers.

23  A.    Yes.

24  Q.    And we had some controversy about this

25  agreement last time, but basically the part I want

1   to focus your attention on is the last paragraph,

2   11, regarding when your client may be required to

3   pay attorney's fees to Weisberg & Meyers.

4   A.   Yes.

5   Q.   And your position is that this is not a

6   violation of the ethics rules, correct?

7   A.   My position is it is not a violation of the

8   ethics rules.  But I have invited the Arizona Bar

9   and will invite the Texas Bar when these proceedings

10  are over to tell me otherwise, and I have invited

11  your criticism, constructive criticism, on it.

12              THE COURT:  You said Tab 14 of which

13  exhibits?

14              MS. MALONE:  Tab 14 of RAB's exhibits,

15  Your Honor.

16              THE COURT:  All right.

17  Q.   (By Ms. Malone)  Do you recall -- you testified

18  to the Court that you have read the transcript for

19  the White trial, correct?

20  A.   Yes.

21  Q.   Do you recall that Mr. Meyers -- I'm sorry, I

22  looked at you and said the wrong name.  I apologize.

23  A.   No problem.

24  Q.   (By Ms. Malone)  -- that Mr. Radbil had a

25  discussion with the Court about whether or not this

1    would be used in such a way that Dr. White could not

2    terminate Mr. Radbil for incompetency because he

3    would be on the line for the attorney's fees, do you

4    recall that testimony?

5    A.    I recall that there was discussion about the

6    issue.  I don't recall precisely the way you say it,

7    and that is not to suggest that you are wrong, but I

8    do recall discussion about the issue.

9    Q.    I am looking at Jury Trial, Volume 3, page 32.

10   This is the Court speaking at line 9:  So right now,

11   if Dr. White were to fire you for your incompetence

12   under your contract he would owe you money; is that

13   right?

14         Mr. Radbil's response:  I disagree with the

15   statement, number one; number two, we won on summary

16   judgment; and number three, we would never do that

17   to Dr. White.

18         Do you recall that?

19   A.    I'm sure you are reading what you are reading.

20   Q.    I'm asking you if you recall it, Mr. Meyers.

21   A.    I wasn't there, Ms. Malone.

22              THE COURT:  But you said you had reviewed

23   the transcript, I think.

24              THE WITNESS:  Yes, and I don't have it in

25   front of me, Judge.

1          THE COURT:  Right, okay.

2          MR. SUAZO:  Your Honor, we have an extra

3    copy if you would like.

4          THE COURT:  That would be fine, if you're

5    going to be using it for a few minutes.

6          MR. SUAZO:  May I approach, Your Honor?

7          THE COURT:  Yes.

8          THE WITNESS:  Thank you.  Thank you.

9    Q.   (By Ms. Malone)  In fact, in the exhibits that

10   you have provided to us -- and I will start with

11   your Exhibit Number 23 -- your firm has sued

12   clients, correct?

13   A.   We have sued two clients in our entire

14   existence, yes.

15   Q.   Okay.  And let's look at Plaintiff's

16   Exhibit Number 23.  The first one is a suit styled,

17   Weisberg & Meyers v. Richard Chalker, correct?

18   A.   Yes.

19   Q.   And the date on this particular document

20   indicates it was filed on February the 14th of 2013.

21   A.   Okay.

22   Q.   Okay.  Do you need to see it?  Would you like

23   me to bring your exhibits to you?

24   A.   It's okay for right now.  If I need them --

25   there are several binders -- I will get them with

1   the Court's permission.

2   Q.   And in this exhibit, which is a suit to enforce

3   your attorneys fees agreement, it was signed by Noah

4   Radbil.

5   A.   Yes.

6   Q.   So at the time that he talked to the judge on

7   the 27th, he knew that your firm had, in fact, sued

8   clients, correct?

9   A.   I'm sure he knew that we had sued Richard

10  Chalker, yes.

11  Q.   And in fact, you put two lawsuits under this

12  same exhibit number.  The second one was filed in

13  Florida, Weisberg & Meyers v. Debra Moore, correct?

14  A.   Yes.

15  Q.   And on page 3 of that particular pleading, your

16  firm quotes the same language about termination,

17  that the only way she can terminate is under these

18  circumstances, correct?

19  A.   I'm all but certain that the language has small

20  differences, but I believe the point of the language

21  remains the same, yes.

22  Q.   Okay.  And in addition, you have also helpfully

23  provided to the Court Ms. Moore's counterclaim back

24  against your law firm, correct?

25  A.   Yes.

1  Q.   And beginning on page 2, Ms. Moore claims that

2  your firm did not keep her informed about the status

3  of what was occurring in the case.  Correct?

4  A.   That is what her pleading says, yes.

5  Q.   And she also goes on to say that she spoke with

6  your partner, Alex Weisberg, about a related

7  lawsuit -- let's be clear.  She was being sued by

8  the creditor at the same time you were representing

9  her in a debt collection action, fair?

10 A.   Correct.

11 Q.   And that Mr. Weisberg told her that he would

12 give her legal advice for this other matter,

13 correct?

14 A.   Her pleading says what it says, Ms. Malone.

15 Q.   I am asking if I generally summarized it,

16 Mr. Meyers; is that correct?

17 A.   I imagine that I would like to review it, but

18 I'm certainly happy to say that it says what it

19 says.

20 Q.   Okay.  On page 4, at paragraph 22, Ms. Moore

21 alleges that Attorney Weisberg told Moore to calm

22 down and to not worry about the summons because the

23 CitiBank v. Moore pretrial conference was 30 days

24 away on or about October the 7th, 2010.  Correct?

25 A.   I don't have reason to doubt that you're

1    reading the pleading correctly.

2    Q.   Would you like your copies, Mr. Meyers?

3    A.   No, I don't have reason to doubt you are

4    reading it correctly.

5    Q.   All right.  And continuing at paragraph 25:

6    Attorney Weisberg plainly offered to Moore that he

7    would provide Moore with legal advice and guidance

8    and provide answers to her substantive legal and

9    procedural questions about the upcoming pretrial

10   conference for the CitiBank v. Moore case if Moore

11   called Weisberg back prior to the scheduled hearing

12   time.

13   A.   Okay.

14   Q.   Is that -- do you recall any of this?

15   A.   I recall very, very vaguely, but I do not have

16   a deep recollection of it, and certainly because at

17   the very least I was not intimately involved with

18   the case.  But I have no reason to believe you are

19   not reading it correctly.

20   Q.   And what occurred at the case was at the

21   pretrial conference on the CitiBank v. Moore case,

22   Ms. Moore settled with the bank to have her debt go

23   away in exchange for dropping her debt collection

24   suit, correct?

25   A.   Yes.

1  Q.   She didn't make arrangements to have your law

2  firm compensated for its fees, correct?

3  A.   That is correct.

4  Q.   And you sued her.

5  A.   That is correct.

6  Q.   On paragraph -- on page 8, paragraph 57,

7  Ms. Moore states:  Instead of informing Moore that

8  the settlement agreement could be set aside,

9  plaintiffs chose to intentionally withheld that

10 information in breach of their fiduciary duty and

11 immediately filed the instant action for breach of

12 contract.  Correct?

13 A.   I have no reason to doubt that you are reading

14 the pleading correctly.

15 Q.   Did you ever have any conversations with

16 Ms. Moore or her counsel after that suit was filed?

17 A.   I certainly wouldn't have had conversations

18 with Ms. Moore after that suit was filed.  And I

19 don't recall whether I had conversations with her

20 counsel or whether Alex Weisberg had conversations

21 with her counsel or whether both of us did, but I

22 know we did communicate with her counsel.

23 Q.   But you didn't change your agreement, did you?

24 A.   Change our fee agreement?

25 Q.   Yes, sir.

```
 1   A.   I don't think that we changed the core
 2   substance of the fee agreement.
 3             MS. MALONE:  Your Honor, in interest of
 4   speeding things along, we have briefed in great
 5   detail why we think his fee agreement violates the
 6   Texas Disciplinary Rules of Professional Conduct.  I
 7   can go through the exercise of having him read the
 8   rule outside and do that, or I can just stand on my
 9   briefing and try to save the Court a little time.
10             THE COURT:  That's fine.  And certainly
11   they can raise it in their part of the case.  If you
12   are all right with that, that's fine with me.
13             MS. MALONE:  I think it would speed things
14   up, and he's not going to agree my interpretation as
15   correct, so maybe we will save a little argument.
16             THE COURT:  All right.
17   Q.   (By Ms. Malone)  All right.  Have you read the
18   transcript from the original hearing with
19   Mr. Radbil?
20   A.   I did.
21   Q.   From that transcript, Mr. Radbil indicated at
22   page 38 that he had not talked to Dr. White
23   regarding the order issued in this case for 9,000
24   and change for costs.  Do you recall that?
25   A.   Yes.
```

```
1    Q.    Have you spoken with Dr. White since then?
2    A.    Yes.
3    Q.    And have you made arrangements to pay that
4    money?
5    A.    We sent you a check, yes.
6    Q.    Okay.  It's not been received by me.  I'm not
7    saying you haven't sent it, I haven't seen one.
8    A.    We sent it via mail, return receipt.
9               THE COURT:  When would that have been?
10              MR. MEYERS:  The first or second or maybe
11   the third.
12              THE COURT:  Of?
13              MR. MEYERS:  October.
14              THE COURT:  This month.
15              MR. MEYERS:  This month.
16              MS. MALONE:  Judge, I haven't seen it.
17   They sent me a late e-mail indicating it had been
18   dropped in the mail.  But if it was mailed on
19   Friday, coming from Arizona it's possible it could
20   be in today's mail.  I'm not saying you haven't, I'm
21   just saying I don't have it.
22   Q.    (By Ms. Malone)  Did Dr. White agree that you
23   would be responsible for paying those costs?
24   A.    We told Dr. White we were responsible.
25   Q.    In your letter, you indicate that you believe
```

1  you are reserving the right to appeal this case,

2  citing a Texas state case, correct?

3  A.    I think that's correct.

4  Q.    You think Texas appellate law governs federal

5  cases, Mr. Meyers?

6  A.    I know it doesn't.

7  Q.    All right.    In Mr. Radbil's testimony in the

8  original sanction hearing on page 82, he indicated

9  that he subpoenaed witnesses, a number of witnesses

10 that we complained about were added late.    Do you

11 recall that?

12 A.    I do.

13 Q.    Do you recall Mr. Meyers (sic) testifying that

14 he didn't know what they were going to say because

15 those witnesses had been prepared by his client?

16 A.    I recall Mr. Radbil saying that he did not know

17 what those witnesses would testify to and that he

18 assumed his client, our client, would have talked to

19 them.

20 Q.    Did I say Mr. Meyers?

21 A.    It's okay, I understood what you were saying.

22 Q.    I want to be clear.    I'm not saying that you

23 were here.    I apologize.

24      And do you think it's appropriate for your

25 client to prepare your witnesses for trial?

1    A.   I have a problem with preparing third-party

2    witnesses who aren't my client, so I don't know that

3    it's necessarily appropriate for a client to prepare

4    them.  But I definitely do have a problem with

5    personally preparing third-party witnesses, yes.

6    Q.   Mr. Meyers, do you think that you should talk

7    to the witnesses before you have them take the

8    stand?

9    A.   I think that it would be nice to give a

10   courtesy call to people and say, hey, we're

11   subpoenaing you.  I don't think that we should be

12   prepping third parties, no.

13   Q.   You don't think it would be appropriate for

14   you, in your preparation, in your attorney work

15   product, that you would ask a third-party witness,

16   What did you see?  Tell me what you heard?  Not

17   preparing them, not telling them what to say, but to

18   ask them what they knew?

19   A.   I think that that's fair.

20   Q.   Did Mr. Radbil do that in this case?

21   A.   I don't think he did.

22         THE COURT:  When you say third-party

23   witnesses, what do you mean?  Somebody that's not

24   your client.

25         THE WITNESS:  Correct.

1          THE COURT:  So if you have a case and

2     you're preparing for trial and you have a list of 20

3     witnesses that, unless they are actually attorney

4     client with you, you won't talk to them?

5          THE WITNESS:  I don't think, Your Honor,

6     that I quote, unquote, won't talk to them, but

7     Ms. Malone asked a question about preparing third

8     parties.

9          THE COURT:  I mean, you don't talk to them

10    ahead of time and organize your evidence and plan on

11    who is going to testify when about what with

12    witnesses other than your clients?

13         THE WITNESS:  I cannot think of an

14    instance, and I could be wrong, where I have

15    personally called a third party.

16         THE COURT:  Again, third party, you're

17    just talking about any witness in the case that's

18    not your client.

19         THE WITNESS:  Correct.  I cannot think of

20    an instance where I have called someone who isn't my

21    client or a representative of the defendants.

22         THE COURT:  Who called or not, I mean they

23    have been on your witness list, certainly.  So you

24    have never had a trial with witnesses who were not

25    your clients?

1          THE WITNESS:  Or the defendants?  To say
2   never, Judge, I would like a few moments to think
3   about it.  But, no, as a rule, that would not be
4   something that I would desire to do.
5          THE COURT:  So put that in simple terms,
6   what would be something that you would desire not to
7   do?
8          THE WITNESS:  Well, I don't know how
9   people who aren't my client are going to testify,
10  and I certainly don't won't to be in a position to
11  either suggest to them testimony or be alleged to
12  suggest to them testimony.
13         THE COURT:  You would like to know what
14  they said before they got up there.  It would be
15  malpractice to put someone out there and not know
16  what they would say, wouldn't it?
17         THE WITNESS:  I don't know the answer to
18  that, Judge, but that is not a practice of mine.
19         THE COURT:  That makes no sense in terms
20  of normal litigation practices.  You know that, I
21  hope.
22         THE WITNESS:  I understand what the Court
23  is saying.  And certainly this is a learning
24  experience, and everything that the Court says is
25  going to be very thoughtful.

4

```
 1              THE COURT:  Mr. Meyers, learning
 2   experience?  You have lawsuits and unhappy clients
 3   all over the country.
 4              THE WITNESS:  That is not true.
 5              THE COURT:  It certainly looks like it
 6   from the exhibits today.  I am continually
 7   astonished at your approach, and more importantly at
 8   the effect that you have had on the community with
 9   the representations to potential clients as to what
10   you might be able to do for them when, in fact, the
11   truth is so, so opposite.
12              It's a great concern for me that you are a
13   danger to potential clients out there because of
14   your practices and your thoughts and what you have
15   done and the overwhelming evidence of the damage
16   that you have caused.
17              All right.  Ms. Malone.
18   Q.   (By Ms. Malone)  In Mr. Radbil's testimony, he
19   also discussed that he didn't believe -- I'm sorry.
20        Do you believe that you have an obligation to
21   notify the other side, if you have a change in your
22   damages, in disclosures?
23   A.   Yes.
24   Q.   In this case, that was not done, was it?
25   A.   I believe that to be true.
```

1    Q.   Mr. Radbil also indicated that he was going to

2    put on medical providers without discussing with

3    them prior to testifying as to what they would say

4    in relation to damages.  Do you recall that

5    testimony?

6    A.   Yes.

7    Q.   And do you think that's appropriate,

8    Mr. Meyers?

9    A.   Well, given what Judge Boyle just told me, I

10   believe that I have to rethink anything that I have

11   ever thought about it.

12   Q.   Prior to what Judge Boyle just told you, do you

13   think it was appropriate to put a medical provider

14   on the stand without first learning what their

15   testimony would be?

16   A.   I don't think it would be.

17   Q.   You testified at the -- I don't think you

18   testified, I think you gave an opening statement at

19   the last hearing indicating that you had not been to

20   a trial where you watched Mr. Radbil perform with a

21   witness.  Is that fair?

22   A.   Yes.

23   Q.   And you also indicated that you had not seen

24   Mr. Radbil in the way that he would conduct himself

25   in a hearing.  Is that fair?

```
 1   A.    Well, he made arguments to the Court in the
 2   case that you and I tried.
 3   Q.    In a hearing that is outside of arguments with
 4   the Court, in a formal hearing setting like we are
 5   in now, would it be fair to say that you had not
 6   watched Mr. Radbil?
 7   A.    I think that's fair.
 8   Q.    Let's go one step further.  Did you not take
 9   Mr. Radbil to watch you try a case until after the
10   White case.  Is that fair?
11   A.    Yes.
12   Q.    You did not take Mr. Radbil to watch you
13   conduct a hearing until after the White case.  Is
14   that fair?
15   A.    I -- I'm not sure.
16   Q.    Do you think that, as a supervising attorney,
17   you have an obligation to make sure that associates
18   who are working under you have a fundamental
19   understanding of both trial procedure and hearing
20   procedures?
21   A.    Yes, I do.
22   Q.    Did you provide to the Court any evidence in
23   exhibits of any sort of policies or procedures or
24   training or anything that you offered to your young
25   associates at your firm?
```

```
 1   A.    No.
 2   Q.    Did you provide to the Court any sort of
 3   indication that you've done anything to encourage
 4   Mr. Radbil or any other young associate to learn how
 5   to try a case prior to today?
 6        Have you given anything to the Court to show
 7   that you sat down and showed them how to try a case?
 8   A.    I've yet to present our case, but no, I have
 9   not.
10        THE COURT:  We're going to take a break.
11   Mr. Meyers.  Do you continue to stand by Mr. Radbil
12   and his abilities as an attorney associated with
13   your firm?
14        THE WITNESS:  I am certain, Your Honor,
15   that you are --
16        THE COURT:  Don't talk about anything
17   about me.  I want to know, do you continue to stand
18   by him as a member of your firm that you will
19   represent publicly and otherwise as a competent
20   attorney -- do you or not -- after you have heard
21   all of this?
22        THE WITNESS:  I would represent Mr. Radbil
23   if I were asked, and he is not a member of my firm
24   any longer, but I would represent him as a competent
25   attorney.
```

```
 1              THE COURT:  That is not my question.  My
 2   question is:  Do you stand by him as a quality
 3   competent attorney from your firm to outside
 4   potential clients as you have over and over again on
 5   websites and otherwise, do you continue to stand by
 6   him, affirm him as a competent attorney representing
 7   your firm?  I'm not asking you would you represent
 8   him.
 9              THE WITNESS:  No, I understand that,
10   Judge.  You're asking me multiple questions.
11              THE COURT:  No, this is really simple.
12   This is really simple.  Your relatives/relative
13   comes up to you and says, I need an attorney for
14   this and such, would you recommend Mr. Radbil after
15   all that you have heard about him so far?
16              THE WITNESS:  I believe Mr. Radbil is a
17   competent attorney.  I don't know if I would
18   recommend him, Your Honor.
19              THE COURT:  All right.  We're going to
20   recess until 1:30.
21              (Recess taken from 12:15 to 1:30 p.m.)
22              THE COURT:  Let's continue where we left
23   off.
24              MS. MALONE:  I don't have a lot left, Your
25   Honor.
```

1   Q.   (By Ms. Malone)  Mr. Meyers, if you would turn

2   with me to Mr. Radbil's exhibits, Number 34, which I

3   think is -- do you see it?

4   A.   Yes.

5   Q.   Okay.  And Number 34 is Dr. White's affidavit,

6   Exhibit D, please.

7   A.   Yes.

8   Q.   The first page indicates that Dr. White is

9   waiting or attempting to obtain medical records,

10   correct?

11   A.   Yes, sir.

12   Q.   No medical records were ever produced in the

13   underlying case; is that correct?

14   A.   I don't believe so.

15   Q.   Let me start off with something that Judge

16   Boyle asked you at the end of the last break.  You

17   indicated that you believe that Mr. Radbil is a

18   competent attorney but you're not sure that you

19   would recommend him to someone else; is that

20   correct?

21   A.   That is what I said.

22   Q.   But you do still advertise him on your website

23   now as Of Counsel, correct?

24   A.   At the present time, seeing that we have cases,

25   yes, I do.  But since the issues that you've raised

```
 1   to me today during this hearing that you have never
 2   raised before, I did send an e-mail to my webmaster
 3   asking that he take down those profiles until they
 4   are advised.
 5   Q.   Mr. Meyers, do you believe that it is the
 6   obligation of other attorneys to advise you to check
 7   the content of your website?
 8   A.   No.
 9   Q.   Is it your obligation to make sure that the
10   information that is being provided to the consumers
11   is accurate?
12   A.   I think so, yes.
13   Q.   At the prior sanction hearing, you suggested
14   that the testimony regarding the $45,000 in damages
15   proffered by Dr. White was a rogue client.  Do you
16   recall something along those lines?
17   A.   I don't believe I used those words, but yes, I
18   believe I understand the general point you are
19   making.
20   Q.   Which is that you believed it was the client's
21   fault that you had not anticipated -- or that
22   Mr. Radbil had not anticipated that Dr. White would
23   give that testimony; is that correct?
24   A.   I believe I said it wasn't the client's fault
25   but that Dr. White gave that testimony without our
```

1   input, yes.

2   Q.   And you understand that you have an obligation

3   to prepare your clients or to talk with them about

4   the kinds of questions and testimony that would be

5   allowed at trial, do you not?

6   A.   Yes.

7   Q.   And you also, when you told the judge that,

8   Judge Boyle pointed out to you from prior testimony

9   that Mr. Radbil had indicated to the Court he did

10  not believe it was required to offer -- or to

11  provide to the other side the 45,000-dollar damage

12  increase.  Do you recall that?

13  A.   I don't recall what you are talking about, but

14  I believe you.

15  Q.   All right.  Let me say it this way:

16       Mr. Meyers, do you recall Judge Boyle providing

17  to you testimony from Mr. Radbil from the trial in

18  which he did not say, This was our client's idea and

19  we did not know it was coming forward, but, in fact,

20  Mr. Radbil said he told the magistrate about it in a

21  settlement conference.

22       Do you recall that now?

23  A.   I recall Mr. Radbil advising the Court that he

24  negotiated on Mr. White's behalf before the

25  magistrate and told the magistrate of Mr. White's

1   demands, if that's what you are asking.

2   Q.   Do you recall that Mr. Radbil indicated to the

3   Court he believed it was sufficient under the

4   Federal Rules of Civil Procedure to tell the

5   magistrate as opposed to formally supplementing his

6   discovery?

7   A.   I don't recall that, but I have no reason to

8   not believe you if that's what the transcript says.

9   Q.   And when Judge Boyle pointed that out to you,

10  she also pointed out -- or there was provided

11  testimony from Dr. White in which he indicated that

12  Mr. Radbil had assured him the damage claims would

13  be offered into evidence.  Do you recall that, sir?

14  A.   Could you repeat that, please?

15  Q.   Sure.  Do you recall that, following, there was

16  an offer of testimony from Dr. White in which he

17  stated that he had been assured by Mr. Radbil that

18  that would be submitted for the trial, that those

19  damages would be submitted for trial.

20  A.   I recall testimony by Dr. White in that regard,

21  yes.

22  Q.   Did you ask Dr. White, following that hearing,

23  what Mr. Radbil had advised him?

24  A.   I have since spoken to Dr. White and since

25  spoken to Dr. White about the issue of whether we

1    suggested that he testify to a specific number and
2    whether we suggested he leave that number to the
3    jury, if that's what you're asking.
4    Q.   No.  I'm asking:  Did you ask Dr. White if
5    Mr. Radbil had assured him that the damage numbers
6    that he provided to Mr. Radbil would be offered at
7    trial?
8    A.   I did not ask him that.
9    Q.   Do you recall Judge Boyle specifically
10   indicating to you that in the prior -- in the trial
11   she found no evidence of there being a rogue
12   response from Mr. Radbil when the issue was first
13   raised during trial?
14   A.   I'm sorry, I don't understand the question.
15   Q.   Sure.  And I apologize, Mr. Meyers, I've got
16   after-lunch-bad-questionitis, so let me try again:
17        Do you recall that in the sanctions hearing
18   Judge Boyle indicated to you that she found no
19   indication during her conversation with Mr. Radbil
20   during trial that, in fact, this was a rogue
21   response from a client and, in fact, that was a
22   concern she had about Mr. Radbil's position at
23   trial.
24   A.   I don't recall that, but if you say that's what
25   the transcript says, I have no reason to disagree.

```
 1              MS. MALONE:  Your Honor, may I approach
 2    him and remind him?
 3              THE COURT:  For the record, state what
 4    that document is line and page.
 5              MS. MALONE:  This would be Volume 1 of the
 6    Motions for Sanctions hearing, page 152, line 6
 7    through line 11, which is the Court's discussion
 8    with Mr. Meyers.
 9              THE COURT:  Go ahead.
10    A.    Thank you.
11    Q.    (By Ms. Malone)  And simply so the record is
12    clear, Mr. Meyers, you actually backed up and read a
13    few pages to get context, correct?
14    A.    I did.
15    Q.    And following Judge Boyle's concern about
16    Mr. Radbil having fabricated or prevaricated
17    regarding the Rule 37 motion and the damages, did
18    you have any conversations with Mr. Radbil about the
19    importance of having candor with the tribunal?
20    A.    Yes.
21    Q.    And would you agree with me that both the Texas
22    Rules of Professional Conduct, Dondi, and the Texas
23    Attorney Creed require that an attorney be truthful
24    in dealing with the Court?
25    A.    Amongst other things, yes.
```

1   Q.   I'm talking specifically about telling the

2   truth to the judge, that there's an obligation to

3   you to do so.

4   A.   It's an obligation to be truthful at all times.

5   Q.   To the Court specifically.

6   A.   To anyone and everyone.

7   Q.   I understand, Mr. Meyers, I'm not arguing that.

8   I'm talking specifically in communications with the

9   Court.

10  A.   Yes.

11  Q.   Okay.  And would you agree with me that in the

12  course of reviewing the transcript from the original

13  trial there were some questions as to whether or not

14  Mr. Radbil had been truthful to the Court.

15  A.   Yes.

16  Q.   Did you have communications with Mr. Radbil

17  about that being inappropriate?

18  A.   Did I have communications with Mr. Radbil about

19  being untruthful being inappropriate, is that your

20  question?

21  Q.   Yes, sir.

22  A.   Yes.  But the questions were more along the

23  lines of, Were you untruthful, as opposed to, It's

24  inappropriate to be untruthful.

25  Q.   All right.  Mr. Meyers, at the last hearing --

1    not the last, which was the continuance, but the

2    prior hearing, the Court talked to you about that

3    you seemed to believe that the only mistake that

4    Mr. Radbil had made was to be late during the trial.

5    I think he was almost three hours late to the trial.

6    Do you recall that?

7    A.    The Court stated that, yes.

8    Q.    Do you believe now, after reviewing -- have you

9    read the transcript again since the last hearing?

10   A.    I have not.

11   Q.    And your testimony to the Court is that you did

12   read the trial, though, prior?

13   A.    Yes.  Yes.

14   Q.    Do you believe now, after having heard the

15   Court's concerns and the testimony that she raised

16   to you, herself, that perhaps Mr. Radbil did more

17   that was inappropriate than be late for court?

18   A.    I am certain that the Court's concerns are

19   genuine.  And I am certain that I, if offered the

20   opportunity, would do anything and everything to

21   make sure nothing like this ever occurred again.

22   Q.    And I appreciate that, Mr. Meyers, but that was

23   not my question.  I am asking if you now believe

24   that Mr. Radbil did something wrong other than be

25   late for court?

1    A.    I don't know how to answer that question apart

2    from the way I just did.

3                MS. MALONE:   Your Honor?

4    Q.   (By Ms. Malone)   I would like an answer,

5    Mr. Meyers.  Do you believe Mr. Radbil did something

6    wrong other than be late for court?  I'm asking what

7    you personally believe, sir, as an attorney.

8                THE COURT:   Yes or no.

9                Mr. Radbil.

10               MR. RADBIL:   Yes, Your Honor.

11               THE COURT:   You are staring at him in a

12   way that looks a little intimidating to me, so if

13   you would just be careful with that.  Take a seat.

14   I don't need anything from you.

15               Answer the question.

16               THE WITNESS:   Can you ask the exact

17   question again, please?

18   Q.   (By Ms. Malone)   I can do my best; I can't

19   promise it will be exact words.

20       Mr. Meyers, after having read the transcript

21   before of the prior hearing, hearing the judge's

22   concerns as she expressed them to you in the

23   hearing, reading the briefings, hearing everything

24   that's happened so far, do you believe now that the

25   only thing Mr. Radbil did that was inappropriate in

```
 1   the trial of this case was be late for court?

 2   A.    I don't know the answer to that.

 3             THE COURT:  Okay.  That's a no that you

 4   don't think he did, then.

 5             Here's my question to you:  Is there

 6   anything going on behind the scenes between you,

 7   Mr. Radbil, and his brother that has caused you to

 8   feel in any way intimidated about candidly answering

 9   these questions?

10             THE WITNESS:  No.

11             THE COURT:  What is it that is causing you

12   to prevaricate and answer such reasonable questions

13   to anyone in law school, let alone practicing law,

14   in such the way that you have?  It makes no sense.

15   You know that, don't you, your responses to these

16   questions, that you are refusing to concede the

17   outrageous nature of Mr. Radbil's conduct.

18             So I'm just trying to figure out if there

19   is some other motivation that you are not telling me

20   about, because I don't see anything but a downside

21   for you; no agreements, no discussions, no

22   intimidation by him or his brother?

23             THE WITNESS:  No, Your Honor.

24             THE COURT:  Okay.

25   Q.    (By Ms. Malone)  Mr. Meyers, do you understand
```

1   that as a supervising attorney and head of a law

2   firm you have an obligation both to the community

3   and to the legal profession to make sure that your

4   associates do understand the fundamental rules of

5   practice?

6   A.   I think so, yes.

7              MS. MALONE:  No further questions, Your

8   Honor.

9              MR. JEFFERSON:  Your Honor, I believe, in

10  kind of due order, Mr. Meyers, since I represent

11  just Mr. Radbil, that he was going to testify on his

12  own behalf in a narrative fashion of some form, and

13  then I would ask my questions once he's done.

14             THE COURT:  Okay.  Go ahead.

15             THE WITNESS:  May I walk down to get my

16  exhibit book.

17             THE COURT:  You may.

18             Ready?

19             Let's go.

20             THE WITNESS:  As ready as I will be, Your

21  Honor.

22             THE COURT:  Go ahead.

23             MR. MEYERS:  On October 2nd, I filed an

24  affidavit with the Court that set forth my position

25  on various matters.

```
 1              THE COURT:  What exhibit is that, please,
 2    if it's an exhibit?
 3              MR. MEYERS:  It is document 158, Your
 4    Honor.
 5              THE COURT:  Is it part of your exhibit
 6    book?
 7              MR. MEYERS:  It is not, Your Honor.
 8              And the first thing I would like to point
 9    out is, I think Ms. Malone makes a good point that
10    my statement that no one at the firm has been
11    disciplined is poorly worded, and it would have been
12    correct to call these sanctions discipline.  My
13    intent was to speak about a bar grievance or a bar
14    discipline, but I again think she is correct.
15              I sent last week an e-mail, that I copied
16    Ms. Malone on, to about 50 defense lawyers and
17    defendants inviting them to contact me to set up a
18    pre-litigation system for resolving complaints.  I
19    sent that e-mail because it is not my desire in any
20    case to drive up attorney's fees.
21              Plaintiff's lawyers relying on fee
22    shifting provisions do not get paid for all their
23    time very frequently, and I would prefer to resolve
24    things without being in court.
25              I have explained in my affidavit ways that
```

1   Ms. Malone and I may be able to work together to do

2   that, from setting up a pre-litigation system to

3   narrowing certain issues, having them brought up to

4   the Fifth Circuit or decided by declaratory action.

5   And I would like very much to be able to find what

6   those issues are and to have them stop causing a

7   great deal of litigation that is not necessary to

8   get to the truth of the matter.

9          When I first began to practice in Arizona

10  with another law firm, a former presiding judge and

11  a couple of the other judges suggested that me and a

12  couple of the defense attorneys form a committee to

13  discuss how to handle the cases that I was bringing

14  at the time, which were lemon law cases.  That

15  committee did not get very far because the defense

16  attorney, who I consider to this day to be my best

17  mentor and best friend in the legal community and

18  has since retired, didn't think it was necessary.

19  But I think that the system could benefit from

20  collaboration like that.

21          THE COURT:  That's all fine and good,

22  Mr. Meyers, but I want to know what happened here.

23  I want to know how all of this happened and what

24  your explanation is for it.  I'm not interested in

25  remedial practices that you would like to or have

1   engaged in the past.  What happened here?  There's a

2   lot of red flags.

3           MR. MEYERS:  And in my affidavit, Your

4   Honor, I have explained that whatever I have done to

5   make you think that this is anything but the worst

6   experience of my professional life, I apologize for.

7   And in congratulating Ms. Malone on her victory when

8   she contacted us about the conference, do we oppose

9   the motion for sanctions, I explained to her then

10  that I was in the process of getting admitted to

11  these courts, before federal courts in Texas, so I

12  could actively make sure under my name, directly, as

13  opposed to my firm name, which is my name, that none

14  of this ever occurred again.

15          And I aver to the Court, for what it's

16  worth to the Court, that as soon as I clearly

17  understand all of the things that the Court does not

18  care for, that they will never happen again by

19  anyone at my law firm or by me, given that these

20  will all be cases that I handle myself.

21          I have narrowed down my firm's active

22  caseload significantly over the course of the year

23  to make sure that I have an absolute handle on

24  everything that occurs.  And the cases that

25  Ms. Malone has brought up are sometimes two and

```
 1   three years old.  That does not change the fact that

 2   if improper behavior occurred that it occurred and

 3   that it's part of my firm's record, but --

 4        THE COURT:  To be honest with you,

 5   Mr. Meyers, I don't even know how you can go out now

 6   under these circumstances and get in and retain a

 7   relationship with a client at all without disclosing

 8   all of this.  This is a lot.  This is substantial.

 9        I don't know how you can -- how you will

10   be able to justify under all the ethical standards

11   taking on any new client that doesn't know about all

12   that you have done here; all these courts that have

13   sanctioned you, the fact that you still stand by

14   Mr. Radbil's egregious behavior, I honestly don't.

15   And this is a public record, and some day another

16   client that you take on after this may wonder, if

17   you don't tell them, why you didn't.

18        MR. MEYERS:  I think, Your Honor, that I

19   would like the opportunity to explain the three --

20        THE COURT:  That's what I'm waiting for,

21   because all I have heard so far is what you plan to

22   do in some sort of remedial fashion while all the

23   same standing by Mr. Radbil's behavior.  And so go

24   ahead, I would like to hear your explanation.  I

25   don't want to hear any more about what you propose
```

1   to do in the future.  I would like to have an

2   explanation for why you misrepresented the kind of

3   trouble that your firm has been in and all the other

4   points that were very well and very clearly brought

5   up by Ms. Malone.  So let's hear about that.

6        MR. MEYERS:  I'm trying to get the

7   opportunity to present my response to Ms. Malone's

8   direct examination, Your Honor.

9        THE COURT:  Okay.  Let's go.

10        MR. MEYERS:  An affidavit was filed with

11   the Court with in excess of 650 client thank you

12   letters.  That affidavit had our BBB rating and BBB

13   excerpts showing 40-something satisfied clients and

14   one unsatisfied client and our FaceBook page, the

15   same thing.  As my affidavit explains, this is why I

16   have been under the impression that I'm actually

17   helping people and not being a danger to them.

18        My attorney-client agreement has since

19   changed to add that clients may be responsible for

20   court costs should they lose their case.  And based

21   on what has occurred here today, I will add the fact

22   that if a client loses a case that bad faith

23   attorney's fees may be awarded against them.

24        I am going to really consider what the

25   Court is saying about what do I have to advise

1    clients about these proceedings, and I'm going to

2    ask the bar the answer to that question as well.

3            I attached the two lawsuits -- or included

4    them as exhibits because the Court asked me how many

5    clients have we sued and how many clients have sued

6    us.  So I provided that information, because the

7    Court asked the question.  The Court asked about bar

8    complaints, and I provided that information because

9    the Court asked the question.

10           This Court had previously certified

11   Mr. Radbil and my firm as class counsel, as have

12   three other courts.  So of three class actions that

13   we have been certified as class counsel, the total

14   attorney's fees incurred in all three cases combined

15   is less than the bill here for Ms. Malone.

16           I try to do things as efficiently as I

17   possible can, and I think -- I thought that it was

18   appropriate for me to look at those class

19   certification orders as commentary that my firm

20   meets the requirements and does good work.  As I

21   explained in my affidavit, we have prevailed

22   multiple times before a Circuit Court of Appeals on

23   various issues.  Again, I thought that that was

24   indicative that my firm did good work.

25           I have explained in my affidavit why I

1    feel Noah is a competent attorney.  And I noted in

2    there that the people who are being represented as

3    aggrieved by actions by my firm have never sued us

4    or filed bar complaints.  And I have never received

5    a complaint about Noah from an opposing counsel,

6    other than, as I say, as I sit here now,

7    Mr. Patterson, as Ms. Malone raises.  So that is an

8    inaccurate statement.

9             THE COURT:  Well, what about the

10   Washington Court that basically threw him out two or

11   three times because he didn't tell the truth on his

12   application to practice law before that court?

13   That's just one example.

14            MR. MEYERS:  I don't -- those courts, Your

15   Honor, I appeared for with other lawyers from the

16   firm, and I was not counsel, I didn't speak or

17   anything, at Judge Coughenour's order to show cause

18   hearing, and Judge Coughenour did not, nor did

19   Pechman, sanction my firm.

20            I am not pleased to tell you that those

21   motions were the product of sloppy work.  And since

22   those motions were filed, numerous people from my

23   firm have appeared as pro hac vice counsel in

24   Washington, and we have never had another problem.

25            I am currently pro hac vice in a

1   particular matter, and a matter that I was

2   pro hac vice that resolved, and other members of my

3   firm are pro hac vice.  So I think those courts were

4   in a good position to determine what precisely

5   happened there, and I think it's important that they

6   did not sanction us; still, that was sloppy work,

7   that is not excusable.

8          THE COURT:  Well, the order says, and I

9   quote:  The plaintiff is currently represented by

10  three attorneys.  The first, Joshua Trigsted, has an

11  address on file with the Washington State Bar

12  Association and this district's electronic docketing

13  system of 5200 Southwest Meadows Road, Suite 150,

14  Lake Oswego, Oregon 97035.  The second, Jon N.

15  Robbins, has an office in Loon Lake, Washington, in

16  the Eastern District of Washington.  The third, Noah

17  D. Radbil, has an office in Houston, Texas.  On

18  July 27, 2011, Noah Radbil applied for leave to

19  appear pro hac vice.  Local General Rule 2(d) states

20  that an attorney from outside the Western District

21  of Washington will be permitted to appear on a

22  matter if he is joined in such an appearance by an

23  associate attorney having an office in this district

24  and admitted to practice in this court.

25  Mr. Radbil's application was sponsored by Joshua

1   Trigsted, who claimed in the application that his

2   address was Seafirst Fifth Avenue Plaza, 800 Fifth

3   Avenue, Seattle, Washington.

4          On August 19th, 2011, the Honorable Robert

5   Lasnik, U.S. District Judge, ruled that the Trigsted

6   Seattle address did not constitute an office under

7   General Rule 2(d).  On October 5th, 2011, the

8   Honorable Marsha J. Pechman, U.S. District Judge,

9   issued an order to show cause in which she observed

10  a pattern -- a pattern of misinformation surrounding

11  pro hac vice applications on the part of

12  Messrs. Robbins, Trigsted, and Radbil.

13         All of this leaves us with a case filed by

14  a plaintiff who has three attorneys, none of whom is

15  eligible to practice in this district, all of whom

16  who have been on notice of this fact since at least

17  August 19th.  Mr. Trigsted now seeks leave to

18  withdraw.  This ship may be sinking, but

19  Mr. Trigsted will not be permitted to flee just yet.

20  This motion is denied.  The Court orders plaintiff

21  to show cause why this case should not be dismissed

22  for failure to prosecute and why Messrs. Robbins,

23  Radbil, and Trigsted should not be sanctioned for

24  their misrepresentations to the Court.

25         This is a huge thing to have on record

1    about an attorney.  And this is one in a sheath of

2    papers that have come forward since the last

3    hearing, and I must say in many ways contradict your

4    position on how your firm has acted and Mr. Radbil

5    has acted.  That's just one.  I'm astonished.  I'm

6    puzzled.  What else do you have to say to explain

7    all of this?

8          MR. MEYERS:  I believe, Your Honor, that

9    if the Courts there thought that we misrepresented

10    facts they would have sanctioned us.  But I again

11    tell you that that was sloppy work for which there

12    is no excuse.  Those courts have dealt with it.

13    There has never been an issue like that since that

14    time; there should have never been an issue to begin

15    with.

16          THE COURT:  All right.

17          MR. MEYERS:  As my affidavit states, Your

18    Honor, Noah's trial results are on par with what I

19    could determine to be national averages.  Noah did

20    prevail in a case before Judge Sparks, and Noah

21    helped me greatly in a case before Judge Schell

22    versus Ms. Malone.

23         I did ask every question myself, perform

24    every examination and every statement, but Noah

25    prepared the vast majority of the statements for

1    me -- Mr. Radbil, I'm sorry, Your Honor -- prepared

2    the vast majority of the statements for me -- the

3    examinations, I'm sorry, the examinations, and he

4    argued a vast majority of the issues before Judge

5    Schell outside the presence of the jury.

6            I am certain that I can fix whatever the

7    Court is concerned about and that I will fix it.  I

8    put in my affidavit the three cases that

9    Weisberg & Meyers has been sanctioned in, and I am

10   perplexed as to when a claim survives summary

11   judgment, survives two motions for directed verdict

12   and we ultimately lose before the jury, how that can

13   be sanctionable behavior.  But the 10th Circuit says

14   it can be, and I have to and have curbed my practice

15   in recognition of that.

16           A second sanction order in the matter of

17   Barchard in the county court in Florida that

18   Ms. Malone raised, we alleged there that a

19   foreclosure action was subject to the FDCPA.  The

20   county court disagreed in the face of split

21   authority before Federal Circuit Courts of Appeals.

22   But since then, several more courts, including the

23   11th Circuit where that case sits, held that

24   foreclosure activity is subject to the FDCPA.

25           The first appellate court, which is simply

1    the higher state court -- it's county court and then

2    the next is state court, district court, and then

3    the appellate court -- reversed the Barchard opinion

4    saying it can't be bad faith.  But the appellate

5    court then said there was not enough evidence for it

6    to do that.  So, again, I am perplexed about how a

7    theory upheld by the court of appeals deserves

8    sanctions.

9            The third case that Ms. Malone mentioned,

10   the Stovall case.  Of the three cases that we have

11   been sanctioned, I think that that case is the

12   fairest one to apply a sanction to us.  I think that

13   we have processes in place now that would have

14   uncovered things that should have been uncovered at

15   the time that case was first engaged.  And I think

16   that a better job could have been done in uncovering

17   what needed to be uncovered in that case to

18   understand the lie of the land.  And I have to very

19   seriously consider in the face of the sanctions and

20   the bar complaint who I should associate with and

21   align myself with.

22           I would like to take responsibility, as my

23   affidavit explains, for anything that I could have

24   done better here to prevent some of the things that

25   the Court is displeased about, and I will be damned

1   if I don't do things to prevent things like that in

2   the future.

3            THE COURT:  But you stand by Mr. Radbil.

4   He's going to continue to be at your firm and you're

5   going to continue to promote him.

6            MR. MEYERS:  He's not at my firm anymore,

7   Your Honor.

8            THE COURT:  You stand by Mr. Radbil.

9            MR. MEYERS:  I believe Mr. Radbil is a

10  competent attorney.

11           THE COURT:  That answers my question.  Go

12  ahead.  Let's move on.

13           MR. MEYERS:  But the Court is clear that

14  we don't work together anymore.

15           THE COURT:  That's what you say.  Go

16  ahead.

17           MR. MEYERS:  Okay.  To address several

18  of -- and like I said to the Court last time, the

19  Court at the first sanctions hearing asked about

20  realtime e-mails that showed that we were making

21  efforts to get Ms. Malone the trial exhibits,

22  efforts that I could have done better --

23           THE COURT:  Well, Mr. Meyers, Mr. Radbil

24  says things that are just later determined to be not

25  true, and he edges his way through these things.  He

1   said during court -- he never got me exhibits, hard

2   copy of exhibits.  At the court hearing I asked him

3   several times, and he said they were on their way.

4   Not a word that they were on their way, lost

5   somewhere in FedEx, nothing.  And at the hearing the

6   last time, he indicated to Ms. Malone that yes he

7   had furnished the Court with exhibits.  So you never

8   know what the answer is going to be, but so far it

9   hasn't been true.

10          So if you're talking about realtime

11   e-mails that establish one thing or another, you

12   will never get past the fact that he lied to me

13   about the exhibits and he lied to Ms. Malone about

14   the exhibits at the last hearing.

15          MR. MEYERS:  I believe that in hindsight I

16   should have done more to help him with the exhibits.

17   And I believe that he was traveling for a final

18   fairness hearing in a class action in New Jersey and

19   a summary judgment hearing in Houston.

20          THE COURT:  I have heard all that.

21          MR. MEYERS:  That's my fault.  I should

22   have done more.

23          THE COURT:  He didn't say any of this to

24   any of us during the trial or in the hearing until

25   later.  And if it was the truth, it seems it would

124

1   have come out in the heat of the moment when he was

2   being pressured for it at trial, and not a word of

3   it, not a word of it.

4           MR. MEYERS:  I understand, Your Honor.

5           THE COURT:  Let's move on to the next

6   topic.  All right?

7           MR. MEYERS:  Thank you.  There are

8   exhibits here in my trial book or in my sanctions

9   hearing book, Your Honor, of e-mail exchanges

10  between Ms. Malone and I.  And before I forget, Your

11  Honor, we did agree, as Ms. Malone mentioned at the

12  beginning, to redact a certain exhibit.  I have it

13  in here, so for the --

14          THE COURT:  That's fine.  Go ahead.  I

15  know you all will take care of that before the final

16  exhibits are submitted to me.  Let's go ahead.

17          MR. MEYERS:  Okay.  In these e-mails that

18  were sent, just in the normal course of business,

19  Ms. Malone states to me that she vouched to her

20  client for my professionalism, that I always call

21  her back, that she's always happy to talk to me,

22  that I'm helpful, been helpful in the past in

23  settling cases, that she respects me and my ability,

24  that I take into account clients' issues, that I do

25  the --

```
 1              THE COURT:  So the purpose of this is
 2   what?  That she was mistaken, she doesn't really
 3   mean what she's saying here today?  Is this before
 4   she found out what you were up to?  When was this
 5   e-mail?
 6              MR. MEYERS:  These e-mails are over
 7   several cases over the course of several years.
 8              THE COURT:  Right.  Before any of this
 9   ever happened, I assume; predated any of these
10   sanctions issues that have arisen out of this court.
11              MR. MEYERS:  One was in response to her
12   sanctions e-mail, but I don't think that Ms. Malone
13   feels --
14              THE COURT:  So one was what?  She said
15   something very nice in a response to a sanctions
16   e-mail that she sent?  I'm not clear on what you are
17   saying.
18              MR. MEYERS:  That Ms. Malone -- before I
19   misspeak, Your Honor, give me one moment, please.
20              On March 14, 2013 --
21              MS. MALONE:  Excuse me, Your Honor.  Can
22   we have an exhibit number, please?
23              THE COURT:  Yes.
24              MR. MEYERS:  Yes, I'm sorry.  This is
25   Exhibit 21.
```

```
 1              MR. JEFFERSON:  I'm sorry.  Whose exhibit
 2   folder?
 3              MR. MEYERS:  My Exhibit 21.
 4              MR. JEFFERSON:  Thank you.
 5              MR. MEYERS:  And in an e-mail dated
 6   March 14, 2013, at 1:33 p.m.  This is in the
 7   exchange about the sanctions motion and what type of
 8   conference is needed.  And Ms. Malone stated:  Thank
 9   you, you proved my point, you always respond, and I
10   for one really appreciate it.
11              I understand that Ms. Malone makes some
12   allegations about my firm.  I don't know that she
13   alleges that I am a dishonest person and has
14   previously said I do what I say when I say it.  So I
15   feel like I'm an honest person.  I understand that
16   the Court doesn't agree with that.
17              To discuss some of the exhibits that
18   Ms. Malone asked me about, as I stated in the Paris
19   and Little-Cadman cases in Washington, the orders to
20   show cause were discharged, as was the order to show
21   cause in the Saunders case.  And in the Saunders
22   case, one of the cases that Judge Cogan relied on to
23   dismiss our client's claim was recently overturned
24   by the 3rd Circuit who stated a consumer can
25   revoke -- can revoke consent.  I have addressed the
```

1    three courts that have sanctioned us and what I
2    think about each of those and how things need to be
3    done differently wherever they possibly can.

4         I've explained to the Court that I could
5    have done a better job in assisting with the trial
6    exhibits and assisting with multiple aspects of the
7    case.  And in hindsight, I should have done a better
8    job of that.

9         There was a trial scheduled, Your Honor,
10   for this week in Houston, and because of these
11   proceedings, I would not have considered sending
12   anyone but myself to try the case.  I obviously
13   wasn't available.

14        THE COURT:  What would your choices have
15   been besides yourself?

16        MR. MEYERS:  My choices would have been
17   other lawyers.

18        THE COURT:  Like who?  Mr. Ehrlich.

19        MR. MEYERS:  He's not with the firm,
20   Judge.

21        THE COURT:  I was wondering.

22        MR. MEYERS:  Mr. Thompson and Mr. Panvini,
23   and neither have tried a case, so therefore they
24   would not have been an option.

25        THE COURT:  Have they been involved in or

1   connected to these numerous sanctions or orders of

2   the different courts across the country?

3         MR. MEYERS:  I think that it's possible,

4   Your Honor, that they worked on the cases; but no,

5   they were not --

6         THE COURT:  Okay.

7         MR. MEYERS:  -- formally involved in the

8   three cases, Your Honor.

9         THE COURT:  You said you would have not

10  considered sending anyone else, and you talked about

11  two lawyers who have not tried a case before, so who

12  else would the choice have been?

13        MR. MEYERS:  Well, that's the point, Your

14  Honor, there would have been no choice.

15        THE COURT:  Okay.  That's really not what

16  you said, but it's clear now.  Okay.  Go ahead.

17        MR. MEYERS:  My point there, Your Honor,

18  is heeding what the Court was saying about making

19  sure that whoever tries a case is well trained.  And

20  that case had been going on for better than a year

21  and a half.  The client recovered, and I did not

22  even recover my costs, let alone any attorney's

23  fees.  But certainly that's the cost of being

24  involved in something like this and being unable to

25  try a case.

```
 1                THE COURT:  Do you still run that website?
 2    Is it AFC, is that what you call it?
 3                MR. MEYERS:  Attorneysforconsumers.com.
 4                THE COURT:  Is that yours?
 5                MR. MEYERS:  It belongs to a marketing
 6    company that I own, yes, Your Honor.
 7                THE COURT:  So it's yours.  And how long
 8    has that been in operation?
 9                MR. MEYERS:  Summer of 2006.
10                THE COURT:  Okay.  And is -- what
11    exactly -- how does it operate?  What does it do?
12                MR. MEYERS:  I would object to the
13    question on the grounds of relevance and
14    notwithstanding --
15                THE COURT:  Well, it's relevant because it
16    goes to your credibility.  And at least at one
17    point -- and I'm looking at Defense Exhibit 35 --
18    you have some stuff in one of those connected
19    websites or from this about a judgment being
20    obtained against Wells Fargo which turns out wasn't
21    true.  So I think it goes directly to your
22    credibility.
23                And of course we discussed at the very
24    first hearing my concern over the unbelievably
25    out-of-order behavior by Mr. Radbil.  And in trying
```

1    to get your sense of it, you indicated and still

2    indicate you didn't see it that way.  And you talked

3    about your law firm and who all was with your law

4    firm, how many people you have with your law firm,

5    but none of this was mentioned.  So I'm curious now

6    what this is about.  Is it money, is it nationwide,

7    exactly what is this?  I think it goes directly to

8    your credibility.

9              MR. MEYERS:  And the question is, what is

10   the website?

11             THE COURT:  Let's start from the

12   beginning.  What is it?  You say you own it.  What

13   is it?  It's been in place since 2006.  What does it

14   do?

15             MR. MEYERS:  I don't think it does much

16   that any other website -- it's just a website.  I'm

17   not necessarily sure I understand.

18             THE COURT:  Why would someone go to the

19   website?  What would be the benefit?  It doesn't

20   have recipes or anything on it.  What does it do?

21   What information does it disseminate that is the

22   purpose of the website.

23             MR. MEYERS:  There are statutes; there are

24   summaries of consumer rights; there are inquiry

25   forms where someone can submit a question or a

1  complaint and have us review it.

2           THE COURT:  So you can solicit business

3  through that.

4           MR. MEYERS:  People contact us, yes.

5           THE COURT:  Okay.  And who is it that

6  decides what information goes on there?  Because it

7  looks like you're putting little blurbs on there

8  about winning trials and whatnot.  Is that straight

9  from you?  Do you make the decision as to what goes

10 on that website?

11          MR. MEYERS:  I've only -- sort of, Your

12 Honor.  I've written my own bio, but I haven't

13 written anyone else's bio --

14          THE COURT:  Well, it's a lot more than

15 bio, though.  You've got news flashes about lawsuits

16 being won or lost.  And you have now indicated that

17 you can sign up for a lawyer, and I suppose you, on

18 that.  So what else is on there?

19          MR. MEYERS:  You can't sign up for a

20 lawyer, Your Honor.

21          THE COURT:  Well, you can contact one.

22          MR. MEYERS:  You can contact a lawyer,

23 right.

24          THE COURT:  Okay.  It's a contact for you

25 to get clients.

1           MR. MEYERS:  Yes.

2           THE COURT:  Right.  Okay.  What else?  How

3    many clients have you gotten from that website?

4           MR. MEYERS:  I couldn't count, Your Honor.

5           THE COURT:  Hundred, two hundred, three?

6           MR. MEYERS:  More than a hundred, Your

7    Honor.

8           THE COURT:  Since 2006?

9           MR. MEYERS:  Yes.

10          THE COURT:  All right.  Are any of the

11   other partners that you have worked with, Mr. Radbil

12   included, have they ever been on that website?

13          MR. MEYERS:  Been on the website?

14          THE COURT:  Yeah, is their name on there

15   for one reason or another?

16          MR. MEYERS:  Yes, every attorney at my law

17   firm has a profile, yes.

18          THE COURT:  Okay.  So who has a profile on

19   there right now?

20          MR. MEYERS:  Me, Alex Weisberg, Aaron

21   Radbil, Russ Thompson, Joe Panvini, Holly Dowd,

22   Jeanne Lahiff, Tracey Tiedman, Venus Booth.  If I

23   didn't say Mr. Radbil, Mr. Radbil.

24          THE COURT:  Not this one.

25          MR. MEYERS:  Both of them.

```
 1              THE COURT:  Oh, I thought you said he
 2   wasn't with your firm anymore.
 3              MR. MEYERS:  He's listed as Of Counsel,
 4   Your Honor, because he has cases --
 5              THE COURT:  So he is with your firm, he's
 6   Of Counsel, so he still is with your firm.
 7              MR. MEYERS:  What I have read about the
 8   meaning of Of Counsel --
 9              THE COURT:  It doesn't matter what you've
10   read about the meaning.  You said he was not
11   associated with your firm anymore, and now you're
12   telling me he is on the website and is Of Counsel.
13   I think there are nine million lawyers that would
14   say that he's with your firm.  He's on the website,
15   right?
16              MR. MEYERS:  Yes.
17              THE COURT:  And he's Of Counsel.
18              MR. MEYERS:  Yes.
19              THE COURT:  So what are his duties as Of
20   Counsel for your law firm?
21              MR. MEYERS:  Watching the Texas state
22   matters until we can find a competent counsel to
23   hire to substitute or withdraw.
24              THE COURT:  You don't think with all
25   that's gone on the last couple of years, that you
```

1   don't owe any kind of disclaimer about what's gone

2   on with Mr. Radbil to keep him on your website?

3   That's not some kind of false advertising?

4          MR. MEYERS:  We are not engaging new Texas

5   state clients.

6          THE COURT:  Well, Texas state clients or

7   any clients anywhere, don't you think that could be

8   considered a deceptive trade practice or false

9   advertising to have him as promoted on your law firm

10  website or your own website without disclaiming and

11  notifying people what's happened with him?

12         MR. MEYERS:  I have never thought about

13  it, but I will send a letter to the bar asking that

14  question.

15         THE COURT:  If you were to hire a law firm

16  for Deceptive Trade Practices Act and become

17  attorney-client privilege, work on this case with

18  them, you wouldn't want to know that they have been

19  in all sorts of trouble with different courts all

20  over the land, you don't think that would be

21  something that you would be entitled to know?

22         MR. MEYERS:  I will have to ask the bar

23  that question, Your Honor, because I don't think

24  that --

25         THE COURT:  Well, if you have to ask the

```
 1   bar, it's another thing that you probably ought to
 2   have on your website, Mr. Meyers.  It's shocking
 3   that you are practicing law with this attitude.  But
 4   at least this is a public record, so it will be out
 5   there, and anyone who wants to know will know what
 6   your attitude is about Mr. Radbil, about his
 7   activities in this case, about putting things out
 8   there that are not true, about not disclosing key
 9   material information that could change a client's
10   decision as to whether or not to retain you.
11            All right.  What else is on this website?
12            MR. MEYERS:  I don't think there's much of
13   anything else on the website.  It's information,
14   statutes, summaries, attorney profiles.
15            THE COURT:  Are there any success stories
16   in there right now?
17            MR. MEYERS:  Yes.
18            THE COURT:  What are those success stories
19   you have put on the website right now?
20            MR. MEYERS:  I believe they relate solely
21   to debt settlement, Your Honor.
22            THE COURT:  Who would be the lawyers
23   involved in those success stories?
24            MR. MEYERS:  Probably most, if not all,
25   lawyers have settled debts at the firm.
```

1           THE COURT:  Who are they?  What names?

2           MR. MEYERS:  I would think me,

3   Mr. Weisberg -- Your Honor, I would be guessing.  I

4   would be happy to look and tell you.  I don't know

5   the answer.

6           THE COURT:  The point is, it seems that if

7   you are going to put success stories on here and say

8   things that would encourage someone to contact

9   you -- which I'm sure is part of the purpose of this

10  website, as any others -- that you would feel some

11  compunction to have some kind of disclaimer or some

12  notification about the downside of your background

13  and your firm's background, at least as far as the

14  last couple of years, and it doesn't sound like

15  there is anything out there like that.

16          MR. MEYERS:  I think that that's a fair

17  statement.

18          THE COURT:  So it just supports the

19  position of the defense counsel that you freely

20  misrepresent yourself and support that kind of

21  activity in the other lawyers that you work with,

22  which is of grave concern.

23          Go ahead.  I want to hear what else you

24  have to say in response to the defense evidence

25  today and anything else you want to say.

```
 1              MR. MEYERS:  I am not aware of any law
 2   firm that lists every single case that it's ever
 3   been involved in, but I will absolutely, positively,
 4   take this transcript and ask the bar what I am
 5   supposed to do.
 6              THE COURT:  Well, this is a lot simpler
 7   than that.  You have been revealed today to have put
 8   success stories on there in cases that were not.  So
 9   a complete misrepresentation of what actually
10   happened in an effort to promote yourself, that's
11   what I'm talking about, not putting every case on
12   the website.  I'm talking about those that might
13   mislead people that there is another side to the
14   story.
15              MR. MEYERS:  I understand and respect the
16   Court's opinion.
17              THE COURT:  Okay.
18              MR. MEYERS:  And all I can do is --
19              THE COURT:  Check with the bar.
20              MR. MEYERS:  Get some guidance, that's
21   right.
22              THE COURT:  Let's go.
23              MR. MEYERS:  Ms. Malone mentioned the case
24   of Dan Lopez and not having the client's authority.
25   There is an exhibit that plainly addresses, as the
```

1  client's declaration, that we got his number and

2  that we had his authority.  That is Exhibit 13

3  and --

4           THE COURT:  All right.

5           MR. MEYERS:  -- it comes with an e-mail

6  exchange between then managing Texas attorney Susan

7  Landgraf and the defense lawyer, Mr. Banowsky.  And

8  Ms. Landgraf had previously set on the grievance

9  committee for the Texas Bar, so I certainly trusted

10 her judgment.

11          THE COURT:  If I could, Ms. Malone, would

12 you tell me what exhibit it is that deals with

13 Lopez?  I see it, it's 17.

14          MS. MALONE:  Yes, ma'am.  And Your Honor,

15 we did not make it an exhibit.  But to our original

16 motion we attached Mr. Lopez's deposition --

17 Mr. Martin can get you an exact cite -- where he

18 said he had not been advised of the settlement

19 offer.  We did that with Mr. Radbil's testimony

20 earlier, and I didn't re-give it to the Court.

21          THE COURT:  That's fine.

22          Mr. Meyers, go ahead.

23          MR. MEYERS:  Thank you.

24          Ms. Malone raised, as an exhibit, the

25 Brookter case.  That was a case where it was a

1   period of class actions where an offer of judgment

2   was made, and the Court here dismissed the case,

3   saying the offer of judgment mooted the claim.

4          On Friday, the Ninth Circuit issued an

5   opinion saying the opposite.  And that case -- we

6   have a similar case, the Payne case, which, not in

7   the class action context, but is it up on appeal

8   before the Fifth Circuit.

9          Ms. Malone mentioned the Allison case and

10  was there a settlement, wasn't there a settlement?

11  I have the letter, and it cannot be an exhibit; the

12  Court said no new exhibits.  But like I said, a

13  letter dated May 24th that says, via overnight

14  delivery from May 30th, and my e-mail shows -- the

15  e-mail in the file shows is from May 29th.

16         And it says:  I have reviewed the First

17  Amended Complaint pertaining to your client, Dan

18  Allison.  I believe your additional claim is

19  unfounded based upon both the facts and the law.

20  That having been said, the only damages to which

21  your client would be entitled under the Texas Debt

22  Collection Act is $100 in statutory damages,

23  therefore I am willing to pay this amount in order

24  to avoid the necessity of responding to your

25  allegations.  Enclosed, please find a check payable

1    to Mr. Allison.  This amount is being tendered

2    without reservation, save and except for the

3    stipulation that it pertains to any claims of

4    damages which Mr. Allison may have against either

5    myself, my client, or my firm under the Texas Debt

6    Collection Act and arising out of the alleged

7    misconduct.  Finally, we oppose your request to

8    amend your complaint because it has no basis in fact

9    or law and because the $100 renders such claim moot.

10         So apparently my firm thought that filing

11   a notice of settlement was appropriate in the face

12   of that letter.

13         THE COURT:  And that was which case?

14   Remind me.

15         MR. MEYERS:  That was the Allison case,

16   Your Honor.

17         MS. MALONE:  Exhibit 29, Your Honor.

18         THE COURT:  Thank you.

19         MR. MEYERS:  Ms. Malone asked me questions

20   about Brookter and Payne.  And the argument that

21   receiving something via e-mail and facsimile is

22   gamesmanship.  Well, the -- I would prefer never

23   to -- never to be debating issues like that --

24         THE COURT:  I didn't hear her say that.  I

25   didn't hear her say that once.  What I heard her say

1    is that your partner or associate, Mr. Radbil,

2    missed his deadlines, and I guess now he's coming

3    back with copies of e-mails and/or facsimiles that

4    somehow are supposed to remedy what he did, but

5    that's the problem.  I don't think there's any

6    overall general problem with e-mails.  I never heard

7    that.

8              MR. MEYERS:  Ms. Malone didn't mention

9    that, and maybe I'm not --

10             THE COURT:  Well, the problem was he was

11   in Houston.  So apparently there was no one who

12   could actually get the hard copies, as I understood

13   it, and it was all too late, is my memory.

14             MR. MEYERS:  I'm not talking about the

15   trial exhibits, Your Honor.

16             THE COURT:  Well, that was one area where

17   the point was raised.

18             MR. MEYERS:  What I'm speaking about is

19   that Ms. Malone said that our firm said that

20   receiving an offer of judgment via e-mail and

21   facsimile is not in compliance with the rules, so

22   therefore it's invalid.  I don't particularly care

23   for that argument.  If you got it, you got it, and

24   that's what really matters is that you got it.

25             THE COURT:  Ms. Malone, why don't you

1    respond to that directly?

2             MS. MALONE:  Yes, Your Honor.  The point

3    of bringing that was that they had made that

4    argument, which I'm hearing from Mr. Meyers saying

5    he doesn't really like that argument.  But the point

6    was that Judge Hoyt, down in the Southern District,

7    found that to be petty gamesmanship.  And following

8    Judge Hoyt's admonition, they turned around and made

9    the exact same argument in the Payne case.  And the

10   problem there was we had sent certified mail and

11   facsimile, because we had already read the Brookter

12   case.  So once Judge Hoyt tried to correct the

13   behavior, they again continued to make that same

14   argument even though it wasn't factually correct.

15            THE COURT:  Thanks for the clarification.

16            MR. MEYERS:  And my point being that the

17   rules are the rules.  And if I get something, then

18   I've gotten it and I don't need to say, well, this

19   didn't come via the proper method, but the rules

20   remain the rules.

21            THE COURT:  So what about Judge Hoyt's

22   admonition?  Did that cause you any pause to do it

23   the same way again?

24            MR. MEYERS:  I was not involved in either

25   of those cases.

```
 1              THE COURT:  So you weren't aware of it.
 2              MR. MEYERS:  I don't know if I was or I
 3   wasn't, Your Honor.  But I'm telling you, I don't
 4   agree with that argument.  You get it, you get it,
 5   that's the end of it, you have it.
 6              THE COURT:  Okay.  Let's move on.
 7              MR. MEYERS:  Ms. Malone correctly points
 8   out that opposing counsel have no duty to tell me
 9   what is on my website, that I should know myself.
10   I, nonetheless, would have liked to have known what
11   bothered her about it and had the opportunity to
12   take action.  Whether I would have, I don't know,
13   but certainly would have liked to have known what
14   bothered her about it.
15              THE COURT:  What was it that bothered her
16   that you would have liked to have known about it,
17   just to refresh my memory?
18              MR. MEYERS:  Apparently some cases could
19   have been better described.
20              THE COURT:  Like, you lost them when you
21   said you won them?
22              MR. MEYERS:  Well, I'm not -- well, yes,
23   the Whaley --
24              THE COURT:  And you are sort of the
25   webmaster on that, are you not?
```

 1          MR. MEYERS:  As that term of art exists, I
 2   am not.
 3          THE COURT:  You are in charge of it,
 4   aren't you?
 5          MR. MEYERS:  When you say in charge of
 6   it --
 7          THE COURT:  What does that mean to you?
 8   You control the information that goes on there,
 9   Mr. Meyers?
10          MR. MEYERS:  I have a strong say in what
11   goes on there.
12          THE COURT:  Okay.  Let's move on to the
13   next point.
14          MR. MEYERS:  Well, the point I'm trying to
15   make, Your Honor, is that the minute someone tells
16   me something is inaccurate, I would take the
17   opportunity to fix it or to get an answer as to
18   whether this is something to be done.
19          THE COURT:  And how dare they not let you
20   know that you have publicly disseminated false
21   information upon which prospective clients might
22   rely about a case that you lost when you say you
23   won.  How dare they not let you know that that is
24   what is out there.  That seems to be the attitude.
25          MR. MEYERS:  That's absolutely not the

1    attitude.  I said Ms. Malone was right in pointing

2    out she has no duty to tell me that stuff.  That's

3    absolutely not the attitude.

4          Ms. Malone pointed out the Stout case and

5    I believe the Brookter case.  They don't say that we

6    were certified as counsel.  They simply say, notable

7    class action information that someone is involved

8    in.  I will have an answer to what should be on a

9    website and what shouldn't be on a website from the

10   bar.

11         THE COURT:  Ms. Malone, if you could just

12   refresh my memory as to where the website posting

13   is, what exhibit is that?

14         MS. MALONE:  Yes, Your Honor.  The exhibit

15   regarding -- I think it's Beason instead of

16   Brookter, I think Mr. Meyers misspoke.  And the

17   other one is the Stout case.  The exhibit was

18   Exhibit Number 31, Your Honor, which is Mr. Aaron

19   Radbil's information.  The references to those two

20   notable sections is on page 3 and 4 of that exhibit,

21   Your Honor.

22         THE COURT:  Okay.  I have it.  Thank you.

23         MR. MEYERS:  The Masters case, judgment

24   was entered.  The order that Ms. Malone attached did

25   not reflect the subsequent order that judgment was

1    entered.

2            MS. MALONE:  Excuse me, Your Honor.  Can

3    we have a short break?  I apologize to the Court.

4            THE COURT:  We will take a ten-minute

5    break.

6            (Recess taken.)

7            MR. JEFFERSON:  Your Honor, before we get

8    going, we were doing some chatting during the break

9    and can we visit with the Court briefly on some

10   housekeeping issues?

11           THE COURT:  Yes.

12           MR. JEFFERSON:  I think that Ms. Malone

13   says that -- or I told her that I did not anticipate

14   taking very long with Mr. Meyers, that I would

15   probably only have maybe 20 minutes' worth of

16   questioning, she's going to have some redirect, and

17   of course he's going to be on the stand as long as

18   he needs to and however long you have with your

19   questioning with him.

20           Then -- it's obviously their case in

21   chief, but Ms. Malone says that she was going to be

22   the next witness after that.  When we were doing the

23   time estimates, she was saying I'm -- you know,

24   we're clearly not going to finish with Ms. Malone

25   today.  And one of the things that I would like to

1    do is have the opportunity to eventually re-call

2    Mr. Radbil to clarify a few issues.

3              So given the fact that we know that we are

4    sadly not going to finish today, Ms. Malone asked,

5    well, if that's the case, then, after Mr. Meyers

6    finishes with his testimony, would you mind if we

7    just called it a day, subject of course to the

8    Court's approval.  And we said, no, we didn't, as

9    long as when we do the reset date we take in mind my

10   upcoming anniversary trip.

11             THE COURT:  Okay.  So let's see.  What I

12   would like to do is have you finish with your

13   questions of Mr. Meyers.

14             MR. JEFFERSON:  Yes, we clearly said we

15   want to finish with him today.

16             THE COURT:  Okay.  I will work with you on

17   this.  I know this is important.  I will work with

18   you.  I have told Mr. Meyers from the beginning that

19   I will give him a chance to fully defend on this, as

20   with Mr. Radbil.  So yes, I need to get another

21   date, but we will get this done this year, so we

22   need to have everybody ready the next time we do

23   this.  Let's finish as much as you we can today.

24             MS. MALONE:  I don't mind taking the stand

25   and starting, I just don't think realistically they

1    would finish.

2              THE COURT:  All right.  I understand.

3              Go ahead.

4              MR. MEYERS:  Ms. Malone and the Court have

5    separately raised questions about my fee agreement.

6    As you have seen, I have asked the Arizona Bar for

7    an opinion on it.  I can't ask the Texas Bar now

8    because it is the subject of a litigation.

9              THE COURT:  Okay.

10             MR. MEYERS:  I put in that letter

11   authority that can be relied on to suggest my fee

12   agreement is proper, but if obviously a bar tells me

13   otherwise, then otherwise it shall be.  But I do

14   want the Court to know that I -- I have submitted --

15   and I would really like constructive criticism from

16   Ms. Malone and an understanding from the Court's

17   perspective how better the clause that the Court and

18   Ms. Malone are questioning should be phrased.

19             The Court at the last hearing asked me

20   about the -- how many clients have sued us.  It's

21   one client who filed a countersuit.  That client

22   raises -- that client's lawyer raises a number of

23   issues in that countersuit.  The client never filed

24   a bar complaint and only said what she said in

25   response to our lawsuit.  I think that it weighs

```
 1   greatly that one client has sued us and it was a
 2   countersuit.
 3           The last point I would like to --
 4   next-to-last exhibit-- maybe not next-to-last, maybe
 5   one of the last few points, but they will be quick.
 6   Exhibit 28, Ms. Malone had mentioned --
 7           MS. MALONE:  I'm sorry, Your Honor, 28 for
 8   who?
 9           MR. MEYERS:  I'm sorry, 28 for
10   Weisberg & Meyers.
11           MS. MALONE:  Thank you.
12           MR. MEYERS:  Ms. Malone had mentioned that
13   all of these courts telling us we overbill, we
14   overstaff.  I had our office pull every single fee
15   motion we could find internally and on Westlaw and
16   prepared a chart for the Court, for the Court to
17   make its own determination what other courts have
18   said with regard to our fees, and I certainly need
19   not spend the Court's time reading the chart.
20           Prior to -- after the White case or after
21   the trial, Your Honor, somebody -- one of
22   Ms. Malone's colleagues reached out to my partner
23   regarding the upcoming motion for sanctions and --
24   let me not misphrase what this gentleman said.
25           THE COURT:  Just let us know what you are
```

```
 1   referring to.
 2              MR. MEYERS:  I am going to Exhibit 29.
 3   Exhibit 29, Your Honor, of the Weisberg & Meyers
 4   book.
 5              THE COURT:  Okay.
 6              MR. MEYERS:  And that concludes:  Robbie's
 7   willing to work with you or Marshall to try to avoid
 8   the ladder, which refers to sanctioning Noah and
 9   maybe Weisberg & Meyers.
10              And the last point -- second-to-last
11   point, Your Honor, second-to-last point.  I have
12   since corresponded with Ms. Malone -- and the e-mail
13   attached as or included as Exhibit 30 is not the
14   complete chain between us because we did correspond
15   after exhibits were due -- to tell her that I would
16   like to take responsibility for anything and
17   everything that is -- that could have been within my
18   control, and that I would like to work with her to
19   resolve these issues and to avoid ever being in a
20   situation like this.
21              I did tell her in an e-mail that is not in
22   the -- in fact, that was transmitted after the date
23   that the exhibits were due, that it makes me
24   nauseous to think that in three cases she could have
25   incurred over $200,000 in attorney's fees, but that
```

1    I don't begrudge her reasonable fee.  And I don't

2    think that these types of cases, as a well-defining

3    role with very limited exceptions, merit the type of

4    litigation that occurs with our offices, between

5    Ms. Malone and our office, Ms. Malone's office and

6    our office.

7           But, like I said to her, it takes two to

8    tango.  And by no means could it possibly be all her

9    doing, and that is why I want to be here to do

10   everything and anything I possibly can to not ever

11   let anything like this happen again.  And I am

12   certain that, given the Court's feelings about what

13   occurred here, that I could have done more to avoid

14   a number of things that the Court finds

15   objectionable, and I will strive to do that in the

16   future and to never be involved in anything like

17   this again.

18          I don't think that when a client doesn't

19   want a thousand-dollar offer of judgment and/or us,

20   in our opinion, think a case has more value, that

21   not accepting that offer of judgment is improper.  I

22   think it's the client's decision, and we certainly

23   have accepted considerably more offers of judgment

24   at the client's direction than we rejected.

25          At the same time, when filings become as

1    numerous as they are in this case and in what I

2    consider the three companion cases of White,

3    Whatley, and Whatley and then Mr. Patterson's case

4    in Scarlott, I could have that on my radar.  And I

5    could get to the bottom of it, figure out why, and

6    do more to make sure that either concludes -- that

7    it concludes, because it's not going to happen

8    again.

9              THE COURT:  All right.

10             Mr. Jefferson, did you have some

11   questions?

12             MR. JEFFERSON:  I do, Your Honor.

13             May I approach the lectern?

14             THE COURT:  You may.

15             MR. JEFFERSON:  Thank you.

16                     **CROSS-EXAMINATION**

17   Q.   (By Mr. Jefferson)  Mr. Meyers, good afternoon.

18        You and I, sir, have met for the first time

19   this morning, right?

20   A.   Yes.

21   Q.   And we've spoke on the phone a few times.

22   A.   Yes.

23   Q.   Okay.  Let me just see if I can clear up a few

24   things from the very beginning concerning some firm

25   structure issues.

1       Can you briefly tell me who the partners of the

2   Weisberg & Meyers firm were on the -- in February of

3   2013, which is during the trial of the underlying

4   case?

5   A.   Yes.  The two equity partners or senior

6   partners would be myself and Alex Weisberg, and

7   non-equity or junior partners would have been Mr.

8   Ehrlich and Mr. Aaron Radbil.

9   Q.   And just to be clear, because a couple of times

10  there were some references to a partner named

11  Mr. Radbil.  And since his brother is at the firm

12  and currently at the firm, Mr. Noah Radbil has never

13  been a partner at the firm.  Is that true?

14  A.   That is true.

15  Q.   The judge asked you a few questions a moment

16  ago regarding the change of the website, of the Of

17  Counsel situation that Mr. Noah Radbil is currently

18  listed under.  Do you recall some of those

19  questions?

20  A.   Yes.

21  Q.   Okay.  I want to have a few points of

22  clarification here for my own edification and for

23  that of my client.

24       The folks that are in charge of the website,

25  whoever that may be today, be it one or more than

154

1   one person, Mr. Noah Radbil is not amongst that

2   group, correct?

3   A.   Yes.

4   Q.   All right.  And as I appreciated the

5   explanation that you gave to the Court, the reason

6   why Mr. Radbil is still being listed as an Of

7   Counsel on the Weisberg & Meyers website is due to

8   the fact that, given the recent departure of his

9   firm, that there haven't been all of the motions to

10  substitute done yet, or did I misunderstand you?

11  A.   That's correct.

12  Q.   And I apologize, but I want, if you will, to

13  put a little meat on that bone.  When you are

14  talking about the motion to substitute counsel, are

15  you referring to all of the cases in which Mr. Noah

16  Radbil is listed as an attorney of record with a

17  Weisberg & Meyers case?

18  A.   I am referring to several different blocks of

19  cases.  One would be cases filed in federal court

20  where Mr. Radbil is either an attorney or designated

21  attorney in charge.

22       His designations as attorney in charge have

23  been removed from every case except this and the

24  Scarlott case, but he has not yet withdrawn or filed

25  a motion to withdraw in those cases.

1          We have, needless to say, been very occupied

2    with the substance of these.  The next set of cases,

3    Mr. Jefferson, is -- or are cases filed in Texas

4    State Court where the firm does not employ any Texas

5    attorneys any longer.

6          In those cases, too, Mr. Radbil, has called the

7    bar and learned -- and it's my understand from a

8    conversation with him -- that those cases are his

9    responsibility and they are not the firm's cases.  I

10   certainly cannot abandon him or the clients, so we

11   have agreed that until we can procure competent

12   counsel that he will stay on as Of Counsel.

13         I have become pro hac vice in a couple of those

14   cases.  And the other cases, I don't have an exact

15   count, but I believe we are probably talking about

16   15 cases.  So that's the second block of cases,

17   cases filed in Texas State Court.

18         And the third block of cases would be unfiled

19   state matters, and there is a short handful of them.

20   All of them have been or were engaged or retained

21   well before he departed.  And since he departed,

22   there is no new or are no new Texas state clients

23   being engaged by the firm.

24         I hope I answered that.

25   Q.   I appreciate it very much.  Thank you very

1  much.

2      Just for point of clarification with respect to

3  these unfiled cases, the way your firm operates is

4  you have a written contingency fee contract with

5  these folks, correct?

6  A.   A fee shifting and/or a contingency agreement,

7  yes.

8  Q.   Okay.  And let me make the distinction this

9  way:  None of the cases in which Mr. Radbil is

10  currently listed with respect to the Texas State

11  Court cases, for example, are cases in which the

12  client is actually paid a retainer and is paying a

13  monthly bill.

14  A.   That is correct.

15  Q.   Just to wrap a bow on all of this --

16  A.   Actually, Mr. Jefferson, there are several debt

17  settlement clients.  Those are not litigation

18  clients unless we have to defend a lawsuit, but

19  those clients did pay a 250-dollar retainer to the

20  firm and do pay a monthly maintenance fee.

21  Q.   I gotcha.

22  A.   And there maybe two or three of those.

23  Q.   Well, maybe a better way to clarify it would be

24  this.  The way the fee contract works with respect

25  to Weisberg & Meyers, the fee contract is a firm fee

```
 1   contract; in other words, the client agrees to hire
 2   the law firm as opposed to, say, Noah Radbil in his
 3   individual capacity.  True?
 4   A.    That is true.
 5   Q.    And that is true across the board irrespective
 6   of whether it's a state case or a federal case,
 7   true?
 8   A.    The only -- in Texas, yes.  The only exception
 9   would be if it's a co-counsel case, then the client
10   would retain both firms.
11   Q.    Sure.  Sure.  But just to be clear on this, I
12   want to make sure that when the client retains --
13   irrespective of who the co-counsel is, when they
14   retain the Weisberg & Meyers law firm, just like for
15   example Dr. White did, that fee contract is with the
16   firm as opposed to any lawyer in his or her
17   individual capacity, true?
18   A.    I think that's true.
19   Q.    Okay.  And the Weisberg & Meyers website,
20   that's a secure your website?  In other words, Noah
21   has departed from the firm, and he doesn't have the
22   ability to go in and hack your website and make
23   changes or modifications to it, true?
24   A.    I'm sure that's true.
25   Q.    Okay.  Now, one of the questions that was --
```

```
 1    that you brought up in your -- in your own direct
 2    was a situation involving this Court's approval of
 3    your law firm and Mr. Radbil as class counsel, but I
 4    don't believe that you referred to the case in
 5    particular.  Is that the case of Powell v.
 6    Procollect?
 7    A.   Yes.
 8    Q.   And did this Court approve not only your firm
 9    as class counsel, but did it award fees?
10    A.   Yes.
11    Q.   Okay.  And was Mr. Noah Radbil involved in that
12    case?
13    A.   Yes.
14            THE COURT:  What was the case number,
15    Mr. Jefferson?
16            MR. JEFFERSON:  It is 3:11-CV-0846.
17            THE COURT:  What's the initial on the end?
18            MR. JEFFERSON:  M.
19            THE COURT:  So it was Judge Lynn.
20            MR. JEFFERSON:  Okay.
21    Q.   (By Mr. Jefferson)  Did the case resolve?
22    A.   Yes.
23    Q.   Is that case now closed?
24    A.   Yes.
25    Q.   All right.  And do you know whether or not the
```

```
 1   order in that case was ultimately signed by Judge

 2   Boyle?

 3   A.    Until Judge Boyle said what she just said, I

 4   was under the impression she was, but now I am

 5   second-guessing that.

 6   Q.    Would it help you if I showed it to you?

 7   A.    Sure.

 8             MR. JEFFERSON:  Your Honor, may I

 9   approach?

10             THE COURT:  You may.

11   A.    Thank you.

12   Q.    (By Mr. Jefferson)  Mr. Meyers, for the record,

13   do you recognize that document as the order upon

14   which I was just questioning you?

15   A.    Yes.

16   Q.    Have you had a moment to peruse that order?

17             THE COURT:  Would you hand it to me,

18   please?

19             MR. MEYERS:  Yes, I have reviewed it

20   before.

21   Q.    (By Mr. Jefferson)  And does that refresh your

22   recollection about who signed it?

23   A.    Yes.

24   Q.    Okay.  Let's move to the next topic.  If you

25   could, sir, do you have in front of you Mr. Radbil's
```

1    exhibits?

2    A.    Yes.

3    Q.    Okay.

4    A.    Hang on one second, please.

5          THE COURT:  This was a case that I think I

6    handled the settlement part for Judge Lynn in the

7    summer a year ago.  I'm remembering the case; it was

8    assigned to Judge Lynn.

9          MR. RADBIL:  That's correct, Your Honor.

10         MR. MEYERS:  Yes, I do.  Mr. Jefferson --

11         MR. JEFFERSON:  Your Honor, can I get that

12   back from you?  Thank you.

13   Q.    (By Mr. Jefferson)  Okay.  Let's look at

14   Exhibit Number 5.

15         Do you understand that one of the allegations

16   that's been made in this case is -- has to do with

17   vexatious litigation and the way settlements are

18   handled?  You know that, sir, correct?

19   A.    Yes.

20   Q.    Okay.  Let's look at Exhibit Number 5.  Briefly

21   just tell the Court what Exhibit Number 5 is.

22   A.    This is a letter that was sent to the

23   defendant, certified mail return receipt, notifying

24   them of the claims that Dr. White, through our

25   office, was making prior to the filing of a lawsuit.

1  Q.   Okay.  And they were made by your firm to

2  Regional Adjustment Bureau?

3  A.   Yes.

4  Q.   And did you get a response where they

5  ignored -- what happened?

6  A.   I don't have a specific recollection.  But I am

7  going to assume, since a suit was filed, that this

8  and the follow-up letter that was sent were ignored,

9  but certainly I could be wrong.

10 Q.   Okay.  Let me ask it to you this way:  Would it

11 be fair to assume that RAB in this case had an

12 opportunity to participate in pre-suit negotiations,

13 given the tenor of this letter?

14 A.   Yes.

15 Q.   Okay.  Sir, if you would, please, let's go to

16 Mr. Radbil's Exhibit Number 1.

17 A.   Number 1?

18 Q.   Yes.

19 A.   Okay.

20 Q.   Do you understand that one of the allegations

21 being made in this case has to do with the way that

22 settlements were conducted?  Have you seen

23 Exhibit Number 1 before?

24 A.   I have.

25 Q.   Okay.  And do you recognize Judge Stickney as

1  being a U.S. Magistrate Judge?

2  A.    Yes.

3  Q.    And this Exhibit Number 1 is the judge's -- the

4  magistrate judge's settlement report?

5  A.    Yes.

6  Q.    Okay.  And based upon your review of this

7  document, do you have an opinion as to whether or

8  not settlement negotiations were conducted in good

9  faith between Mr. Radbil on behalf of your law firm

10 and Ms. Malone on behalf of her client?

11 A.    The order says -- or the settlement report, I'm

12 sorry, says that they were.

13 Q.    Okay.  And do you have any reason to dispute

14 what Magistrate Stickney had to say in this order?

15 A.    No, I don't.

16 Q.    Okay.  Do you see from the order who all was

17 present?

18 A.    Yes.

19 Q.    And one of the persons that was present was, in

20 fact, the plaintiff, Dr. White, correct?

21 A.    Yes.

22 Q.    Okay.  And have you seen any documents filed by

23 any side in the underlying case that attempted to

24 refute the findings of the magistrate that the

25 negotiations were conducted in good faith?

1   A.   I believe that that is one of the general

2   themes of Ms. Malone's motion that we were not

3   participating in settlement.

4   Q.   Okay.  Well, let me -- maybe my question was

5   poorly worded, so I apologize.  My question is:

6   Were there any contemporaneous complaints filed once

7   the magistrate's order came out?

8   A.   Not that I'm aware of.

9   Q.   Okay.  If you would, sir, please turn to

10  Exhibit--

11  A.   Mr. Jefferson, hang on one second.  I do

12  recall -- if I may just have a moment just to --

13  review.

14          THE COURT:  Go ahead.

15          MR. JEFFERSON:  Certainly.

16          MR. MEYERS:

17  A.   -- an e-mail between Ms. Malone and I just to

18  make sure I am being accurate.  One moment, please.

19      I am looking at 21 right now of

20  Weisberg & Meyers, but I'm not pointing to anything

21  yet.

22  Q.   (By Mr. Jefferson)  Let me ask the question

23  this way, Mr. Meyers, and certainly I want to give

24  you whatever time you need to review those

25  documents.  But were any written objections made to

 1    the magistrate's report?

 2    A.    Not that I'm aware of, no.

 3    Q.    Okay.  And tell me when you are finished with

 4    that exhibit.  I want to move on, but I want to give

 5    you an opportunity to do whatever you need to do.

 6    A.    Thank you.

 7          I see that prior to the settlement conference

 8    that Ms. Malone -- but after this Court granted

 9    summary judgment, partial summary judgment in

10    Dr. White's favor, that Ms. Malone and I began to

11    engage in settlement negotiations.

12          I believe, though I'm not sure, that this was

13    the case where Ms. Malone noted to me that our

14    client would listen to the magistrate, but I am not

15    sure of that.

16          So to the extent that that constitutes some

17    sort of objection or feelings that there weren't

18    good faith negotiations, just to be clear.

19    Q.    Okay.  Well, since you brought up the issue of

20    the partial summary judgment, for timeline purposes,

21    when was that garnered?

22    A.    That was prior to this settlement conference.

23    I believe that was late November of 2012.

24    Q.    Okay.  And so to put that into context, if you

25    would, sir, in Mr. Radbil's exhibit book, if you

1   would turn to Exhibit Number 34, specifically

2   Exhibit A to 34.

3   A.   Okay.

4   Q.   Okay.  And this, of course, is a document from

5   2011, correct?

6   A.   Yes.

7   Q.   Okay.  So this is more than a year prior to the

8   summary judgment that you just got through

9   discussing, correct?

10  A.   Yes.

11          THE COURT:  Are we looking, Mr. Jefferson,

12  at Radbil's Exhibit 34?

13          MR. JEFFERSON:  Yes, Your Honor, Exhibit A

14  to Exhibit Number 34.

15          THE COURT:  Okay.  All right.  Go ahead.

16          MR. JEFFERSON:  And are you with me, Your

17  Honor?

18          THE COURT:  Yes, I am.

19          MR. JEFFERSON:  Okay.  Thank you.

20  Q.   (By Mr. Jefferson)  And you will notice on here

21  that this is an e-mail sent from you to a gentleman

22  at graycats@hotmail.com.  Do you recognize that as

23  Dr. White's e-mail address?

24  A.   Yes.

25  Q.   And there is a cc on here to Dennis Kurz,

1   correct?

2   A.   Yes.

3   Q.   This is at a point in time in which Mr. Noah

4   Radbil -- let me ask you, is Mr. Noah Radbil a

5   lawyer on this case at this time, or do you know?

6   A.   I don't know the answer to that.

7   Q.   Okay.  And so if he is, he's not copied on this

8   e-mail from you.  But regardless, does this e-mail

9   document or reflect conversations that you had with

10  your client regarding settlement negotiations and a

11  Rule 68 offer?

12  A.   Yes.

13  Q.   And without getting into the specifics, did

14  this -- the e-mail starts off by saying:  It was a

15  pleasure speaking with you today.

16       So would it be fair to assume that what

17  preceded that particular e-mail was actually some

18  sort of telephonic client conference?

19  A.   Yes.

20  Q.   And without getting into the specifics, was the

21  purpose of that telephonic client conference, for

22  you as the team leader or whatever your title was,

23  to keep Dr. White apprised of what was going on with

24  respect to settlement in this case?

25  A.   Yes.

1    Q.    Okay.  If you would, sir -- and I apologize for

2    jumping around, but I'm trying to keep this in

3    somewhat of a logical sequence.  Go with me, now, if

4    you will, to Exhibit Number 4 of Mr. Radbil's

5    exhibits.  Okay?

6    A.    I am there.

7    Q.    Okay.  And so my question to you is:  You

8    recall getting some questions previously from

9    Ms. Malone about the Whatley case, correct?

10   A.    I don't know that she asked me any questions

11   about it.  I do recall mentioning it in my

12   narrative, but I am not disagreeing with you.  I

13   really don't know.

14   Q.    Okay.  In this particular case, did Mr. Noah

15   Radbil participate in this case?

16   A.    Yes.

17   Q.    Okay.  And it's fair to say that in this case

18   you have liability findings that are in your favor

19   with respect to damages.  The damages were a

20   thousand dollars, right?

21   A.    For the FDCPA.

22   Q.    That's right.  And there were other

23   machinations about this case that we have already

24   discussed, true?

25   A.    I'm not sure I understand your question,

1    Mr. Jefferson.

2    Q.    Okay.  Let's just do it this way.  Okay?  In --

3    ultimately, in -- go to Exhibit Number 9, and I will

4    kind of show you where I am going with this.

5    A.    Okay.  I'm there.

6    Q.    Okay.  And in that case, did Ms. Malone's

7    client move for sanctions against your client and

8    the firm in that case?

9    A.    Yes.  This is a different case than the Whatley

10   case that we were just speaking about.

11   Q.    Yes.  And just so this is clear, this is the

12   Thomas E. Whatley case, right?

13   A.    Yes.  This is one of the three cases I refer to

14   as White, Whatley, and Whatley.

15   Q.    Just for the record, there are two Whatley

16   cases.  So this is Thomas Whatley v. AHF Financial

17   Services, LLC, and others, correct?

18   A.    Yes.

19   Q.    And that was in the United States District

20   Court for the Eastern District of Texas?

21   A.    Yes.

22   Q.    Okay.  And in that case, was a motion for

23   sanctions made against your client and your law

24   firm?

25   A.    Yes.

```
 1   Q.    And was that motion denied?

 2   A.    Yes.

 3   Q.    Okay.  All right.  In that case, was one of the

 4   complaints lodged against your law firm by

 5   Ms. Malone a complaint that you multiplied the

 6   proceedings unreasonably or vexatiously, in other

 7   words, a 1927 Motion?

 8   A.    Yes.

 9   Q.    And that part was denied as well, correct?

10   A.    Yes.

11   Q.    All right.

12             MS. MALONE:  Your Honor, can I interrupt?

13             THE COURT:  Yes, Ms. Malone.

14             MS. MALONE:  I just want to make sure the

15   Court understands that the case -- and I think

16   Mr. Meyers is trying to clarify.  The case in which

17   there was a verdict against my client was a

18   different case in which there was a 1927 Motion.  In

19   that case, my client prevailed on summary judgment.

20   And I think Mr. Meyers is trying to make that clear.

21   Their names are very similar, so it's confusing

22   except perhaps to the lawyers that were involved.

23             MR. JEFFERSON:  Yes, I appreciate that.

24   That's why I wanted to go back and point out that

25   the first one, Exhibit 4, is the CreditWatch
```

1    Services Thomas Whatley case.  The one I am

2    questioning on now with respect to Exhibits 9 and 10

3    is the Whatley v. AHF case.  So I apologize if I

4    caused the confusion.

5    Q.    (By Mr. Jefferson)  And likewise, just to wrap

6    this up, with respect to Exhibit Number 10, there

7    was also a report and recommendation of the

8    magistrate judge considering the defendant's joint

9    motion for attorney's fees and costs in the Whatley

10   v. AHF case, correct?

11   A.    Yes.

12   Q.    And what did the federal magistrate judge do

13   with respect to that motion?

14   A.    The Court denied the motion.

15   Q.    Okay.  And then, ultimately, if we can look at

16   Exhibits 11 and 12 very briefly -- and I will just

17   kind of shorthand it for reasons of time -- would

18   you agree that there were signed orders adopting the

19   report and recommendation of the magistrate judge

20   with respect to the denying of sanctions and

21   attorney's fees?

22   A.    Yes.

23   Q.    Okay.  Now I want to ask you just a couple of

24   other questions.  There were some questions that

25   were posited to you by the Court regarding some of

1    the deficiencies with the motions for pro hac vice

2    and the Washington State Court.

3        My question to you is:  Who was -- or let me

4    put it this way.  Weisberg & Meyers were the folks

5    that were in charge of finding the associated

6    counsel that would appear as local counsel in the

7    pro hac vice motions as opposed to non-partner folks

8    like Mr. Noah Radbil, correct?

9    A.   I think I would have been responsible for that,

10   yes.

11   Q.   And ultimately in those cases, were either

12   Mr. Noah Radbil or your law firm ever sanctioned in

13   those Washington courts?

14   A.   No.  And you were asking, Mr. Jefferson, about

15   the Whatley v. CreditWatch case.  The judge there

16   noted, at least as to part of Ms. Malone's motion,

17   that the situation was of their own making.

18   Q.   Okay.  And I think maybe -- and maybe I'm the

19   person that's confused, but I want to make sure that

20   the record is correct, because you said Whatley v.

21   CreditWatch.  Did you mean AHF?

22   A.   I did.

23   Q.   Okay.  That's all right.  I made the same

24   mistake earlier.  Anything else that you needed to

25   add on that?

```
 1   A.   That order is in Exhibit 15 of my book.  I'm
 2   not sure if it's in your book.
 3   Q.   Okay.  And then finally, let me ask you this
 4   question:  Have you ever believed -- irrespective of
 5   whether or not there were mistakes made or errors in
 6   judgment, however you want to categorize them, have
 7   you ever believed that any attorney associated with
 8   Weisberg & Meyers who worked on the Timothy White
 9   case acted in bad faith?
10   A.   I have not.
11        MR. JEFFERSON:  Thank you.  That's all I
12   have, Your Honor.
13        THE COURT:  Ms. Malone.
14        MS. MALONE:  Thank you, Your Honor.
15                  REDIRECT EXAMINATION
16   Q.   (By Ms. Malone)  Mr. Meyers, there's something
17   that you said earlier that I just wanted to clarify.
18   When you were talking with the Court about the
19   Stovall order involving Mr. Weisberg and your firm
20   you said, In light of the Court's sanctions and bar
21   complaint, was there an attendant bar complaint that
22   was filed on that case?
23   A.   I did not say that.
24   Q.   That's what I heard, and it may be a
25   misunderstanding, that's why I'm asking you, sir.
```

```
1    Was there an attendant bar complaint?

2    A.    No.

3    Q.    That's fine.  I just wanted to make sure I

4    understood what you said.  Thank you.

5          Is Mr. Radbil getting paid on the cases in

6    which he continues as Of Counsel?

7    A.    He is not, and that is a bone of contention

8    that him and I have to work out.

9    Q.    Do you anticipate Mr. Radbil being paid in the

10   fee shifting area if you receive costs or attorney's

11   fees in those cases?

12   A.    No.

13   Q.    So if your firm is awarded attorney's fees in

14   those cases, you do not anticipate Mr. Radbil being

15   compensated for his time.

16   A.    He won't be.

17   Q.    Even though he's doing work.

18   A.    Yes.  For cases that he worked on while he was

19   at the firm, his salary covered that and the firm

20   obviously recovers the fees.  For cases that him and

21   I have to either have him take or substitute

22   competent Texas counsel, I'm going to have to

23   compensate him for his time --

24   Q.    Okay.  And you will --

25   A.    -- win or lose.
```

1   Q.   Okay.  And you would be submitting invoices to

2   the other side or to the Court for payment under

3   those fee shifting statutes that would include

4   Mr. Radbil's time in this interim period of time.

5   Is that fair?

6   A.   I don't know the answer to that.

7   Q.   Okay.  On your website as of a few days ago,

8   Mr. Ehrlich is also still listed as Of Counsel,

9   correct?

10  A.   Yes.

11  Q.   So both Mr. Ehrlich and Mr. Radbil are no

12  longer members of your firm.

13  A.   That is right.

14  Q.   And they are both listed as Of Counsel on your

15  website.

16  A.   Mr. Ehrlich is listed the same way for the same

17  reason as Mr. Radbil are.  There are cases that were

18  engaged by Weisberg & Meyers when he was there, and

19  now he has left, but I still feel like I am

20  responsible for those cases.

21  Q.   You took a moment to talk to the Court about an

22  exhibit in your binder, 29, which was an e-mail

23  between an attorney in Florida and Mr. Weisberg.  Do

24  you remember that?

25  A.   Yes.

1    Q.    The date of that e-mail is February 28, 2013,
2    correct?
3    A.    I'm going to it.  Yes, it is.
4    Q.    And Mr. Golden suggested that you might want to
5    speak with me, correct?
6    A.    Yes.
7    Q.    And in the e-mail that you told the Court that
8    you reached out to me to see if we could find a
9    resolution to this issue is in Exhibit Number 30,
10   which is October 1st, 2013, correct, Mr. Meyers?
11   A.    Yes.
12   Q.    And no contact about potential resolution
13   between those, other than my asking you if you would
14   like to speak, correct?
15   A.    You approached me on two occasions, yes.
16   Q.    So the only communication was me saying,
17   Mr. Meyers, would you like to talk about this, or
18   words to that effect, and no response from you.  Is
19   that correct?
20   A.    I did respond, but -- I believe your point is
21   correct, that I did not invite a conversation with
22   you to resolve this between your client and my firm
23   until October 1st.
24   Q.    You told the Court that you would have
25   preferred or would have liked for me to have

1    identified for you things that I thought were

2    misrepresentation on your website, give you the

3    opportunity to correct those matters.  Do you recall

4    that?

5    A.    Yes.

6    Q.    But in the case of the Whaley case, I did reach

7    out to you, Mr. Meyers; my client complained to you,

8    as well, correct?

9    A.    Yes.

10   Q.    And you did not take those matters down until

11   about a week ago, correct?

12   A.    No.  I believe that your client reached out to

13   me about the Newswire report, and I believe that

14   that was prior to the second trial.  I could be

15   incorrect.

16         THE COURT:  Ms. Malone, because there have

17   been so many instances on the Whaley situation,

18   would you remind the exhibit and the representation

19   on the website that was offensive to your client?

20         MS. MALONE:  Yes, ma'am, I will.  Your

21   Honor, that appears in Exhibit 37 under Noah

22   Radbil's website, Associated Attorney Note.  There

23   is a reference to a victory in the Whaley trial.

24         And then the second place that it would

25   matter to the Court is Exhibit Number 39, which is

1   Mr. Meyers' letter to the State Bar of Texas in

2   which he references e-mails attached where I ask him

3   to remove the paid submission to the Law Firm News

4   and just remove references to my client and they

5   would stop complaining.

6   Q.    (By Ms. Malone)  Do you recall generally that I

7   asked you just to take it down and my client would

8   quit complaining?

9   A.    I don't think that that completely describes

10  our conversation, but yes, that was part of the

11  conversation.

12  Q.    The Whaley judgment that was entered in this

13  case by Judge Hoffman appears at Exhibit 18 --

14  A.    Okay.

15  Q.    -- and it's signed by Judge Hoffman on April

16  the 5th of 2013; is that correct?

17  A.    Yes.

18  Q.    You did not remove that from your website,

19  though, until last week sometime, correct?

20  A.    Yes.

21  Q.    Now, Mr. Meyers, if Mr. Radbil had indicated to

22  us that you control the information on the website

23  and that he didn't have the authority to remove that

24  from his biography, would Mr. Radbil be incorrect?

25  A.    Well, like I said before, I don't write

1    people's bios.  So anything that's written there is

2    written -- with the exception of my bio, is written

3    by other people.  Had someone said to me, I would

4    like this updated, it certainly would have been

5    updated.  But I do think that it's correct that I do

6    control the website.

7    Q.    Who wrote Mr. Radbil's bio?

8    A.    I'm sure Mr. Radbil did.

9    Q.    So in the case of Aaron Radbil, he wrote that,

10   as well?

11   A.    Yes.

12   Q.    So if Mr. Radbil told us during the discussion

13   of the Whaley case that a potential resolution would

14   be to remove that from the website, that he could

15   not do that without your authority, would that be

16   wrong?

17   A.    I assume that -- I think that that would be

18   right, but that is not something that I would have

19   withheld.

20   Q.    So you're saying he would have had -- he would

21   have to have had your permission to remove it from

22   the website, he could not have done it on his own?

23   A.    I think that the webmaster would have received

24   a request from Mr. Radbil and that the webmaster

25   would have asked me prior to doing it.  I think

1  that's what would have occurred.

2  Q.   And you would have freely given him that

3  permission at his request?

4  A.   Yes.

5             MS. MALONE:  No further questions.

6             THE COURT:  Who was the webmaster?  I

7  didn't think you knew who that was.

8             MR. MEYERS:  The webmasters's name is

9  Matthew Smelley (phonetic).

10            THE COURT:  I have a couple of questions

11  on this website, looking at Exhibit 37 in RAB's

12  exhibits, if you have that, if you will go to that.

13            MR. MEYERS:  Yes.

14            THE COURT:  Now, I don't know the date of

15  this posting, but I know that Mr. Radbil has been

16  practicing about since 2009, as I recall.  Do you

17  have this?

18            MR. MEYERS:  Yes.

19            THE COURT:  I want to go down to -- sort

20  of towards under, Notable Representations.

21            MR. MEYERS:  Okay.

22            THE COURT:  Okay.  You go down to, there

23  is a big paragraph, and right under that one it says

24  that Mr. Radbil served as plaintiff's counsel for a

25  major league baseball player in a seven-figure

1   breach of fiduciary duty case.

2           Could you tell me who that was?

3           MR. MEYERS:  No, I couldn't.

4           THE COURT:  Could that have happened in

5   connection with your firm?

6           MR. MEYERS:  No.

7           THE COURT:  So this brand-new lawyer is

8   working with a major league baseball player and a

9   seven-figure salary, and you never heard of that

10  before?

11          MR. MEYERS:  That would be before he

12  joined my firm.

13          THE COURT:  Would that surprise you that a

14  young lawyer would have that kind of experience?

15          MR. MEYERS:  I don't know who he was

16  working with.

17          THE COURT:  Okay.  Well, it says,

18  Plaintiff's Counsel, it doesn't say, Of Counsel or

19  Among Others.

20          It also says that he served as plaintiff's

21  counsel -- going down a few blurbs -- for several

22  authors in a copyright infringement class action

23  against S-C-R-I-B-D, the world's largest social

24  publishing company.  Now both of these last two

25  entries are far above and away the kind of clients

1    that you have described Mr. Radbil being associated

2    through the FDCPA or TBCPA type cases.  Do you know

3    who this would have been?

4              MR. MEYERS:  I do not.

5              THE COURT:  These are large cases that

6    would have not been involved with anything in your

7    firm.

8              MR. MEYERS:  Correct.

9              THE COURT:  Okay.  Yet, he's only

10   practiced since 2009.  Does this surprise you?

11             MR. MEYERS:  You know, Your Honor, I rely

12   on people to write a biography that's accurate, so I

13   never thought about it.

14             THE COURT:  So then he's among several --

15   next one down, several lawyers in law firms

16   representing a group of former NCAA Division I

17   student-athletes in a class action against videogame

18   producer EA Sports and the NCAA for use of -- for

19   sale and use of student-athlete likenesses.

20             Do you know any of the student athletes

21   that would have been connected with that?

22             MR. MEYERS:  Again, Your Honor, it's not

23   our case.  I have no idea.

24             THE COURT:  But these are much, much

25   larger and much more substantive cases than you have

1    described have been under Mr. Radbil's authority in

2    your firm; is that right?

3              MR. MEYERS:  Yeah, I think that's right.

4              THE COURT:  But you think this is true?

5              MR. MEYERS:  I have no reason to think it

6    isn't true, Your Honor.  But again, I rely on people

7    to write a biography that's accurate.

8              THE COURT:  Again, just going back up to

9    the first representation, Notable Representations.

10   Mr. Radbil served as lead counsel for a real estate

11   development firm in a seven-figure condemnation

12   action concerning a City of Houston public museum.

13   Any knowledge of that?

14             MR. MEYERS:  No, Your Honor.

15             THE COURT:  Okay.  These aren't the kind

16   of cases that some lawyers wouldn't have any

17   authority over for ten or 15 years in their practice

18   normally, wouldn't you say?

19             MR. MEYERS:  I think that might be

20   accurate.

21             THE COURT:  People with 15 years of

22   experience would be fighting over these kind of

23   cases as I would see.

24             MR. MEYERS:  That's probably correct, Your

25   Honor.

1          THE COURT:  That's all I have.  Anything

2    else.

3          MR. JEFFERSON:  Yes, Your Honor, I have

4    just a few.

5                    **RECROSS-EXAMINATION**

6    Q.   (By Mr. Jefferson)  And let me, just for

7    purposes of -- do you know anything about

8    Mr. Radbil's prior employers, like the Ahmad

9    Zavitsanos firm in Houston or the Camara & Sibley

10   firm, do you know anything about them or what kind

11   of cases they handle?

12   A.   A little bit; a little bit.

13   Q.   Okay.  Now let me ask you this question:  Do

14   you know enough about those law firms to speculate

15   as to who their clientele is?

16   A.   Well, AZA, the first firm you mentioned, we met

17   them, so to speak, because they represented Mercedes

18   in a couple of lemon law claims.  I don't think that

19   at that time I even knew who Mr. Radbil was.

20        Camara Sibley, Sibley was the lawyer who worked

21   at AZA on the lemon law cases, so I had some

22   experience with Mr. Sibley previously.

23        Mr. Camara's reputation is fairly well known.

24   But for the -- with the exception of some co-counsel

25   cases with Camara & Sibley when I first met

1   Mr. Radbil, this one, when he was working there, at

2   a dinner with I believe Mr. Ahmad and several

3   members of Camara & Sibley, I don't know a great

4   deal about what they do.

5          MS. MALONE:  I'm sorry.  May I interrupt?

6   And I apologize to the Court.  But I think it would

7   be helpful if Mr. Jefferson was willing -- if

8   Mr. Radbil could tell us how long he was with those

9   firms and what his positions were.

10          THE COURT:  At some point we need to

11  determine that.  If that's part of your protocols

12  today, I'm not going to have you --

13          MR. JEFFERSON:  Again, Your Honor, one of

14  the things we plan on doing is calling Mr. Radbil

15  back to the stand.  And certainly I agree that some

16  of those questions would be fair game.

17          All I'm trying to establish with this

18  gentleman is the nature, if any, of his

19  understanding of Mr. Radbil's prior employers, not

20  the specifics of any of the cases.

21          THE COURT:  That's fine.  Thank you.

22  Q.   (By Mr. Jefferson)  And one of the reasons we

23  call them AZA is because the firm is actually Ahmad,

24  Zavitsanos & Anaipakos.  I'm sure the court reporter

25  will not need help spelling those names.

1   A.    I take your word for it.

2   Q.    Fortunately, it's on the exhibit before you.

3         One last question:  Ms. Malone just got through

4   asking you some questions about, well, if Mr. Radbil

5   assists during the wind-down process of making sure

6   that there is somebody else enrolled in his place

7   before he steps out and leaves the person

8   unrepresented, you said in response to one of

9   Ms. Malone's questions that you may submit Noah

10  Radbil's time on those cases.  Do you recall those

11  questions?

12  A.    I do.  I said -- I believe I said I don't know

13  if I would submit his time.  I haven't even thought

14  about it.

15  Q.    Fair enough.  Thank you for that clarification,

16  A; and B, would you agree with me that you would

17  also have to get Mr. Radbil's permission to submit

18  that time before you could do so?

19  A.    Yes.

20  Q.    Okay.  And as you sit here today, you do not

21  have that permission, true?

22  A.    I think that's true.

23         MR. JEFFERSON:  Okay.  Thank you, sir.

24         THE COURT:  Where are we?  Anything else,

25  Mr. Meyers.

```
 1                MR. MEYERS:  Not at this time.

 2                THE COURT:  All right.

 3                MS. MALONE:  I think that I was going to

 4      take the stand and Mr. Martin was going to question

 5      me.

 6                THE COURT:  It's been a long day.  Let's

 7      talk before everybody leaves about the next

 8      available calendar date.  And I was wondering if our

 9      court coordinator is here, if you could ask

10      Mr. Reynolds to come out.  Do you have some dates?

11                MR. JEFFERSON:  I asked my secretary to

12      send me dates, so I ask for permission to do that?

13                THE COURT:  Absolutely.

14                You may step down.

15                MR. MEYERS:  May I also get available

16      dates from my office?

17                THE COURT:  Yes, please.  Actually, what I

18      think I will do is have Mr. Reynolds talk to you all

19      and everybody look at their dates and we will do it

20      then.  I appreciate the patience.  I have all of the

21      exhibits.  I have exhibits up here.  I'm not sure

22      whose all of these are, but I would ask that we

23      don't leave anything duplicative here.  Please take

24      your exhibits back.

25                MS. MALONE:  What about the set for the
```

```
1    court reporter?
2          THE COURT:  She'll take care of them.
3          Go ahead and leave it.  I'm just worried
4    about all of this up here, all of the affidavits and
5    all of that.  So what we are talking about are three
6    notebooks:  The Radbil exhibits; your exhibits,
7    which are both in separate notebooks; and then
8    Mr. Meyers', which are in three big notebooks.  And
9    I don't know that we need two or three copies of the
10   three notebooks.  Do we have those?
11         MS. MALONE:  Maybe I was confused, but I
12   thought Mr. Meyers had brought a copy for the court
13   reporter.  I think both Mr. Jefferson and I brought
14   copies for the court reporter that we were using for
15   the witness, and I believe ours are the two
16   notebooks sitting there.
17         THE COURT:  Let's just do this:  All I
18   want to do is make sure that when you all leave here
19   we know what we have and you know what you have so
20   we don't have notebooks sitting around that don't
21   have an owner.
22         If you can figure that out, we will
23   recess, and I will see you back here at the next
24   hearing.
25         (Court in recess at 3:44 p.m.)
```

```
 1                  C E R T I F I C A T E

 2           I, Shawnie Archuleta, CCR/CRR, certify

 3    that the foregoing is a transcript from the record

 4    of the proceedings in the foregoing entitled matter.

 5           I further certify that the transcript fees

 6    format comply with those prescribed by the Court and

 7    the Judicial Conference of the United States.

 8           This 30th  day of October 2013.

 9

10

11                        s/Shawnie Archuleta
                          Shawnie Archuleta CCR No. 7533
12                        Official Court Reporter
                          The Northern District of Texas
13                        Dallas Division

14

15

16    My CSR license expires:  December 31, 2013

17    Business address:  1100 Commerce Street
                         Dallas, TX  75242
18    Telephone Number:  214.753.2747

19

20

21

22

23

24

25
```

**SHAWNIE ARCHULETA, CSR/CRR**
**FEDERAL COURT REPORTER – 214.753.2747**