```
            IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF TEXAS
                     DALLAS DIVISION

TIMOTHY WHITE,              )
                            )
          Plaintiff,        )
                            )
vs.                         )  3:11-CV-1817-B
                            )
REGIONAL ADJUSTMENT         )
BUREAU, INC., d/b/a         )
RAB, INC.,                  )
                            )
          Defendant.        )

                JURY TRIAL - VOLUME 3
         BEFORE THE HONORABLE JANE J. BOYLE
            UNITED STATES DISTRICT JUDGE
                 FEBRUARY 27, 2013

              A P P E A R A N C E S
For the Plaintiff:

     WEISBERG & MEYERS, LLC
     9330 LBJ FREEWAY - SUITE 900
     Dallas, TX  75243
     (888)595-9111
     BY:  NOAH D. RADBIL

For the Defendant:

     ROBBIE L. MALONE
     8750 North Central Expressway - Suite 1850
     Dallas, TX  75231
     (214)346-2631

COURT REPORTER:  SHAWNIE ARCHULETA, TX CCR No. 7533
                 1100 Commerce Street
                 Dallas, Texas 75242


proceedings reported by mechanical stenography,
transcript produced by computer.
```

### TRANSCRIPT OF PROCEEDINGS – VOLUME 3

Ruling on Rule 50 Motion                              10

Charge Conference                                     39

Closing Argument by Mr. Radbil                        61

Closing Argument by Ms. Malone                        63

Rebuttal Argument by Mr. Radbil                       78

Jury Instructions read to the jury                    80

```
1                    (In open court at 9:09 a.m.)

2              THE COURT:  Good morning.  For the record,

3    this is Civil Action 3:11-CV-1817, Dr. Timothy White

4    v. RAB.

5              We are here on the second day of trial.  I

6    see defense counsel is here.  I see Dr. White,

7    plaintiff, is here.  I do not see counsel.  Everyone

8    was directed to be here by 8:00.  It's ten after

9    nine.

10             Dr. White, do you know what's going on?

11             DR. WHITE:  I don't, Your Honor.  I left

12   several messages for Mr. Radbil.  I apologize.  I

13   don't know the circumstances.

14             THE COURT:  Did you have a chance to

15   confer with him last night?  I mean just in any way

16   that might indicate there was something that might

17   get in the way with him getting here on time today?

18   And I will ask you to stand up, because you talk

19   softly, and it's hard to hear you.

20             DR. WHITE:  Oh, I'm sorry.

21             No, quite the opposite.  We agreed to meet

22   at 7:00.  He wasn't here.  I was actually early to

23   meet at 6:30.  I've left him several messages.

24             THE COURT:  Here at the courthouse?

25             DR. WHITE:  Yes.
```

4

```
 1                THE COURT:  And you got nothing from him?
 2                DR. WHITE:  Yes.  And I let him know I was
 3       coming directly to the courtroom.
 4                THE COURT:  And you have been dealing with
 5       him for quite some time, have you not?
 6                DR. WHITE:  Yes, Your Honor.
 7                THE COURT:  And have you ever had this
 8       kind of an issue?
 9                DR. WHITE:  No, only when the trial
10       started, he has been late on more than one occasion;
11       not prior to that, though.
12                THE COURT:  Okay.  Thank you.  Again, I
13       apologize.  You deserve competent counsel, as does
14       everyone in a trial.  I've been real concerned in
15       this case for you.
16                Let me hear from Ms. Malone.
17                MS. MALONE:  Your Honor, I actually do
18       have a concern, and I would not ordinarily tell the
19       Court of this, but I think I have an obligation to
20       do so.
21                In the beginning of this case -- it was
22       filed originally in July of 2011.  After we received
23       service of the lawsuit, I contacted the firm, the
24       plaintiff's firm and asked them for a settlement
25       demand and received a response from them, which is
```

1   very unusual, which was they were not interested in
2   discussing settlement.

3          In October of 2011, we made a significant
4   offer of judgment to Mr. Radbil's firm, specifically
5   for the entire maximum statutory award that
6   Mr. White would be entitled to, as well as all
7   attorney's fees as of that date.

8          I spoke with Mr. Radbil yesterday.  I
9   tried to talk to him about the charge.  He wasn't
10  interested.  When I had him on the phone --

11          THE COURT:  This was after court.

12          MS. MALONE:  Yes, ma'am, it was about ten
13  minutes to nine last night.

14          I asked Mr. Radbil, I said, after the
15  judge's discussion, I'm surprised you don't want to
16  talk settlement to me, to which he responded he did
17  not.

18          And I said, Mr. Radbil -- I said, Noah, to
19  be honest with you, Judge.  I said, Noah, you do
20  understand that because we made an offer of
21  judgment, if we win on the issue of the actual
22  damages on anything else in front of the jury, your
23  client could, in fact, be exposed to a judgment for
24  our attorney's fees.  And he said he was not
25  interested in discussing settlement.

1              We have had two other cases in state

2    court, Your Honor, and I apologize I did not bring

3    the transcripts, where we've become aware that

4    Mr. Radbil did not relay offers of judgments or

5    settlements to his client.  I am concerned that

6    Mr. White does not know that an offer of judgment

7    was made or that there could be a risk of a judgment

8    entered against him in this kind of a case.

9              THE COURT:  Dr. White, you've got counsel.

10   He's not here, and he's acting way out of the

11   ordinary since this trial started.  You don't have

12   to talk to opposing counsel since you're represented

13   by counsel.

14             Under the circumstances, I would just say,

15   it's up to you if you would like to talk to them

16   without knowing where he is.  He's an hour and 15

17   minutes late on the day of a jury trial with the

18   jury going to be here soon.  And if you want to

19   answer this question, fine.  If you don't, I

20   understand.  But are you aware of anything of the

21   nature of what Ms. Malone just described, this offer

22   of judgment rule and how it might bind you

23   potentially?

24             DR. WHITE:  No, Your Honor, I was not.

25             THE COURT:  That's all right.

1              DR. WHITE:  No, I was not.

2              THE COURT:  Okay.  We are in a bind here

3     with a jury trial.  And I can't -- I don't know of

4     any reason to declare a mistrial, but that would

5     make more expense and burden further the defendants,

6     who have pretty much followed the rules so far, and

7     I know you have, too.  I know this has been a

8     difficult situation for you, as well.

9              You are the only one that can decide if

10    you want to talk to them in this situation without

11    counsel.  I would say under the circumstances I see

12    no legal or ethical barriers or nor would I support

13    any kind of sanctions against defense for bringing

14    this up and talking to you under these circumstances

15    so that they are protected down the road.

16             It seems to me you may want to talk to

17    them, but I will leave that up to you.  We have to

18    do something today though.  We have to go forward

19    with the jury trial with or without him.

20             So do you want -- do you want -- I will

21    give you a few minutes to maybe try to call him

22    again and then let me know if you want to talk to

23    Ms. Malone.

24             DR. WHITE:  I can do that.  And again, I

25    apologize.  I'm embarrassed, actually mortified, you

1    know, by the circumstances.

2         This is a huge inconvenience to the Court,

3    and I apologize to Ms. Malone and Mr. Wyatt.  I'm

4    really not aware of what's going on with Mr. Radbil.

5    I didn't -- you know, I didn't dial a lawyer.  I

6    contacted a student loan advice website and -- over

7    a number of months, actually, and was referred to

8    this law firm.  Everything seemed to be square.

9    Everything seemed to be legitimate.  I'm not an

10   attorney, but, you know, they seemed to know what

11   they were doing, and I'm sorry that this has

12   happened.  I'm happy to apologize to the jury, too.

13        THE COURT:  I don't think you need to do

14   that.  I don't think there's any indication that you

15   have done anything that caused any of this.  His

16   conduct has been way off the charts in terms of --

17   well, you saw what happened yesterday.  Even a lay

18   person could see what was going on with what he was

19   attempting to do and then seems to have no basis for

20   what he was saying.  I don't know if that's why he

21   is not here or not.

22        But he has a responsibility as a licensed

23   attorney to stand up for you, to get through this

24   case, good or bad.  And if he's abandoned that

25   today, that is a big problem.  But the bigger

1    problem facing us is, we are in the middle of a jury

2    trial.  I couldn't, in my view, put defense through

3    another trial because of what Mr. Radbil is doing.

4              Perhaps you can call a friend or get some

5    advice, but I would like for you to come to an idea

6    if you think you can come to some agreement with

7    defense, with or without Mr. Radbil, so we don't

8    have to go forward with this jury trial without your

9    attorney, because I will go ahead with it.  We have

10   no idea where he is.  Okay?  Let me give you about

11   15 minutes to sort of think it through.  All right?

12             DR. WHITE:  Thank you, Your Honor.

13             THE COURT:  Ms. Malone, anything else?

14             MS. MALONE:  Yes, Judge.  This is really

15   unchartered waters for me, so I'm not really sure

16   what to do.

17             During the course of this case, we were

18   provided with a copy of the attorney-client

19   agreement that Mr. White signed with that law firm.

20   And there is a clause here that I think is maybe

21   problematic for Mr. White, and I think it's been

22   waived by the law firm, which is that, if he makes

23   an agreement with us and they don't get their

24   attorney's fees, that he could be subject to paying

25   their attorney's fees.  But when they abandon him at

1    trial, I don't see how they can enforce that.

2           Frankly, I don't think this is compliant

3    with Texas law, but, you know, I'm not in that

4    position of doing that.  I would think that the

5    Court, under the circumstances of recognizing that

6    Mr. Radbil is not here and his behavior in the

7    trial, would give Mr. White some protection if he

8    did want to resolve the issue with us.

9           THE COURT:  Under the circumstances, I

10   would absolutely give you protection from what --

11   what Ms. Malone has described as this clause in this

12   particular contract.  And if you can hand that to

13   Ms. Woodward.  Let me make a copy of that so we have

14   it.

15          And let me go ahead and say for the record

16   that, as to the motion under Rule 50 with regard to

17   the telephone collection -- Telephone Protection

18   Act, 47, I believe it is -- 47 U.S.C.

19   227(b)(1)(A)(iii), I grant the Rule 50 motion for

20   the following reasons -- so that means that that

21   claim is out of the case.  This was going to happen

22   whether your attorney was here or not, Mr. White.  I

23   just needed to do some additional research based on

24   hearing the arguments yesterday.

25          So just basically, defense counsel has

1    made a motion for judgment as a matter of law under

2    Federal Rule of Civil Procedure 50(a).  Rule 50(a)

3    permits relief as a matter of law where a party has

4    been fully heard on an issue during a jury trial and

5    the Court finds that a reasonable jury would have a

6    legally sufficient evidentiary basis to find for the

7    party on that issue.

8            Section 227(b)(1)(A)(iii) of the TCPA

9    prohibits an entity from making any call, using any

10   automatic telephone dialing system or an artificial

11   or prerecorded voice to any telephone number

12   assigned to a paging service, cellular telephone

13   service, specialized mobile radio service, or other

14   radio common carrier service, or any service for

15   which the called party is charged for the call.

16           47 U.S.C. Section 227(b)(1)(A)(iii) --

17   this is a cite -- the federal definition of an

18   automatic telephone dialing system is equipment that

19   has the capacity, A, to store or produce telephone

20   numbers to be called using a random or sequential

21   number generator; and B, to dial such numbers.

22   That's in the statute already cited to.

23           In essence to prevail on claim under

24   Section 227(b)(1)(A)(iii), plaintiff must prove that

25   defendant used an automatic telephone dialing system

1  or prerecorded voice to call plaintiff's cell phone.

2          Defendant has moved for judgment as a

3  matter of law on the basis that:

4          One:  Plaintiff failed to present evidence

5  that defendant uses an automatic telephone dialing

6  system as defined by federal law;

7          Two:  Plaintiff failed to present evidence

8  that defendant used such a system to call

9  plaintiff's cell phone.

10          The plaintiff's response to the argument

11  by defense addressed only the first argument, namely

12  whether defendant operates an automatic telephone

13  dialing system.  The evidence presented in the

14  plaintiff's case in chief came solely from the

15  defendant's Director of Compliance and Human

16  Resources and the only witness for that defendant

17  and the only other of two witnesses for the

18  plaintiff, Robert Wyatt.

19          Plaintiff also submitted through Wyatt,

20  Plaintiff's Exhibit 10, which is a printout of the

21  defendant's website.

22          In his testimony and on direct exam, Wyatt

23  stated that the defendant utilizes the Ontario

24  systems guaranteed contacts dialer.  He testified

25  that their dialing system does not store numbers to

1   be called, but that each night the number system is

2   wiped clean and each morning defendant must enter

3   the numbers to be called into the dialing system.

4           Defendant's website, Plaintiff's Exhibit

5   10, advertises that he uses a predictive dialer and

6   explains the benefits of using such a dialer.  But

7   Mr. Wyatt testified on direct, and then again on

8   cross, that the website contains a mistake -- and

9   that was not contradicted anywhere -- that the

10  defendant dialing system is not a predictive dialer.

11          Mr. Wyatt also testified on cross that

12  regardless of the dialing system it operates, each

13  of the calls to plaintiff -- each of the calls made

14  to plaintiff's cell phone, which are the calls that

15  would underlie the liability under the Texas --

16  under the TCPA, each of those calls to plaintiff's

17  cell phone were dialed manually.  There is nothing

18  that refutes that.

19          Mr. Wyatt explained that a manual dial

20  means that the collector physically punched in each

21  of the numbers that make up the plaintiff's cell

22  phone number.

23          Wyatt based his testimony on defendant's

24  account notes, and they were a preadmitted exhibit,

25  which indicate that each call to the cell phone was

1  made manually.

2          Wyatt also testified that, if a call was

3  made using defendant's dialing system, the system

4  would automatically label the call log entry as

5  having been made from the dialing system and that no

6  employee could modify that label.

7          Plaintiff's counsel argues that the

8  defendant's website proves that the defendant has a

9  predictive dialer.  Counsel also argued that the FCC

10 has ruled that predictive dialers constitute

11 automatic telephone dialing systems.

12         In a summary judgment briefing, plaintiff

13 had pointed to a case, Lee v. Credit Management, 846

14 F.Supp. 716, Southern District 2012.  The Lee case,

15 however -- and in that case they cite to the rules

16 and regulations implementing the TCPA.

17         The Lee case, though, did not decide

18 whether predictive dialers were -- whether or not

19 predictive dialer, the predictive dialer in that

20 case, was an impermissible automatic dialer; nor did

21 it decide whether the predictive dialer was used.

22 The Court merely found that there was an issue of

23 fact.

24         Further, the FCC rules that the Lee case

25 follows merely state that a predictive dialer could

1   be an automatic dialing telephone dialing system

2   when certain computer software is attached or when

3   paired with certain software.

4          Plaintiff next points to, In re: In the

5   Matter of Rules and Regulations Implementing the

6   TCPA of 1991, found at 23 FCC rcd. 559, January 4,

7   2008, wherein the FCC stated in this declaratory

8   ruling:  We affirm that a predictive dialer

9   constitutes an automatic dialing system, telephone

10  dialing system, and is subject to the TCPA's

11  restrictions on the use of auto dialers.  There is

12  some, then, support that predictive dialers may be

13  automatic telephone dialing systems.

14          Nonetheless, here, on the evidence

15  presented, plaintiff has not presented evidence,

16  anywhere close to adequate evidence, that, even if

17  its system was a predictive dialer -- and they have

18  not established that -- that it had the capacity to

19  store or to produce numbers as required to

20  constitute an automatic dialing system.  My

21  recollection was that Mr. Wyatt specifically said

22  that it didn't do that.

23          More importantly, even if plaintiff could

24  argue that its evidence shows that the defendant's

25  dialer was an automatic telephone dialing system,

1    plaintiff neither presented evidence nor

2    contradicted evidence brought out by it during

3    Wyatt's direct examination that the calls made by

4    the defendant to the plaintiff's cell phone were all

5    manually dialed and not dialed using the dialing

6    system.

7              Accordingly, having heard the arguments,

8    done additional research, examining the law and Rule

9    50 standards, the Court finds that plaintiff has

10   been fully heard on this issue with regard to the

11   Telephone Consumer Protection Act, and that -- and a

12   full opportunity, plaintiff has had, to present his

13   evidence on this claim, and concludes that a

14   reasonable jury would not have a legally sufficient

15   evidentiary basis to find for the plaintiff on this

16   TCPA claim.  So I grant the motion by the defendant

17   under Rule 50 on plaintiff's TCPA claim.  So that

18   claim is out of the case.

19             So what's left, then, are those claims

20   that were ruled in favor of plaintiff on summary

21   judgment to be submitted for potential damages.  And

22   then there's that issue with regard to discovery

23   disclosures on damages and how that might curtail

24   how much can be asked for by plaintiff, and one jury

25   issue, and that's under the Fair Debt Collection

1   Practices Act, and that's the collector's call to

2   debtor's employer under 15 U.S.C. Section 1692c.

3          So potentially going to the jury would be

4   that one I just mentioned, the 15 U.S.C. 1692d(6),

5   no disclosure of collector's identity where summary

6   judgment was granted for plaintiff.

7          Under 15 U.S.C. 1692e(11), false means of

8   collection, the February 17th and the March 11th

9   calls, summary judgment under that statute were

10  found in favor of plaintiff, so those are for

11  damages.

12         Under the Texas Finance Code,

13  392.304(a)(4), the February 17th call and March 11th

14  call were found to be in favor on summary judgment

15  of plaintiff, so those claims under the TDCPA would

16  be submitted for potential damages by the -- to the

17  plaintiff.

18         And then the Texas Finance Code,

19  Section 392.304(a)(5)(B), where there is no

20  disclosure of the collector's identity, the February

21  17th call and the March 11th call were found in

22  favor of the plaintiff.  I believe that's what's

23  left.

24         So Dr. White, I will give you a chance to

25  try to decide what you want to do.  I am going to go

1    forward with this trial, lawyer or not, to the jury.

2             I would strongly advise you to consider

3    talking about -- talking with Ms. Malone about what

4    can be done at this time; that, perhaps, would be to

5    your benefit as opposed to going through the jury

6    trial.  So let's give you about 15 minutes or so.

7    All right?

8             DR. WHITE:  Okay.

9             THE COURT:  Any questions?

10             DR. WHITE:  Just one.  And I apologize, it

11   seems presumptuous for me -- seems like I'm acting

12   like my own attorney, which I am not in any way.

13   But I felt like I should make a response to the

14   issue of sandbagging yesterday with the claims.

15             I did quantify the damages.  And they were

16   not an abstract sum for mental anguish, they were

17   real financial damages that I suffered.  I made sure

18   Mr. Radbil had that information.  The judge recorded

19   it in the settlement conference, and I was led to

20   believe it would be submitted for this trial, which

21   of course it wasn't.  So I apologize."

22             THE COURT:  I don't think anyone is taking

23   issue with any of your conduct at all in this case.

24             The idea that the very clear Federal Rules

25   of Civil Procedure, the pretrial disclosure

1   requirements from -- the requirements that begin at

2   the inception of a case all require that some

3   specific amount, if it's going to be requested, be

4   disclosed pursuant to these rules.  Disclosing and

5   addressing what you might agree to settle in a

6   mediation, which is confidential and not to be

7   disclosed to anyone, would not be enough, even if

8   your attorney told you that.  Even if he gave you

9   that impression, that's not going to be enough to

10  give them the notice they are entitled to under the

11  law to prepare for that proof.

12         DR. WHITE:  In fact, his response was that

13  that doesn't need to be submitted, that it's

14  entirely up to the jury, which I know isn't true,

15  because I have served on a jury before where damages

16  were decided.  I was the foreman on that jury, and I

17  know you have to have some kind of -- some kind of

18  suggestion of damages.  The jury can't be left on

19  their own to decide what somebody's damages are.

20         THE COURT:  And there are some parameters

21  on that.  But the bottom line is that, in the civil

22  system, everybody gets to be on notice of what

23  everybody else is going to do, especially when it's

24  how much money are you asking for; how much do you

25  say you were harmed; what's your specific amount.

1    And the exceptions to that, if there are any, don't

2    apply here.  So no one is faulting you for that,

3    Dr. White.

4          Let's take a break and let you collect

5    your thoughts and see what you want to do.  Either

6    way, we are going to have this settled or go with

7    the jury.  Under these circumstances, as far as I'm

8    concerned if you haven't heard from Mr. Radbil,

9    unless there's something completely unforeseen, like

10   an accident, he's pretty much abandoned you.  And I

11   don't know how to answer that at this stage.  He

12   doesn't even have a partner or anyone who has

13   contacted us if something like that has happened.

14         Ms. Malone.

15         MS. MALONE:  The only thing I wanted to

16   say on behalf of my client to Dr. White is that we

17   have no ill feelings toward him.  We don't want him

18   to think that by any means -- in fact, I told you

19   the issue this morning, because I am concerned as an

20   attorney that I think someone has not been told the

21   information.

22         THE COURT:  Okay.  Let's have you all talk

23   and see if you can come to some agreement, and we'll

24   go from there.

25         (Recess taken from 9:31 to 10:15.)

```
 1              THE COURT:  All right.  It's 10:15.
 2    Lawyers were to be here at 8:00.  Everyone was but
 3    Mr. Radbil.  Where were you?
 4              MR. RADBIL:  Your Honor, I was not feeling
 5    well.  I have food allergies, and I think I ate
 6    something yesterday evening shortly after I filed
 7    our jury instructions.  So I was in my hotel room a
 8    block away.  I apologize to the Court.  I didn't
 9    know that it had milk ingredients in it, but that's
10    where I was.
11              THE COURT:  Mr. Radbil, we never heard
12    from you until close to ten.
13              MR. RADBIL:  When I eat stuff with milk in
14    it, I get sick, so I was not available to call
15    prior.
16              THE COURT:  And you agreed to meet your
17    client at 6:00 or something this morning.
18              MR. RADBIL:  Early, yes.
19              THE COURT:  But you didn't; you didn't
20    call him, either.
21              MR. RADBIL:  There was nobody that I could
22    call.  I couldn't call anybody.
23              THE COURT:  Why?
24              MR. RADBIL:  I was not in -- I was not
25    awake to call people.  I was in bed sick.
```

 1             THE COURT:  Mr. Radbil, we're in the

 2    middle of a jury trial.  We have jury instructions

 3    that were supposed to be ready to go by 10:15.

 4    That's why everyone was supposed to be here at 8:00.

 5             You have an obligation to your client,

 6    which I have seen you fall short on since this trial

 7    started, for all the reasons I talked about

 8    yesterday.  I am extremely troubled that you didn't

 9    show up today; didn't call us until almost two hours

10    after you were due.  So we have all been waiting

11    here with no jury instructions; the jury is here.

12             Your client, needless to say, has been

13    extremely concerned about where you were.  Your

14    client has a right to counsel of choice.  He also

15    has a right at any time to fire his counsel.  And I

16    think that that ought to be a discussion at this

17    point.  It was pretty clear to most of us that you

18    had abandoned this case.  I've never had a lawyer do

19    that before.

20             MR. RADBIL:  I disagree.

21             THE COURT:  So I would like to make

22    sure -- Mr. Radbil, could I finish?  I would like to

23    make sure that you've thoroughly addressed this with

24    Dr. White and I hear directly from Dr. White as to

25    how he wants to proceed.

1          Dr. White, if you will stand, please.

2          DR. WHITE:  Your Honor, I think I've

3    already come to a decision with opposing counsel

4    about how to proceed.  I don't think firing or

5    retaining has anything to do with the decision.

6          THE COURT:  When you were gone, it was the

7    clear idea that you had abandoned the case

8    Mr. Radbil.  I've never had anybody not show up like

9    this without a phone call.  It's highly disturbing

10   behavior -- let me finish.

11         Your client indicated while we were

12   waiting for you that there were certain things that

13   came up yesterday that were new to him as far as

14   this damages issue and what had and hadn't been

15   disclosed.  So you've got some issues between he and

16   you that may need to get resolved at some point.

17         In the meantime, I gave defense counsel

18   permission and described to Dr. White that he had an

19   absolute right to do what he wanted, to either talk

20   to them or not talk to them, but I was going to let

21   him make that decision on his own since we had not

22   heard a word from you.  So apparently there was some

23   discussion with my blessing on where the case ought

24   to go.  Have you talked to him about this?

25         MR. RADBIL:  Briefly, as I was walking

1  into the courtroom.  I talked to him about it very

2  briefly.

3           THE COURT:  So Dr. White, is it your

4  desire to try to resolve this on some terms that you

5  were briefly able to discuss with defense counsel or

6  with or without counsel?

7           MR. RADBIL:  I don't think --

8           THE COURT:  I'm not asking you anything,

9  Mr. Radbil.  I want to hear from Dr. White.

10           MR. RADBIL:  He's my client.

11           THE COURT:  I don't know that he's your

12  client anymore.  I want you to be quiet for a moment

13  and let me hear from Dr. White.

14           DR. WHITE:  Your Honor, I'm not sure of

15  the conditions of retaining counsel.  I don't think

16  that's a question.  It seems we've already come to

17  an agreement, and that's probably the best.

18           THE COURT:  Okay.  And would that be

19  between you and the defense without Mr. Radbil

20  involved?  Or is he somehow -- I'm just trying to

21  figure out, is he part of the signing off on the

22  papers?  And Mr. Radbil, just leave him alone.  Take

23  a seat.

24           MR. RADBIL:  I don't know --

25           THE COURT:  Take a seat, Mr. Radbil.  Take

1  a seat.  Okay.

2          The question is this:  You have a right to

3  proceed and settle this case with or without

4  counsel.  You have a right to counsel of choice.

5  You don't have to put up with the kind of behavior

6  you have had with counsel in this case so far, but

7  you can.  It's up to you.

8          When he didn't show up at all this morning

9  and we didn't hear from him, well beyond the period

10  of time he was supposed to, that's highly unusual

11  behavior.  I've not had that in 30 years, an

12  attorney just not show up like that.

13          So the question is, what were you to do?

14  I told you we were going to have to go ahead without

15  hearing from him with the jury trial without him.  I

16  have already made a ruling on the Texas Telephone

17  Act claim, which is now out of the case for the

18  reasons I stated.  And so the issue is that these --

19  take a seat, Mr. Radbil.  Mr. Radbil, take a seat.

20  I don't want to hear from you until I tell you I

21  want to hear from you.

22          The question is:  Do you want to proceed

23  in your settlement discussions with Mr. Radbil, or

24  do you want to settle this case without him and

25  terminate him?  Those are really your two options.

```
 1              DR. WHITE:  I do want to proceed with the
 2    settlement agreement.  I'm not sure that -- I'm not
 3    sure that firing counsel changes that in any way.
 4              THE COURT:  The only way it would change
 5    it is if he is your agent and refuses to sign off on
 6    the settlement papers.
 7              Mr. Radbil.
 8              MR. RADBIL:  I would like to counsel my
 9    client, please, Your Honor.
10              THE COURT:  Well, before you do that, I
11    want to find out what your intentions are.  Do you
12    -- are you interested in engaging in settlement
13    discussions with defense counsel at this point or
14    not?
15              MR. RADBIL:  We have engaged --
16              THE COURT:  Are you interested at this
17    point or not?
18              MR. RADBIL:  Yes, but I would like to
19    counsel my client.
20              THE COURT:  Let me make something real
21    clear.  I will let you counsel your client.  I am
22    concerned about what you might say to him,
23    considering what I have heard about you so far and
24    watched about you so far, but just be clear on
25    something.  For the two hours, three hours that you
```

```
 1    were supposed to be here today that you weren't
 2    here, the attorney's fees incurred by the defense on
 3    this side will be paid by you out of pocket for
 4    those three hours we have been sitting around
 5    waiting for you.  I will get a bill from them, find
 6    out what they are, and you are going to pay them.
 7    So just make sure you are clear that that's part of
 8    this ultimate resolution of this case.
 9              MR. RADBIL:  Before --
10              THE COURT:  Ms. --
11              MS. MALONE:  Your Honor, I would like to,
12    if I could, put on the record the agreement that we
13    had made with Mr. White so that Mr. Radbil can hear
14    it and so the Court can hear it.
15              I have told Mr. White that the agreement
16    from our standpoint still stands, but I think it
17    would help the Court understand what our agreement
18    exactly was.
19              We have agreed that we would pay Mr. White
20    the $1,000 that we had offered him at the beginning
21    of the case, and we would waive any right to pursue
22    attorney's fees --
23              THE COURT:  It's impossible for Mr. White
24    to hear this if you are talking to him, Mr. Radbil.
25              MR. RADBIL:  I would like to counsel my
```

1  client.

2          THE COURT:  Take a seat.  If you don't

3  take a seat, you will be held in contempt.  You have

4  done enough already in this case.  Take a seat.  I

5  will let you counsel with your client, if he is your

6  client, at the appropriate time.

7          Go ahead.

8          MS. MALONE:  Your Honor, we said we would

9  pay the $1,000 directly to Mr. White made payable to

10  Mr. White and waive any right to pursue attorney's

11  fees that we would be entitled to under a Rule 68

12  offer of judgment if it were to proceed.

13          We also agreed with Mr. White that we

14  would specifically retain the right to proceed for

15  attorney's fees against the law firm of

16  Weisberg & Meyers and Noah Radbil under 1927 motions

17  for attorney's improper filings of pleadings and

18  procedures and also the Rule 37 sanctions we

19  discussed as part of our motion yesterday.  And we

20  had indicated to Dr. White we would have no further

21  actions towards him, we only wanted to retain our

22  right to go for attorney's fees against the law

23  firm, and we would file it in this case.

24          THE COURT:  Okay.  All right.  I want,

25  Mr. Radbil, you and your client to step outside and

1   talk.  And then I want to hear from him how he wants

2   to go ahead, with you or without you.  And once we

3   figure that out, we will decide.  I know I've heard

4   from you.  He wants a chance to talk to you.  Until

5   it's clear that he's fired from the case or not, I'm

6   going to give him that opportunity to talk to you,

7   Dr. White, unless you are telling me right now you

8   don't want to do that.

9           DR. WHITE:  No, I am not.

10          THE COURT:  Let's take ten minutes.

11          (Recess taken from 10:23 to 10:39.)

12          MR. RADBIL:  Your Honor, may I request a

13   conference in chambers briefly?

14          THE COURT:  With the other counsel?

15          MR. RADBIL:  Yes.

16          THE COURT:  It would be on the record.

17          MR. RADBIL:  Okay.  That's fine.

18          THE COURT:  Does this have something to do

19   with attempting to resolve this case?

20          MR. RADBIL:  It does have something to do

21   with attempts to resolve the case.

22          THE COURT:  We have a jury that's already

23   been waiting 20 minutes past what we have told them.

24   Is this like moving towards settlement?

25          MR. RADBIL:  Well, I'm concerned because I

1    understand my client may have been threatened this

2    morning.

3            THE COURT:  Oh, please.  First of all,

4    Mr. Radbil, I don't believe the excuse that you have

5    given us for showing up this morning.  You look

6    fine, you never called us.  So I think it's yet

7    another one of your prevarications in this case that

8    is completely in the disinterests of everything the

9    Court is supposed to move ahead and everything

10   that -- the Court's obligations to ensure that both

11   sides are proceeding ethically and professionally,

12   particularly the Court's inherent responsibility

13   over watching over counsel.

14           So once again, in, I don't know how many

15   incidents, I have found you untruthful and

16   incompetent.  And now, as I have suspected, instead

17   of going forward with what appears to be in the best

18   interests of your client, you are pointing your

19   finger again, which so far has rendered you, again,

20   to appear as someone who doesn't know how to tell

21   the truth.

22           So if that's all this is about, then, no.

23   The truth is, is that you have let your client down,

24   you have let the Court down, you have inconvenienced

25   the jury, and you have inconvenienced and cost money

1   and expense to defense counsel.

2          So it sounds like what you have done is

3   turned the whole thing around for your poor client

4   and make it sound like he's been the victim of

5   someone besides you.

6          What is your agreement between you and

7   Dr. White with regard to attorney's fees?

8          MR. RADBIL:  Our agreement with regards to

9   attorney's fees is that he is not going to be

10  responsible for paying our attorney's fees --

11         THE COURT:  Anyone's.

12         MR. RADBIL:  -- under the statute.  And

13  under the FDCPA, the Court is the decider of

14  reasonable and necessary attorney's fees.

15         THE COURT:  Here's my question:  Does he

16  owe you, by contract or otherwise, any potential

17  responsibility for attorney's fees?

18         MR. RADBIL:  Not anymore.

19         THE COURT:  Okay.  What do you mean, not

20  anymore?  Because isn't there a signed agreement

21  between the two of you that would indicate that he

22  does?

23         MR. RADBIL:  I think that it indicates

24  that if he would accept a settlement, which would

25  provide for less than the amount of recovery -- and

```
 1    I have to go back and read it carefully before --
 2            THE COURT:  Well, what about this,
 3    paragraph 11 of your agreement?  There are only
 4    three ways that client can be required to pay
 5    attorney's fees to Weisberg & Meyers or anything
 6    more than the amounts stated above, one:  If the
 7    client terminates attorneys services or otherwise
 8    fails to cooperate in the prosecution of his case.
 9            So right now, if Dr. White were to fire
10    you for your incompetent, under your contract he
11    would owe you money; is that right?
12            MR. RADBIL:  I disagree with the
13    statement, number one; number two, we won on summary
14    judgment; and number three, we would never do that
15    to Dr. White.
16            THE COURT:  But you signed an agreement
17    that says you will.
18            MR. RADBIL:  And I will amend the
19    agreement.
20            THE COURT:  You will vitiate the
21    agreement?  Are you saying right now it's no good?
22            MR. RADBIL:  No.
23            THE COURT:  You're not going to hold him
24    liable for this agreement?
25            MR. RADBIL:  I'm not saying --
```

```
 1              THE COURT:  Let me read the next sentence.
 2   Again, if he terminates your services, it looks like
 3   under this contract, he owes you money.  If the
 4   client enters an agreement whatsoever with the
 5   defendant that does not require the defendant to pay
 6   in full attorney's fees and costs incurred by
 7   Weisberg & Meyers without prior written consent of
 8   Weisberg & Meyers to enter into such agreement.
 9              So basically, if he agrees with them and
10   fires you, he has a whole lot of liability towards
11   Weisberg & Meyers, correct?
12              MR. RADBIL:  He's concerned that he was
13   threatened with that this morning.  And I was
14   talking to him and explaining that not only will
15   that not happen, but I am happy to memorialize that.
16   That's something I will talk about with my client.
17              THE COURT:  Let's go ahead and get it in
18   writing here in court.
19              Mr. Radbil, you haven't -- you've
20   indicated and presented yourself as someone who is
21   not to be believed at every turn.  You have let your
22   client down.  You weren't prepared for trial.  You
23   didn't even submit marked exhibits.  You took on
24   theories that made no sense.  You made statements,
25   at least four that I can think of off the top of my
```

34

1  head, that were completely untrue.  Your strategy

2  and your questions weren't even close to what I

3  thought they would be compared to the summary

4  judgment pleadings.

5          So you have handled yourself in a way that

6  I see as detrimental to your client in this case.

7  And then, on top of all that, you are supposed to be

8  in here on the big day, jury argument with the jury

9  instructions and the Court's ruling on the Rule 50

10 motion, and you are a no-show.  You don't show up at

11 7:00, you don't show up at 6:30.  You don't even

12 call.  We finally hear from you at 9:45.  That's

13 incompetence.  That's worse than incompetence.

14         So I just want to make sure that this

15 idea, with this incompetence, that he actually wants

16 to keep you in this case and is not keeping you

17 because he is afraid you will somehow hold this

18 contract against him.  So you are not going to?

19         MR. RADBIL:  No.  I mean, we have a

20 contract of representation.  He does not want to

21 fire me, because I have represented him well in this

22 case.  We won on summary judgment.

23         THE COURT:  Dr. White, let me have you

24 speak for yourself.

25         Please take a seat, Mr. Radbil.  Please

1  take a seat.

2          Dr. White, you have a right to counsel of

3  your choice, of course.  I have never seen this kind

4  of behavior in federal court from a defense attorney

5  or a plaintiff's attorney.  It's not just

6  inexperience, it's incompetence, and it's not being

7  truthful; operating in bad faith.  To leave you here

8  this morning for two hours is unconscionable.

9          Having said all of that, I think you can

10  glean from what I have said, you have a choice to go

11  forward with him or not.  If there is a concern that

12  you have to being bound by some agreement, then we

13  need to talk about it, because I would be really

14  worried about the ethics behind your decision.

15          So what do you want to do?

16          DR. WHITE:  Your Honor, I apologize.  I'm

17  a little overwhelmed by the --

18          THE COURT:  I understand.

19          DR. WHITE:  -- legalities.  And Mr. Radbil

20  has assured me that that will be a matter of record,

21  that I'm not responsible for any attorney's fees.

22          It's equally threatening to consider

23  firing my counsel.  I'm not sure which, honestly,

24  would be the better choice at this point.  I'm

25  interested in settling the case as quickly as

1  possible, whether that be by jury or otherwise.

2          THE COURT:  And it doesn't sound, though,

3  now that Mr. Radbil is with you and you have decided

4  to retain him, that settlement is a possibility; is

5  that correct?

6          DR. WHITE:  I'm sorry?

7          THE COURT:  It sounded like settlement was

8  off the table with him representing you, or am I

9  wrong about that?

10         DR. WHITE:  That's wrong.

11         THE COURT:  Okay.  So you still can agree

12  to settle this case and resolve it before the jury

13  makes a decision.

14         DR. WHITE:  If we can come to an

15  agreement, yes.  I feel -- I don't feel safe firing

16  counsel at this point.

17         THE COURT:  That is your choice.  All I'm

18  trying to point out is that you haven't been

19  well-served from your perspective.  It is your

20  choice.

21         Now, with that in mind, I would like to

22  give you a chance with Mr. Radbil to talk to

23  opposing counsel for a short time.  I'm going to let

24  the jury go for the day, and we will start this jury

25  trial up tomorrow.  I won't have them waiting here

1  any longer.  But I want to hear back from you in 30

2  minutes as to whether or not there has been a

3  settlement, understanding that, Dr. White, you would

4  like to keep your attorney.

5          See you back in 30 minutes and see where

6  we are.

7          (Recess taken from 10:48 to 11:13.)

8          THE COURT:  Okay.  I guess really the only

9  question is if the parties have settled.

10         Mr. Radbil?

11         MR. RADBIL:  We have not, Your Honor.

12         THE COURT:  Okay.  Ms. Malone?

13         MS. MALONE:  We have not, Your Honor.

14  There is one matter we need to clear up.

15         THE COURT:  Okay.

16         MS. MALONE:  Mr. Radbil seems to think I

17  had inappropriate conversations with his client this

18  morning after the Court gave me specific permission

19  to do so, and I am frankly furious about it.

20         THE COURT:  Well, it's -- Mr. Radbil, your

21  behavior has been shocking.  And I have found it

22  driven as we go through this by bad faith and

23  dishonest behavior.

24         You didn't show up for trial this morning

25  after your poor, substandard behavior yesterday; no

1   word from you.  As I said, I have no glimmer of

2   belief that you were sick, but you just didn't show

3   up to create a little chaos here in the courtroom,

4   and you did.  And you have shown up and you look

5   fine, and no one heard from you for two hours,

6   including your client.

7           So don't you dare accuse defense counsel

8   of anything, when you brought on all of the chaos

9   this morning that caused the Court to ask, in my

10  obligation, to make sure things are being ethically

11  conducted, to ask your client if he heard from you,

12  and, if not, what his position was on this case.

13          As far as I knew, you abandoned the case.

14  And no good attorney, not even close to competent

15  attorney, would have done what you did.  So if you

16  haven't settled, we will do the jury argument at

17  3:00 today, so I need some jury instructions.  I

18  will not let the jury go.

19          We will take care, Mr. Radbil, of your

20  conduct after this case is over, and it will be

21  serious.

22          I've got proposed jury instructions, and

23  I'm going to put something together and get it out

24  here to you.  I want both sides here until we get

25  that out, and I want an agreement to the charge.  If

1   there is nothing else on the jury charge, we will

2   recess, but I want you here.  The jury argument, I

3   hope, will be conducted between 2:30 and 3:00.

4            MS. MALONE:  So we're supposed to wait

5   until the charge comes out, Your Honor?

6            THE COURT:  Yes.  Are you all right?

7            MS. MALONE:  Yes.  I'm just mad.

8            THE COURT:  All right.  We will be in

9   recess.

10           (Recess taken from 11:15 to 2:20.)

11           (Out of the presence of the jury.)

12           THE COURT:  You should have a copy with

13  many of the typos and whatnot from the first version

14  corrected.  I've got -- okay.  So let me hear from

15  both of you.  We are still going to start up at

16  3:00.  The jury will be back at three, Mr. Radbil.

17  Just tell me what page you are on.

18           MR. RADBIL:  Your Honor, I'm on page 5 of

19  14.

20           THE COURT:  Okay.  Are you on the one I

21  sent you back, because there are some major changes.

22           MR. RADBIL:  No, Your Honor, I'm not.

23           THE COURT:  Go to that one, please.

24           MR. RADBIL:  I think it was stipulated

25  also that the consumer -- that the debt was a

1    consumer debt under the FDCPA and that stipulation

2    is not included.  I would object to the

3    non-including of that.

4            THE COURT:  I have Joint Statement of

5    Stipulated Facts, and I have four stipulated facts.

6            MR. RADBIL:  We did that when I raised

7    this issue before trial began, I believe.

8            THE COURT:  Okay.  So what you're asking

9    is that something else be in there as a stipulated

10   fact, and that is what?

11           MR. RADBIL:  That the debt that RAB

12   attempted to collect from Dr. White was, in fact, a

13   consumer debt.

14           THE COURT:  Ms. Malone?

15           MS. MALONE:  Judge --

16           THE COURT:  I don't see a need to add it.

17   The stipulated facts are an optional addition by the

18   Court in the charge, and they're in there.  I

19   understand your position.  Let's move on to your

20   next position.  It's a quarter of three.  We were

21   supposed to start today at ten.

22           MR. RADBIL:  I wanted to preserve my

23   objections.

24           THE COURT:  I am not letting you not

25   preserve your objections, I just want to be clear on

```
 1    the time frame here.
 2              MR. RADBIL:  On Section 2, liability.
 3              THE COURT:  What page?
 4              MR. RADBIL:  Page 6 of 20.
 5              THE COURT:  Okay.
 6              MR. RADBIL:  I believe -- and I will
 7    double-check.  I thought that the Court found as a
 8    matter of law in its summary judgment ruling that
 9    Simple Surrogacy was the place of employment.
10              THE COURT:  Ms. Malone?
11              MS. MALONE:  I thought you found it as a
12    fact issue.
13              THE COURT:  I disagree; overrule that
14    objection.  Let's move on to your next one.  Okay?
15              MR. RADBIL:  Okay.
16              THE COURT:  While he's doing that,
17    Ms. Malone, I'm assume you are not contesting that
18    stipulated fact that he was asking about, that it's
19    a consumer debt?
20              MS. MALONE:  No, ma'am.  I just don't
21    think it's an issue.
22              THE COURT:  It's not.  Okay.
23              Where are you, Mr. Radbil?  What page?
24              MR. RADBIL:  I'm on page 6 of 20.
25              THE COURT:  Let's move along here.
```

1          MR. RADBIL:  I would like to include, if

2     possible -- or I object to the exclusion of an

3     instruction or explanation of 1692c(a)(3) based on

4     Horkey, so what is necessary for the debt collector

5     to have reason to know.

6          THE COURT:  Okay.  Is there a pattern

7     5th Circuit on that?

8          MR. RADBIL:  No.

9          THE COURT:  Is there a case you are aware

10    of that that has been approved or mandated as part

11    of the jury instruction?

12         MR. RADBIL:  I haven't looked at the

13    instruction on it.

14         THE COURT:  But you aren't aware of any?

15         MR. RADBIL:  No.

16         THE COURT:  Let's move on to your next

17    objection.  Overruled.

18         What page are you on, Mr. Radbil?

19         MR. RADBIL:  I'm on page 7 of 20.

20         THE COURT:  You've got to move along.

21    It's ten to three.  I want your objections.  Come

22    on.

23         MR. RADBIL:  I will pick it up.  So

24    question 1 says --

25         THE COURT:  What page?

```
 1                MR. RADBIL:  Page 7 of 20.

 2                THE COURT:  Okay.

 3                MR. RADBIL:  Actually, I don't object.

 4   That's okay.

 5                THE COURT:  Okay.  Let's move to page 8.

 6                MR. RADBIL:  Okay.  So the biggest problem

 7   I have actually does relate to page 7, which is --

 8                THE COURT:  Page 7 or page 8?

 9                MR. RADBIL:  Page 7.

10                THE COURT:  Are you on the new copy?

11                MR. RADBIL:  Yes.

12                THE COURT:  Okay.  What's the problem?

13                MR. RADBIL:  It appears to me that if they

14   answer no to Question 1, that the jury would skip

15   the entire instruction on damages by skipping, and

16   there's no -- at least I haven't gotten that far

17   yet.

18                THE COURT:  I don't agree with you on

19   that, so your objection is so noted.

20                Let's move on to your next objection,

21   please.

22                MR. RADBIL:  Can I get a ruling on the

23   objection?

24                THE COURT:  Overrule the objection.

25                MR. RADBIL:  So also placing the
```

```
 1   instruction on page 7 of 20 to refer over and past
 2   the damages part seems to inform the jury of their
 3   legal effect.
 4           THE COURT:  Mr. Radbil, the transition
 5   sentence down there indicates to them, which would
 6   otherwise be greatly confusing to them, if they
 7   answer yes, then they go to damages essentially.  It
 8   doesn't say that, but they go to Question Number 2,
 9   which, if you don't want them to consider damages if
10   they answer yes, that's fine, but I'm assuming you
11   do.  Otherwise, if they answer no, if they don't
12   answer yes, which is pretty straightforward, they
13   are supposed to go to Question Number 4, which takes
14   them to the damages on the predetermined claims.
15           So overrule that objection.  Give me
16   another one.
17           What page are you on?
18           MR. RADBIL:  I'm on 12 of 20.
19           THE COURT:  So we have passed 8, 9, and
20   10, and you are on page -- past 11 and on page 12;
21   is that right?
22           MR. RADBIL:  That's correct.
23           THE COURT:  Okay.  What's the objection?
24           Mr. Radbil?
25           MR. RADBIL:  I don't have any objections
```

1   to that page.

2            THE COURT:  Next page, next objection.

3            MR. RADBIL:  I object to the exclusion of

4   the elements of the cause of action, 15 U.S.C.

5   1692d(6).

6            THE COURT:  On what page?

7            MR. RADBIL:  Page 14 of 20.

8            THE COURT:  Okay.  And you want the

9   elements of the cause of action?

10           MR. RADBIL:  Of the text of d(6).

11           THE COURT:  Overruled.  Go ahead.  Next

12  objection.

13           MR. RADBIL:  Same objection on page 15 of

14  20, Question 5.  We would request the inclusion of

15  the text of 1692e(11).

16           THE COURT:  Overruled.

17           I'm going to assume that those statutory

18  texts were included in your proposed charges filed

19  late last night?

20           MR. RADBIL:  They were.

21           THE COURT:  Okay.  Move ahead.  Go ahead.

22           MR. RADBIL:  Same objection on page 16 of

23  20 to Question 6.

24           THE COURT:  Overruled.  Again, I haven't

25  been provided a pattern or any authority that

```
 1    indicates that's a required portion of the jury
 2    instructions.  With that, overrule those objections.
 3              You have the same to Question 7?
 4              MR. RADBIL:  Yes, Your Honor.
 5              THE COURT:  That's on page 17.  That's
 6    overruled.  And the final instructions.
 7              MR. RADBIL:  I object to the part that the
 8    Court has no opinion as to the merits of the --
 9              THE COURT:  I changed that based upon your
10    interlining of that previous sentence.  I believe
11    the previous sentence is straight out of a pattern.
12    So now you are objecting to the change?  Because
13    your previous objection was different, so I changed
14    it.
15              MR. RADBIL:  I object -- I don't think I
16    object to the change --
17              THE COURT:  You interlined the other one,
18    so pick up your interlined portion and look at
19    that --
20              MR. RADBIL:  I know --
21              THE COURT:  -- and see if you didn't
22    interline that very part of the sentence.
23              MR. RADBIL:  I did.  I know what it says.
24              THE COURT:  That was because you were
25    objecting to it?
```

```
 1              MR. RADBIL:  To that word, but I also

 2     object to the word, opinion as to the merits.

 3              THE COURT:  Okay.  Overruled.  Anything

 4     else?  It's five till three.  You were supposed to

 5     be here this morning at 8:00, got here close to ten.

 6     It's five to three.  The jury has had to wait.

 7              Do you have any other objections?

 8              MR. RADBIL:  No.

 9              THE COURT:  I want the record to be clear

10     on this.  You don't?

11              MR. RADBIL:  No more objections.

12              THE COURT:  Ms. Malone?

13              MS. MALONE:  First of all, beginning on

14     page 8, which is the damages section, I would

15     generally object to the failure to include the

16     requested instructions for both preexisting

17     conditions and mitigation of damages, which were

18     submitted in our doc number 78, which was our

19     proposed charge.

20              THE COURT:  Okay.  I overrule that

21     objection unless you can show me a pattern or a case

22     that indicates that's a required part of these jury

23     instructions.

24              MS. MALONE:  Your Honor, we cited it from

25     the -- we used a pattern jury charge from the Texas
```

1    Supreme Court, as there isn't one -- and I believe

2    one of them had a 5th Circuit one for preexisting.

3    But let me look on the page, and I will tell you

4    exactly.  On the bottom of our page, Your Honor, of

5    the submitted proposed charge, we did include the

6    authorities.

7              THE COURT:  Ms. Malone, I understand where

8    you're coming from.  You can certainly argue that,

9    you have raised that by the cross-examination.  But

10   at this point, I overrule the objection as that

11   being a mandatory part of the jury instructions.  Go

12   ahead.

13             MS. MALONE:  I understood this to be

14   preservation of our error.  Some of them I know you

15   will overrule, I just want to protect my record.

16             THE COURT:  I understand.  It's just been

17   a long day.  That's all.

18             MS. MALONE:  I understand.  It has been

19   for me, too.

20             We also would object to the failure to

21   include, under the actual damage section, the

22   Parkway Standard, which is on doc 78 of our proposed

23   charge, page 13.  In that case we cited Gonzalez,

24   Parkway, and Guajardo, Your Honor, which is a

25   5th Circuit Court of Appeals that said that they

1   should have used the Parkway Standard, particularly

2   in light of the fact that they were submitting Texas

3   Debt Collection Act stuff.  And also an Austin Court

4   of Appeals case Elston v. RMS.

5          THE COURT:  Just so that I am clear, I

6   know you have raised this in your papers and you are

7   and preserving your objection now, but could you

8   give me a little specifics about what the language

9   is that you're asking?  Not all of it.

10          MS. MALONE:  Sure.  The definition that we

11   have provided to you is straight out of the Parkway

12   case, which is a Texas Supreme Court case.  And it

13   defines mental anguish to be more than mere

14   humiliation, anger, et cetera.  It must rise to the

15   level of causing a daily disruption in a person's

16   life, and it gives a very specific definition.

17          That definition was one that the attorney

18   failed to argue in the lower court in Guajardo, and

19   the 5th Circuit said you should have raised it

20   there.

21          THE COURT:  Was it debt collection

22   practices case?

23          MS. MALONE:  Yes, ma'am.  And both Elston

24   and Gonzalez are Texas Court of Appeals cases that

25   talked about the need to do a proximate cause.  One

1    of the problems I have is there is no proximate

2    cause definition, and there is also no proximate

3    cause requirement for the Texas statutes, which are

4    required by Texas controlling state law.  And so

5    that's my problem with the damage questions, to be

6    honest.

7                  Your question merely asks, are due to,

8    which is different than proximate cause.  As the

9    Court knows, proximate cause is a higher standard

10   for the plaintiff to meet, and certainly the

11   defendant needs that level to be there, that there

12   is a proximate causal relationship between the

13   events and claimed damages.

14                  THE COURT:  Mr. Radbil, do you agree with

15   that?

16                  MR. RADBIL:  Our firm handled Guajardo, so

17   I think she may be correct insofar as the standard

18   for disruption of the daily routine.  I don't agree

19   with proximate cause.  I haven't read Guajardo in a

20   while.

21                  THE COURT:  Do you have a proposal that

22   you can hand up to me?

23                  MS. MALONE:  I do.  It's on doc 78, page

24   13.  If you will give me.  I'm sorry, Judge, I

25   flipped it.

1              THE COURT:  That's all right.

2              MS. MALONE:  Actually, I have a pink flag

3     on that.

4              THE COURT:  If you will hand that to

5     Ms. Woodward, please.  Tell me exactly where you are

6     asking it to be inserted.

7              MS. MALONE:  I think it needs to be

8     inserted in the definition of actual damages.  I

9     would actually put it at the beginning of

10    paragraph -- on page 9 with the first paragraph,

11    maybe there, or if you wanted to put it in the

12    preceding paragraph.

13             THE COURT:  You're asking for it at the

14    bottom of page 9, first paragraph -- bottom of the

15    first paragraph on page 9?

16             MS. MALONE:  I should have thought about

17    that better, Judge.  Actually I think it should be

18    page 8 of 20, when you are talking about the

19    compensatory damages, at the end of that paragraph.

20             THE COURT:  Okay.  I understand what you

21    are asking.  Now, what do you have on proximate

22    cause that you are wanting to submit?

23             MS. MALONE:  Well, we submitted a

24    definition of proximate cause from the pattern jury

25    charge.  And I did not flag that, Your Honor.  I

```
 1    have a pattern jury charge, though.
 2              THE COURT:  This is a 5th Circuit --
 3              MS. MALONE:  I think proximate cause for
 4    the Texas one is actually out of the Texas Supreme
 5    Court one.
 6              MR. RADBIL:  Your Honor, while she's
 7    looking that up --
 8              THE COURT:  Let's give them their turn,
 9    and then I will let you answer, unless you agree to
10    it.
11              MR. RADBIL:  Well --
12              THE COURT:  Do you agree to it?  If you
13    don't, I will let you speak when she is finished.
14              MR. RADBIL:  No.  This has to do with the
15    location of the --
16              THE COURT:  Guajardo language?
17              MR. RADBIL:  Yes.  That only applies to
18    the Texas Debt Collection Act, so it should not go
19    in the general actual damages.
20              THE COURT:  All right.
21              MS. MALONE:  Your Honor, the definition of
22    proximate cause as provided by the Texas Supreme
23    Court is here.
24              THE COURT:  And tell me where you think
25    this should go.
```

```
 1          MS. MALONE:  I think it should go
 2   following that paragraph that we were just looking
 3   at.  Or the other option, Your Honor, if he wants to
 4   tie -- this could be actually a real solution.  We
 5   could include it as a definition on the page with
 6   the questions for the Texas cases only.
 7          THE COURT:  I know your position on the
 8   first question, Mr. Radbil.  What about the
 9   proximate cause definition with regard to the Texas
10   statute?
11          MR. RADBIL:  I don't think that proximate
12   cause is an element of damages under the TDCA.  I
13   think that there just has to be -- I think in
14   Guajardo it talks about that -- I don't recall
15   exactly what, but just has to be shown that it was
16   reasonably foreseeable, that the damages could have
17   resulted, and I think that's the Guajardo language
18   in the footnote, rather than proximate cause, which
19   is a much different standard, then we would have to
20   explain proximate cause.
21          MS. MALONE:  Your Honor, Elston v. RMS,
22   950 S.W.2d 950, I think I -- I will get you a better
23   page for that.  It's in our trial brief, and I'm
24   sorry, I will get it for you.  It specifically says
25   proximate cause is a requirement under the Texas
```

```
 1   Statute, and that is the Austin Court of Appeals
 2   case.  And it's also adopted in the Gonzalez case,
 3   which is San Antonio Court of Appeals case.  There
 4   is no Texas Supreme Court case on it at this time.
 5             THE COURT:  Okay.  I think what we have to
 6   clarify for purposes of argument is this idea of
 7   causation.  I know the position is here that this is
 8   a strict liability statute, but there's got to be
 9   some measure of proof that supports the amount of
10   damages.  And so I don't want to have you both up
11   there arguing something confusing on how they are
12   supposed to determine damages.  Am I to hear you
13   say, Mr. Radbil, that there -- if there's no
14   proximate cause, how are they to determine the
15   measure of damages to award?
16             MR. RADBIL:  The Guajardo case out of the
17   5th Circuit actually addresses that specifically in
18   a footnote.  I wrote it down.  It's to be based on
19   just the testimony of the witness and --
20             THE COURT:  What support?  There's got to
21   be factual support for a jury's determination on
22   anything?
23             MR. RADBIL:  There is no established
24   causation.
25             THE COURT:  Where do they come up with a
```

1  figure?

2          MR. RADBIL:  His testimony.

3          THE COURT:  All right.  Go ahead.

4          MS. MALONE:  Your Honor, actually,

5   there's -- there is a requirement of proximate

6   cause.  In the statute, itself, it actually says,

7   actual damages sustained as a result of a violation

8   of this chapter, which is Texas Findings Code

9   392.403(a)(2), and I have the rest Ellison cite.

10  It's Elston v. Resolution Services, 950 S.W.2d 180.

11  And just to give you a heads-up, Judge, at the time

12  Elston was written, the Finance Code had not been

13  codified yet, so it does give a different number,

14  but it defines it as the Texas Debt Collection Act.

15  So when you first look at it -- and it has been

16  adopted, again, by the Gonzalez case.

17          And in the Elston case, what happened was

18  they found a technical violation of the statute.

19  And the Court said, because you failed to show how

20  that technical violation resulted in damage to this

21  person, proximate cause, you lose.  So that's pretty

22  heads-up.

23          THE COURT:  I certainly understand your

24  position on this.  And at the very least, I think it

25  would be appropriately something, depending on what

1   this jury does, to examine postjudgment.  At this

2   point I'm not comfortable enough from what I have

3   heard to add this to the jury instructions.

4            I share the confusion about where they are

5   supposed to come up with damages and the amount.

6   But be that as it may, I think it's a safer route to

7   deny those -- overrule those objections with regard

8   to your request to include the Guajardo,

9   G-U-A-J-A-R-D-O, case, as well as the Texas Pattern

10  on Proximate Cause.  Let me pass these back down to

11  you.

12           What else, Ms. Malone?

13           MS. MALONE:  Also I have to object to the

14  inclusion of any actual damages based on my Rule 37

15  Motion yesterday, and I would like to continue my

16  objection on that issue.

17           THE COURT:  Yes, and that's overruled

18  without prejudice at this time.

19           MS. MALONE:  Your Honor, additionally, I

20  have a problem with the statutory question.  You

21  have it in two places now, which is in 4 and 5.  It

22  has been removed from 6.  But the way that this is

23  written now, they could have two separate findings

24  of $1,000 in an amount of 2,000.

25           THE COURT:  Right.  And here's what my

1    thought is on that, and we thought about that.  It

2    brings to mind some of these employment statutes in

3    federal court where there is a 300,000 cap, and we

4    don't tell the jury that.  We just let them make the

5    award, and then we cap it as the statute requires

6    posttrial.  And so it seems to me that the

7    statute -- there's no reason to put a specific

8    instruction about that, and that's the reason I

9    didn't.  If you can give me some reason why that's

10   erroneous, I will be glad to reconsider it.

11           MS. MALONE:  My last objection, Your

12   Honor, is specifically a failure to include a

13   bona fide error defense related to the issue on the

14   employment question, contacting the employer's

15   office.

16           THE COURT:  Overruled.  Anything else,

17   Ms. Malone?

18           MS. MALONE:  That's it, Judge.

19           THE COURT:  I will give you 15 minutes

20   each.  How much do you want on opening and rebuttal?

21           MR. RADBIL:  Ten and five.

22           THE COURT:  Okay.  And Ms. Malone?

23           MS. MALONE:  I'm sorry?

24           THE COURT:  What kind of warning do you

25   want?

1          MS. MALONE:  Five.  Judge, I do think
2    there is one recordkeeping thing we have to do.
3          THE COURT:  Go ahead.
4          MS. MALONE:  I never formally rested
5    yesterday.
6          THE COURT:  Yes, you are right.
7          MS. MALONE:  So I guess defendant rests.
8          THE COURT:  Both sides rest and close; is
9    that correct?
10          MR. RADBIL:  Correct.
11          MS. MALONE:  Yes.
12          THE COURT:  Okay.  Thank you.
13          Do we have the exhibits?  Because what I
14    want to make sure of is that each of you have
15    touched and viewed -- and I still don't know if I
16    have your marked exhibits, Mr. Radbil, for the
17    Court.  But at this point I want to make sure there
18    are marked exhibits that both sides have looked at
19    that are admitted or preadmitted before they go back
20    to the jury.  You don't have to do that this minute,
21    but we will do that after argument.
22          So is there anything else?  Any questions
23    about argument or anything of that nature?  Okay.
24          Let's fix the lecturn so it's turned
25    around.  We will go ahead, and I will get

```
 1   Mr. Reynolds to come in here and make our jury
 2   instructions.  I will read the instructions after
 3   the arguments.  If you will make sure, Mr. Everett,
 4   that the jurors are here.
 5            MR. RADBIL:  Your Honor, will you give a
 6   warning did you say?
 7            THE COURT:  What did you want again?
 8            MR. RADBIL:  I said ten and five, but
 9   maybe I won't need the whole ten.
10            THE COURT:  So you want me to give you a
11   warning after you have used eight minutes?
12            MR. RADBIL:  Yes, please.
13            THE COURT:  And a warning when you have
14   used, say, three at the end?
15            MR. RADBIL:  Please.
16            THE COURT:  The jury is ready.  Both sides
17   ready?
18            MR. RADBIL:  Yes, Your Honor.
19            THE COURT:  Let's bring them in.  All
20   rise, please.
21         (Jury enters courtroom at 3:10 p.m.)
22            THE COURT:  I first apologize, and I hope
23   you know it's from my heart and the attorneys.  We
24   have been working since 8:00 this morning and
25   nonstop on some issues that -- some of which were
```

```
 1   not anticipated.  That's what's taken so long.  So

 2   just be glad it's a nice day out there, and I hope

 3   you got to enjoy it a little bit.

 4          Before we go any further, I think the

 5   record should reflect the position of the case on

 6   both sides.

 7          Mr. Radbil, the plaintiff rests?

 8          MR. RADBIL:  Yes.

 9          THE COURT:  And the defense?

10          MS. MALONE:  Rest, Your Honor.

11          THE COURT:  Both sides rest and close?

12          Gentlemen, ladies, both sides rest and

13   close?

14          MR. RADBIL:  Yes.

15          MS. MALONE:  I'm sorry, yes, ma'am.

16          THE COURT:  Ladies and gentlemen, where we

17   are now is the closing arguments.  I had toyed with

18   the idea of just bringing you back tomorrow and

19   starting over with this, but it really did not seem

20   fair to not get this case submitted to you this

21   afternoon.  So the lawyers have 15 minutes each to

22   argue, and then I will read the instructions, and

23   then the case is yours to take back and make a

24   decision on.

25          Without further ado, Mr. Radbil, with the
```

1    burden of proof, let me call on you first.

2              Mr. Radbil?

3              MR. RADBIL:   Thank you, Your Honor.

4              MR. RADBIL:   Ladies and gentlemen, thank

5    you again for the time and the patience throughout

6    yesterday and this morning and today especially.

7    Your service is appreciated by Dr. White and myself.

8              Dr. White invested 12 years of his life

9    after high school studying to practice psychology.

10   One of the major issues in this case is the student

11   loans that unfortunately Dr. White defaulted on.

12             There is no dispute that there was a

13   default.   It's not something that he's proud of.

14   He's making arrangements to pay back his loans, and

15   he intends to fully pay back every penny of those

16   loans.

17             But Regional Adjustment Bureau is a debt

18   collector, and it's a fine business, but if you

19   operate such a business, you must do it in a lawful

20   manner.   In this case, the evidence shows that the

21   debt collection business was conducted in an

22   unlawful manner and that they placed calls, Regional

23   Adjustment Bureau, to Dr. White's place of

24   employment, Simple Surrogacy, after they were placed

25   on clear notice that he couldn't receive such calls.

1            That caused a tremendous problem for

2    Dr. White, not only that it violated the Federal

3    Fair Debt Collection Practices Act, but because he

4    wasn't permitted to use his telephone numbers at

5    Simple Surrogacy for personal use.  And so every day

6    he lived in fear that Stephanie, this supervisor

7    that he had --

8            MS. MALONE:  Objection, Your Honor.  I'm

9    going to object as going outside the record.

10            THE COURT:  Overruled.

11            MR. RADBIL:  He was concerned, waking up,

12    going to sleep, that he was going -- that that day

13    was going to be the day that he was going to get the

14    call saying, I'm fired from my job at Simple

15    Surrogacy, and that was his only source of income.

16            Without his source of income, he can't

17    make any payments on any of these student loans.

18    Which, by the way, he was paying $300 a month, I

19    believe, for one year and then $409 a month for a

20    second year, all the while trying to work with

21    Regional Adjustment Bureau on a payment arrangement

22    they wouldn't provide to him.

23            So with no income, he can't pay back -- he

24    wouldn't be able to continue to pay back his loans.

25    If he couldn't continue to pay back his loans, he

1    couldn't be licensed and couldn't practice

2    psychology.  So every day he was concerned about the

3    real possibility that he would lose what he had

4    worked for for most of his life.  He's a hard

5    worker.  You have heard his story.

6              In regard to the actual damages he's

7    suffered, that's for you to decide based on his

8    testimony.  I have tried to present him in as direct

9    and fair light as I could.  And I think the evidence

10   shows that there are legitimate actual damages in

11   this case.  But again, it's something for you

12   decide.

13             If you should decide he doesn't deserve

14   any, that's your choice.  And if you decide that he

15   does, he would certainly be obliged.  So I will turn

16   it over.

17             Thank you.

18             THE COURT:  All right.  Thank you,

19   Mr. Radbil.

20             THE COURT:  Ms. Malone.

21             MS. MALONE:  Good afternoon, ladies and

22   gentlemen.  My grandfather was a great, great man.

23   He was born in the late 1890s.  And as you can

24   imagine, being born at that time, he saw huge

25   changes in the world with the industrialization.

1              And in 1941, he was too old to actually be

2     a member of the service when Pearl Harbor happened,

3     but my grandfather was a civil engineer.  He built

4     bridges.  You may remember those one-lane bridges

5     you used to drive across in Texas that have the big

6     beams on them.  My grandad built a lot of those.

7              And he used to tell me a lot of stories

8     about things that he thought were important to me.

9     One of the things he told me, because he knew I was

10    headed for law school and had big dreams, and I was

11    a teenager, he said that it was very important that

12    I never judge a person by what kind of sheepskin

13    they hang on the wall.

14             He told me that some of the bravest men

15    that he ever met and some of the smartest men he met

16    were in Pearl Harbor.  They were field construction

17    guys who were pulled in, who were older guys, to try

18    to say what they could at the harbor, and they often

19    didn't have the degrees.  But they knew the answer

20    the MIT guy didn't know.

21             My grandfather told me, you make a

22    decision on a person based on the actions of the

23    man, not the words.  And he told me it was very

24    important in terms of personal responsibility that I

25    live my life that way; that I know exactly what my

1    words mean and I follow them up with my actions.

2         Timothy White was an individual who

3    obtained a student loan -- I'm sorry.  I have

4    allergies, and I apologize to everybody for that.

5    But I'm glad it waited until today to happen.

6         Timothy White was an individual who took

7    out a couple of student loans to obtain two degrees

8    in the State of Texas.  And with those degrees, he

9    began a Licensed Professional Counselor degree, for

10   which he was licensed to practice with the various

11   members of the State of Texas.

12        He started working for a while and stopped

13   going for his degree, so it took him over ten years

14   to go back to his Ph.D.  During that time, he met

15   the gentleman he talked about as his spouse.  He

16   moved to Dallas, he did lots of things.

17        What he didn't do was pay back those

18   student loans.  That matters, folks, because the

19   State of Texas guaranteed those loans with taxpayer

20   dollars, and so they paid them back.  And now the

21   State of Texas wants their money back.  So to do

22   that, they hired RAB to go and make collections.

23        It is true in Texas that if the state pays

24   your student loan they have certain consequences

25   that they can take that are different than a regular

1  creditor.  For example, if you don't pay your

2  student loans back, the IRS gets to keep your money.

3  That seems kind of fair, because if you owe money to

4  the government, they shouldn't be giving you money

5  as a tax return.

6          Another example is, if you don't pay your

7  student loans, then you can't practice as a doctor,

8  a lawyer, a professional counselor; it makes sense.

9  You shouldn't profit off of Texas taxpayers and at

10 the same time refuse to pay money back that you owe.

11         Last but not least, they can keep you from

12 getting your degree if you have not paid your

13 student loans.  If you don't pay your car loan back,

14 you don't get to keep the car, so that makes a lot

15 of sense to me.

16         I would submit to you that this case isn't

17 about attempted calls to his employer or even

18 whether or not there was a message that was left

19 that didn't include the phrase "debt collector."  I

20 will submit to you that Mr. White is concerned about

21 those exact things.  That matters in this case,

22 folks, because we will be talking about whether or

23 not he was actually harmed by what he says my client

24 did and what he found his circumstances in life to

25 be.

```
 1              In the Bible, they talk about a day of
 2   reckoning.  You've heard the expression, when stuff
 3   hits the fan.  In my home town of Odessa, we say,
 4   when the bar tab comes due.  It means the point
 5   where the consequences that you have created for
 6   yourself are staring you right in the face.  You
 7   have to figure out what you do.  That's where my
 8   grandfather would come in.  He would look at the
 9   action of the man and not the words to figure out
10   what really happened.
11              In these specific instances, Dr. White
12   will tell you that he was worried about being fired
13   because of all of these messages that were left on
14   his work number that he was so sure someone might
15   hear, and he told you that caused him a great deal
16   of concern.
17              Folks, remember my little chart that we
18   did, this 866 number -- and by the way, you will
19   find this in Defendant's Exhibit Number 1, which is
20   the account notes for RAB, and I think we spent time
21   explaining how to read them.
22              This 866 number is Mr. White's place that
23   he went to work.  And what you will find is that,
24   for each of those entries, there's an M for manual
25   dial, and you will find whether or not there was a
```

1  message left.

2        And folks, no messages left, save one.  So

3  you have to ask yourself, was Mr. White really

4  concerned that a message, one message, would have

5  caused him to lose his job at Simple Surrogacy, or

6  was he worried that losing his license for not

7  paying his student loans, something my client had

8  nothing to do with, would in fact cause him harm?

9        Are his concerns about not being able to

10  take care of his family?  Are his concerns about

11  having his outbreak in his preexisting medical

12  condition?  Were those really related to these phone

13  calls, or were they related to his problems in his

14  life?  I would submit to you that it is the second

15  thing.

16        There's another thing about student loans

17  that are different than other loans.  You can rehab

18  them.  You can -- as you heard Mr. White talk about,

19  there was a discussion about making a payment of

20  interest of $100.  And if you would pay that $100

21  and work out a payment plan for him, he could get

22  back on track, which he apparently eventually did.

23        In this case, though, what you heard from

24  Mr. Wyatt and confirmed by Dr. White is that, when

25  he was told he would make the payment of the $100,

1    he didn't do it.  When they asked him, he told them,

2    I will call you back, he didn't do that.

3              There were actually three conversations

4    with Dr. White, all three of which he said he would

5    call them back to set up a plan, none of which he

6    did.

7              You will also hear there was a message

8    left at his home, the 214 number.  By the way,

9    folks, remember this:  Plaintiff's counsel suggested

10   to you that they should have been calling that

11   number all along because they would have gotten him

12   there.  They left messages for him.  Did he call

13   back?  No.  What did he do?  He called a law firm

14   and spent 23 minutes in three conversations with

15   them, more than the two calls that he made to RAB.

16   So folks, what I am telling you is you look at a

17   man's actions and not his words.

18             I'm going to tell you about a few things

19   the judge will have you answer questions on.  There

20   are some things in the charge called sort of

21   instructions that I think are important, and I just

22   want to emphasize a couple of them for you.  I'm not

23   going to go through the whole thing, because it can

24   be a little lengthy, that's what happens in the

25   practice of law sometimes.

 1          First thing is, you don't let bias or
 2     prejudice inform you, and that's on page 1.  That's
 3     very important.  The reason it begins at the very
 4     beginning of the charge, you're not supposed to
 5     decide who you like better and then pick that person
 6     to be the winner.  You are supposed to make your
 7     decision based on the facts.  But you can consider,
 8     do they have something to gain by their testimony.
 9          Recall that Dr. White testified, oh, I
10     lost a teaching position.  And when I reminded him
11     that in his deposition he said it had no impact on
12     his teaching whatsoever.  Could it be there might be
13     a reason for his change of testimony while sitting
14     in the courtroom and asking for money.  I don't
15     know.  That's a call you have to make.
16          Remember, also, that Dr. White said that
17     he hadn't seen any sort of treaters; he didn't go
18     and look for any sort of care as a result of the
19     actions that were taken here.  Now he wants you to
20     believe that he had these medical conditions that
21     were inflamed, but he never talked to anyone about
22     it, even up to the time of his deposition, some nine
23     months after these alleged phone calls.  So you have
24     to ask yourself, was that really a problem?
25          The other question I want you to pay some

1    attention to is actually on page 8.  These are the

2    damage questions.  They sort of explain what the

3    damage law is and what you should do about it.  Look

4    at these really carefully.  You don't get to recover

5    damages because somebody might have hurt your

6    feelings or somebody might have made you feel a

7    little bit bad about yourself or maybe they didn't

8    like what you wore that day.  It has to have some

9    consequence, and you need to tie the action of what

10   the defendant did to the consequence that you are

11   claiming here.

12           In fact, it says that.  In the first

13   paragraph the Court says, defendant must pay the

14   plaintiff damages for conduct that it did, not for

15   some preexisting condition.  Dr. White was sick with

16   this rheumatoid illness long before my client ever

17   met him.  You should not factor that as a damage to

18   my client.  In fairness, he didn't say we caused his

19   illness --

20           THE COURT:  Slow down just a little bit.

21   You are speeding up there.  Go ahead.

22           MS. MALONE:  The second thing is that you

23   should not consider things that were not the result

24   of anything my client did.

25           For example, the fact that his license

1    could be lost is a State of Texas law.  It's not

2    something my client had any control over.  In fact,

3    they were trying to help him keep it from happening

4    by getting him on a payment plan that would allow

5    him to rehab his loan and get back into the good

6    graces of the state.  So those are things that you

7    need to consider.

8           You also have to ask yourself if there

9    were other issues in Dr. White's life that may have

10   been causing the problem.  He testified that, sure,

11   you look at things like stressors in a person's

12   life, move, completion of a degree, studying to take

13   your Ph.D exams, all of those things.  Those are not

14   stress/mental anguish issues that my client caused,

15   that's just part of Dr. White's life.  Do not

16   include those when you make a decision about this

17   issue.

18          The other question that I wanted you to

19   spend some time looking at is, of course, Question

20   Number 1.  And in Question Number 1, the issue is,

21   did my client have knowledge that Dr. White was

22   prohibited from having phone calls at his employer.

23   And let me just suggest to you, the answer to that

24   question is a simple no.

25          Folks, first of all, I'm not sure Simple

1    Surrogacy is his employee.  He told you they were a

2    contract employee.  We also know that he, in his

3    conversation -- you will see his notes, they are

4    documenting what the communication was.  The note

5    says that he gave special permission to call his

6    home phone number and to speak with his spouse,

7    Terry, and there is discussion of POI.  There is no

8    records at all to any sort of concern about whether

9    or not they could call that number.

10          Dr. White now says that he expressly told

11   the folks, don't call me at work.  His deposition

12   testimony was, gosh -- and remember, he agreed to

13   this on the stand.  His deposition testimony was,

14   well, I didn't want them calling me there because I

15   couldn't answer directly.  Is that the same thing

16   he's saying, I'm going to get into trouble over

17   this?

18          You have to go back to the other story

19   that he's now saying.  He was so concerned about

20   these messages from his employer that he might lose

21   his job, but folks, there's only one message, one.

22   And I would be willing to bet you a 2/28/11 message

23   disappeared a pretty long time ago, it's no longer

24   in anybody's phone system.  So that's the first

25   question, and I think the answer should be no.

```
 1              Then from that question it will direct you
 2    to answer a damage question if you believe that, in
 3    fact, RAB violated that.  I want to talk to you a
 4    little bit about the damage question.  I don't think
 5    you will find that there was a violation.  But if
 6    you did, one of the things you're going to have to
 7    find is whether or not there was an actual harm as a
 8    result of that specific message or calling his
 9    employer after he was told not to call.
10              You're going to have to ask yourself --
11    because he didn't say it was the phone calls making
12    my phone ring, he said the message on my machine
13    caused me to have harm with my particular employer.
14              I will submit to you that's not the case
15    here.  Dr. White certainly was troubled, but he was
16    troubled about the financial consequences he found
17    his life in and the fact he could lose his license
18    because he had twice defaulted on the same group of
19    student loans.
20              Now, the other question you're going to be
21    asked is, if you do find that Dr. White, in fact,
22    has a point and that there was a violation, you
23    could find there's no actual damages.  And you could
24    say, but RAB should have done a better job, so we're
25    going to give them what the Court is calling
```

1   statutory damages, and that award could be up to

2   1,000.

3           I want you to think about this, folks.  If

4   you look at statutory damages, the 1,000 is the

5   biggest number.  But that's to encompass all kinds

6   of things, like if the debt collectors calls you bad

7   names, if they cuss you out, call you racial

8   epithets, threaten you with physical harm, threaten

9   to take your child, have you arrested.  All of those

10  kinds of things are on the far end.

11          Does this fit in that category?  I would

12  submit to you it does not.  If there was an actual

13  communication to them that the employer wouldn't

14  allow those phone calls, I would submit to you that

15  this is something like $100 maximum.

16          THE COURT:  Two minutes.

17          MS. MALONE:  I don't think you should get

18  there.

19          The other calls have to do with the

20  messages left on the machine.  They say that, in

21  fact, they forgot to say there was a debt collector.

22  The judge is going to tell you that the recordings,

23  in fact, left out there was not a debt collector.

24  There is no actual damage.  Dr. White didn't even

25  talk about that as being an actual harm to him, he

1    only talked about the messages on his work machine.

2            I submit to you that you give him $2.

3    That's for the two phone calls where they were

4    returning calls, he said I knew that they were, I

5    knew why they were calling me, they just didn't say

6    the magic word, I'm a debt collector.

7            You have to ask yourself, if his complaint

8    is that they didn't say, I'm a debt collector, then

9    why are they worried about a message that they

10   didn't say "debt collector"?  That's the question I

11   ask myself.

12           My grandfather would say, at the end of

13   the day, you have to look at what a person's actions

14   are and what their words are and match them up.

15   Instead of working out his problem, Dr. White called

16   his lawyer.  Instead of paying $100 and getting on

17   track, Dr. White called a lawyer.  And he may be

18   doing right now, but, folks, for a long time he

19   didn't, and Texas taxpayers paid the bill for him.

20           Thank you.

21           THE COURT:  Thank you, Ms. Malone.

22           Mr. Radbil?

23           MR. RADBIL:  May I approach briefly, Your

24   Honor?

25           THE COURT:  Approach the bench.

```
 1              (The following discussion held at the
 2    bench:)
 3              THE COURT:  Go ahead.
 4              MR. RADBIL:  So we heard a statement about
 5    Mr. White profiting off the State of Texas, and I
 6    think that opens the door for -- she alleged that he
 7    was profiting off the State of Texas.  So does that
 8    open the door for me to argue the actual damages --
 9              THE COURT:  I don't understand what that
10    means.  What do you want to say?
11              MR. RADBIL:  I want to say that she's
12    alleging that he profited somehow off the State of
13    Texas intentionally when, in fact, this whole ordeal
14    caused him to pay 40,000 more.
15              THE COURT:  That has to do with this idea
16    that Ms. Malone brought up yesterday that the
17    damages were limited by virtue of the pretrial
18    disclosures, and you're trying -- and this is what
19    the problem is.
20              MS. MALONE:  I think that's what he's
21    saying.  I didn't say that.
22              THE COURT:  I think all she said was
23    argument and not as a fact, and I won't permit you
24    to go into that.  Okay?
25              (Bench conference concluded.)
```

1                THE COURT:  Go ahead, Mr. Radbil.

2                MR. RADBIL:  Only a few things to add,

3       ladies and gentlemen.  It will be very brief.

4                Dr. White hasn't attempted to profit off

5       of the State of Texas in any way.  He's worked hard.

6       And for however many years that he was supposedly

7       doing wrong, the times that he was in default he was

8       making payments directly to Texas Guaranteed because

9       Regional Adjustment Bureau would not work out an

10      arrangement with him despite his efforts to work out

11      such an arrangement.  And I think the second --

12               THE COURT:  Could you say that again?

13               MR. RADBIL:  And I think the second year

14      he was paying 400-some-dollars per year.  Thankfully

15      everything is back on track now.

16               But the statutory damages that Ms. Malone

17      was talking about are to be based on specific

18      factors that are set forth in the instructions.

19               So there's extreme cases of debt

20      collection abuses, certainly, and extreme cases of

21      debt collection abuses can cause actual damages.

22      But the specific factor for the additional statutory

23      factors don't have anything do with things that she

24      mentioned.

25               And everybody here is perfectly capable of

1    going through these instructions.  The reason we

2    have them and take care to write them, together with

3    the judge, is so that they are understandable.  I

4    think they are self-explanatory.

5              Dr. White, again, has been legitimately

6    damaged by wrongful debt collection conduct.  Nobody

7    is saying he didn't default.  Nobody is saying there

8    are not consequences.  He's paid consequences for

9    defaulting.  But you cannot collect debt in an

10   unlawful manner.  You cannot threaten to strip

11   someone of their degrees, and you cannot call them

12   at their place of employment and jeopardize their

13   job when they tell you not to call them there.

14             He's not asking for anything more than

15   what the ladies and gentlemen of the jury think is

16   fair.  So with that, I will conclude.

17             THE COURT:  Thank you, Mr. Radbil.

18             Ladies and gentlemen, I know you haven't

19   physically viewed each of these exhibits, but

20   everything admitted will go back to you when we

21   finish the jury instructions.  This particular

22   document, which I believe is -- according to

23   Ms. Malone, I agree is reflected, at least in part

24   in the exhibits, is actually a demonstrative

25   exhibit, so it's not something that will go back to

1   the jury room.

2           Without further ado, I will have the jury

3   instructions passed to each one of you, and I will

4   get Mr. Everett -- thank you.

5           Ladies and gentlemen of the jury, these

6   are your instructions, starting with the general

7   instruction on page 1:

8           You have heard the evidence in this case,

9   and I will now instruct you on the law that you must

10  apply.  It is your duty to follow the law as I give

11  it to you.  On the other hand, you, the jury, are

12  the judges of the facts.

13          Do not consider any statement that I have

14  made in the course of trial or make in these

15  instructions as an indication that I have any

16  opinion about the facts of this case.

17          You have heard the closing arguments of

18  the attorneys.  Statements and arguments of the

19  attorneys are not evidence and are not instructions

20  on the law.  They are intended only to assist the

21  jury in understanding the evidence and the parties'

22  contentions.  Answer each question from the facts as

23  you find them.  Do not decide who you think should

24  win and then answer the questions accordingly.  Do

25  not let bias, prejudice, or sympathy play any part

1    in your deliberations.

2             A corporation and all other persons are

3    equal before the law and must be treated as equals

4    in a court of justice.  Your answers and your

5    verdict must be unanimous.

6             Burden of proof.  You must answer all

7    questions from a preponderance of the evidence.  By

8    this is meant the greater weight and degree of

9    credible evidence before you.  In other words, a

10   preponderance of the evidence just means the amount

11   of evidence that persuades you that a claim is more

12   likely so than not so.

13            In determining whether any fact has been

14   proved by a preponderance of the evidence in this

15   case, you may, unless otherwise instructed, consider

16   the testimony of all witnesses, regardless of who

17   may have called them, and all exhibits received in

18   evidence, regardless of who may have produced them.

19   If the proof fails to establish any central part of

20   the plaintiff's claim by a preponderance of the

21   evidence, you should find for the defendant as to

22   that claim.

23            Witness testimony.  In determining the

24   weight to give to the testimony of a witness, you

25   should ask yourself whether there was evidence

1    tending to prove that the witness testified falsely

2    concerning some important fact or whether there was

3    evidence that at some other time the witness said or

4    did something or failed to say or do something that

5    was different from the testimony the witness gave

6    before you during the trial.

7            You should keep in mind, of course, that a

8    simple mistake by a witness does not necessarily

9    mean that the witness was not telling the truth as

10   he or she remembers it, because people may forget

11   some things or remember other things inaccurately.

12   So if a witness has made a misstatement, you need to

13   consider whether that misstatement was an

14   intentional falsehood or simply an innocent lapse of

15   memory, and the significance of that may depend on

16   whether it has to do with an important fact or only

17   an unimportant detail.

18           Evidence.  While you should consider only

19   the evidence in this case, you are permitted to draw

20   such reasonable inferences from the testimony and

21   exhibits as you feel are justified in the light of

22   common experience.  In other words, you may make

23   deductions and reach conclusions that reason and

24   common sense lead you to draw from the facts that

25   have been established by the testimony and the

1  evidence in the case.

2        The testimony of a single witness may be

3  sufficient to prove any fact even if a greater

4  number of witnesses may have testified to the

5  contrary if, after considering all of the other

6  evidence, you believe that single witness.

7        There are two types of evidence that you

8  may consider in properly finding the truth as to the

9  facts in the case.  One is direct evidence, such as

10 the testimony of an eyewitness.  The other is

11 indirect or circumstantial evidence, the proof of a

12 chain of circumstances that indicates the existence

13 or nonexistence of certain other facts.

14       As a general rule, the law makes no

15 distinction between direct and circumstantial

16 evidence, but simply requires that you find the

17 facts from a preponderance of all the evidence, both

18 direct and circumstantial.

19       During the course of this trial, you've

20 heard counsel make objections to evidence.  It is

21 the duty of the attorneys on each side to object

22 when the other side offers testimony or other

23 evidence that the attorney believes is not properly

24 admissible.

25       You should not draw any inference against

1    an attorney or his client because the attorney has

2    made objections.  Upon allowing testimony or other

3    evidence to be introduced over the objection of any

4    attorney, the Court does not indicate any opinion as

5    to the weight or effect of such evidence.

6          You are the sole judges of the credibility

7    of all witnesses and the weight and effect of all

8    evidence.  When the Court has sustained an objection

9    to a question addressed to a witness or to the

10   introduction of any other evidence, you must

11   disregard the question entirely and may draw an

12   inference -- may draw no inference from the wording

13   of it or speculate as to what the witness would have

14   said if the witness had been permitted to answer.

15         From time to time during the trial, it may

16   have been necessary for me to talk to the attorneys

17   out of your hearing, either by having a conference

18   at the bench while you were present in the courtroom

19   or by calling a recess.  The purpose of these

20   conferences was not to keep relevant information

21   from you, but to decide how certain evidence is to

22   be treated under the Rules of Evidence and to avoid

23   confusion and error.

24         Cautionary instruction.  I will give you

25   instruction regarding damages at certain points in

1     these instructions.  You should not interpret the
2     fact that I have given instructions about damages as
3     an indication in any way that I believe a party
4     should or should not win this case.
5            Definitions.  You are instructed that the
6     following definitions apply throughout these jury
7     instructions.  White refers to Plaintiff,
8     Dr. Timothy White.  RAB refers to Defendant,
9     Regional Adjustment Bureau.
10           Joint stipulated facts.  The parties have
11    agreed or stipulated to the following facts.  That
12    means that both sides agree that these are facts.
13    You must therefore treat these facts as having been
14    proved:
15           RAB is under contract with Texas
16    Guaranteed to provide debt collection services in
17    connection with TG student loan portfolio.
18           In August 2010, TG placed Dr. White's
19    student loan debt with RAB for collection.
20           RAB maintains business records in the form
21    of account notes documenting RAB's communications
22    and attempting communications with Dr. White.
23           POE stands for place of employment or work
24    number.
25           RAB is a debt collector within the meaning

1    of the Fair Debt Collection Practices Act.

2            Dr. White is a consumer within the meaning

3    of the Fair Debt Collection Practices Act.

4            Moving, then, to the claims of the

5    parties.

6            Plaintiff Dr. Timothy White claims that

7    Defendant Regional Adjustment Bureau, Inc., violated

8    Section 1692c(a)(3) of the Fair Debt Collection

9    Practices Act, (FDCPA) 15 U.S.C. 1692 c(a)(3) when

10   RAB called White's place of employment, Simple

11   Surrogacy, after White informed RAB that it was

12   against his employer's policy to do so.  RAB denies

13   that White ever informed RAB that it could not call

14   Simple Surrogacy.  RAB also denies that Simple

15   Surrogacy is plaintiff's employer.

16           To prevail on this claim, White must prove

17   by a preponderance of the evidence the following

18   elements in dispute:  One, that Simple Surrogacy was

19   White's employer; and two, RAB knew or had reason to

20   know that it could not contact White at Simple

21   Surrogacy.

22           In answering Question Number 1, you are

23   instructed as follows:  The Fair Debt Collection

24   Practices Act prohibits a debt collector from making

25   communications regarding debt collection to a

1    consumer at the consumer's place of employment if

2    the debt collector knows or has reason to know if

3    the consumer's employer prohibits the consumer from

4    receiving such communications.

5            This is your first question.

6            Number 1:  Did RAB violate 15 U.S.C.

7    Section 1692c(a)(3) -- which, just for clarity, is

8    the Federal Debt Collection Procedures section

9    that's in reference with the elements of proof on

10   the previous page -- by calling White at his place

11   of employment after RAB knew or had reason to know

12   that White's employer prohibited White from

13   receiving such communications?

14           Instruction:  If so, answer yes;

15   otherwise, answer no.  There is a place for your

16   answer and then instructions as to where to go next

17   depending on your answer.  So let's just go

18   chronologically through.

19           Next page.  Damages.  General Instructions

20   on Damages.  The questions that follow apply to

21   awarding damages to White if you believe he is owed

22   damages under the law.  You should not interpret the

23   fact that I have given instructions about the

24   plaintiff's damages as an indication in any way that

25   I believe that the plaintiff should or should not be

1    awarded damages in this case.

2            Plaintiff seeks two types of damages in

3    this case:  Actual damages and statutory damages.

4    Actual damages are actual losses that the plaintiff

5    suffered due to the defendant's conduct.  Statutory

6    damages are damages that are permitted by federal

7    law regardless of whether the plaintiff suffered

8    actual damages.  Statutory damages are separate and

9    distinct from actual damages.

10           Now we move into the definition of actual

11   damages.  If you find that the defendant is

12   liable -- and we are talking now about on this one

13   question that I referred to earlier -- you must

14   award the amount that you find by a preponderance of

15   the evidence as full and just compensation for all

16   of the plaintiff's damages.  You will also be asked

17   to determine if the defendant must pay the plaintiff

18   damages for conduct that this Court determined to be

19   a violation of federal and state law prior to trial.

20           Let me just clarify this for a minute.

21   Prior to trial, it was determined as a matter of law

22   that certain violations occurred.  And as I will

23   explain to you all later, don't be confused by that,

24   it is still completely the jury's prerogative as to

25   whether or not you decide the evidence warrants

1    damages or not as to those particular claims.  And I

2    will explain that more later, I just don't want you

3    to be confused about that.

4         Compensatory damages are not allowed as a

5    punishment against a party.  Such damages cannot be

6    based on speculation, for it is only actual damages,

7    what the law calls compensatory damages, that are

8    recoverable.

9         However, compensatory damages are not

10   restricted to actual loss of time or money.  They

11   include both the mental and physical aspects of

12   injury, tangible and intangible.  They are an

13   attempt to make the plaintiff whole or to restore

14   him to the position he would have been if the

15   violation had not happened.

16        You should consider the following elements

17   of damages to the extent you find that the plaintiff

18   has established compensatory damages by a

19   preponderance of the evidence:  Physical pain and

20   suffering, including physical disability,

21   impairment, and inconvenience, and the effect of the

22   plaintiff's injuries and inconvenience on the normal

23   pursuits and pleasures of life; mental anguish,

24   feelings of economic insecurity caused by

25   disability; income loss in the past; impairment of

1  earning capacity or ability in the future, including
2  impairment and the normal progress in the
3  plaintiff's earning capacity due to his physical
4  condition; postmedical expenses; the reasonable
5  value, not exceeding actual cost to the plaintiff,
6  of medical care that you find from the evidence will
7  be reasonably certain to be required in the future
8  as a proximate result of the injury in question.
9          Some of these damages, such as mental or
10 physical pain and suffering, are intangible things
11 about which no evidence of value is required.  In
12 awarding these damages, you are not determining
13 value, but you show award an amount that will fairly
14 compensate the plaintiff for his injuries.  Again,
15 you should not interpret the fact that I have given
16 instructions about plaintiff's damages as an
17 indication in anyway that I believe -- the Court --
18 believes that the plaintiff should or should not be
19 awarded damages in this case.
20          The questions regarding what damages, if
21 any, the jury finds are justified in this case are
22 divided into two parts:  First are questions
23 regarding damages that apply only if you answered
24 yes to Question Number 1.  And that is regarding
25 RAB's liability as to that one allegation of a

1    violation we talked about earlier in question one.

2            The second section relates to what

3    damages, if any, the jury finds are justified as to

4    certain claims determined prior to trial to have

5    occurred as a matter of law.

6            A.   Damages for claims determined by the

7    jury in Question Number 1.

8            Federal law permits a plaintiff to recover

9    actual and statutory damages for violations of the

10   FDCPA.  The jury must determine whether White is

11   entitled to recover actual damages and statutory

12   damages.  It's nice to see one blank page with one

13   word on it.

14           Question Number 2:  Answer only -- and you

15   will see as you answer Question Number 1 where it

16   takes you.  It may take you here, depends on your

17   answer.

18           Question Number 2:  Answer only if you

19   answered yes to Question Number 1; otherwise,

20   proceed to Question Number 4 on page 14.

21           Question:  Did White suffer actual damages

22   which may include out-of-pocket expenses, personal

23   humiliation, embarrassment, mental anguish and/or

24   emotional distress due to any of the conduct

25   described in Question Number 1?

1          And there's a spot for your answer, yes or

2     no.  And then it gives you an amount if you say yes

3     as to the amount of actual damages.

4          Now, we move to page 12.

5          Question 3:  Answer only if you answered

6     yes to Question Number 1; otherwise, proceed to

7     Question Number 4 on page 14.

8          And again, this is the -- what we're

9     talking about here and the reason there are two

10    questions on Question Number 1 have to do with the

11    different kinds of damages to consider.  First was

12    actual, and now we are talking about statutory as to

13    that first question.

14         Federal law also provides for statutory

15    damages, which are separate from any actual damages,

16    for pecuniary loss or mental anguish of up to $1,000

17    if you answered yes to Question Number 1.  What

18    amount of statutory damages, if any, do you award to

19    White up to a maximum of $1,000.

20         Let's move to the second section we talked

21    about:  Damages for liabilities on claims determined

22    as a matter of law prior to trial.

23         You are instructed that prior to this

24    trial it was determined as a matter of law that

25    certain actions by RAB violated provisions of the

1    Federal Debt Collection Procedures Act (FDCPA) and

2    the Texas Debt Collection Procedures Act (TDCPA).

3            Specifically, it has been determined that

4    RAB violated FDCPA, 15 U.S.C. Section 1692d(6) and

5    1692e(11), which sections prohibit a debt collector

6    from placing calls without meaningful disclosure of

7    the caller's identity and failing to disclose that

8    the subsequent communications are from a debt

9    collector, when it contacted White on February 17,

10   2011, and March 11, 2011, without identifying its

11   business name or stating that the call was from a

12   debt collector.

13           It has been further determined -- again,

14   as matter of law prior to trial -- that RAB violated

15   the TDCPA, that's Texas Finance Code, Sections

16   392.304(a)(4) and (a)(5)(B), which prohibit failing

17   to disclose the name of the person to whom the debt

18   has assigned or is owed and failing to disclose that

19   a communication was made from a debt collector when

20   it contacted White on February 17, 2011, and

21   March 11, 2011, without identifying its business

22   name or stating that the call was from a debt

23   collector.  It is up to the jury to determine the

24   amount of damages, if any, White should receive for

25   RAB's violations of these statutes.

1          And when I say, "violations of these

2     statutes," again, ladies and gentlemen, I am

3     referring to these we talked about that were looked

4     at and resolved as a matter of law prior to trial.

5          Again, you should not interpret the fact

6     that I have given instructions about the plaintiff's

7     damages as an indication in any way that I, the

8     Court, believes plaintiff should or should not be

9     awarded damages in this case.

10          Let me move to Question Number 4.  As I

11     mentioned, prior to trial, page 14, it was

12     determined as a matter of law that RAB violated the

13     FDCPA, 15 U.S.C. Section 1692d(6) when it contacted

14     White on February 17, 2011, and March 11, 2011,

15     without identifying its business name or stating

16     that the call was from a debt collector.

17          Question is:  Did White suffer actual

18     damages, which may include out-of-pocket expenses,

19     personal humiliation, embarrassment, mental anguish,

20     and emotional distress due to any of the conduct

21     described in Question Number 4.  And there's a spot

22     for your answers and description as to what each

23     answer for damages will show.

24          Moving, then, to Question Number 5 on page

25     15.  And this gets to the Federal Debt Collection

1    Act section that we talked about.

2           Prior to this trial, it was determined as

3    a matter of law that RAB violated the FDCPA at 15

4    U.S.C. Section 1692e(11) when it contacted White on

5    February 17, 2011, and March 11, 2011, without

6    identifying its business name or stating that the

7    call was from a debt collector.

8           The question is:  Did White suffer actual

9    damages which may include out-of-pocket expenses,

10   personal humiliation, embarrassment, mental anguish,

11   and emotional distress due to any of the conduct

12   described in Question Number 5.

13          And there's a place for your answer,

14   instructed to answer yes or no.  And then if you

15   answered yes, a spot at each place for your

16   calculation on the damages question.

17          Question Number 6:  Prior to this trial,

18   it was determined as a matter of law that RAB

19   violated the TDCPA, Texas Finance Code 392.304(a)(4)

20   when it contacted White on February 17, 2011, and

21   March 11, 2011, without identifying its business

22   name or stating that the call was from a debt

23   collector.

24          The question:  Did White suffer actual

25   damages, which may include out-of-pocket expenses,

```
 1   personal humiliation, embarrassment, mental anguish,
 2   and emotional distress due to any of the conduct
 3   described in Question Number 6.  And then there is a
 4   spot for your answer, yes or no.
 5          Just to avoid confusion -- and these
 6   statutes can be confusing.  I mentioned that there
 7   were two statutes determined as a matter of law
 8   before court to have been violated and the fact that
 9   there are four questions just indicates that there
10   are four separate situations, two under each
11   statute, that you will be looking at.
12          Question Number 7:  Prior to this trial,
13   it was determined as a matter of law that RAB
14   violated the TDCPA, Texas Finance Code,
15   Section 392.304(a)(5)(b) when it contacted White on
16   February 17, 2011, and March 11, 2011, without
17   identifying its business name or stating that the
18   call was from a debt collector.
19          Question:  Did White suffer actual
20   damages, which may include out-of-pocket expenses,
21   personal humiliation, embarrassment, mental anguish,
22   and emotional distress due to any of the conduct
23   described in Question 7.  And there is a place for
24   your answer, yes or no, and a place, if necessary,
25   to into the damages.
```

1          Finally, ladies and gentlemen, the

2     instructions on deliberations.

3          The fact that I have given you these

4     instructions about a particular claim or defense or

5     that I have not so instructed you should not be

6     interpreted in any way as an indication that the

7     Court has any opinion as to the merits of the

8     parties' claims and/or defenses.

9          In order to return a verdict, your verdict

10    must be unanimous.  Everyone must agree.  It is your

11    duty as jurors to consult one another and to

12    deliberate with a view towards reaching an

13    agreement.

14         Each of you must decide the case for

15    yourself, but only after an impartial consideration

16    with each other of all the evidence in the case.

17         In the course of your deliberations, do

18    not hesitate to reexamine your own view and change

19    your opinion if convinced it is erroneous.  Do not,

20    however, surrender your honest conviction as to the

21    weight or effect of the evidence solely because of

22    the opinion of other jurors or for the mere purpose

23    of returning a verdict.

24         Remember, at all times, that you are not

25    partisans, you are judges, judges of the facts.

1   Your sole interest is to seek the truth from the

2   evidence in the case.

3            As soon as I finish reading this charge,

4   you will retire to the jury room.  I will send you

5   the exhibits that have been admitted into evidence.

6            You will first select one member of your

7   jury as the presiding juror.  The presiding juror

8   will preside over your deliberations and speak on

9   your behalf here in court.

10           Do not deliberate unless all members of

11  the jury are present in the jury room.  In other

12  words, if one or more of you go out to lunch

13  together or together outside the jury room, do not

14  discuss the case.

15           When you have reached unanimous agreement

16  as to your verdict, the presiding juror shall fill

17  in your answers to the questions on this copy of the

18  charge, which is going to be the one with my

19  signature in blue, and sign and date the last page

20  of the charge, which will indicate that you have

21  reached a verdict.  And that's going to be the

22  verdict form that's in this copy.  I don't know if

23  you got one or not, but this will be the one.  The

24  Court security office will then deliver the verdict

25  to me.

1          The Court will honor the schedule you set

2     for your deliberations and your requests for breaks.

3     It's completely up to you, ladies and gentlemen,

4     what schedule you want to set, how late you want to

5     work, when you want to come in, you just let us

6     know.

7          From time to time I may communicate with

8     you concerning your schedule.  This is done

9     primarily for the purpose of anticipating the

10    Court's staffing needs and not in any way intended

11    to suggest that your deliberations should be

12    conducted at a different pace or a different

13    schedule.

14         During the trial, the court reporter made

15    a verbatim record of the proceedings.  And this is a

16    really important part of the instructions.  The

17    court rules do not provide the testimony to be

18    produced for the jury in written form or for

19    testimony to be read back to the jury as a general

20    aid in refreshing the jury's memories.

21         I say this is because, so often over the

22    years I have been doing this, the note will come out

23    that we want to see the testimony of such a witness.

24    And the response will be that there's got to be a

25    dispute that's reflected in the note over something

1    material to the case before I provide the testimony.

2    It takes a long time to do that.  It's not that you

3    can't get it, but it's got to be more than a request

4    for the testimony, so I don't waste your time.

5           In some limited circumstances, under those

6    circumstances as I have mentioned, the Court may

7    direct the court reporter to read testimony back to

8    the jury in open court.  This is done, however, only

9    when the jury certifies it disagrees as to the

10   testimony of a particular witness and identifies the

11   specific testimony in dispute.

12          I can't communicate with you, as you all,

13   know, back and forth in any fashion.  If you need to

14   communicate with me, then your presiding juror

15   should reduce the message to writing, sign it, and

16   pass the note to the court security officer, who

17   will bring it to my attention.

18          I will then respond as promptly as

19   possible, either in writing or by asking you to

20   return to the courtroom so I can address you orally.

21          If you do send a message or ask a question

22   in which you indicate that you are divided, never

23   state or specify your numerical division at any

24   time.

25          After you have reached a verdict, you are

1    not required to talk to anyone about the case unless

2    the court orders otherwise.

3              Ladies and gentlemen, thank you for your

4    patience today.  I'm going to send you back there.

5    You're on your own.  I will send you these original

6    jury instructions, and then we will get the exhibits

7    back to you.  All rise, please.

8                   (Jury leaves courtroom)

9              THE COURT:  If you all will get those

10   exhibits together.  This is my normal way of doing

11   this:  Everybody get the preadmitted and admitted

12   exhibits.  Everybody look over them, and then let

13   Ms. Archuleta know when you are ready, and I will

14   put on the record that both sides have looked at and

15   agreed to exactly what's going back there.  It's not

16   a huge issue in this case, but it's always important

17   to check.  So I will be looking to hear from you in

18   five minutes or so.

19             Is there anything before we adjourn?

20             MS. MALONE:  Judge, I wanted to introduce

21   you to Xerxes Martin, who is my associate who has

22   written most of these things, and I think you might

23   know his dad, E.X.

24             THE COURT:  Oh, E.X. Martin; yes, you're

25   the baseball player.

```
 1              MR. MARTIN:  Former.
 2              THE COURT:  I have heard about you for
 3    many, many years.
 4              MR. MARTIN:  I'm sure you have.
 5              THE COURT:  From your dad.
 6              MS. MALONE:  And he wrote like 90 percent
 7    of the documents in this case, Judge, so it's always
 8    nice to have a face to go with the writer.
 9              MR. MARTIN:  Sometimes a ghost writer.
10              THE COURT:  It's nice to meet you.
11              MR. MARTIN:  Nice to meet you to.
12              THE COURT:  Mr. Radbil, do you want to
13    make sure we have the exhibits?  Anything before we
14    adjourn?
15              MR. RADBIL:  No, Your Honor.
16              THE COURT:  All right.
17              (Recess taken from 4:00 to 4:24.)
18              THE COURT:  You all probably have an idea
19    of why I require everyone to go through the
20    exhibits, because there is not always an agreement.
21              So are we in agreement, Mr. Radbil?
22              MR. RADBIL:  Yes, Your Honor.
23              MS. MALONE:  Yes, ma'am.
24              THE COURT:  And what I have in my records
25    are preadmitted by agreement of the plaintiff were
```

103

1    Defense 1 and 6; admitted at trial were Defense 5

2    and 2.

3              Preadmitted by agreement of the plaintiff

4    on defense were 6, 7, 14, 15 and 17; admitted by

5    offer, it was Plaintiff's 10.

6              MS. MALONE:  Your Honor, 17 was withdrawn.

7              THE COURT:  17 was withdrawn, I have that.

8              MS. MALONE:  So it's 6, 7, 14, 15 and 10

9    by plaintiff.

10             THE COURT:  6, 7, 14 and 15, and 17 was

11   withdrawn.

12             MS. MALONE:  That matches up with the

13   binders, Judge.

14             THE COURT:  Let's send them back.

15             (Court in recess at 4:25.)

16             (Jury requested at 5:00 to return for

17   deliberations at 8:30 a.m. the following day.)

18

19

20

21

22

23

24

25

**SHAWNIE ARCHULETA, CSR/CRR**
**FEDERAL COURT REPORTER – 214.753.2747**

1                    C E R T I F I C A T E

2              I, Shawnie Archuleta, CCR/CRR, certify

3    that the foregoing is a transcript from the record

4    of the proceedings in the foregoing entitled matter.

5              I further certify that the transcript fees

6    format comply with those prescribed by the Court and

7    the Judicial Conference of the United States.

8              This 21st day of March 2013.

9

10

11                         s/Shawnie Archuleta
                           Shawnie Archuleta CCR No. 7533
12                         Official Court Reporter
                           The Northern District of Texas
13                         Dallas Division

14

15

16   My CSR license expires:  December 31, 2013

17   Business address:  1100 Commerce Street
                        Dallas, TX  75242
18   Telephone Number:  214.753.2747

19

20

21

22

23

24

25

**SHAWNIE ARCHULETA, CSR/CRR**
**FEDERAL COURT REPORTER – 214.753.2747**