```
            IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF TEXAS
                      DALLAS DIVISION

TIMOTHY WHITE,              )
                            )
          Plaintiff,        )
                            )
vs.                         ) 3:11-CV-1817-B
                            )
REGIONAL ADJUSTMENT         )
BUREAU, INC., d/b/a         )
RAB, INC.,                  )
                            )
          Defendant.        )

                JURY TRIAL - VOLUME 2
          BEFORE THE HONORABLE JANE J. BOYLE
             UNITED STATES DISTRICT JUDGE
                   FEBRUARY 26, 2013

                A P P E A R A N C E S
For the Plaintiff:

      WEISBERG & MEYERS, LLC
      9330 LBJ FREEWAY - SUITE 900
      Dallas, TX  75243
      (888)595-9111
      BY:  NOAH D. RADBIL

For the Defendant:

      ROBBIE L. MALONE
      8750 North Central Expressway - Suite 1850
      Dallas, TX  75231
      (214)346-2631

COURT REPORTER:  SHAWNIE ARCHULETA, TX CCR No. 7533
                 1100 Commerce Street
                 Dallas, Texas 75242


proceedings reported by mechanical stenography,
transcript produced by computer.
```

TRANSCRIPT OF PROCEEDINGS - VOLUME 2

Pretrial Matters                                          4

Jury Voir Dire - By The Court                            11

Opening Statement by Mr. Radbil                          87
Opening Statement by Ms. Malone                          93

ROBERT F. WYATT
Direct Examination By Mr. Radbil                         98
Cross-Examination by Ms. Malone                         126
Redirect Examination by Mr. Radbil                      158

TIMOTHY WHITE
Direct Examination By Mr. Radbil                        169
Cross-Examination by Ms. Malone                         191
Redirect Examination by Mr. Radbil                      216

EXHIBITS ADMITTED INTO EVIDENCE

| EXHIBIT | DESCRIPTION | OFFERED/ADMITTED |
|---|---|---|
| Plaintiff's Exhibit 6 - Preadmitted | | 7 |
| Plaintiff's Exhibit 7 - Preadmitted | | 7 |
| Plaintiff's Exhibit 14 - Preadmitted | | 7 |
| Plaintiff's Exhibit 15 - Preadmitted | | 7 |
| Plaintiff's Exhibit 17 - Preadmitted (WD) | | 7 |
| Plaintiff's Exhibit 10 | | 117 |

**********************

| Defendant's Exhibit 1 - Preadmitted | | 6 |
| Defendant's Exhibit 2 | | 193 |
| Defendant's Exhibit 5 | | 150 |
| Defendant's Exhibit 6 - Preadmitted | | 6 |

```
 1                    (In open court at 9:42 a.m.)
 2                    THE COURT:  Good morning.  Please be
 3     seated.
 4                    For the record, this is Civil Action
 5     3:11-CV-1817, Timothy White v. Regional Adjustment
 6     Bureau.  We are here this morning to begin the trial
 7     in this case.  We're going to finish up some
 8     pretrial issues before we get the jury panel up
 9     here, so if you will bear with me just a moment.
10                    Let's go ahead and have the parties
11     introduce themselves for the record.  State your
12     name as attorney and you who represent.
13                    MR. RADBIL:  My name is Noah Radbil, and I
14     represent the plaintiff, Dr. Timothy White.
15                    THE COURT:  Thank you.
16                    MS. MALONE:  Robbie Malone, and I
17     represent the defendant, Regional Adjustment Bureau
18     d/b/a RAB.
19                    THE COURT:  Who is here with you today?
20                    MS. MALONE:  This is Robert Wyatt, Your
21     Honor.
22                    THE COURT:  Is it White or Wyatt?
23                    MS. MALONE:  Wyatt.
24
25
```

1              THE COURT:  Thank you.  That's what I

2    thought.  Please be seated.

3              The first thing I wanted to do is see if

4    you were able to come to any agreement on any of the

5    exhibits such that we could preadmit them and

6    dispense with at least the predicate on some of the

7    exhibits.

8              Mr. Radbil.

9              MR. RADBIL:  Yes, I think we have agreed

10   on the account notes, which is Plaintiff's Exhibit

11   6.

12             THE COURT:  Let's do this:  Go ahead and

13   give me the numbers of defense exhibits that you

14   agree to preadmit.

15             MR. RADBIL:  Defense?  Which is defense?

16   Which is the accounts --

17             THE COURT:  Okay.  You agree to admit

18   Defense Exhibit Number 1.  Okay.  You will have to

19   speak up, Mr. Radbil.

20             MR. RADBIL:  We will agree to the account

21   notes, which are 0215.

22             MS. MALONE:  That's not my exhibit.  I

23   think she asked you for my exhibits that you

24   preadmitted.

25             THE COURT:  I am looking for defense

```
 1    numbered exhibits that you agree you won't object to
 2    so that I can preadmit them, and I will do the same
 3    with Ms. Malone as to plaintiff's exhibits.
 4              MR. RADBIL:  What is the defense number
 5    for the November 4, 2011, from Texas Guaranteed?
 6              THE COURT:  The record isn't going to work
 7    if you all are conferring back and forth like that.
 8              MS. MALONE:  Your Honor, I don't think
 9    Mr. Radbil has brought my copy of exhibits with him.
10    If you will oblige me, I brought a spare and I will
11    give it to him.
12              THE COURT:  Okay.
13              MS. MALONE:  I think he just doesn't have
14    them.
15              THE COURT:  Okay.
16              MS. MALONE:  Here you go.
17              MR. RADBIL:  Thank you.  Now that I've
18    been provided a copy --
19              THE COURT:  One moment.  Mr. Radbil, when
20    you talk, look up and speak, because it's all on the
21    record.  Okay?  It's really hard to hear what you
22    are saying, but hang on just a moment.
23              So we have Defense Exhibit 1 that you have
24    agreed to preadmit.
25              MR. RADBIL:  Correct.  Number 6 we agree
```

1   to preadmit.

2            THE COURT:  Okay.

3            MS. MALONE:  Your Honor, we're withdrawing

4   7 and 8.  Those were only in the event that we would

5   need them, and I don't.  So I'm withdrawing 7 and 8

6   for the defendants.

7            THE COURT:  Okay.

8            MR. RADBIL:  And Number 5 we had a slight

9   disagreement about.  There were some last-minute

10  redactions by --

11           THE COURT:  Do you agree to preadmit it or

12  not?

13           MR. RADBIL:  Not in the form that it was

14  presented this morning.

15           THE COURT:  Okay.  Let's go on, if there

16  are any others that you agree to preadmit.

17           MR. RADBIL:  I believe that's all, Your

18  Honor.

19           THE COURT:  So Defense Exhibit 1 and

20  Defense Exhibit 6 on agreement by the plaintiff are

21  preadmitted.

22       (Defendant's Exhibits 1 and 6 admitted.)

23           THE COURT:  Ms. Malone, let's hear what

24  you have to say about defense exhibits.

25           MS. MALONE:  The plaintiff's exhibits,

```
 1    Your Honor?
 2              THE COURT:  Yes, plaintiff's exhibits.
 3              MS. MALONE:  Okay.  We will agree to
 4    preadmit 6, 7, 14, 15 and 17.  There are two others,
 5    Your Honor, that we may be able to resolve the issue
 6    on and preadmit those.  He's mistaken about the one
 7    I talked to him about this morning.  It was not our
 8    Exhibit 5, but it appears as his Exhibit 13, which
 9    is a copy of a contract with Texas Guaranteed
10    Student Loan.  He gave me his exhibits yesterday.
11              THE COURT:  Right now what I am interested
12    in, just to move things along, is what you agree to
13    preadmit.  We obviously aren't going to start the
14    actual trial.  So if you have an agreement on
15    preadmitted exhibits, let's get those on the record.
16    Otherwise, if there are others before we start the
17    trial that you can get a chance to talk about, we
18    will do that at the time.
19              Were there any others, Ms. Malone?
20              MS. MALONE:  The other one was 16, which
21    Mr. Radbil was supposed to send me a better copy, I
22    didn't get it.  I am still open to preadmitting it
23    if I get the better copy.
24              THE COURT:  Mr. Radbil.
25              MR. RADBIL:  We don't have a better copy.
```

```
1    I wasn't able to improve the quality of the print.
2             THE COURT:  That's not preadmitted, and I
3    think we have covered that.  So let's go ahead and
4    talk about some other issues with regard to
5    questions, voir dire questions.
6             Do you have any to submit to the Court,
7    Mr. Radbil?
8             MR. RADBIL:  No, I don't think in this
9    case anything beyond identity of the parties, if
10   anybody is familiar or knows them.
11            THE COURT:  Just to be clear, because I
12   told you all that I was going to let you talk to the
13   jurors to the extent we have some out there that may
14   have some issues with a case like this, but those
15   would be follow-up type questions.  I don't think
16   that would be misunderstood.  But just in case, I
17   don't want any statements on the law or attempts to
18   extract promises from them or statements of what you
19   expect the evidence will show to the jury.
20            I always instruct the jury when I do allow
21   individual voir dire for that, but since we're only
22   going to be doing it question and answer to the jury
23   individually, I want to make sure that's clear ahead
24   of time.
25            Okay.  Are there any other pretrial
```

```
 1    matters that the plaintiff has to raise before we

 2    move on, then, to the trial?

 3              MR. RADBIL:  Yes, Your Honor.  We're going

 4    to withdraw our Exhibit 16 -- I'm sorry, our

 5    Exhibit 17, which would be Defendant's Exhibit 2, I

 6    believe.

 7              THE COURT:  Okay.  Anything else?

 8              MR. RADBIL:  No, Your Honor.

 9              THE COURT:  Your witnesses are ready and

10    they are here?

11              MR. RADBIL:  Yes.  And if the Court would

12    grant me leave, I think we are going to excuse the

13    two that we subpoenaed.

14              THE COURT:  Okay.  But otherwise, you are

15    ready to get started once we pick the jury?

16              MR. RADBIL:  Indeed.

17              THE COURT:  Ms. Malone?

18              MS. MALONE:  We are ready, Your Honor.

19              THE COURT:  Let me make sure I don't have

20    anything else.

21              The pretrial order has been filed.  If you

22    don't have a copy of it, we can get you one.  It's

23    the same thing you all submitted, it's just signed

24    and filed at this point, just in case anyone had a

25    question about that.
```

1          Have you all had a chance to talk about
2     jury instructions after we left yesterday?
3     Mr. Radbil?
4          MR. RADBIL:  Unfortunately, no, Your
5     Honor.
6          THE COURT:  I will just ask that you do
7     that before we adjourn today.  I want to make sure
8     that you all have had a chance to talk about the
9     jury charge and make sure there is -- at least I
10    understand where you agree and where you disagree.
11    All right?
12         MR. RADBIL:  Yes, Your Honor.
13         THE COURT:  Ms. Malone?
14         MS. MALONE:  Nothing, Judge.
15         THE COURT:  Okay.  We're going to go ahead
16    and get the jury lists to you if we don't have them
17    to you already.  We're going to go ahead and get the
18    physical jury up here, if you will turn your seats
19    around.  We will bring the jury in, and they will
20    start over there.  We will show you how they are
21    numbered.  I usually double-check and have them
22    stand and tell me their names so we are real clear
23    on corresponding your list as to who is actually
24    sitting there.
25         Please remember, everyone, to steer clear

1   of the jury; no discussions, even social amenities,

2   good morning to them in any fashion.  Please stay

3   away from them at all costs.

4           Let's go ahead and get the panel up here

5   and get our lists, and then we will get started.

6           (Recess taken.)

7           THE COURT:  Ladies and gentlemen, let's

8   bring the jury in.

9           MS. MALONE:  Mr. Radbil's witnesses are

10  sitting out in the hallway.  Can he release them?

11          THE COURT:  Yes, that's fine; not right

12  now.

13          (Jury Panel enters courtroom)

14          THE COURT:  Ladies and gentlemen, good

15  morning.  I'm Judge Jane Boyle.  Welcome to court on

16  Tuesday morning.  Before we go any further with this

17  jury selection, I want to have you sworn as our jury

18  panel, if you all would please rise and raise your

19  right hands while Mr. Reynolds administers the oath.

20          (Jury panel sworn in.)

21          THE COURT:  Please be seated.  Good

22  morning.  Jury service.  You all probably have been

23  wondering about this for a few weeks, maybe

24  yesterday even, wondering how this was going to turn

25  out, where you would end up, would you get on the

1    jury, how long would the case last, so I will answer

2    those questions for you.

3              First, just right up front, I will tell

4    you that this is a civil as opposed to a criminal

5    case.  I can't get into the evidence.  I will talk

6    to you a little bit more about it in a few minutes.

7    I don't expect the case to last longer than this

8    week.  It should be a short case.

9              What we're here for right now -- have any

10   of you served on a jury before?  So you know about

11   the jury selection part of it.

12             Let me just tell you that your time and

13   presence here is precious to us.  We take that in

14   consideration, and we will try to make this whole

15   process as efficient as possible with your time.

16   All of you put something aside to come down here

17   today, I know that, so please know that we take that

18   seriously.

19             The purpose of this part of the trial is

20   jury selection.  It's to determine -- it's the only

21   time that the jury panel can communicate with us by

22   asking questions, raising your hands and giving us

23   some opinions.

24             And the purpose of this process is to make

25   sure that we have a fair and impartial jury in this

1    case.  There will be seven.  The whole trial

2    process, the whole justice system ultimately is

3    about fairness, a level playing field, making sure

4    that the judge and the jury and everyone else

5    connected with this case is objective and fair.  We

6    all come to every situation with a certain amount of

7    background experiences that could affect and color

8    the way we look at particular situations.

9           So we start off with that idea as the

10   driving force, as the objective, so that's why the

11   questions will be asked.  If there's something

12   personal that you don't want to answer in front of

13   everyone else, just let me know and we will talk to

14   you separately outside the presence of the rest of

15   the jury panel.  I do that every time.  I expect we

16   will do it today, as well.

17          Let me start by introducing the

18   participants to you as the first step towards

19   determining if any of you know anyone involved in

20   the case.

21          The name of the case is Timothy White v.

22   Regional Adjustment Bureau.  That's Timothy White v.

23   Regional Adjustment Bureau.  The case involves

24   allegations regarding debt collection practices.

25   That's generally what we are talking about here.

```
 1              I'm going to have each of the attorneys
 2    introduce themselves, their firm, and their client,
 3    and I will start with counsel for the plaintiff.
 4              Mr. Radbil.
 5              MR. RADBIL:  Good morning, everyone.  My
 6    name is Noah Radbil, and this is my client Timothy
 7    White.  I'm with the law firm of Weisberg & Meyers,
 8    LLC.
 9              THE COURT:  Thank you, Mr. Radbil.  Do any
10    of you know Mr. Radbil, his firm, or Mr. White?
11    Okay.  I take it by your silence that you don't.
12              If you have happen to have some spark of
13    recognition that comes later, it's not too late
14    until we put you in the jury box, so please let me
15    know.
16              Thank you very much, Mr. Radbil.  You can
17    take a seat.
18              Ms. Malone, on the defense side.
19              MS. MALONE:  Thank you, Your Honor.  My
20    name is Robbie Malone.  And actually I have a small
21    firm, three lawyers, and my firm's name is Robbie
22    Malone.  And this is my client, Robert Wyatt,
23    W-Y-A-T-T, which may be a little confusing with
24    Mr. White's name.  Mr. Wyatt is the Director of
25    Human Resources and also of Compliance for the
```

1    company, Regional Adjustment Bureau, which is

2    located in Tennessee.

3                   THE COURT:  Thank you very much.

4                   Ladies and gentlemen, do any of you know

5    either of these individuals, Ms. Malone, Mr. Wyatt,

6    or anything about the Regional Adjustment Bureau?  I

7    take it by your silence that you don't.

8                   As I have introduced myself to you, my

9    court reporter in front of me, who is taking

10   everything down and making the record of these

11   proceedings, which we have to have in every trial,

12   is Shawnie Archuleta.

13                  As I am talking and as each of you will

14   talk, she's taking this down in real time.  So if

15   I'm looking at my computer, it's because I'm

16   watching because I have a question perhaps about

17   what was said.  I'm not playing cards or anything

18   over here, I'm trying to double-check.  It's a

19   horrible habit that's built up in me over the many

20   years.  When I'm talking to my children or someone

21   else, I sometimes look for the screen so I can look

22   back at what they said and it's not there.  It only

23   works in trial, so I had to get used to that.

24                  Next to her is Rod Reynolds, my court

25   administrator.  He organizes everything for us.  And

 1    to his left is Amber Woodward.  She's one of my law
 2    clerks, came to us from Washington University and
 3    the 6th Circuit.  We are lucky to have her for the
 4    year.
 5            And Jim Everett, who is one of our court
 6    security officers, is also one -- you will see him.
 7    We don't always necessarily have the same court
 8    security officer.  Mr. Everett was a high level
 9    official with the Dallas Police Department for
10    several years and the Police Chief in Austin for
11    many years.  If you recognize him from your college
12    days, he's instructed to pretend like he doesn't
13    remember you.
14            All right.  We talked a little bit about
15    the case.  It is a civil case.  It involves
16    allegations in a complaint, unlike in a criminal
17    case where a case goes through a grand jury process.
18    It's screened for probable cause in a civil case.
19    The allegations come to the Court by the filing of a
20    complaint, by plaintiff through his attorney.
21            And that doesn't say anything good or bad
22    about the allegations, but they are allegations.
23    And the plaintiff, as the charging party, has to
24    prove the allegations to the jury by a preponderance
25    of the evidence.  So that's the role of the -- in a

1    civil case of the plaintiff.

2              The defense has no burden.  They can put

3    evidence on if they want, but it's up to them.  But

4    the burden of proving the allegations lays squarely

5    on the shoulders of the plaintiff.

6              In this particular case, we don't talk

7    about the evidence before the case gets started, but

8    I can tell you a little bit about the case.  And the

9    purpose of that is to make sure there is no one out

10   there in this particular area that has a particular

11   recent experience or just a general bias or

12   prejudice that you don't think you could set aside

13   in this case.

14             And let me say that there isn't a case

15   that comes before us as adults, whether it's an

16   employment discrimination case, an insurance

17   contract case, criminal burglary of a vehicle case,

18   that someone on our jury panel hasn't had some

19   experience with.  So it's not that you have a good

20   or bad experience in this area.

21             The question is if you've had one, can you

22   put it aside.  Most often people can, but if they

23   can't from their heart of hearts, then we need to

24   know that because both sides deserve to have seven

25   completely objective arm's length people looking at

1    the case.

2            The allegations here are generally that a

3    Texas state statute and a federal statute, which

4    govern debt collection practices -- and I think

5    everyone is familiar that there are laws that cover

6    debt collection practices.  The allegations are that

7    the defendants, through individuals working for the

8    company in the process of collecting a debt,

9    violated these statutes.  Again, those are the

10   allegations.  Whether or not there is evidence to

11   prove them is another matter, and that's for the

12   jury to decide.  But that's generally what the case

13   is about.

14           Now, as I tell you that right now, is

15   there anyone in particular that has an issue they

16   can tell me up front that would affect them in this

17   particular case? And I will start row by row.  I'm

18   not going to interrogate you as you sit there about

19   what the problem was.  The question is, can you be

20   fair?  If there's something you want to talk to us

21   about and you think we should know, again, that

22   would be something we could talk about in private

23   with the lawyers and the one juror after we finish

24   this general part of the jury selection.

25           So as I -- as I go row by row, is there

 1  anyone on the first row, going across from Mr. Seay
 2  through Mr. Kalinowski, who would have an answer to
 3  that question?  Not have you had an experience in
 4  this regard, but have had an experience that you
 5  think might affect you in this case?  Anyone on the
 6  first row.  Take it by your silence that there is
 7  not.  Anyone on the second row?  Take it by your
 8  silence there is not.
 9          What I will do now is give you a chance to
10  get exercise and verify that everyone is where we
11  think they are in the seating chart.  I will ask you
12  each to stand and state your name one by one, stand
13  and then sit down.
14          We are also -- again, because this record
15  is of everything that happens, including what the
16  jurors on the panel say, please speak up.
17          So Mr. Seay.
18          PROSPECTIVE JUROR SEAY:  Cedric Seay.
19          PROSPECTIVE JUROR DENNIE:  Sheryl Ann
20  Dennie.
21          PROSPECTIVE JUROR MORRIS:  Oliver Morris.
22          PROSPECTIVE JUROR PARKER:  Marilyn Parker.
23          PROSPECTIVE JUROR LETOT:  Paul Letot.
24          PROSPECTIVE JUROR SIEGEL:  Melody Siegel.
25          PROSPECTIVE JUROR BROOKS:  Reginald

```
 1    Brooks.
 2               PROSPECTIVE JUROR FOX:  Karen Fox.
 3               PROSPECTIVE JUROR BRAUD:  Patricia Braud.
 4               PROSPECTIVE JUROR MEDINA:  Jere Medina.
 5               PROSPECTIVE JUROR McINTOSH:  Ollicsia
 6    McIntosh.
 7               PROSPECTIVE JUROR ABDELJABAR:  Ribhi
 8    Abdeljabar.
 9               PROSPECTIVE JUROR MAURER:  T. Maurer.
10               PROSPECTIVE JUROR GAITHER:  Greg Gaither.
11               PROSPECTIVE JUROR STROTHER:  Sylvia
12    Strother.
13               PROSPECTIVE JUROR KALINOWSKI:  Joseph
14    Kalinowski.
15               PROSPECTIVE JUROR OSBORNE:  Cassandra
16    Osborne.
17               PROSPECTIVE JUROR MICHENER:  Ria Michener.
18               PROSPECTIVE JUROR RENFRO:  Larry Renfro.
19               PROSPECTIVE JUROR RYDE:  Donna Ryde.
20               PROSPECTIVE JUROR MOFFITT:  Candace
21    Moffitt.
22               PROSPECTIVE JUROR KAY:  Gary Kay.
23               PROSPECTIVE JUROR COLLINS:  Audra Collins.
24               PROSPECTIVE JUROR BUERMAN:  Stuart
25    Buerman.
```

```
 1              PROSPECTIVE JUROR GONSER:  Stephanie

 2  Gonser.

 3              PROSPECTIVE JUROR JACKSON:  Vershunda

 4  Jackson.

 5              PROSPECTIVE JUROR DZANGARE:  Rwisai

 6  Dzangare.

 7              PROSPECTIVE JUROR AGUIRRE:  Margarita

 8  Aguirre.

 9              PROSPECTIVE JUROR BELL:  Tanya Bell.

10              THE COURT:  Thank you.  Now that you have

11  had a chance to hear a little bit about what the

12  case is about, I'm going to go back in a few minutes

13  and ask you some more questions about this

14  particular area.

15              But with jury selection, generally, and

16  the trial process, generally, again, we have -- in a

17  criminal case, it's the prosecution; they bring the

18  case, they have the burden of proof.  In a civil

19  case, it's the same; the plaintiff brings the case,

20  they have the burden of proof.

21              The Court is not involved in the

22  fact-finding.  The Court is more like an umpire,

23  makes the decisions on procedural issues, timing

24  issues, evidentiary issues, and otherwise has no say

25  in or opinion about who should win or lose in this
```

1    case.

2         The jury has the most important role, and

3    let me say this:  Every one of us, especially in

4    today's society, we are all so busy.  Everyone --

5    each one of you have had many things that you have

6    had to put aside and people that you have had to

7    inconvenience, including yourselves, to come down

8    here today.

9         And most judges will tell you, and I have

10   been doing this for close to 20 years, one of the

11   most precious rights that we have in this country is

12   a jury trial, unlike many countries that don't.

13   This is a chance for a jury of citizens who are

14   unconnected with the case to hear allegations made

15   by someone against someone else and decide what

16   happened.  And that is a critical, critical power

17   that our Constitution gives us as citizens.

18        So remember, as I always try to remind

19   people, that as you are concerned and probably

20   getting more worried as the days came closer to this

21   about what this was going to do to your life, please

22   do remember that the parties in this case, which was

23   filed in 2011, have been waiting for this day for a

24   long time and for the seven of you who will decide

25   what happened for a long time.  And as I said, we

 1   will keep this as efficient and smoothly running as

 2   possible.

 3            It's all about this notion that undergirds

 4   our society that fairness should pervade in areas of

 5   disputes.  And in order to do that, there ought to

 6   be a process by which decisions are made by people

 7   who aren't connected to the dispute.

 8            It's a beautiful thing to watch play out,

 9   and I have over many years.  As I said, this

10   particular trial will be short.  The Court, as I

11   mentioned, decides the evidence, what comes in.

12   That's important, especially in today's age, because

13   the evidence has to be admissible in court and

14   admitted by the Court for you to consider.  There

15   are lots of reasons for that.

16            The basic driving force is this idea of

17   fairness.  You don't want people who are listening

18   to your case talking to outside sources, talking to

19   the person that you have a dispute with next door,

20   googling and finding out something that someone said

21   about you that might affect their ability to judge

22   you in a case.

23            So any outside sources about this case

24   cannot be consulted.  We never -- when I started

25   this judging business years ago, we didn't have

```
 1   Google, we didn't have cell phones, we didn't even

 2   have real time court reporters.  Things have changed

 3   so much.  We have so much access to information.

 4        It also has caused, in some courts,

 5   problems with people googling outside information

 6   about a particular case.  I really don't think that

 7   there's anything out there, but I want to make sure

 8   that everyone knows that, from this point on, there

 9   shouldn't be any discussion about this case, even at

10   breaks before we pick the jury.

11        Occasionally you might have someone who --

12   the only way that you all know each other is because

13   you are here today, together.  So your common factor

14   is that you are on a jury panel on a particular

15   case.  So it naturally would be an instinctive thing

16   to maybe talk about this kind of case.  But that's

17   the kind of thing that would make us have to start

18   all over again.  So talk about anything but.

19        It used to be you could talk about the

20   Cowboys.  And of course it's off season now, but

21   there has to be a lot of other topics in this day

22   and age in the news that you can talk about.  Please

23   don't talk about the case so we don't have to start

24   over again.  Please don't Google or consult any

25   outside source about the issues in this case,
```

1   because that's all about the evidentiary points.

2          Again, the jury will be seated, I hope,

3   within an hour or so at the most, and sworn.  If

4   there is something that you think the Court needs to

5   know about you serving, please let me know.  I can't

6   say that a vacation or something like that

7   disqualifies you, but I want to make sure there

8   isn't anything -- which occasionally happens --

9   where I say, speak now or forever hold your peace,

10  and then everyone is seated.

11         And as I had one time, one young lady put

12  her head on the bar over there and wouldn't look

13  over here and wouldn't look up, thinking she had

14  slid under the radar.  And sure enough, she ended up

15  on the jury and had issues with being on the jury,

16  and at that point it was too late.

17         I can't tell you that you can get excused

18  for any reason, but there may be something private

19  or otherwise that you need to tell me about your

20  ability to serve.  So please let me know; not right

21  this minute, we will talk about that as we go.

22         So on that particular point, is there

23  anyone with any physical or other type of personal

24  ailment that could affect your ability to see, hear,

25  or sit through again a few-day trial?

1              Anyone on the first row?  And I'm not

2    going to ask you to speak about your specific

3    condition.  I'm looking over here and I'm getting --

4    one moment, please.  Ms. Osborne -- no, Ms. Braud.

5    Is that correct?

6              PROSPECTIVE JUROR BRAUD:  Do you want me

7    to tell you?

8              THE COURT:  Is it a back or something like

9    that?

10             PROSPECTIVE JUROR BRAUD:  No, it's

11   hearing.

12             THE COURT:  Hearing.  Okay.

13             PROSPECTIVE JUROR BRAUD:  I can hear you

14   fine, but I have been in courts where it was hard to

15   hear.

16             THE COURT:  Okay.  I will talk to you a

17   little bit about that more and make sure we are

18   clear.  As we go through this, if you are having

19   trouble hearing anyone, just put your hand up and we

20   will make sure that they speak up.  Okay?

21             Anyone else on the first row?  We have a

22   very healthy group here.  Second row?  Yes, ma'am.

23   That is Ms. Bell.

24             PROSPECTIVE JUROR BELL:  I have a problem.

25   I have lupus.

```
 1              THE COURT:  I will talk to you a little
 2    bit more about that in private.  Thank you.
 3              Did I miss anyone?  Once in a while
 4    there's someone that comes down for jury service
 5    that has moral, personal, religious, or other
 6    reasons that they can't sit in judgment.  Believe
 7    me, it's a very unsettling thing when you get
 8    through all of this and get through the trial and
 9    you find out that someone on the jury can't decide
10    because they don't think it's right for them to make
11    a decision.
12              Let's make sure there isn't anyone that
13    has that kind of personal concern that you would not
14    be able to make a decision for any reason.  Anyone
15    on the first row.
16              Ms. Siegel?  I'm going to talk to you
17    about that separately.  Okay?
18              Anyone else on the first row?  Somebody?
19    Yes, ma'am, and that is Ms. Strother?
20              PROSPECTIVE JUROR STROTHER:  Yes, ma'am.
21              THE COURT:  We will talk about that
22    separately, as well.  Did I miss anyone?
23              As I mentioned, this case involves debt
24    collection practices.  In this day and age, most of
25    us are more familiar with those kinds of things than
```

1   we ever used to be, with our economy and all of the

2   issues in the news about the economy.

3          Is there anyone -- and I'm not going to

4   ask you to state it, please don't state it out loud.

5   Is there any who has a strong feeling about debt

6   collection practices, either positive or negative,

7   that you think we need to hear about?  And we will

8   start on the first row.  We will start on the first

9   row, and I won't ask you to tell me now.  Anyone on

10  the first row that has an issue?  And I will go back

11  to you, Ms. Siegel.

12         How about the second row?  Yes, ma'am,

13  Ms. Bell.  Okay.

14         Is there anyone who, you or a close family

15  member, would affect you or a close friend wherein

16  it would affect you, has had a bad experience with a

17  debt collection entity?

18         And I'm going to talk to you, Ms. Siegel.

19  Thank you.  Anyone on the first row?  And I am going

20  over then to Ms. Braud.

21         PROSPECTIVE JUROR McINTOSH:  McIntosh.

22         THE COURT:  I'm sorry.  Ms. Braud, you

23  raised your hand for that, as well, did you not?

24         PROSPECTIVE JUROR BRAUD:  Yes.

25         THE COURT:  And Ms. McIntosh, you did, as

1    well?

2                    PROSPECTIVE JUROR McINTOSH:  Yes.

3                    THE COURT:  Anyone else on the first row?

4    Second row?  Okay.  Okay.

5                    Let's talk about student loans.  Have any

6    of you had -- or family member or close friend -- an

7    issue, a negative experience with regard to a

8    student loan, college or otherwise?  You don't have

9    to spell out what the problem was, just want to know

10   if there was one, and we can talk about it in

11   private.

12                   Anyone on the first row?  Anyone on the

13   second row?  I take it by your silence that you

14   don't.

15                   Has anyone -- and I ask this as a

16   follow-up question, and I think I know the answer.

17   Has anyone had a degree, college or otherwise -- or

18   a close family member or friend -- withheld because

19   of an issue with a student loan?  A degree withheld

20   as a consequence for not paying or not -- or

21   defaulting on a student loan?  Anyone on the first

22   row?  No?  Second row?  Okay.  I see no hands.

23                   This is probably going to get some

24   answers.  How many of you have worked in the

25   telemarketing field?  How many of you have worked in

```
1   the telemarketing field or a spouse?  Someone that
2   you would have regularly heard from, not your
3   neighbor, but you know what I mean, someone that you
4   would be close enough to have an opinion.  I will
5   get to you in a minute, Ms. Bell.
6           Anyone on the first row, telemarketing
7   field, cold calls?  That's Ms. Dennie?
8           PROSPECTIVE JUROR DENNIE:  Yes, ma'am.
9           THE COURT:  Okay.  Without telling me, is
10  there anything about that experience in the
11  telemarketing field that you think could affect you
12  in this case?
13          PROSPECTIVE JUROR DENNIE:  No, ma'am.
14          THE COURT:  Anyone else on the first row
15  that I have missed?  And that is Ms. Medina.
16  Working yourself or someone in your family?
17          PROSPECTIVE JUROR MEDINA:  Myself.
18          THE COURT:  Anything about that that might
19  affect you in this particular case?
20          PROSPECTIVE JUROR MEDINA:  I don't think
21  so.
22          THE COURT:  Okay.  And for both Ms. Dennie
23  and Ms. Medina, were these positions where you had
24  to make calls to people, not necessarily debt
25  collection, but just calls to strangers for one
```

1   reason or another to sell or something like that.

2           PROSPECTIVE JUROR DENNIE:  Yes, Your

3   Honor.

4           PROSPECTIVE JUROR MEDINA:  (Nodding head.)

5           THE COURT:  Second row?  I see a hand, and

6   that is going to be Mr. Kay?  Mr. Buerman?  You,

7   yourself, worked in the telemarketing field?

8           PROSPECTIVE JUROR BUERMAN:  Yes.

9           THE COURT:  Anything about that experience

10  that might affect you in this case?

11          PROSPECTIVE JUROR BUERMAN:  No.

12          THE COURT:  And Ms. Bell.  I have a lot of

13  things to talk to you about.  Thank you.  All right.

14          Again, we talked about the defense --

15  defendant corporation's name here, it's Regional

16  Adjustment Bureau.  There are two similarly named

17  companies, one in Texas and one in Tennessee.  This

18  particular company, as addressed by Ms. Malone, is

19  from Tennessee.  Now that I have had a chance to

20  hear about this company and generally about the

21  case, is there anyone familiar with this company or

22  the other one?  Okay.  I don't see any hands on that

23  question.

24          Has anyone in the courtroom, starting with

25  the first row, been involved with either working for

1    it, a spouse working for it, or in the process,

2    itself, with the debt consolidation process?  We

3    hear a lot about that these days.  All you have to

4    do is turn on KRLD or some of these others and

5    there's someone talking about debt consolidation.

6    We get these mailers about debt consolidation.

7            Anybody involved in that process or a

8    close friend or family member?  Anyone on the first

9    row?

10           Yes, ma'am.  Ms. Strother?

11           PROSPECTIVE JUROR STROTHER:  Yes.

12           THE COURT:  Okay.  We are going to talk to

13   you about something else.

14           And the second row, debt consolidation?

15   Okay.

16           Now, also you all will know -- and most of

17   you that have been on juries already know this:  The

18   parties and the lawyers and everyone associated with

19   my court has to stay away from you all at arm's

20   length.  Even hello, good morning, could cause a

21   problem.  So no one is trying to be rude, but they

22   have been specifically instructed not to have any

23   kind of eye contact if they can avoid it with any of

24   you, not to get on the elevator with you.  So please

25   understand that's what's going on.

     1          If someone -- and I don't think it will

     2     ever happen, but if someone were to approach you

     3     about this case in any fashion, to notify the Court

     4     immediately so that we can take care of that.

     5     Again, I don't expect that to happen.

     6          Let me ask before we break -- and I talked

     7     to some of you one by one -- yes, ma'am, Ms. Dennie?

     8          Could you stand up?

     9          PROSPECTIVE JUROR DENNIE:  I have

    10     Christian Credit Counseling.  Is that the same

    11     thing?  I don't know if it's debt consolidation, but

    12     I didn't want to misrepresent.

    13          THE COURT:  Thank you.  You were part of

    14     that?

    15          PROSPECTIVE JUROR DENNIE:  Yeah.  They

    16     just helped me get my bills and stuff when I was

    17     like 22 years old --

    18          THE COURT:  Okay.

    19          PROSPECTIVE JUROR DENNIE:  -- together.

    20     But I didn't have a bad experience, and I didn't

    21     necessarily call it debt consolidation.

    22          THE COURT:  All right.  Thank you.  Anyone

    23     else?

    24          Is there anything in particular that I

    25     haven't talked about that you are sitting there and

1   you are thinking, I really need to talk about this

2   but I don't know -- the question hasn't been asked.

3          At some point one lawyer in one case said

4   to the jury, if you talk you walk, and that was not

5   true.  In other words, if you talk, you get out of

6   jury service, that's not correct.  But I just want

7   to make sure there isn't anything out there that I

8   have missed that you feel as though you need to tell

9   us either with the group or privately?  Anyone on

10  the first row?  And we're already going to talk to

11  you Ms. Medina.  Okay.  And I have both Ms. Dennie

12  and Mr. Morris.  Is that right, Mr. Morris?

13          MR. MORRIS:  Yes.

14          THE COURT:  Okay.  Second row?  Yes, sir.

15  That is Mr. Renfro.  We will talk about that.  I

16  will bring you up separately.  All right.  Anyone

17  else?  All right.

18          Ms. Fox, you're married to an attorney.

19          PROSPECTIVE JUROR FOX:  I am.

20          THE COURT:  Where does your husband work?

21          PROSPECTIVE JUROR FOX:  At

22  Fish & Richardson.

23          THE COURT:  I thought you looked familiar.

24  All right.  I think that's probably my last question

25  will be if there's anyone who has worked in the

```
 1   legal area as a paralegal or as an attorney or
 2   obviously your spouse, husband or wife, works for a
 3   law firm here in town.  I think it's helpful to know
 4   that.  We have already heard from Ms. Fox that her
 5   husband is a civil attorney working for one of the
 6   firms.
 7             Is there anyone else on the first row that
 8   worked in law, paralegal, or a spouse or a relative?
 9             PROSPECTIVE JUROR BRAUD:  I have a son
10   that's a lawyer.
11             THE COURT:  Where does he work?
12             PROSPECTIVE JUROR BRAUD:  In Alabama.  And
13   I have a sister-in-law that's a lawyer in Houston.
14             THE COURT:  Do you know what kind of law
15   they practice?
16             PROSPECTIVE JUROR BRAUD:  She does
17   environmental.
18             THE COURT:  Okay.
19             PROSPECTIVE JUROR BRAUD:  And he does more
20   corporate.
21             THE COURT:  Okay.  Thank you.  Anyone
22   else?  First row?  Yes, ma'am, Ms. Parker?
23             PROSPECTIVE JUROR PARKER:  My daughter is
24   a senior legal clerk in Collin County-Frisco.  It's
25   a peace court, and she handles civil matters.
```

1          THE COURT:  Okay.  Thank you.  Anything
2    about her experience there in court -- in Collin
3    County you said?
4          PROSPECTIVE JUROR PARKER:  Collin
5    County-Frisco, yes, ma'am.
6          THE COURT:  -- that could affect you here?
7          PROSPECTIVE JUROR PARKER:  No, I don't
8    believe so.
9          THE COURT:  Frisco has grown in the last
10   20 years.
11         PROSPECTIVE JUROR PARKER:  Yes.
12         THE COURT:  Lot more business up there.
13         Anyone on the second row?  Okay.  All
14   right.  Ladies and gentlemen, we're going to break
15   now so the lawyers and I can talk to you
16   individually as to some of you that had issues and
17   questions.  Please remember not to talk about the
18   case.  Without anything further, I'm going to go
19   ahead and have everyone rise, and I will have Mr.--
20   our court security officer escort you out to the
21   hallway.
22         (Jury panel excused.)
23         THE COURT:  Counsel, I will ask with
24   regard to those witnesses, if they are sitting out
25   there, maybe Mr. Everett can have them come in and

```
1   you can excuse them without any conversation in
2   front of the jury.  Do you know where they are?
3               MR. RADBIL:  They should be right outside.
4               THE COURT:  Do you know which ones they
5   are, the Wilsons?
6               CSO EVERETT:  Yes, I know where they are.
7   I had them go and sit by Judge Furgeson's chambers.
8               THE COURT:  Can you bring them back in,
9   and I think we can excuse them.
10              Let's bring your chairs around.
11              CSO EVERETT:  I have a third one out there
12  also.
13              THE COURT:  Who is the third one?
14              Yes, ma'am, who are you?
15              MS. CURETON:  Jaclynn Cureton.
16              THE COURT:  Ms. Malone, your position was
17  to -- is there an agreement on excusing --
18              MS. MALONE:  I didn't subpoena them,
19  Judge, but I'm happy to excuse them.
20              THE COURT:  Mr. Radbil, I believe we
21  addressed these issues yesterday in court.
22              MR. RADBIL:  Yes, Your Honor.
23              THE COURT:  I'm not asking you to waive
24  what you brought up yesterday, because you certainly
25  haven't.  But if they are the subject of the Court's
```

order yesterday, my recollection is that there is no
need for them to remain as witnesses here.

        MR. RADBIL:  I agree, Your Honor.

        THE COURT:  Ladies and gentlemen, I don't
know if -- I am certain -- if you will move to the
side so I can talk to them.  I am certain that you
are not going to be needed for the plaintiff's case
in chief based upon some legal hearings we had
yesterday.

        That doesn't mean there might not be
something that would come up where there would be an
issue where you might have to be called as something
we call rebuttal witnesses.  So please be sure you
are available in the next few days.  I'm sure you
have contact information with Mr. Radbil; is that
right?

        MR. WILSON:  Yes.

        THE COURT:  Go ahead and identify
yourself.

        MR. WILSON:  Keith Wilson.

        MRS. WILSON:  Christine Wilson.

        MS. CURETON:  Jaclynn Cureton.

        THE COURT:  Are you in the Dallas area?

        MR. WILSON:  My wife and I are.

        THE COURT:  Ms. Cureton.

```
 1              MS. CURETON:  I am an hour-and-a-half
 2    away.
 3              THE COURT:  You are in the general
 4    Metroplex, you don't have to fly here.
 5              MS. CURETON:  Right.
 6              THE COURT:  Please be sure you are
 7    available until Mr. Radbil let's you know that the
 8    trial is over in case you are needed for rebuttal.
 9              Otherwise, you are excused.  Please be
10    sure not to say a thing or even look at the jury
11    panel as you are walking by them.
12              Thank you very much.  You are excused for
13    now.
14              (Witnesses excused.)
15              THE COURT:  Go ahead and take a seat,
16    Mr. Radbil.  All right.
17              First one I have a question with is
18    Ms. Dennie.  She's Juror Number 2.  She has
19    something she wanted to tell us that she didn't
20    mention in front of everyone, and that was in
21    response to my last question.  So let's go ahead and
22    bring her in.  I will ask her some questions, and I
23    will let you each ask her follow-ups and excuse her
24    and see where we are.
25              (Ms. Dennie enters the courtroom.)
```

```
 1              THE COURT:  Ms. Dennie, how are you?
 2              PROSPECTIVE JUROR DENNIE:  Thank you,
 3    fine.
 4              THE COURT:  One moment.
 5              Ms. Dennie, you mentioned something you
 6    wanted to bring up outside the presence of everyone
 7    else.  You said -- you talked about something when
 8    you were a teenager, and you can't be much older
 9    than a teenager at this point as I'm looking at you.
10              PROSPECTIVE JUROR DENNIE:  I'm 40.
11              THE COURT:  You are very young looking.  .
12              PROSPECTIVE JUROR DENNIE:  Thank you.
13              THE COURT:  Okay.  What was the issue?
14              PROSPECTIVE JUROR DENNIE:  I didn't know
15    if you were going to bring this up as far as
16    hardship reasons that you couldn't serve on the
17    court.  The excuse for children on here didn't
18    really go with my circumstance.  But I am a teacher,
19    and I have small children that don't have before and
20    after school care.  They come to school with me and
21    come to my classroom with me after.  So they have to
22    be there at 8:20 when I start teaching, and then
23    they go to their class and are back in my room at
24    3:30.  So I don't have before and after school care
25    for them.
```

1            THE COURT:  Okay.

2            PROSPECTIVE JUROR DENNIE:  And I wasn't

3   sure that would be an excuse.  My husband works,

4   also, but he had to be late to work and he has to

5   leave early to come get them.

6            THE COURT:  And that's the only issue that

7   you had to raise with us?

8            PROSPECTIVE JUROR DENNIE:  Yes, ma'am.

9            THE COURT:  Let me talk to the lawyers for

10  a few minutes, and I will have you step outside.

11           PROSPECTIVE JUROR DENNIE:  Yes, ma'am.

12  Thank you.

13           (Ms. Dennie exits courtroom.)

14           THE COURT:  I would see no reason to have

15  you asking her questions about the only issue that

16  she has.  I don't know what your position is.  You

17  have no obligation.  We have plenty of jurors here.

18  Do either side take a position on agreeing to?  We

19  don't tell her right now that we agree to excuse

20  her, she just won't be part of the panel.

21           Mr. Radbil and Ms. Malone?

22           MS. MALONE:  I will agree to excuse her.

23           MR. RADBIL:  She may go.

24           THE COURT:  Thank you both.  We will have

25  her back in, and she won't know how she got out of

```
1   it.  That's one for cause, and that takes us to 14.
2           The next one is Mr. Morris.  And he didn't
3   say anything except that he had something to talk to
4   us about.  So let's bring Mr. Oliver Morris in.
5           (Mr. Morris enters the courtroom.)
6           THE COURT:  Mr. Morris, if you will come
7   up to the microphone.  How are you?
8           MR. MORRIS:  Fine.  How are you?
9           THE COURT:  Just fine.  You mentioned
10  something about having an issue, perhaps, that you
11  wanted to talk to us about about service.
12          MR. MORRIS:  I had a debt consolidation
13  with the Wells Fargo, and I am in the last two years
14  of settling it; 854 per month.
15          THE COURT:  Thank you.  Is there anything
16  about that experience -- and there are no right or
17  wrong answers at this point.
18          MR. MORRIS:  Okay.
19          THE COURT:  Just think about if you were a
20  juror for either side, is there anything about that
21  experience that you think might affect your ability
22  to be fair in this case?
23          MR. MORRIS:  No, there is not.
24          THE COURT:  Thank you very much.  I
25  appreciate that.  I will let the lawyers ask you a
```

```
 1  question or two.  I will start with Mr. Radbil.  Any
 2  questions?
 3          MR. RADBIL:  No, sir.
 4          THE COURT:  Anything, Ms. Malone?
 5          MS. MALONE:  I didn't hear what you said
 6  about the debt consolation.
 7          MR. MORRIS:  They consolidated all of my
 8  bills, and it comes out to $854 per month, and I am
 9  in the last two years of settling.  And I think --
10  this is '13; in '15 I will be through.
11          MS. MALONE:  Okay.  So if I understand,
12  you went to Wells Fargo and lumped everything
13  together?
14          MR. MORRIS:  They consolidated my house
15  and all of that.
16          MS. MALONE:  This is not like a Dave
17  Ramsey consolidation?
18          MR. MORRIS:  No.
19          THE COURT:  Thank you very much.  That's
20  exactly what we needed to know.  Thank you.  Okay.
21          (Mr. Morris exits the courtroom.)
22          THE COURT:  The next person, ladies and
23  gentlemen, that I have is Melody Siegel.  She had an
24  issue with just sitting in judgment, and she had an
25  issue with debt.  So let's go ahead and bring
```

```
 1    Ms. Siegel in.
 2              (Ms. Siegel enters the courtroom.)
 3              THE COURT:  Ms. Siegel, how are you?
 4              PROSPECTIVE JUROR SIEGEL:  I'm fine, thank
 5    you.
 6              THE COURT:  You are a teacher?
 7              PROSPECTIVE JUROR SIEGEL:  Yes, ma'am.
 8              THE COURT:  How many years have you been a
 9    teacher?
10              PROSPECTIVE JUROR SIEGEL:  I've been at my
11    current position six-and-a-half years.  I've taught
12    one-year-olds, and I've taught the 12-month to
13    18-month group.  In January I was placed in with the
14    infants, so I have the two to eight-month-old ones
15    now.
16              THE COURT:  That's wonderful.  Great
17    career for people and for the people you serve.
18              PROSPECTIVE JUROR SIEGEL:  Yes.  I have
19    been in care longer than that, but my current
20    position is six-and-a-half years at this place.
21              THE COURT:  You said a couple of things.
22    One is about deciding.  Let's talk about that.
23              PROSPECTIVE JUROR SIEGEL:  I have a very
24    hard time listening to both sides of the issues,
25    because I hear the good and the bad to both sides,
```

1   and I have trouble making decisions on those.

2            And also regarding this matter, a number

3   of years ago, my ex-husband and I were in a very

4   severe financial situation, and we were constantly

5   harassed by collectors.  Needless to say, it left a

6   sour taste in my mouth.

7            Things are better now.  I am single now

8   and have been for a number of years.  But in the

9   back of my mind, I'm not sure how well I would do

10  deciding a situation like this since I've been in

11  those shoes.  I understand the company's position,

12  the company need, and I also understand the other

13  side of it.  And I don't know if I would be able to

14  make an easy decision or if I would struggle with

15  it.

16           THE COURT:  Well, this is exactly what we

17  need to hear.  And there are no right or wrong

18  answers as to how you feel.

19           PROSPECTIVE JUROR SIEGEL:  Right.

20           THE COURT:  Just picture yourself on the

21  jury for each of these people, and would you want on

22  there given what you have.

23           PROSPECTIVE JUROR SIEGEL:  Right.

24           THE COURT:  So I will let the lawyers each

25  ask you a couple of questions.  I appreciate your

```
 1   candor very much.  And I will start with plaintiff's
 2   counsel.  Mr. Radbil.
 3            MR. RADBIL:  Yes.  Thank you for your
 4   time.
 5            PROSPECTIVE JUROR SIEGEL:  Yes, sir.
 6            MR. RADBIL:  So given the history, do you
 7   think you could follow the law based on the
 8   evidence, or do you think that your emotions would
 9   affect your ability to follow the law in terms of
10   some preference over who would win and who should
11   lose?
12            PROSPECTIVE JUROR SIEGEL:  To be honest, I
13   would like to think I would have the ability to
14   follow the law.  I would pray that my emotions would
15   not get to me.  I'm not -- I would like to guarantee
16   it, but I don't know that I can honestly guarantee
17   it.
18            MR. RADBIL:  I appreciate that.  Thank
19   you.
20            MS. MALONE:  No questions, Your Honor.
21            THE COURT:  Thank you, Ms. Siegel.  We
22   will have a discussion and make a determination.  We
23   will have all of you back in here within a few
24   minutes.
25            (Ms. Siegel exits the courtroom.)
```

```
1              THE COURT:  Okay.
2              MS. MALONE:  Judge, I'm sorry, do you want
3    us -- if we're going to move for cause, do you want
4    us to wait to the end?
5              THE COURT:  Person by person.
6              MS. MALONE:  I would move to strike her
7    for cause.
8              THE COURT:  And for the record, your
9    position is?
10             MS. MALONE:  Because of her testimony
11   that, from her prior experience that had left a bad
12   taste in her mouth that she could emotionally not be
13   able to make a fair decision in this case, which
14   would be prejudicial to my client.
15             THE COURT:  Mr. Radbil?
16             MR. RADBIL:  I agree.
17             THE COURT:  Okay.  I appreciate that.  I
18   agree, as well.  Ms. Siegel will be struck for
19   cause.  That means we have two out for cause, so we
20   are up to juror 15.
21             MR. RADBIL:  Who was the first for cause?
22             THE COURT:  Dennie, Ms. Dennie.  So we
23   have Number 2 stricken for cause and Number 6
24   stricken for cause, and we go to Ms. Braud, who had
25   the issue of hearing.  I think that was basically
```

1  her issue.  Let's have her come in.

2           MS. MALONE:  She said she had a problem

3  with debt collectors.

4           THE COURT:  She did.

5           (Ms. Braud enters the courtroom.)

6           THE COURT:  Ms. Braud, come on up.  On the

7  hearing issue, tell me a little bit about that,

8  because I know that can be difficult.  It's

9  frustrating when you can't hear people.

10          PROSPECTIVE JUROR BRAUD:  I can't hear if

11 people aren't speaking loud enough.  And I have

12 found that the guy downstairs today, he was really

13 hard for me to hear, but he was talking really soft.

14 I could hear you just fine.  But I think if someone

15 is not at a mic, you know, and I'm in the back of

16 the room or back, you know, row, it's just hard for

17 me to hear.

18          THE COURT:  All right.

19          PROSPECTIVE JUROR BRAUD:  I do have some

20 hearing loss.  I don't wear a hearing aid.  I'm not

21 to that point.

22          THE COURT:  Ms. Braud, you also mentioned

23 something about debt collection practices.  Did you

24 have an issue with regard to any of that?

25          PROSPECTIVE JUROR BRAUD:  Well, I have a

1   special needs child that I had growing up.  She's

2   doing wonderful now.  But we had a lot of medical

3   bills, and we had a lot of times that we couldn't

4   pay everything out, and we were hounded by debt

5   collectors calling us.

6            And actually, to this day, there's still

7   some debt that came after my daughter turned 18.

8   Everything was in her name, so she still has debt

9   collectors calling her on some bills that she is not

10  able to pay at this point because she doesn't make

11  enough income.  So I don't feel like I'm prejudiced

12  against them, I just think I got used to being

13  hounded, so I just sort of kind of tune it out now.

14           It is a source of annoyance when it is

15  happening to you continually.  And this is from the

16  time she was born until she was about 20 years old.

17  She had 12 surgeries.  We incurred hundreds of

18  thousands of dollars of medical expenses, and a lot

19  of that we were not financially available to pay

20  back.  We eventually did.  I spent all these years

21  paying medical debts back.

22           THE COURT:  Well, I appreciate that

23  disclosure.  She's okay now, your daughter?

24           PROSPECTIVE JUROR BRAUD:  She's getting

25  married in May.  She's doing very well.

```
 1              THE COURT:  Good.  There are no right or
 2   wrong answers here.  You have to let us know in your
 3   heart of hearts if, given that personal experience,
 4   if you think you can set that aside really as
 5   someone who could be able to sit on the jury for
 6   both sides or if you think it might affect you if
 7   you hear certain things that ring a bell.
 8              PROSPECTIVE JUROR BRAUD:  It could.  I
 9   don't know really the facts of the case, but it
10   possibly -- you know, I'm not going to say
11   definitely.  It just depends on how it is presented,
12   but it could make me think, well, I might be more
13   sympathetic because I have had that experience.
14              THE COURT:  Okay.
15              PROSPECTIVE JUROR BRAUD:  I never had any
16   legal things, just more threatening kind of, you
17   know, things.  Like, if you don't, you know, pay,
18   we're going to do this kind of thing.
19              THE COURT:  I'm going to let the lawyers
20   each ask you a couple of questions just to follow
21   up, and I will make sure they speak up.  Mr. Radbil,
22   did you have any questions?
23              MR. RADBIL:  Yes, very briefly.  In spite
24   of your experiences with debt collectors and debts
25   in the past, do you think you would be able to
```

```
 1   follow the law and completely set aside any

 2   emotional influence based on your past experience

 3   and just look at the facts of this particular case

 4   objectively?  Or do you think that's not

 5   guaranteeable.

 6              PROSPECTIVE JUROR BRAUD:  I think I could

 7   follow the law, but I could not guarantee that I

 8   couldn't just put everything aside.

 9              MR. RADBIL:  Do you think that would

10   affect your ability --

11              PROSPECTIVE JUROR BRAUD:  I think it would

12   to a certain extent.

13              THE COURT:  Thank you, Mr. Radbil.

14              Ms. Malone?

15              MS. MALONE:  No, Your Honor.

16              THE COURT:  Thank you very much, Ms.

17   Braud, and we will be bringing all of you back in

18   here in just a few minutes.  I'm happy to hear about

19   your daughter.  I'm sure that's a lot of work for

20   you.

21              (Ms. Braud exits the courtroom.)

22              MS. MALONE:  Move to strike, Your Honor.

23              MR. RADBIL:  No objection.

24              THE COURT:  All right.  I appreciate that.

25   I agree.  That's Number 9.  So we're up to 16.  I've
```

```
 1   -- I believe it's Ms. Medina that worked as a
 2   telemarketer and had something she wanted to tell
 3   us.  So let's bring Ms. Medina up.
 4               (Ms. Medina enters the courtroom.)
 5               THE COURT:  Ms. Medina, how are you?
 6               PROSPECTIVE JUROR MEDINA:  I'm great.
 7               THE COURT:  I know that you had a -- you
 8   had something that you wanted to talk to us about.
 9   Looks like you and your husband both work in the
10   schools.
11               PROSPECTIVE JUROR MEDINA:  Yes, and own a
12   restaurant.  So after three, I'm the primary
13   caregiver of two little twins, so he's gone.  I
14   didn't know what time this ended or anything, but
15   I'm it.
16               THE COURT:  Is there anyone that can stand
17   in for you?
18               PROSPECTIVE JUROR MEDINA:  Not that I'm
19   aware of.  I let the lady go at that time so she can
20   go take care of her children, so. . .
21               THE COURT:  Okay.  Was there anything
22   else, other than that issue, which I want to talk
23   about to the lawyers, insofar as any concerns you
24   had about the underlying case that we mentioned?
25               PROSPECTIVE JUROR MEDINA:  No.
```

1              THE COURT:  Okay.  All right.

2              Any questions, Mr. Radbil?  Ms. Malone?

3              MR. RADBIL:  I understand that you worked

4    in telemarketing, correct?

5              PROSPECTIVE JUROR MEDINA:  Yes.

6              THE COURT:  That's not an issue we were

7    going to address.  I don't think that she indicated

8    she had a problem with that.  Is there anything

9    about the telemarketing at all that would affect

10   you?

11             PROSPECTIVE JUROR MEDINA:  No.  It was

12   home building.  It was for a home builder.

13             THE COURT:  One more question, Mr. Radbil.

14             MR. RADBIL:  I have no more.

15             THE COURT:  If you will step outside.

16             (Ms. Medina exits the courtroom.)

17             THE COURT:  My thought was this kind of

18   screening would be ahead of time.

19             MS. MALONE:  I will agree to let her go,

20   Judge.

21             THE COURT:  There's no obligation.

22             MR. RADBIL:  If she has a family to take

23   care of, I mean --

24             THE COURT:  I appreciate it.  I -- again,

25   if we were getting down to the bottom of the jury, I

1    would disagree and we would keep her.  And I have

2    kept them before, I just don't know why the ladies

3    and gentlemen come to jury service when they have

4    something so life-altering that would keep them from

5    coming.

6            Mr. Radbil, this is up to you.  I'm not

7    forcing you into it, I just want to know what your

8    position is.  Do you agree or not?

9            MR. RADBIL:  I do.  I think she should

10   take care of her family.

11           THE COURT:  Number 10 is excused for cause

12   then.  That's four, which would be Juror Number 2,

13   Juror Number 6, Juror Number 9 and Juror Number 10.

14   And so we're up to 17, and we still have

15   Ms. Strother to talk about.  She had some issues

16   that she couldn't sit in judgment and maybe some

17   other things, so let's --

18           MS. MALONE:  Judge, you skipped

19   Ms. McIntosh, who said she had a problem with debt

20   collectors.

21           THE COURT:  She did, and I apologize for

22   that.  I missed her.  Let's bring her in.

23           (Ms. McIntosh enters the courtroom.)

24           THE COURT:  Ms. McIntosh, right up here to

25   the microphone, if you will.  How are you?

1              PROSPECTIVE JUROR McINTOSH:  Good.

2              THE COURT:  You mentioned that you had had

3    an issue with regard to debt collection, and you

4    also -- do you work for a mortgage company?

5              PROSPECTIVE JUROR McINTOSH:  Yes.

6              THE COURT:  Tell us about the issues that

7    you wanted to tell us about.

8              PROSPECTIVE JUROR McINTOSH:  I think you

9    asked was it a friend.  It was a friend that had an

10   issue with a debt consolidation company.

11             THE COURT:  Was it a bad experience?

12             PROSPECTIVE JUROR McINTOSH:  Yes, it was.

13             THE COURT:  It wasn't the defendant,

14   obviously.

15             PROSPECTIVE JUROR McINTOSH:  No, it was

16   not the defendant.

17             THE COURT:  What about that, if anything,

18   would affect you in this case?

19             PROSPECTIVE JUROR McINTOSH:  Nothing.

20             THE COURT:  And tell me about the mortgage

21   business.  Where do you work?

22             PROSPECTIVE JUROR McINTOSH:  I currently

23   work for Bank of America, and I am responsible for

24   saving homes that are in foreclosure.

25             THE COURT:  Okay.  Is there anything about

```
 1   that work, seeing people that have obvious debt

 2   issues, that you think might color or affect your

 3   ability to be fair to both sides in this case?

 4             PROSPECTIVE JUROR McINTOSH:  No.

 5             THE COURT:  Briefly, any questions,

 6   Mr. Radbil?

 7             MR. RADBIL:  Have you ever been involved

 8   as a witness in a judicial or administrative

 9   proceeding regarding foreclosure or the process?

10             PROSPECTIVE JUROR McINTOSH:  No.

11             THE COURT:  Okay.  Thank you.

12             Ms. Malone?

13             MS. MALONE:  The only question I have is,

14   Ms. McIntosh, in helping these folks through the

15   process, do you help them rehab their loans

16   sometimes?

17             PROSPECTIVE JUROR McINTOSH:  What do you

18   mean?

19             MS. MALONE:  Refinance or find an

20   alternate way to repay the loan?

21             PROSPECTIVE JUROR McINTOSH:  Yes, through

22   modifications and repayment plans.

23             THE COURT:  You have indicated, other than

24   your friend who had a bad experience, you can be

25   fair in this case?
```

```
 1              PROSPECTIVE JUROR McINTOSH:  Yes.
 2              THE COURT:  Thank you very much,
 3    Ms. McIntosh.
 4              (Ms. McIntosh exits the courtroom.)
 5              THE COURT:  Okay.  That takes us to 17.  I
 6    don't have anyone else, then, that had an issue
 7    until you get to Renfro --
 8              MS. MALONE:  You skipped Ms. Strother.  We
 9    got you out of order.  Ms. Strother said she had a
10    moral issue and debt consolidation issue.
11              THE COURT:  Thank you.
12              MS. MALONE:  Number 16 and Number 19 are
13    both possibly in our strike zone.  Number 16 listed
14    his occupation as retired.  The only thing I would
15    want to know is what his job was so I could weigh
16    him a little bit.  And the same is true for
17    Mr. Renfro, which is 19.
18              THE COURT:  If we get there.  And
19    Mr. Radbil, other than Ms. Strother, anyone else
20    that you had a question of perhaps because of some
21    indication or something on their materials?
22              MR. RADBIL:  If we can ask what he used to
23    do, if he's retired, there's -- I think there are
24    two that are retired, three that are retired, and
25    then there's some others that are --
```

```
 1              THE COURT:  If we haven't brought them up,
 2    I'm not going to bring them back in.  I'm asking
 3    about people that don't have any issues that we are
 4    getting to the end of the list.  I'm not going to
 5    bring them back in here to ask what they are retired
 6    from.
 7              MR. RADBIL:  I would like to bring in
 8    Ms. Ryde.
 9              THE COURT:  What number is she?
10              MR. RADBIL:  Number 20, Your Honor.
11              THE COURT:  We may not get to her, but I
12    will be glad to bring her in.  As to Mr. Renfro, if
13    we get there, but let's bring Ms. Strother in.
14              (Ms. Strother enters the courtroom.)
15              THE COURT:  Ms. Strother, come on up here
16    to the microphone, please.  You raised your hand
17    about having an issue, first of all, just with
18    deciding on moral grounds who is right and who is
19    wrong here, and then an issue with debt
20    consolidation.  I appreciate your candor.  Go ahead
21    and tell us what the issues are that might affect
22    you in this case.
23              PROSPECTIVE JUROR STROTHER:  I don't want
24    to be a jury.  I don't believe in judging nobody.
25              THE COURT:  So you would not be able to
```

1    make a decision?

2              PROSPECTIVE JUROR STROTHER:  No.

3              THE COURT:  Even if the law said you have

4    to follow the law?

5              PROSPECTIVE JUROR STROTHER:  Throw me in

6    jail.

7              THE COURT:  Thank you, Ms. Strother.  You

8    can step outside.

9              PROSPECTIVE JUROR STROTHER:  Thank you.

10             (Ms. Strother exits the courtroom.)

11             THE COURT:  The thought of trying to

12   rehabilitate her, I wasn't even able to define any

13   possibility, so I would strike her for cause.  Both

14   sides agree?

15             MR. RADBIL:  Agree.

16             MS. MALONE:  Yes, ma'am.

17             THE COURT:  All right.  I will, because I

18   looked at this -- that takes us through -- again, we

19   are at 17.  Both sides agree with that?

20             MS. MALONE:  Judge, I think we're at 18.

21             THE COURT:  Let me make sure.  You're

22   right.  We're at 18.

23             In an abundance of caution, because

24   there's nothing on the spouse side, I'm going to let

25   you bring Mr. Kalinowski back in here to ask what

```
 1    his occupation was before he was retired, and we
 2    will do that.  Juror Number 16.  And I will let you
 3    ask Mr. Maurer what his was after that.
 4                MS. MALONE:  I'm sorry, Judge, I missed
 5    that.
 6                THE COURT:  I'm going to bring
 7    Mr. Kalinowski in here --
 8                (Mr. Kalinowski enters the courtroom.)
 9                THE COURT:  Mr. Kalinowski, if you will
10    come up here to the microphone, a very quick
11    question, and that is:  What was your occupation
12    before you retired?
13                PROSPECTIVE JUROR KALINOWSKI:  Computer
14    programmer.
15                THE COURT:  Computer programmer.  And for
16    what company?
17                PROSPECTIVE JUROR KALINOWSKI:  Republic
18    Insurance.
19                THE COURT:  Anything about that experience
20    that could affect you in any of these proceedings
21    that you have heard about so far?
22                PROSPECTIVE JUROR KALINOWSKI:  No.
23                THE COURT:  Thank you very much.  You may
24    step back outside.
25                (Mr. Kalinowski exits the courtroom.)
```

```
 1              THE COURT:  And I am going to bring in
 2    Number 13, Mr. Maurer, to ask what his occupation
 3    was before he was retired.
 4              (Mr. Maurer enters the courtroom.)
 5              THE COURT:  Quick question for you,
 6    Mr. Maurer.
 7              PROSPECTIVE JUROR MAURER:  Sure.
 8              THE COURT:  Your occupation, which you
 9    retired -- which you look too young to be retired --
10    what was it?
11              PROSPECTIVE JUROR MAURER:  Auto truck
12    renting and leasing and also real estate
13    development.
14              THE COURT:  Anything in that business that
15    exposes you to these debt-collection type issues.
16              PROSPECTIVE JUROR MAURER:  Of course.
17              THE COURT:  Anything about that experience
18    that could color your ability to look at this case
19    fairly for both sides?
20              PROSPECTIVE JUROR MAURER:  Probably not.
21              THE COURT:  Okay.  Probably is going to
22    make both sides nervous.
23              PROSPECTIVE JUROR MAURER:  No.
24              THE COURT:  And you're 100 percent sure
25    about that?
```

1              PROSPECTIVE JUROR MAURER:  I don't know

2     about 100.

3              THE COURT:  Why would it potentially

4     affect you?

5              PROSPECTIVE JUROR MAURER:  Well, it's very

6     difficult to be in business for yourself for a

7     number of years and not have positive and negative

8     encounters with collection agencies.

9              THE COURT:  Okay.  All right.  Let me --

10             PROSPECTIVE JUROR MAURER:  I've been on

11    both sides of the fence.

12             THE COURT:  I understand.  And just

13    because the lawyers are entitled to know as much as

14    they can, let me let them ask you a couple of

15    questions along those lines with regard to your

16    position.  And Mr. Radbil, if you will speak up,

17    please.

18             MR. RADBIL:  Would you say you've had more

19    experience on the positive side, on the creditor

20    side, versus the debtor's side in terms of your

21    position?

22             PROSPECTIVE JUROR MAURER:  Probably as the

23    creditor.

24             MR. RADBIL:  Okay.  Do you think that as a

25    result of the more experience on the creditor's

1    side, you would tend to view that side with some

2    measure of sympathy above and beyond the debtor

3    side?

4              PROSPECTIVE JUROR MAURER:  I think all of

5    my experiences on the creditor side leaves me with

6    mixed emotions.  I've had success and failure.

7              MR. RADBIL:  Do you think if you were the

8    plaintiff or the defendant, you would prefer you for

9    the reason that they may think -- one side or the

10   other may think?

11             PROSPECTIVE JUROR MAURER:  No, no.

12             MR. RADBIL:  You think you could be fair?

13             PROSPECTIVE JUROR MAURER:  I think so.

14             THE COURT:  Okay.  Thank you, Mr. Radbil.

15             Ms. Malone, any questions?

16             MS. MALONE:  No, Your Honor.

17             THE COURT:  Thank you very much,

18   Mr. Maurer.

19             PROSPECTIVE JUROR MAURER:  You're welcome.

20             (Mr. Maurer exits the courtroom.)

21             THE COURT:  Okay.

22             MR. RADBIL:  I would move to strike for

23   cause, Your Honor, on the hesitancy.  He doesn't

24   seem a hundred percent, and he's on the fence about

25   whether he could be fair.  And I think the more

1    experience on the creditor side, given the ambiguity

2    of the answers, he thinks he could be fair, but he

3    didn't say, you know, he could be fair I think --

4          THE COURT:  I'm sorry.  I'm listening to

5    you, I'm looking at what he said.

6          Ms. Malone?

7          MS. MALONE:  Judge, what I heard him

8    say -- and granted I don't have your magic screen to

9    double-check -- was that he was pretty even-handed

10   on both sides and had been through both experiences,

11   which most folks in business have.  And I got the

12   impression that he would do his best to be fair.

13         THE COURT:  I didn't hear enough from him,

14   even watching his demeanor, to indicate that he came

15   with a preconceived bias against one side or the

16   other.  I can see what he said, at least initially,

17   would make anyone nervous, but I don't think he's

18   disqualified himself.

19         And the answer was no, no, when you asked

20   him that question about being on one person's jury

21   as opposed to the other.  So I'm going to deny the

22   request with regard to Mr. Maurer.  And if you will

23   recall, he didn't raise his hand with a question.  I

24   brought him in to find out why he was retired.

25         THE COURT:  I think the record is

 1    sufficient that he did not indicate that he would be

 2    unfair.  Again, he didn't respond in any way to the

 3    several questions of the panel in that regard.  And

 4    the issue came up, because we were asking about his

 5    former occupation, and he indicated he was on both

 6    sides favorable and negative.

 7          So I'm going to deny him.  And his

 8    demeanor didn't indicate to me, as opposed to the

 9    others that did indicate they had some strong

10    emotional feelings against debt collection

11    practices, so I deny the request.  All right.  So I

12    believe we're at 18.  Everyone agree with that?

13          MS. MALONE:  Yes, ma'am.

14          THE COURT:  Through Ms. Michener.  I would

15    like to give you about 20 minutes to strike your

16    lists.  One side can use the jury room.  Please

17    don't leave anything in there of your own materials.

18    We will get the jury seated and will break an hour

19    and 15 minutes for lunch and then start with the

20    openings.

21          So Mr. Everett, if you will let the jury

22    take a 15-minute break, we will have them back in

23    here in 15 minutes.

24          Anything else before we adjourn?

25          MR. RADBIL:  I have a few questions

1    regarding openings, particularly with respect to the

2    pretrial order.

3                THE COURT:  Can we do that after we get

4    the jury seated, because you will not do your

5    openings until after lunch.

6                MR. RADBIL:  Sure.

7                THE COURT:  We will cover it, and I will

8    be asking you how much time you want and we will

9    talk about that at the time.  But if there's nothing

10   else with regard to the jury selection --

11               MS. MALONE:  Other than when we're

12   finished, do you want us to turn it back in to Rod.

13               THE COURT:  Yes.

14               MS. MALONE:  Thank you.

15               MR. RADBIL:  Thank you, Your Honor.

16               (Recess taken from 11:25 to 11:51.)

17               THE COURT:  I've had Mr. Reynolds show you

18   the jury and there's no mistakes, everyone agrees on

19   the -- we will bring them in and bring the whole

20   panel, and I will call them one by one.  I will read

21   a few instructions to them, and then I will send

22   them on their way.  And I would like to start back

23   up at 1:30, try to give you one hour and 15 minutes,

24   take that long to get to that appoint.  Okay?  We

25   will talk about the openings after that.  All right.

1   Let's go ahead and bring them in.

2            (Jury panel in.)

3            THE COURT:  As I call your names, the next

4   seven people, please come forward and bring your

5   belongings and take a seat in the jury box.

6            Juror Number 1 is Marilyn Parker, Marilyn

7   Parker; Juror Number 2 is Paul Letot; Juror Number 3

8   is Reginald Brooks, that's Reginald Brooks; Juror

9   Number 4 is Karen Fox, that's Karen Fox; Juror

10  Number 5 is Ribhi Abdeljabar, and I apologize if I

11  haven't pronounced that correctly; Juror Number 6 is

12  Mr. Maurer, that's Mr. Maurer; and finally, Juror

13  Number 7 is Gregory Gaither, Gregory Gaither.

14           Ladies and gentlemen, welcome to the jury

15  in this case.  As I said, we plan to have a brief

16  trial.  Your first order of business, though, is to

17  swear you in as the jury in this case.  So if you

18  will rise and raise your right hands.

19       (The oath was administered to the jury)

20           THE COURT:  All right.  Ladies and

21  gentlemen, please be seated.  I'm going to excuse

22  you for lunch in just a moment.

23           In the meantime, ladies and gentlemen of

24  the panel, you are excused.  Please return back down

25  to the jury room, and they can give you further

1    instructions.  If we can all rise for the jury

2    panel.

3            (Jury panel excused.)

4            THE COURT:  We will go through some brief

5    instructions.  Ladies and gentlemen, you've now been

6    sworn as the jury to try this case.  As the jury,

7    you will decide the disputed questions of fact.  As

8    the judge, as I have mentioned, I will decide all

9    questions of law and procedure.

10           From time to time during the trial and at

11   the end of the trial, I will instruct you on the

12   laws, rules of law that you must follow in making

13   your decisions.  You don't have to have any

14   preconceived knowledge of debt collection law or

15   anything like that.  I will provide all of the law

16   that you need to know and the elements of proof in

17   that regard when I send you the jury instructions at

18   the close of the case.

19           After lunch, the lawyers for each of the

20   parties will make what we call an opening statement.

21   Opening statements are not evidence.  In fact,

22   nothing that the lawyers say is evidence.  They are

23   simply provided by each side to give you an outline,

24   a blueprint, help simplify for you what they expect

25   the evidence will show.

 1              After the opening statements, the
 2    plaintiff, who has the burden of proof, will call
 3    witnesses and present evidence.  Then the defendant
 4    will have an opportunity to call witnesses and
 5    present evidence.
 6              After the party's main case is completed,
 7    there may be, in some cases, rebuttal testimony.
 8    After all of the evidence is completed, the lawyers
 9    will again address you to make final arguments.
10    Again, the final arguments will conclude what they
11    believe is their proper view of the evidence, but
12    again, they are not evidence themselves.
13              Keep an open mind throughout the trial.
14    That's very important.  I have learned that
15    especially over the years being a judge.  Keep an
16    open mind.  Don't decide any facts until you have
17    heard all the evidence, the closing argument, and
18    the Court's instruction.  I will permit you to take
19    notes if you need to in this case.  Sometimes jurors
20    like to, sometimes they don't.  Just remember your
21    notes are not evidence, it's the collective
22    recollection of the jury that is to govern.
23              Until the trial is over, do not discuss
24    the case with anyone, and don't permit anyone to
25    discuss the case with you.  Every one of you have

1    several people who know that you've been down here

2    today and where are you and what happened.  So

3    you're going to be calling them to tell them what's

4    going on.  You can tell them about the trial.  I do

5    expect, without question, it will be done before the

6    end of the week, but please don't give them any

7    details.

8              Again, all of that matters as far as the

9    potential as far us having to start all over again.

10   Nothing involved in the case can be discussed until

11   the case is over.  Again, that applies to any

12   outside research, googling, and all the other

13   things, some of which I am not aware you are capable

14   of, are out there.

15             If anyone should attempt to discuss the

16   case with you or approach you concerning the case,

17   please inform the Court immediately, as the lawyers

18   have been instructed and the parties hold yourself

19   completely apart from the people in the case, the

20   parties, the witnesses, the attorneys, and the

21   persons associated with them.  Even if I see you in

22   the hall, I will likely try to go the other

23   direction.  Don't take that the wrong way.  Because

24   it's not only important that you be fair and

25   impartial, but that you appear fair and impartial.

```
1              You would hate to think that the head
2     referee, right before the Super Bowl, was going to
3     dinner with the quarterback.  You would kind of
4     wonder, even if they were just friends, what could
5     be happening the next day.  And even if it was
6     completely on the level, the appearance of
7     unfairness could affect your perception of the
8     fairness of the game.  And it's even more so when
9     you talk about the fairness of our justice system.
10             Again, as I mentioned, don't make any
11    independent investigation of any fact or matter in
12    this case.  You are to be guided solely by what you
13    see and hear in this trial, and do not learn
14    anything about the case from any other source.
15             Your time here is precious.  You are
16    honored guests in this federal courthouse, and we
17    don't have as many jury trials as we used to.  It's
18    always then an extra honor to have one, to see our
19    Constitution playing out in reality.  And I will and
20    the lawyers will consider your time of the utmost
21    importance and try not to inconvenience you.  If we
22    have you for some reason outside the presence of the
23    court for a discussion, it's about a legal issue
24    that I can't talk about in front of you.  We will
25    try to make those meetings as quick as possible and
```

1  get you back out here or start the trial back up

2  again.

3        You will get some instruction sheets as to

4  where it is you can go and eat around here.  You can

5  bring food.  We have a refrigerator.  There's

6  coffee; should be soft drinks in there.  If you want

7  to bring water out here during the trial, that's

8  fine as well.  We start at nine and go to five.  We

9  usually have about an hour and 15 minutes for lunch,

10 15-minute breaks or so during the morning and the

11 afternoon.

12       So give yourself a little extra time when

13 you try to get here in the morning, because there is

14 traffic and there are magnetometers that you have to

15 go through.  They are starting to, and I don't know

16 if they have implemented it yet, trying to get

17 jurors up to the front of the line.  I don't know if

18 they have started that yet.  That's something we

19 have been trying to get done for years.  So just

20 keep that in mind as you get here so we can start on

21 time.

22       As I mentioned, the lawyers will start up

23 the evidence as soon as we get you back here from

24 lunch, and I am going to break until 1:20.  So you

25 should be able to make your calls and tell everyone

```
 1   where you are, and we will start up here at 1:20.
 2   And as I said, I don't expect this to be a lengthy
 3   case.
 4            Thank you all very much for your service.
 5   You will be getting some more information, and feel
 6   free to ask Mr. Everett if you have any questions.
 7   Thank you very much, and we will see you in an hour
 8   and 20 minutes.
 9            (Jury leaves courtroom)
10            THE COURT:  I'm going to do something a
11   little different.  It's highly unusual for a
12   prospective juror to say they would rather go to
13   jail than be on a jury, so I want to talk to
14   Ms. Strother just briefly.  She's out in the
15   hallway.  I'm going to ask Mr. Reynolds if you could
16   see if she's out there, and we are going to talk to
17   her for a few minutes and send her on her way.
18            (Ms. Strother enters the courtroom.)
19            THE COURT:  Ms. Strother, if you will come
20   back up here to the microphone.
21            Ms. Strother, I think in all my years of
22   doing this I have never had a juror come back after
23   they had been excused, but I was so troubled to hear
24   you say you would rather go to jail than serve on a
25   jury.  I'm trying to figure out why, what would be
```

1   the reason that you would rather go to jail than

2   serve on a jury.

3           PROSPECTIVE JUROR STROTHER:  Not really, I

4   wouldn't.  No disrespect.  I got -- I just got too

5   much going on.

6           THE COURT:  So it's because you are busy.

7           PROSPECTIVE JUROR STROTHER:  Not just

8   busy.  I just don't want to be no judge, no jury.

9           THE COURT:  The concern is, as you might

10  imagine, is occasionally we get people in here who

11  have been told or figure out if they say enough like

12  that they get off the jury.

13          PROSPECTIVE JUROR STROTHER:  No, ma'am.

14          THE COURT:  Well, it's hard to believe

15  that.  I mean, it's very disturbing to think that

16  someone would take something so important as their

17  rights under the law and serving on a jury in a way

18  where you are just too busy and you're going to tell

19  the judge you can't be fair and just get off the

20  jury, because that's really what it looks like.

21  It's of great concern to me that that's what you are

22  doing.

23          PROSPECTIVE JUROR STROTHER:  Like I say, I

24  just don't want to be a juror, no judge.

25          THE COURT:  Have you ever been on a jury?

1              PROSPECTIVE JUROR STROTHER:  I don't want

2     to make no decisions for nobody.  It's hard enough

3     making my own.

4              THE COURT:  Have you ever been on a jury?

5              PROSPECTIVE JUROR STROTHER:  No.

6              THE COURT:  Have you ever had anyone in

7     your family involved in a case that involved a jury?

8              PROSPECTIVE JUROR STROTHER:  Oh, yeah.  I

9     have four brothers in the penitentiary.

10             THE COURT:  Is that part of this?

11             PROSPECTIVE JUROR STROTHER:  Could be.  I

12    just -- I don't want to blame it on nothing, I just

13    don't want to be here.

14             THE COURT:  Because if you refused to

15    serve on a jury, you could be in contempt of court,

16    you understand that.

17             PROSPECTIVE JUROR STROTHER:  I'm not

18    trying to do that.  What can I say?

19             THE COURT:  Well, I just hope that this

20    isn't going to end up with you going back and

21    telling friends that you got yourself off of a jury

22    by standing up to the judge and saying you couldn't

23    serve on a jury, that you would go to jail.

24             PROSPECTIVE JUROR STROTHER:  No.

25    Actually, I don't know nobody that's ever been

1    called.

2                THE COURT:  Ms. Strother, I am having a

3    hard time believing you, but you are excused from

4    the jury.  But I hope in the future as you leave

5    here that you will consider how important our jury

6    system is.  And I hope that this is not the topic of

7    some conversation with you and your friends about

8    how you got yourself off a jury, because that would

9    be a real tragedy.  I'm going to have you wait until

10   the rest of the jury gets out of here and let you

11   go.  I will direct you not to say anything to any of

12   them.  If you do, you will be in contempt of court

13   and then you will be back here.  All right?

14               PROSPECTIVE JUROR STROTHER:  Yes, ma'am.

15               THE COURT:  All right.  You are excused.

16               (Ms. Strother exits the courtroom.)

17               THE COURT:  Briefly, how much time do you

18   want for opening?

19               MR. RADBIL:  No more than --

20               THE COURT:  I'm not talking to you like I

21   was talking to her.  We're off that topic now.  This

22   is a very serious issue for me.  We have it happen

23   every once in a while, and I just wanted to find out

24   where she was coming from.

25               Okay.  That doesn't mean your time has to

1   be any shorter or longer than you planned, so what

2   are you asking for?

3            MR. RADBIL:  It depends with the questions

4   I had about the pretrial order, because some of the

5   things and elements I think are established, so I

6   don't think there's any need to prove, for example,

7   that they are a debt collector because summary

8   judgment has been granted under the --

9            THE COURT REPORTER:  Excuse me.  Would you

10  please come up to the mic.  I'm having a very hard

11  time hearing you.

12           THE COURT:  You're going to have to speak

13  up during this trial.  Pull it close to you, please.

14           MR. RADBIL:  I apologize.  I'm trying to

15  save my voice.

16           THE COURT:  Go ahead.

17           MR. RADBIL:  The summary judgment has been

18  granted under the FDCPA and TCPA on two claims.  And

19  that requires a finding as a matter of law that they

20  are debt collectors, the defendant, and that the

21  plaintiff is a consumer and that the debt we're

22  dealing with is a consumer debt.  And eliminating

23  the requirement to reprove those elements at trial

24  with respect to the same parties and the same debt I

25  think would streamline the process.  So --

```
 1              THE COURT:  So what is it that you are

 2   planning to say?

 3              MR. RADBIL:  Well, the -- I would say the

 4   defendants are debt collectors, the plaintiff is a

 5   consumer, the statutes apply, and the Court has

 6   determined that two provisions of each statute have

 7   been violated --

 8              THE COURT:  Okay.  No, that's not

 9   appropriate for opening statement.  There are many

10   cases where a legal determination is made by the

11   Court via summary judgment that ultimately may find

12   its way into the Court's instructions so that they

13   are not deciding an issue that's already been

14   determined by the Court.  But to indicate the Court

15   has made decisions is inappropriate for the lawyers

16   to make to the jury, particularly during opening

17   statement.  So I won't let you go into that on

18   opening statement.

19              MR. RADBIL:  Okay.  So then, regarding the

20   elements, can we do away with some of the -- I don't

21   see any need to reprove the elements that have been

22   decided as a matter of law.

23              THE COURT:  Let me just hear what

24   Ms. Malone has to say about this.

25              MS. MALONE:  Your Honor, if the only thing
```

1   that he is asking is if my client is a debt

2   collector and that his client is a consumer and that

3   this is a consumer debt, if those are the only three

4   elements he's asking, at this point we could

5   stipulate to those.  I don't think we actually even

6   objected to those.

7         THE COURT:  How about this:  Rather than

8   talking about what the Court did, you could say that

9   it's undisputed, these three things.

10         MS. MALONE:  These three things only.

11         THE COURT:  Be careful that you say only

12   those three.

13         MR. RADBIL:  Additionally, Your Honor --

14         THE COURT:  Are we square on this first

15   one?  Do you understand that?

16         MR. RADBIL:  Debt collector, consumer,

17   yeah, and consumer debt.  So the acts apply.

18         THE COURT:  I'm sorry?  You're going to

19   have to speak up.

20         MR. RADBIL:  The acts apply.

21         THE COURT:  Closer to the microphone.

22         MR. RADBIL:  The statutes at issue are

23   applicable, so there is no question about that.

24         THE COURT:  What is it you want to say?  I

25   just told you you could say those three things were

1    not disputed.  So what else do you want to say?

2              MR. RADBIL:  I would like to also say

3    regarding -- one moment -- that the defendant does,

4    in fact, possess and use an automatic telephone

5    dialing system as defined by the TCPA as provided

6    for in the pretrial order.

7              THE COURT:  I don't think that's

8    undisputed.

9              MS. MALONE:  That is absolutely disputed,

10   Your Honor.

11             THE COURT:  It's not undisputed.

12             MR. RADBIL:  Defendant's contentions, Your

13   Honor, state, defendant contends that the vast

14   majority of its calls were made manually.  In fact,

15   only three calls were made engaging --

16             THE COURT:  It's not undisputed.  It's not

17   undisputed, so you can't say that it's a fact.

18   Okay?  I disagree with you.  I will let you make a

19   record on it.  But right now I want to get to

20   framing up this opening argument.  You can't say

21   that what you just asked me to say.

22             MR. RADBIL:  Okay.  And then with respect

23   to the -- what's Your Honor's position on discussing

24   the elements of the claims?

25             THE COURT:  This is what opening statement

1    is supposed to be.  It's supposed to be a prediction

2    of what you think the evidence will show.  It's not

3    supposed to be arguments.  If you say that the

4    plaintiff has brought these causes of action against

5    the defendant and talk about just generally what

6    they are and then talk about what factual proof

7    you're going to be bringing to prove that, you would

8    confuse them if you were to start to talk about the

9    law and the elements, which is something that you

10   can talk about once we get the jury instructions,

11   they will be in the jury instructions, and you can

12   talk about at closing.  But I think you're going to

13   confuse them if you try to get into the elements.

14         So talk about the statutes if you would

15   like.  Talk about the factual proof that you expect

16   will establish those, and that's basically the

17   purpose of an opening statement.

18         MR. RADBIL:  The one problem I do see with

19   that approach is that liability has been established

20   as to certain claims, but damages have not been

21   established in terms of statutory damages for those

22   claims.

23         THE COURT:  Ms. Malone.

24         MS. MALONE:  Your Honor, I don't think

25   it's appropriate for him to tell the jury liability

1   has been established.

2              THE COURT:  Right, it's not.

3              MR. RADBIL:  So how do I talk about the

4   other claims, because it's not appropriate to say

5   that it has not been established.

6              THE COURT:  Well, it's not something to be

7   talking really about in opening.  Again, where this

8   has come up in the past is where the Court has made

9   some determination as a matter of law that does

10  impact the elements submitted to the jury for their

11  decision.

12             Normally the Court will say in the charge,

13  this particular issue has been resolved, and it's

14  not for you to decide.  But I think you're getting

15  very hypertechnical at this point.

16             Again, what is it factually you are going

17  to bring?  I won't let you say it's been established

18  as a matter of law.  Okay?  You can't.

19             MR. RADBIL:  Right.  So then are we

20  required to re-present evidence of violations that

21  have been established?

22             THE COURT:  No.  You're talking about what

23  you can say in your opening statement.  I'm not

24  going to tell you what you do and don't need to

25  bring forward at this point and combine myself in

1    some fashion to something that, from our experience

2    so far, could be confusing.  We may not have the

3    same perception of what I am saying.  But your

4    opening statement is not the place to do that.  So

5    that's really all we are talking about right now.

6         MR. RADBIL:  I don't want to run afoul in

7    the opening statement.

8         THE COURT:  Just don't say anything that

9    the Court has already decided or it's already been

10   established.  You can say on those points where it's

11   agreed and stipulated, there is no dispute that this

12   is correct, this has occurred, whatever those three

13   things are that you mentioned.

14        MR. RADBIL:  That consumer defendant or

15   consumer debt collector and consumer debt.  But I

16   don't know how to tell the jury about the claims

17   that have been decided without talking about what

18   the evidence would show.

19        THE COURT:  You can't do that, if you and

20   Ms. Malone want to confer and come to some

21   agreement.  But you can't talk about what's already

22   been established by the Court or a Court ruling, you

23   can't do that.  So I'm not sure how to advise you

24   otherwise, without putting the Court in a position

25   that you could come back later and tell me that I

```
 1   told you something that I disagree I told you.

 2   Opening statement is not evidence, it's to predict

 3   what the evidence will show.  That's as much as I

 4   can give you right now.  Go ahead and talk to her,

 5   and we will see you back here at 1:20.

 6            How much time do you want?

 7            MR. RADBIL:  No more than 15 minutes.

 8            THE COURT:  Okay.

 9            MS. MALONE:  I'm a fast talker, Judge; ten

10   minutes is fine.

11            THE COURT:  No more than 15 minutes each.

12   We will be in recess.  See you at 1:20.)

13            (Court in recess from 12:15 to 1:20.)

14            (Out of the presence of the jury.)

15            THE COURT:  Let's quickly make sure we are

16   on the same page about this.  Have you had a chance

17   to talk at all about some of the questions on

18   opening by the plaintiff, Mr. Radbil?

19            MR. RADBIL:  I attempted to, but I didn't

20   get very far.

21            THE COURT:  Okay.  So it seems to me, just

22   so that we're clear, again, you can't say that the

23   Court has found in favor of your client in your

24   opening statement nor can it be referenced during

25   the trial.
```

1          It will be clear that they won't be able

2     to, in the instructions, do anything but assess or

3     decide damages on those claims that have already

4     been decided in your favor.  But I just want to make

5     sure that there is no confusion about that.

6          You can talk about what these different

7     statutes require.  You can talk about what you plan

8     to prove.  You can talk about the fact that you are

9     asking for damages.  But just no confusion in regard

10    to -- you can't talk about what's been decided by

11    the Court.  All right?

12          MR. RADBIL:  I am confused still, though,

13    as to what I need to prove with things that have

14    already been decided.

15          THE COURT:  Well, I think you have to

16    prove the damages with what has already been

17    decided, but that's different from what you can tell

18    the jury.  I mean --

19          MR. RADBIL:  I follow that.  But in terms

20    of, for example, playing a recording that

21    constituted a violation, I don't see that that would

22    be necessary.

23          THE COURT:  See, here's the issue, I

24    think, that maybe you are getting too

25    hypertechnical.  There's a body of facts here that

1    underlie your client's claims.  I'm going to be

2    surprised if they are discrete from each other to

3    the sense where you're carving out those ones that

4    you want to show liability on and not those that you

5    have already been -- liability has been determined,

6    because we're essentially talking about phone calls

7    and this kind of a thing that occurred over a period

8    of time.

9            I'm assuming that you're planning to offer

10   this body of facts that surround the case.  And I

11   wouldn't sustain an objection from defense if you're

12   asking to bring proof on something that's already

13   been decided because I think it's necessary to show

14   context.

15           You're not going to get a directed verdict

16   for not proving claims that have already been

17   established.  It's just what you can talk about in

18   front of the jury, and that's about as good as I can

19   do.  Anything else?

20           MR. RADBIL:  Can I read the statutory text

21   of the provisions that have already been decided as

22   violations?

23           THE COURT:  For what purpose?

24           MR. RADBIL:  To show that that behavior

25   has been engaged in.

 1              THE COURT:  No.  I'm not sure why you need

 2    to read the statute at this point.  I am also not

 3    used to having these kinds of conversations at this

 4    point in the case or any point in a case, let alone

 5    five minutes after the jury is supposed to be back

 6    out here.

 7              Mr. Radbil, that's the best I can tell

 8    you.  This is stuff that you should already know.

 9    We shouldn't be having these conversations.  If you

10    are confused and there is an objection, I will

11    sustain it if you go off from what I have instructed

12    you.  Let's go ahead and bring the jury in.

13                 (Jury enters the courtroom)

14              THE COURT:  Ladies and gentlemen, please

15    be seated.  We are going to go ahead, as I

16    mentioned, with the opening statements.  The

17    plaintiff has the burden of proof.  So Mr. Radbil,

18    go ahead.

19              MR. RADBIL:  Thank you, Your Honor.

20              MR. RADBIL:  Ladies and gentlemen, thank

21    you for your time and being here today.  Everybody

22    appreciates your service.  As you know, this is my

23    client, Dr. White.  This lawsuit is not probably

24    going to be the most thrilling that you have ever

25    heard of, but it's important to Dr. White.  This

1    case involves student loans and attempts to collect

2    them by a debt collector, Regional Adjustment

3    Bureau, the defendant.

4              THE COURT:  You're going to have to speak

5    up, Mr. Radbil.  Even I can't hear you, so pull it

6    closer to you.

7              MR. RADBIL:  Pardon me.

8              THE COURT:  Could you move closer to it?

9              MR. RADBIL:  Certainly.

10             THE COURT:  Thank you.

11             MR. RADBIL:  The evidence will show that

12   Dr. White took out certain student loans to finance

13   parts of his education and that he defaulted on

14   those loans.  And in an attempt to collect those

15   loans, the defendant, who is a debt collector,

16   violated a federal act known as the Fair Debt

17   Collections Practices Act, which is designed to

18   protect consumers against false, deceptive,

19   misleading, and harassing tactics.

20             There is a state analog called the Texas

21   Debt Collection Act which tracks the federal act

22   pretty closely.  So most of the same violations of

23   the federal act also constitute violations of the

24   Texas act.

25             The facts of this case are fairly

```
 1    straightforward.  Both acts require that when you
 2    place calls to a consumer, you must provide
 3    meaningful disclosure of the caller's identity and
 4    you must state the communication is from a debt
 5    collector.
 6              In this case the evidence will show
 7    neither of those things were done.  And
 8    additionally, the federal act prohibits a debt
 9    collector from contacting a consumer's place of
10    employment without the prior express consent of the
11    consumer.  For good measure, because nobody wants to
12    be hounded with debt collection calls in the first
13    place, but certainly not at their workplace.  In
14    this particular instance --
15              MS. MALONE:  Your Honor, I'm sorry that's
16    not accurate.
17              THE COURT:  Overruled.  This is not
18    evidence, ladies and gentlemen.  If you will go
19    ahead.  And again, this is what the lawyers expect
20    the evidence to show, and it's not evidence.  Go
21    ahead.  Let's move ahead.
22              MR. RADBIL:  Thank you.  So Dr. White had
23    loans, they were in default.  There was attempts to
24    collect them by the defendant, and the defendant did
25    things that are unlawful.  It's not unlawful to
```

1    engage in debt collection in Texas.  You can

2    certainly do it.  It's a profitable business, and

3    there's many, many debt collection companies.  In

4    fact, there's almost as many lawyers who participate

5    in collecting debts as there are nonlawyers

6    collecting debts.

7           But if you do participate in the business

8    of debt collection in Texas, you must comply with

9    the federal act, and you must comply with the state

10   act.  And these are strict liability statutes, so

11   one violation is enough to establish liability.  And

12   under the federal act and the state act, you can

13   recover actual damages and statutory damages.

14          The biggest aspect of this case, and the

15   predominant reason that we have waited so long to

16   come to trial, is Dr. White has suffered legitimate

17   actual damages.  You're going to hear his testimony.

18   And the facts are going to show that over the course

19   of a limited period of time, multiple calls were

20   placed to his employer and his place of employment,

21   despite the fact that Dr. White requested no more

22   calls be placed to his employer and place of

23   employment.

24          Dr. White, as a result, was concerned that

25   he would be terminated as a result of receiving

91

1   those calls to his place of employment.  And if he

2   was terminated, his only source of income while he

3   was working on his Ph.D would disappear.

4          Meanwhile, he's trying to negotiate

5   repayment plans with the lender, and he was making

6   payments and has continued to make payments.  He's

7   worked very hard for where he's gotten to date.  And

8   the prospect of being terminated and not being able

9   to make any payments would cause him to face the

10   possibility of not being able to practice

11   psychology, which he had worked for for a number of

12   years, as you will hear.

13          It's been a long road for Dr. White to get

14   to the point where he can be licensed to practice in

15   the State of Texas.  He was faced with the prospects

16   of losing everything every day.  He would be waiting

17   for the call from his employer saying, we can't have

18   you work here anymore, or, you violated, you know,

19   the policy or used our work lines for personal

20   calls.

21          He could not have these calls at work.

22   And he will elaborate, of course, but the

23   consequences were severe.  And despite his repeated

24   requests, the calls to his place of employment

25   continued.  So he was put in a position of constant

1    worry about not only his only source of income but

2    about the possibility of never being able to use his

3    degrees and his license to practice in the State of

4    Texas.

5             And there were false threats made by the

6    debt collector in this case to strip him actually of

7    his Ph.D before he had earned it, among various

8    other threats.  Both the federal and the state act

9    prohibit false representations, false threats of

10   actions that can't be legally taken and so forth.

11            This is, I think, one of the most basic

12   situations that these statutes were designed to

13   address, which is --

14            THE COURT:  Mr. Radbil, we need to have

15   you focus on where the facts are going to go and not

16   on argument.  All right?

17            MR. RADBIL:  Certainly.  I don't want to

18   do too much more talking.  The facts are not overly

19   complex.  The statutes are simple, they are

20   straightforward.  So I do thank everybody for their

21   time.

22            All that I request is you listen to

23   Dr. White's testimony.  You are obviously the judge

24   of the facts of the case.  So he will testify, and

25   you will ultimately be asked to decide whether he

1    was damaged and in what amount, and that question is

2    completely yours to answer.  I'm only here to

3    present the facts to you, so that's what I'm going

4    to try to do.

5              Again, not the most exciting thing, but

6    something that Dr. White takes very seriously.  So

7    we would appreciate you listening carefully, and

8    with that I will close.  Thank you again.

9              THE COURT:  Thank you, Mr. Radbil.

10             Ms. Malone.

11             MS. MALONE:  Thank you, Your Honor.

12             I disagree.  My 25-year-old son would tell

13   me that's a dumb moment.  I don't really need to

14   tell you that, because I wouldn't be standing here

15   if I agreed with what Mr. Radbil had to say.  I'm

16   not going to go through everything he said, because

17   you will hear the evidence on it.

18             THE COURT:  Slow down just a little bit.

19             MS. MALONE:  I'm sorry, Judge.

20             THE COURT:  Everybody does it.

21             MS. MALONE:  The fact of the matter is,

22   the law says that you can call someone's employer at

23   their place of employment unless they tell you they

24   can't have telephone calls there or you are given

25   some reason to believe that's the case.

SHAWNIE ARCHULETA, CSR/CRR
FEDERAL COURT REPORTER - 214.753.2747

1          In this situation, the telephone that was
2     being called is not for his actual employer, it was
3     for a company that he was doing contract work for.
4     You will also hear the reason he didn't want calls
5     was because he couldn't answer the phone because it
6     would ring to his cell phone to let him know that
7     there was a message for him.  So listen to that,
8     folks.  It's very important.
9          This brings to me to kind of a Paul Harvey
10    statement.  I used to tell people about how Paul
11    Harvey does.  You may remember, he used to say, and
12    now, the rest of the story.  And I used to say that
13    all the time in opening.  And then a couple of years
14    I noticed that all the jurors were too young to know
15    who Paul Harvey was.  But thanks to the Super Bowl
16    this year, he is back.  And this is one of those
17    moments where I encourage you folks to hear the rest
18    of the story.
19         You will hear testimony or argument from
20    the plaintiff's side.  Wait until you hear the other
21    side before you make up your mind.  The reason I
22    bring that up is a very good chance that I may not
23    put on any evidence in my case at all.  It may just
24    all flow through one witness to help save time and
25    help you guys move along.  And so don't assume

1   anything until you have heard the whole story and
2   make the decision.
3           I will tell you what I think some of the
4   facts in the evidence will be.  The evidence will be
5   that Mr. White did, in fact, take student loans out
6   to pay for two college degrees, an undergraduate
7   degree and a master's degree.  And with those
8   degrees, he obtained a licensed professional
9   counseling license for the State of Texas.
10          He then went to work, and he worked for a
11  long time.  During that period of time, he defaulted
12  on those loans.  And the State of Texas, who had
13  guaranteed those loans, paid them.  The State of
14  Texas, through their agency, the Texas Guaranteed
15  Students Loans, hired my client to help get that
16  money back.
17          When you default on a student loan, I
18  believe the evidence will be, are there
19  consequences?  For example, the state can withhold
20  your degree, and they can withhold your license.  If
21  you are a lawyer or a doctor or a counselor, you
22  don't get to practice in the State of Texas if you
23  don't pay the money back to the State of Texas.
24  It's that simple.
25          I will submit to you, that's really what

1  Mr. White was upset about.  I believe the story you
2  will hear is that in two phone messages, which were
3  return calls from a debt collector, the person
4  identified who they were and who they worked for and
5  didn't say, I'm a debt collector.  These were return
6  calls.  I would submit to you that really didn't
7  upset Mr. White.  The consequence or facing the fact
8  that he could lose his license, that was what was
9  the cause of his panic and his upset.
10          You will hear some testimony about
11  something that's called an auto dialer.  There's
12  going to be a big dispute about whether or not it
13  meets some statutory definition, and we're going to
14  say it doesn't.  But at the end of the day, folks,
15  it doesn't really matter, because in this case, my
16  client called manually.  That means they picked up a
17  phone and dialed Mr. White's cell phone number.  The
18  law allows you to make a manual call to a cell
19  phone.
20          It's not unlike me.  In my office, I have
21  a computer.  I'm an old school attorney.  I can
22  promise you, I use way more yellow pads and pens
23  than I do the computer.
24          In the debt collection industry, very
25  often they make manual calls because, if you are

1    calling a cell phone, you have to be careful.

2    You're going to hear that testimony.  At the end of

3    the day, remember, it is their burden of proof to

4    show that they were not manually made.  And I will

5    submit to you there will be no evidence on that.

6            There's really more to this story, but the

7    truth of the matter is, it's going to unfold here.

8    And at the end of the day, you are the final judges

9    of both the facts and the credibility of the

10   witnesses.  It's kind of like the Paul Harvey story,

11   you get to write the final chapter.

12           THE COURT:  Thank you, Ms. Malone.

13           Let's go ahead and have you call your

14   first witness, Mr. Radbil.  And if you would not

15   mind turning the lectern around so it faces the

16   proper way.

17           Who is your first witness?

18           MR. RADBIL:  First witness will be Robert

19   Wyatt in his individual capacity.

20           THE COURT:  Mr. Wyatt, if you will come

21   over here and watch for any wires on the floor as

22   you come, please.  And if you will stop for a moment

23   and raise your right hand.

24

25

1                     **ROBERT F. WYATT,**

2     having been first duly sworn, testified as follows:

3                      **DIRECT EXAMINATION**

4     Q.    (By Mr. Radbil)  Good afternoon, Mr. Wyatt.

5     A.    Good afternoon, Mr. Radbil.

6     Q.    Could you please state your name for the record

7     in full?

8     A.    Yes, sir.  Robert F. Wyatt.

9     Q.    Are you currently employed?

10    A.    Yes, sir.

11    Q.    And you work for Regional Adjustment Bureau; is

12    that correct?

13    A.    That is correct.

14    Q.    Could you state the capacity, please, in which

15    you work?

16    A.    Yes.  I am the Director of Compliance in Human

17    Resources.

18    Q.    Okay.  And you and I have met on the phone once

19    before I believe; is that correct?

20    A.    Yes, sir, we have talked on the phone.

21    Q.    Do you agree that Regional Adjustment Bureau --

22    and if I may refer to Regional Adjustment Bureau as

23    RAB for convenience sake?

24    A.    Yes, sir, that's fine.

25    Q.    (By Mr. Radbil)  -- placed no less than 17

1   telephone calls to Dr. White's work telephone line

2   in an effort to collect a consumer debt from

3   Dr. White?

4   A.   What was that, sir?

5   Q.   Do you agree that 17 phone calls were placed to

6   the main telephone number of Dr. White's employer?

7            MS. MALONE:   Your Honor, I'm going to

8   object; assumes facts not in evidence.

9            THE COURT:   Overruled, but I would like

10  for you to give a time frame there.

11           THE WITNESS:   I'm not sure how many calls

12  were made, sir.

13           THE COURT:   Wait for another question.

14  I'm going to have him direct you to a time frame.

15           MR. RADBIL:   Seventeen times in 59 days.

16           THE COURT:   In what year?

17           MR. RADBIL:   I believe it was 2011.

18           THE COURT:   Okay.

19           THE WITNESS:   I would have to count the

20  calls.  I'm not sure of the number, sir.

21           MR. RADBIL:   Okay.  At this time, Your

22  Honor, we would like to introduce Plaintiff's

23  Exhibit 6, which has been agreed to.

24           THE COURT:   If you want to show that to

25  him, Plaintiff's Exhibit 6, that's fine.  It's been

1    previously admitted.

2            Ms. Malone?

3            MS. MALONE:  Your Honor, are we marking on

4    admitted exhibits with a highlighter?

5            THE COURT:  Mr. Radbil?

6            MR. RADBIL:  We have several copies so

7    that we can admit one, and for his convenience he

8    can highlight if he needs to.  If not, he can just

9    count.

10           THE COURT:  All right.  This is

11   Plaintiff's Exhibit 6.  I will allow you to

12   highlight it.  Go ahead.

13           THE WITNESS:  All right, sir.

14           THE COURT:  With the understanding that

15   the substitution of what was preadmitted will be

16   what we give to the jury.

17           MR. RADBIL:  Yes, Your Honor.

18           THE COURT:  Okay.  Go ahead.

19           THE WITNESS:  Do you want me to highlight

20   which of them, sir?

21           MR. RADBIL:  (866)417-8776.

22           THE WITNESS:  Yes, sir.

23           THE COURT:  Mr. Radbil, I will ask you to

24   approach and make sure we are almost to the

25   conclusion of this.  Okay.  Would you please?

101

```
 1            MR. RADBIL:  Sure.

 2            He's close.

 3            THE COURT:  Okay.  Mr. Radbil?

 4   Q.   (By Mr. Radbil)  What was your count, sir?

 5   A.   Let me count those.  I'm sorry, I didn't count

 6   them, I just highlighted them.  Seventeen, sir.

 7   Q.   Thank you.  And on the top of the account

 8   notes, there is certain information contained about

 9   Dr. White and his account; is that correct?

10   A.   Yes, sir.

11   Q.   And that information is the basic type of

12   information that a debt collector would need, for

13   example, contact information, telephone numbers,

14   place of employment, date of birth, city, state, zip

15   code, et cetera?

16   A.   Yes, sir.

17   Q.   Okay.  And on the right-hand column there is a

18   list of phone numbers.  The first one is

19   (214)792-9650.

20   A.   Yes, sir.

21   Q.   Okay.  The second says, RP.

22   A.   Yes, sir.

23   Q.   PH (281)435-1163-C.

24   A.   Yes.

25   Q.   Can you interpret what that means?
```

1    A.    The 1163 number?

2    Q.    Correct?

3    A.    That's a cell phone number.

4    Q.    What indicates it's a cell phone number?

5    A.    Sir?

6    Q.    The indication of it being a cell phone is the

7    C?

8    A.    That's correct.

9    Q.    And below that POE, what does that stand for?

10   A.    Place of employment.

11   Q.    Can you read the number listed there?

12   A.    (866)417-8776.

13   Q.    Okay.  And then to the left of that, there is

14   another POE category, which I presume stands for

15   place of employment; is that correct?

16   A.    Where are we looking, sir?

17   Q.    So the POE number that you just read, if you go

18   straight to the left --

19   A.    That's -- you meant name of the place of

20   employment?

21   Q.    Yes.

22   A.    Yes, sir.

23   Q.    Can you read the name of the place of

24   employment?

25   A.    Simple Surrogacy.

```
 1   Q.    And the address?
 2   A.    Address, 4925 Greenville Avenue, Dallas, Texas
 3   75206.
 4   Q.    And down below there is a time listed.  And it
 5   says, Time 388, what does that mean?
 6   A.    That's the number of seconds that someone was
 7   on the account.
 8   Q.    388 seconds total?
 9   A.    Yes.  Um-hum.
10   Q.    Does that mean on the account, working on it,
11   or does that include phone calls?
12   A.    You could be sitting on the account doing
13   nothing, and it would still show that time.
14   Q.    If I made a phone call, would that be included
15   in that time?
16   A.    Yes.
17   Q.    Okay.  And in 388 seconds, how many calls were
18   made according to this document?
19   A.    According to this, 70 calls it says.
20   Q.    Okay.  And C-O-N means?
21   A.    Number of contacts.
22   Q.    And how many?
23   A.    Four.
24   Q.    Okay.  The asterisk on the top near the
25   CVRPH214 number, the telephone number is
```

```
 1   (214)792-9650?

 2   A.    Yes, sir.

 3   Q.    And it has an asterisk by it?

 4   A.    Right.

 5   Q.    What does that asterisk stand for?

 6   A.    That usually indicates that it's a cell phone

 7   number that we have received permission -- or a

 8   telephone number that we have received permission to

 9   call.

10   Q.    So in this instance, because the cell phone

11   number delineated by the C, which is the 1163

12   number, does not have an asterisk by it --

13   A.    That is correct.

14   Q.    -- there was no permission to call that number.

15   A.    That's correct.

16   Q.    Now, the total number of calls documented is

17   70.

18   A.    Yes.

19   Q.    But if I recall correctly, during your

20   deposition testimony we counted the number of calls

21   and there was actually more calls than the 70

22   indicated here; is that correct?

23   A.    That's my recollection, yes, sir.

24   Q.    Okay.  So there's some chance that things are

25   not accurate in these account notes?
```

```
 1   A.    That the number of calls were not being
 2   accurate.
 3   Q.    Okay.   Is there a reason or an explanation why
 4   the number would be inaccurate as far as number of
 5   calls?
 6   A.    This is information that's input a lot of times
 7   by collectors.   Our dialing will also go out and
 8   call a number of calls and drop off the calls that
 9   are not reached.
10   Q.    So --
11   A.    It's not unusual for this number to be off.
12   Q.    Okay.   Because there's some chance that a
13   dialer calls a number many times and doesn't connect
14   and that call is not logged actually --
15   A.    Right.
16   Q.    -- on these account notes.
17         Same way that a call that's not answered by
18   somebody's cell phone, for instance, might not show
19   up on their bill because they didn't pick up.
20   A.    We attempted to call, right.
21   Q.    How long have you worked for Regional
22   Adjustment Bureau?
23   A.    Thirty years.
24   Q.    Thirty years?
25   A.    Yes, sir.
```

```
 1   Q.   Could you state your position?  I don't recall
 2   if I asked you your position.
 3   A.   What was that, sir?
 4   Q.   What's your position in the company?
 5   A.   I am the Director of Compliance in Human
 6   Resources.
 7   Q.   Okay.  Regarding calls to the place of
 8   someone's employment --
 9   A.   Yes, sir.
10   Q.   -- what is the policy of Regional Adjustment
11   Bureau, to your personal knowledge?
12   A.   That we can call -- we can call the place of
13   employment unless we are told that it's an
14   inconvenient time or place or if we have reason to
15   know that calls cannot be received at that number.
16   Q.   Do you dispute -- let me back up a step.  Do
17   you agree that Regional Adjustment Bureau, RAB, is
18   required to disclose in voice messages that it
19   leaves with consumers that it's a debt collector?
20   A.   We are required to do that.
21   Q.   Do you agree in this case that that was not
22   complied with?
23   A.   I have no way of knowing that, sir.  I know
24   what the collectors are trained to do, and that's to
25   leave that message.
```

1    Q.    Have you done anything since the inception of

2    this case to -- well, have you learned anything from

3    the facts of this case?

4              THE COURT:  Excuse me.

5              MS. MALONE:  Your Honor, objection, calls

6    for attorney-client communication.

7              THE COURT:  Sustained.

8    Q.    (By Mr. Radbil)  Would you agree that placing

9    calls to somebody's employment's telephone number or

10   place of employment could potentially cause

11   significant problems for that individual?

12   A.    That would depend on where the individual

13   worked, I would imagine, what those company's

14   policies are towards the individuals receiving calls

15   at work.

16   Q.    Would you agree if someone was not allowed to

17   use their business line for personal calls or to

18   take nonbusiness-related calls, that that could

19   cause a serious problem?  You're a manager, and so

20   there's -- there's things that you want your

21   employees to do and things your employees cannot do.

22   A.    I guess you would have to know the company's

23   policies in order to be able to answer that

24   question.

25   Q.    Uh-huh.  What exactly do you teach your

1    employees -- well, how do you teach them how to

2    comply with the restrictions under federal law

3    related to placing calls to employment?  Is there a

4    written policy?

5    A.   We have a printed program that we put our

6    employees through.  And part of that training

7    program is on the Fair Debt Collection Practices

8    Act.  I can go into a little bit of the training if

9    you would like me to.

10   Q.   Specifically with respect to telephone calls

11   placed to places of employment, please.

12   A.   Places of employment.  I answered that earlier.

13   I will be glad to answer that again, sir.  We're

14   allowed to call a place of employment unless we are

15   told that it's an inconvenient time or place or if

16   we have reason to believe that those calls would not

17   be allowed by that particular employer.  It could be

18   in the case of someone who is on a production line

19   and would have to be called off and would interrupt

20   the flow of business.

21   Q.   Um-hum.  Do you dispute in this case the fact

22   that Dr. White requested that calls to his place of

23   employment from Regional Adjustment Bureau stop?

24   A.   I have no record of him making such a request,

25   no, sir.

1   Q.   When you talk about records, what records are

2   you looking at?

3   A.   The employee notes; these account notes right

4   here.

5   Q.   And how are employees compensated based on

6   their work at RAB?

7   A.   They are paid a straight salary plus a

8   commission based on what they collect.  If they

9   reach a certain goal, then they can make additional

10  money.

11  Q.   And are they assigned a particular group of

12  accounts, or is it random?

13  A.   They are assigned to different divisions within

14  the company.  It could be the Retail Division or the

15  Student Loan Division.

16  Q.   So would an employee have an interest

17  financially in not noting an account relating to a

18  request to stop calling a place of employment lodged

19  by a consumer?

20  A.   That could cause legal issues, and I don't know

21  that that would be a monetary incentive for anybody

22  to do that.

23  Q.   Well, what's the purpose of calling somebody's

24  place of employment?

25  A.   To talk with them about their delinquent debt.

```
 1   Q.    And you can talk to somebody about their
 2   delinquent debt at their home telephone number also,
 3   correct?
 4   A.    Correct.
 5   Q.    Um-hum.  So do you say it's more effective or
 6   less effective if you can call more phone numbers?
 7   A.    If you can call what, sir?
 8   Q.    More telephone numbers.
 9   A.    More telephone numbers?
10   Q.    Uh-huh.
11   A.    The whole purpose of it is to be able to talk
12   to the individual that you are trying to reach.  So
13   as far as how many telephone numbers that requires,
14   I would assume that would vary.  Again, the sole
15   purpose is trying to reach the individual you are
16   trying to reach so you can arrive at a solution to
17   the collection problem.
18   Q.    Do collectors suffer any discipline for not
19   noting things in accounts?
20   A.    It depends on the severity of the act.
21   Q.    Okay.
22   A.    They are at least reprimanded.  And again, it
23   depends upon the severity of the act.
24   Q.    And who are the individuals in this case who
25   placed calls to Dr. White's place of employment?
```

1   A.    Where did they what, sir?

2   Q.    The individual debt collectors or the

3   individual employees --

4   A.    Um-hum.

5   Q.    -- do you know their names?

6   A.    Do I know their names?  They would be in the

7   notes of this account, sir.  I think we supplied

8   those.

9   Q.    Sure.  I think they are also in front of you.

10          THE COURT:  Mr. Radbil, just to speed this

11   up, maybe you can approach and refer him to those

12   names if that's what you were going to ask him.

13          MR. RADBIL:  I'm not as familiar at

14   interpreting the names.  There's initials, I

15   believe, on the left-hand side and because --

16          THE COURT:  I guess my question is,

17   perhaps if you are asking him a question that would

18   cause him to go through these notes, that perhaps

19   you can speed it up by coming up here and sort of

20   showing him what you are referring to.

21          MR. RADBIL:  Sure.

22   Q.    (By Mr. Radbil)  Are these the ones you

23   highlighted?

24   A.    Yeah.  They are way down the list there.

25   Q.    So there we have the initials MZA.  Who is MZA?

```
 1   A.    I have 370 employees.  I can't -- I can't
 2   remember all these initials.  Again, I did supply
 3   those to you.  I don't have a list in front of me of
 4   all of the names associated with these initials.
 5   Q.    Okay.  Is there any on that list that you
 6   recognize?
 7   A.    I believe KL is Karen Nelson.  I believe AAG is
 8   Aaron Garber.  I don't recall who MRH is, CYD.  I'm
 9   sorry, I don't remember the rest of these, sir.
10   Q.    That's fine, sir.  Do you recall whether any of
11   those employees have been disciplined or reprimanded
12   for any conduct undertaken in connection with
13   attempts to collect debt from Dr. White?
14            MS. MALONE:  Objection, Your Honor,
15   irrelevant, and also subsequent remedial actions.
16            THE COURT:  I'm going to allow it if he
17   knows it in connection with the period of time that
18   we are talking about, if he knows the answer to that
19   question with regard to these employees.  But my
20   understanding is he only knows about two people
21   whose initials are there, so if you can be more
22   specific.
23   A.    I don't recall.
24            THE COURT:  He says he doesn't recall.
25   Let's move on to the next question.
```

```
 1    Q.    (By Mr. Radbil)  Who handles the discipline?
 2    A.    Either the collection managers or myself.
 3    Q.    Okay.  Is it a 50-50 split, or do you handle
 4    certain types of disciplinary cases?
 5    A.    They handle the normal day-to-day disciplinary
 6    actions.  I would handle anything that is probably
 7    of an egregious nature.
 8    Q.    How would you classify the failure to document
 9    a cease and desist request or a request from a
10    consumer to stop calling a place of employment?  Is
11    that egregious?
12    A.    I would consider that a violation, yes.
13    Q.    And you said there are 300-plus individual debt
14    collectors employed by Regional Adjustment Bureau?
15    A.    Yes, sir.
16    Q.    How many managers oversee those 300?
17    A.    We have approximately --
18          THE COURT:  Mr. Radbil --
19    A.    -- 20-something.
20          THE COURT:  -- I don't see the relevancy
21    of that, so could you move on to your next question,
22    please?
23          MR. RADBIL:  Certainly.
24          THE COURT:  Thank you.
25    Q.    (By Mr. Radbil)  Have you spoken with Karen
```

```
 1   Nelson regarding whether or not Dr. White demanded
 2   that calls to his place of employment cease?
 3              MS. MALONE:  Objection, Your Honor,
 4   hearsay; also anticipation of litigation and defense
 5   privileges.
 6              MR. RADBIL:  No substance was asked for.
 7              THE COURT:  I'm sorry?
 8              MR. RADBIL:  I hadn't asked for any
 9   substance of the conversation, if there was one.
10              THE COURT:  Overrule the objection.  Do
11   you want to ask the question again?
12   Q.  (By Mr. Radbil)  Yes.  Have you had any
13   discussions with Karen Nelson regarding whether or
14   not Dr. White requested the telephone calls to his
15   place of employment cease?
16              THE COURT:  And this would be as to
17   discussions outside of this litigation.  If you have
18   discussed this with her in the context of your
19   attorney in preparing, that's -- you don't have to
20   answer that.  If it's outside of that, then answer
21   it, please, if you know.
22   A.   My notes don't indicate that any conversation
23   such as that was held, so I wouldn't have reason to
24   talk with her about that.
25   Q.  (By Mr. Radbil)  Okay.  You agree that Regional
```

1    Adjustment Bureau placed calls to Dr. White's

2    cellular telephone, home telephone, and place of

3    employment?

4    A.    I do agree.

5    Q.    And I believe you also agreed that RAB did not

6    have consent to place calls to his cell phone; is

7    that correct?

8    A.    That's -- that's hard to answer that question

9    because the calls that we made to his cell phone

10   were called manually, they were not called to a

11   dialer.  And it's my understanding that you do not

12   have to have permission to call a cell phone number

13   if you dial so manually.

14   Q.    Does RAB use the Ontario Systems Guaranteed

15   Contacts dialer?

16   A.    Yes, sir, it does.

17   Q.    And does that generate pools of numbers that

18   are dialed by the dialing system?

19   A.    It does generate pools of -- yes, sir, it does.

20   Q.    Does RAB publicly represent on its company

21   website that its guaranteed contact dialing system

22   is a, quote, predictive dialer?

23   A.    That is on the website, but we do not have a

24   predictive dialer.  That's a mistake on the website.

25   Q.    Okay.  Does the website state, quote,

1    persistence is the essential trait of successful

2    collections, guaranteed contacts, quote, a

3    predictive dialer provides persistent --

4             THE COURT:  Hang on.  Hang on.  You are

5    reading something, it's apparent, into the record.

6    That would be hearsay.  It's okay to ask him a short

7    question, but to read from a paragraph would not be

8    appropriate.

9             MR. RADBIL:  Sure.

10            May I approach the witness and show the

11   witness --

12            THE COURT:  Make sure Ms. Malone sees what

13   you are approaching with, please.

14            MR. RADBIL:  It's Plaintiff's Exhibit 10.

15            THE COURT:  Okay.  This is Plaintiff's

16   Exhibit --

17            MR. RADBIL:  Number 10.

18            THE COURT:  Okay.  Go ahead.

19   Q.   (By Mr. Radbil)  Do you recognize that

20   document, sir?

21   A.   This is part of our website.

22   Q.   Can you read -- I know it's small print --

23            THE COURT:  It's not in evidence.  Are you

24   offering it?

25            MR. RADBIL:  Yes.

1          MS. MALONE:  Your Honor, the same

2    objection that I raised earlier.

3          THE COURT:  Overruled.  He's acknowledged

4    that this is something he recognizes, albeit with

5    some dispute as to its content, it's an admission.

6    Overrule.

7      (Plaintiff's Exhibit 10 admitted into evidence.)

8    Q.   (By Mr. Radbil)  If you can read those two

9    paragraphs.

10   A.   "Persistence is a successful trait of

11   successful collections.  Guaranteed Contacts, a

12   predictive dialer, provides persistence that

13   collectors cannot manually duplicate.  Using

14   Guaranteed Contacts enables our collectors to

15   efficiently and quickly contact account holders."

16        "Guaranteed Contacts dials thousands of numbers

17   each day.  Through dialer strategies selected by the

18   computer, telephone numbers to be called are placed

19   in a dialing pool.  Right party communications are

20   dramatically increased based upon best practices

21   that are implemented and coordinated by the highly

22   experienced RAB management team."

23   Q.   Thank you.  You previously testified that

24   you're familiar with how that dialer works.

25   A.   We do not have a predictive dialer.  The way

1    our dialer works is the collector makes a call, and

2    until he hits the enter key, it does not dial

3    another account.  Whereas a predictive dialer

4    determines how long a collector talks on an account,

5    anticipates when he is going to hang up, and has

6    another call ready to call.

7    Q.    You are familiar with how the system works.

8    A.    I am familiar with how the system works, yes,

9    sir.

10   Q.    And you have described the system as working in

11   tandem with something called the Ontario Systems

12   Flexible Automated Collections System?

13   A.    Yes, sir.  That's the database.

14   Q.    You call it FACS or F-A-C-S for short?

15   A.    Yes, sir, FACS.

16   Q.    And I think you also previously explained that

17   FACS is RAB's basic operational software and

18   database containing account and debtor information

19   concerning the alleged debts that RAB seems to

20   collect.

21   A.    That is a correct statement.

22   Q.    And the Guaranteed Contacts dialer is

23   integrated with the FACS system software?

24   A.    Yes, sir, that's correct.

25   Q.    And pools of numbers, criteria selected, which

1    generates pools of numbers which are then dialed by

2    the dialing system?

3    A.    That's correct.

4    Q.    And you explained, I think in your deposition,

5    the advantage of having a -- a predictive dialer is

6    that it can dial more than a human can.

7    A.    It's not a predictive dialer, but it can dial

8    more telephone numbers than a human can, yes.

9    Q.    And I think you also said you can set a dialer

10   to dial several numbers at a time, and whichever

11   individual -- whichever it connects to first, it

12   drops the other calls off.  But the advantage

13   obviously is being able to cover more accounts.

14   A.    That's correct.

15   Q.    Okay.  Do you dispute that Dr. White's

16   telephone numbers were placed into the dialing pool?

17   A.    His cell would not be in the dialing pool.

18   Q.    Okay.  Why wouldn't it be?

19   A.    Because of the risk of violating the Telephone

20   Consumer Protection Act by not having permission to

21   place the number in an automated dialing pool.

22   Q.    Dr. White didn't provide his cell phone number

23   to Regional Adjustment Bureau, did he?

24   A.    I don't know how it was obtained.

25   Q.    Okay.  Do you dispute that on February 15,

1   2011, the account notes show that RAB updated its

2   FACS or F-A-C-S database to include Dr. White's

3   cellular telephone number?

4   A.   February 15th?

5   Q.   Yes.

6   A.   May I look at the note?

7        THE COURT:  You may.

8   A.   On February the 15th, we called the place of

9   employment.  We spoke with Dr. White.  We talked

10  about terms of repayment.  We updated his address.

11  He gave us permission to talk with Terry, and gave a

12  telephone number of (214)792-9650.

13  Q.   And to be clear, that's not the employment

14  number that you have listed, correct?

15  A.   Let's see.  We manually called the employment

16  number and spoke with Dr. White.  And as I said, he

17  gave us permission to call this other number, this

18  (214)792-9650, and that's pretty much what the note

19  says on the 15th.

20  Q.   And on February 17th, 2011, RAB changed the,

21  quote, responsible party telephone number for

22  Dr. White's account to his cellular telephone

23  number.  So the RP number was changed from

24  (281)324-2406 to (281)435-1163 with a G after it.

25  A.   It says it was a good number, yes.

1   Q.    And a good number indicates what?

2   A.    The G, is that what you asked me, sir?

3   Q.    Yes.

4   A.    The G indicates it's a good number.

5   Q.    In terms of the order of the numbers that would

6   be called?

7   A.    It changed a number that was on there that

8   apparently was not good to a number that says it is

9   good.  I'm not sure what number this one that was

10  removed is, (281)324-2406.  I'm not sure what that

11  number is.

12  Q.    Do you recall testifying that the G indicated

13  that that number would be called first?

14  A.    The G indicates, yes, it would be called first.

15  Q.    So on February 17, 2011, Dr. White's cellular

16  telephone number was changed in your system to the

17  number that should be called first.

18  A.    It was changed, yes.

19  Q.    Okay.  And do you dispute that the account

20  notes show that Dr. White's account, including his

21  newly designated RP telephone -- cellular telephone

22  number was repeatedly moved back into the automatic

23  dialer by the employees of Regional Adjustment

24  Bureau?

25  A.    I don't see where it was -- it was not called

1    through the dialer, it was called manually.

2    Q.    But the calls that are listed here, as you

3    mentioned before, the number of calls listed don't

4    include those where no contact was made, correct?

5    A.    The number of calls includes the number of

6    attempts to call, so it would include those.

7    Q.    I was under the impression before you testified

8    that the reason that there's a discrepancy between

9    the number of calls being 70 and the total number

10   counted was because some are not documented.

11   A.    I think we counted, what, 77 calls.

12   Q.    Um-hum.

13   A.    Yeah.  And it shows 70 on here.  So there's

14   actually more calls that were made that are on here

15   than the number indicates.

16   Q.    Correct.

17   A.    Okay.

18   Q.    And there could be more than that, as well.

19   A.    It's possible.

20   Q.    The 3TRP notation, represents Dr. White's

21   account moving back to the automatic dialer; is that

22   correct?

23   A.    Where do you see that, sir?

24   Q.    I believe it's in your employee training

25   manual.

```
 1              THE COURT:  Why don't you refer him to it
 2    if you've got it.
 3              Mr. Wyatt, do you know what the 3TRP
 4    designation is without referring to the manual?
 5              THE WITNESS:  TRP means trap.  And what
 6    that does is, it takes it back into the account and
 7    puts it back in the general work flow.  It doesn't
 8    necessarily put it into a dialing pool.
 9              Normally that account would be in
10    someone's route; in other words, under someone's
11    initials, and that would move that back into the
12    general work flow.
13              THE COURT:  Mr. Radbil?
14    Q.   (By Mr. Radbil)  So is there any dispute that
15    Dr. White's cellular telephone number was placed in
16    the dialing pool of the dialing system that you
17    used?
18    A.   I don't think there was any question that
19    Dr. White's cell phone was never in the dialing
20    pool.
21    Q.   You're saying it was not in the dialing pool?
22    A.   It was not in the dialing pool.
23    Q.   Well, what indicates it was not in the dialing
24    pool?
25    A.   Because all of the calls that have been made
```

124

```
 1   that I have seen here are done manually, and that's
 2   to avoid problems with the Telephone Consumer
 3   Protection Act.
 4   Q.   So on March 2, 2011, the account notes show an
 5   RAB employee identified as SMF moved Dr. White's
 6   account back to the automatic dialer.
 7   A.   When?
 8   Q.   March 2nd, 2011.
 9   A.   Yes, sir.  It shows 3TRP, which moves it back
10   not into a dialing pool, it moves it back into the
11   regular business flow.  It makes no reference to a
12   dialing pool.
13            THE COURT:  Let's have a question, please.
14            MR. RADBIL:  Yes.
15   Q.   (By Mr. Radbil)  Do you recall testifying that
16   SMF is an individual in the IT Department that
17   handles tactics and dialing situations?
18   A.   That is correct.
19   Q.   Okay.  How does the dialing system work from an
20   individual collector standpoint?
21   A.   The collector puts in a command that puts them
22   into the dialing pool.  They hit the enter key on
23   the keyboard of their computer that begins the
24   dialing sequence.  It goes out and dials.  If it's
25   set for three -- three calls per collector, it goes
```

```
 1    out and tries three numbers.  The first number that

 2    goes off hook, meaning the person answers, it paints

 3    that account on the screen and drops the other calls

 4    off.  That means -- when the account paints, that

 5    means someone has picked up the phone and said

 6    hello.

 7    Q.   And when a call routed to any particular

 8    station of a collector is actually terminated, RAB's

 9    employees are trained to initiate the automatic

10    dialing system again by hitting the enter key on

11    their computer?

12    A.   Once they are ready to go to the next account.

13    Q.   When they hit that enter key, the dialer starts

14    dialing, right?

15    A.   The dialer does what, sir?

16    Q.   The dialer starts dialing numbers?

17    A.   Yes.

18    Q.   More than one number?

19    A.   Yes.

20    Q.   Whichever connects first is transferred back.

21    A.   Whoever answers first and paints that account

22    on the screen, it drops the others; in other words,

23    disconnects the other numbers it might have been

24    trying.

25    Q.   And that's how the calls are -- that's how
```

1  business is done at RAB?

2  A.    That's how they use the dialer.

3  Q.    Okay.  And then the dialer used by RAB

4  recognizes when the live voice is on the other end,

5  that's what triggers the transfer?

6  A.    When it recognizes the voice, it puts the

7  account on the screen, yes, sir.

8         THE COURT:  Mr. Radbil, how many more

9  questions do you have?

10         MR. RADBIL:  None at this time, Your

11  Honor.

12         THE COURT:  Okay.

13         MR. RADBIL:  Pass the witness.

14         THE COURT:  Cross-examination?

15         MS. MALONE:  Thank you.  Your Honor, can I

16  pull the easel over?

17         THE COURT:  You may.

18                    **CROSS-EXAMINATION**

19  Q.    (By Ms. Malone)  Mr. Wyatt, I want to back up

20  and ask you if you would explain to the jury, how is

21  RAB owned?

22  A.    It's owned by the employees of Regional

23  Adjustment Bureau through a stock ownership program.

24  Q.    So you're one of the owners?

25  A.    I'm one of the owners.

```
 1   Q.    All right.  Just for a minute, could you tell
 2   the jury just a little bit about your educational
 3   background, sir?
 4   A.    I am a 1970 graduate of Southeast Missouri
 5   State University.  I have a Bachelor of Science
 6   degree in Business Administration.
 7   Q.    Okay.  And in your career, have you always
 8   worked in the collection area?
 9   A.    Well, my first job was a collector for a
10   finance company, I guess in 1970.  I'm trying to
11   remember back that far.  And I had worked my way up
12   to a manager's position with a finance company.  I
13   worked for them for a period of time, and I had to
14   quit because they required people to transfer all
15   over the country, and my wife wasn't willing for me
16   to do that.
17         I was then a senior lending officer for a bank
18   and worked in that capacity for approximately two
19   years and found out that I could not get promoted
20   until someone died.  I'm sorry to put it that way.
21   Then I went into the collection business, and I
22   worked for another collection agency for, oh,
23   approximately a year and a half.  And then I moved
24   over to Regional Adjustment Bureau, and I've been
25   there for the last 30 years.
```

1  Q.   And you said you are married.  How long have

2  you been married, sir?

3  A.   I have been married 38 years to the same

4  wonderful woman.

5  Q.   Kids, grandchildren?

6  A.   I have three children and six grandchildren I

7  am proud of.

8  Q.   And I know you are proud of your MPD son.

9  A.   My son is a Memphis Police officer.  And I am

10 very proud of him and jump every time the phone

11 rings.

12 Q.   Do you have any dogs or anything?

13 A.   Oh, I have two pit bulls that are like my

14 children.  I take them walking.  We play in the

15 backyard.  It's -- they are -- people have bad

16 impressions of pit bulls.  They are the sweetest,

17 kindest, gentlest, smartest dogs I have ever seen.

18 Q.   Okay.  Let's talk more about your time at RAB

19 in the 30 years.  I'm not going to ask you from when

20 to when, but can you just tell us generally the jobs

21 you held there?

22 A.   I started as a collector, started on the

23 collection floor just as everyone else, and I was

24 promoted to the collection manager.  I worked as a

25 collection manager, and because we were a small --

1  small agency at the time, I was also the training

2  director.  So I split my duties during the same day

3  of going from the collection floor to the training

4  lab and training collectors on how to do things

5  properly.

6       After a period of time, I was promoted to

7  general manager, and I performed those duties for a

8  while.  And I then made a lateral move to the

9  Director of Compliance in Human Resources.  And the

10  general manager became the former owner's son.

11 Q.   I'm going to talk to you about training, but

12 first I want to get some explanation on how to read

13 these account notes.

14 A.   Okay.

15 Q.   Okay.  You have been telling us that you can

16 tell when a call is manual --

17 A.   Um-hum.

18 Q.   -- or a dialer?

19 A.   Right.

20 Q.   Okay.  How do you do that?

21 A.   Well, it has the letters QC, which is

22 Guaranteed Contacts, which is the name of the dialer

23 that we use, or whether it refers to manual dial and

24 the telephone number directly after that number.

25 Q.   So if it says, manual dial, what does that

1  mean?

2  A.   That means the collector -- I don't have one in

3  front of me -- picks up the telephone and dials it

4  just as you would dial it from your phone.

5  Q.   From my office?

6  A.   From your office.

7  Q.   Push numbers into a phone.

8  A.   Yes, ma'am.

9  Q.   Okay.  And in this particular case, we were

10  talking -- and I'm going to have you go, sir, to

11  page 21 -- I'm sorry.  Let me back you up a little

12  bit.

13       It's page 19.  I apologize, Mr. Wyatt.

14          THE COURT:  That's Plaintiff's Exhibit --

15          MS. MALONE:  It is both Plaintiff's

16  Exhibit 6 and Defendant's Exhibit 1.

17          THE COURT:  Thank you.

18  Q.   (By Ms. Malone)  Mr. Wyatt, when we are

19  comfortable with the notebooks that has the pages

20  attached, feel free to use that.

21       On page 19, I believe this is the first time we

22  see an entry to the manual, the telephone number,

23  (866)417-8776; is that correct?

24  A.   Yes, ma'am.  Yes, ma'am.

25  Q.   And you've heard that that is the phone number

131

1    for Simple Surrogacy, right?

2    A.    Yes, ma'am.  I have that as the place of

3    employment, that telephone number, yes, ma'am, I do.

4    Q.    Mr. Radbil had you count those numbers, so I

5    just want you to go with me and tell me if the first

6    entry on February 1st, whether that was a manual

7    dial or dialer call?

8    A.    That was manually dialed, ma'am.

9    Q.    Okay.  And I'm going to put M for manual.

10   A.    Okay.

11   Q.    All right.  Can you tell me whether or not any

12   contact was made or a message was left?

13   A.    Just read the notes.  Telephoned possible POE,

14   voicemail, no message was left.

15   Q.    So I'm going to put N for message if it's no

16   and Y for yes.

17          And the next entry I see there is on the same

18   page on the next day, on February the 2nd; is that

19   correct?

20   A.    Yes, ma'am.

21   Q.    Again, how was the call made?

22   A.    This is a manually dialed call to the place of

23   employment.  It says, Telephoned place of

24   employment, got a recording of some kind; there was

25   no message left.

1    Q.    When you leave a message from RAB, how is that

2    message left?  Is it a person, a computer, what

3    leaves the message?

4    A.    We don't have computer-generated messages.

5    Those would all be messages from a live collector.

6    Q.    Okay.  And then looking on the same page -- and

7    I think we are now at 2/3?

8    A.    There is another manually dialed call to the

9    place of employment, telephoned place of employment,

10   recording, no message left.  That's indicated by

11   NML.

12   Q.    So if we're reading these notes and it says

13   NML --

14   A.    It means no message left.

15   Q.    The other one I see is NWL.

16   A.    It means the same thing; no leave word.

17   Q.    All right.  And when we go through these

18   account notes on the very first page you said there

19   was something called calls?

20   A.    Yes, ma'am.

21   Q.    And you said --

22   A.    Sorry, I apologize.  What was the question?

23   Q.    It says calls --

24   A.    Yes, ma'am.

25   Q.    -- is that actual making somebody's phone ring?

1  A.    This could be attempts.  It could be attempts

2  to call those phones.

3  Q.    So if the call gets a busy signal, would it

4  show up?

5  A.    Yes.

6  Q.    What happens if, in the middle of the call, it

7  drops off, as you described from your system?

8  A.    It would probably show a call.

9  Q.    Even if it didn't dial the whole number.

10  A.    Right, because it attempted it.

11  Q.    If I were sitting in my office and calling on

12  the phone and somebody said, hey, your husband is on

13  line two and I hung up, it would count that first

14  call.

15  A.    It would.

16  Q.    What does contacts mean?

17  A.    You actually speak to someone.

18  Q.    Okay.  So when we go through here in the

19  bottom, will every call be marked in the actual

20  account notes even if it doesn't up on the call

21  count at the beginning?

22  A.    What, ma'am?

23  Q.    That was a bad question.  I'm sorry, Mr. Wyatt.

24        From your company's perspective, do you believe

25  that all of the attempted action on a case would

1   show up in the actual, physical notes whether or not

2   they marked the count as a call on the front page?

3   A.   All the work is on the notes -- in the notes.

4   Q.   So that's what you use to decide whether or not

5   somebody has done something, is that fair?

6   A.   That is correct.

7   Q.   Okay.  Now let's go back to our work numbers.

8   The next one I see is also on page 19 at 2/4; is

9   that correct?

10  A.   Yes, ma'am.  There's a call on 2/4.

11  Q.   Again, how was it made?

12  A.   Manual dial, telephone number (866)417-8776.

13  Telephoned place of employment; says recording, no

14  message left.

15  Q.   Okay.  And then the next one I have is also on

16  page 19 at 2/7; is that right?

17  A.   Yes, ma'am.  It says, long ring tone, did not

18  go through.  They encountered some kind of problem

19  calling the number at that point.

20  Q.   How was that called?

21  A.   That was called manually.

22  Q.   Okay.  So it didn't result in an actual --

23  A.   It says it didn't go through.

24  Q.   Okay.  And then the next one I have is on the

25  same page at 2/7 -- I'm sorry, 2/11?

1  A.   Yes, ma'am.  Manual dial, same phone number.

2  Telephoned -- they got residence here for some

3  reason -- recording, no message left.

4  Q.   Up to this point in time -- by the way, when

5  was this account first opened?

6  A.   August the 8th, 2010.

7  Q.   Had anyone spoken to Mr. White yet?

8  A.   Not up to this point.

9  Q.   Okay.

10 A.   According to these notes, no.

11 Q.   All right.  And then on the next page I have a

12 note for that same phone number on page 20.  Can you

13 tell me what it says there?

14 A.   Page 20?

15 Q.   Yes, sir.

16 A.   Okay.  Manually dialed, (866)417-8776.

17 Q.   Okay.

18 A.   And we spoke with Dr. White; read him the Mini

19 Miranda; talked about balance in full as settlement.

20 Q.   So I'm just trying to get whether or not there

21 was communication and how the call was.

22 A.   We talked to him.

23 Q.   So this time you got somebody.

24 A.   Yes, ma'am.

25 Q.   All right.  And then the next page that I have

1   is on page -- is on page 21.  I have an entry after

2   2/17.  Do you see one before that, sir?

3   A.    I see where Dr. White called our office on

4   2/15 at 11:33 a.m.

5   Q.    We will come back to Mr. White.  Right now I'm

6   trying to make a record of the work calls.

7   A.    Okay.

8   Q.    Do you see one at 2/17?

9   A.    Yes, ma'am.

10  Q.    And can you tell me, was that a manual call?

11  A.    That was a manual call.  Telephoned place of

12  employment; only got automated system.

13  Q.    So message left, yes or no?

14  A.    No.

15  Q.    And before we leave that page, let me ask you a

16  question:  Do you see any note on this page where

17  there was an indication that Mr. White told anyone

18  that he was not allowed to receive phone calls at

19  the 866 number?

20  A.    No, ma'am.

21  Q.    Okay.  And I think you had told us earlier that

22  there was some discussion of a payment or discussion

23  about a payment?

24  A.    I'm looking at the notes on 2/15/11.  He said

25  he would call back later today; checking account

1    information to set up payment of intent for $100;

2    collector said, I advised him we will need to start

3    a rehab program, too.

4    Q.    Okay.  Immediately above that note, sir, it

5    says something regarding a tax seizure.  Can you

6    tell us what that entry says and what it means?

7    A.    Debtor is aware of tax seizure.  On guaranteed

8    student loans like this, our client participates in

9    the federal tax offset programs, which means that

10   they can seize any taxes that are due to the

11   individual if they owe delinquent federally funded

12   student loans.

13   Q.    You mean, like they get to keep their tax

14   refund check?

15   A.    Keep their tax refund check.

16   Q.    Okay.  All right.  Do you see any other --

17   immediately below that note, is there a reference

18   that Mr. White will call back?

19   A.    Yes.  It says, call back today with checking

20   information and set up payment of intent for $100.

21   Q.    Okay.  And while we're still on this page, if

22   you will go down and read for us the entry at 2/17,

23   11:58.

24   A.    Yes, ma'am.  Debtor called back in.  Debtor

25   called in from -- looks like the cell phone number

SHAWNIE ARCHULETA, CSR/CRR
FEDERAL COURT REPORTER - 214.753.2747

1   that we have on file here; stated Mini Miranda;

2   claims that he does not want to make arrangements on

3   loan; he is fully aware of the debt; he is fully

4   aware when loan went to default that balance in

5   full -- I guess that's balance in full is due.

6   Q.   And again, is there any reference to not

7   calling him at the 866 number?

8   A.   No, there's no reference.  That's the entirety

9   of the note.

10  Q.   Okay.  And I noticed on these two entries where

11  you are describing, it says GC in parentheses and

12  then inbound call.  Can you explain that?

13  A.   It means that the collector had their headset

14  on, were in a dialing mode, and received an inbound

15  call through that.

16  Q.   So if it says, inbound call from a cell phone

17  number, that's Mr. White calling you?

18  A.   That's him calling us.

19  Q.   All right.  If we could, sir, go to the bottom

20  of that page at 2/23, I see one more call to that

21  number?

22  A.   Yes, ma'am.  It says, manually dialed

23  (866)417-8776.  Telephoned POE; got general machine,

24  which is, I guess, an answering machine.  So they

25  would not have left a message for him at that time.

```
1   Q.   So manual call, no message left.
2   A.   Right.
3   Q.   All right.  Up to this point in time, has there
4   been any dialer call to this 866 number?
5   A.   These are manually dialed calls.
6   Q.   Has there been any indication from Mr. White
7   that you are not to call that number?
8   A.   There is no indication in these notes.
9            THE COURT:  Ms. Malone, we are going to
10  take a 15-minute break.  Ladies and gentlemen, we
11  will break every day at five unless there is
12  something unusual, and I will warn you about it
13  ahead of time.
14           Please remember that you can't discuss the
15  case at all.  The natural inclination is to talk
16  about what happened in the courtroom, but, again,
17  that's off limits until you are all in there with
18  the jury instructions deliberating.  So we will see
19  you back here in 15 minutes.  All rise for the jury,
20  please.
21           (Jury leaves courtroom)
22           THE COURT:  Mr. Radbil, I don't have
23  marked exhibits from you.  I have your summary
24  judgment exhibits, but that's all I have.  I don't
25  need them this minute, but I do need marked exhibits
```

```
 1    for the Court, otherwise I can't follow along.
 2             MR. RADBIL:  I have one binder of exhibits
 3    that is complete, and I have each exhibit that I
 4    plan to offer marked.  Tomorrow morning I will bring
 5    a binder with everything marked.
 6             THE COURT:  Okay.  And I'm sure it's just
 7    an inadvertent oversight, but the Court directs that
 8    copies of the exhibits be submitted.  So I need
 9    that, that way I can make sure I rule properly on
10    objections.
11             MR. RADBIL:  First thing tomorrow.
12             THE COURT:  Okay.  We will see you in
13    about 15 minutes.
14             (Recess taken from 2:46 to 3:11.)
15             THE COURT:  Sorry to keep you waiting.  We
16    had something come up in another case and took
17    longer than I thought.
18             Ms. Malone, go ahead.
19             MS. MALONE:  Thank you, Your Honor.
20    Q.   (By Ms. Malone)  Mr. Wyatt, we're at page 22.
21         Do you see on page 22 any attempted calls to
22    the 866 phone number?
23    A.   To the what, ma'am?
24    Q.   Page 22, any calls to the 866 phone number?
25    A.   No, ma'am.
```

1  Q.    Okay.  And do you see any indication there was

2  communication directly with Mr. White on page 22?

3  A.    Not at all.

4  Q.    If you will look with me on page 23, the next

5  time that I show an entry to the 866 number is 2/28.

6        Is that accurate, sir?

7  A.    That is correct.

8  Q.    Okay.  Same question.  How is it called?

9  A.    It was a manually dialed number.

10  Q.    Message left or not?

11  A.    Left message it says.

12  Q.    Yes?

13  A.    Yes.

14  Q.    Okay.  And what kind of message would that have

15  been, electronic or personal?

16  A.    It would have been a message, personal message.

17  Q.    Human voice?

18  A.    Human voice, right.

19  Q.    Okay.  All right.  I see another entry on that

20  page down about 3/7.  Do you see any before that?

21  A.    No, ma'am.

22  Q.    Okay.  Immediately above the 3/7 note, just so

23  when someone is looking at these letters they can

24  interpret them, it says, IRS offset status received.

25        Can you explain what that means?

1    A.    It's an indication regarding tax offset.  The

2    note is made by a computer programmer.

3    Q.    Okay.  Is that an entry that's made -- is that

4    something your company does or does Texas Guaranteed

5    do that?

6    A.    We have nothing to do with tax offsets.  They

7    initiate that; they handle that.  And they only

8    report to us if money is received through an offset,

9    and we don't receive any kind of commission or

10   benefit from that.  It's just to adjust the balance.

11   Q.    Okay.  And so the next entry we have is at 3/7;

12   is that right?

13   A.    Yes, ma'am.

14   Q.    By 3/7 we mean March the 7th, right?

15   A.    Yes.  And it says, manually dialed.  Under

16   that -- directly under that it says, telephoned

17   debtor's place of employment.  It was a voicemail;

18   no message left, it says.

19   Q.    All right.  And then I see one more at 3/8.

20   A.    3/8, telephoned place of employment; no message

21   left on that one, ma'am.

22   Q.    Do you see any other telephoned to place of

23   employments on that page, sir?

24   A.    No, I do not.

25   Q.    Do you see any indication of communication

1    directly with Mr. White on that page, sir?

2    A.   No.

3    Q.   Okay.  At the bottom of the page it says, 3/11;

4    it says manual dial.  Is that a cell phone number

5    there, sir?

6    A.   That is a cell phone number, yes, ma'am.

7    Q.   I'm not going to do all of them.  I want to

8    make sure that someone can read these letters.  All

9    right?

10   A.   Okay.

11   Q.   On the next page, page 24, I see one at 3/14.

12   Do you see any others?

13   A.   Yes, ma'am.

14   Q.   You see the same one?

15   A.   I see one at 5:00.

16   Q.   Okay.  On 3/14?

17   A.   Yes, ma'am.

18   Q.   And can you tell me how the call was made?

19   A.   It says, manual dialed, (866)417-8776.

20   Telephoned place of employment; no answer; went to

21   voicemail; no message left.

22   Q.   Okay.  And do you see any indication on that

23   page that there was a communication directly with

24   Mr. White?

25   A.   There was no communication.

```
 1   Q.   Was there an indication that they spoke with
 2   someone?
 3   A.   Spoke to someone at (214)792-9650; telephoned
 4   residence; man refused to take a message; said to
 5   call back.
 6   Q.   Okay.  On the next page, do you see an entry to
 7   the 866 one?
 8   A.   Yes, 3:47 p.m.
 9   Q.   On what day, sir?
10   A.   3/15/11.
11   Q.   Again, how was the call made?
12   A.   It's a manual call.
13   Q.   Message left?
14   A.   Says, no answer.
15   Q.   So?
16   A.   No message.
17   Q.   Okay.  But no answer?
18   A.   No answer.
19   Q.   All right.  And do you see indication on that
20   page that there was communication with Mr. White?
21   A.   Not with Mr. White.  I see indication that
22   someone was spoken to, but it was not Mr. White.
23   Q.   Could you read that entry for us, sir?
24   A.   Spoke with debtor's spouse; stated debtor was
25   out of town; not in position to make any decisions
```

145

1    for debtor, but he is to call back at 9:00 p.m.,

2    will have -- will have him call us at that time.

3    Q.    Do you see any indication that there was a

4    return call on that page, sir?

5    A.    No, I do not.

6    Q.    Okay.  And I see one more entry for the 866

7    number.  Do you see one?

8    A.    I see one on 3/16/11 at 2:24 p.m.

9    Q.    Again?

10   A.    Telephoned -- this is a manually dialed call --

11   and it says, no answer immediately below that.

12   Q.    So no message left?

13   A.    No message left.

14   Q.    And no answer?

15   A.    No answer.

16   Q.    All right.  On the next page, 26, do you see

17   any calls to the 866 number?

18   A.    I do not.

19   Q.    Do you see any indication there was

20   communication with Mr. White?

21   A.    There was no communication.

22   Q.    Okay.  On the next page, page 27 --

23   A.    Okay.

24   Q.    -- do you see any indication there was a call

25   to the 866 number?

```
 1   A.    I do see one, 4/1/11 at 12:53 p.m., and it says
 2   we left a message.
 3   Q.    Okay.
 4   A.    That was manually dialed, I'm sorry, and left
 5   message.
 6   Q.    All right.  And do you see any indication there
 7   was communication with Mr. White?
 8   A.    There was no contact with him.
 9   Q.    So was the only communication directly with
10   Mr. White the notes that were made on the
11   February 15th/17th time frame on page 21?
12   A.    I see the communication on 2/15, and I see he
13   returned a call on the same date, 2/15.
14   Q.    And do you see a call on 2/17?
15   A.    I do see the 2/17 call.
16   Q.    And no other communication with Mr. White; is
17   that right?
18   A.    No, ma'am.  That's right, I don't see one.
19   Q.    Okay.  And if I were to go through this and do
20   this with the cell phone number for Mr. White --
21   A.    Um-hum.
22   Q.    -- when you are looking through them, do any of
23   them indicate they were used with the dialer?
24   A.    May I check through them, please?
25   Q.    Sure.  Please feel free to, sir.  If it helps
```

```
 1   you, Mr. Wyatt, all of the entries for the cell
 2   phone appear between page 21 --
 3   A.    Okay.
 4   Q.    -- and 27.
 5   A.    Yes, ma'am.  These are all manually dialed
 6   calls.
 7   Q.    Did you count nine calls?
 8   A.    I can count them.
 9   Q.    No, I won't make you do it.
10   A.    That's all right.
11   Q.    All manually called?
12   A.    Yes.
13   Q.    Just so we can see something different, for a
14   Guaranteed context call, would you look on page 11?
15   A.    Sure.
16   Q.    I just randomly picked one, sir.
17   A.    All right.
18   Q.    Do you see an entry at 10/18/2010?
19   A.    Yes, I do.
20   Q.    Can you read that and explain it?
21   A.    GC is skipped number, which is a reference
22   number; gives a number of the reference,
23   (281)501-9192 called; says, wrong number, no message
24   left.
25   Q.    Okay.  So if you go through these, it says --
```

1    if it says SKP, that's a skipped number?

2    A.    Right.   That's not a residence number, it's a

3    skipped number attempting to locate the individual.

4    Q.    All right.   Now, Mr. Wyatt, let's just back up

5    a minute and talk about this training program that

6    is operated at RAB.

7    A.    Okay.

8    Q.    When you hire a new employee and they come on

9    board, can you just basically tell us what you do in

10   terms of training?

11   A.    We have -- to start with, we have a full-time

12   training director, an assistant training director.

13   We have a separate training lab and part of the

14   collection floor that's devoted just to newly-hired

15   individuals.

16        During the first week of training, the first

17   few days after orientation, they learn about the

18   Fair Debt Collection Practices Act.   We go through

19   the entire act.   Then we require them to take a test

20   on that act and make -- make 100 percent.   If they

21   don't, they are trained on that.   We do some role

22   playing sessions.   We learn about state laws.

23        Then we put the collector on the collection

24   floor in a segregated -- in a segregated area.   We

25   have supervisors walking the floor among them,

1    letting them get their feet wet.

2         And then we bring them back into the training

3    room and say, since you've touched a few things,

4    what have you learned?  What questions do you have,

5    and so forth.  And they are assigned to their

6    different divisions.  But they are closely monitored

7    by managers who stand between them, walk the floor,

8    and constantly monitor that situation.

9         Then they are called back in again to find out

10   what other questions or comments that they have.

11   Q.   Okay.  If you would turn in that binder, sir,

12   next to you under tab 5.  Could you identify that

13   particular document for me?

14   A.   Certainly.  This is the -- it says, Retail

15   Collector Training Manual, but this is the generic

16   training manual that's given to the collectors when

17   they start.

18   Q.   Is this a document that's created by

19   individuals at Regional Adjustment Bureau?

20   A.   Yes.

21   Q.   And is this a document that's maintained in the

22   ordinary course of your business at that company?

23   A.   Yes, it is.

24        MS. MALONE:  Your Honor, at this time

25   defendant would offer Defendant's Exhibit 5.

```
 1                THE COURT:  Any objection?
 2                MR. RADBIL:  Yes, I object on the grounds
 3    that the Regional Adjustment Bureau doesn't apply --
 4                THE COURT:  The objection is that it's
 5    hearsay?  Or what's the legal objection?
 6                MR. RADBIL:  Relevance.
 7                THE COURT:  Overruled.  Defendant's 5 --
 8                MS. MALONE:  Yes, ma'am.
 9                THE COURT:  -- is admitted.
10     (Defendant's Exhibit No. 5 admitted into evidence.)
11    Q.   (By Ms. Malone)  Now, Mr. Wyatt, this item that
12    we find at Defendant's 5, can you tell us generally
13    what it is?
14    A.   It's different aspects -- it talks about things
15    like the various windows on a particular account;
16    how to create mail; talks about inbound and incoming
17    calls.  It also talks about how to provide good
18    customer service to individuals; it goes into
19    several pages of that.  It talks about different
20    urgency payments; how to listen and work with
21    individuals.
22    Q.   Okay.  In this document, does it tell your
23    individual employees how to leave messages?
24    A.   Yes, I'm sure it does.  Let me see what page
25    that is.
```

1    Q.   I tell you what, Mr. Wyatt, just to move you

2    along, let me flip you to a page, and we will come

3    back to that one, and I will give you a page number.

4    I apologize for not having it.

5    A.   That's fine.

6    Q.   If you would look with me on page -- it says at

7    the bottom, page 187.

8    A.   One what, ma'am?

9    Q.   87.

10   A.   87.   Okay.   Cease call to a specific number?

11   Q.   Yes, sir.   Can you tell us basically what this

12   particular procedure says?

13   A.   Ceasing calls to a specific number can be

14   accomplished in writing or by verbal communication.

15   A collector must stop calling a specific number when

16   anyone answering the phone states that the customer

17   cannot be contacted at that number, used to live

18   there but no longer does, or has never lived there.

19   Anyone answering the phone states that the person

20   called has the same name as the customer but is not

21   the customer, a written notice to cease calls to the

22   number shall cease; any of those reasons.

23   Q.   If you would, just in the middle of the page

24   there are some little bullets.   It says an example

25   of when you are supposed to cease calls.   Do you see

1    what it says regarding place of employment?

2    A.    It says, Prohibited calls to place of

3    employment.

4    Q.    Okay.  What does that mean?  Just -- not

5    reading it, Mr. Wyatt, just tell us generally.

6    A.    The indicator B beside that information refers

7    to the fact that we would code this as a bad number.

8    So it would not either be called manually or

9    wouldn't be called through a dialer.  It flags that

10   particular phone number as bad.

11   Q.    Okay.  I noticed when we were going through the

12   account notes earlier there was a reference to

13   something called a Mini Miranda.  What is that?

14   A.    Section 807, I believe, subparagraph 11 of the

15   Fair Debt Collection Practices Act, which says, This

16   is an attempt to collect a debt by a debt collector,

17   and any information obtained will be used for that

18   purpose.

19   Q.    And is -- how is the Mini Miranda supposed to

20   be used, sir?

21   A.    We are supposed to use that either verbally or

22   in writing on all communications, and we are

23   supposed to say that at the beginning of the

24   conversation.

25   Q.    Okay.  And would that include leaving a message

1   on a phone?

2   A.    That would include leaving a message on a

3   phone.

4   Q.    Is that the training policy at RAB?

5   A.    That is the way we train our collectors to do

6   it, yes, ma'am.

7   Q.    Are RAB policies the same as the FDCPA or

8   stricter?

9   A.    We are very much more stringent than the FDCPA

10  requires us to be for compliance reasons and for

11  our -- because that's the way our company does

12  business.

13  Q.    Okay.  If -- you told us about the initial

14  training program.  How long do you test your

15  existing employees?

16  A.    Our employees are tested quarterly.  But as far

17  as training goes, training never stops at Regional

18  Adjustment Bureau.  We have update meetings on the

19  collection floor with various groups of collectors

20  at least every Monday.

21  Q.    Okay.  So you give a test to an existing

22  employee and they don't do well, what happens?

23  A.    That employee is put into a training class.

24  And if there's a group of those, then they are all

25  schooled on the same subject and then asked to take

1  another test until we are sure they are proficient

2  in what they are dealing with.

3  Q.   Okay.  And in these weekly meetings, what kinds

4  of things are discussed with collectors?

5  A.   Well, we talk about any changes in various

6  state or federal laws, any updates that we receive.

7  We're members of the ACA International, which is a

8  collector's association, any kind of updates or

9  bulletins that we get from them.  It could relate to

10 changes in client procedures or matters, anything

11 like this.

12 Q.   Okay.  Are they tested initially before they

13 are ever allowed to talk to a consumer on the floor?

14 A.   They take that Fair Debt Collection Practices

15 Act test within the first few days.  And as I said,

16 if they don't pass that with a grade of 100 percent,

17 they are gone back -- they have to go back through

18 the training, and they have to complete that with

19 100 percent.

20 Q.   Okay.  When an employee messes up, what is the

21 range of disciplinary action that you would take or

22 can take?

23 A.   Depending upon the nature of the action, it

24 could be a verbal warning, it could be a written

25 warning, it could be a suspension without pay, or it

1   could be termination, based on the action.

2   Q.   Are there some things that warrant termination

3   the first time it happens?

4   A.   There certainly are.  There are some egregious

5   acts that we do not tolerate.

6   Q.   Can you give me an example of something you

7   would terminate for immediately?

8   A.   If we -- if we are aware that profanity is used

9   on the telephone, they are immediately terminated.

10  Q.   Okay.  Racial epithets?

11  A.   Racial epithets included; goes without saying.

12  Q.   Okay.  And if an employee is sanctioned or

13  terminated (sic), could it affect their bottom line?

14  A.   If they are what, ma'am?

15  Q.   If they are sanctioned or reprimanded, could it

16  affect their bonuses?

17  A.   Yes, certainly.  Yeah, they could be lowered to

18  a different degree of collections, which could not

19  result in, you know, commissions and so forth.  They

20  could be penalized.

21  Q.   Okay.  Let's talk a little bit about this

22  dialer that we have been discussing.  Does your

23  dialer store or randomly generate telephone calls?

24  A.   We build pools of numbers.  I think what --

25  what people get confused about is the difference

1   between our dialer and a dialer that, say, for

2   telemarketing, randomly dials thousands and

3   thousands of numbers not knowing where it's calling.

4   Q.    Okay.  And what does your phone system do?

5   A.    Our filing system is -- we build pools of

6   numbers of our customers into that, and that dials

7   those specific numbers.  It doesn't store those

8   numbers, and we have to we rebuild those numbers.

9   Q.    Every day?

10  A.    Every day.  It's not -- it's not a random

11  selection.

12  Q.    If you have a call that goes through the

13  dialer, is it recorded in your system?

14  A.    If it goes through the dialer, it is recorded.

15  Q.    You answered my question but it was a bad

16  question.  Is there actual electronic recording in

17  the system?

18  A.    Yes.

19  Q.    In this case, were there any electronic

20  recordings?

21  A.    No, there were not.

22  Q.    If a call is sent through the dialer, is it

23  automatically notated in those account notes?

24  A.    Yes, it would be.

25  Q.    Is that something a collector can change?

1   A.    Collectors cannot change notes; notes are

2   permanent.

3   Q.    Once a note is entered by a collector and they

4   finished but they think there's a problem, can they

5   go back and change it?

6   A.    No, they can't change it.  What they have to do

7   is make another note correcting the previous note.

8   Q.    I want to talk to you for a minute about Texas

9   Guaranteed Student Loans.  We talked about the IRS

10  stuff.  Can it affect --

11          MS. MALONE:  I'm sorry, Judge.  I realized

12  I have ink all over me.

13  Q.    (By Ms. Malone)  Can Texas Guaranteed Student

14  Loan, under their program that they give you, are

15  you taught to tell consumers about the effect

16  default would have on their graduations?

17  A.    Yes.

18  Q.    Are you taught to tell them about the effect it

19  might have on their licensure?

20  A.    Yes, we are.

21  Q.    What is a rehab program in the Texas Guaranteed

22  Student Loan system?

23  A.    What is it?  It's a program that allows them to

24  rehabilitate their loan, bring it current, get it

25  removed from their credit bureau rating, and then

```
1    basically give them a fresh start.

2    Q.   In the account notes, you told us earlier there

3    was a POI of $100.  What would be the point of doing

4    that?

5    A.   Just it would give the individual -- just to

6    show their interest in paying the debt.

7              MS. MALONE:  I will pass the witness.

8              THE COURT:  Redirect?

9              MR. RADBIL:  Yes, Your Honor.

10                   REDIRECT EXAMINATION

11   Q.   (By Mr. Radbil)  Mr. Wyatt, you have been up

12   there a while, and I will try to keep this brief.

13        That Retail Training Manual that was just

14   entered --

15   A.   Yes, sir.

16   Q.   -- do you remember testifying about that at

17   your deposition?

18   A.   I remember some of it, yes, sir.

19   Q.   Okay.  Do you remember that I asked you in this

20   case, because we're dealing with the student loan,

21   that the student loan division --

22             THE COURT:  Excuse me one moment.

23             MS. MALONE:  Your Honor, may I move that?

24             THE COURT:  Yes, please do.

25             MS. MALONE:  I know it's mine.  Also I
```

1    would object because I think it's improper

2    impeachment.  There's been no testimony.  He just

3    started in about impeachment.

4              THE COURT:  Okay.  Let me have you ask the

5    question again, the last question again.

6              MR. RADBIL:  I was asking the witness

7    whether he remembered testifying that because this

8    was a student loan the procedures would be different

9    than in the retail division.

10             THE COURT:  Overrule the objection.  Do

11   you remember?

12   A.   They would be different.  Everyone is given the

13   manual that you are referring to as a general

14   procedures manual.  And then, at the end of their

15   training program, or at the end of that session,

16   they are designated as to which department they go

17   into.  And then they could be given other

18   information, depending on what kind of business they

19   had be working.

20   Q.   And do you recall that I asked you whether

21   there was anything expressly mentioning or

22   referencing educational or student loan collection

23   in that generic manual?

24   A.   I vaguely remember the question, yes, sir.

25   Q.   Do you remember your answer?

1    A.    No, I don't remember my answer.

2    Q.    Your answer --

3             MR. RADBIL:  May I read the witness's

4    answer?

5             THE COURT:  Why don't you say, do your

6    agree your answer was thus and such?

7    Q.    (By Mr. Radbil)  Do you agree that your answer

8    was, there was only one page, RAD179, that

9    references student loans intermediate training?

10   A.    That was in the manual, right.

11   Q.    And I asked -- do you recall that I asked,

12   where are the documents that you use for training on

13   educational or student loan collection?

14   A.    Um-hum.

15   Q.    And do you remember your response to that

16   question?

17   A.    No, I don't.

18            MS. MALONE:  Your Honor, could I ask as a

19   courtesy for a page number or reference?

20            THE COURT:  Yes.  There is no reason under

21   the present federal rules to have to show the

22   witness what you are referring to in the deposition

23   before you ask the impeachment question.

24            Nonetheless -- that's a very appropriate

25   point.  But before you refer to a section, give us a

 1   page and line so that Ms. Malone can keep up with

 2   you.  Okay?

 3              MR. RADBIL:  Certainly.  This is

 4   Plaintiff's Exhibit 2, deposition page 25, line 18.

 5              THE COURT:  Hang on a second.  Let's make

 6   sure Ms. Malone has that.

 7              MS. MALONE:  Your Honor, Plaintiff's

 8   Exhibit 2 is specifically not admitted.

 9              THE COURT:  I know.  But the deposition is

10   fair game for asking questions, just to make sure

11   you have it with the line and page.

12              MS. MALONE:  Could you repeat it?  I

13   apologize.  I heard Exhibit 2 and got distracted.

14              MR. RADBIL:  It's Exhibit 2, page 25, line

15   18 is where we are on.

16              MS. MALONE:  Thank you.

17   Q.   (By Mr. Radbil)  Your answer, Mr. Wyatt, was:

18   This looks like a generic set of paperwork that's

19   given the new hires when it's not been determined

20   whether they are -- what department they are going

21   in to.

22   A.   Okay.

23   Q.   And I asked:  Okay.  What are the documents

24   that are specific to the educational or student loan

25   collection department?

```
 1          Do you remember your response?
 2    A.    No, I do not remember.
 3    Q.    Your response was:  I'm not the trainer.  I'm
 4    not sure what those documents would look like.
 5    A.    Okay.
 6    Q.    Do you recall that I asked whether you were
 7    prepared to testify about the guides, handbooks,
 8    policies, and manuals and procedures utilized by RAB
 9    in the performance --
10          THE COURT:  Line and page.  Line and page.
11          MR. RADBIL:  26.
12          THE COURT:  Line?
13          MR. RADBIL:  Line 1 through 4.
14          MS. MALONE:  Your Honor, I need to make an
15    objection, but I don't know how to do it without
16    being too windy.  This was covered in the second
17    deposition, so -- and he was a corporate
18    representative.
19          THE COURT:  Okay.  I overrule that
20    particular objection, but I will say that this has
21    got to be rebuttal examination.  Moreover, and more
22    importantly, I will not let you just go through and
23    get this deposition in by question and answer.
24    There has got to be some impeachment value, and I am
25    beginning to wonder what that is at this point.  I
```

1    haven't seen anything that necessarily contradicts

2    what he said on Ms. Malone's examination.

3              MR. RADBIL:  Okay.

4              THE COURT:  Okay?

5              MR. RADBIL:  My point was, I think --

6              THE COURT:  Just ask another question.

7              MR. RADBIL:  Yes, Your Honor.

8    Q.   (By Mr. Radbil)  Is it true that, under the

9    contract between Texas Guaranteed and Regional

10   Adjustment Bureau, complaints made or lodged by

11   consumers are required to be reported to Texas

12   Guaranteed?

13             THE COURT:  Before you answer that --

14             MS. MALONE:  Object regarding testimony

15   for exhibits that have not been offered into

16   evidence, and I don't think it's relevant, Your

17   Honor.

18             THE COURT:  Overruled.  I will allow the

19   question.

20             THE WITNESS:  Could you repeat it for me,

21   please, sir?

22             MR. RADBIL:  Sure.

23   Q.   (By Mr. Radbil)  Is it true that, if consumers

24   lodged complaints about the way that RAB collects

25   debts, that RAB is obligated under its contract with

1    Texas Guaranteed to report those disputes or

2    complaints back to Texas Guaranteed?

3    A.    That is correct.

4    Q.    And is there a consequence for complaints?

5    A.    I'm not sure what the consequence is or if

6    there is one; I'm not sure.

7    Q.    Do you recall whether Texas Guaranteed has the

8    right to recall those specific accounts?

9    A.    I would -- Texas Guaranteed has a right to

10   recall any account from us for any reason.

11   Q.    But specifically, if they receive complaints,

12   that would be a ground for recalling?

13   A.    I don't recall, sir.

14   Q.    Okay.  Do you recall where there was a

15   provision in the contract between Texas Guaranteed

16   and Regional Adjustment Bureau that requires that

17   Regional Adjustment Bureau maintain complete and

18   accurate records of each loan assigned to it and its

19   collection activity, particularly correspondence and

20   telephone contacts with the debtors or other

21   parties, as well as those records set forth in 34

22   CFR Section 682.414(a)(1) for no less than five

23   years?

24           THE COURT:  That's a big question.  Why

25   don't you stop there.  I'm not sure where this is

1   going and how this is at issue in this case.

2          Are you aware of this provision that he is

3   referring to, Mr. Wyatt?

4          THE WITNESS:  Yes, Your Honor.

5          THE COURT:  Let's ask another question,

6   please.

7   Q.   (By Mr. Radbil)  Are you familiar that the

8   contract provides that Regional Adjustment Bureau

9   must close and return to Texas Guaranteed

10  immediately any account upon which TG or the

11  contractor has received what TG determines in its

12  sole discretion to be a valid written or verbal

13  complaint from the debtor regarding Regional

14  Adjustment Bureau's collection practices or

15  activities?

16  A.   I believe that to be correct, yes.

17  Q.   And the Mini Miranda we talked about before

18  that Ms. Malone questioned you on --

19  A.   Yes, sir.

20  Q.   -- where is that Mini Miranda supposed to be

21  stated?

22  A.   At the beginning of the conversation.

23  Q.   Is that supposed to be documented in the --

24  A.   Yes, sir.

25  Q.   -- account notes?

1    A.    Yes, sir.

2    Q.    And is it supposed to be documented before any

3    other information in the borrower's account history?

4    A.    That is correct.

5    Q.    Okay.  Are you familiar with the procedures for

6    handling borrower complaints?

7    A.    Yes, sir.

8    Q.    Okay.  What are those procedures, sir?

9    A.    We are supposed to notify Texas Guaranteed

10   within one day of the complaint.  If it's a written

11   complaint, we're supposed to send a copy of it to

12   Texas Guaranteed.  I believe that's the procedure.

13              THE COURT:  Mr. Radbil, I think this is

14   outside the scope of the examination.  We are

15   getting into new areas.  So what I will ask you to

16   do is wrap up your questions in the next five

17   minutes.  Mr. Wyatt is going to be here if there is

18   some need to call him.  Right now I haven't heard

19   anything that is part of what's been raised or that

20   I think is directly relevant to the issues in the

21   case.  So go ahead.  And again, I said I will give

22   you five minutes to wrap up this part of the

23   examination.

24              MR. RADBIL:  Five minutes?

25              THE COURT:  Yes.

```
 1              MR. RADBIL:  That's fine.
 2   Q.   (By Mr. Radbil)  I think we talked a bit about
 3   the borrower's cease and desist procedures.
 4   A.   Yes, sir.
 5   Q.   On the same day a cease and desist is received,
 6   is that supposed to be also communicated to Texas
 7   Guaranteed?
 8   A.   Yes.
 9   Q.   And a hold is supposed to be placed on the
10   account?
11   A.   That's my understanding, yes.
12   Q.   That means that no money can be collected?
13   A.   I don't recall.
14   Q.   What does a hold mean on the account?
15   A.   That they wish you not to continue collection
16   efforts at that time.
17   Q.   So if a complaint is received, that would stop
18   you effectively from collecting money?
19   A.   Yeah, that's my understanding.
20   Q.   Do you recall Regional Adjustment Bureau
21   sending a letter to the Federal Communications
22   Commission sometime ago in response to a request for
23   public comment on whether the law should be changed
24   to include debt collection calls within the scope of
25   the TCPA, which is --
```

1    A.    I'm not aware of that letter.

2    Q.    You're not?   Okay.

3              MR. RADBIL:   No further questions at this

4    time.

5              THE COURT:   Mr. Wyatt, you may step down.

6              THE WITNESS:   Thank you.

7              THE COURT:   Call your next witness,

8    please.

9              MR. RADBIL:   I would call Robert White in

10   his capacity as corporate representative for

11   Regional Adjustment Bureau.

12             THE COURT:   He's just been on the witness

13   stand.

14             MR. RADBIL:   She objected that he was

15   testifying in his individual capacity in response to

16   some of the questions.

17             THE COURT:   I'm not going to permit that

18   at this point.   You've had him on direct for a long

19   period of time.   Call your other witness, please,

20   your next witness other than him.

21             MR. RADBIL:   I call Timothy White.

22             THE COURT:   All right.   Mr. White, if you

23   will come up here, please.

24             Raise your right hand.

25

```
 1                        TIMOTHY WHITE,
 2    having been first duly sworn, testified as follows:
 3               THE WITNESS:  I do.
 4               THE COURT:  Take a seat.  And it looks
 5    like you don't have any cups over here, but there
 6    are cups for some water if you want some.
 7               THE WITNESS:  Thank you.
 8                     DIRECT EXAMINATION
 9    Q.   (By Mr. Radbil)  Would you please state your
10    full name for the jury?
11    A.   Timothy Gilbert White.
12    Q.   Where do you currently live?
13    A.   Dallas, Texas.
14               THE COURT:  Can you pull that microphone a
15    little closer to you?
16               THE WITNESS:  Sure.
17               THE COURT:  Thank you.
18    Q.   (By Mr. Radbil)  And what do you do for a
19    living?
20    A.   I'm a psychologist.
21    Q.   Are you currently employed?
22    A.   Yes.
23    Q.   Where are you currently employed?
24    A.   With the State of Texas.
25    Q.   And what do you do for the State of Texas?
```

```
 1   A.    I work for The Division for Blind Services as a

 2   psychologist.  I do vocational and psychological

 3   evaluations for blind persons.

 4   Q.    What does that mean?

 5   A.    I help blind people find work.

 6   Q.    Do you have any other jobs, or is that your

 7   only employment currently?

 8   A.    I have another job.

 9   Q.    What is your other job?

10   A.    I -- I also work for Simple Surrogacy.

11   Q.    What is that?  Can you describe that to the

12   jury, please?

13   A.    It's a surrogacy agency that matches potential

14   surrogate mothers with intended parents.

15   Q.    And for Simple Surrogacy, you practice

16   psychology, or how is --

17   A.    I practice with my LPC license.  I do

18   psychosocial interviews and assessments.

19   Q.    Of children or of adults?

20   A.    Adults.

21   Q.    Adults?

22   A.    Only.

23   Q.    Are you required to be licensed to practice

24   psychology in the State of Texas?

25   A.    Yes.
```

171

1    Q.    Do you hold a license currently of any kind?

2    Do you practice psychology in the State of Texas?

3    A.    My practice in psychology is done under my

4    State position, which is -- is titled psychologist.

5    If you're a government psychologist, a license isn't

6    required -- or rather, a master's license will

7    suffice.

8    Q.    Can you describe your educational history for

9    the ladies and gentlemen of the jury, please,

10   briefly?

11   A.    I went to high school at Hargrave High School

12   in Huffman, Texas.  I graduated with a Bachelor's in

13   Psychology from the University of Texas at Austin.

14        I graduated with my Master's in Counseling

15   Psychology from Ball State University in Muncie,

16   Indiana.  I also graduated in 2011 with another

17   master's degree, MS in Research Psychology from

18   Texas A&M University-Commerce.  And in that same

19   year, I graduated from same with a Ph.D in

20   Educational Psychology.

21   Q.    Have you ever been involved in a lawsuit other

22   than this particular lawsuit?

23   A.    No.

24   Q.    Have you ever been convicted of a crime?

25   A.    No.

```
 1   Q.    Have you ever filed a complaint against any

 2   credit card company?

 3   A.    No.

 4   Q.    Against any collections agency?

 5   A.    No.

 6   Q.    Or for that matter, any person or entity

 7   besides this case?

 8   A.    No.

 9   Q.    Can you explain briefly for the ladies and

10   gentlemen of the jury the debt that Regional

11   Adjustment Bureau attempted to collect from you?

12   A.    Two student loans.

13   Q.    You used those student loans to finance your

14   education I presume?

15   A.    Yes.

16   Q.    Your higher education, or was it undergraduate?

17   A.    Part of my undergraduate education and my first

18   graduate degree.

19   Q.    Okay.  And then the remainder you paid out of

20   pocket or --

21   A.    Yes.

22   Q.    When you were in undergraduate school, did you

23   hold any jobs?

24   A.    Yes, I've always had two or three jobs, even

25   while I was in school.
```

```
 1   Q.    What did you do in undergraduate school?

 2   A.    I worked for the State Hospital.

 3   Q.    Which State Hospital?

 4   A.    Austin State Hospital.

 5   Q.    Doing what?

 6   A.    I was a case manager at the Center for the Deaf

 7   and sign language interpreter.

 8   Q.    When you were getting your master's degrees,

 9   did you also work?

10   A.    Yes.

11   Q.    What did you do during that period?

12   A.    For my first master's, the first year I was a

13   graduate assistant in a paid position, and the

14   second year I was in a paid internship.

15   Q.    Which paid internship?

16   A.    At the Dunn Mental Health Center in Winchester,

17   Indiana, as a therapist intern.

18         In my second master's, I worked -- well, I

19   worked at several places.  I worked for an insurance

20   company and also for a clinical trials site.

21   Q.    And then when you were getting your Ph.D, did

22   you also work?

23   A.    Yes.

24   Q.    Where did you work during that time?

25   A.    Well, I took a few years to earn my Ph.D.  And
```

1    I had also worked for an insurance company during

2    that time, also in research at the University of

3    Texas Medical Branch, and also teaching at the

4    University.

5    Q.    In Galveston?

6    A.    No, teaching at the university where I earned

7    my Ph.D, in Commerce, Texas.

8    Q.    The proceeds of the loans that you used for --

9    or the proceeds of the educational loans, did you

10   actually use those to pay for your education?

11   A.    Yes.

12   Q.    Did you use any of the proceeds for business

13   purposes, commercial purposes?

14   A.    No.

15   Q.    So to be clear, just to pay tuition and

16   personal living expenses?

17   A.    Yes.

18   Q.    Are you familiar with the terms of the student

19   loans that you took?

20   A.    Yes.

21   Q.    Do you know whether the terms required you to

22   make monthly payments?

23   A.    Yes, they do.

24   Q.    And did you believe that your loans would come

25   due and payment would be triggered prior to your

```
 1   completion of your Ph.D?
 2   A.   No.   That was not the information that I
 3   received.
 4   Q.   What was your understanding?
 5   A.   My understanding was that -- was that a
 6   combination of forbearance and in-school deferment
 7   would have allowed me to complete my degree before
 8   my loans came due.
 9   Q.   Did you actually default on your loans by
10   failing to make the monthly payments?
11   A.   Yes.
12            MR. RADBIL:  I would like to show the
13   witness, if I may, Plaintiff's Exhibit Number 15.
14            THE COURT:  All right.  That is
15   preadmitted.  Okay.
16   Q.   (By Mr. Radbil)  Do you recognize that
17   document?
18   A.   Yes.
19   Q.   What is it?
20   A.   It's a notice dated November 4th, 2011, from
21   Texas Guaranteed Student Loan Corporation.
22   Q.   Would you mind reading the first two paragraphs
23   into the record, please?
24   A.   "Texas Guaranteed Student Loan Corporation paid
25   the claim for your defaulted consolidated student
```

1   loan on February 2nd, 2010.  However, even though

2   your loan is in default, you do still have options

3   available to remove your loan from default and

4   repair your credit rating."

5        "TG has referred your account to Regional

6   Adjustment Bureau for further collection.  Please

7   contact Regional Adjustment Bureau at the following

8   address and telephone number to discuss your

9   account, your available options to remove your loan

10  from default, and to establish your satisfactory

11  repayment arrangements."

12  Q.   Did you reach out per the instructions in that

13  letter and try to take action?

14  A.   No, I did not.

15  Q.   When you received that letter, did you try to

16  contact Texas Guaranteed to arrange for a payment

17  plan?

18  A.   Yes.  This letter came months after I had

19  already talked with Regional Adjustment Bureau with

20  no success, so this notice came much later than

21  that.  I did try to talk with Texas Guaranteed

22  again.  They wouldn't take my calls or communicate

23  with me in any way.  They simply directed me to RAB.

24  Q.   When was the first time that you communicated

25  with Regional Adjustment Bureau?

```
 1   A.    I think that was -- well, it was February of
 2   2011, definitely, on or around the 15th.
 3   Q.    Do you remember the person's name that you
 4   talked to at Regional Adjustment Bureau?
 5   A.    I -- I talked actually to several people, I
 6   think three different people.  But the person I
 7   spoke with at length was Karen Nelson.
 8   Q.    And the first time you and Karen Nelson spoke,
 9   do you remember that conversation?
10   A.    Yes, I do.
11   Q.    Can you tell us about that conversation?
12             MS. MALONE:  Your Honor, I'm going to
13   object to hearsay.
14             THE COURT:  Your response?
15             MR. RADBIL:  The witness is unavailable,
16   Your Honor.
17             THE COURT:  Okay.  It's hearsay, and
18   that's not enough.  So maybe you could establish
19   that this was an employee at some level.  I just
20   need a little more information about who she is and
21   why it might possibly be admissible.
22             MR. RADBIL:  Okay.
23   Q.    (By Mr. Radbil)  Who is Karen Nelson?
24   A.    She identified herself as a collection agent
25   from RAB.
```

1    Q.    Okay.  And --

2              THE COURT:  Overrule the objection.  I

3    will allow the testimony.

4              MR. RADBIL:  Thank you, Your Honor.

5    Q.    (By Mr. Radbil)  Can you describe that

6    conversation?

7    A.    Yes.  I -- I spoke with her.  I believe I

8    called her on that occasion and asked her not to

9    call my work number any longer.  I did expressly

10   state that I would get in trouble at work if she

11   were to continue calling, and also that the number

12   didn't come directly to me so I wouldn't pick up if

13   she called.

14   Q.    At the time you were working at Simple

15   Surrogacy; is that correct?

16   A.    Yes.

17   Q.    And did Simple Surrogacy have a main telephone

18   line?

19   A.    Yes.

20   Q.    And they also gave you an extension that would

21   go to a voicemail service for you?

22   A.    Yes.

23   Q.    Were you allowed to use either the direct

24   number of Simple Surrogacy for personal matters or

25   the direct number with the extension to your

```
 1  voicemail for personal matters?
 2  A.   Absolutely not.
 3  Q.   Okay.  What is Simple Surrogacy's reputation
 4  amongst its peers, if there are similar
 5  organizations?
 6           MS. MALONE:  Objection, relevance.
 7           THE COURT:  Sustained.  Ask another
 8  question, please.
 9  Q.   (By Mr. Radbil)  After you requested -- well,
10  do you think that you provided plain notice to Karen
11  Nelson, made it clear not to call those numbers?
12  A.   Yes, I did.  I said that exactly.  And I asked
13  her not to call my cell phone either.
14  Q.   Did you provide any contact information that
15  she could reach you?
16  A.   I did.  I updated my address with her and gave
17  her my landline at my home and the hours to call me,
18  when she could reach me.
19  Q.   When Karen Nelson would call you, what was the
20  purpose of those calls?
21  A.   To collect a debt.
22  Q.   Do you recall how many times you actually spoke
23  with Karen Nelson?
24  A.   I recall three occasions, although one was very
25  brief.
```

SHAWNIE ARCHULETA, CSR/CRR
FEDERAL COURT REPORTER - 214.753.2747

1   Q.   Can you explain in a practical sense how the

2   forwarding system would work with the extension you

3   were given at Simple Surrogacy?

4   A.   I'm not an expert, but I do know that the calls

5   come in to Simple Surrogacy, and they are stored

6   there.  They are accessible by the staff at Simple

7   Surrogacy.  It's just a courtesy that they forward

8   them to your cell phone.

9   Q.   Through a central mailbox system, or is it

10  unique to you?  Is it private?

11  A.   No, it is not private.  And they informed me

12  that they do, in fact, listen to calls.  And this

13  was part of informing me that I should not use the

14  number for personal calls, because they do listen to

15  them.  If there's someone in distress or there is an

16  emergency, they need to be able to listen to the

17  messages.

18  Q.   So do you have reason to believe that your

19  employer or coworkers at Simple Surrogacy knew or

20  may have understood that Regional Adjustment Bureau

21  was calling you at your Simple Surrogacy numbers at

22  your place of employment to collect a debt?

23  A.   Yes.

24  Q.   Did you ever discuss that or bring that issue

25  to light with your supervisor?

1   A.    No.

2   Q.    Why?

3   A.    I -- I didn't want them to know that -- the

4   debt collector was calling that number, that it was

5   a personal reason that somebody was calling.  I

6   didn't bring it up.  And I valued my job, as it was

7   my only source of income at the time.

8   Q.    During the time that Regional Adjustment Bureau

9   was placing calls to the Simple Surrogacy numbers,

10  after you told them to stop, were you still making

11  payments on the loans?

12  A.    Yes.  I failed to make arrangements -- or

13  rather, didn't work out with Regional Adjustment

14  Bureau.  I -- and I -- I -- I believed in the first

15  phone call that we had set up an arrangement, and in

16  the second I realized we didn't.  So I took it upon

17  myself to pay Texas Guaranteed directly on their

18  website, which I could.  And I paid them

19  consistently every month what I could afford, which

20  was $300 a month, to be consistent.

21  Q.    What happened when you tried to work out

22  anything with Regional Adjustment Bureau in terms of

23  payment plans?

24  A.    Ms. Nelson asked me to send $100, which I can

25  understand good faith.  And I told her, you have a

1    hard job.  I understand if you need $100 to show
2    good faith, that's fine, but I'm interested in
3    setting up a payment plan for every month that I can
4    pay to bring my loan current to stay out of the
5    default status.  She was not willing to do that.
6    Q.    What happens if you stay in default status,
7    what was the risk?
8    A.    I would lose my license, which means I would
9    lose my job.
10   Q.    And how many years did you go to school to gain
11   that license?
12   A.    Over 20 years.
13   Q.    If Simple Surrogacy had terminated you for
14   using their personal -- or using their business
15   lines for personal matters -- well, let me go back.
16         Is that something that you legitimately thought
17   you could be terminated for?
18   A.    Yes.  I was terrified that I was going to be
19   terminated.  I was waiting for that call any day to
20   tell me I was fired.  And if I was fired, then I
21   would have lost my only source of income.  If I lost
22   my income, RAB certainly would not be paid, and they
23   would keep me in default, preventing me from keeping
24   my license or getting another job.  And it was a
25   pretty scary economy, so I was -- I was constantly

1   worried about that.  And that would have meant that

2   the 20 years that I spent trying to become a

3   psychologist would have been gone.  It would have

4   been a missed opportunity.

5   Q.   I think what is important in this case is the

6   impact of those calls and the failure to stop

7   calling your place of employment after you requested

8   that, I think that's probably what the ladies and

9   gentlemen of the jury and everybody is interested

10  in.  So can you just describe in your own words how

11  it affected you or impacted you?

12  A.   Well, I was in a constant state of anxiety and

13  often panic.  I didn't know when these people were

14  going to do something new.  They continued to call

15  my employer, and I told them it was a problem.  They

16  put my job in jeopardy, but they continued to call.

17  They threatened to take my degree away before it was

18  even earned; to do everything in their power -- and

19  not by education.  She stated the purpose was to

20  take away these things, to take away my license, my

21  degree, and even my Social Security fund if

22  something like that would have happened.  This is

23  the only income that I had at the time.

24       I was trying to get through school with only,

25  you know, less than a year to go, and so I had that

1    hanging over my head constantly.  I did not know

2    what these folks would do next.  If I had been -- if

3    there had been any way to make a payment plan with

4    them, I would have.

5          I finally took it upon myself to do that, but

6    they refused to do that.  And not only would I have

7    lost my license, I had a family to support.  I still

8    do.  I have an autoimmune inflammatory disease, and

9    stress sets that off.

10         At the time, it was so awful that my scalp was

11   actually seeping blood.  I -- one of my eyes was so

12   swollen, and I have to use medication when that

13   happens.  I had no vision in one eye, so I was

14   typing my reports with one eye and working three

15   jobs later that year while I went to school, all

16   while trying to collect research for dissertation

17   and defend that and finish my degree.  So it was --

18   my life was constant anxiety and often turned into

19   panic.

20              THE COURT:  Let's have a question, please.

21   Q.   (By Mr. Radbil)  During that period, was the

22   anxiety and the feelings you felt, was that

23   something every day, or was it something that now

24   and again would trouble you?

25   A.   It was every day, all day long, and interfered

1   with my work and -- and school.
2   Q.   Were you ever expecting to have an encounter
3   with anybody at Simple Surrogacy regarding the
4   calls?
5   A.   Yes.  I expected the director, Stephanie, to
6   call me any day, every day.  You know, especially if
7   I saw a call from her, that would set off panic, I
8   thought for sure that that would be the call and she
9   would tell me that I was fired.
10  Q.   Do you think you would have been able to find
11  another job in order to make ends meet if you lost
12  your job at Simple Surrogacy at that point?
13          THE COURT:  I think that's a little
14  speculative.
15  A.   No.
16          THE COURT:  Could you ask another
17  question, perhaps maybe more specific, something
18  within his personal knowledge as opposed to a guess?
19  Q.   (By Mr. Radbil)  Were you concerned that your
20  life's work was in jeopardy?
21  A.   Yes.  If I did find a job, it wouldn't have
22  been for long because my license -- I was about to
23  lose my license.
24  Q.   How many years did you go to school for your
25  license total?

```
 1              THE COURT:  I think he said 20 years.
 2              MR. RADBIL:  20.
 3              THE WITNESS:  12 years altogether,
 4   collectively; it was over 20 years, but 12 years of
 5   education.
 6   Q.   (By Mr. Radbil)  Are you easily upset in terms
 7   of character?  Do things bother you?  Do you get
 8   emotional at the drop of a hat?  What type of person
 9   are you with respect to handling stressful
10   situations?
11   A.   No, I do testing and assessment.  I have worked
12   in prison and the State Hospital.  I don't get upset
13   easily.  I have worked with CPS clients.  No, not
14   much rattles me -- well, until now.
15   Q.   In terms of rattling, how would you compare the
16   impact that -- the thought of losing basically your
17   livelihood had on -- had on you compared to if
18   there's another traumatic event in your life that
19   you can compare it to.  I don't know.  I'm just
20   trying to give the best sense I can to the ladies
21   and gentlemen of the jury.
22              THE COURT:  I think you made the question
23   clear.  How would you answer that?
24              THE WITNESS:  Could you restate the
25   question?
```

```
 1                THE COURT:  I will read it back for you.
 2                (Record read back by the Judge.)
 3     A.    I don't think I can.  I've -- I've always had
 4     pretty good coping skills, so I didn't have this
 5     kind of anxiety before.  It never happened.  I have
 6     nothing to compare it to.  I have always been able
 7     to stay in control.
 8     Q.    (By Mr. Radbil)  And have you sought any
 9     counseling or treatment as a result?
10                THE COURT:  Excuse me.  Ms. Malone?
11                MS. MALONE:  Objection, Rule 37.  The
12     specific question on this was not supplemented to
13     change that answer, and the answer was none at the
14     time.
15                THE COURT:  Approach the bench, please.
16         (The following discussion held at the bench.)
17                THE COURT:  Ms. Malone, what's your
18     objection?
19                MS. MALONE:  Sure.  I asked him a specific
20     question regarding treatment for this matter and if
21     he was going through any treatment or if there was
22     any further, in Interrogatory 33, asking for current
23     or future psychiatric care, and his answer was, No.
24     No.
25                MR. RADBIL:  I don't know the answer.
```

1          THE COURT:  I'm assuming you must be

2    looking for something favorable or you wouldn't have

3    asked it.

4          MR. RADBIL:  Sure.

5          THE COURT:  Do you think he's going to say

6    none?

7          MR. RADBIL:  No.

8          THE COURT:  That's the good faith answer,

9    so I would sustain the objection.

10          MS. MALONE:  Thank you.

11          (Discussion at bench concluded.)

12          THE COURT:  Sustain the objection.  Go

13    ahead, Mr. Radbil.

14   Q.   (By Mr. Radbil)  Is there anything you can

15   think of in retrospect that you could have done to

16   have prevented or worked out an agreement to stop

17   the calls to Simple Surrogacy?

18   A.   No.  I requested more than once that they do

19   that.

20   Q.   That they do what?

21   A.   That they stop calling Simple Surrogacy.  I

22   can't imagine anything that I could have done.  I

23   couldn't have stopped them from taking my license.

24   Q.   How much money were you sending to Texas

25   Guaranteed directly?

189

```
1    A.    $300 a month.
2    Q.    And Regional Adjustment Bureau you said asked
3    you for a 100-dollar good faith payment?
4    A.    Yes, sir.
5    Q.    And you gave them an alternative number to call
6    you?
7    A.    An alternative number.
8    Q.    Did you give them information that they could
9    actually contact you with?
10   A.    Yes.
11   Q.    And what is the status of your loans today?
12   A.    I was able to reconsolidate with only one
13   option.  And to do that I had to accept the $40,000
14   in fees that were assessed during the time that
15   Regional Adjustment Bureau managed the loan and
16   wouldn't work with me on a repayment schedule.  So I
17   had to accept that, and now that's part of my
18   student loan balance, $40,000 in excess of what it
19   already was.  But I do make payments every month of
20   $409.  They are about to go up to $1,100 a month
21   next month.  And I'm out of default status.  And I
22   have been paying them for a year.
23              THE COURT:  Mr. Radbil.
24   Q.    (By Mr. Radbil)  Do you default on many loans?
25   A.    No.
```

1   Q.   Have you defaulted on any loans other than

2   these two specific student loans?

3   A.   Yes.

4   Q.   Can you describe which loans you defaulted on

5   besides these?

6   A.   There were two loans.  And in order to pay

7   Texas Guaranteed, I had -- I had to make a choice of

8   either keeping my license and keeping my job or

9   making all the payments, which I wasn't able to do

10  at the time.  So there were two loans.

11  Q.   And what are the status of those two loans

12  currently?

13  A.   One has since been paid, and the other is not.

14  Q.   Okay.  Do you plan to pay back all of your

15  loans?

16  A.   Yes.

17  Q.   Are you looking for a free ride or free money,

18  or did you intend to take money for education

19  without ever paying it back?

20  A.   No.

21  Q.   Had you been able to work out a reasonable

22  payment agreement with Regional Adjustment Bureau,

23  would you have willingly done so?

24  A.   Yes.  And I wouldn't have had any problems with

25  other loans.

```
 1              MR. RADBIL:  I don't think I have any
 2    further questions for the witness at this time.
 3              THE COURT:  All right.  Thank you very
 4    much.
 5              Cross-examination, Ms. Malone.
 6              MS. MALONE:  Yes, ma'am.
 7                    CROSS-EXAMINATION
 8    Q.   (By Ms. Malone)  Good afternoon, Dr. White.
 9    A.   Good afternoon.
10    Q.   Let's start off with one point that I would
11    like to clear up with you.
12         You don't actually have a license as a licensed
13    psychologist, correct?
14    A.   No.  I'm in the process of earning licensure as
15    a psychologist.
16    Q.   So you actually have a licensed professional
17    counselor degree, correct?
18    A.   Yes.
19    Q.   And that's a different sort of license that's
20    recognized in the State of Texas.
21    A.   Right.
22    Q.   You have to have at least a master's degree to
23    get that particular license, but there are Ph.D
24    LPC's, as we call them, right?
25    A.   Yes.
```

1   Q.   So you have been that since December of 2011,

2   correct?  You're a Ph.D who holds an LPC, right?

3   A.   Correct, yes.

4   Q.   Let me back up with you for just a second.  On

5   that letter that you talked with Mr. Radbil from

6   Texas Guaranteed, which I believe is in front of

7   you, sir -- do you still have it?

8   A.   Yes.

9   Q.   Does it indicate you to that in fact they are

10  looking for you to pay a loan that you had already

11  defaulted on, correct?

12  A.   That's what's indicated in the loan.

13  Q.   That's what happened, isn't it, Dr. White?  You

14  had a student loan with another entity and defaulted

15  on it, right?  You told me this is your deposition;

16  is that correct?

17  A.   Yes.

18  Q.   And that loan was then, as it was guaranteed by

19  the State of Texas, picked up by the State of Texas,

20  and they are still trying to collect from you in

21  that letter; is that correct?

22  A.   Yes.

23  Q.   And the amount that they were looking for was

24  $148,000; is that correct?

25  A.   I don't recall.

```
 1   Q.    Do you recall receiving a letter from Regional
 2   Adjustment Bureau about the details of the loan --
 3   A.    No.
 4   Q.    -- of the debt.  Would you turn with me to Tab
 5   Number 2, sir, in that black binder right in front
 6   of you?
 7               THE COURT:  Let's make sure we are clear
 8   on what exhibit we're referring to.
 9   Q.    (By Ms. Malone)  Do you recognize this letter,
10   Dr. White?
11   A.    Yes.
12   Q.    Okay.  And is this a letter that you received
13   from Regional Adjustment Bureau?
14   A.    Yes.
15               MS. MALONE:  At this time I would offer
16   Defendant's Exhibit 2, Your Honor.
17               THE COURT:  Mr. Radbil?
18               MR. RADBIL:  No objection.  Pardon me,
19   Your Honor.  No objection.
20               THE COURT:  All right.  Which
21   Exhibit Number, Defense 2?
22               MS. MALONE:  Yes, ma'am.
23               THE COURT:  Defense 2 is admitted.
24               MS. MALONE:  Thank you, Your Honor.
25    (Defendant's Exhibit No. 2 admitted into evidence.)
```

1    Q.   (By Ms. Malone)  Dr. White, on this letter it

2    indicates that it was the Texas Guaranteed Student

3    Loan Corporation.  Can you tell us what the balance

4    of the first loan was?

5    A.   $72,783.03.

6    Q.   There is a second loan also indicated.  Can you

7    tell us what the balance of that loan was?

8    A.   $76,017.77.

9    Q.   That's not my strong suit, but that's about

10   148,000 and change, correct?

11   A.   Yes.

12   Q.   According to this loan, to the letter that we

13   were look at before, Texas Guaranteed paid for this

14   in February of 2010, correct?

15   A.   I don't recall that.

16   Q.   The letter in front of you, sir, indicates that

17   Texas Guaranteed paid your student loan in February

18   of 2010, is that correct, sir?

19   A.   That's correct, on this letter that I received

20   in 2011.

21   Q.   And you indicated to me that you did try to

22   reconsolidate these loans back in 2008; isn't that

23   correct?

24   A.   Yes.

25   Q.   And you were denied your request at that time;

```
 1   isn't that correct?
 2   A.   Yes.
 3   Q.   And you never again did that until I guess
 4   apparently recently; is that correct?
 5   A.   That's correct.
 6   Q.   Okay.  Let's talk a little bit about these
 7   phone calls.  When you had these telephone calls
 8   with Karen Nelson, you called her back on your cell
 9   phone, is that correct, sir?
10   A.   Yes.
11   Q.   And your cell records indicate two calls from
12   you to the RAB phone number; isn't that correct?
13   A.   Yes.
14   Q.   So there were two conversations you had with
15   Ms. Nelson, correct?
16   A.   Yes, I called her.
17   Q.   Right.  And those all occurred in February of
18   2011, correct?
19   A.   Yes.
20   Q.   You also indicated in your account notes -- or
21   in the account notes there's an indication that you
22   authorized RAB to speak with your spouse, Terry,
23   correct?
24   A.   That's not correct.
25   Q.   That's in the notes.  Whether you agree with it
```

```
 1   or not, you would agree that's what Mr. Wyatt read.
 2   A.    I don't agree with that.
 3   Q.    Okay.  Well, let me -- I think you are
 4   misunderstanding my question, so let me rephrase it.
 5         I am not saying you agree the content is
 6   correct, I'm saying that that is in the account
 7   notes that Mr. Wyatt read to us earlier.  Do you
 8   recall that testimony, sir?
 9   A.    I recall the testimony.
10   Q.    Okay.  And you do, in fact, have a spouse named
11   Terry, correct?
12   A.    I have a partner named Terry.
13   Q.    I'm sorry.  You have -- you are --
14   A.    We're not married.
15   Q.    You're not married.  You have a male partner --
16              THE COURT:  Slow down a little bit.
17              MS. MALONE:  I'm sorry, Judge.  It's late
18   in the day.
19   Q.    (By Ms. Malone)  You have a male partner that
20   you refer to as Terry, correct, because you are not
21   allowed to be legally married in Texas, right?
22   A.    Right.
23   Q.    And the two of you have adopted a child,
24   correct?
25   A.    No.
```

1  Q.    You didn't adopt a child?

2  A.    No.

3  Q.    Did you tell me in your deposition that you had

4  adopted a child?

5  A.    No, I didn't.  I told you that we completed a

6  surrogacy.

7  Q.    I'm sorry?

8  A.    We completed a surrogacy; there was no

9  adoption.

10  Q.    I guess I don't understand surrogacy.

11         THE COURT:  I'm not sure where there this

12  is going, but let's move on to the next topic,

13  please.

14  Q.    (By Ms. Malone)  Mr. White, were you in the

15  process of, during the time these calls were going

16  on, did you have a small child with you that you

17  were responsible for?

18  A.    Yes.

19  Q.    And during the period of time that these calls

20  occurred in roughly the one-month period of time

21  from the middle of February, middle of March 2011,

22  were you able to spend time with your child unless

23  you had to work?

24  A.    Yes, some time.

25  Q.    Okay.  And you also indicated to me that you

1    had not missed any time with your family as a result

2    of these calls; isn't that correct?

3    A.    If you mean as a result of being on the

4    telephone?

5    Q.    Yes, ma'am -- sir, I'm sorry, I apologize.

6    A.    During the conversation --

7    Q.    Yes, sir.

8    A.    -- that occurred on the phone, no.

9    Q.    You also indicated you were able to spend

10   Easter, St. Patrick's Day, Valentine's Day, those

11   holidays with your family during these times; is

12   that correct?

13   A.    I don't remember a whole lot of celebration,

14   no.

15   Q.    Do you remember testifying that you were able

16   to spend holidays with your family, to do things

17   with your family?

18   A.    Yes, I was able to do things with them.

19   Q.    Okay.  And you didn't miss any birthdays or

20   anniversary dates as a result of these calls, isn't

21   that correct, sir?

22   A.    By missed, I was home.  It might have only been

23   30 minutes or an hour during the day, but I was

24   present part of the day.

25   Q.    Okay.  You also were not docked any pay as a

```
 1   result of the calls; isn't that true?
 2   A.    That's true.
 3   Q.    You were not reprimanded --
 4   A.    No.
 5   Q.    -- is that true?
 6   A.    That's true.
 7   Q.    It had no effect on completing your coursework;
 8   isn't that true?
 9   A.    Barely; yes, I completed it.
10   Q.    And you also were able to do your teaching
11   assignments?
12   A.    Actually, no.  I had to drop a class that I was
13   teaching.
14   Q.    Do you recall, Mr. White, in your deposition
15   that I asked you:  Were you able to do your teaching
16   assignments during this period of time?
17         And at that time your answer was yes?
18   A.    Yes.  I was able to teach one class, not two.
19   Q.    Okay.  But at the time of your deposition, your
20   answer was simply yes; was that correct, sir?
21   A.    I answered the question as I understood it,
22   yes.
23   Q.    You also testified that the only real harm was
24   that it might have caused you some problem with
25   Simple Surrogacy; isn't that correct?
```

```
 1   A.    Yes.
 2   Q.    In fact, sir, no one at Simple Surrogacy ever
 3   talked to you about these phone calls; is that
 4   correct?
 5   A.    Thank God, no.
 6   Q.    No one said to you, Mr. White, we have an issue
 7   with you or we have a concern with you; is that
 8   correct?
 9   A.    That's correct.
10   Q.    And in fact, Simple Surrogacy wasn't actually
11   your employer, they were a contract employee
12   position you had; isn't that true?
13   A.    Yes, contract employment.  I've been on their
14   website for four years.
15   Q.    All right.  And isn't it true, sir, that, in
16   fact, in your answers to discovery in this case, you
17   identified only Texas A&M University-Commerce as
18   your employer?
19   A.    No.
20   Q.    In your interrogatory answers you identified
21   only Texas A&M University-Commerce, isn't that true,
22   sir?
23   A.    I think the question as I -- I was trying to
24   understand if you meant that contract employment was
25   employment.  I consider it employment since my
```

```
 1   livelihood depended on it.
 2   Q.    That's not my question, sir.  My question is:
 3   Isn't it true that during the course of discovery in
 4   this case, the only answer that you provided
 5   regarding your place of employment was Texas A&M
 6   University-Commerce.
 7   A.    If that -- if that is what I said, I was
 8   incorrect.
 9   Q.    Isn't it also true, sir, that you testified in
10   your -- testified that you were not aware of any
11   current economic damages at the time of your
12   deposition?
13   A.    No, and I --
14           THE COURT:  One moment.  I'm sorry,
15   Doctor.  Let me just -- let's go line and page just
16   like we had Mr. Radbil do.  So on that last
17   question, start over again, line and page, and then
18   ask the question.
19           MS. MALONE:  Yes, ma'am.
20   Q.    (By Ms. Malone)  Page 125, beginning at line
21   18.  Do you recall testifying in your deposition
22   that you had not been out of pocket any money as a
23   result of these events?
24   A.    Out of pocket?
25   Q.    Yes, sir.
```

```
1    A.    No.

2    Q.    That's not true?

3    A.    It's actually not true.  I found out that I did

4    lose $5,000 by not teaching that class.

5    Q.    Okay.  Are you denying that that was your

6    testimony at the time of the deposition?

7    A.    No, I am not.  That was my testimony.

8    Q.    Is it also true that you didn't have any reason

9    to believe that you were denied a raise or other

10   bonus as a result of these calls?

11   A.    Again, it was not because of calls, themselves.

12   It was their effect on my life.  I was not denied

13   anything because of the phone calls.

14   Q.    Okay.  And Dr. White -- page 126, Counsel, line

15   4 -- isn't it true that you have no reason -- that

16   you have no reason specifically to believe that

17   anyone -- I'm sorry, line 20, I apologize.  You

18   don't know for sure that anyone actually listened to

19   the calls; isn't that true?

20   A.    No.

21   Q.    That's true?

22   A.    Yeah, that's true, I don't know.

23         THE COURT:  When you're talking about

24   anyone, you're talking about people at Simple

25   Surrogacy?
```

```
 1              MS. MALONE:  Yes, ma'am.  Thank you.
 2              THE COURT:  Okay.
 3   Q.   (By Ms. Malone)  And you know that no one
 4   brought it to your attention at Simple Surrogacy,
 5   correct?
 6   A.    Correct.
 7   Q.    Now, when you had these conversations with
 8   Ms. Nelson where she left a voicemail to you, isn't
 9   it true that you understood after you had spoken
10   with her and she left you a voicemail that you
11   understood she was a debt collector from RAB?
12   A.    That's true.
13   Q.    And isn't it true that in the conversations you
14   had with any of the collectors from RAB, no one
15   called you any sort of derogatory names.
16   A.    No.
17   Q.    Is that true?
18   A.    Not to my recollection, no.
19   Q.    So it is true.  I think we have a double
20   negative going, Dr. White.  Is it a true statement
21   that no one called you derogatory names?
22   A.    That's a true statement.
23   Q.    Is it a true statement that no one cussed you
24   out?
25   A.    That's a true statement.
```

```
1    Q.    It is it a true statement that no one
2    physically threatened you?
3    A.    That's a true statement.
4    Q.    Is it a true statement that no one threatened
5    your home?
6    A.    That's a true statement.
7    Q.    Isn't it true that they told you that the IRS
8    could offset any funds that you had?
9    A.    Yes.
10   Q.    And you knew that to be true already?
11   A.    Yes.
12   Q.    Because that had happened, correct?
13   A.    Yes.
14   Q.    And isn't it also true that you knew that a
15   government agency could, in fact, revoke your
16   license or not renew your license if you were
17   defaulted on a student loan?
18   A.    No.
19   Q.    You didn't know that?
20   A.    No.
21   Q.    Dr. White, are you familiar with the Texas
22   State Board of Examiners for Counselors?
23   A.    Yes.
24   Q.    And are you required under their rules and
25   guidelines to be familiar with the ethical rules and
```

1    guidelines?

2    A.    I'm sorry, I didn't understand that -- that

3    that had been done with my license.  I understand it

4    can be done.  I'm sorry.  I misunderstood the

5    question.

6    Q.    So you understand that under the Texas State

7    Board for Examiners of Psychologists there is a

8    specific provision that says your license can be not

9    renewed if you fail to or if you default on

10   educational loans.  That's the State of Texas

11   requirement for your licensure, correct?

12   A.    Yes.

13   Q.    And is it also true, sir, that, in your

14   evaluations as a psychologist for, I guess folks

15   with -- blind folks now, right, at the state, you

16   are familiar with the Diagnostic and Statistical

17   Manual, correct?

18            MR. RADBIL:  Objection, Your Honor.

19            THE COURT:  Slow down.  The Diagnostic and

20   Statistical Manual, is that what you were saying?

21            MS. MALONE:  Yes.

22            THE COURT:  Mr. Radbil?

23            MR. RADBIL:  I think we addressed this in

24   the pretrial conference.

25            THE COURT:  I'm going to sustain the

```
 1   objection.  We can talk about that at the close of
 2   today.  Let's move on to the next topic.
 3               MS. MALONE:   Okay.
 4   Q.   (By Ms. Malone)  Are there any particular areas
 5   that you should be concerned about as causing stress
 6   in a person's life, like having financial
 7   difficulties?
 8   A.   In any person's life?
 9   Q.   Sure.
10   A.   Yes, that's a stressor.
11   Q.   Okay.  And is it a stressor in a person's life
12   to think they might lose their license?
13   A.   Certainly, yes.
14   Q.   And is it stress in a person's life to think
15   that there is a large debt, $148,000, that they
16   don't know how to pay back?
17   A.   If they don't have a plan to pay it back, that
18   would be a significant stressor.
19   Q.   Isn't it true, Dr. White, that the fact that
20   someone didn't say, I'm a debt collector, on the
21   phone wasn't really the concern here, it was the
22   problems with your license?
23   A.   I'm sorry, there were a lot of negatives.
24   Could you rephrase the question?
25   Q.   You know, I will try.
```

```
 1        Dr. White, would you agree with me that you
 2   were much more concerned about losing your license
 3   than whether or not someone used the phrase, "debt
 4   collector," in a message?
 5   A.    I was concerned about both.
 6   Q.    Your testimony is that someone not using the
 7   phrase "debt collector" in two messages caused you
 8   to have this stressful situation that you have
 9   described for us, is that correct, sir?
10   A.    That's not the sole cause, no.
11   Q.    In fact, it's not -- the real problem here is
12   you were going to lose your license if you didn't
13   work out something with Texas Guaranteed, isn't that
14   correct, sir?
15   A.    Yes, that was a stressor, but I was also afraid
16   I was going to lose the job I had.
17   Q.    Okay.  Let's talk about that.  You have
18   testified for us today that you told them expressly
19   not to call you back on your Simple Surrogacy number
20   because you were not allowed to have those numbers,
21   correct?
22   A.    Yes.
23   Q.    And you said that's what you were so concerned
24   about, correct?
25   A.    Yes.
```

```
 1              MS. MALONE:  Counsel, page 49, line 15.
 2  Q.   (By Ms. Malone)  Do you recall, sir, in your
 3  deposition I asked you the concern about the office
 4  number, and at the time do you recall you told me:
 5  It's their 800 number, and I have an extension to
 6  call -- actually they contacted them -- they
 7  contacted the number for me, and it rolls over to my
 8  cell phone --
 9              THE COURT:  Slow, slow, slow.  When you
10  read you talk faster.
11              MS. MALONE:  I speed up.
12              THE COURT:  Everybody does.  Go back a
13  couple of sentences.
14              MS. MALONE:  I will back it up, Judge.
15  Thank you.
16  Q.   (By Ms. Malone)  Do you recall that you said:
17  They contacted me at that number repeatedly, and it
18  rolls over to my cell phone, but I can't answer the
19  call, and I explained that.
20       That is the only definition or explanation you
21  gave to me in your deposition, isn't that correct,
22  sir?
23  A.   I don't think that's the only explanation.
24  Q.   That's the only one you gave to me when I took
25  your deposition, isn't that correct, Dr. White?
```

1   A.   I don't recall.

2   Q.   Okay.

3   A.   I could explain.

4   Q.   I'm just saying that's what you said in your

5   deposition, isn't that right, Dr. White?

6   A.   Yes.

7   Q.   All right.  Now, Doctor, are there things that

8   are sometimes good things in a person's life that

9   can act as stressors, like completion of a degree

10  plan?

11  A.   Yes.  I've completed four, though.  I think

12  I've mastered it.

13  Q.   Sure.  And you would agree with me that there

14  are things like moving to a new city that can be

15  maybe a good thing, but that can be a stressful

16  thing to a person?

17  A.   Yes.

18  Q.   Entering into a relationship with an individual

19  or raising a child while being a good thing can be a

20  stressful thing?

21  A.   We've been in a relationship for 24 years.

22  Q.   I'm just saying in general, sir.

23  A.   For many people it can.

24  Q.   Okay.  And in the situation following all of

25  these calls -- I'm sorry, let me back up.

```
 1        You have also had, during this period of time,
 2   going back from I think you told me 1998, a
 3   rheumatoid disease, correct?
 4   A.    Yes.
 5   Q.    In fairness, you are not suggesting my client
 6   caused you to have the rheumatoid illness; is that
 7   correct?
 8   A.    Caused me to have the illness?  No.
 9   Q.    All right.
10   A.    That's correct.
11   Q.    And that is -- that particular -- I'm going to
12   say it wrong, but I will try -- ankylosing
13   spondylitis?
14   A.    That's right.
15   Q.    That particular illness is one that can cause
16   you to have a hip replacement?
17   A.    I did have a hip replacement because of it.
18   Q.    It can cause you to have a fusion in your
19   spine?
20   A.    My spine is fused.
21   Q.    When I checked out the website, one of the
22   concerns is it can cause depression issues.
23             MR. RADBIL:  Objection.
24             THE COURT:  If you're going to object,
25   please stand.  Overruled.
```

1    A.    No.   I'm quite accustomed to having the pain

2    that comes with ankylosing spondylitis.   It's the

3    flare-ups, especially when unexpected, that disrupt

4    your life.

5    Q.   I appreciate your answer, Dr. White.   I'm just

6    saying, isn't that a concern, when you have this

7    long-term illness, that it can cause this overall

8    sense of depression in a person?   I'm not saying you

9    said you had it, I'm just saying that's a concern.

10   A.    It can be with any disease that's chronic.

11   Q.   Sure.   And in fact, one of the things that you

12   look for as a psychologist is another stressor

13   called legal complications, correct?

14   A.    Legal complications?

15   Q.   Sure, being involved in a lawsuit or testifying

16   in a lawsuit for something that's important to you,

17   those are issues of stress, correct?

18   A.    Yes.

19   Q.   And in fact, Doctor, are you aware in the DSM

20   that there is a discussion --

21            MR. RADBIL:   Your Honor --

22            THE COURT:   Sustained.   I'm not going to

23   get into the DSM at this point.

24   Q.   (By Ms. Malone)   Dr. White, would you agree

25   with me that there is a concern that someone who is

1  going through the legal system may have a tendency

2  to have exaggerated symptoms?

3          MR. RADBIL:  Objection, calls for

4  speculation.

5          THE COURT:  Overruled.

6  A.    No, I don't agree.

7  Q.    (By Ms. Malone)  Would you agree with me,

8  Doctor, that there are diagnoses -- or there are

9  symptoms that are concerned with in your field that

10 look to see whether or not someone will exaggerate

11 or overstate symptoms in an effort to receive some

12 sort of personal benefit, either of personal variety

13 or a monetary variety?

14 A.    Are you asking me to name a disorder?

15 Q.    I'm just asking you if that is true.

16 A.    That is true.

17 Q.    And one of the things that you would look for

18 is whether or not someone exaggerates their symptoms

19 in response to a particular stimuli, correct?

20 A.    That can be correct.

21 Q.    Okay.

22 A.    That's a lot of speculation about the general

23 population.

24 Q.    In fact, sir, you have indicated to me in your

25 deposition that the reason you felt hopeless and

1   helpless -- on page 83, line 8, Counsel -- was

2   because you couldn't pay back the money and you

3   didn't have a way to satisfy Texas Guaranteed, isn't

4   that correct, sir?

5   A.    On their terms, no, I couldn't.

6   Q.    And that's why you felt helpless and hopeless

7   in this situation.

8   A.    I was unable to speak with them, so, yes, that

9   made me feel hopeless and helpless.

10  Q.    Isn't it true, sir, that you never sent

11  anything in writing to either RAB or Texas

12  Guaranteed specifically complaining about these

13  phone calls that you had?

14  A.    No.  I didn't know that I needed to with RAB.

15  I did complain to Texas Guaranteed.

16  Q.    In writing, sir?

17  A.    About -- but not about Regional Adjustment

18  Bureau.  They had given me misinformation.  I didn't

19  know my loan was in default.  I checked in online,

20  just like I do about twice a year, and I saw nothing

21  about default.  I didn't even know my loans were in

22  default.  And I was receiving my mail at the address

23  I had given them.  I kept my information updated and

24  never knew the loan was in default until much, much

25  later.

1   Q.   So we're clear, if you complained to Texas

2   Guaranteed, it was not about Regional Adjustment

3   Bureau, is that correct, Dr. White?

4   A.   That's correct.

5   Q.   Okay.  And it's also true that you did not seek

6   out any special medications or treatments, at the

7   time of your deposition you had not seen a counselor

8   or asked to see a psychologist?

9   A.   A psychologist, no; I saw my family doctor.

10  Q.   Okay.  You did not discuss that -- you did not

11  discuss with your family doctor either the telephone

12  calls or the student loan problems, isn't that

13  correct, Doctor?

14  A.   That's correct.

15  Q.   Dr. White, according to the account notes that

16  were read earlier, there was an indication or a

17  request that you would call them back in March of

18  2011.  Do you recall that reading of the account

19  notes?

20  A.   I'm sorry, call Regional Adjustment Bureau

21  back?

22  Q.   Yes, sir.

23  A.   I thought it was February 2011, but . . .

24  Q.   Later in March there was -- Dr. Wyatt -- I knew

25  I was going to do that.  I apologize, sir.

```
 1        Mr. Wyatt read a note in March where someone
 2    had left a message with your spouse, and he said he
 3    would have you call back.
 4        Do you recall his reading that account note?
 5    A.   And he said that I would call back, yes, I do
 6    recall that; yes.
 7    Q.   Okay.  And you didn't call back, did you, sir?
 8    A.   No.
 9    Q.   In fact, you called, instead, according to your
10    cell phone records that your counsel offered us, you
11    called the law firm, correct?
12    A.   Much later.
13    Q.   According to the account notes, you called the
14    law firm on March the 17th, March the 21st, and I
15    can't read this one, but it looks to be March the
16    22nd; is that correct?
17    A.   Seeking advice, yes; not a lawsuit.
18    Q.   And you, in fact, spent, according to your cell
19    phone records, some 25 minutes discussing that with
20    the law firm; is that correct?
21    A.   Yes.
22    Q.   But you didn't send in the 100 bucks to work
23    out a payment plan with RAB, correct?
24    A.   They refused to work out a payment plan, so the
25    $100 would have been irrelevant.
```

**SHAWNIE ARCHULETA, CSR/CRR**
**FEDERAL COURT REPORTER — 214.753.2747**

```
 1              MS. MALONE:  Pass the witness, Your Honor.
 2              THE COURT:  Redirect.
 3              MR. RADBIL:  In your deposition --
 4              THE COURT:  Mr. Radbil?
 5              MR. RADBIL:  Pardon me.
 6              THE COURT:  Give line and page, please.
 7                     REDIRECT EXAMINATION
 8   Q.  (By Mr. Radbil)  Yes, this is Dr. White's
 9   deposition, page 87, line -- I'm sorry, page 88, the
10   whole part of 88 through --
11              THE COURT:  Starting at the top of the
12   page?
13              MR. RADBIL:  Yes.
14              THE COURT:  Okay.
15   Q.  (By Mr. Radbil)  Question was:  "Dr. White, did
16   you do any sort of counseling with Dr. Cush?"
17         Who was Dr. Cush?
18   A.   He's a rheumatologist who I saw twice for
19   ankylosing spondylitis.
20   Q.   I think Ms. Malone asked you:  "Did you see a
21   counselor?"
22         You responded:  "No."
23         And then her next question, if you recall, was:
24   "A lot of churches have what they call pastoral
25   counseling.  I know you are familiar that those
```

1  folks have some training in counseling background.

2  Do you do pastoral counseling?"

3      Do you remember what your response was?

4  A.   No, I do not.

5  Q.   You don't know what your response was?

6  A.   I don't do that and -- but I don't remember the

7  response, either.

8  Q.   The response was, no, you didn't.

9  A.   Oh.

10 Q.   Then Ms. Malone asked:  "Okay.  Not all folks

11 do.  Okay.  At your school at Texas A&M

12 University-Commerce, a lot of psychology programs

13 have student counseling for helping graduate

14 students go through what appears basically a very

15 stressful time in their life.  Do you partake --"

16          THE COURT:  Okay.  Where is this going?

17 What is the point?  Is this to come back on some

18 point that she made?  Can you tell me the topic of

19 the point?

20          MR. RADBIL:  Yeah, that he hadn't sought

21 out any treatment, but the deposition testimony

22 contains testimony about antianxiety medication.

23          THE COURT:  Okay.  Ms. Malone?

24          MS. MALONE:  Your Honor, none of that has

25 anything to do with antianxiety medication.

```
 1              THE COURT:  Okay.  My recollection is
 2   there was an objection and she was going into this
 3   counseling area.  Why don't we move on to the next
 4   topic, and we will see where we are at the end of
 5   the day, which will be in ten minutes.
 6              MR. RADBIL:  Really, I don't think I have
 7   too many more topics.  The issue in the case --
 8              THE COURT:  I don't need argument, I need
 9   questions.  This isn't time for argument in front of
10   the jury.  So do you have a question?
11              MR. RADBIL:  Yes.
12   Q.  (By Mr. Radbil)  Did the fact that Regional
13   Adjustment Bureau continued to call your Simple
14   Surrogacy employment telephone numbers after you
15   told them not to cause you to suffer actual damages?
16   A.   Yes, it caused a domino effect in my life that
17   caused me to develop mental health symptoms I had
18   never experienced before.  And it literally cost me
19   by adding exponentially to my debt and with some
20   out-of-pocket costs.
21   Q.   And it's true that you are making the
22   300-dollar payments to Texas Guaranteed directly at
23   that time?
24   A.   Yes.  I understood that RAB was not going to be
25   reasonable, although I tried to be, and so I simply
```

1    started paying Texas Guaranteed.

2    Q.   What you could.

3    A.   Yes.

4    Q.   And had you lost your job at Simple Surrogacy,

5    how much could you have paid then?

6    A.   Absolutely nothing.

7    Q.   And if you paid nothing, what were the odds of

8    you ever being able to practice?

9            MS. MALONE:  Asked and answered.

10           THE COURT:  Sustained.  Sustained.

11   Q.   (By Mr. Radbil)  Has your testimony today been

12   truthful?

13   A.   Yes, absolutely.

14   Q.   Are you making this up, that you suffered

15   actual --

16           THE COURT:  You've asked that, and it's a

17   bolstering-type question, which really isn't

18   permissible.  What else do you have, Mr. Radbil?

19           MR. RADBIL:  That's it.

20           THE COURT:  Redirect -- recross?

21           MS. MALONE:  No, Your Honor.

22           THE COURT:  Dr. White, you may step down.

23           Ladies and gentlemen, we're going to break

24   for the day.  I will tell you that we've made

25   significant progress.  We got the jury selected, we

1    had the opening statements, and we have had two

2    witnesses on.  That's pretty darn good for the first

3    day of jury trial, especially when you came here

4    today without knowing where you would end up.  So

5    the progress report is that we are doing well.

6              Please do give yourself plenty of time to

7    be ready to start at 9:00 tomorrow.  As I said, I

8    don't think this case will last a long time.  I

9    think it will be short again this week.  And please

10   remember not to talk about the case.  See you

11   tomorrow.  Thank you.

12              (Jury leaves courtroom)

13             THE COURT:  First question is on this

14   counseling issue.  Ms. Malone objected that the

15   answer to the interrogatory was there was no

16   counseling, and it hadn't been supplemented.  So how

17   did we get into counseling, Mr. Radbil?  I didn't

18   see that that was opened up.  How did we get into

19   that area which I specifically said not to go in to.

20             MR. RADBIL:  I apologize, Your Honor.  I

21   may have misunderstood, but I thought she stated in

22   his deposition that there was no reference at that

23   time of him seeking any treatment.

24             THE COURT:  Ms. Malone, maybe you can

25   clarify this, because it seems like a blatant

```
 1   violation of the sidebar discussion we had.
 2           MS. MALONE:  I think it is, Your Honor.
 3   In the interrogatory answer, the answer was, "None."
 4   All I said to him was, at the time of your
 5   deposition you had sought no counseling, which is
 6   not inconsistent with the interrogatory answer.
 7   Anything that's different in his interrogatory
 8   answer I think regarding -- which Mr. Radbil's
 9   question was specifically about current counseling,
10   that his client is undergoing would be a violation.
11           THE COURT:  Normally what would happen,
12   Mr. Radbil, is, if you thought it was opened up --
13   and I am not convinced that it was, especially under
14   the circumstances that we had sidebar -- that you
15   would at least approach the bench.
16           So I've been concerned about your conduct
17   in this case for a long time.  And once again,
18   you've done something that causes me more concern.
19   I'm still trying to figure out where in the pretrial
20   order you are gleaning this idea that somehow they
21   have agreed and it's uncontested that this telephone
22   automatic recording device was not contested.
23           Again, a point of some concern to the
24   Court, given that it's a major issue in the case.
25   And I don't see where it's been stipulated to in any
```

**SHAWNIE ARCHULETA, CSR/CRR**
**FEDERAL COURT REPORTER – 214.753.2747**

1    form or fashion.  In fact, it's probably one of the

2    primary issues in the case.

3              Having said that, where are we in your

4    case?

5              MR. RADBIL:  We are almost finished.

6              THE COURT:  What does that mean?

7              MR. RADBIL:  It means I have a few

8    questions to ask the corporate representative.

9              THE COURT:  For what purpose?

10             MR. RADBIL:  For the purpose of

11   demonstrating the financial incentive and motivation

12   to keep inaccurate records.  Can we exclude -- I

13   guess we can't.  Can we exclude the witness?

14             THE COURT:  He's a party.  You've sued

15   him.  He's actually one of the owners of the

16   company, so we are not going to exclude him.

17             MR. RADBIL:  So the letter that was sent

18   to -- let me think for a second.

19             The letter shows that a big part of their

20   business is using the automatic telephone dialing

21   system.  It shows that they were extremely concerned

22   about a law that would affect their ability to do

23   so.  They also have documents that I haven't gone

24   over yet in the training manuals that talk about the

25   difference between the older type of collection and

1    modern technology.

2            THE COURT:  You have had all day to ask

3    Mr. Wyatt these questions, and you haven't.  And now

4    all of a sudden you're calling him a corporate

5    representative.  I'm not sure what you are talking

6    about.  You've had all day to ask him these

7    questions.  And once again, and I apologize, but I

8    am losing my patience with you, I really am.  You

9    are coming up with a nonsensical position in this

10   case, this idea that you can call him again as a

11   corporate representative when you have had most of

12   the day to question him.

13           Ms. Malone?

14           MS. MALONE:  Your Honor, Mr. Wyatt already

15   testified that he wasn't familiar with that letter,

16   so I don't think it can go in.  He already asked

17   Mr. Wyatt, is my recollection, he asked him about

18   the training.  He also asked him about whether or

19   not the account could be called back to Texas

20   Guaranteed.  He asked him about whether or not the

21   collectors got a commission or a bonus based on

22   that.

23           All of that has already been gone into.

24   And frankly -- you know, Mr. Wyatt, while I guess he

25   didn't say he was a corporate rep, I certainly had

```
 1    him testify as to corporate policies and a corporate
 2    representative.  I would assume he would only take
 3    the stand one time, because that's normally what
 4    happens with an individual who is the corporate
 5    representative and one of the owners of the company.
 6            So frankly, I think that it would be
 7    mostly asked and answered and bolstering for no good
 8    reason, Your Honor.
 9            THE COURT:  Mr. Radbil.
10            MR. RADBIL:  The record will show that
11    there was objections lodged by Robbie Malone to the
12    fact that he was testifying in an individual
13    capacity.  And you also asked me, Your Honor, to
14    line it up because I could re-call him to get into
15    topics --
16            THE COURT:  But you asked him the same
17    questions over and over again, three or four times
18    the same topic asked three or four different ways.
19    And I'm concerned, first of all, that again it makes
20    no sense that you are all of a sudden deciding he is
21    a corporate rep and you're calling him back.  But I
22    haven't heard from you what specifics that you would
23    have that would somehow not be repetitive and
24    somehow probative to your case.  So that's what I
25    would like to know.  What you have told me so far
```

1    you have already asked.

2              MR. RADBIL:  Okay.  So the letter to the

3    FCC, the corporate representative must have

4    knowledge of because it was sent in an official

5    capacity of that corporation.

6              THE COURT:  Well, did you depose him?  Did

7    you depose someone in the corporate capacity,

8    30(b)(6)?

9              MR. RADBIL:  I did.

10             THE COURT:  And what was the answer to

11   that question at that time?

12             MS. MALONE:  It was not a topic, Your

13   Honor, it was not requested.

14             THE COURT:  Too little, too late.

15             MR. RADBIL:  I'm not sure that's correct.

16             THE COURT:  Mr. Radbil, you can't come --

17   again, what you have been doing is coming up

18   unprepared.  I've got no exhibits from you, no

19   marked exhibits.  You're coming up here, and you're

20   telling me that the other side is falling short on

21   something that perhaps would have come up in

22   discovery, but there has been no motion to compel.

23   None of this was ever brought before this Court or

24   the magistrate judge.  So the question I would have

25   is this idea of the corporate rep being or not being

1   familiar with this letter is something that you

2   should have fleshed out a long time ago in

3   discovery.

4           MR. RADBIL:  I have a motion to compel.  I

5   actually brought it with me.

6           THE COURT:  Well, I want to know, first of

7   all, was it the topic of a deposition, 30(b)(6)

8   deposition notice?

9           Are you telling me that you think it was?

10          MR. RADBIL:  Yes, I'm telling you that I

11  think we argued about it in the deposition.  And the

12  second deposition was ordered because he was

13  unprepared on certain topics.

14          THE COURT:  Okay.  But the point is, did

15  you ask about this letter of the corporate

16  representative during a deposition?

17          MR. RADBIL:  I believe the answer is yes.

18          THE COURT:  Who was it that you

19  questioned?

20          MR. RADBIL:  Mr. Wyatt.

21          THE COURT:  And he's now telling you from

22  the witness stand that he doesn't have any personal

23  knowledge of this letter.

24          MR. RADBIL:  Right.

25          THE COURT:  How does that change as

1   corporate representative?

2           MR. RADBIL:  Because the --

3           THE COURT:  The point is, Mr. Radbil, that

4   everything that you are raising -- having presided

5   over probably thousands of discovery disputes, I can

6   tell you the subject and topic of a good attorney's

7   motions during discovery process.  That's what

8   should have happened if you thought there was an

9   insufficient answer on this particular letter from

10  the corporate rep.

11          There is nothing to indicate that's ever

12  been ordered or you didn't get the answer that you

13  were asking for during discovery.  So as far as I'm

14  concerned, that ends the issue.  Can you show me

15  something to the contrary?

16          MR. RADBIL:  Yes, I can show you the

17  motion to compel, Your Honor.

18          THE COURT:  Where was the notice of a

19  corporate dep 30(b)(6) notice?

20          MR. RADBIL:  I believe it should be an

21  attachment to the motion to compel, which I am going

22  to find immediately.

23          MS. MALONE:  Your Honor, if I could, I

24  could show Mr. Wyatt's deposition.  There is -- in

25  the index, there is no reference to FCC at all.  So

1    if the letter had been requested as questioned about

2    in the deposition, there is to FACS, but there is no

3    FCC.  FACS is the operating system.

4          MR. RADBIL:  I don't want to point

5    fingers, but the conduct at the deposition was one

6    of the reasons that we moved to compel.

7          THE COURT:  All right.  Then put your

8    money where your mouth is.  Show me what you're

9    talking about, because right now you are making a

10   lot of empty accusations, as you have so far in this

11   case.

12         Stay where you are and show this to

13   Ms. Malone and point to her exactly what you are

14   talking about.  What is the document?

15         MS. MALONE:  It's a motion to compel,

16   Judge, that I don't know if it's even been filed.

17   It doesn't have a Doc number on the top.

18         MR. RADBIL:  We had a hearing on this.

19         MS. MALONE:  If I may look at it.  This is

20   the -- we didn't have a hearing on this.  We did not

21   have a hearing on this, Your Honor.

22         Judge Kaplan -- when Mr. Radbil filed

23   this, Judge Kaplan issued an order saying, no more

24   motions to be filed.  We had an informal conference

25   in his area, and he -- I said I found one document

```
 1    that had not been produced, and he asked me to

 2    produce my client by telephone for one hour to cover

 3    that topic, which I did, and it was not that letter.

 4              THE COURT:  What was the topic?

 5              MS. MALONE:  It was the Texas Guaranteed

 6    additional pages for their training manual, which is

 7    what we were talking about earlier.

 8              MR. RADBIL:  Your Honor, it is not that

 9    simple.  I am putting my money where my mouth is.

10    In that motion to compel, it lays out the grounds of

11    the discovery conduct.

12              THE COURT:  When was the hearing?

13              MR. RADBIL:  It was -- I don't recall the

14    date.

15              THE COURT:  What was the order that came

16    out of the hearing?

17              MR. RADBIL:  That a new deposition would

18    take place and that the contractual documents that

19    were withheld had to be produced.

20              THE COURT:  And where is it that this

21    specific document is that you are referring to?

22              MR. RADBIL:  I don't think that I got that

23    document.

24              THE COURT:  Where is it that you got it as

25    a topic in this motion and that you had it ordered
```

```
 1   by Judge Kaplan?
 2            MR. RADBIL:  Judge Kaplan didn't order
 3   that.  He -- unfortunately, he didn't grant many of
 4   the things that I asked for.
 5            THE COURT:  So you never got this motion
 6   granted.
 7            MR. RADBIL:  Yes, it was granted.  We had
 8   a second deposition.
 9            THE COURT:  All right.  And where is it,
10   Ms. Malone, if you can tell me from your review of
11   it that it mentioned anything about this letter that
12   we are talking about?
13            MS. MALONE:  It doesn't, Your Honor.
14            THE COURT:  Mr. Radbil, I am beginning to
15   become very concerned about your conduct.  I
16   honestly don't know if you know what you are doing.
17   I have never said that to an attorney before.  I
18   don't know if you know what you are doing, honestly.
19   I'm not sure how you have gotten this far in this
20   case.  I understand finally why it hasn't come to
21   some kind of a resolution.
22            But there is, from what I can hear,
23   nothing to support this accusation that you are
24   making with regard to this letter in the record, in
25   the motions, or in the deposition questions.  And so
```

1    as far as that goes, there's not going to be any

2    further questions on it tomorrow.

3            Is there anything else that you need to

4    question him about?

5            MR. RADBIL:  No.  No, there is not, Your

6    Honor.

7            THE COURT:  Anything else?

8            MS. MALONE:  Your Honor, I would be

9    prepared to make a motion, if he's resting, outside

10   of hearing, and if you want to --

11           THE COURT:  I want to give Mr. Radbil a

12   chance to talk to his client.  But if there is no

13   further testimony and the only thing, at least

14   projective was what you have mentioned so far, which

15   I am not permitting for the reasons I have stated,

16   then we would be looking at some jury instructions

17   ready for tomorrow.

18           Mr. Radbil, are you ready to rest, or do

19   you need to Dr. White?

20           MR. RADBIL:  I need to talk to Dr. White.

21           THE COURT:  All right.  I would like to

22   take about a 15-minute break.  And then I would like

23   to hear what the plan is for tomorrow so we can plan

24   accordingly.  So let's take a 15-minute break.

25           (Recess taken.)

1              THE COURT:  We talked about if you can't

2    decide in the short period we have about this

3    tonight, Mr. Radbil, that's fine, but I want to see

4    where you are after talking to your client.

5              MR. RADBIL:  I would like to show Your

6    Honor the materials specifically that I would intend

7    to re-call Mr. Wyatt to discuss and explain how I

8    think they are relevant and why I think they would

9    be of meaningful use.

10             THE COURT:  Okay.  Have you shown them to

11   Ms. Malone?

12             MR. RADBIL:  Well, one is an exhibit,

13   Plaintiff's Exhibit 11.

14             THE COURT:  Is this the letter we have

15   been referring to?

16             MR. RADBIL:  Yes, Your Honor.

17             THE COURT:  Let's talk about that for a

18   minute.  He has indicated, as an individual, which

19   it couldn't change as corporate representative, that

20   he has no personal knowledge about this.  Whether he

21   was supposed to or not is something that, as I

22   mentioned, should have been brought up and raised in

23   a motion to compel.

24             You filed a motion to compel under seal

25   and maybe ex parte, I'm not sure, on July 22nd of

1    last year, Document 32-1.  Judge Kaplan denied your

2    request to file this, as you had filed it under

3    seal, and it was never refiled and never ruled upon.

4           Even if it had been, nowhere in this

5    particular document, 32 or 32.1, is anything

6    addressed with regard to this letter.  So as it is

7    right now, this letter is not something I'm going to

8    let you re-call him, as a corporate rep or not,

9    because we already know his answer.  To the extent

10   you think it's inappropriate, you should have

11   brought that up by now.  So that's my position on

12   that.  So that's that.

13          Why don't you generally give me some ideas

14   about where these other points are, and I will see

15   where we are.

16          MR. RADBIL:  The testimony that's outlined

17   in our motion to compel would be used to impeach

18   Mr. Wyatt's testimony.  For instance, Question:

19   What are the compromise procedures?

20          I don't know what they are.

21          Are you familiar with the TG contractual

22   procedural manual?

23          I am not aware of a procedural manual.

24          I don't know if we have this manual.  I'm

25   not the trainer.  I'm not sure what those documents

1    would look like.  I'm not sure if there is a

2    separate set of documents.  I'm not sure.  I'm not

3    familiar with that manual.

4         THE COURT:  Mr. Radbil, but how does this

5    further the ball in any way that's probative to what

6    you have to prove?

7         MR. RADBIL:  That's my next point, which

8    is, if there is no bona fide error defense, which I

9    think there has been no evidence presented of any

10   error, then I don't think this needs to be

11   presented.  And since Your Honor has made the

12   decision regarding the letter, then I don't think

13   there is much left.

14        THE COURT:  I want to make sure you have

15   made your record here.  If there is no bona fide

16   error defense.  This is the first time I have heard

17   this, then what?

18        MR. RADBIL:  The only reason that policies

19   and procedures are relevant to an FDCPA claim is if

20   you assert the one statutory defense against the

21   strict liability statute it imposes.  The elements

22   of the defense are, you have policies and procedures

23   in place designed to protect against the specific

24   type of error that occurred which caused the

25   violation.

235

1              THE COURT:  Before you go any further, is

2    that somehow raised in the pretrial order?

3              MR. RADBIL:  I think that it is.

4              THE COURT:  Ms. Malone, it's your defense.

5              MS. MALONE:  Yes, ma'am.  The remaining

6    FDCPA claim was to do with whether or not they had

7    properly documented or ceased communication to the

8    employer -- or to the number of the employer, that

9    he had been told not to call that number or call in

10   any way.

11             Our position is that was never said.  But

12   if there had been mistake in the entry, certainly

13   Mr. Wyatt testified and gave a specific policy that

14   says that they are supposed to cease cause to a

15   specific number, including an employer number if

16   requested.

17             And so we do have that policy in place.  I

18   certainly think that is sufficient.  That has

19   nothing do with the Texas Guaranteed contract,

20   though.  That's two different -- we already had that

21   testimony.  He questioned him on that training

22   manual.

23             THE COURT:  Mr. Radbil.

24             MR. RADBIL:  Simply I would respond that

25   in this Court's order on summary judgment the Court

1    laid out the requirements of the bona fide error

2    defense.  And the reason the bona fide error defense

3    was denied was because they didn't cite to any

4    specific error that occurred.

5              THE COURT:  The point now, though, is,

6    where does it fit in your case with regard to

7    Mr. Wyatt as now you've said you want him as a

8    corporate representative and how is it relevant?

9              MR. RADBIL:  If the bona fide error

10   defense is in play, then they would have the

11   obligation and the burden to show that these

12   policies and procedures were sufficient to protect

13   against the type of violation that occurred here.

14   And to the extent he can be impeached about the

15   understanding or his testimony about the policies

16   and procedures, I think that's relevant.

17             THE COURT:  And how is it that you -- I'm

18   still not clear on this.  It seems that you asked

19   him about this during his previous direct testimony,

20   but I'm still not clear on how that is probative on

21   anything that you have to prove, besides this

22   bona fide defense, what you have to prove.

23             MR. RADBIL:  That's -- I'm not saying it

24   is.

25             THE COURT:  What is your best case

```
 1   scenario of the kind of responses that you will get
 2   that will aid you in, I guess, refuting this
 3   defense?
 4            MR. RADBIL:  That the policies and
 5   procedures aren't real; that he had no knowledge of
 6   them; that they were presented only for the purpose
 7   of this case and not actually implemented.  Because
 8   several months ago he didn't even know they existed,
 9   and he has testified that he's the guy who is
10   responsible.
11            THE COURT:  Ms. Malone?
12            MS. MALONE:  Your Honor, the secondary
13   policies and procedures he's talking about were the
14   subject of the second deposition.  After we learned
15   that they had not been turned over to us initially,
16   I actually told Judge Kaplan, this is the only thing
17   I haven't given to them.  He didn't know about it.
18   Kaplan said I had to re-present a corporate
19   representative on that topic.  In the interim,
20   Mr. Wyatt educated himself as a corporate
21   representative can.  And in the second deposition,
22   Mr. Radbil spent 45 minutes asking him about the
23   very document from the corporate representative.
24            So it is really misleading to say that
25   that didn't come up, because it was covered in a
```

```
 1   separate topic.  It was not clearly listed in the
 2   30(b)(6) in the first time.  I didn't agree with him
 3   about it.  But Judge Kaplan's solution was, you give
 4   them this document -- did you let him question him
 5   about it?  And I said, no, Judge, I didn't.  And he
 6   said, produce him by phone for an hour, and I did.
 7            THE COURT:  And your specific precise
 8   refutation or rebuttal to Mr. Radbil's position to
 9   where it fits in this case, just so I'm clear.
10            MS. MALONE:  Nothing.  It means nothing to
11   this case.  In my bona fide error policy defense,
12   all I have to produce is what our policies are.  If
13   we have additional obligations under the Texas
14   Guaranteed loans on top of that, that's just gravy,
15   Judge.  I have done what I wanted to do.  It has
16   nothing to do with his case.
17            THE COURT:  Okay.
18            MR. RADBIL:  It's very easy to take care
19   of, because there hasn't been any testimony
20   presented about any specific error, and that is
21   required to establish the bona fide error defense.
22            THE COURT:  Let's hear your questions.
23            MR. RADBIL:  My questions?
24            THE COURT:  Uh-huh.  What do you want to
25   ask him?  Because we have talked in generalities,
```

255

```
 1   and I am still not convinced it's relevant.
 2              MR. RADBIL:  I don't want to ask him --
 3              THE COURT:  I just want to hear your
 4   questions.  Give me some sample questions you will
 5   be asking him.
 6              MR. RADBIL:  Well, a review of what he has
 7   testified about today.
 8              THE COURT:  Go ahead, as though he is up
 9   there.
10              MR. RADBIL:  Okay.  What was the date of
11   his first deposition.  I would ask something along
12   the lines of:  You testified that you shared
13   responsibility over the course of your tenure at the
14   company for implementing the policies and procedures
15   designed to protect against violations of the Fair
16   Debt Collections Act.  Yet, at your deposition only
17   a few months ago, or however many months ago, I
18   asked you to identify the training manuals, the
19   training materials and documents that are used
20   specifically for a student loan, not retail, student
21   loan or educational collection divisions.
22              The response was:  I'm not sure there is a
23   separate set of documents.  I'm not sure.
24              Are you familiar with TG's Contractor
25   Procedural Manual which governs the policies?
```

1              I am not familiar with that manual.  I
2    have no idea what version it would be.  Honestly, I
3    wouldn't.  I am not familiar with it, sir, I am not.
4    I'm sure.  I'm not sure, sir.  I don't know if there
5    are --
6              THE COURT:  Slow down.  Keep going.  These
7    are questions that you plan to ask him.
8              MR. RADBIL:  Is there any instructional
9    documentation that the defendant has regarding how
10   to use the tactics?
11             I'm not sure.
12             Is there any user manuals or technical
13   documents related to the FACS system that the
14   defendant has?
15             Not that I'm aware of.
16             It says the Contractor Procedural Manual
17   contains client specifics for Texas Guaranteed.
18             Answer:  I'm not sure if I have seen that
19   Contractor Procedural Manual.
20             And you can't answer whether or not the
21   Contractor Procedural Manual contained any
22   authority; is that correct?
23             That's correct.
24             THE COURT:  Okay.  That's enough.  I think
25   I have an idea.

1          Ms. Malone, now that you have heard some

2    more specifics.

3          MS. MALONE:  Sure.  Two things:  First of

4    all, that's completely out of context.

5          Mr. Wyatt testified that there wasn't --

6    he asked him if there was a manual for the FACS

7    Operating Section, and Mr. Wyatt testified, no, the

8    Ontario guys came in and trained us on the equipment

9    directly.  We don't have an actual manual.  So

10   that's out of context.

11         Everything else about the Texas Guaranteed

12   loans situation, their account records, were in the

13   second deposition, Judge.  And for him to read the

14   first one, where he says he didn't know about him

15   and as corporate representative becomes educated on

16   it and testifies about it in the second deposition

17   would be extremely misleading.

18         THE COURT:  So what you were quoting from

19   was the first deposition and not the second?

20         MR. RADBIL:  Yes.

21         THE COURT:  Did you get answers in the

22   second deposition?

23         MR. RADBIL:  No, not sufficient answers,

24   Your Honor.  It is limited to --

25         THE COURT:  Mr. Radbil, give me a break.

1    You just quoted from the deposition that you had

2    essentially then brought to Judge Kaplan's

3    attention, and he ordered another deposition, and

4    you are trying to rely on the inadequacy of the

5    first deposition when you got a second one?

6              MR. RADBIL:  The point of relying on the

7    first --

8              THE COURT:  Is the answer to that yes or

9    no?

10             MR. RADBIL:  Yes, but there is a reason.

11             THE COURT:  Okay.  All right.  I've heard

12   enough.

13             Mr. Radbil, I am concerned about your

14   conduct in this case.  I know you are a young

15   attorney and young attorneys make mistakes.  But

16   what I have seen here is disingenuous behavior and

17   behavior that seems to skirt the truth in more than

18   one respect.

19             Again, you mentioned that this whole issue

20   with regard to the automatic dialing device was

21   resolved in the pretrial order, did you not?

22             MR. RADBIL:  Yes, and I still think that

23   it is.

24             THE COURT:  Show me exactly where that is

25   that's been agreed to by the other side in the

1    pretrial order.

2         MR. RADBIL:  Page 5, Defendant Regional

3    Adjustment Bureau Incorporated.  Defendant's

4    contentions.  The TCPA.  In order to prevail under

5    the TCPA, plaintiff must establish that defendant

6    used an automated telephone dialing system or

7    artificial prerecorded voice message to make a call

8    to plaintiff's cell phone without their consent.

9    Defendant contends that the vast majority of its

10   calls were made manually.  In fact, only three calls

11   were made engaging the ATDS.  That is an admission

12   that an automatic telephone dialing system was used.

13        THE COURT:  Ms. Malone.

14        MS. MALONE:  No, ma'am, that is not.  That

15   is not -- maybe somebody made a shorthand.  I'm not

16   sure how that got in there, because we do refer to

17   the dialers as ATDS's, but we never said it complies

18   with the TCPA.  In fact, we have vehemently fought

19   that throughout this case, Judge.  You know that.

20        THE COURT:  Once again, Mr. Radbil, you're

21   making no sense.  These are tactics that I don't see

22   in federal court.  It doesn't make any sense.  It

23   has no truth to it.  You're arguing things that

24   basically have no element of truth to them.  If the

25   defense had -- are you saying they unwittingly

1   admitted to it?  Is that what it is, you caught them

2   and they unwittingly admitted to it?

3          MR. RADBIL:  No.  I think they used that

4   automatic telephone dialing system and we are honest

5   here.

6          THE COURT:  Well, I disagree with you.  So

7   far I haven't heard anything that indicates any

8   possible additional relevant testimony with regard

9   to Mr. Wyatt.  If you have anything else, I will be

10  glad to hear about it; otherwise, I would like to

11  know what other witnesses you have.

12         MR. RADBIL:  I don't have any other

13  witnesses.

14         THE COURT:  All right.  Is there any other

15  reasons, other than what you have stated, that you

16  would have to submit for re-calling Mr. Wyatt?

17         MR. RADBIL:  Yes.  To the extent that

18  there is going to be any discussion about a

19  bona fide error, I think it needs to be clarified

20  whether those retail policies and procedures that

21  his deposition testimony --

22         THE COURT:  Okay.  There's been no

23  discussion about it so far.

24         MR. RADBIL:  Okay.

25         THE COURT:  And right now, if you rest,

```
 1   unless there's a defense, there's no discussion
 2   about it.  So if there's a defense, then perhaps a
 3   lot of what you are talking about would be opened
 4   up.  But right now we are talking about in
 5   plaintiff's case in chief.
 6             MR. RADBIL:  Is there a defense?
 7             THE COURT:  Well, I don't think they have
 8   to tell you that.  There's no defense right now as
 9   far as actual evidence, their own case, so. . .
10             MR. RADBIL:  Okay.  Then, yes, we rest.
11             THE COURT:  Well.  I -- what I want is, I
12   want the lawyers here by 8:00 and I want proposed
13   jury instructions hopefully agreed to.
14             Ms. Malone.
15             MS. MALONE:  Your Honor, if they are
16   formally resting, I have two motions for the Court's
17   consideration that need to be done outside the
18   hearing of the jury.  And one of them obviously is a
19   directed verdict, and one of them is a little more
20   serious.
21             THE COURT:  Okay.  Let's go ahead.
22             Are you resting?
23             MR. RADBIL:  Yes.
24             MS. MALONE:  Your Honor, related to the
25   directed verdict, I would ask the Court to grant a
```

1   directed verdict on the Telephone Consumer

2   Protection Acts claims.

3            In order for the plaintiff to prevail,

4   they have to show that there was an automated

5   telephone dialer that, according to the statute,

6   stores and randomly generates telephone calls to

7   someone.

8            The only evidence that has been put on in

9   this case is from Mr. Wyatt, who specifically said

10  their telephone dialing system does not store nor

11  randomly generate telephone calls.

12           Additionally, they have to show that that

13  dialing system was used to call Mr. White's cell

14  phone.  There was no evidence, no question even

15  really asked about whether or not there were any

16  calls made to a cell phone that were not manually

17  made.

18           The only evidence before the Court is that

19  these telephone calls were manually made.  And so

20  for that reason, I think the automated telephone

21  dialing system question kills the TCPA claims, and

22  it's done and there is nothing else to be done on

23  that issue.

24           THE COURT:  Let me hear from Mr. Radbil on

25  that point, please.

```
 1            MR. RADBIL:  As numerous courts have held,
 2   a predictive dialer satisfies the definition of an
 3   automatic telephone dialing system.  That's by order
 4   of the Federal Communications Commission.  I don't
 5   have the cite on me.
 6            Their website states and admits that they
 7   use a predictive dialer.  We also have testimony
 8   from Mr. Wyatt about how manual calls are really
 9   made, which is the button is pushed and it dials a
10   bunch of numbers.  That satisfies the definition.
11   There is plenty of evidence in the record as is.
12            In fact, I -- I think those two things
13   combined alone and those are the only two pieces
14   that stick out in my mind.
15            THE COURT:  Go ahead and add anything else
16   you would like to add.
17            MR. RADBIL:  I am not prepared to argue
18   the motion for directed verdict without looking at
19   the testimony.
20            THE COURT:  Mr. Radbil, this is a trial.
21   The case has gone as it has gone, and it's time to
22   give me your response to their motion for directed
23   verdict if you have rested, and you have.
24            MR. RADBIL:  A predictive dialer satisfies
25   the definition pursuant to FCC order.  Their website
```

1    contains an expressive mission that they used a

2    predictive dialer.  He testified why they use it,

3    because they can make many more calls much more

4    efficiently than people punching numbers.  Okay?

5              And he also testified that when a manual

6    call is dialed, what's really happening is a person

7    is pushing the button to start the automatic

8    telephone dialing system, and whichever connects

9    first comes back.  That's an automatic telephone

10   dialing system.

11             THE COURT:  Anything else?

12             MR. RADBIL:  No, Your Honor.

13             THE COURT:  Let me hear back from

14   Ms. Malone.

15             MS. MALONE:  Three things, Your Honor:

16   That last thing is not what the testimony was.  What

17   Mr. Wyatt testified was, that's how their dialer

18   worked, was for them to push a button and it would

19   automatically call.

20             I specifically asked him, what is a manual

21   call mean?  And he said they actually dial the phone

22   number into the phone, and that was his testimony.

23   There has been nothing offered contrary.

24             Secondly, Your Honor, the FCC ruling,

25   which I know we have cited in summary judgment and

1    everywhere else, actually said a predictive dialer
2    can be an automatic telephone dialing system.  It
3    never said, all predictive dialers are automatic
4    telephone dialing systems for purposes of the TCPA.
5         I'm an Irish girl; I'm also American.  Not
6    all Irish girls are Irish-American.  Those two
7    things cannot necessarily be the same.  That's basic
8    logic that we did in school.
9         The other thing is, there is a case
10   directly on point in this issue that we put in
11   summary judgment.  It's the Satterfield case, Your
12   Honor, if you would like the cite I will pull it.
13        THE COURT:  I have it.
14        MS. MALONE:  That case specifically talked
15   about the obligation of the plaintiff to establish
16   that the dialing system meets the automatic
17   telephone dialing system definition under the TCPA
18   looking at the FCC problem.
19        So there is actually no evidence to that.
20   And in fact, Satterfield, if I recall correctly,
21   even talked about the need of bringing expert
22   testimony in on the part of the parties to establish
23   what the technology of the system was.
24        Mr. Radbil certainly knows that case.
25   It's been around for a long time.  He had the option

1    of doing that and chose not to.

2            THE COURT:  Your second point.

3            MS. MALONE:  You know what?  I ran them

4    together, Judge.

5            Oh, Judge, my second motion for directed

6    verdict.  Your Honor, I would also move for a

7    directed verdict because I don't think there has

8    been a proper cause for causation or damages.  And

9    that really kind of goes into my issue with my Rule

10   37 motion.

11           And I apologize, Judge, I don't normally

12   make these kinds of motions before the Court.  In

13   their answers to damages on request for disclosure,

14   plaintiff actually said that they are claiming

15   damages in the amount of $1,500 and reserves the

16   right to disclose any additional damages.  In

17   Mr. White's deposition, he testified that he had no

18   out-of-pocket damages.

19           In answers to discovery, in actual damages

20   they said none; they said there was no medical.  In

21   his deposition testimony, he also testified that he

22   wasn't aware of any additional results.

23           We get to trial today, and suddenly I hear

24   that he has $40,000 in actual damages as a result of

25   the loan.  He has $5,000 from a teaching assignment

1    that wasn't provided to us in addition to the issues
2    about these counseling sessions that haven't gone
3    where they were supposed to go.
4         Rule 37 unfortunately talks about what the
5    Court should do when one party is trying to try the
6    case by ambush.  So I honestly would ask the Court
7    for some instruction to the jury, either that they
8    can't consider any of that as testimony or, better
9    yet, not to submit actual damages at all, given the
10   fact they tried to sandbag us, Judge.
11        THE COURT:  The information that you have
12   via discovery, pretrial requests with regard to
13   damages, remind where this is and exactly what the
14   amount is?
15        MS. MALONE:  Sure.  Your Honor, the first
16   place it appears is in their initial disclosures.
17   Their answer was:  Plaintiff claims actual damages
18   in the amount of $1,500 but reserves the right to
19   disclose any additional damages suffered should they
20   become known.
21        That was never supplemented, obviously.
22        MR. RADBIL:  What about our pretrial --
23        THE COURT:  Mr. Radbil, you will get your
24   chance.  Go ahead.
25        MS. MALONE:  In their late-filed

1   January 2013 supplements, the only thing they

2   supplemented were witness names.  They did not

3   change that answer, Your Honor.

4        And in Mr. White's deposition I asked him

5   specifically regarding out-of-pocket expenses.  His

6   answer was, "None."  Today he testified $5,000 for

7   losing a teaching assignment, plus 40,000 in costs

8   related to this loan modification and some other

9   things we hadn't heard about before.

10        Judge, I just -- I have never seen this,

11   and I really don't make Rule 37 motions like this,

12   but honestly, I'm a little frustrated here.

13        THE COURT:  Okay.  Thank you.  Mr. Radbil.

14        MR. RADBIL:  I may be young, Your Honor,

15   but I don't litigate in bad faith.

16        THE COURT:  That's a little questionable,

17   to be honest with you at this point.  Go ahead.

18        MR. RADBIL:  I do not.  And in our

19   supplemental disclosures, our pretrial disclosures,

20   we have amended that.  I believe with respect to the

21   charges that Mr. White incurred, he incurred those

22   after the deposition.

23        THE COURT:  Where are the submissions that

24   give them notice of the amount of damages that you

25   are seeking outside of the initial response that

1    Ms. Malone referred to?  Where are they disclosed?

2            MR. RADBIL:  In the pretrial order.  They

3    were disclosed at the mediated settlement

4    conference.

5            THE COURT:  Okay.  Well, you know better

6    than that.  You know -- the federal rules require

7    you to respond to questions about damages so that

8    they can meet your proof at trial.  So the fact that

9    you discussed it in mediation doesn't count.

10           MR. RADBIL:  Okay.

11           THE COURT:  And you know that.  And so the

12   pretrial order --

13           MR. RADBIL:  Pretrial disclosures.

14           THE COURT:  The pretrial disclosures,

15   okay.  Show me where and what page and where those

16   would be.

17           MR. RADBIL:  I believe we copied and

18   pasted from the pretrial order.  I don't know if I

19   have a copy of our pretrial disclosures with me.

20           THE COURT:  Ms. Malone, do you have those?

21           MS. MALONE:  Yes, ma'am, I sure do.

22           THE COURT:  Thank you.

23           Mr. Radbil, take a seat.  Let me hear what

24   she has to say.

25           MS. MALONE:  Your Honor, just so you know,

1    the first entry under tab 6 is his original

2    disclosures.  I apologize for the highlighting.

3           And the second one behind the yellow sheet

4    is his supplemental.

5           THE COURT:  And they are not in there?

6           MS. MALONE:  They are.

7           THE COURT:  As far as --

8           MS. MALONE:  The references to the damages

9    is not included in the supplemental.

10          THE COURT:  Mr. Radbil?

11          MR. RADBIL:  I don't know what document --

12          THE COURT:  Okay.  Let's have you take a

13   look at it.

14          MR. RADBIL:  Defendant's wrongful conduct

15   caused the plaintiff to suffer legitimate actual

16   damages.  Plaintiff's actual damages not only

17   include out-of-pocket expenses but also damages for

18   personal humiliation --

19          THE COURT:  What exactly are you reading

20   from?

21          MR. RADBIL:  Defendant's APP018, document

22   76-1.

23          THE COURT:  I guess my question is, where

24   is it in there that talks about this amount of money

25   above the $1,500 that you initially disclosed.  And

```
 1   I think it would be better if you went back to the
 2   microphone.
 3            MR. RADBIL:  It's not quantified.
 4            THE COURT:  So they weren't on notice of
 5   the amounts that you have come up with here during
 6   the testimony at trial.
 7            MR. RADBIL:  Through our settlement
 8   negotiations.
 9            THE COURT:  Okay.
10            MR. RADBIL:  And --
11            THE COURT:  I'm sorry, Doctor, that you've
12   had to have this kind of representation.  And I
13   don't recall ever saying that ever in court in 30
14   years that I have been here.  This is extremely,
15   once again, disingenuous.
16            Go ahead.  What else?  Where else?
17            MR. RADBIL:  Certainly not here.
18            THE COURT:  So you agree that the amounts
19   that were talked about were never specifically
20   disclosed.
21            MR. RADBIL:  I don't know the definitive
22   answer, but I know that we have supplemented and
23   they have been on notice of a significant amount of
24   actual damage for a long time.
25            THE COURT:  By virtue of what?
```

```
 1              MR. RADBIL:  I don't have all of our
 2    discovery responses.
 3              THE COURT:  You can't tell me off the top
 4    of your head where you might have disclosed the
 5    specific amount beyond the $1,500?
 6              MR. RADBIL:  A specific amount?  I don't
 7    know whether we did disclose a specific amount.
 8              THE COURT:  I've heard enough.
 9              Anything else?
10              MR. RADBIL:  There's a requirement to
11    disclose the exact amount of the damages that we're
12    seeking?
13              THE COURT:  What is your position on that?
14              MR. RADBIL:  That the damages --
15              THE COURT:  You have a federal practice,
16    is that what you say?
17              MR. RADBIL:  I'm sorry?
18              THE COURT:  You have a federal practice,
19    and you don't know the answer to that question?
20              MR. RADBIL:  He's seeking damages --
21              THE COURT:  How about a straight answer?
22              MR. RADBIL:  -- for mental anguish and
23    emotional distress.
24              THE COURT:  How about a straight answer?
25    You don't know the answer to that question?
```

 1            MR. RADBIL:  That is a straight answer to

 2     the question.

 3            THE COURT:  That you have no obligation to

 4     quantify your damages in federal practice when asked

 5     in discovery and even by virtue of the disclosure

 6     requirement.  You're saying that you don't know if

 7     that's a requirement.  You don't know that that's a

 8     requirement.  That's what you have said.  Am I

 9     right?

10            MR. RADBIL:  That's a question for -- the

11     jury determines the actual amount of damages.

12            THE COURT:  Mr. Radbil, I have never heard

13     more prevarication in my life.  Have a seat.  Have a

14     seat.

15            There are some causes of action the

16     plaintiff has prevailed on here.  At this point, if

17     there's any possibility of settling, I would

18     strongly urge that to occur, given everything that's

19     happened from Mr. Radbil.

20            If that's not possible, we're going to go

21     to the jury tomorrow.  I'm going to rule on this

22     motion tomorrow on the Rule 37.  I'm going to take

23     some time on that, and it's serious, but that's

24     something that I will be looking at.

25            If there is a settlement, then we can

```
 1   resolve this case and move ahead and hopefully have

 2   this whole thing behind all of us.  If that's not

 3   going to happen, then we will go ahead with all of

 4   this.

 5           I'm going to have the jury in at ten, and

 6   if the case isn't settled, I want the lawyers here

 7   by 8:00 and I want some proposed jury instructions.

 8   Right now I can't tell you exactly what my ruling is

 9   going to be on the motion with regard to the

10   automatic -- the Texas Act.

11           So be prepared on that.  But I need

12   something a little bit more than what I have right

13   now.  The Court, under Rule 49 of the Federal Rules

14   of Civil Procedure, has an option to use general

15   verdict forms or special.  In this court's practice

16   and in my understanding mostly is to use the general

17   verdict, and that's what we're going to do.

18           So I will be looking for you all at 8:00

19   tomorrow.  The jury will be here at ten.  If there

20   is nothing else we will be in recess.

21       (The proceedings concluded at 5:56 p.m.)

22

23

24

25
```

**SHAWNIE ARCHULETA, CSR/CRR**
**FEDERAL COURT REPORTER – 214.753.2747**

1                    C E R T I F I C A T E

2              I, Shawnie Archuleta, CCR/CRR, certify

3    that the foregoing is a transcript from the record

4    of the proceedings in the foregoing entitled matter.

5              I further certify that the transcript fees

6    format comply with those prescribed by the Court and

7    the Judicial Conference of the United States.

8              This 21st day of March 2013.

9

10

11                        s/Shawnie Archuleta
                          Shawnie Archuleta CCR No. 7533
12                        Official Court Reporter
                          The Northern District of Texas
13                        Dallas Division

14

15

16   My CSR license expires:  December 31, 2013

17   Business address:  1100 Commerce Street
                        Dallas, TX  75242
18   Telephone Number:  214.753.2747

19

20

21

22

23

24

25

**SHAWNIE ARCHULETA, CSR/CRR**
**FEDERAL COURT REPORTER – 214.753.2747**