UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

TIMOTHY WHITE,                    §
                                  §
    Plaintiff,                    §
                                  §
v.                                §     CIVIL ACTION NO. 3:11-CV-1817-B
                                  §
REGIONAL ADJUSTMENT              §
BUREAU, INC., d/b/a RAB, INC.,    §
                                  §
    Defendant.                    §

SANCTIONS ORDER

Before the Court are Defendant Regional Adjustment Bureau, Inc.'s (RAB's) Motion for

Sanctions, pursuant to Fed. R. Civ. P. 37 (doc. 119) ("Rule 37 Motion")and Motion for Sanctions

Under 28 U.S.C. §1927 (doc. 120)("§1927 Motion").[1] RAB, represented by attorneys Robbie

Malone ("Malone") and Eugene X. Martin ("Martin"), seeks sanctions against Plaintiff's attorney

Noah Radbil and Radbil's former employer, the Weisberg & Meyers law firm("Weisberg"),[2] for

misconduct RAB claims Radbil engaged in during the pendency of this case. More to the point, RAB

accuses Radbil and his firm of a litany of  litigation abuses, foremost of which is that Radbil and

Weisburg engaged in a pattern of prevarication and outright misrepresentations to the Court and

counsel throughout the case. RAB further maintains that Radbil and Weisburg deliberately failed

---

[1] The Court also alternatively refers to these motions collectively as the "sanctions motions."

[2] The Weisberg firm was represented by partner, Marshall Meyers ("Meyers") at the sanctions hearings. Meyers was also personally involved in the underlying litigation as well as the sanctions hearings. For clarity, when referring to "Weisburg," the Court is solely referencing Weisburg partner, Marshall Meyers.

to timely and accurately disclose their lay witnesses, their damage calculations and their experts; only to later "ambush" RAB with the withheld information at trial.[3]

For their part, Radbil and Weisburg deny they engaged in any of the alleged misconduct, and maintain that all of RAB's allegations are refuted by the record.[4]

The Court begins its discussion of the sanctions motions by summarizing the factual and procedural background of the case.

# I.

## CASE BACKGROUND

*A. Factual and Procedural*

This is a debt collection case. As detailed in previous court filings, Plaintiff, Timothy White, is a counselor for a Dallas-based surrogacy agency called Simple Surrogacy. Among his degrees, he obtained a Bachelor of Arts from the University of Texas at Austin in 1998 and a Master of Arts from Ball State University in 2000.[5] Plaintiff financed his 1998 and 2000 degrees through student loans. He consolidated his student loans with non-party Sallie Mae, which transferred the consolidated loan to non-party Texas Guaranteed Student Loan Corporation ("TG"). TG hired Defendant Regional Adjustment Bureau, Inc. ("RAB") to provide debt-collection services with regard to TG's student loans. Plaintiff did not meet his repayment obligations, and in August 2010, TG referred Plaintiff's loan for $148,000 to RAB for collection. Thereafter, RAB commenced

---

[3] Def.'s Rule 37 and §1927 Motions.

[4] Pl.'s Resp. To Def.'s Rule 37 Motion; Pl.'s Resp. To Def.'s §1927 Motion.

[5] The Court's factual account is derived from Plaintiff's Original Complaint, filed July 28, 2011. Doc. 1.

collection efforts. This suit followed.

Plaintiff's suit against RAB centers on RAB's conduct in attempting to collect on the debt White owed to TG. Specifically, the Complaint against RAB alleges four causes of action: violation of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692c(a)(2) and (3),1692d(6), and 1692e(11); the Texas Debt Collection Practices Act ("TDCPA"), Tex. Fin. Code §§392.304(a)(4), (a)(5)(B), (a)(19), and 392.404(a); the Texas Deceptive Trade Practices Act ("DTPA"), Tex. Bus. & Com. Code § 17.50(h); and the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227(b)(1)(A)(iii).[6] In connection with his claims, White sought statutory damages, actual damages, treble damages, pre- and post-judgment interest, and attorney's fees and costs.[7]

The parties filed cross-motions for summary judgment.[8] After review, the Court awarded summary judgment to White on his claims that Defendant violated the FDCPA, 15 U.S.C. §§692d(6) and 1692e(11) (on the February 17, 2011 and March 11, 2011 calls), and the TDCPA, Tex. Fin. Code §§ 392.304(a)(4) and (a)(5)(B) (on the February 17, 2011 and March 11, 2011 calls). The Court awarded summary judgment to Defendant on Plaintiff's claims that Defendant violated the FDCPA, 15 U.S.C. §§ 1692c(a)(2) and 1692e(11) (on the March 15, 2011 call), the TDCPA, Tex. Fin. Code § 392.304(a)(5)(B) (on the March 15, 2011 call) and 392.304(a)(19), as well as the DTPA, Tex. Bus. & Com. Code § 17.50(h).

As to Plaintiff's claims under the FDCPA, based on 15 U.S.C. § 1692c(a)(3), and under the

---

[6] Doc. 1, Compl.

[7] *Id.*

[8] Docs. 37, 51.

TCPA, based on 47 U.S.C. § 227(b)(1)(A)(iii), the Court found that genuine issues of material fact precluded summary judgment in favor of either party. At trial, the Court issued a directed verdict dismissing Plaintiff's TCPA, 47 U.S.C. § 227(b)(1)(A)(iii) claim.[9] The remaining claim, under the FDCPA, 15 U.S.C. § 1692c(a)(3), was submitted to the jury following a three-day trial.

On February 28, 2013, the jury returned a verdict determining that Defendant RAB did not violate § 1692c(a)(3).[10] The issue of damages on the claims Plaintiff prevailed on at summary judgment was also submitted to the jury. The jury awarded no damages of any kind to Plaintiff on the claims for which he was awarded summary judgment.[11] The Court entered Judgment on March 12, 2013, stating that Plaintiff take nothing by his suit against Defendant and dismissing the case at Plaintiff's costs.[12] In a subsequent order, the Court granted RAB's motion for costs as the prevailing party in the case under Fed. R. Civ. P. 54(d) but denied its request for attorney's fees under Rule 54.[13]

As mentioned RAB filed two post-trial motions for sanctions against Radbil and his firm. RAB's sanctions motions and the testimony from the hearings are summarized below.

---

[9] TR-3 at 10-16.  The four volumes comprising the pretrial and trial transcripts are denoted "TR-1, TR-2,TR-3 and TR-4," respectively.

[10] Doc. 116, Jury Verdict.

[11] *Id.*

[12] Doc. 117, J.

[13] Doc. 134, Order.

## II.

## RAB'S MOTIONS FOR SANCTIONS

*Rule 37 Motion - Failure To Disclose Plaintiff's Actual Damages, Counseling Efforts and Experts*

Shortly after the jury trial ended, RAB filed its Rule 37 motion in which it argued that, during discovery, Radbil failed to disclose and otherwise misrepresented key information sought by RAB on three evidentiary issues. The first of these regards Plaintiff's damages. RAB claims that, in Plaintiff's initial disclosures and at his pretrial deposition, he stated he incurred only $1500 in actual damages, and sustained no out-of-pocket costs. RAB asserts that it relied on this information in preparing for trial only to have Radbil "ambush" it with undisclosed damages evidence at trial. Radbil did this, RAB maintains, by offering testimony at trial from Plaintiff that he had, in fact, incurred $40,000 in excess loan fees due to RAB's conduct and that he had sustained another $5000 in actual damages when he "had to drop [teaching] a class" due to the stress caused by RAB's collection efforts.[14]

Second, RAB maintains that, despite Plaintiff's representation in his pretrial disclosures that he had received *no* professional counseling as a result of RAB's debt collection activities,[15] at trial—much to the surprise of RAB—Radbil attempted to introduce evidence that Plaintiff *had* sought counseling due to RAB's collection efforts.[16] RAB maintains that the entry of this 'surprise' evidence was an attempt by Radbil to deprive it of its ability to defend itself on the issue of whether Plaintiff had incurred damages due to counseling efforts.

Third, RAB claims that Radbill made an untimely attempt to add previously undisclosed

---

[14] Def.'s Rule 37 Mot. at 4; TR-2 at 199, 201-02.

[15] Def.'s Rule 37 Mot. at 3-4, App. 1-3; 5-6.

[16] Def.'s Rule 37 Mot. at 4; TR-2 at 187-88, 216-18, 220-21.

witnesses[17] to Plaintiff's witness list—some of whom appeared to be potential experts—even though the expert designation deadline of June 4, 2012 had long passed. RAB states it filed objections to these new disclosures[18] focusing in particular on the undisclosed experts. Radbil responded on February 13, 2013 (in doc. 90), to RAB's pretrial motion to strike experts (*see* doc. 75), by denying experts would testify in the following statement to the Court:

> Expert testimony is *not* required for Dr. White to prove the actual damages that he suffered as a result of RAB's legitimately abusive, deceptive, and harassing debt collection practices, several of which this Court has determined violate the FDCPA and TDCA as a matter of law. *No experts* have been designated by either party in this case and, therefore, there are none to strike. RAB's motion is frivolous, serves only to multiply proceedings unnecessarily, and should respectfully be denied. [19] (emphasis added).

Less than one week later, however, on February 18, 2013 and just days before trial, RAB notes that Radbil stated in Plaintiff's response (doc. 95) to RAB's objection to Plaintiff's pretrial disclosures (doc. 76), that[20] ". . . [c]ontrary to [RAB's] claims and speculative argument, Dr. White . . . timely disclosed each fact *witness—one* of whom will provide *expert* testimony . . . ."[21] (emphasis added).

Radbil denies all of the foregoing allegations in RAB's Rule 37 Motion, insisting that: ". . . (1) Dr. White disclosed the counseling and treatment through his original interrogatory answers and

---

[17] Def.'s Rule 37 Mot.  at 5-7; This included four previously unidentified witnesses on December 7, 2012 (doc. 69) and six previously unidentified witnesses on January 18, 2013 (doc. 74). *See also* Doc. 76.

[18] Docs. 75, 76.

[19] Def.'s Rule 37 Mot. at 6 (citing doc. 90 at 1).

[20] Doc. 95 contains Whites' Response to RAB's objections to White's Supplemental Disclosures.

[21] Def.'s Rule 37 Mot. at 6-7 (citing doc. 75).

deposition testimony,[22] (2) Dr. White supplemented his disclosures and discovery responses with his actual damages; and that (3) Dr. White's counsel neither intended to, nor did, offer any expert testimony at trial."[23]

In its Reply, RAB hotly disputes the version of events offered by Radbil in his Response. As to the damages issue, RAB maintains that Radbil's claim that Plaintiff's disclosures "placed RAB on notice of a significantly higher measure of actual and economic damages" is flatly contradicted by the record which includes, *inter alia*, White's December 15, 2011 deposition testimony.[24]

As to the counseling efforts, RAB, again, in its Reply, references specific portions of White's December 15, 2011 pretrial deposition testimony contradicting Radbil's account and substantiating RAB's position that White never disclosed any counseling efforts prior to trial. Specifically, RAB refers to Plaintiff's pretrial deposition where its counsel asked Plaintiff whether he undertook any counseling efforts (resulting from RAB's debt collection activities). White answered that he had not talked to his doctor or any other healthcare provider about RAB's debt collection activity.[25] RAB further points to White's deposition testimony that he had never discussed his panic attacks with any healthcare provider other than Dr. Cush, his rheumatologist.[26] RAB further notes that White

---

[22] Radbil asserts that White disclosed that he sought treatment from Dr. Cush at the Arthritis Care and Research Center in Dallas and at Texas A&M for anxiety and panic attacks. Radbil further argues, that Plaintiff testified "extensively" at his deposition about counseling he sought for anxiety and panic attacks as well as the medical treatment he received for the anxiety caused by RAB. Pl.'s Resp. Rule 37 Mot. at 1-2, 5.

[23] *Id*. at 5.

[24] *Id*. at 6-7; Doc. 126-1 (Plaintiff's December 15, 2011 deposition).

[25] Def.'s Reply, Rule 37 Mot. at 2-3 (citing doc. 126-1 at 42).

[26] *Id*. at 3.

testified at his deposition that he had not sought *counseling* from Dr. Cush or any other psychologist or psychiatrist.[27] As further evidence that Radbil had not disclosed White's counseling efforts prior to trial, RAB refers to an interrogatory asking White the following question:

> **INTERROGATORY NO. 23:** If you likely will require medical and/or psychiatric treatment in the future with respect to the symptoms of stress and/or mental anguish alleged in Plaintiff's Original Petition, state the name and address of each person who has advised you that you will likely require medical and/or psychiatric treatment in the future, the treatment you will likely receive, the date such treatment will likely be received, and the cost of such future medical and/or psychiatric treatment.

To which White answered:

> **ANSWER:** None. Plaintiff hereby expressly reserves the right to supplement this response throughout the continuing course of discovery

So far as Radbil's contention in his Response that White had testified "extensively" at his deposition about counseling he sought at Texas A&M, RAB again strongly discounts Radbil's contention, referring the Court to White's deposition in which he testified that the extent of his counseling at A&M was scheduling an appointment and then cancelling the appointment and not rescheduling or following through with any counseling.[28]

Finally, RAB notes that Radbil failed to even address in his Response why he gave his inconsistent responses to the Court in docs. 90 and 95 in his pretrial filings regarding his intent to present expert testimony.[29]

*§1927 Motion*

---

[27] Doc. 126-1, App. 126; TR-2 at 214.

[28] Def.'s Reply, Rule 37 Mot. at 4 (citing doc. 126-1 at 27-28).

[29] *Id.* at 9.

In its §1927 Motion, RAB complains about conduct by Radbil and his firm that spans the pretrial, trial and post-trial phases of this case. RAB maintains that Radbil and the Weisberg firm "unreasonably and vexatiously multiplied the proceedings in this case" by refusing to make a settlement demand, failing to cooperate during discovery and by withholding discoverable information. RAB further charges that Radbil and the Weisberg firm filed unnecessary motions and delayed the course of trial with disingenuous objections and obstructionist trial tactics.[30] RAB further grounds its §1927 Motion on Radbil and Weisburg's general "dishonest" conduct toward the Court and counsel.[31]

Radbil and the Weisberg firm deny all of RAB's accusations and oppose sanctions under §1927.

To sum up, the foregoing litany of allegations against Radbil and Weisberg in RAB's motions paint a troubling picture of misconduct by Radbil and his firm during the pendency of this case. The seriousness of the events described in the motions, the bulk of which were witnessed by the undersigned during the proceedings, prompted the Court to schedule an evidentiary hearing on the motions.[32] Unfortunately, instead of resolving any of the issues, the hearing served only to expand the Court's concerns about Radbil and Weisburg/Meyers. Put simply, what started as a single hearing on whether sanctions should be ordered on RAB's motions, morphed into an multi-hearing inquiry by the Court about the overall tactics and ethics of Radbil and the Weisberg firm.

---

[30] Def.'s §1927 Mot. at 5-8.

[31] STR-1 at 16-17. "STR" refers to the transcripts of the sanctions hearings.

[32] TR-2 at 221-22, 230-31, 242, 243-44, 252-57; TR-3 at 22, 30-34, 37-38; TR-4 at 17, 22.

## III.

## EVIDENCE AND FACTUAL FINDINGS

*Evidence Considered - Generally*

A considerable portion of the evidence relied on by the Court in deciding the sanctions motions was derived from the trial and sanctions proceedings themselves. Specifically, transcripts of the pretrial, trial and post-trial sanctions hearings—over which this Court presided—constitute a significant part of the evidentiary record on the sanctions issue. In addition, the parties submitted a multitude of exhibits appended to their briefing on the sanctions motions as well as numerous exhibits admitted at the sanctions hearings. The transcripts, the briefing and the exhibits—along with the Court's first-hand observation of the proceedings—form the evidentiary basis for the Court's credibility determinations, its findings of fact and for its ultimate finding that Radbil and Weisburg partner Marshall Myers engaged in bad faith conduct warranting sanctions.

It is also important to note at the outset of the Court's evidentiary review that the unusually large volume of evidence submitted by the parties, combined with the convoluted and inconsistent nature of Radbil and Myers' defenses to the accusations, made organizing the proof challenging at best. In fact, so inconsistent were Radbil's defenses to the accusations during the trial and at the later sanctions hearings, that his overall credibility as a competent, believable advocate suffered greatly. Moreover, the nature of the conduct underlying the sanctions analysis—Radbil's questionable trial tactics combined with his numerous inconsistent excuses for his conduct, which started during the trial and continued throughout the sanctions hearings—required a certain amount of repetition by the Court in its fact findings and, hence, produced this lengthy opinion. With that backdrop, the Court turns to the facts.

*Pre-Trial and Trial Conduct*

Pretrial

1.   The pretrial discovery phase of this case was marked by numerous disputes, all of which were overseen and resolved by Magistrate Judge Jeff Kaplan prior to trial—with minimal involvement by this Court. Although the pretrial acrimony was troubling, scant mention was made of the discovery disputes at the pretrial conference ("PTC"). Instead, discovery issues were referenced tangentially and only to the extent that Radbill re-urged certain discovery issues that had either already been resolved during discovery or should have been.[33] Perplexingly, it was not clear to this Court as the pretrial conference commenced, which side was responsible for the inordinately high number of skirmishes and the mutual discord that pervaded the pretrial phase. Nonetheless, as the trial progressed, the fog cleared and the Court's opinion—once informed—shifted dramatically. Specifically, a disturbing pattern of troubling conduct on Radbil's part began to emerge, ranging from a defiant, unprofessional attitude to making outright misrepresentations to the Court and RAB's counsel.

2.   First, as the Court began to interact with Radbil during the PTC, it noted a few missteps on his part which—at first blush—appeared those of a new lawyer learning the ropes of trial practice. For example, RAB's counsel, Robbie Malone, stated at the pretrial conference (without protest from Radbil) that he failed to timely return her "ten" calls and "ten" e-mails over the weekend before trial as she attempted to comply with this Court's Pretrial Order entered the preceding Friday. The order had directed the parties to attempt to resolve certain issues before the pretrial conference.[34] Radbil

---

[33] TR-1 at 27-33.

[34] TR-1 at 4-5; Doc. 107.

- 11 -

also made an untimely attempt to add witnesses to his witness list; witnesses that he had never timely or properly disclosed to RAB.[35] Moreover, Radbil exhibited considerable confusion during the pretrial proceedings over how to properly present his opening statement to the jury.[36] And he failed to provide a copy of his marked exhibits to the Court at anytime during the trial despite being directed to do so in the Pretrial Order.[37] He continually assured the Court during the trial that he had the exhibits and would provide them to the Court. He never did.

Trial

*Counseling*

3.   From the Court's vantage point, Radbil's 'novice-lawyer' missteps began to appear more purposeful than hapless during his direct examination of Plaintiff White. Specifically, Radbil posed a question to Plaintiff about whether he had sought treatment as a result of RAB's debt collection efforts, asking; "[a]nd have you sought any counseling or treatment as a result?"[38] RAB immediately objected to Radbil's question as an attempt to elicit evidence relating to damages that had not been disclosed during discovery. This prompted the Court to call a bench conference.[39] At the bench conference, when asked to respond to RAB's objection, Radbil oddly answered, that even though he had asked the question, he did *not* know what Plaintiff's answer to the question would be.[40] Confused,

---

[35] Docs. 75, 76, 95, 96; TR-1 at 33-37, 41-42.

[36] TR-1 76-87.

[37] TR-2 at 5, 139-140, 225.

[38] *Id.* at 187.

[39] *Id.*

[40] *Id.* at 187-88.

the Court followed up by asking Radbil: "I'm assuming you must be looking for something favorable or you wouldn't have asked it [the question]."[41] To which Radbil curiously responded: "sure."[42] The Court then asked Radbil: "[d]o you think [Plaintiff] . . . [is] going to say [that he sought no counseling]?" to which Radbil responded: "no."[43] The Court then sustained RAB's objection and resumed the trial.[44]

Radbil's response to the Court's questions at sidebar as to why he asked the question regarding counseling of Plaintiff; stating first that he *did not know* what the answer would be only to agree a few minutes later, under further questioning by the Court, that he assumed the answer would be *favorable*, began the steady erosion of his credibility. Further, this interaction began the first in a series of internally inconsistent explanations given by Radbil for his questionable behavior.

*$45,000 Actual Damages - Surprise Testimony*

4.   Later during the trial, also in connection with Plaintiff's damages—and contrary to his pretrial stance—Radbill asked Plaintiff about the present "status" of his loans, which evoked a response from White stating—for the first time since the inception of the case—that he had incurred an *additional $40,000* in excess fees due to RAB's refusal to work with him on a repayment schedule.[45] Also later during the proceedings, and again contradicting his pretrial disclosures and his deposition

---

[41] *Id.* at 188.

[42] *Id.*

[43] *Id.*

[44] Plaintiff later told RAB's counsel on cross examination that he had not seen a psychologist or counselor as a result of RAB's activities. TR-2 at 214.

[45] TR-2 at 189-190 (emphasis added).

testimony, White testified, on questioning by Malone, that he lost an additional $5000 when RAB's activities caused him to have to drop a teaching class.[46] When RAB's counsel questioned him on the inconsistency between his trial testimony and pretrial disclosures, Plaintiff conceded the contradiction and agreed with RAB's counsel that he (Plaintiff) had testified in his pretrial deposition that—at the time of the deposition—he was not aware of any "current economic damages" or money "out-of-pocket" as a result of RAB' actions.[47]

> *$45,000 Damages Testimony - RAB Objects - Radbil's Three Conflicting Excuses*

5.   At the close of the trial proceedings for that day, Malone complained to the Court about the unexpected $45,000 in damages testimony, arguing that Radbil had knowingly failed to disclose the $5000 and $40,000 damages figures to RAB during discovery, including during White's deposition, or at any time during the pretrial proceedings and was attempting to "ambush" RAB at trial.[48] When asked for a response by the Court, Radbil responded by indicating the figures had been disclosed: ". . . in our supplemental disclosures, our pretrial disclosures, we have amended that. I believe with respect to the charges that Mr. White incurred, *he incurred those* after the deposition."[49] To this the Court inquired: "Where are the submissions that give them [RAB] notice of the amount of damages that you are seeking outside of the initial response Ms. Malone referred to ? Where are they [$45,000] disclosed?"[50] Radbil responded by providing three internally inconsistent explanations

---

[46] *Id.* at 201-02 (emphasis added).

[47] *Id.*

[48] *Id.* at 250-52.

[49] *Id.* at 252.

[50] *Id.* at 252-53.

for his actions.[51] Radbil first insisted again that he *had* in fact disclosed the $5000 and $40,000 to RAB

---

[51] The full account from this discussion between the Court and Radbil when the Court asks whether he had made the $40,000 and $5000 damages disclosures reads:

MR. RADBIL: . . . [describing when and how he disclosed the foregoing damages] . . . And in our [Radbil's] supplemental disclosures, our pretrial disclosures, we have amended that. I believe with respect to the charges that Mr. White incurred, he incurred those after the deposition.

THE COURT: Where are the submissions that give them notice of the amount of damages that you are seeking outside of the in initial response that Ms. Malone referred to? Where are they disclosed?

MR. RADBIL: In the pretrial order. They were disclosed at the mediated settlement conference.

THE COURT: Okay. Well, you know better than that. You know -- the federal rules require you to respond to questions about damages so that they can meet your proof at trial. So the fact that you discussed it in mediation doesn't count.

MR. RADBIL: Okay.

THE COURT: And you know that. And so the pretrial order --

MR. RADBIL: Pretrial disclosures.

THE COURT: The pretrial disclosures, okay. Show me where and what page and where those would be.

MR. RADBIL: I believe we copied and pasted from the pretrial order. I don't know if I have a copy of our pretrial disclosures with me.

THE COURT: Ms. Malone, do you have those?

MS. MALONE: Yes, ma'am, I sure do.

THE COURT: Thank you.

Mr. Radbil, take a seat. Let me hear what she has to say.

MS. MALONE: Your Honor, just so you know, the first entry under tab 6 is his original disclosures. I apologize for the highlighting. And the second one behind the yellow sheet is his supplemental.

THE COURT: And they are not in there?

MS. MALONE: They are.

THE COURT: As far as --

MS. MALONE: The references to the damages is *not* included in the supplemental.

THE COURT: Mr. Radbil?

MR. RADBIL: I don't know what document --

THE COURT: Okay. Let's have you take a look at it.

MR. RADBIL: Defendant's wrongful conduct caused the plaintiff to suffer legitimate actual damages. Plaintiff's actual damages not only include out-of-pocket expenses but also damages for personal humiliation --

THE COURT: What exactly are you reading from?

MR. RADBIL: Defendant's APP018, document 76-1.

THE COURT: I guess my question is, where is it in there that talks about this amount of money above the $1,500 that you initially disclosed. And I think it would be better if you went back to the microphone.

MR. RADBIL: It's not quantified.

THE COURT: So they weren't on notice of the amounts that you have come up with here during

"in the pretrial order" and "at the mediated settlement" conference. But Radbil could not substantiate

this claim in the referenced materials or anywhere else in the record for that matter.[52] Upon further

---

the testimony at trial.

MR. RADBIL: Through our settlement negotiations.

THE COURT: Okay.

MR. RADBIL: And --

THE COURT: . . .

Go ahead. What else? Where else?

MR. RADBIL: Certainly not here.

THE COURT: So you agree that the amounts that were talked about were never specifically disclosed.

MR. RADBIL: I don't know the definitive answer, but I know that we have supplemented and they [RAB] have been on notice of a significant amount of actual damage for a long time.

THE COURT: By virtue of what?

MR. RADBIL: I don't have all of our discovery responses.

THE COURT: You can't tell me off the top of your head where you might have disclosed the specific amount beyond the $1,500?

MR. RADBIL: A specific amount? I don't know whether we did disclose a specific amount.

THE COURT: I've heard enough. Anything else?

MR. RADBIL: There's a requirement to disclose the exact amount of the damages that we're seeking?

THE COURT: What is your position on that?

MR. RADBIL: That the damages --

THE COURT: You have a federal practice, is that what you say?

MR. RADBIL: I'm sorry?

THE COURT: You have a federal practice, is that what you say?

MR. RADBII: You have a federal practice, and you don't know the answer to the question ?

MR. RADBIL: He's seeking damages --

THE COURT: How about a straight answer?

MR. RADBIL: -- for mental anguish and emotional distress.

THE COURT: How about a straight answer? You don't know the answer to that question?

MR. RADBIL: That is a straight answer to the question.

THE COURT: That you have no obligation to quantify your damages in federal practice when asked in discovery and even by virtue of the disclosure requirement. You're saying that you don't know if that's a requirement. You don't know that that's a requirement. That's what you have said. Am I right?

MR. RADBIL: That's a question for -- the jury determines the actual amount of damages.

THE COURT: Mr. Radbil, I have never heard more prevarication in my life. Have a seat. Have a seat.

*Id.* at 251-57.

[52] *Id.* at 253-57.

- 16 -

delving by the Court, Radbil shifted to a second explanation that the $5,000 and $40,000 figures were actually not "quantified" in the pretrial disclosures but insisting that RAB had "been on notice of a significant amount of [Plaintiff's] actual damage for a long time."[53] Appearing then to abandon his insistence that the actual *figures* had ever been disclosed, Radbil shifted theories for the third time, expressing dismay that the $5,000 and $40,000 figures even had to be disclosed in their "exact amount"[54] because they were based on Plaintiff's "mental anguish and emotional distress" and for the jury and not the Plaintiff to quantify.[55] Radbil never explained how the $40,000 and $5000 figures, he defended as properly in evidence, were not quantifiable given that the figures were derived from testimony by Plaintiff about his actual out-of-pocket losses—as opposed to abstract emotional/mental anguish damages—due to RAB's debt collection activities. From the Court's perspective, Radbil appeared to be 'making it up as he went along' in a litany of internally inconsistent explanations to the Court.

*Second Deposition Argument by Radbil*

6.    Another disturbing event—in keeping with Radbil's pattern of prevarication and evasiveness—that occurred at the close of the trial testimony was when Radbil insisted he needed to recall Robert F. Wyatt, the Director of Compliance for Human Resources for RAB. Radbil urged the Court to allow him to recall Wyatt as a "corporate representative" even though Radbil had already called him to the witness stand and questioned him at length. Radbil's excuse for recalling Wyatt was that Wyatt had given insufficient answers at his pretrial deposition. To support his position that the

---

[53] *Id.*

[54] *Id.* at 255-56.

[55] *Id.* at 256-57.

deposition was faulty and inadequate, Radbill quoted from that deposition to the Court. Disconcertingly, a few minutes later, RAB's counsel pointed out—and Radbil conceded—that Radbil, in arguing to recall Wyatt, had disingenuously been quoting from Wyatt's *first* pretrial deposition. When, in fact, the magistrate judge on Radbil's motion had permitted Radbil a *second* pretrial deposition to re-explore this very topic with Wyatt who, in preparation, had educated himself on the topic and had testified for 45 minutes at the second deposition under questioning by Radbil.[56] Moreover, Radbil had asked Wyatt the same-type questions in the second deposition that he sought to ask by recalling Wyatt to the stand on direct examination at trial—all the while justifying recalling White by pointing to the inadequacies in the first deposition.[57]

*Warning by the Court*

7. At the close of the foregoing discussion, the parties rested. Radbil's trial missteps coupled with the disturbingly circular explanations for his conduct prompted a warning from the Court. The Court admonished Radbil about his tactics, stating to him: "I am concerned about your conduct in this case . . . . [W]hat I have seen here is disingenuous behavior . . . that seems to skirt the truth in more that one respect."[58] The Court then adjourned for the day but instructed the parties to appear the next day by 8:00 am to finalize the jury instructions and present their closing arguments to the jury.[59]

---

[56] *Id.* at 222-42.

[57] *Id.* at 158-68.

[58] *Id.* at 242.

[59] *Id.* at 258.

*Second Day of Trial - Radbil's No-Show and White's Admission to the Court in Radbil's Absence That He Had Quantified his Damages*

8.   The following day, the Court, RAB's counsel, Malone and Martin, and Radbil's client, Timothy White, were present in court at 8:00 am as directed. Radbil, however, was nowhere to be found; he neither appeared nor called the Court to explain his absence. By 9:00 am Radbil had still not appeared nor had he called the Court. At ten minutes after 9:00 am, the Court convened proceedings in the courtroom and asked Plaintiff if he had heard anything from the still-absent Radbil. Plaintiff stated that he had not heard from Radbil and that they had agreed to meet at 7:00 am that morning.[60] Plaintiff, looking exasperated, stated he had left several unreturned messages for Radbil and did not know what was going on.[61] The Court then asked Plaintiff if he would like time to try to reach Radbil again and decide how to proceed; to which Plaintiff spontaneously offered:

> I can do that. And again, I apologize. I'm embarrassed, actually mortified, you know, by the circumstances. This is a huge inconvenience to the Court, and I apologize to Ms. Malone and Mr. Wyatt. *I'm really not aware of what's going on with Mr. Radbil.* I didn't -- you know, I didn't dial a lawyer. I contacted a student loan advice website and -- over a number of months, actually, and was referred to this law firm. Everything seemed to be square. Everything seemed to be legitimate. I'm not an attorney, but, you know, they seemed to know what they were doing, and I'm sorry that this has happened . . . .[62]

The discussion on how to proceed without Radbil continued. And the Court proceeded, as planned, still assuming Radbil would appear, to grant RAB's Rule 50 motion as to the TCPA claim which RAB and Radbil had argued the previous afternoon.[63] With jury arguments looming and the

---

[60] TR-3 at 3

[61] *Id.*

[62] *Id.* at 7-8.

[63] *Id.* at 10-16.

Court's instructions set to be finalized, the Court advised Plaintiff that he did not have to speak to RAB's counsel about possible settlement but that it was entirely his choice. White was advised by the Court to take some time to decide what he wanted to do.[64]

Later, still waiting for Radbil, Plaintiff spontaneously offered a comment as to Radbil's confusing argument the previous day when he attempted to justify his non-disclosure of the $45,000 in damages to the Court with three conflicting excuses. White stated:

> . . . I apologize, it seems presumptuous for me -- seems like I'm acting like my own attorney, which I am not in any way. But I felt like I should make a response to the issue of sandbagging [by Radbil] yesterday with the claims. **I did quantify the damages**. And they were *not* an abstract sum for mental anguish [as urged by Radbil], they were *real financial damages* that I suffered. **I made sure Mr. Radbil had that information**. The [magistrate judge] . . . recorded it in the settlement conference, and **I was led to believe it would be submitted** for this trial, which of course it wasn't. So I apologize."[65]

*Radbil Appears Two Hours Late for Trial*

9.  The Court then adjourned briefly to allow Plaintiff and RAB to discuss possible settlement as indications were that Radbil had abandoned his client. The Court recessed at 9:15 am until 10:15 at which time Radbil appeared in court.[66] He explained that he had suffered food poisoning that morning but did not contact anyone because "there was nobody that [he] could call."[67] From the Court's viewpoint, Radbil's appearance and demeanor that morning did not comport with his story that he had been—just an hour or so earlier—so stricken with food poisoning that he was unable to contact the Court or his client.

---

[64] *Id.* at 18.

[65] *Id.* (emphasis added).

[66] *Id.* at 20-21 (emphasis added).

[67] *Id.* at 21-22.

After Radbill arrived, White indicated to the Court that—in Radbill's absence—he had tentatively reached an agreement with RAB.[68] RAB's counsel recited the terms of the settlement on the record. Radbil, having none of it, insisted on counseling his client.[69] After talking to Radbil in private, White stated he wished to continue with Radbil as his lawyer.[70] The Court adjourned as the parties agreed to discuss settlement which apparently involved nothing more that Radbil accusing RAB's counsel of misconduct in talking to his client. In short, Radbil refused go forward with the settlement agreement that Plaintiff had agreed to in his absence and instead accused RAB's counsel of threatening White.[71]

*More Warnings by the Court*

The Court warned Radbil:

. . . Mr. Radbil, your behavior has been shocking. And I have found it driven as we go through this by bad faith and dishonest behavior. You didn't show up for trial this morning after your poor, substandard behavior yesterday; no word from you. As I said, I have no glimmer of belief that you were sick, . . . [Y]ou have shown up and you look fine, and no one heard from you for two hours, including your client. So don't you dare accuse defense counsel of anything, when you brought on all of the chaos this morning that caused the Court to ask, in my obligation, to make sure things are being ethically conducted, to ask your client if he heard from you, and, if not, what his position was on this case. As far as I knew, you abandoned the case . . . . We will take care, Mr. Radbil, of your conduct after this case is over, and it will be serious.[72]

10.  Next, the parties presented their jury arguments, the Court read the jury instructions and

---

[68] *Id.* at 22-26.

[69] *Id.* at 28-29.

[70] *Id.*

[71] *Id.* at 37.

[72] *Id.* at 37-38.

the jury retired to deliberate at 4:25 pm on February 27, 2013 and then adjourned for the day at 5:00 pm.[73] The jury returned the next day at 8:30 am. By 9:15 am they returned a verdict in favor of RAB on all claims against them. As to those claims on which Plaintiff had prevailed on summary judgment, the jury found that Plaintiff should receive "$0" damages.[74]

Before adjourning the trial, the Court notified Radbil:

> Mr. Radbil, we will have a full sanctions hearing, not only about your conduct and misrepresenting facts to the Court over and over in this case and then falsely accusing counsel, which are two of the most serious offenses that you can make as before a tribunal, but also I am really concerned that you are not capable or competent to be representing clients in federal court. And so the hearing will also bear upon your qualifications and whether or not you should be prohibited from practicing in federal court based upon the incompetence and, more importantly than that, the dishonesty that you have displayed throughout this case.[75]

11.   To sum up, Radbil's conduct at the pretrial and trial, from the Court's first-hand observation, appeared to be that of an arrogant, yet surprisingly short-on-experience and unprepared representative for his client. He displayed a woefully inadequate understanding of basic pretrial procedures on such issues as timely designating witnesses, the components of a proper opening statements and even the need to provide marked exhibits to the Court and co-counsel. More importantly, during trial, he elicited testimony (about actual damages and counseling efforts from his client) that he had never disclosed to RAB despite RAB's proper discovery requests for the information. This unexpected testimony was highly disconcerting to RAB, having gone to extensive efforts to prepare for trial based on the discovery and disclosures it received from Radbil.

---

[73] *Id.* at 103.

[74] TR-4 at 2-24; Doc. 116.

[75] TR-4 at 13-14.

By far the most egregious and disappointing aspect of Radbil's trial conduct was his willingness to mislead the Court and counsel. Indeed, as will be addressed in more detail in the next sections, replete throughout the record, is example after example of Radbil's seemingly ingrained practice of prevarication and misrepresentation. It was this practice that tainted the entire trial and obstructed the truth-seeking function of the Court.

As mentioned above, RAB filed its sanctions motions shortly after trial. A hearing on the motions was convened on August 2, 2013.

*Sanctions Hearings*

<u>August 2, 2013 Hearing</u>

12.  At the August 2, 2013 hearing on the sanctions motions, attorneys Malone and Martin appeared on behalf of RAB. Noah Radbil was represented by Marshall Meyers, a partner in the Weisburg firm. Meyers also appeared on behalf of the Weisburg firm.[76]

13.  Malone, in her opening statement explained that her motions for sanctions were based, *inter alia*, on Radbil's misrepresentations and attempted "sandbagging" of RAB during trial with the previously undisclosed $5000 and $40,000 in damages.[77] She further stated that she was basing her request for sanctions on Radbil's deception to RAB and the Court regarding Plaintiff' counseling efforts.[78] She argued that Radbil's overall refusal to cooperate during the entirety of the proceedings

---

[76] STR-1 at 3 (The sanctions hearings transcripts will be denoted with an "S" preceding the "TR" and will include the volume number of the transcript.)

[77] *Id.* at 8.

[78] *Id.* at 10.

caused RAB multiple extra hours of work.[79] These extra efforts, she maintained, included attempting to prepare and defend a case in which they were lied to, given incomplete and/or incorrect information and were forced to review numerous documents. All of this, Malone complains, was required to establish to the Court that numerous representations by Radbil to the Court and counsel were flatly contradicted by the record.[80] As a side note, much of the complained-of conduct occurred in the Court's presence or was evident to the Court by virtue of Radbil's behavior during the proceedings.

14.   Meyers spoke next. Much to the Court's dismay, he adopted an unexpectedly defiant tone, most of which failed to address the accusations in RAB's sanctions motions or Malone's argument. Instead, Meyers touted his confidence in his and his firm's integrity. He refused to concede that Radbil engaged in any misconduct—save failing to appear in court on the day of jury argument. In short, by refusing to acknowledge the undeniable shortcomings in Radbil's representation of Plaintiff, he lost credibility with the Court as soon as he began speaking and things only got worse from there. In short, Meyers adopted the same evasive refusal to answer direct questions or concede facts that were clearly established by the record that characterized Radbil's approach to the case. A sampling from Meyers' opening comments:

It's exceptionally difficult, Judge, to sit and listen to what Ms. Malone said. I am here, Your Honor, to take responsibility for anything that my firm did, and Mr. Radbil is part of my firm. Ms. Malone certainly uses a lot of words, but I see them, Your Honor, *as really naked allegations*. There are clearly some things -- and obviously Mr. Radbil being late to trial, there is no excuse for that, there is no response to that, and we deserve whatever penalty the Court imposes. To suggest that Mr. Radbil is a liar really hurts me, Your Honor,

---

[79] *Id.* at 8-10.

[80] *Id.* at 4-13.

because I know Noah and have worked with him for a long time. I'm here to listen, like the Court is, to the evidence and see if I'm mistaken. But everything I know about Noah runs contradictory to what Ms. Malone says. When we talk about the Rule 37 motion, Your Honor, I think we laid out in our response point by point to every allegation that Ms. Malone made how she was mistaken as to what occurred. And I believe in the 1927 motion we did the same, Your . . . But I've obviously got to touch on some of these issues to show the difference between us being wrong as a matter of fact or law in the Court's view versus us engaging in behavior that deserves sanctions. And I can't talk about one without crossing into the other, but I want to be clear. I'm not asking the Court to reconsider anything.[81]

. . .

   It is obviously imperative to me as a person, not as a lawyer but as a person, that I do things the right way and my firm does things the right way. And to suggest I am manipulating consumers is really a very tough pill to swallow.[82]

. . .

   I'm here, Your Honor, to -- to learn from the Court what we could have done differently, what we could have done better. And I'm here to explain, Your Honor, that no matter how it is casted,(sic) it is not who I am as a lawyer, as a business person, as a human being, to be the terrible person that Ms. Malone makes me out to be. I am very selective in the cases I bring and in the clients I accept, Your Honor. And certainly it's the practice of law, and I've got to get better at it, and I believe that I will get better every day until I obviously stop working, Your Honor. But at the end of the day, Your Honor, I think -- I would -- very clear on being late to trial, no question, sanctions. *A little less clear on what exactly it was that we did during the case that is worthy of sanctions.* And I would like obviously to hear specifically and be able to present the Court evidence.[83]

15.   Toward the close of Meyers' opening remarks, the Court asked Meyers whether, in preparing for the hearing, he had spoken to Plaintiff White about the allegations by RAB against Radbil. Meyers responded; ". . . I have not [spoken to White]." The Court, taken aback that Meyers had not approached his firm's client under the circumstances, then inquired: "So you've got . . . these motions for sanctions, you've got a highly unusual situation with one of your attorneys . . . , and you

---

[81] STR-1 at 17-18 (emphasis added).

[82] *Id.* at 19.

[83] *Id.* at 37 (emphasis added).

*haven't talked to the client* about what happened?"[84] Meyers responded:

> You know, I haven't, Your Honor. I haven't. And it was a decision that I did not want to bring up anything to Dr. White that would, you know, rehash anything that was bad that occurred, Your Honor. And because I was not there, I really didn't want to get a skewed vision of what happened. I wanted my understanding to be based on the transcript, itself, because that would seem to be the strongest indicator of what happened.[85]

Meyers then stated that "this has been a very difficult, difficult thing for me to get my head around."[86] Shortly after this discussion, the testimony began with Malone calling Radbil as her first witness.

*Radbil's Testimony*

16.   Rather than recount Radbil's lengthy sanctions hearing testimony in full, the Court will review the key points.[87] First, as an overview, Radbill's testimony at the hearing was fraught with the same defiant, frustratingly obtuse manner of answering questions that mirrored his approach at trial.[88] As will be seen below, Radbil's description of many events was illogical and in many respects contradicted by the record including by his own prior statements. It also required the Court, on countless occasions, to call on RAB to research its records, the court records and the transcripts in order to respond to Radbil's numerous conflicting statements about what had occurred in the case.

---

[84] *Id.* at 38 (emphasis added).

[85] *Id.*

[86] *Id.* at 39.

[87] Because there are multiple instances of misconduct by Radbil complained of by RAB, (i.e. Radbil's failure to properly prepare for trial, to timely file and serve his exhibit list on RAB; his failure to provide the Court with any exhibits, etc.), the Court, for the most part, confines its discussion to the most serious violations.

[88] *See* Mem. Op., *supra*, at 15-16, n.51.

17.  Radbill testified that he graduated from law school in 2009 and resides in Arizona.[89] He testified (in a later hearing) that in July 2012, after approximately 18 months of practice, he was counsel of record in approximately 100 cases.[90]

18.  Although Radbil claimed at the time of his testimony that he had an actual—as opposed to 'virtual'—office in Texas, his official office address, at the time of the hearing, listed with the State Bar of Texas is a post office box. Radbil denied this, claiming to have updated the address, but when confronted with the State Bar website information by RAB's, counsel, he conceded the issue.[91]

*Radbil Suspended from Practice*

19.  Radbil had been suspended from the practice of law during a portion of the pendency of this case for failing to pay his dues to the State Bar of Texas. Nonetheless, at the hearing, he refused to admit he had been suspended. The now-standard, extremely frustrating back and forth with him on this topic is set out below.[92] Even Meyers, Radbil's lawyer, later told the Court that Radbil should

---

[89] STR-1 at 44-52.

[90] STR-4 at 237.

[91] *Id.* at 48-49.

[92] The discussion on his suspension mirrored his circular method of avoiding a straight answer to a straightforward questions:

Q. (By Malone): Mr. Radbil, during the course of this case on the second deposition that was taken of Bob Wyatt, at that time you were technically suspended from the State Bar of Texas for failure to pay your bar dues; isn't that correct?

A. (Radbil): I don't know the answer to that. I don't recall the exact date when that occurred. . . . I know that you and I had a case in the Dallas County District Court, and before court one morning I came in and was sitting next to you. And then we made our appearances on the record, at which time you said there was a housekeeping matter, Judge. It's come to my attention that Mr. Radbil has been -- his law license has been suspended for not paying bar dues, at which point -- and this is all on the record. Of course I was surprised and shocked and told the judge that that was news to me, that it was something that my firm handles as a logistical matter for me. And you said that I couldn't appear in court. And we actually called the

have admitted to the suspension question.[93]

20.   Radbil was also asked about several incidents that RAB considered misconduct on his part. One of those issues was whether his firm had ever conveyed a reasonable settlement demand to RAB.[94] After a frustratingly circular response, Radbil finally admitted that the only post-filing demand *he* gave RAB was for approximately $100,000.[95]

---

State Bar on a conference call and found out that what I had to do was just to pay my dues immediately and that I could do that online, and we took care of that online and proceeded. So there's a record of that, and I would defer the Court --

Q. (Court): You were suspended, she was right, correct?

A. (Radbil): I don't know whether . . .

Q. (Court): Oh, come on, Mr. Radbil. You were suspended when she said you were suspended, you just agreed to it by talking about what you did with the State Bar; you were suspended when she said you were suspended during that case for not paying your dues, correct?

A. (Radbil): I don't know the answer to that. I think the fee issue is the eligible practice versus merit-based suspension.

Q. (Court): Were you suspended from the practice of law for not paying your dues?

A. (Radbil): I would have to contact the State Bar and find out the answer to that.

Q. (Court): So you don't know the answer.

A. (Radbil): Correct.

STR-1 at 50-52.

[93] *Id.* at 53.

[94] *Id.* at 58.

[95] *Id.* at 58-63. The specific testimony on the demand issue was:

Q. (Malone): Isn't it also true that following the summary judgment motion only Mr. Meyers communicated with me regarding settlements.

A. (Radbil): That's incorrect.

- 28 -

Q. (Malone): Are you saying that you communicated with me regarding settlements after the summary judgment ruling by the Court?

A. (Radbil): Specifically, yes.

Q. (Malone): At mediation only.

A. (Radbil): No, prior to.

Q. (Malone): When did you communicate a demand to me, Mr. Radbil?

A. (Radbil): I remember -- I have an e-mail in one of the binders that you and I are discussing settlement, particularly my view that our clients would hopefully resolve this matter at the mediated settlement conference so we wouldn't have to try Dr. White's remaining claims.

THE COURT: The question she [Malone] asked you was, when did *you* communicate a demand to her?

A. (Radbil): There was an initial demand *before* we filed suit, and then far before the mediated settlement conference there was an $8,500 demand that was communicated to Ms. Malone.

THE COURT: By you?

A. (Radbil): Personally, no, it was not.

Q. (By Ms. Malone): My question is: When did you relay any demands to me prior to the mediated settlement conference, Mr. Radbil?

A. (Radbil): Relay or personally -- I didn't personally --

Q. ((Malone): Personally give me one, Mr. Radbil.

A. (Radbil): I don't recall whether I did or not. I may  have --

Q. (Malone):Thank you, sir.

A. (Radbil): -- but we certainly --

Q. (Malone): Okay. Now, Mr. Radbil, at the mediated settlement conference, did you make a demand in excess of $100,000?

A. (Radbil): Does the Court allow me to talk about the mediated settlement conference?

THE COURT: I want you to answer the question; yes.

- 29 -

*Unexpected $45, 000 in Actual Damages Testimony - Two New Post-Trial Excuses*

*Background*

21.   Malone next questioned Radbil about the incident at trial regarding the testimony by White about his $40,000 and $5000 in damages. As described above and for context here, in Radbil's September 29, 2012 pretrial disclosures to RAB, Radbil stated that Plaintiff's damages were limited to $1500 in actual damages, reserving the right to supplement.[96] As also described above, on January 18, 2013, just weeks before trial, Radbil disclosed that Plaintiff's actual damages—without citing any monetary figures—included any out-of-pocket damages as well as damages for public humiliation, embarrassment, mental anguish and emotional distress.[97] Later, at trial— for the first time, since the inception of the case—Plaintiff testified that he had incurred $40,000 in excess fees due to RAB's refusal to work with him on a repayment schedule.[98] White also testified that he lost an additional $5000 due to RAB's activities causing him to have to drop a teaching class.[99] RAB objected at trial to the unexpected damages testimony. And, as described above, after RAB's objected to the

---

A. (Radbil): After discussing with my client at length and based on the strategy that I had prepared in good faith to try to settle this matter, I think that, yes, a demand over $100,000 was made, although I don't recall the specific amount.

Q. (Malone): Did Judge Stickney tell you that that demand was inappropriate in a case with the kind of damages we had.

A. (Radbil): I don't recall. I don't think so . . . .

[96] STR-1 at 69-72; RAB -S, Tab 1, at 164. ("RAB-S" denotes the notebook of exhibits offered by RAB at the sanctions hearing).

[97] STR-1 at 69-70; RAB-S, Tab 2, at 158-59.

[98] TR-2 at 189-190 (emphasis added).

[99] *Id*. at 201-02 (emphasis added).

testimony, Radbil gave the Court *three* different explanations as to how he had fulfilled his pretrial disclosure obligations as to the damages figures. First, he said that he *had* disclosed the damage figures. Second, he claimed that the damages were disclosed but not quantified. And, third, Radbil maintained that the $40,000 and $5000 figures were based on emotional distress and mental anguish and, therefore, did not need to be reduced to specific amounts.[100]

As discussed next, at the August 2, 2013 sanctions hearing and in his sanctions briefing, Radbil came up with two new reasons for his failure to disclose the $45,000. Neither of these new excuses were mentioned by Radbil when the Court questioned him at trial. Moreover, both of his new excuses conflicted with his explanations to the Court during trial.[101]

*New (Fourth) Excuse - Actual Damages Were Part of a Confidential "Privileged" Settlement Memorandum and Thus Could Not Be Disclosed*

22.  For context, as mentioned, during trial, RAB accused Radbil of attempting to ambush it at trial with the $45,000 damages testimony by White. In support of its "ambush" theory, in its Rule 37 Motion, filed shortly after trial, RAB argued that Radbil's attorney billing records revealed that Radbil, the day before pretrial disclosures were due (December 7, 2012), had reviewed a memorandum from White to Radbil on the topic of White's actual damages but that this memorandum had never been disclosed to RAB in violation of Fed. R. Civ. P. 37.[102] This, RAB argued in its sanctions briefing, proved that Radbil had intended to "ambush" RAB at trial with

---

[100] TR-1 at 251-57.

[101] TR-2 at 251-57.

[102] Def.'s Rule 37 Motion at 5; *see also* STR-1 at 71-72; RAB-S, Tab 7 at 108.

undisclosed damages evidence provided to Radbil before trial.[103]

Responding to this allegation, Radbil maintained in his post-trial sanctions briefing that White's December 6, 2012 actual damages memorandum was received and reviewed by him but not disclosed to RAB because it was a privileged document. Nonetheless, Radbil insisted, RAB was well aware of this privileged memorandum prior to trial—ostensibly, from Radbil's attorney billing records in RAB's possession—but that RAB never moved to compel. Radbil justified his non-disclosure of the information in the memo as follows:

> . . .
> . . . The particular document in question is a memorandum regarding actual damages that Dr. White's counsel requested he draft in preparation for trial. *See* Doc. 119 at 5. Dr. White's counsel was not required to provide Dr. White's actual damages memorandum to RAB under Fed. R. Civ. P. 26(a)(1)(B) because Dr. White's actual damages memorandum is privileged or protected from disclosure under Fed. R. Civ. P. 26(b)(3)(A)(i)-(ii) . . . .
>
> Having been prepared specifically at the request of his counsel in preparation for trial, Dr. White's memorandum regarding his **actual damages** would not ordinarily be discoverable absent RAB showing a substantial need for the materials to prepare its case *and* an inability, without undue hardship, to obtain substantially equivalent evidence by other means. *See* Fed. R. Civ. P. 26(b)(3)(A)(i)-(ii). Dr. White's deposition provided such means. *See* App. 25 (White Dep. at 29:16-23 (estimating disputed amount of debt owed to Texas Guaranteed at $40,000).
>
> While Dr. White did not expressly claim that Dr. White's actual damages memorandum was privileged and protected as trial-preparation materials under Rule 26(b)(5), **RAB admittedly received notice of the Dr. White's trial preparation memorandum prior to trial. Doc. 119 at 5.** Having filed two prior motions to compel discovery . . . one denied as moot and the other on its merits, *see* sections I and II, *supra*, RAB took no action to compel the memorandum's production. Therefore, RAB necessarily failed to show any substantial need for the memorandum or that it could not obtain substantially equivalent evidence through its client, Texas Guaranteed.[104]

In other words, Radbil urges in his sanctions briefing, that on December 6, 2012, he (Radbil) received a "confidential" memorandum from White regarding White's actual damages, which Radbil

---

[103] Def.'s Rule 37 Motion at 3-5.

[104] Pl.'s Resp. To Def.' Rule 37 Motion at 11-13 (emphasis added); Doc.119 at 5.

claims RAB was aware of but, nonetheless, failed to move to compel, thus depriving itself of the ability to view its contents. Thus according to Radbil, it was RAB's own fault for not getting the information Radbil possessed regarding White's actual damages that RAB claimed it was entitled to. Radbil repeated this theory at the sanctions hearing on August 2, 2013.[105]

But this made little sense under the circumstances. Despite being inconsistent with his plethora of other excuses for permitting the $40,000 and $5000 damage testimony by White, Radbil wholly fails to explain how RAB had a duty or even the ability to glean from Radbil's cryptically worded billing statements[106] that they contained White's hard damages figures. Moreover, Radbil fails to address how or why RAB would even suspect that it needed to move to compel this memorandum from the billing statements when all indications from Radbil to RAB during the entirety of formal discovery and pretrial phases of the case were that White had no more than $1500 in actual

---

[105] STR-1. at 72-74; Pl.'s Resp. To Def.' Rule 37 Motion at 11-12.

[106] The invoice in question, found in RAB-S, Tab 7 at 108, simply reads:

| 12/6/12 | Noah Radbil | Receive and review Dr. White's memorandum regarding actual damages (.2); email to Marshall Meyers and Aaron Radbil (.1); reply email to Dr. White (.1) | .40 |
| 12/6/12 | Aaron Radbil | Review statement of actual damages [REDACTED] (.2); prepare email to Noah and Marshall with questions and comments (.1). | .30 |

damages.[107]

*The Fifth Excuse for the $45,000 Undisclosed Damage Testimony at Trial - "Rogue Response" by White.*

23.  Further undermining Radbil's steadily faltering credibility was, again, during the August 2, 2013 hearing  when he came up with yet a fifth theory for not turning over the $45,000 figure to RAB. Specifically, Radbil, during his August 6, 2013 testimony, for the first time since White's trial testimony, stated (in response to a question by Meyers), that the $40,000 and $5000 damages figures came out as a complete surprise to Radbil, a sort of "rogue" response by White.[108]

But, this newly added "rogue client" theory was as dubious as the others for several reasons. For one, Radbil had vigorously defended the admission of the $45,000 during trial. Even when he stated that the $45,000 constituted unquantifiable mental anguish damages, never did he say at trial that the $40,000 and $5000 figures did not belong in the case or were erroneously interjected into the case by him or by a "rogue" client. And not once did Radbil allude to this "rogue client" theory in his sanctions briefing.

*Undisclosed Counseling Efforts*

24.  Next, Malone questioned Radbil regarding RAB's contention that Radbil tried to offer undisclosed testimony about Plaintiff's efforts to undergo counseling.[109] As recounted above, during the trial, Radbil asked Plaintiff whether he had sought counseling due to RAB's debt collection activities, RAB objected, prompting the Court to call a side-bar conference. At the side-bar

---

[107] STR-1 at 69-72; RAB -S, Tab 1 at 164.

[108] STR-1 at 140-43, 148-53.

[109] *Id.* at 74-76.

conference, Radbil strangely told the Court that he did *not know* what Plaintiff's response to the counseling question would be.[110] And then, after a question by the Court, Radbil said he assumed the answer would be favorable.

At the sanctions hearing, however, Radbil did an about-face, now insisting that Plaintiff *had* sought counseling prior to trial.[111] Radbil also maintained—in his responsive briefing to the sanctions motions—that Plaintiff had disclosed both in his interrogatory responses and in "extensive" deposition testimony that he had received counseling.[112] But, as explained in RAB's Reply to Radbil's Response to RAB's Rule 37 Motion, none of this is true. As described below, nothing in the record supports Radbil's assertion that Plaintiff either sought counseling or disclosed any counseling efforts before trial.

In its Reply and at the sanctions hearing on the counseling issue, RAB points to pretrial deposition questions by its counsel asking White whether he undertook any counseling efforts (resulting from RAB's debt collection activities). White answered that he had not talked to his doctor or any other healthcare provider about RAB's debt collection activity.[113] RAB further points to White's deposition testimony that he had never discussed his panic attacks with any healthcare provider other than Dr. Cush, his rheumatologist.[114] RAB also notes that White testified at his deposition that he had not sought counseling from Dr. Cush or any other psychologist or

---

[110] TR-2 187-88.

[111] STR-1 at 75-76.

[112] Pl.'s Resp. To Def.'s Rule 37 Mot. at 4-6.

[113] Def.'s Reply, Rule 37 Mot. at 2, 8-9; Doc. 126-1 at App. 124-27.

[114] Def.'s Reply, Rule 37 Mot. at 2-4 (citing Doc-126-1).

psychiatrist.[115] As further evidence that Radbil had not disclosed White's counseling efforts prior to

trial, RAB refers to an interrogatory asking White the following question:

> **INTERROGATORY NO. 23:** If you likely will require medical and/or psychiatric
> treatment in the future with respect to the symptoms of stress and/or mental anguish
> alleged in Plaintiff's Original Petition, state the name and address of each person who has
> advised you that you will likely require medical and/or psychiatric treatment in the future,
> the treatment you will likely receive, the date such treatment will likely be received, and
> the cost of such future medical and/or psychiatric treatment.

To which White answered:

> **ANSWER:** None. Plaintiff hereby expressly reserves the right to supplement this response
> throughout the continuing course of discovery

In the face of this undeniable evidence, Radbil's assertions that White sought counseling and

that it was, therefore, an appropriate area of inquiry at trial is flatly false.

*Undisclosed Witnesses*

25. Next up at the August 2, 2013 hearing was the topic of RAB's complaint about Radbil's

attempt to offer undisclosed witnesses at trial.[116] Specifically, on December 7, 2012, Radbil

supplemented his pretrial disclosures with nine previously undisclosed witnesses.[117] On January 18,

2013, a few weeks before trial, Radbil again supplemented his pretrial disclosures with additional

witnesses, five of whom had not previously been disclosed, four of those who appeared to be expert

witnesses.[118] Radbil had not designated expert witnesses at anytime earlier in the case. That Radbil

---

[115] *Id.* Doc. 126-1, at App. 125-26.

[116] STR-1 at 77-88.

[117] RAB-S at Tab 5.

[118] The witnesses were designated as follows: . . .
10. Tracy Henley, Ph.D.
    Department of Psychology, Counseling & Special Education

might be attempting to add undisclosed experts in the case at the eleventh hour, prompted RAB to prepare and file motions to strike.[119] Then, as set forth above, Radbil filed two contradictory responses to RAB's motions to strike the undisclosed experts. In his first response, Radbil denied that any experts would testify. Later, on the heels of denying experts would testify, he filed another document with the Court, stating that, in fact, "one" of his witnesses *would* provide expert testimony.[120]

After the trial, in response to RAB's Rule 37 Motion for Sanctions regarding this issue, Radbil stated that he never intended to offer expert testimony and that the expert dispute had been resolved by the parties at the PTC and essentially was a dead issue.[121] Yet, he fails in his sanctions briefing to

---

       Texas A&M University – Commerce
       P.O. Box 3011
       Commerce, TX 75429-3011
11. Nancy Lamphere
       Department of Psychology, Counseling & Special Education
       Texas A&M University – Commerce
       P.O. Box 3011
       Commerce, TX 75429-3011
12. Audra Blythe
       Department of Psychology, Counseling & Special Education
       Texas A&M University – Commerce
       P.O. Box 3011
       Commerce, TX 75429-3011
       (970) 534-1057
13. Jaclynn Cureton
       Department of Psychology, Counseling & Special Education
       Texas A&M University – Commerce
       P.O. Box 3011
       Commerce, TX 75429-3011
RAB-S at Tab 5.

[119] Docs. 75, 76; Def.'s Rule 37 Mot. at 5-7.

[120] Docs. 90, 95.

[121] Pl.'s Resp. to Def.'s Rule 37 Mot. at 15-16.

address the inconsistency in his responses to the motions to strike. That is, until the August 2, 2013 sanctions hearing, where Radbil—for the first time—offered a new explanation for his inconsistent responses; that being that the statement that "one" of his witnesses would provide expert testimony, was simply a typo that should have said "**n**one" instead of "one."[122] This new version of events is questionable for several reasons, not the least of which is Radbil's own billing records, dated September 21, 2012, indicating that Radbil notified his "expert" of the trial date.[123] Specifically, Malone asked Radbil about one of his billing records with the entry ". . . prepare letter to *expert* re[:] date for trial . . . ."[124]

The fact that no experts were ultimately called by Radbil at trial is of no moment to the sanctions analysis, because the point of recounting this incident is that it provides yet another in a mounting series of incidents demonstrating Radbil's substandard lawyering in this case and, more importantly, his persistent pattern of 'moving target' explanations for his litigation tactics.

*Plaintiff's No Show for the Verdict*

26.   Another point raised at the August 2, 2013 sanctions hearing involved Plaintiff's failing to appear for the return of the verdict at trial.[125] Specifically, when the jury returned their verdict on February 28, 2013, Plaintiff was not present. When asked by the Court where he was, Radbil stated that he was not there because he had to work.[126] Radbil then stated "I let him know as soon as the

---

[122] STR-1 at 85-86.

[123] Def.'s Rule 37 Mot. at 7, App. at 111; STR-1 at 87.

[124] STR-1 at 86-87.

[125] *Id.* at 110-14.

[126] TR-4 at 18-19.

verdict was in, and he was going to head over here as soon as he could."[127] The Court directed Radbil to tell White that he was to appear in court immediately.[128] When Plaintiff arrived, he told the Court, "I was advised by my attorney that I didn't have to be here."[129] The following conversation between the Court, Radbil and Plaintiff ensued:

> MR. RADBIL: . . . Mr. White, didn't I advise you that you should be here when the verdict came back?
> DR. WHITE: You advised me that I did not need to be here; it was not necessary.
> MR. RADBIL: And did I advise you that you should be here when the verdict came back this morning when we --
> THE COURT: Just be honest, Dr. White.
> DR. WHITE: A few minutes ago, yes.
> THE COURT: But not before a few minutes ago.
> DR. WHITE: Right.
> THE COURT: Thank you. Mr. Radbil, once again I have caught you in a less than candid assertion to the Court. But we can take all that up when we have the hearing that we're going to have regarding your behavior in this case at a later time. Dr. White, you are free to go. Thank you.[130]

At a later hearing, Radbil produced an e-mail exchange between himself and White, purportedly at the time the verdict was returned—albeit, reflecting an hour's difference in time from the time the actual verdict was returned.[131] The e-mail contains an exchange between Radbill and White the morning the verdict was returned showing Radbil telling White to come to court when the verdict was returned.[132] That said, the introduction of

---

[127] *Id.*

[128] *Id.* at 19.

[129] *Id.* at 20- 21.

[130] *Id.* at 21-22.

[131] STR-5 at 34-37; Radbil-S at Tab 35.

[132] *Id.*

this exhibit does not clarify why, in the presence of the Court the morning of the verdict, White and Radbil gave conflicting accounts of why White was not present in court for the verdict.

*More Warnings to Radbil*

27.    At the close of the August 2, 2013 (full day) sanctions hearing, the Court made the following statement to the parties:

> THE COURT: (Speaking to Radbil). . . [My] concern is that I'm not seeing any indication from you today, other than the fact that you were late to court, that you did anything wrong. Is that what your position is, that you are right and they are just nitpicking?
> RADBIL: No, Your Honor. My position is that I didn't do anything --
> THE COURT: Speak up, please.
> THE WITNESS: My position is that nothing was done in bad faith; nothing was done intentionally or vexatiously. . . .
> . . .
> THE COURT: What I am seeing is an overwhelming record of misrepresentations and misconduct and not being honest with the Court about one thing after another after another. . . . And what at least I was hoping to hear  from you today was that you recognized that and are sorry, and I don't see that. And I [also] don't see that from you, Mr. Meyers, except for a little bit more of a concession that his behavior was unacceptable. . . .[133]
> . . .
> I would like to move ahead and see whatever else we have. I would like to hear a little bit more specific on the attorney's fees and the nexus or causation therefore, the conduct and the attorney's fees. But otherwise, you can step down, Mr. Radbil, going to move ahead. . . .[134]

After some discussion with the lawyers the Court concluded the proceedings for the day and scheduled a second hearing for the following week, August 7, 2013. Before adjourning, the Court notified Meyers of his potential personal responsibility for bad faith conduct, stating:

---

[133] STR-1 at 206-07.

[134] *Id.* at 206-08.

THE COURT: Here is what my thoughts are at this point. . . . This is a very, very serious type of hearing, conduct that is completely unacceptable not only professionally towards opposing counsel. . . . [T]he Court had [a] firsthand view of the anguish that this behavior caused the client when he was left here for two hours with no word from counsel. We need to finish this. And we need to make sure that the record is clear before the ultimate decision and responsibility is determined. . . . [W]ith . . . [Malone's] position that Mr. Meyers should be called to testify for his responsibility and that of the firm, I think that may be appropriate, but I don't think it's appropriate today because, as far as I know, he hasn't been placed on notice that he might be subject to that kind of sanction. And when you are talking about potential bad faith conduct -- and I want to be sure I'm clear, the Court is also going to rely here on its inherent authority -- then I think Mr. Meyers needs to have a chance to find counsel and speak on his own behalf and on behalf of his firm.[135]

The case was adjourned until August 7, 2013.

August 7, 2013 Sanctions Hearing

28. Instead of proceeding on August 7, 2013, Meyers moved to continue the sanctions hearing for 30 days, his filing accompanied by numerous documents not previously noticed as exhibits.[136]

The Court rejected Meyer's attempt to offer the new documents at that time but granted his motion for continuance to further prepare and organize his new exhibits, given Malone's intent to call him as a witness.[137] An Order was entered resetting the hearing for October 9, 2013 and directing the parties to prepare and exchange exhibits they planned to offer that were not already part of the record.[138]

---

[135] Id. at 209-10.

[136] STR-2 at 8-22.

[137] Id. at 14-22.

[138] Doc. 148.

October 9, 2013 Sanctions Hearing

29. At the October 9, 2013 hearing, Malone and Martin appeared again for RAB. Meyers appeared on his own behalf and on behalf of the Weisberg firm. New to the case, attorneys Dale Jefferson and Raul Suazo made their first appearance on behalf of Radbil. The Court commenced the hearing by clarifying the record as to the admitted exhibits.[139] The testimony then began with Malone calling Meyers to the witness stand.

30. The thrust of Malone's questioning of Meyers was to establish—and she did—that, although Meyers and other members of the Weisburg firm were aware of a litany of ethical and tactical missteps by Radbil in the course of his work as an attorney for their law firm, they nonetheless publicly promoted him as a key member of their firm for the state of Texas.[140] For example, Meyers admitted that the firm's website—up until a few weeks before the October 9th hearing—listed Radbil as their "managing attorney" for Texas.[141] This, despite the fact that Meyers—as he testified—had never seen Radbil perform in a formal hearing or trial and Meyers' concession at the sanctions hearing that he was not sure that he would recommend Radbil's services to others.[142]

31. Malone also asked Meyers about a case, of which Meyers was well aware and in which

---

[139] STR-3 at 5-11. This was due to the fact that the parties had attached exhibits to their sanctions briefing and had also sought to offer other exhibits in evidence at the hearings.

[140] *Id.* at 15-17, 98. In fact, Meyers conceded that he and at least three of the firm's partners (Weisburg, Craig Erlich and Aaron Radbil) had reviewed portions of this case as it proceeded to trial. *Id.* at 16-17.

[141] *Id.* at 16.

[142] *Id.* at 95-99.

Meyers had some first-hand involvement. The case was pending (at that time) in the Southern District of Texas and was styled *Scarlott v. Nissan North America, Inc., et al.*, No. 4:10-CV-4865, in which defendant Nissan North America, Inc ("Nissan") sought sanctions against plaintiff's counsel, Noah Radbill,[143] Aaron Radbil, and Dennis Kurz.[144] Nissan's thirty-page motion for sanctions, filed October 31, 2011, accused the three attorneys of violating Rule 11 Fed. R. Civ. P. as well as transgressing numerous ethical codes, including the Texas Disciplinary Rules of Professional Conduct and the Texas Lawyer's Creed.[145] Reduced to its essence, the crux of the conduct complained of by Nissan was that Noah Radbil and co-counsel lied in their pleadings numerous times to sustain an untenable legal case against Nissan.[146] The presiding judge, in his order granting the defendants' motions for summary judgment entered on August 28, 2013, directed that the Plaintiff "take nothing" from Nissan "because her claims are not supported by facts or law."[147] The court then invited the prevailing defendants to "request fees, sanctions, or both."[148]

On September 27, 2013, Nissan filed an amended motion for sanctions.[149] A hearing was held on Nissan's and its co-defendant's motions for sanctions on October 10, 2013. The transcript of the

---

[143] Noah Radbil is referred to throughout as "Radbil." His brother, Aaron Radbil, is referred to as "Aaron Radbil."

[144] RAB-S at Tab 16.

[145] *Id.* at 1-2.

[146] *Id.* at 7-25.

[147] *Scarlott v. Nissan N. Am., Inc.*, No. 4:10-CV-4865, (S.D. Tex. Aug. 28, 2013) (Summary Judgment Opinion at 6) (doc. 119) (attached as Appendix A to this Opinion).

[148] *Id.*

[149] *Scarlott*, No. 4:10-CV-4865, (Def.'s Am. Mot. For Sanctions) (Doc. 132) (attached as Appendix B to this Opinion).

hearing shows that the district court spent the bulk of the hearing chastising Noah Radbil for his "abysmal judgment and performance" in the case.[150] The court granted Nissan's sanctions motions, ordering $195,000 be paid by Radbil and his firm to Nissan, specifically calling out Radbil and his firm for their "unconscionable"[151] conduct in pursuing Nissan in the case and describing Noah Radbil and his firm as "unprincipled."[152]

32.   Malone also questioned Meyers about an in-court filing by Radbil in an unrelated case which Malone suggested showed that Radbil lacked a basic understanding of fundamental jury selection principles. Specifically, in 2011, Radbil had filed a motion for new trial in the 48th Judicial District Court for Tarrant County, Texas. In his motion, Radbil argued that the state trial court had erred in allowing the attorneys to move to strike certain venire panel members for cause before permitting them to exercise their peremptory strikes.[153] When confronted with this tactical misstep by Radbil during the sanctions hearing, after a frustrating attempt to get a straight answer from him, Meyers conceded Radbil's error.[154]

---

[150] *Scarlott,* No. 4:10-CV-4865 (Transcript of October 10, 2013 proceedings at 28) (attached to this Opinion as Appendix C).

[151] *Id.* at 87-88.

[152] The case was later reversed by the Fifth Circuit Court of Appeals and ordered remanded to state court based on an unrelated jurisdictional issue. The district court's sanctions order, however, was not disturbed by the circuit save its direction to the district court to reconsider its sanctions order in *light of its lack of jurisdiction.* The merits of the district court's basis for the sanctions order was not questioned by the circuit. *Scarlott v. Nissan N. Am., Inc.,* 771 F3d 883, 891 (5th Cir. 2014).

[153] STR-3 at 18.

[154] Q.(by Malone): If you would look with me, sir, at Exhibit Number 15. This is a motion for new trial that was filed by Mr. Radbil in a case in Tarrant County. Do you see that?
A.(Meyers): Yes.
Q: Would you turn with me to page 765, which would be the last paragraph or the last section in that motion.
A: I am here.

33.   Malone also asked Meyers about other incidents of troubling conduct by Radbil in particular as well as by other partners in the Weisburg firm in unrelated cases.[155] She produced numerous exhibits, including motions, orders and judgments from various cases suggesting that

---

Q: Do you see here that Mr. Radbil is making a motion to the Court indicating that he believes that a counsel must exhaust their peremptory strikes prior to the Court making rulings on motions for cause on jurors?

A: Could you repeat that, please?

Q: Sure. If you need to read it, please do so, sir. Do you see from this particular section that Mr. Radbil is making the argument that counsel must exhaust their peremptory strikes prior to the Court ruling on motion to cause strikes on particular jurors?

A: Okay. I have read that.

Q: Okay. And that's essentially what he's saying, is he not, Mr. Meyers?

A: I'm sorry, would you repeat the question one last time?

Q: Sure. Would you agree with me that he is arguing that the Court should have required the peremptory strikes to be exhausted prior to making rulings on motions for cause.

A: I think the pleading says what it says, but I don't have a reason to disagree with what you are saying.

Q: Okay. And that's not the way the jury selection works, does it, Mr. Meyers?

A: I think the rules speak for themselves.

Q: I am asking you, sir, as a supervising attorney, is that the way jury selection is supposed to work?

. . .

THE COURT: Okay.

A. (By Meyers): I believe -- and I could be wrong -- that you strike for cause and then you do peremptory challenges.

Q. (By Ms. Malone): So as of September 2011, when Mr. Radbil filed this motion, he at least did not appear to understand the process for jury selection, is that fair?

A: I can't say that.

Q. Did you read the transcript from the Brown trial, sir?

A: I've read parts of it, yes, and I may have fully read it on one occasion.

Q: Okay.

A: But it would have been a very long time ago.

Q: Okay. So as of 2011, Mr. Radbil filed a motion that would indicate he didn't understand the jury looks like that is the argument being made. So the question is: Do you agree that this would be incorrect?

. . .

THE WITNESS: I'm a little confused by the questions back and forth, but I do agree and believe that you would strike for cause and then exercise peremptory challenges, if that's what's being asked.

THE COURT: All right.

Q. (By Ms. Malone): Thank you.

STR-3 at 18-21.

[155] *Id.* at 18-183.

Radbil and/or the Weisburg firm had been involved in questionable conduct in other cases.[156]

34.  Malone referred Meyers to an order issued April 26, 2011 by a federal judge in the

Southern District of Texas describing Noah Radbil, who was plaintiff's counsel in the case, of "petty

gamesmanship" for making a "disingenuous technical argument" that the defendant had improperly

served its Rule 68 offer of judgment on plaintiff in the case by facsimile and email.[157] The court

further warned Radbil that the court would "not permit" such tactics in the future.[158] Meyers

acknowledged the order and its contents.[159] Meyers also did not dispute that after this admonishment

for "petty gamesmanship," Radbil repeated the identical argument against RAB in a case pending

in the Northern District of Texas.[160]

35.  Malone also established that Radbil, along with two other attorneys, was the subject of

a show cause order in 2011 by a federal judge in the Western District of Washington for making

_____

[156] RAB-S at Tabs 15–42, 44. Radbil and Meyers are entitled to due process before sanctions are awarded against them by the Court. Due process, in turn, requires notice and a meaningful opportunity for them to be heard. *Ingram v. Glast, Phillips & Murray*, 196 F. App'x 232, 233 (5th Cir. 2006). Due process, however, does not necessarily require that those facing sanctions be afforded an evidentiary hearing or even a hearing on arguments alone before being subject to sanctions. *Id.* (citing *Merriman v. Sec. Ins.*, 100 F.3d 1187, 1191-92 (5th Cir. 1996); *see also Cook v. American S.S. Co.*, 134 F.3d 771, 774-75 (6th Cir. 1998)). Here, Radbil, Meyers and the Weisburg firm were afforded notice of the pending sanctions motions, an opportunity to respond via briefing and exhibits, four full evidentiary hearings and the ability to offer evidence in the form of exhibits and testimony at those hearings. Even so, some of the "other case misconduct"exhibits offered by RAB were not, in this Court's view, sufficiently supported by the record or the testimony to constitute reliable, probative evidence for the Court's consideration. Though the Federal Rules of Evidence do not necessarily apply to sanctions proceedings, the Court will not credit tenuously supported proof with probative value. Thus, unless a particular exhibit is cited by the Court as being considered, RAB's exhibits and testimony relating to other case misconduct is disregarded.

[157] STR-3 at 36-38; RAB-S at Tab 22.

[158] RAB-S at Tab 22 at 6.

[159] STR-3 at 37-38.

[160] *Id.* at 37-38, 50.

"misrepresentations" to that court regarding his eligibility to practice law in that court.[161]

36.  Malone also asked Meyers about the Weisburg law firm's public website which, at least up until a week before the October 9th sanctions hearing, contained false and misleading information about Radbil and other members of the firm.[162] Among numerous misstatements about Radbil, conceded by Meyers, contained on the firm's website, was an entry under "Notable Trial Victories" indicating that Radbil had secured a victory for a plaintiff named Shannon Whaley, in a 2012 Dallas County debt collection action.[163] In fact, as Meyers conceded at the hearing, and as the final judgment in the case reflects, Radbil lost that case when the jury returned a verdict of $92,000 against his client.[164] Meyers also conceded that the firm sent out a false press release indicating that Radbil had won the Whaley case.[165]

37.  Another of several questionable postings on the firm's website, which was sponsored and controlled by Meyers and called "Attorneys for Consumers,"[166] hailed Radbil as counsel in "the first RIAA music-downloading case to go to trial in the United States."[167] In fact as Malone pointed out, the actual court website for that entry shows the case going to trial two years before Radbil was even

---

[161] STR-3 at 34-36, RAB-S at Tab 21.

[162] STR-3 at 64-73; RAB-S at Tab 37.

[163] RAB-S at Tab 37 at 1.

[164] STR-3 at 27-28, 65; RAB-S at Tab 18.

[165] STR-3 at 70-74; RAB-S at Tab 38.

[166] The "Attorneys for Consumers" website is run by a company called AFC Legal Marketing, LLC, which, according to Meyers, he owns. STR-3 at 68-69.

[167] RAB'-S at Tab 37 at 1.

licensed as an attorney.[168] Meyers indicated that he knew "nothing about that case" but conceded that he had, nonetheless, permitted it on the firm website without checking the validity of the posting.[169] The website also notes that Radbil represented "several authors" in a copyright-infringement case against "Scribd," which, according to Malone and not disputed by Meyers, also concluded before Radbil was licenced.[170] The website lists Radbill as being among a group of lawyers representing a group of NCAA athletes in a class-action against the NCAA when, in fact, the official court record does not even list Radbil as counsel of record.[171] Radbil made no attempt at the hearing to refute Malone's challenges to the questionable website postings about his experience.[172]

38.    Malone also questioned Meyers about several instances where members of his firm—other than Radbil—had been sanctioned by courts for misconduct.[173] Meyers did not dispute that these incidents had occurred, despite the fact that prior to the October 9, 2013 hearing, he filed a sworn affidavit with the Court swearing under oath that "no attorney in his firm ha[d] . . . ever

---

[168] STR-3 at 66.

[169] *Id.* at 67; STR-4 at 224-25 (Meyers reiterating that he did not question the information posted on the firm's website because he was "assuming . . . that people tell the truth.").

[170] STR-3 at 66-67.

[171] *Id.* at 68.

[172] The sheer complexity and high profile nature of some of the cases listed on the firm's website as handled by a newly-licensed Radbil as counsel render most of the entries dubious at best. Not only did Meyers testify that, despite an obligation to do so as the firm's managing partner, he did not verify the accuracy of these entries before they were posted, none of these claims were supported by any evidence at the hearing. Meyers also professed ignorance as to the veracity of several questionable postings, one lauding Radbil's representation of a "major league" baseball player in a seven figure breach of fiduciary duty case and another touting Radbil's work in a "seven-figure condemnation action concerning a City of Houston public museum." STR-3 at 65, 67, 179-82.

[173] *Id.* at 39-58.

been disciplined."[174] Those sanctions included a 2011 order by a federal judge in Colorado against Meyers' partner at the time, Craig Erlich, pursuant to 28 U.S.C. § 1927 for "proceeding to trial without plausible evidence to support the claim made."[175] That ruling was affirmed by the Tenth Circuit.[176]

39.   Another sanctions order, this one in 2011, was entered against founding partner, Alex D. Weisburg and the Weisburg firm by a Florida state court for filing "baseless" grievances against four attorneys involved in a case in that court.[177] The Florida court found Weisburg's conduct to be "unjustified, vicious, willful and malicious."[178] In another case out of federal court in Florida in 2013, again involving founding partner, Alex D. Weisburg, who was also directly involved in the instant case, the court sanctioned Weisburg under § 1927 for "knowingly and recklessly pursu[ing] claims . . . which clearly would have been foreclosed."[179]

40.   Meyers himself was the subject of scorn by a federal judge in the Eastern District of New York who noted the court's "serious concern" that the lawsuit filed by Meyers, pending in his court

---

[174] *Id*. at 47-50 (citing doc. 158). Meyers' precise words in his affidavit were: ". . . I can absolutely, positively tell this Court that no attorney at Weisberg and Meyers has *ever* been disciplined while at the firm." Doc. 158 at 4.

[175] *Id*. at 39-40; RAB-S at Tab 23.

[176] RAB-S at Tab 24.

[177] STR-3 at 42-43; RAB-S, atTab 25.

[178] RAB-S, at Tab 25 at 5. The Florida court also found that the grievances were filed "as a litigation tactic." *Id*.

[179] RAB-S at Tabs 27, 42; STR-3 at 44-47.

was "an attempt by plaintiff and/or his attorneys to manipulate the law for an improper purpose."[180] Although the firm was not ultimately sanctioned, that judge also noted "other circumstantial evidence suggesting bad faith" and raised his concern that "plaintiff is a repeat filer of FDCPA lawsuits, and he is represented by the *same attorneys* in those lawsuits."[181] The court also questioned whether plaintiff's attorneys in that case had acted in "good faith" in advancing their arguments.[182]

41.   After Malone finished her questioning of Meyers, Meyers, testifying on his own behalf, launched into a redundant, platitude-filled defense of his law firm, which for the most part did not relate to the specifics alleged against the firm in this case or to the foregoing instances of misconduct by Radbil and the firm in other cases.[183] When pressed by the Court, Meyers insisted that he had "never received a complaint about Noah [Radbil] from opposing counsel."[184] This statement, however, was directly contradicted by, *inter alia*, Nissan's 2011 and 2013 motions for sanctions, addressed above and pending at the time Meyers made this statement[185] accusing Radbil of numerous, serious ethical transgressions. Moreover, at the time of his statement to this Court, Meyers (although he did not disclose it to the Court) was scheduled to appear the next day—with Radbil—in the Houston federal court presiding over Nissan's sanctions motions.[186]

---

[180] STR-3 at 51-52; RAB-S at Tab 28 at 5-7.

[181] RAB-S at Tab 28 at 5-7 (emphasis added).

[182] *Id.*

[183] STR-3 at 110-113; 116-148.

[184] *Id.* at 116.

[185] *See also* paragraph 31, *supra*.

[186] *Id.* at 116.

42.  Meyers also told the Court at the October 9, 2013 hearing that he and Radbil no longer worked together even though, as mentioned, Meyers was scheduled to, and did, appear with Radbil the day after the October 9th hearing at the Houston federal court sanctions hearing.[187] When questioned at the subsequent November 6, 2013 sanctions hearing about his presence at the Houston federal court sanctions hearing, Meyers conceded that he had appeared at the hearing with Radbil on October 9, 2013, but for some reason insisted that Noah Radbil did not take the lead in defending the sanctions motion.[188] Meyers stated that, not only did Noah Radbil not take the lead in the sanctions hearing for the firm, Radbil only spoke at the request of the judge who, according to Meyers, entreated at one point: "I want to hear from Noah Radbil."[189]

But Meyers' description of what happened at the Houston federal court hearing is not supported by the transcript of the hearing. The transcript unmistakably shows Noah Radbil firmly taking the lead at the hearing. The transcript showing him speaking—not at the judge's request, but on his own initiative—as the primary, if not sole, advocate for the firm as reflected on pages 19 through 93 of the 94-page transcript.[190] Although Meyers had insisted that Radbil did not take the lead at the Houston hearing, when asked by this Court about the specifics of the accusations against Radbil at the Houston hearing, Meyers professed a lack of memory stating to the Court that he did

---

[187] STR-3 at 122.

[188] STR-4 at 210-12.

[189] *Id.* at 211.

[190] Mem. Op., App. C at 19-93 (*Scarlott,* No. 4:10-CV-4865)(Transcript of October 10, 2013 proceedings).

not remember the specifics of the allegations against Radbil by Nissan.[191]

43.   To sum up, the foregoing litany of questionable incidents involving Radbil, Meyers and other members of their firm presented by RAB constituted credible evidence in this Court's view of a firm with no ethical oversight, run amok. First, Radbil and Meyers mounted negligible, if any, opposition to the evidence of Radbil's and the firm's ethical run-ins with other courts or to the evidence of the dubious website postings about Radbil's experience as a lawyer for the NCAA, a major league baseball player and the like. When Meyers did speak up to describe the Houston federal court sanctions hearing at the November 6, 2013 hearing, his rendition of Radbil's role was flatly wrong based on the record. Ultimately, the credible proof at the October 9, 2013 sanctions hearing, established Radbil's and the firm's willingness—if not propensity—to engage in questionable litigation tactics. Not only that, the evidence demonstrated both Radbil's and Meyers' willingness to fabricate information about Radbil's and the firm's litigation experience as posted on the firm's public website. Finally, and most importantly, Meyers' refusal to concede Radbil's undeniably substandard practices at trial coupled with the fact that Meyers, himself, employed an almost identical pattern of evasion and prevarication in the sanctions hearings, doomed Meyers' and Radbil's credibility and strongly implicated Meyers' complicity in Radbil's bad faith conduct.

44.   The presentation of the evidence was not completed at the close of the October 9, 2013, sanctions hearing. Radbil's attorney represented to the Court that he intended to recall Radbil to the witness stand and Malone indicated that she, likewise, had additional evidence to present.[192] Thus

---

[191] STR-4 at 212-15.

[192] *Id.* at 184-86.

a third full sanctions hearing was scheduled for November 6, 2013.

<u>November 6, 2013 Sanctions Hearing</u>

*More False Public Website Postings*

45.  Malone's first witness called at the third full hearing on RAB's motions for sanctions was Martin, Malone's co-counsel in the case. Martin was a credible witness. Martin testified that he had located a Twitter account belonging to Meyers that, on July 25, 2013—five months after Radbil lost White's case—that indicated that the Weisburg firm had prevailed in White's case and that White was entitled to significant damages.[193] This information was posted by Meyers despite the fact that at the time of this posting, July 25, 2013, the jury's verdict in this case, returned in February 2013, and the Court's judgment that followed in March 2013 unequivocally stated that Radbil lost the case and that White "take nothing by his suit" against RAB.[194]

*$45,000 Damages - Surprise Sworn Declaration from White in absentia*

46.  Also at the November 6, 2013 hearing, during Martin's testimony, Meyers produced—for the first time in court—an affidavit that purported to be a "Declaration of Timothy White,"dated October 2, 2013, obtained some seven months after the trial and just days before the October 9, 2013 sanctions hearing.[195] Interestingly, this late-filed entry into the sanctions exhibit mix, produced

---

[193] STR-4 at 20-22.

[194] This Court's Judgment (doc. 117), based on the Jury's Verdict (doc. 116), specifically stated:

This case was tried before the Court and a jury on February 26, 27, and 28, 2013. On February 28, 2013, the jury returned its verdict pursuant to which this Judgment is entered. IT IS **ORDERED, ADJUDGED AND DECREED** by the Court that Plaintiff Timothy White take nothing by his suit against Defendant Regional Adjustment Bureau, Inc., doing business as RAB, Inc., and that this suit be, and it is hereby, **DISMISSED** on the merits at Plaintiff's cost.

[195] STR-4 at 69-70.

by Meyers during his cross-examination of Martin,[196] was by Meyers' own admission, partially drafted by Meyers, who then forwarded it to Radbil and Jefferson.[197] More importantly, there is no indication from the record that White himself played any role in contributing to the contents of his own Declaration. Attached to the Declaration were several e-mails as well as a letter purportedly written by White to Radbil, dated December 28, 2012, in which White recited a summary of his damages, *none* of which contained any of out-of pocket figures.[198] Missing were the $45,000 in out-of-pocket damages that White had testified about at trial. In his Declaration, and at odds with his statements to the Court at trial, White averred that neither Radbil nor Meyers ever counseled or advised White to seek specific "out-of-pocket" losses in his testimony to the jury.[199]

White's Declaration and attached letter were suspect, to say the least, given White's absence for the entirety of the five sanctions hearings[200] and considering the fact that much of the Declaration's contents and those of the attached letter sharply conflicted with White's trial testimony that he had incurred $45,000 in economic damages and his insistence to the Court during trial that he *had* quantified his damages for Radbil who told him the figures would be submitted at trial.[201]

---

[196] *Id.*

[197] *Id.* at 69, 73-76.

[198] Doc. 161, Exh. D; Radbil-S at Tab 34 & Att. D.

[199] Doc. 161, Radbil-S at Tab 34.

[200] White's "Declaration" indicates he was unable to attend the October 9, 2013 sanctions hearing. *See* Radbil-S at Tab 34 at 3 para. 10. Nonetheless, his Declaration was introduced at the November 6, 2013 hearing. In any event, there was no indication that White had any intention to appear at the sanctions hearings.

[201] *See* TR-2 at 18 (White to the Court "I apologize, it  seems presumptuous for me -- seems like I'm acting like my own attorney, which I am not in any way. But I felt like I should make a response to the issue of sandbagging [against Radbil] yesterday with the claims. *I did quantify the damages.* And they were *not* an

Further detracting from the evidentiary value of the Declaration and its attachments was the statement of Jefferson, Radbil's attorney, to the Court that "Meyers" had actually "put together" the "affidavit" for White's signature.[202] Meyer's himself told the Court he prepared paragraphs 1-5 and 11 of the affidavit and then forwarded it to Radbil and Jefferson.[203] Jefferson said the affidavit was later—through Jefferson's office—transmitted to a "mobile notary service" that, in turn, transported it to White's home where White purportedly signed the affidavit.[204] In essence, all of this suggesting that, after the August 2, 2013 sanctions hearing, White agreed to sign a notarized statement, prepared by the lawyers, that sharply conflicted with his statements to the Court during the trial and his testimony to the jury. Moreover, White's December 28, 2012 letter—if true—could have bolstered Radbil's theory that he never intended to seek out-of-pocket damages; not once was the letter mentioned or even alluded to by Radbil during trial, in his Response to the sanctions motions (in which he addressed White's confidential settlement memorandum regarding actual damages) or at the August 2, 2013 sanctions hearing.

Equally curious was that the exhibit appeared at all in the sanctions proceedings. This, in that the Declaration was prepared and procured to a large extent by Meyers who had firmly told the Court at the initial sanctions hearing, on August 2, 2013, that he had not approached or spoken to White at all about the problems that occurred during trial which were now causing Meyers, Radbil

---

abstract sum for mental anguish [as urged by Radbil], they were *real financial damages* that I suffered. I made sure Mr. Radbil had that information. The [magistrate judge] . . . recorded it in the settlement conference, and I was led to believe it would be submitted for this trial, which of course it wasn't. So I apologize.").

[202] STR-4 at 75.

[203] *Id.* at 76.

[204] *Id.* at 75.

and the Weisburg firm to face potentially devastating sanctions. Specifically, when asked by the Court if he had spoken to White, his firm's only client in the case, Meyers said:

> You know, I haven't, Your Honor. I haven't [spoken to White]. And it was a decision that I did not want to bring up anything to Dr. White that would, you know, rehash anything that was bad that occurred, Your Honor. And because I was not there, I really didn't want to get a skewed vision of what happened. I wanted my understanding to be based on the transcript, itself, because that would seem to be the strongest indicator of what happened.[205]

Apparently Meyers had a change of heart in deciding not only to contact White but also to draft a portion of White's Declaration which deviated materially from "the [trial] transcript itself" which Meyers initially described as the "strongest indicator of what happened." Equally questionable about the "Declaration of Timothy White" is its material departure from White's statements to the Court during the trial on the morning that Radbil failed to appear insisting he had given Radbil "his real financial damages" and was assured by Radbil the figures would be presented at trial.[206] Whereas, the about-face in his Declaration averred:

> 9. At no time ever did Noah Radbil, Marshall Myers or anyone at Weisburg and Meyers coach me, advise me, or otherwise tell me to tell the jury a specific dollar figure for damages. To the contrary, Noah always said leave it up to the jury alone to arrive at a specific figure for actual damages . . . .[207]

*Malone Testifies*

47.  Also at the November 6, 2013 hearing, Malone testified, called by her co-counsel,

---

[205] STR-1 at 38.

[206] *See* Mem. Op., *supra*, at 46, n.157.

[207] Radbil-S at Tab 34 at 3 para. 9.

Martin. Among other topics, she testified about her interactions with Radbil and the Weisburg firm. She described her frustration when Radbil failed to return her "10 calls and e-mails" the weekend before trial as directed by the Court.[208] She said her observation of Radbil in this and other cases she had with him was that he lacks fundamental knowledge of trial basics.[209] She said that Radbil lied to this Court during trial and the sanctions hearings and also lied about prior representations of high profile clients on his website.[210] She said that in another case she had with Radbil, she caught him reviewing her trial notebook after she returned to the courtroom from the restroom.[211] Malone was a highly credible witness.

*Radbil Testifies Again: $45,000 - Another Version - More Inconsistencies*

48.   Radbil testified at the proceedings on November 6, 2013, this time called by his counsel, Raul Suazo. Suazo, on Radbil's behalf, first argued that it was Malone, not Radbil, who prompted the questions about damages.[212] But this is disingenuous—in that it was Radbil who prompted the inquiry with the question "what is the current status of your student loan" to which Malone—surprised by the unexpected introduction of undisclosed actual damages evidence—logically followed up later with a question asking if there was anything else by way of damages that had not been disclosed, prompting the $5000 figure.[213]

---

[208] STR-4 at 173-74.

[209] *Id.* at 178.

[210] *Id.* at 179-84, 202.

[211] *Id.* at 204.

[212] *Id.* at 267.

[213] TR-2 at 189-90; 201-02.

49. During his November 6, 2013 testimony, Radbil, for the first time stated that the $45,000 was not "mental anguish" damages at all but was (all along) simple "economic" damages which Radbil never intended to seek in the first place because they were solely attributable to Texas Guaranteed, not to RAB.[214]

This latest attempt by Radbil to distance himself from the undisclosed $45,000 evidence fell flat. First, and most obvious was that this was yet another in a series of entirely inconsistent excuses for the $45,000. Second, nowhere in his statements to the Court during the trial or in his sanctions briefing or at any other time had Radbil ever mentioned that the $45,000 was attributable solely to Texas Guaranteed and thus not sought by him at trial.[215] Radbil and Suazo argued at the hearing that Radbil and White had discussed the fact that Texas Guaranteed was solely responsible for the $45,000 in damages and that there were two pretrial memoranda that supported this position.[216] But this is simply not true upon examination of these documents.[217] In fact, as will be addressed below, once the contents of the memorandum were finally disclosed at the November 26, 2013 hearing, it was clear that nothing in that memorandum remotely suggests that White ever attributed the $40,000 solely to Texas Guaranteed.[218]

The gist of the November 6, 2013 sanctions hearing was that it was more of the same sleight-

---

[214] STR-4 at 256, 258, 274-75, 280-81.

[215] Suazo and Radbil maintained that Texas Guaranteed's role was revealed in Radbil's briefing and in two pretrial memoranda. But these papers reveal nothing of this nature.

[216] STR-4 at 280, 285-86.

[217] *Id.* at 280-81, 285-86.

[218] *See* RAB-S at Tab 45; Radbil-S at Tab 34.

of-hand tactics by Radbil and Meyers that marked all of the prior hearings. In fact, Meyers' introduction of the lawyer-generated "Declaration" by White, who, *in absentia*, months after the trial, contradicted his own prior statements to the Court about the nature of his damages, was suspect to say the least. Then Radbil's latest version of conflicting explanations for the $45,000 damages snafu—that it was all along "economic" damages—never sought from RAB because the damages were caused solely by Texas Guaranteed theory—was not only not believable, it smacked of a "shell game"—and a poor one at that—perpetrated on the Court.

After the close of the November 6, 2013 hearing, the Court scheduled the fifth and final sanctions hearing on RAB's motions for November 26, 2013.

<u>November 26, 2013 Sanctions Hearing</u>

50.   The fifth and final sanctions hearing began with a continuation of Radbil's testimony, which essentially consisted of Radbil re-urging his theory that, he did nothing wrong but, if he did, his actions were not taken in bad faith and caused no prejudice to RAB.[219]

51.   On cross-examination by Malone, Radbil testified that he handled the bulk of the substantive work on White's case.[220] He also agreed that his work on the case was reviewed by Weisburg partners, Weisburg, Meyers, Ehrlich and Aaron Radbil.[221]

52.   Undoubtedly the most significant portion of the November 26th hearing was the seemingly inadvertent disclosure of the actual contents of the December 6, 2012 "confidential settlement memorandum," discussed above. The memo contained White's written assessment of his

---

[219] STR-5 at 5-57.

[220] *Id.* at 64-69.

[221] *Id.* at 69.

actual damages which he sent to Radbil the day before pretrial disclosures were due. This "privileged" memorandum had been addressed in the sanctions briefing and at the other sanctions hearings. Most recently this memo was discussed at the November 6, 2013 sanctions hearing by Malone when she complained that, although the December 6, 2012 memo had been cited by Radbil[222] and Suazo as containing information that supported Radbil's theory that he had not intended to seek the $45,000 in damages, Radbil had never disclosed its contents to RAB.[223]

Specifically, as Malone began to question Radbil about his December 6, 2012 attorney billing records,[224] asking him about the heretofore described "confidential" actual damages memo from White dated December 6, 2012, Suazo spontaneously offered; ". . . I have the actual memo if it will speed it up."[225] The sudden appearance of the previously undisclosed memorandum's contents by Radbil's counsel, from the Court's observation, appeared completely unexpected by Radbil. In fact, Suazo thereafter attempted to claim, despite having offered up the document, purportedly only to establish the veracity of Radbil's billing records, that the memo remained a privileged document.[226] Suazo further maintained that the memo was in most respects the substantially similar to the December 28, 2012 memo already in evidence as Radbil's sanctions hearing exhibit 34.[227] Malone, who stated she had never seen the memo before, strongly disputed Suazo's argument that the memo

---

[222] STR-4 at 285-86.

[223] *Id.* at 280-82.

[224] STR-5 at 72-74; RAB-S at Tab 7.

[225] *Id.* at 75.

[226] *Id.* at 74, 78-79.

[227] *Id.* at 78.

was privileged or that it was "substantially similar" to the December 28, 2012 memo.[228] The Court agreed with Malone and, over Suazo and Radbil's objections, admitted the December 6, 2012 memo as RAB-S Exh. 45.[229]

The significance of the contents of the December 6, 2012 memo cannot be overstated. First, it stands in stark contrast to White's already-questionable "Declaration" and attached letter[230] dated December 28, 2012, produced by Meyers at the November 6, 2013 hearing.[231] While that Declaration and letter strongly indicated that hard figures were never a viable part of White's and Radbil's pretrial damages discussions, the December 6, 2012 memo confirms the opposite, that White—as he insisted to the Court during trial—did provide hard damages figures to Radbil, the day before their pretrial disclosures were due to be filed in court.

Moreover, as pointed out by Malone once the contents of the memo were disclosed,[232] she observed that the language used in White's December 6, 2012 memo to Radbil closely tracks White's trial testimony about the $45,000 in damages.[233] For example, at trial Radbil specifically asked White: "Did the fact that Regional Adjustment Bureau continued to call your Simple Surrogacy employment telephone numbers after you told them not to cause you to suffer *actual* damages?"[234] To this

---

[228] *Id.* at 79-89.

[229] *Id.* at 81-82.

[230] Radbil-S at Tab 34, D

[231] STR-4 at 69, 73-76.

[232] STR-5 at 80-85.

[233] *Id.*; RAB-S at Tab 45.

[234] TR-2 at 218.

question, White responded: "Yes, it caused a domino effect in my life that caused me to develop mental health symptoms I had never experienced before. And it literally cost me by adding exponentially to my debt and with some out-of-pocket costs."[235] This is precisely the type of information included in White's December 6, 2012 memo that Radbil, by his question, solicited from White at trial and later insisted was unplanned.[236]

Further, not only is the December 6, 2012 memo *not* "substantially similar to White's December 28, 2012 letter," as urged by Suazo, it effectively contradicts what White wrote in that letter and it renders White's purported October 2, 2013 "Declaration," prepared by the lawyers, bereft of evidentiary value. For example, the December 6, 2012 memorandum includes among other hard damages figures, two $20,000 figures and one $5000 figure that White claimed as damages caused by RAB.[237] And, in complete contradiction to Radbil's testimony at the November 6, 2013 hearing, the December 6, 2012 memo contains nothing to support Radbil's most recent explanation that the $45,000 was attributable solely to Texas Guaranteed. In fact at the top of the December 6, 2012 memo, White states that he is describing his damages "*caused* by Regional Adjustment Bureau."[238]

After Radbil's testimony, the evidence on the sanctions motions was closed and the lawyers, Martin (for RAB), Meyers (for himself and the firm) and Jefferson (for Radbil) gave their closing remarks. Jefferson's comments, on behalf on Radbil, repeated Radbil's theme that his missteps, if any,

---

[235] *Id.*

[236] *Id.; See* RAB-S at Tab 45.

[237] RAB-S at Tab 45.

[238] *Id.*

were not intentional but "communication quirks by Radbil."[239]

*Summary of Factual Findings*

To sum up, three overall conclusions can be drawn from the foregoing fifty-pages of factual findings. First, Radbil, despite being heavily promoted by his firm as a legal talent, does not possess the competence or integrity to represent clients in federal court. Second, Radbil's firm, specifically, partner Marshall Meyers, knows this, endorses Radbil's conduct and models it himself. Third, Radbil and Meyers effected a fraud on the Court through evasion, prevarication and outright lies, in an attempt to avoid negative legal consequences against them and their firm due to Radbil's unprofessional trial conduct.

To understand what went so wrong in this case, it is helpful to start with a description of what should have happened. Under the Federal Rules of Civil Procedure, a trial is designed, beginning with the pretrial discovery process, to be a fair and predictable exercise by the parties in presenting their theory of a case to a judge or jury.[240] That means, in turn, that the parties are entitled to notice of the other side's evidence through the pretrial discovery process. The pretrial process allows for broad discovery, tempered by court-imposed deadlines with the goal of attaining streamlined and cost-effective trial preparation by the parties culminating in a trial with no surprises. The mutual exchange of information through discovery also encourages the fair and cost-effective resolution of disputes short of trial. That said, the very integrity of the federal civil trial process hinges on the parties' adherence to the foregoing principles and, most essentially, upon the honesty and character

---

[239] STR-5 at 121-51.

[240] *See generally*, 4C Wright & Miller, Federal Practice & Procedure § 1029, at 134-61 (2d ed. 2002) (purpose of Federal Rules of Civil Procedure).

of the attorneys involved.

Here, the process failed miserably due to Radbil's and later Myers' refusal to respect the process, follow the rules and simply tell the truth. In a textbook example of what the Rules are designed to avoid, RAB's counsel was unfairly forced to fend off undisclosed evidence and misrepresentations by Radbil at every turn during the trial. These tactics were both distracting and costly to RAB as it attempted to defend its case.

From the outset, Radbil's advocacy skills and overall experience as a lawyer were of concern to the Court. Starting at the pretrial phase, Radbil's late designation of witnesses[241] followed by his inconsistent explanations for the untimely designations were not in keeping with the actions of a seasoned lawyer taking on the role of lead advocate for his client at trial. Not only that, Radbil's seemingly inept tactics were highly disconcerting to RAB as it attempted to prepare for the trial just weeks away. So unsettling was Radbil's naming of several unexpected witnesses to RAB in the weeks before trial, that it filed two sets of objections to the witness designations. Yet, due to Radbil's conflicting responses to its objections, (first, no experts would testify then "one" expert would testify), RAB was left in the dark as to Radbil's intentions until the eve of trial. Only adding to RAB's distress, as Malone recounted during the sanctions hearings, Radbil refused to return her "ten" phone calls and "ten" e-mails the Saturday before trial despite the Court's order that the parties confer.

At trial, Radbil's unprofessional antics only worsened as did its effects on RAB's ability to defend its case. First were Radbil's attempts to introduce evidence to the jury about never-before-disclosed counseling efforts by White. And then came the surprise testimony by White that he had

---

[241] Mem. Op., *supra*, at 12-15. This included four previously unidentified witnesses on December 7, 2012 (doc. 69) and six previously unidentified witnesses on January 18, 2013 (doc. 74). *See also* Doc. 76.

incurred $45,000 in actual damages due to RAB's actions. As with the untimely witness designations, this evidence (counseling and $45,000 damages) was completely unexpected by RAB's counsel and, at least temporarily, derailed their trial plan as they had to search their files to support their objection to the Court. But even recognizing these below-the-belt tactics as such, a much more serious pattern of conduct on Radbil's part emerged during the trial and in the sanctions hearings that followed. That being Radbil's unabashed willingness to lie to the Court to avoid negative consequences for his behavior.

Examples of this bad faith conduct abound in the fifty-pages of factual findings. This troubling behavior came partly in the form of Radbil's frustratingly evasive and circular non-responses to simple questions about his conduct. For example, as to the counseling evidence, Radbil firmly told the Court during trial that he did *not* know what White's response would be to the counseling question only to shift gears moments later and state that he expected the testimony to be favorable. As to RAB's claim that Radbil had "ambushed" it with the $45,000 damages testimony, Radbil's circular, three-fold response, set forth in detail above, was simply not believable in any sense, particularly once RAB was able to point to portions of its records that contradicted Radbil's response.[242] Adding to the dubious nature of Radbil's excuses at trial for offering the $45,000—and bordering on the ridiculous—were the number of conflicting excuses that followed throughout the later sanctions hearings. The excuses from trial and the sanctions hearings included, but were not limited to; that the $45,000 *had* been disclosed to RAB, that the $45,000 was disclosed but not quantified, that the $45,000 was not disclosed because it was mental anguish damages, that it was not disclosed because

---

[242] *See* Mem. Op., *supra*, at 15-16, n.51.

it was privileged and RAB never sought the privileged document, that it was nothing but a "rogue" response by White never intended to be offered, and, that it was never intended to be offered *because* the $45,000 in damages was solely attributable to Texas Guaranteed and not RAB. The fact that Radbil was lying to the Court about the $45,000 was further substantiated by his own client's comments, the day Radbil failed to appear for trial, when he apologized to the Court that Radbil had not been straightforward about the damages evidence. As addressed multiple times above, this occurred during trial on the morning that Radbil failed to appear.[243]

Another example of Radbil's penchant for prevarication was in his argument to the Court during trial that he needed to recall RAB's Director of Compliance, Robert F. Wyatt, to the witness stand to question Wyatt on a topic that he had, according to Radbil, inadequately answered at his pretrial deposition. In making his argument to the Court, Radbil quoted from Wyatt's deposition. A key fact that Radbil failed to disclose to the Court—but was later revealed by RAB—was that the sufficiency of Wyatt's deposition, from which Radbil quoted, had already been addressed during pretrial discovery and remedied by the magistrate judge who ordered a second deposition that corrected the problem.[244] Radbil's arguments and his quoting from the first deposition, without mentioning the second, were blatantly misleading to the Court. On top of that, once caught, Radbil refused to acknowledge his misdeed to the Court either at trial or in the post-trial sanctions

---

[243] Specifically, White apologized for Radbil's behavior the day and stated:
. . . I felt like I should make a response to the issue of sandbagging [by Radbil] yesterday with the claims. I did quantify the damages. And they were *not* an abstract sum for mental anguish [as urged by Radbil], they were *real financial damages* that I suffered. I made sure Mr. Radbil had that information. . . . and I was led to believe it would be submitted for this trial, which of course it wasn't. So I apologize.

[244] Mem. Op., *supra*, at 17-18.

hearings.[245]

During the sanctions hearings, Radbil's bad faith actions—in tandem with Myers'—escalated. In question after question by Malone, Radbil refused to concede the obvious, delaying the proceedings and obfuscating the truth. For example, during his testimony at the August 2, 2013 sanctions hearing, Radbil refused to concede the simple truth that his Texas office was actually just a post office box or that he had previously been suspended from the practice of law for failing to pay his dues.[246] Similarly wanting, was his response to RAB's counsel's question as to whether he had ever communicated a reasonable settlement demand to RAB. So convoluted and evasive was Radbil's answer, that the Court had to intervene.[247] And then, as mentioned, were his continually evolving and conflicting excuses for the $45,000 in damages, none of which were credible. He also switched his position on the counseling issue from trial where he told the Court he did *not* know whether White had sought counseling to the sanctions hearing where he insisted that White *had* sought counseling and had disclosed it to RAB.[248] On top of that, there was absolutely no support at all for his claim either that White had sought counseling or had ever disclosed such efforts. Radbil simply lied to the Court about this, both at the hearing and in his sanctions hearing briefing.

As discussed, Myers' entry into the case at the start of the sanctions hearings, as Radbil's and the firm's representative, only made matters worse, at times lending an almost 'circus-like'

---

[245] TR-2 at 241-43; STR-4 at 304-05.

[246] Mem. Op., *supra*, at 27-28, n.92.

[247] *Id.* at 28-30, n.95.

[248] *Id.* at 34-36.

atmosphere to the proceedings with Myers' 'sleight-of-hand'[249] approach to the facts. First, and much to the Court's surprise, in his opening statement, Meyers refused to acknowledge that Radbil had done anything wrong during trial—save showing up late for the second day of the proceedings. Myers also oddly told the Court during his opening that he had never even spoken to White about the trial or the pending sanctions motions because he (Myers) "didn't want to get a skewed vision of what happened." That Myers, the firm's representative, would not have even spoken to the client about Radbil's handling of the client's case when Radbil's handling of the case was the sole reason for the sanctions motions was nonsensical. Myers' flimsy justification for not talking to White was not credible. This is particularly so given Myers' later production of the October 2, 2013 "Declaration" by White at the November 6, 2013 sanctions hearing. More specifically, even though Myers had told the Court during his opening that he had purposely not spoken to White in preparation for the sanctions hearing, he not only later spoke to White, he had White sign a sworn statement that was submitted by Myers as an exhibit at the November 6, 2013 hearing. In this belated "Declaration" by White, he disavowed that he had ever any intent to seek hard damages from the jury, and parroted Meyers' and Radbil's argument that Radbil and White had never planned to submit such damage figures to the jury.

As mentioned, the evidentiary value of White's belated "Declaration" was questionable given White's absence from the entirety of the sanctions proceedings and given that it contradicted White's strong statements to the Court during trial that he had intended to submit hard damages

---

[249] *See Zapata Hermanos Sucesores, S.A. v. Hearthside Baking Co., Inc.*, No. 99 C 4040, 2001 WL 1000927, at *1 n.2 (N.D. Ill. Aug. 29, 2001) (bemoaning the attorneys' "sleight-of-hand" argument as "better suited to a shell game along the midway of a state fair than to a legal memorandum . . . .").

figures to the jury. But what truly undermined the Declaration's validity and called into question Myers' and Radbil's motives in sponsoring the Declaration was the eventual disclosure (during the last sanctions hearing) of the contents of White's much earlier and highly contradictory December 6, 2012 pretrial memo to Radbil. As described above, Radbil had the December 6, 2012 memo in his possession during all of the proceedings and had alluded to it but refused to disclose its contents, saying it was privileged and that RAB had never established an exception to the privilege. All the while, Radbil maintained that he and White had not planned to seek hard damages from the jury. When it was finally disclosed, over Radbil's counsel's objection, the December 6, 2012 memo corroborated what White told the Court during trial that he and Radbil planned to seek hard damages from the jury. Without White at the sanctions hearings to explain the discrepancies between the two writings, the Court is left to speculate as to whether the October 2, 2013 memo was concocted by Myers and Radbil to support their defense to the sanctions motions. One thing is certain and that is that the fact that the two withheld the contents of the December 6, 2012 memo and prepared another memo for White's signature that flatly contradicted the one in their possession smacks of a fraud on the Court or, at the least, highly unprofessional behavior that should not be countenanced in federal court.

Whether Radbil's and Myers' questionable behavior in this case was an aberration or simply business as usual for the firm, was clarified at the October 9, 2013 sanctions hearing, which confirmed the latter. As addressed above, through a series of documents from other court cases as well information acquired from public web-sites controlled by Myers, RAB was able to show that Radbil, Myers and other members of the firm had been involved in multiple run-ins with other courts

and had fabricated information about Radbil's accomplishments.[250] One of the more notable skirmishes was in the *Scarlott* case in the Southern District of Texas, described above, in which the attorneys for Defendant Nissan filed a thirty-page motion for sanctions accusing Radbil and his co-counsel of lying in their pleadings in order to sustain an untenable case.[251] In granting the motion for sanctions against Radbil and co-counsel and awarding $195,000 to Nissan, the judge criticized Radbil for his "abysmal judgment and performance"and described the firm's actions in that case as "unconscionable" and "unprincipled."[252] Another federal judge chastised Radbil for "petty gamesmanship" while yet another accused him of making "misrepresentations" regarding his eligibility to practice law in that district.[253]

RAB was also able to show that Radbil and Myers (as the sponsor of the public web-sites) fabricated information about Radbil's experience and accomplishments on their public web-sites. From claiming victories in cases that Radbil lost, such as the *Whaley* case described above, to simply making up stories about Radbil's purported clients, through public web-sites, controlled by Meyers, Radbil and Myers shamelessly lied to the public.[254] In one posting hailing Radbil as a sort of pioneer in music downloading cases, the evidence showed that Radbil was not even licensed to practice law when that case went to trial.[255] Same with a posting lauding Radbil for his involvement in a major

---

[250] Mem. Op., *supra*, at 42-50.

[251] *Id.* at 42-44.

[252] *Id.* at 43-44.

[253] *Id.* at 46.

[254] *Id.*

[255] *Id.* at 47.

copyright infringement case involving "Scribd," which occurred before Radbil was licensed as an attorney.[256] Another posting touts Radbil's involvement in a case representing a group of NCAA athletes when Radbil was never even listed as attorney of record.[257] Much more detail is set forth above and thus will not be repeated. Suffice it to say, first, that none of this was refuted by Radbil or Myers. And second, as set out above, clear and convincing evidence reveals a pattern of conduct by Radbil and Myers, with no ethical oversight, run amok. Sanctions for bad faith conduct are most assuredly in order.

## IV.

## LEGAL STANDARDS

*Sanctions - The Court's Inherent Authority*

Federal courts have the inherent authority to manage their own affairs so as to achieve the orderly and expeditious disposition of cases. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43-45 (1991) (citations omitted). Toward that end, federal courts are empowered to sanction bad faith conduct occurring during the litigation. *Elliott v. Tilton*, 64 F.3d 215, 216 (5th Cir. 1995). It goes without saying that lying to the court[258] constitutes bad faith conduct. *See generally*, *Chambers*, 501 U.S. at 42, 46, 50-51 (upholding the district court's use of its inherent authority to sanction bad faith conduct which included "misleading and lying to the court."). The court's inherent authority is to

---

[256] *Id.* at 47-48.

[257] *Id.* at 48.

[258] The term "bad faith" has been described as conduct involving "fraudulent intent and a desire to suppress the truth." *Consolidated Aluminum Corp. v. Alcoa, Inc.*, 244 F.R.D. 335, 344 (M.D. La. 2006).

be invoked, however, only when "no sanction established by the Federal Rules or pertinent statute is 'up to the task,'" *Chambers*, 501 U.S. at 43-46. As explained by the Supreme Court in *Chambers*, certain sanctioning mechanisms reach "only certain individuals or conduct" but "the inherent power extends to a full range of litigation abuses." *Id.* at 46.

Here, although RAB's motions for sanctions are grounded in Fed. R. Civ. P. 37 and Title 28 U.S.C. § 1927, which cover a certain range of the conduct alleged, neither are up to the task of meting out the appropriate punishment for the egregious conduct in this case. Specifically, recognizing Radbil's undeniable misdeeds involving faulty pretrial disclosures, late witness list supplementation, and the like, it is his and Meyers' flagrant abuse of the judicial process—their bad faith conduct— that is due the most scrutiny. The scope of their conduct exceeds the conduct punishable under Rule 37 and § 1927. To put a finer point on it, Radbil and Meyers perpetrated a fraud on the Court and counsel through a persistent pattern of misrepresentations, evasive responses, and outright lies to the Court and counsel. To be clear, the Court is not discounting Radbil's serial violations of the Federal Rules of Civil Procedure or Meyers' and Radbil's flouting of the rules of professional conduct. Instead, the evidence of those violations, replete in fifty some odd pages of this opinion, is considered in the aggregate by the Court in concluding that Radbil and Meyers engaged in bad faith conduct and, in so doing, abused the judicial process. Both Meyers and Radbil were informed, more than once by the Court, that their conduct was being scrutinized for bad faith under the Court's inherent authority.[259]

Coextensive with the inherent authority to mete out sanctions is the requirement that these

---

[259] STR-1at 209-10; Mem. Op., *supra*, at 22, 41 (citing TR-4 at 13-14 and STR-1 at 209-10).

implied powers be exercised with restraint and discretion. *Chambers*, 501 U.S. at 44 (citing *Roadway Express v. Piper*, 447 U.S. 752, 764 (1980)). Inherent powers "may be exercised only if essential to preserve the authority of the court and the sanction must employ" the least possible power adequate to the purpose to be achieved. *Natural Gas Pipeline of Am. v. Energy Gathering Inc.*, 86 F. 3d 464, 467 (5th Cir. 1996) (citations omitted). In other words, the sanction must "be tailored to fit the particular wrong." *Topalian v. Ehrman*, 3 F.3d 931, 936 n.5 (5th Cir. 1993) (extending the analytical principles for determining sanctions under Rule 11 "across-the-board" to all of the district court's sanctioning powers). The court's inherent authority vests the court with discretion "to fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers*, 501 U.S. at 44-45. Conduct which abuses the judicial process includes, but is not limited to; practicing a fraud upon the court as well as delaying or disrupting litigation. *Id.* at 45-46. Available sanctions under the court's inherent authority include a number of options ranging from an assessment of attorney's fees to disbarment. *Id.*; *In the Matter of Sealed Appellant*, 194 F.3d 666, 671 (5th Cir. 1999) (internal citations omitted).

*Attorney's Fees*

1. Trial Misconduct

RAB seeks to recover all of its attorney's fees and expenses for its preparation and participation in the trial of this case. RAB also seeks its attorney's fees and expenses for its preparation for and appearance at all of the sanctions hearings. The Court will address the trial fees first and then the fees incurred for the sanctions proceedings. So far as its trial-related fees, RAB seeks its costs and fees covering the time period from the inception of the case, August, 2011 through

the end of trial, February 28, 2013.[260]

Appropriate factors to consider in determining the amount of an award of attorney's fees sanction include: (1) the precise conduct being punished; (2) the precise expenses caused by the violation; (3) the reasonableness of the fees imposed; and (4) the least severe sanction adequate to achieve the purpose of the rule relied upon to impose the sanction. *Topalian*, 3 F.3d at 936. Only those fees *caused* by the party's misconduct are permissible. *Smith & Fuller v. Cooper Tire & Rubber Co.*, 685 F.3d 486, 490 (5th Cir. 2012).

While it cannot be said that Radbil's unprofessional behavior leading up to and continuing through the trial caused *all* of RAB's trial attorney's fees, the Court finds that a portion of those fees, beginning in December 2012 through the end of trial in February 28, 2013, were incurred as a direct result of Radbil's bad faith conduct. In so finding, the Court incorporates, without repeating, its factual findings, detailed above, regarding Radbil's trial conduct. Just a few of the multitude of examples of this behavior include when, immediately before trial, RAB's attorneys were forced to research and file objections to Radbil's untimely witness designations. Radbil never did provide an adequate explanation for his untimely witness designations or his inconsistent responses to RAB's objections to his witness designations, leaving RAB in the dark as to Radbil's intended witnesses until the pretrial conference. During trial, Radbil improperly offered evidence on counseling and damages that had never been disclosed to RAB before trial. This, in turn, caught RAB by surprise, forcing it to object and spend time researching its records and explaining to the Court precisely why Radbil's actions were objectionable instead of focusing on its trial strategy. The amount of time that RAB

---

[260] Def.'s Rule 37 Mot. at 8; STR-4 at 147.

spent going back through its own records to counter false statements by Radbil is not adequately reflected in the trial transcript. Nonetheless, the Court watched first-hand as RAB's attorneys scrambled on several occasions to search their files to respond to Radbil's misrepresentations during trial. And, of course, persistent throughout the trial, were Radbil's evasive, circular responses and outright misrepresentations to the Court which disrupted and delayed the proceedings.[261]

Having reiterated in general terms Radbil's offending behavior at trial, the Court acknowledges that determining the precise amount of RAB's attorney's fees—dollar-for-dollar—that were directly caused by Radbil's bad faith conduct at trial cannot be done with exactitude. In other words, segregating the fees that RAB incurred as a direct result of Radbil's misconduct from the fees that were otherwise incurred by RAB in the course of trial does not lend itself to numerical precision. But courts recognize that attorney fees sanctions need not and sometimes cannot be calculated with mathematical precision. *Topalian v. Ehrman*, 3 F.3d 931, 938 n. 7 (5th Cir. 1993). The sanctioning court must, however, provide "some avenue to trace [its] reasoning and review [its] exercise of discretion." *Id.*

Here, the Court's extensive involvement in the trial proceedings and first-hand observation of Radbil's behavior during the trial provides a substantial basis for quantifying RAB's reasonable attorney's fees incurred due to Radbil's behavior. While Radbil's unfortunate conduct permeated the trial, it did not subsume all of the trial time. In this Court's view, a conservative estimate by the Court of RAB's attorney's fees that were caused by Radbil's conduct would be one-third of the total attorney's fees incurred by RAB at trial. The relevant time period for calculating these fees is between

---

[261] For a sampling, *see* notes 51, 92, and 95, *supra*.

December 2012 through February 28, 2013. To determine the specific amount of fees due, additional records are needed from RAB.[262] This information should include all relevant billing records for the time period from December 2012 through February 28, 2013, with a total figure of fees incurred for that time period divided by one-third. Having said that, the Court notes that Malone testified credibly at the November 6, 2013 sanctions hearing about how she calculated RAB's fees and costs incurred from the inception of the case through the November 6th sanctions hearing. Her testimony covered and satisfied all of the relevant "lodestar" considerations and such information need not be resubmitted with these additional records.[263]

As mentioned, the Court's first-hand involvement in the case made assessing the reasonableness of the fees a much more straightforward task than that confronting other courts

---

[262] Although RAB presented testimony from Malone and exhibits at the sanctions hearings supporting its attorney's fee request, the Court finds that additional information is needed for clarity. Specifically, Ms. Malone testified about attorney's fees incurred at trial but the records she relied upon were documents submitted in connection with RAB's Rule 68 motion (doc. 118), STR-4 at 112-55. The records attached to the Rule 68 motion (doc. 118) contain listings of fees and expenses from the inception of the case in August 2011 through the end of the trial. *See* Doc. 118, Def. App. 155-315. Those records also include affidavits by RAB's attorneys and paralegals as well as other documents supporting the reasonableness of RAB's fee requests. *Id.,* Def. App. 316-50. But the fees that are being awarded in this case for Radbil's misconduct cover a more limited time period. Specifically, it is Radbil's misconduct, during and immediately prior to trial, for which fees are being awarded. As stated above, the precise figure allowable would be one third of the attorney's fees incurred as a result of Radbil's conduct between December 2012 and the end of trial, February 28, 2013. Costs in amount of $9,438.73 in the case have already been ordered by separate order and cannot be included in this total.

[263] STR-4 at135-56; A "strong presumption" of reasonableness attaches to attorney's fees calculated under the lodestar method. *Smith & Fuller,* 685 F.3d at 490 (citing *Heidtman v. County of El Paso,* 171 F.3d 1038, 1044 (5th Cir. 1999)). Those factors include: (1) the time and labor required; (2) the novelty and difficulty of the case; (3) the skill required; (4) the preclusion of other employment; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed; (8) the results obtained; (9) the experience, reputation and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717-19 (5th Cir. 1974).

deciding fee awards lacking this perspective. Moreover, Malone's hourly rate was only $175.[264] This

is an extremely reasonable hourly rate for a lawyer of Malone's experience.[265] Malone's associates and

paralegals[266] billed at hourly rates of $140 and $80, respectively.[267] This award is due and owing

jointly and severally from Radbil and Meyers. As set out in the factual findings, Meyers was directly

involved in this case before trial as a partner of the Weisburg firm. Moreover, he dubiously defended

Radbil's trial conduct, seemingly perplexed by what he described as "naked allegations" against

Radbil.[268] The Court finds this attorney's fee award to be the least severe sanction appropriate to

deter similar trial misconduct.

2. Sanctions Hearings

RAB also seeks its attorney's fees and costs in relation to the sanctions motions and hearings

that followed. This would include all of its costs and fees incurred in preparing the sanctions motions

as well as those incurred in connection with each of the sanctions hearings on August 2, 2013,

---

[264] Malone testified that as of November 2013, her hourly rate increased to $200. STR-4 at 138.

[265] In other cases involving Texas lawyers, the hourly rates range from $220 for associates to $510 for senior partners. *E.g., Champion v. ADT Sec. Servs., Inc.*, No. 2:08-CV-417-TJW, 2010 WL 4736908, at * 8-9 (E.D. Tex. Nov. 16, 2010) (finding that $350 for partner-level work is reasonable given that the hourly rates for partners in the Eastern District of Texas range from $250 per hour to $450 per hour "for certain premium work"); *Randolph v. Dimension Films*, 634 F. Supp. 2d 779, 797-98 (S.D. Tex. 2009) (finding that rates of $510 per hour for a partner specializing in intellectual property law and $220 to $300 per hour for associates are reasonable); *cf., e.g., Ranger Steel Servs., LP v. Orleans Materials & Equipment*, No. 10-112, 2010 WL 3488236, at *1 (E.D. La. Aug. 27, 2010) (finding that hourly rates of $395 for partners are reasonable); *Hornbeck Offshore Servs., L.L.C. v. Salazar*, No. 10-1663, 2011 WL 2214765, at *2 (E.D. La. June 1, 2011) (finding hourly rates of $295 to $420 for partners and $180 to $195 for associates "are at the high end of rates," but finding an hourly rate of $450 reasonable for a partner with specialized qualifications).

[266] *See Greer v. Richardson Indep. Sch. Dist.*, 471 F. App'x 336, 340 (5th Cir. 2012) (approving an award of attorney's fees and *paralegal* fees as a sanction).

[267] STR-4 at 138.

[268] Mem. Op., *supra*, at 25.

August 7, 2013, October 9, 2013, November 6, 2013, and November 26, 2013. It is hardly a leap of logic to conclude that RAB's fees and expenses incurred in connection with the sanctions hearings were solely caused by Radbil's and Meyer's bad faith conduct as detailed in the Court's factual findings. Under appropriate circumstances, a sanction award may include the entire amount of attorney's fees incurred as a result of the bad faith conduct. *Chambers*, 501 U.S. at 55. Accordingly, RAB is entitled to recover all of its reasonable attorney's fees and expenses incurred in connection with preparing the sanctions motions as well as for its preparation for and attendance at the sanctions hearings.

Malone testified credibly at the November 6, 2013 sanctions hearing regarding the amount of RAB's costs and expenses incurred by her and her firm in connection with the sanctions motions and hearings. For the same reasons discussed above, Malone's testimony satisfied the lodestar factors.[269] Specifically, she established, *inter alia*, the reasonableness of the fees and expenses RAB incurred, as well as her hourly rate, the time, labor and skill required. The undesirability of the case was clear from the record. Nonetheless, her testimony and records covered RAB's expenses in connection with the sanctions issues only up through her testimony at the November 6, 2013 hearing. Given that the November 26, 2013 hearing had yet to occur, the evidence supporting RAB's total sanction-related fees and expenses is incomplete.[270] Malone's credible testimony established that the total figure for RAB's fees and expenses from the close of trial and preparation of the sanctions motions through the November 6, 2013 hearing was $44,951.50.[271] So, in order to adequately and

---

[269] STR-4 at 134-56; RAB-S at Tab 41.

[270] STR-4 at 112-56, RAB-S at Tab 41.

[271] STR-4 at 155.

accurately compensate RAB for its total attorney's fees and expenses incurred in connection with the sanctions issues, RAB is directed to submit supplemental billing records (to RAB-S Tab, 41) setting out its attorney's fees and expenses incurred up through the conclusion of the November 26, 2013 sanctions hearing. Given the egregious conduct of both Radbil and Meyers at the sanctions hearings, this fee award is due and owing from both Radbil and Meyers and is also the least sanction appropriate under the circumstances to compensate RAB for its attorney's fees and expenses caused directly by Radbil's and Meyers' conduct.

*Suspension/Disbarment*

Finally, and most importantly, Radbil and Meyers must be sanctioned for their egregious abuse of the judicial process. Their systematic pattern of evasion, misrepresentation and outright lies during the trial and the sanctions proceedings did not just negatively impact RAB, it degraded the entire judicial process. *See Chambers*, 501 U.S. at 42, 46 (misleading and lying to the court degrades the judicial system). When the integrity of the judicial process itself has been abused, the court's authority to remedy the wrong derives from its inherent power to police itself and to vindicate its judicial authority. *Id.* at 45-46. Toward that end, courts have the right to "control admission to its bar and discipline attorneys who appear before it." *Id.* at 43 (internal citations omitted). This includes the power to disbar an attorney for bad faith conduct. *Crowe v. Smith*, 261 F.3d 558, 563 (5th Cir. 2001).[272] "The power of disbarment is necessary to protect the public's confidence in the profession and judicial system because a court implicitly represents that an attorney permitted to practice before

---

[272] Civil Rule 83.8(b) of the Local Rules of the United States District Court for the Northern District of Texas provides that "[a] presiding judge, after giving opportunity to show cause to the contrary, may take any appropriate disciplinary action against a member of the bar for . . . conduct unbecoming a member of the bar; . . . [or] unethical behavior." N.D. Tex. Local R. 83.8(b).

it is in good standing to do so." *In re Sealed Appellant,* 194 F.3d at 674(internal citations omitted).

"Courts have long recognized an inherent authority to disbar attorneys." *Id.* at 671. A specific finding of bad faith by the court is a prerequisite to disbarment. *Id.* The term "bad faith" has been described as conduct involving "fraudulent intent and a desire to suppress the truth." *Consolidated Aluminum Corp. v. Alcoa, Inc.,* 244 F.R.D. 335, 344 (M.D. La. 2006). Misrepresentations to the court and other intentional misconduct involving dishonesty, fraud, and deceit can be grounds for disbarment. *In re Sealed Appellant,* 194 F.3d at 674 (internal citation omitted); *Crowe,* 261 F.3d at 563. Because attorney disbarment is an extreme sanction, the court's decision to disbar must be supported by clear and convincing evidence of bad faith. *Id.*

With the foregoing standards in mind, the Court finds that there is clear and convincing—if not overwhelming—evidence that Radbil and Myers engaged in bad faith conduct by lying to and otherwise misleading the Court and RAB's counsel during the course of the proceedings. In so finding, the Court relies upon its factual findings, in particular, its summary of the factual findings for support.[273] Some general observations are also helpful. First, as evident in the 50-plus pages of factual findings, Radbil's and Meyer's missteps were by no means subtle. In other words, it does not require an in-depth analysis to conclude that, on numerous occasions, Radbil and Meyers were simply making things up. In fact, many of their misrepresentations were startlingly obvious. For example, Radbil's statement to the Court—when he asked White during his trial testimony about counseling—that he did *not* know what White's response would be and then, a few minutes later, stating that he expected the testimony to be favorable was just not logical. The same goes for Radbil's

---

[273] Mem. Op., *supra,* at 63-71.

numerous inconsistent statements about the $45,000 in damages testimony. With five or so internally inconsistent explanations for the $45,000, one thing is certain: they cannot all be true.

Myers fared no better. His opening statement at the August 2, 2013 sanctions hearing, in which he insisted to the Court that he had not spoken to White because he did not want to get a "skewed vision" of what happened during the trial made no sense and called into question Meyers' fitness to practice law. His later co-production of White's "Declaration" only reinforced that he and Radbil were equal partners in their abuse of the judicial process.[274]

In sum, there is overwhelming evidence of bad faith conduct by Radbil and Myers in this case. They must therefore be called to account for their behavior. A simple assessment of attorney's fees falls far short of what is needed to deter Radbil's and Myers' bad faith conduct and vindicate the judicial process. This, given the fact that both attorneys and their former firm have had numerous ethical run-ins with other courts in the past and, nevertheless, conducted themselves as they did in this case. To prevent their disreputable behavior from recurring, they must be precluded from practicing in the Northern District of Texas for a defined period of time. While disbarment is certainly an option, the Court finds the lesser sanction of a three-year suspension is adequate under the circumstances to accomplish the purpose to sanctioning Radbil and Myers for their bad faith conduct and to deter such conduct in the future. Accordingly both Radbil and Myers are suspended from practicing law in the Northern District of Texas for a period of three years commencing on the date this Order is entered in this case. After the three year period, Radbil and Myers may reapply for admission but only on the condition that they have paid the attorneys fees assessed against them and

---

[274] STR-5 at 74-79.

due and payable to RAB.

## V.

## CONCLUSION

For the foregoing reasons, Defendant Regional Adjustment Bureau, Inc.'s (RAB's) Motion for Sanctions, pursuant to Fed. R. Civ. P. 37 (doc. 119) and its Motion for Sanctions Under 28 U.S.C. §1927 (doc. 120) are **GRANTED.** The Motions are **GRANTED** to the extent set forth above and based on the Court's inherent authority.[275]

Accordingly, Radbil and Myers are jointly and severally liable for RAB's attorney's fees and paralegal fees and expenses as follows: Radbil and Myers are **ORDERED** to pay attorney's fees and expenses to RAB as follows: Radbil and Myers are **ORDERED** to pay one-third of RAB's attorney's and paralegal fees incurred in the preparation and presentation of the trial of this case between December 1, 2012 and February 28, 2013; Radbil and Myers are **FURTHER ORDERED** to pay all of RAB's attorney's fees and paralegal fees as well as its costs and expenses incurred in connection with the preparation and presentation of its sanctions motions as well as the preparation and presentation at each of the sanctions hearings on August 2, 2013, August 7, 2013, October 9, 2013, November 6, 2013, and November 26, 2013.

RAB is **ORDERED** to supplement its invoices for its attorney's fees and its costs as directed above [276] within thirty (30) days of the date of this ORDER. Radbil and Myers are **ORDERED** to pay these fees and expenses within thirty days of the date this Court enters its Order containing the

---

[275] As explained above, the Court relies on its inherent authority in awarding sanctions. To the extent RAB relies on Fed. R. Civ. P. 37 and 28 U.S.C. §1927 for its sanctions motions, the Court declines to award relief under those provisions.

[276] *See* Mem. Op., *supra*, at 73-79, n.218.

updated amounts.

**IT IS FURTHER ORDERED** that Noah D. Radbil and Marshall S. Myers are hereby

**SUSPENDED** from the practice of law for **THREE YEARS** commencing on the date of this Order.

Before Radbil and Myers can reapply for admission to this District, they must show proof to the Clerk

of Court that they have paid RAB in full the costs and attorney's fees ordered by this Court above

and, further, that they have incurred no additional sanctions from any other state or federal court

in the interim.


SO ORDERED.

DATED: JUNE 23, 2015


_____
JANE J. BOYLE
UNITED STATES DISTRICT JUDGE