UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| TIMOTHY WHITE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:11-CV-1817-B |
| | § | |
| REGIONAL ADJUSTMENT | § | |
| BUREAU, INC., d/b/a RAB, INC., | § | |
| | § | |
| Defendant. | § | |

# APPENDIX C

(Hearing Transcript, October 10, 2013, *Scarlott v. Nissan North America, Inc., et. al., 4-10-cv-4865*)

1                    UNITED STATES DISTRICT COURT

2                    SOUTHERN DISTRICT OF TEXAS

3                         HOUSTON DIVISION

4  APRIL SCARLOTT,                       .

5                    Plaintiff,          .
                                         .  Civil Action
6  VS.                                   .  No. H-10-CV-4865
                                         .
7  NISSAN NORTH AMERICA, INC.,           .  Houston, Texas
   et. al.,                              .  October 10, 2013
8                                        .  10:34 a.m.
                    Defendants.          .
9  . . . . . . . . . . . . . . . . .

10                   TRANSCRIPT OF PROCEEDINGS
                BEFORE THE HONORABLE LYNN N. HUGHES
11                          HEARING

12 APPEARANCES:

13 FOR THE PLAINTIFF:

14            Mr. Noah Daniel Radbil
              WEISBERG & MEYERS, LLC
15            1200 Smith Street
              16th Floor
16            Houston, Texas 77002
              888.595.9111, ext. 275
17            FAX:  866.565.1327
              noah.radbil@attorneysforconsumers.com
18
              Mr. Aaron Radbil
19            Mr. Marshall Meyers
              WEISBERG & MEYERS, LLC
20            5025 N. Central Avenue
              #602
21            Phoenix, Arizona  85012
              888.595.9111, ext 122
22            888.595.9111, ext 111
              ECF@attorneyforconsumers.com
23            mmeyers@attorneyforconsumers.com

24           PROCEEDINGS RECORDED BY STENOGRAPHIC MEANS,
      TRANSCRIPT PRODUCED FROM COMPUTER-AIDED TRANSCRIPTION
25

```
 1                              APPEARANCES

 2                             (continued)

 3

    FOR THE DEFENDANT NISSAN NORTH AMERICA, INC.:
 4
              Mr. Jeffrey S. Patterson
 5            HARTLINE, DACUS, BARGER, DREYER, LLP
              6688 North Central Expressway
 6            Suite 1000
              Dallas, Texas 75206
 7            214.369.3701
              FAX:  214.369.2118
 8            jpatterson@hdbdlaw.com

 9   FOR THE DEFENDANT HURRICANE AUTO CARE & ACCESSORIES, INC.:

10            Mr. Leslie William Adams
              Ms. Angelle M. Adams
11            LWA & ASSOCIATES
              3900 Essex Lane
12            Suite 1111
              Houston, Texas  77027
13            713.728.6360
              FAX: 713.728.6366
14            LWA@LeslieWmAdams.com
              AMA@LeslieWmAdams.com
15

16

17

    COURT REPORTER:
18
              GAYLE L. DYE, CSR, RDR, CRR
19            515 Rusk, Room 8016
              Houston, Texas  77002
20            713.250.5582

21

22

23

24

25
```

Gayle Dye, CSR, RDR, CRR – 713.250.5582

1                              PROCEEDINGS

2                           October 10, 2013

3          THE COURT:  Good morning.  Sorry to keep you waiting.

4     Mr. Adams, do you have anything you want to add to your motion?

10:34:31   5          MR. LESLIE ADAMS:  No, your Honor, we don't.  Only

6     that the only sanctions we're seeking is the return of costs and

7     fees.

8          THE COURT:  I'm sorry, speak up.

9          MR. LESLIE ADAMS:  I'm sorry.  By way of sanctions, we

10:34:43   10    only seek return of costs and fees.

11         THE COURT:  Costs and fees?

12         MR. LESLIE ADAMS:  Yes, thank you.

13         THE COURT:  I don't do the punitive kind anyway.  I

14    only do equitable costs.

10:34:56   15         MR. LESLIE ADAMS:  Thank you, your Honor.

16         THE COURT:  I disapprove of when the FCC decides

17    something, your broadcast wasn't right, so they say $300,000;

18    and all the other folks who are in power can do that.

19              Mr. Radbill ---

10:35:16   20         MR. NOAH RADBIL:  Your Honor.

21         THE COURT:  -- do you have anything to add to your --

22         MR. NOAH RADBIL:  Your Honor, this is my brother,

23    Aaron Radbill.

24         MR. AARON RADBIL:  Your Honor, to the extent that you

10:35:27   25    have any questions, I would gratefully take the opportunity to

1   answer them.  However, if you don't have any other questions, I

2   will not waste your time.

3          THE COURT:  Well, I do have a question.  Would you

4   step to the lectern, please.

10:35:40   5          MR. AARON RADBIL:  Yes, sir.

6          THE COURT:  Let's talk about the folks at Hurricane.

7          MR. AARON RADBIL:  Okay.

8          THE COURT:  Do you know when the lawsuit was filed in

9   the 281st District Court?

10:36:01  10          MR. AARON RADBIL:  281st District Court?  About a year

11   before the one was filed in this Court.  The first complaint was

12   filed over a year before it was removed to this Court.

13          THE COURT:  And who was named in the original

14   petition?

10:36:20  15          MR. AARON RADBIL:  Nissan North America, Incorporated.

16          THE COURT:  And when were the Clear Lake Nissan

17   dealer, somebody else, and then, more important, Hurricane

18   added?

19          MR. AARON RADBIL:  After Bob Gore's deposition, in

10:36:44  20   which Bob Gore --

21          THE COURT:  When?  That's a date.

22          MR. AARON RADBIL:  Well, after November of 2009.

23   Shortly after November of 2009.

24          THE COURT:  When was Hurricane served?

10:37:18  25          MR. AARON RADBIL:  Several months later, I believe.

1           THE COURT:  Three and one half years later.

2           MR. AARON RADBIL:  From the original complaint.

3           THE COURT:  How much do you want to take off?

4    Actually, I only started from January of 2010 from the response

10:37:40  5    by some obscure Dallas law firm.

6           MR. AARON RADBIL:  When was Hurricane --- I'm sorry, I

7    misunderstood the question.

8           THE COURT:  No.  You said Hurricane was joined in

9    November of 2009.

10:38:04  10          MR. AARON RADBIL:  Right.

11          THE COURT:  So, when I was counting how long all these

12   things had been, I was just starting with January of '10 because

13   I had the February letter from Nissan which responded to the

14   complaint.

10:38:19  15          MR. AARON RADBIL:  Right.

16          THE COURT:  So, I knew it had been filed and I knew

17   they had known about it.

18          MR. AARON RADBIL:  Right.

19          THE COURT:  And when was the mirror installed?

10:38:37  20          MR. AARON RADBIL:  The mirror was installed in 2007.

21          THE COURT:  In '10?

22          MR. AARON RADBIL:  2007.

23          THE COURT:  Seven?

24          MR. AARON RADBIL:  Yes.  2006 possibly.  It was

10:38:54  25   installed days after --

1              THE COURT:  I have the receipt here.

2              MR. AARON RADBIL:  Yes.

3              MS. APRIL SCARLOTT:  December 27, 2006.

4              THE COURT:  Well, the slip from the dealer is dated in

10:39:42    5  December of '06 ---

6              MR. AARON RADBIL:  Right, right.

7              THE COURT:  --- saying to pay for the mirror.

8              MR. AARON RADBIL:  Right.

9              THE COURT:  There's a promise.

10:39:50   10              MR. AARON RADBIL:  You're right, December of 2006.

11              THE COURT:  And how long was it after the mirror was

12  installed that the car developed problems?

13              MR. AARON RADBIL:  A month after the car developed

14  problems, electrical problems, Hurricane -- I apologize, Clear

10:40:16   15  Lake attempted to repair the problem.

16              THE COURT:  I know that.

17              MR. AARON RADBIL:  Right.

18              THE COURT:  So, within months ---

19              MR. AARON RADBIL:  Yes, your Honor.

10:40:19   20              THE COURT:  -- of the end of 2006, the problem was

21  open, obvious, and really irritating your client.

22              MR. AARON RADBIL:  The electrical problems, yes, they

23  were open, obvious, and irritating Ms. Scarlott.  Yes, they

24  were.

10:40:47   25              THE COURT:  Yet, you sued Hurricane three years later.

1              MR. AARON RADBIL:  Right.  This is why:  During the

2    deposition of Bob Gore, Bob Gore, who is the service director

3    for Clear Lake, said the HomeLink is the cause of the problem.

4              THE COURT:  Wait a minute.  You knew in February of

10:41:14   5    '10 that the mirror was the problem.  The letter from Nissan's

6    lawyer says she had an after market-mirror installed and all

7    that.

8              MR. AARON RADBIL:  That's correct.  And at that point

9    we did not believe the mirror was the problem.  We believed the

10:41:33  10    BCM was the problem.  Clear Lake told Ms. Scarlott the mirror

11    was not the problem.

12              THE COURT:  Don't wander off the point.

13              MR. AARON RADBIL:  Your Honor, yes, we have a letter

14    from Nissan that says the HomeLink was the cause of the problem.

10:42:05  15              THE COURT:  In February of '10, it says it was the

16    mirror.

17              MR. AARON RADBIL:  You're right.

18              THE COURT:  And had the mirror been repaired by then?

19              MR. AARON RADBIL:  Repaired?  No.

10:42:15  20              THE COURT:  Well, reinstalled.

21              MR. AARON RADBIL:  No, no.

22              THE COURT:  Why not?

23              MR. AARON RADBIL:  Because Ms. Scarlott took the

24    vehicle back to Clear Lake, Nissan's authorized --

10:42:23  25              THE COURT:  So, she chose not to have it fixed.

```
 1              MR. AARON RADBIL:  She took her vehicle --
 2              THE COURT:  She chose not to have it fixed at the
 3  place that installed it.  She had been to Hurricane physically.
 4              MR. AARON RADBIL:  She had physically been to
 5  Hurricane.
 6              THE COURT:  Sat there while they installed the mirror.
 7              MR. AARON RADBIL:  I believe so.
 8              THE COURT:  That's my recollection but my recollection
 9  is not all that good.
10              So, one of the potential sources of the problems
11  with the car is, obviously, Hurricane; and it took three and
12  half years for Scarlott to serve Hurricane.
13              MR. AARON RADBIL:  That's correct.
14              THE COURT:  Isn't that a little late?
15              MR. AARON RADBIL:  Ms. Scarlott didn't believe so.
16  Her attorneys --
17              THE COURT:  I'm sorry.
18              MR. AARON RADBIL:  Yes, yes.
19              THE COURT:  I'm sorry.  This is not Geraldo.  Where do
20  you practice, in Vegas?
21              MR. AARON RADBIL:  I'm licensed to practice in
22  Illinois and Florida.
23              THE COURT:  No.  But where do you sit most of the
24  time?
25              MR. AARON RADBIL:  Arizona.
```

1              THE COURT:  Where?

2              MR. AARON RADBIL:  Arizona.

3              THE COURT:  Where in Arizona?

4              MR. AARON RADBIL:  Phoenix.

10:44:05    5              THE COURT:  Okay.  Move the microphone closer to you,

6      please.

7              MR. AARON RADBIL:  Phoenix, Arizona.

8              THE COURT:  I'm sorry, I didn't have the -- there are

9      firms in Las Vegas that practice nationwide and everybody

10:44:32   10      practices nationwide.

11              A decision by the Plaintiff or her counsel not to

12      pursue Hurricane was a choice.  That choice has its

13      consequences.  And the statutes of limitations, the requirements

14      of suit -- I mean, of service within 120 days under our rules --

10:45:06   15      I have now forgotten what the state rule is.

16              Mr. Adams, does the state have a parallel

17      serve-them-or-die rule?

18              MR. LESLIE ADAMS:  I don't believe so, your Honor

19              THE COURT:  But the state still requires you to serve

10:45:27   20      somebody.  Limitations is only extended for a -- usually on

21      emotion and an order but a reasonable effort having been made

22      and somehow having been bought.  Naming the wrong party, even, I

23      believe, serving the wrong party and wandering around for three

24      and half years, is not reasonable anything.

10:46:03   25              And it wasn't just the ineptness of the service,

1   the mispleading of the parties' name, all of which are the sorts

2   of things that would justify sanctions of some kind.  It just

3   wasn't done.  Ms. Scarlott knew exactly where Hurricane was.

4   She could have pointed it out on Google maps or Bing maps,

10:46:53   5   couldn't she?

6           MR. AARON RADBIL:  (Indicated yes.)

7           THE COURT:  Answer out loud, please.

8           MR. AARON RADBIL:  I believe she probably could.

9           THE COURT:  And Hurricane probably has a telephone.

10:47:07   10   It probably has ads wherever people advertise today.  And yet,

11   she persisted -- how many brothers are there?

12           MR. AARON RADBIL:  How many brothers do I have?  I

13   have two brothers.

14           THE COURT:  Two others?

10:47:40   15           MR. AARON RADBIL:  No.  Noah is my brother.  And I

16   have a brother Sam.  He's not an attorney.

17           THE COURT:  I thought I saw some -- I saw some -- I

18   thought once another brother showed up.  Maybe he was just with

19   the firm, Mr. Radbill; is that right?

10:47:55   20           MR. NOAH RADBIL:  That was me, your Honor.  I lost

21   some weight since last time --

22           THE COURT:  I can't hear you.

23           MR. NOAH RADBIL:  I lost a little bit of weight since

24   the last time you saw me.  I was the person who you thought was

10:48:07   25   from Las Vegas.

1          THE COURT:  I know you.  I thought at one point when
2     you were sick or something --
3          MR. AARON RADBIL:  I appeared.
4          THE COURT:  It was you?
10:48:18  5          MR. AARON RADBIL:  I appeared.
6          THE COURT:  You're very forgettable.
7          MR. AARON RADBIL:  Thank you.
8          THE COURT:  I remember him.
9          MR. AARON RADBIL:  That's when I ---
10:48:20  10          THE COURT:  It's one minor part of it.
11          MR. AARON RADBIL:  That's when I -- I entered the case
12     when my brother got sick.  It was me.
13          THE COURT:  I thought it was a different brother
14     but ---
10:48:28  15          MR. AARON RADBIL:  No, your Honor.
16          THE COURT:  That's why you can't trust my memory.
17               Why did Scarlott persist in suing Hurricane after
18     it knew limitations had passed?
19          MR. AARON RADBIL:  We, as her attorneys, didn't
10:49:06  20     believe the limitations period has passed.  We believed ---
21          THE COURT:  Your belief is not the gold standard,
22     Counsel.
23          MR. AARON RADBIL:  I certainly understand that.
24          THE COURT:  And is your argument still that it was a
10:49:19  25     latent defect?

                    Gayle Dye, CSR, RDR, CRR - 713.250.5582

1          MR. AARON RADBIL:  The defect in the vehicle itself?

2          THE COURT:  Yes.  The defects in the pleading were

3   obvious.

4          MR. AARON RADBIL:  Our argument is that the defect was

10:49:32   5   not the Hurricane-installed HomeLink mirror, yes.

6          THE COURT:  That's not how it works, counsel.  It's

7   you know you have a problem.  It's the problem.  It's not who

8   caused the problem, the exact mechanics of the problem.

9          MR. AARON RADBIL:  Right.

10:49:48  10          THE COURT:  Scarlott knew in early '07 that her car

11  had a problem, and it wasn't just a noise that she didn't

12  understand.

13          MR. AARON RADBIL:  That's right.

14          THE COURT:  According to her testimony, it was dying,

10:50:14  15  leaving her stranded, all that stuff.

16          MR. AARON RADBIL:  That's right.

17          THE COURT:  So, she knew she had an injury.

18          MR. AARON RADBIL:  That's right.

19          THE COURT:  It wasn't latent, and that's why she's

10:50:25  20  given two years to investigate and prepare.  When did she retain

21  counsel?

22          MR. AARON RADBIL:  She retained us -- well, I don't

23  know exactly.

24          THE COURT:  No.  When did she retain her first

10:50:45  25  counsel?  Didn't she have Weisberg & Meyers?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1          MR. AARON RADBIL:  She did not have Weisberg & Meyers

2    for her first counsel.  She retained our office --

3              Do you remember, Ms. Scarlott?

4          MS. APRIL SCARLOTT:  It was shortly after I found out

10:50:57   5    that the other guy had --

6          THE COURT:  Why was Nissan's lawyer writing this

7    lawyer at Weisberg & Meyers?

8          MR. AARON RADBIL:  That was us, your Honor.

9          THE COURT:  Pardon?

10:51:21  10          MR. AARON RADBIL:  That was us, obviously.

11          THE COURT:  Oh, was that you?

12          MR. AARON RADBIL:  That was our office.  Writing to

13    Weisberg & Meyers, of course, that was our office.

14          THE COURT:  You're all with them, okay.

10:51:37  15          MR. AARON RADBIL:  Yes.

16          THE COURT:  So, when were you retained?

17          MS. APRIL SCARLOTT:  I believe --

18          MR. AARON RADBIL:  Shortly before that letter.  We,

19    obviously, took Ms. Scarlott's case as we noted.

10:51:56  20          THE COURT:  It had been filed at the time of this.

21          MR. AARON RADBIL:  At the time of the letter?  Right.

22    The letter -- we took the case.  We sent notice to NNA.  We had

23    some initial discussions about settlement.  That failed.  And

24    then, we filed the case, yes.  So, it was several months before

10:52:13  25    NNA sent the letter, likely.

1          THE COURT:  Why did not Weisberg & Meyers spend a

2    little more time investigating before it decided to sue

3    everybody?

4          MR. AARON RADBIL:  Weisberg & Meyers thought they had

10:52:31   5    the problem, thought they knew what the problem was.  Your Honor

6    disagreed.  Weisberg & Meyers believed the BCM was the cause.

7    They proceeded that way and on that basis.

8          THE COURT:  And because you thought wrong, Nissan has

9    to pay hundred thousand dollars or so, whatever the number was,

10:52:58   10   right?  Your error.  And it's not what I think is wrong.  Even

11   Mr. Adams can count.  His penetrating legal analysis in this

12   case is phenomenal.  You made a mistake and then you rectified

13   the mistake by adding the lender, the dealer, and Hurricane,

14   right?  Still -- so, you must have thought Hurricane had done

10:53:41   15   something wrong when you added them.

16         MR. AARON RADBIL:  That's right.

17         THE COURT:  And when did you add them -- it?

18         MR. AARON RADBIL:  After November of 2009.  The date

19   of the complaint is January 20, 2011.

10:54:07   20         THE COURT:  And service was executed on Hurricane

21   when?

22         MR. AARON RADBIL:  Several months after that.

23         THE COURT:  Mr. Adams, do you -- there's a lot on this

24   docket sheet.  Do you remember when?

10:54:33   25         MR. LESLIE ADAMS:  We had service in March 4th of

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1   2011.

2          THE COURT:   So, Weisberg & Meyers' definition of a few

3   months is two years and two months?

4          MR. AARON RADBIL:   I misunderstood.   I meant service

10:55:04   5   after the complaint was filed on January 20th was in March of

6   2011.   So, that would be three months -- two and half months

7   following the filing of the amended complaint naming Hurricane.

8          THE COURT:   '09 to '11?

9          MR. AARON RADBIL:   No.   The amended complaint was

10:55:23   10   filed --

11          THE COURT:   No.

12          MR. AARON RADBIL:   Okay.

13          THE COURT:   The complaint that first named Hurricane,

14   any Hurricane --

10:55:30   15          MR. AARON RADBIL:   Uh-huh.

16          THE COURT:   -- was when?

17          MR. NOAH RADBIL:   Your Honor, we moved for leave in

18   the state court in the 281st.   I argued the motion with

19   Mr. Patterson.   I don't recall the exact date, but it was before

10:55:46   20   the case was removed to this Court, your Honor.

21          THE COURT:   Don't you have the state docket sheet?

22   Wouldn't that be something that you should have had from the day

23   it was removed, much less now?

24          Mr. Adams, do you know when you were added or

10:56:04   25   they moved for leave to add you?   That would have been --

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1          MR. LESLIE ADAMS:  My firm wasn't joined until later

2    in 2011, late 2011, your Honor.  I don't have any state records.

3          MR. AARON RADBIL:  I think I misunderstood.  Your

4    Honor is correct.  The date that we believe the HomeLink mirror

10:56:34   5    was a problem, yes.  It was a year later.

6          THE COURT:  Speak into the microphone.

7          MR. AARON RADBIL:  It was a year later.  Yes, you're

8    right.

9          THE COURT:  All of '09, all of '10, and three months

10:56:45   10   of '11 is not a year later.

11         MR. AARON RADBIL:  All of '10 --- the last month of

12   '09, all of '10 --

13         THE COURT:  You said January 20, '09.

14         MR. AARON RADBIL:  The complaint was filed January 20,

10:57:00   15   2011.  We believed that the HomeLink mirror -- or we --

16         THE COURT:  And there is a return service three months

17   later?

18         MR. AARON RADBIL:  That's right.

19         THE COURT:  I think what you're talking about is the

10:57:15   20   return of service to name the party correctly.  You issued

21   service on somebody who wasn't the installer.

22         MR. AARON RADBIL:  That's correct.

23         THE COURT:  Your duty to serve them starts not when

24   you figure out their middle name but when you know you have a

10:57:41   25   problem with them, not a belief, not a supposition, not a hoax.


Gayle Dye, CSR, RDR, CRR - 713.250.5582

```
         1  But you had reason to believe the mirror was the problem at
         2  least as early as February 15, 2010, when Nissan said "It's not
         3  us, it's them."
         4          MR. AARON RADBIL:  Yes.
10:58:18 5          THE COURT:  And of course, Ms. Scarlott knew all along
         6  that Hurricane installed the mirror, didn't she?
         7          MR. AARON RADBIL:  That's right.
         8          THE COURT:  And so, that was a component of her case
         9  that was open, obvious, and reasonably recent.
10:58:58 10             Apparently, Hurricane was served March 4, 2011.
        11          MR. AARON RADBIL:  That sounds right.
        12          THE COURT:  She bought her car December 26, 2006.
        13  Hurricane installed the mirror the next day.  Electrical
        14  problems began September of '07.  She sued over the electrical
10:59:34 15 problems two years and ten months -- sued Nissan two years and
        16  ten months later.  She sued Hurricane four years and four months
        17  after she bought the car.
        18             So, take nine months out.  It's three and half
        19  years after the electrical problems.  It would probably be 25
11:00:09 20 months after she didn't get service on Nissan until -- it says
        21  Scarlott sues -- when did you get service on Nissan?  That's a
        22  four-year contract.
        23          MR. AARON RADBIL:  That's right.
        24          THE COURT:  Scarlott knew she used Hurricane.  She
11:00:43 25 knew she had a problem with the car.  She furnished the
```

```
         1   documents she had.  Did it include a receipt for an after-market
         2   mirror?
         3              MR. AARON RADBIL:  I'm sorry, are you asking if there
         4   was a receipt for the after-market mirror?
11:01:17  5              THE COURT:  Did the paperwork she furnished you with
         6   include the receipt for the after-market mirror?
         7              MR. AARON RADBIL:  We did have the receipt for the --
         8                  Well, did you furnish that to us recently?
         9              THE COURT:  You have to speak right into it, ma'am.
11:01:35 10              MS. APRIL SCARLOTT:  What they gave -- I'm sorry.
        11              THE COURT:  That's okay.  Just pull it.
        12                  Not too far.
        13              MS. APRIL SCARLOTT:  What they gave -- what they gave
        14   me was a work order because I didn't pay for it, Clear Lake did.
11:01:46 15              THE COURT:  Did you give that --
        16              MS. APRIL SCARLOTT:  I'm sorry?
        17              THE COURT:  That's all right.
        18              MS. APRIL SCARLOTT:  I'm sorry, your Honor.
        19              THE COURT:  The lawyers have to or I'll kill them.
11:02:00 20                  Can you see that?
        21              MS. APRIL SCARLOTT:  Barely.  And I think I do have
        22   that.
        23              THE COURT:  Right.  If it is -- what it is is a work
        24   order that says Nissan will pay for what Hurricane does.
11:02:10 25              MS. APRIL SCARLOTT:  And there was also something that
```

1   Hurricane gave me that said that they installed --- that they

2   were billing Clear Lake.  So, I didn't actually get a receipt

3   but I got --

4                THE COURT:  That is.

11:02:20   5           MS. APRIL SCARLOTT:  Right.

6                THE COURT:  That's a receipt that you got the mirror

7   and they're going to get their money somewhere else.

8                MS. APRIL SCARLOTT:  Right.

9                THE COURT:  That's the best kind of receipt.

11:02:24  10           MS. APRIL SCARLOTT:  Right.

11                THE COURT:  You had already paid for it because Nissan

12   said they would have that kind of mirror.  And it took more than

13   a year after they were added as a party to serve them.

14   Hurricane is what, six miles from Clear Lake Nissan?

11:03:09  15           MS. APRIL SCARLOTT:  Closer to -- about 15, your

16   Honor.

17                THE COURT:  15?  How close to Hobby Airport is

18   Hurricane?

19                MS. APRIL SCARLOTT:  Probably about ten; ten, twelve

11:03:20  20   miles.

21                THE COURT:  Is it 12 miles north of Hobby or is it --

22   I thought Hurricane was farther south.

23                MR. NOAH RADBIL:  It's 1100, I believe.  1100 Gulf

24   Freeway, I believe, your Honor.

11:03:42  25           MR. LESLIE ADAMS:  It is between Hobby Airport and

1   Clear Lake.

2           THE COURT:  Can you explain the year to serve?

3           MS. AARON RADBIL:  I can't explain it.  We have --

4   nothing, your Honor, is going to -- we named the wrong party.

11:04:03   5   We had Hurricane Glass instead of Hurricane -- served Hurricane

6   Glass instead of Hurricane --

7           THE COURT:  And did the people at the first Hurricane

8   tell you they weren't the right people?

9           MR. AARON RADBIL:  I believe that they did.

11:04:13   10          THE COURT:  And did you promptly voluntarily dismiss

11  them?

12          MR. AARON RADBIL:  I believe --

13          MR. NOAH RADBIL:  Your Honor, may I?  I did

14  investigate Hurricane Glass who was first identified which turns

11:04:27   15  out to be Hurricane Auto Care and Accessories.  I talked to Joy

16  Carter.  And they leased the building to the people who actually

17  run Hurricane Auto Care and Accessories.  I believe that we

18  filed -- or I think we filed an affidavit from them because I

19  checked the Texas Secretary of State's website in researching

11:04:47   20  the entities.

21          THE COURT:  You got it wrong.

22          MR. NOAH RADBIL:  I did, yes.

23          THE COURT:  And your client had been there.  She knew

24  where it was.  And sitting at your computer is not the only way

11:04:59   25  to research things.

1          MR. NOAH RADBIL:  Yes, your Honor.  And I -- when I

2    was in law school in Houston, I lived in Webster, Texas, off

3    NASA 1.  So, I'm familiar with the area; and the problem was

4    that the address was the same.

11:05:14   5          THE COURT:  No.  The problem was you didn't do what

6    you needed.  Look, you can get probably -- at 901 Louisiana, you

7    can get probably three or four thousand.  That's One Shell Plaza

8    if I did my math right.  Whatever the address of the Sear's

9    Tower in Chicago is, it's probably an infinitude of people who

11:05:54  10   have that address.  Your job is to sue the actual party.  And it

11   didn't take you a year to figure out that you had the wrong

12   party.  What happened when you sued the wrong company?

13          MR. NOAH RADBIL:  We requested leave.

14          THE COURT:  No.  What did that company do?

11:06:28  15          MR. NOAH RADBIL:  They disclaimed that they -- I

16   believe they disclaimed that they had anything to do with

17   Hurricane Auto Care and Accessories, Incorporated; but because

18   of the same address, I requested an affidavit from them.

19          THE COURT:  All right.  Counsel ---

11:06:43  20          MR. NOAH RADBIL:  Yes.

21          THE COURT:  --- the same address doesn't work.  Go a

22   couple of blocks past One Shell Plaza and you get to one of the

23   several Chevron buildings.  There are lots of companies in the

24   Chevron -- and they all have the same name somewhere.  If you

11:07:04  25   keep going, you bump into the Exxon building and it has even

1   more.

2            MR. NOAH RADBIL:  I was incorrect, your Honor.  My

3   belief -- I wanted to be sure that it wasn't the Defendant.

4            THE COURT:  It's not supposed to be done on your

11:07:15   5   belief.  It's supposed to be done on competent research and you

6   didn't do it.  And then, it took you a year.  How can you --

7            MR. NOAH RADBIL:  The same --

8            THE COURT:  When was the wrong company served?

9            MR. NOAH RADBIL:  I don't recall the exact date.

11:07:36   10            THE COURT:  I didn't expect you to recall.  I expected

11   you to have something there that would tell you.

12            MR. NOAH RADBIL:  Certainly.

13            THE COURT:  Mr. Radbil --

14            MR. NOAH RADBIL:  Yes, your Honor.

11:09:11   15            THE COURT:  -- neither I nor the lawyers for the

16   Defendant nor Ms. Scarlott nor the rest of the Court staff, all

17   of whom are very expensive, need to sit through your trying to

18   prepare for this hearing about which you've known for sometime

19   in a case that has festered under your supervision for four

11:09:38   20   years.

21            The hearing this morning is illustrative of the

22   whole problem.  Your assertion of subjective good faith is worth

23   nothing.  The world goes by an obdurate reality which is what

24   you did and when you did it.  You had the data from your client,

11:10:15   25   and you couldn't do the simple mechanics of making sure, not

1   guessing you were probably right, not copying down the easy way,

2   not talking to some lady but making certain, which in this case

3   meant driving 30 minutes south on Interstate 45 to see

4   everything that happened to be at that address.  You knew it was

11:10:49   5   a small independent business, didn't you?

6         MR. NOAH RADBIL:  I did.

7         THE COURT:  As the Army had it in the big war, expect

8   what you inspect.  But you didn't do it.  You named them as a

9   party, got the wrong party; and still, it took you a long time

11:11:25   10   to serve them.  90 days is a long time to serve somebody that

11   you've been trying to serve for the preceding year, all in town,

12   all places known to your client.

13         Instead, you stuck to making claims, not

14   investigating claims, not preparing claims; and the claim that

11:12:20   15   because Nissan or the dealership or anybody else responded

16   constructively to a customer of their's request is a waiver of

17   the terms of the warranties or is a confession of liability at

18   law is despicable.  Despicable.

19         The law does not require people not to cooperate

11:12:59   20   with each other without running the risk that somebody like you

21   is going to sue them.  The entire case is infused with that kind

22   of sophomoric pedantry.  And this is not the first time you've

23   had a problem with serving the right party, I guess it was, is

24   it?

11:13:46   25         MR. NOAH RADBIL:  Probably not, your Honor.

1           THE COURT:  Also, on the eve of the summary judgment,

2  as I recall, you moved to remand.  Having pled $50,000, you met

3  the $50,000 threshold, right?

4           MR. NOAH RADBIL:  I disagreed with that respectfully,

11:14:15   5  your Honor; and we cited case law.  I understand your Honor's

6  position, and I respect it.

7           THE COURT:  $50,000 doesn't mean $50,000?

8           MR. NOAH RADBIL:  The Texas Rules of Civil Procedure

9  require you to plead a discovery level with certain language,

11:14:30  10  and we used that language, and that's --

11          THE COURT:  You used a form pleading.  And you put a

12  bunch of hyperbole stuck in and around it.  The Rules of Civil

13  Procedure do not bar you from telling the truth, do they?

14          MR. NOAH RADBIL:  Of course not.

11:14:48  15          THE COURT:  So, if your claim is 25 --

16          MR. NOAH RADBIL:  They bar you from lying.

17          THE COURT:  Which would include pleading 50 when you

18  didn't know it was 50.

19          MR. NOAH RADBIL:  It says $50,000 or less.

11:15:02  20          THE COURT:  $50,000 means $50,000.  Plus attorney's

21  fees.

22          MR. NOAH RADBIL:  Which are -- my understanding was

23  not to be included in calculating the amount in controversy for

24  purpose of removal.  Your Honor, I must say in my defense here

11:15:18  25  today that I did undertake many, many hours of investigation.

1    In the first letter that we received, it took the exact opposite

2    position of the position taken on summary judgment and the

3    position now taken by Nissan North America.  So, if there's

4    fault in investigating this -- you know, I will take

11:15:44  5    responsibility for the service issue.

6              THE COURT:  How else are you going to do it?

7              MR. NOAH RADBIL:  I'll tell you how I'm --

8              THE COURT:  Do you want me to blame Ms. Scarlott?

9              MR. NOAH RADBIL:  No.

11:15:54  10             MR. AARON RADBIL:  No.

11             THE COURT:  Of course not.  I don't know much about

12   her except she bought a car that didn't work, and she was

13   unhappy about that.

14             MR. NOAH RADBIL:  Uh-huh.

11:16:04  15             THE COURT:  That seems all perfectly reasonable.  The

16   meanness of your pleadings --

17             MR. NOAH RADBIL:  The meanness?

18             THE COURT:  The meanness of your pleadings, in both

19   senses, if you know both senses -- if not, look them up -- the

11:16:27  20   intransigence, the incompetence -- and it is incompetence to do

21   what you have done in this case.

22             MR. NOAH RADBIL:  What is that, your Honor?  I don't

23   understand.  Respectfully, I do not.

24             THE COURT:  Mr. Radbill, your lack of understanding

11:16:46  25   has been consistent throughout this case.  I cannot give you

1    understanding.  You are unteachable.

2              MR. NOAH RADBIL:  Is it okay to lie in a pleading or a

3    paper filed with the Court?

4              THE COURT:  Sure, as long as you're willing to take

11:17:11  5    the consequences.

6              MR. NOAH RADBIL:  Okay.

7              THE COURT:  You can rob a bank if you want to.

8    There's some fairly serious consequences.

9              MR. NOAH RADBIL:  Your Honor allows oral motions per

11:17:22  10    your judge specific procedures?

11             THE COURT:  To do what?  Quit walking away from the

12    microphone.  Say what you said again.

13             MR. NOAH RADBIL:  I asked if your Honor's procedures

14    permitted oral motions.  In conferences I know in the past I've

11:17:42  15    appeared before you, you've expressed that you would entertain

16    oral motions but ---

17             THE COURT:  The law allows parties to move orally in

18    court.  So, what's your motion?

19             MR. NOAH RADBIL:  The only thing --- well, I don't

11:18:10  20    think I would make an oral motion at this time, your Honor.

21             THE COURT:  What oral motion were you going to make?

22             MR. NOAH RADBIL:  It has to do with the consequences

23    of filing papers in court that are false and papers in court

24    that were filed ---

11:18:29  25             THE COURT:  My guess is what you want to do is say

1    that Nissan lied in its pleadings, right?  The best defense is a

2    good offense?

3              MR. NOAH RADBIL:  No, sir.  No, your Honor.

4              THE COURT:  Well, what were you going to move?

11:18:43   5              MR. NOAH RADBIL:  I was going to --

6              THE COURT:  This is the second time I have asked you

7    the question and now you're not saying anything.  The first time

8    you gave me a smoke screen.

9              MR. NOAH RADBIL:  I don't want to distract from ---

11:19:03   10              THE COURT:  I didn't ask you that question.  I asked

11   you what you were fixing to do, as we say in the west.

12              MR. NOAH RADBIL:  I was going to call the Court's

13   attention to pleadings and papers that are demonstrably false,

14   attacking my personal reputation, character and in the worst

11:19:29   15   possible sense and also evidence of omissions of doing the same.

16              And I think Mr. Patterson will certainly not

17   disagree with what's been done there.  But I do take

18   responsibility for the investigation of Hurricane.  As I said,

19   we got the affidavit of Joy Carter.

11:19:46   20              THE COURT:  Was it your contention that Patterson is a

21   skunk?

22              MR. NOAH RADBIL:  Well, I've always liked

23   Mr. Patterson.  This is the first time I met him.  In fact, in

24   the 281st, I thought he did a good job arguing the motion.

11:19:59   25              THE COURT:  Well, who are you calling a rat?

1        MR. NOAH RADBIL:  A rat?  Nobody.

2        THE COURT:  A liar?  Liars are rats.  Not -- I'm not

3  -- I don't want to over-generalize and be prejudiced towards all

4  rodents.

11:20:14    5        MR. NOAH RADBIL:  Whoever signed the pleading falsely

6  accusing me of things, your Honor.

7        THE COURT:  So, the best defense is a good offense?

8        MR. NOAH RADBIL:  No.

9        THE COURT:  This is another illustration of exactly

11:20:27   10  how abysmal your judgment and performance are.  With a competent

11  lawyer, Ms. Scarlott could have negotiated a settlement, gotten

12  the car fixed, and be out of here because a competent -- don't

13  walk away when I'm talking to you.

14        MR. NOAH RADBIL:  Sorry, your Honor.

11:20:49   15        THE COURT:  -- a competent lawyer would have talked to

16  her, talked to them, and tried to do something that is alien to

17  your mode of thought, which is solve the problem.

18        Ms. Scarlott did not want a four-year fight.  She

19  wanted her car fixed.  She has consistently taken that position.

11:21:19   20  Her position, "I want my car fixed," is reasonable.  It's

21  factually based.  But instead of helping her solve that problem,

22  you chose to file a bunch of pleadings hoping to get money,

23  maybe she would have gotten the car back or whatever.  But what

24  you really wanted was to get some money for Noah Radbil.

11:21:53   25        MR. NOAH RADBIL:  Incorrect, your Honor.

1              THE COURT:   It's not incorrect.

2              MR. NOAH RADBIL:   That is incorrect, your Honor.

3    Respectfully, I disagree with that statement.

4              THE COURT:   Go ahead and disagree.   Your performance

11:22:04    5    here has been anything but attempting to solve her problem.   It

6    has been --- you have been gratuitously litigious and have

7    persisted wrong headily in saying that "My thoughts are pure;

8    therefore, my deeds are purer"; and that doesn't work.   It also

9    doesn't work the other way around.   You can have impure thoughts

11:22:27   10    and pure deeds.

11              MR. NOAH RADBIL:   So, should ---

12              THE COURT:   Should you act like a reasonable counsel

13    and investigate the facts and not how many times her car has

14    stopped.   That's fairly simple.   And then, hire -- well,

11:22:46   15    actually, you didn't hire an expert in this case.   Your firm has

16    one on retainer that did what -- I've forgotten now the number

17    -- 300 opinions --

18              MR. NOAH RADBIL:   Sure.

19              THE COURT:   --- a year for you?

11:23:01   20              MR. NOAH RADBIL:   I also deposed an expert designated

21    by Nissan North America who had never testified in a case

22    before, and his testimony supports the fact that the BCM is the

23    likely cause of the problems, which still I do not believe is

24    known.   I don't believe ---

11:23:16   25              THE COURT:   The what?

```
 1              MR. NOAH RADBIL:  Body control module, your Honor.
 2     It's a part in the car that their expert recognized causes
 3     defects of the precise nature that Ms. Scarlott was
 4     experiencing.
 5              THE COURT:  But the new mirror fixed it, didn't it?
 6              MR. NOAH RADBIL:  No.  There was no new mirror.  That
 7     was the position they took initially, that a diode was
 8     installed.
 9              THE COURT:  Wait a minute.  She never got a
10     replacement mirror?
11              MR. AARON RADBIL:  No.
12              MR. NOAH RADBIL:  No, she did not.
13              THE COURT:  How much was the replacement mirror -- I
14     mean, how much was the original mirror?
15              MR. AARON RADBIL:  Four hundred some odd dollars, your
16     Honor.
17              THE COURT:  It's on here somewhere.  It ought to be.
18              MS. APRIL SCARLOTT:  $405, your Honor.
19              THE COURT:  Thank you.
20              MR. NOAH RADBIL:  Your Honor, the problem --
21              THE COURT:  Why isn't there a new mirror?  Is the car
22     still having problems?
23              MR. NOAH RADBIL:  It is.
24              THE COURT:  So, a reasonable counsel would advise his
25     client to replace the mirror at her own expense; and if that
```

1    cures the problem, if nothing else, she has a fixed car.

2         MS. APRIL SCARLOTT:  May I speak, your Honor?

3         THE COURT:  Yes, ma'am.

4         MS. APRIL SCARLOTT:  They made a mistake.  The vehicle

11:24:42   5    was returned to Hurricane Auto.  Bob Gore at Clear Lake Nissan

6    took it himself, and they -- they went through the whole wiring

7    harness.  Everything that was in it, they tested it.  They

8    replaced the -- they switched the plugs out, put them back; and

9    he said the mirror is working.  He said there's not a problem

11:25:05   10   with the mirror.  And then, I took it back to Clear Lake Nissan;

11   and even Bob Gore said he couldn't find it.  He couldn't find

12   anything --

13        THE COURT:  When did you do that?

14        MS. APRIL SCARLOTT:  Oh, my God.  I'll have to look.

11:25:18   15        THE COURT:  I mean, a long time ago.

16        MR. AARON RADBIL:  2009.

17        MS. APRIL SCARLOTT:  2011, I believe.  And then, after

18   that, we replaced the battery twice more.

19        THE COURT:  It's not the battery.

11:25:28   20        MS. APRIL SCARLOTT:  No, I know that.  I know that.

21        MR. NOAH RADBIL:  Your Honor, on March 2nd --

22        THE COURT:  Wait a minute.

23         What kind of problems are you still having?

24        MS. APRIL SCARLOTT:  Right before my father passed, he

11:25:38   25   bought me one of the best heavy-duty batteries you can get in

1    March of 2012.  Since then, I haven't had any more problems.

2    But before that, like, I would drive to Redbox to get a movie

3    and turn it off, go get my movie, come back, wouldn't start.  It

4    wouldn't even click.  You know how you can tell if it's the

11:25:58    5    starter or something?

6         THE COURT:  Unfortunately, yes, ma'am, I do.  I had

7    that experience.

8         MS. APRIL SCARLOTT:  So, you know.  And I would be,

9    like, "Oh, my God, not again."  So, I sent them -- another

11:26:06    10    thing, I took it back to Clear Lake; and they just, basically,

11    said, you know, "It's the battery."  I'm just, like, "Oh, my

12    God."  But my dad felt -- took pity on me and he bought me the

13    best battery you can buy.  And we have not experienced any more

14    issues since March of 2012.  So, a little over a year.

11:26:25    15         MR. NOAH RADBIL:  Your Honor, in March, 2010,

16    Mr. Patterson sent us a letter that says our cause of action

17    appears to be against the dealer for negligent workmanship

18    and --

19         THE COURT:  Counsel, counsel ---

11:26:39    20         MR. NOAH RADBIL:  Yes, your Honor.

21         THE COURT:  -- Patterson doesn't work for you --

22         MR. NOAH RADBIL:  No, sir.

23         THE COURT:  -- he doesn't work for Ms. Scarlott.

24         MR. NOAH RADBIL:  Exactly.

11:26:54    25         THE COURT:  It is the case that Defendants prefer to

1   stand in a circle and point fingers at each other.

2           MR. NOAH RADBIL:  But they threatened sanctions

3   because of a fact that was proven demonstrably false which they

4   had not investigated since the outset of the suit.  So, we are

11:27:13   5   not to rely on their pointing fingers at people.  We are to

6   investigate.  And that's what I have tried to do.

7           THE COURT:  Mr. Radbil, not when you were in law

8   school, not when you were in undergraduate school but when you

9   were a small child in knee pants, did you ever hear the

11:27:31   10   expression two wrongs don't make a right?

11           MR. NOAH RADBIL:  Yes.

12           THE COURT:  Well, then, this is not about

13   Mr. Patterson, it's about you.  And you just misstated earlier

14   about the facts of her car.  I don't know what's wrong with the

11:28:04   15   car.  I've never known what's wrong with the car.  The problem

16   is --

17           MR. NOAH RADBIL:  That's precisely our point, your

18   Honor.

19           THE COURT:  No.  Your point is that you've taken four

11:28:12   20   years and you still don't know enough.  So, it can't be somebody

21   else's fault.

22           MR. NOAH RADBIL:  Okay.  Perhaps, I should have been a

23   mechanic --

24           THE COURT:  You know --

11:28:25   25           MR. NOAH RADBIL:  -- because their expert witness did

1   not know.

2           THE COURT:   -- ignorance is not a successful lawsuit.

3   Not knowing, not knowing, not knowing adds up to not knowing.

4   It is your client's responsibility to prove her case and to have

11:28:44   5   -- it still doesn't explain the search.  So, now you want to go

6   back and retroactively dismiss Hurricane.

7           MR. NOAH RADBIL:   No.  We moved for leave and leave

8   was granted to join them.  And your Honor, respectfully, came

9   down fairly hard on me at the first conference about the name of

11:28:59   10   the Hurricane company.

11          THE COURT:   Yes.

12          MR. NOAH RADBIL:   Uh-huh.  And it was understandable.

13   And you granted me leave to amend to include the correct

14   Defendant.

11:29:08   15          THE COURT:   Counsel, but now you're standing here

16   telling me you've discovered it's not Hurricane at all.

17          MR. NOAH RADBIL:   I did not say that, your Honor.

18          THE COURT:   Okay.  So, you -- despite what your client

19   just said, that she's satisfied it's not Hurricane at all, after

11:29:27   20   having it checked in '12, which is last year, whenever it was

21   checked, not when it should have been checked when you got the

22   case --

23          MR. NOAH RADBIL:   Do you know what Nissan is saying to

24   sanction us, your Honor?

11:29:41   25          THE COURT:   Counsel --

Gayle Dye, CSR, RDR, CRR - 713.250.5582

```
 1              MR. NOAH RADBIL:  Their position --
 2              THE COURT:  -- we're talking about Hurricane.
 3              MR. NOAH RADBIL:  Okay.  Yes.
 4              THE COURT:  And you're not willing today to say
 5      Hurricane didn't have anything to do with it, could you?
 6              MR. NOAH RADBIL:  I don't think that's a position that
 7      Nissan is taking.
 8              THE COURT:  I didn't ask Nissan.  I'm perfectly
 9      capable of asking them questions.
10              MR. NOAH RADBIL:  I do not know what the cause of this
11      problem is.  I think it was likely the BCM as testified by
12      Nissan's expert.
13              THE COURT:  Then, why do you need Hurricane?
14              MR. NOAH RADBIL:  Because you can plead in the
15      alternative and the cause is unknown of these defects.
16      However --
17              THE COURT:  No.  That explains it.  You have two or
18      four years, depending on whom you're suing, to investigate.  An
19      inept investigation does not allow you to persist in the lawsuit
20      against everybody.  So, you're doing what California lawyers do.
21      They sue everybody that had anything to do with it, sometimes
22      the obstetrician who delivered the Defendants.  They sue the
23      employers even though they were at a baseball game in whatever,
24      Dodgers Stadium.  Are the Dodgers still in California?
25              MR. AARON RADBIL:  They are.
```

1          THE COURT:  I don't know anything about sports.  My
2   colleague, Judge Hittner, is the president of the Texas Brooklyn
3   Dodgers Fan Club.  He's kind of stuck in the past.  But it's
4   funny.
5          Saying you can plead in the alternative doesn't
6   mean you can plead somebody against whom you have no facts,
7   against whom you have not investigated and whose name it took
8   you three years to figure out.
9          MR. NOAH RADBIL:  Nissan has blamed Hurricane many,
10   many times and pointed at facts they thought supported that.
11          THE COURT:  Your pleadings are your responsibility.
12          MR. NOAH RADBIL:  Uh-huh.  And there are facts that
13   support everything that I have said.
14          THE COURT:  There are not.
15          MR. NOAH RADBIL:  There are, your Honor.  There are no
16   facts supporting the allegations that were made against me
17   personally, and that has been admitted by Mr. Patterson, which I
18   appreciate.
19          Jeff, thank you.
20          However, the evidence is here.
21          THE COURT:  Counsel, you -- again, you're
22   persisting --
23          MR. NOAH RADBIL:  Yes.
24          THE COURT:  -- in cosmic wrong headedness.  Here you
25   are --

1            MR. NOAH RADBIL:  What if I was right?

2            THE COURT:  It's your responsibility in the times

3    required by the law to marshal the facts that meet that law, not

4    suppositions and not accusations.  And you're standing here

11:32:33    5    saying, "Well, now, I'm going to rely on" --

6            MR. NOAH RADBIL:  No.

7            THE COURT:  -- "Nissan's mechanic."  Don't interrupt

8    me.

9            MR. NOAH RADBIL:  I apologize, your Honor.

11:32:40   10            THE COURT:  You want to reargue the whole case.  The

11   problem is you didn't -- the issue today is you did not do what

12   you responsibly should have done.  There is no question about

13   your naming and serving Hurricane is unacceptable, and that's

14   the nice term for it.

11:33:15   15            What you've done consistently is impose the costs

16   of your inability to do your job on Hurricane, on Nissan, on

17   Clear Lake, on a bunch of other people.  There's nothing about

18   this case that suggests a reasonable investigation of the facts,

19   and it's not -- I know what you're going to say:  I pleaded

11:33:56   20   every time her car broke down and how upset she was and her

21   desire for an automatic, I guess, a built-in --

22            Is it automatic, you drive up and your door

23   opens?

24            MS. APRIL SCARLOTT:  No, your Honor.  It's called a

11:34:11   25   HomeLink because it actually opens your garage and it turns on

1   the lights in your house.  I was the victim of a stalker, and I

2   had the HomeLink on my previous vehicle.  And I just -- it's a

3   safety feature.

4              THE COURT:  Okay.  You drive up --- when your car

11:34:26  5   approaches the garage, it opens?

6              MS. APRIL SCARLOTT:  Correct.

7              THE COURT:  You don't have to push a button?

8              MS. APRIL SCARLOTT:  No.  It's on the mirror itself

9   and you push the button.  And then, there's two other buttons

11:34:35 10   that will actually turn on your interior alarm or turn it off,

11   and it will also turn on the lights for you.

12              MR. NOAH RADBIL:  Your Honor, I've reviewed 45 pages

13   of documentation provided by Ms. Scarlott.  We've taken numerous

14   depositions.  And the testimony of their expert, Ryan Schooley,

11:34:54 15   supports --

16              THE COURT:  It's not when you brought the suit.  Let's

17   start --

18              MR. NOAH RADBIL:  Discovery?

19              THE COURT:  We're starting with them.

11:35:00 20              MR. NOAH RADBIL:  Okay.  Well, starting with them,

21   Nissan threatened sanctions claiming that it was --

22              THE COURT:  Quit whining.

23              MR. NOAH RADBIL:  This is a fact, your Honor.

24              THE COURT:  It is a fact and you've repeated it.  This

11:35:07 25   is the third time.

1          MR. NOAH RADBIL:  So, the position they took

2    threatening sanctions against us is now not their position.

3          THE COURT:  Is not what?

4          MR. NOAH RADBIL:  Not their position.

11:35:16  5          THE COURT:  I don't care.

6          MR. NOAH RADBIL:  I do.

7          THE COURT:  I care that you go somewhere and talk to

8    somebody.  The issue here -- and you keep wanting to talk about

9    Nissan and you've got no explanation for Hurricane except you're

11:35:36  10   no good at your job because that's what you told me.  You talked

11   to some people and your reasonable investigation produced a

12   categorically wrong party when the truth was easily knowable.

13         MR. NOAH RADBIL:  I wanted to get an affidavit from

14   people who have shared the same address and who had claimed they

11:35:53  15   subleased the same operation --

16         THE COURT:  No.

17         MR. NOAH RADBIL:  -- before dismissing a party that

18   could be liable.  Joy Carter.  It's in the record, your Honor.

19   Joy Carter.

11:36:01  20         THE COURT:  I'm not talking about Joy Carter.

21   Cleaning up your mess does not excuse the mess.  The original

22   one shouldn't have had to say "We're not the party" --

23         MR. NOAH RADBIL:  Okay.

24         THE COURT:  -- should they?

11:36:16  25         MR. NOAH RADBIL:  And we let --

1          THE COURT:  Should they?

2          MR. NOAH RADBIL:  No.  And we let them go.

3          THE COURT:  The point is the gross incompetence of

4     having served them in the first place because you've told me

11:36:31   5     again today how wonderful your investigation was.

6          MR. NOAH RADBIL:  I did not say wonderful, your Honor;

7     and I said my investigation regarding service I take

8     responsibility for, that I was careful in that I --

9          THE COURT:  You weren't careful.

11:36:46  10          MR. NOAH RADBIL:  Okay.  I thought I was being

11    careful.

12          THE COURT:  No.  Your thinking is not the standard.

13          MR. NOAH RADBIL:  Okay.

14          THE COURT:  You served somebody because they had the

11:36:54  15    same address.  You came to somebody with the similar name or

16    whom you thought had a similar name who had the same address and

17    you served them.

18          MR. NOAH RADBIL:  No.  That's -- I did more than that,

19    your Honor.

11:37:06  20          THE COURT:  That's not what you told me.

21          MR. NOAH RADBIL:  I told you that I researched the

22    Texas Secretary of State's website for the entity and for the

23    registered agents of the entity.

24          THE COURT:  It had the address.  We've covered that in

11:37:20  25    excruciating detail here this morning.


Gayle Dye, CSR, RDR, CRR - 713.250.5582

1          MR. NOAH RADBIL:  Uh-huh.  And I spoke to --

2          THE COURT:  Same addresses don't count.

3          MR. NOAH RADBIL:  And the people there identified

4   themselves as being involved with Hurricane; yet, denied,

11:37:33   5   contrary to what the state's record says, the SOS direct

6   records, that they were that operation.  So, I demanded before I

7   let them go an affidavit proving --

8          THE COURT:  No.  We're talking about before you served

9   them.

11:37:44  10          MR. NOAH RADBIL:  That was before.

11          THE COURT:  So, you demanded an affidavit.

12          MR. NOAH RADBIL:  From Joy Carter, the wrong

13   Defendant, to prove that, in fact, that was the wrong Defendant.

14   I did not believe her because the Texas Secretary of State's

11:37:57  15   records showed that --

16          THE COURT:  Wait a minute.  You call up the wrong

17   party and the next thing you do is demand an affidavit from that

18   party before you don't sue somebody?  When somebody says, "I'm

19   the wrong party," shouldn't you kind of check what they say

11:38:19  20   rather than say "The Secretary of State says it's you so you got

21   to die"?

22          MR. NOAH RADBIL:  Yes.  I did.  I called them and

23   talked to Joy Carter.

24          THE COURT:  And then, she gave you an affidavit.

11:38:29  25          MR. NOAH RADBIL:  Yes.  And I --

1          THE COURT:  And then, you, based on no evidence other

2     than the same address, sued her anyway.

3          MR. NOAH RADBIL:  No, no.  The motion for leave to

4     amend to include Hurricane Auto Care and Accessories was the

11:38:41   5     motion that Joy Carter's affidavit was attached explaining the

6     mishap and the mistake by me.

7          THE COURT:  It's not a mishap.

8          MR. NOAH RADBIL:  The mistake.  The error that was not

9     intentionally done.

11:38:53   10          THE COURT:  And when did you get the affidavit?

11          MR. NOAH RADBIL:  The motion --

12          THE COURT:  When was the affidavit -- the date that

13     Ms. Carter signed it?

14          MR. NOAH RADBIL:  Very shortly before we --

11:39:06   15          THE COURT:  I want a date.  I don't want your opinion.

16          MR. NOAH RADBIL:  I don't have the date on-hand, your

17     Honor.  I was --

18          THE COURT:  Isn't it on the affidavit?

19          MR. NOAH RADBIL:  Of course, your Honor.  I'm looking

11:39:19   20     at the docket control order.

21          THE COURT:  All right.  Let's take a 15-minute recess.

22          (Court recessed at 11:39 a.m.)

23          (Court resumed at 11:55 a.m.)

24          THE COURT:  Thank you.  Be seated.

11:55:35   25               Before you sued a party named Hurricane, you

1    called the Secretary of State and talked to a Joy Carter; is

2    that what you've told me?

3           MR. NOAH RADBIL:  No.  I did not say called the

4    Secretary of State.  I used the Texas SOS direct website to look

11:55:50    5    up the name Hurricane Auto and assumed names.

6           THE COURT:  You called it electronically.  And that's

7    your sole investigative -- and you talked to Ms. Carter.

8           MR. NOAH RADBIL:  Yes.  I talked to Ms. Carter, and I

9    believe I may have talked to her husband, as well.  I don't

11:56:16    10    recall.

11           THE COURT:  And did you tell her why you were calling?

12           MR. NOAH RADBIL:  I believe so, yes.

13           THE COURT:  What did she tell you when you called her?

14           MR. NOAH RADBIL:  Well, here's my recollection, and my

11:56:30    15    affidavit is on file.  I don't think this should differ from --

16    I recall talking to Joy Carter and her disclaiming any

17    affiliation with the people who run Hurricane Auto Care and

18    Accessories.  And she said they leased -- or her husband leased

19    the building to them, but they had nothing to do with Hurricane

11:56:47    20    Auto Care and Accessories.

21           It didn't make sense to what she was saying.  In

22    defense, I often will avoid attempts -- nobody wants to be sued.

23    So, I wanted to be certain.  So, I asked if she would supply an

24    affidavit --- that's my recollection, your Honor -- so that I

11:57:03    25    could show the Court why I was filing an unopposed motion to

1  amend to include --

2        THE COURT:  No.  I'm talking about before you sued

3  Hurricane, you moved in the state court for leave to amend to

4  add Hurricane.

11:57:27  5        MR. NOAH RADBIL:  Correct.  We added the wrong party.

6        THE COURT:  Did you talk to the Secretary of State or

7  Ms. Carter before you did that?

8        MR. NOAH RADBIL:  No.  I think I relied on the letter

9  blaming Hurricane Glass from Nissan North America and sanctions

11:57:44  10  against us.  So, they threatened sanctions and pointed their

11  finger at something called Hurricane Glass.  And somebody

12  threatens you with sanctions, I'm thinking that -- you know,

13  that was before I conducted an investigation because I had tried

14  to act reasonably --

11:58:05  15        THE COURT:  Wait.  It was before you --

16        MR. NOAH RADBIL:  I don't recall, your Honor.

17        THE COURT:  Wait.

18        MR. NOAH RADBIL:  I do not recall.

19        THE COURT:  Wait.  It was before you investigated

11:58:15  20  because -- and then you stopped that sentence and started a new

21  one.  Finish that sentence.

22        MR. NOAH RADBIL:  I can't, your Honor, because I don't

23  recall and I don't want to tell the Court something that is

24  untrue.  I honestly do not recall exactly what I've done, but I

11:58:28  25  can --

1            THE COURT:  So, you joined a party.  Had you looked
2  them up at all?
3            MR. NOAH RADBIL:  Yes.
4            THE COURT:  At the Secretary of State?
11:58:41  5     MR. NOAH RADBIL:  I don't recall exactly the procedure
6  of what I did.  My affidavit, your Honor, was written at the
7  time; and there is nothing false in my affidavit.  If I
8  contradicted anything, then I'm not remembering; but I have in
9  good faith tried to find out what's going on.
11:58:57  10          If your Honor would allow me please for the
11  record; and I will then stop talking; and your Honor can
12  sanction me.  I just want to show you the investigation and
13  things that I've done.  That's all that I want to do, and then I
14  will --
11:59:09  15     THE COURT:  I just asked you.
16           MR. NOAH RADBIL:  Okay.
17           THE COURT:  I want to know what investigation you had
18  done other than -- the letter you're talking about is the letter
19  of February 15th, 2010, where they say that Nissan understands
11:59:31  20  that she purchased a rearview mirror on the aftermarket?  Is
21  that -- is that the letter you're talking about?
22           MR. NOAH RADBIL:  I believe -- it was the first
23  letter, your Honor.
24           THE COURT:  I don't have that.  Does somebody have a
12:00:00  25  copy of it?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1        MR. NOAH RADBIL:  I do, your Honor.  February 15,

2  2010, I believe.

3        THE COURT:  February 15, 2010?

4        MR. NOAH RADBIL:  Yes.

12:00:28   5        THE COURT:  And it includes the same receipt or a

6  similar receipt about the mirror.

7        MR. NOAH RADBIL:  Uh-huh.

8        THE COURT:  And Ms. Scarlott has said earlier today

9  that she gave you the paid receipt that she had gotten after she

12:00:48  10  had it installed on December 27th.

11        MR. NOAH RADBIL:  I didn't have the paper receipt, I

12  don't believe, at that time.

13        THE COURT:  You had her papers.

14        MR. NOAH RADBIL:  I don't believe that I had the check

12:00:59  15  or the paid receipt.  I had the nothing-else promised,

16  nothing-else owed HomeLink installed by Hurricane Auto slip

17  along with the letter from -- to Ms. --

18        THE COURT:  She said she gave you all the things she

19  had, including a paid receipt.

12:01:16  20        MR. NOAH RADBIL:  She has.  At that time I don't think

21  that I had that paid receipt.  I think that I had this --

22        THE COURT:  I don't care if you had this version.

23  What I care about is you had from your client a receipt that

24  said the same thing.

12:01:34  25        MR. NOAH RADBIL:  At the time, I don't think I had a

1    receipt.

2         THE COURT:  Why not?  It was in your client's

3    possession.  But you didn't bother to ask her for the

4    information?  How did that happen, Mr. Radbil?

12:01:54   5         No.  You can't cross examine your client.

6         MR. NOAH RADBIL:  I'm not --- I'd like to explain

7    exactly, your Honor.  We have an intake process, your Honor; and

8    Mr. Weisberg and Ms. Landgraf and Mr. Weaver, our expert, all

9    vetted Ms. Scarlott's claims and decided they had merit.

12:02:10   10         THE COURT:  Wait a minute.  That's just like your

11    expert, that statement is useless until we know exactly what

12    they had given to them.

13         MR. AARON RADBIL:  If you mind, your Honor, I can tell

14    you exactly what was given to Mr. Weisberg, Ms. Landgraf, and

12:02:29   15    Mr. Weaver.  It's --

16         THE COURT:  How can you do that?

17         MR. AARON RADBIL:  There's an affidavit that

18    Mr. Weisberg submitted and it lists the documents -- it lists

19    the documents that Ms. Scarlott originally provided.  The

12:02:39   20    affidavit is filed, and it's Exhibit 135-1.  So, Exhibit 135 ---

21         THE COURT:  To what?

22         MR. AARON RADBIL:  Sorry?

23         THE COURT:  Exhibit 135 to what?

24         MR. AARON RADBIL:  One.  135, dash, 1.

12:02:57   25         THE COURT:  Well, let me see it.

1              MR. AARON RADBIL:  Sure.

2                   The list of the documents is at paragraph 5.

3              THE COURT:  There are ten documents listed, including

4     things like Scarlott's driver's license; a letter to the firm,

12:03:56   5     which is not evidence; the sales contract.  What's an agreement

6     application?  Do you know what that means?

7              MR. NOAH RADBIL:  What is the full name of the

8     agreement application?

9              THE COURT:  On this.

12:04:18  10              MR. NOAH RADBIL:  I'm not sure what that's referring

11     to.

12              THE COURT:  The buyer's credit application, the repair

13     history -- I don't know whether that's a Nissan

14     dealership-generated document or what -- estimates from

12:04:35  15     somebody.  And this would be -- my question is what were the

16     repair estimates going to repair?

17              MR. NOAH RADBIL:  I don't know what repair estimates.

18              MS. APRIL SCARLOTT:  We were never given a total

19     amount of what the costs were because I had purchased an

12:04:55  20     additional $1400 warranty.  So, they never really itemized

21     anything for me.

22              THE COURT:  Well, I'm sorry.  So, you did not furnish

23     Weisberg & Meyers with a stack of estimates from people to fix

24     any particular problem?

12:05:14  25              MS. APRIL SCARLOTT:  I was forbidden by Nissan to go

1    to anybody else.  So, I didn't do that.

2              THE COURT:  Well, ma'am, you either did or -- I'm

3    just --

4              MS. APRIL SCARLOTT:  No, no.

12:05:23   5              THE COURT:  -- worried about the affidavit.

6              The e-mails between her and the dealership, her

7    rental car receipt which has nothing to do with causation.

8    What?

9              MR. NOAH RADBIL:  The point I was making with the

12:05:43   10   rental car is that their expert testified that coverage was

11   available for the repairs under the $1400 extended service

12   contract she purchased which definition only covers, quote,

13   mechanical defects and materials in workmanship for which NNA --

14             THE COURT:  All right, stop it.  We've already covered

12:06:07   15   that.  We have covered that.  If they erroneously paid her, that

16   does not create, as they say in Washington, an entitlement.

17             MR. NOAH RADBIL:  True, your Honor.

18             THE COURT:  That's the end of it.

19             MR. NOAH RADBIL:  No.  Because there's more evidence.

12:06:30   20             THE COURT:  Stop.  The case is over.  The question

21   here is what you did.  This list of documents in paragraph 5

22   does not reflect expressly the receipt.  So, I don't know what

23   these generalizations include.  But you cannot conclude from her

24   driver's license and her credit application that the false --

12:07:12   25   pay attention.  Do you want time to confer with him?

1          MR. NOAH RADBIL:  I'm sorry?

2          THE COURT:  Do you want time to confer with him?

3          MR. NOAH RADBIL:  No.  I just did.  I apologize, your

4    Honor.  I just had a quick question.  I apologize.

12:07:27   5          THE COURT:  Mr. Radbil --

6          MR. NOAH RADBIL:  I apologize, your Honor.

7          THE COURT:  -- one of my delusions is I like to

8    pretend I'm in charge.

9          MR. NOAH RADBIL:  You are, your Honor.

12:07:36   10          THE COURT:  If you want to talk to him, then, we'll

11   take a recess.  But you ask.

12          MR. NOAH RADBIL:  I understand.  I apologize.

13          THE COURT:  But you cannot tell from this description

14   -- the only thing in there is seven pages of repair history.

12:07:56   15   And her description are the only evidence, right?  The rest of

16   it is all background stuff.

17          MR. NOAH RADBIL:  And I believe that one of those

18   pages -- one of those seven pages would have included a repair

19   order that says BCM replaced for not falling asleep; attention,

12:08:18   20   Bob Gore.  BCM, body control module, replaced.  This is the

21   known defect that their expert testified about was not

22   supplying --

23          THE COURT:  Can you ever state a fact without throwing

24   in some spin in it?

12:08:32   25          MR. NOAH RADBIL:  Yes.  The repair orders say that the

1  BCM did not fall asleep and that it was replaced under warranty

2  because it was not falling asleep.  The fact is that that's a

3  defect that is known to Nissan.

4              THE COURT:  Counsel ---

12:08:45   5              MR. NOAH RADBIL:  Those are facts, your Honor.

6              THE COURT:  And did the replacement of the BCM fix the

7  problem?

8              MR. NOAH RADBIL:  I do not --

9              THE COURT:  Yes or no?

12:08:57  10              MR. NOAH RADBIL:  I do not know.

11              THE COURT:  It continued to fail after that.  So, you

12  do know.  It didn't fix the problem.

13              MR. NOAH RADBIL:  The proximity to the last battery

14  failure after the BCM, it had been a number of months because,

12:09:13  15  as Mr. Gore testified, the problem was so intermittent and as ---

16              THE COURT:  Has there been another battery failure

17  since it was replaced, yes or no?

18              MR. NOAH RADBIL:  I believe there was one.

19                  Has there been more than one?

12:09:27  20              MS. APRIL SCARLOTT:  There was two.

21              MR. NOAH RADBIL:  There was more than one.

22              MS. APRIL SCARLOTT:  We put a battery and then, three

23  days later, it failed.  So, we called the guy to come back out,

24  and we bought the most expensive battery he could sell us.

12:09:41  25              MR. NOAH RADBIL:  And Bob Gore testified --

1          THE COURT:  Wait a minute.  Your client just said

2     there were two failures after that was replaced.  And is Bob --

3     who is Bob Gore?

4          MR. NOAH RADBIL:  The Clear Lake Nissan service

12:09:48    5     manager who, when the BCM was replaced, testified that he called

6     NNA and an engineer told him, when you got a known history, if

7     you got the GTR or Murano with the battery going dead, just fan

8     them, put a BCM in there because they're waking up and zapping

9     the batteries, end quote.

12:10:07   10          Mr. Barnes --

11          THE COURT:  That's a generalization.

12          MR. NOAH RADBIL:  Okay.

13          THE COURT:  It didn't solve the problem in this case.

14     Stop.  That's the point:  It didn't solve the problem.

12:10:19   15          MR. NOAH RADBIL:  Okay.

16          THE COURT:  And that's something that was known in

17     July 28th of 2009, isn't it?  Yes?

18          MR. NOAH RADBIL:  I think that was known the date of

19     Bob Gore's deposition.

12:10:37   20          THE COURT:  Counsel, don't do that.  Counsel, I asked

21     you on July 28th, 2009, the BCM had been replaced and the

22     battery had died.  Is that what you're telling me?

23          MR. NOAH RADBIL:  May I double-check to make sure

24     that --

12:11:03   25          THE COURT:  Yes.

1           MR. NOAH RADBIL:  Thank you, your Honor.

2           MR. AARON RADBIL:  Your Honor, what date are we

3  looking for?

4           THE COURT:  July 28th, 2009.

12:11:15   5           All right.  Mr. Radbil, there are only two

6  possible states of nature:  either the replacement of the BCM

7  was in the repair history and the car continued to have problems

8  or the BCM replacement was not in the car history so it couldn't

9  have been the problem.  And each case, it couldn't have been the

12:11:41  10  problem.

11           MR. NOAH RADBIL:  This repair order is dated September

12  10, 2009; and it is documented 63, dash, 3.  It states,

13  "Customer states battery is dead."

14           THE COURT:  What's the date of it?

12:11:58  15           MR. NOAH RADBIL:  The repair order itself is dated

16  September --- or the -- September 10, '09.  The invoice date is

17  actually September 16th.  And it was filed in this Court.

18           THE COURT:  Wait.  I don't need to know when it was

19  filed.  And is that date the date the BCM was replaced?

12:12:20  20           MR. NOAH RADBIL:  It appears to be so, yes.

21           THE COURT:  All right.  Which meant it was not in the

22  stuff that your colleagues reviewed in July of that year.  It's

23  really hard to review the records of something that had not been

24  done.  Once again, you take a position in ignorance; and then,

12:12:41  25  when you look at the documents, it turns out you're wrong.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

 1          MR. NOAH RADBIL:  What position have I taken in

 2  ignorance?

 3          THE COURT:  That they looked at the BCM.  It's

 4  categorically wrong.

12:12:52   5          MR. NOAH RADBIL:  You're right.  And I have no way of

 6  knowing from --- the exact documents that my colleagues did look

 7  at.

 8          THE COURT:  Yes, you did.  No.  What you told me was

 9  paragraph 5, Item 5, seven pages of repair history included the

12:13:14  10  BCM problem; therefore, the firm was justified in suing

11  everybody.

12          MR. NOAH RADBIL:  So ---

13          THE COURT:  It just continues, Mr. Radbil.

14          MR. NOAH RADBIL:  Yes.

12:13:31  15          THE COURT:  It continues and continues and continues.

16          MR. NOAH RADBIL:  And I would like to stop after -- if

17  your Honor will just give me an opportunity to just make a quick

18  record of the steps I've taken and investigations and the

19  evidence that supports my pleadings because I've been accused

12:13:50  20  of --

21          THE COURT:  You had the opportunity to do that.  You

22  filed a 35-page answer.

23          MR. NOAH RADBIL:  Yes.

24          THE COURT:  Didn't you?

12:14:05  25          MR. NOAH RADBIL:  To the motion -- Document 101, the

1   motion for sanctions, we did.  We also attempted to waive the

2   safe harbor period because I felt so strongly, based on these

3   facts, that the case was very good; and we will rely on that.

4   That contains a reference and attaches the evidence that we

12:14:26   5   would present today, particularly, the expert testimony of

6   Nissan's own expert contradicts the very position they're asking

7   you to impose sanctions upon us for after they originally

8   threatened us with sanctions based on a position that we know

9   has been proven to be false.

12:14:46   10       THE COURT:  My problem is this motion's based on

11   deeds, not positions; and your deeds are deficient, your actual

12   performance -- your performance.

13       MR. NOAH RADBIL:  Okay.  My performance -- I just --

14   I'd like to know so that I can improve and I'd like to know so

12:15:07   15   that I don't --

16       THE COURT:  Mr. Radbil, I've been counseling you all

17   along that you have a method of operation and you're perfectly

18   happy with it.  You see nothing wrong with it.  You think it's

19   bizarre that people are upset that they're sued when they're the

12:15:29   20   wrong party or when the right party is sued three and half years

21   after the incident on a two-year limitation --

22       MR. NOAH RADBIL:  What I --

23       THE COURT:  -- and they're --

24       MR. NOAH RADBIL:  Sorry.

12:15:37   25       THE COURT:  -- perplexed when you won't drop it.  And

1    you see nothing wrong with not dropping a party whom you have

2    sued too late, that it just -- it's confusing to you.

3                Now, we have to move on.

4                On Hurricane's motion, you and your firm, because

12:16:26   5    we've had multiple lawyers appearing for it and justifications

6    for your behavior based on their affidavit of what they

7    reviewed, under both Section 1927 and the inherent power of this

8    Court, for suing them too late and serving them too late -- and

9    I don't know that the Carters don't have some costs.  But that's

12:17:15   10   the problem with your lack of insight, thoroughness,

11   application, responsibility, research, and fixed costs on a lot

12   of other people, including the Carters who are totally alien to

13   all this.

14               MR. NOAH RADBIL:  I will say, your Honor, that Nissan

12:17:40   15   recommended we sue the manufacturer of the mirror; and had we

16   done that, there would have been another party and more costs;

17   but I investigated --

18               THE COURT:  And if the guy in the next seat on the bus

19   recommends you sue somebody, if you sue them, it's your

12:17:57   20   responsibility.

21               MR. NOAH RADBIL:  Yes.

22               THE COURT:  When he says sue the Highway Traffic

23   Safety Administration and you sue them, that's your

24   responsibility.

12:18:07   25               MR. NOAH RADBIL:  Yes.  And when Nissan --

1          THE COURT:  And listening to Mr. Patterson is not a

2    reasonable investigation.

3          MR. NOAH RADBIL:  You're right.  And I haven't

4    listened to him.  When he threatened sanctions if I don't

12:18:24   5    dismiss his firm or his case -- I'm sorry, his client based on

6    something that is now proven false, I didn't listen to him; and

7    I proved that false.  Had I listened to him --

8          THE COURT:  All you've told me today is, having gone

9    through all of this, you have no clue who's responsible for this

12:18:43  10    because you don't know what the problem was.

11          MR. NOAH RADBIL:  I have evidence but I do not have

12    conclusive proof of what the problem was.

13          THE COURT:  You don't even have evidence.  You have

14    suppositions because all the -- even the Nissan guy that you're

12:18:56  15    so fond of this week says he doesn't know.

16          MR. NOAH RADBIL:  Right.

17          THE COURT:  You can't succeed in a case by having a

18    collection of people who say they don't know.

19          MR. NOAH RADBIL:  Bob Gore said he did know.  He said,

12:19:12  20    "You know what I did after I replaced the BCM after I talked to

21    Nissan" --

22          THE COURT:  I'm talking about the experts --

23          MR. NOAH RADBIL:  Uh-huh.

24          THE COURT:  -- Nissan's and yours who did not even

12:19:21  25    consider anything except it being whatever it is that he was

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1  told that it needed to be.

2         MR. NOAH RADBIL:   The BCM.   There is strong

3  circumstantial evidence; and it is circumstantial, I admit; but

4  it is strong --

12:19:34  5         THE COURT:   You still can't use a witness who chooses

6  his answer and works back.   That's what he did; and that you

7  would use him --- not use him --- I mean, I can't punish you for

8  the other 300 cases but that you would use him --

9         MR. NOAH RADBIL:   I'm talking about Nissan's expert.

12:19:54  10        THE COURT:   No.   I'm talking about the firm's retained

11  experts, the guy --

12         MR. NOAH RADBIL:   Weaver.

13         THE COURT:   Weaver?

14         MR. NOAH RADBIL:   Yes.   I believe his report was

12:20:11  15  struck, if I'm mistaken; but I am talking about Nissan's expert.

16         THE COURT:   Well, see, that's the problem.   I'm

17  talking about the expert you tendered to the Court.   You're

18  responsible for him, and he was wholly irresponsible.

19         MR. NOAH RADBIL:   Your Honor, I'll just add that I

12:20:49  20  note and respect your Honor very much; and when you said that my

21  subjective opinion of good faith makes no difference, I agree.

22         THE COURT:   That's the law, that's not my opinion.

23         MR. NOAH RADBIL:   Correct.   But had I been the

24  attorney who filed this case initially --- and I don't believe

12:21:06  25  that I was -- even had I been -- and my subjective good faith

1  belief led to the right answer, well, every dog finds a bone

2  sometimes.  That doesn't mean that the answer is wrong.

3         THE COURT:  Some of the greatest scientific

4  discoveries were made trying to prove a hypothesis disproving it

12:21:37  5  but discovering something more important.

6         MR. NOAH RADBIL:  Sure.

7         THE COURT:  That's not serving Hurricane.  That's an

8  elemental practical undignified paperwork thing.  It's something

9  creepy old paralegals --

12:21:53  10         Are you a lawyer?

11         MS. ANGELLE ADAMS:  Yes.

12         THE COURT:  Well, I thought -- who does the work?

13  Does he have a paralegal?  They do all the work.

14         MR. NOAH RADBIL:  I think that the problem of this was

12:22:10  15  caused when Ryan Schooley at Nissan was trying to prove a

16  hypothesis which was proven incorrect, that is, the installation

17  of the mirror caused the problem and that it remained on at all

18  times.  They have boxed themselves into a corner, threatening us

19  with sanctions, and --

12:22:28  20         THE COURT:  They haven't -- quit rearguing the case

21  that you've lost.

22         MR. NOAH RADBIL:  Okay.  We don't know the problem.

23         THE COURT:  You don't know -- no.  You know the

24  problem, you don't know the cause.  It is Scarlott's

12:22:42  25  responsibility to have evidence, not -- well, it might be.

1          So, persisting -- pursuing after it should have

2    and persisting in that suit against Hurricane, Hurricane will

3    recover $15,765.50 plus $500 for this morning.

4          Now, let's talk about Nissan.  Nissan North

12:23:47   5    America has what relationship to this transaction?

6          MR. NOAH RADBIL:  They were the manufacturer who

7    issued a warranty and --

8          THE COURT:  Well, wait a minute.

9          MR. NOAH RADBIL:  The manufacturer.

12:24:01  10          THE COURT:  There was a warranty.

11          MR. NOAH RADBIL:  Yes.

12          THE COURT:  By a different party.  Or was it the

13    warranty?

14          MR. NOAH RADBIL:  There was a warranty by Nissan North

12:24:14  15    America.

16          THE COURT:  So, it's --

17          MR. AARON RADBIL:  Would you mind if I fielded the

18    questions about Nissan, your Honor?

19          THE COURT:  Why can't he answer a simple question

12:24:27  20    about the parties he sued?  Counsel, I'm happy to have you here.

21    But this is again illustrative.

22          MR. AARON RADBIL:  Okay.

23          THE COURT:  All right.  So, Nissan North America was

24    the manufacturer.

12:25:06  25          And Mr. Patterson ---

 1              MR. PATTERSON:  Yes, your Honor.

 2              THE COURT:  -- besides the natural warranty, did it

 3   also issue a paper warranty?

 4              MR. PATTERSON:  There's a factory warranty; and NNA

12:25:22   5   is the warrantor for that; and then, there is a security-plus

 6   agreement; and that's a different entity; and it provides

 7   additional benefits.  But it is not an extended warranty, and it

 8   didn't apply to this particular incident.

 9              THE COURT:  And it's not in Nissan North America, the

12:25:40  10   extended protection or whatever you said?

11              MR. PATTERSON:  I think it is a subsidiary of Nissan

12   North America.

13              THE COURT:  Is it a corporation or an assumed name?

14              MR. PATTERSON:  I believe it's a division.

12:25:53  15              THE COURT:  All right.  So, Nissan North America

16   stands in the shoes of the manufacturer and issued a written

17   warranty, right?

18              MR. NOAH RADBIL:  Correct.

19              THE COURT:  We have the same problem except for

12:26:18  20   service.  We started out with a suit against Nissan North

21   America.

22              MR. NOAH RADBIL:  Correct.

23              THE COURT:  And then, we added the lender and the

24   dealer and the after-market equipment person.

12:26:50  25              MR. NOAH RADBIL:  I don't think we added any

1    individuals.  We added Hurricane Auto Care and Accessories;

2    Nissan Motor Acceptance Corporation; and the authorized

3    dealership, Clear Lake Nissan.

4              THE COURT:  Are there a lot of unauthorized

12:27:07   5    dealerships in Clear Lake?

6              MR. NOAH RADBIL:  They're authorized.

7              THE COURT:  Are there a lot of unauthorized ones?

8              MR. NOAH RADBIL:  No.

9              THE COURT:  Then, why did you feel compelled to say

12:27:18  10    authorized dealership?

11             MR. NOAH RADBIL:  Because the warranty requires that

12    Ms. Scarlott obtain service of her vehicle exclusively at an

13    authorized -- at an authorized Nissan dealership as a term and

14    condition of the warranty.  So, she had to go there.

12:27:32  15             THE COURT:  She had to go to --

16             MR. NOAH RADBIL:  She had to go to Clear Lake Nissan.

17             THE COURT:  Not to Clear Lake.  She had to go to some

18    authorized dealer.

19             MR. NOAH RADBIL:  Yes.  And she purchased it in Clear

12:27:45  20    Lake Nissan.  So, she ---

21             THE COURT:  I know that, counsel.

22             MR. NOAH RADBIL:  You're correct, Judge.

23             THE COURT:  But she could have gone to one in

24    Minnesota.

12:27:49  25             MR. NOAH RADBIL:  Why would she do that?


                    Gayle Dye, CSR, RDR, CRR - 713.250.5582

1                THE COURT:   Because she is in Minnesota when the car

2    dies.

3                MR. NOAH RADBIL:   She was not.   She went back to the

4    place where she bought it from, and that's perfectly reasonable.

12:28:04   5     THE COURT:   I'm discussing the terms of the warranty,

6    not what she actually did.

7                MR. NOAH RADBIL:   And I think your analysis is correct

8    on that point.

9                THE COURT:   So, you're pretty clear she wasn't in

12:28:16   10   Minnesota?

11               MR. NOAH RADBIL:   Yes, I feel comfortable in saying

12   that.

13               THE COURT:   I'm just going to accept that.

14                     We have the same problem with Nissan and the

12:28:39   15   dealership.   If the dealership -- the authorized dealership

16   failed to repair it properly, whose responsibility is that?

17               MR. NOAH RADBIL:   Under the Texas Business and

18   Commerce Code where you delegate a duty under a contract to

19   another, you are being responsible.

12:28:57   20   THE COURT:   Excuse me.   Saying we want you to go get

21   yours at an approved vendor does not make you the principal for

22   the vendor.

23               MR. NOAH RADBIL:   Saying you must go get yours at the

24   vendor does.

12:29:20   25   THE COURT:   I don't believe that.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

```
 1              MR. NOAH RADBIL:  Well, Nissan North America's
 2   response to our discovery request said, "We don't perform the
 3   repairs.  We rely on our authorized dealership," in this case,
 4   Clear Lake Nissan.
 5              THE COURT:  They want to control whom they have to
 6   talk to and to have people they have some confidence in.
 7              MR. NOAH RADBIL:  Correct.
 8              THE COURT:  So, when my insurer tells me in order to
 9   get my insurance I have to go to an in-network -- is that what
10   they're called, in-network provider? --
11              MR. NOAH RADBIL:  Uh-huh.
12              THE COURT:  -- I prefer doctors to in-network
13   providers -- so that makes them warrant the quality of the
14   medical care?
15              MR. NOAH RADBIL:  No.  It requires them --
16              THE COURT:  Why not?
17              MR. NOAH RADBIL:  -- to provide medical care.  So, if
18   there's an in-network provider --
19              THE COURT:  But if a negligence claim against --
20              MR. NOAH RADBIL:  You have a health care provider --
21   you have a health care liability claim against the insurer.  The
22   Insurance Code is involved.  This is a warranty issue.  So, it's
23   more complicated.  But when you force somebody to go
24   somewhere --
25              THE COURT:  They don't force, they give me a choice.
```

1           MR. NOAH RADBIL:  She had a choice to buy the car,

2    yes.

3           THE COURT:  Yes.

4           MR. NOAH RADBIL:  And she bought --

12:30:29   5           THE COURT:  She had a choice to buy -- well, I guess

6    the warranty came with the car.  But she doesn't have to rely on

7    the warranty.  But if I go to an in-network provider, it's only

8    a question of financing.

9           MR. NOAH RADBIL:  In this case, it's a question of the

12:30:47  10    manner in which --

11           THE COURT:  Answer my question.

12           MR. NOAH RADBIL:  If you're getting -- I think you're

13    driving at the point of agency and control.  And there is a

14    wealth of evidence in their warranty manual about how they

12:30:57  15    control everything from the tools they use to the hotline that

16    Bob Gore called straight to Nissan North America's engineering

17    department who suggested, when you have this problem, it's the

18    BCM.

19           THE COURT:  And that lowers the cost of the warranty

12:31:11  20    to Ms. Scarlott, doesn't it?

21           MR. NOAH RADBIL:  No.  Ms. Scarlott --

22           THE COURT:  Yes, it does.

23           MR. NOAH RADBIL:  I don't know.  I don't have their

24    financials.

12:31:18  25           THE COURT:  Why did you deny it?

1          MR. NOAH RADBIL:   They would not --- because I thought

2    you were talking about what Ms. Scarlott paid out of pocket.

3    Now, I realize you're talking commercially.   Yes.   It possibly

4    could.

12:31:28   5          THE COURT:   If Nissan did not have this practice of

6    monitoring its dealerships' service on warranty service, the

7    warranties would cost more.   She could have bought a warranty

8    that said she could go anywhere she wants to, couldn't she, on

9    the open market?

12:31:44   10          MR. NOAH RADBIL:   Yes.   She could have bought a Rolls

11   Royce also on the open market but she didn't.

12          THE COURT:   No.

13          MR. NOAH RADBIL:   She entered into a contract.

14          THE COURT:   A contract.   She could have entered into a

12:32:01   15   different contract if she didn't want to take it to Nissan's

16   service department.   My question was what did the dealership do

17   that was wrong?

18          MR. NOAH RADBIL:   They could not identify or repair

19   the electrical problems that the Murano had been plagued with

12:32:30   20   since Ms. Scarlott made the choice to enter into a contract, as

21   was --

22          THE COURT:   Wait.

23          MR. NOAH RADBIL:   Uh-huh.

24          THE COURT:   You just told me that that's Nissan's

12:32:40   25   fault.

1          MR. NOAH RADBIL:  Because their --

2          THE COURT:  So, you don't need to sue the monkey when

3    the organ grinder is in the room.

4          MR. NOAH RADBIL:  Well, if they acted outside of the

12:32:52  5    scope of --

6          THE COURT:  Wait a minute.  You just said they were in

7    the scope.  Come on.

8          MR. NOAH RADBIL:  The reason -- yes.

9          THE COURT:  Every time --- every time one of your

12:32:59  10   arguments turns out to lead to a dead end, then you change it

11   and say, "Well, what about outside the scope?"  You don't know

12   anything about outside of the scope.

13         MR. NOAH RADBIL:  That's right.  That's why you plead

14   in the alternative.  That's why you add the party --

12:33:10  15        THE COURT:  No, you cannot ---

16         MR. NOAH RADBIL:  They designated them as a

17   responsible party.

18         THE COURT:  You interrupt me once more and there will

19   be an additional something.

12:33:22  20        MR. NOAH RADBIL:  I apologize.

21         THE COURT:  No.  Don't keep apologizing.  You keep

22   doing it.  Apologize when you do it once and stop.  That's means

23   the apology is credible.  You can plead in the alternative, but

24   you cannot succeed in the alternative.  And when you tell me,

12:33:37  25   yes, they're the agent and Nissan has made them do it so Nissan

1   is responsible and I said "Then, why don't you add the party?"

2   and you said, "Well, what happens if they did something outside

3   the scope" --

4                MR. NOAH RADBIL:  I have the answer.  I remember the

12:33:50  5   answer.  Jeff Patterson sent a letter that said your cause of

6   action seems to be against the dealership for negligent

7   workmanship.

8                THE COURT:  Once again -- don't look so smug.

9                MR. NOAH RADBIL:  I'm not trying to.  That's just my

12:34:02 10  face.

11               THE COURT:  Well, you shouldn't look smug because

12  that's stupid.

13               MR. NOAH RADBIL:  I agree.

14               THE COURT:  Again, you're taking your legal advice

12:34:10 15  from an adversarial party, a ruthless corporate lawyer from

16  Dallas.  Isn't that right?

17               MR. NOAH RADBIL:  Yes, from Dallas.

18               THE COURT:  A bloodless Dallas lawyer.

19               MR. NOAH RADBIL:  I like Mr. Patterson, actually.

12:34:24 20               Jeff.

21               THE COURT:  For a Dallas lawyer, yeah.

22               So, you're taking your advice from him.  That's a

23  confession of incompetence right there.

24               MR. NOAH RADBIL:  No, your Honor.  You have a duty of

12:34:31 25  candor.  I know it's a tribunal.  But you can't represent false

1   facts to opposing counsel either.

2           THE COURT:  It's not a fact.  It was a legal

3   recommendation.  You wouldn't know a fact if it sat on you.

4           MR. NOAH RADBIL:  Is that -- well, okay.

12:34:57   5           THE COURT:  If you sued me, I'd say you probably ought

6   to sue my brother and hope you did mainly because I don't like

7   my brother.  If you follow suit on that, you are the one suing.

8   You did it.  And you didn't say since Patterson is an agent of

9   Nissan and Nissan controls the dealership, that gives me a cause

12:35:21   10  of action against the dealership, did you?  It was a

11  recommendation.

12          MR. NOAH RADBIL:  I'm not sure I understand.  No, I

13  have not sued Jeff Patterson.

14          THE COURT:  It was a recommendation that maybe you

12:35:35   15  ought to leave us alone and talk to somebody else.  But as it

16  stands, your claim against the dealership for all that's been

17  done has been about whether the charges were covered.  And they

18  did pay them, didn't they?

19          MR. NOAH RADBIL:  But they didn't fix it.

12:35:58   20          THE COURT:  Right.  The ruthless manufacturer and

21  warrantor and their stooge, the dealership, tried their best --

22  they spent their own money trying to fix the problem.

23          MR. NOAH RADBIL:  And they failed.

24          THE COURT:  Failure is not liability.

12:36:21   25          MR. NOAH RADBIL:  So, why am I being sanctioned?

1          THE COURT:  Because failure is not liability.  You say

2     the house burned down, somebody else is liable.  Houses

3     sometimes just burn down.

4          MR. NOAH RADBIL:  No, they don't.  There's always a

12:36:41    5     cause.  Something is --

6          THE COURT:  There is.  But it's not necessarily a

7     human cause.  You're being sanctioned for abusive prolongation

8     of litigation, of tendering an expert late in the case who was

9     unqualified by reason of his association with the firm and

12:37:19   10     because he failed to consider alternatives to his preferred

11     theory --- that makes him an advocate, not an evaluator -- for

12     all of the other things that you've done in this case that made

13     it take way too long, the evolving nature of every claim, every

14     argument.  It's not just today that you won't stick to the

12:37:45   15     point.

16          MR. NOAH RADBIL:  I relied on the motion, the response

17     fully.  That's -- I tried to say nothing different than that,

18     and I will say that all of the evidence is attached to our

19     response.  And I wanted to waive the safe harbor period.  The

12:37:56   20     evidence is there.  If I don't know evidence when it sits on me,

21     you certainly do; and I respect your views, your opinion.  I

22     mean, I'm just asking --

23          THE COURT:  How much was the Murano?

24          MR. NOAH RADBIL:  34,000 or $35,000, I believe.  I can

12:38:15   25     get the exact purchase price.

1           THE COURT:  How much was it worth in its defective

2    condition?

3           MR. NOAH RADBIL:  Well, less than the purchase price.

4           THE COURT:  I mean, it wasn't worthless, was it?

12:38:30   5           MR. NOAH RADBIL:  No.

6           THE COURT:  During the entire pendency of the suit

7    Scarlott has contended to drive that car.

8           MR. NOAH RADBIL:  No.  It was not -- she was not able

9    to rely on the vehicle.  It caused her a myriad of personal

12:38:46  10    problems.  It did not work.  The car was broken.

11           THE COURT:  Where is the car today?

12               Ms. Scarlott, where's the car today?

13           MS. APRIL SCARLOTT:  The car -- I drove the vehicle

14    here.

12:38:59  15           THE COURT:  And how many miles have you driven a car

16    other than that in the last two years?

17           MS. APRIL SCARLOTT:  Honestly, I couldn't say.  The

18    vehicle while it was still under the warranty was in the shop 53

19    days.

12:39:12  20           THE COURT:  No.  But it's been out of the warranty for

21    awhile.

22           MS. APRIL SCARLOTT:  Yeah.

23           THE COURT:  All right.  And in those cases, obviously,

24    you needed a replacement vehicle.  But when you decide to go to

12:39:22  25    the Galleria --- I have no idea where you live.  I assume in

1  Clear Lake somewhere?

2          MS. APRIL SCARLOTT:  Correct, sir.

3          THE COURT:  That when you decide to go to Friendswood

4  to the Galleria, you don't go rent a car from Hertz to go, you

12:39:38   5  take your car and hope?

6          MS. APRIL SCARLOTT:  Yes, your Honor, that's correct.

7          THE COURT:  So, the car has consistently been

8  consumed, right?

9          MR. NOAH RADBIL:  Yes.

12:39:53  10          THE COURT:  Of course, you told me no a minute ago

11  but --

12          MR. NOAH RADBIL:  No, I did not.  That was a different

13  question.

14          THE COURT:  You did what, you misunderstood?

12:40:02  15          MR. NOAH RADBIL:  I did misunderstand.

16          THE COURT:  She drove it here today.

17          MR. NOAH RADBIL:  Uh-huh.

18          THE COURT:  And I asked you if she continued to use

19  the car and you said no.  It's in the record.  That car turns

12:40:25  20  out not to have been worth $35,000.  There is a problem.  Nobody

21  knows what the problem is.  Since it's been out of warranty, has

22  your client taken the car to the free market?

23          MR. NOAH RADBIL:  When the battery died, she took it

24  to a battery -- a specialist, and they tested it, and we filed

12:41:03  25  the receipts.  We moved to supplement.

```
          1              THE COURT:  Wait a minute.

          2              MR. NOAH RADBIL:  Yes, yes.  The question is, yes, she

          3  has.

          4              THE COURT:  She took it to a place to buy a new

12:41:14  5  battery.

          6              MR. NOAH RADBIL:  Batteries Plus.

          7              THE COURT:  That's not --- that wouldn't void her

          8  warranty, would it?

          9              MR. PATTERSON:  (Indicated no.)

12:41:20  10             THE COURT:  Going to Sear's and getting a battery

          11  instead of going to Clear Lake Nissan?

          12                 So, how about the mirror and all that stuff?

          13  Been to somebody else about that?

          14             MS. APRIL SCARLOTT:  May I answer?

12:41:30  15             THE COURT:  Yes, ma'am.

          16             MS. APRIL SCARLOTT:  I believe the battery people came

          17  to me after, my understanding was, the warranty was no more.

          18  Aaron shared with me last night that the supplemental warranty

          19  that I purchased was actually supposed to go into effect after

12:41:43  20  the manufacturer's warranty expired.  Nobody told me that, so I

          21  didn't know.

          22             THE COURT:  It's in writing, isn't it?

          23             MS. APRIL SCARLOTT:  Probably.

          24             THE COURT:  Yes, ma'am.

12:41:51  25             MR. NOAH RADBIL:  Mr. Schooley was deposed at
```

1  length --

2        THE COURT:  What?

3        MR. NOAH RADBIL:  Ryan Schooley was deposed at length

4  about that very issue.

12:41:56  5        THE COURT:  Why is he opposed?  It's in the warranty.

6        MR. NOAH RADBIL:  And it's in the pleadings that I

7  wrote for -- the response to the motion for sanctions.

8        THE COURT:  Is it or is it not expressly written into

9  the warranty about when it begins and ends?

12:42:10  10       MR. NOAH RADBIL:  The coverage overlaps.  The

11  coverage --

12        THE COURT:  Wait.  The question is not what -- the

13  period of coverage --

14        MR. NOAH RADBIL:  They run concurrently.  If coverage

12:42:21  15  is provided for something else --

16        THE COURT:  You interrupted me again.

17        MR. NOAH RADBIL:  Sorry.  I'm trying to answer the

18  question.

19        THE COURT:  No, you weren't trying to answer the

12:42:32  20  question.  You didn't like the question.

21        MR. NOAH RADBIL:  It's concurrent coverage for some

22  things, like rental cars.

23        THE COURT:  The question was very simple:  The

24  coverage for repairing what's wrong is expressly in the

12:42:46  25  warranty.  The time, the conditions are expressly written into

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1   it.   Sometimes the time is mileage and sometimes it's months.

2   Sometimes it's faces of the moon or something.

3          MR. NOAH RADBIL:   Yes, sir.

4          THE COURT:   Okay.   Now, Ms. Scarlott is, apparently,

12:43:09   5   just like me in, at least, one minor respect:   that I didn't

6   read my warranty either.   And I might --- she clearly is not.

7   I'm a complete nerd.   I'm the kind of guy that reads the back of

8   my receipts in restaurants and other things.   After all, I have

9   two law degrees.   I ought to make some use of it.

12:43:38   10          MR. NOAH RADBIL:   I'm the type of guy who reads

11   contracts of carriage for airlines.   That's ---

12          THE COURT:   And did you get off the airline after you

13   read them?

14          MR. NOAH RADBIL:   Well, we actually filed a breach of

12:43:41   15   warranty action, another firm that I was with.   And Harry

16   Reasoner was appointed to the Defendant.   It had some serious

17   teeth.   And they had --- I think the case settled, but I had left

18   the firm.   But the point is I read all those things.

19          THE COURT:   But you got paid to do that?

12:43:57   20              When you go out to get on Southwest to go back to

21   Phoenix, do you read the entire contract of carriage?

22          MR. NOAH RADBIL:   Occasionally, I do, yes.

23          THE COURT:   Occasionally?

24          MR. NOAH RADBIL:   Yes.   And I read AirTran's, and I

12:44:11   25   read United's.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1              THE COURT:  Have you ever traveled by steamship?

2              MR. NOAH RADBIL:  No.

3              THE COURT:  You ought to read their contract.  I mean,

4       much of it is about the perils of the sea.  We can dump you at

12:44:20   5    any port in the world, dump your luggage in another one, and

6       throw you both overboard if the safety of the vessel requires,

7       which makes sense under the circumstances.

8              MR. NOAH RADBIL:  Maritime law is actually something

9       that I admittedly don't know much about, but I find it

12:44:37  10    interesting in that there are some things I could salvage.  You

11      can salvage a ship, you're entitled to, I guess, a percentage of

12      the value.

13             THE COURT:  Depends on which ocean you're in.  There's

14      a Baltic Convention.  The presumption, I think, is ten percent.

12:44:53  15    And the Baltic -- and I just had one in Malta.  I think they

16      told me that the presumptive fee for a non-sinking salvage --

17      the ship lost its anchor and was drifting in the Mediterranean

18      and had no fuel.  And so, the salvor wants ten percent.  For a

19      long time, essentially, they got the boat.  From there, you

12:45:23  20    would negotiate.

21             MR. NOAH RADBIL:  Due to pay back, then the down -- or

22      the time -- the value of the cost of the boat during the time

23      that they wrongly withhold the boat?  In other words, if they're

24      not entitled to ten percent, do the people who had custody of

12:45:37  25    the boat have to pay for the use -- period of use?

1          THE COURT:  No.

2          MR. NOAH RADBIL:  Okay.

3          THE COURT:  They still save the boat.

4          MR. NOAH RADBIL:  Sure.

12:45:43  5          THE COURT:  The question is how much.  And other

6  conventions, one South African salvage case had a sliding scale.

7               All right, Mr. Patterson --

8          MR. PATTERSON:  Yes, your Honor.

9          THE COURT:  -- do you have anything you want to add to

12:46:03  10  this?

11          MR. PATTERSON:  I do.  But I don't want to test the

12  Court's patience.

13          THE COURT:  Well, the 180,000 --

14          MR. PATTERSON:  It's actually 225,000.  And your

12:46:34  15  Honor, I did bring my billing records for the Court to peruse.

16  And I will explain to the Court that my younger partner,

17  Ms. Bingham, who worked on this case was billing out at $155 an

18  hour, which is very low.  It was during the recession, and we

19  were discounting our rates.  And my associate on the case was

12:46:55  20  $135 an hour.  I was $260.

21               I also will tell you that this is -- this case

22  has caused a tremendous strain on my relationship with Nissan

23  because I urged them to stand on principle and not pay extortion

24  to get out of this case.  As a result throughout the litigation

12:47:14  25  for the last four years, I've been cutting my time between ten

1 and twenty percent every single month.

2          So, I think my actual fees are closer to 275, but

3 the billing records reflect 215,000 through September 25th plus

4 some additional time over the last two weeks.  So, I agree it's

12:47:34 5 high.  A breach of warranty case normally in my firm will cost

6 the client between 10 and $15,000.

7          This case is just outrageous.  It's disgusting.

8 I'm appalled by the fees that we have charged, but I'm also

9 horrified by the behavior of the other side.  I know that the

12:47:58 10 Court has been commenting on it as, you know, the lawyers have

11 not behaved in a competent manner.  They've made mistakes.

12          I think it's far worse than that.  This is much

13 worse than mistakes.  This is intentional acts.  I don't want to

14 wrestle in the mud over the facts, but I will tell you earlier

12:48:23 15 in the hearing we were talking about whether they should have

16 known that this was a Hurricane problem and not a Nissan

17 problem.  And in fact, it -- it started much before my letter of

18 February 15th of 2010.

19          Ms. Scarlott testified that she suspected that it

12:48:41 20 was the mirror early on in 2009 when she kept taking it over and

21 over and over again to Clear Lake.  Mr. Gore testified also that

22 at about the same time that Nissan was served with this lawsuit,

23 that's when he discovered that it was the mirror.

24          And he discovered it by the drain test, and he

12:49:01 25 could tell that the battery was being drained by the mirror.

1   And he immediately took it to Hurricane, and he immediately took

2   it --- after Hurricane repaired it, took it to Ms. Scarlott and

3   said, "Good news. We found the problem. And here it is."

4              And so, at the same time that Nissan was being

12:49:16   5   sued, both Ms. Scarlott and her lawyers knew what the problem

6   was. Now, they say today that that wasn't the problem and that

7   that didn't fix it. But in fact, we went through three years of

8   litigation where she didn't have any continuing problems.

9              Only today, do we find out that she's had a

12:49:34   10   couple of dead batteries, but we have no indication whatsoever

11   that that is part of the chronic electrical problem that we had

12   early on.

13              I sent -- you know, Mr. Radbil states repeatedly

14   this morning that I threatened him with sanctions. What I

12:49:51   15   actually did was call Dennis Kurz who was the lawyer handling

16   the case initially. I called him in November of 2009 after I

17   had spoken with Mr. Gore and he had told me that he had fixed

18   the problem.

19              And so, I called Dennis who I knew from other

12:50:07   20   warranty cases; and I said, "Dennis, you got a good case here,

21   but it's not against Nissan, it's against Hurricane." We talked

22   about it, and he said he would call me back. Then, he called me

23   back and said, "No, we're not going to nonsuit Nissan. You have

24   to pay us if you want to get out."

12:50:27   25              At that point --

1          THE COURT:  Who is that?

2          MR. PATTERSON:  Dennis Kurz, K-u-r-z.  He is no longer

3   with the firm.  This Court actually had a hearing over a year

4   ago where Mr. Kurz was found to have not followed the proper pro

12:50:28   5   hac vice procedures to appear in your court, and you removed him

6   -- you removed his admissibility for practicing in this court.

7          THE COURT:  In this case?

8          MR. PATTERSON:  In this case, yes, sir.

9          MR. NOAH RADBIL:  I had already taken over at that

12:50:49   10   point, your Honor.  The only thing --

11          THE COURT:  Mr. Patterson did not interrupt you,

12   counsel, did he?

13          MR. PATTERSON:  So, Mr. Kurz and I were working on

14   this case for many months initially.  Finally, in February, when

12:51:03   15   he made it clear he was not going to release Nissan and he had

16   indicated to me he wasn't going to sue Hurricane, I sent him the

17   letter of February 15.

18              I was not threatening sanctions; but I did say,

19   you know, "We're going to have to file a counterclaim against

12:51:17   20   you for filing a frivolous lawsuit because you have no evidence

21   against Nissan, and I've told you who the culprit is."  And

22   that's -- you know, we have been consistent throughout, and I

23   still believe -- even though Ms. Scarlott today complains of a

24   couple of dead batteries, I still believe that it was the mirror

12:51:35   25   that caused her problems.  And after --

1          THE COURT:  May still be the mirror.

2          MR. PATTERSON:  Excuse me?

3          THE COURT:  May still be the mirror.

4          MR. PATTERSON:  I don't think so because Hurricane

12:51:43   5  rewired the mirror and did it properly the second time.  And

6  after that, she went three years without any problems.  And

7  then, there's another litigation going on in Dallas, and the

8  lawyer up there has provided me with some information, and it

9  includes an e-mail from Mr. Dennis Kurz sent to her in August of

12:52:06  10  this year.

11          May I offer this to the Court?

12          THE COURT:  Yes, sir.

13          MR. PATTERSON:  Mr. Kurz is no longer with the firm,

14  but he says he's heard about this hearing today.  He says, "I'm

12:52:25  15  being called to federal court in Texas on a likely sanctions

16  hearing on a lemon case."

17          Again, he's writing to this other lawyer in

18  Dallas not at my firm.  He says, "I begged them to drop this

19  case" -- he's talking about the Radbils -- "after I took the

12:52:40  20  deposition of the dealer tech" -- that's Bob Gore, who he took

21  in early 2010 -- "and established that there was no liability

22  against the manufacturer."

23          He proceeds, "I was shot down, and the case was

24  given to Aaron and Noah and here we are again."  So, again,

12:53:00  25  Ms. Scarlott knew it, the lawyers knew it.  I very courteously

1   advised them what their real case was; and in fact, their own

2   lawyer, Dennis Kurz, told them the same thing; and yet, they

3   proceeded.  They prosecuted this case for another four years

4   after this, driving up our fees up to now $225,000.

12:53:22   5            My concern, of course, is that, you know, Nissan

6   decided to defend this case and not pay extortion.  We have many

7   other cases with the Weisberg & Meyers firm, and this teaches --

8   this will teach Nissan if we don't recover our fees that it's

9   cheaper just to pay the extortion, and that's what so many

12:53:43  10   Defendants do.

11            I'm proud of Nissan for standing on principle in

12   this case, but I'm very disappointed that it's gone on for so

13   long and it has cost the client so much money.

14            Your Honor, there are -- the Radbils filed a

12:54:03  15   response in this case and they cited a number of cases about

16   attorney's fees and the burden of proof on us in order to

17   demonstrate our fees.  We have reviewed those cases and done our

18   own research.

19            I started to file a reply, but I figured the

12:54:17  20   Court had way too much paper on this case and decided not to.  I

21   can cite the Court the cases that are appropriate.  The cases

22   that they say stand for the fact that you should deny our

23   request for fees actually don't say that.

24            Most of them say the Court can request additional

12:54:35  25   information, if it needs to, in order to substantiate the fees;

1   but particularly, a Supreme Court case actually says this is not

2   rocket science.  The Court can rely on a number of different

3   factors in awarding fees based on the success of the outcome,

4   his knowledge of the case, the knowledge of the pleadings, the

12:54:57   5   things that have been --

6          THE COURT:  Many of those things pertain to a

7   post-success award of attorney's fees as opposed to transferring

8   costs from the party incurred by vexatious litigation back to

9   the vexer.  It's hard to -- I mean, your fees have to be

12:55:23   10   reasonable and that's what many of the factors address.

11          MR. PATTERSON:  And my only point, your Honor, is that

12   the cases that they rely on to say that the Court should deny

13   our request actually say the Court is entitled to ask for more

14   information if it deems appropriate.

12:55:41   15          And so, I brought my billing records to the

16   Court.  They're unredacted.  They contain lots of work product.

17   And so, I would invite the Court to review in camera if you need

18   more information about our fees.  But they include all of the

19   description of each increment of time.

12:56:01   20          THE COURT:  I will look at them.  And may they look at

21   them?

22          MR. PATTERSON:  I think that would be waiving work

23   product so I can't do that.

24          THE COURT:  Okay.  Save your gestures, Mr. Radbil.  I

12:56:23   25   don't care whether you approve of what Mr. Patterson says.

1                    Is there a summary?

2              MR. PATTERSON:  No, your Honor, I do not have a

3    summary, I'm sorry.

4              THE COURT:  Mr. Radbil, how many hours has your firm

12:56:50   5    spent on this case?

6              MR. NOAH RADBIL:  I don't know the total number of

7    hours, your Honor.

8              THE COURT:  Pardon?

9              MR. NOAH RADBIL:  I don't know.  I spent probably more

12:56:58   10   than Mr. Patterson has.  Many, many more than my firm would have

11   liked me to, but I don't have the numbers.

12             THE COURT:  And Kurz and the other Radbil and the team

13   of intake people.

14             MR. NOAH RADBIL:  I think those fees, your Honor,

12:57:18   15   would probably be what Mr. Patterson is used to dealing with in

16   a warranty case that was handled for his client, Nissan.  I also

17   understand that some manufacturers have a scorched earth policy

18   in terms of settlement and why teach a lesson that, once in

19   awhile, we're not going to settle a case to teach everybody not

12:57:39   20   to sue us again.

21             I'm not saying that's what happened here.  I

22   don't know.  I do know that I didn't give up in the face of

23   shifting theories of defense of causation; and you know, if you

24   look at the position they originally took, how many hours they

12:57:58   25   spent defending that position and you flip-flop and say

1  causation is something else --

2         THE COURT:  Actually, stop, Mr. Radbil.

3         MR. NOAH RADBIL:  I will stop.

4         THE COURT:  Stop.  By my quick arithmetic, that works

12:58:45  5  out to be around 270 hours a year.

6         MR. PATTERSON:  Yes, your Honor.  And when you asked

7  me if I had a summary, I thought you meant a summary of the

8  descriptions; but I do have a summary.  We've billed 1,065 hours

9  over the four years.  So, your arithmetic was right on.  And the

12:59:04  10  fees are -- through September 27 $195,000 and the costs are

11  about $20,000.

12         THE COURT:  Tell me the fees again.

13         MR. PATTERSON:  $194,918.

14         THE COURT:  I'd dock his pay but he's not getting

12:59:44  15  paid.  He's here so -- furloughed worker.  He loves it so much,

16  he just can't go away.

17              So, that's probably leading up to being sick; but

18  strangely enough, if you want to take personal leave, even

19  though you'd be entitled to earn personal leave, they're not

01:00:11  20  going to pay you for that.  That makes sense if you're not

21  working at all, you know, you're just staying home.

22              But if you're actually working as an unpaid

23  worker and you need to go to the doctors when you would have

24  gotten sick leave if you had been being paid -- I don't think I

01:00:39  25  want to look at your records.  That Mr. Radbil has agreed that

1   180,000 odd hours in the case is reasonable and with that ---

2           MR. NOAH RADBIL:  I must object, your Honor.  I do not

3   agree with that.  Do not agree with that.

4           THE COURT:  You said that's about what you'd spend on

01:01:09   5   a warranty case.

6           MR. NOAH RADBIL:  No.  What I said was I thought I had

7   spent more hours than Mr. Patterson.  I did not say that an

8   award of fees in that amount for this particular case to

9   Mr. Patterson or his firm or Nissan North America is

01:01:28  10   appropriate.

11           THE COURT:  The party is Nissan North America.  But

12   the question -- what's your billing rate?

13           MR. NOAH RADBIL:  My billing rate in this case I

14   believe was $225.

01:01:41  15           THE COURT:  All right.  So, I should raise theirs to

16   360 to match yours?

17           MR. NOAH RADBIL:  No.  Because they should not be

18   awarded sanctions.

19           THE COURT:  That's a different question.  The question

01:01:55  20   of entitlement is different from the question of damages,

21   another fundamental basics of law that you don't understand.

22           MR. NOAH RADBIL:  Okay.  Well, then, let's --

23           THE COURT:  Okay?

24           MR. NOAH RADBIL:  If the Court wants to doubt ---

01:02:04  25           THE COURT:  I'm sorry.  Okay?

1        MR. NOAH RADBIL:  I'm not agreeing with the statement.

2    I do not agree with it because I haven't seen their time sheets.

3        THE COURT:  In Phoenix, do they let you say "okay"?

4        MR. NOAH RADBIL:  They don't let me file things that

01:02:18   5    are lies because it means so much to the firm to -- and to a

6    client or otherwise.  As Mr. Patterson has testified, you know,

7    this case means so much to his firm that --

8        THE COURT:  Mr. Radbil, you can, perhaps, have a

9    better career as some populous politician than you're having as

01:02:38  10    a lawyer.  Don't.  No.  You do that every once in awhile and you

11    have through the course of this case talked about policy and

12    emotion and the little man or the ruthless big corporation.

13        Don't lean towards the microphone because you

14    cannot stop yourself from talking.  Mr. Patterson also didn't

01:03:03  15    stand up five times during your very long presentation.  That's

16    how many times you stood up in the middle of his.  You have no

17    sense of context.

18        MR. NOAH RADBIL:  I didn't --

19        THE COURT:  The description of the work and people and

01:03:25  20    the rates by Nissan's counsel is perfectly reasonable.  The

21    amount of time having to endure both sides' behavior in this

22    case, all the pleadings seems to be about right.  The Court will

23    agree with Mr. Patterson that what has been consumed as public

24    and private resources in this case is unconscionable, and that

01:04:00  25    is largely a consequence of the firm's practices because the

1   whole cluster of the firm has been implicated and it's

2   continuing to send you to do the client's bidding.

3                   After four years, the answer is you don't know

4   but you'd just like to do some more stuff and rely on something

01:04:31   5   else; but even the people you want now to rely on don't know.

6   Don't know is not a reason to sue.  Ignorance is never the

7   answer.  You have been and the firm has been unfocused,

8   unprincipled.  The case has evolved.  Cases tend to evolve, but

9   this one has evolved in dodges and weaves and catapults.

01:05:01   10           MR. NOAH RADBIL:  Even personal attacks, your Honor.

11           THE COURT:  You continue to illustrate your inability

12   to behalf like a lawyer.

13           MR. NOAH RADBIL:  I only see --

14           THE COURT:  You seem to talk when you should be quiet.

01:05:24   15   What do you do, stand up in the middle of the sermon and say,

16   "Reverend, that's not right.  Isaiah says something different

17   from what you said it says"?  Is that what you say?

18           MR. NOAH RADBIL:  No, your Honor.  You're correct.

19   And to grasp emotionally, the rest of the case I will not stand

01:05:45   20   up.

21           THE COURT:  You have been consistently unfocused.  And

22   I have read the e-mail from Dennis Kurz, who is actually

23   admitted to practice in Texas.  Mr. Patterson is right.  My

24   earlier focus on ineptness does not capture the spirit of the

01:06:45   25   whole, which is guerilla warfare modification.  A 35,000 maximum

1   dispute has been prolonged by the addition and subtraction and

2   replacement of the parties and constantly evolving, a series of

3   arguments.  Even here if the firm genuinely believes that Nissan

4   North America is wholly responsible for the repair -- repairs

01:07:32   5   and non-repairs of Clear Lake Nissan, we didn't need to add them

6   months into the -- if not years into the litigation.  It's just

7   add parties, add claims, dodge, and weave.  It's not litigation.

8               So, Nissan North America will recover $180,000 in

9   attorney's fees and costs because I don't want to audit the

01:08:03   10   costs.

11               MR. PATTERSON:  Thank you, your Honor.

12               THE COURT:  Anything else, Mr. Adams?

13               MR. LESLIE ADAMS:  Nothing, your Honor.

14               MR. PATTERSON:  Your Honor, there are some monies in

01:08:21   15   the registry of the Court.  I don't know if you want to enter an

16   order.  You had -- you know, they had sued the lender.  They've

17   settled.  And they sued somebody else who settled.  And then, we

18   had requested that the Court enter those monies in the registry

19   of the Court until we could resolve our counterclaim.  And I

01:08:38   20   think it's -- the Court may want to decide what to do with that

21   money.

22               THE COURT:  How much money is in the registry?

23               MR. PATTERSON:  I want to say $18,000, but I'm not

24   sure.

01:08:49   25               THE COURT:  18,000?

1          MR. PATTERSON:  Yes, sir.

2          THE COURT:  That's a fair recovery.

3              Mr. Radbil, 1200 hours, $18,000, with no

4    principle, with an l-e, at stake.

01:09:15   5              All right, anything else?

6          MR. PATTERSON:  One other thing, your Honor:  Is this

7    judgment against the law firm or Ms. Scarlott or both?

8          THE COURT:  It's not against Ms. Scarlott.  It's

9    against the law firm.

01:09:28   10         MR. PATTERSON:  Thank you, your Honor.

11         THE COURT:  And Mr. Noah Radbil jointly and severally.

12   I don't know what his arrangement with the firm is.  They can

13   probably work that out.  But it's a firm problem.  We've had,

14   apparently, Kurz, Radbil, Radbil, and then Radbil again; and

01:09:48   15   that's fine.  But we can't have -- blame it on Radbil even

16   though he's been sent by somebody.

17             I take it, Mr. Meyers, that Noah Radbil is not in

18   charge?

19         MR. MEYERS:  He's not with the firm anymore, your

01:10:07   20   Honor.  We have some cases that we need to obtain other counsel

21   or have a payment.  Yes, sir, this is the firm's responsibility,

22   Judge.

23         THE COURT:  And I understand that there may be all

24   kinds of people with the firm who wouldn't have done this; but a

01:10:26   25   judgment against Mr. Radbil may, indeed, be worthless.


          Gayle Dye, CSR, RDR, CRR - 713.250.5582

1                  Ms. Scarlott is seriously unhappy.  I understand

2      that.  But a lawyer's responsibility is not to be a cheerleader

3      and translate the client's bitterness, unhappiness, frustration

4      into exorbitant expenses for other people, including the other

01:11:00   5      Hurricane.

6                  So, to that extent, I am personally sorry that

7      it's a broad brush.  But it has to be; otherwise, it's

8      ineffectual.

9                  But thank you, sir.

01:11:15   10                  Ms. Scarlott, do you have any questions?

11             MS. APRIL SCARLOTT:  Yes, your Honor.  The other

12      settlement that was reached that was put into escrow, a portion

13      of that was to go to me for all of this insanity.  What happens

14      with that now?  I didn't understand.

01:11:31   15             THE COURT:  What he said is I should give it to the

16      lawyers to make up for their costs; and to that extent, you

17      probably ought to bear your share of hiring -- having hired and

18      -- at some point you should have gotten -- and I know it's hard

19      for a layman.  That's the trouble with hiring doctors, lawyers,

01:11:50   20      engineers, and people; but you know this shouldn't have lasted

21      this long.

22             MS. APRIL SCARLOTT:  To be honest with you, I had an

23      attorney before them.  I made a mistake.  And I kept calling and

24      calling and e-mailing and e-mailing; and the guy wouldn't return

01:12:04   25      my call.  And finally, I found out he's not even licensed in

1    Texas, but he advertises as if he were.

2             THE COURT:  Well, Radbil is not licensed in Texas.

3             MS. APRIL SCARLOTT:  Well, I --

4             THE COURT:  I personally don't care all that much.

01:12:16    5         MR. NOAH RADBIL:  Your Honor, I'm licensed in Texas.

6             THE COURT:  Oh, who isn't?  You?

7             MR. AARON RADBIL:  I'm not.

8             THE COURT:  Oh.  I was absolutely right.  Radbil is

9    not.

01:12:25   10         MS. APRIL SCARLOTT:  So, he --

11            THE COURT:  But look, my problems are not bad

12   out-of-state lawyers, my problems are bad lawyers.  And they're

13   pretty much evenly distributed with maybe a little California

14   surplus.  But --

01:12:43   15         MS. APRIL SCARLOTT:  So, I went through multiple

16   attorneys, and I still -- here we are.

17            THE COURT:  And you should change lawyers when you're

18   not happy with their response to you.  You shouldn't change them

19   when you're not happy that they don't win or they don't make

01:13:04   20   every claim you say they should.  But if they don't return your

21   phone calls, that is the number one source of grievances.

22            MS. APRIL SCARLOTT:  Yes, sir.

23            THE COURT:  The reason lawyers don't return client's

24   phone calls is they've determined the case is not worth

01:13:21   25   pursuing.


                 Gayle Dye, CSR, RDR, CRR - 713.250.5582

1          MS. APRIL SCARLOTT:  They should at least call and say

2    it's not worth pursuing.

3          THE COURT:  Oh, but that --

4          MR. NOAH RADBIL:  Just to be clear for the record,

01:13:29   5    it's not referenced to me, I believe.

6          MS. APRIL SCARLOTT:  No.

7          THE COURT:  She was clear.  She's a perfectly sensible

8    person.  She didn't say "hereinafter" after that.

9               So, ma'am, to that extent, you're going to have

01:13:39  10   to bear the costs because it was in your behalf.  If they had

11   gotten a judgment for $200,000 or a million three or something,

12   you would have gotten a lot of money.  And so, they -- they

13   tried to get you a lot of money, and they were working for you.

14   And to that very modest extent, I think it should be applied to

01:13:59  15   the attorney's fees pro rata based on the attractiveness of the

16   lawyers.

17               So, you'll get most of it.

18               All right.  Any other questions?

19         MS. APRIL SCARLOTT:  No, sir.

01:14:16  20   THE COURT:  Okay.  Thank you, counsel.

21               Ma'am, it's nice to have seen you after having

22   heard so much about you for so long.

23         MS. APRIL SCARLOTT:  Well, I hope -- I'm not sure what

24   you heard.  But thank you.

01:14:29  25   THE COURT:  Yes, you do.  You heard --

Gayle Dye, CSR, RDR, CRR - 713.250.5582

 1          MS. APRIL SCARLOTT:  I'm sorry, your Honor?

 2          THE COURT:  You heard a three-hour summary this

 3  morning.

 4          MS. APRIL SCARLOTT:  Oh.

01:14:33  5          THE COURT:  It wasn't anything bad.

 6      (Proceedings concluded at 1:17 p.m.)

 7

 8

 9

10                C E R T I F I C A T E

11

12      I certify that the foregoing is a correct transcript

13  from the record of proceedings in the above-entitled matter, to

14  the best of my ability.

15

16  By: /s/Gayle L. Dye_____      11-3-2013_____

17          Gayle L. Dye, CSR, RDR, CRR        Date

18

19

20

21

22

23

24

25


             Gayle Dye, CSR, RDR, CRR - 713.250.5582